IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRY DEESE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case Number:  1:06-cv-643 MHT** |
| | * | |
| **CHAMPION ENTERPRISES, INC., *et al.,*** | * | |
| | * | |
| **Defendants.** | * | |

## RENEWED MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

**COMES NOW,** Champion Enterprises, Inc. (hereinafter referred to as "CEI") and

Champion Home Builders Co. (hereinafter referred to as "CHB") pursuant to Rules 12 and 56 of

the *Federal Rules of Civil Procedure* as well as the Order entered the 22nd day of August, 2006

(Doc. No.11),[1] renews the motion to dismiss, or in the alternative, motion for a summary

judgment (Doc. No. 5) in CEI and CHB's favor and in support thereof states as follows:

1.      There is no genuine issue as to any material fact and CEI and CHB are entitled to

a judgment in its favor as a matter of law.

2.      CEI and CHB incorporate herein the Motion to Dismiss or, in the alternative,

Motion for Summary Judgment (Doc. No. 5) (hereinafter referred to as the "Original Motion"),

including all evidentiary submissions.[2]

3.      As additional support for the motion, CEI is submitting herewith excerpts from

the deposition of CEI's corporate representative, which is attached hereto as Exhibit "A" and

---

1      In accordance with the Order, CEI and CHB were granted leave to renew the
motion for summary judgment after a reasonable opportunity for discovery.
2      With regard to CHB, this motion may be considered as a Rule 12 (c) motion as no
specific claims against CHB were alleged and the pleadings are now closed.

made a part hereof by reference.[3] CEI hereby respectfully requests this Honorable Court to order Exhibit A hereto be sealed.

4.    Attached hereto as Exhibit "B" and made a part hereof by reference are deposition excerpts from the deposition of the plaintiff, Terry Deese, along with pertinent Exhibits introduced at the deposition.

5.    CEI and CHB are also attaching hereto as Exhibit "C", a true and correct copy of Plaintiff's Responses to Defendant Champion Enterprises, Inc.'s Request for Production of Documents to Plaintiffs and as Exhibit "D", a true and correct copy of portions of Plaintiff's Responses to Defendant Champion Home Builders Co.'s Request for Production of Documents to Plaintiffs.

6.    In further support of this motion, CEI incorporates herein the Memorandum Opinion and Order on Motion entered the 26th day of June, 2007 by the Honorable Terry F. Moorer which relates to substantially the same evidence and issues, a true and correct copy of which is attached hereto as Exhibit "E" and made a part hereof by reference.

## SUPPLEMENTAL NARRATIVE SUMMARY OF UNDISPUTED FACTS

Plaintiff understood that Legend was the entity that built the home. (Ex. B, p. 47, 5-7). Plaintiff never lived in the home. (Ex. B, p. 10, 19-23; p. 11, 1-17). No doctor has ever diagnosed Plaintiff with regard to any physical ailment concerning the subject manufactured home. (Ex. B, p. 119, 3-10). According to the Plaintiff, every time service representatives came out, they did a good job; all repairs were done satisfactorily; after the last repairs were performed, plaintiff's wife signed a form giving excellent marks to the repair men and noted that all work was completed; after the last repairs were performed, no further request for repairs was

---

3    The parties agreed that the deposition of CEI's corporate representative was for several cases, including the Terry Deese matter. (Ex. A, p. 7, 11-12).

2

made. (Ex. B, see generally, pp. 91-98 and Ex. B Defendant's Exhibits 12-17 attached to Ex. B). Plaintiff could not produce any evidence or provide any information to support any theory of liability against CEI or CHB, other than to reference what was stated in the Compliant. (Ex. B, see generally pp. 46-60).

In response to discovery propounded by CEI and CHB, Plaintiff responded to nearly every request with an objection and/or statement that "[w]ithout waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review." (Exs. C and D, Responses to Request Nos. 2-17 and 19). At his deposition, Plaintiff was asked to provide a copy of the requested documents and Plaintiff produced all documents he had with regard to the home. (Ex. B, p. 12, 23; p. 13, 1-16; p. 14, p. 18-23; p. 15, 1-3; p. 35, p. 6-13; p. 16, 6-13; p. 108, 15-21; p. 111, 9-14; p. 112, 4-7, p. 113, 1-12; p.120, 3-6).

CEI was established in 1953, is now a stock holding company and owns one-hundred percent of the stock of CHB, which is presently its only asset. (Ex. A, p. 16, 9-11; p. 41, 6-9; p. 43, 12-24). No manufacturing facilities operate under the name of CEI. (Ex. A, p. 48, 4-15). Until 2003 or 2004, CEI had some employees, and also directly owned other subsidiaries until around 2001 or 2002. (Ex. A, p. 40, 6-25; p. 41, 1-5; p. 50, 21-25; p. 51, 1-2). CEI, CHB and Legend have complied with corporate formalities. (Goltz Affidavit attached as Exhibit "A" to the Original Motion and referred to hereinafter as the "Goltz Affidavit", ¶¶ 5-9)

Pursuant to a Management Agreement between CEI and CHB and a Management Agreement between CHB and a non-party, Champion Enterprises Management Co. (hereinafter referred to as "CEM"), services are provided by or to CEI, CHB, and CEM in accordance with

such agreements. (Ex. A, p. 38, 4-14). Such services include, but are not limited to, providing furniture, leasing space, employees and services. (Ex. A, p. 38, 12-13).

Publicly traded companies such as CEI are required to comply with the Sarbanes-Oxley Act of 2002 (hereinafter referred to as "Sarbanes-Oxley Act"). Section 302 of the Sarbanes-Oxley Act mandates a set of internal procedures designed to ensure accurate financial disclosure. The CEO and CFO of a publicly traded company must certify that they are "responsible for establishing and maintaining internal controls" and "have designed such internal controls to ensure that material information relating to the company and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared." 15 U.S.C. § 7241(a)(4). Said officers must "have evaluated the effectiveness of the company's internal controls as of a date within 90 days prior to the report" and "have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date." *Id.* Additionally, Section 404 of the Sarbanes-Oxley Act requires management to produce an "internal control report" as part of each annual Exchange Act report. See 15 U.S.C. § 7262. The report must affirm "the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting." 15 U.S.C. § 7262(a). The report must also "contain an assessment, as of the end of the most recent fiscal year of the Company, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting." *Id.*

In accordance with SEC regulations, the Sarbanes-Oxley Act requirements, and other federal laws, CEI has formulated guidelines and other documents with regard to its operation. (Ex. A, p. 42, 16-25; p. 45, 21-25; p. 46, 1-25; p. 55, 2-7; p. 72, 2-25; p. 73, 1-12;). While the guidelines and job descriptions specify on paper supervisory roles as well as the chain of

command, and conceivably, a person higher in command can have authority to give directives, etc., that is not how things operate day to day. (Ex. A, p. 61, 14-25; p. 62, 1-25; p. 63, 1-7; p. 67, 12-25; p. 69, 1-25; p.70, 1-4). The day to day manufacturing decisions are not made by the CEO of CEI, but rather, by plant managers of the various plants. (Ex. A, p. 67, 12-18). Each of the plants has its own Design Approval Primary Inspection Agency ("DAPIA") that approves drawings and plans from each plant's separate engineering department; further, each individual entity is responsible for its own actions. (Ex. A, p. 63, 14-25; p. 64, 1-24; p. 73, 20-25; p. 74, 1-16).

Although CEI is the registered domain owner of the website "championhomes.net" (or championhomes.com), it does not conduct any activity on the website; the website itself, all inputting, design and activity, are handled and controlled by Paul Paruji, an employee of a non-party, CEM. (Ex. A, p. 84, 1-10; p. 92, 15-25; p. 93, 1-4). The website is informational in nature and allows someone to view listings of homes produced by CHB or such other subsidiary of CHB in a particular area sold by independent retailers. (Ex. A, p. 80, 17-25; p. 81, 1-16). The independent retailers have entered into an agreement with CHB or one of CHB's subsidiaries, not CEI. (Ex. A, p. 82, 2-21).

## SUMMARY JUDGMENT STANDARD

This court should apply the summary judgment standard enunciated in *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428 (11th Cir. 1991). There, the court stated:

> The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the *nonmoving* party has the burden of proof at trial, the moving party is not required

to 'support its motion with affidavits or other similar material *negating* the opponents claim,' *Celotex*, 477 U.S. 323, in order to discharge this 'initial responsibility.' Instead, the moving party simply may show[] '—that is, point[] out to the district court – that there is an absence of evidence to support the nonmoving party's case.' *Id.* at 324. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 331. (Brennan, J., dissenting). If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial. Fed.R.Civ.P. 56(e); *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the nonmoving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' *Celotex*, 477 U.S. at 323, the moving party is entitled to summary judgment.

*Four Parcels of Real Property*, 941 F.2d at 1438.

Because the Plaintiff has the burden of proof at trial, CEI and CHB may move for summary judgment with or without supporting evidence. Fed.R.Civ.P. 56(c); *Four Parcels of Real Property*, 941 F.2d at 1438. To defeat summary judgment, the Plaintiff may not rest on the pleadings; instead, the Plaintiff must introduce admissible evidence showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Plaintiff cannot meet this burden as Plaintiff does not have and has not produced a single document that supports any theory of liability against CEI or CHB. (Exs. C and D, Responses to Request Nos. 2-17 and 19; Ex. B, p. 12, 23; p. 13, 1-16; p. 14, p. 18-23; p. 15, 1-3; p. 35, p. 6-13; p. 16, 6-13; p. 108, 15-21; p. 111, 9-14; p. 112, 4-7, p. 113, 1-12; p.120, 3-6).

## ARGUMENT

At his deposition, the Plaintiff could not produce any evidence or provide any information to support any theory of liability against CEI or CHB, other than to reference what was stated in the Compliant. (Ex. B, see generally pp. 46-60). Reliance on pleadings, without more, is not sufficient to defeat a motion for summary judgment. *Sorenson v. IRS*, No. 96-A-

1410-N, 1997 U.S. Dist. LEXIS 2656 (M.D. Ala. Feb. 27, 1997)("A party opposing a motion for summary judgment cannot rely only on his unsworn pleadings but must oppose the motion by filing sworn affidavits that set forth specific facts which demonstrate that there is a genuine issue of material fact for trial in this case").  Plaintiff was, however, able to admit that to his knowledge, Legend was the entity that built the home.  (Ex. B, p. 47, 5-7).  The Plaintiff did not have any knowledge of dealing with CEI, CHB or Legend with regard to the purchase as he went through a dealership and only dealt with dealership employees.  (Ex. B, p. 38, 12-23; p. 39, 1-23; p. 40, 1-3).  Thus, no admissible evidence exists to support Plaintiff's theories of liability against CHB or CEI related to the home.

It appears CEI and CHB were made defendants to this action based on nothing more than the allegation that "Champion is the parent corporation and/or alter ego of Defendant Champion Home Builders, Co. and Homes of Legend, Inc." (Complaint, ¶ 17).  First and foremost, CEI is not the parent corporation of Legend.  (Goltz Affidavit ¶ 2).  CHB is Legend's parent corporation. (Goltz Affidavit, ¶ 2).  Interestingly, it is not alleged that CHB is the alter ego or parent corporation of Legend.  No relationship whatsoever is alleged between CHB and Legend and as such, CHB is due to be dismissed for failure to state a claim as the time for amendments to the Complaint has passed.

### I. Alter Ego.

"Piercing the corporate veil is not a power that is lightly exercised.  The concept that a corporation is a legal entity existing separate and apart from its shareholders is well settled in this state." *Backus v. Watson*, 619 So.2d 1342, 1345 (Ala.1993); (*citing Co-Ex Plastics, Inc. v. AlaPak, Inc.*, 536 So.2d 37 (Ala.1988)).  The essential elements necessary to support alter ego or piercing the corporate veil claims are as follows:

(1) The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own;

2) The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is necessary to prevent injustice or inequitable circumstances, misuse of control will be presumed;

3) The misuse of this control must proximately cause the harm or unjust loss complained of.

*Messick v. Mooring,* 514 So.2d 892, 894-895 (Ala.1987), (*citing Lowendahl v. Baltimore & O. Ry.,* 247 A.D. 144, 287 N.Y.S. 62 (1936)).

To defeat CEI and CHB's motion for summary judgment, Plaintiff has the burden of proving each of the three prongs of the alter ego theory. Because the Plaintiff has the burden of proof at trial, CEI and CHB may move for summary judgment with or without supporting evidence. Fed.R.Civ.P. 56(c); *Four Parcels of Real Property,* 941 F.2d at 1438. To defeat summary judgment, the Plaintiff may not rest on the pleadings; instead, the Plaintiff must introduce admissible evidence showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Here, even if the Plaintiff could support the first prong of the alter ego theory (a point neither CEI nor CHB concedes), Plaintiff cannot carry the burden due to the lack of sufficient evidence supporting the second and third prongs of the alter ego theory. Indeed, Judge Moorer found that after "[h]aving read the numerous pleadings filed by the parties, the extensive evidence attached to said pleadings, and listening to the oral arguments of the parties at the hearing on June 11, 2007, the Court does not find any evidence tending to prove CEI misused its control, if any, over CHB, or that the misuse of control proximately caused the Stricklands' loss." (Ex. E, p. 14, ¶ 1). As the second and third prongs cannot be established, they will be addressed at the outset.

**Second Prong:**        **The control must have been misused by the dominant party**

Under the second prong of the alter ego theory, Plaintiff must prove misuse of control. There is no evidence in the record that the home in question is defective. Indeed, the plaintiff admitted that all repairs were performed satisfactorily and that no notice of any remaining problems were provided to Legend. (Ex. B, generally pp. 95-99). There is no evidence in the record that CEI or CHB caused Legend to build the home in question, as Plaintiff alleges in their complaint. In fact, the testimony of Goltz establishes that CEI does not control the day-to-day operations of CHB. (Ex. A, p. 63, 14-25; p. 64, 1-24; p. 67, 12-18; p. 73, 20-25; p. 74, 1-16). There also is no evidence in the record that Plaintiff was damaged or that proximate harm resulted from any alleged misuse of control.

Importantly, CEI and CHB asked Plaintiff through an interrogatory to "[']identify['] everything you claim supports your contention that Champion Enterprises, Inc. "is the parent corporation and/or alter ego of Defendant Champion Home Builders, Co. and Homes of Legend, Inc." as alleged in the Complaint." In response, Plaintiff failed to cite to a single shred of evidence that showed misuse of control, or even any damage. (See Ex. C and Ex. D, Response to Interrogatory No. 12; Response to Request for Production No. 12).[4] Plaintiff will no doubt claim that misuse of control should be "presumed when it is necessary to prevent injustice or inequitable results." *Perry v. Household Retail Services, Inc.*, 953 F. Supp. 1378 (M.D. Ala. 1996). Although Alabama law does not flesh-out the analysis associated with this prong of the test, persuasive authority demonstrates that "injustice" or "inequity" could result only if CEI or

---

4        In the Plaintiff's Response to Defendant Champion Home Builders Co.'s First Request for Production of Documents and First Request for Admissions (Ex. D), question No. 12 was incorrectly typed (question No. 13 was typed in instead of No. 12). Question No. 12 in Ex. D should have been the same question that is reflected in No. 12 for Ex. C.

CHB perpetrated a fraud on Plaintiff through an insolvent subsidiary that could not pay a judgment, if one were obtained.

This principle is discussed in *Dorris Marketing Group v. Dorris*, No. 03-15025-SSM, 2006 Bankr. LEXIS 1096 (Bankr. E.D. Va. March 17, 2006). There the Bankruptcy Court pierced the corporate veil of a company where the evidence showed that the company could not pay its debts and the company assets were used to pay the personal debts of an individual. *Id.* at *37-41 ("It would simply work an injustice to creditors to allow such egregious behavior to go unchecked").

Likewise, in *Dana v. 313Freemason, a Condominium Assoc., Inc.*, 587 S.E.2d 548 (Va. 2003) the Supreme Court of Virginia held:

> It then only remains to be resolved whether the trial court properly concluded that as a matter of law piercing the veil of the corporation was necessary to avoid an injustice. One of the principal factors we look to in resolving the issue of piercing the veil of a corporation, and pertinent here, is whether the inability of the corporation to satisfy the judgment against it is the result of the deliberate undercapitalization by the incorporating stockholders.

*Dana*, 587 S.E.2d at 554.

Based on the corporation's inability to pay a judgment, and other reasons, the court in *Dana* pierced the corporate veil. *Id.* at 554-5.

In the case at bar, there is no evidence that CEI thinly capitalized CHB or CHB thinly capitalized Legend to escape paying a judgment in this or any other case. Even if Plaintiff obtains a judgment against Legend, there is no evidence that even a substantial verdict in connection with this singular manufactured home would impact the company at all. In short, no injustice or inequity will result, even if CEI or CHB has "dominated" Legend.

**Second Prong:    The misuse of this control must proximately cause the harm**

Even if some alter ego factors are present, a plaintiff must still present evidence to establish that the misuse of control was the proximate cause of the plaintiff's injuries. *First Health, Inc. v. Blanton*, 585 So.2d 1331, 1335 (Ala.1991), *citing Simmons v. Clark Equipment Credit Corp.*, 554 So.2d 398 (Ala.1989); *Messick*, supra. No such evidence has been submitted. (See Ex. C and Ex. D, Response to Interrogatory No. 12; Response to Request for Production No. 12). Even though CEI and CHB specifically asked Plaintiff to "identify" everything that supports the contention that CEI or CHB is the parent corporation and/or alter ego of Defendant Legend as alleged in the Complaint, absolutely no evidence was produced. Even though CEI and CHB specifically asked Plaintiff to produce any and all documentation which in any way supports the damages alleged in the complaint, Plaintiff produced no evidence of harm or proximate cause of harm. (Ex. C and Ex. D, Response to No. 19). At Plaintiff's deposition, it was admitted that no doctor has ever diagnosed him with regard to any physical ailment concerning the subject manufactured home. (Ex. B, p. 119, 3-10). In fact, with regard to repairs performed by Legend, the Plaintiff admitted that every time they came out, they did a good job, all repairs were done satisfactorily, and after the last repairs were performed, plaintiff's wife signed a form giving excellent marks to the repairmen and that all work was completed and no further request for repairs were made. (Ex. B, see generally, pp. 91-98 and Ex. Defendant's Exhibits 12-17 attached to Ex. B). In fact, the Plaintiff never lived in the home. (Ex. B, p. 10, 19-23; p. 11, 1-17).

**First Prong:  The dominant party must have complete control and domination of the subservient corporation**

Even assuming the plaintiff could meet the second and third prongs of the alter ego theory, there is still no evidence to support the first prong. "Mere domination or control of a corporation by its stockholder cannot be enough to allow a piercing of the corporate veil. **There must be the added elements of misuse of control and harm or loss resulting from it.**" *First Health, Inc. v. Blanton*, 585 So.2d 1331, 1335 (Ala.1991), (*citing Simmons v. Clark Equipment Credit Corp., 554 So.2d 398 (Ala.1989)); Messick,* supra. (Emphasis added). Where the law recognizes one-man corporations, it is obvious that the law accepts the fact of domination by one person. *Backus v. Watson*, 619 So.2d at 1345; (*citing* Ala. Code 1975, § § 10-2A-90, 10-2A-58, 10-2A-57); *Co-Ex Plastics, Inc. v. AlaPak, Inc., supra.*

The appropriate time in question would only be at the time the subject manufactured home was built. *See Messick v. Moring*, 514 So.2d 892, 894-895 (Ala. 1987); *see also Kwick Set Components Inc. v. Davidson Indus., Inc.*, 411 So.2d 134 (Ala. 1982). Since the manufactured home was built in 2003, plaintiff must produce sufficient admissible evidence in this applicable time period. All other evidence outside the time period is irrelevant and immaterial.

All corporate formalities have been followed by CEI, CHB and Legend. (Goltz Affidavit, ¶¶ 5-9). Although CEI owns one-hundred percent of the stock of CHB, it does not control the day to day activities of CHB's or Legend's plants; such day to day operations are handled by the plant managers. (Ex. A, p. 67, 12-18).

Judge Cohen, in his opinion in *Aureus Internationa, Inc. v. Coala, Inc. (In re Coala),* 182 B.R. 887 (N.D.Ala. 1995) succinctly set forth case law with regard to total domination of a subservient corporation as follows:

> Mere domination or control of a corporation by its stockholders is not however, enough to allow a piercing of the corporate veil. **The stockholders must have misused that control and harm or loss must have resulted from it.** [footnote omitted]. It is typical for the majority stockholders to control the operation of a

closely held corporation. The fact that majority stockholders control the business of the corporation does not make that corporation a sham. [footnote omitted]. The law, in fact, recognizes one-person corporations and accepts the fact of domination by one person. [footnote omitted]. **Therefore, in order to justify piercing the veil of corporate existence, it is not enough to show that the corporation may have been controlled by one or a few persons.** [footnote omitted]. In the absence of fraud or inequity, the shareholders will be protected from individual liability by the corporate entity, even though the corporation is controlled by the shareholders. [footnote omitted]. In order to pierce the corporate veil, the complaining party must show not only that the dominant party has complete control and domination of the subservient corporation's finances, policy, and business practices but also that it misused that control to his detriment. [footnote omitted]. If the stockholders dominated the subservient corporation, and were guilty of fraud in asserting the corporate existence, or if recognition of the corporate existence will result in injustice or inequitable consequences, the corporate veil may be pierced. [footnote omitted]. If the corporation has been organized solely by stockholders to avoid personal liability and used by the stockholders for their personal purpose, subversive to the rights of others, the corporate veil can be pierced to impose personal liability on the stockholders. [footnote omitted].

