IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRY DEESE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case Number: 1:06-cv-643 MHT** |
| | * | |
| **CHAMPION ENTERPRISES, INC., et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COMES NOW**, Champion Homes of Boaz, Inc., formerly known as Homes of Legend, Inc. (hereinafter referred to as "Legend"), one of the defendants in the above-styled action, by and through counsel of record, and in support of its Motion for Summary Judgment, states as follows:

1.      Legend incorporates herein its Motion for Summary Judgment.

2.      In support of its motion, Legend is submitting herewith as Exhibit "1", excerpts from the deposition of the plaintiff, Terry Deese (hereinafter referred to as "Deese"), along with pertinent exhibits marked "Defendant's Exhibit", introduced at the deposition, which include the following: Defendant's Exs. 7, 11 to 18.

3.      Legend is also attaching hereto as Exhibit "2", a true and correct copy of Plaintiff's Responses to Defendant Homes of Legend, Inc.'s Request for Production of Documents to Plaintiffs, and as Exhibit "3", a true and correct copy of portions of Plaintiff's Responses to Defendant Homes of Legend's Interrogatories to Plaintiff.

4.      Legend is also attaching hereto as Exhibit "4", excerpts from the deposition of the plaintiff's expert, Bobby Parks (hereinafter referred to as "Parks").

## ALLEGATIONS

There are ten (10) counts in the Complaint, as amended. Count One claims a violation of the Magnuson-Moss Warranty - Federal Trade Commission Improvement Act, 15 U.S.C. § 2301 *et seq.* (hereinafter referred to as the "Magnuson-Moss Warranty Act"); Count Two claims a breach of the express warranty; Count Three alleges a breach of implied warranty of merchantability; Count Four alleges a breach of fitness for a particular purpose; Count Five alleges breach of warranty of habitability; Count Six alleges negligence with regard to the manufacture, design, building or assembly of the manufactured home; Count Seven alleges that Legend is guilty of wanton construction of the manufactured home; Count Eight alleges unjust enrichment; Count Nine alleges fraudulent concealment of the alleged known defect set forth in the Background Facts (placing the vapor retarder on the warm side of the wall instead of the interior or living space side of the exterior wall in hot, humid climates) (Complaint, ¶ 7); and Count Ten alleges a violation of the Alabama Extended Manufacturers Liability Doctrine (hereinafter referred to as "AEMLD").

## NARRATIVE SUMMARY OF UNDISPUTED FACTS

On or about the 7th day of November, 2003, Deese purchased a 2004 Legend 80′ x 16′ manufactured home, Model AM-SP and bearing Serial No. HL15661AL. (Ex. 1, Defendant's Exs 7 and 11). Deese understood that Legend was the entity that built the home. (Ex. 1, p. 47: 5-7). No one at Legend participated in the sale and Deese understood that the people he dealt with at Best Value Homes, the dealership that sold the home, were employees of Best Value Homes. (Ex. 1, p. 30: 6-8; p. 38: 12-18; p. 39: 8-23; p. 40: 1-3). Deese did not have any knowledge of dealing with Legend with regard to the purchase as he went through a dealership and only dealt with dealership employees. (Ex. 1, p. 38: 12-23; p. 39: 1-23; p. 40: 1-3). Deese

2

never lived in the home. (Ex. 1, p. 10: 19-23; p. 11: 1-23). No doctor has ever diagnosed Deese with regard to any physical ailment concerning the subject manufactured home. (Ex. 1, p. 119: 3-10; Ex. 3 Response to No. 17). According to Deese, every time service representatives came out, they did a good job; all repairs were done satisfactorily; after the last repairs were performed, Deese's wife signed a form giving excellent marks to the repair men and noted that all work was completed; after the last repairs were performed, no further request for repairs was made. (Ex. 1, p. 86: 12-23; p. 87: 1-23; p. 88: 1-23; p. 89: 1-10; *see generally* pp. 91-98; p. 122: 9-23; p. 123: 1-10; and Ex. 1, Defendant's Exhibits 12-17 attached to Ex. 1). The only remaining problem is a stain above the bathroom tub. (Ex. 1, p. 98: 17-21; p. 99: 1-14). Deese never turned in to Legend the alleged stain above the bathroom tub nor anything listed in the lawsuit that is now claimed to be a problem. (Ex. 1, p. 99: 2-23). Deese could not produce any evidence or provide any information to support any theory of liability against Legend, other than to reference what was stated in the Compliant. (Ex. 1, *see generally* pp. 46-60).

In response to discovery propounded by Legend, Deese responded to nearly every request with an objection and/or statement that "[w]ithout waiving these objections, Plaintiff will produce all documents that, at this time are in his possession, custody and control that are not protected or subject to the above referenced objections at a mutually agreed upon time and place for inspection, copying and review." (Exs. 2 and 3, Responses to Request Nos. 2-17, 19). At his deposition, Deese was asked to provide a copy of the requested documents and Deese produced all documents he had with regard to the home. (Ex. 1, p. 12: 23; p. 13: 1-16; p. 14; p. 18-23; p. 15: 1-3; p. 35; p. 6-13; p. 16: 6-13; p. 108: 15-21; p. 111: 9-14; p. 112: 4-7, p. 113: 1-12; p.120: 3-6).

3

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). Rule 56 of the *Federal Rules of Civil Procedure* sets forth a two-tiered standard for determining whether to enter a summary judgment. In order to enter a summary judgment, the Court must determine (1) that there is no genuine issue of material fact; and (2) that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). The plain language of Rule 56(c):

> [M]andates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed. 2d 774 (1989), *quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2549, 91 L.Ed.2d 265 (1986); *see also Kramer v. Unitas*, 831 F.2d 994, 997 (11th Cir. 1987) ("The Supreme Court has interpreted [the Rule 56 standard] to mandate summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial'").

If a party seeking summary judgment meets the initial burden of demonstrating that there is no genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and

admissible evidence. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). A nonmoving

party, opposing a summary judgment motion which is supported by depositions or affidavits

"cannot meet the burden of coming forth with relevant competent evidence by simply relying on

legal conclusions or evidence which would be inadmissible at trial." *Id., citing Fontenot v.*

*Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986)). "The evidence presented cannot consist of

conclusory allegations or legal conclusions." *Avirgan*, 932 F.2d at 1577, *citing First National*

*Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569

(1968).

This court should apply the summary judgment standard enunciated in *United States v.*

*Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941

F.2d 1428 (11th Cir. 1991). There, the court stated:

> The moving party bears "the initial responsibility of informing the . . . court of the
> basis for its motion, and identifying those portions of the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if
> any, which it believes demonstrates the absence of a genuine issue of material
> fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the *nonmoving*
> party has the burden of proof at trial, the moving party is not required to "support
> its motion with affidavits or other similar material *negating* the opponents claim,"
> *Celotex*, 477 U.S. 323, in order to discharge this "initial responsibility." Instead,
> the moving party simply may show[] "—that is, point[] out to the district court –
> that there is an absence of evidence to support the nonmoving party's case." *Id.* at
> 324. Alternatively, the moving party may support its motion for summary
> judgment with affirmative evidence demonstrating that the nonmoving party will
> be unable to prove its case at trial. *Id.* at 331. (Brennan, J., dissenting). If the
> moving party shows the absence of a triable issue of fact by either method, the
> burden on summary judgment shifts to the nonmoving party, who must show that
> a genuine issue remains for trial. Fed.R.Civ.P. 56(e); *Chanel, Inc. v. Italian
> Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the nonmoving party
> fails to "make a sufficient showing on an essential element of her case with
> respect to which she has the burden of proof," *Celotex*, 477 U.S. at 323, the
> moving party is entitled to summary judgment.

*Four Parcels of Real Property*, 941 F.2d at 1438.

To defeat summary judgment, Deese may not rest on the pleadings; instead, Deese must introduce admissible evidence showing that there is a genuine issue for trial. *Fed.R.Civ.P.* 56(e). Reliance on pleadings, without more, is not sufficient to defeat a motion for summary judgment. *Sorenson v. IRS*, No. 96-A-1410-N, 1997 U.S. Dist. LEXIS 2656, *2 (M.D. Ala. Feb. 27, 1997) ("A party opposing a motion for summary judgment cannot rely only on his unsworn pleadings but must oppose the motion by filing sworn affidavits that set forth specific facts which demonstrate that there is a genuine issue of material fact for trial in this case").

## ARGUMENT

### COUNTS ONE AND TWO – The Express Warranty Claims

Legend is entitled to a judgment in its favor as to the allegations in Count One, alleged breach of the Magnuson Moss Warranty Act[1] and Count Two, alleged breach of express warranty. Legend's Limited Warranty states that it "only applies to substantial defects that become evident within the Warranty Period and where **written** notice is provided to the Manufacturer not later than 10 days following the expiration of the Warranty Period." (Defendant's Ex. 18, p. 4, ¶ 2) (Emphasis added). A federal court, while sitting in diversity, is bound to apply the substantive law of the state in which it sits. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

It is undisputed that every time service representatives came out, they did a good job; all repairs were done satisfactorily; after the last repairs were performed, plaintiff's wife signed a form giving excellent marks to the repair men and noted that all work was completed; and after the last repairs were performed, no further request for repairs was made. (Ex. 1, p. 86: 12-23; p.

---

[1] Legend also disputes that the Magnuson-Moss Act is applicable to manufactured housing. See Footnote 4 below. It is respectfully submitted that the plaintiff has the burden to establish that the Act is applicable to manufactured housing.

87: 1-23; p. 88: 1-23; p. 89: 1-10; *see generally* pp. 91-98; p. 122: 9-23; p. 123: 1-10; and Ex. 1.

Defendant's Exhibits 12-17). It is further undisputed that at no time did Deese notify Legend of

any problems with the interior vapor barrier or of any other problem that was not reflected on

Legend's work orders. (Ex. 1, p. 98: 11-21; p. 122: 9-23; p. 123: 1-10). The only remaining

problem is a stain above the bathroom tub. (Ex. 1, p. 98: 17-21; p. 99: 1-14). Deese did not

notify Legend of the alleged stain above the bathroom tub, nor any items listed as a problem in

the lawsuit. (Ex. 1, p. 99: 2-23).

In order to prove that the warranty was breached, it must be shown that either Legend

refused to repair or replace any defective parts in accordance with its warranty or did not repair

or replace the defective parts within a reasonable time. *See Alabama Code* § 7-2-729(1)(a); *see*

*also Ag-Chem Equipment Company, Inc. vs. Limestone Farmers Co-op., Inc.*, 567 So.2d 250

(Ala. 1990). The warranty specifically stated that "written notice" must be given. (Defendant's

Ex. 18, p. 4, ¶ 2). When a warranty states the only way to obtain warranty service, a homeowner

must follow the specific requirements in the warranty. *See Southern Energy Homes, Inc. v.*

*Washington*, 774 So.2d 505 (Ala. 2000).[2] In addressing whether sufficient notice had been

provided, the Supreme Court of Alabama noted:

---

[2] A warranty is also similar to an insurance policy wherein the insured is required to
submit a claim for benefits. Thus, cases in the insurance context may also provide guidance with
regard to situations where a condition precedent, such as notice, is not met. *See, e.g., Nationwide*
*Ins. Co. v. Nilson*, 745 So.2d 264 (Ala. 1998) (in order to recover on his claim alleging breach of
contract, plaintiff was required to first comply with the condition precedent that he submit to an
examination under oath as required by the insurer); *United Ins. Co. v. Cope*, 630 So.2d 407 (Ala.
1993) (an insurer's obligation to pay an insured's claim does not arise until the insured has
complied with the terms of the contract with respect to submitting claims); *Mordecai v. Blue*
*Cross Blue Shield*, 474 So. 2d 95 (Ala. 1985) (until the insured furnishes proof of loss in the
form required in the policy, the insurer is under no obligation to pay or to investigate the claim).
In addition to the above, the Alabama Supreme Court has noted that "no case from this Court
places on an insurance company an obligation to either investigate or pay a claim until the

" 'Express warranties [are] treated like any other type of contract and interpreted according to general contract principles.' *See Ex parte Miller*, 693 So.2d 1372, 1376 (Ala.1997)(citing 2 Alphonse M. Squillante & John R. Fonseca, Williston on Sales, § 15-9 (4th ed.1974)). If a company wishes to require a specific mode of notice as a prerequisite to warranty coverage, it may do so. *See generally Miller*, 693 So.2d at 1376 (stating that a company can limit its warranty coverage); see also *Rhode v. E & T Invs., Inc.*, 29 F.Supp.2d 1298, 1303 (M.D.Ala.1998)(construing a warranty under which a manufacturer agreed to replace defective parts 'PROVIDED THAT the Owner gives written notice of any such defect to the Manufacturer or its Dealer at their business address within one (1) year and ten (10) days')."

*Southern Energy Homes, Inc. v. Washington*, 774 So.2d at 511.

Alabama case law clearly holds that when the first notice of an alleged defect or claim for breach of warranty is given after the warranty expired, it is too late and a claim for breach of warranty can not be maintained *See, e.g. Turner v. Westhampton Court, LLC*, 903 So.2d 82, 91 (Ala.2004) (where Limited New-Home Warranty required written notice of a latent defect be given within the one (1) year warranty period, such a provision "operates as a waiver of the [claimants] rights to sue under the warranty if they fail to give notice of the defect within the one-year warranty period"); *Puckett, Taul & Underwood, Inc. v. Schreiber Corp., Inc. v. Schreiber Corporation, Inc.*, 551 So.2d 979, 983; (Ala. 1989) (one year warranty given at latest in March, 1985 and first notice of claimed breach of warranty given in July, 1986; notice was too late and defendant entitled to a judgment on all warranty claims); *Ag-Chem Equipment Company, Inc. vs. Limestone Farmers Co-op., Inc.* 567 So.2d 250 (Ala. 1990) (warranty did not fail of its essential purpose where dealer stood ready to rebuild engine in accordance with warranty but buyer never tendered engine to enable dealer to complete repairs); *Feil vs. The Wittern Group, Inc.*, 784 So.2d 302 (Ala. 2000) (buyer failed to establish breach of express warranty where during the warranty period of a repair or replacement warranty, manufacturer

insured has complied with all of the terms of the contract with respect to submitting claims for payment." *Cope*, 630 So.2d at 407.

supplied replacement parts and according to warranty, buyer was responsible for shipping and reinstallation); *Central Mining, Inc. vs. Simmons Machinery Co., Inc.* 547 So.2d 529, 531 (Ala. 1989) (summary judgment on warranty issue was proper where evidence showed only that "various and sundry" repairs were made on the loader and that manufacturer was not called on to make repairs to the hydraulic system that allegedly caused the fire); *Jewell v. Seaboard Industrial, Inc.,* 667 So.2d 653, 660-661 (Ala. 1985) (list of 128 items given, but never complained about set-up of home until after suit filed; Supreme Court concluded Jewell did not give sufficient notice); *Century 21-Reeves Realty, Inc. v. McConnell Cadillac, Inc.,* 626 So.2d 1273, 1275 (Ala. 1993) *overruled on other grounds by Hines v. Riverside Chevrolet Olds, Inc.,* 655 So.2d 909 (Ala. 1994) (summary judgment proper were engine failed after warranty expired); *Haynes vs. Ford Motor Company, Inc.,* 435 So.2d 1227, 1230 (Ala. 1983) (affirming summary judgment on breach of warranty claim where express warranty had expired prior to request for service and where vehicle was out of warranty, due to excessive mileage, at time claim arose); *Redman Industries v. Binkey,* 49 Ala.App. 595, 599-600, 274 So. 2d 621, 625 (Ala.Civ.App. 1973) (failure to give manufacturer's requested jury charge that manufacturer was entitled to notice within reasonable time after discovery of any breaches of warranty was reversible error); *Copenhagen Reinsurance Company v. Champion Home Builders Company, Inc.,* 872 So.2d 848, 855 (Ala.Civ.App. 2003) (manufacturer's warranty required "written notice" of any claim for warranty related defects; proper notice was not given to the manufacturer as the only notice given was over the telephone).

It should also be noted that under Alabama law, the mere filing of a lawsuit does not constitute notice of breach. *Hobbs v. General Motors Corp.,* 134 F.Supp.2d 1277, 1281 (M.D.Ala. 2001). Since it is undisputed that all requested repairs were performed to the

satisfaction of Deese and no other written notice was sent regarding any other problems, Legend

is entitled to a judgment in its favor on Counts One and Two.

**COUNTS THREE, FOUR AND FIVE – The Implied Warranty Claims**

Legend is entitled to a judgment as a matter of law as to Count Three, alleged a breach of

implied warranty of merchantability, Count Four, alleged breach of fitness for a particular

purpose and Count Five, alleged breach of warranty of habitability since Legend is a remote

manufacturer and did not participate in the sale of the home.[3]   The Supreme Court of Alabama

has repeatedly addressed whether a remote manufacturer is a "seller" in the implied warranty

context, and has over and again stated that implied warranty theories may not be applied to

remote manufacturers precisely because they are not in privity with the buyer and are therefore

not "sellers." *See, e.g., Hobbs v. General Motors Corp.,* 134 F.Supp.2d 1277, 1281 (M.D.Ala.

2001) (A "remote manufacturer" has been identified as being a manufacturer who is not involved

in any transaction with and, therefore, is not in privity with the buyer); *Ex parte Miller,* 693

So.2d 1372, 1375 (Ala. 1997) (Finding no error in directed verdict for remote manufacturer on

implied warranty theories and revocation of acceptance issue); *Bryant v. Southern Energy*

*Homes, Inc.,* 682 So.2d 3, 5 (Ala. 1996) (Under Alabama law, the implied warranty of fitness for

a particular purpose does not apply to Southern Energy, who was the manufacturer, not the

seller); *Johnson v. Anderson Ford, Inc.,* 686 So.2d 224, 228 (Ala. 1996) (Absence of privity of

contract that arises out of seller/buyer relationship is fatal to implied warranty claim under

---

3  Even if implied warranties were applicable to Legend as a remote manufacturer, to
make a claim for any kind of warranty liability, a plaintiff must provide the manufacturer with
notice and opportunity to cure.  The kind of notice required is written notice as provided for in
Legend's limited warranty. *Redman Industries v. Binkey,* 274 So. 2d 621 (Ala. 1973) (notice
required for implied warranty claim); *Parker v. Bell Ford, Inc.,* 425 So. 2d 1101 (Ala.
1983)(same).  As expressed previously, it is undisputed the Deese has not provided the requisite
notice.

Alabama version of UCC in cases of strictly economic loss); *Rhodes v. General Motors Corp.*, 621 So.2d 945, 947-48 (Ala. 1993) (Without privity of contract, there is no right of action against a manufacturer for direct economic loss[4]); *Kidd v. Kilpatrick Chevrolet, Inc.*, 613 So.2d 336, 338 (Ala. 1993) (Because Kilpatrick was not the "seller," the implied warranty sections are not applicable); *Wellcraft Marine v. Zarzour*, 577 So.2d 414, 419 (Ala. 1990) (There is no right of action on an implied warranty theory against a *manufacturer* for property damage without privity of contract); *State Farm Fire and Cas. Co. v. J.B. Plastics, Inc.*, 505 So.2d 1223, 1227 (Ala. 1987) (While Alabama's version of U.C.C. §2-318 has abolished privity requirements in actions involving injuries to natural persons, the privity requirement still remains in cases of strictly economic injury). Moreover, the Alabama Supreme Court has expressly confronted and rejected the argument that a remote manufacturer's express warranty creates "privity" sufficient to deem the remote manufacturer a "seller" with respect to the buyer. *Rhodes v. General Motors Corp.*, 621 So.2d 945, 947-48 (Ala. 1993) (Regardless of any express warranties that a manufacturer may wish to give with a product, by their very language the commercial code's implied warranty sections apply to the seller of the product).

With regard to the specific claim of an implied warranty of habitability, such warranties only apply to real property or "buildings", and do not apply to goods. *See Waites v. Toran*, 411 So.2d 127, 129 (Ala. 1982). Therefore, if a manufactured home is considered to be a consumer product, a belief which is disputed by Legend,[5] the warranty of habitability does not apply to the

---

4    An action for damages for physical harm to the plaintiff's property is one for "property damage"; and an action for damages for "inadequate value, costs of repair, and replacement of defective goods or consequent loss of profits is one for 'economic loss'." James J. White and Robert S. Summers, Uniform Commercial Code: Practitioner's Edition, § 11-4 at 534 (3d ed. 1988).

5    The Manufactured Housing Improvement Act of 2000 struck subsection (a) of 42 U.S.C. 5403 which required the Secretary to consult with the Consumer Product Safety

Manufactured Home made the basis of this civil action.[6] Even if the implied warranty of habitability does apply, privity is also a requirement for the implied warranty of habitability. *See Howe v. Bishop.* 446 So.2d 11, 14 (Ala. 1984) (noting that one of the elements of the implied warranty of habitability is that the plaintiff purchased a residence "from" the defendant); *Cochran v. Keeton,* 47 Ala.App. 194, 198-199; 252 So.2d 307 (Ala.Civ.App. 1970) (adopting the implied warranty of habitability as an exception to the rule of *caveat emptor* solely "for the sale of a brand-new house by a vendor-builder to a first buyer").

Based on the foregoing, Legend is entitled to a judgment in its favor as to the implied warranty claims.

---

Commission prior to establishing appropriate Federal manufactured home construction and safety standards. Pub. L.106-569, 114 Stat. 2997. The new law governing manufactured housing establishes a consensus committee to, among other things, provide periodic recommendations to the Secretary to adopt, revise and interpret the Federal manufactured housing and construction safety standards and the procedural and enforcement regulations. 42 U.S.C. 5403(a)(3). Based on the forgoing and the Manufactured Housing Improvement Act of 2000's purpose to, among other things, "facilitate the availability of affordable manufactured homes and to increase homeownership for all Americans" 42 U.S.C. 5401 (a)(2), it appears Congress no longer considers manufactured housing as a "consumer product". *See also Clark v. Jim Walters Homes, Inc.,* 719 F.Supp. 1037, 1043 (M.D.Ala. 1989) (finding that the "plain reading of the statute suggests that sales of dwellings are not covered by the Magnuson-Moss Warranty Act"); *Zimprich v. Stratford Homes, Inc.,* 453 N.W.2d 557, 561 (Minn. App. Ct. 1990) (finding that the sale of a manufactured home involved the sale of separate building materials and component parts, thus the Magnuson-Moss Act did not apply); *but see See, e.g. Yoemans v. Homes of Legend, Inc.,* 2001 WL 237313 (M.D.Ala. 2001), not reported in F. Supp.2d (Relying in part on 40 Fed.Reg. 25721, 27722 (1975), 16 C.F.R. §§ 700.1(a)--(f) and *In re VanBlarcum,* 19 S.W.3d 484, 491-92 (Tex.Ct.App.2000), which was subsequently overruled by *In re American Homestar of Lancaster, Inc.* 50 S.W.3d 480 (Tex. 2001).

6  In the alternative, if the manufactured home is considered real property, as opposed to a "good" or "consumer product", it is not subject to claims for breach of implied warranties for merchantability, fitness for a particular purpose, or Magnuson-Moss Warranty Act claims. *See Code of Alabama,* §§ 7-2-105; 7-2-314; 7-2-315; 15 U.S.C. § 2301(1); *Cf. Clark v. Jim Walter Homes, Inc.,*719 F. Supp. 1037, 1043 (M.D. Ala. 1989).

**COUNTS SIX AND SEVEN - Negligence and Wanton Claims**

Claims alleging negligence, wantonness or liability under the AEMLD are barred under Alabama law by its two year statute of limitations. *See* § 6-2-38(l), *Code of Alabama, (1975). See, generally, Smith v. Medtronic, Inc.,* 607 So. 2d 156, 159 (Ala. 1992) (an action alleging negligence, wantonness, or liability under the AEMLD must be brought within two years after the cause of action accrued). The cause of action arose as soon as Deese was entitled to maintain it, which Deese testified was in December of 2003 when he did the "walk-through", approximately thirty (30) days after the the home was first occupied. (Ex. 1, pp. 86: 8-23; 87: 1-16; Defendant's Ex. 12). "A cause of action 'accrues' as soon as the party in whose favor it arises is entitled to maintain an action thereon." *Id., (citing Garrett v. Raythorn Co.,* 368 So.2d 516 (Ala. 1979)). Any cause of action for the alleged defective manufactured home accrued on or shortly after Deese accepted delivery of the house in November or December, 2003. The cause of action was not brought until the 19th of June, 2006, which is after the two year statute of limitations period.

Assuming, *arguendo,* that the statute of limitations did not expire prior to the filing of the civil action, any negligent or wanton manufacture or repair claims are due to be summarily dismissed as said claims are merely breach of warranty claims and not cognizable under Alabama law.[7] One cannot recover in tort for injury to the product itself, compensation for such injury may be obtained through available contractual remedies, i.e. claims for breach of express

---

7 Additionally, the statute of limitations for such claims expired as said claims were not brought within the two (2) year statute of limitations period. *See Smith v. Medtronic, Inc.,* 607 So. 2d 156, 159 (Ala. 1992) (an action alleging negligence, wantonness, or liability under the AEMLD must be brought within two years after the cause of action accrued). "A cause of action 'accrues' as soon as the party in whose favor it arises is entitled to maintain an action thereon." *Id., (citing Garrett v. Raythorn Co.,* 368 So.2d 516 (Ala. 1979)). Any cause of action for the alleged defective Manufactured Home accrued on or shortly after Deese moved into the house.

warranty. *See Dairyland Ins. Co. v. General Motors Corp.*, 549 So.2d 44, 46 (Ala. 1989); *see also Lloyd Wood Coal Co. v. Clark Equip. Co.*, 543 So.2d 671, 673-674 (Ala. 1989) (relying on *East River S.S. Corp. v. Transamerica Delavel, Inc.*, 476 U.S. 858 (1986), which held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself" and that "[d]amage to a product itself is most naturally understood *as a warranty claim.*") (emphasis in original); see also *Grand Manor, Inc. v. Dykes*, 778 So.2d 167, 171, n.3 (Ala.Civ.App. 1998) ("warranty actions under the Uniform Commercial Code are the only appropriate means for seeking recovery for damage to the product itself caused by negligent manufacture") (overruled on other grounds by *Ex parte Grand Manor, Inc.*, 778 So.2d 173 (Ala. 2000)).