The following factors are generally considered when determining whether the corporate form may be disregarded: (1) inadequacy of capital; (2) fraudulent purpose in conception or operation of the business; or (3) operation of the corporation as an instrumentality or alter ego. [footnote omitted]. The last mentioned factor, domination of the subservient corporation, is indicated "where a corporation is set up as a subterfuge, where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where corporate and personal funds are intermingled and corporate funds are used for personal purposes, or where an individual drains funds from the corporation." *Backus v. Watson*, 619 So.2d 1342, 1345 (Ala.1993), quoting *Simmons v. Clark Equipment Credit Corp.*, 554 So.2d 398, 400-401 (Ala.1989). None of these factors are present in the instant case.

*Aureus Internationa, Inc. v. Coala, Inc. (In re Coala)*, 182 B.R. 894-896. (Emphasis added).

Based on the forgoing, the Plaintiff has the burden of proving the following factors: (1) inadequacy of capital; (2) fraudulent purpose in conception or operation of the business; or (3) operation of the corporation as an instrumentality or alter ego.

1.    **Capitalization.**

"A corporation that was adequately capitalized when formed but later suffers financial reverses is not undercapitalized. *U.S. v. Fidelity Capital Corp.*, 920 F.2d 827, 839 (11th Cir. 1991); see also 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 44.1, at 529 (Rev. Perm. Ed. 1983). Presently, CEI's sole asset is one hundred percent ownership of CHB. (Ex. A, p. 16, 9-11; p. 41, 6-9; p. 43, 22-24). CEI was formed in 1953 and directly owned other subsidiaries until around 2001 or 2002. (Ex. A, p. 43, 12-21; p. 50, 21-25; p. 51, 1-2). There is no evidence that CEI was undercapitalized when it was incorporated in 1953. As was noted in *Co-Ex Plastics, Inc. v. AlaPak, Inc.*, 536 So.2d at 39, the Supreme Court of Alabama held in *East End Memorial Ass'n v. Egerman*, 514 So.2d 38 (Ala.1987), that "a party who has contracted with a financially weak corporation and is disappointed in obtaining satisfaction of his claim cannot look to the dominant stockholder or parent corporation in the absence of additional compelling facts." 514 So.2d at 44, (*quoting Tigrett v. Pointer*, 580 S.W.2d 375, 382 (Tex.Civ.App.1978)).

2.    **Fraudulent Purpose in Conception or Operation.**

There is no evidence in this case to support any allegation that CEI, CHB or Legend was formed for any fraudulent purpose or operated for a fraudulent purpose. CEI is a stock holding company and CHB and its subsidiaries manufacture homes on an on-going basis. In any event, even if there was a showing that CEI or any subsidiary failed to comply with all corporate formalities, such a showing would not be sufficient to pierce the corporate veil. A failure to follow minor corporate formalities is not sufficient to invoke the lowering of the protective corporate shell. *Alfa Mutual Fire Ins. Co. v. Memory*, 185 B.R. 985, 993 (M.D.Ala. 1995); *See also Co-Ex Plastics Inc. v. AlaPak, Inc.*, 536 So.2d 37, 39 (Ala.1988).

In *U.S. v. Fidelity Capital Corp.*, the Eleventh Circuit found that Fidelity and American had the same telephone number, shared offices, stationery, and employees, filed consolidated tax returns and that pursuant to a management agreement, American managed Fidelity. Similarly in this case, CEI and CHB share home office space in one particular office in Auburn Hills, Michigan (CHB has many other offices in plants across the United States where it handles its day to day activities), file consolidated tax returns (although they have separate Tax I.D. Nos.) and pursuant to a Management Agreement, different functions are handled by or for CEI or CHB. (Ex. A, p. 36, 13-25; p. 38, 4-14 p. 61, 14-25; p. 62, 1-25; p. 63, 1-7; p. 67, 12-25; p. 69, 1-25; p.70, 1-4). Such factors, without other evidence of abuse, are not sufficient to pierce the corporate veil. *See U.S. v. Fidelity Capital Corp.*, 920 F.2d at 840; *see also Trans-American Communications v. Nolle*, 214 S.E.2d 717 (1975) (a holding company and its wholly owned subsidiary may be separate entities even though they share the same offices and bookkeeping facilities and trade information and employees); *Memory v. Alfa Mutual Fire Ins. Co. (In re Martin)*, 205 B.R. 646, 649 (M.D.Ala. 1993) (businesses operated out of same address with the same telephone number and employed some of the same people; but separate bank accounts, tax I.D. nos. and tax returns; facts did not support alter ego theory).

**3.      Operation of the Corporation as an Instrumentality or Alter Ego.**

"[T]wo elements are essential for liability under the [']instrumentality['] doctrine. First, the dominant corporation must have controlled the subservient corporation, and second, the dominant corporation must have proximately caused plaintiff harm through misuse of this control." *Krivo Industrial Supply Co. v. Nat'l Distillers and Chemical Corp.*, 483 F.2d 1098,

1103 (5th Cir. 1973);[5] (*citing Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991 (5th Cir. 1972), *cert. denied*, 409 U. S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972) (applying New York law)); *see also National Bond Finance Co. v. General Motors Corp.*, 238 F.Supp. 248 (W.D.Mo. 1964), aff'd, 341 F.2d 1022 (8th Cir. 1965); *Huski-Bilt, Inc. v. First-Citizens Bank & Trust Co.*, 271 N.C. 662, 157 S. E.2d 352 (1967). Even when the corporation appears to be an alter ego, in order to pierce the corporate veil, "[t]here must be the added elements of misuse of control and harm or loss resulting from it." *South Alabama Pigs, LLC v. Farmer Feeders, Inc.*, 305 F.Supp.2d 1252, 1258 (M.D.Ala. 2004); (*citing Backus v. Watson*, 619 So.2d 1342, 1345 (Ala.1993)); *see also Messick v. Moring*, 514 So.2d 892, 894-95 (Ala.1987).

In discussing factors to consider when piercing the corporate veil on an alter ego theory, the standard for piercing the corporate veil between a parent company and its subsidiaries should be considered, rather than the standard in cases of individually owned corporations. *See South Alabama Pigs, LLC v. Farmer Feeders, Inc.*, 305 F.Supp.2d 1252, 1258 (M.D.Ala. 2004) [FN1]. Based on the foregoing, cases involving individually owned corporations should not be considered in this matter as we are dealing with a parent corporation and subsidiaries.

In *Ex parte Baker*, 432 So.2d 1281 (Ala. 1983), the Supreme Court of Alabama had an opportunity to review a case involving alter ego allegations similar to those alleged in this matter. In *Ex parte Baker*, Hospital Corporation of America ("HCA") was a holding company that owned a number of subsidiary corporations engaged in various businesses related to the delivery of health care services. *Ex parte Baker*, 432 So.2d at 1282. Likewise in this case, CEI is a holding company that owns a subsidiary corporation which in turn owns a number of

---

5  In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

corporations engaged in various businesses, some of which are related to the manufactured home

industry. In *Ex parte Baker*, the Supreme Court of Alabama specifically found that "[a] parent

corporation which owns all the stock of a subsidiary corporation is not liable for the acts of its

subsidiary corporation, unless the parent corporation so controls the operation of the subsidiary

corporation as to make it a mere adjunct, instrumentality, or alter ego of the parent corporation."

*Ex parte Baker*, 432 So.2d at 1284; (*citing Birmingham Realty v. Crossett*, 210 Ala. 650, 98 So.

895 (1923)); *Krivo Industrial Supply Co. v. Nat'l Distillers and Chemical Corp.*, 483 F.2d 1098

(5th Cir. 1973);[6] *see also Nobles v. Rural Community Ins. Serv.*, 303 R.Supp.2d 1279, 1288

(M.D.Ala. 2004).

Additional facts set forth in *Ex parte Baker*, which are similar to the facts of this case, are

as follows:

> Most of HCA's subsidiary corporations own and operate hospitals located
> throughout the United States and foreign countries.  Each hospital owned by a
> subsidiary of HCA is operated under local control by an administrator and a board
> of trustees who reside in the community where the hospital is located.  GCC,
> d/b/a Woodland Community Hospital, is an example of such a subsidiary/hospital.

> HCA owns, directly or indirectly, the stock of two subsidiary corporations whose
> sole business is providing management consulting services for hospitals not
> owned by HCA or any of its affiliates (the "management subsidiaries"). Hospital
> Affiliates Management Corporation (HAMC) is one of these two management
> subsidiaries.  It has a contract to provide management consulting services at
> South Highlands Hospital, in Birmingham, and, consequently, does business in
> Jefferson County.  HCA acquired HAMC by a merger in 1981.  HAMC had its
> management contract with South Highlands prior to the merger.

> HAMC has three directors, all of whom are officers of HCA.  None, however, is
> involved in HCA's day-to-day operations.  There are also several individuals who
> perform staff functions, such as corporate counsel, and corporate secretary and
> treasurer for all subsidiary corporations owned by HCA, including HAMC; but

---

6 Alternatively, to the extent any claims in the complaint are interpreted to assert that
CEI had some duty to control its subsidiaries, under Alabama law, the "duty to control" doctrine
cannot be applied to hold a parent corporation liable for the acts of its subsidiary. *Underwood v.
Armstrong World Industries, Inc.*, 619 So.2d 1360, 1362-1363 (Ala. 1993).

they are removed from the actual operations of any subsidiary. **The only aspects of commonality identified among the HCA subsidiaries relate to administrative matters, such as a centralized payroll, and to financial reporting, which is necessary to comply with regulations of the Securities and Exchange Commission and the New York Stock Exchange.**

The officers and employees who manage the operations of HAMC are not employees of HCA, and have no duties with HCA. HCA does not sign or in any manner guarantee performance by HAMC under its management contracts.

HAMC operated independently of HCA for the years prior to the time HCA acquired the stock of HAMC through merger of HAMC's parent, Hospital Affiliates International, Inc., with an HCA subsidiary in August, 1981.

*Ex parte Baker,* 432 So.2d at 1282-1283. (Emphasis added).

The Supreme Court of Alabama determined that such activity was not sufficient to allow the piercing of the corporate veil and found no error by the trial court in dismissing HCA. *Ex parte Baker,* 432 So.2d at1285. It is respectfully submitted that CEI, just as in *Ex parte Baker,* must comply with SEC regulations, the New York Stock Exchange and more specifically, the Sarbanes-Oxley Act. Section 302 of the Sarbanes-Oxley Act mandates a set of internal procedures designed to ensure accurate financial disclosure. The CEO and CFO of a publicly traded company must certify that they are "responsible for establishing and maintaining internal controls" and "have designed such internal controls to ensure that material information relating to the company and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared." 15 U.S.C. § 7241(a)(4). Said officers must "have evaluated the effectiveness of the company's internal controls as of a date within 90 days prior to the report" and "have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date." *Id.*

In addition, Section 404 of the Sarbanes-Oxley Act requires management to produce an "internal control report" as part of each annual Exchange Act report. See 15 U.S.C. § 7262. The report must affirm "the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting." 15 U.S.C. § 7262(a). The report must also "contain an assessment, as of the end of the most recent fiscal year of the Company, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting." *Id.* Such action, in compliance with the Sarbanes-Oxley Act, has been taken by CEI. (Ex. A, p. 42, 16-25; p. 45, 21-25, p. 46, 1-25; p. 55, 2-7; p. 72, 2-25, p. 73, 1-12).

## II.    Personal Jurisdiction.

"Where a district court in its discretion decides a personal jurisdiction issue without an evidentiary hearing, it is the plaintiff's burden to establish a prima facie case of personal jurisdiction over a nonresident defendant." *Homebingo Network, Inc. v. Chayevsky*, 428 F.Supp.2d 1232, 1240-1241 (S.D.Ala. 2006); (*citing Electronics for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed.Cir.2003)); *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002). In *Chayevsky*, the two types of personal jurisdiction, general and specific, were discussed as follows:

> There are two types of personal jurisdiction: general and specific. General personal jurisdiction arises "when a defendant maintains continuous and systematic contacts with the forum state even when the cause of action has no relation to those contacts." *Trintec Industries, Inc. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, 1279 (Fed. Cir. 2005) (citations omitted); *Silent Drive, Inc. v. Strong Industries, Inc.*, 326 F.3d 1194, 1200 (Fed. Cir. 2003) . . . Specific jurisdiction is proper, even if a defendant's contacts with the forum state are "isolated and sporadic," so long as such activities arise out of or relate to the cause of action. See *Trintec*, 395 F.3d at 1279; *Silent Drive*, 326 F.3d at 1200.
>
> When a defendant challenges specific personal jurisdiction in a federal question case, the plaintiff has the twin burdens of establishing that personal jurisdiction over the defendant comports with the forum state's long-arm provision, as well as the strictures of the due-process clause of the Fifth Amendment to the United

States Constitution. See *Trintec*, 395 F.3d at 1279; *Silent Drive*, 326 F.3d at 1200-01; *Deprenyl [Animal Health, Inc. v. University of Toronto Innovations Foundation*, 297 F.3d 1343, 1349-50 (Fed. Cir. 2002)]. In Alabama, this two-pronged inquiry collapses into a single question because Alabama's long-arm provision permits its courts to exercise personal jurisdiction to the full extent permitted by the Due Process Clause. See *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000); *Lasalle Bank N.A. v. Mobile Hotel Properties*, LLC, 274 F.Supp.2d 1293, 1296 (S.D. Ala. 2003). Where, as here, the reach of the state long-arm statute is coextensive with the limits of due process, "these two inquiries coalesce into one." *Trintec*, 395 F.3d at 1279. . .

Due process authorizes the exercise of personal jurisdiction when both (1) the nonresident defendant has purposefully established minimum contacts with the forum state; and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. See *Deprenyl*, 297 F.3d at 1350-51.

*Homebingo Network, Inc. v. Chayevsky*, 428 F.Supp.2d at 1241-1242.

The Eleventh Circuit has recognized that the requirements for satisfying general jurisdiction are more stringent than those of specific jurisdiction as continuous and systematic contacts with the forum state must be shown. *Consolidated Dev. Corp. v. Sherrit, Inc.*, 216 F.3d 1289, 1292 (11th Cir. 2000). There has been no showing of "continuous and systematic contacts" by CEI in Alabama.

Specific jurisdiction has further been analyzed as follows:

"Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint." *Consolidated Dev. Corp.[ v. Sherrit, Inc.*, 216 F.3d 1289, 1291 (11th Cir. 2000)]. It must be shown that Defendants purposefully availed themselves "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* The "purposeful availment" standard prevents personal jurisdiction based on "random" or "fortuitous" contacts. *Burger King [Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)]. Rather, defendants must have "deliberately . . . engaged in significant activities within a State." *Id.* at 475-76.

*Peacock v. Merrill*, 2005 WL 2233466 (S.D.Ala. Sept. 14, 2005).

There is absolutely no evidence that any CEI representative was involved in the manufacture, design, sale, or service of the manufactured home. It is expected that Deese will claim that since CEI is the registered domain owner of championhomes.net, the personal jurisdiction requirement has been met. Case law, however, suggests otherwise.

In June of 2006, Judge Albritton had an opportunity to review a personal jurisdiction question involving a website. In *Thomas v. Mitsubishi Motor North America, Inc.*, 436 F.Supp.2d 1250 (M.D.Ala. 2006), a transaction to purchase a vehicle was commenced and completed in Union City, Georgia; two days later, an individual in the vehicle was killed in an accident in Lowndes County, Alabama. *Thomas v. Mitsubishi Motor North America, Inc.*, 436 F.Supp.2d at 1252. Suit was filed in Lowndes County, Alabama, which was removed to federal court and a motion to dismiss was filed by the dealership alleging the court lacked personal jurisdiction, that the dealership did not conduct business in Alabama, did not have agents or offices in Alabama, that no purchasers of vehicles had taken delivery in Alabama and the dealership did not advertise or solicit business in Alabama. *Thomas v. Mitsubishi Motor North America, Inc.*, 436 F.Supp.2d at 1251-1252. In response, the plaintiff, through counsel, asserted that personal jurisdiction existed based on following electronic evidence:

> The Plaintiff argues that it is clear that *in personam* jurisdiction exists over Don Jackson in Alabama in this case, based in part on evidence of electronic mail correspondence between Plaintiff's counsel and Don Jackson, which Plaintiff's counsel initiated pursuant to Don Jackson's website. Several weeks after the fatal accident, the Plaintiff's attorney corresponded by e-mail with Don Jackson and inquired about purchasing a specific vehicle. The purported email from Don Jackson responds that the dealership regularly ships cars out to other states. The Plaintiff asserts that the negotiations to purchase a car demonstrate that *in personam* jurisdiction exists because the representative from Don Jackson said that it ships cars to many different states. The Plaintiff also argues that it can be inferred from the Defendants' evidence that Don Jackson has sold vehicles to Alabama citizens in the past.

*Thomas v. Mitsubishi Motor North America, Inc.*, 436 F.Supp.2d at 1253.

It was determined that the email and purported previous sales did not involve the transaction between the owner of the subject vehicle and the dealer, no evidence was submitted that any aspect of the transaction between the parties occurred in Alabama and the email and website evidence did not concern the transaction between the purchaser and dealer, but rather, involved plaintiff's counsel and transpired after the accident; thus, such information was insufficient to establish specific or general jurisdiction. *Thomas v. Mitsubishi Motor North America, Inc.,* 436 F.Supp.2d at 1253-56.

In reaching the above determination, it was noted that the Northern District of Alabama in *Butler v. Beer Across America*, 83 F.Supp.2d 1261 (N.D.Ala. 2000) adopted a model for analyzing websites as minimum contacts described in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119 (W.D.Pa. 1997), which essentially is as follows:

> The *Zippo* model is based on a sliding scale analysis. At one end, jurisdiction is created when there are knowing and repeated transmissions of computer files over the internet. See *Butler*, 83 F.Supp.2d at 1266. At the other end, personal jurisdiction is improper where the defendant's internet site is passive, and consists of little more than an electronic billboard. *Id.* In between these extremes are websites which allow for exchange of information. *Id.*

*Thomas v. Mitsubishi Motor North America, Inc.,* 436 F.Supp.2d [FN1].

In this case, CEI's activity is clearly passive, as it is merely the owner of the domain; CEI does not conduct any activity on the website as such activity is exclusively handled by CEM. (Ex. A, p. 84, 1-10; p. 92, 15-25; p. 93, 1-4). The website is informational in nature and allows someone to view listings of homes produced by CHB or such other subsidiary of CHB in a particular area sold by independent retailers. (Ex. A, p. 80, 17-25; p. 81, 1-16). At best, CEM (and not CEI) gives referrals to independent dealers. The independent retailers have entered into

an agreement with CHB or one of CHB's subsidiaries, not CEI. (Ex. A, p. 82, 2-21). No sales are made over the internet.

There is absolutely no evidence to establish that the transaction in question took place over the internet or to show that CEI was involved. In other words, the website is not a contact with the forum state related to the cause of action. *See Thomas v. Mitsubishi Motor North America, Inc.*, 436 F.Supp.2d at 1254; (*citing Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Therefore, specific jurisdiction cannot be shown.

With regard to general jurisdiction, it was determined that while the *Zippo* analysis was helpful in some circumstances, it is not determinative of the general personal jurisdiction inquiry. *Thomas v. Mitsubishi Motor North America, Inc.*, 436 F.Supp.2d at 1255. In *Thomas*, the reasoning in *Butler* was found to be persuasive, which is more particularly set forth below:

> The court is persuaded that the reasoning of *Butler* applies in this case. At most, there is evidence in this case that some sales of automobiles to Alabama residents could have occurred in the past. This is certainly less compelling evidence than that in *Butler* where there was actual evidence of sales to Alabama citizens via the internet. Even assuming without deciding that the website in this case lies somewhere in the middle of the *Zippo* interactivity spectrum, given the lack of evidence regarding the quantity of internet contact by Alabama citizens, and in view of the Defendants' uncontroverted evidence, including but not limited to, that Don Jackson has no agent in Alabama, owns no property in the state, sells no cars in Alabama, has not delivered cars to Alabama, and does not advertise in Alabama, the court concludes that the contacts identified by the Plaintiff are not sufficient to establish general personal jurisdiction over Don Jackson in Alabama.

*Thomas v. Mitsubishi Motor North America, Inc.*, 436 F.Supp.2d at 1255-1256.

In this case, it is clear that CEI did not sell the home to Deese over the internet, has no agents or offices in Alabama, does not operate or run the internet site, owns no property in the state, does not sell anything into Alabama, has not delivered anything into Alabama, and does

not advertise in Alabama. (Ex. A, p. 84, 1-10; p. 92, 15-25; p. 93, 1-4; Goltz Affidavit, ¶¶ 3-4).

Therefore, there is insufficient evidence to establish general personal jurisdiction.

**WHEREFORE PREMISES CONSIDERED**, CEI and CHB pray for a summary

judgment in their favor, that Exhibits A and B will be sealed in accordance with the Order on

Motion and Stipulated Protective Order-Confidentiality (Doc. No. 18) and for such other, further

and different relief as may be just.

Respectfully submitted,

RITCHEY & SIMPSON, PLLC

_____

Gregory S. Ritchey, Esquire {ASB-8193-H68G}
Richard S. Walker, Esquire {ASB-8719-L70R}
Counsel for Homes of Legend, Inc. now
known as Champion Homes of Boaz, Inc.,
Champion Home Builders, Co. and
Champion Enterprises, Inc.