Notwithstanding the above, Deese cannot support any negligent or wanton manufacture or repair claims as there is no substantial evidence that Legend harbored an intent not to repair the home or otherwise injure or deceive Deese. *See, e.g., Jewell v. Seaboard Industrial, Inc.*, 667 So.2d 653, 659 (Ala. 1995) (Jewell presented no substantial evidence that manufacturer harbored an intent not to repair the mobile home or otherwise to injure or deceive Jewell; the evidence indicated that on one occasion, a representative from Southern Energy spent two or three days making repairs to Jewell's mobile home, apparently repairing all but 5 of 128 defects in Jewell's original list-on other occasions, Southern Energy tried to make appointments with Jewell, but the parties could not agree on a time or else Jewell could not be reached). In this case, Legend addressed all repairs for which it received notice and Deese was satisfied with all repairs. (Ex. 1, p. 86, 12-23; p. 87, 1-23; p. 88, 1-23; p. 89, 1-10; see generally, pp. 91-98; p. 122, 9-23; p. 123 1-10; Ex. 1, Defendant's Exhibits 12-17).

It is further respectfully submitted there is no public or common law duty owed by manufactured home builders in Alabama or anywhere else in the country to build a perfect home or to perform repairs. *See Burnell v. Morning Star Homes, Inc.*, 494 NYS 2d 488 (NY App. Div. 1985). In *Burnell*, the Supreme Court of New York correctly recognized that a manufactured home manufacturer that provides a limited warranty to a purchaser owes duties under the limited warranty to the purchaser. If a home is manufactured incorrectly, or improperly repaired thereafter, a manufacturer is guilty of breach of express warranty. The manufacturer cannot simultaneously be guilty of negligence since there is no common law or public law duty for a manufactured housing company to do anything.

Even if a legal duty could be established, negligence claims would still fail because Deese suffered no damage recoverable under Alabama law. It appears Deese seeks money damages for alleged defects in the home, as well as mental anguish damages. It is clear under Alabama law that property damage claims are barred by the economic loss doctrine, which precludes any plaintiff from recovering economic damages attributable to the product itself under a tort theory. *Carrell v. Masonite Corp.*, 775 So. 2d 121, 124 (Ala. 2000). Thus, Deese can make no claim for property loss in tort.

With respect to the mental anguish claims, Deese cannot satisfy the zone of danger test. Indeed, Deese never has lived in the home. (Ex. 1, p. 10, 19-23; p. 11, 1-23). No doctor has ever diagnosed Deese with regard to any physical ailment concerning the subject manufactured home. (Ex. 1, p. 119, 3-10). Theoretically speaking, a plaintiff can recover mental anguish damages in the absence of physical harm where the plaintiff suffers a near miss, but satisfies the zone of danger test. *Ex parte Grand Manor*, 778 So. 2d 173, 178-81 (Ala. 2000). Deese cannot recover mental anguish as no real physical injury has been suffered, and there is no evidence of a near

15

miss where Deese almost suffered physical harm (like a collapsing roof or a burning home, etc.). Thus, Deese cannot prevail on any negligence or wanton claims because no recoverable damage exists.

**COUNT EIGHT - Unjust Enrichment Claim**

There is no such cause of action in Alabama. "Unjust enrichment" is instead a discrete inquiry employed to determine whether certain equitable remedies, such as a constructive trust or quasi-contract, are appropriate. *See, e.g., Jordan v. Mitchell*, 705 So. 2d 453, 458 (Ala. Civ. App. 1997). Deese's claim of unjust enrichment sounds in common law fraud. Legend has demonstrated that Deese's fraud theories are defective as a matter of law.

The claim of "Unjust Enrichment" is premised exclusively on conclusory allegations that the "Defendants by its acts and omissions described [in the Complaint], have wrongfully appropriated, retained or otherwise possessed funds that rightfully in justice and equity belong to Plaintiff," and the "Defendants had earned enormous profits from this deceptive act." (Complaint at ¶ 55). No evidence supports these claims. "[C]onclusory allegations are insufficient to create a genuine issue for trial." *Bogle v. Scheer*, 512 So. 2d 1336, 1340 (Ala. 1987).

Notwithstanding the above, unjust enrichment claims are equitable in nature and cannot be maintained when there is an adequate remedy at law. *See Nat'l Life Ins. Co. v. Propst*, 219 Ala. 437, 122 So. 656 (Ala. 1929) (The rule in this state is that "'fraud itself is never a distinctive ground of equity jurisprudence . . . No matter how gross the fraud may be, if the party can have full, complete and adequate redress at law, he cannot go into a court of equity.'") (citation omitted). In any event, no unjust enrichment could ever be shown based on Deese's own testimony that he feels the home is worth what he has it insured for, which covers "the home cost, maybe a little bit more for add-on." (Ex. 1, pp. 107:18-23; 108: 1-14; Defendant's Ex. 7).

16

**COUNT NINE - Fraudulent Concealment Claim**

It is respectfully submitted that the two (2) year statute of limitations for fraud claims expired prior to the filing of the lawsuit. *See* § 6-2-38(l), *Code of Alabama, (1975); Foremost Insurance Co. v. Parham,* 693 So.2d 409, 417 (Ala.1997). Even if the statute of limitations had not expired, Deese cannot satisfy the elements of a fraudulent suppression claim. The elements of a fraudulent suppression claim are:

> (1) that the defendant had a duty to disclose a material fact, (2) that the defendant concealed or failed to disclose this material fact, (3) that the defendant's concealment or failure to disclose this material fact induced the plaintiff to act or to refrain from acting, and (4) that the plaintiff suffered actual damage as a proximate result. *Locklear Dodge City, Inc. v. Kimbrell,* 703 So.2d 303, 305 (Ala.1997); quoting *Hines v. Riverside Chevrolet-Olds, Inc.,* 655 So.2d 909, 918 (Ala.1994); *Ala.Code 1975,* § 6-5-102.

"Although the term 'inducement' has often been used in the description of the fourth element of suppression, it is clear that a plaintiff's . . . 'reasonable reliance' . . . is an essential element of a suppression claim." *Ex parte Household Retail Servs., Inc.,* 744 So.2d 871, 879 (Ala.1999); *see also Alfa Life Insurance Corporation v. Green,* 881 So.2d 987, 992 (Ala. 2003). In order to satisfy the reliance element of a fraud claim, a plaintiff must show not only that he relied on the alleged misrepresentation, but also that the reliance was *reasonable* in light of the facts surrounding the transaction in question. *Baker v. Metropolitan Life Insurance Co.,* 907 So.2d 419, 421 (Ala.2005) (emphasis in original).

As expressed in *Graham v. First Union National Bank of Georgia,* 18 F.Supp.2d 1310, 1317-1318 (M.D.Ala. 1998), the determination of reliance should be "based on all of the circumstances surrounding a transaction including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *Id.* However, "where a party has

reason to doubt the representation or is informed of the truth before he acts, he has no right to act thereon." *Bedwell Lumber Co. v. T & T Corp.*, 386 So.2d 413, 415 (Ala.1980).

The requirement that a plaintiff show that a failure to disclose an existing material fact created a false impression is as basic to an action alleging fraudulent suppression as the requirement that a plaintiff establish the defendant's duty to disclose. *Ford New Holland v. Proctor-Russell Tractor*, 630 So. 2d 395, 399 (Ala. 1993). The existence of a duty to disclose is a question of law to be determined by the trial judge. *State Farm Fire and Casualty Company v. Owen*, 729 So.2d 834, 839, *overruling Whataburger, Inc. v. Rockwell*, 706 So.2d 1220 (Ala.Civ.App.1997); *Ballard v. Lee*, 671 So.2d 1368 (Ala. 1995); *Baker v. Bennett*, 603 So.2d 928 (Ala.1992) (citations omitted). When parties to a contract deal at arm's length, with no confidential relations, no duty to disclose arises unless information is requested. *Ala.Code 1975* § 6-5-102; *Miller v. Pawn World, Inc.*, 705 So.2d 467 (Ala.Civ.App. 1997). It is evident from a reading of the statute and the case law that, without a duty to disclose, there can be no recovery for suppression. *Freighliner, LLC v. Whatley Contract Carriers, LLC*, 932 So.2d 883, 891 (Ala. 2005).

It is undisputed Legend did not participate in any aspect of the sale of the Manufactured Home by the selling dealer and that at all times relevant, Deese only dealt with representatives from the dealership. (Ex. 1, p. 30, 6-8; p. 38, 12-18; p. 39, 8-23; p. 40, 1-3). Therefore, Legend could not have participated in any fraud. There was no contact by and between Deese and Legend by which a duty to disclose could have arose. Since there was no direct contact between the Deese and Legend before the sale of the Manufactured Home, no duty can be established to support any fraud claim.

The only representations regarding the Manufactured Home, for which Deese could claim fraud, would be contained in the Limited Warranty delivered in connection with the sale of the Manufactured Home. (Ex. 1, Defendant's Ex. 18). However, the language contained in the Limited Warranty does not amount to an actionable representation that the Manufactured Home was "free from defects". *See Palm Harbor Homes, Inc. v. Crawford*, 689 So.2d 3 (Ala. 1997); *Rhodes v. General Motors Corp.*, 621 So.2d 945 (Ala.1993); *Tittle v. Steel City Oldsmobile GMC Truck, Inc.*, 544 So.2d 883 (Ala.1989). In the *Crawford* case, it was alleged that the manufacturer expressly warranted that the home was "free from defects in material and workmanship" and that the manufactured home was "constructed in compliance with the federal guidelines". *Palm Harbor Homes, Inc. v. Crawford*, 689 So.2d at 9-10. The Supreme Court of Alabama, relying on previous holdings, found that the language of an express warranty to repair cannot be construed as a representation that a product is entirely free of defects. *Palm Harbor Homes, Inc. v. Crawford*, 689 So.2d at 10-11.

In *Rhodes v. General Motors Corp.*, 621 So.2d 945, 948 (Ala.1993), the Supreme Court held that language in a warranty stating that the "warranty covers repairs to correct any defect in material or workmanship of the vehicle" cannot be construed as a representation that the car was and would remain free of defects. In *Tittle v. Steel City Oldsmobile GMC Truck, Inc.*, 544 So.2d 883 (Ala.1989), the Supreme Court reviewed language in a warranty that stated: "This warranty covers any repairs and needed adjustments to correct defects in material or workmanship." *Tittle*, 544 So.2d at 891. The Supreme Court determined that rather than guaranteeing the car to be free of defects, the warranty actually anticipated that defects would arise and provided for remedying such defects. *Id.*

It is anticipated Deese will claim that the alleged problems set forth in his Background Facts support his fraudulent concealment theory. However, the Background Facts failed to provide any admissible evidence in support of the generalized statements. Even if it can be proven that there was some sort of recurring defect, such a fraud claim is not actionable. The Supreme Court of Alabama has reviewed similar claims in several cases and held there is no duty to disclose recurring defects in a line of products to a buyer. When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested. *Mason v. Chrysler Corporation.* 653 So.2d 951, 954-955 (Ala. 1995), *citing Bama Budweiser of Montgomery. Inc. v. Anheuser-Busch Inc.,* 611 So.2d 238 (Ala.1992); *Norman v. Amoco Oil Co.,* 558 So.2d 903 (Ala.1990); *see* Ala.Code 1975, § 6-5-102.

In *Mason,* the Masons' contacts with Chrysler Corporation consisted primarily of their viewing national advertisements before they purchased the vehicle and their presenting the vehicle for repair. Neither the Masons' depositions nor their affidavits in opposition to the summary judgment motion contained any evidence indicating that they inquired of Chrysler Corporation or Royal Motor Company regarding whether problems similar to theirs had occurred in other automobiles. *Mason v. Chrysler Corporation.* 653 So.2d at 955.

The Supreme Court of Alabama in *Mason* held as follows:

> Although the Masons took their car in for repairs on several occasions, that fact standing alone--bringing a car in for repairs--does not establish any special relationship between the dealer and the purchaser that would require the dealer to disclose to the purchaser that the car may require additional repairs. The Masons complain that they were assured by the salesman and by Chrysler Corporation' promotional material that the car they bought would give a smooth ride, like that of a Cadillac, and that the warranty Chrysler Corporation offered was one of the best. They contend that these statements were false and that the dealer knew they were false. The statements may have been false, but they were not statements of material fact that a buyer could be expected to rely on.

20

Under the express provisions of its warranty, Chrysler Corporation would be responsible for repairing the car, but the plaintiffs produced no evidence that will support a fraud action based either on statements made at the time of the sale or on the defendants' failure, when the car was brought in for repairs under the warranty, to disclose that the problems with the car might recur. Because the plaintiffs failed to establish the necessary facts to support their fraud claim, the trial court correctly entered the summary judgment as to this claim.  The extent and the nature of the harm the Masons claim in this case are substantially similar to those of the harm claimed in *McGowan, supra.* As we noted in *McGowan:*

> "Even if there was substantial evidence that [the dealer] knew of the problems with the Fifth Avenue line, the record does not contain substantial evidence to support the inference that [it] actively or knowingly concealed these problems with an intent to deceive McGowan.   Likewise, even if was substantial evidence that Chrysler knew of the problems with its Fifth Avenue cars, McGowan produced no evidence of a confidential relationship or of any special circumstances between him and Chrysler, nor did he present substantial evidence that Chrysler knowingly or actively concealed from him its knowledge of the problems with the Fifth Avenue line."

  631 So.2d at 847-48.    The summary judgment is also affirmed as to the fraudulent suppression claim.
*Mason v. Chrysler Corporation,* 653 So.2d at 955.

This position has steadfastly been followed by the Supreme Court of Alabama.  *See e.g.*

*Freightliner, LLC v. Whatley Contract Carriers, LLC,* 932 So. 2d 883, 892 (Ala. 2005) (with

arm's length transaction and no specific inquiry, no duty to disclose any information regarding

the internal audit results for the Mexico plant, which found discrepancies above-sometimes four

to five times above-the goal set by Freightliner; law generally allows a business to keep

confidential its internal operating procedures and data unless that information is specifically

requested); *DaimlerChrysler Corp. v. Morrow,* 895 So.2d 861, 867 (Ala.2004) (no generalized

duty to disclose similar problems occurring in other vehicles).

The above is true even where work was performed at the factory. In *Century 21-Reeves Realty, Inc. v. McConnell Cadillac, Inc.*, GM, the manufacturer of the subject vehicle, serviced the automobile at its factory prior to its sale to a finance company to correct a problem with the engine and had no contacts with buyer; the Supreme Court of Alabama concluded that a summary judgment for GM was proper as to Century 21's fraud claim based on the following analysis:

> The undisputed evidence shows that Century 21 purchased the automobile from GMAC, not from GM.  GM was not involved with the negotiations leading up to Century 21's purchase of the automobile from GMAC. GM, which had no confidential relationship with Century 21 (in fact, GM had no contacts with Century 21 at all), had serviced Century 21's automobile at the factory to correct the problem with the engine.    Although GM may have misjudged the effectiveness of its efforts to rectify the problem with the engine's gasket, we can find no basis under the circumstances of this case upon which to impose a duty on GM's part to disclose information concerning the automobile directly to Century 21.  See *Cobb v. Southeast Toyota Distributors, Inc.*, 569 So.2d 395 (Ala.1990). [FN1]
>
>> FN1. The record shows that GM adopted a plan to notify owners of record of automobiles equipped with the HT-4100 engine of the problem that it had had with the gaskets.  The record is unclear; however, as to whether GMAC or Century 21 actually received specific notice of the engine's problematic history.
>
> *Century 21-Reeves Realty, Inc. v. McConnell Cadillac, Inc.*, 626 So.2d 1273, 1275-1276 (Ala. 1993).

Based on the foregoing, it is respectfully submitted that Legend is entitled to a judgment in its favor as to the fraudulent suppression claim.

## COUNT TEN - AEMLD Claims

Assuming, *arguendo*, that the statute of limitations has not expired, Legend is entitled to a judgment in its favor as to any AEMLD claims. As explained in *American States Ins. Co. v. Lanier Business Products*, 707 F.Supp. 494, 495-96 (M.D.Ala.1989), the Alabama Supreme Court first announced the adoption of the AEMLD in *Casrell v. Altec Industries, Inc.*, 335 So.2d

128 (Ala.1976). and *Atkins v. American Motors Corp.*, 335 So.2d 134 (Ala.1976); *See also Code of Alabama (1975)* Article 28. §6 5 500, *et seq.*  Under this doctrine, "a manufacturer, supplier, or seller who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, is negligent as a matter of law." *American States*, 707 F.Supp. at 495; *see also Entrekin v. Atlantic Richfield Co.*, 519 So.2d 447, 449 (Ala.1987).  To establish liability under the AEMLD, a plaintiff must prove: "(1) he suffered injury of damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. (2) Showing these elements, the plaintiff has proved a prima facie case although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller." *Casrell*, 335 So.2d at 132-33; *Atkins*, 335 So.2d at 141.

The claims made under the AEMLD are due to be dismissed for several reasons. First, claims under the AEMLD are barred under Alabama law by its two year statute of limitations. See § 6-2-38(l), *Code of Alabama. (1975)*.  Deese purchased the home in November, 2003. (Complaint, ¶ 64). The cause of action arose as soon as Deese was entitled to maintain it, which Deese testified and the Complaint alleges was during the year after the warranty expired. (Ex. 1, p. 86, 12-23; p. 87, 1-23; p. 88, 1-23; p. 89, 1-10; see generally, pp. 91-98; p. 122, 9-23; p. 123 1-10 and Ex. 1, Defendant's Exhibits 12-17; Complaint, ¶ 67); *see generally. Smith v. Medtronic. Inc.*, 607 So. 2d 156, 159 (Ala. 1992) (an action alleging negligence, wantonness, or liability under the AEMLD must be brought within two years after the cause of action accrued). "A cause of action 'accrues' as soon as the party in whose favor it arises is entitled to maintain an

action thereon." *Id.,* (citing *Garrett v. Raythorn Co.,* 368 So.2d 516 (Ala. 1979)). Any cause of action for the alleged defective manufactured home accrued on or shortly after Deese purchased the house. The cause of action was not brought until June 19, 2006, which exceeds the two year statute of limitations for products liability claims by four years.

In addition to the above, a house and fixtures attached to a house are not products under the AEMLD. The Supreme Court of Alabama has held that exterior walls of homes are not products under the AEMLD. *Keck v. Dryvit Systems, Inc.,* 830 So.2d 1 (Ala. 2002) (holding that a house's exterior insulation finishing system is not a product); see also See *Wells v. Clowers Construction Co.,* 476 So.2d 105,106 (Ala. 1985) (holding that a fireplace is not a product as attachments or improvements to realty that become as much a part of a house as the four walls cannot be considered a product under the AEMLD); but see *Foremost Ins. Co. v. Indies House, Inc.,* 602 So.2d 380, 382 (Ala. 1992) (finding that manufacturer of mobile home was not considered a "distributor" of a finished product, a refrigerator, because when Indies House combined a finished product with other materials to create a mobile home, it was the manufacturer of the mobile home, *in toto*). It is respectfully submitted that the issue of whether a manufactured home could be considered a product under the AEMLD was not argued or addressed in the *Foremost* case. As stated by the Supreme Court of Alabama in *Foremost,* the "focus is considerably narrowed to the defense asserted by Indies House to Foremost's AEMLD action. . . Specifically, in its answer Indies House raised the affirmative defense of a lack of causal relation." *Foremost Ins. Co. v. Indies House, Inc.,* 602 So.2d at 381. Thus, the Supreme Court of Alabama has not specifically addressed whether a manufactured home built to the HUD Code standards is a product under the AEMLD.

The decision in *Keck v. Dryvit Systems, Inc.*, 830 So.2d 1 (Ala. 2002) related to a house's exterior wall finish is directly on point with regard to the allegations in this case with respect to a house's exterior wall. In *Keck*, the Supreme Court of Alabama specifically addressed when an item attached to realty may be considered a "product" for purposes of the AEMLD as follows:

> Now that the question is squarely presented to us again, we take this opportunity to define with greater clarity when an item attached to realty may be considered a "product" for purposes of the AEMLD. We reaffirm our holding in *Bell v. T.R. Miller Mill Co.*, 768 So.2d 953 (Ala.2000)] that the law of fixtures is inapplicable to determining what constitutes a product for purposes of the AEMLD. The question whether an item attached to realty may be considered a product for purposes of the AEMLD must be based on the underlying policies of product-liability law in Alabama, not on the law of fixtures. *When considering whether an item attached to realty constitutes a "product" for purposes of the AEMLD, we must consider the overall function and life span of the item.*

> The owner of a house or of any building should reasonably expect that many components will have the same useful life as the house or building itself and will not need to be replaced over the life of the building. Such components include, by way of example, an exterior brick wall, a staircase, or a fireplace. There are also certain components of a house or a building the purchaser reasonably expects to wear out and to require replacement in the course of normal and ordinary usage, such as roof shingles, a dishwasher, a furnace, or a hot-water heater. *Whether an item that is incorporated into real property may be considered a "product" for purposes of the AEMLD is determined by whether the item is a part of the structural integrity of the house or building or is reasonably expected to last for the useful life of the house or building. If it is, then the item cannot be considered a "product" for purposes of the AEMLD.* However, if the item is attached or incorporated into real property and, yet its very function and nature clearly makes it an item that one would reasonably expect to repair or to replace during the useful life of the realty, the item may be considered a "product" for purposes of the AEMLD. For instance, although paint, when applied to the structure of a wall, becomes incorporated into the surface of the wall, paint is a structural improvement that does not have the same useful life as the wall itself or the building to which the wall is attached; one would expect to have to repaint a wall to maintain the quality of the first application. Therefore, paint would be considered a product for purposes of the AEMLD.

> Our decisions in *Wells* [*v. Clowers Construction Co.*, 476 So.2d 105 (Ala.1985)] and *Bell* are both consistent with this test. A fireplace is generally built into the structural integrity of a home and is expected to last for the useful life of the house or building to which it is attached. A fireplace is not a component that one would expect to have to replace because of ordinary wear and tear; under this test,

therefore, a fireplace cannot be considered a "product" for purposes of the AEMLD. A telephone pole, although not a component of the structural integrity of a home or building, is attached to real property; however, telephone poles require maintenance and, when necessary, replacement. The fact that the telephone pole is attached or incorporated into real property does not, alone, cause the telephone pole to lose its character as a "product" for purposes of the AEMLD.

*Keck v. Dryvit Systems. Inc.*, 830 So.2d at 6-7. (Emphasis added).

It is respectfully submitted that a manufactured home affixed to realty is certainly closer to a "home" than a telephone pole. The overall function of the Manufactured Home is for a residential dwelling. The Manufactured Home made the basis of this civil action *is the house or building and is reasonably expected to last the lifetime of the house or building.* The expected life span of a manufactured home is generally the same as other housing. Since the manufactured home is a residential dwelling, and this case involves the sale of the dwelling and not the sale of separate building materials and component parts, it is not a "product" under the AEMLD. To hold otherwise would be tantamount to treating manufactured housing differently from "stick-built" or modular housing, which is expressly prohibited by federal law. See 42 USCA § 5401, *et seq.*

Until a manufactured home is installed and connected to utilities, it is not useful for the purpose for which it was intended and cannot be occupied. A manufactured home once installed, is certainly closer to realty than personalty. In fact, under *Ala.Code (1975)* § 6-10-2, a manufactured home, if it is the principal place of residence, is deemed a homestead for exemption purposes. Further, a manufactured home becomes part of the realty by anchoring it to ground. *See Crews v. Moore.* 579 So.2d 1334, 1335 (Ala. 1991) (The [manufactured home] that plaintiffs seek to have removed has been made a part of the realty by being anchored to the ground; porches and decks having been added). Additionally, interest paid on a manufactured

26

home loan is considered by the Internal Revenue Service in the same fashion as interest paid on other dwellings.

There appears to be little difference between a manufactured home built under the present Manufactured Housing Construction and Safety Standards Act (hereinafter referred to as the "MHCSSA") and "stick-built" housing. In *Scurlock v. City of Lynn Haven, Fla.*, 858 F.2d 1521 (11th Cir. 1988), expert testimony indicated that, for the most part, the standards set forth in the MHCSSA are equivalent to the Southern Standard Building Code, the National Electrical Code, and the Electrical Code of the City of Lynn Haven. *Scurlock v. City of Lynn Haven, Fla.*, 858 F.2d at 1523. It should be noted that the two examples of differing standards mentioned in the *Scurlock* opinion issued in 1988 appear to no longer exist based on amendments to the MHCSSA in 1994. *See* 24 CFR § 3280.305(c)(1)(ii); 24 C.F.R. § 3280.801. Also, a Code Comparison Summary of the 1995 CABO One and Two Family Dwelling Code, the 1995 Model Energy Code, and the MHCSS Act found that on balance, the codes are comparable. Jeffrey Gordon and William B. Rose, *Code Comparison Summary*, University of Illinois at Urbana-Champaign School of Architecture-Building Research Council (December, 1997).

Based on the foregoing, it certainly cannot be claimed that a manufactured home is a product. *See also Frander and Frander, Inc. v. Griffen*, 457 So.2d 375, 378 (Ala. 1984) (pre-manufactured home financed for 30 years not a "structure of a temporary character"). In *Frander and Frander*, testimony suggested that it was no easier to move the pre-manufactured home once anchored than it would be to move most conventional "stick-built" homes. *Frander and Frander, Inc. v. Griffen*, 457 So.2d at 378. Additionally, it was noted that the home came with a one year warranty covering defects in materials or labor, which automatically terminated if the home was relocated. *Frander and Frander, Inc. v. Griffen*, 457 So.2d at 378. Similarly in

this case, the Manufactured Home came with a warranty covering "substantial defects in materials and workmanship", which also automatically terminates if the home is moved from its original site. (Ex. 1, Defendant's Ex. 18). Simply stated, a house, such as a manufactured home, cannot be classified as a "product" under the AEMLD. *See Wells v. Clowers Constr. Co.*, 476 So.2d 105, 106 (Ala. 1985).