OF COUNSEL:
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, AL 35216-3084
Phone:        205.876.1600
Facsimile     205.876.1616

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on the 28th day of _____, 200___, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of the foregoing upon the following:

Jere L. Beasley, Esquire
W. Daniel Miles, III, Esquire
C. Gibson Vance, Esquire
C. Lance Gould, Esquire
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103

Jon D. Pels, Esquire
Lawrence J. Anderson, Esquire
Pels, Anderson & Lee, LLC
4833 Rugby Avenue, 4th Floor
Bethesda, MD 20814

_____
OF COUNSEL

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2              SOUTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5    ALBERT ALLEN, et al.,

6              Plaintiffs,            Case No.:

7    -vs-                             1:06-cv-422-BH-C

8    CHAMPION ENTERPRISES, INC., et al.,

9              Defendants.

10   ----------------------------------/

11   DEPONENT:     DAVID N. GOLTZ, ESQUIRE

12   DATE:         Wednesday, October 25, 2006

13   TIME:         10:00 a.m.

14   LOCATION:     39577 Woodward Avenue,

15                 Room C

16                 Bloomfield Hills, Michigan

17

18   REPORTER:     John J. Slatin, CSR-5180

19                 Certified Shorthand Reporter

20                 (248) 205-7010

21

22              (Appearances listed on page 2)

23

24

25

EXHIBIT
A

```
 1   APPEARANCES:

 2

 3        C. GIBSON VANCE, ESQUIRE

 4        C. LANCE GOULD, ESQUIRE

 5        Beasley, Allen, Crow, Methvin, Portis &

 6        Miles, P.C.

 7        272 Commerce Street

 8        Montgomery, Alabama   36103

 9        (334) 269-2343

10             Appearing on behalf of the Plaintiff.

11

12        GREGORY S. RITCHEY, ESQUIRE

13        Ritchey & Ritchey, P.A.

14        1910 28th Avenue South

15        Birmingham, Alabama   35209

16        (205) 271-3100

17             Appearing on behalf of the Defendants.

18

19

20

21

22

23

24

25
```

1          Wednesday, October 25, 2006

2          Bloomfield Hills, Michigan

3          10:00 a.m.

4                    *       *       *

5     MR. VANCE:  Greg, first of all, let's do a

6  little -- keep this on the record.

7          Let's do a little housecleaning.

8          I'm going to show you, I guess, what is going to be

9  marked as Plaintiffs' Exhibit 1, and it's the Deposition

10  Notice for the Albert Allen case, the Jerry Allen case,

11  the Ralph Brown case, the Robert Ford case, the Terry

12  Deese case and the Nicholas Strickland case, and I guess

13  we just need to agree that his deposition is being taken

14  in all these cases.

15     MR. RITCHEY:  Yeah.  And that's fine, I mean within

16  the parameters of the orders that we have out there.

17     MR. VANCE:  Okay.

18          (Deposition Exhibit No. 1

19          marked for identification.)

20     MR. RITCHEY:  And I have discovery for Albert Allen

21  and Ford, which I'm going to give to ya'll here, and

22  I've got the documents, but -- we don't have a

23  protective order in there yet, but I've got an agreed --

24  let me let you look at this.

25     MR. VANCE:  Are they the same documents that you've

 1   already --

 2        MR. RITCHEY:  There are some that are going to be

 3   different.

 4        But here's what we can do.  That's the motion for

 5   protective order and protective order in Ford, and I've

 6   got the same for Allen, and on the motion, I've just got

 7   a signature line.  If you want to look at that, just see

 8   if that's fine with you.  Basically it's just saying

 9   you'll agree to be bound by them, and then I can give

10   you the documents.

11        MR. VANCE:  Is it the same protective order that

12   we --

13        MR. RITCHEY:  It's the same protective order, other

14   than the signature at the bottom.  What I'll probably do

15   is file it either with or without that signature, and

16   that's just saying that you'll agree to be bound by them

17   in exchange for me giving up the documents early.

18        MR. VANCE:  Are the documents not due yet?

19        MR. RITCHEY:  I think they're due, but --

20        MR. VANCE:  You mean prior to a protective order?

21        MR. RITCHEY:  Prior to the protective order.

22        MR. VANCE:  What documents are different?

23        MR. RITCHEY:  The Redman case has different

24   documents.

25        MR. VANCE:  Redman?

1       MR. RITCHEY:  The Redman case.

2       MR. VANCE:  Right.

3       MR. RITCHEY:  I mean all of them -- they all are

4    Bates-stamped.

5       MR. VANCE:  I guess where we are is, if I don't

6    sign this protective order today, I don't get the

7    documents that are due to me in order to take his

8    deposition which is scheduled today?

9       MR. RITCHEY:  Well, right.

10       MR. VANCE:  Yeah.

11       MR. RITCHEY:  I guess.

12       (Discussion held off the record.)

13       MR. VANCE:  Is this the exact same one we signed

14    before?

15       MR. RITCHEY:  It is.  And if you want to -- if

16    anything is different, you go back to your office and

17    say, "This is different," you let me know.  We'll change

18    it.  Because I --

19       MR. VANCE:  Are you going to give me when I sign

20    this just the documents that are different?

21       MR. RITCHEY:  I'm going to give you all of them.

22       MR. VANCE:  Okay.  Can you show me the ones that

23    are -- I guess when you say "different," they're just

24    specific to Redman?

25       MR. RITCHEY:  Right.

1     MR. VANCE:  Okay.  Can you --

2     MR. RITCHEY:  Like the minutes; the Redman minutes.

3     MR. VANCE:  Okay.

4     MR. RITCHEY:  Those were not --

5     MR. VANCE:  Okay.

6     MR. RITCHEY:  Thank you.

7     MR. VANCE:  Keep those --

8     MR. RITCHEY:  That's going to be a copy for you to

9    look at.

10     All right.  Then I've got PDFs of the Ford, PDFs of

11    the Allen, and then these are the Redman minutes that

12    are not on the disk and have not been Bates-stamped.

13     MR. VANCE:  Okay.

14     MR. RITCHEY:  If you want me to, what I'll do is,

15    when I get back to my office, I'll get them

16    Bates-stamped, e-mail them to you so you can keep them

17    all together if that will be easier for you.

18     MR. VANCE:  Okay.  But on the disk, are those going

19    to be all documents that I've already received in the

20    other cases?

21     MR. RITCHEY:  They're substantially the same, yes,

22    other than what is here.

23     MR. VANCE:  I'm going to reserve the right to

24    re-depose this deponent if, in fact, I go through that

25    disk and I find documents that I would have asked

1  questions about.

2       MR. RITCHEY:  Sure.

3       MR. VANCE:  Okay.  I guess one other housekeeping

4  matter.

5       We can move the deposition along a lot quicker --

6  and I read the deposition you gave in another similar

7  case, the class action case down in Louisiana.

8       As it relates to the authentication of the business

9  records that have been produced, can we agree or can the

10 deponent agree that any documents that were produced by

11 ya'll that are Bates-stamped are business records of the

12 Defendant?

13      MR. RITCHEY:  The documents that we produced?

14      MR. VANCE:  Right.

15      MR. RITCHEY:  Yeah.

16      Do you have any problem?

17      THE WITNESS:  No.

18      MR. VANCE:  So, just for the record, any documents

19 that were produced by the Defendants, and those would be

20 documents that have the Bates stamps, would be business

21 records that were kept in the normal course of business

22 for the Defendant, and it was the normal course of the

23 Defendant to keep such records, and that those documents

24 are, in fact, business records?

25      MR. RITCHEY:  That's fine.

1          And including the minutes we just gave you.

2          MR. VANCE:  Including the minutes that we just

3      received.

4                        *    *    *

5              DAVID N. GOLTZ, ESQUIRE,

6      having been first duly sworn, was examined and testified

7      as follows:

8                        EXAMINATION

9  BY MR. VANCE:

10  Q.   Is that okay?

11  A.   That's fine with me.

12  Q.   Okay.  I'm going to show you what I'm marking as Exhibit

13      2, and ask you if you can identify what that is, please,

14      sir?

15              (Deposition Exhibit No. 2

16              marked for identification.)

17  A.   It appears to be a copy of the Affidavit that I supplied

18      in the Jerry Allen case.

19  BY MR. VANCE:

20  Q.   Okay.  To your knowledge, in the cases I'm deposing you

21      on today, did you give basically the same Affidavit in

22      each case?

23  A.   I believe it is substantially the same.  I don't know

24      that there are significant changes between the various

25      Affidavits.  In substance, I think they're the same.

1        out.   Sorry about that.

2              MR. VANCE:   No.   It's our fault.

3              (Discussion held off the record.)

4              MR. VANCE:   Back on the record.

5    BY MR. VANCE:

6    Q.   Back to our indication if one were to go to the Champion

7         Enterprises, Inc., website and review the 10-K's found

8         on that website, those would be the accurate 10-K's for

9         the years noted?

10   A.   I have no reason to believe that they're not.

11   Q.   Would that be a "yes"?

12   A.   Yes.

13   Q.   Okay.   Where is the home office of Champion Enterprises?

14   A.   Auburn Hills, Michigan.

15   Q.   What's the address; if you know?

16   A.   2701 Cambridge Court.

17   Q.   Where is the home office of Champion Home Builders?

18   A.   Same address.

19   Q.   Where's the home office of Redman Industries?

20   A.   That, I don't know.

21   Q.   Okay.   Where is the home office of Homes of Legend, now

22        Champion Homes of Boaz?

23   A.   Well, there was only one that -- the one, and I believe

24        it was Dennison Road in Boaz, Alabama.   That was the

25        operating office, and certain corporate records are now

1  A.  Yes.

2  Q.  Same question for Redman.

3  A.  It's the same area, yes.

4  Q.  Do these entities -- and for these questions I'm talking

5     about Champion Enterprises, Champion Home Builders and

6     Redman.

7        Do these entities share the same office furniture?

8  A.  There are management agreements that allow Champion

9     Enterprises, Inc., to provide services to Champion Home

10    Builders Co., and then there is a management agreement

11    that provides for Champion Home Builders Co. to provide

12    services to its subsidiaries as well, including

13    furniture, leasing space, employees, services.  Those

14    types of things.

15  Q.  So, would the office furniture at this physical location

16    be shared among the employees for all three of those

17    entities?

18        MR. RITCHEY:  Object to the form.

19  A.  I don't know that they're -- I don't know how to answer

20    that.  I don't know that there's a distinction that this

21    is Redman furniture and this is Champion furniture.

22  BY MR. VANCE:

23  Q.  If we were to walk over to that building now, and

24    there's a receptionist, I assume sitting -- is there a

25    receptionist up front?

1   Q.   Whoever works in that building on those floors, do they

2        share the same copy machines?

3   A.   Whoever works in that building, yes.  And I think that

4        everybody that works in that building is a Champion

5        Enterprises Management Co. employee.

6   Q.   Okay.  Is it true that Champion Enterprises, Inc., for

7        the last five years has had no employees?

8   A.   Champion Enterprises, Inc., did have several employees

9        at one time, and I don't know when that changed.

10  Q.   As we sit here today, do they have any employees?

11  A.   No.

12  Q.   Did they have any in 2005?

13  A.   I don't believe so.

14  Q.   How about 2004?

15  A.   That's right around the time that everybody was

16       consolidated into the Champion Enterprises Management

17       Co. employees.

18  Q.   And who all was consolidated?  I mean not individual

19       names, but what entities were consolidated into that?

20  A.   Since I've been at Champion, there were a couple of

21       people that were paid through Champion Enterprises, Inc.

22       I can't tell you who.  There were some people at the

23       corporate office that were paid by Redman Homes or

24       Redman Industries, one of the two.  There were -- most

25       of the employees were paid at that time prior to

1        Champion Enterprises Management Co. by Champion Home

2        Builders Co.

3            It was around 2003, 2004 that they were all

4        consolidated as employees of Champion Enterprises

5        Management Co.

6    Q.  Does Champion Enterprises, Inc., have any assets?

7    A.  100 percent stock of Champion Home Builders Co.

8    Q.  Other than stock ownership, do they have any assets?

9    A.  I don't think so.  I don't know for sure.

10           MR. VANCE:  Can we take a quick break?

11              (Short recess at 11:02 a.m.)

12                    *    *    *

13              (Record resumed at 11:10 a.m.)

14   BY MR. VANCE:

15   Q.  I'm going to show you the 10-K marked as Plaintiffs'

16       Exhibit 11, and I'm going to refer you to a page at the

17       bottom identified as F-31.

18           Looking at that page, for that year what were the

19       assets shown for Champion Enterprises, Inc.?

20           MR. RITCHEY:  Object to the form.

21   BY MR. VANCE:

22   Q.  Under "Current Assets"?

23   A.  There are no Current Assets shown.

24   Q.  Down below where it says, "Property, Plant and

25       Equipment, net goodwill," for 2005, what does it show?

1    A.    For the parent?

2    Q.    Yes, sir.

3    A.    There is no number.

4    Q.    Okay.  Would that indicate none?

5    A.    Without being an accountant and having had anything to

6          do with this, I would assume so, yes.

7    Q.    Okay.  Further below where it says, "Long-term Debt,"

8          does it show that the long-term debt for the parent in

9          2005 was $89 million, plus?

10   A.    Yes.  $89,273,000.

11   Q.    Do you know why Champion Enterprises incurred that

12         long-term debt?

13   A.    I do not.

14   Q.    Okay.  Who would be the most knowledgeable regarding

15         this document?

16   A.    Regarding this document itself, most likely Rick

17         Hevelhorst, who is the controller.

18              I mean this is a document that is part of the 10-K.

19         It's made public.  It's required by the SEC and the New

20         York Stock Exchange and Sarbanes-Oxley, and it's checked

21         over by third party auditors from PricewaterhouseCoopers

22         or Ernst and Young, which is our current auditing firm.

23              But as far as the information specifically

24         contained in the balance sheet, probably Rick Hevelhorst

25         would be the best person to explain that.

1   Q.   And really you're not that knowledgeable regarding these

2        10-K's, are you?

3   A.   No.  I have a small role in reviewing portions of the

4        10-K basically related to litigation and warranty

5        issues.

6   Q.   Okay.  I'm going to refer you now to -- can I borrow

7        that back from you, please?

8   A.   Sure.

9   Q.   I guess what's marked as page 1, and I'm going to, if

10       you don't mind, ask you a couple of questions.

11            Could you read that first paragraph out loud?

12   A.   Okay.

13            "Established in 1953, Champion

14            Enterprises, Inc., and its subsidiaries

15            collectively, we, Champion, or the company,

16            primarily produce and sell factory built

17            homes.  As of December 31st, 2005, we were

18            operating 32 manufacturing facilities in

19            14 states in the United States and two

20            provinces in western Canada and 20 company

21            owned retail sales locations in California."

22   Q.   Okay.  Does Champion Enterprises, Inc., produce

23        manufactured homes?

24   A.   Itself, no.  It does not.  It's a holding company.

25   Q.   Does it operate 32 manufacturing facilities in the U.S.?

1    A.    Champion Home Builders Co.'s subsidiaries do.

2    Q.    And does it own 20 retail locations in Canada?

3          MR. RITCHEY:   Object.

4    BY MR. VANCE:

5    Q.    Excuse me.

6          In California?

7    A.    The retail locations in California would have been

8          owned -- those were San Jose Advantage Homes facilities,

9          and those are owned by Champion Retail, Inc.

10   Q.    Which is owned by?

11   A.    Champion Home Builders Co.

12   Q.    Which is owned by?

13   A.    Champion Enterprises, Inc.

14   Q.    Would you agree with me you're not the most

15         knowledgeable person regarding corporation financing by

16         and between Champion and its subsidiaries?

17         MR. RITCHEY:   Object to the form.

18   A.    I would agree with that.

19   BY MR. VANCE:

20   Q.    Also, you're not the most knowledgeable regarding

21         capitalization of the entities within the Champion group

22         by Champion Enterprises?

23   A.    I'm not sure exactly what that means, but I would say

24         I'm not the most knowledgeable person, yes.

25         (Discussion held off the record.)

1   BY MR. VANCE:

2   Q.   Would you be the most knowledgeable person to testify

3        regarding the allocation of profit and losses between

4        Champion and its subsidiaries or entities of Champion

5        group?

6            MR. RITCHEY:   Could you read that again?

7   BY MR. VANCE:

8   Q.   Would you be the most knowledgeable person regarding the

9        allocation of profits and losses between Champion and

10       its subsidiary corporations?

11  A.   I would not say that I am the most knowledgeable person

12       on that subject.

13  Q.   Okay.  And who would that be?

14  A.   The allocation of profits and losses issue would --

15       probably Rick Hevelhorst would be most knowledgeable.

16  Q.   I'm going to show you what's being marked as Plaintiffs'

17       Exhibit 12.

18            (Deposition Exhibit No. 12

19            marked for identification.)

20  BY MR. VANCE:

21  Q.   And I'll ask you to identify that, if you would, please?

22  A.   It's the May 3rd, 2005 Champion Enterprises, "Corporate

23       Governance Guidelines."

24  Q.   And what is the purpose of such guidelines?

25  A.   Well, there are several issues relating to how the

1    business should be operated.

2            These are guidelines that are not only good

3    business in corporate practice, but I believe that they

4    are either recommended and/or mandated by SEC

5    regulations, Sarbanes-Oxley and other corporate

6    guidelines and regulations.

7  Q.  And this document applies to Champion Enterprises, Inc.?

8  A.  Yes.

9  Q.  And anybody else?

10  A.  These are the Board of Directors' guidelines for

11    Champion Enterprises, Inc.

12            I don't know that they apply to anybody else.  I'm

13    not sure what you mean by "apply."

14  Q.  I mean do you know of any other company or entity that

15    these Corporate Governance Guidelines apply to?

16  A.  No.  The other subsidiaries -- Champion Home Builders

17    Co. and the subsidiaries of Champion Home Builders Co.

18    will have their own Bylaws and Articles of Incorporation

19    that govern them, but I don't believe they have separate

20    Corporate Governance Guidelines like this.

21  Q.  So, would these Corporate Governance Guidelines be the

22    corporate governing guidelines for Champion Home

23    Builders and their subsidiaries?

24  A.  No.  I believe this is directed to Champion Enterprises,

25    Inc.

1          restructuring plans that include the closing

2          of manufacturing plants, retail locations or

3          other facilities owned or leased by the

4          corporation and its subsidiaries, the closed

5          facilities and..."

6  Q.   Do you know what they were talking about there?

7  A.   I do not.  I was not in attendance at this meeting.

8  Q.   The paragraph above that says:

9              "Mr. Young then discussed the sale of

10         various facilities in light of the company's

11         restructuring activities."

12         Do you know who Mr. Young is?

13  A.   I'm sure that it's Walter Young, the former CEO of

14  Champion Enterprises.

15  Q.   And in 2002, did Champion Enterprises, Inc., own any

16  facilities?

17  A.   This meeting minute is from September 9th of 2002.

18         It may have.  I don't know what the exact corporate

19  structure was in 2002.

20  Q.   Okay.

21  A.   It was around that time when Champion Home Builders Co.

22  became the only wholly owned subsidiary of Champion

23  Enterprises, Inc.

24         I think it was either in late 2001 or 2002.

25  Q.   Okay.

1   A.   Before that, Champion Enterprises, Inc., had direct

2        subsidiaries that it owned.

3   Q.   But clearly by 2003, Champion Enterprises, Inc., did not

4        own any facilities, whether they be manufacturing plants

5        or retail operations?

6   A.   By 2003 the only thing that Champion Enterprises, Inc.,

7        owned is Champion Home Builders Co.

8   Q.   I'm going to show you what's being marked as Plaintiffs'

9        Exhibit Number 14.

10                (Deposition Exhibit No. 14

11                marked for identification.)

12  BY MR. VANCE:

13  Q.   I'll ask you, if you would, to identify that?

14  A.   It appears to be meeting minutes from September 4th of

15       2003, as well as attached to it are some for October

16       25th of 2005.

17  Q.   And that is for Champion Enterprises, Inc.; correct?

18  A.   Correct.

19  Q.   Okay.  At the bottom of that first page it says:

20                "Whereas the corporation has received

21            and reviewed a consolidation plan (the

22            consolidation plan) covering certain of the

23            companies plants and retail sales centers..."

24            And it reads on.

25            Let me ask you, Champion Enterprises, Inc., didn't

```
 1   A.   Yes.

 2   Q.   South Carolina?

 3   A.   I believe so.

 4   Q.   Who is Mr. Jarvis employed by?

 5   A.   Champion Home Builders Co., I believe.

 6   Q.   Mr. Williams, in his capacity as President of

 7        Manufacturing for Champion Enterprises, directly

 8        supervises Mr. Paul Jarvis; correct?

 9   A.   Yes.  That's who he reports to.

10   Q.   Okay.  Does B.J. Williams have a position with Champion

11        Home Builders?

12   A.   He may have an officer position with Champion Home

13        Builders.  I'm not sure.

14   Q.   Okay.  What is a "general manager" as referred to in

15        this paragraph?

16   A.   They are the person responsible for managing the

17        day-to-day operations of an individual manufacturing

18        facility.

19   Q.   Such as the ones owned by Redman?

20   A.   Yes.

21   Q.   And the ones owned by Champion Homes of Boaz?

22   A.   Yes.

23   Q.   Okay.  Is he the plant manager?

24   A.   Plant manager.

25   Q.   Okay.  And the plant manager is directly supervised by
```

1      the President of Manufacturing for Champion Enterprises,

2      Inc.?

3  A.  Maybe indirectly.  I think the reporting requirements

4      actually go with the general manager -- or the plant

5      manager to the regional president, and then the regional

6      president to the president, B.J. Williams.

7  Q.  But pursuant to this document, Mr. Williams has

8      supervisory responsibility for the general managers?

9  A.  Yes.

10 Q.  Could Mr. Williams tell the general manager how to

11     manufacture the homes?

12        MR. RITCHEY:  Object to the form.

13 A.  Could he?

14 BY MR. VANCE:

15 Q.  Yes, sir.

16 A.  He could, but I don't think he does or would.

17 Q.  But he has the power to do that?  The authority?

18 A.  Well, I suppose he has the power, but there are also

19     other issues that need to be complied with.  Obviously

20     if it's a HUD code home, you have to comply with the HUD

21     code.

22        So, Mr. Williams wouldn't have the authority to

23     tell him to build a house that didn't comply with the

24     HUD code.

25 Q.  Right.

1          But within reason, the plant managers, or the

2     general managers as they're entitled here, has to do

3     what Mr. Williams tells them to do?

4          MR. RITCHEY:   Object to form.

5   A.   I don't think that that says that, and I don't know that

6        that -- that's certainly not the way that it operates

7        day-to-day.

8   BY MR. VANCE:

9   Q.   But clearly Mr. Williams has supervisory responsibility

10       over the general manager?