Even if a manufactured home was a product under the AEMLD, the first prong of an AEMLD claim cannot be established. To establish liability under the AEMLD, a plaintiff must prove: "(1) he suffered injury of damages to himself or his property by one who sells a product in a defective condition *unreasonably dangerous* to the plaintiff as the ultimate user or consumer." *Casrell*, 335 So.2d at 132-33; *Atkins*, 335 So.2d at 141. (Emphasis added). Deese only claims damages related to costs of repair, plus worry and mental anguish due to problems with the manufactured home. (Complaint, ¶ 27).[8] Further, Deese's expert did not find that the alleged problems with the walls were an imminent safety hazard or in any way "unreasonably dangerous", which is a necessary fact to establish liability under the AEMLD. Instead, Deese's expert only labeled the alleged problem as a "defect" as that term is defined in the HUD Code. (Ex. 4, pp. 239: 7-23; 240: 1-23; 241:1-23; 242: 1-11). The term "defect" is defined in 24 CFR § 3282.7(j) as follows:

> "Defect" means a failure to comply with an applicable Federal manufactured home safety and construction standard that renders the manufactured home or any part or component thereof not fit for the ordinary use for which it was intended, but does not result in an unreasonable risk of injury or death to occupants of the affected manufactured home.

Further, while it is admitted that the AEMLD allows for a recovery against a remote manufacturer, without privity of contract, *see White Consolidated Industries, Inc. v. Wilkerson*,

---

8  Although mold claims were alleged, Deese testified that he is not making any mold related personal injury claims. (Ex. 1, p. 30, 9-12; 119, 3-10).

737 So.2d 447, 451 (Ala. 1999) *in dissent*, (AEMLD does not require privity), the Supreme

Court of Alabama has explicitly held that "there is no cause of action in tort under the AEMLD

for a product defect that results in damage only to the product itself." *Wellcraft Marine v.*

*Zarzour*, 577 So.2d 414, 418 (Ala. 1990); *See also Dairyland Ins. Co. v. General Motors Corp.*,

549 So.2d 44 (Ala. 1989) and *Lloyd Wood Coal Co. v. Clark Equipment Co.*, 543 So.2d 671

(Ala. 1989). As the only claims made by Deese relate to property damage to the product itself,

there is no cause of action and Legend is entitled to a judgment in its favor. *See White*

*Consolidated Industries, Inc. v. Wilkerson*, 737 So.2d at 449 (the trial court erred by permitting

the jury to award damages based on a claim of mental anguish; "the law will not allow recovery

of damages for mental distress where the tort results in mere injury to property"). Alabama

follows the "zone of danger" test, which limits recovery of mental anguish damages to those

plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are

placed in immediate risk of physical harm by that conduct. *See Ex parte Grand Manor, Inc.*, 778

So.2d 173, 179 (Ala. 2000); *Wal-Mart Stores, Inc. v. Bowers*, 752 So.2d 1201, 1203 (Ala.

1999.); *quoting AALAR, Ltd., Inc. v. Francis*, 716 So.2d 1141, 1147 (Ala. 1998); *accord, White*

*Consol. Indus., Inc. v. Wilkerson*, 737 So.2d 447, 449 (Ala. 1999).

In this case, there is no testimony tending to establish that Deese was placed in

"immediate risk" of any physical harm. Even if there were some "concern" of being placed in

harm's way, such a "concern" does not amount to an actionable claim. In *Ex parte Grand*

*Manor, Inc.*, the Supreme Court of Alabama held as follows:

> Mrs. Dykes testified at trial that she had been told by two "certified people" that
> the interior electrical wiring in her home was "very dangerous," and she
> testified that because of the possibility of having a fire caused by an electrical
> problem, she had "worried a lot about [her] children being safe when [she was]
> not home." Mrs. Dykes also testified that she had "lost many nights' sleep from
> wondering why [she] was treated the way [she] was by both of the companies

[Grand Manor and Better Cents]," specifically, that she "was told that neither one of them would fix the problems" with the mobile home and that she "spent a lot of time ... worrying if [she and her husband] made the right decision in buying the home." While Mrs. Dykes's testimony, when reviewed in a light most favorable to her, tends to show that she was anxious for her children's safety and that she worried a great deal, her testimony does not constitute substantial evidence indicating that, as a result of the alleged negligent manufacture of the mobile home, she "fear[ed] for [her] own physical safety." *AALAR*, 716 So.2d at 1148. At most, the evidence presented by the Dykeses in support of their negligent-manufacture claim shows injury to the mobile home itself, and Alabama law does not permit recovery of mental-anguish damages based on a claim of simple negligence where the negligent act or omission results in mere injury to property. *See Bowers*, 752 So.2d at 1204 (holding that the trial court erred in allowing the jury to award mental-anguish damages to the plaintiff homeowners based on their negligence claim, where fire destroyed the house but they suffered no physical injury and were not in the zone of danger)

. . .

Therefore, because under Alabama law one cannot recover for the tort of negligent manufacture where the only damage is to the product itself, but instead must assert a claim for contract damages, the trial court erred in submitting the Dykeses' claim of negligent manufacture to the jury.

*Ex parte Grand Manor, Inc.*, 778 So.2d at 179-181.

Based on the foregoing, it is respectfully submitted that Legend is entitled to a judgment in its favor as to the AEMLD claims.

## DAMAGES- There is No Legally Cognizable Claim for Risk of Future Damages

This case is essentially a "fear of vinyl wallboard" case. There has been no showing that the walls of the Deese home have failed. Rather, it is undisputed by Deese that he has never seen any soft walls in the home. (Deese, p. 107: 15-17). According to Deese's expert witness, the use of vinyl sided wall board or vapor barriers in the hot, humid climate may "lead to" moisture problems. (Parks, p. 87: 10-19). Such potential damage is expressly excluded in Legend's Limited Warranty which in pertinent part, states as follows:

THE WARRANTY DOES NOT COVER:

. . .

> deterioration or damage from high relative humidity, condensation, ground
> moisture, the use of moisture producing appliances (i.e., kerosene heaters,
> humidifiers, etc.) or extended moisture exposure caused by plants, building
> attachments or accessories; or the failure to maintain adequate ventilation in
> and/or underneath the home; or the failure to properly vent the dryer exhaust
> away from the home; or the failure to provide an adequate vapor barrier; or the
> failure to provide adequate drainage away from the home;

(Ex. 1, Defendant's Ex. 18, pp. 4, 5; ¶ 3).

In any event, this case is analogous to *Phizer, Inc. v. Farsian*, 628 So.2d 405 (Ala. 1996).

In *Phizer*, the recipient of an artificial heart valve, which had not failed, filed an action in an

Alabama state court alleging he was fraudulently induced to purchase the valve and misled about

the rate of failure of the same model valve in other recipients and claimed, among other things,

that the valve was manufactured "despite knowing of serious manufacturing problems that

directly related" to valve failures in other recipients. *Phizer, Inc. v. Farsian*, 682 So. 2d at 406.

Although the valve functioned properly, the plaintiff claimed the following injury: "with its

higher rate of fracture and risk of death, [it was] worth less than the valve would have been

worth if it had been what [the manufacturer] represented it to be" and also sought recovery for

emotional distress and expenses related to the removal and replacement of the valve. *Id.* at 407.

The case was removed to federal court and the United States Court of Appeals for the Eleventh

Circuit certified the following question to the Supreme Court of Alabama:

> Does a heart valve implantee have a valid cause of action for fraud under
> Alabama law if he asserts that the valve's manufacturer fraudulently induced him
> to have the valve implanted when the damages that he asserts do not include an
> injury-producing malfunction of the product because the valve has been and is
> working properly?
>
> *Phizer, Inc. v. Farsian*, 682 So. 2d at 406.

In response to the above, the Supreme Court of Alabama provided the following analysis:

The question certified to this Court concerns whether Farsian may maintain a fraud claim under Alabama law. We conclude that he may not.

Regardless of how Farsian pleads his claim, his claim is in substance a product liability/personal-injury claim--Farsian seeks damages because of the risk that his heart valve may one day fail. Alabama courts have never allowed a recovery based on a product that, like Farsian's valve, is and has been working properly. Each of our prior cases in which fraud or other intentional conduct was alleged has involved a failure, a malfunction, or an accident that involved the defendant's products and which injured the plaintiff. See *Quality Homes Co. v. Sears. Roebuck & Co.*, 496 So. 2d 1 (Ala. 1986); *Treadwell Ford, Inc. v. Campbell*, 485 So. 2d 312, 313 (Ala. 1986), *appeal dismissed*, 486 U.S. 1028, 100 L. Ed. 2d 596, 108 S. Ct. 2007 (1988).

Under Alabama law, Farsian's fear that his valve could fail in the future is not, without more, a legal injury sufficient to support his claim. Although the facts as presented by the Court of Appeals indicate that the Bjork-Shiley heart valve has experienced problems with strut failures, Farsian's concern that his heart valve, which is presently functioning normally, could later malfunction is not an injury recognized by Alabama law.

. . .

For the foregoing reasons, we answer the United States Court of Appeals' question in the negative.

*Phizer, Inc. v. Farsian*, 682 So. 2d at 407-08.

The Supreme Court of Alabama has steadfastly stood behind its reasoning above. *See. e.g. Houston County Health Care Authority v. Williams*, 961 So.2d 795, 811 (Ala. 2006) (finding that under Alabama caselaw, mere exposure to a hazardous substance resulting in no present manifestation of physical injury is not actionable where a person has suffered only mental anguish, even where the exposure has increased the exposed person's chance of developing a serious physical disease); *Southern Bakeries. Inc. v. Knipp*, 852 So.2d 712, 718 (Ala. 2002) (opening the courts generally to compensation for fear of future disease would be a dramatic change in the law and could engender significant unforeseen and unforeseeable consequences;

awarding such compensation is better left to the Legislature).[9]  *Hinton v. Monsanto Co.*, 813 So.2d 827, 830-832 (Ala. 2001) (Alabama law provides no redress for a plaintiff who has suffered no present injury or illness; no cause of action exists for medical monitoring for a potential problem that may occur in the future); *Ford Motor Co. v. Rice*, 726 So.2d 626, 627 (Ala. 1998) (allegations that Ford suppressed that Bronco II contained design defect causing an undue propensity to roll over in sudden avoidance maneuvers, stating vehicles were worth less, cost to "repair", punitive damages, attorney fees, and equitable relief in the form of a warning, even though no plaintiffs' Bronco II actually rolled over or caused personal injuries or property damage; Supreme Court of Alabama found its previous decision in *Phizer* controlling and claims of injury were insufficient to sustain action alleging fraudulent suppression).

In *Ford Motor Co. v. Rice*, the Supreme Court of Alabama noted that its holding is in accord with the view of most courts, as "it is well established that 'purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own.'" *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y. 1997), *quoting Hubbard v. General Motors Corp.*, 1996 U.S. Dist. LEXIS 6974, No. 95 Civ. 4362, May 22, 1996 (S.D.N.Y. 1996) (not reported in F. Supp.); *see also Chin v. Chrysler Corp.*, 182 F.R.D. 448, (D.N.J. 1998)*, citing cases. *Ford Motor Co. v. Rice*, 726 So.2d at 628-629. "Where . . . a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies." *Ford Motor Co. v. Rice*, 726 So.2d at 629; *citing Weaver, supra, at 100* (citation omitted). Further, other commentators have agreed with this approach. *See* Victor E. Schwartz et al.,

---

[9]  In *Knipp*, mental anguish and emotional distress was alleged, but at the deposition, the claimants admitted that they did not seek medical care for the alleged emotional distress and did not have any psychiatric or psychological treatment or counseling for emotional distress or mental anguish. *Southern Bakeries, Inc. v. Knipp*, 852 So.2d at 717-718. Likewise in this case, Deese also did not seek any medical care for any alleged emotional distress or mental anguish. (Ex. 3, Response to Int. No. 17).

*Medical Monitoring: Should Tort Law Say Yes?*, 34 Wake Forest L. Rev. 1057, 1059 (Winter 1999) ("For over two hundred years, one of the fundamental principles of tort law has been that a plaintiff cannot recover without proof of a physical injury") (*citing* William L. Prosser, *Handbook on the Law of Torts* § 54, at 330-33 (4th ed. 1971)); W. Page Keeton et al., *The Law of Torts* § 30, at 165 (5th ed. 1984) ("The threat of future harm, not yet realized, is not enough") (footnote omitted).

Based on the foregoing, Deese does not have a legally cognizable claim or injury.

**Conclusion**

Legend's Motion for Summary Judgment is due to be granted for all the reasons stated above.

Respectfully submitted,

RITCHEY & SIMPSON, PLLC

Gregory S. Ritchey, Esquire {ASB-819?-H68G}
Richard S. Walker, Esquire {ASB-87?9-L70R}
Counsel for Homes of Legend, Inc. now
known as Champion Homes of Boaz, Inc.,

OF COUNSEL:
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, AL 35216-3084
Phone:        205.876.1600
Facsimile    205.876.1616

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on the *17* day of *October*,
200___, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system
which will send notification of the foregoing upon the following:

Jere L. Beasley, Esquire                    Jon D. Pels, Esquire
W. Daniel Miles, III, Esquire               Lawrence J. Anderson, Esquire

34

C. Gibson Vance, Esquire
C. Lance Gould, Esquire
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103

Pels, Anderson & Lee, LLC
4833 Rugby Avenue, 4th Floor
Bethesda, MD 20814

OF COUNSEL

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TERRY DEESE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case Number: 1:06-cv-643 MHT |
| | * | |
| CHAMPION ENTERPRISES, INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |

**EXHIBIT LIST FOR**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1.  Excerpts from Deposition of Terry Deese taken November 28, 2006;

    Defendant's Exhibit 7 – Best Value Homes Form 500;
    Defendant's Exhibit 11 – Homes of Legend Compliance Certificate;
    Defendant's Exhibit 12 – Homes of Legend 30-Day Satisfaction Inspection Sheet;
    Defendant's Exhibit 13 – Homes of Legend Service Work Order dated 3/11/04;
    Defendant's Exhibit 14 – Homes of Legend Service Work Order dated 6/4/04;
    Defendant's Exhibit 15 – Homes of Legend Service Work Order dated 7/1/04;
    Defendant's Exhibit 16 – Service Check-List;
    Defendant's Exhibit 17 - Customer Survey dated 7/1/04;
    Defendant's Exhibit 18 – Manufacturer's Limited Warranty;

2.  Plaintiff's Response to Defendant Homes of Legend, Inc.'s First Request for

    Production of Documents and First Request for Admissions;

3.  Plaintiff's Response to Defendant Homes of Legend, Inc.'s First Interrogatories;

4.  Excerpts from Deposition of Robert Parks taken February 19, 2007.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NUMBER

1:06-CV-643-MHT


TERRY DEESE,

    Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al.,

    Defendant(s).


DEPOSITION TESTIMONY OF:

TERRY DEESE


November 28, 2006

9:45 a.m.


COURT REPORTER:

DEBORAH B. TOWNSEND, CSR

EXHIBIT
1

ORIGINAL

**American Court Reporting**
**toll-free (877) 320-1050**

Page 2

1              S T I P U L A T I O N

2              IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel that the deposition of TERRY DEESE, may

5    be taken before Deborah B. Townsend, Certified

6    Shorthand Reporter and Notary Public, State at

7    Large, at the offices of BEASLEY, ALLEN, CROW,

8    METHVIN, PORTIS & MILES, Montgomery, Alabama, on

9    November 28, 2006, commencing at approximately

10   9:45 a.m.

11             IT IS FURTHER STIPULATED AND

12   AGREED that the signature to and the reading of

13   the deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws

16   and rules of Court relating to the taking of

17   depositions.

18             IT IS FURTHER STIPULATED AND

19   AGREED that it shall not be necessary for any

20   objections to be made by counsel to any

21   questions, except as to form or leading

22   questions, and that counsel for the parties may

23   make objections and assign grounds at the time

**American Court Reporting**
**toll-free (877) 320-1050**

Page 3

1    of trial or at the time said deposition is

2    offered in evidence, or prior thereto.

3                    In accordance with Rule 5(d) of

4    the Alabama Rules of Civil Procedure, as

5    amended, effective May 15, 1988, I, Deborah B.

6    Townsend, am hereby delivering to Gregory S.

7    Ritchey the original transcript of the oral

8    testimony taken November 28, 2006, along with

9    exhibits.

10                   Please be advised that this is the

11   same and not retained by the Court Reporter, nor

12   filed with the Court.

13

14

15                   EXAMINATION INDEX

16

17   TERRY DEESE

18       BY MR. RITCHEY                          8

19

20

21

22

23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 4

EXHIBIT INDEX

Defendant's

|   |   | PAGE |
|---|---|------|
| 1 | Notice of Deposition | 13 |
| 2 | Homes of Legend Request for Production | 13 |
| 3 | Champion Home Builders Interrogatories | 15 |
| 4 | Champion Home Builders Request for Production | 15 |
| 5 | Champion Enterprises Interrogatories | 15 |
| 6 | Champion Enterprises Request for Production | 15 |
| 7 | Contract, Deese 001 | 32 |
| 8 | Contract with $500 Deposit | 32 |
| 9 | House Plan | 33 |
| 10 | Service Request Form | 34 |
| 11 | Data Plate | 85 |
| 12 | Warranty Problems | 86 |
| 13 | Service Work Order # 5611 | 92 |
| 14 | Service Work Order # 4621 | 93 |
| 15 | Service Work Order # 6186 | 94 |
| 16 | Service Checklist | 95 |
| 17 | Service Survey | 96 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | 18 | Homeowner's Manual | 101 |
| 3 | 19 | Setup Instructions | 101 |
| 4 | 20 | Newspaper Ad | 105 |
| 5 | 21 | Newspaper Ad | 105 |
| 6 | 22 | Diagram of House | 120 |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 6

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF(S):

4            C. Gibson Vance, Esquire

5            BEASLEY, ALLEN, CROW, METHVIN,

6            PORTIS & MILES

7            218 Commerce Street

8            Montgomery, Alabama  36104

9

10

11   FOR THE DEFENDANT(S):

12            Gregory S. Ritchey, Esquire

13            RITCHEY & RITCHEY

14            1910 28th Avenue South

15            Birmingham, Alabama  35209

16

17

18   ALSO PRESENT:

19            DAWN DEESE

20

21

22

23

**www.AmericanCourtReporting.com**
**November 28, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 7

1          I, Deborah B. Townsend, a Certified

2     Shorthand Reporter of Birmingham, Alabama, and a

3     Notary Public for the State of Alabama at Large,

4     acting as Commissioner, certify that on this

5     date, pursuant to the Federal Rules of Civil

6     Procedure, and the foregoing stipulation of

7     counsel, there came before me at the offices of

8     BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,

9     Montgomery, Alabama, commencing at approximately

10    9:45 a.m. on November 28, 2006, TERRY DEESE,

11    witness in the above cause, for oral

12    examination, whereupon the following proceedings

13    were had:

14

15

16

17               THE REPORTER:   Usual

18    stipulations?

19               MR. VANCE:   Please.

20               MR. RITCHEY:   Yes.

21

22

23

**www.AmericanCourtReporting.com**
**November 28, 2006**

Page 8

1                          TERRY DEESE,

2      After having first been duly sworn, was examined

3      and testified as follows:

4                          EXAMINATION

5      BY MR. RITCHEY:

6          Q.      Can you state your full name for

7      me, please?

8          A.      Terry Wayne Deese.

9          Q.      And, Terry, I -- Is it okay if I

10     call you Terry?

11         A.      Fine.

12         Q.      I'm Greg Ritchey.  I represent

13     Homes of Legend, which is now known as Champion

14     Homes of Boaz; Champion Enterprises, Inc., and

15     also Champion Home Builders, the three

16     defendants in this case.

17         Have you ever given a deposition before?

18         A.      No.

19         Q.      You obviously have just gotten

20     sworn in to tell the truth, the whole truth, and

21     nothing but the truth.  Obviously, you've heard

22     those terms before.  We're only here seeking the

23     truth, so to speak.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1    A.    Right.

2    Q.    I will ask you a series of

3    questions to which you'll have to respond out

4    loud.  She can't get the up-and-down motions.

5    She can note them, but it doesn't show up well.

6    So I may have to ask you to come forward with

7    some answer.

8    A.    Right.

9    Q.    Okay.  If I ask a question that

10   you don't understand or you don't -- or it's two

11   questions or it's so convoluted you can't figure

12   out what I'm trying to ask, say, please stop and

13   rephrase the question.

14   A.    Okay.

15   Q.    I can do that.  It's no problem.

16   Don't feel bad if you -- if I've said something

17   that you just don't understand.  There may be a

18   term out there that I might know that you may

19   not know, just as you may know many terms I

20   don't know about.  So if you'll just ask me to

21   use a different term or different sentence with

22   it, I'll be glad to do that for you.  Okay?

23   A.    Okay.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 10

1       Q.     However, if I do ask a question

2  and you do respond, I'm going to take it as that

3  you understood the question and you responded to

4  it properly.  Is that fair enough?

5       A.     That's fair.

6       Q.     Can you give me your home address?

7       A.     It's 3393 Hunter Road, Columbia,

8  Alabama  36319.

9       Q.     Columbia?

10      A.     Columbia, C-O-L-U-M-B-I-A.

11      Q.     And the home that's made the

12  subject of this lawsuit, is it located at this

13  address?

14      A.     It's actually at 3321.

15      Q.     3321.  Henry Road?

16      A.     Hunter Road.

17      Q.     Do you just receive mail at a

18  different --

19      A.     My mother-in-law actually lives in

20  the home.

21      Q.     Your mother-in-law lives in the

22  home.  Have you ever lived in the home?

23      A.     (Witness shakes head.)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 11

1      Q.      Is that a no?

2      A.      No.

3                      MR. VANCE:   You need to speak

4      up just a little bit.

5      Q.      Who is your mother-in-law?

6      A.      Sheila Enfinger.

7      Q.      Sheila -- Can you --

8      A.      Enfinger, E-N-F-I-N-G-E-R.

9      Q.      And you do not and have never

10     lived in this particular house?

11     A.      No.

12     Q.      Is that yes, you've never lived in

13     it?

14     A.      I've never lived in the home.

15     Q.      Has she lived in it since it was

16     purchased?

17     A.      Yes.

18     Q.      Did you purchase it for her?

19     A.      Yes.

20     Q.      Is she paying you back?

21     A.      No.

22     Q.      This is just a gift for her?

23     A.      Right.

**www.AmericanCourtReporting.com**
**November 28, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 12

1      Q.    Can you give me a little bit of

2  your educational background?

3      A.    Twelve years of high school and

4  about two and a half years of college at Troy

5  State University, Dothan.

6      Q.    Did you graduate from Troy State?

7      A.    No, never did graduate.

8      Q.    You said twelve years of high

9  school, but you meant twelve years of grade

10  school?

11      A.    Right.

12      Q.    Certainly didn't spend twelve

13  years in high school.

14      A.    Four years of high school.

15      Q.    You can read and write?

16      A.    Yes.

17      Q.    We had originally noticed this

18  deposition -- I'm going to show you a copy of

19  the renotice of taking of deposition and ask if

20  you've seen this before.  Have you seen that

21  before?

22      A.    Yes.

23      Q.    I've also received responses to

Page 13

1    discovery.  Why don't we do this:  Let me -- I'm

2    going to mark this notice of deposition as

3    Defendant's Exhibit 1.

4         And I'm going to show you what I've

5    marked as Defendant's Exhibit 2 and see if you

6    recognize that.  It's entitled plaintiff's

7    response to defendant Homes of Legend, Inc.'s

8    first request for production of documents and

9    first request for admissions.

10        (WHEREUPON, Defendant's Exhibit

11   Numbers 1 and 2 were marked for identification

12   and are attached to the original transcript.)

13        A.    Yes.

14        Q.    Are all those responses true and

15   correct, to the best of your knowledge?

16        A.      To the best of my knowledge, yes.

17        Q.      I don't have signed responses, so

18   I'm going to ask you to go ahead and sign

19   these.  There are a couple of places, I think,

20   for you to sign.

21        Well, let me do this:  The signature

22   lines aren't there, but if you will, I'm going

23   to get you to sign at the end of interrogatories

**American Court Reporting**
**toll-free (877) 320-1050**

Page 14

1    where I've drawn the line on page 11 at the end

2    of the request for admissions on page 12 where

3    I've also drawn a line.  And as far as the

4    request for -- Let's see.

5         Actually, I take that back.  Here we go.

6    On page 11, I believe that is at the end of the

7    request for production.  And then there's

8    another page 11 at the back which is the back of

9    the interrogatories.  If I could just get you to

10   sign there too.

11              MR. VANCE:  Off the record.

12              (Off-the-record discussion.)

13        Q.    I understand that we're getting --

14   You signed the interrogatories and request for

15   production and request for admissions this

16   morning?

17        A.    Yes.

18        Q.    Did you also do it for the

19   plaintiff's responses to defendant Champion Home

20   Builders Company's first interrogatories, which

21   is marked as Defendant's Exhibit 3, also the

22   request for production and first request for

23   admissions from Champion Homes Builders, which

**American Court Reporting**
**toll-free (877) 320-1050**

Page 15

1   was marked as Exhibit 4, as well as the same for

2   Champion Enterprises, which are marked as

3   Defendant's 5 and 6?  Did you sign those two?

4              (WHEREUPON, Defendant's Exhibit

5   Numbers 3 thru 6 were marked for identification

6   and are attached to the original transcript.)

7              MR. VANCE:  I think she has

8   two of them coming.  Let's see in just a second

9   what she has coming.  We may have to get another

10  one done, but we'll certainly do whatever you

11  need us to.

12             MR. RITCHEY:  Okay.

13             MR. VANCE:  You'll leave here

14  with them.

15             MR. RITCHEY:  Why don't we --

16  Is she going to give me a --

17             MR. VANCE:  Yeah.  She's

18  notarizing it right now.

19             MR. RITCHEY:  And the copy is

20  coming in?

21             MR. VANCE:  Yeah.

22             MR. RITCHEY:  We'll just

23  substitute those copies, if that's okay with

**American Court Reporting**
**toll-free (877) 320-1050**

Page 16

1    you.

2                    MR. VANCE:   Super.

3                    MR. RITCHEY:   And that will

4    save us some time.   Let's put these here for

5    right now.

6         Q.      The only document we show that was

7    produced was part of the documents that were --

8    or a single document that was produced in

9    response to Homes of Legend's first request for

10   production of documents, which is the -- which

11   is labeled Deese 001.   Is that the only document

12   you got at closing of this house?

13        A.      I think so.

14        Q.      Did you finance the house?

15        A.      No.

16        Q.      Just paid cash for it?

17        A.      Paid cash for it.

18        Q.      Do you have the back side of this

19   contract?

20        A.      I'm not sure.

21        Q.      Do you have the original here?

22        A.      I don't know.

23        Q.      Who has the original?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

1    attorney.