11  A.   Yes.

12  Q.   Who would be a V.P. of Engineering?

13          What is a V.P. of Engineering?

14  A.   The only V.P. of Engineering that I'm aware of is Bill

15       Stamer.

16  Q.   Who is he employed by?

17  A.   Champion Enterprises Management Co.

18  Q.   And what is his job?

19  A.   In general, he provides engineering services to Champion

20       Home Builders Co. and it's subsidiaries as requested or

21       needed.

22  Q.   And he reports to B.J. Williams?

23  A.   Yes.

24  Q.   Does the V.P. of Engineering instruct the different

25       facilities on how they need to manufacture homes from an

1          engineering perspective?

2     A.   Well, each of the plants has a DAPIA, Design Approved

3          Product --

4               MR. RITCHEY:  Primary Inspection.

5     A.   Primary Inspection Agency.

6               So, there's a third party engineering facility that

7          approves its drawings and plans.  The Vice President of

8          Engineering doesn't direct that for each of the

9          subsidiaries.

10    BY MR. VANCE:

11    Q.   Do the different facilities have engineers at the

12         facility?

13    A.   I believe so.

14               Not all of them have a professional engineer.  Some

15         of them have an "engineer" that would be involved in

16         design and with CAD drawings and other compliance with

17         engineering requirements.

18    Q.   And who would they report to?

19    A.   To the Vice President of Engineering.

20    Q.   So, any facility like Redman or Champion Homes of Boaz

21         that has an engineer in the facility, they would

22         directly report to the Vice President of Engineering?

23               MR. RITCHEY:  Object to the form.

24    A.   I think it would be a dotted line direct.

25    BY MR. VANCE:

1   A.    That's what it says, yes.

2   Q.    Do you know that to be accurate?

3   A.    I do not know that to be accurate currently.  I mean I

4         presume that's what the situation was in 2004.  I don't

5         know how many plants he currently has responsibility

6         over.

7   Q.    But Mr. Jarvis as of today supervises certain plants in

8         the Southern Region?

9   A.    Yes.

10  Q.    And he reports to Mr. Williams; correct?

11  A.    Yes.

12  Q.    Would you agree that the CEO of Champion Enterprises

13        makes day-to-day decisions that directly affect the

14        manufacturing activities of the subsidiaries?

15  A.    No.

16  Q.    Why not?

17  A.    The day-to-day manufacturing decisions are made by the

18        plant managers.

19  Q.    That report to who?

20  A.    That report to Paul Jarvis and to B.J. Williams.

21  Q.    And B.J. Williams ultimately reports to who?

22  A.    The CEO.

23  Q.    Okay.  Could the CEO of Champion Enterprises make

24        day-to-day decisions for the subsidiary facilities?

25        Does he have that authority?

1         delegation of authority and -- you know, would he, as

2         opposed to does he, I don't know.

3 Q.    I guess my ultimate question is this:  We've established

4         several times that the CEO of Champion Enterprises,

5         Inc., is at the top of the chain that flows directly to

6         the general managers of the facilities, and my question

7         is, if the CEO wants to make a decision that is a legal,

8         lawful decision within his responsibility given to him

9         by the Bylaws that that directly affects the subsidiary

10         manufacturing plants, can he make that decision?

11         MR. RITCHEY:  Object to the form.

12 A.    Well, you're leaving out -- there's a couple of issues,

13         I think, with your question.

14         The CEO reports to the Board of Directors.  So, I

15         don't think that the CEO is going to do anything that he

16         doesn't have authority within the Bylaws or the like to

17         do outside of a Board of Directors approval.  And, two,

18         it's basically a dotted line reporting relationship

19         between the plant manager and the CEO.

20         But assuming the rest of your hypothetical, the

21         compliance and everything else, I suppose that's a

22         possibility.  It's not a practical probability, though.

23 BY MR. VANCE:

24 Q.    Okay.  If the CEO made the decision to cut production in

25         half in a facility owned by Redman or Homes of Legend,

1        could he make such a decision?  Would they honor his

2        decision?

3                MR. RITCHEY:  Object to the form.

4    A.   I don't know.

5                    (Deposition Exhibit No. 18

6                    marked for identification.)

7    BY MR. VANCE:

8    Q.   Plaintiffs' Exhibit 18, could you identify this

9        document, please?

10   A.   It's a "Job Description" for general managers, which are

11       the plant managers we talked about before.

12   Q.   Who do you supervise?

13   A.   I have two people that report to me.

14   Q.   And what are their titles?

15   A.   One is Corporate Counsel.

16   Q.   And the other?

17   A.   Litigation Manager.

18   Q.   Do they have people that report to them?

19   A.   We have an administrative assistant that works for all

20       of us that I guess in theory reports to them.

21   Q.   The administrative assistant that reports to those two

22       individuals, are you also responsible for the

23       administrative assistant?  Supervising them?

24   A.   Yes.

25   Q.   So, you can tell that person what to do?

1          Sarbanes-Oxley, and it was provided to the subsidiaries

2          through the management agreements.

3    Q.    Right.

4          But my question is, this document shows that

5          Champion Enterprises, Inc., is giving a job description

6          for the general managers of the manufacturing facilities

7          of their subsidiaries?

8          MR. RITCHEY:  Asked and answered.

9    A.    Of Champion Enterprises -- the subsidiaries of Champion

10         Enterprises, Inc., yes.  This would be for Champion Home

11         Builders Co. and Champion Home Builders Co. subsidiaries

12         that are involved in plant manufacturing.

13   BY MR. VANCE:

14   Q.    And if a general manager did not follow this job

15         description, they would in fact be in violation of

16         Champion Enterprises, Inc.'s, job description; correct?

17   A.    If they violated the job description?

18   Q.    Yes, sir.  If they didn't follow it.

19   A.    Then it would be in violation of the job description.

20   Q.    All right.  Who do you say the Vice President of

21         Engineering is?

22   A.    Bill Stamer.

23   Q.    Would Mr. Stamer be ultimately responsible for the

24         engineering done in each of the facilities of the

25         subsidiaries?

1              MR. RITCHEY:  Object to the form.

2    A.   No.   Each of the plants would be responsible ultimately

3         for their individual plant, because each of the

4         subsidiaries, the various subsidiaries have different

5         third party DAPIAs that they are responsible for

6         reporting to.

7    BY MR. VANCE:

8    Q.   But each separate facility as it relates to engineering

9         issues, do they not report those issues to the Vice

10        President of Engineering?

11   A.   Under the management agreement that I referenced before,

12        Champion provides the subsidiaries with engineering

13        services, just as they provide them with my legal

14        services and purchasing services that we talked about

15        before.  But each individual entity is responsible

16        legally for its own actions.

17              (Deposition Exhibit No. 19

18              marked for identification.)

19   BY MR. VANCE:

20   Q.   Exhibit Number 19, can you identify this, please?

21   A.   This is one of the Management and Administrative

22        Services Agreements that I referenced before.

23           This is actually one dated December 30th, 2002

24        between Champion Home Builders Co. and Homes of Legend.

25   Q.   Who owns Champion Management Co.?

1          geographic information and get the results similar to

2          that found on page four?

3                    MR. RITCHEY:  Object to form.

4    A.    It is an interactive website that allows a consumer to

5          punch in geographic information to find out what types

6          of homes might be available in the geographic area,

7          either from subsidiaries of Champion Home Builders Co.

8          or I believe there's a retailer site that directs the

9          consumer to an independent retailer within their area

10         where they could go and find out more information about

11         Champion Home Builders' or its subsidiary's home.

12   BY MR. VANCE:

13   Q.    And just to be clear, as you can see from page three,

14         the geographic area here was Montgomery, Alabama;

15         correct?

16   A.    Yes.

17   Q.    So, based on what you just said, would you agree that

18         Champion Enterprises, Inc.'s, website allows a person in

19         Alabama to go in, put in the geographical information,

20         such as Montgomery, Alabama, and the website would show

21         the person using the website that entered the

22         information a listing of homes produced by their

23         subsidiaries that can be found in an area around or in

24         Montgomery, Alabama?

25                   MR. RITCHEY:  Object to the form.

1   A.   Yes.

2   BY MR. VANCE:

3   Q.   Okay.  And then you mention the retailers.  I'm going to

4        show you the page where it says, "Find a retailer."

5             The same question.

6             Could a person in Montgomery, Alabama go to the

7        Champion Enterprises, Inc., website, request the

8        location of the retailer of Champion Enterprises or its

9        subsidiaries in or around Montgomery, Alabama, and get a

10       result similar to the result we got here?

11            MR. RITCHEY:  Object to the form.

12  A.   Yes.

13            The only caveat I would say is that these are

14       independent retailers.  These aren't Champion owned

15       retailers.  These are independent retailers that sell

16       Champion Home Builders or other subsidiary product.

17                 (Deposition Exhibit No. 23

18                 marked for identification.)

19  BY MR. VANCE:

20  Q.   Okay.  Exhibit 23, can you identify that for me, please,

21       sir?

22  A.   Okay.

23  Q.   What is that, sir?

24  A.   This is a list of independent retailers that were -- was

25       created in response to one of the discovery requests in

1      the Allen case.

2   Q.  These are independent retailers that have entered into

3       agreements with Champion Enterprises to be independent

4       retailers that sell Champion product?

5   A.  No.

6   Q.  What is it?  Help me out.

7   A.  If you look on the far right side, the "Original

8       Company," that would show the entity with whom the

9       agreement was entered into.  "CHB" would be Champion

10      Home Builders Co.  "Redman" is obviously Redman Homes.

11      "HOM" is Homes of Merit.  There's, "Grand Manor."

12          Those are the entities that entered into a retail

13      agreement with the individual retailer or d/b/a that's

14      listed on the far left-hand side of the document.

15  Q.  And those are all subsidiaries of Champion Enterprises

16      on the right-hand column?

17  A.  No.  Only Champion Home Builders is a subsidiary of

18      Champion Enterprises.

19  Q.  And the others would be subsidiaries of Champion Home

20      Builders; correct?

21  A.  Correct.

22  Q.  And could one find the locations of these facilities by

23      going to the Champion Enterprises, Inc., website?

24          MR. RITCHEY:  Object to form.

25  A.  If they're currently active with Champion Home Builders

1      Champion Home Builders or any of the subsidiaries of

2      Champion Home Builders.

3                 (Discussion held off the record.)

4                 (Short recess at 12:36 p.m.)

5                         *     *     *

6                 (Record resumed at 12:41 p.m.)

7            MR. VANCE:  Greg, I want to withdraw as an Exhibit

8      Number -- I believe it's Number 5.

9            I'm withdrawing Plaintiffs' Exhibit 5 as an

10     exhibit.

11           That's all I have.

12                      *     *     *

13                      EXAMINATION

14     BY MR. RITCHEY:

15     Q.   Greg Ritchey.  I represent Champion Enterprises.

16          Other than registering the domain name

17     championhomes.net, does Champion Enterprises, Inc., do

18     anything else with the website?

19     A.   The website was created and is maintained by a gentleman

20     named Paul Paruji(ph).

21     Q.   Who is his employer?

22     A.   Champion Enterprises Management Co.

23     Q.   So, anything that's on that website would have been, I

24     guess, developed or inputted by a representative from

25     Champion Enterprises Management Co.?

1   A.    That's correct.  It's administered and provided as a

2         service to Champion Enterprises, Inc., through the

3         management and services agreements that we talked about

4         earlier.

5              MR. RITCHEY:  Okay.  I have no further corrections.

6              MR. VANCE:  Thank you.

7              THE REPORTER:  I'm sorry.  Mr. Gibson(sic), do you

8         want to order the transcript?

9              MR. VANCE:  Yes.

10             THE REPORTER:  Thank you.

11             Mr. Ritchey?

12             MR. RITCHEY:  Yes.

13             THE REPORTER:  Thank you.

14             (Deposition concluded at 12:47 p.m.)

15                         *    *    *

16

17

18

19

20

21

22

23

24

25

1  STATE OF MICHIGAN )

2  COUNTY OF OAKLAND )

3              CERTIFICATE OF NOTARY PUBLIC

4       I do hereby certify that the witness, whose

5  attached testimony was taken in the above matter, was

6  first duly sworn to tell the truth; the testimony

7  contained herein was reduced to writing in the presence

8  of the witness by means of stenography; afterwards

9  transcribed; and is a true and complete transcript of

10  the testimony given.

11  I further certify that I am not connected by blood or

12  marriage with any of the parties; their attorneys or

13  agents; and that I am not interested, directly or

14  indirectly, in the matter of controversy.

15       In witness whereof, I have hereunto set my

16  hand this day at Farmington, Michigan, County of

17  Oakland, State of Michigan.

18

19

20  _____

21  John J. Slatin, CSR-5180

22  Certified Shorthand Reporter

23  Notary Public, Oakland County, Michigan

24  My commission expires:  July 25, 2011

25

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NUMBER

1:06-CV-643-MHT


TERRY DEESE,

     Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al.,

     Defendant(s).


DEPOSITION TESTIMONY OF:

TERRY DEESE


November 28, 2006

9:45 a.m.


COURT REPORTER:

DEBORAH B. TOWNSEND, CSR



ORIGINAL

American Court Reporting
toll-free (877) 320-1050

Page 2

1           S T I P U L A T I O N

2               IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel that the deposition of TERRY DEESE, may

5    be taken before Deborah B. Townsend, Certified

6    Shorthand Reporter and Notary Public, State at

7    Large, at the offices of BEASLEY, ALLEN, CROW,

8    METHVIN, PORTIS & MILES, Montgomery, Alabama, on

9    November 28, 2006, commencing at approximately

10   9:45 a.m.

11              IT IS FURTHER STIPULATED AND

12   AGREED that the signature to and the reading of

13   the deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws

16   and rules of Court relating to the taking of

17   depositions.

18              IT IS FURTHER STIPULATED AND

19   AGREED that it shall not be necessary for any

20   objections to be made by counsel to any

21   questions, except as to form or leading

22   questions, and that counsel for the parties may

23   make objections and assign grounds at the time

Page 3

1    of trial or at the time said deposition is

2    offered in evidence, or prior thereto.

3                In accordance with Rule 5(d) of

4    the Alabama Rules of Civil Procedure, as

5    amended, effective May 15, 1988, I, Deborah B.

6    Townsend, am hereby delivering to Gregory S.

7    Ritchey the original transcript of the oral

8    testimony taken November 28, 2006, along with

9    exhibits.

10               Please be advised that this is the

11   same and not retained by the Court Reporter, nor

12   filed with the Court.

13

14

15                   EXAMINATION INDEX

16

     TERRY DEESE

17

18       BY MR. RITCHEY                      8

19

20

21

22

23

American Court Reporting
toll-free (877) 320-1050

Page 6

1          A P P E A R A N C E S

2

3    FOR THE PLAINTIFF(S):

4          C. Gibson Vance, Esquire

5          BEASLEY, ALLEN, CROW, METHVIN,

6          PORTIS & MILES

7          218 Commerce Street

8          Montgomery, Alabama   36104

9

10

11   FOR THE DEFENDANT(S):

12          Gregory S. Ritchey, Esquire

13          RITCHEY & RITCHEY

14          1910 28th Avenue South

15          Birmingham, Alabama   35209

16

17

18   ALSO PRESENT:

19          DAWN DEESE

20

21

22

23

Page 7

```
 1            I, Deborah B. Townsend, a Certified

 2    Shorthand Reporter of Birmingham, Alabama, and a

 3    Notary Public for the State of Alabama at Large,

 4    acting as Commissioner, certify that on this

 5    date, pursuant to the Federal Rules of Civil

 6    Procedure, and the foregoing stipulation of

 7    counsel, there came before me at the offices of

 8    BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,

 9    Montgomery, Alabama, commencing at approximately

10    9:45 a.m. on November 28, 2006, TERRY DEESE,

11    witness in the above cause, for oral

12    examination, whereupon the following proceedings

13    were had:

14

15

16

17                    THE REPORTER:   Usual

18    stipulations?

19                    MR. VANCE:   Please.

20                    MR. RITCHEY:   Yes.

21

22

23
```

Page 8

1                    TERRY DEESE,

2    After having first been duly sworn, was examined

3    and testified as follows:

4                    EXAMINATION

5    BY MR. RITCHEY:

6         Q.     Can you state your full name for

7    me, please?

8         A.     Terry Wayne Deese.

9         Q.     And, Terry, I -- Is it okay if I

10   call you Terry?

11        A.     Fine.

12        Q.     I'm Greg Ritchey.  I represent

13   Homes of Legend, which is now known as Champion

14   Homes of Boaz; Champion Enterprises, Inc., and

15   also Champion Home Builders, the three

16   defendants in this case.

17        Have you ever given a deposition before?

18        A.     No.

19        Q.     You obviously have just gotten

20   sworn in to tell the truth, the whole truth, and

21   nothing but the truth.  Obviously, you've heard

22   those terms before.  We're only here seeking the

23   truth, so to speak.

Page 9

1          A.       Right.

2          Q.       I will ask you a series of

3    questions to which you'll have to respond out

4    loud.  She can't get the up-and-down motions.

5    She can note them, but it doesn't show up well.

6    So I may have to ask you to come forward with

7    some answer.

8          A.       Right.

9          Q.       Okay.  If I ask a question that

10   you don't understand or you don't -- or it's two

11   questions or it's so convoluted you can't figure

12   out what I'm trying to ask, say, please stop and

13   rephrase the question.

14         A.       Okay.

15         Q.       I can do that.  It's no problem.

16   Don't feel bad if you -- if I've said something

17   that you just don't understand.  There may be a

18   term out there that I might know that you may

19   not know, just as you may know many terms I

20   don't know about.  So if you'll just ask me to

21   use a different term or different sentence with

22   it, I'll be glad to do that for you.  Okay?

23         A.       Okay.

Page 10

1     Q.     However, if I do ask a question

2  and you do respond, I'm going to take it as that

3  you understood the question and you responded to

4  it properly.  Is that fair enough?

5     A.     That's fair.

6     Q.     Can you give me your home address?

7     A.     It's 3393 Hunter Road, Columbia,

8  Alabama  36319.

9     Q.     Columbia?

10    A.     Columbia, C-O-L-U-M-B-I-A.

11    Q.     And the home that's made the

12 subject of this lawsuit, is it located at this

13 address?

14    A.     It's actually at 3321.

15    Q.     3321.  Henry Road?

16    A.     Hunter Road.

17    Q.     Do you just receive mail at a

18 different --

19    A.     My mother-in-law actually lives in

20 the home.

21    Q.     Your mother-in-law lives in the

22 home.  Have you ever lived in the home?

23    A.     (Witness shakes head.)

Page 11

1      Q.      Is that a no?

2      A.      No.

3              MR. VANCE:   You need to speak

4   up just a little bit.

5      Q.      Who is your mother-in-law?

6      A.      Sheila Enfinger.

7      Q.      Sheila -- Can you --

8      A.      Enfinger, E-N-F-I-N-G-E-R.

9      Q.      And you do not and have never

10  lived in this particular house?

11     A.      No.

12     Q.      Is that yes, you've never lived in

13  it?

14     A.      I've never lived in the home.

15     Q.      Has she lived in it since it was

16  purchased?

17     A.      Yes.

18     Q.      Did you purchase it for her?

19     A.      Yes.

20     Q.      Is she paying you back?

21     A.      No.

22     Q.      This is just a gift for her?

23     A.      Right.

Page 12

1      Q.      Can you give me a little bit of

2  your educational background?

3      A.      Twelve years of high school and

4  about two and a half years of college at Troy

5  State University, Dothan.

6      Q.      Did you graduate from Troy State?

7      A.      No, never did graduate.

8      Q.      You said twelve years of high

9  school, but you meant twelve years of grade

10  school?

11      A.      Right.

12      Q.      Certainly didn't spend twelve

13  years in high school.

14      A.      Four years of high school.

15      Q.      You can read and write?

16      A.      Yes.

17      Q.      We had originally noticed this

18  deposition -- I'm going to show you a copy of

19  the renotice of taking of deposition and ask if

20  you've seen this before.  Have you seen that

21  before?

22      A.      Yes.

23      Q.      I've also received responses to

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1    discovery.  Why don't we do this:  Let me -- I'm

2    going to mark this notice of deposition as

3    Defendant's Exhibit 1.

4         And I'm going to show you what I've

5    marked as Defendant's Exhibit 2 and see if you

6    recognize that.  It's entitled plaintiff's

7    response to defendant Homes of Legend, Inc.'s

8    first request for production of documents and

9    first request for admissions.

10             (WHEREUPON, Defendant's Exhibit

11   Numbers 1 and 2 were marked for identification

12   and are attached to the original transcript.)

13        A.       Yes.

14        Q.       Are all those responses true and

15   correct, to the best of your knowledge?

16        A.       To the best of my knowledge, yes.

17        Q.       I don't have signed responses, so

18   I'm going to ask you to go ahead and sign

19   these.  There are a couple of places, I think,

20   for you to sign.

21        Well, let me do this:  The signature

22   lines aren't there, but if you will, I'm going

23   to get you to sign at the end of interrogatories

**www.AmericanCourtReporting.com**
**November 28, 2006**

Page 14

1    where I've drawn the line on page 11 at the end

2    of the request for admissions on page 12 where

3    I've also drawn a line.  And as far as the

4    request for -- Let's see.

5           Actually, I take that back.  Here we go.

6    On page 11, I believe that is at the end of the

7    request for production.  And then there's

8    another page 11 at the back which is the back of

9    the interrogatories.  If I could just get you to

10   sign there too.

11                  MR. VANCE:  Off the record.

12                  (Off-the-record discussion.)

13         Q.      I understand that we're getting --

14   You signed the interrogatories and request for

15   production and request for admissions this

16   morning?

17         A.      Yes.

18         Q.      Did you also do it for the

19   plaintiff's responses to defendant Champion Home

20   Builders Company's first interrogatories, which

21   is marked as Defendant's Exhibit 3, also the

22   request for production and first request for

23   admissions from Champion Homes Builders, which

Page 15

1    was marked as Exhibit 4, as well as the same for

2    Champion Enterprises, which are marked as

3    Defendant's 5 and 6?  Did you sign those two?

4                    (WHEREUPON, Defendant's Exhibit

5    Numbers 3 thru 6 were marked for identification

6    and are attached to the original transcript.)