2         A.       Okay.

3         Q.       What other documents were signed

4    at closing?

5         A.       I'm not sure.  That's been a

6    couple of years back, so I'm not sure.

7         Q.       Do you still have a copy of those?

8         A.       I think so.  It should -- Anything

9    that I have should be with this one.

10        Q.       Where is that, the one you're

11   pointing to?

12                  THE WITNESS:  Do you want to

13   go look in the van and see if it's in the van,

14   those papers?

15                  MRS. DEESE:  If I can find it,

16   I will.

17                  MR. VANCE:  Off the record.

18                  (Off-the-record discussion.)

19        Q.       Do you know if you got a

20   homeowner's manual with the particular house?

21        A.       I did.

22        Q.       Okay.  Where is that?

23        A.       I have no idea.  I'm assuming it

**www.AmericanCourtReporting.com**
**November 28, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 19

1    got thrown away.

2         Q.      How about setup instructions with

3    the house?

4         A.      Yes.

5         Q.      You got that also?

6         A.      Yes.

7         Q.      Do you know where those are?

8         A.      No, I do not.

9         Q.      Do you have any other documents

10   that would have come from the manufacturer?

11        A.      Not that I can recall.  I mean, it

12   came with a whole stack of the warranty, you

13   know, everything in the envelope, but the

14   envelope disappeared.  I don't know.  I don't

15   know if my mother-in-law threw it away.  She's

16   bad about cleaning house per se, so that may be

17   what happened.

18        Q.      I notice you didn't produce any

19   written service requests.  Did you ever send in

20   any written service requests to anybody?

21        A.      They came out.  How was it?  I

22   don't remember if they came out or -- I think we

23   filled out one or either called it in, and they

**American Court Reporting**
**toll-free (877) 320-1050**

Page 20

1    came out once to do some service.  And then

2    another time, they did some welding.  They were

3    doing the skirting or something like that.

4        Q.      Now, they, is that the dealership?

5        A.      The dealership or somebody from

6    Homes of Legend.

7        Q.      You don't know which one?

8        A.      The welder was a local welder, it

9    seems like.  I think the dealership did that.

10   The other was a Homes of Legend, or something

11   like that, serviceman that did that.

12       Q.      If I can direct your attention to

13   page three of the interrogatories, which I

14   believe, if you turn a couple of pages past

15   that -- In number one, I'd asked for any

16   information recalled from any representative

17   from the dealership.

18       Do you recall anything specific from any

19   of your discussions with the dealer?

20       A.      The main thing whenever we

21   purchased the home, we wanted to make sure that

22   they put storm windows on it and that skirting

23   was included and installed for that price.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1    That's basically -- And that they would fix all

2    the defects, but they said that the year

3    warranty would cover any defects in the home.

4        Q.    But the home, as you saw it on the

5    lot, did not have storm windows?

6        A.    No.

7        Q.    That was something that you wanted

8    the --

9        A.    The dealer to install.

10       Q.    And did they agree to do that?

11       A.    Yes.

12       Q.    Did they install the storm

13   windows?

14       A.    They installed it.

15       Q.    The second thing was -- What was

16   the second thing?

17       A.    The skirting.

18       Q.    Skirting.  Okay.  And did they

19   also install that?

20       A.    Yes.

21       Q.    The third thing is that you saw

22   some problems while the house was on the lot?

23       A.    Yes.  It had a few holes in some

**American Court Reporting**
**toll-free (877) 320-1050**

Page 22

1    of the metal siding.

2           Q.      Okay.

3           A.      I think we may have actually

4    picked out all the stuff that they came and

5    fixed whenever it was still on the lot.  I can't

6    remember.  Because, I mean, it was obvious what

7    needed to be fixed.  It stood out.

8           Q.      You think it may have been fixed

9    on the lot before it ever got delivered?

10          A.      No.  They actually fixed it after

11   it got delivered, but we may have pointed it out

12   to them.

13          Q.      On the lot?

14          A.      On the lot.

15          Q.      Okay.  Do you recall anything

16   specific that the -- Who did you deal with at

17   the dealership?

18          A.      I don't recall.

19          Q.      Do you recall anything specific

20   that they said about the house other than what

21   we've discussed?

22          A.      No.

23          Q.      Do you recall any specific

**American Court Reporting**
**toll-free (877) 320-1050**

Page 23

1    conversations after the home was installed?

2         A.     No.

3         Q.     Nothing?

4         A.     No.  I do recall, when I think

5    about it, it was missing some outdoor screens

6    that was later called in.  It took them forever

7    to get the screens -- certain screens in, come

8    to think about it.  I think they finally came

9    in, but it took a long time.

10        Q.     Okay.  In response -- If I can

11   direct your attention to page six, number 11.

12   Have there been any fires, natural occurrences

13   like floods, hurricanes, tornadoes, strong

14   winds, or anything of that nature that's caused

15   damage to the home?

16        A.     No.

17        Q.     Have y'all ever turned in any type

18   of insurance claim for anything you think should

19   have been covered by insurance for that

20   particular home?

21        A.     No.

22        Q.     On number 17, have you seen any

23   doctors with regard to any of your claim; mental

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1    names?

2          A.          No.

3          Q.          Is that just referred to sometimes

4    as a doc-in-the-box?

5          A.          Yeah.  Just a --

6          Q.          Okay.

7          A.          Where you get sick and you need

8    some medicine.

9          Q.          All right.  If I can now direct

10   your attention to number 24.  It's on page

11   nine.  Were you present when any of the experts

12   were at your house?

13         A.          The last time.

14         Q.          And when was the last time?

15         A.          I don't know the exact date.

16         Q.          Okay.  How many times have they

17   been to your house?

18         A.          Twice.

19         Q.          Twice.  Okay.

20         A.          That I can recall.

21         Q.          Do you recall about when the first

22   time was?

23         A.          I don't know the date.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 26

1        Q.        About generaly, summer, fall?

2        A.        Seems like it was in the spring,

3    and then the second time was in the summertime.

4        Q.        Do you recall who came?

5        A.        I don't know the names, no.

6        Q.        Okay.  Have you heard the name

7    Bobby Parks?

8        A.        That's familiar.

9        Q.        Was he one of the ones?

10        A.        Seems like it.  I think he was the

11    one that knew everything about it.

12        Q.        How about Roy Bonney?

13        A.        It's on the form, so --

14        Q.        Did they come together?

15        A.        Yes.

16        Q.        Both times?

17        A.        At the time that I met them, they

18    did.

19        Q.        And that was the second time?

20        A.        Yes.

21        Q.        You weren't there the first time?

22        A.        I wasn't there the first time.

23        Q.        The second time, did you speak

**American Court Reporting**
**toll-free (877) 320-1050**

Page 27

1    with either one of the individuals?

2        A.      Yes.

3        Q.      Okay.  Can you tell me what you

4    discussed with them?

5        A.      Just talking.  Just about where

6    they live and some of their surroundings and

7    because, I mean -- I forgot where they -- One

8    was like up north, and the other one was from

9    Louisiana, I think.

10       Q.      Okay.  Did you discuss anything

11   specific about the house?

12       A.      I just asked what some of the

13   tests might be for, and he went in telling about

14   basically what it was with the moisture barrier

15   being on the inside of the wall instead of on

16   the outside of the wall.  That's the way I got

17   it, anyway.

18       Q.      Do you recall him asking you any

19   questions, or either of them?

20       A.      Just if we had noticed any soft

21   spots in the walls and stuff like that.

22       Q.      Did you notice any soft spots in

23   the walls?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 28

1        A.      No.

2        Q.      Did he ask you about how you

3   operated the air handler?

4        A.      Doesn't seem that he did.

5        Q.      Did he ask you about where the

6   thermostat was generally set in the heating

7   months and generally set in the cooling months?

8        A.      Not that I can recall.

9        Q.      Did he ask you whether or not

10  doors were kept open or closed during the

11  particular times of the day?

12       A.      It doesn't seem like it.

13       Q.      Do you recall anything that he

14  asked you?

15       A.      Now, he may have.

16       Q.      Do you recall anything specific he

17  may have asked you?

18       A.      No, not really.

19       Q.      Did he ask you any questions or go

20  through a list of questions?

21       A.      He had a list, but I don't -- I

22  don't recall him actually pointblank asking a

23  lot of questions.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 30

1    dealership?

2          Q.      Right.

3          A.      The dealership did everything.

4          Q.      The dealership did everything?

5          A.      Right.

6          Q.      Nobody at Homes of Legend

7    participated in the sale?

8          A.      Not that I know of.

9          Q.      All right.  Number six, just on

10   the next page, are you making any mold-related

11   personal injuries in this case?

12         A.      No.

13                 MR. RITCHEY:  Do you have the

14   documents?  Do you have more documents?

15                 MR. VANCE:  Yeah.  I was going

16   to get Heidi to make us a copy of them.

17                 MR. RITCHEY:  All right.

18   Let's take a break for just a second.

19                 (Off-the-record discussion.)

20         Q.      We've got a group of documents,

21   and some clearly appear to be dealer-related

22   documents.  And then I think you said that

23   you've refinanced your house?

**www.AmericanCourtReporting.com**
**November 28, 2006**

Page 35

1    called it in.

2         A.        I think we did.

3         Q.        Okay.

4         A.        Because we got it fixed, but we

5    didn't fill the form out.

6         Q.        All right.  Can I direct your

7    attention back to Defendant's Exhibit Number 2,

8    the request for production, and specifically

9    two, four, six, nine, ten and 30?  And I guess

10   my question will be:  Do I now have everything

11   that you have concerning this particular home in

12   response to those requests?

13        A.        Yes.  To the best of my knowledge.

14        Q.        Okay.  Now, you had mentioned that

15   prior to the sale, you had pointed out some

16   things that the dealership needed to fix.

17        A.        Yes.

18        Q.        Okay.  In response to number 11,

19   do you have any documents or any other writings

20   with regard to those statements or those items

21   that you pointed out?

22        A.        No.

23        Q.        Okay.  And then for number 12, as

**American Court Reporting**
**toll-free (877) 320-1050**

Page 38

1   experts looked at while they were at your house,

2   any documents of that nature, any lists or

3   anything like that?

4        A.    I don't know.  I have -- I have

5   looked at the test results this morning just to

6   look over what they --

7        Q.    And as far as you know, we have

8   all the documents that support --

9        A.    As far as I know.

10       Q.    -- your claims?

11       A.    Yes.

12       Q.    Okay.  To your knowledge, did

13  Champion Enterprises, Inc. participate in the

14  sale of the manufactured home?

15       A.    I went through the dealership.

16  That's all I know.

17       Q.    The dealership only?

18       A.    Yes.

19       Q.    Did you do anything with Champion

20  Enterprises, Inc.?

21       A.    Whoever came out and fixed the

22  home for the warranty repairs.

23       Q.    Was that Champion Enterprises,

Page 39

1    Inc.?

2        A.    I don't know if it was -- who

3    exactly they worked for.

4        Q.    How about Champion Home Builders

5    Company; did they participate in the sale of

6    this house?

7        A.    I don't know.

8        Q.    Do you recall -- Did you say you

9    didn't recall the name of the person you dealt

10   with?

11       A.    What, that came out?

12       Q.    That you dealt with at the

13   dealership.

14       A.    The business card said Larry

15   Mercer was the salesman.

16       Q.    Did you understand Larry Mercer to

17   be an employee of Best Value Homes?

18       A.    Yes.

19       Q.    And was Larry Mercer the only

20   person you dealt with at Best Value Homes?

21       A.    There was somebody else, Bonnie or

22   somebody.

23       Q.    Did you understand that other

**American Court Reporting**
**toll-free (877) 320-1050**

Page 40

1    person also to be an employee of Best Value

2    Homes?

3          A.      Yes.

4          Q.      Do you have any relatives that

5    live in the state of Alabama?

6          A.      Yes.

7          Q.      Do you have any that live in or

8    around your county?

9          A.      Yes.

10         Q.      Okay.  What are their names?

11         A.      All of them?

12         Q.      Do you have a bunch?

13         A.      Yes.

14                 MR. RITCHEY:  Why don't I do

15    this:  Gibson, will you just get that for the

16    counties in that area, and then we can keep you

17    from having to try to figure out -- I've got 49

18    first cousins, so I know it can be very

19    difficult.  My dad had 12 brothers and sisters.

20    That's just on one side.

21         Q.      Are you presently employed?

22         A.      Yes.

23         Q.      What do you do?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 46

1      Q.      Okay.  Do you personally have any

2  information that supports any contention that

3  either Champion Enterprises or Champion Home

4  Builders built or designed or manufactured the

5  subject home?

6      A.      What do you mean by --

7      Q.      There are allegations in the

8  complaint that Champion Home Builders and

9  Champion Enterprises designed or built the

10  subject home.  Do you have any independent

11  knowledge of that?

12      A.      I know there's Homes of Legend is

13  the subsidy of --

14      Q.      Subsidiary?

15      A.      Yes.

16      Q.      Other than that, do you have

17  anything that leads you to believe that either

18  Champion Enterprises, Inc. or Champion Home

19  Builders built the home or designed it?

20              MR. VANCE:  You're just

21  talking about his independent -- He's just

22  asking you what you know.

23      A.      What I know?

**www.AmericanCourtReporting.com**
**November 28, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 47

1      Q.      Yeah.

2      A.      I just know it's a subsidiary.  I

3   don't know if they actually -- I know Homes of

4   Legend is on the home itself.

5      Q.      Do you understand that Homes of

6   Legend was the one that built the home?

7      A.      That's what I assumed, yes.

8      Q.      There's some other allegations in

9   the complaint, and if you don't mind, I'm going

10  to just go over them.  You may not have any

11  independent knowledge, but there's some things

12  I'm going to have to ask you that I just have to

13  ask you.  Okay?

14     A.      Okay.

15     Q.      Do you have any information to

16  support your contention that either Champion

17  Homes Builders or Champion Enterprises knew of

18  any alleged defect in the design of the

19  manufactured home that was sold in this

20  particular area?

21     A.      You mean, like the one -- the

22  forms -- these forms or --

23     Q.      Well, what I'm -- Just to be fair,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 48

1   I'm going to give you a copy of the complaint.

2   I'm looking at 13, 14, going from there, and my

3   question to you is:  Do you have any knowledge

4   on your own that supports any of the contentions

5   that are contained in paragraph 13 of the

6   complaint with regard to Champion Enterprises or

7   Champion Home Builders?

8        A.      Okay.  Restate the question.

9        Q.      Do you have anything independently

10   on your own that supports the allegations

11   contained in paragraph 13 of the complaint?

12       A.      Me personally?

13       Q.      Yes, sir.

14       A.      As far as I know, I just know

15   Homes of Legend built the home.

16       Q.      Do you have any -- anything that

17   we don't have before us that supports your

18   belief that the defendants had known of a defect

19   in design or manufacture of the home that was

20   sold in this state, basically your home?

21       A.      Like that's not presented here?

22       Q.      Yeah.  That's other than what you

23   produced here.

**www.AmericanCourtReporting.com**
**November 28, 2006**

Page 49

1              MR. VANCE:   And other than

2    what you and I may have talked about.

3    Basically, what he's doing is he's going to go

4    through that complaint, which you didn't draft

5    because you're not a lawyer and you don't have a

6    legal background, and ask you if you have

7    independent knowledge about that.  And as fair

8    or unfair as that may be, you just answer what

9    you know about and what you don't know about.

10         A.       Okay.

11         Q.       Do you have any independent

12   knowledge?

13         A.       No.

14         Q.       Do you have anything to support

15   your contention that either Champion Home

16   Builders or Champion Enterprises lobbied HUD to

17   allow waiver of the HUD code as alleged in the

18   complaint?

19         A.       I just know what is in the

20   paperwork.

21         Q.       Do you have any independent

22   knowledge of that?

23         A.       No.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 50

1       Q.     Do you have anything to support

2  that that we don't have before us?

3       A.     No.

4       Q.     Do you have anything that you

5  claim supports your contention that either

6  Champion Home Builders or Champion Enterprises

7  disingenuously alleged that it was impractical

8  to comply with the waiver?

9       A.     Restate that.

10       Q.     Okay.  You want me to show you

11  what I'm looking at?  Again, I'll try to be fair

12  with you.  I'm not trying to ask trick

13  questions, but I've got -- we all have our

14  duties, so to speak.

15     All right.  In paragraph 14, basically,

16  you've alleged that either Champion Enterprises

17  or any of the defendants disingenuously alleged

18  that it was impractical to comply with the

19  waiver.  Do you have anything to support that?

20       A.     Personally?

21       Q.     Yes, sir.

22       A.     Just what's provided.

23       Q.     Only what's provided.  Do you have

Page 51

1    anything else?

2         A.        No.

3         Q.        Do you have anything that supports

4    your claims that any of the defendants sold

5    homes to consumers in the Gulf Coast region

6    without informing them of a known defect and to

7    choose profit over conscience, which was, again,

8    alleged in your complaint at number 14, the last

9    sentence?

10        A.        I don't have any -- I mean, I

11   have -- they've told me about it.

12        Q.        Who is they?

13        A.        The ones that did the test and the

14   paperwork.

15        Q.        Okay.  Can you tell me what they

16   told you?  These are those -- Is that Roy Bonney

17   or Bobby Parks?

18        A.        Bobby Parks.

19        Q.        What did he say?

20        A.        I asked them exactly what they

21   were looking for, and they were going on about

22   how the vinyl walls on the inside are a moisture

23   barrier on the inside instead of the outside,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 52

1    basically.

2          Q.       Anything else?

3          A.       That's basically it.

4          Q.       Okay.

5          A.       And we were wondering why the

6    bathroom wall had a stain on it, and he said it

7    was due to mildew inside the wall.

8          Q.       Okay.  Anything else?

9          A.       (Witness shakes head.)

10         Q.       And that's all that you would have

11   to support that last statement?

12         A.       Can you read it again?

13         Q.       Okay.  Anything that supports your

14   contention that any of the defendants sold homes

15   to consumers in the Gulf Coast region without

16   informing them of an alleged known defect and to

17   choose profit over conscience.

18         A.       One more time, please.

19         Q.       Okay.  I'll just pretty much try

20   to paraphrase what's in paragraph 14.  But

21   again, anything that you claim supports your

22   contention that any of the defendants sold homes

23   to consumers in the Gulf Coast region without

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1    informing them of an alleged known defect and

2    thus them choosing profit over conscience?

3         A.      Okay.  Everything, as far as I

4    know, has been presented.

5         Q.      Do you have anything that supports

6    the contention that, despite a reasonable

7    opportunity and repeated complaints by countless

8    individuals, that the defendants merely, at

9    most, offered to replace gypsum wallboard on

10   occasion?

11        A.      In some of the paperwork, it

12   mentions that they have.

13        Q.      What paperwork are you talking

14   about?

15        A.      It seems like I've read it

16   before.  I don't know exactly where it is in

17   some of it.

18        Q.      I think this is in your

19   complaint.  Other than what's stated in your

20   complaint --

21        A.      Complaint, right.

22        Q.      -- do you have anything else?

23        A.      No.

Page 54

1      Q.      Do you have anything that supports

2    your contention that the defendants never

3    informed the consumer of the alleged known

4    defect and failed to offer a complete refund of

5    the purchase price?

6      A.      That's asking if they've ever got

7    in contact with me or --

8      Q.      Well, do you have anything to

9    support that contention that that's ever

10   happened?

11     A.      Restate it.

12     Q.      Okay.

13     A.      It would be better if I could read

14   it.

15     Q.      Yeah.  I'll tell you what I'm

16   reading from.  It's basically number 16 of your

17   complaint.  Despite repeated complaints by

18   countless individuals, the defendant's would

19   merely offer to replace the gypsum wallboard on

20   occasion.

21     Do you have any independent knowledge

22   that that's ever happened?

23     A.      I do not.

Page 55

1       Q.      Do you have anything to support

2    that claim?

3       A.      No.

4       Q.      Can you please advise or tell me

5    everything that you have to support your

6    contention that Champion Home Builders and

7    Champion Enterprises, Inc., either one of those,

8    are the parent corporation or alter ego of Homes

9    of Legend, Inc?

10      A.      Could you restate it?

11      Q.      Can you tell me everything that

12   you claim supports your contention that either

13   Champion Home Builders and/or Champion

14   Enterprises is the parent corporation and/or the

15   alter ego of Homes of Legend, Inc.?

16      A.      It's just what's in --

17      Q.      What's stated in the complaint?

18      A.      Right.

19      Q.      Do you have anything else besides

20   that?

21      A.      No.

22      Q.      Can you please tell me anything

23   that you claim supports your contention that, as

Page 56

1    part of the purchase price, the defendants made

2    a written express warranty or the defendants

3    Champion Home Builders or Champion Enterprises

4    made a written express warranty to you?

5         A.       Restate it.  I'm sorry.

6         Q.       Can you give me everything that

7    supports your contention that, as part of the

8    purchase price, Champion Home Builders and/or

9    Champion Enterprises made a written express

10   warranty to you?

11        A.       Yes.  They made a warranty.

12        Q.       Who made a warranty?

13        A.       I -- Whenever I purchased it, they

14   had a year warranty.

15        Q.       Who gave you that year warranty?

16        A.       I don't have the paperwork with

17   me.

18        Q.       Would it have been Homes of

19   Legend, the manufacturer?

20        A.       I'm assuming it is.

21        Q.       Do you have anything that supports

22   any written warranty that you would have

23   received from Champion Home Builders and/or

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1    Champion Enterprises, Inc.?

2         A.       As far as I know, I don't.

3         Q.       You don't have anything?

4         A.       Huh-uh.

5         Q.       No, you don't have anything?

6         A.       No.

7         Q.       No, I don't have anything; is that

8    correct?   You do not have anything?

9         A.       Have any paperwork or anything?

10        Q.       Yeah.

11        A.       No, I do not.

12        Q.       Okay.   Do you have anything that

13   supports your contention that Champion Home

14   Builders and/or Champion Enterprises warranted

15   that any defects in materials or workmanship in

16   the home which they were given notice within the

17   warranty period would be repaired or remedied at

18   no cost?

19        A.       Yes.

20        Q.       What do you have for that?

21        A.       That's what we have in the

22   paperwork.

23        Q.       Was that the warranty that Homes

Page 58

1    of Legend gave to you?

2          A.       Yes.

3          Q.       Do you have anything, though,

4    specifically from Champion Home Builders or

5    Champion Enterprises -- and/or Champion

6    Enterprises?

7          A.       No.

8          Q.       You never gave any notice of any

9    problems to either Champion Enterprises or

10   Champion Home Builders, right?

11         A.       It was through the dealership

12   only.

13         Q.       You only notified the dealership

14   of any problems?

15         A.       Correct.

16         Q.       Other than the dealership, you

17   never gave any written or oral notice to anybody

18   else.  Is that a fair statement?

19         A.       Except for the guys that actually

20   came back and did the work.

21         Q.       And those guys are with Homes of

22   Legend?

23         A.       I'm not sure if they were.  I'm

Page 59

1    assuming they were.

2        Q.      Do you know if those guys were

3    with Champion Home Builders or Champion

4    Enterprises?

5        A.      I don't know.

6        Q.      Okay.

7        A.      Because a lot of it was just

8    basically walking around the house and looking

9    at it.  I don't even remember if they gave me

10   any paperwork after they finished it.

11       Q.      Did you ever give Champion Home

12   Builders or Champion Enterprises notice of a

13   breach of warranty claim prior to bringing your

14   suit?

15       A.      No.  Not -- not dealing with the

16   walls.

17       Q.      I'm sorry?

18       A.      Not dealing with the walls.

19       Q.      Did you ever give them notice of

20   anything, Champion Enterprises?

21       A.      Champion Enterprises?

22       Q.      Or Champion Homes.

23       A.      It would be Homes of Legend.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 60

1      Q.      So the only person you would have

2  given would be Homes of Legend --

3      A.      Right.

4      Q.      -- or the dealership?

5      A.      Right.

6      Q.      Have you discussed everything you

7  know about Champion Enterprises or Champion Home

8  Builders?

9      A.      Yes.

10      Q.      What were some of the reasons why

11  you were looking for this particular house?

12      A.      For my mother-in-law.

13      Q.      Was strictly for her?

14      A.      Strictly for her.

15      Q.      Did she go with you to look at

16  them?

17      A.      Yes, she did.

18      Q.      How did you start looking?

19      A.      The lots, the different trailer

20  places that sold them around town.

21      Q.      The only -- Did you look at any

22  advertising beforehand?

23      A.      No.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 86

1      A.      Yes.

2      Q.      And that is -- was in one of your

3 cabinets or drawers somewhere?

4      A.      Yes.  It's still in the house.

5 Seems like it's hard to find.  They're usually

6 under the kitchen sink, but on this, it's

7 somewhere else.

8      Q.      Okay.  And then once the house was

9 installed, did y'all do any type of walk-

10 through?

11      A.      Yes.

12      Q.      I'm going to remark this exhibit.

13 I'm going to show you what's been marked as

14 Defendant's Exhibit 12 and see if you recognize

15 that.

16           (WHEREUPON, Defendant's Exhibit

17 Number 12 was marked for identification and is

18 attached to the original transcript.)

19      A.      Yes.  It looks like the problems

20 with the house that we found for the warranty.

21      Q.      Is this the walk-through that you

22 were talking about doing with -- I think was it

23 Bonnie that said that?  Somebody --

**www.AmericanCourtReporting.com**
**November 28, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 87

1            MRS. DEESE:  We done that.

2    She told us to just walk through it, and then

3    she told us to call her back with that stuff.

4         Q.    Okay.  So to paraphrase your wife,

5    y'all walked through and did this?

6         A.    Yes.

7         Q.    And I guess that's your signature

8    there at the bottom left?

9         A.    Yes.

10        Q.    So you did the walk-through on the

11   22nd of December.  Does that sound --

12        A.    I'm assuming.  That's when it was

13   dated.

14        Q.    And that was about thirty days

15   after living in the house?

16        A.    Yes.

17        Q.    And who all did the walk-through?

18        A.    Me, my wife, and mother-in-law.

19        Q.    And as far as you recall, did

20   y'all write down everything you could find?

21        A.    As far as I know.  We pretty well

22   went through the whole house.

23        Q.    Fair to say the list was complete,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 88

1    then?

2         A.       From what we could tell, yes.

3         Q.       Were some of these items noticed

4    while the house was on the dealer's lot?

5         A.       Yes.

6         Q.       Do you recall specifically which

7    of them were?