7                    MR. VANCE:  I think she has

8    two of them coming.  Let's see in just a second

9    what she has coming.  We may have to get another

10   one done, but we'll certainly do whatever you

11   need us to.

12                   MR. RITCHEY:  Okay.

13                   MR. VANCE:  You'll leave here

14   with them.

15                   MR. RITCHEY:  Why don't we --

16   Is she going to give me a --

17                   MR. VANCE:  Yeah.  She's

18   notarizing it right now.

19                   MR. RITCHEY:  And the copy is

20   coming in?

21                   MR. VANCE:  Yeah.

22                   MR. RITCHEY:  We'll just

23   substitute those copies, if that's okay with

Page 16

1     you.

2                    MR. VANCE:  Super.

3                    MR. RITCHEY:  And that will

4     save us some time.  Let's put these here for

5     right now.

6          Q.     The only document we show that was

7     produced was part of the documents that were --

8     or a single document that was produced in

9     response to Homes of Legend's first request for

10    production of documents, which is the -- which

11    is labeled Deese 001.  Is that the only document

12    you got at closing of this house?

13         A.     I think so.

14         Q.     Did you finance the house?

15         A.     No.

16         Q.     Just paid cash for it?

17         A.     Paid cash for it.

18         Q.     Do you have the back side of this

19    contract?

20         A.     I'm not sure.

21         Q.     Do you have the original here?

22         A.     I don't know.

23         Q.     Who has the original?

Page 35

1    called it in.

2          A.      I think we did.

3          Q.      Okay.

4          A.      Because we got it fixed, but we

5    didn't fill the form out.

6          Q.      All right.  Can I direct your

7    attention back to Defendant's Exhibit Number 2,

8    the request for production, and specifically

9    two, four, six, nine, ten and 30?  And I guess

10   my question will be:  Do I now have everything

11   that you have concerning this particular home in

12   response to those requests?

13         A.      Yes.  To the best of my knowledge.

14         Q.      Okay.  Now, you had mentioned that

15   prior to the sale, you had pointed out some

16   things that the dealership needed to fix.

17         A.      Yes.

18         Q.      Okay.  In response to number 11,

19   do you have any documents or any other writings

20   with regard to those statements or those items

21   that you pointed out?

22         A.      No.

23         Q.      Okay.  And then for number 12, as

Page 46

1      Q.     Okay.  Do you personally have any

2  information that supports any contention that

3  either Champion Enterprises or Champion Home

4  Builders built or designed or manufactured the

5  subject home?

6      A.     What do you mean by --

7      Q.     There are allegations in the

8  complaint that Champion Home Builders and

9  Champion Enterprises designed or built the

10  subject home.  Do you have any independent

11  knowledge of that?

12      A.     I know there's Homes of Legend is

13  the subsidy of --

14      Q.     Subsidiary?

15      A.     Yes.

16      Q.     Other than that, do you have

17  anything that leads you to believe that either

18  Champion Enterprises, Inc. or Champion Home

19  Builders built the home or designed it?

20           MR. VANCE:  You're just

21  talking about his independent -- He's just

22  asking you what you know.

23      A.     What I know?

Page 47

```
1          Q.      Yeah.

2          A.      I just know it's a subsidiary.  I

3   don't know if they actually -- I know Homes of

4   Legend is on the home itself.

5          Q.      Do you understand that Homes of

6   Legend was the one that built the home?

7          A.      That's what I assumed, yes.

8          Q.      There's some other allegations in

9   the complaint, and if you don't mind, I'm going

10  to just go over them.  You may not have any

11  independent knowledge, but there's some things

12  I'm going to have to ask you that I just have to

13  ask you.  Okay?

14         A.      Okay.

15         Q.      Do you have any information to

16  support your contention that either Champion

17  Homes Builders or Champion Enterprises knew of

18  any alleged defect in the design of the

19  manufactured home that was sold in this

20  particular area?

21         A.      You mean, like the one -- the

22  forms -- these forms or --

23         Q.      Well, what I'm -- Just to be fair,
```

Page 48

1    I'm going to give you a copy of the complaint.

2    I'm looking at 13, 14, going from there, and my

3    question to you is:  Do you have any knowledge

4    on your own that supports any of the contentions

5    that are contained in paragraph 13 of the

6    complaint with regard to Champion Enterprises or

7    Champion Home Builders?

8         A.        Okay.  Restate the question.

9         Q.        Do you have anything independently

10   on your own that supports the allegations

11   contained in paragraph 13 of the complaint?

12        A.        Me personally?

13        Q.        Yes, sir.

14        A.        As far as I know, I just know

15   Homes of Legend built the home.

16        Q.        Do you have any -- anything that

17   we don't have before us that supports your

18   belief that the defendants had known of a defect

19   in design or manufacture of the home that was

20   sold in this state, basically your home?

21        A.        Like that's not presented here?

22        Q.        Yeah.  That's other than what you

23   produced here.

Page 49

1            MR. VANCE:  And other than
2    what you and I may have talked about.
3    Basically, what he's doing is he's going to go
4    through that complaint, which you didn't draft
5    because you're not a lawyer and you don't have a
6    legal background, and ask you if you have
7    independent knowledge about that.  And as fair
8    or unfair as that may be, you just answer what
9    you know about and what you don't know about.
10        A.     Okay.
11        Q.     Do you have any independent
12   knowledge?
13        A.     No.
14        Q.     Do you have anything to support
15   your contention that either Champion Home
16   Builders or Champion Enterprises lobbied HUD to
17   allow waiver of the HUD code as alleged in the
18   complaint?
19        A.     I just know what is in the
20   paperwork.
21        Q.     Do you have any independent
22   knowledge of that?
23        A.     No.

Page 50

1        Q.        Do you have anything to support

2   that that we don't have before us?

3        A.        No.

4        Q.        Do you have anything that you

5   claim supports your contention that either

6   Champion Home Builders or Champion Enterprises

7   disingenuously alleged that it was impractical

8   to comply with the waiver?

9        A.        Restate that.

10       Q.        Okay.  You want me to show you

11  what I'm looking at?  Again, I'll try to be fair

12  with you.  I'm not trying to ask trick

13  questions, but I've got -- we all have our

14  duties, so to speak.

15       All right.  In paragraph 14, basically,

16  you've alleged that either Champion Enterprises

17  or any of the defendants disingenuously alleged

18  that it was impractical to comply with the

19  waiver.  Do you have anything to support that?

20       A.        Personally?

21       Q.        Yes, sir.

22       A.        Just what's provided.

23       Q.        Only what's provided.  Do you have

Page 51

1    anything else?

2         A.      No.

3         Q.      Do you have anything that supports

4    your claims that any of the defendants sold

5    homes to consumers in the Gulf Coast region

6    without informing them of a known defect and to

7    choose profit over conscience, which was, again,

8    alleged in your complaint at number 14, the last

9    sentence?

10        A.      I don't have any -- I mean, I

11   have -- they've told me about it.

12        Q.      Who is they?

13        A.      The ones that did the test and the

14   paperwork.

15        Q.      Okay.  Can you tell me what they

16   told you?  These are those -- Is that Roy Bonney

17   or Bobby Parks?

18        A.      Bobby Parks.

19        Q.      What did he say?

20        A.      I asked them exactly what they

21   were looking for, and they were going on about

22   how the vinyl walls on the inside are a moisture

23   barrier on the inside instead of the outside,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 52

1    basically.

2         Q.       Anything else?

3         A.       That's basically it.

4         Q.       Okay.

5         A.       And we were wondering why the

6    bathroom wall had a stain on it, and he said it

7    was due to mildew inside the wall.

8         Q.       Okay.  Anything else?

9         A.       (Witness shakes head.)

10        Q.       And that's all that you would have

11   to support that last statement?

12        A.       Can you read it again?

13        Q.       Okay.  Anything that supports your

14   contention that any of the defendants sold homes

15   to consumers in the Gulf Coast region without

16   informing them of an alleged known defect and to

17   choose profit over conscience.

18        A.       One more time, please.

19        Q.       Okay.  I'll just pretty much try

20   to paraphrase what's in paragraph 14.  But

21   again, anything that you claim supports your

22   contention that any of the defendants sold homes

23   to consumers in the Gulf Coast region without

Page 53

1    informing them of an alleged known defect and

2    thus them choosing profit over conscience?

3         A.    Okay.  Everything, as far as I

4    know, has been presented.

5         Q.    Do you have anything that supports

6    the contention that, despite a reasonable

7    opportunity and repeated complaints by countless

8    individuals, that the defendants merely, at

9    most, offered to replace gypsum wallboard on

10   occasion?

11        A.    In some of the paperwork, it

12   mentions that they have.

13        Q.    What paperwork are you talking

14   about?

15        A.    It seems like I've read it

16   before.  I don't know exactly where it is in

17   some of it.

18        Q.    I think this is in your

19   complaint.  Other than what's stated in your

20   complaint --

21        A.    Complaint, right.

22        Q.    -- do you have anything else?

23        A.    No.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 54

1      Q.      Do you have anything that supports

2    your contention that the defendants never

3    informed the consumer of the alleged known

4    defect and failed to offer a complete refund of

5    the purchase price?

6      A.      That's asking if they've ever got

7    in contact with me or --

8      Q.      Well, do you have anything to

9    support that contention that that's ever

10   happened?

11     A.      Restate it.

12     Q.      Okay.

13     A.      It would be better if I could read

14   it.

15     Q.      Yeah.  I'll tell you what I'm

16   reading from.  It's basically number 16 of your

17   complaint.  Despite repeated complaints by

18   countless individuals, the defendant's would

19   merely offer to replace the gypsum wallboard on

20   occasion.

21     Do you have any independent knowledge

22   that that's ever happened?

23     A.      I do not.

**www.AmericanCourtReporting.com**
**November 28, 2006**

Page 55

1      Q.      Do you have anything to support

2   that claim?

3      A.      No.

4      Q.      Can you please advise or tell me

5   everything that you have to support your

6   contention that Champion Home Builders and

7   Champion Enterprises, Inc., either one of those,

8   are the parent corporation or alter ego of Homes

9   of Legend, Inc?

10      A.      Could you restate it?

11      Q.      Can you tell me everything that

12   you claim supports your contention that either

13   Champion Home Builders and/or Champion

14   Enterprises is the parent corporation and/or the

15   alter ego of Homes of Legend, Inc.?

16      A.      It's just what's in --

17      Q.      What's stated in the complaint?

18      A.      Right.

19      Q.      Do you have anything else besides

20   that?

21      A.      No.

22      Q.      Can you please tell me anything

23   that you claim supports your contention that, as

Page 56

1    part of the purchase price, the defendants made

2    a written express warranty or the defendants

3    Champion Home Builders or Champion Enterprises

4    made a written express warranty to you?

5          A.      Restate it.  I'm sorry.

6          Q.      Can you give me everything that

7    supports your contention that, as part of the

8    purchase price, Champion Home Builders and/or

9    Champion Enterprises made a written express

10   warranty to you?

11         A.      Yes.  They made a warranty.

12         Q.      Who made a warranty?

13         A.      I -- Whenever I purchased it, they

14   had a year warranty.

15         Q.      Who gave you that year warranty?

16         A.      I don't have the paperwork with

17   me.

18         Q.      Would it have been Homes of

19   Legend, the manufacturer?

20         A.      I'm assuming it is.

21         Q.      Do you have anything that supports

22   any written warranty that you would have

23   received from Champion Home Builders and/or

Page 57

1    Champion Enterprises, Inc.?

2         A.    As far as I know, I don't.

3         Q.    You don't have anything?

4         A.    Huh-uh.

5         Q.    No, you don't have anything?

6         A.    No.

7         Q.    No, I don't have anything; is that

8    correct?  You do not have anything?

9         A.    Have any paperwork or anything?

10        Q.    Yeah.

11        A.    No, I do not.

12        Q.    Okay.  Do you have anything that

13   supports your contention that Champion Home

14   Builders and/or Champion Enterprises warranted

15   that any defects in materials or workmanship in

16   the home which they were given notice within the

17   warranty period would be repaired or remedied at

18   no cost?

19        A.    Yes.

20        Q.    What do you have for that?

21        A.    That's what we have in the

22   paperwork.

23        Q.    Was that the warranty that Homes

Page 58

1    of Legend gave to you?

2        A.    Yes.

3        Q.    Do you have anything, though,

4    specifically from Champion Home Builders or

5    Champion Enterprises -- and/or Champion

6    Enterprises?

7        A.    No.

8        Q.    You never gave any notice of any

9    problems to either Champion Enterprises or

10   Champion Home Builders, right?

11       A.    It was through the dealership

12   only.

13       Q.    You only notified the dealership

14   of any problems?

15       A.    Correct.

16       Q.    Other than the dealership, you

17   never gave any written or oral notice to anybody

18   else.  Is that a fair statement?

19       A.    Except for the guys that actually

20   came back and did the work.

21       Q.    And those guys are with Homes of

22   Legend?

23       A.    I'm not sure if they were.  I'm

American Court Reporting
toll-free (877) 320-1050

Page 59

1    assuming they were.

2         Q.     Do you know if those guys were

3    with Champion Home Builders or Champion

4    Enterprises?

5         A.     I don't know.

6         Q.     Okay.

7         A.     Because a lot of it was just

8    basically walking around the house and looking

9    at it.  I don't even remember if they gave me

10   any paperwork after they finished it.

11        Q.     Did you ever give Champion Home

12   Builders or Champion Enterprises notice of a

13   breach of warranty claim prior to bringing your

14   suit?

15        A.     No.  Not -- not dealing with the

16   walls.

17        Q.     I'm sorry?

18        A.     Not dealing with the walls.

19        Q.     Did you ever give them notice of

20   anything, Champion Enterprises?

21        A.     Champion Enterprises?

22        Q.     Or Champion Homes.

23        A.     It would be Homes of Legend.

Page 60

1      Q.      So the only person you would have
2   given would be Homes of Legend --
3      A.      Right.
4      Q.      -- or the dealership?
5      A.      Right.
6      Q.      Have you discussed everything you
7   know about Champion Enterprises or Champion Home
8   Builders?
9      A.      Yes.
10     Q.      What were some of the reasons why
11  you were looking for this particular house?
12     A.      For my mother-in-law.
13     Q.      Was strictly for her?
14     A.      Strictly for her.
15     Q.      Did she go with you to look at
16  them?
17     A.      Yes, she did.
18     Q.      How did you start looking?
19     A.      The lots, the different trailer
20  places that sold them around town.
21     Q.      The only -- Did you look at any
22  advertising beforehand?
23     A.      No.

Page 95

1    didn't have that exact pattern with them.  I do

2    recall that.

3        Q.    And they came back to replace

4    those?

5        A.    Yes.

6        Q.    And Dawn Deese, is that your wife?

7        A.    Yes.

8        Q.    Is that her signature at the

9    bottom?

10        A.    Yes.

11        Q.    Were all repairs done to your

12    satisfaction?

13        A.    Yes.

14        Q.    I want to show you what I'll mark

15    as Defendant's Exhibit 16, which was a --

16    supposed to be a service checklist.  See if you

17    recognize that.

18                (WHEREUPON, Defendant's Exhibit

19    Number 16 was marked for identification and is

20    attached to the original transcript.)

21        A.    Looks like a checklist.

22        Q.    Is that your wife's signature at

23    the bottom?

Page 96

1      A.      Yes.

2      Q.      You're familiar with her

3    signature?

4      A.      Yes.

5      Q.      And is that your understanding

6    this was a checklist of things they went through

7    to make sure everything --

8      A.      It is.

9      Q.      And was everything working

10   properly at that time?

11     A.      Yes.

12     Q.      I'm going to show you what I'm

13   marking as Defendant's Exhibit 17.  This was

14   also dated the 1st of July, '04, the same time

15   as the checklist that was on Defendant's Exhibit

16   16.  Do you recognize that?

17             (WHEREUPON, Defendant's Exhibit

18   Number 17 was marked for identification and is

19   attached to the original transcript.)

20     A.      My wife must have -- She signed

21   it.

22     Q.      I guess all work was performed

23   either excellent or very good?

Page 97

1    A.    Every time they came out, they did

2  a good job.

3    Q.    Was there anything else that was

4  left to do after they left in July of '04?

5    A.    Not that I can recall.

6    Q.    Do you recall whether a phone

7  survey was made also at that time?

8    A.    I couldn't tell you.

9    Q.    Okay.  Do you have any other

10 written notice after July of '04 of any problems

11 with the home?

12   A.    Not that I can recall.

13   Q.    Okay.  Did you have anything --

14 Did you ever contact the dealership after July

15 of '04 with any problems?

16   A.    The screens took a while, but not

17 that I can recall on the rest of it.  I know the

18 gutters, they leaked after they fixed them the

19 first time, but I don't know if I ever got in

20 touch with them with that or if it was after the

21 one-year warranty went out on them.

22   Q.    Okay.

23   A.    Because they put a gutter seam

Page 98

1    above the window, and it leaks in the window.

2         Q.    You don't recall if you've ever

3    turned that back in?

4         A.    I don't know.  I know I did the

5    first time, but I don't know if I did the second

6    time.

7         Q.    As far as the screens, those

8    finally got to you and they got put on?

9         A.    Yes.  After they were ordered and

10   backordered, and seemed like they wouldn't --

11        Q.    Did you have any other written or

12   verbal notice of problems with the home before

13   July of '04 that we haven't addressed in some of

14   these documents we just went through?

15        A.    I think that pretty much covers

16   it, all that's in the documents.

17        Q.    And what problems do you claim

18   still exist with the home today?

19        A.    Actually, it's in pretty good

20   shape, except there's a stain above the bathroom

21   tub.

22        Q.    Okay.

23        A.    That just appeared and keeps

Page 99

1    getting bigger.

2         Q.    Other than that stain above the

3    bathroom tub, anything else?

4              MR. VANCE:  Other than what's

5    in his lawsuit.

6         A.    Other than what's in the lawsuit,

7    no.

8         Q.    Have you ever turned in the stain

9    to the bathroom tub to anybody?

10        A.    No.  Because it was after the one-

11   year warranty went out.

12        Q.    Did you ever turn in anything

13   that's in your lawsuit to anybody?

14        A.    No.

15        Q.    Would it be fair to say that none

16   of the defendants have been made aware of any of

17   the problems with the bathroom tub or the claims

18   in your lawsuit until the lawsuit was filed?

19        A.    Right.

20             MR. VANCE:  Object to the

21   form.

22        A.    Because, actually, it was after

23   the year warranty when the spot appeared.

Page 108

1          MR. RITCHEY:  Can you spell

2   Layton?

3          MRS. DEESE:  L-A-Y-T-O-N.

4      Q.      And have you had it insured since

5   you purchased it?

6      A.      Yes.

7      Q.      And how much do you have it

8   insured for?

9      A.      That's a good question.  I don't

10  recall right offhand.

11     Q.      Do you feel it's worth what you

12  have it insured for?

13     A.      Yes.  It covers what the home

14  cost, maybe a little bit more for add-on.

15     Q.      Other than what we've discussed

16  today, do you have any other evidence to support

17  that any of the defendants negligently

18  manufactured, designed, built, or assembled the

19  home?

20     A.      Other than what's been discussed,

21  no.

22     Q.      You have a claim for unjust

23  enrichment.  In paragraph 55 of the complaint,

Page 111

1          So I guess, Mr. Deese, I'm just

2   going to instruct you, if you don't understand

3   what legal terms he's talking about, just tell

4   him.

5          A.     I don't understand.

6          Q.     Which term do you not understand?

7          A.     I don't understand the whole

8   question per se.

9          Q.     As far as paragraph 55 -- and I

10  guess I'll let you read it.  And as we sit here

11  today, do you have anything that will support

12  that?

13         A.     I don't know.

14         Q.     You don't know?

15         You also have a fraudulent concealment

16  count where you say that the defendants have

17  failed to provide you with information, so to

18  speak.  And you can look over that; it's

19  paragraphs 57 through 62.

20         And my question is:  Do you have anything

21  that supports those claims that we've not

22  already discussed today?

23                MR. VANCE:  I mean, if you --

Page 112

1    Do you understand what that complaint says, the

2    legalese part of it?

3         A.     Not exactly.

4         Q.     Well, do you have anything that

5    we've not discussed today that supports any of

6    those claims?

7         A.     No.

8                MR. VANCE:  To the extent that

9    you understand what it says.

10        A.     Right.  To the extent I don't

11   understand.

12        Q.     But the answer would be no, then;

13   is that correct?

14               MR. VANCE:  The answer would

15   be to the extent that he understands it, it

16   would be no.

17               You're taking everything down?

18   Whether he looks at you or not, you're getting

19   it?

20               THE REPORTER:  Yes, sir.

21        Q.     Is that your -- What was your

22   answer?

23        A.     What?

Page 113

1      Q.      As we sit here today, do you have

2  anything more that supports any of those claims,

3  paragraphs 57 through 62?

4      A.      Okay.  What's your question?

5      Q.      Do you have anything that supports

6  any of those claims other than what we've

7  discussed today?

8      A.      Restate your question.

9      Q.      Do you have anything more that

10  supports your claims other than what we've

11  discussed today?

12     A.      I don't know.

13     Q.      Let me see that again.

14      All right.  The date that you were

15  present when the inspectors came, which I think

16  you said was -- Was that early in the year?

17     A.      It was later in the year.

18     Q.      The summer?

19     A.      The summer.

20     Q.      Okay.  The summer.  Who else was

21  there with you?

22     A.      At that time?

23     Q.      Yes, sir.

Page 120

1    anything else?

2        A.      Just to fix the house.

3        Q.      And have you produced everything

4    that you're aware of that's associated with this

5    particular house?