8         A.       I'm not sure, but I'm sure the

9    glue on the walls was fairly noticeable.

10        Q.       So that was on the dealer lot?

11        A.       Yes.  The mini blind, probably.

12   The glue on the refrigerator, the cracked

13   window.

14        Q.       The cracked window, where is that?

15        A.       It's got 35 beside it.  Says

16   window cracked.

17        Q.       It's right below it.  Sorry.

18        A.       The two holes in the back, because

19   they were on the outside.  Still don't know how

20   the holes got in it.  I guess -- There was two

21   holes that looked like they had been dented in

22   while it was on the lot some way.  I don't know

23   how that happened.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    Q.    Anything else?

2    A.    That's probably it, because the

3    rest of it, it had to be set up before you could

4    actually tell.

5    Q.    The cracked window, where was

6    that?

7    A.    I don't recall exactly.

8         MRS. DEESE:    The living room.

9    Q.    Oh, living room.    It has it on the

10   left-hand side.    I see it now.

11        Okay.    Now, do y'all have a dryer in this

12   house?

13   A.    Yes.

14   Q.    Did it come with the house, or did

15   y'all buy one?

16   A.    We purchased it separately, it

17   seems like.

18   Q.    Who installed it?

19   A.    I did.

20   Q.    Was that after the house had been

21   installed?

22   A.    Yes.

23   Q.    Was the skirting already up at

**American Court Reporting**
**toll-free (877) 320-1050**

Page 91

1     Q.     Do you know what size it is?

2     A.     What?

3     Q.     The air conditioning unit.

4     A.     Not right offhand, I don't.

5     Q.     But somebody with the dealership

6 installed that or --

7     A.     Yes.

8     Q.     -- they contracted out that?

9     A.     Right.  Does seem like they sent

10 somebody out.  There was some leaking.  Seems

11 like both tubs were leaking or something.  They

12 sent a plumber out.

13     Q.     Who is they?

14     A.     The dealership did.

15     Q.     Did they get that fixed?

16     A.     Yes.

17     Q.     Okay.

18     A.     Actually, I fixed one of them

19 because it was a pretty bad leak.  You couldn't

20 run water.  And then he went back behind me and

21 double-checked what I did.

22     Q.     Okay.  I think you had mentioned

23 earlier that there were some angle brackets.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 92

1    I'm going to show you what I'm marking as

2    Defendant's Exhibit 13.   You said something

3    about some welds?

4                   (WHEREUPON, Defendant's Exhibit

5    Number 13 was marked for identification and is

6    attached to the original transcript.)

7         A.      Yeah.

8         Q.      And there's -- Defendant's Exhibit

9    13 appears to be a service work order with

10   regard to braces in the axle area.   Is that

11   about where the problem was?

12        A.      Yes.

13        Q.      Were you there when they fixed

14   those welds?

15        A.      It seems like we were leaving as

16   he was getting there.

17        Q.      Okay.   Were they fixed?

18        A.      Yes.   They were fixed afterwards.

19   I checked them.   They did a good job of it.

20        Q.      And I'm going to show you what I'm

21   marking as Defendant's Exhibit 14, which appears

22   to be a service work order.   And if I could get

23   you to compare that with what's listed with

Page 93

1    Defendant's Exhibit 12, and I think -- and just

2    let me know -- is that a list of those items?

3                    (WHEREUPON, Defendant's Exhibit

4    Number 14 was marked for identification and is

5    attached to the original transcript.)

6            A.      Yes.  It looks like it.

7            Q.      Okay.  Were you there when the

8    repairs were performed?

9            A.      Yes.

10           Q.      And is that your signature at the

11   bottom left-hand side?

12           A.      Yes.

13           Q.      And were you satisfied with all

14   those repairs?

15           A.      Yes.

16           Q.      And did they get all those repairs

17   handled?

18           A.      Yes.  Everything that we could

19   find, they did.

20           Q.      So all of the items that were on

21   Defendant's Exhibit 12 got repaired?

22           A.      Yes.

23           Q.      To your satisfaction?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 94

1          A.       At that time, yes.

2          Q.       Now, do you recall doing a -- I

3     guess a customer survey, somebody calling you?

4          A.       I may have.  I don't recall right

5     offhand, but I may have done it.

6          Q.       Do you recall saying that you were

7     satisfied with the repairs afterwards?

8          A.       Yes.  I'm sure I was, because they

9     did a good job.

10          Q.       Were there a couple of items that

11     they had to come back and do --

12          A.       I'm not sure.

13          Q.       -- they didn't reach, maybe, at

14     that time?

15          A.       They may have.

16          Q.       I'm going to show you what I'm

17     marking as Defendant's Exhibit 15.  See if you

18     recognize that.

19               (WHEREUPON, Defendant's Exhibit

20     Number 15 was marked for identification and is

21     attached to the original transcript.)

22          A.       Okay.  That's when they didn't

23     have the window or the wallboard that -- they

**American Court Reporting**
**toll-free (877) 320-1050**

Page 95

1    didn't have that exact pattern with them.    I do

2    recall that.

3        Q.       And they came back to replace

4    those?

5        A.       Yes.

6        Q.       And Dawn Deese, is that your wife?

7        A.       Yes.

8        Q.       Is that her signature at the

9    bottom?

10       A.       Yes.

11       Q.       Were all repairs done to your

12   satisfaction?

13       A.       Yes.

14       Q.       I want to show you what I'll mark

15   as Defendant's Exhibit 16, which was a --

16   supposed to be a service checklist.    See if you

17   recognize that.

18               (WHEREUPON, Defendant's Exhibit

19   Number 16 was marked for identification and is

20   attached to the original transcript.)

21       A.       Looks like a checklist.

22       Q.       Is that your wife's signature at

23   the bottom?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 96

1      A.      Yes.

2      Q.      You're familiar with her

3  signature?

4      A.      Yes.

5      Q.      And is that your understanding

6  this was a checklist of things they went through

7  to make sure everything --

8      A.      It is.

9      Q.      And was everything working

10  properly at that time?

11      A.      Yes.

12      Q.      I'm going to show you what I'm

13  marking as Defendant's Exhibit 17.  This was

14  also dated the 1st of July, '04, the same time

15  as the checklist that was on Defendant's Exhibit

16  16.  Do you recognize that?

17          (WHEREUPON, Defendant's Exhibit

18  Number 17 was marked for identification and is

19  attached to the original transcript.)

20      A.      My wife must have -- She signed

21  it.

22      Q.      I guess all work was performed

23  either excellent or very good?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1    A.    Every time they came out, they did

2    a good job.

3    Q.    Was there anything else that was

4    left to do after they left in July of '04?

5    A.    Not that I can recall.

6    Q.    Do you recall whether a phone

7    survey was made also at that time?

8    A.    I couldn't tell you.

9    Q.    Okay.  Do you have any other

10   written notice after July of '04 of any problems

11   with the home?

12   A.    Not that I can recall.

13   Q.    Okay.  Did you have anything --

14   Did you ever contact the dealership after July

15   of '04 with any problems?

16   A.    The screens took a while, but not

17   that I can recall on the rest of it.  I know the

18   gutters, they leaked after they fixed them the

19   first time, but I don't know if I ever got in

20   touch with them with that or if it was after the

21   one-year warranty went out on them.

22   Q.    Okay.

23   A.    Because they put a gutter seam

Page 98

1  above the window, and it leaks in the window.

2      Q.     You don't recall if you've ever

3  turned that back in?

4      A.     I don't know.  I know I did the

5  first time, but I don't know if I did the second

6  time.

7      Q.     As far as the screens, those

8  finally got to you and they got put on?

9      A.     Yes.  After they were ordered and

10  backordered, and seemed like they wouldn't --

11      Q.     Did you have any other written or

12  verbal notice of problems with the home before

13  July of '04 that we haven't addressed in some of

14  these documents we just went through?

15      A.     I think that pretty much covers

16  it, all that's in the documents.

17      Q.     And what problems do you claim

18  still exist with the home today?

19      A.     Actually, it's in pretty good

20  shape, except there's a stain above the bathroom

21  tub.

22      Q.     Okay.

23      A.     That just appeared and keeps

**American Court Reporting**
**toll-free (877) 320-1050**

Page 99

1    getting bigger.

2         Q.      Other than that stain above the

3    bathroom tub, anything else?

4                  MR. VANCE:   Other than what's

5    in his lawsuit.

6         A.      Other than what's in the lawsuit,

7    no.

8         Q.      Have you ever turned in the stain

9    to the bathroom tub to anybody?

10        A.      No.  Because it was after the one-

11   year warranty went out.

12        Q.      Did you ever turn in anything

13   that's in your lawsuit to anybody?

14        A.      No.

15        Q.      Would it be fair to say that none

16   of the defendants have been made aware of any of

17   the problems with the bathroom tub or the claims

18   in your lawsuit until the lawsuit was filed?

19        A.      Right.

20                  MR. VANCE:   Object to the

21   form.

22        A.      Because, actually, it was after

23   the year warranty when the spot appeared.

**www.AmericanCourtReporting.com**
**November 28, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 107

1    continually since --

2         A.      Yes.

3         Q.      -- November of 2003?

4         A.      When it was set up, yes, and moved

5    her in, she has.

6         Q.      Do you feel like it's safe enough

7    for her to live in it?

8         A.      As far as I know.  It's kind of

9    scary about mold, when you hear mold and mildew.

10        Q.      Have you ever seen any mold and

11   mildew in it?

12        A.      Well, that in the bathroom.

13        Q.      Other than the bathroom?

14        A.      No.

15        Q.      And you've never seen any soft

16   walls in the house?

17        A.      No.

18        Q.      Do you have insurance on the home?

19        A.      Yes.

20        Q.      Who is that through?

21        A.      Alfa.

22        Q.      Who is your agent?

23             MRS. DEESE:  Ben Layton.

Page 108

1              MR. RITCHEY:  Can you spell

2      Layton?

3              MRS. DEESE:  L-A-Y-T-O-N.

4      Q.      And have you had it insured since

5      you purchased it?

6      A.      Yes.

7      Q.      And how much do you have it

8      insured for?

9      A.      That's a good question.  I don't

10      recall right offhand.

11      Q.      Do you feel it's worth what you

12      have it insured for?

13      A.      Yes.  It covers what the home

14      cost, maybe a little bit more for add-on.

15      Q.      Other than what we've discussed

16      today, do you have any other evidence to support

17      that any of the defendants negligently

18      manufactured, designed, built, or assembled the

19      home?

20      A.      Other than what's been discussed,

21      no.

22      Q.      You have a claim for unjust

23      enrichment.  In paragraph 55 of the complaint,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 111

1          So I guess, Mr. Deese, I'm just

2   going to instruct you, if you don't understand

3   what legal terms he's talking about, just tell

4   him.

5          A.        I don't understand.

6          Q.        Which term do you not understand?

7          A.        I don't understand the whole

8   question per se.

9          Q.        As far as paragraph 55 -- and I

10  guess I'll let you read it.  And as we sit here

11  today, do you have anything that will support

12  that?

13         A.        I don't know.

14         Q.        You don't know?

15  You also have a fraudulent concealment

16  count where you say that the defendants have

17  failed to provide you with information, so to

18  speak.  And you can look over that; it's

19  paragraphs 57 through 62.

20         And my question is:  Do you have anything

21  that supports those claims that we've not

22  already discussed today?

23                MR. VANCE:  I mean, if you --

**American Court Reporting**
**toll-free (877) 320-1050**

Page 112

1   Do you understand what that complaint says, the

2   legalese part of it?

3        A.      Not exactly.

4        Q.      Well, do you have anything that

5   we've not discussed today that supports any of

6   those claims?

7        A.      No.

8                MR. VANCE:   To the extent that

9   you understand what it says.

10       A.      Right.   To the extent I don't

11  understand.

12       Q.      But the answer would be no, then;

13  is that correct?

14               MR. VANCE:   The answer would

15  be to the extent that he understands it, it

16  would be no.

17               You're taking everything down?

18  Whether he looks at you or not, you're getting

19  it?

20               THE REPORTER:   Yes, sir.

21       Q.      Is that your -- What was your

22  answer?

23       A.      What?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1    Q.    As we sit here today, do you have

2  anything more that supports any of those claims,

3  paragraphs 57 through 62?

4    A.    Okay.  What's your question?

5    Q.    Do you have anything that supports

6  any of those claims other than what we've

7  discussed today?

8    A.    Restate your question.

9    Q.    Do you have anything more that

10  supports your claims other than what we've

11  discussed today?

12    A.    I don't know.

13    Q.    Let me see that again.

14    All right.  The date that you were

15  present when the inspectors came, which I think

16  you said was -- Was that early in the year?

17    A.    It was later in the year.

18    Q.    The summer?

19    A.    The summer.

20    Q.    Okay.  The summer.  Who else was

21  there with you?

22    A.    At that time?

23    Q.    Yes, sir.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 119

1     Q.     Did they make any recommendations?

2     A.     No.

3     Q.     Has any doctor ever diagnosed you

4 with any physical ailment with regard to this

5 house or being around it?

6     A.     No.

7     Q.     Has any doctor diagnosed you with

8 any type of mental anguish associated with this

9 house?

10     A.     No.

11     Q.     Are there any other persons that

12 have knowledge of the facts that are alleged in

13 the complaint, other than the people we've

14 discussed today?

15     A.     No.

16     Q.     Do you have an estimate of what

17 damages you're claiming in this case?

18     A.     It's in some of the paperwork.

19     Q.     What particular paperwork?

20     A.     Plaintiff's 1, isn't it?

21     Q.     I'm sorry?

22     A.     It's to replace all the wallboard.

23     Q.     Other than that, do you have

Page 120

1    anything else?

2         A.      Just to fix the house.

3         Q.      And have you produced everything

4    that you're aware of that's associated with this

5    particular house?

6         A.      As far --

7         Q.      Okay.  Just give me a second.

8         Have we discussed all conversations you

9    recall having with anyone at the dealership?

10        A.      As far as I know.

11        Q.      Any conversations you recall

12   having with anyone at the -- at Homes of Legend?

13        A.      Yes.

14        Q.      I've got a diagram, which I think

15   is the same as yours, I'm going to mark as

16   Defendant's Exhibit 22.  Does that appear to be

17   the diagram of the house that you had?

18               (WHEREUPON, Defendant's Exhibit

19   Number 22 was marked for identification and is

20   attached to the original transcript.)

21        A.      Where's the diagram?  It's around

22   here somewhere.

23        Q.      Here it is.

Page 122

1          A.        It's just a gutter leak outside.

2          Q.        Oh, it's just a gutter leak.

3     Okay.  Any other leaks inside the house?

4          A.        One of the vents in the bathroom,

5     when it rains, it somehow blows in the vent.

6     It's actually not -- the vent doesn't leak per

7     se; it just blows up under the cap on top.  It's

8     in the other bathroom.

9          Q.        Is that the one you're talking

10    about the problem around the ceiling area?

11         A.        Yes.

12         Q.        And that's the one you said was

13    never turned in to anybody?

14         A.        Yes.  Because that was after the

15    warranty.

16         Q.        And then what you've circled on

17    Defendant's Exhibit 22, has that ever been

18    turned in to anybody?

19         A.        It was after the warranty period.

20         Q.        So never turned in to anybody?

21         A.        No.

22         Q.        Any electrical problems with the

23    home?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 123

1      A.      No.

2      Q.      Plumbing problems with the home?

3      A.      No.

4      Q.      Any other leaks we haven't

5   discussed?

6      A.      As far as I know, that's it.  Some

7   of the gutters leak on the outside where they

8   join together, but --

9      Q.      Okay.  Any floor problems?

10     A.      No.

11     Q.      This went a lot quicker than I

12  thought.  That's all.

13             MR. VANCE:  Thank you.

14

15             11:59 a.m.

16

17         FURTHER DEPONENT SAITH NOT

18

19

20

21

22

23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 124

C E R T I F I C A T E

STATE OF ALABAMA)

JEFFERSON COUNTY)

      I hereby certify that the above
and foregoing deposition was taken down by me in
stenotype, and the questions and answers thereto
were transcribed by means of computer-aided
transcription, and that the foregoing represents
a true and correct transcript of the deposition
given by said witness upon said hearing.

      I further certify that I am
neither of counsel nor of kin to the parties to
the action, nor am I in anywise interested in
the result of said cause.

      DEBORAH B. TOWNSEND, CSR

       Certificate No. AL-CSR-207

My Commission expires

March 3, 2008

DEFENDANT'S EXHIBIT

7

# BEST VALUE HOMES
5284 Montgomery Highway
DOTHAN, ALABAMA 36303
334/983-4517

| BUYER(S) Terry W. Deese | PHONE 696-2273 | DATE 11-7-03 |
|---|---|---|
| ADDRESS 3393 Hunter Rd. Columbia AL. 36319 | | SALESPERSON Larry Mercer |
| DELIVERY ADDRESS 3321 Hunter Rd. Columbia, AL. 36319 | | |

| MAKE & MODEL Homes of Legend | YEAR 2004 | BEDROOMS 3 | FLOOR SIZE L 76 W 16 | HITCH SIZE L 80 W 16 | STOCK NUMBER |
|---|---|---|---|---|---|
| SERIAL NUMBER HL156661AL   ☒ NEW   ☐ USED | | COLOR TaN | PROPOSED DELIVERY DATE | | KEY NUMBERS Houston |

| LOCATION | R-VALUE | THICKNESS | TYPE OF INSULATION | | |
|---|---|---|---|---|---|
| CEILING | 21 | | Cellulos | BASE PRICE OF UNIT | $ 22,900.00 |
| EXTERIOR | 11 | | Fiberglass | OPTIONAL EQUIPMENT | |
| FLOORS | 7 | | Fiberglass | | |
| | | | | SUB-TOTAL | $ 22,900.00 |

THIS INSULATION INFORMATION WAS FURNISHED BY THE MANUFACTURER AND IS DISCLOSED IN COMPLIANCE WITH THE FEDERAL TRADE COMMISSION RULE 16CRF, SECTION 460.16.

| OPTIONAL EQUIPMENT, LABOR AND ACCESSORIES | | | |
|---|---|---|---|
| SALES TAX 2.5% | | | 572.50 |
| Price Includes | $ | NON-TAXABLE ITEMS | 15.00 |
| | | VARIOUS FEES AND INSURANCE | |
| 1 Year Manufacturers Warranty | | 1. CASH PURCHASE PRICE | $23,487.50 |
| | | TRADE-IN ALLOWANCE $ | |
| Delivery - Setup - Tied down to AL Stab Code | | LESS BAL. DUE on above $ | |
| | | NET ALLOWANCE | |
| 3 Ton A/C Unit installed | | CASH DOWN PAYMENT $ 500.00 | |
| | | CASH AS AGREED (SEE REMARKS) $ | |
| Skirting installed. Color CAMEO | | 2. LESS TOTAL CREDITS | $ 500.00 |
| | | SUB-TOTAL | $ 22,987.50 |
| 2 sets of steps | | SALES TAX (If Not Included Above) | |
| | | 3. Unpaid Balance of Cash Sale Price | $22,987.50 |
| Install storm windows | | REMARKS: | |
| Install Ice maker | | | |
| Refrigerator | | | |
| Stove | | | |
| Dishwasher | | | |
| | | | |
| BALANCE CARRIED TO OPTIONAL EQUIPMENT | $ | | |

NOTE: WARRANTY AND EXCLUSIONS AND LIMITATIONS OF DAMAGES ON THE REVERSE SIDE.

| DESCRIPTION OF TRADE-IN | YEAR | SIZE |
|---|---|---|
| MAKE N/A MODEL | | BEDROOMS |
| TITLE NO. SERIAL NO. | | COLOR |
| AMOUNT OWING TO WHOM | | |

ANY DEBT BUYER OWES ON TRADE-IN IS TO BE PAID BY ☐ DEALER ☐ BUYER

Dealer and Buyer certify that the additional terms and conditions printed on the other side of this contract are agreed to as a part of this agreement, the same as if printed above the signatures. Buyer is purchasing the above described manufactured home, trailer or vehicle; the optional equipment and accessories, the insurance as described has been voluntary; that Buyer's trade-in is free from all claims whatsoever, except as noted.

THIS AGREEMENT CONTAINS THE ENTIRE UNDERSTANDING BETWEEN DEALER AND BUYER AND NO OTHER REPRESENTATION OR INDUCEMENT, VERBAL OR WRITTEN, HAS BEEN MADE WHICH IS NOT CONTAINED IN THIS CONTRACT. BUYER(S) ACKNOWLEDGE RECEIPT OF A COPY OF THIS ORDER AND THAT BUYER(S) HAVE READ AND UNDERSTAND THE BACK OF THIS AGREEMENT.

BEST VALUE HOMES _____ DEALER

Not Valid Unless Signed and Accepted by an Officer of the Company or an Authorized Agent

By Bonnie Harrison
        Approved

SIGNED X Terry W Deese _____ BUYER
SOCIAL SECURITY NO. _____/_____/_____

SIGNED X _____ BUYER
SOCIAL SECURITY NO. _____/_____/_____

FORM 500-1 ®                    A PLAIN LANGUAGE PURCHASE AGREEMENT   Rev of

# ADDITIONAL TERMS AND CONDITIONS

Buyer understands that the terms and conditions on this agreement concerns the Mobile/Manufactured Home or any item or combination of items as described on the front of this agreement. Buyer further understands and agrees to accept the following terms and conditions:

1. **IF NOT A CASH TRANSACTION.** If Buyer does not complete this purchase as a cash transaction, Buyer knows before or at the time of delivery of the unit purchased, Buyer will enter into a retail installment contract and sign a security agreement or other agreement as may be required to finance Buyer's purchase.

2. **TITLE.** Title to the unit purchased will remain in Dealer until the agreed upon purchase price is paid in full in cash, or Buyer has signed a retail installment contract and it has been accepted by a bank or finance company at which time title passes to Buyer even though the actual delivery of the unit purchased may be made at a later date.

3. **TRADE-IN.** If Buyer is trading in a used car, manufactured home, trailer or other vehicle, Buyer will give Dealer the original bill of sale or the title to the trade-in. Buyer promises that any trade-in which Buyer gives is owned by Buyer and is free of any lien or other claim except as noted on the other side of this contract. Buyer promises that all taxes of every kind levied against the trade-in have been fully paid. If any government agency makes a levy or claims a tax lien or demand against the trade-in, Dealer may, at Dealer's option, either pay it and Buyer will reimburse Dealer on demand, or Dealer may add that amount to this contract as if it had been originally included.

4. **REGISTRATION OR LICENSE OF TRADE-IN.** If Buyer has a trade-in and it is registered or licensed in a state outside of the one where this order is written, Buyer will immediately have the trade-in registered or licensed in the state Dealer indicates and Buyer will pay any and all expenses and registration or licensing fees required. If Dealer handles the registration or licensing of the trade-in, Buyer will reimburse Dealer for the expense on demand or Dealer may add that amount to this contract as if it had been originally included.

5. **REAPPRAISAL OF TRADE-IN.** If Buyer is making a trade-in and it is not delivered to Dealer at the time of the original appraisal and if later, on delivery, it appears to Dealer that there have been material changes made in the furnishings or accessories, or in its general physical condition, Dealer may make a reappraisal. This later appraisal value will then determine the allowance to be made for the trade-in.

6. **FAILURE TO COMPLETE PURCHASE.** If Buyer fails or refuses to complete this purchase within the time frame specified in this contract or as specified in the Uniform Commercial Code of the state in which Buyer signs this contract, or within an agreed upon extension of time, for any reason (other than cancellation because of any increase in price), Dealer may keep that portion of Buyer's cash deposit which will adequately compensate Dealer for Dealer's actual, consequential, and incidental damages, and all other damages, expenses or losses which Dealer incurs because Buyer failed to complete Buyer's purchase. If Buyer has not given Dealer a cash deposit or it is inadequate and Buyer has given Dealer a trade-in, Dealer may sell the trade-in at public or private sale, and deduct from the money received an amount that will adequately compensate Dealer for any and all of the above mentioned damages, expenses, and losses incurred because Buyer failed to complete this purchase. Retention of any portion of the cash deposit or the application of sale proceeds shall be in addition to and not to the exclusion of, any other remedies Dealer may have at law, and this contract shall not be interpreted as containing a liquidated damages provision. Dealer shall have all the rights of a seller upon breach of contract under the Uniform Commercial Code, except the right to seek and collect "liquidated damages" under Section 2-718. If Dealer prevails in any legal action which Dealer brings against Buyer, or which Buyer brings against Dealer, concerning this contract, Buyer agrees to reimburse Dealer for Dealer's reasonable attorneys' fees, court costs and expenses which Dealer incurs in prosecuting or defending against that legal action.

7. **CHANGES BY MANUFACTURER.** Buyer understands that the manufacturer may make any changes in the model, or designs, or any accessories and parts from time to time, and at any time, if the manufacturer does make changes, neither Dealer nor the manufacturer are obligated to make the same changes in the unit Buyer is purchasing and covered by this order, either before or after it is delivered to Buyer.

8. **DELAYS.** Buyer will not hold Dealer liable for delays caused by the manufacturer, accidents, strikes, fires, or any other cause beyond Dealer's control.

9. **INSPECTION.** Buyer has examined the product and finds it suitable for Buyer's particular needs. Buyer has relied upon Buyer's own judgement and inspection in determining that it is of acceptable quality. On the special unit ordered, Buyer has relied on Dealer's inspection of the display model(s), the brochures and bulletins and/or the floor plan provided to Dealer by the Manufacturer, in making Buyer's decision to purchase the unit described on the reverse side of this agreement.