6        A.      As far --

7        Q.      Okay.  Just give me a second.

8        Have we discussed all conversations you

9    recall having with anyone at the dealership?

10       A.      As far as I know.

11       Q.      Any conversations you recall

12   having with anyone at the -- at Homes of Legend?

13       A.      Yes.

14       Q.      I've got a diagram, which I think

15   is the same as yours, I'm going to mark as

16   Defendant's Exhibit 22.  Does that appear to be

17   the diagram of the house that you had?

18              (WHEREUPON, Defendant's Exhibit

19   Number 22 was marked for identification and is

20   attached to the original transcript.)

21       A.      Where's the diagram?  It's around

22   here somewhere.

23       Q.      Here it is.

Page 123

1    A.    No.

2    Q.    Plumbing problems with the home?

3    A.    No.

4    Q.    Any other leaks we haven't

5    discussed?

6    A.    As far as I know, that's it.    Some

7    of the gutters leak on the outside where they

8    join together, but --

9    Q.    Okay.    Any floor problems?

10    A.    No.

11    Q.    This went a lot quicker than I

12    thought.    That's all.

13                MR. VANCE:    Thank you.

14

15                11:59 a.m.

16

17        FURTHER DEPONENT SAITH NOT

18

19

20

21

22

23

Page 124

1                    C E R T I F I C A T E

2

3     STATE OF ALABAMA)

4     JEFFERSON COUNTY)

5

6              I hereby certify that the above

7     and foregoing deposition was taken down by me in

8     stenotype, and the questions and answers thereto

9     were transcribed by means of computer-aided

10    transcription, and that the foregoing represents

11    a true and correct transcript of the deposition

12    given by said witness upon said hearing.

13              I further certify that I am

14    neither of counsel nor of kin to the parties to

15    the action, nor am I in anywise interested in

16    the result of said cause.

17

18

19                    DEBORAH B. TOWNSEND, CSR

20                    Certificate No. AL-CSR-207

21

22    My Commission expires

23    March 3, 2008

HOMES OF LEGEND, INC.
P.O. BOX 699 BOAZ, AL 35957
PHONE NO. (256) 593-9630

**30-DAY SATISFACTION INSPECTION SHEET**

*Reprinted #4621*
696-2243
696-5511

JLER NAME:
West Value Homes
5284 Montgomery Hwy,
Dothan, AL 36303

HOMEOWNER'S NAME: Terry Deese
ADDRESS 3321 Hunter Road
CITY Columbia ST AL ZIP 36319
PHONE NUMBER (334) 696-2060

SERIAL NUMBER 15661
BRAND NAME Homes of Legend
MODEL NO. Am-5P
DATE OF RECEIPT OF HOME FROM RETAILER 11.7.03

Upon receipt of your home, please look over the items listed below as well as those items listed in the Homeowner's Guide or the "Homeowner's Checkout Guide" Section.
If any item listed on this form is not satisfactory, list that item by number and room in the space provided below and give a brief explanation of the problem.
For items that are not satisfactory in relation to the "Homeowner's Checkout Guide" please list them separately.

**LP/NATURAL GAS SYSTEMS:**
1. Supply lines tested (NO LEAKS)
2. Furnace (operation)
3. Range (operation, burners & oven)
4. Water Heater (pilot and burner)
5. Gas Dryer (operation and venting)

**WATER SYSTEM:**
6. Water supply connected and inspected by a licensed plumber
7. Faucets
8. Tub / shower unit
9. Toilet stool and tank
10. Hot water heater
11. Shower stall
12. Drain lines (sewer connections)
13. Traps (leaks)

**ELECTRICAL SYSTEMS:**
14. Electrical supply connected and inspected by a licensed electrician
15. Electric water heater (operation)
16. Electric range / oven / cooktop
17. Electric dryer (operation & venting)

18. Electric furnace
19. Electric washer
20. Air conditioner
21. Refrigerator
22. Garbage disposal
23. Dishwasher
24. Receptacles
25. Interior fans
26. Interior switches
27. Interior lights
28. Furnace thermostat
29. Exterior electrical receptacle(s)
30. Exterior lights
31. Trash compactor

**EXTERIOR:**
32. Home is level (Doors not dragging, windows not binding)
33. Drip caps over exterior doors
34. Entrance door(s) lock and keys fit
35. Egress windows (operation)
36. Window screens
37. Roof

38. Exterior metal / vinyl
39. Vents
40. Shutters and trim
41. Copy of Homeowner's Guide present
42. Copy of Installation and Set-up Manual
43. Homeowner tie down straps per Installation and Set-up Manual
44. Home set-up per Manufacturer's Installation and Set-up Manual
45. Multi-section homes aligned evenly at walls, floors and ceilings (interior and exterior)

**INTERIOR:**
46. Smoke detectors installed and operational
47. Heat registers
48. Wall paneling
49. Ceilings
50. Mirrors
51. Tub or shower enclosure
52. Light globes and shades
53. Door knobs, latches & handles
54. Drawers (operation)
55. Closet doors, latches

56. Carpet, linoleum
57. Curtains
58. Window Closures
59. Storm windows
60. Trim mouldings

**LEGEND FOR ROOM DESIGNATION**
| | |
|---|---|
| K | KITCHEN |
| L/R | LIVING ROOM |
| D/R | DINING ROOM |
| DEN | DEN |
| STU | STUDY |
| MBR | MASTER BEDROOM |
| BR2 | SECOND BEDROOM |
| BR3 | THIRD BEDROOM |
| BR4 | FOURTH BEDROOM |
| BR5 | FIFTH BEDROOM |
| MBA | MASTER BATH ROOM |
| BA2 | SECOND BATH ROOM |
| BA3 | THIRD BATH ROOM |
| U/R | UTILITY ROOM |
| HALL | HALLWAY(S) |

| Number / Room | Description | Number / Room | Description |
|---|---|---|---|
| 8 / MBR | Glue on Walls | 13 / MBR | Check shower master bedroom |
| 3 / MBR | Hard to close | 21 / K | Kick Guard missing |
| 58 / MBR | Mini Blind - missing parts | 51 / MBA | Loose Panel |
| 48 / K | Glue on Walls | / | |
| 1 / K | Glue on Refrigerator | / | |
| 35 / L/R | Window cracked | / | |
| 48 / L/R | Glue on Walls | / | |
| 55 / BR2 | Closet door will Not latch | / | |
| 48 / BR3 | Glue on Wall | / | |
| 38 / | 2 holes in back | / | |
| 38 / | hole in front | / | |
| 37 / | Gutters Caulking leak | / | |
| / | Main Beam connectors Welds | / | |
| / | have been broken | / | |
| / | Under home | / | |

**HOMEOWNER'S CERTIFICATION**

I have carefully inspected my home and understand that beyond the items noted above, all future cosmetic items are my responsibility. I understand that during the duration of the warranty, service is limited to the structural, mechanical, electrical, plumbing, or weather-resistance systems of the home. I hereby agree with and accept the terms and conditions set forth in the Limited Warranty & Arbitration Agreement and acknowledge receipt of the Homeowner's Information Packet, Including: Homeowner's Guide, Limited Warranty & Arbitration Agreement; Installation Manual and 3-Part Homeowner Information Card; 30-Day Satisfaction Inspection Sheet; Insulation Information; and the Appliance Warranty and Use-and-Care Booklets.

Homeowner's Signature _Terry Deese_ Date 12-22-03    Retailer's Signature _Bonnie Hanson_ 12-22-03

Homeowner's Signature _____ Date _____

TE: A COMPLETED AND SIGNED FORM MUST BE SUBMITTED TO HOMES OF LEGEND, INC WITHIN (30) THIRTY DAYS OF THE RETAILER'S TENDER OF POSSESSION OF THE HOME AT ITS ORIGINAL INSTALLATION SITE.

| DISTRIBUTION GUIDE FOR COPIES | WHITE - HOMES OF LEGEND, INC | YELLOW - RETAILER | PINK - HOMEOWNER |
|---|---|---|---|

T Wife, Terry will call me tomorrow
Gave $$$#

DEFENDANT'S EXHIBIT
12

SERIAL NO. **HL15661**

CUSTOMER   DEESE, TERRY
3393 HUNTER RD
COLUMBIA, AL 36319

DEALER # 01141   00000
**BEST VALUE HOMES**
5284 MONTGOMERY HWY.
DOTHAN, AL 36303

**SERVICEMAN COPY**

| | | |
|---|---|---|
| HOME PHONE | (334) 696-2243 | RETAIL SOLD DATE 11/07/2003 |
| DAY PHONE | 334-618-3385 cell | DATE RECEIVED 03/11/2004 |

DEALER PHONE

Entered By **TMB** CSR **TMB**

Decor.      Model No.      Model Year **2004**

| SERVICE REPAIRS REQUESTED | WORK PERFORMED | Assessment | Labor Hours | Expense | Material Cost |
|---|---|---|---|---|---|
| **01-10 WELD FAILURE** <br> homeowner states main beam connectors welds have been broken / | - | 08 | | | |

*Repaired angle Braces in axle area of Frame -*

**DEFENDANT'S EXHIBIT**

13

| | | |
|---|---|---|
| SERVICEMAN'S SIGNATURE | STARTING DATE 3/11/04 | LABOR |
| BEST VALUE HOMES | FINISH DATE 3/12/04 | EXPENSE |
| CUSTOMER'S SIGNATURE | STARTING TIME | MATERIAL |
| | FINISH TIME | TOTAL COST |
| (CONFIRMS ACCEPTANCE AND SATISFACTION OF WARRANTY WORK PERFORMED) | | DRIVING HRS. 12 |
| | INVOICE TOTAL | MILEAGE CHARGE 720 |

ASSESSMENT CODE
01 MANUFACTURING
02 COMPONENT
03 SALES
04 INSTALLATION
05 MAINTENANCE
06 OTHER
07 DRIVER DAMAGE
08 DEALER RELATE



Homes of Legend

**SERVICE WORK ORDER**

No. 2 Page 1

CON NO. 250

DEALER # 01141

NO. **HL15661**

**DEFENDANT'S EXHIBIT 14**

BEST VALUE HOMES
5284 MONTGOMERY HWY.
DOTHAN, AL 36303

30-55
Metal corridor
Screws
L.R. SR

MER DEESE, TERRY
3393 HUNTER RD
COLUMBIA, AL 36319

**SERVICEMAN COPY**

RETAIL SOLD DATE 11/07/2003
DATE RECEIVED 03/09/2004

DEALER PHONE

(334) 696-2243

Entered By TMB  CSR LM

Model No. **AM-SP**

Model Year **2004**

| Decor. | WORK PERFORMED | Assessment | Labor Hours | Expense | Material Cost |
|---|---|---|---|---|---|
| SERVICE REPAIRS REQUESTED | | 04 | | | 11.75 |
| 4 CEILING CRACKS / 2 CEILING CRACKS IN THE KITCHEN | Scraped Resprayed cracked | | 2.5 | | |
| 02 INTER. TRIM/MOLDING LOOSE / LOOSE TRIM T/O THE HOME | Renailed Loose Molding To Home | 04 | 1.0 | | |
| 05 WALL PANEL INADEQUATELY ATTACHED / LOOSE WALL IN MASTER BATH | Sheet Rock Glue Broke Lose Renailed | 01 | 1.0 | | |
| 7 GLUE ON WALL BOARD / GLUE ON WALLS IN MASTER BEDROOM, KITCHEN, LR, BEDROOM #3, | Replaced Panel with Glue. And Imper | 01 | 3.5 | | 30.80 |
| 07-08 ALUMINUM DAMAGED, BUCKLED, DENTED / THERE IS 6 PIECES OF CREAM METAL DENTED ON THE HOME | Repared Metal that was Dented. Had Part no Sealed | 04 | 2.0 | | |
| 08-15 GUTTER, DRIP EDGE, FACIA / GUTTERS LEAKING | Cleaned and Calked Seams of Gutter | 08 | .5 | | |
| 10-03 INT. DOOR WON'T OPEN, CLOSE, LATCH / MASTER BEDROOM HARD TO CLOSE / / CLOSET DOOR WONT LATCH IN BEDROOM #2 | Adjust doors to Home. Adjusted again Not (Hitter Latch) | 08 | | | |
| 3 Men | | | | | |

SERVICEMAN'S SIGNATURE
R&R MOBILE HOME SERV

CUSTOMER'S SIGNATURE
Terry Deese
(CONFIRMS ACCEPTANCE AND SATISFACTION OF WARRANTY WORK PERFORMED)

STARTING DATE 6-4-04
FINISH DATE 6-4-04
STARTING TIME 700
FINISH TIME 400

LABOR
EXPENSE
MATERIAL $45.09
TOTAL COST $45.09

DRIVING HRS.
INVOICE TOTAL 9 HRS
MILEAGE
CHARGE 75

**ASSESSMENT CODES**
01 MANUFACTURING
02 COMPONENT
03 SALES
04 INSTALLATION
05 MAINTENANCE
06 OTHER
07 DRIVER DAMAGE
08 DEALER RELATED

Homes of Legend

**SERVICE WORK ORDER**

| NO. 250 | | WORK ORDER NO. **4621** | Page 2 |

SERIAL NO. **HL15661**

| CUSTOMER | DEESE, TERRY | BEST VALUE HOMES |
| | 3393 HUNTER RD | 5284 MONTGOMERY HWY. |
| | COLUMBIA, AL 36319 | DOTHAN, AL 36303 |

**SERVICEMAN COPY**

Decor.          Model No. **AM-SP**          Model Year **2004**

| SERVICE REPAIRS REQUESTED | WORK PERFORMED | Assessment | Labor Hours | Expense | Material Cost |
|---|---|---|---|---|---|
| **11-40 WINDOWS - OTHER** WINDOW CRACKED IN LR / Sent. Window. Wrong Style. | order 30x53, model wndo | 01 | 5 | | |
| **14-11 TUB / SHOWER SURROUNDS LEAK,** CHECK SHOWER MASTER BEDROOM / Called and Sealed Tub & Shower. | Seal Broke loose | 01 | .25 | | |
| **17-40 APPLIANCES - OTHER** GLUE ON REFRIDGERATOR / Cleaned Glue off of Ref. | | 04 | .25 | | |
| **19-15 CURTAINS, MINIBLINDS - DAMAGED,** MINI BLIND MISSING PARTS IN MASTER BEDROOM / Replaced Parts Broken. | | 08 | .5 | | 2.54 |

45.09

ASSESSMENT CODES
01 MANUFACTURING
02 COMPONENT
03 SALES
04 INSTALLATION
05 MAINTENANCE
06 OTHER
07 DRIVER DAMAGE
08 DEALER RELATED

DIVISION NO.  250

**Homes of Legend**

**SERVICE WORK ORDER**

WORK ORDER NO. 3    Page 1

SERIAL NO.  **HL15661**

DEALER NO. 011 44 00000

CUSTOMER  **DEESE, TERRY**
3393 HUNTER RD
COLUMBIA, AL 36319

**BEST VALUE HOMES**
5284 MONTGOMERY HWY.
DOTHAN, AL  36303

DEFENDANT'S EXHIBIT

15

**SERVICEMAN COPY**

HOME PHONE    (334) 696-2243

RETAIL SOLD DATE  11/07/2003

DATE RECEIVED  06/14/2004

DEALER PHONE

Entered By  **TMB**  CSR  **LM**

DAY PHONE

Model No.  **AM-SP**    Model Year  **2004**

| SERVICE REPAIRS REQUESTED | WORK PERFORMED | Assessment | Labor Hours | Expense | Material Cost |
|---|---|---|---|---|---|
| Decor. | | | | | |
| REWRITE FROM WO# 0000004621 | | | | | |
| 06-08 WALL PANELS - STAINED/DISCOLORED | *Could NOT Clean glue OFF* | 01 | | | |
| per Jimmy needs one more pc of sr in lr / | | | | | |
| *Replaced S/R under L/R window* | | | 25 m | | |
| 11-40 WINDOWS - OTHER | | 01 | | | |
| WINDOW CRACKED IN LR /order 30x53 metal window | | | 30 | | |
| *Replaced Busted Window* | | | | | |

**COSMETIC WARRANTY**
**COMPLETED LAST VISIT**

**RE-WRITE**

SERVICEMAN'S SIGNATURE  *Chris Tedbetter  Tammy Baker*
NOT SIGNED

CUSTOMER'S SIGNATURE  *Dawn Deese*
(CONFIRMS ACCEPTANCE AND SATIFACTION OF WARRANTY WORK PERFORMED)

STARTING DATE  7-1-04
FINISH DATE  7-1-04
STARTING TIME  7:25
FINISH TIME  8:45

LABOR
EXPENSE
MATERIAL
TOTAL COST

DRIVING HRS.
MILEAGE
CHARGE

INVOICE TOTAL

ASSESSMENT CODES
01 MANUFACTURING
02 COMPONENT
03 SALES
04 INSTALLATION
05 MAINTENANCE
06 OTHER
07 DRIVER DAMAGE
08 DEALER RELATED

Please use this check list for EACH AND EVERY UNIT.

Check commode fittings, flush and fill up.
Check all baths, P-Traps, dishwasher & refridgerator ice maker hook-ups for leaks.
Check all faucets & fittings at sink under & on top , tubs, showers.
Do a visual check for cuts, scratches on tub/shower finish.
Check washer & dryer area for proper fittins, venting, & electrical.
Check all electrical outlets & switches inside & outside (with electrical tester), check outside plugs for seal.
Check interior & exterior lights for seal, also for opening & closing properly.

Master Bath & 2nd Bath:
Sink faucets/fittings ___✓___
Nuts & bolts ___✓___
Commode fittings ___✓___
Tubs/Shower ___✓___
Plugs/Switches ___✓___
Comments:_____
_____
_____

Utility Room:
Hot Water Heater (leaks) ___✓___ OK
Washer box hook-up ___✓___
Dryer vent to outside ___✓___
Plugs/Switches ___✓___
Comments:_____
_____
_____

Kitchen/Living Room:
Faucet/Fittings ___✓___
Range vent hood ___✓___
Plugs/Lights/Switches ___✓___
S/G Door ___✓___
Comments:_____
_____

Check Cabinets Through-Out ___✓___
Visual Check Moldings Through-Out Unit _____

Date: 7-1-04

Dawn Deese
Customer Signature

Exterior Doors:
Proper open & close ___✓___
Exterior lights ___✓___
Door caps/seal ___✓___
Perimeter blocks ___✓___
Comments:_____
_____
_____

Hallway:
Plugs/Switches ___✓___
Comments:_____
_____

2nd & 3rd Bedrooms:
Plugs/Switches ___✓___
Doors(adjustments) ___✓___
Comments:_____
_____

Visual Check Exterior of Unit:
Masonite N/A
Metal ✓
Windows ✓
Roof ✓
Smoke Alarm ✓
Egressed Windows N/A
Vinyl Siding N/A

Chris Ledbetter
Danny Baker
Service Technician

Customer Comments:_____
_____

DEFENDANT'S
EXHIBIT

16

SERIAL NUMBER *HL 15661*

Dear Homeowner:

We would appreciate you taking a few moments to complete this form. Your service technician(s) are required to present this form to this office. Please rate your service technician(s) in the following categories:

Scheduling appointment with you............... (Excellent)   Good   Fair   Po
Promptness in keeping appointment......... (Excellent)   Good   Fair   Po
Technician(s) appearance................... (Excellent)   Good   Fair   Po
Cleaning-up after completing work......... (Excellent)   Good   Fair   Po
Was all work from repair order completed.. (Yes)   No
Were they courteous?..................... (Yes)   No

If all work was NOT completed, please list below those items not completed.

_____

_____

_____

_____

Please list below any additional comments concerning your service technician(s).

_____

_____

_____

Please understand that your service technician(s) are not allowed to schedule any additional work on your home unless this office reassigns the work.

Thank you for completing this form, and for letting us service your home.

*Dawn Deese*
Customer's signature

*Chris Ledbetter  Danny Baker*
Technician's Signature

*7-1-04*
Date

DEFENDANT'S
EXHIBIT

*17*

_____
Service Representative
From Office Whom You Spoke
ith Today

P.O. Box 557 · 240 Denson Road · Boaz, Alabama 35957 · (205) 593-9225
256

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TERRY DEESE, | * |
| | * |
|     Plaintiff, | * |
| | * |
| v. | *    1:06-cv-643-MHT |
| | * |
| CHAMPION ENTERPRISES, INC., *et al.,* | * |
| | * |
|     Defendants. | * |

### PLAINTIFF'S RESPONSE TO DEFENDANT CHAMPION ENTERPRISES, INC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND FIRST REQUEST FOR ADMISSIONS

Plaintiff Terry Deese hereby responds to Defendant Champion Enterprises, Inc.'s First Request for Production of Documents and First Request for Admissions as follows.

### General Objections

1.    The objections to the pending discovery made by Plaintiff are made without waiver of, or prejudice to, additional objections that Plaintiff may make. All such objections are hereby expressly preserved, as is the right to move for a protective order. Plaintiff also reserves all objections to the admissibility at trial of any information provided.

2.    Plaintiff objects to the discovery to the extent each request for production and request for admission has absolutely no relevance to the proceedings before the Middle District of Alabama and is not calculated to lead to the discovery of admissible evidence.



EXHIBIT
C

3.     The supplying of any information does not constitute an admission by Plaintiff that such information is relevant in this action.   All information provided by Plaintiff is for use in this litigation only; that is, to be used for no other purpose.

4.     Plaintiff objects to each and every discovery request to the extent the documents or information called for, if any, are privileged.   In particular, Plaintiff objects to each and every discovery request to the extent the documents or information called for, if any, are protected by the attorney-client privilege and/or work product doctrine.  Plaintiff also states that any inadvertent production or disclosure of privileged material is not intended, or should not be construed, as a waiver of privilege, and Plaintiff reserves the right to seek the return of any such material and, further, to object to its use.

5.     Plaintiff objects to each and every discovery request to the extent it seeks to vary the obligations imposed upon Plaintiff under the Alabama Rules of Civil Procedure.