10. **WARRANTIES AND EXCLUSIONS.** BUYER UNDERSTANDS THAT THERE MAY BE WRITTEN WARRANTIES COVERING THE UNIT PURCHASED, OR ANY COMPONENT(S), OR ANY APPLIANCE(S) WHICH HAVE BEEN PROVIDED BY THE MANUFACTURERS. DEALER HAS GIVEN BUYER AND BUYER HAS READ AND UNDERSTOOD A STATEMENT OF THE TYPE OF WARRANTY COVERING THE UNIT PURCHASED AND/OR COMPONENT(S) AND/OR APPLIANCE(S) BEFORE BUYER SIGNED THIS SALES CONTRACT. THERE IS NO EXPRESS WARRANTY ON USED UNITS EXCEPT WHERE PROHIBITED BY LAW. (i) DELIVERY BY DEALER TO BUYER OF THE WARRANTY OR THE MANUFACTURER OF THE UNIT PURCHASED, OR ANY COMPONENT(S), OR ANY APPLIANCE(S) DOES NOT MEAN DEALER "ADOPTS THE WARRANTY(S) OF SUCH MANUFACTURER(S). (ii) BUYER ACKNOWLEDGES THAT THESE EXPRESS WARRANTIES MADE BY THE MANUFACTURER(S) HAVE NOT BEEN MADE BY DEALER EVEN IF THEY SAY DEALER MADE THEM OR SAY DEALER MADE SOME OTHER EXPRESS WARRANTY AND (ii) DEALER IS NOT AN AGENT OF THE MANUFACTURER(S) FOR WARRANTY PURPOSES EVEN IF DEALER COMPLETES, OR ATTEMPTS TO COMPLETE REPAIRS FOR THE MANUFACTURER(S). EXCEPT IN WV, MS, VA, WHERE OTHERWISE PROHIBITED BY LAW, (i) BUYER UNDERSTANDS THAT THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTIES EXPRESSED OR IMPLIED ARE EXCLUDED BY DEALER FROM THIS TRANSACTION AND SHALL NOT APPLY TO THE UNIT OR ANY COMPONENT OR ANY APPLIANCE CONTAINED THEREIN, (ii) BUYER UNDERSTANDS THAT DEALER MAKES NO WARRANTIES WHATSOEVER REGARDING THIS UNIT OR ANY COMPONENT OR ANY APPLIANCE CONTAINED THEREIN, AND (iii) BUYER UNDERSTANDS THAT DEALER DISCLAIM AND EXCLUDE FROM THIS TRANSACTION, ALL WARRANTY OBLIGATIONS WHICH EXCEED OR EXIST OVER AND ABOVE THE LEGAL WARRANTIES REQUIRED BY APPLICABLE STATE LAW.

11. **LIMITATION OF DAMAGES.** EXCEPT IN WV AND ANY OTHER STATE WHICH DOES NOT ALLOW THE LIMITATION OF INCIDENTAL AND/OR CONSEQUENTIAL DAMAGES, THE FOLLOWING LIMITATION OF DAMAGES SHALL APPLY. IF ANY WARRANTY FAILS BECAUSE OF ATTEMPTS AT REPAIR ARE NOT COMPLETED WITHIN A REASONABLE TIME OR ANY REASON ATTRIBUTED TO THE MANUFACTURER, INCLUDING MANUFACTURERS WHO HAVE GONE OUT OF BUSINESS, BUYER AGREES THAT IF BUYER IS ENTITLED TO ANY DAMAGES AGAINST DEALER, BUYER'S DAMAGES ARE LIMITED TO THE LESSER OF EITHER THE COST OF NEEDED REPAIRS OR REDUCTION IN THE MARKET VALUE OF THE UNIT CAUSED BY THE LACK OF REPAIRS. BUYER ALSO AGREES THAT ONCE BUYER HAS ACCEPTED THE UNIT EVEN THOUGH THE MANUFACTURER(S) WARRANTY DOES NOT ACCOMPLISH ITS PURPOSE, THAT BUYER CANNOT RETURN THE UNIT TO DEALER AND SEEK A REFUND FOR ANY REASON.

12. **INSURANCE.** Buyer understands that Buyer is **not** covered by insurance on the unit purchased until accepted by an insurance company, and Buyer agrees to hold Dealer harmless from any and all claims due to loss or damage prior to acceptance of insurance coverage by an insurance company.

13. **CONTROLLING LAW AND PLACE OF SUIT.** The law of the State, in which Buyer signs this contract, is the law which is to be used in interpreting the terms of the contract. Dealer and Buyer agree that if any dispute between us is submitted to a court for resolution, such legal proceeding shall take place in the county in which Dealer's principle offices are located. If under state law a special dispute resolution procedure or complaint process is available, Buyer agrees to the extent permitted by law that procedure shall be the only method of resolution and source of remedies available to Buyer.

14. **IF PART INVALID REST OF CONTRACT SAVED.** Dealer and Buyer agree that each portion of this contract is independent and if any paragraph or provision violates the law and is unenforceable, the rest of the contract will be valid.

15. **DELIVERY AND PLACEMENT.** If Dealer has included delivery of the unit purchased in the purchase price, or if Dealer quotes a charge for delivery to Buyer's destination, Dealer's agreement to transport the unit purchased, as well as the price quotation made, is based upon Buyer's assurance that travel is along acceptable all-weather surfaced roads, fully open and accessible, from point of origin to point of delivery, during the period required for transportation. Buyer assumes all responsibility for the proper preparation of Buyer's property to both receive and locate the unit purchased. If Dealer must hire extra labor and/or equipment in order to deliver and place the unit purchased because of something not previously disclosed to Dealer, Buyer will pay for all those additional costs. Buyer understands that Dealer does not guarantee proper placement unless a concrete pier runlining below the frost line has first been prepared. Buyer will pay for all labor and material costs to re-set the unit when caused by future settling or sinking resulting from failure to provide a foundation approved by the State or Local Code in which the home is sited. Buyer understands that the sewer must be stubbed out of the ground, the waterline must be capped and the electric line connected to a meter pole with a proper receptacle within 20 feet of the electric box inside of the home. Buyer understands that unless otherwise provided on the other side of this contract, the unit purchased is sold by Dealer F.O.B. Dealer's lot and Buyer is responsible for transporting it.

16. **CONNECTIONS, PERMITS AND CHANGES.** Buyer understands that Dealer is not permitted to make plumbing or electrical connections or connection of certain natural gas or propane appliances where state or local ordinance require a licensed plumber or electrician to do the work. Buyer understands that Dealer is not responsible for obtaining health or sanitary permits, nor for any local, county, or state permits required because of restrictive zoning. Buyer understands that Dealer is not responsible for making changes to plumbing, electrical or construction changes required by special building ordinances or laws. Buyer will pay the costs of any changes needed for compliance with local, county or state laws or zoning requirements.

17. **NOTICE OF WIDTH LIMITATIONS.** Buyer has been informed of the length and width limitations, as of the date of this contract, now enforced in the several states, or provinces of Canada, as they may apply to the movement of manufactured homes over the public highways, and the fact that special permits are required. Buyer understands that some states, or the provinces of Canada, may grant the required permits where the size exceeds the statutory maximum. Buyer releases Dealer and Dealer's assigns, and the manufacturer and its assigns from any and all demands suits counterclaims, based on the size of the unit purchased, if it exceeds the limitations which are now or may later be, imposed by any state or province.

THIS FORM IS PROTECTED UNDER FEDERAL COPYRIGHT LAWS, AS FILED BY JENKINS BUSINESS FORMS. ANY REPRODUCTION WITHOUT ITS EXPRESS WRITTEN CONSENT IS SUBJECT TO LEGAL LIABILITY. JENKINS BUSINESS FORMS DOES NOT GIVE LEGAL ADVICE NOR REPRESENT ANY PARTICULAR LEGAL EFFECT AS RESULTING FROM THE USE OF THIS FORM. IF THE USER DOES NOT UNDERSTAND ANY TERMS, OR LEGAL EFFECT, SEEK COMPETENT LEGAL COUNSEL.
FORM 500 Rev 05/02

HOMES OF LEGEND, INC.
P.O. Box 699 · Industrial Park

Plant Number

| Date of Manufacture | HUD No. |
|---|---|
| 4-9-03 | MTA1279933 |

Manufacturer's Serial Number and Model Unit Designation

HL15661AL    AH-57    16186

Design Approval by (D.A.P.I.A.)

MTA

This manufactured home is designed to comply with the federal manufactured home construction and safety standards in force at time of manufacture.
(For additional information, consult owner's manual.)

The factory installed equipment includes:

| Equipment | Manufacturer | Model Designation |
|---|---|---|
| For heating | NORDYNE | B2BR-01SER |
| For air cooling | | |
| For cooking | GE | JBS07 |
| Refrigerator | GE | GTS17 |
| Water heater | NORDYNE | 1N19D |
| Smoke Detector | FIREX | ADC |
| Dishwasher | GE | GSD2200 |
| Garbage Disposal | | |
| Fireplace | | |

**COMPLIANCE CERTIFICATE**

---

HOME CONSTRUCTED FOR   ☒ Zone I   ☐ Zone II   ☐ Zone III

This home has not been designed for the higher wind pressure and anchoring provisions required for ocean/coastal areas and should not be located within 1500' of the coastline in Wind Zones II and III, unless the home and its anchoring and foundation system have been designed for the increased requirements specified for Exposure D in ANSI/ASCE 7-88.

s home has ____ has not____ been equipped with storm shutters or other protective coverings for windows
ɟ exterior door openings. For homes designed to be located in Wind Zones II and III, which have not been
nded with shutters or equivalent covering devices, it is strongly recommended that the home be made
ʇy to be equipped with these devices in accordance with the method recommended in manufacturers
...nted instructions.

**BASIC WIND ZONE MAP**



DESIGN ROOF LOAD ZONE MAP     North  40 PSF     South  20 PSF
                              Middle  30 PSF     Other  ___ PSF



---

within Uo Value zone ____

Heating equipment manufacturer and model (see list at left)
model 1G114 ___ has the capacity to ... average 70 Degrees F
temperature this home at outdoor temperatures of __-17__ F.
To maximize furnace operating economy, and to conserve energy, it is recommended t
home be installed where the outdoor winter design temperature (97 1/2%) is not

higher than ___9___ degrees Fahrenheit.
The above information has been calculated assuming a maximum wind velocity of 15 ...
standard atmospheric pressure.

**COMFORT COOLING**

[  ] Air conditioner provided at factory (Alternate I)
Air conditioner manufacturer and model (see list at left).
Certified capacity _____ B.T.U./hour in accordance with the appropria
conditioning and refrigeration institute standards.
The central air conditioning system provided in this home has been sized assuring an orie
of the front (hitch end) of the home facing _____. On this basis the sys
designed to maintain an indoor temperature of 75 degrees F when outdoor

temperatures are _____ F dry bulb and _____ F wet bulb.
The temperature to which this home can be cooled will change depending upon the am
exposure of the windows of this home to the sun's radiant heat. Therefore, the home's hea
will vary dependent upon its orientation to the sun and any permanent shading pr
Information concerning the calculation of cooling loads at various locations, window exposures and sh
are provided in Chapter 22 of the 1989 edition of the ASHRAE Handbook of Fundamen
Information necessary to calculate cooling loads at various locations and orientation is pr
in the special comfort cooling information provided with this home.

[✓] Air conditioner not provided at factory (Alternate II)
The air distribution system of this home is suitable for the installation of central air conditi
The supply of air distribution system installed in this home is sized for a manufactured h

central air conditioning system of up to __33600__ B.T.U./hour rated capacity which are c
in accordance with the appropriate air conditioning and refrigeration institute standards, wl
air circulators of such air conditioners are rated at 0.3 inch water column static pressure or ɡ
for the cooling air delivered to the manufactured home supply air duct system.
Information necessary to calculate cooling loads at various locations and orientatio
provided in the special comfort cooling information provided with this manufactured hon

[  ] Air conditioning not recommended (Alternate III)
The air distribution system of this home has not been designed in anticipation of its use
central air conditioning system.

**INFORMATION PROVIDED BY THE MANUFACTURER NECESSARY TO CALCULATE SENSIBLE HEAT GAIN**

| | |
|---|---|
| Walls (without windows and doors) | 'U' 0.096 |
| Ceilings and roofs of light color | 'U' 0.051 |
| Ceilings and roofs of dark color | NA |
| Floors | 'U' 0.087 |
| Air ducts in floor | 'U' 0.114 |
| Air ducts in ceiling | 'U' NA |
| Air ducts installed outside the | 'U' NA |

The following are the duct ar

| | |
|---|---|
| Air ducts in floor | 68 |
| Air ducts in ceiling | NA |
| Air ducts outside the home | NA |

To determine the required capacity of equipment to cool a home efficiently and economi
cooling load (heat gain) calculation is required. The cooling load is dependent on the orien
location and the structure of the home. Central air conditioners operate most efficiently and ɡ
the greatest comfort when their capacity closely approximates the calculated cooling loac
home's air conditioner should be sized in accordance with Chapter 22 of Handbook of Fund
tals, 1989 Edition, once the location and orientation are known.
This manufactured home has been thermally insulated to conform with the requirements
Federal Manufactured Home Construction and Safety Standards for all locations within Uc
Zone.

**Uo VALUE ZONE MAP FOR MANUFACTURED HOUSING**



| Zones | 1 | 2 | 3 |
|---|---|---|---|
| U-Values | 0.116 | 0.096 | 0.079 |

DEFENDANT'S EXHIBIT
11

*reprinted #4621*

696-2243
696-5511

**HOMES OF LEGEND, INC.**
P.O. BOX 699 BOAZ, AL 35957
PHONE NO. (256) 593-9630

**30-DAY SATISFACTION INSPECTION SHEET**

RETAILER NAME
West Value Homes
5284 Montgomery Hwy,
Dothan, AL 36303

HOMEOWNER'S NAME Terry Deese
ADDRESS 3321 Hunter Road
CITY Columbia ST AL ZIP 36319
PHONE NUMBER (334) 696-2060

SERIAL NUMBER 15661
BRAND NAME Homes of Legend
MODEL NO Am-5P
DATE OF RECEIPT OF HOME FROM RETAILER 11-7-03

Upon receipt of your home, please look over the items listed below as well as those items listed in the Homeowner's Guide on the "Homeowner's Checkout Guide" Section. If any item listed on this form is not satisfactory, list that item by number and note in the space provided below and give a brief explanation of the problem. For items that are not satisfactory in relation to the "Homeowner's Checkout Guide", please list them separately.

**LP/NATURAL GAS SYSTEMS:**
1 Supply lines tested (NO LEAKS)
2 Furnace (operation)
3 Range (operation, burners & oven)
4 Water Heater (pilot and burner)
5 Gas Dryer (operation and venting)
**WATER SYSTEM:**
6 Water supply connected and inspected by a licensed plumber
7 Faucets
8 Tub, shower unit
9 Toilet stool and tank
10 Hot water heater
11 Shower stall
12 Drain lines (sewer connections)
13 Traps (leaks)
**ELECTRICAL SYSTEMS:**
14 Electrical supply connected and inspected by a licensed electrician
15 Electric water heater (operation)
16 Electric range / oven / cooktop
17 Electric dryer (operation & venting)

18 Electric furnace
19 Electric washer
20 Air conditioner
21 Refrigerator
22 Garbage disposal
23 Dishwasher
24 Receptacles
25 Interior fans
26 Interior switches
27 Interior lights
28 Furnace thermostat
29 Exterior electrical receptacles
30 Exterior lights
31 Trash compactor
**EXTERIOR:**
32 Home is level (Doors not dragging, windows not binding)
33 Drip caps over exterior doors
34 Entrance door(s) lock and keys fit
35 Egress windows (operation)
36 Window screens
37 Roof

38 Exterior metal / vinyl
39 Vents
40 Shutters and trim
41 Copy of Homeowner's Guide present
42 Copy of Installation and Set-up Manual
43 Hurricane tie-down straps per Installation and Set-up Manual
44 Home set-up per Manufacturer's Installation and Set-up Manual
45 Multi-section homes, aligned evenly at walls, floors and ceilings, interior and exterior
**INTERIOR:**
46 Smoke detectors installed and operational
47 Heat registers
48 Wall paneling
49 Ceilings
50 Mirrors
51 Tub or shower enclosure
52 Light globes and shades
53 Door knobs, latches & handles
54 Drawers (operation)
55 Closet doors, latches

56 Carpet installation
57 Curtains
58 Window Closures
59 Storm windows
60 Trim mouldings

**LEGEND FOR ROOM DESIGNATION**
K KITCHEN
L/R LIVING ROOM
D/R DINING ROOM
DEN DEN
STU STUDY
MBR MASTER BEDROOM
BR2 SECOND BEDROOM
BR3 THIRD BEDROOM
BR4 FOURTH BEDROOM
BR6 FIFTH BEDROOM
MBA MASTER BATH ROOM
BA2 SECOND BATH ROOM
BA3 THIRD BATH ROOM
U/R UTILITY ROOM
HALL HALLWAY(S)

| Number / Room | Description | Number / Room | Description |
|---|---|---|---|
| 8 / MBR | Glue on Walls | 13 / MBR | Check shower masterbedroom |
| 3 / MBR | Hard to Close | 21 / K | Kick guard missing |
| 58 / MBR | Mini Blind — Missing parts | 51 / MBA | Loose Panel |
| 48 / K | Glue on Walls | / | |
| 48 / K | Glue on Refrigerator | / | |
| 55 / K | Window cracked | / | |
| 48 / L/R | Glue on Walls | / | |
| 55 / BR2 | Closet door Will Not latch | / | |
| 48 / BR3 | Glue on Wall | / | |
| 38 / | 2 holes in back | / | |
| 38 / | hole in front | / | |
| 38 / | Gutters catching leak | # | fans |
| / | Main Beam Corner/iron Welds have been broken | / | |

Under home

**HOMEOWNER'S CERTIFICATION**

I have carefully inspected my home and understand that beyond the items noted above, all future cosmetic items are my responsibility. I understand that during the duration of the warranty, service is limited to the structural, mechanical, electrical, plumbing, or weather-resistance systems of the home. I hereby agree with and accept the terms and conditions set forth in the Limited Warranty & Arbitration Agreement and acknowledge receipt of the Homeowner's Information Packet, including: Homeowner's Guide, Limited Warranty & Arbitration Agreement; Installation Manual and 3-Part Homeowner Information Card; 30-Day Satisfaction Inspection Sheet; Insulation Information; and the Appliance Warranty and Use-and-Care Booklets

Homeowner's Signature Terry Deese Date 12-22-03    Retailer's Signature Bonnie Hanson Date 12-22-0

Homeowner's Signature _____ Date _____

NOTE: A COMPLETED AND SIGNED FORM MUST BE SUBMITTED TO HOMES OF LEGEND, INC WITHIN (30) THIRTY DAYS OF THE RETAILER'S TENDER OF POSSESSION OF THE HOME AT ITS ORIGINAL INSTALLATION SITE.

| DISTRIBUTION GUIDE FOR COPIES | WHITE - HOMES OF LEGEND, INC | YELLOW - RETAILER | PINK - HOMEOWNER |
|---|---|---|---|

T Wife, Terry will call me tomorrow
save $800#

DEFENDANT'S EXHIBIT

12

DIVISION NO. 250

## SERVICE WORK ORDER

AUTHORIZATION NO. 75611

2   Page   1

SERIAL NO.  **HL15661**

CUSTOMER  **DEESE, TERRY**
3393 HUNTER RD
COLUMBIA, AL  36319

DEALER # **01141    00000**
**BEST VALUE HOMES**
5284 MONTGOMERY HWY.
DOTHAN, AL  36303

**SERVICEMAN COPY**

HOME PHONE  (334) 696-2243
DAY PHONE  334-618-3385 cell

RETAIL SOLD DATE  **11/07/2003**
DATE RECEIVED  **03/11/2004**

DEALER PHONE
Entered By  **TMB**  CSR  **TM**

Model Year  **2004**

| Decor. SERVICE REPAIRS REQUESTED | Model No. WORK PERFORMED | Assessment | Labor Hours | Expense | Mater Cost |
|---|---|---|---|---|---|
| **01-10  WELD FAILURE** | - | 08 | | | |
| homeowner states  main beam connectors welds have been broken / | | | | | |

Repaired angle Braces in axle area
of Frame -

DEFENDANT'S EXHIBIT

13

SERVICEMAN'S SIGNATURE
BEST VALUE HOMES

CUSTOMER'S SIGNATURE

(CONFIRMS ACCEPTANCE AND SATIFACTION OF WARRANTY WORK PERFORMED)

STARTING DATE  3/11/04
FINISH DATE  3/12/04
STARTING TIME
FINISH TIME

INVOICE TOTAL

LABOR
EXPENSE
MATERIAL
TOTAL COST

DRIVING HRS.  12
MILEAGE
CHARGE  720

ASSESSMENT CO
01 MANUFACTUR
02 COMPONENT
03 SALES
04 INSTALLATION
05 MAINTENANCE
06 OTHER
07 DRIVER DAMA
08 DEALER RELA

DIVISION NO. 250

# SERVICE WORK ORDER

SERIAL NO. **HL15661**

CUSTOMER  DEESE, TERRY
3393 HUNTER RD
COLUMBIA, AL 36319

**DEFENDANT'S EXHIBIT**

**14**

DEALER # 01141   00000

**BEST VALUE HOMES**
5284 MONTGOMERY HWY.
DOTHAN, AL 36303

**SERVICEMAN COPY**

HOME PHONE   (334) 696-2243

RETAIL SOLD DATE  11/07/2003
DATE RECEIVED     03/09/2004

DEALER PHONE

Entered By  **TMB**  CSR  **LM**

Model No.  **AM-SP**

Model Year  **2004**

| SERVICE REPAIRS REQUESTED | WORK PERFORMED | Assessment | Labor Hours | Expense | Material Cost |
|---|---|---|---|---|---|
| Decor. | | 04 | | | 11.75 |
| **04-04 CEILING CRACKS** 2 CEILING CRACKS IN THE KITCHEN | Scraped Respackel cracked | | 2.5 | | |
| **05-02 INTER. TRIM/MOLDING LOOSE** LOOSE TRIM T/O THE HOME | Renailed Loose Molding To Home | 04 | 1.0 | | |
| **06-05 WALL PANEL INADEQUATELY ATTACHED** LOOSE WALL IN MASTER BATH | Sheet Rock Glue Broke loose Renailed | 01 | 1.0 | | |
| **07 GLUE ON WALL BOARD** GLUE ON WALLS IN MASTER BEDROOM, KITCHEN, LR, BEDROOM #3, | Replaced Panel with Glue. Reed loose | 01 | 3.5 | | 30.8 |
| **07-08 ALUMINUM DAMAGED, BUCKLED, DENTED** THERE IS 6 PIECES OF CREAM METAL DENTED ON THE HOME | Repaired Metal that Was Dented Had Dent not Sealed | 04 | 2.0 | | |
| **08-15 GUTTER, DRIP EDGE, FACIA** GUTTERS LEAKING / | Cleaned and Calked Seams of Gutter | 08 | .5 | | |
| **10-03 INT. DOOR WON'T OPEN, CLOSE, LATCH** MASTER BEDROOM HARD TO CLOSE / | Adju doors To Home | 08 | .5 | | |
| CLOSET DOOR WONT LATCH IN BEDROOM #2 | Adjusted door Not Hitting Latch | | | | |

3 Mon

SERVICEMAN'S SIGNATURE  R&R MOBILE HOME SERV

CUSTOMER'S SIGNATURE  Terry Deese
(CONFIRMS ACCEPTANCE AND SATISFACTION OF WARRANTY WORK PERFORMED)

STARTING DATE  6-4-04
FINISH DATE    6-4-04
STARTING TIME  7:00
FINISH TIME    1:00

INVOICE TOTAL  9 HRS

LABOR
EXPENSE
MATERIAL     $45.09
TOTAL COST   $45.09

DRIVING HRS.
MILEAGE      75
CHARGE

**ASSESSMENT CODES**
01 MANUFACTURING
02 COMPONENT
03 SALES
04 INSTALLATION
05 MAINTENANCE
06 OTHER
07 DRIVER DAMAGE
08 DEALER RELATED

# SERVICE WORK ORDER

WORK ORDER NO. **462184**

Page   2

SERIAL NO. **HL15661**

CUSTOMER   **DEESE, TERRY**
3393 HUNTER RD
COLUMBIA, AL  36319

**BEST VALUE HOMES**
5284 MONTGOMERY HWY.
DOTHAN, AL  36303

## SERVICEMAN COPY

Decor.                                              Model No.  **AM-SP**          Model Year  **2004**

| SERVICE REPAIRS REQUESTED | WORK PERFORMED | Assessment | Labor Hours | Expense | Material Cost |
|---|---|---|---|---|---|
| **11-40 WINDOWS - OTHER** WINDOW CRACKED IN LR / *Sent. Window. Wrong Style.* | *Order 30x53 model* | 01 | *5* | | |
| **14-11 TUB / SHOWER SURROUNDS LEAK,** CHECK SHOWER MASTER BEDROOM / *Called and Sealed Tub Shower* | *Seal broke loose* | 01 | .25 | | |
| **17-40 APPLIANCES - OTHER** GLUE ON REFRIGERATOR / *Cleaned Glue off of Ref.* | | 04 | .25 | | |
| **19-15 CURTAINS, MINIBLINDS - DAMAGED,** MINI BLIND MISSING PARTS IN MASTER BEDROOM / *Replaced Parts. Broken.* | | 08 | .5 | | 2.5 |

45.0

ASSESSMENT CODES
01 MANUFACTURING
02 COMPONENT
03 SALES
04 INSTALLATION
05 MAINTENANCE
06 OTHER
07 DRIVER DAMAGE
08 DEALER RELATED

DIVISION NO. 250

Homes of Legend
**SERVICE WORK ORDER**

WORK ORDER NO. **6186**
Page    1

SERIAL NO. **HL15661**

CUSTOMER    **DEESE, TERRY**
3393 HUNTER RD
COLUMBIA, AL 36319

DEALER NO. # **01141**    **00000**
**BEST VALUE HOMES**
5284 MONTGOMERY HWY.
DOTHAN, AL 36303

**DEFENDANT'S EXHIBIT**

**15**

**SERVICEMAN COPY**

| HOME PHONE | (334) 696-2243 | RETAIL SOLD DATE **11/07/2003** | DEALER PHONE |
| DAY PHONE | | DATE RECEIVED **06/14/2004** | Entered By **TMB** CSR **LM** |

Model No. **AM-SP**          Model Year **2004**

| Decor.<br>SERVICE REPAIRS REQUESTED | WORK PERFORMED | Assessment | Labor Hours | Expense | Material Cost |
|---|---|---|---|---|---|
| REWRITE FROM WO# 0000004621 | | | | | |
| 06-08 WALL PANELS - STAINED/DISCOLORED<br>per Jimmy needs one more pc of sr in lr / | Could Not Clean glue OFF | 01 | | | |
| Replaced S/R under L/R window | | | 25 M | | |
| 11-40 WINDOWS - OTHER<br>WINDOW CRACKED IN LR /order 30x53 metal window | | 01 | 30 | | |
| Replaced BusTed Window | | | | | |

**COSMETIC WARRANTY**
**COMPLETED LAST VISIT**

**RE-WRITE**

SERVICEMAN'S SIGNATURE    Chris Tedbetter Bunny Baker
NOT SIGNED

CUSTOMER'S SIGNATURE    Dawn Deese
(CONFIRMS ACCEPTANCE AND SATIFACTION OF WARRANTY WORK PERFORMED)

| STARTING DATE | 7-1-04 | LABOR |
| FINISH DATE | 7-1-04 | EXPENSE |
| STARTING TIME | 7:25 | MATERIAL |
| FINISH TIME | 8:45 | TOTAL COST |
| | | DRIVING HRS. |
| INVOICE TOTAL | | MILEAGE |
| | | CHARGE |

ASSESSMENT CODE
01 MANUFACTURING
02 COMPONENT
03 SALES
04 INSTALLATION
05 MAINTENANCE
06 OTHER
07 DRIVER DAMAGE
08 DEALER RELATE

SERVICE CHECK-LIST

SERIAL NUMBER __HL 15661__

Please use this check list for EACH AND EVERY UNIT.