6.     Plaintiff objects to each and every discovery request to the extent it is vague, ambiguous, overly broad, oppressive, unduly burdensome, or unduly expensive.

7.     Plaintiff objects to each and every discovery request to the extent it seeks confidential or proprietary information.  Similarly, Plaintiff reserves the right to redact confidential or proprietary information from any document that is produced.

8.    Any production to occur at a later date will occur at a mutually convenient time and place.

## FIRST REQUEST FOR PRODUCTION

1.    All "documents" or "communications" that came with the Manufactured Home or was received from CEI of or concerning the Manufactured Home, including, but not limited to warranties, service manuals, owner's manuals, set up instructions, repair records, correspondence, etc.

RESPONSE:      Plaintiff is in the process of gathering the information responsive to this request and will produce them once located.

2.    All "documents" or "communications" concerning the Manufactured Home transmitted or delivered by you, or anyone acting on your behalf, to CEI.

RESPONSE:      Plaintiff will produce all documents that, at this time are in his possession, custody and control at a mutually agreed upon time and place for inspection, copying and review.

3.    All "documents" or "communications" received by you, or by anyone acting on your behalf, from CEI.

RESPONSE:      Plaintiff will produce all documents that, at this time are in his possession, custody and control at a mutually agreed upon time and place for inspection, copying and review.

4.    All "documents" or "communications" of records regarding any factual allegations made in the Complaint or that support any claim being made in the Complaint alleged against CEI.

3

RESPONSE:    Plaintiff will produce all documents that, at this time are in his possession, custody and control at a mutually agreed upon time and place for inspection, copying and review.

5.    All "documents" or "communications" you claim supports your contention that CHB "designed and manufactured" the subject Manufactured Home as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

6.    All "documents" or "communications" you claim supports your contention that CEI knew of any alleged "defect in the design and manufacture of homes sold in the respective State and Counties indicated [in the Complaint] since at least the mid 1990's" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

7.    All "documents" or "communications" you claim supports your contention that CEI "lobbied HUD to allow a waiver of the HUD code" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

8.    All "documents" or "communications" you claim supports your contention that CEI "disingenuously allege[d] that it is impracticable to comply with the waiver" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

9.    All "documents" or "communications" you claim supports your contention that CEI "sold homes to consumers in the [']Gulf Coast['] region

without informing them of [the alleged] known defect and thus chose profit over conscience" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

10.    All "documents" or "communications" you claim supports your contention that "despite a reasonable opportunity and repeated complaints by countless individuals" CEI "merely at most offer[ed] to replace the gypsum wallboard on occasion" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

11.    All "documents" or "communications" you claim supports you contention that CEI "never inform[ed] the consumer of the [alleged] known defect and fail[ed] to offer a full refund of the purchase price" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents

protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

12.    All "documents" or "communications" you claim supports your contention that CEI "is the parent corporation and/or alter ego of Defendant Champion Home Builders Co. and Homes of Legend, Inc." as alleged in the Complaint.

RESPONSE:     Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert

witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

13.    All "documents" or "communications" you claim supports your contention that CEI "as a part of the purchase price" CEI "made a written express warranty to the Plaintiff' as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his

11

allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

14.    All "documents" or "communications" you claim supports you contention that CEI "further warranted that any defects in the materials or workmanship in the home, which [CEI was] given notice of within the warranty period, would be repaired or remedied at no cost to the Plaintiff" as alleged in the Complaint.

RESPONSE:     Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as

discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

15.    All "documents" or "communications" you claim supports your contention that Plaintiff gave notice to CEI of "the failure of the manufactured home" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that

is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

16.    All "documents" or "communications" you claim supports your contention that "Plaintiff have given [sic] CHB "notice of Plaintiff' [sic] breach of warranty claim prior to bringing suit" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all

documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

17.    All "documents" or "communications" evidencing any warranties you claim you were given by CEI.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

18.    Any "document" or exhibit which you or your attorney plan to use in any way at the trial, deposition, hearing, or proceeding, including "documents" or exhibits which may be offered or used for rebuttal or impeachment or demonstrative purposes only.

**RESPONSE:**    **Plaintiff will produce a list of exhibits pursuant to the scheduling order.**

19.    Any "documents" or "communication" which in any way relates to the claims or damages alleged in the lawsuit that has not already been produced.

**RESPONSE:**    **Plaintiff will produce all documents that, at this time are in his possession, custody and control at a mutually agreed upon time and place for inspection, copying and review.**

20.    All "document" or "communication" received from any party or non-party, including such items that may have been produced pursuant to a subpoena to a non-party, of or concerning the Manufactured Home of any claims made in this civil action.

**RESPONSE:**    **None.**

## REQUEST FOR ADMISSIONS

1.    Please admit that CEI did not transport the Manufactured Home to your property.

**RESPONSE:**    **Admit.**

2.    Please admit that CEI did not set up the Manufactured Home on your property.

**RESPONSE:**        **Admit.**

3.        Please admit that CEI did not participate in the sale of the

Manufactured Home by the dealer to you.

**RESPONSE:**        **Denied.**


_____
C. Gibson Vance (ASB-1923-N77C)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing document upon all counsel of record as listed below by placing the same in the United States mail, properly addressed and first class postage prepaid on this the 1st day of November, 2006.

Gregory S. Ritchey, Esquire
Richard S. Walker, Esquire
Ritchey & Ritchey, P.A.
P.O. Drawer 590069
Birmingham, Alabama 35259-0069
greg@ritcheylaw.com
richard@ritcheylaw.com

OF COUNSEL

18

THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TERRY DEESE,  

    Plaintiff,  

v.  

                                     1:06-cv-643-MHT  

CHAMPION ENTERPRISES, INC., *et al.*,  

    Defendants.  

### PLAINTIFF'S RESPONSE TO DEFENDANT CHAMPION HOME BUILDERS CO.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND FIRST REQUEST FOR ADMISSIONS

Plaintiff Terry Deese hereby responds to Defendant Champion Home Builders Co.'s First Request for Production of Documents and First Request for Admissions as follows.

### General Objections

1.    The objections to the pending discovery made by Plaintiff are made without waiver of, or prejudice to, additional objections that Plaintiff may make. All such objections are hereby expressly preserved, as is the right to move for a protective order. Plaintiff also reserves all objections to the admissibility at trial of any information provided.

2.    Plaintiff objects to the discovery to the extent each request for production and request for admission has absolutely no relevance to the proceedings before the Middle District of Alabama and is not calculated to lead to the discovery of admissible evidence.



EXHIBIT
D

3.     The supplying of any information does not constitute an admission by Plaintiff that such information is relevant in this action.    All information provided by Plaintiff is for use in this litigation only; that is, to be used for no other purpose.

4.     Plaintiff objects to each and every discovery request to the extent the documents or information called for, if any, are privileged.    In particular, Plaintiff objects to each and every discovery request to the extent the documents or information called for, if any, are protected by the attorney-client privilege and/or work product doctrine.  Plaintiff also states that any inadvertent production or disclosure of privileged material is not intended, or should not be construed, as a waiver of privilege, and Plaintiff reserves the right to seek the return of any such material and, further, to object to its use.

5.     Plaintiff objects to each and every discovery request to the extent it seeks to vary the obligations imposed upon Plaintiff under the Alabama Rules of Civil Procedure.

6.     Plaintiff objects to each and every discovery request to the extent it is vague, ambiguous, overly broad, oppressive, unduly burdensome, or unduly expensive.

7.     Plaintiff objects to each and every discovery request to the extent it seeks confidential or proprietary information.  Similarly, Plaintiff reserves the right to redact confidential or proprietary information from any document that is produced.

8.    Any production to occur at a later date will occur at a mutually convenient time and place.

## FIRST REQUEST FOR PRODUCTION

1.    All "documents" or "communications" that came with the Manufactured Home or was received from CHB of or concerning the Manufactured Home, including, but not limited to warranties, service manuals, owner's manuals, set up instructions, repair records, correspondence, etc.

**RESPONSE:**    Plaintiff is in the process of gathering the information responsive to this request and will produce them once located.

2.    All "documents" or "communications" concerning the Manufactured Home transmitted or delivered by you, or anyone acting on your behalf, to CHB.

**RESPONSE:**    Plaintiff will produce all documents that, at this time are in his possession, custody and control at a mutually agreed upon time and place for inspection, copying and review.

3.    All "documents" or "communications" received by you, or by anyone acting on your behalf, from the CHB.

**RESPONSE:**    Plaintiff will produce all documents that, at this time are in his possession, custody and control at a mutually agreed upon time and place for inspection, copying and review.

4.    All "documents" or "communications" or records regarding any factual allegations made in the Complaint or that support any claim being made in the Complaint alleged against CHB.

3

RESPONSE:     Plaintiff will produce all documents that, at this time are in his possession, custody and control at a mutually agreed upon time and place for inspection, copying and review.

5.     All "documents" or "communications" you claim supports your contention that CHB "designed and manufactured" the subject Manufactured Home as alleged in the Complaint.

RESPONSE:     Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

4

6.     All "documents" or "communications" you claim supports your contention that CHB knew of any alleged "defect in the design and manufacture of homes sold in the respective State and Counties indicated [in the Complaint] since at least the mid 1990's" as alleged in the Complaint.

RESPONSE:        Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

7.    All "documents" or "communications" you claim supports your contention that CHB "lobbied HUD to allow a waiver of the HUD code" as alleged in the Complaint.

**RESPONSE:**    **Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.**

8.    All "documents" or "communications" you claim supports your contention that CHB "disingenuously allege[d] that it is impracticable to comply with the waiver" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

9.    All "documents" or "communications" you claim supports your contention that CHB "sold homes to consumers in the [']Gulf Coast['] region without informing them of [the alleged] known defect and thus chose profit over conscience" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents

7

protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

10.    All "documents" or "communications" you claim supports your contention that "despite a reasonable opportunity and repeated complaints by countless individuals" CHB "merely at most offer[ed] to replace the gypsum wallboard on occasion" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert

8

witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

11.    All "documents" or "communications" you claim supports you contention that CHB "never inform[ed] the consumer of the [alleged] known defect and fail[ed] to offer a full refund of the purchase price" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the

defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

12.    All "documents" or "communications" you claim supports your contention that "as a part of the purchase price" CHB "made a written express warranty to Plaintiff' as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with

10

the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

13.    All "documents" or "communications" you claim supports your contention that "as a part of the purchase price" CHB "made a written express warranty to Plaintiff as alleged in the Complaint.

RESPONSE:        Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and

other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

14.    All "documents" or "communications" you claim supports you contention that CHB "further warranted that any defects in the materials or workmanship in the home, which [CHB was] given notice of within the warranty period, would be repaired or remedied at no cost to the Plaintiff" as alleged in the Complaint.

RESPONSE:        Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained

by the plaintiff.  Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

15.    All "documents" or "communications" you claim supports your contention that Plaintiff gave notice to CHB of "the failure of the manufactured home" as alleged in the Complaint.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff.  Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that

are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.

16.    All "documents" or "communications" you claim supports your contention that "Plaintiff have given [sic]" CHB "notice of Plaintiff' [sic] breach of warranty claim prior to bringing suit" as alleged in the Complaint.

**RESPONSE:**       **Plaintiff objects to this Request on the grounds it is overly broad; unduly burdensome; seeks information or documents protected by the attorney client and/or work product doctrine; and/or requests information that is held in the opinions of the plaintiff's expert witnesses that is premature for discovery at this time under FRCP 26(c). Additionally, there are documents and information in the possession of the defendant(s)' that the plaintiff seeks to discover and use in support of his allegations, and these discovery responses will be supplemented as discovery develops and pretrial disclosures are made in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. Furthermore, there is information responsive to this discovery request that is in the possession of the Federal and State Government Agencies and other third parties that is as easily obtained by the defendants as obtained by the plaintiff. Without waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review.**

17.    All "documents" or "communications" evidencing any warranties you claim you were given by CHB.

**RESPONSE:        Plaintiff will produce all documents that, at this time, are in his possession, custody and control at a mutually agreed upon time and place for inspection, copying and review.**

18.    Any document or exhibit which you or your attorney plan to use in any way at the trial, deposition, hearing, or proceeding, including "documents" or exhibits which may be offered or used for rebuttal or impeachment or demonstrative purposes only.

**RESPONSE:        Plaintiff will produce a list of exhibits pursuant to the scheduling order.**

19.    Any "documents" or "communication" which in any way relates to the claims or damages alleged in the lawsuit that has not already been produced.

**RESPONSE:        Plaintiff will produce all documents that, at this time are in his possession, custody and control at a mutually agreed upon time and place for inspection, copying and review.**

20.    All "document" or "communication" received from any party or non-party, including such items that may have been produced pursuant to a subpoena to a non-party, of or concerning the Manufactured Home of any claims made in this civil action.

**RESPONSE:        None.**

## REQUEST FOR ADMISSIONS

1.          Please admit that CHB did not transport the Manufactured

Home to your property.

**RESPONSE:          Admit.**

2.          Please admit that CHB did not set up the Manufactured

Home on your property.

**RESPONSE:          Admit.**

3.          Please admit that CHB did not participate in the sale of the

Manufactured Home by the dealer to you.

**RESPONSE:          Denied.**


_____
C. Gibson Vance (ASB-1923-N77C)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing document upon all counsel of record as listed below by placing the same in the United States mail, properly addressed and first class postage prepaid on this the 1st day of November, 2006.

Gregory S. Ritchey, Esquire
Richard S. Walker, Esquire
Ritchey & Ritchey, P.A.
P.O. Drawer 590069
Birmingham, Alabama 35259-0069
greg@ritcheylaw.com
richard@ritcheylaw.com

_____
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| NICHOLAS STRICKLAND, et al., | ) | |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:06-cv-682-TFM |
| | ) | (WO) |
| CHAMPION ENTERPRISES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER ON MOTIONS

This action is assigned to the undersigned magistrate judge to conduct all proceedings

and order entry of judgment by consent of all the parties (Docs. 8-9, filed August 26, 2006)

and 28 U.S.C. § 636(c).

Pending before the Court is Defendant Champion Enterprises, Inc.'s *Motion for*

*Summary Judgment* (Doc. 5, filed August 4, 2006) and *Motion to Strike Jury Demand as to*

*Alter Ego Claims and to Stay Alter Ego Claims* (Doc. 10, filed September 7, 2006). The

Court previously denied the *Motion to Dismiss* contained in the same document as the

*Motion for Summary Judgment*. *See* Docs. 12, 20, and 43. The Court considers the *Motion*

*for Summary Judgment*, filed by Defendant Champion Enterprises Inc. (Doc. 5, filed August

4, 2006), *Plaintiffs' Response to Defendant Champion Enterprises, Inc.'s, Motion to Dismiss*

*or, In Alternative, Motion for a Summary Judgment* (Doc. 7, filed August 25, 2006),

Defendant's *Supplement to Motion for Summary Judgment* (Doc. 18, filed November 17,

2006), *Plaintiffs' Response to Defendants' Motion to Dismiss or, In the Alternative, Motion*

*for Summary Judgment* (Doc. 24, filed November 30, 2006 *sealed*),  Defendant's *Second*


EXHIBIT
E

*Supplement to Motion to Dismiss or, In the Alternative, Motion for Summary Judgment* (Doc. 39, filed March 12, 2007), *Plaintiffs' Response to Defendants' Second Supplement to Motion to Dismiss, or In the Alternative, Motion for Summary Judgment* (Doc. 41, filed April 11, 2007), and Defendant's *Reply to Plaintiffs' Response to Second Supplement to Motion to Dismiss or, In the Alternative, Motion for Summary Judgment* (Doc. 42, filed April 20, 2007). Further, taking into consideration the backdrop of controlling Alabama law, the Court **GRANTS** Defendant Champion Enterprises, Inc.'s **Motion for Summary Judgment** and **DENIES as moot** the **Motion to Strike Jury Demand.**

## I.  PARTIES

Plaintiffs are Nicholas and Jennifer Strickland ("Plaintiffs" or "the Stricklands") and they reside in Houston County, Alabama, within the Middle District of Alabama.

Defendant Champion Enterprises, Inc. ("CEI" or "Defendant") is a Michigan Corporation whose principal place of business is in Auburn Hills, Michigan.

Defendant Champion Home Builders Co. ("CHB") is a Michigan Corporation whose principal place of business is in Auburn Hills, Michigan. CHB is not a party to the pending Motion for Summary Judgment.

## II.  JURISDICTION

Defendant CHB removed this case to this Alabama federal court pursuant to 28 U.S.C. §§ 1332 (diversity jurisdiction), 1367 (supplemental jurisdiction), and 1441 (removal jurisdiction). As stated in the Motion for Summary Judgment, CEI contests personal jurisdiction citing as grounds insufficient contacts with the state of Alabama and there is no

evidence CEI is the alter-ego of CHB.

### III. NATURE OF THE CASE/FACTUAL BACKGROUND

The underlying facts of are necessarily viewed in favor of the nonmovant Plaintiffs. Plaintiff alleges the manufactured homes designed and manufactured by the Defendants, including the home purchased by Plaintiffs, have an improper design and construction of the exterior walls in violation of the Department of Housing and Urban Development's ("HUD") Manufactured Home Construction and Safety Standards. *See* Doc. 1, Ex. A Complaint ¶ 13. Plaintiffs state the defect existed at the time of sale and violates the written manufacturer's express warranty that the home was free from defect. *Id.* ¶ 13 and ¶ 18. Plaintiffs aver Defendants should have known of the defect since at least the mid-1990s and actually lobbied HUD to allow a waiver of the HUD Code for this specific defect. *Id.* ¶ 14.

Plaintiffs allege condensation will become trapped within the walls and result in moisture seeping out of openings in the wall such as screw holes or light fixtures. The defect results in "soft walls" where the moisture makes it possible to easily poke holes through the sheetrock. *Id.* ¶ 15 Further, it results in the growth of black mold and other fungus. *Id.* Plaintiffs allege Defendants knew of these problems, yet did not inform the consumer of the known defect nor did it offer to refund the purchase price. *Id.* ¶ 16. Plaintiffs aver the manufactured home failed to perform and serve as a suitable place of residence and therefore failed in its intended purpose. *Id.* ¶ 19.

Plaintiffs state they notified Defendants of the problem as required under Ala. Code § 7-2-607(3), but Defendants failed to effectuate all repairs to the manufactured home.

Plaintiffs filed suit on June 26, 2006 in the Circuit Court of Houston County, Alabama. *See* Doc. 1. The Stricklands bring claims under 15 U.S.C. § 2391, *et seq.* ("Magnuson Moss Warranty Act"), breach of express warranty, breach of implied warranty of merchantability, breach of fitness for a particular purpose, breach of warranty of habitability, negligence, wantonness, unjust enrichment, fraudulent concealment, and Alabama's Extended Manufacturers Liability Doctrine. *See* Doc. 1 ¶ 23-68. Plaintiff also alleges Defendant CEI is the parent corporation and alter-ego of Defendant CHB. *Id.* ¶ 17. Defendant CHB denies the allegations in its Answer and Defendant CEI filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. *See* Docs. 4-5. The Court denied CEI's Motion to Dismiss, but reserved judgment pending the completion of discovery on personal jurisdiction and the alter-ego allegation made by the Stricklands. Limited discovery ended on February 9, 2007. *See* Doc. 33. CEI filed a final supplement to the Motion for Summary Judgment on March 12, 2007. *See* Doc. 39. Plaintiffs filed their response on April 11, 2007. *See* Doc. 41. Defendants filed a reply on April 20, 2007. *See* Doc. 42. The Motion for Summary Judgment was fully submitted without oral argument on April 20, 2007.

## IV. DEFENDANT CEI'S MOTION FOR SUMMARY JUDGMENT

In the pending Motion for Summary Judgment,[1] CEI asserts Plaintiffs cannot prove CHB is the alter ego of CEI. Further, CEI argues it lacks sufficient contacts with Alabama to establish personal jurisdiction because CHB is not the alter ego of CEI. CEI avers it lacks

---

[1]     The Court considers the *Motion for Summary Judgment* (Doc. 5, filed August 4, 2006), the *Supplement to the Motion for Summary Judgment* (Doc. 18, filed November 17, 2006), and the *Second Supplement to the Motion for Summary Judgment* (Doc. 39, filed March 12, 2007).

sufficient minimum contacts with the state of Alabama to require CEI to defend the action in Alabama. In sum, jurisdiction cannot attach without offending traditional notions of fair play and substantial justice.

In their first response, the Stricklands said they could not adequately oppose the motion since they had no opportunity to conduct discovery. *See* Doc. 7. The Court reserved ruling on the Motion for Summary Judgment and permitted limited discovery on the alter ego and jurisdictional issues. *See* Doc. 12. The Stricklands filed a Supplemental Response on November 30, 2006 and the Second Supplemental Response on April 11, 2007. *See* Docs. 24 and 41. The response filed on November 30, 2006 outlines the bulk of the Stricklands' response in opposition to summary judgment. *See* Doc. 24. The Stricklands allege they satisfied the elements as required under Alabama law to establish CHB is the alter ego of CEI, also known as piercing the corporate veil. *See* Doc. 24, p. 3. The Stricklands contend the Court should deny the motion for summary judgment.