Check commode fittings, flush and fill up.
Check all baths, P-Traps, dishwasher & refridgerator ice maker hook-ups for leaks.
Check all faucets & fittings at sink under & on top, tubs, showers.
Do a visual check for cuts, scratches on tub/shower finish.
Check washer & dryer area for proper fittins, venting, & electrical.
Check all electrical outlets & switches inside & outside (with electrical tester), check outside plugs for seal.
Check interior & exterior lights for seal, also for opening & closing properly.

**Master Bath & 2nd Bath:**
Sink faucets/fittings ✓
Nuts & bolts ✓
Commode fittings ✓
Tubs/Shower ✓
Plugs/Switches ✓
Comments: _____
_____
_____

**Utility Room:**
Hot Water Heater (leaks) ✓ OK
Washer box hook-up ✓
Dryer vent to outside ✓
Plugs/Switches ✓
Comments: _____
_____
_____

**Kitchen/Living Room:**
Faucet/Fittings ✓
Range vent hood ✓
Plugs/Lights/Switches ✓
S/G Door ✓
Comments: _____
_____

Check Cabinets Through-Out ✓
Visual Check Moldings Through-Out
Unit _____

**Exterior Doors:**
Proper open & close ✓
Exterior lights ✓
Door caps/seal ✓
Perimeter blocks ✓
Comments: _____
_____
_____

**Hallway:**
Plugs/Switches ✓
Comments: _____
_____

**2nd & 3rd Bedrooms:**
Plugs/Switches ✓
Doors(adjustments) ✓
Comments: _____
_____

**Visual Check Exterior of Unit:**
Masonite N/A
Metal ✓
Windows ✓
Roof ✓
Smoke Alarm ✓
Egressed Windows N/A
Vinyl Siding N/A

Date: 7-1-04

_____
Customer Signature Dawn Dees

_____
Service Technician Chris Tedbetter / Danny Baker

Customer Comments: _____
_____

DEFENDANT'S EXHIBIT 16

Chandeleur
Homes, Inc.

SERIAL NUMBER _HL 15661_

Dear Homeowner:

We would appreciate you taking a few moments to complete this form. Your service technician(s) are required to present this form to this office. Please rate your service technician(s) in the following categories:

| | | | |
|---|---|---|---|
| Scheduling appointment with you.................. | (Excellent) | Good | Fair Po |
| Promptness in keeping appointment.......... | (Excellent) | Good | Fair Po |
| Technician(s) appearance................... | (Excellent) | Good | Fair Po |
| Cleaning-up after completing work.......... | (Excellent) | Good | Fair Po |
| Was all work from repair order completed.. | (Yes) | No | |
| Were they courteous?.................... | (Yes) | No | |

If all work was **NOT** completed, please list below those items not completed.

_____

_____

_____

Please list below any additional comments concerning your service technician(s).

_____

_____

_____

Please understand that your service technician(s) are not allowed to schedule any additional work on your home unless this office reassigns the work.

Thank you for completing this form, and for letting us service your home.

_Dawn Deese_
Customer's signature

_Chris Ledbetter_ _Danny Baker_
Technician's Signature

_____
Service Representative
From Office Whom You Spoke
With Today

_7-1-04_
Date

DEFENDANT'S
EXHIBIT

_17_

256

DEFENDANT'S EXHIBIT

18



# HOMES OF LEGEND, INC.

# Homeowner's Guide, Limited Warranty & Arbitration Agreement

KEEP THIS MANUAL WITH YOUR HOME

REVISED September 2001

Printed-9-2002

# MANUFACTURER'S LIMITED WARRANTY & ARBITRATION AGREEMENT

### Homes of Legend, Inc.'s Limited Warranty

Homes of Legend, Inc. ("Manufacturer") warrants to you, the Homeowner, for a period of one year that the new manufactured home purchased by you was manufactured free from substantial defects in materials and workmanship. The term "substantial defects in materials and workmanship" means any factory introduced failure of the structural, mechanical, electrical, plumbing, or weather-resistance systems of the home to meet the performance or specification requirements of the applicable building standards as specified on the house certification label, but not including minor or cosmetic items. The warranty only applies if the home is purchased from an authorized retailer, which does not include retailers that acquire the home from sources other than directly from the manufacturer.

This warranty begins on the date of the retailer's tender of possession of the home at its original installation site and continues for one year from that date, provided the home is not moved from its original installation site, rented to others, nor used for commercial purposes, which is the one year "Warranty Period." The warranty only applies to substantial defects that become evident within the Warranty Period and where written notice is provided to the Manufacturer not later than 10 days following the expiration of the Warranty Period. The only remedy for substantial defects offered under this warranty is repair or replacement of affected parts after inspection by the Manufacturer or its authorized representative. If the identical part or component is not available, the Manufacturer will provide a similar part or component of equal or greater value. All parts or components repaired or replaced under the warranty are the exclusive property of the Manufacturer. The Manufacturer will make the final decision whether to repair or replace any part or component or system.

The Manufacturer reserves the right to make changes or improvements at any time in the design or manufacture of its manufactured home or any component thereof without incurring any obligation to others.

DISCLAIMER OF WARRANTIES: THIS WARRANTY IS GIVEN EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE REMEDIES SET FORTH IN THIS WARRANTY ARE THE SOLE REMEDIES PROVIDED BY THE MANUFACTURER. ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, TO THE EXTENT IMPLIED BY LAW, ARE LIMITED IN DURATION TO ONE YEAR AND OTHERWISE DISCLAIMED. Some states do not allow limitations on how long an implied warranty lasts, so the above exclusions or limitations may not apply to you.

THIS WARRANTY DOES NOT COVER:

- problems resulting from failure to comply with instructions in this Guide, including instructions for obtaining warranty service, or the Installation Manual;

- damage caused by use of the home for anything other than private residential occupancy;

- appliances and accessories installed in the manufactured home, which may be separately

4

# MANUFACTURER'S LIMITED WARRANTY & ARBITRATION AGREEMENT

warranted by the appliance or accessory manufacturer;

- alterations or modifications provided by retailers or other third parties, including appliances, appurtenances, accessories or options, such as air conditioning installation and service, skirting and other similar items;

- problems resulting from transportation, improper or inadequate set-up, leveling, re-leveling, or securement;

- problems resulting from an inadequate foundation, settling, or shifting soil or which relate to daily changes in temperature and humidity (i.e., the appearance of minor cracks in walls or ceiling texture, wavy exterior siding, minor gaps in trim or trim pulling away from wall or ceiling, or doors or windows becoming out of adjustment −such items are generally the result of normal settling of a home or seasonal changes and not an indication of any type of warranted item and therefore, considered normal maintenance items);

- problems resulting from damage by others, abuse, misuse, unauthorized repairs, negligence or accidental damage, or from theft, vandalism, natural disasters or Acts of God;

- deterioration or damage from high relative humidity, condensation, ground moisture, the use of moisture producing appliances (i.e., kerosene heaters, humidifiers, etc.) or extended moisture exposure caused by plants, building attachments or accessories; or the failure to maintain adequate ventilation in and/or underneath the home; or the failure to properly vent the dryer exhaust away from the home; or the failure to provide an adequate vapor barrier; or the failure to provide adequate drainage away from the home;

- deterioration or damage caused by unauthorized repairs or alteration of the home or any component parts or the imposition of loads for which the home was not designed to support or resist including damage as the result of attaching additions, decks, porches, carports, etc. to the home;

- deterioration from exposure to insects or decay;

- normal wear and tear, which includes, but is not limited to, visible scratches, tears, cuts and dents, and other similar damage to the roof, exterior siding, bottom board, floor coverings, wall coverings, ceilings, cabinets, trim, doors, windows, screens and other components occurring during or after delivery and installation;

- water distribution leaks on systems that have water pressure supplies in excess of 80 psi;

- improper or inadequate connection of utility systems to the utility supply services or between sections of multi-sectional units;

- roof leaks caused by ice or debris build-up, ice or debris dams, or water ponding on the roof;

# MANUFACTURER'S LIMITED WARRANTY & ARBITRATION AGREEMENT

- damage caused by improper electrical service grounding;

- bedding, blinds, draperies, furniture, wheels, tires, axles or brakes;

- any undertaking, representation or warranty made by a retailer or other person beyond those expressly set forth in this warranty;

- minor or cosmetic items, as defined in this Guide or other problems not constituting substantial defects;

- loss or damage which the owner has not taken timely action to minimize or damage caused by improper preventive maintenance as specified in this Guide (i.e., caulking of roof vents, windows, doors, sinks, tubs, shingles, fasteners, or failure to clean gutters, etc.);

- payments by Homeowner to third parties for work performed on the home unless such work is approved by Manufacturer in advance pursuant to the procedures set forth herein; and

- INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO YOUR LOSS OF TIME OR INCONVENIENCE, LOSS OF REVENUE, COMMERCIAL LOSS, BEING DISPLACED OR UNABLE TO USE YOUR HOME, MENTAL DISTRESS, TRAVEL, LODGING, OR TELEPHONE CALLS. NEITHER THE MANUFACTURER OR OTHERS ASSUME ANY RESPONSIBILITY UNDER ANY CIRCUMSTANCES FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES. Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above exclusions or limitations may not apply to you.

THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY ALSO HAVE OTHER RIGHTS THAT MAY VARY FROM STATE TO STATE.

If any part, subpart, clause or sentence of this warranty is determined to be in conflict with any applicable law, rule or regulations, this limited warranty and all other provisions shall be effective to the extent required thereby.

---

### -NOTICE-
### TAPE & TEXTURE DRYWALL FINISH IS NOT WARRANTED
### BY HOMES OF LEGEND, INC.

Homes of Legend, Inc. does not warrant that tape and texture finishes of drywall walls or ceilings will be free from cracks. Homes of Legend, Inc. will not make or pay for repairs to drywall or ceiling cracks, or drywall or ceiling finishing including multi-section close-ups. Homes of Legend, Inc. strongly recommends that all homes with tape and texture finishes have additional perimeter blocking, as described in the Installation Manual. The additional blocking is not required by the standards, but such blocking may reduce the opportunity for minor movement and settlement, which can affect tape and textured drywall finish.

---

# *MANUFACTURER'S LIMITED WARRANTY & ARBITRATION AGREEMENT*

**ARBITRATION AGREEMENT:** It is agreed that any controversy, claim or dispute between or among the Manufacturer, homeowner, independent dealer, finance company or any other person or entity arising from or relating to the Manufactured Home, its sale, transportation, setup, repair, installation, use, design, manufacture, financing, insurance, any other condition, the manufacturer's limited warranty, any contract or any alleged promise, representation, agreement or instrument relating to or delivered in connection with the Manufactured Home, or any alleged breach thereof, and any claim based on or arising from an alleged tort or claim of any kind whatsoever, including any claim relating to the validity of this arbitration provision [collectively "Claim(s)"], and if the Claim(s) cannot be resolved through direct discussions or negotiations, – and unless the parties otherwise agree on a different mediation or arbitration process – then the Claim(s) first shall be mediated as administered by the American Arbitration Association ("AAA") under its applicable mediation Rules before resorting to binding arbitration. Thereafter, any unresolved Claim(s) shall be settled by binding arbitration administered by the AAA in accordance with its applicable arbitration Rules for such Claim(s), and any judgment on the award rendered by the arbitrator(s) may be entered in any Court having jurisdiction thereof. The parties reserve their rights to resolve the Claim(s) in an applicable small claims court for disputes or Claim(s) within the scope of the small claims court's jurisdiction. The assessment of all fees and expenses of the mediation or arbitration shall be governed by the applicable rules of the AAA, unless otherwise agreed by the parties. Moreover, each party shall bear the expense of its own counsel, experts, witnesses and other costs, including preparation and presentation of proofs, subject to re-apportionment based on applicable laws of the jurisdiction in which the Claim(s) is heard. All mediation or arbitration proceedings shall be conducted in the jurisdiction of the original retail sale or at any other place selected by agreement of all parties.

**IT IS AGREED AND UNDERSTOOD THAT THE PARTIES ARE KNOWINGLY GIVING UP AND WAIVING CERTAIN RIGHTS TO LITIGATE DISPUTES IN COURT, INCLUDING WAIVING OF A TRIAL BY JURY.** This arbitration provision is part of the manufacturer's limited warranty for the Manufactured Home and shall be binding on and inure to the benefit of the parties' respective heirs and assigns.

A copy of the applicable Rules of the AAA is available upon request by contacting the American Arbitration Association at the following address: 2200 Century Parkway, Suite 300, Atlanta, Georgia 30345-3203 or (800) 778-7879, or www.adr.org.

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TERRY DEESE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 1:06-cv-643-MHT |
| | * | |
| CHAMPION ENTERPRISES, INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |

### PLAINTIFF'S RESPONSE TO DEFENDANT HOMES OF LEGEND, INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND FIRST REQUEST FOR ADMISSIONS

Plaintiff Terry Deese hereby responds to Defendant Homes of Legend, Inc.'s First Request for Production of Documents and First Request for Admissions as follows.

### General Objections

1.    The objections to the pending discovery made by Plaintiff are made without waiver of, or prejudice to, additional objections that Plaintiff may make. All such objections are hereby expressly preserved, as is the right to move for a protective order. Plaintiff also reserves all objections to the admissibility at trial of any information provided.

2.    Plaintiff objects to the discovery to the extent each request for production and request for admission has absolutely no relevance to the proceedings before the Middle District of Alabama and is not calculated to lead to the discovery of admissible evidence.



3.    The supplying of any information does not constitute an admission by Plaintiff that such information is relevant in this action.  All information provided by Plaintiff is for use in this litigation only; that is, to be used for no other purpose.

4.    Plaintiff objects to each and every discovery request to the extent the documents or information called for, if any, are privileged.  In particular, Plaintiff objects to each and every discovery request to the extent the documents or information called for, if any, are protected by the attorney-client privilege and/or work product doctrine.  Plaintiff also states that any inadvertent production or disclosure of privileged material is not intended, or should not be construed, as a waiver of privilege, and Plaintiff reserves the right to seek the return of any such material and, further, to object to its use.

5.    Plaintiff objects to each and every discovery request to the extent it seeks to vary the obligations imposed upon Plaintiff under the Alabama Rules of Civil Procedure.

6.    Plaintiff objects to each and every discovery request to the extent it is vague, ambiguous, overly broad, oppressive, unduly burdensome, or unduly expensive.

7.    Plaintiff objects to each and every discovery request to the extent it seeks confidential or proprietary information.  Similarly, Plaintiff reserves the right to redact confidential or proprietary information from any document that is produced.

2

8. Any production to occur at a later date will occur at a mutually convenient time and place.

## FIRST REQUEST FOR PRODUCTION

1. All "documents" or "communications" received from the Dealer of or concerning the purchase, finance, set up or service of the Manufactured Home, including, but not limited to orders, invoices, bills of sales, titles, notes, security agreements, warranties, service manuals, owner's manuals, set up instructions, repair records, correspondence, etc.

**RESPONSE:    Plaintiff is in the process of gathering the information responsive to this request and will produce them once located.**

2. All "documents" or "communications" that came with the Manufactured Home or was received from Legend of or concerning the Manufactured Home, including, but not limited to warranties, service manuals, owner's manuals, set up instructions, repair records, correspondence, etc.

**RESPONSE:    Plaintiff is in the process of gathering the information responsive to this request and will produce them once located.**

3. All "documents" or "communications" regarding requests to anyone, for warranty service, repair or adjustments, and, requests for non-warranty service, maintenance or repair of the Manufactured Home.

**RESPONSE:    None.**

4. All "documents" or "communications" concerning the Manufactured Home transmitted or delivered to you, or by anyone acting on your behalf, to the Dealer, Legend or any other "person".

3

Continuation of partially transmitted fax.

**RESPONSE:**    Plaintiff is producing all documents in his possession.

5.    All "documents", "communications" or complaints made by or for you to any city, county, state or federal agency, of or concerning the Manufactured Home.

**RESPONSE:**    Plaintiff is producing all documents in his possession.

6.    All "documents" or "communications" received by you, or by anyone acting on your behalf, from the Dealer, Legend, any city, county, state or federal agency, or any other "person" of or concerning the Manufactured Home.

**RESPONSE:**    Plaintiff is producing all documents in his possession.

7.    All "documents", "communications" or records of payment for the Manufactured Home for any repairs or maintenance thereto since the purchase.

**RESPONSE:**    **None.**

8.    All "documents" relating to cancelled checks, check stubs, receipts or other documents evidencing payment for any repairs to the Manufactured Home.

**RESPONSE:**    **None.**

9.    All "documents", "communications", or records regarding any factual allegations made in the Complaint or that support any claim being made in the Complaint.

4

Continuation of partially transmitted fax.

**RESPONSE:**    Plaintiff is producing all documents in his possession.

10.    All "documents", "communications", advertisements, brochures or other written materials relied upon by you, in whole or in part, in connection with the purchase of the Manufactured Home.

**RESPONSE:**    Plaintiff is producing all documents in his possession.

11.    All "documents" or "communications" regarding the condition of the Manufactured Home prior to or at the time of the sale.

**RESPONSE:**    Plaintiff objects to this Request on the grounds it is vague.    Plaintiff does not know what is meant by "regarding the condition."

12.    All "documents" or "communications" regarding the condition of the Manufactured home after the time of sale.

**RESPONSE:**    Plaintiff objects to this Request on the grounds it is vague.    Plaintiff does not know what is meant by "regarding the condition".

13.    All "documents", "communications", memos or reports which deal with any inspection or testing of the Manufactured Home.

**RESPONSE:**    None.

14.    All "documents" or "communications" regarding any alleged depreciation in value of the Manufactured Home.

Continuation of partially transmitted fax.

**RESPONSE:**     See expert reports of Roy Bonney and Bobby Parks.

15.   All "documents" or "communications" evidencing telephone calls relating to the Manufactured Home or any claims made in the Complaint.

**RESPONSE:**     None.

16.   All "documents", "communications", sounds recordings, video recording, movies, photographs, or transparencies in your or your attorney's custody or control which depict the Manufactured Home, or any component part.

**RESPONSE:**     Plaintiff objects to this request for production in that the information requested by Defendant is protected by the attorney/client privilege and/or work product doctrine.

17.   All "documents", "communications", sound recordings, video recordings, movies, photographs, or transparencies in your or your attorney's custody or control which depict any "representative", known agent, servant or employee of the Dealer or Legend or of any "person" with respect to the Manufactured Home or any claims in this action.

**RESPONSE:**     Plaintiff objects to this request for production in that the information requested by Defendant is protected by the attorney/client privilege and/or work product doctrine.

18.   All "documents" or "communications" which support any of our claimed damages in this action.

**RESPONSE:**     Further discovery is needed in order to provide a complete description and/or computation of the categories and extent of

6

damages suffered by Plaintiff as a result of Defendants conduct. Additionally, Plaintiff will need an expert to compute the total monetary damages and supplement this answer once the necessary discovery is completed.   As such, Plaintiff is unable to state the amount of damages Plaintiff seeks or will accept at this time.

19.    If you filed a bankruptcy petition of any kind since your purchase of the Manufactured Home, please produce all "documents" or "communications" of or concerning your bankruptcy petition.

**RESPONSE:**    **Plaintiff has not filed bankruptcy since he purchased the manufactured home.**

20.    All "documents" or "communications" of or concerning insurance covering the Manufactured Home.

**RESPONSE:**    **Plaintiff is producing all documents in his possession.**

21.    All "documents" or "communications" of or concerning insurance claims made for property damage to the Manufactured Home.

**RESPONSE:**    **None.**

22.    All "documents" or "communications" or records between you and any non-party (excluding correspondence between you and your attorney) which in any way relates to any claims or damages alleged in this civil action.

**RESPONSE:**    **None.**

23.    A copy of the curriculum vitae of each expert witness you have consulted or retained to assist in this lawsuit.

7

**RESPONSE:**    See curriculum vitae previously produced with Plaintiff's expert disclosures.

24.    All "documents" or "communications" provided to any expert witness.

**RESPONSE:**    Plaintiff objects to this Request on the grounds it is vague.  Without waiving said objection, Plaintiff states he has produced to Defendants a copy of all client documents provided to Plaintiff's expert witnesses.

25.    All reports provided to or prepared by you or your expert relating to the investigation of any claims or opinion or conclusions about any claims.

**RESPONSE:**    See expert reports of Roy Bonney and Bobby Parks previously produced.

26.    All "documents" or "communications" which you or your expert reviewed or was made available for review in any way relating to this civil action.

**RESPONSE:**    Plaintiff objects to this Request on the grounds it is vague.  Plaintiff does not know what is meant by "was made available for review in any way relating to this civil action".

27.    Any and all medical records or "documentation" from any hospital, doctor or clinic concerning any and all injuries allegedly suffered by you, for any examination, treatment or admission, including, but not limited to, doctor's notes, excuses, return to work slips, prescriptions, bills, invoices, reports from any psychologist, or any other medical professional authorized and/or certified to

8

Continuation of partially transmitted fax.

determine mental or physical health and to support any allegations in the Complaint.

**RESPONSE:**    **Plaintiff objects on the grounds the information requested is privileged and confidential. Without waiving said objection, Plaintiff has suffered mental anguish and emotional distress, anxiety, embarrassment, anger, fear, frustration, disappointment, worry, annoyance, and inconvenience as a result of Defendants knowingly manufacturing the defective manufactured home purchased by Plaintiff.**

28.    Any "document" or exhibit which you or your attorney plan to use in any way at the trial, deposition, hearing, or proceeding, including "documents" or exhibits which may be offered or used for rebuttal or impeachment or demonstrative purposes only.

**RESPONSE:**    **Plaintiff will produce a list of exhibits pursuant to the Scheduling Order.**

29.    Any "communication" or statement or account, whether in original form or transcribed or re-written or re-typed, and whether signed or unsigned, made by any person, including parties, who claims to have any knowledge whatsoever pertaining in any way to any occurrence referred to in the Complaint as amended.

**RESPONSE:**    **None.**

30.    Any "document" or "communication" of or concerning any warranties you claim you were given with the home.

9

RESPONSE:    Plaintiff is producing all documents in his possession.

31.    Any "document" that relates to your purchase or financing of any manufactured home, automobile, satellite dishes, furniture, appliances, stereos, televisions, etc. over the past five (5) years.

RESPONSE:    Plaintiff objects to this interrogatory as being irrelevant and immaterial to this action. Furthermore, the information sought does not appear to be reasonably calculated to lead to the discovery of admissible evidence.

32.    Any "document" or pro tanto release which in any way relates to the settlement of any claims or damages alleged in this lawsuit or with regard to any other claims or damages alleged to have occurred with respect to the Manufactured Home.

RESPONSE:    None.

33.    Any "document" or "communication" which in any way relates to the claims or damages alleged in this lawsuit that has not already been produced.

RESPONSE:    Plaintiff objects to this Request on the grounds it is overly broad, ambiguous, and unduly burdensome.

34.    Any "document" or "communication" received from any party or non-party, including such items that may have been produced pursuant to a subpoena to a non-party, of or concerning the Manufactured Home or any claims made in this civil action.

RESPONSE:    None.

Continuation of partially transmitted fax.

35.    For any Request for Admission propounded, which you denied, please "identify" and produce any "document" or "communication" which in any way supports the denial or upon which such denial is based.

RESPONSE:    Plaintiff objects to this interrogatory in that the information requested by Defendant is protected by the attorney/client privilege and/or work product doctrine.    Plaintiff further objects to this interrogatory on the grounds it is overly broad, ambiguous, and unduly burdensome.

## REQUEST FOR ADMISSIONS

1.    Please admit that Legend did not transport the Manufactured Home to your property.

RESPONSE:    Admit.

2.    Please admit that Legend did not set up the Manufactured Home on your property.

RESPONSE:    Admit,

3.    Please admit that Legend did not participate in the sale of the Manufactured Home by the Dealer to you.

RESPONSE:    Plaintiff does not have sufficient information to either admit or deny this Request for Admission.

4.    Please admit that the Manufactured Home is used as a dwelling.

RESPONSE:    Admit.

5.    Please admit that you have claimed a homestead exemption on the

11

Manufactured Home.

**RESPONSE:**    **Denied.**

6.    Please admit that you are not claiming mold related personal

injuries.

**RESPONSE:**    **Plaintiff does not have sufficient information to**

**either admit or deny this Request for Admission.**

C. 3U

C. Gibson Vance (ASB-1923-N77C)

12

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing document upon all counsel of record as listed below by placing the same in the United States mail, properly addressed and first class postage prepaid on this the 18th day of October, 2006.

Gregory S. Ritchey, Esquire
Richard S. Walker, Esquire
Ritchey & Ritchey, P.A.
P.O. Drawer 590069
Birmingham, Alabama 35259-0069
greg@ritcheylaw.com
richard@ritcheylaw.com

C. 3U

_____
OF COUNSEL

13

Continuation of partially transmitted fax.