## V.  SUMMARY JUDGEMENT STANDARD

A party in a lawsuit may move a court to enter summary judgment before trial. FED. R. CIV. P. 56(a) and (b).  Summary judgment is appropriate when the moving party establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91

L.Ed.2d 202 (1986). Only disputes about those facts will preclude the granting of summary judgment. *Id.* A material fact is one "that might affect the outcome of the suit under governing law," and a dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1277 (11th Cir. 2005) (quoting *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344-45 (11th Cir. 2003)) ("In determining whether an issue of fact is 'genuine' for the purpose of defeating summary judgment, we ask whether the evidence is 'such that a reasonable jury could return a verdict for the nonmoving party.'"). Thus, the initial burden of proof rests on the movant. *Celotex*, 477 U.S. at 325; *Gonzalez*, 161 F.3d at 1294. This burden is satisfied when the movant shows that if the evidentiary record were reduced to admissible evidence at trial, it would be insufficient to permit the non-movant from carrying its burden of proof. *Celotex*, 477 U.S. at 322-23. The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County, Georgia*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)). Once the movant meets its burden under Rule 56, the non-movant must designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lejaun v. Nat'l Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The party opposing summary judgment must respond by setting

forth specific evidence in the record and articulating the precise manner in which that evidence supports his or her claim, and may not rest upon the mere allegations or denials of the pleadings. FED. R. CIV. P. 56(e); *Johnson v. Board of Regents of University of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Johnson*, 263 F.3d at 1242-43; *Smith v. F.D.I.C.*, 61 F.3d 1552, 1562 n. 18 (11th Cir. 1995) (on summary judgment, the court resolves all reasonable doubts about the facts in favor of the nonmovant). Further, "all justifiable inferences are to be drawn in [that party's] favor." *Anderson*, 477 U.S. at 255; 106 S.Ct. at 2513. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to its case on which it will bear the burden of proof at trial, summary judgment <u>must</u> be granted. *Celotex*, 477 U.S. at 322-23. In other words, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Id*. at 322, 106 S.Ct. at 2552.

## VI.   DISCUSSION AND ANALYSIS

### A.   Piercing the Corporate Veil/Alter-Ego Theory

It is a well-established concept that "a corporation is a distinct and separate entity from the individuals who compose it as stockholders or who manage it as directors or officers." *Nimbus Techs., Inc. v. Sunndata Prods., Inc.*, 484 F.3d 1305, (11th Cir. 2007) (quoting *Cohen v. Williams*, 294 Ala. 417, 318 So.2d 279, 281 (1975)); *see also Perry v.*

*Household Retail Servs., Inc.*, 953 F.Supp. 1378, 1381 (M.D. Ala. 1996) ("the concept that a corporation is a legal entity existing separate and apart from its shareholders is well-settled law.") (citing *Backus v. Watson*, 619 So.2d 1342, 1345 (Ala. 1993)). The mere fact that one corporation owns all the stock of another corporation does not destroy the separate corporate identities. *Messick v. Moring*, 514 So.2d 892, 895 (Ala. 1987); *see also South Alabama Pigs, LLC v. Farmer Feeders, Inc.*, 305 F.Supp.2d 1252, 1258 (M.D. Ala. 2004) (quoting *Simmons v. Clark Equip. Credit Corp.*, 554 So.2d 398, 400 (Ala. 1989)); *Perry*, 953 F.Supp. at 1381 (citing *Messick*). Under Alabama law, "[p]iercing the corporate veil is not a power that is lightly exercised." *First Health, Inc. v. Blanton*, 585 So.2d 1331, 1334 (Ala. 1991); *see also Perry*, 953 F.Supp. at 1381 (quoting *Blanton*). At times, a court may disregard the corporate entity and impose liability upon the controlling party.

To establish that one party is the alter-ego of another party, or to pierce the corporate veil, Plaintiffs must show the following:

(1) The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own;

(2) The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is necessary to prevent injustice or inequitable circumstances, misuses of control will be presumed;

(3) The misuse of this control must proximately cause the harm or unjust loss

complained of.

*Blanton*, 585 So.2d at 1334-35 (quoting *Messick*, 514 So.2d at 894-95); *see also Perry*, 953 F.Supp. at 1381 (citing *Blanton* and *Messick*); *Hollingshead v. Burford Equip. Co.*, 828 F.Supp. 916, 919 (M.D. Ala. 1993) (citing *United Steelworkers of America v. Connors Steel*, 855 F.2d 1499, 1506-07 (11th Cir. 1988)). Given the fact-intensive nature of the veil-piercing analysis, the determination is typically one to be resolved at trial, where the trier of fact can make choices as to credibility and weight of the evidence. *See Perry*, 953 F.Supp. at 1381 (citations omitted). However, in light of Rule 56, the court may grant summary judgment if a trial court, under appropriate standards, have but one result. *Id.*

1.    **Domination and Control**

In considering whether a business organization is an alter-ego, a plaintiff must show one organization has complete control and domination of the other organization in relation to the transaction attacked. *See Hollingshead*, 828 F.Supp. at 919. To measure indicia of control, the Supreme Court of Alabama has provided a laundry list of factors to be used in determining whether a subsidiary is under the domination and control of its parent. *Duff v. Southern Ry. Co.*, 496 So.2d 760, 763 (Ala. 1986); *see also Connors Steel*, 855 F.2d at 1505 (11th Circuit lists similar laundry list with a few differences). The following is a combined list from the Supreme Court of Alabama and Eleventh Circuit for use in determining whether the subsidiary is under the domination and control of its parent.

(1)    The parent corporation owns all or most of the capital stock of the subsidiary.

(2)    The parent and subsidiary corporations have common directors or officers.

(3)    The parent corporation finances the subsidiary.

(4)   The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

(5)   The subsidiary has grossly inadequate capital.

(6)   The parent corporation pays the salaries and other expenses or losses of the subsidiary.

(7)   The subsidiary has substantially no business except with the parent corporation or has no assets conveyed to it by the parent corporation.

(8)   In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(9)   The parent corporation uses the property of the subsidiary as its own.

(10)  The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(11)  The formal legal requirements of the subsidiary are not observed.

(12)  The parent and subsidiary have common business departments.

(13)  The parent and subsidiary file consolidated financial statements and tax returns.

(14)  The daily operations of the two companies are not kept separate.

*See Duff*, 496 So.2d at 760 (Factors 1 through 11); *Connors Steel*, 855 F.2d at 1505 (Factors

12 through 14 and reiteration of most factors in 1 through 11 for a total of twelve factors);

*see also Perry*, 953 F.Supp. at 1381-82 (listing of factors 1 through 11 and citing to *Duff*);

*Hollingshead*, 828 F.Supp. at 919 (listing 12 factors from *Connors Steel*). Courts do not

assign greater or lesser value to any of the factors or indicate how many factors must be

present before the court may find domination by the parent, and the *Duff* court even noted

"[n]o one of these factors is dispositive; nor does the list exhaust the relevant factors." *Duff*, 496 So.2d at 763; *see generally Connors Steel*, 855 F.2d 1499 (court did not assign weight to any of the factors, nor did it indicate how many must be present). However, it is clear "plaintiffs do not have to prove the existence of all [the] factors in order to prevail" and "the court may assign some relative weight based upon its familiarity with the record." *Hollingshead*, 828 F.Supp. at 919.

Plaintiffs concede they do not have sufficient information to establish factors 4 (parent subscribes to all the capital stock or causes incorporation), 7 (subsidiary has no business except with parent), and 11 (formal legal requirements of subsidiary not observed). As such, the Court concludes Factors 4, 7, and 11 are not present.

The Court finds, and CEI admits, that factor 1 (common stock ownership) is present. Champion Enterprises, Inc. (CEI) is a stock holding company and owns one-hundred percent (100%) of the stock of Champion Home Builders Co. (CHB) *See* Doc. 18 at p.2. The Court also finds that factors 9 (uses the property of subsidiary) and 13 (file consolidated financial statements and tax returns) are present. CEI concedes it shares office space with CHB, but contends CHB has many other offices in plants across the United States where its handles its day to day activities. *Id*. at p.8. The home offices for CHB and CEI are both located in Auburn Hills, Michigan and are even on the same floors of the building. CEI also states CEI and CHB file consolidated tax returns, though they have separate tax I.D. numbers. As such, factors 1, 9, and 13 are all present. Neither Plaintiffs nor Defendants specifically address Factors 12 or 14, and as such, the Court finds they are not present. The remaining factors are disputed thus the Court devotes the remainder of this section to the reasons for its findings.

a.    **Factor 2 - Common directors or officers**

Plaintiffs assert CEI and CHB have or had several officers in common. *See* Doc. 24

at p.7. CEI concedes many officers of CHB and CEI are the same, but the Board of Directors

for each company is completely different other than the President and CEO of CEI on both

Boards during some years. *See* Doc. 18 at p.2-3 citing Ex. B. Based on this information, the

Court finds this factor is only partially present.

b.    **Factors 3, 5, 6 - Parent corporation finances the subsidiary, Subsidiary
      has grossly inadequate capital, and Parent corporation pays the salaries
      and other expenses/losses of the subsidiary**

Plaintiffs retained the services of Edward W. Sauls, a certified public accountant, as

an expert witness on the financial matters relating to CEI and CHB. Mr. Sauls affidavit is

attached as Exhibit I to Plaintiffs' Response. *See* Doc. 24, Ex. I. In his affidavit, Mr. Sauls

concludes CEI finances CHB, CHB has grossly inadequate capital, and CEI pays for the

losses of its subsidiaries. Defendant contests these assertions and cite to various excerpts

from Mr. Sauls' deposition. Between the affidavit and deposition testimony, there is

conflicting testimony from which the Court may draw various conclusions which in turn

requires a weighing of the testimony and credibility of Mr. Sauls and his conclusions. As

such, the Court is unable to conclude for the purposes of summary judgment whether or not

Factors 3, 5, and 6 are present.

c.    **Factors 8 and 10 - Subsidiary is described as a department/division of the
      parent corporation or business is referred to as the parent corporation's
      own and Directors/executives of subsidiary do not act independently in the
      interest of the subsidiary**

Plaintiffs assert the two elements intertwine and contend CEI and CHB are part of a single business enterprise. *See* Doc. 24 at p.11. Plaintiffs state Champions' Form 10-K's, filed with the SEC, all begin with introductory language "[e]stablished in 1953, Champion Enterprises, Inc., and its subsidiaries (collectively "we", "Champion", or "the company") primarily produce and sell factory-built homes." *Id*. citing Ex. J - O. Plaintiffs point to numerous other instances where CEI appears to assert CHB's operations as its own. *Id*. at p.11-13. Moreover, Plaintiff cites an instance where a contract for CHB was signed by CEI's President and CEO instead of the President of CHB. CEI argues this is not sufficient and irrelevant as the referenced contract occurred two (2) years outside of the relevant time period. From the conflicting information and contradictory conclusions drawn by the party, the Court is unable to conclude for the purposes of summary judgment whether or not Factors 8 and 10 are present.

### d.    Conclusions regarding Element of Control

Based on the above, the Court finds Factors 1, 2, 9, and 10 are present while Factors 4, 7, 11, 12, and 14 are not present. The remaining factors, 3, 5, 6, 8, and 10 are factors where the information is contradictory. Viewing the information in the light most favorable to the nonmovant Plaintiff, with the four Factors present, there is sufficient information to conclude CEI exerts control and domination over CHB. However, "[m]ere domination or control of a corporation by its stockholder cannot be enough to allow a piercing of a corporate veil. There must be the added elements of misuse of control and harm or loss resulting from it." *Blanton*, 585 So.2d at 1335.

### 2.    Misuse of Control and Proximate Causation of Loss

Having read the numerous pleadings filed by the parties, the extensive evidence attached to said pleadings, and listening to the oral arguments of parties at the hearing on June 11, 2007, the Court does not find any evidence tending to prove CEI misused its control, if any, over CHB, or that the misuse of control proximately caused the Stricklands' loss. Plaintiffs rely on the fact Element 2 states "misuse of control will be presumed." The Stricklands fail to consider this presumption only applies if the Court finds it necessary "to prevent injustice or inequitable circumstances." *See Blanton*, 585 So.2d at 1334-35 (quoting *Messick*, 514 So.2d at 894-95) (listing the full version of element 2); *Perry*, 953 F.Supp. at 1381 (same); *Hollingshead*, 828 F.Supp. at 919 (citing *Connors Steel*, 855 F.2d at 1506-07) (same). In the instant suit, the Court does not find injustice or inequitable circumstances exist to allow Strickland to pierce the corporate veil. The Stricklands' cite no authority demonstrating the presumption is mandatory upon the Court. Rather, the Stricklands make conclusory assertions they have established CEI is "continuously misusing its control of its subsidiaries" and "[i]t is clear Champion Enterprises is attempting to control the process, reap the benefits and avoid any and all liability." Further, the Stricklands assert "[i]njustice is not only to be presumed, but is open and obvious." The Court disagrees. The Stricklands provide no evidence CEI actually controlled the day to day manufacturing of the home during the relevant time frame. In fact, the Stricklands fail to address CEI's assertion it does not control the day to day activities of CHB's plants, but that those operations are handled by the plant managers. *See* Doc. 18 at p.6. Moreover, "[i]n a closely held corporation, it is not unusual for the majority stockholder to control the entity's operation. The fact that [the majority shareholder] controlled [the] business does not make that corporation a sham" that

the corporate veil should be pierced. *South Alabama Pigs*, 305 F.Supp.2d at 1258 (quoting *McKissick v. Auto-Owners, Inc. Co.*, 429 So.2d 1030, 1033 (Ala. 1983)).

Further, even when the corporation appears to be an alter-ego, to pierce the corporate veil, "[t]here must be the added elements of misuse and control and harm or loss resulting from it." *South Alabama Pigs*, 305 F.Supp.2d at 1258 (quoting *Backus*, 619 So.2d at 1345 and *citing Messick*, 514 So.2d at 894-95). The Stricklands fail to enumerate sufficient evidence to demonstrate the misuse of control either in their extensive briefs or in the June 11, 2007 hearing. Accordingly, the Court determines Elements 2 and 3 were not met, the corporate veil remains intact, and as such, CEI is entitled to summary judgment on this issue. As a result, the *Motion to Strike Jury Demand as to Alter Ego Claims and to Stay Alter Ego Claims* (Doc. 10) is thus moot.

## B.  Personal Jurisdiction

A plaintiff need only establish a prima facie case of jurisdiction, and may do so by presenting evidence sufficient to defeat a motion for judgment as a matter of law. *Delong v. Washington Mills*, 840 F.2d 843, 845 (11th Cir. 1988); *South Alabama Pigs*, 305 F.Supp.2d at 1257 (citing *Perry*, 953 F.Supp. 1380-81). "The burden for overcoming a motion for judgment as a matter of law is the same as that for overcoming a motion for summary judgment; legally sufficient evidence must exist to create a genuine issue of material fact." *Id.* (citing *Celotex*, 477 U.S. 317, 106 S.Ct. 2548; *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987)).

When a nonresident defendant challenges personal jurisdiction, the plaintiff must establish personal jurisdiction that comports with (1) the State's long-arm statute and (2) the

requirements of the due-process clause of the Fourteenth Amendment of the United State Constitution. *Id.* (citing *Williams Elec. Co. v. Honeywell, Inc.*, 854 F.2d 389, 391 (11th Cir. 1988)). The Supreme Court of Alabama has extended the jurisdiction of Alabama courts to the extent permissible under the due process clause of the Fourteenth Amendment. *See Alabama Waterproofing Co., Inc. v. Hanby*, 431 So.2d 141, 145 (Ala. 1983); *Olivier v. Merritt Dredging Co., Inc.*, 979 F.2d 827, 830 (11th Cir. 1992); *see also* ALA. R. CIV. P. 4.2(b) (current version of statute referenced by courts). Therefore, a plaintiff may establish the court's personal jurisdiction over a defendant by showing the requirements of due process have been met. *Olivier*, 979 F.2d at 830; *Morris v. SSE, Inc.*, 843 F.2d 489, 494 n.3 (11th Cir. 1988). Due process first requires that the defendant perform "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" - that is "minimum contacts" with the forum state. *Morris*, 843 F.2d at 492 (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985)); *South Alabama Pigs*, 305 F.Supp.2d at 1257 (citations omitted). Second, the exercise of personal jurisdiction over the defendant must not offend the "traditional notions of fair play and substantial justice." *Morris*, 843 F.2d at 492 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed 95 (1945)); *South Alabama Pigs*, 305 F.Supp.2d at 1257 (citations omitted). Both conditions must be satisfied to establish personal jurisdiction over a defendant.

Two types of personal jurisdiction exist: specific and general. Specific jurisdiction is based on the party's contacts with the forum state that are related to the cause of action. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8, 104 S.Ct. 1868,

1872, 80 L.Ed.2d 404 (1984). General personal jurisdiction arises from a party's contacts with the forum state that are unrelated to the litigation. *Thomas v. Mitsubishi Motor North America, Inc.*, 436 F.Supp.2d 1250, 1253 (M.D. Ala. 2006) (citing *Helicopteros Nacionales de Colombia*, 466 U.S. at 414 n.9, 104 S.Ct. at 1872). "The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and forum state." *Consolidated Development Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11thCir. 2000), *cert. denied*, 534 U.S. 827, 122 S.Ct. 68, 151 L.Ed.2d 34 (2001). The Stricklands assert they have met their burden in establishing both general and specific contacts. *See* Doc. 24 at p.22.

1.    **Specific Personal Jurisdiction**

The Stricklands base their assertion of the court's specific personal jurisdiction on the fact CHB does business and operates a manufacturing plant in Alabama. *See* Doc. 24 at p.20. The Stricklands argue CEI's 100% ownership of CHB stock establishes specific contacts with the state of Alabama ergo specific personal jurisdiction exists assuming the Court decides to pierce the corporate veil. The Court has already determined the corporate veil must remain intact. The Stricklands acknowledged at the June 11, 2007 hearing, specific jurisdiction hinges on piercing the corporate veil. The corporate veil remains intact, thus there is no specific jurisdiction over CEI.

2.    **General Jurisdiction**

The Stricklands also assert general jurisdiction over CEI because CEI is the registered domain owner of championhomes.net which is a copyrighted website used to market

Page 17 of 20

Champion Manufactured Homes across the United States and Western Canada.[2] No party asserts direct sales contact between the Stricklands and CEI via the website. No evidence is before the Court that any aspect of the Stricklands' transaction involved the website. Rather, the Stricklands' website argument refers to the website as a general sales tool. In fact, it is even listed under the heading "General Contacts." As such, the Court will analyze the website to determine whether it establishes general personal jurisdiction - i.e. substantial, continuous, and systematic contacts with the State of Alabama.

Whether a website can establish personal jurisdiction is a developing area of law. Several courts look to *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* and use its "sliding scale" model as an analytical framework. 952 F.Supp. 1119 (W.D.Pa. 1997). In short, the *Zippo* court evaluates whether the requisite degree of contact with the forum state exists based on the degree of interactivity of the website.[3] *Id.* However, this analysis was performed with relation to specific personal jurisdiction. Courts are split on whether to apply the *Zippo* analysis in a general personal jurisdiction analysis. *See Lakin v. Prudential Securities, Inc.,* 348 F.3d 704, 711 (8th Cir. 2003) (comparing various court decisions).

In the context of interactive websites, the Fifth Circuit noted that even repeated contacts with citizens of the forum state may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction. *Revell v.*

---

[2]     *See* http://www.championhomes.net/story/homebuilders.asp

[3]     As noted by Judge Albritton in the *Thomas* case, this model is based on a sliding scale analysis. At one end, jurisdiction is created when there are knowing and repeated transmissions of computer files over the internet and at the other end, personal jurisdiction is improper where the website is passive. In between those extremes are websites which allow for the exchange of information. *Thomas*, 436 F.Supp.2d at 1254 n.1 (citations omitted).

*Lidov*, 317 F.3d 467, 471 (5th Cir. 2002); *see also Thomas*, 436 F.Supp.2d at 1254 (same). This Court agrees with the courts who determined interactivity of the website is only one factor in a general personal jurisdiction analysis. *See Lakin*, 348 F.3d at 712; *Revell*, 317 F.3d at 471; *Thomas*, 436 F.Supp. at 1254-55; *Bell v. Imperial Palace Hotel/Casino, Inc.*, 200 F.Supp.2d 1082, 1091 (E.D. Mo. 2001).

The Stricklands cite the deposition testimony of David Goltz, associate general counsel for CEI and corporate representative of the Defendants. *See* Doc. 24 at p. 19. Mr. Goltz said, "[i]t is an interactive website that allows a consumer to punch in geographical information, find out what types of homes may be available in the geographic area, either from subsidiaries of Champion Home Builders Co., or I believe there is a retailer site that directs the consumer to an independent retailer within their area where they could go find out more information about Champion Home Builders, or its subsidiaries' home." *See* Doc. 24, Ex. A, p. 80. However, the mere fact the Champion website does not fall at the "passive" end of the *Zippo* interactivity scale does not mean the Court has general jurisdiction over CEI in Alabama. Instead, the Court must determine whether CEI has systematic and continuous conduct within the State of Alabama. From the evidence, the Champion website provides some degree of interactivity in that it allows a user to put in geographical locale to find a local distributor and general information on available products. No evidence is before the Court that the website can actually be used to purchase a home. In fact, CEI specifically notes "no sales are made over the internet." *See* Doc. 18 at p.16. Moreover, the Stricklands have not disputed CEI's assertion that it is simply the owner of the domain and Champion Enterprises Management Co. actually maintains the website. *Id*. Furthermore, there is no

evidence of CEI offices, employees or agents in Alabama; CEI does not directly own any property in Alabama; CEI itself has never sold or delivered a product in Alabama; and finally CEI does not as an entity advertise in Alabama. *See* Doc. 18 at p.17 (citing Ex. A). Given the plethora of uncontroverted evidence, the Court concludes there is insufficient evidence to establish general personal jurisdiction over CEI in Alabama.

## VII. CONCLUSION

Pursuant to the foregoing *Memorandum Opinion*, it is **ORDERED** as follows:

(1)     Defendant Champion Enterprises, Inc.'s *Motion for Summary Judgment* (Doc. 5, filed August 4, 2006) is **GRANTED**.

(2)     Defendant Champion Enterprises, Inc. is **DISMISSED** for lack of personal jurisdiction.

(3)     The *Motion to Strike Jury Demand as to Alter Ego Claims and to Stay Alter Ego Claims* (Doc. 10) is **DENIED as moot**.


DONE this 26th day of June, 2007.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.   **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a)   **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

   (b)   **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c)   **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d)   **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5:** The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e)   **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

Rev.: 4/04

2.  **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

    (a)  **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

    (b)  **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c)  **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d)  **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e)  **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.  **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4.  **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).