# BEST VALUE HOMES

5284 Montgomery Highway
DOTHAN, ALABAMA 36303
334/983-4517

| BUYER(S) Terry W. Deese | PHONE 696-2243 | DATE |
|---|---|---|
| ADDRESS 3393 Hunter Rd. Columbia, AL. 36319 | SALESPERSON Larry Mercer | |

DELIVERY ADDRESS

| MAKE & MODEL Homes of Legend | YEAR 2004 | BEDROOMS 3 | FLOOR SIZE 76 w 16 | HITCH SIZE 80 w16 | STOCK NUMBER |
|---|---|---|---|---|---|
| SERIAL NUMBER HL15661 AL | ☒ NEW  ☐ USED | COLOR | | PROPOSED DELIVERY DATE | KEY NUMBERS Houston |

| LOCATION | R-VALUE | THICKNESS | TYPE OF INSULATION | BASE PRICE OF UNIT | $ 22,900.00 |
|---|---|---|---|---|---|
| CEILING | 21 | | Cellulos | OPTIONAL EQUIPMENT | |
| EXTERIOR | 11 | | Fiberglass | | |
| FLOORS | 7 | | Fiberglass | SUB-TOTAL $ 22,900.00 | |

*THIS INSULATION INFORMATION WAS FURNISHED BY THE MANUFACTURER AND IS DISCLOSED IN COMPLIANCE WITH THE FEDERAL TRADE COMMISSION RULE 16CRF, SECTION 460.16.*

| | SALES TAX 2.5% | 572.50 |
|---|---|---|

| OPTIONAL EQUIPMENT, LABOR AND ACCESSORIES | | NON-TAXABLE ITEMS | 15.00 |
|---|---|---|---|
| Price Includes: | $ | VARIOUS FEES AND INSURANCE | |
| 1 Year Manufacturer's Warranty | | 1. CASH PURCHASE PRICE | $ 23,487.50 |
| Delivery - Setup - Tied down to AL State Code | | TRADE-IN ALLOWANCE $ | |
| | | LESS BAL. DUE on above $ | |
| 3 Ton A/C Unit installed | | NET ALLOWANCE $ | |
| | | CASH DOWN PAYMENT $ 500.00 | |
| Skirting installed: Color CAMEO | | CASH AS AGREED (SEE REMARKS) $ | |
| 2 sets of steps | | 2. LESS TOTAL CREDITS | $ 500.00 |
| | | SUB-TOTAL | $ 22,987.50 |
| Install storm windows | | SALES TAX (if Not Included Above) | |
| Install Ice maker | | 3. Unpaid Balance of Cash Sale Price | $ 22,987.50 |
| Refrigerator | | REMARKS: | |
| Stove | | | |
| Dishwasher | | | |

| BALANCE CARRIED TO OPTIONAL EQUIPMENT | $ | Dealer and Buyer certify that the additional terms and conditions printed on the other side of this contract are agreed to as a part of this agreement, the same as if printed above the signatures. Buyer is purchasing the above described manufactured home, trailer or vehicle; the optional equipment and accessories, the insurance as described has been voluntary; that Buyer's trade-in is free from all claims whatsoever, except as noted. |
|---|---|---|

**NOTE: WARRANTY AND EXCLUSIONS AND LIMITATIONS OF DAMAGES ON THE REVERSE SIDE.**

| DESCRIPTION OF TRADE-IN | YEAR | SIZE |
|---|---|---|
| MAKE N/C MODEL | | BEDROOMS |
| TITLE NO. SERIAL NO. | | COLOR |

AMOUNT OWING TO WHOM

ANY DEBT BUYER OWES ON TRADE-IN IS TO BE PAID BY  ☐ DEALER  ☐ BUYER

THE AGREEMENT CONTAINS THE ENTIRE UNDERSTANDING BETWEEN DEALER AND BUYER AND NO OTHER REPRESENTATION OR PROMISE, VERBAL OR WRITTEN, HAS BEEN MADE WHICH IS NOT CONTAINED IN THIS CONTRACT. BUYER(S) ACKNOWLEDGE RECEIPT OF A COPY OF THIS ORDER AND THAT BUYER(S) HAVE READ AND UNDERSTAND THE BACK OF THIS AGREEMENT.

| BEST VALUE HOMES | DEALER | SIGNED X Terry W Deese | BUYER |
|---|---|---|---|
| Not Valid Unless Signed and Accepted by an Officer of the Company or an Authorized Agent | | SOCIAL SECURITY NO. | |
| By Bonnie Harrison | | SIGNED X | Deese-0001 |
| Approved | | SOCIAL SECURITY NO. | |

A PLAIN LANGUAGE PURCHASE AGREEMENT

FORM 500-1 ®

Continuation of partially transmitted fax.

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TERRY DEESE,

      Plaintiff,

v.

CHAMPION ENTERPRISES, INC., *et al.,*

      Defendants.

    1:06-cv-643-MHT

## PLAINTIFF'S RESPONSE TO DEFENDANT HOMES OF LEGEND, INC.'S FIRST INTERROGATORIES

Plaintiff Terry Deese hereby responds to Defendant Homes of Legend, Inc.'s First Interrogatories as follows.

### General Objections

1.    The objections to the pending discovery made by Plaintiff is made without waiver of, or prejudice to, additional objections that Plaintiff may make. All such objections are hereby expressly preserved, as is the right to move for a protective order. Plaintiff also reserves all objections to the admissibility at trial of any information provided.

2.    Plaintiff objects to the discovery to the extent each interrogatory has absolutely no relevance to the proceedings before the Middle District of Alabama and is not calculated to lead to the discovery of admissible evidence.

3.    The supplying of any information does not constitute an admission by Plaintiff that such information is relevant in this action. All information provided by Plaintiff is for use in this litigation only; that is, to be used for no other purpose.

**EXHIBIT**

**3**

4.     Plaintiff objects to each and every discovery request to the extent the documents or information called for, if any, are privileged.   In particular, Plaintiff objects to each and every discovery request to the extent the documents or information called for, if any, are protected by the attorney-client privilege and/or work product doctrine.  Plaintiff also states that any inadvertent production or disclosure of privileged material is not intended, or should not be construed, as a waiver of privilege, and Plaintiff reserves the right to seek the return of any such material and, further, to object to its use.

5.     Plaintiff objects to each and every discovery request to the extent it seeks to vary the obligations imposed upon Plaintiff under the Alabama Rules of Civil Procedure.

6.     Plaintiff objects to each and every discovery request to the extent it is vague, ambiguous, overly broad, oppressive, unduly burdensome, or unduly expensive.

7.     Plaintiff objects to each and every discovery request to the extent it seeks confidential or proprietary information.  Similarly, Plaintiff reserves the right to redact confidential or proprietary information from any document that is produced.

8.     Any production to occur at a later date will occur at a mutually convenient time and place.

2

## INTERROGATORIES

1.   Please "identify" everything that you can recall that each "representative" of the Dealer told you about the Manufactured Home, up to the time of your purchase thereof.

**RESPONSE:     Plaintiff had numerous conversations with representatives of the Dealer and cannot recall everything he was told. Plaintiff does recall he was told the home was free from defects; he had a one-year warranty and if any repairs were needed, they needed to be submitted within that year.  Cost of the home and features of the home were also discussed.**

2.   Please "identify" everything that you can recall that each "representative" of the Dealer told you about the Manufactured Home, after the time of your purchase thereof.

**RESPONSE:     Plaintiff had numerous conversations with representatives of the Dealer and cannot recall everything he was told. Plaintiff does recall he was told the home was free from defects; he had a one-year warranty and if any repairs were needed, they needed to be submitted within that year.   Cost of the home and features of the home were also discussed.**

3.   Please "identify" everything that you can recall that each "representative" of Legend told you about the Manufactured Home, up to the time of your purchase thereof.

3

RESPONSE:        To Plaintiff's knowledge, he has not had any conversations with a representative from Legend.

4.    Please "identify" everything that you can recall that each "representative" of Legend told you about the Manufactured Home, after the time of your purchase thereof.

RESPONSE:        To Plaintiff's knowledge, he has not had any conversations with a representative from Legend.

5.    With regard to any alleged problem or deficiency noticed by you while the Manufactured Home was on the Dealer's lot, please "identify" all such items:

RESPONSE:        None.

6.    With regard to each alleged problem or deficiency noticed by you after the Manufactured Home was delivered to your site, please "identify" as to each separate item:

    a.    Each alleged problem or deficiency discovered;

    b.    When each problem or deficiency was discovered;

    c.    When and to whom notice was given regarding each alleged problem or deficiency;

    d.    Type of notice given (i.e., oral, written, etc.);

    e.    Representations made with regard to remedying each alleged problem or deficiency;

    f.    Action taken to remedy each alleged problem or deficiency; and

4

g.    Cost to repair each alleged problem or deficiency.

**RESPONSE:**    **See expert reports of Roy Bonney, Bobby Parks, and Robert Kondner previously produced.**

7.    Please "state the basis of" each claim known to you or your attorney upon which you allege you have against Legend.

**RESPONSE:**    **See expert reports of Roy Bonney, Bobby Parks, and Robert Kondner previously produced.**

8.    Please "identify" all facts for each claim known to you or your attorney upon which you will rely with regard to each claim you stated in response to the proceeding interrogatory.

**RESPONSE:**    **See expert reports of Roy Bonney, Bobby Parks, and Robert Kondner previously produced.**

9.    In connection with any service, repair, maintenance, construction, remodeling or any other type of work performed upon the Manufactured Home by Legend or anyone else including yourself, since the date of purchase, please "identify" the following:

a.    The date of each service, repair, maintenance, construction, remodeling or any other type of work was performed upon the Manufactured home;

b.    The name of the facility or person performing such service, repair, maintenance, construction, remodeling or any other type of work;

c.          The nature of the work performed upon the Manufactured Home; and

d.          The costs to you of the service, repair, maintenance, construction, remodeling or any other type of work.

RESPONSE:          None.

10.    If any re-leveling work on the home has been conducted, please "identify" the party that performed such work and the date work was performed.

RESPONSE:          None.

11.    Please "identify" all fires or natural occurrences such as floods, hurricanes, tornados, strong winds, hailstorms, settlement of lands or soil movements which have taken place on or in the vicinity of your property, as well as giving dates of such occurrences.

RESPONSE:          Plaintiff is not in possession of this information.

12.    Please "identify" all insurance claims made for property damage to your home as well as dates upon which such claims were made and a description of the property damage for which such claims were made.

RESPONSE:          None.

13.    Please itemize in detail, providing the monetary amount claimed, each and every item of actual or compensatory damage claimed by you in this action.

RESPONSE:          See expert reports of Roy Bonney, Bobby Parks and Robert Kondner.  Additionally, Plaintiff has been proximately damaged as follows: the defects in the manufactured home have substantially and

severely impaired its use and rendered the home practically worthless; the home is of decreased or lesser value than represented when purchased; and Plaintiff has suffered mental anguish and emotional distress, anxiety, embarrassment, anger, fear, frustration, disappointment, worry, annoyance, and inconvenience.    Plaintiff is entitled to and claims compensatory and punitive damages against Defendants in an amount to be determined.

14.    Please state your judgment of the value of the Manufactured Home at the following times:

a.    At the date of acquisition; and

b.    When suit was filed in this action.

RESPONSE:    a.    $22,987.50

b.    practically worthless

15.    In connection with any expert that you intend to call in the trial of this cause, please "identify" and provide for each, the information set forth in Rule 26(b)(4)(A)(I), of the applicable rules of civil procedure.

RESPONSE:    See expert reports of Roy Bonney, Bobby Parks, and Robert Kondner previously produced.

16.    Please "identify" the names and address of each person known to you or your attorney that has any knowledge of any of the facts that support any claims or contentions in this action or any aspect of your damages.

RESPONSE:    Plaintiff, Plaintiff's attorneys, Plaintiff's experts, Roy Bonney, Bobby Parks and Robert Kondner, Defendants, Dawn Deese,

Sara Deese, Larry Mercer of Best Value Homes, and Bonnie Harrison of Best Value Homes.

17.    Please "identify" the name and last known address of every health provider (i.e., medical doctor, chiropractor, psychologist, counselor, social worker, pharmacy, hospital, clinic, etc.) with whom you have consulted on a professional basis, or from whom you have obtained health related services or products, relating to the purchase of the Manufactured Home.

**RESPONSE:**    **Plaintiff objects on the grounds the information requested is privileged and confidential.   Without waiving said objection, Plaintiff has suffered mental anguish and emotional distress, anxiety, embarrassment,    anger,    fear,    frustration,    disappointment,    worry, annoyance, and inconvenience as a result of Defendants knowingly manufacturing the defective manufactured home purchased by Plaintiff.**

18.    If you contend that a defendant acted through agents, servants and employees in connection with any of the matters sued upon, please "state the basis" of any such contention and provide the "identification" of each agent, servant or employee referred to by you and from whom they acted.

**RESPONSE:**    **The dealer and manufacturer represented the home was free from defects.**

19.    Please "identify" and state the location of each and every tangible document known to you or your attorney that supports any legal contentions or factual contentions made by you in this action.

8

RESPONSE:        Plaintiff is producing all documents in his possession.

20.    Please "identify" the type air conditioner installed in your home, including information regarding its make, model number, serial number, size and blower speeds (separately for both heating and air conditioning).

RESPONSE:        Nordyne
                 Serial # WLMM013657
                 Model # AC042X1021A

21.    Please "identify" each document referred to by you in preparing to answer or in answering these interrogatories.

RESPONSE:        Plaintiff is attaching all documents in his possession that are responsive to this request.

22.    Please "identify" all "documents" or "communications" you intend to use at any hearing or trial in this matter.

RESPONSE:        Plaintiff will provide this information pursuant to the Scheduling Order.

23.    Please "identify" all "documents" or "communications" evidencing any warranties you claim you were given with the home.

RESPONSE:        Plaintiff is attaching all documents in his possession that are responsive to this request.

24.    Please "identify" and state in detail all information asked of you by or that you provided to any expert or individual that inspected your home (designating separately as to each expert), including, but not limited to, information related to lifestyle issues such as use of ventilation fans in the home,

setting of the thermostat at given times throughout the year air handler maintenance, covered or closed floor registers, whether doors are opened or closed during the day or evening, etc.

**RESPONSE:**    **Plaintiff objects to this Request on the grounds it is overly broad, ambiguous, and unduly burdensome.**

25.    If you contend any party or representative has made an admission against interest, please "identify" such party or representative and state the place, time, substance of and witness to each claimed admission against interest.

**RESPONSE:**    **None.**

26.    For any Request for Admission propounded, which you denied, please state each fact known to you or your attorney upon which such denial is based.

**RESPONSE:**    **Plaintiff objects to this interrogatory in that the information requested by Defendant is protected by the attorney/client privilege and/or work product doctrine.  Plaintiff further objects to this Interrogatory on the grounds it is overly broad, ambiguous, and unduly burdensome.**

_TERRY DEESE_

TERRY DEESE

Sworn to and subscribed before me on this 24 day of
November , 2006.

_Mari-Ann Colley_

NOTARY PUBLIC
My Commission Expires:

My Commission Expires January 24, 2008

11

*C. 3U—*

C. Gibson Vance (ASB-1923-N77C)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing document upon all counsel of record as listed below by placing the same in the United States mail, properly addressed and first class postage prepaid on this the 18th day of October, 2006.

Gregory S. Ritchey, Esquire
Richard S. Walker, Esquire
Ritchey & Ritchey, P.A.
P.O. Drawer 590069
Birmingham, Alabama 35259-0069
greg@ritcheylaw.com
richard@ritcheylaw.com

*C. 3U—*

OF COUNSEL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NUMBER

1:06-CV-643-MHT


TERRY DEESE,

     Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al.,

     Defendant(s).


DEPOSITION TESTIMONY OF:

ROBERT PARKS


February 19, 2007

9:10 a.m.


COURT REPORTER:

DEBORAH B. TOWNSEND, CSR


EXHIBIT
4

ORIGINAL

Page 2

1                    S T I P U L A T I O N

2                    IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel that the deposition of ROBERT PARKS, may

5    be taken before Deborah B. Townsend, Certified

6    Shorthand Reporter and Notary Public, State at

7    Large, at the offices of BEASLEY, ALLEN, CROW,

8    METHVIN, PORTIS & MILES, Montgomery, Alabama, on

9    February 19, 2007, commencing at approximately

10   9:10 a.m.

11                   IT IS FURTHER STIPULATED AND

12   AGREED that the signature to and the reading of

13   the deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws

16   and rules of Court relating to the taking of

17   depositions.

18                   IT IS FURTHER STIPULATED AND

19   AGREED that it shall not be necessary for any

20   objections to be made by counsel to any

21   questions, except as to form or leading

22   questions, and that counsel for the parties may

23   make objections and assign grounds at the time

Page 3

1  of trial or at the time said deposition is

2  offered in evidence, or prior thereto.

3           In accordance with Rule 5(d) of

4  the Alabama Rules of Civil Procedure, as

5  amended, effective May 15, 1988, I, Deborah B.

6  Townsend, am hereby delivering to Gregory S.

7  Ritchey the original transcript of the oral

8  testimony taken February 19, 2007, along with

9  exhibits.

10          Please be advised that this is the

11 same and not retained by the Court Reporter, nor

12 filed with the Court.

13

14

15

16                EXAMINATION INDEX

17

18 ROBERT PARKS

19     BY MR. RITCHEY                    8

20

21

22

23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 4

EXHIBIT INDEX

PAGE

Defendant's

| | | |
|---|---|---|
| 1 | Notice of Deposition | 14 |
| 2 | Curriculum Vitae | 18 |
| 3 | Retainer Agreement and Invoices | 35 |
| 4 | List of Testimony | 39 |
| 5 | List of Retained Cases | 40 |
| 6 | List of Attorneys | 42 |
| 7 | Parks' Report on the Deese Home | 84 |
| 8 | Parks' File on the Deese Home | 102 |
| 9 | Data Collection Protocol | 105 |
| 10 | 8/10/05 Letter to HUD and Response | 126 |
| 11 | Tools Utilized | 137 |
| 12 | 8/10/05 Letter to HUD and Response | 174 |
| 13 | Correspondence Dealing with F-1-76 | 179 |
| 14 | Excerpt of Trial Testimony from Aucoin Case | 217 |
| 15 | Report from Aucoin Case | 219 |
| 16 | Indoor Air Quality Report | 297 |
| 17 | Mold Remediation Summary | 311 |
| 18 | Healthy Homes Report on FEMA Mobile Homes | 334 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 5

1                    A P P E A R A N C E S

2


3    FOR THE PLAINTIFF(S):

4            C. Lance Gould, Esquire

5            BEASLEY, ALLEN, CROW, METHVIN,

6            PORTIS & MILES

7            218 Commerce Street

8            Montgomery, Alabama   36104

9


10   FOR THE DEFENDANT(S):

11           Gregory S. Ritchey, Esquire

12           RITCHEY & RITCHEY

13           1910 28th Avenue South

14           Birmingham, Alabama   35209

15


16           W. Scott Simpson, Esquire

17           Simpson Law Firm

18           3288 Morgan Drive, Suite 112

19           Birmingham, Alabama   35216

20


21   ALSO PRESENT:   BRAD CAMPBELL,  Videographer

22                   JACK HENRY  *   PARKER HOLLOWAY

23                   DAVE TOMPOS  *   FRANCIS CONLIN

Page 6

1          I, Deborah B. Townsend, a Certified

2    Shorthand Reporter of Birmingham, Alabama, and a

3    Notary Public for the State of Alabama at Large,

4    acting as Commissioner, certify that on this

5    date, pursuant to the Federal Rules of Civil

6    Procedure, and the foregoing stipulation of

7    counsel, there came before me at the offices of

8    BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,

9    Montgomery, Alabama, commencing at approximately

10   9:10 a.m. on February 19, 2007, ROBERT PARKS,

11   witness in the above cause, for oral

12   examination, whereupon the following proceedings

13   were had:

14

15          THE VIDEOGRAPHER:  This marks the

16   beginning of videotape number one in the

17   deposition of Bobby Parks.  Today's date is

18   February the 19th of the year 2007.  The time is

19   9:12 a.m.  This is in the matter of Terry Deese,

20   plaintiff, versus Champion Enterprises, Inc., et

21   al., defendants.  Case number is 1:06-CV-643-

22   MHT.  It's being held in the United States

23   District Court for the Middle District of

Page 87

1    to give opinions as to basic engineering

2    practices, one can get that strictly from the

3    experience that you have?

4          A.      I believe so, yes, sir.

5          Q.      Okay.

6          A.      In this particular subject matter,

7    I believe that I have more than sufficient

8    experience and knowledge in this area to render

9    that type of opinion.

10         Q.      Okay.  What basic engineering

11   practice do you say has not been met?

12         A.      Well, I believe it's well known

13   within the engineering -- or within the

14   published engineering community throughout

15   different standards, as well as the publications

16   from the industry itself, that placing an

17   impermeable surface on the cold side of the wall

18   in a hot, humid climate is going to lead to this

19   type of moisture problem.

20         Q.      Just like the Aucoin house, right?

21         A.      I didn't test the Aucoin house for

22   that.

23         Q.      I didn't ask you if you tested the

Page 239

1                    02:02 p.m.

2                    (Brief recess.)

3                    02:13 p.m.

4                    THE VIDEOGRAPHER:   This marks

5        the beginning of the videotape number four.

6        Going back on the record, 2:13 p.m.

7             Q.      You mentioned earlier that you

8        felt that the use of interior vapor barrier on

9        these houses was a defect under the HUD code.

10       Is that still -- Is that your opinion?  Am I

11       saying that right?

12            A.      I believe it would -- it could be

13       classified as that, because it will eventually

14       render the home unfit -- or the -- the walls

15       unfit for its intended purpose.

16            Q.      Are you familiar with the -- the

17       classifications HUD has with regard to those

18       problems with -- inside manufacturing housing?

19            A.      Yes, sir.

20            Q.      And is it your opinion that this

21       particular issue fits into the -- the defect

22       classification, as opposed to any of the other

23       three, I guess?

Page 240

1      A.      Well, it -- it would be -- Are we

2    talking about the specific Deese home?

3      Q.      We're just talking about

4    anything.  I mean, I guess let's -- What

5    classifications are you familiar with?

6      A.      Non-compliance, defect, serious

7    defect, imminent safety haz -- hazard.

8      Q.      And if you had to classify the use

9    of interior vapor barriers in a home, where

10   would you classify it, as a defect?

11     A.      In -- in general, at best, at --

12   at defect, because it will render a component of

13   the home unfit for its intended purpose.  You

14   know, I think it's argumentatively -- At times,

15   I've seen some of these walls get to the point

16   and so much water built up in them that, you

17   know, it may be arguably determined an imminent

18   safety hazard.

19     Q.      You've never made that

20   determination, though?

21     A.      I don't recall specifically.

22     Q.      Okay.  I mean, you're not making

23   that determination in any of these cases you

Page 241

1   have now, are you?

2          A.       Well, I can only speak to the

3   Deese case right here, but we have seen some

4   pretty serious wall damage in some of these

5   cases.

6          Q.       Okay.  But you're not making that

7   determination in the Deese case?

8          A.       I haven't made that determination

9   in any of the cases that I'm aware of.

10         Q.       Then why would you say that the

11  use of VOG in the hot, humid climate would be an

12  imminent safety hazard?

13         A.       Well, I -- I think that's --

14         Q.       Or do you agree you say that?

15         A.       I didn't say that.

16         Q.       Okay.  That's fine.

17         A.       I think that, you know, you can

18  run into some situations to where the problems

19  have manifested themselves to such an extreme

20  level that that situation may be interpreted,

21  you know, as an imminent safety hazard.

22         Q.       Okay.  Have you made any -- In any

23  of the reports that you've done for Mr. -- or

Page 242

1    for the Beasley firm, have you made any

2    determination that the use of the vinyl-on-

3    gypsum in hot, humid climates is an imminent

4    safety hazard?

5         A.      I think I pretty much stuck with

6    the defect.  I believe it's a non-conformance or

7    defect

8         Q.      A non-conformance or a defect, or

9    just a non-conformance?

10         A.      Well, it's -- I believe it to be a

11   defect.

12         Q.      Okay.  If the house is maintained

13   at neutral to slightly positive pressure, would

14   you ever have a problem with the wallboard,

15   whether or not it has the interior vapor

16   barrier?

17         A.      Yes, sir.  I think even -- I think

18   a lot of the research and a lot of these homes

19   were actually found to be slightly pressurized

20   and still had moisture accumulation within the

21   wall structures.

22         Q.      Okay.  And -- and that would show

23   up in some of these reports that you have?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 340

1    Q.    Okay.  That's fine.

2    A.    But I'll be glad to copy them for

3  you.

4          MR. GOULD:  Just take them to

5  a copy service, and bill -- we'll send them the

6  bill.

7    A.    Okay.

8    Q.    And the -- the only part I need --

9  for whatever reason, that was missing from my

10  notebook.

11    A.    Okay.

12    Q.    All part of -- all I have is A.

13    A.    Okay.  Sure.

14          MR. GOULD:  What you have

15  clipped?

16          MR. RITCHEY:  Just what I have

17  clipped.

18          MR. GOULD:  Okay.

19    A.    Okay.

20    Q.    And that's -- that's all I have,

21  all the questions I have.

22          MR. GOULD:  I don't have

23  anything.  I do just want to request that your

**American Court Reporting**
**toll-free (877) 320-1050**

Page 341

1   experts maintain any notes that they've made

2   here today during this deposition or questions

3   they've passed back and forth to you, because we

4   will be requesting those.

5             MR. RITCHEY:  Okay.  I don't

6   think anybody passed me any questions, but

7   that's fine.

8             MR. GOULD:  I don't -- I don't

9   know what happened when I was outside the room.

10            MR. RITCHEY:  All right.

11            THE VIDEOGRAPHER:  This

12   concludes the deposition of Bobby Parks.  Going

13   off the record, 4:24 p.m.

14

15                04:24 p.m.

16

17       &middot; FURTHER DEPONENT SAITH NOT

18

19

20

21

22

23

**www.AmericanCourtReporting.com**
**February 19, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 342

1                    C E R T I F I C A T E

2

3    STATE OF ALABAMA)

4    JEFFERSON COUNTY)

5

6              I hereby certify that the above

7    and foregoing deposition was taken down by me in

8    stenotype, and the questions and answers thereto

9    were transcribed by means of computer-aided

10   transcription, and that the foregoing represents

11   a true and correct transcript of the deposition

12   given by said witness upon said hearing.

13             I further certify that I am

14   neither of counsel nor of kin to the parties to

15   the action, nor am I in anywise interested in

16   the result of said cause.

17                    *Deborah B. Townsend*

18

19                    DEBORAH B. TOWNSEND, CSR

20                    Certificate No. AL-CSR-207

21

22   My Commission expires

23   March 3, 2008

**www.AmericanCourtReporting.com**
**February 19, 2007**