IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TERRY DEESE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case Number: 1:06-cv-643 MHT |
| | * | |
| CHAMPION ENTERPRISES, INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |

## BRIEF IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT-PREEMPTION

**COMES NOW**, Champion Homes of Boaz, Inc., formerly known as Homes of Legend,

Inc. (hereinafter referred to as "Legend"), one of the defendants in the above-styled action, by

and through counsel of record, and for its brief in support of its Motion for Summary Judgment-

Preemption, states as follows:

1.      Legend incorporates herein its Motion for Summary Judgment-Preemption.

2.      In support of its motion, Legend is submitting herewith and incorporates by

reference herein its Brief in Support of its Motion for Summary Judgment and supporting

exhibits.

3.      In additional support of its motion, Legend is submitting herewith as Exhibit "1",

excerpts from the deposition of the plaintiff's expert, Bobby Parks (hereinafter referred to as

"Parks"), the Affidavit of Roger Garrett (hereinafter referred to as "Garrett Affidavit") and

supporting documents, which is marked as Exhibit "2" and made a part hereof by reference and

the Affidavit of David R. Tompos, P.E. (hereinafter referred to as the "Tompos Affidavit") and

supporting documents, which is attached hereto as Exhibit "3" and made a part hereof by

reference.

1

## ALLEGATIONS

Legend incorporates herein the Allegations set forth in its Motion for Summary Judgment.

## NARRATIVE SUMMARY OF UNDISPUTED FACTS

Legend incorporates herein the Narrative Summary of Undisputed Facts set forth in its Motion for Summary Judgment. In additions to said facts, Deese's expert, Parks, testified that his background is in HVAC; Parks ceased doing business in 2005 and now only does "expert" consultation. (Parks, p. 10: 6-9; 19: 3-14; 130: 21-23). Parks has no college education (Parks, p. 18: 1-4) nor is he a licensed engineer or architect as is required under 24 CFR § 3280.303(e)(2) or 3280.305(c)(2) in order to perform certain tasks. (Parks, p. 77: 2-16; 99: 9-23; 100: 1-14).

Testing of a piece of the wallboard in the Deese home revealed that the walls were paper not vinyl. (Garrett Affidavit, ¶ 3). Deese testified that Mr. Parks asked him whether he ever noticed any soft walls in the home and he said "no". (Deese, pp. 25: 9-23; 26: 1-23; 27: 1-23; 28: 1). Deese has never seen any soft walls in the home. (Deese, p. 107: 15-17).

The HUD Code[1] provides for an appropriate mechanism for change if there is a deficiency within the code. See generally 42 U.S.C. § 5403(a)(4)-(6). Through this mechanism, HUD[2] invites comments and opinions to be submitted. Id. Parks wrote to HUD regarding his opinions and HUD stated that there was not any "data, research, or other information that would substantiate restricting the use of alternative condensation control method written in the Manufactured Home Construction and Safety Standards as codified in 3280.504(b)(1) to only

---

[1] The two sections of Title 24 related to manufactured housing, 24 CFR § 3280, *et seq.* and 24 CFR § 3282, *et seq..* are commonly referred to in the manufactured housing industry as the "HUD Code."

[2] The U.S. Department of Housing and Urban Development is sometimes referred to as "HUD".

Thermal Zones 2 and 3" and invited Parks to submit anything he had to support a change. (Parks, pp. 174: 4-23; 175: 1-23; 176: 1-23; 177: 1-9; Ex. 12, August 10, 2005 correspondence to HUD and response). Parks submitted nothing to HUD. (Parks, p. 177: 10-23; 178: 1-16).

Parks admits that he has never reviewed a home's complete DAPIA manual,[3] only bits and pieces. (Parks, pp. 165: 14-23, 166: 1-8). Parks did not use Manufactured Home Research Alliance protocols in his investigation; he used his own made up protocol which has never been peer reviewed. (Parks, pp. 232: 5-13; 315: 17-21). Parks' testing protocols and procedures with regard to mold are not generally accepted methods. (Parks, see generally pp. 277-286).

## SUMMARY JUDGMENT STANDARD

Legend incorporates herein the Summary Judgment Standard set forth in its Motion for Summary Judgment. With regard to expert testimony, the burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 n. 10 (1993).

Expert testimony is proper when (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and, (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand that evidence or to determine a fact in issue. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999). Under the new version of Rule

---

3    The acronym "DAPIA" stands for Design Approval Primary Inspection Agency. Pursuant to 24 CFR § 3282.361, a DAPIA is "responsible for evaluating all manufactured home designs submitted to it by the manufacturer and for assuring that they conform to the standards." The DAPIA manual is essentially the construction drawings and/or specifications showing the structural details and layouts of frames, floors, walls and roofs, chassis; material specifications, framing details, door locations, etc. as required under 24 CFR § 3282.203(b).

702,[4] courts are now obliged to screen expert testimony to ensure that it is based upon, not just reliable methodology, but also a sufficient factual basis and reliable application of the methodology to the facts. *Rudd v. General Motors Corp.*, 127 F. Supp. 2d 1330, 1337 (M.D. Ala. 2001). The amended Rule 702 appears to require a trial judge to make an evaluation that delves more into the facts than was recommended in *Daubert*, including as the rule does an inquiry into the sufficiency of the testimony's basis and an inquiry into the application of a methodology to the facts. *Rudd*, 127 F. Supp. at 1336. Rule 403, working in conjunction with Rules 702 and 703, militates against the general policy of liberal admission of evidence by giving courts discretion to preclude expert testimony unless it passes the more stringent standards of reliability and relevance. *Allison*, 184 F.3d at 1310.

## ARGUMENT

Deese claims that the walls in his home have an improper design since they allegedly utilize vinyl over gypsum (sometimes referred to herein as "VOG") on the interior sides of the exterior walls. (See Compliant, ¶¶ 6-16). However, the only admissible evidence establishes that the interior walls were covered with paper, not vinyl. (Affidavit of Garrett, ¶ 2).[5] Therefore, Deese's theory fails even if it was not subject to the preemption argument set forth herein.[6]

---

[4] Federal Rule 702, as recently amended, states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of this case.

5    Parks was not sure whether the walls in the Deese home were VOG and could not definitively state whether the home was built to the 3280.504(b)(1) or 3280.504(b)(3) of the

Assuming that Deese is able to overcome the fact that the wallboards utilized in his home were paper and not vinyl, any such claims related thereto are preempted.

## I. Introduction

In this action, plaintiffs claim that the manufactured home produced by Legend which was sold into a coastal and inland region sometimes referenced as a hot, humid and/or fringe zone climate,[7] is defective because the exterior walls of the home were constructed with an interior vapor barrier. This theory of recovery overlooks the fact walls with interior vapor barriers conform to the federal building code for manufactured homes. 24 C.F.R. § 3280.504(b)(1). Manufactured Home manufacturers are required to comply with the Federal Manufactured Home Construction and Safety Standards promulgated by the U.S. Department of Housing and Urban Development ("HUD"). The National Manufactured Housing Construction and Safety Standards Act, 42 U.S.C. § 5401, *et seq.* (MHCSSA), was passed and signed into law in August 1974. The MHCSSA required the Secretary of the Department of Housing and Urban Development to establish Federal manufactured home construction and safety standards and to

---

HUD Code. (Parks, pp. 228: 18-23; 229: 1-9). Parks claimed he performed a "burn test" to determine whether the wallboard in this home was VOG, but he admitted such testing was not noted in his expert report and that no testing authority has concluded that such a test is proper to use, stating that is why he has to ask the manufacturer whether the wallboard is vinyl or paper. (Parks, pp. 226: 22-23; 227: 1-23; 228: 1-23; 229: 1). Obviously, Parks does not rely on the test and agrees that it is not generally accepted in the industry and thus, fails to meet the *Daubert* standard for admissibility.

6  Parks' only other alleged problem with the home was that the ventilation fan in the home allegedly "created negative pressure"; however he admitted that he never even turned on the fan or tested it in any way to confirm his assumption. (Parks, pp. 255: 21-21; 256: 1-23; 257: 1-23; 258: 1-23; 259: 1-23; 260: 1-17). Again, such an assumption fails to meet the *Daubert* standard for admissibility. In any event, the Affidavit of David Tompos attached hereto clearly establishes that the ventilation fan is specifically allowed and has been tested to comply with the HUD Code. (Tompos Affidavit, ¶ 5).

7  The counties included in the humid and fringe zone climates were identified in the Federal Register at 67 F.R. 20402-20403 (April 24, 2002), and are now listed in 24 C.F.R. § 3290.504(b)(4).

issue regulations to carry out the purpose of the MHCSSA. The standards for the construction of and safety issues concerning manufactured homes are contained in the Code of Federal Regulations, Title 24, Federal Manufactured Home Construction and Safety Standards. 24 CFR § 3280, *et seq.* In addition, there are many regulations concerning the construction and safety of manufactured homes, which appear in the Code of Federal Regulations Title 24, Manufactured Home Procedural and Enforcement Regulations. 24 CFR § 3282, *et seq.* These two sections of Title 24 are commonly referred to in the manufactured housing industry as the "HUD Code." The standards promulgated pursuant to the MHCSSA apply to all manufactured homes manufactured for sale to purchasers in the United States on or after the effective date of the standards, which was June 15, 1976. Accordingly, Legend is due judgment in its favor because Deese's claims are preempted by federal law.

Legend is aware of one Alabama court that has issued a decision on similar claims made by counsel for Deese in another matter. On the 28th day of September, 2007, the Honorable Mark E. Fuller entered an Order in *Perry v. Fleetwood Enterprises, Inc.*, pending in the United States District Court for the Middle District of Alabama, Northern Division, Case No.: 2:06-cv-502-MEF finding that similar claims being pursued by the same counsel for Deese were preempted, a true and correct copy of said order is attached hereto as Exhibit "4". Additionally, on January 26, 2007, the United States District Court for the Western District of Louisiana, in *Russell J. Guidroz, Jr. v. Champion Enterprises, Inc.*, Civil Number 05-1148 (referred to hereafter as "*Guidroz*") a ruling was handed down on nearly identical claims based on the defense of federal preemption, among other reasons, a true and correct copy of which is attached hereto as Exhibit "5".

Based on *Guidroz*,[8] and other authorities cited herein, Legend respectfully requests that this Court: (1) hold that the claims made in this matter are preempted by federal law; and (2) enter an order granting Legend a judgment in its favor as a matter of law.

**A. The Applicable HUD Code Provisions**

Exterior wall design in manufactured homes is governed by 24 CFR § 3280.504(b). In the 2003 time period (when the subject home was built) the HUD Code set forth three different exterior wall design options:

(b) Exterior walls.

(1) Exterior walls must have a vapor retarder[9] with a permeance no greater than 1 perm (dry cup method) installed on the living space side of the wall; or
(2) Unventilated wall cavities must have an external covering and/or sheathing that forms the pressure envelope. The covering and/or sheathing must have a combined permeance of not less than 5.0 perms. In the absence of test data, combined permeance is permitted to be computed using the following formula: P total = $(1/[(1/P[1]) + (1/P[2])])$, where P[1] and P[2] are the permeance values of the exterior covering and sheathing in perms. Formed exterior siding applied in sections with joints not caulked or sealed, are not considered to restrict water vapor transmission; or
(3) Wall cavities must be constructed so that ventilation is provided to dissipate any condensation occurring in these cavities;
24 C.F.R. § 3280.504(b).[10]

Additionally, on April 24, 2002, HUD issued a "waiver," outside the HUD Code, which gave manufacturers a fourth option. Under the waiver, manufacturers had the option of constructing exterior walls with exterior vapor barriers in the humid and fringe climate zones. (67 F.R. 20400–20403 (April 24, 2002)). "Waiver" is a term of art under the HUD Code: "[w]here a waiver has been issued, the requirements of the Federal Standard to which the waiver

---

8 Pursuant to Fed.R.Civ.P. 10(c), Legend incorporates each of the arguments and authorities discussed in *Guidroz*, as if fully set forth herein.

9 The terms "vapor retarder" and "vapor barrier" are interchangeable.

10 Section 3280.504(b) now sets forth a fourth option at Section 504(b)(4); however, that option did not become available until May 30, 2006. The Deese home was built in 2003; therefore, Section 504(b)(4) did not apply.

relates may be met either by meeting the specifications set out in the Standard or by meeting the requirements of the waiver published in the Federal Register." 24 C.F.R. § 3280.8. Thus, Legend could have selected from any of four different wall designs for the subject home: (1) walls with interior vapor barriers (Section 504(b)(1)); or (2) walls with unventilated exterior walls and no vapor barrier (Section 504(b)(2)); or (3) ventilated exterior walls (Section 504(b)(3)); or (4) walls with exterior vapor barriers under the waiver (67 F.R. 20400–20403 (April 24, 2002)).

Importantly, HUD never placed a geographical limitation on the location of homes constructed with interior vapor barriers under Section 504(b)(1). The HUD Code has expressly permitted the use of interior vapor barriers in homes throughout the country since the inception of the HUD Code itself in 1975. 40 F.R. 58752 (December 18, 1975).[11] **HUD did, however, place a geographical restriction a fourth option at Section 504(b)(4) which went into effect May 30, 2006. It is respectfully submitted that if HUD wished to place a geographical restriction on the location of homes constructed with interior vapor barriers under Section 504(b)(1), it could have done so.**

The claims in this case are preempted because the exterior walls of this home comply with the HUD Code. As discussed fully in the next section, the HUD Code, and its implementing statutes, set forth preemption provisions that preclude the application of standards of care that are not "identical to" the HUD Code. Thus, private litigants cannot maintain suits against manufacturers based on a manufacturer's compliance with federal law.

---

11 By contrast, homes with exterior vapor barriers built under the waiver may not be sold outside of the humid and fringe zone climates. 67 F.R. 20401 (April 24, 2002); 24 C.F.R. § 3280.504(b)(4).

## B. Federal Preemption Standards

The preemption doctrine is based on the Supremacy Clause of Article VI of the U.S. Constitution, and provides that federal legislation enacted pursuant to Congress' constitutionally delegated authority can nullify conflicting state or local actions. U.S. Const. Art VI, § 2. Federal administrative regulations have the same preemptive effect as federal statutes. *Fidelity Federal Savings & Loan Assoc. v. de la Cuesta*, 458 U.S. 141, 153-54 (1982); *Turner v. PFS Corp.*, 674 So. 2d 60, n.1 (Ala. 1995)(recognizing this principle in a HUD Code case). Furthermore, federal preemption displaces not only state statutory and administrative laws, but also judicial decisions based on tort law. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959).

Federal law may preempt state or local law in any of three ways: (1) expressly; (2) impliedly where Congress occupies an entire field of regulation; and (3) impliedly where a local law conflicts with federal law. *Michigan Canners and Freezers Assoc., Inc. v. Agricultural Marketing and Bargaining Bd.*, 467 U.S. 461, 470 (1984). Express preemptive language may be found on the face of a statute, in its legislative history and in regulations promulgated pursuant to law. *Howard v. Uniroyal, Inc.*, 719 F.2d 1552, 1556 (11th Cir. 1983). The preemptive reach of federal regulations is a question of departmental intent, and the opinion of the agency is entitled to some weight. *Geier v. American Motor Honda Co., Inc.*, 529 U.S. 861, 883 (2000). In the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation; in which case, the states must leave all regulatory activity in that area to the federal government. *E.g., Fidelity Federal Savings & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153 (1982); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Additionally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the

extent that the state law actually conflicts with federal law. *English v. General Electric Co.*, 496 U.S. 72, 79 (1990). This is known as conflict preemption. Such a conflict arises when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Federal law preempts the claims made in this case both expressly and impliedly.[12] Express preemptive language is found both in the MHCSSA, and the HUD Code. 42 U.S.C. § 5403(d); 24 C.F.R. § 3282.11.

In 1974, Congress enacted the MHCSSA in order to regulate construction standards in the manufactured housing industry. The purposes of the MHCSSA are: (1) to protect the quality, durability, safety and affordability of manufactured homes; (2) to facilitate the availability of affordable manufactured homes and to increase homeownership; (3) to provide for the establishment of practical, uniform, and, to the extent possible, performance-based Federal construction standards for manufactured homes; (4) to encourage innovative and cost-effective construction techniques for manufactured homes; (5) to protect residents of manufactured homes with respect to personal injuries and property damage in manufactured housing, consistent with the other purposes of the Act; (6) to establish a balanced consensus process for the development, revision, and interpretation of Federal construction and safety standards for manufactured homes and related regulations for the enforcement of such standards; (7) to ensure uniform and effective enforcement of Federal construction and safety standards for manufactured homes; and (8) to ensure that the public interest in, and need for, affordable manufactured housing is duly

---

12 Legend does not argue that the HUD Code gives rise to a field preemption argument.

considered in all determinations relating to the Federal standards and their enforcement. 42 U.S.C. § 5401.

The MHCSSA sets forth an express preemption provision that displaces any local standard that is not "identical to" the federal standard:

> (d) Supremacy of Federal standards. Whenever a Federal manufactured home construction and safety standard established under this title [42 USCS §§ 5401 et seq.] is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403.

HUD promulgated a regulation that implemented the preemption policy of Congress. HUD echoed congressional intent through a regulation that expressly preempts any local standard that is not "identical to" the federal construction standard:

> § 3282.11 Preemption and reciprocity.
> (a) No State manufactured home standard regarding manufactured home construction and safety which covers aspects of the manufactured home governed by the Federal standards shall be established or continue in effect with respect to manufactured homes subject to the Federal standards and these regulations unless it is identical to the Federal standards. . .

24 C.F.R § 3282.11(a).

In late December 2000, Congress amended and expanded the scope of the MHCSSA's preemption clause to provide that federal preemption is to be broadly and liberally construed:

> Federal preemption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this title.

42 U.S.C. § 5403(d); *Burton v. City of Alexander*, No. 99-D-1233-E, 2001 U.S. Dist. LEXIS, 6651, *26 (M.D. Ala. March 20, 2001).

Not all local standards are preempted under the HUD Code. The MHCSSA sets forth a savings clause, which provides that "[c]ompliance with any Federal manufactured home construction or safety standard . . . does not exempt any person from any liability under common law. 42 U.S.C. § 5409(c).

Furthermore, the MHCSSA also sets forth a state court jurisdiction provision, which provides:

> Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any manufactured home construction or safety issue with respect to which no Federal manufactured home construction and safety standard has been established pursuant to the provisions of section 5403 of this title.

42 U.S.C. § 5422(a).

In 1997, HUD published a guideline, clarifying its position on HUD Code preemption. There, HUD confirmed that federal preemption doctrine precludes state laws from interfering with specific aspects of federal performance standards in the HUD Code:

> Additional questions arise in situations in which the state or locality attempts to apply its own building or safety code to the manufactured home. Under § 604 of the Act, State law is preempted whenever there is a state performance standard regarding construction and safety that is not identical to an established federal standard. On the other hand, § 623 of the Act provides that Federal law does not preempt State construction or safety standards for which a Federal standard has not been established. Thus, for there to be Federal preemption, there must be a specific aspect of a Federal performance standard which duplicates a local standard.

> Federal preemption cannot be based upon a general purpose of the Act, or the need for national uniformity in the manufactured housing industry. The courts have applied this "aspect of performance" standard in analogous situations by focusing not on the purpose or scope of the Act, but, rather, on the specific requirements of an established Federal

standard. If the Federal standard is encompassed or impacted by the State requirement, the State law is preempted.

62 F.R. 3456 (Jan. 23, 1997).

## II.    Express Preemption

The leading case on HUD Code preemption in this Circuit is *Scurlock v. City of Lynn Haven, Florida*, 858 F.2d 1521 (11th Cir. 1988). In *Scurlock*, the Eleventh Circuit Court of Appeals held that Section 5403(d) of Title 42 expressly preempted a local zoning ordinance that imposed greater safety requirements for manufactured homes than those mandated by federal law. *Scurlock*, 858 F.2d at 1522-24. According to the court, local standards "that differ in any respect" from the standards developed by HUD are expressly preempted. *Id.*

The HUD Code also preempts common law claims that seek to impose standards of care that differ from the HUD Code. In *Turner v. PFS Corp.*, 674 So. 2d 60 (Ala. 1995), the Alabama Supreme Court held that common law claims that apply the HUD Code standard of care are not preempted; whereas common law claims that seek to impose a "non-identical" state standard of care are preempted. *Id.* at 63; *see also Woolridge v. Redman Homes. Inc.*, 792 F. Supp. 1469 (N.D. Tex. 1991).

The claims in this case are expressly preempted here because an attempt is made to impose a non-identical state standard of care in this case. This court appears to be asked to retroactively re-write the HUD Code to eliminate Section 3280.504(b)(1) altogether in the humid and fringe zone climates, and then hold Legend liable for violating the new standard being proposed. Federal law does not permit such a result because a local standard is sought to be imposed that differs from the HUD Code. Accordingly, Legend respectfully requests that this court grant Legend's motion for summary judgment based on the express preemption doctrine.

III.    **Implied Preemption**

In *Guidroz*, the federal court for the Western District of Louisiana held that state law claims based on a manufacturer's use of interior vapor barriers in the humid and fringe zone climates were impliedly preempted under conflict preemption principles. (Ex. 5, pp. 22-29). In so holding, the court relied extensively on a United States Supreme Court decision, *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000).

In *Geier*, the plaintiff filed suit to recover money damages arising out of an automobile accident. Plaintiff's car was equipped with a seat belt, but not a driver's-side airbag. At the time of the *Geier* suit, federal law permitted manufacturers to design cars either with seat belts or airbags. *Id.* at 864-65. Like the MHCSSA, the federal law at issue in *Geier*, the National Traffic and Motor Vehicle Safety Act of 1966, set forth both an express preemption provision and a savings clause that is nearly identical to the same provisions in the MHCSSA. (Ex. 5, p. 18). The United States Supreme Court held that the plaintiff's claims were impliedly preempted because the rule of state tort law advocated by the plaintiff would have stood as an obstacle to the accomplishment of federal objectives. *Geier*, 529 U.S. at 881. If the plaintiff's claims were allowed to proceed, then a state rule of law would effectively eliminate one of the chosen federal methods of design. Federal preemption law does not permit such a result. *Id*; *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 524 (1981) (holding that the Employee Retirement Income Security Act of 1974 preempted state law which "eliminates one method for calculating pension benefits-- integration -- that is permitted by federal law"); *Fidelity Federal Savings & Loan Association v. de la Cuesta*, 458 U.S. 141, 155 (1982)(a state common law rule cannot take away the flexibility provided by a federal regulation, and cannot prohibit the exercise of a federally granted option); *Griffith v. General Motor Corp.*, 303 F.3d 1276, 1280-82 (11th Cir.

2002)(same); *Hurley v. Motor Coach Industries, Inc.*, 222 F.3d 377, 381-82 (7th Cir. 2000)(same); *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998)("a state cannot impose common law damages on individuals for doing what a federal act or regulation 'authorized them to do.'")(*quoting Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318-320 (1981)).

The same concerns are raised in this case. Essentially, Deese's expert, Parks, a heating and air installer and repairman turned "expert" in manufactured housing that has no college education (Parks, p. 18: 1–4) nor is a licensed engineer or architect as is required under HUD Code § 3280.303(e)(2) and 3280.305(c)(2) to perform certain engineering and design tasks (Parks, p. 77: 13-16), intends to give testimony that the use of VOG in the hot, humid climate areas does not meet his idea of "acceptable engineering practices and sound engineering principles." (Parks, pp. 77: 17-23; 203: 9-18). However, Parks agrees that the HUD Code is based on sound engineering principals. (Parks, pp. 76: 10-23; 77: 1; 184: 15-22).[13] According to Parks, the "sole problem" is the presence of vinyl on gypsum "VOG" wallboard, and everything else just makes matters worse over time (Parks, p. 210: 13-20).

This Honorable Court is being asked to eliminate one of the federally mandated choices for exterior wall design – interior vapor barriers under Section 3280.504(b)(1). Such a result would not only re-write the HUD Code retroactively, but also second-guess HUD's decision *not to* limit the use of interior vapor barriers throughout the United States. (Ex. 5, pp 28-29).

---

13 A question of fact cannot be created by a person's own inconsistent testimony. *See Robinson v. Hank Roberts, Inc.*, 514 So.2d 958, 961 (Ala. 1987); See also *MCLemore v. Ford Motor Company*, 628 So.2d 548, 550 (Ala. 1993) (Plaintiff failed to produce substantial evidence of fraud where she was unsure if she specifically used words like "wrecked" or "damaged" when questioning car seller regarding scratches on top of car).

Litigants should not be permitted to impose a local tort standard that conflicts with HUD's rule-making authority, which essentially eliminates federally-approved construction design choices.

Legend wishes to point out that the Court in *Guidroz*, after issuing a thorough 29-page order dismissing plaintiffs' wallboard claims with prejudice, complied with a promise it made at an earlier hearing and granted plaintiffs' leave to amend their complaint in order to plead a new theory of recovery. Legend contends that the court's decision to permit an amendment is a signal that the preemption defense remains valid. A transcript of the hearing in *Guidroz*, a true and correct certified copy of which is attached hereto as Exhibit "6" and made a part hereof by reference, demonstrates that the court has not reconsidered its decision on the preemption issue. In fact, the court affirmed that its original decision was, and is, correct: the wallboard theory is indeed preempted by federal law. (Ex. 6, pp. 3: 3-6; 4: 5-16). The court entered an order partially amending its prior decision, simply because the court promised plaintiffs' counsel the opportunity to do so in a prior hearing. (Ex. 6, pp. 2: 13-23; 3: 3-6; 4: 5-16). During the hearing, the court again held that plaintiffs' wallboard theory is preempted and any amendment incorporating similar allegations would likewise be preempted. (Ex. 6, pp. 4: 5-16). Thus, the court did not substantively amend its original 29-page decision addressing federal preemption standards in the context of wallboard claims. Pertinent portions of the court's remarks are set forth below.

> THE COURT: So I apologize to you. I apologize for forgetting about you, for forgetting about what I told you. I don't apologize for the opinion, which I happen to think was right, but I do apologize for not allowing you your opportunity to amend which I told you I was going to do. I have no excuse for that.
>
> This was an opinion that Janet and I agonized over for a long time. It's a hard case and it was a hard opinion to write. She and I don't normally agonize. We usually argue. In this one we agonized.
>
> I believe the conclusion I reached was the correct one under the circumstances, but it was the passage of that time in trying to get the opinion right

that it just simply slipped my mind what I had told you I was going to allow you to do.

(Ex. 6, p. 2:18-25; 3: 1-6).

> THE COURT: ... The claim that you pled in the initial complaint I believe it to be peremptory.
> We'll see if the amending complaint gets you past that, but to the extent that the amending complaint incorporates those allegations found in the original complaint, I believe that is preempted and that's why I'm going to make it a partial dismissal. That's the intent of what I'm trying to get done, and then we'll take a look at – we'll take a look at the amended pleading after that.

(Ex. 6, p. 4: 7-16).

It is respectfully submitted that the sound reasoning in the *Guidroz* original order is still being applied by the *Guidroz* Court.

It is anticipated a claim will be made that Legend's selection of a wallboard design under 24 C.F.R. § 3280.504(b)(1) (interior vapor barrier) violates a general provision of the HUD Code set forth at 24 C.F.R. § 3280.303(b), which states in pertinent part:

> All construction methods shall be in conformance with accepted engineering practices to insure durable, livable and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades.

24 C.F.R. § 3280.303(b).

However, the rules of regulatory construction, as a general provision of the HUD Code cannot be invoked to overcome a specific provision. Moreover, the *Guidroz* court recently rejected the above argument. Applying rules of statutory construction, the court held that a general regulation cannot be used to control a specific regulation that is "tailor made for" the facts of the case. (Ex. 5, pp. 17-18). The outcome should be the same here, as controlling law in this Circuit provides that general code provisions cannot be utilized to supersede specific ones. *Tug Allie-B, Inc.* v. *United States*, 273 F.3d 936, 948 (11th Cir. 2001). Furthermore, a court is

duty bound to harmonize regulations whenever possible, since regulations are due to be enforced in accordance with their plain meaning. *McClenney v. United Air Lines. Inc.*, 178 F. Supp. 372, 375 (W.D. Mo. 1959); *Tierdael Constr. Co. v. Occupational Safety and Health Review Comm.*, 340 F.3d 1110, 1114 (10th Cir. 2003).

Not surprisingly, the wallboard cases in the southeast have captured the attention of HUD itself. HUD has taken the position that the "Section 3280.303(b)" argument is flawed. HUD recently reviewed this novel legal theory and firmly rejected it through an informal opinion letter, a true and correct certified copy of the certified letter is attached hereto as Exhibit "7" and made a part hereof by reference. HUD's Associate Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, William W. Matchneer III, recently wrote:

> Following up on our December meeting with you and your colleagues, we have had a chance to review the plaintiffs' pleadings you have provided us on various vapor barrier cases. As the HUD official responsible for the enforcement of the Manufactured Home Construction and Safety Standards, I can say that these pleadings consistently misrepresent HUD enforcement policy by arguing that HUD's general standard at 3280.303(b) should be applied to manufacturers' practices regarding the placement of vapor barriers even though these manufacturers have complied with HUD's more specific vapor barrier standard at 3280.504(b).
>
> Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction. Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).
>
> Thank you again for bringing this situation to our attention. HUD has a distinct interest in maintaining an accurate understanding by arbitrators and the courts of HUD's enforcement policies and practices regarding the Manufactured Home Construction and Safety Standards. We would be especially concerned by a reported judicial decision that misstated HUD policy and practice, so please keep us advised of developments in these cases.

(Ex. 7).

Agency interpretations should be given deference, as courts have recognized that the agency that crafts a regulation is in a superior position to understand its own rules. *See Secretary of the Interior v. Tallman*, 380 U.S. 1, 16 (1965); *see also Christensen v. Harris County*, 529 U.S. 576, 578 (2000)(*quoting Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)(internal quotations omitted)(agency opinion letters are "entitled to respect" to the extent they "have the power to persuade"); *Geier v. American Motor Honda Co., Inc.*, 529 U.S. 861, 883 (2000) (the preemptive reach of federal regulations is a question of departmental intent, and the opinion of the agency is entitled to some weight).

Any argument that Section 3280.303(b) should be read to displace the design option set forth at Section 3280.504(b)(1) is without merit. Accordingly, this Court should hold that the general regulation of section 3280.303(b) does not overcome or displace the wallboard design option set forth at Section 3280.504(b), and grant a judgment as a matter of law in Legend's favor.

It is of interest to note that an argument is not being made that Legend violated the provisions of Section 3280.504(b), by selecting an unapproved wall design. Instead, it is argued that Legend violated the general dictates of Section 3280.303(b) by incorporating a design option expressly permitted in Section 3280.504(b)(1). Essentially, through this litigation an attempt is being made to craft a new version of the HUD Code by simultaneously declaring Section 3280.504(b)(1) to be retrospectively invalid, and then seeking to hold Legend liable for violating the proposed new HUD Code provision. Respectfully, such an interpretation must be rejected because the law does not allow a litigant to invalidate a formal regulation, enacted in accordance with federal law, simply by urging incongruity with another regulation. Similarly, the United

States Supreme Court has held that courts should not second-guess the policy choices of administrative agencies acting within their statutory mandate:

> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches."

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)(*quoting TVA v. Hill*, 437 U.S. 153, 195 (1978)).

Indeed, the HUD Code should not be blithely set aside in this case simply because one litigant desires that outcome. HUD's policy choices with respect to wallboard design were made in keeping with federal administrative law in order to ensure that the public is properly protected and the correct outcome is reached. A brief discussion of the processes involved demonstrates this point.

Congress enacted comprehensive manufactured home legislation (the MHCSSA), in order to regulate construction and safety standards for manufactured homes. Congress delegated rule-making authority to HUD, and ordered HUD to promulgate construction standards consistent with the purposes of the MHCSSA. 42 U.S.C. § 5403. There are a variety of stated purposes in the MHCSSA. Some relate to safety, while others emphasize uniformity of construction techniques and cost savings:

> (b) Purposes. The purposes of this title are--
> (1) to protect the quality, durability, safety, and affordability of manufactured homes;
> (2) to facilitate the availability of affordable manufactured homes and to increase homeownership for all Americans;
> (3) to provide for the establishment of practical, uniform, and, to the extent possible, performance-based Federal construction standards for manufactured homes;
> (4) to encourage innovative and cost-effective construction techniques for manufactured homes;

(5) to protect residents of manufactured homes with respect to personal injuries and the amount of insurance costs and property damages in manufactured housing, consistent with the other purposes of this section;

(6) to establish a balanced consensus process for the development, revision, and interpretation of Federal construction and safety standards for manufactured homes and related regulations for the enforcement of such standards;

(7) to ensure uniform and effective enforcement of Federal construction and safety standards for manufactured homes; and

(8) to ensure that the public interest in, and need for, affordable manufactured housing is duly considered in all determinations relating to the Federal standards and their enforcement.

42 U.S.C. § 5401.

Consistent with the purposes of the MHCSSA, HUD promulgated the HUD Code 1975, which regulates virtually every aspect of manufactured housing construction. 24 C.F.R. § 3280 and § 3282. Unlike conventional building codes, the HUD Code is promulgated through formal rule-making procedures under the Federal Administrative Procedure Act, 5 U.S.C. § 501 *et seq*. HUD balances the policy goals of the MHCSSA, and promulgates rules that best meet Congress' intent with respect to construction standards. There are additional safeguards built into the regulatory process, as federal statutory law creates a standing consensus committee, which must approve of proposed changes to the HUD Code before the Secretary of HUD publishes a proposed rule in the Federal Register. 42 U.S.C. § 5403(a)(4)-(6). In short, Congress has crafted a thorough regulatory scheme to ensure that the right regulations are enacted, and that such regulations are not modified until considerable deliberation and debate has taken place, including the receipt of public comments solicited through the Federal Register. This case, which involves one homeowner's point of view, is not the proper forum to launch a repeal of HUD's wallboard design regulations, which have been in place since 1975. For these reasons, Legend urges this Court to reject the proposed litigation inspired changes to the HUD Code and grant a judgment in its favor as a matter of law.

It is also respectfully submitted that that Section 3280.504(b) is not a "performance based" standard that requires manufacturers to select the "best" choice from among the federally prescribed options set forth in the HUD Code. To the contrary, the regulation is written in the disjunctive (each choice is set off by the word "or"), which gives every manufacturer the right to select any method prescribed by HUD. In order to prevail under their theory, it must be shown that there is an *implied* picking duty with respect to wallboard designs in order to have any success on the merits; otherwise, this theory is negated by federal preemption law.

The *Guidroz* court addressed this argument, where the court held that:

Section 3280.504(b), like the regulation at issue in *Geier*, does not set a minimum standard for exterior wall construction, but rather the regulation provides manufacturers with federally authorized options for the construction of exterior walls. While HUD has, in some instances, designated certain manufactured housing standards as "minimums" or used modifying language to designate that the standard sets only a minimum requirement, there is no such language contained in 3280.504(b). To the contrary, the options are contained in one of the energy conservation regulations, designated by Congress as "preemptive." *See* 42 U.S.C. 5403 (g); *See also* 57 Fed. Reg. 6420 (Feb. 24, 1992) (proposing to amend 504 "to include preemptive standards significantly upgrading the existing energy conservation requirements"); 58 Fed. Reg. 54975, 54975 (Oct. 25, 1993)(amending 504 "to include preemptive standards significantly upgrading the existing energy conservation requirements"). Accordingly, as in *Geier*, if plaintiffs were successful in this action, a state rule of law would effectively eliminate one of the statutorily approved options, forcing manufactured home manufacturers to choose one of the other two options (ventilated or unventilated walls) over the option permitting placement of a vapor barrier on the "living space side" of the wall. Such a rule would conflict with, impair and frustrate the Federal superintendence of the manufactured home industry by effectively precluding the use of one of the federal chosen methods of exterior wall construction. Under *Geier*, that result is impermissible. Plaintiffs' state law claims are impliedly conflict preempted.

(Ex. 5, pp. 24-5.

HUD knows when to make a regulation geographically specific. It has done so in at least three situations. The interior vapor barrier design choice (§ 3280.504(b)(1)) is not a regulation that HUD decided to limit, geographically speaking. First, in Section 3280.506, HUD divided

the country into thermal zones (1, 2 and 3). Alabama lies in zone 1, and homes situated there are required to have less insulation, for example, than homes sold into Maine, which lies in zone 3. HUD law does not permit a zone 1 home to be moved into zone 3 because the colder climate will cause the Alabama home to not perform correctly in a colder climate.

Similarly, the experience gained from major hurricanes over the last 15 years caused HUD to create wind zones (1, 2 and 3). 24 C.F.R. § 3280.305. Homes sold into the gulf coast regions are now designed with higher wind tolerances than homes sold into inland areas. The HUD Code does not permit a wind zone 1 home to be sold into the hurricane prone coastal regions (wind zones 2 and 3) for obvious reasons.

Lastly, and most importantly, HUD did specify one geographical limitation on exterior wall design, but that regulation does not help Deese; in fact, it destroys Deese's argument. In May, 2006, HUD added a fourth option to exterior wall design options under Section 3280.504(b). Exterior vapor barrier are now permitted in the humid and fringe zone climates. However, HUD is not confident that this design will work elsewhere, so it limited the use of that design to only those regions identified at Section 3280.504(b)(5). HUD did not limit the use of interior vapor barrier designs under Section 3280.504(b)(1) to any specific locale.[14] The point is, HUD knows when to limit design choices to specific geographical areas, when it is proper to do so. The fact that HUD consciously chose *not to limit* the use of interior vapor barriers in the

---

14 Interestingly, Alabama building code sections related to "stick-built" housing and the use of interior vapor barriers are consistent with the HUD Code. Alabama voluntarily adopted the 2000 International Energy Conservation Code building code for site-built homes (hereinafter referred to as the "IECC", which is the successor to the CABO Model Energy Code). The 2000 IECC references vapor retarders in Section 501.1.1.1 and states that "Vapor retarders must be installed in all non-vented frame ceilings, walls and floors . . ." but goes on to set forth an exception: "Vapor barriers are not required" in zones identified as hot and humid. Thus, vapor barriers may be used; the IECC stipulates only that vapor barriers are not required in hot, humid climates.

south underscores the weakness of the position being taken by Deese. The regulatory history relating to wall designs demonstrates that HUD was, and is, actively regulating wall designs. 58 F.R. 54975 (Oct. 25, 1993); 67 F.R. 20400 (Apr. 24, 2002); 69 F.R. 70016 (Dec. 1, 2004); 70 F.R. 72024 (Nov. 30, 2005). The fact that HUD had an opportunity to limit ability to place a restriction of the use of a § 3280.504(b)(1) wall design in certain geographical locations, but did not, should be persuasive to this Court to not alter controlling administrative regulations crafted by HUD.

**Conclusion**

The plaintiff's claims against Legend in this case are expressly and impliedly preempted by federal law. Based on the foregoing, Legend's Motion for Summary Judgment is due to be granted.

Respectfully submitted,

RITCHEY & SIMPSON, PLLC

Gregory S. Ritchey, Esquire{ASB-8193-H68G}
Richard S. Walker, Esquire {ASB-8719-L70R}
Counsel for Homes of Legend, Inc. now
known as Champion Homes of Boaz, Inc.

OF COUNSEL:
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, AL 35216-3084
Phone:        205.876.1600
Facsimile     205.876.1616

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on the _17_ day of _Oct_, 200_7_, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of the foregoing upon the following:

Jere L. Beasley, Esquire
W. Daniel Miles, III, Esquire
C. Gibson Vance, Esquire
C. Lance Gould, Esquire
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103

Jon D. Pels, Esquire
Lawrence J. Anderson, Esquire
Pels, Anderson & Lee, LLC
4833 Rugby Avenue, 4th Floor
Bethesda, MD 20814

OF COUNSEL

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRY DEESE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case Number:  1:06-cv-643 MHT** |
| | * | |
| **CHAMPION ENTERPRISES, INC.,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |

## EXHIBIT LIST FOR
## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1.  Excerpts from Deposition of Robert Parks taken February 19, 2007;

    Defendant's Exhibit 12- August 10, 2005 correspondence to HUD and response;

2.  Affidavit of Roger Garrett and Expert Report dated March 26, 2007;

3.  Affidavit of David R. Tompos and Expert Report March 5, 2007;

4.  Memorandum Opinion and Order entered  in re *James Perry v. Fleetwood*

    *Enterprises, Inc., et al.*;

5.  Reasons for Judgment in re *Russell J. Guidroz, Jr., et al. v. Champion*

    *Enterprises, Inc., et al.;*

6.  Transcript of hearing before the Honorable C. Michael Hill dated May 27, 2007,

    in re *Russell J. Guidroz, Jr., et al. v. Champion Enterprises, Inc., et al.;*

7.  Letter from Associate Deputy Assistant Secretary for Regulatory Affairs and

    Manufactured Housing dated January 19, 2007.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NUMBER

1:06-CV-643-MHT


TERRY DEESE,

    Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al.,

    Defendant(s).


DEPOSITION TESTIMONY OF:

ROBERT PARKS


February 19, 2007

9:10 a.m.


COURT REPORTER:

DEBORAH B. TOWNSEND, CSR


EXHIBIT
1

ORIGINAL

**American Court Reporting**
**toll-free (877) 320-1050**

Page 2

1          S T I P U L A T I O N

2               IT IS STIPULATED AND AGREED by and

3     between the parties through their respective

4     counsel that the deposition of ROBERT PARKS, may

5     be taken before Deborah B. Townsend, Certified

6     Shorthand Reporter and Notary Public, State at

7     Large, at the offices of BEASLEY, ALLEN, CROW,

8     METHVIN, PORTIS & MILES, Montgomery, Alabama, on

9     February 19, 2007, commencing at approximately

10    9:10 a.m.

11               IT IS FURTHER STIPULATED AND

12    AGREED that the signature to and the reading of

13    the deposition by the witness is waived, the

14    deposition to have the same force and effect as

15    if full compliance had been had with all laws

16    and rules of Court relating to the taking of

17    depositions.

18               IT IS FURTHER STIPULATED AND

19    AGREED that it shall not be necessary for any

20    objections to be made by counsel to any

21    questions, except as to form or leading

22    questions, and that counsel for the parties may

23    make objections and assign grounds at the time

**American Court Reporting**
**toll-free (877) 320-1050**

Page 3

1    of trial or at the time said deposition is

2    offered in evidence, or prior thereto.

3                In accordance with Rule 5(d) of

4    the Alabama Rules of Civil Procedure, as

5    amended, effective May 15, 1988, I, Deborah B.

6    Townsend, am hereby delivering to Gregory S.

7    Ritchey the original transcript of the oral

8    testimony taken February 19, 2007, along with

9    exhibits.

10                Please be advised that this is the

11    same and not retained by the Court Reporter, nor

12    filed with the Court.

13

14

15

16                EXAMINATION INDEX

17

18    ROBERT PARKS

19        BY MR. RITCHEY                    8

20

21

22

23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 4

EXHIBIT INDEX

PAGE

Defendant's

| 1  | Notice of Deposition | 14 |
| 2  | Curriculum Vitae | 18 |
| 3  | Retainer Agreement and Invoices | 35 |
| 4  | List of Testimony | 39 |
| 5  | List of Retained Cases | 40 |
| 6  | List of Attorneys | 42 |
| 7  | Parks' Report on the Deese Home | 84 |
| 8  | Parks' File on the Deese Home | 102 |
| 9  | Data Collection Protocol | 105 |
| 10 | 8/10/05 Letter to HUD and Response | 126 |
| 11 | Tools Utilized | 137 |
| 12 | 8/10/05 Letter to HUD and Response | 174 |
| 13 | Correspondence Dealing with F-1-76 | 179 |
| 14 | Excerpt of Trial Testimony from Aucoin Case | 217 |
| 15 | Report from Aucoin Case | 219 |
| 16 | Indoor Air Quality Report | 297 |
| 17 | Mold Remediation Summary | 311 |
| 18 | Healthy Homes Report on FEMA Mobile Homes | 334 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

1                    A P P E A R A N C E S

2

3     FOR THE PLAINTIFF(S):

4             C. Lance Gould, Esquire

5             BEASLEY, ALLEN, CROW, METHVIN,

6             PORTIS & MILES

7             218 Commerce Street

8             Montgomery, Alabama   36104

9

10    FOR THE DEFENDANT(S):

11            Gregory S. Ritchey, Esquire

12            RITCHEY & RITCHEY

13            1910 28th Avenue South

14            Birmingham, Alabama   35209

15

16            W. Scott Simpson, Esquire

17            Simpson Law Firm

18            3288 Morgan Drive, Suite 112

19            Birmingham, Alabama   35216

20

21    ALSO PRESENT:  BRAD CAMPBELL, Videographer

22             JACK HENRY  *  PARKER HOLLOWAY

23             DAVE TOMPOS  *  FRANCIS CONLIN

Page 6

1          I, Deborah B. Townsend, a Certified

2     Shorthand Reporter of Birmingham, Alabama, and a

3     Notary Public for the State of Alabama at Large,

4     acting as Commissioner, certify that on this

5     date, pursuant to the Federal Rules of Civil

6     Procedure, and the foregoing stipulation of

7     counsel, there came before me at the offices of

8     BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,

9     Montgomery, Alabama, commencing at approximately

10    9:10 a.m. on February 19, 2007, ROBERT PARKS,

11    witness in the above cause, for oral

12    examination, whereupon the following proceedings

13    were had:

14

15          THE VIDEOGRAPHER:  This marks the

16    beginning of videotape number one in the

17    deposition of Bobby Parks.  Today's date is

18    February the 19th of the year 2007.  The time is

19    9:12 a.m.  This is in the matter of Terry Deese,

20    plaintiff, versus Champion Enterprises, Inc., et

21    al., defendants.  Case number is 1:06-CV-643-

22    MHT.  It's being held in the United States

23    District Court for the Middle District of

Page 10

1          A.      Yes, sir.

2          Q.      And if I do ask a question and you

3    answer, I'm going to assume that you understood

4    that question.

5          A.      Yes, sir.

6          Q.      Okay.  Can you state your business

7    name?

8          A.      Healthy Homes of Louisiana.

9          Q.      Okay.  Is that the only business

10   you have presently?

11         A.      Yes, sir.

12         Q.      What's that address?

13         A.      Mailing address is P.O. Box 3127,

14   West Monroe, Louisiana  71294.  The physical

15   address is an office at my place of residence,

16   which is 104 Cherokee Drive, West Monroe  71291.

17         Q.      Okay.  Now, you still have several

18   other business; is that right?

19         A.      Correct.  These businesses, the

20   entities are still intact; I just don't operate

21   under them currently.

22         Q.      Okay.  What businesses were those?

23         A.      Parks Mobile Air and the parent

**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

1    Q.    Okay.  And you have no post-high

2  school education?

3    A.    No college education, that's

4  correct.

5    Q.    Okay.  And do you have the CV in

6  front of you, and I'll --

7    A.    Yes.  And it printed on some heavy

8  paper, so rather than reprint it -- I think I

9  brought two copies of it.

10    Q.    Okay.  That's fine.  May I mark

11  one of these?

12    A.    Absolutely.

13    Q.    All right.  What I'm going to do

14  is mark as Defendant's Exhibit 2 the CV that you

15  brought, and I'm going to give you that one --

16    A.    Okay.

17    Q.    -- if that's okay.

18    A.    Yes, sir.

19    (WHEREUPON, Defendant's Exhibit

20  Number 2 was marked for identification and is

21  attached to the original transcript.)

22    Q.    And is this CV comprehensive as

23  far as what you have done, I suppose, since

**American Court Reporting**
**toll-free (877) 320-1050**

Page 19

1  graduating from high school?

2      A.      Yes, sir.  I believe it to be.

3      Q.      Okay.  All right.  On page three

4  under HVAC, you have several items listed.  Are

5  those -- those your licenses and courses?

6      A.      Correct, yes, sir.

7      Q.      Okay.  Would it be fair to say

8  that since 1999, you have not taken any

9  licenses -- or taken any courses or obtained any

10  licenses in HVAC?

11      Well, let me -- let me strike that.

12      A.      Well, I think in --

13      Q.      Let me strike that.

14      A.      Yeah.

15      Q.      It looks like -- I apologize.  It

16  looks like you still hold -- hold mechanical

17  license and electrical license to the present,

18  right?

19      A.      Correct.  All of -- Right.

20      Q.      Okay.  As far as any courses,

21  though, it appears that 1999 was the last time

22  you ever took a course?

23      A.      No.  Actually, I think the Air --

Page 76

1    in common was the vapor barrier being on the

2    living side of the wall.  Some of them had

3    inappropriate ventilation systems, and some of

4    them had extensive duct leakage that I felt

5    notable.

6         Q.      Okay.  Now, do you agree that the

7    HUD code is the standard for the manufacturing

8    housing industry?

9         A.      I do.

10        Q.      Okay.  Do you believe that if it's

11   important enough to make it into the standard,

12   that whatever is in that standard should be

13   followed?

14        A.      I believe HUD has done a good job,

15   an acceptable job, in providing options for the

16   manufacturers that can be utilized to build a

17   solid home, safe and durable.

18        Q.      So you'd agree that if it's in the

19   standard, it's -- it's good enough to be

20   followed?

21        A.      I think it goes through a rigid

22   peer review process, yes.  I -- I believe HUD

23   has done a descent job, a good job, of providing

Page 77

1    these options.

2         Q.      Now, do you plan to give any

3    engineering opinions today?

4         A.      My opinions are based on solid

5    engineering principles, but I'm -- I'm not a

6    licensed engineer.  I'm more of a building

7    science practitioner.

8         Q.      Well, you're -- It would be true

9    that you're not a licensed engineer as that's

10   defined in the HUD code, right?

11        A.      I'm not a licensed engineer; that

12   is correct.

13        Q.      You're not a licensed engin --

14   architect as that's defined in the HUD code,

15   correct?

16        A.      That's correct.  I'm not.

17        Q.      Again, do you give -- do you

18   intend to give any engineering opinions today?

19        A.      That would be based on your

20   interpretation of an engineering opinion.  My

21   opinions are based on what I believe acceptable

22   engineering practices and sound engineering

23   principles.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 99

1       Q.     Okay.  And --

2       A.     -- that I've completed reports on.

3       Q.     And each of those reports that

4 you've completed, did you find a problem?

5       A.     Yes, sir, I did.

6       Q.     Okay.  On each of those reports

7 that you did, did you do the same testing?

8       A.     Yes, sir, we did.

9       Q.     Okay.  Now, for manufactured

10 housing, are you familiar with who is charged

11 with doing any type of engineering testing on

12 manufactured homes?

13       A.     I believe that's a joint

14 connection between the -- the manufacturer and

15 the DAPIA.

16       Q.     Okay.

17       A.     The DAPIA can require the

18 manufacturer to substantiate certain information

19 that they deem necessary.

20       Q.     Okay.  Professional engineer would

21 have to be a part of it, would it not?

22       A.     Correct.

23       Q.     Okay.  And that's under

**American Court Reporting**
**toll-free (877) 320-1050**

Page 100

1    3280.303(b)(2) and -- and (g); is that correct?

2         A.      I believe so, yes, sir.

3         Q.      Okay.  And it's my understanding

4    that either it needs to be a professional

5    engineer or professional architect that can do

6    testing on manufactured housing.

7         A.      Correct.  For the -- for the

8    purpose of certification.

9         Q.      Well, to determine if the -- the

10   particular home can be built or whether or not

11   it meets the code, right?

12        A.      Well, that's part of their

13   certification progress -- process to receive the

14   HUD label on a home, yes.

15        Q.      Now, have you ever done any

16   engineering testing on homes pursuant to HUD's

17   code requirements?

18        A.      I've participated with some of my

19   consulting clients, yes, sir.

20        Q.      Okay.  You participated with an

21   engineer -- registered engineer or architect?

22        A.      Yes, sir.  In some instances, I

23   believe that some of my clients have actually

**American Court Reporting**
**toll-free (877) 320-1050**

Page 130

1     A.     Correct.  For the air conditioning

2  system.

3     Q.     Okay.  And it's a three-coil

4  system?

5     A.     Three-row coil.

6     Q.     Three-row coil.

7     A.     Meaning the evaporator coil was

8  three rows thick.

9     Q.     Okay.  Now, are you familiar with

10  what speed setting the -- well, the HVAC

11  equipment is set when it leaves the factory?

12     A.     The furnace equipment, when it

13  leaves the furnace manufacturer, it's my

14  understanding it's typically set on high and

15  low.  And it's the A/C installer's

16  responsibility to set that speed in accordance

17  to whatever size unit he's installing.

18     Q.     Okay.  Now, how big or how large

19  is this house?

20     A.     This house was a 16 X 80.

21     Q.     Okay.  Now, you were an A/C man,

22  right?

23     A.     Uh-huh.  Yes, sir.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1    specifically says.  That may be their intent,

2    but again, if -- if their intent is to use their

3    bottom board as a means of duct sealing, I've

4    never seen anything where that's --

5         Q.    I'm not asking about duct sealing.

6         A.    Okay.

7         Q.    I'm asking about the -- the --

8         A.    Primary air barrier?

9         Q.    Well, the pressure envelope.

10        A.    It -- I would agree the bottom

11   board is intended to be the primary air

12   barrier.  And it may be -- very well be their

13   intent as being part of a pressure envelope.

14        Q.    And have you ever seen any --

15   anybody's DAPIA, any manufacturer's DAPIA

16   package, where the vapor -- the bottom board was

17   not considered the pressure envelope?

18        A.    I've not looked for that, and I've

19   not reviewed that information.

20        Q.    Have you ever seen anybody's DAPIA

21   package?

22        A.    Just in pieces and parts.

23        Q.    You've never seen a complete DAPIA

Page 166

1    package?

2          A.       I've never reviewed a complete

3    DAPIA package for that specific instance.  But

4    primarily, my point was simply that primarily

5    what I find is that the floor, more often than

6    not, will act as the primary, unless you have an

7    extremely tight bottom board.  But again, you're

8    asking me about intent.

9          Q.       Well, it's -- The bottom board is

10   intended to be completely sealed, correct?

11         A.       As tight as possible, correct.

12         Q.       And if that's the case, that could

13   be -- If the intent is there for that to be the

14   pressure envelope, then it can act as the

15   pressure envelope?

16         A.       It's possible, yes, sir.

17         Q.       Okay.

18         A.       Not arguing with that.

19         Q.       Okay.  The -- the problems now

20   that you're saying with the vapor barrier being

21   on the interior side of walls in hot, humid

22   climates, when did that become a problem?

23         A.       The first one that I inspected was

**American Court Reporting**
**toll-free (877) 320-1050**

Page 174

1      Q.      Got 11.

2      A.      I'm going to put those in the

3  stack.  That's 7, 2 4 and 1 --

4      Q.      Defendant's Exhibit 12, and is

5  this a letter, I believe, that you sent to HUD?

6      A.      That's correct.

7              (WHEREUPON, Defendant's Exhibit

8  Number 12 was marked for identification and is

9  attached to the original transcript.)

10     Q.      Was this the -- I guess the

11 answers are contained on the next page?

12     A.      Yes.

13     Q.      Okay.

14     A.      Starts with, Mr. Parks, here is

15 the clarification you requested.

16     Q.      Okay.  Can I see that?

17     A.      Sure.

18     Q.      And specifically, I guess the

19 question to you was clarify the need for having

20 four choices.  Is that --

21     A.      Well, there was three different

22 questions.

23     Q.      Okay.  And this was question two?

Page 175

1       A.      Uh-huh.

2       Q.      And then the second one is the --

3   well, the third one is a question on separate

4   correspondence.  Is that what --

5       A.      Correct.

6       Q.      Okay.  The first two questions, do

7   those relate to another e-mail or to --

8       A.      They're -- they're right there.

9       Q.      Okay.

10      A.      They're all stapled together.

11      Q.      All right.  So the first one is

12  the August 10th, and then you sent -- okay --

13  two --

14      A.      Uh-huh.

15      Q.      -- two letters?

16      A.      Uh-huh.

17      Q.      Okay.  And it appears that they --

18  with regard to your request for whether or not

19  HUD considered the application of 504(b)(1) as a

20  reasonable application of homes in the Thermal 1

21  Zone --

22      A.      Uh-huh.

23      Q.      -- HUD did not have a problem with

Page 176

1    the use of (b)(1) walls in Thermal 1 Zone,

2    correct?

3        A.    I don't -- I can't say that they

4    didn't have a problem with the use.  What they

5    stated was that there was no geographic

6    specificity --

7        Q.    Correct.

8        A.    -- to where -- But then again,

9    they put it back to the -- that it was the

10    manufacturer's responsibility to make the

11    appropriate option.

12        Q.    Well, didn't they also say -- and

13    I'll just quote it for you -- the department

14    does not have data, research, or other

15    information that would substantiate restricting

16    the use of alternative condensation control

17    method written in the Manufactured Home

18    Construction and Safety Standards as codified in

19    3280.504(b)(1) to only Thermal Zones 2 and 3.

20        A.    Correct.

21        Q.    Okay.  And it also, if I'm reading

22    this correctly, suggested to you that if you

23    have anything or would like to propose a

Page 177

1    standard, that you can write -- you could

2    provide a proposed standard change to the

3    administration -- administering organization of

4    the Manufactured Housing Consensus Committee,

5    right?

6         A.    Right.  And I -- I interpreted

7    that to mean that simply that no one has taken

8    the steps to present that kind of documentation

9    to HUD to make that restriction of one.

10        Q.    Have you ever done that?

11        A.    No, I haven't.

12        Q.    So you -- even though back in

13   August -- apparently, August of 2005, they asked

14   you if -- if you felt -- felt like you had a

15   problem, to present something to the consensus

16   committee, you've not done that?

17        A.    I have not done that yet.

18        Q.    The -- the department also said

19   that they did not have the sufficient data,

20   research, or other information that would

21   substantiate restricting the use of the

22   alternative construction control -- condensation

23   control method in 504(b)(1).

Page 178

1    Did you provide any data, research, or

2    other information to HUD?

3         A.    Okay.  I think we just answered

4    that.  That -- when I -- You asked me have I

5    provided, and I said no, I haven't.  Now you're

6    asking the same exact question again.

7         Q.    Well, I'm just asking if you

8    had -- if you provided any data, research, or

9    other information.

10        A.    That's the same question you asked

11   a minute ago, and no, sir, I haven't.

12        Q.    No.  I -- The question I meant to

13   ask a second ago was whether or not you proposed

14   a standard change to HUD?

15        A.    Oh.  Well, no, I haven't proposed

16   a standard change.

17        Q.    So it's --

18        A.    That letter --

19        Q.    -- it's -- I guess --

20        A.    May I finish?

21   I have not proposed a standard change.

22        Q.    Okay.

23        A.    And that wasn't the intent of me

**American Court Reporting**
**toll-free (877) 320-1050**

Page 184

1    Q.    Well, if you are a contractor for

2    an SAA, do you not have an obligation to

3    petition HUD?

4    A.    No.  My obligation is to the SAA

5    that I'm working for, and I've made him very

6    well aware of this for years.  But it is their

7    option as to how they use the information that I

8    provide to them.

9    Q.    So you disagree that you have an

10   obligation to do that under the HUD code?

11   A.    My obligation at -- was to the

12   SAA's I was working for.  You asked me as a

13   consultant for the SAA, did I have an obligation

14   to petition HUD.  And no, sir, I disagree.

15   Q.    Okay.  Well, would you -- would

16   you agree that the HUD code is based on

17   generally-accepted engineering practices?

18   A.    I would.

19   Q.    And if it's good enough to be in

20   the code, it's good enough to be followed?

21   A.    If it's applied properly, yes,

22   sir.

23   Q.    Okay.

**www.AmericanCourtReporting.com**
**February 19, 2007**

Page 203

1    of less than 50 square foot for the backsplashes

2    and tub surrounds.

3        Q.      Would you agree with me that

4    condensation issues in homes are generally due

5    to more than just one cause?

6        A.      Depends on the type of

7    condensation issue you're referring to.

8        Q.      Say interior walls.

9        A.      The -- the type of wall problem

10   that we're talking about that's occurring in the

11   Deese home and the subject of this litigation

12   is caused from having a vapor barrier in an

13   inappropriate position.  Now, there are other

14   types of condensation problems, such as water

15   accumulating in a light globe, you know, high

16   humidity within the home -- there's a number of

17   other -- other issues that -- that can be caused

18   by numerous different causes.

19       Q.      Let's go over those numerous

20   different causes.

21       A.      Okay.

22       Q.      Okay.  High humidity in the home,

23   right?

Page 210

1    A.    If we're talking about the

2    moisture -- It depends on what type of moisture

3    problem you're identifying, Counselor.  If --

4    Q.    In -- Any moisture problems

5    related to --

6    A.    The wall structure?

7    Q.    -- the wall structure.

8    A.    Well, if I've got a vapor barrier

9    on the living side of the wall, then I know

10   that's my first problem.  And then from there,

11   you identify the other issues that could make it

12   exacerbate.

13   Q.    Okay.  So in your opinion, the

14   sole problem with moisture accumulation in walls

15   is, one, the vinyl-sided -- the vapor barrier on

16   the interior side of the wall, and anything else

17   that I just listed on this list just makes it

18   worse over time.  Is that your opinion?

19   A.    I believe that would be a pretty

20   fair statement, yes, sir.

21   Q.    Okay.

22   A.    Because I've seen numerous homes

23   that had many of these problems --

**American Court Reporting**
**toll-free (877) 320-1050**

Page 226

1       A.      No, sir.

2       Q.      Look at the setup instructions?

3       A.      No, sir.

4       Q.      Have you ever read the homeowner's

5  manual?

6       A.      I couldn't say for sure.  I've

7  read many homeowner's manuals.

8       Q.      Have you read the setup

9  instructions for this home?

10      A.      Again, I've read -- read many of

11  them, but as I stated a minute ago, I did not

12  read this specific manual for this specific

13  house before I went out.

14      Q.      Before you did any testing, did

15  you check to see if any windows were open?

16      A.      Yes, sir.

17      Q.      Check -- check to see if any storm

18  windows opened up -- up -- the storm windows

19  were up or down?

20      A.      Yes, sir.  Go through and make

21  sure all the windows are closed.

22      Q.      Now, can you tell whether a house

23  has vinyl or paper wall -- wallboard?

Page 227

1       A.      There is a -- With a certain level

2    of assurety, but I typically ask, as I believe

3    has been done here, a request to specify for

4    sure that it has.  But you can take a small

5    sample of that wallboard and actually burn it,

6    and the paper wallboard will burn very clean and

7    crisp, where the vinyl covering, because it is a

8    petroleum base, will smoke and bubble up and

9    reveals itself.

10      Q.      You didn't do that in this case?

11      A.      Yes, I did.

12      Q.      Okay.  When did you do that?

13      A.      During this inspection.

14      Q.      So you actually took a little

15   piece of vinyl and burned it?

16      A.      A little -- a little piece of the

17   wallboard, I believe, maybe, with their

18   permission, from underneath one of the bathroom

19   cabinets that was the same wallboard that was on

20   the perimeter.

21      Q.      Okay.  Which bathroom cabinet?

22      A.      I believe it to be the front

23   bathroom cabinet.

Page 228

1     Q.    Okay.  There's only two, so it

2  would be the --

3     A.    The guest bathroom.

4     Q.    Okay.  And you burned it, and what

5  did you find?

6     A.    If I remember correctly, it

7  bubbled up as if it were vinyl covering, and

8  that explained the -- the -- to me the

9  concentration or the elevation of moisture

10  content that I found around the perimeter.

11     Q.    Did you make any note of that in

12  any part of your report?

13     A.    That I believed it to be a vinyl-

14  covered wallboard, yes, sir.

15     Q.    Okay.  Did you make any report of

16  that test?

17     A.    No, sir.

18     Q.    Has that test -- Is there any

19  testing authority that says that that's proper

20  to use?

21     A.    No, sir.  That's why we ask for

22  the manufacturer to specifically acknowledge

23  whether it is or is not.  And if it's not, I'm

Page 229

1   wrong.

2        Q.        Okay.  Well, if you had to

3   classify this house as a (b)(1) to (b)(4) wall

4   or a waiver wall, what type of classification

5   would you give?

6        A.        I don't have enough information to

7   make that classification, because it -- it

8   combines two wall structures, as it appears to

9   me.

10       Q.        Okay.  The -- the thermal imaging

11  that you took, the pictures that you took --

12       A.        Yes, sir.

13       Q.        -- if we go out and look at this

14  house tomorrow, are we going to be able to find

15  the same thing?

16       A.        As long as you have a temperature

17  difference across that structure.

18       Q.        And how would you -- What was the

19  temperature difference the day that you were out

20  there?

21       A.        I believe I stated earlier that it

22  was 74 on the inside and 85 on the outside, so

23  about ten degrees.

Page 232

1    that I've been able to locate on this file.

2         Q.    Is this the only draft of the

3    opinion you have given?

4         A.    Yes, sir.

5         Q.    Okay.  Now, would it be fair to

6    say that you did not follow the MHRA protocol in

7    Defendant's Exhibit 9 when you went through and

8    did your inspection?

9         A.    Yes.  That would be a fair

10   comment, based on that protocol was -- was

11   developed for a research project, and my

12   information was not to develop a research

13   project.

14        Q.    Well, the research project was to

15   determine problems with moisture in the walls,

16   right?

17        A.    It was -- it -- Not specifically,

18   no, sir.  It was -- They isolated and commented

19   on numerous problems throughout the structure.

20   It wasn't focused on only one issue.

21        Q.    Okay.  Well, what -- Out of this

22   report, did you take basically just information

23   you felt would be necessary for your

Page 255

1    that type of -- to attack that type of market.

2    Personally, I wouldn't go into the upper-end

3    houses where they're building -- That's just my

4    personal opinion.

5         Q.        So you --

6         A.        That's my personal reference.

7         Q.        So you like the (b)(3) walls?

8         A.        If I was going -- if -- I was

9    asked if I was going to build one.  That's the

10   house I would build would be a low-end mobile

11   home.  I wouldn't go into the upper end.

12        Q.        And the Deese house is a

13   ventilated wall cavity, which is a (b)(3) house,

14   right?

15        A.        Well, it shows -- it shows

16   characteristics of that, yes, sir, but it also

17   has -- I believe it to have the vinyl covering

18   on the living side, which would be option one.

19   So again, I can't testify as to which one it is

20   because it has characteristics of two of them.

21        Q.        All right.  In your report, you

22   have negative air pressure within the home.

23   This is on page two, number two:  Negative air

Page 256

1  pressure within the home caused by an improper

2  ventilation system.

3      A.      Uh-huh.  Yes, sir.

4      Q.      If I recall correctly from your

5  earlier testimony, you never turned on that fan.

6      A.      Correct.

7      Q.      So how did you determine that the

8  negative air pressure was caused by that

9  particular ventilation system?

10      A.      Because it had the wrong

11  ventilation system, and had it had the proper

12  ventilation system, it would have offset the

13  minor duct leakage that was found to be in the

14  house.

15      Q.      Did you do any testing to

16  determine the negative air pressure was caused

17  by the -- that particular vent?

18      A.      Yes.

19      Q.      You tested it?

20      A.      Not that vent, but that -- It's

21  the wrong vent.  If you had turned it on, it

22  would have even exaggerated the problem even

23  more.  My point here is that it has, as I

Page 257

1    stated, an improper ventilation system.  It has

2    the wrong one.  It's not in compliance.

3          Q.     Did you --

4          A.     Had it had the correct one, it

5    would have negated the minor duct leakage that

6    was found in the home.

7          Q.     Did you ever turn it on to see if

8    the improper ventilation system caused negative

9    air pressure within the home?

10         A.     Okay.  I think that's the third or

11   fourth time you've asked me that, and I've

12   already stated over and over I did not turn it

13   on because it was the wrong system to start

14   with.  If it's wrong, I don't care how bad wrong

15   it is; it's simply wrong.

16         Q.     So you never determined that the

17   negative air pressure was caused -- I'm asking

18   about the cause; just yes or no.

19         A.     And I've -- and I've told you

20   three times or four or five times I never turned

21   it on.  And my statement here is that that

22   pressure is allowed to be happening because it

23   has an improper system.  It has the improper

Page 258

1  type.  I don't know how to make that any more

2  plainer -- plainer for you, Counselor.

3        Q.      Well, let's answer a yes-or-no

4  question for me.  Okay?

5        A.      Okay.

6        Q.      Is that fine?

7        A.      If you ask a yes-or-no question,

8  then I'll give you a yes-or-no answer.

9        Q.      Did you ever determine that the

10  negative air pressure within the home was caused

11  by the improper ventilation system?  Yes or no.

12        A.      Yes.  In my opinion, it was.

13        Q.      Okay.  And your opinion is based

14  on the fact that you never turned it on, right?

15        A.      No.

16        Q.      Did --

17        A.      My -- No.  I answered it no.

18        Q.      Okay.

19        A.      My opinion is based on the fact it

20  had the improper type.  Had it had -- had the

21  proper type system, it would have negated the

22  minor duct leakage and offset the pressure

23  imbalance that was there, which was minor in and

Page 259

1    of itself.  I'm not saying that -- that the

2    improper system that's installed was causing a

3    negative pressure.  I'm saying the negative

4    pressure is there because it had an improper --

5    the improper type.

6         Q.      Now -- Okay.  And you found

7    negative pressure at point -- negative .5

8    pascals; is that right?

9         A.      Negative .5, right.

10        Q.      So that's not even a whole pascal?

11        A.      Right.

12        Q.      Now, you've testified before that

13   anything less than one pascal is negligible,

14   right?

15        A.      You typically don't see the -- the

16   strong symptoms occurring in a house until you

17   get greater than that .1, so it's a matter of

18   relatively.

19        Q.      It's -- it's not.  There's nothing

20   to say that there's any negative pressure there

21   at that point.

22        A.      I don't -- Right.  What I'm doing

23   is quantifying that there was not a -- It was

Page 260

1    not a significant factor, and that's why the

2    house is no worse than what it is.

3         Q.    So in other words, you can't say,

4    as we sit here today, that there's any negative

5    pressure in the house?

6         A.    Yes.  There is -- there is a

7    slight negative pressure in the house.

8         Q.    But not anything quantifiable?

9         A.    Not -- I don't think it was

10   significant to these problems, no.

11        Q.    Okay.

12        A.    Let me rephrase that.  It wasn't

13   significant in other than explaining why the --

14   the problems are not worse -- is one of the

15   factors of why it's not worse than what it is.

16   The more important point is that it had the

17   incorrect system.

18        Q.    Let's go back to your -- the three

19   things you need for moisture accumulation; the

20   source, the path, and the driving force.

21        A.    Those are the things that you try

22   to quantify and control, correct.

23        Q.    All right.  The source is hot,

Page 277

1    working probably.

2         Q.      I don't think you're understanding

3    my question.

4         A.      Okay.  I'm sorry.

5         Q.      I'm asking for like a control home

6    or something with which to use as a comparison

7    to these houses.

8         A.      I'm sorry.  Not -- not as you're

9    defining it, not as I understand your question.

10        Q.      This isn't a scientific test of

11   any type, is it?

12        A.      No.  This is an accumulation of

13   the data that -- from looking at all the houses

14   that I've looked at to establish that

15   consistency between the moisture in the walls

16   and the mold growth.

17        Q.      Okay.  So it's not any type of

18   publication you'd ever want to put out and have

19   a peer review or anything like that?

20        A.      I think the data is -- is very

21   conclusive and a lot of good information is --

22   could be -- could come of it if it was available

23   or could get permission to use it at a later

Page 278

1  date.

2      Q.      But you don't have any intention

3  of doing that?

4      A.      Not at this point in time.  I

5  don't have permission.

6      Q.      It's not been peer reviewed, to

7  your knowledge?

8      A.      No, sir, it hasn't.

9      Q.      And is -- If I understand

10  correctly, you only have taken samples of the

11  interior wall cavity and outdoor samples, right?

12      A.      Correct.

13      Q.      You didn't take any indoor

14  samples?

15      A.      Indoor air samples, no, sir.

16      Q.      Okay.  Did you take control

17  samples or blank samples for each --

18      A.      Yes.

19      Q.      -- one of these?

20      A.      Yes, sir.

21      Q.      For every one that's in there?

22      A.      Blank samples were sent in with

23  the -- with the sample kits.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 279

1    Q.    Did you take any marriage wall

2    samples?

3    A.    I think there were some marriage

4    wall samples at times, yes.

5    Q.    Did you classify those as marriage

6    wall samples?

7    A.    I believe I did, yes, sir.

8    Q.    How do you -- If I understand you

9    correctly on the mold testing, after you drill

10   two holes in, push back the insulation, and then

11   you stick in a -- what do you --

12   A.    It's an air stem.  It's designed

13   specifically for the purpose of taking wall

14   cavity air samples.

15   Q.    Okay.  What kind -- who makes it?

16   A.    All of my supplies come from

17   Galson, G-A-L-S-O-N, Laboratories out of East

18   Syracuse, New York.

19   Q.    So what's -- what's the name of

20   the air stem or whatever?

21   A.    I haven't seen a specific name on

22   it, but I believe it's built by the same company

23   that builds Zeflon Air-O-Cells, Z-E-F-L-O-N.

**www.AmericanCourtReporting.com**
**February 19, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 280

1    Q.    Okay.  Well, go -- If you will,

2    step me through the steps that you would go

3    after you first get to the house.  You

4    immediately go -- go in and -- I mean, let's

5    strike that.

6    Let's just say when you're doing your

7    mold testing --

8    A.    Uh-huh.

9    Q.    -- is your first step to drill the

10   holes?

11   A.    Well, my first step would be to

12   consult with the homeowner; let them know what

13   my intent was in drilling the holes, taking some

14   air samples from inside the wall when

15   investigating an area that we can't see

16   visually, although I do have a camera that I can

17   get in there and look at now.  But -- Then I

18   would walk through with the homeowner and pick

19   out spots that were suitable for them,

20   typically, behind pictures or areas where they

21   said they could hang a picture or -- you know,

22   after that was located.

23   Q.    I'm talking about your sampling.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 281

1      A.      Okay.

2      Q.      Let me -- let's go with that.

3      A.      Okay.  After the area was

4  identified, then we would drill two holes

5  approximately eight millimeters in size.  A tool

6  was inserted into the lower hole to push back

7  the insulation.  In taking an air sample, you

8  want to minimize the debris that the sample may

9  pick up, so that was the purpose of pushing back

10  the insulation, to clear out a cavity area that

11  it could pull.

12      We then pulled 15 liters of air for one

13  minute.  That's actually 15 liters per minute,

14  so we pulled that for -- at that rate for one

15  minute.  We -- I would first turn on the pump

16  and verify that it was calibrated at 15 liters

17  per minute.  I would attach the Air-O-Cell, the

18  stem, install it into the top hole.  Then I have

19  a stopwatch that I would start simultaneously

20  with the pump, run for one minute, turn the pump

21  off, seal the Air-O-Cell back up, label and bag.

22      Q.      Okay.  Is there some type of

23  protocol that you got this from, or is this just

Page 282

1    your own --

2         A.      Galson Laboratories.

3         Q.      Okay.  Did you follow each and

4    every step?

5         A.      Yes, sir.

6         Q.      Have we gone over each and every

7    step?

8         A.      I believe so, yes, sir.

9         Q.      How do you calibrate the pump?

10        A.      It's a manual calibration, and

11   then I also carry a separate -- I believe it's

12   referred to as a bubble tube to double check the

13   calibration to make sure that it's -- it is

14   seeing the same on both ones.  It's calibrated

15   before the testing, viewed during the testing to

16   assure that it stays there.

17        Q.      All right.

18        A.      And then after that, the holes are

19   then sealed with caulk.  And then the final test

20   was done outside of the home at three minutes of

21   sampling.

22        Q.      Okay.  At the same 15 liters per

23   minute?

Page 283

1      A.      Yes, sir.

2      Q.      Why did you choose one minute and

3  three minutes as the sampling times?

4      A.      Because you're trying to control

5  the debris.  You would expect to have a lot more

6  debris inside that wall cavity, and if you

7  overload the sample with debris, then it's --

8  it's not as legible.

9      Q.      How about the outside?

10     A.      The outside, three to five minutes

11 is a typical recommendation.

12     Q.      Why did you pick three?

13     A.      It's sufficient.

14     Q.      Sufficient based on what?

15     A.      Based on the recommendations from

16 Galson Laboratory.

17     Q.      Where did you go to take the

18 outside sampling?

19     A.      Typically, we got upwind of the

20 house and at least 20 to 25 foot away from the

21 house, as far as our extension cord would

22 reach.  Tried to stay in open areas.

23     Q.      Were you on grass areas or

Page 284

1    concrete areas?

2        A.        It would vary.  In this particular

3    home, we were on a grass area.  The Deese home

4    we were in a grassy area.  The home is located

5    kind of in an open area, pasture or field.

6        Q.        Did you do a control sample for

7    the interior wall?

8        A.        And by that you mean -- Can you --

9        Q.        Do you know what a control sample

10   is?

11       A.        Are you talking about a sample

12   from a partition wall like on the inside?  No,

13   sir, I did not.  I was only investigating the

14   areas around the perimeter that -- where

15   moisture was located.  It was to solidify and

16   substantiate the fact that the moisture was

17   present in the walls.

18       Q.        Did you have a concern about

19   contaminated samples by pushing back the

20   insulation?

21       A.        Yes.  That's why we ran them at

22   one minute.

23       Q.        Well, is it possible that that

Page 285

1  pushing back of the insulation could have

2  contaminated the samples?

3      A.      No.  Because virtually all of our

4  samples came back with -- none of them came back

5  with an overcrowding, a debris of overcrowding.

6  Most of them stayed within the -- the level one

7  or level two of crowding, which is sufficient

8  for the laboratory to analyze.

9      Q.      Well, did Galson Labs suggest

10  pushing back the insulation in its protocol?

11      A.      No.  I think that -- that's pretty

12  much common sense.  You can't stick the probe up

13  in the insulation or your debris is going to

14  insert your tube.  And -- and again, insulation

15  in itself is not made out of mold, so, you

16  know -- That's what we were trying to read was

17  the mold, to find out if there, in fact, was

18  significant mold spores within the wall, which

19  would indicate and solidify the -- the fact that

20  the walls were wet.

21      Q.      Okay.  So Galson Labs didn't

22  recommend pushing back the insulation.  Do you

23  have any generally-accepted publication,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 286

1    protocol of any type that says you need to first

2    push back the insulation?

3         A.    No.  Again, that's professional

4    judgment and common sense.

5         Q.    Yours?

6         A.    Yes.

7         Q.    What's the air -- air rate on mold

8    testing?

9         A.    I'm not sure.

10        Q.    Would it surprise you that it's

11   plus or minus 200 percent?

12        A.    That would surprise me.

13        Q.    Well, what reference material do

14   you have that supports the way you have done

15   this cavity testing?

16        A.    I -- There's a couple of -- one

17   from Zeflon Air-O-Cell and one from Galson

18   Laboratories, as well as consulting with them in

19   the past as far as that being an appropriate

20   method.

21        Q.    Other than that, that's all you

22   have?

23        A.    Uh-huh.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 315

1      this letter to these people?

2          A.      No.  But they -- shortly before

3      they provided me with the remediation estimate,

4      which would be November of 2006.

5          Q.      Well, any reason why this was not

6      turned in or turned over to us until February?

7          A.      You're asking the wrong person.  I

8      have no idea.

9          Q.      Did you turn this over to your

10     attorneys at that time?

11         A.      I believe that I turned it over

12     upon completion of receiving the estimate.

13         Q.      So sometime in November of 2006?

14         A.      I believe that to be true.

15         Q.      Did you read the report?

16         A.      Yes, sir, I did.

17         Q.      The mold remediation protocol, is

18     that something you made up?

19         A.      Yes, sir.  It's one that I

20     frequently use with my manufacturers providing

21     warranty work.

22         Q.      Is that taken from any publication

23     or generally-accepted standard or protocol that

**American Court Reporting**
**toll-free (877) 320-1050**

Page 340

1      Q.      Okay.  That's fine.

2      A.      But I'll be glad to copy them for

3  you.

4              MR. GOULD:  Just take them to

5  a copy service, and bill -- we'll send them the

6  bill.

7      A.      Okay.

8      Q.      And the -- the only part I need --

9  for whatever reason, that was missing from my

10  notebook.

11      A.      Okay.

12      Q.      All part of -- all I have is A.

13      A.      Okay.  Sure.

14              MR. GOULD:  What you have

15  clipped?

16              MR. RITCHEY:  Just what I have

17  clipped.

18              MR. GOULD:  Okay.

19      A.      Okay.

20      Q.      And that's -- that's all I have,

21  all the questions I have.

22              MR. GOULD:  I don't have

23  anything.  I do just want to request that your

**American Court Reporting**
**toll-free (877) 320-1050**

Page 341

1   experts maintain any notes that they've made

2   here today during this deposition or questions

3   they've passed back and forth to you, because we

4   will be requesting those.

5            MR. RITCHEY:  Okay.  I don't

6   think anybody passed me any questions, but

7   that's fine.

8            MR. GOULD:  I don't -- I don't

9   know what happened when I was outside the room.

10           MR. RITCHEY:  All right.

11           THE VIDEOGRAPHER:  This

12  concludes the deposition of Bobby Parks.  Going

13  off the record, 4:24 p.m.

14

15                04:24 p.m.

16

17           · FURTHER DEPONENT SAITH NOT

18

19

20

21

22

23

Page 342

1          C E R T I F I C A T E

2

3     STATE OF ALABAMA)

4     JEFFERSON COUNTY)

5

6              I hereby certify that the above

7     and foregoing deposition was taken down by me in

8     stenotype, and the questions and answers thereto

9     were transcribed by means of computer-aided

10    transcription, and that the foregoing represents

11    a true and correct transcript of the deposition

12    given by said witness upon said hearing.

13              I further certify that I am

14    neither of counsel nor of kin to the parties to

15    the action, nor am I in anywise interested in

16    the result of said cause.

17                    *Deborah B. Townsend*

18

19                    DEBORAH B. TOWNSEND, CSR

20                    Certificate No. AL-CSR-207

21

22    My Commission expires

23    March 3, 2008

Parks Mobile Air, llc
111 Green Rd.
West Monroe, La 71291
Ph. 318-355-1918
Fax. 318-397-2123

Director, Manufactured Housing Standards Division,
Department of Housing and Urban Development,
451 Seventh Street, SW.,
Washington, DC 20410

Dear sir,

In the spirit of Sec. 3282.54 Public information, I would appreciate some assistance in the clarification of The Manufactured Home Construction and Safety Standard, Part 3280.

Specifically; *Sec. 3280.504 Condensation control and installation of vapor retarders.*

*(b) Exterior walls. (1) Exterior walls shall have a vapor barrier not greater than 1 perm (dry cup method) installed on the living space side of the wall, or*

Question 1: Does the use of the word "or" within this section indicate that a choice must be made to use one of the three (now four counting waiver) options within this standard.

Question 2: Please clarify the need for having (4) four choices.

Your prompt response is greatly appreciated,
Robert Parks
Parks Mobile Air, llc

August 10,2005



DEFENDANT'S
EXHIBIT

12

Parks Mobile Air, llc
111 Green Rd.
West Monroe, La 71291
Ph. 318-355-1918
Fax. 318-397-2123

Director, Manufactured Housing Standards Division,
Department of Housing and Urban Development,
451 Seventh Street, SW.,
Washington, DC 20410

August 10, 2005

Dear sir,

In the spirit of Sec. 3282.54 Public information, I would appreciate some assistance in the clarification of The Manufactured Home Construction and Safety Standard, Part 3280.

Specifically; **Sec. 3280.504 Condensation control and installation of vapor retarders.**
*(b) Exterior walls. (1) Exterior walls shall have a vapor barrier not greater than 1 perm (dry cup method) installed on the living space side of the wall, or*

and

*(e) CONSIDERATIONS IN ESTABLISHING AND INTERPRETING STANDARDS AND REGULATIONS. The consensus committee, in recommending standards, regulations, and interpretations, and the MANUFACTURED HOME STANDARDS*
**Sec. 604 1448 Secretary, in establishing standards** *or regulations or issuing interpretations under this section, shall*
*(1) consider relevant available manufactured home construction and safety data, including the results of the research, development, testing, and evaluation activities conducted pursuant to this title, and those activities conducted by private organizations and other governmental agencies to determine how to best protect the public;*
*(2) consult with such State or interstate agencies (including legislative committees) as he deems appropriate;*
*(3)* **consider whether any such proposed standard is reasonable** *for the particular type of manufactured home or* **for the geographic region for which it is prescribed;**

Question : Does HUD consider the application (and/or choice of use) of 3280.504(b)(1) "a reasonable" application for use in homes "prescribed" to be placed within the "geographic region" known by HUD as Thermal Zone 1 which contains the hot humid climate?

Your prompt response is greatly appreciated,
Robert Parks
Parks Mobile Air, llc

Mr. Parks,
Here is the clarification you requested in your August 10th inquiries.

**Question 1:**
**Does the use of the word "or" within this section indicate that a choice must be made to use one of the three (now four counting the waiver) options within this standard?**
The inclusion of the word "or" following 3280.504(b)(1) and (b)(2) requires a manufacture home producer to design and construct a home, at the choice of the manufacturer, in accordance with either of the provisions of 3280.504(b). The final Waiver published in the Federal Register on April 24, 2002, recognizes the options in 3280.504 as "alternatives" and the Waiver permits yet one more alternative for homes produced for installation in the specified counties of the humid and fringe climate map.

**Question 2:**
**Please clarify the need for having four choices.**
The Manufactured Home Construction and Safety Standards is for the most part a performance-based standard. The subject standards were originally promulgated to permit a range of design options that can satisfy the goals of safe, sanitary, and affordable housing. More information regarding the promulgation of the Waiver can be found in the preambles of the Proposed and Final Rules published in Volume 65, Numbers 62 and 79 respectively, of the Federal Register.

**Question on separate correspondence:**
**Does HUD consider the application (and/or choice of use) of 3280.504(b)(1) "a reasonable" application for use in homes "prescribed" to be placed within the "geographic region" known by HUD as Thermal Zone 1, which contains the hot humid climate?**
The current requirements of the Manufactured Home Construction and Safety Standards, including the Waiver published April 24, 2002, do not prohibit the use of 3280.504(b)(1) based on Thermal Zone. However, the Department promulgated an alternative to 3280.504(b)(1) and published this alternative in the Federal Register as a Waiver, for the specific reasons identified in the Waiver''s preamble. The Department does not have data, research, or other information that would substantiate restricting the use of the alternative condensation control method written in the Manufactured Home Construction and Safety Standards and codified as 3280.504(b)(1) to only Thermal Zones 2 and 3. Further, HUD has recognized that in humid and fringe climate areas, identified in the Waiver that some construction techniques could be detrimental and thus, publishing the alternatives provides manufacturers with an alternative that a manufacturer can use in the design and construction of manufactured homes that may be compatible with their construction techniques. Should you believe that the Manufactured Home Construction and Safety Standards needs modification, please provide a proposed standards change to the Administering Organization for the Manufactured Housing Consensus Committee. Below is the link for proposing changes to the Standards.
http://www.nfpa.org/PDF/MHCCpropform0303.pdf?src=nfpa

I hope these answers help. If you need anything else please let me know.

Shawn P. McKee, P.E.
Structural Engineer
U.S. Department of Housing & Urban Development
Office of Manufactured Housing Programs
Suite 9164
451 Seventh Street, S.W.
Washington, D.C. 20410
(202) 708-6423 ext. 5609

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRY DEESE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case Number:  1:06-cv-643 MHT** |
| | * | |
| **CHAMPION ENTERPRISES, INC.,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |

STATE OF ___Indiana___ *
                                    *            **A F F I D A V I T**
___Elkhart___ **COUNTY** *

     Before me the undersigned authority, in and for said state and county, personally appeared, Roger Garrett, who being by me first duly sworn, under oath, deposes and says:

     1.     My name is Roger Garrett and I am over the age of 19 years.  I was formerly the Director of Quality for Adorn, LLC ("Adorn") and I have personal knowledge of the facts set forth in this Affidavit.  Adorn is a manufacturer and supplier of lamination and other products, including such laminated products as vinyl over gypsum and paper over gypsum.  I worked for Adorn and in the lamination industry for over eight (8) years.  As Director of Quality for Adorn, I oversaw the production and quality of various products including vinyl and paper over gypsum.  I examined on a daily basis vinyl and paper on gypsum.  I routinely reviewed paper and vinyl samples and if required, tested to determine the background of the laminated material.  I am familiar with the difference characteristics between vinyl and paper on gypsum and can distinguish between the two types of lamination on gypsum.  I make this Affidavit and appear specifically for the purpose of supporting the motion filed in the above styled action.  I obtained

1



a Bachelor of Science in Mechanical Engineering Technology from Purdue University and a Masters in Business Administration from Indiana Wesleyan. .

    2.    I was asked to inspect and test a sample of wallboard from the manufactured home owned by Mr. Deese.  The sample of wallboard I inspected and tested was signed and dated by Patrick Cagle, a representative from Mr. Deese's attorney's office.  A true and correct copy of my entire expert report with regard to my inspection and testing of the sample wallboard is attached hereto and incorporated herein by reference.

    3.    After my evaluation of the sample from Mr. Deese's home, I determined that the sample was a printed paper covering over gypsum.

    4.    This affidavit is true and correct to the best of my knowledge, information and belief.

Roger Garrett

**STATE OF** Indiana     *

                    *

Elkhart     **COUNTY** *

**A C K N O W L E D G E M E N T**

I, the undersigned, a Notary Public in and for said County and State, hereby certify that Roger Garrett, as the former Director of Quality of Adorn, LLC, whose name is signed to the foregoing Affidavit, and who is known to me, acknowledged before me on this date that, being informed of the contents of the instrument, he executed the same voluntarily.

Given under my hand and official seal this 15th day of October , 200 7 .

Nori A. O'Connor

Notary Public

My Commission Expires: 3-17-09

3



# TESTING OF A SAMPLE PIECE OF WALLBOARD FROM THE MANUFACTURED HOME

RE:  Terry Deese v. Champion Enterprises, Inc. et al.
Serial No.: HL15661
Case No.: 1:06-cv-643 MHT
Our File No.: 1562.0789

Test/Prepared for:

Ritchey & Ritchey, PA
1910 26th Avenue South
Birmingham, Alabama 35209-2604

Test Report: RG0326007
Issued: March 26, 2007

Prepared by:
Roger Garrett
Director of Quality

Adorn, LLC              2421 S. Nappanee St., Suite B              Elkhart, IN 46517

## A. Background

    a. I am the Director of Quality for Adorn, LLC. Adorn is a manufacture and supplier of lamination and other products, including such laminated products as vinyl over gypsum and paper over gypsum. I have worked for Adorn and in the lamination industry for over eight years. As Director of Quality for Adorn, I oversee the production and quality of various products including vinyl and paper on gypsum. As Director of Quality, I exam on a daily basis vinyl and paper on gypsum. I routinely review paper and vinyl samples and if required test to determine the background of the laminated material. I am familiar with the difference characteristics between vinyl and paper on gypsum and can distinguish between the two types.

    b. Education: Bachelor of Science in Mechanical Engineering Technology from Purdue University; Masters in Business Administration from Indiana Wesleyan.

## B. Publications

    a. I do not have any publication within this field of knowledge.

## C. Prior Testimony within the last 4 years

    a. None

## D. Cost Related to Testimony or Reimbursement for Lost Time

    a. Coverage of Hourly Rate based on lost work time

Adorn, LLC        2421 S. Nappanee St., Suite B        Elkhart, IN 46517

# 1.0 Introduction

## 1.1 General

This test is a visual evaluation of the lamination surface. A sample of wallboard was provided from the manufactured home made subject of the above-referenced matter. The back of the wallboard is signed and dated by Patrick Cagle for identification purpose. This sample will be referred to as "Unknown" in the testing procedure. This sample will be evaluated and compared to a known paper sample labeled as "Known Paper Sample" and a known vinyl sample labeled as "Know Vinyl Sample". This test is a visual evaluation of the charicteristic of the laminated material and the lamination surface. This type of testing (evaluation) is accepted in this field (industry) and is a reliable method of distinguishing between laminated cover materials. The materials will be evaluated using a Paxit Camera System. This system will allow for detailed examination of the material laminated to the surface of the wallboard (gypsum or sheet rock).

## 1.2 Objective and Scope

The purpose of this evaluation is to access the material laminated to the surface of the wallboard (gypsum or sheet rock).

# 2.0 Test Program

## 2.1 Description of Test Samples

Each specimen consists of a small cutout of a large panel of wallboard. The detail on each sample is listed below.

A. **Terry Deese v. Champion Enterprises, Inc. et al "Unknown" (approx. 5/16" X 1 ½" X 3") Note: Signed and dated by Patrick Cagle for identification purpose. Size is identified as (Thickness X Width X Length)**
   - i.  Substrate – Wallboard or gypsum (unknown supplier)
   - ii.  Glue – Water based (unknown supplier)
   - iii.  Printed Cover Material (unknown supplier)

B. **Laminated Paper "Known Paper Sample" (approx. 5/16" X 2 1/8" X 5 ½")**
   - i.  Substrate – Wallboard or gypsum (National Gypsum)
   - ii.  Glue – Water based (National Starch)

Adorn, LLC                    2421 S. Nappanee St., Suite B                    Elkhart, IN 46517

      iii. Printed Cover Material – Paper (Name: Zoee Olive from Waldan)

**C. Laminated Vinyl "Known Vinyl Sample" (approx. 5/16" X 2 ¾" X 2 7/8")**
      i. Substrate – Wallboard or gypsum (National Gypsum)
      ii. Glue – Water based (National Starch)
      iii. Printed Cover Material – Vinyl (Name: Ambrosia Valencia from Gravure)

**2.2 Preparation for Testing**
Prior to placement under the Paxit Camera System the top surface of each laminated sample was removed or peeled away from the substrate.

**2.3 Test Procedure**
Each test was conducted in the same manor. The sample was placed under the Paxit Camera System. The samples were evaluated at differing magnification. Within this evaluation the exact magnification can not be determined, however, a scale is added to the surface of the sample to aid in determining the magnification level. Pictures were taken at different points within the evaluation.

**2.4 Test Characteristics**
Each of the Printed Cover Material(s) has different characteristics. We will use these characteristics to evaluate the three samples. The characteristics will be used to compare and contrast the "Known Samples" vs. the "Unknown Sample".
      **i.**   **Paper Characteristics**
         *a.* Fibrous – crossing strands due to the cellulose or wood fibers within the paper. *(picture: known paper - mp4)*
         *b.* Layered – when the material is removed or peeled back. A paper will separate between the layers leaving material on the substrate. *(picture: known paper - mp4 low)*
         *c.* Thickness .13 mm or .005" *(picture: known paper 3 - mp4)*

  *d.* Embossment – smooth appearance on the surface of the material. *(picture: known paper - mp4 – 1)*

 **ii.**   **Vinyl Characteristics**
  *a.* Not fibrous (shiny appearance) -- the surface will have a plastic appearance (smooth). The typical make-up of a vinyl printed covering material is poly vinyl chloride (PVC) or poly propylene. *(picture: known vinyl – mp4+)*
  *b.* Not Layered -- the appearance will be 1 sheet. This is consistent with how the material is produced. *(picture: known vinyl 2 – mp4)*
  *c.* Thickness - .22 mm or .009" *(picture: known vinyl 2 – mp4)*
  *d.* Embossment – pitted appearance on the surface of the material. *(picture: known vinyl 3 – mp4)*

**3.0 Test Results**

After peeling back the printed covering from the "Unknown" sample it was evaluated based on the Paper & Vinyl Characteristics. The "Unknown" sample has a fibrous structure (characteristic of paper) *(picture: unknown – mp4 & unknown – mp4+)*. When the printed covering material was removed or peeled back it separated or layered (characteristic of paper) *(picture: unknown oa – mp4)*. The thickness of the material was compared to the known paper & vinyl sample. The thinner nature of the material would indicated a paper characteristic (note: the material is difficult to measure due to the layering or attachment to the substrate) *(picture: unknown oa – mp4)*. The embossment of the material is smooth this would be a characteristic of paper *(picture: unknown oa3 – mp4)*. After the evaluation (compare and contrast) to the known samples; the "Unknown" sample is a Printed Paper Covering.

**4.0 Other**

I am not aware of any burn method to determine the type of laminated cover material (paper or vinyl).

**Test Performed By:**

Roger L. Garrett
**Director of Quality**
**574-295-5223 ext. 506**

Cc:
Todd Cleveland









KNOWN PAPER - MP4 low

LAYERED
SEPARATED

MATERIAL

SPECIMEN

cm

1

2

3

(3)





Brown Vinyl - MP4 +

Not Fibrous
Smooth / Serious Plastic Appearance

94



KNOWN Vinyl 2 - MP4

NOT LAYERED
(ONE SHEET)
THICKNESS

KNOWN VINYL 3 - MP4



EMBOSSMENT
PITTED APPEARANCE



FIBROUS CHARACTERISTIC



FACE BASE PAPER - GYPSUM.











IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TERRY DEESE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case Number:  1:06-cv-643 MHT |
| | * | |
| CHAMPION ENTERPRISES, INC., *et al.,* | * | |
| | * | |
| Defendants. | * | |

STATE OF _Indiana_      *

_Elkhart_ COUNTY      *          **A F F I D A V I T**

Before me the undersigned authority, in and for said state and county, personally appeared, David R. Tompos, P.E., who being by me first duly sworn, under oath, deposes and says:

1.     My name is David R. Tompos, P.E. and I am over the age of 19 years.  I am Vice-President/General Manager of NTA, Inc., a Consultant Engineering Firm with direct responsibility in the following areas:

> a.     Responsible for mobile & modular, manufacturers code certification and compliance in the following areas: structural, mechanical, electrical, plumbing, building, fire safety and accessibility;

> b.     Direct responsibility for IPIA/DAPIA function.  Responsibilities include initial plant certifications, Dapia review and inspector training;

> c.     Provide liaison for manufacturers to states and regulatory agencies to maintain code compliance. Participate in HUD and IBTS meetings;

EXHIBIT
3

      d.     Assist manufacturers and dealers in resolving consumer compliant problems. Monitor IPIA responsibilities under Sub-Part I:

      e.     Provide Professional Certification and design of commercial structures and assist in submittals through state agencies. Provide structural, electrical and heat loss calculations; and

      f.     Provide expert testimony in law suits for manufactured structures. Inspect homes on-site for consumer complaints.

2.     I make this Affidavit and appear specifically for the purpose of supporting the motion filed in the above styled. I obtained a Bachelor of Science in Civil Engineering from Valparaiso University and presently, I am a Registered Engineer in twenty-two (22) states. Attached hereto and made a part hereof by reference is a true and correct copy of my Resume which outlines my employment history, qualifications and technical committees in which I am involved.

3.     I was asked to inspect the manufactured home owned by Mr. Deese and provide my findings in a report. A true and correct copy of my expert report is attached hereto and made a part hereof by reference. I investigated the claims made by Mr. Parks with regard to the wallboard in the home and the claimed "negative" ventilation system.

4.     After my inspection, testing and evaluation of Mr. Deese's home, I determined within a reasonable degree of engineering certainty that the wall in the Deese home were designed and constructed in compliance with the prescriptive standards of 3280.504(b)(1) and 3280.504(b)(3) of the HUD Code. I defer to my expert report with regard to specifics aspects of my findings.

5.    I also inspected, and participated in the testing and evaluation of the whole house ventilation system in Mr. Deese's home.  I determined within a reasonable degree of engineering certainty that the whole house ventilation system in Mr. Deese's home conforms to section 3280.103(b) of the HUD Code.  I defer to my expert report with regard to specifics aspects of my findings.

6.    This affidavit is true and correct to the best of my knowledge, information and belief.

David R. Tompos, P.E.

STATE OF _Indiana_ *

_Elkhart_ COUNTY *

**A C K N O W L E D G E M E N T**

I, the undersigned, a Notary Public in and for said County and State, hereby certify that David R. Tompos, P.E., as the Vice-President/General Manager of NTA, Inc., whose name is signed to the foregoing Affidavit, and who is known to me, acknowledged before me on this date that, being informed of the contents of the instrument, he executed the same voluntarily.

Given under my hand and official seal this 15th day of _October_ , 200 7 .

Notary Public
My Commission Expires: 3·17·09

4



**ENGINEERS**
**PLANNERS**
**CONSULTANTS**

305 NORTH OAKLAND AVENUE · P.O. BOX 490 · NAPPANEE, INDIANA 46550

PHONE: 574·773·7975
FAX: 574·773·2732

March 5, 2007

Gregory S. Ritchey, Esquire
Ritchey & Ritchey, P.A.
1910 28th Ave. South
Birmingham, AL  35209-2604

RE:  Terry Deese vs. Champion Enterprises, Inc.,  et al

In response to your March 1, 2007 letter, I am providing the following information as requested.

I am a registered Professional Engineer and certified inspector in many states, with more than thirty-five (35) years experience in the mobile/modular home industry.  A copy of my curriculum vitae is attached hereto.  I have not authored any publications in the past ten (10) years.  To the best of my knowledge, I have had one deposition taken in the last four (4) years.  The case was Boyd Tisdale, et al v. Futuristic, Inc. and Oakwood Homes Corporation in Onslow County, NC.  I am being compensated at the rate of One Hundred and Fifty and 00/100 dollars ($150.00) per hour for my services on behalf of Champion Enterprises, Inc.

If you have any questions on the above, please do not hesitate to contact the undersigned.

Sincerely,

David R. Tompos, P.E.
Vice President/General Manager
NTA, Inc.

RESUME

David R. Tompos
26225 CR 52, RR #4
Nappanee, IN. 46550

PERSONAL:          Married, Three Children
                   D.O.B. 12-08-48
                   Height: 6'5"
                   Weight: 225

EDUCATION:         Plum Senior high School 1962-1966
                   Valparaiso University 1967-1971 B.S.C.E.

PROFESSIONAL
QUALIFICATIONS:    Registered Engineer in (23) states:

| | | | |
|---|---|---|---|
| Delaware | PE# 7929 | Florida | PE# 55636 |
| Georgia | PE# 12850 | Indiana | PE# 16484 |
| Illinois | PE# 62036142 | Kansas | PE# 12486 |
| Louisiana | PE# 24332 | Maryland | PE# 14076 |
| Massachusetts | PE# 30423 | Michigan | PE# 23419 |
| Minnesota | PE# 13226 | New Jersey | PE# 27944 |
| New York | PE# 53601 | N. Carolina | PE# 12127 |
| Ohio | PE# E41025 | Oregon | PE# 16311 |
| Rhode Island | PE# 5473 | S. Carolina | PE# 10436 |
| Tennessee | PE# 17855 | Texas | PE# 60600 |
| Virginia | PE# 16698 | Alabama | PE#28119 |
| Wisconsin | PE# E17498 | | |

INSPECTION
CERTIFICATION:     NCPCCI Exam
                   1A- Building, 1 & 2 Family Dwelling
                   2A- Electrical, 1 & 2 Family Dwelling
                   4A- Mechanical, 1 & 2 Family Dwelling
                   5A- Plumbing, 1 & 2 Family Dwelling
                   1B- Building General
                   2B- Electrical General
                   3B- Fire Protection General
                   4B- Mechanical General
                   5B- Plumbing General

                   ICC Exam
                   Residential Energy Inspector/Plans Examiner
                   Commercial Energy Inspector

SBCCI
1 & 2 Family Combination Inspector
Electrical inspector
1 & 2 Family Electrical Inspector
Plumbing Inspector


Page 2
David R. Tompos
Resume

International Code Council Certifications (ICC)
Residential Building Inspector
Residential Electrical Inspector
Residential Mechanical Inspector
Residential Plumbing Inspector
Residential Combination Inspector
Commercial Building Inspector
Commercial Electrical Inspector
Commercial Mechanical Inspector
Commercial Plumbing Inspector
Commercial Combination Inspector
Building Inspector
Electrical Inspector
Mechanical Inspector
Plumbing Inspector

Industrialized Buildings Commission (IBC)
Industrialized Buildings Inspector        #I-015

International Association of Plumbing & Mechanical Officials (IAPMO)
Certified Plumbing Inspector        #N99040
Certified Mechanical Inspector#N91069

International Association of Electrical Inspectors (IAEI)
Electrical Inspector; One & Two-Family Dwelling        #7029048
Electrical Inspector; General        #7029048

California
Quality Assurance Inspector #IM920450

Florida
Standard Modular Inspector        #SMI38

<u>Idaho</u>
Third Party Electrical Inspector
Third Party Plumbing Inspector
Third Party Residential & Commercial Modular Building & Energy Inspector

<u>New Mexico</u>
In-Plant Inspector

<u>North Carolina</u>
Building Level III
Electrical Level III
Plumbing Level III

<u>Ohio</u>
Building Inspector        #P001640

Page 3
David R. Tompos
Resume

<u>Texas</u>
Residential & Commercial Third Party Inspector        #IHI-18
Registered Accessibility Specialist

<u>Wisconsin</u>
UDC Electrical Inspector        #248713
UDC HVAC Inspector
UDC Plumbing Inspector
UDC Construction Inspector

PLAN REVIEW
CERTIFICATION:        <u>NCPCCI Exam</u>
                      1C- Building Plan Review
                      2C- Electrical Plan Review
                      3C- Fire Protection Plan Review
                      5C- Plumbing Plan Review

                      <u>ICC Exam</u>
                      Residential Energy Inspector/Plans Examiner

                      <u>SBCCI</u>
                      Building Plan Review
                      Electrical Plan Review
                      Mechanical Plan Review

International Code Council Certifications (ICC)
Building Plans Examiner
Electrical Plans Examiner
Mechanical Plans Examiner
Plumbing Plans Examiner
Combination Plans Examiner

Industrialized Buildings Commission (IBC)
Unlimited (Level II) Plans Examiner     #P-013

International Association of Electrical Inspectors (IAEI)
Electrical Inspector; Plan Review     #7029048

Florida
Standard Voluntary Modular Plans Examiner     #SMP23

COMMITTEES:     MHI Technical Exchange Committee
MHI Consensus Committee
    Chairman Heating & Ventilation Sub-Committee
DAPIA Technical Activities Committee
IPIA Technical Activities Committee

Page 4
David R. Tompos
Resume

EXPERIENCE:     January 1976 to Present - NTA, Inc., Nappanee, IN.
Vice-President/General Manager of Consultant Engineering Firm with direct responsibility in the following areas:
1.  Responsible for mobile & modular, manufacturers code certification and compliance in the following areas: structural, mechanical, electrical, plumbing, building, fire safety and accessibility.

2.  Direct responsibility for IPIA/DAPIA function.  Responsibilities include initial plant certifications, Dapia review and inspector training.

3.  Provide liaison for manufacturers to states and regulatory agencies to maintain code compliance. Participate in HUD and IBTS meetings.

4.  Assist manufacturers and dealers in resolving consumer compliant problems. Monitor IPIA

responsibilities under Sub-Part I.

5. Provide Professional Certification and design of commercial structures and assist in submittals through state agencies. Provide structural, electrical and heat loss calculations.

6. Provide expert testimony in law suits for manufactured structures. Inspect homes on-site for consumer complaints.

### April 1975 - December 1975 - Wickes Homes, Argos, IN.
Product Engineer directly responsible for the following:

1. Review all plumbing, electrical, and mechanical production drawings for code compliance for in-plant use.

2. Review actual product being manufactured in-plant for code compliance and conformance to production drawings.

3. Responsible for all new designs and new product line to verify that code compliance is met.

4. Responsible to review all new materials to be used in the home for proper code approvals and to insure proper installation.

5. Responsible to verify that all products meet the code requirements through calculations. (Structural, Electrical, Heat Loss, and Duct Sizing, etc.)

6. Responsible for actual testing performed on the components of the unit (rafter testing, floor testing, sidewall testing, interior partition testing, heat duct testing, etc.)

7. Responsible for all code submittals to state and regulatory agencies.

8. Responsible for establishing and maintaining in-plant quality control procedures.

Page 5
David R. Tompos
Resume

### 1972 - 1974 C.S.A. Engineering, Inc., Elkhart, IN.
Responsible for engineering functions of approximately 10 mobile/modular manufacturers as follows:

1. Submit and maintain all state and third party submittal packages.

2. Responsible for electrical, plumbing and mechanical drawing review for code compliance.

3. Review actual in-plant production method and product for code compliance.

4. Responsible to verify that all products meet the code requirements through calculations (Structural, Electrical, Heat Loss, Duct Sizing, etc.)

5. Provide liaison between manufacturer and various state and regulatory agencies.

6. Inspect Mobile Homes, Modulars, and Recreational Vehicles for Code Compliance Certification.

1971 - 1972 - Underwriters Laboratories, Northbrook, IL.
Product engineer responsible for the following:
1. Review submittal from mobile/modular manufacturers for code compliance.

2. Review actual product in-plant for code compliance.

3. Write follow-up procedure for manufacturers for inspectors.

4. Verify that products meet code compliance through actual calculations.

5. Involved in actual testing of mobile home components.
   (Trusses, windows, etc.)

6. Inspect Mobile Homes for Code Compliance Certification.


1970 - 1971 - Flour Corporation, Joliet, IL.
Instrument Man. Physical Survey Layout of Gulf Oil Refinery.

1968 - 1970 - Peller, Tanck & Gertsmier, Valparaiso, IN.
Survey and draftsman. Physical layout of housing subdivisions. Drawings of topographic and lot layouts.


REFERENCES:    Both business and personal references will be furnished upon request.



ENGINEERS
PLANNERS
CONSULTANTS

305 NORTH OAKLAND AVENUE · P.O. BOX 490 · NAPPANEE, INDIANA 46550

PHONE: 574-773-7975
FAX: 574-773-2732

February 27, 2007

Gregory S. Ritchey, Esquire
Ritchey & Ritchey, P.A.
Post Office Drawer 590069
Birmingham, AL 35259-0069

RE: Terry Deese v. Champion Homes

On February 20, 2007 I inspected the residence of Dawn and Terry Deese located in Columbia, AL.

The purpose of the inspection was to evaluate the items listed in the expert's reports of Mr. Bobby Parks, Mr. Konder, P.E., and Mr. Bonney.

My report is based upon my visual inspection of the Deese residence and the documents you provided.

Each report will be identified and addressed separately.


**1. Mr. Parks report (not dated):**

Mr. Parks states the purpose of his investigation of the Deese house and his conclusions are as follows:

> "1) Elevated moisture content within the perimeter walls causing structural softening and deflections.
>
> 2) Possible fungal-like growth within the home."

The following conclusions are based on information gathered from this investigation. This home was found to have several serious non-compliant code issues causing structural deterioration and mold growth. Issues include,

"1) improper application of the wall construction standards.
Does not concur with basic engineering practices or meet the prescriptive
standards which requires *"home producers in assuring that homes built and sited
in humid and fringe climates are durable and free of moisture-related problems."
*24 CFR Part 3280 [Docket No. FR-4578-F-02]    3280.504(b)

2)  Negative air pressure within the home caused by an improper ventilation
system. - Sec. 3280.103 (b) (3)"

In Mr. Parks's conclusion 1), improper application of wall construction standard is
incorrect in stating the wall construction is improper and it does not meet basic
engineering practices or meet the prescriptive requirements of the HUD Standards.  HUD
oversees the Federal Manufactured Home Construction and Safety Standard and develops
the code through a consensus process that relies on professionals that have expertise to
make recommendations to a consensus committee by supplying conclusive technical
documentation on issues that will become code and establish good engineering practice.
Meeting the specific requirements of the codes is meeting basic engineering practices

During my inspection, it was not possible for me to visually look at the surface of the
wall covering and determine if the covering on the gypsum was vinyl or paper. During
my inspection, I removed a receptacle in the rear bedroom to examine the edges of the
wall covering.  It is my opinion, after my visual inspection of the edge, that the wall
covering was paper.  It is my opinion that the wall covering in the Deese's home should
be inspected by an independent laboratory to verify that the wall covering is actually
paper.  My comments in this report are based upon Mr. Parks's assumption that the
interior finish is vinyl, having a perm rating less than 1.

To address Mr. Park's conclusions, the exterior walls of the Deese's home are assumed to
be constructed with vinyl covered gypsum wallboard, 2 x 4 stud construction with R-11
batt insulation, and exterior metal siding.  This construction method conforms to section
3280.504 (B) (1) and section 3280.504 (B) (3) of the Federal Manufactured Home
Construction and Safety Standard.

Section 3280.504 (B) (1) states, "Exterior wall must have a vapor retarder with a
permeance no greater than 1 perm (dry cup method) installed on the living space side of
the wall." The vinyl covered gypsum has a perm rating of less than 1 which conforms to
the prescriptive requirements of section 3280.504 (B) (1). This code section permits the
cavity to be ventilated or unventilated to meet the requirements and the wall construction
in the Deese's residence conforms to the specific requirement for condensation control in
section 3280.504(b) (1) and section 3280.504(b) (3) of the HUD Standards.

Section 3280.504(B)(3) states. "Wall cavities must be constructed so that ventilation is provided to dissipate any condensation occurring in these cavities."

Section 3280.504(b)(2) states. "formed exterior siding applied in sections with joints not caulked or sealed, shall not be considered to restrict water vapor transmission." The exterior metal siding is corrugated to provide ventilation and is applied in sections with the joints not caulked or sealed, which meets the HUD requirements of 3280.504(b)(2) for not restricting water transmission. In addition, section 3280.504(B)(3) does not restrict the use of interior finishes having a perm rating of less than 1 when exterior walls are ventilated. Therefore, the wall construction conforms to section 3280.504(B)(3) of the HUD Standards for a ventilated wall cavity.

Based upon a reasonable degree of engineering certainty, it is my opinion that the walls constructed in the Deese home are built and conform with the prescriptive requirements of sections 3280.504(B)(1) and 3280.504(B)(3) of the HUD Standard.

The wall designs utilized in the Deese's residence are typical in the industry for all climatic conditions and have been approved by all of the DAPLA's as required by the regulations. These designs have been reviewed and inspected in-plant by IBTS, HUD agent, and they have determined the constructions method utilized in the Deese's residence conforms to section 3280.504 (b) of the HUD Standard.

In Mr. Parks's conclusion 2), negative air pressure within the home caused by an improper ventilation system is incorrect in stating negative pressure is within the home and caused by an improper ventilation system.

Mr. Parks never tested the whole house ventilation system during his inspection, but did run extensive leakage tests on the home. During his test, he did not activate the ventilation system to assess whether a negative pressure results. Therefore, his conclusion that additional negative pressure created by the whole house ventilation system is without substantiation and incorrect.

The Deese's house is provided with a whole house ventilation system which consists of a Ventline, model V2270-50 fan, located in the ceiling of the hallway.

Section 3280.103 requires a ventilation system having a capacity of .035 cfm per square foot of interior floor space. "The ventilation capacity may be provided by: A mechanical system, or a passive system, or a combination passive and mechanical system." "The ventilation system or provisions shall not create a positive pressure in $U_o$ value Zone 2 and 3 or a negative pressure condition in $U_o$ value Zone 1. Mechanical systems shall be balanced. Combination passive and mechanical systems shall have adequately size inlets

or exhaust to release and unbalanced pressure...temporary imbalances due to gusting or high winds are permitted."

The Deese house is provided with a combination mechanical and passive system. The mechanical part of the system is the Ventline fan model V2270-50 (see attached approved DAPIA pages for this model). Ventline states in their literature that the fan is to be used as a whole house ventilation system "when used as directed, your Ventline whole house ventilation system will improve indoor air quality by exhausting stale indoor air and replacing it with fresh outdoor air."  The inlet or passive part of the system is accomplished through the bath vent fans (model V2270-50) and the kitchen range hood (model PR).  The Passive system of airflow was tested for Ventline in 1997 by a registered professional in accordance with the test protocol described in the Levy Partnership Report of March 3, 1997: "Measured air flow capacity through engineered orifices' comparative testing of passive ventilators in manufactured homes."   HUD has accepted the levy test protocol to show equivalency to a 3" diameter hole inlet in the wall. the bath fans and kitchen range hood will relieve the negative pressure in thermal U value Zone I, and will conform with section 3280.103 of the HUD Standard (see attached test report for Ventline exhaust fan).

The Ventline test data clearly shows that using an exhaust fan in conjunction with relief inlets such as bath fans (model V2270-50) and kitchen range hood (Model PR) can bring in the required whole house ventilation air without creating additional negative pressure in the home

 During my inspection Mr. Colin set up a pressure test in the home to determine if the combination passive and mechanical system provided in the Deese home met the requirements of 3280.103 (b) of the HUD Standards. The results of the test confirmed that the combination mechanical and passive whole house ventilation system made up of the Ventline mechanical exhaust and the relief inlets provided by bath fans and a kitchen range hood create a passive system that did not induce additional negative pressure in the home when operating. The conclusion is that the two bath fans and range hood provided in the Deese's house will supply sufficient air intake not to allow any negative pressure in the home when the whole house ventilation system is operating, and therefore conforming to the requirements in section 3280.103.

Based upon a reasonable degree of engineering certainty, it is my opinion that the whole house ventilation system provided in the Deese house conforms to section 3280.103 (b) of the HUD Standards.

Mr. Parks also states in his conclusion that "the combination of the above problems have created extremely moist conditions within the perimeter walls. This moisture has caused structural deterioration and created fungal growth within the wall structure."  At the time

of my inspection I visually examined and applied pressure to walls throughout the home and I did not find any walls that were moist to the touch, deteriorating, or signs of fungal growth. All of the walls were sound and within industry standards. A receptacle was removed from the wall in the rear bedroom to examine the wall cavity. The cavity was dry and there were no signs of moisture, mold or mildew. The fiberglass insulation was inspected and found to be intact without any signs of moisture. It should be noted that the hole in the wall at receptacle location would show signs of moisture before other areas of the walls since it would be a possible airflow path.

In "issue 1" on page 4 of Mr. Parks report, he states "Figure 3 depicts the wall standard which was found to be utilized in the construction of the Deese's home." The type of construction in figure 3 represents a wall constructed to 3280.504(b) 1, which is code compliant. Mr. Parks fails to note in his report that the wall also is a ventilated wall cavity which conforms to section 3280.504(b) (3). Mr. Parks concludes that the wall in Deese's home is built to figure 3, which conforms to the HUD Standard.

Page 5 of Mr. Parks report identifies examples of heat transfer found within the walls near the ceiling of the Deese's home by using an infrared camera. I assume Mr. Parks took readings throughout the home and only identified two small areas in two rooms where differences in color existed. The range in temperatures at the locations were not identified in his report. The HUD Standard addresses areas such as the ones shown in the pictures under section 3280.508(c), and refers to these low-R-value heat-flow paths as thermal shorts. The HUD Standards permit a total of 1% of the total exterior surface area to be classified as thermal shorts. The areas identified by the infrared pictures have an aggregate area far less than the 1% permitted by the Standards. Therefore, the areas identified by Mr. Parks are known as thermal shorts and conform to the HUD Standards.

In "issue 2", on page 6, Mr. Parks states that the ventilation system expels air from the home. Mr. Parks is correct, however, Mr. Parks does not address the fact that the home is provided with bath fans and a range hood which are approved inlets to relief and any negative pressure from the home when the whole house ventilation system is operating, which conforms with section 3280.103 of the HUD Standard. If Mr. Parks would address the entire system that exists in the Deese's home, both the mechanical portion (bath exhaust fan) and the passive inlet portion (two bath fans and a kitchen range hood), he must agree with the test data sealed by a Registered Professional Engineer for the Ventline fan in accordance with the approved HUD protocol, that this system conforms with section 3280.103 of The HUD Standard.

**Mr. Kondner, P.E. report dated October 13, 2006**

Mr. Kondner has provided a narrative of generalization (nothing specific to the Deese's residence) on vinyl wall board in hot and humid climates without providing any

documented technical data substantiating his position. Mr. Kondner is basing his opinion only on the reports of Mr. Parks and Mr. Bonney, which are inaccurate.

The HUD Standard provides specific prescriptive options for condensation control which must be met to meet the Standard. The HUD Code was established through a consensus committee and approved by the Department of Housing and Urban Development using conclusive documented technical data provided by knowledgeable professionals to establish the code and good engineering practice.

The walls constructed in the Deese's house by Homes of Legend conform to the requirements prescriptive of sections 3280.504 and 3280.103, and therefore meet the HUD Code and established good engineering practice.

## Mr. R.T. Bonney report dated June 6, 2006

Mr. R.T. Bonney's report does not give specific code violations, but only reference on the final page of his report that "wet condition occurring in the vinyl covered wall board." My visual inspection of the wall surface and the cavity at the location where a receptacle was removed showed all of the walls were dry and within industry standards.
Conclusion:
Walls constructed to section 3280.504(b) (1) and 3280.504(b) (3) of the HUD Standards and whole house ventilation systems consisting of a combination mechanical and passive system conforming to section 3280.103 of the HUD Standard are utilized by most of the manufacturer's building HUD Code homes. To a reasonable degree of engineering certainty, the wall construction and the whole house ventilation system in the Deese's home conforms to section 3280.504(b) (1), 3280.504(b) (3), and 3280.103 of the Federal Manufactured Home Construction & Safety Standards.

If you have questions on the above report, please do not hesitate to contact the undersigned.

David R. Tompos, P.E.
NTA, Inc.

DRT:ap

**MHI**

*Manufactured Housing Institute*

## MEMORANDUM

To:          Manufacturer Certified Representatives
                    Supplier Certified Representatives
                    Technical Activities Committee

From:       Frank Walter, P.E.

Date:        April 3, 1997

Subject:    Housing Alert -- HUD Settles the Whole-House Ventilation Issue

Yesterday we faxed to MHI members a copy of the enclosed Housing Alert. As we indicated in the Alert, enclosed with this memo is a copy of the HUD's letter and the test report by the consultant, the Levy Partnership, Inc.

Enclosures (3)

# HOUSING ALERT
## MHI

### HUD Settles the Whole-House Ventilation Issue as Proposed by Industry

April 2, 1997, Arlington, VA -- Acknowledging industry concerns, HUD has concluded that manufacturers may use the existing openings in the bathroom and kitchen ventilation systems to meet the whole-house ventilation requirements. HUD's determination was announced in a March 31 letter to the Manufactured Housing Technical Exchange Group (TEG) secretariat at MHI. The TEG, which was organized in 1985, is a consensus forum of engineers and technicians with interests in the HUD manufactured home program. The TEG and MHI have been pursuing a positive resolution to this issue for more than 14 months. In their effort, the TEG engaged a consultant, at MHI's expense, to conduct a test to verify the passive capacity of bathroom and kitchen exhaust systems as sufficient to meet requirements under subpart 3280.103(b)(3) of the Manufactured Home Construction and Safety Standards.

After examining the consultant's test results, HUD acknowledged that, by meeting certain conditions, the current passive openings are sufficient, individually or collectively, in meeting the whole-house ventilation requirements. One of the conditions is that the assembly is to be evaluated in accordance with the test protocol described in the consultant's report. A copy of the HUD's letter, as well as the test protocol, is being mailed to manufacturers' and suppliers' certified representatives and members of the Technical Activities Committee. Anyone else interested in a copy of the letter and the test report should contact MHI's Technical Activities Department at (703) 558-0400 or by e-mailing Keisha@mfghome.org.

With HUD's acceptance of the test protocol, manufacturers now have the option of meeting the whole-house ventilation requirements without having to incorporate an opening in the wall of each home. Manufacturers must bring all their designs for whole-house ventilation systems into compliance by June 1, 1997.

Suppliers of products involved in the testing have been notified to identify their approved products for their clients.

The Levy Partnership, Inc.

---

## FOR YOUR INFORMATION

---

To:                      David Tompos
Company:                 NTA, Inc.
Fax number:              +1 (219) 773-2732
Business phone

From:                    Emanuel Levy
Fax number:              +1 (212) 666-5389
Home phone:
Business phone           (212) 666-7100

Date & Time:             4/4/97  5:00:21 PM
Pages sent               3
Re                       Whole house ventilation compliance under the HUD code

---

Letter attached

220 West 93rd Street
11th Floor
New York, NY 10025

April 4, 1997

MEMORANDUM

By facsimile

From:        Francis Conlin, The Levy Partnership, Inc.

Date:        April 4, 1997

Subject:     **Instructions for testing exhaust fan products for passive exhaust capability**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Bathroom and kitchen exhaust fan products and assemblies may now qualify as providing the required exhaust for whole house ventilation systems in lieu of dedicated side wall vents.

This was demonstrated through testing conducted by The Levy Partnership, Inc. (TLP) for the MHI TEG and accepted by the Director of the Office of Consumer and Regulatory Affairs of HUD by letter of March 31, 1997. The Housing and Building Technology Division (HBT) of NCSBCS and all DAPIA's have been advised of this determination and have been instructed to bring whole house ventilation systems into compliance by June 1, 1997.

Pursuant to the HUD letter, any product or assembly to be designated as the passive exhaust for the whole house ventilation system must be tested in accordance with the accepted protocols. The following is a description of how to submit products and assemblies for testing:

Submit the following:

1.  Four (4) samples of the product(s) or assembly(ies) to be tested (multiple products are tested together to develop a sample average);
2.  product installation and operating instructions;
3.  connecting ducts, inlet and termination grilles used in assembly;
4.  any special instructions about how the product is installed.

Include the testing fee with product samples

The cost per product is $1,200. Checks should be made out to:
*The Levy Partnership, Inc.*

Ship products (UPS or overnight courier preferred) and testing fee to:

> Francis Conlin
> The Levy Partnership, Inc.
> 133 Marlon Drive
> Chapel Hill, NC 27514
> (919) 942-8256
> (919) 932-5597 (fax)
> E-mail: comfortwks@aol.com

TLP will evaluate the product applying the test protocol described in the TLP report *"Measured air flow capacity through engineered orifices: comparative testing of passive ventilators in manufactured homes,"* (March 1997). A report will be issued within one week of the test.

The test chamber is designed to accommodate most through the wall and through the ceiling applications. Products or assemblies that require significant modification to the test chamber may be subject to additional charges.

Please notify TLP in advance of submitting product samples.

The Levy Partnership, Inc.
220 West 93rd Street, 11th Floor
New York, New York 10025
(212) 666-7100
(212) 666-5389 (FAX)
tlpny@earthlink.net (E-mail)

March 4, 1997



Mr. David Williamson, Director
Office of Consumer and Regulatory Affairs
Department of Housing and Urban Development
451 Seventh Street, SW  Room 9156
Washington, DC  20410-8000

Dear Mr. Williamson,

Pursuant to the request of the Manufactured Housing Technical Exchange Group (TEG), my office conducted a series of tests measuring the air flow capacity of engineered orifices in manufactured homes.

The report of our findings is attached.  I hope this information is useful in your deliberations with regard to compliance under the ventilation provisions of the HUD standards.  We will be providing copies of the results to the TEG and the manufacturers and suppliers that furnished products for the tests.

Please contact me if you have any questions or require clarifications of the material presented in the report.

Sincerely yours,
The Levy Partnership, Inc.

Emanuel Levy
President

cc.    Ms. Marion F. Connell, US Dept. of HUD
       Mr. John Stevens, US Dept. of HUD
       Frank Walter, Secretary, Manufactured Housing TEG

The Levy Partnership, Inc.

# Measured air flow capacity through engineered orifices

## Comparative testing of passive ventilators in manufactured homes

March 3, 1997

220 West 93rd Street, New York, NY 10025 • (212) 666-7100 • (212) 666-5389 (fax) • tlpny@earthlink.net (e-mail)

# Measured air flow capacity through engineered orifices in manufactured homes

**The Levy Partnership, Inc.**
Francis Conlin, PE
Emanuel Levy
William Warren

March 3, 1997

## Introduction

This report describes tests which were designed to examine the relative air flow capacity of different engineered orifices found in HUD-code manufactured homes. A whole house ventilation system is required by the HUD standards section §3280.103(b)(3). The text of section contains the following passage: "Combination passive and mechanical systems shall have adequately sized inlets or exhaust to release any unbalanced pressure." A current industry accepted practice is the use of mechanical supply coupled with passive side wall vents. The dedicated side wall vents have generated consumer complaints from homeowners who, in many cases, block the vent opening interfering with its performance. The tests described herein, are intended to determine whether other orifices present in the home are equivalent or superior to the side wall vents in their capacity to create a balanced pressure thus rendering the side vent redundant and unnecessary.

Besides the side wall vent, homes are equipped with kitchen range exhaust systems and bathroom ventilators that serve as passive ventilators when their fans are not operating. The occupant operated bathroom ventilators are also used in hallways and utility rooms to exhaust air mechanically. The testing compared air flow capacity of two examples of each product type, selected at random, with two of the more commonly used dedicated side wall vent products. The comparisons were made with the aid of a test chamber fitted with a calibrated fan and a digital micro-manometer for measuring the air flow through each of these orifices.

Air flow data measured in cubic feet per minute (CFM) were collected over a range of pressures. The relationship between air flow and pressure is an indicator of the capacity of the orifice to act as a ventilator, the higher the airflow at a given pressure the higher the capacity. Measured data and a calculated trend line for the six products tested are shown by the accompanying diagram (see figure 1). The curves profile the capacity of each of the orifices tested. The curves correspond to the following types of ventilation products:

## Recommendations

- All of the products except one of the kitchen exhaust systems (curve D) should be accepted as having equal or greater air flow capacity at all pressures when compared to the minimum accepted side wall vent (curve A).
- In order to certify the kitchen exhaust system characterized by curve D as equivalent or superior in capacity to the minimum design side wall vent, changes are required in its damper design to assure that air is exfiltrated at low pressures.
- The combined capacity of all engineered orifices should be considered when determining if these vents have sufficient capacity when compared to minimum side wall vent. If the bathroom ventilators are to be a part of the system, measures must be taken to allow relatively unobstructed air flow into the bathroom when doors are shut (such as, door undercuts or transom vents). Specific designs should be subject to DAPIA approval.
- Other combinations of orifices intended as substitutes for the side wall vents should be similarly tested.



Figure 1
Relative air flow from engineered orifices in manufactured homes

Appendix A:  **Testing protocol**

## Summary

The objective is to demonstrate that typical manufactured housing kitchen and bathroom exhaust fan openings have sufficient capacity to exhaust 0.10 air changes per hour (ach) as specified by §Section 3280.103(b)(7) of the HUD Manufactured Housing Construction and Safety Standards.  This test will characterize air flow as a function of driving pressure through a standard manufactured housing side-wall relief vent and through the openings provided by the bathroom and kitchen fans (not operating).  The tests will cover the range of air flows required to provide 0.1 ach for typical manufactured home volumes.

## Procedure

Airflow through different orifices will be characterized by establishing the constants in the equation describing airflow through openings in buildings (ASHRAE Fundamentals 1989, F23.7 Equation 16):

$$cfm = C \, \Delta P_n$$

where:   cfm = the airflow through a hole
C = the flow coefficient constant
$\Delta P$ = the pressure difference across the hole
n = the dimensionless flow exponent constant (for sharp edged orifices = 0.5)

Measurements of cfm through each orifice will be taken for several pressure differences within the range of interest.  The constants C and n will be derived through a standard curve fitting approach.  The curve fit will be tested to ensure an appropriate correlation coefficient.  These results will be compared graphically.

A test chamber is to be constructed from plywood in the approximate dimensions of 5'x 4'x 3'.  Two ends of the chamber will be made from 2"x 4" wall panels fabricated at a manufactured housing plant.  On a perpendicular side of the box a calibrated duct fan will be mounted to pressurize the box.  The box will be constructed such that the test panels can be removed and replaced with other test panels.  The plywood box will be tested to assure it develops a uniform pressure drop under dynamic conditions.

The test chamber will have at least the following orifice arrangements:
1. From one to four side-wall exhaust vents mounted in the wall panel
2. One kitchen fan and one bathroom fan exhaust vent including ducting and the roof-top terminations mounted through the top of the box.

Additional testing configurations to be considered:
1. One kitchen fan exhaust vent mounted through the wall with exterior wall termination.

## Visual Tests

- Fill the test chamber with smoke for a visual representation of the various flows. Demonstrate the damper opening characteristics. Note at what pressures the orifice opens and measure the damper opening.

## Analysis

- Plot airflow through the orifice as a function of driving pressure for each orifice on the same graph.
- Convert to air flow using the following equation:

$$\text{cfm} = C \, \Delta P_n \quad \text{to} \quad \text{Log (cfm)} = n \, \text{Log (P)} + \text{Log (C)}$$

- Solve for slope = n and intercept = Log (C)
- Check the correlation coefficient to be sure the model represents the actual data within accepted tolerance levels.

202 755 0303
03/31/97  17:27   US DEPT OF HUD → 97035560001                    No.002/003



U. S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

MAR 31 1997

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

Mr. Frank Walter P.E.
Secretary
Manufactured Housing TEG
Manufactured Housing Institute
2101 Wilson Blvd., Suite 610
Arlington, VA  22201

Dear Mr. Walter:

   This is in response to your request of January 22, 1997, for the Department to consider whole house ventilation systems using the passive exhaust capability of bathroom and kitchen exhaust fans.  The Department agreed, and tests were then performed by the Levy Partnership, to establish the passive airflow capacity of certain bathroom and kitchen exhaust fan assemblies relative to DAPIA-approved side wall exhaust vent assemblies.

   Based upon the test results, the Department has determined there is a basis to consider the passive capacity of bathroom and kitchen exhaust fan assemblies to be used either individually or in combination to provide the required exhaust for whole house ventilation systems [24 CFR 3280.103(b)].  However, any such assembly approved for this purpose must meet the following conditions:

   1.   The assembly is evaluated in accordance with the test protocol described in the Levy Partnership report of March 3, 1997:  "Measured air flow capacity through engineered orifices/Comparative testing of passive ventilators in manufactured homes".

   2.   The bathroom or kitchen exhaust system tested must demonstrate a capacity that is equal to or greater than the capacity of an exhaust vent assembly which is currently DAPIA-approved.  The required capacity shall be demonstrated for the entire range of comparative pressures evaluated in the report.

   3.   The tested assembly demonstrates air flow over the entire range of comparative pressures evaluated in the report. (Note:  the kitchen exhaust assembly represented by curve "D" in the report would not be acceptable as an individual vent system because there was no air flow through the system at a pressure of 8 pascals or below.)

2

4. Where an individual side wall vent, bathroom, or kitchen exhaust fan assembly has less capacity than the capacity of the side wall vent designated by curve "A" in the report, it may be combined with another assembly to meet the equal or greater requirement. The combined capacity is to provide an airflow of at least 5 cubic feet per minute when measured at a test pressure of 10 pascals.

5. A bathroom exhaust fan assembly that meets the above criteria may be used in a hallway or utility room or in a bathroom if the bathroom is provided with a grill or register from the home's air distribution system.

The Department recognizes that this determination revises criteria for approving whole house ventilation systems, and that it would be reasonable to allow additional time for other systems to be tested in order for manufacturers to obtain the necessary design approval. Therefore, by copy of this letter, the Housing and Building Technology Division (HBT) of the National Conference of States on Building Codes and Standards (NCSBCS), and all DAPIA's, are being advised of this determination and are hereby instructed to allow manufacturers to bring all their designs for whole house ventilation systems into compliance by June 1, 1997. On June 2, 1997, HBT/NCSBCS is instructed to report that all non-conforming designs have been withdrawn.

Thank you for your patience and cooperation in helping the Department resolve this matter. If you have any questions, please contact John Stevens at (202) 708-6423, ext. 5599.

Sincerely,

David R. Williamson
Director
Office of Consumer
   and Regulatory Affairs

# Ventline Engineering Bulletin

Date    April 7, 1997

From    Ventline Engineering Department

Subject:   Whole House Ventilation Changes

As many of you have been notified, recent changes in the enforcement of the HUD Manufactured Housing Construction and Safety Standards will allow bath fans and range hoods to act as passive pressure relief vents for combination mechanical / passive whole house ventilation systems.

In a communication from HUD, it was noted that testing has been conducted by The Levy Partnership in order to validate a test protocol which manufacturers will be subjected to. This test protocol has been accepted by HUD. The tests conducted by the Levy Partnership were not intended to determine the acceptability of any specific manufacturers products. Each manufacturer will be required to demonstrate compliance of their product.

While these tests were not intended to determine the acceptability of any specific manufacturers products, we are happy to say that Ventline products were used for the testing and meet all test criteria. To quote the Levy report, "Both kitchen exhaust systems and bathroom ventilators had higher flow rates at equivalent pressures and therefore possess air flow capacities in excess of a DAPIA pressures and therefore possess air flow capacities in excess of a DAPIA accepted product. These products should be acknowledged by HUD as complying with the aforementioned provisions of section §3280.103(b)(3)."

Independent tests will be conducted which will conclusively demonstrate that Ventline products meet all of the revised requirements for passive pressure relief. Ventline will expedite these tests and issue test reports to all interested parties upon completion

# Ventline Engineering Bulletin

Date:      April 29, 1997

To:        All Interested Parties

From:      Robert J Luter II, Engineering Manager

Subject:   Whole House Ventilation Changes

As you have been notified, recent changes in the enforcement of the HUD Manufactured Housing Construction and Safety Standards will allow bath fans and range hoods to act as passive pressure relief vents for combination mechanical / passive whole house ventilation systems.

In a communication from HUD, it was noted that testing has been conducted by The Levy Partnership in order to validate a test protocol which manufacturers will be subjected to. This test protocol has been accepted by HUD. The tests conducted by the Levy Partnership were not intended to determine the acceptability of any specific manufacturers products. Each manufacturer will be required to demonstrate compliance of their product.

Attached are results of tests conducted in accordance with the accepted Levy Partnership test protocol which demonstrate that Ventline ventilation products are in complete compliance and may be used as passive pressure relief in lieu of dedicated sidewall vents.

Please note that these tests apply solely to products manufactured by Ventline and do not apply to ventilation products which are manufactured by others.



DIVISION OF PHILIPS PRODUCTS

# MEASURING THE CAPACITY TO EXHAUST UNBALANCED PRESSURE IN MANUFACTURED HOMES.

Robert J. Luter, Engineering Manager
Matthew J. Copeland, Project Engineer

April 25, 1997

## Abstract

This report details the testing procedure used to measure the ability of various VENTLINE products to relieve unbalanced pressure in manufactured housing. The tests are in response to new criteria for approving whole house ventilation as outlined by David R. Williamson, Director, Office of Consumer and Regulatory Affairs. Refer to HUD standards 24 CFR 3280 103(b)(3) and correspondence from David Williamson to Frank Walter, P.E., Manufactured Housing Institute dated 3/31/97.

All data is gathered and evaluated in a manner that will allow direct correlation with the approved results outlined in the Levy Partnership, Inc. report of March 3, 1997: "Measured air flow capacity through engineered orifices".

All products were tested over a pressure imbalance range of 0 to 100 Pa and plotted against data from an approved DAPIA Product. Every Ventline product tested exceeded the requirements outlined in the results section.





FIGURE A
AIR TEST CHAMBER
(NOT TO SCALE)

PLANE A: ENGINEERED ORIFICE PLANE.
PRESSURE DIFFERENTIAL OCCURS
ACROSS THIS PLANE.

PLANE B: VENTURI NOZZLE PLANE.
AIR FLOW MEASURED
ACROSS THIS PLANE.

Test equipment

Laboratory equipment used:

Beehler B-1500-R-1993 Air Test Chamber.
     -Range: 0-1500 CFM
     -Calibrated from 3.7 CFM to 1477.1 CFM at 69 deg. F and 0.075 Dg.

Meriam Inclined tube manometers 406D10 WM and 40HEX35 WM
     -0 to 249 Pa. (0-1" Water Column)
     -Accuracy: 0.62 Pa (+/- 1/4 smallest division).

Princo Nova 469 fortin type mercurial barometer.

Taylor glass bulb wet/dry thermometers.

Test Setup:

The air test chamber creates a differential pressure across the engineered orifice. An air tight partition separates the two sides and is sealed to the chamber. Four separate static pressure taps measure the pressure on the exhaust side of the vent. Exhaust air flow is measured as a pressure drop across nozzles (8 separate taps) in accordance with A.M.C.A. published standard (bul. 210, fig. 12). See Fig. A. Air density is calculated and recorded for the purpose of calculating the actual volume flow rates for the given ambient conditions.



Procedure

Initialization tests (ref.: Levy, P. 6):

    -Zero leakage and smoke tests:

Before each product model was tested, a smoke bomb was dropped in the test chamber at a pressure of 25 Pa. The integrity of the chamber was verified as well as the seal between the partition and the test chamber.

    -Uniform pressure drop:

Uniform pressure drop is created due to the addition of multiple settling screens and engineered venturi orifices, ref: A.M.C.A bul. 210. See Fig. A.

Orifice Tests:

• Four identical units of each product tested were randomly chosen from inventory.

• The first unit was set up as it would be installed in a house. This includes all dampers, filters, and outside vents or roof caps (see test product descriptions)

• The product was attached to the air test chamber is the above mentioned manner (see figure A).

• Manometers were tared and ambient air density was recorded.

• Air flow was measured through the product (with the fan not in operation). 13 data points were taken form 0 to 100 Pascals. The pressure was allowed to stabilize between readings.

• The test was repeated for all four identical units and the results were averaged. All five models were tested in the same manner.



## Test product descriptions

1) PH series range hoods were randomly selected from stock and numbered 1 through 4 for testing. A V2111 outlet vent was mechanically fastened to the outlet. Installed to simulate a field setup, all components were in place. This test is representative of all PH hoods and PC horizontal discharge hoods as the air flow paths are identical (see list 1 below)

2) PR series range hoods were randomly chosen from stock and numbered 1 through 4 for testing. A V2005 5" roof cap was mechanically fastened to the outlet vent. All system components were in place. This test is representative of all 5" PR and PI hoods as the air flow paths are identical. 7" discharge models PS and PL were not tested, as the 5" outlet represents the worst case scenario (see list 2 below).

3) V2262 series bathroom vents were chosen randomly from stock and labeled A through D for testing. A VB0541 7" roof cap was mechanically fastened to the outlet vent. All system components were in place. This test is representative of all 7" ceiling insert fans, including V2244, as the air flow paths are identical (see list 3 below).

4) V2265 series bathroom vents were randomly chosen from stock and labeled A through D for testing. A V2058 4" roof cap was mechanically fastened to the outlet. All system components were in place. This test is representative of all 4" side discharge fans, including V2245 and V2158, as the air flow paths are identical (see list 4 below).

5) V2270 series bath fans were taken from first run evaluation samples and labeled A through E for testing. 3" flex duct was fastened to the outlet. A standard 3" roof cap was fastened to the other end of the flex duct. All system components were in place. This test is representative of all 3" side discharge fans as the air flow paths are identical (see list 5 below).

6) Side wall vent 'A'. A DAPIA approved Evcon wall vent tested by Levy is referenced. This curve is taken directly from the above mentioned Levy report. The given equation is cfm = 1.77319*(Pressure imbalance)^.52074.

7) S numbers have been developed from standard model numbers with special features, for example, S636-42W is the same as PR50. Special features do not affect pressure relief characteristics.

### LIST OF MODEL NUMBERS

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| PH40 | PR50 | V2262-50 | V2265-50 | V2270-50 |
| PH41 | PR61 | V2262-75 | V2246-50 | V2270-65 |
| PH50 | PR61 | V2262-100 | V2158-01 | V2270-75 |
| PH51 | PI50 | V2244-50 | V2158-2 | V2280-50 |
| PH61 | PI51 | V2244-75 | | V2280-75 |
| PC40 | PS50 | V2244-100 | | |
| PC50 | PL50 | S0598-50 | | |
| PC61 | | S0598-75 | | |
| | | S0598-100 | | |
| | | S0599-50 | | |
| | | S0599-75 | | |
| | | S0599-100 | | |



Results

The pass/fail criteria as outlined in the above mentioned letter is as follows:

All Products must meet both of the following criteria:

1) The tested assembly demonstrates air flow over the entire range of comparative pressures evaluated in the Levy report.

2)

    A) The ventilation system tested must demonstrate a capacity that is equal to or greater than the capacity of a pressure relief vent which is currently DAPIA approved.

                    or

    B) The ventilation system tested must demonstrate a capacity for air flow of at least 5 cubic feet per minute when measured at a test pressure of 10 Pascals.

Results follow in both table and graph form. Graphs show the mean values of all four product tests.



# VENTLINE LABORATORY PERFORMANCE RESULTS
## PRODUCT: VENTLINE 'V2282REV'

| ENTER PHYSICAL CONSTANTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| First Nozzle diameter (ft.): | 0.042 | 0.042 | 0.083 | 0.083 | 0.083 | 0.083 | 0.133 |
| Second nozzle diameter (ft.): | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Fan discharge area (ft): | 0.267 | 0.267 | 0.267 | 0.267 | 0.267 | 0.267 | 0.267 |

| ENTER AIR VARIABLES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Barometric pressure (IN Hg): | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 |
| Wet-bulb Temperature (F): | 87 | 67 | 87 | 67 | 67 | 67 | 67 |
| Dry-bulb temperature (F): | 73 | 73 | 73 | 73 | 73 | 73 | 73 |
| Static Pressure (IN H2O): | 0.010 | 0.040 | 0.050 | 0.080 | 0.100 | 0.260 | 0.400 |
| Differential pressure (IN H2O): | 0.555 | 2.000 | 0.295 | 0.512 | 0.662 | 1.757 | 0.425 |

| ENTER MOTOR DATA | | | | | | | |
|---|---|---|---|---|---|---|---|
| Motor speed (RPM): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Voltage to motor (V): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Current to motor (A): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Power to motor (W): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

| NUMERICAL CALCULATIONS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nozzle area | 0.001 | 0.001 | 0.005 | 0.005 | 0.006 | 0.005 | 0.014 |
| Vapor pressure, saturation | 0.578 | 0.578 | 0.578 | 0.678 | 0.578 | 0.678 | 0.578 |
| Vapor pressure, partial | 0.512 | 0.512 | 0.512 | 0.512 | 0.512 | 0.512 | 0.512 |
| Ambient air density | 0.0729 | 0.0729 | 0.0729 | 0.0729 | 0.0729 | 0.0729 | 0.0729 |
| Chamber air density | 0.0728 | 0.0729 | 0.0730 | 0.0730 | 0.0730 | 0.0730 | 0.0730 |
| Air viscosity | 1.2314E-C5 | 1.231E-05 | 1.231E-05 | 1.231E-05 | 1.231E-05 | 1.231E-05 | 1.23E-05 |
| Velocity pressure | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.001 | 0.001 |
| Total pressure | 0.010 | 0.040 | 0.050 | 0.080 | 0.100 | 0.251 | 0.401 |
| Reynolds number of nozzle | 12436 | 23609 | 18134 | 23891 | 27187 | 44266 | 34311 |
| Fan output horsepower | 0.0000 | 0.0000 | 0.0001 | 0.0002 | 0.0003 | 0.0011 | 0.0023 |
| Nozzle velocity | 3023.2 | 5738.8 | 2204.0 | 2903.5 | 3301.4 | 5377.4 | 2644.3 |
| Expansion factor | 0.9992 | 0.9973 | 0.9998 | 0.9993 | 0.9991 | 0.9976 | 0.9994 |
| Discharge coefficient | 0.9492 | 0.9608 | 0.9582 | 0.9608 | 0.9629 | 0.9698 | 0.9865 |
| Uncorrected nozzle flow rate | 3.91 | 7.50 | 11.49 | 15.21 | 17.32 | 28.37 | 35.66 |

| CORRECTION FACTORS | | | | | | | |
|---|---|---|---|---|---|---|---|
| X | 2.49E-05 | 9.98E-05 | 1.25E-04 | 1.99E-04 | 2.49E-04 | 6.23E-04 | 9.98E-04 |
| Xc | 2.52E-05 | 1.01E-04 | 1.26E-04 | 2.02E-04 | 2.53E-04 | 6.32E-04 | 1.01E-03 |
| Z | 7.12E-06 | 2.85E-05 | 3.56E-05 | 5.70E-05 | 7.13E-05 | 1.78E-04 | 2.85E-04 |
| Z/Zc | 9.88E-01 | 9.88E-01 | 9.86E-01 | 9.86E-01 | 9.86E-01 | 9.88E-01 | 9.86E-01 |
| Zc | 7.22E-06 | 2.89E-06 | 3.61E-05 | 5.78E-05 | 7.23E-05 | 1.81E-04 | 2.89E-04 |
| Kp/Kpc | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 |

| VOLUMETRIC AIR FLOW RESULTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Corrected nozzle flow rate (cfm) | 3.91 | 7.50 | 11.49 | 15.21 | 17.32 | 28.37 | 35.66 |
| Adjusted fan discharge flow rate (cfm) | 3.91 | 7.50 | 11.49 | 15.21 | 17.33 | 28.39 | 35.70 |
| Adjusted standard flow rate (cfm) | 3.80 | 7.29 | 11.18 | 14.79 | 16.86 | 27.61 | 34.72 |
| | 2.5 Pa | 10.0 Pa | 12.4 Pa | 19.9 Pa | 24.9 Pa | 62.3 Pa | 100 Pa |

# VENTLINE LABORATORY PERFORMANCE RESULTS

## PRODUCT: VENTLINE 'PC_REV'

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **ENTER PHYSICAL CONSTANTS** | | | | | | | |
| First Nozzle diameter (ft.): | 0.042 | 0.042 | 0.083 | 0.083 | 0.083 | 0.083 | 0.083 |
| Second nozzle diameter (ft.): | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Fan discharge area (ft) | 0.198 | 0.198 | 0.198 | 0.198 | 0.198 | 0.198 | 0.198 |
| **ENTER AIR VARIABLES** | | | | | | | |
| Barometric pressure (IN Hg): | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 |
| Wet-bulb Temperature (F): | 62 | 62 | 62 | 62 | 62 | 62 | 62 |
| Dry-bulb temperature (F): | 70 | 70 | 70 | 70 | 70 | 70 | 70 |
| Static Pressure (IN H2O): | 0.010 | 0.040 | 0.050 | 0.080 | 0.100 | 0.250 | 0.400 |
| Differential pressure (IN H2O): | 0.680 | 1.900 | 0.170 | 0.285 | 0.360 | 1.093 | 2.347 |
| **ENTER MOTOR DATA** | | | | | | | |
| Motor speed (RPM): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Voltage to motor (V): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Current to motor (A): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Power to motor (W): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **NUMERICAL CALCULATIONS** | | | | | | | |
| Nozzle area | 0.001 | 0.001 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 |
| Vapor pressure, saturation | 0.435 | 0.435 | 0.435 | 0.435 | 0.435 | 0.435 | 0.435 |
| Vapor pressure, partial | 0.347 | 0.347 | 0.347 | 0.347 | 0.347 | 0.347 | 0.347 |
| Ambient air density | 0.0735 | 0.0735 | 0.0735 | 0.0735 | 0.0735 | 0.0735 | 0.0735 |
| Chamber air density | 0.0735 | 0.0735 | 0.0735 | 0.0735 | 0.0735 | 0.0736 | 0.0736 |
| Air viscosity | 1.226E-05 | 1.226E-05 | 1.23E-05 | 1.23E-05 | 1.23E-05 | 1.226E-05 | 1.23E-05 |
| Velocity pressure | 0.000 | 0.000 | 0.000 | 0.085 | 0.100 | 0.001 | 0.002 |
| Total pressure | 0.010 | 0.040 | 0.050 | 0.085 | 0.100 | 0.251 | 0.402 |
| Reynolds number of nozzle | 12819 | 23202 | 13881 | 17873 | 20201 | 35205 | 51598 |
| Fan output horsepower | 0.0000 | 0.0001 | 0.0001 | 0.0002 | 0.0002 | 0.0009 | 0.0021 |
| Nozzle velocity | 3078.5 | 5571.8 | 1666.8 | 2157.8 | 2425.1 | 4224.9 | 6189.8 |
| Expansion factor | 0.9992 | 0.9974 | 0.9998 | 0.9996 | 0.9995 | 0.9985 | 0.9988 |
| Discharge coefficient | 0.9498 | 0.9604 | 0.9513 | 0.9560 | 0.9581 | 0.9667 | 0.9717 |
| Uncorrected nozzle flow rate | 3.98 | 7.28 | 8.85 | 11.25 | 12.67 | 22.24 | 32.70 |
| **CORRECTION FACTORS** | | | | | | | |
| X | 2.49E-05 | 8.87E-05 | 1.25E-04 | 1.99E-04 | 2.49E-04 | 6.24E-04 | 9.99E-04 |
| Xc | 2.51E-05 | 1.00E-04 | 1.25E-04 | 2.01E-04 | 2.51E-04 | 6.27E-04 | 1.00E-03 |
| Z | 7.13E-06 | 2.85E-05 | 3.56E-05 | 5.70E-05 | 7.13E-05 | 1.78E-04 | 2.86E-04 |
| Z/Zc | 9.94E-01 | 9.94E-01 | 9.94E-01 | 9.94E-01 | 9.84E-01 | 9.94E-01 | 9.94E-01 |
| Zc | 7.17E-06 | 2.87E-05 | 3.59E-05 | 5.74E-05 | 7.17E-05 | 1.78E-04 | 2.87E-04 |
| Kp/Kpc | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 |
| **VOLUMETRIC AIR FLOW RESULTS** | | | | | | | |
| Corrected nozzle flow rate (cfm) | 3.98 | 7.28 | 8.65 | 11.25 | 12.67 | 22.24 | 32.70 |
| Adjusted fan discharge flow rate (cfm) | 3.98 | 7.28 | 8.65 | 11.25 | 12.67 | 22.26 | 32.73 |
| Adjusted standard flow rate (cfm) | 3.90 | 7.13 | 8.47 | 11.03 | 12.42 | 21.81 | 32.08 |
| | 2.5 Pa | 10.0 Pa | 12.4 Pa | 19.9 Pa | 24.9 Pa | 62.3 Pa | 100 Pa |

# VENTLINE LABORATORY PERFORMANCE RESULTS
## PRODUCT: VENTLINE 'PR_REV'

| ENTER PHYSICAL CONSTANTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| First Nozzle diameter (ft.): | 0.042 | 0.042 | 0.042 | 0.083 | 0.083 | 0.133 | 0.133 |
| Second nozzle diameter (ft.): | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Fan discharge area (ft): | 0.138 | 0.136 | 0.136 | 0.136 | 0.136 | 0.136 | 0.136 |

| ENTER AIR VARIABLES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Barometric pressure (IN Hg): | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 |
| Wet-bulb Temperature (F): | 62 | 62 | 62 | 62 | 62 | 82 | 62 |
| Dry-bulb temperature (F): | 70 | 70 | 70 | 70 | 70 | 70 | 70 |
| Static Pressure (IN H2O): | 0.010 | 0.040 | 0.050 | 0.080 | 0.100 | 0.250 | 0.400 |
| Differential pressure (IN H2O): | 0.815 | 2.103 | 2.760 | 0.310 | 0.390 | 0.965 | 3.540 |

| ENTER MOTOR DATA | | | | | | | |
|---|---|---|---|---|---|---|---|
| Motor speed (RPM): | | | | | | | |
| Voltage to motor (V): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Current to motor (A): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Power to motor (W): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

| NUMERICAL CALCULATIONS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nozzle area | 0.001 | 0.001 | 0.001 | 0.005 | 0.005 | 0.014 | 0.014 |
| Vapor pressure, saturation | 0.435 | 0.435 | 0.435 | 0.435 | 0.435 | 0.435 | 0.435 |
| Vapor pressure, partial | 0.347 | 0.347 | 0.347 | 0.347 | 0.347 | 0.347 | 0.347 |
| Ambient air density | 0.0735 | 0.0735 | 0.0735 | 0.0735 | 0.0735 | 0.0736 | 0.0736 |
| Chamber air density | 0.0735 | 0.0735 | 0.0735 | 0.0735 | 0.0735 | 1.226E-05 | 1.23E-05 |
| Air viscosity | 1.226E-05 | 1.226E-05 | 1.23E-05 | 1.23E-05 | 0.001 | 0.010 | 0.035 |
| Velocity pressure | 0.000 | 0.000 | 0.000 | 0.050 | 0.080 | 0.260 | 0.435 |
| Total pressure | 0.010 | 0.040 | 0.050 | 0.080 | 0.101 | | |
| Reynolds number of nozzle | 13200 | 24410 | 27865 | 18745 | 21026 | 52927 | 101391 |
| Fan output horsepower | 0.0000 | 0.0000 | 0.0001 | 0.0001 | 0.0002 | 0.0022 | 0.0071 |
| Nozzle velocity | 3170.1 | 6861.8 | 6715.3 | 2250.5 | 2524.1 | 3969.8 | 7601.9 |
| Expansion factor | 0.9992 | 0.9971 | 0.9962 | 0.9996 | 0.9995 | 0.9987 | 0.9952 |
| Discharge coefficient | 0.9504 | 0.9612 | 0.9633 | 0.9588 | 0.9587 | 0.9720 | 0.9789 |
| Uncorrected nozzle flow rate | 4.10 | 7.66 | 8.79 | 11.74 | 13.19 | 53.81 | 103.40 |

| CORRECTION FACTORS | | | | | | | |
|---|---|---|---|---|---|---|---|
| X | 2.50E-05 | 1.00E-04 | 1.25E-04 | 2.00E-04 | 2.50E-04 | 8.45E-04 | 1.08E-03 |
| Xc | 2.52E-05 | 1.01E-04 | 1.26E-04 | 2.01E-04 | 2.52E-04 | 8.49E-04 | 1.09E-03 |
| Z | 7.15E-06 | 2.86E-05 | 3.57E-05 | 5.72E-05 | 7.15E-05 | 1.85E-04 | 3.10E-04 |
| Z/Zc | 9.84E-01 | 9.94E-01 | 9.94E-01 | 9.94E-01 | 9.94E-01 | 9.94E-01 | 9.94E-01 |
| Zc | 7.19E-06 | 2.88E-05 | 3.60E-05 | 5.76E-05 | 7.20E-05 | 1.86E-04 | 3.11E-04 |
| Kp/Kpc | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 |

| VOLUMETRIC AIR FLOW RESULTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Corrected nozzle flow rate (cfm) | 4.10 | 7.66 | 8.79 | 11.74 | 13.19 | 53.81 | 103.40 |
| Adjusted fan discharge flow rate (cfm) | 4.10 | 7.66 | 8.79 | 11.74 | 13.20 | 53.84 | 103.50 |
| Adjusted standard flow rate (cfm) | 4.02 | 7.51 | 8.61 | 11.51 | 12.88 | 53.77 | 101.46 |
| | 2.5 Pa | 10.0 Pa | 12.4 Pa | 19.9 Pa | 24.9 Pa | 62.3 Pa | 100 Pa |

[illegible round stamp] 8344

# VENTLINE LABORATORY PERFORMANCE RESULTS
## PRODUCT: VENTLINE 'V2265REV'

| ENTER PHYSICAL CONSTANTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| First Nozzle diameter (ft.): | 0.042 | 0.042 | 0.042 | 0.042 | 0.042 | 0.042 | 0.042 |
| Second nozzle diameter (ft.): | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Fan discharge area (ft): | 0.041 | 0.041 | 0.041 | 0.041 | 0.041 | 0.041 | 0.041 |
| **ENTER AIR VARIABLES** | | | | | | | |
| Barometric pressure (IN Hg): | 29.41 | 29.41 | 29.41 | 29.41 | 29.41 | 29.41 | 29.41 |
| Wet-bulb Temperature (F): | 76 | 76 | 76 | 76 | 76 | 76 | 76 |
| Dry-bulb temperature (F): | 81 | 81 | 81 | 81 | 81 | 81 | 81 |
| Static Pressure (IN H2O): | 0.010 | 0.040 | 0.050 | 0.080 | 0.100 | 0.250 | 0.400 |
| Differential pressure (IN H2O): | 0.065 | 0.273 | 0.385 | 0.650 | 0.780 | 1.750 | 2.500 |
| **ENTER MOTOR DATA** | | | | | | | |
| Motor speed (RPM): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Voltage to motor (V): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Current to motor (A): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Power to motor (W): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **NUMERICAL CALCULATIONS** | | | | | | | |
| Nozzle area | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| Vapor pressure, saturation | 0.832 | 0.832 | 0.832 | 0.832 | 0.832 | 0.832 | 0.832 |
| Vapor pressure, partial | 0.777 | 0.777 | 0.777 | 0.777 | 0.777 | 0.777 | 0.777 |
| Ambient air density | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0715 |
| Chamber air density | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0714 |
| Air viscosity | 1.2458E-05 | 1.246E-05 | 1.25E-05 | 1.25E-05 | 1.25E-05 | 1.246E-05 | 1.25E-05 |
| Velocity pressure | 0.000 | 0.000 | 0.000 | 0.001 | 0.001 | 0.002 | 0.003 |
| Total pressure | 0.000 | 0.000 | 0.000 | 0.081 | 0.101 | 0.252 | 0.403 |
| Reynolds number of nozzle | 0.010 | 0.040 | 0.050 | 13162 | 14419 | 21602 | 25824 |
| Fan output horsepower | 4162 | 8530 | 10130 | 0.0001 | 0.0001 | 0.0003 | 0.0005 |
| Nozzle velocity | 0.0000 | 0.0000 | 0.0000 | 3306.7 | 3622.2 | 5424.5 | 8482.3 |
| Expansion factor | 1045.7 | 2143.1 | 2544.9 | 0.9991 | 0.9989 | 0.9976 | 0.9966 |
| Discharge coefficient | 0.9999 | 0.9996 | 0.9996 | 0.9503 | 0.9520 | 0.9592 | 0.9621 |
| Uncorrected nozzle flow rate | 0.9265 | 0.9416 | 0.9451 | 4.28 | 4.70 | 7.08 | 8.47 |
| | 1.32 | 2.75 | 3.28 | | | | |
| **CORRECTION FACTORS** | | | | | | | |
| X | 2.51E-06 | 1.00E-04 | 1.26E-04 | 2.01E-04 | 2.51E-04 | 8.28E-04 | 1.00E-03 |
| Xc | 2.59E-05 | 1.04E-04 | 1.30E-04 | 2.08E-04 | 2.60E-04 | 6.49E-04 | 1.04E-03 |
| Z | 7.18E-06 | 2.87E-05 | 3.69E-05 | 5.75E-06 | 7.19E-05 | 1.80E-04 | 2.87E-04 |
| Z/Zc | 9.68E-01 | 9.88E-01 | 9.88E-01 | 9.68E-01 | 9.68E-01 | 9.68E-01 | 9.68E-01 |
| Zc | 7.41E-06 | 2.97E-05 | 3.71E-05 | 5.94E-05 | 7.42E-05 | 1.85E-04 | 2.97E-04 |
| Kp/Kpc | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 |
| **VOLUMETRIC AIR FLOW RESULTS** | | | | | | | |
| Corrected nozzle flow rate (cfm) | 1.32 | 2.75 | 3.28 | 4.28 | 4.70 | 7.08 | 8.47 |
| Adjusted fan discharge flow rate (cfm) | 1.32 | 2.75 | 3.28 | 4.28 | 4.70 | 7.08 | 8.48 |
| Adjusted standard flow rate (cfm) | 1.26 | 2.62 | 3.12 | 4.08 | 4.47 | 6.74 | 8.08 |
| | 2.5 Pa | 10.0 Pa | 12.4 Pa | 19.9 Pa | 24.9 Pa | 62.3 Pa | 100 Pa |

# VENTLINE LABORATORY PERFORMANCE RESULTS
## PRODUCT: VENTLINE 'V2270REV'

| ENTER PHYSICAL CONSTANTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| First Nozzle diameter (ft.): | 0.042 | 0.042 | 0.042 | 0.042 | 0.042 | 0.042 | 0.042 |
| Second nozzle diameter (ft.): | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Fan discharge area (ft): | 0.041 | 0.041 | 0.041 | 0.041 | 0.041 | 0.041 | 0.041 |
| **ENTER AIR VARIABLES** | | | | | | | |
| Barometric pressure (IN Hg): | 29.41 | 29.41 | 29.41 | 29.41 | 29.41 | 29.41 | 29.41 |
| Wet-bulb Temperature (F): | 78 | 78 | 76 | 76 | 76 | 76 | 76 |
| Dry-bulb temperature (F): | 81 | 81 | 81 | 81 | 81 | 81 | 81 |
| Static Pressure (IN H2O): | 0.010 | 0.040 | 0.050 | 0.080 | 0.100 | 0.250 | 0.400 |
| Differential pressure (IN H2O): | 0.065 | 0.217 | 0.345 | 0.577 | 0.733 | 1.890 | 3.450 |
| **ENTER MOTOR DATA** | | | | | | | |
| Motor speed (RPM): | | | | | | | |
| Voltage to motor (V): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Current to motor (A): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Power to motor (W): | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **NUMERICAL CALCULATIONS** | | | | | | | |
| Nozzle area | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| Vapor pressure, saturation | 0.832 | 0.832 | 0.832 | 0.832 | 0.832 | 0.832 | 0.832 |
| Vapor pressure, partial | 0.777 | 0.777 | 0.777 | 0.777 | 0.777 | 0.777 | 0.777 |
| Ambient air density | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0715 |
| Chamber air density | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0714 | 0.0715 |
| Air viscosity | 1.2458E-05 | 1.246E-05 | 1.25E-05 | 1.25E-05 | 1.25E-05 | 1.246E-05 | 1.25E-05 |
| Velocity pressure | 0.000 | 0.000 | 0.000 | 0.001 | 0.001 | 0.002 | 0.004 |
| Total pressure | 0.010 | 0.043 | 0.050 | 0.081 | 0.101 | 0.252 | 0.404 |
| Reynolds number of nozzle | 4162 | 7605 | 8589 | 12401 | 13978 | 22449 | 30336 |
| Fan output horsepower | 0.0000 | 0.0000 | 0.0000 | 0.0001 | 0.0001 | 0.0003 | 0.0006 |
| Nozzle velocity | 1045.7 | 1910.7 | 2409.1 | 3115.4 | 3611.3 | 5637.3 | 7615.0 |
| Expansion factor | 0.9999 | 0.9997 | 0.9995 | 0.9992 | 0.9990 | 0.9974 | 0.9952 |
| Discharge coefficient | 0.9265 | 0.9392 | 0.9440 | 0.9491 | 0.9514 | 0.9598 | 0.9645 |
| Uncorrected nozzle flow rate | 1.32 | 2.45 | 3.10 | 4.03 | 4.55 | 7.36 | 9.97 |
| **CORRECTION FACTORS** | | | | | | | |
| X | 2.51E-05 | 1.00E-04 | 1.26E-04 | 2.01E-04 | 2.51E-04 | 6.28E-04 | 1.01E-03 |
| Xc | 2.59E-05 | 1.04E-04 | 1.30E-04 | 2.08E-04 | 2.59E-04 | 6.49E-04 | 1.04E-03 |
| Z | 7.18E-08 | 2.87E-05 | 3.59E-05 | 5.75E-05 | 7.19E-05 | 1.80E-04 | 2.88E-04 |
| Z/Zc | 9.88E-01 | 9.68E-01 | 9.68E-01 | 9.68E-01 | 9.88E-01 | 9.68E-01 | 9.68E-01 |
| Zc | 7.41E-06 | 2.96E-05 | 3.71E-05 | 5.84E-05 | 7.42E-05 | 1.86E-04 | 2.97E-04 |
| Kp/Kpc | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 |
| **VOLUMETRIC AIR FLOW RESULTS** | | | | | | | |
| Corrected nozzle flow rate (cfm) | 1.32 | 2.45 | 3.10 | 4.03 | 4.55 | 7.36 | 9.87 |
| Adjusted fan discharge flow rate (cfm) | 1.32 | 2.45 | 3.10 | 4.03 | 4.55 | 7.36 | 9.88 |
| Adjusted standard flow rate (cfm) | 1.26 | 2.33 | 2.95 | 3.84 | 4.33 | 7.01 | 9.50 |
| | 2.5 Pa | 10.0 Pa | 12.4 Pa | 19.9 Pa | 24.9 Pa | 62.3 Pa | 100 Pa |



**Figure 1**

Air Flow Through PH Range Hood



**Figure 2**

Air Flow Through PR Range Hood



**Figure 3**

Air Flow Through V2262 Bath Fan

AVG. V2262 VALUES ··· SIDE WALL VENT 'A'



**Figure 4**
Air Flow Through V2265 Bath Fan

AVG. V2265 VALUES ····· SIDE WALL VENT 'A'



**Figure 5**

Air Flow Through V2270 Bath Fan

Conclusion

This test verifies that all Ventline range hoods and bath fans meet the requirements for providing passive pressure relief for whole house ventilation systems [24 CFR 3280.103(b)]

* Each product showed the capability to act as a passive pressure relief over the entire pressure range of 0 to 100 Pascals, thus meeting pass/fail requirement #1 as outlined in the results section.

* Each product showed the capability to relieve more air than required to pass requirement #2a or #2b as outlined in the results section.

* While average results were reported on the graphs and some of the tables, each individual test (21 samples in all), passed the above mentioned criteria in the same manner (see appendix A).

Test conducted by: _Matthew J. Copeland_ 4/28/97
Matthew J. Copeland, Project Engineer

Reviewed by: _____
Robert J. Luter, Engineering Manager

Witnessed by: _Philip Drake_ 4/28/97
Philip Drake, P.E.

I hereby certify that this report was prepared under my direct personal supervision and that I am a duly registered Professional Engineer under the laws of the state of Iowa and that I am competent to prepare this document.

PHILIP
DRAKE
8344

# ADDENDUM:

## MEASURING THE CAPACITY TO EXHAUST UNBALANCED PRESSURE IN MANUFACTURED HOMES.

Robert J. Luter, Engineering Manager
Matthew J. Copeland, Project Engineer

June 11, 1997

## INTRODUCTION

It has been suggested that the pressure relief test protocol developed for MHI by the Levy Partnership and subsequently approved by HUD, overlooked differences in available combination mechanical/passive whole house ventilation systems. Specifically, those that supply air to the home versus exhaust air from the home. The following tests illustrate the capacity of Ventline products to relieve negative pressure which may be created by ventilation systems which exhaust air from the home. Ventline products include dampers to limit this reverse air flow, or "backdraft" effect. However, the minimum air flow required at a test pressure of 10Pa is extremely low (5 CFM). The following test results demonstrate that sufficient airflow occurs through these dampers individually and in combination to adequately relieve negative pressure in manufactured homes in accordance with guidelines established by HUD.

## PROCEDURE

Refer to the Ventline report "Measuring the Capacity to Exhaust Unbalanced Pressure in Manufactured Homes." The test equipment and test setup were identical to those in the above mentioned report. The orifices tested were reversed, and air was drawn past the dampers in a simulation of negative pressure within the home.



TEST PRODUCT DESCRIPTIONS

1) **3 X 9.5.** A PC series 3 x 9.5 inch convertible outlet and plastic damper combination was tested as described above. This style orifice is typical of that used in all range hood products in list (1) below.

2) **5"R.** A PR series 5 inch round damper frame/venturi and foam damper combination was tested as described above. This style orifice is used in all range hood products in list (2) below. 5 inch versions represent the worst case, thus all 7 inch outlets are included in this group as well.

3) **7"R.** A V2262 7 inch round damper frame and foam damper combination was tested as described above. This style orifice is used in all bath fan products in list (3) below.

4) **4"R.** A V2265 series 4" side discharge outlet and plastic damper combination was tested as described above. This style orifice is used in all bath fan products described below.

5) **3"R.** A V2270 series 3" side discharge outlet and plastic damper combination was tested as described above. This style orifice is used in all bath fan products described below.

S numbers represent low volume special constructions which have been developed from standard models, for example, S636-42W is the same as PR50. Special features do not affect pressure relief characteristics.

## LIST OF MODEL NUMBERS

| **1** | **2** | **3** | **4** | **5** |
|---|---|---|---|---|
| PH40 | PR50 | V2262-50 | V2265-50 | V2270-50 |
| PH41 | PR51 | V2262-75 | V2245-50 | V2270-65 |
| PH50 | PR61 | V2262-100 | V2158-01 | V2270-75 |
| PH51 | PI50 | V2244-50 | V2168-2 | V2280-50 |
| PH61 | PI51 | V2244-75 | | V2280-75 |
| PC40 | PS50 | V2244-100 | | |
| PC50 | PL50 | S0598-50 | | |
| PC61 | DPI | S0598-75 | | |
| | | S0598-100 | | |
| | | S0599-50 | | |
| | | S0599-75 | | |
| | | S0599-100 | | |

Results:



Results:

Table 1: Air Flow Through Ventline Engineered Orifices.

| Product group | 3 X 9.5 | 5"R | 7"R | 4"R | 3"R |
|---|---|---|---|---|---|
| Air Flow (CFM) | 7.1 | 7.5 | 7.3 | 2.6 | 2.3 |

Table one illustrates airflow through the Engineered Orifices at a negative test pressure of 10 Pa.

Conclusion:
Every engineered orifice tested relieved negative pressure over the entire range of 0 to 100Pa. Every product in group 3 X 9.5, 5"R, or 7"R has an air flow capacity of greater than 5 CFM at a negative exhaust pressure of 10Pa and thus satisfies the requirements for passive pressure relief. Those products in product groups 4"R and 3"R may be combined with other products to satisfy the requirements for 5 CFM of passive pressure relief.

Tests Conducted and Report Prepared By:

*Matthew J. Copeland*          5/11/97

Matthew J Copeland, Project Engineer
Ventline, Division of Phillps Products

Tests Witnessed, Report Reviewed And Approved By:

*[signature]*          6/11/97

Robert J Luter II, Engineering Manager
Ventline, Division of Phillps Products

[seal: REGISTERED PROFESSIONAL ENGINEER PHILLIP DRAKE 8344 IOWA]

# ADDENDUM:

## MEASURING THE CAPACITY TO EXHAUST UNBALANCED PRESSURE IN MANUFACTURED HOMES.

Robert J. Luter, Engineering Manager
Matthew J. Copeland, Project Engineer

June 11, 1997

## INTRODUCTION

It has been suggested that the pressure relief test protocol developed for MHI by the Levy Partnership and subsequently approved by HUD, overlooked differences in available combination mechanical/passive whole house ventilation systems. Specifically, those that supply air to the home versus exhaust air from the home. The following tests illustrate the capacity of Ventline products to relieve negative pressure which may be created by ventilation systems which exhaust air from the home. Ventline products include dampers to limit this reverse air flow, or "backdraft" effect. However, the minimum air flow required at a test pressure of 10Pa is extremely low (5 CFM). The following test results demonstrate that sufficient airflow occurs through these dampers individually and in combination to adequately relieve negative pressure in manufactured homes in accordance with guidelines established by HUD.

## PROCEDURE

Refer to the Ventline report "Measuring the Capacity to Exhaust Unbalanced Pressure in Manufactured Homes." The test equipment and test setup were identical to those in the above mentioned report. The orifices tested were reversed, and air was drawn past the dampers in a simulation of negative pressure within the home.



TEST PRODUCT DESCRIPTIONS

1) 3 X 9.5. A PC series 3 x 9.5 inch convertible outlet and plastic damper combination was tested as described above. This style orifice is typical of that used in all range hood products in list (1) below.

2) 5"R. A PR series 5 inch round damper frame/venturi and foam damper combination was tested as described above. This style orifice is used in all range hood products in list (2) below. 5 inch versions represent the worst case, thus all 7 inch outlets are included in this group as well.

3) 7"R. A V2262 7 inch round damper frame and foam damper combination was tested as described above. This style orifice is used in all bath fan products in list (3) below.

4) 4"R. A V2265 series 4" side discharge outlet and plastic damper combination was tested as described above. This style orifice is used in all bath fan products described below.

5) 3"R. A V2270 series 3" side discharge outlet and plastic damper combination was tested as described above. This style orifice is used in all bath fan products described below.

S numbers represent low volume special constructions which have been developed from standard models, for example, S636-42W is the same as PR50. Special features do not affect pressure relief characteristics.

## LIST OF MODEL NUMBERS

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| PH40 | PR50 | V2262-50 | V2265-50 | V2270-50 |
| PH41 | PR51 | V2262-75 | V2245-50 | V2270-65 |
| PH50 | PR61 | V2262-100 | V2158-01 | V2270-75 |
| PH51 | PI50 | V2244-50 | V2158-2 | V2280-50 |
| PH61 | PI51 | V2244-75 | | V2280-75 |
| PC40 | PS50 | V2244-100 | | |
| PC50 | PL50 | S0598-50 | | |
| PC61 | DPI | S0598-75 | | |
| | | S0598-100 | | |
| | | S0599-50 | | |
| | | S0599-75 | | |
| | | S0599-100 | | |

Results:

Results:

Table 1: Air Flow Through Ventline Engineered Orifices.

| Product group | 3 X 9.5 | 5"R | 7"R | 4"R | 3"R |
|---|---|---|---|---|---|
| Air Flow (CFM) | 7.1 | 7.5 | 7.3 | 2.6 | 2.3 |

Table one illustrates airflow through the Engineered Orifices at a negative test pressure of 10 Pa.

Conclusion:
Every engineered orifice tested relieved negative pressure over the entire range of 0 to 100Pa. Every product in group 3 X 9.5, 5"R, or 7"R has an air flow capacity of greater than 5 CFM at a negative exhaust pressure of 10Pa and thus satisfies the requirements for passive pressure relief. Those products in product groups 4"R and 3"R may be combined with other products to satisfy the requirements for 5 CFM of passive pressure relief.

Tests Conducted and Report Prepared By:

_Matthew J. Copeland_    8/11/97

Matthew J Copeland, Project Engineer
Ventline, Division of Phillps Products

Tests Witnessed, Report Reviewed And Approved By:

_[signature]_    6/11/97

Robert J Luter II, Engineering Manager
Ventline, Division of Phllips Products

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JAMES PERRY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 2:06-cv-502-MEF |
| | ) (WO) |
| FLEETWOOD ENTERPRISES, INC., | ) |
| *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

James Perry (hereinafter "Plaintiff") brings this action against Fleetwood Enterprises, Inc. and Fleetwood Homes of Georgia, Inc. (hereinafter collectively "Defendants").[i] Plaintiff alleges violation of the Magnuson Moss Warranty Act, breaches of various warranties, negligence, wantonness, and violation of the Alabama Extended Manufacturers Liability Doctrine. This cause is presently before the Court on Defendants' Motion to Dismiss (Doc. # 4). Therein, Defendants argue that Plaintiff's state law claims are preempted by the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. §§ 5401 *et seq.* (hereinafter "the Manufactured Housing Act" or "the Act"). The Court has considered the Complaint and the arguments in support of and in

---

[i] Plaintiff also names a number of fictitious defendants. Federal courts do not allow fictitious party practice. *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n.1 (11th Cir. 1997) ("[F]ictitious party practice is not permitted in federal court."). Therefore, the fictitious defendants are due to be dismissed. *See, e.g., Wiggins v. Risk Enterprise Mgmt. Ltd.*, 14 F. Supp. 2d 1279, 1279 n.1 (M.D. Ala. 1998) (DeMent, J.) (dismissing *sua sponte* fictitious defendants).



EXHIBIT
4

opposition to the Motion. For the reasons set forth in this Memorandum Opinion and Order,

Defendants' Motion is due to be GRANTED IN PART and DENIED IN PART.

## I. JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332 (diversity). The parties do not contest personal jurisdiction or venue, and the Court

finds adequate allegations in support of both.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. Prior to the

Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct.

1955 (2007), a motion to dismiss could only be granted if a plaintiff could prove "no set of

facts . . . which would entitle him to relief." *See Conley v. Gibson*, 355 U.S. 41, 45-46

(1957); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Wright v. Newsome*, 795

F.2d 964, 967 (11th Cir. 1986). Now, in order to survive a motion to dismiss for failure to

state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible

on its face." *Twombly*, 127 S. Ct. at 1974. Plaintiff's "[f]actual allegations must be enough

to raise a right to relief above a speculative level on the assumption that the allegations in the

complaint are true." *Id.* at 1965. It is not sufficient that the pleadings merely "le[ave] open

the possibility that the plaintiff might later establish some set of undisclosed facts to support

recovery." *Id.* at 1968 (internal quotation and alteration omitted). The court will accept as

true all well-pleaded factual allegations and view them in a light most favorable to the

plaintiff. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). Furthermore, the threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985).

## III. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Fleetwood Homes (hereinafter "Fleetwood Homes") manufactures and sells manufactured homes. Fleetwood Enterprises (hereinafter "Fleetwood Enterprises") is the parent corporation or alter ego of Fleetwood Homes. On or about May 2, 2002, Plaintiff purchased a manufactured home made by Fleetwood Homes. Defendants made a written express warranty to Plaintiff as part of the purchase of the home. In addition, Defendants warranted that any defects in the materials or workmanship of the home would be repaired or remedied at no cost to Plaintiff if Defendant received notice within the warranty period. Plaintiff alleges that the home failed in its intended purpose. He further alleges that Fleetwood Homes failed to repair the home, despite his notice of its deficiencies, and that the home as a result continues to deteriorate structurally. Plaintiff alleges that he has given Defendants notice of his breach of warranty claim prior to bringing this suit, pursuant to § 7-2-607(3) of the Alabama Code.

Plaintiff filed the Complaint on May 1, 2006 in the Circuit Court of Bullock County (Doc. # 1). In his Complaint, he alleges causes of action under the following theories: the Magnuson Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* (Count I); breach of express

3

warranty (Count II); breach of implied warranty of merchantability (Count III); breach of

fitness for particular purpose (Count IV); breach of warranty of habitability (Count V);

negligence (Count VI); wantonness (Count VII); and the Alabama Extended Manufacturers

Liability Doctrine (Count VIII).

On June 2, 2006, Defendants removed the action to this Court (Doc. # 1). Defendants

filed a Motion to Dismiss (Doc. # 4) on July 5, 2006.

## IV. DISCUSSION

Defendants contend that Plaintiff's state law claims are preempted by the

Manufactured Housing Act. "Congress's intent to preempt state law may be explicitly stated

in the language of a federal statute or implicitly contained in the structure and purpose of the

statute." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004). There

are three types of preemption: (1) express preemption; (2) field preemption; and (3) conflict

preemption. *Id.* The second and third types are collectively referred to as "implied

preemption." Defendants argue that Plaintiff's state law claims are both expressly and

impliedly preempted.

The Court's preemption analysis "start[s] with the assumption that the historic police

powers of the states are not superseded by federal law unless preemption is the clear and

manifest purpose of Congress." *Nat'l Ass'n of State Utility Consumer Advocates v. FCC*,

457 F.3d 1238, 1252 (11th Cir. 2006); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485

(1996) ("[W]e have long presumed that Congress does not cavalierly pre-empt state-law

4

causes of action."). "Therefore, [t]he purpose of Congress is the ultimate touchstone of preemption analysis." *Cliff*, 363 F.3d at 1122 (alteration and internal quotation omitted).

## A. Express Preemption

Defendants argue that Plaintiff's state law claims are barred by express preemption, whereby "Congress can define explicitly the extent to which its enactments pre-empt state law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). Express preemption may be found in the language of the statute, its legislative history, or the regulations promulgated pursuant to the statute. *Howard v. Uniroyal, Inc.*, 719 F.2d 1552, 1556 (11th Cir. 1983). Congress must express a clear intent to preempt state law. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (U.S. 1986). "Federal preemption under [subsection § 5403(d) of the Manufactured Housing Act] shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter." 42 U.S.C. § 5403(d).

Defendants contend that Congress expressly preempted Plaintiff's claims when it provided in the Act that the "manufactured home construction and safety standards established by the Secretary under this section shall include preemptive energy conservation standards in accordance with this subsection." 42 U.S.C. § 5403(g)(1). Defendants also point to the fact that the regulations specifically set out "the requirements for condensation control, air infiltration, thermal insulation and certification for heating and comfort cooling."

5

24 C.F.R. § 3280.501.

In response, Plaintiff points to the saving clause, which provides, "Compliance with any Federal manufactured home construction or safety standard issued under this chapter does not exempt any person from any liability under common law." 42 U.S.C. § 5409(c). Plaintiff argues that the saving clause exempts this action from preemption.

The statutory language instructs the Secretary to include "preemptive energy conservation standards." 42 U.S.C. § 5403(g)(1). The preemptive effect of the Act is set forth in subsection (d) of the same section:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding the construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403(d). *See Ga. Manufactured Hous. Ass'n, Inc. v. Spalding County*, 148 F.3d 1304, 1308-09 (11th Cir. 1998) (noting that Congress defined the preemptive effect of the Act in § 5403(d)).

The United States Supreme Court has held that nearly identical language in another statute does not expressly preempt state law tort claims. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000). Further, several courts have held that identical language in the Manufactured Housing Act does not expressly preempt state law products liability claims.

6

*See, e.g., Choate v. Champion Home Builders Co.*, 222 F.3d 788, 793-94 (10th Cir. 2000);

*Richard v. Fleetwood Enters., Inc.*, 4 F. Supp. 2d 650, 657 (E.D. Tex. 1998) ("The

Manufactured Housing Act does not explicitly preempt state causes of action."). In addition,

the regulations promulgated under the Act provide for the maintenance of state law claims.

*See, e.g.*, 24 C.F.R. § 3282.402(a) ("Nothing in this subpart or in these regulations shall limit

the rights of the purchaser under any contract or applicable law.").

Defendants argue that the preemption provision here should be read broadly and that

such a reading would preempt Plaintiff's state law claims. In *Geier v. Am. Honda Motor Co.*,

the Supreme Court addressed this issue in the context of a nearly identical preemption

provision and saving clause in the National Traffic and Motor Vehicle Safety Act.[2] The

Court explained:

> [A] reading of the express pre-emption provision that excludes
> common-law tort actions gives actual meaning to the saving
> clause's literal language, while leaving adequate room for state
> tort law to operate-for example, where federal law creates only
> a floor, *i.e.*, a minimum safety standard. Without the saving
> clause, a broad reading of the express pre-emption provision
> arguably might pre-empt those actions, for, as we have just
> mentioned, it is possible to read the pre-emption provision,
> standing alone, as applying to standards imposed in common-
> law tort actions, as well as standards contained in state

---

[2] The saving clause at issue in *Geier* is nearly identical to that in the Manufactured
Housing Act: "Compliance with any Federal motor vehicle safety standard issued under this
subchapter does not exempt any person from any liability under common law." *See* 49
U.S.C. § 30103(e); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 895 & n.11 (2000)
(Stevens, J., dissenting) (quoting the saving clause and noting that it is now codified in 49
U.S.C. § 30103(e)).

7

> legislation or regulations. And if so, it would pre-empt all
> nonidentical state standards established in tort actions covering
> the same aspect of performance as an applicable federal
> standard, even if the federal standard merely established a
> minimum standard.

*Geier*, 529 U.S. at 868 (internal citation omitted). The presence of the saving clause, however, did not permit a broad reading. The court stated that it did not find any convincing evidence of congressional intent to preempt common-law tort actions, and therefore, a broad reading of the preemption provision could not be correct. *Id.* Given the presence of the saving clause, the court stated that the preemption clause must be read narrowly. *Id.*

Defendants argue that the saving clause analysis set forth above is only applicable where the regulations set forth in the statute are minimum standards intended to provide a "floor," or minimum safety standard. They contend that the specifications in the Act are mandatory requirements, not minimum standards. Defendants point out that the Act states that the manufactured home construction and safety standards are to "meet high standards of protection," *see* 42 U.S.C. § 5403(a)(1)(A)(ii), and the relevant regulation is one of the "requirements for condensation control, air infiltration, thermal insulation and certification for heating and cooling," *see* 24 C.F.R. § 3280.501.

The Court does not agree that the saving clause only saves those actions challenging regulations intended to provide a minimum safety standard. In *Geier*, the Court listed regulations intended to provide a minimum safety standard as an example of a regulation that might fall within the savings clause. *Geier* did not state that state law actions are barred if

8

the federal regulation goes beyond providing a minimum standard. In fact, the opinion suggests that the saving clause exempts tort actions generally. *See, e.g., Geier*, 529 U.S. at 868 ("The language of the pre-emption provision permits a narrow reading that excludes common-law actions."); *id.* at 869 ("We have just said that the saving clause *at least* removes tort actions from the scope of the express pre-emption clause."). *But see id.* at 870 ("[T]he saving provision still makes clear that the express pre-emption provision does not of its own force pre-empt common-law tort actions. And it thereby preserves those actions that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor.").

This view is supported not only by the language in *Geier*, but also by its analysis. The Court stated that the regulation at issue was not a minimum standard; rather, the regulation provided manufacturers of airbags with a "range of choices among different passive restraint devices." *Id.* at 874-75. *See also Griffith v. Gen. Motors Corp.*, 303 F.3d 1276, 1281 (11th Cir. 2002) ("In *Geier*, the Court found that the rule-making history of [the regulation at issue] makes clear that [the Department of Transportation] saw it not merely as a minimum standard, but as a comprehensive regulatory scheme."). If the saving clause only excluded from operation of the express exemption clause actions based on those regulations intended to provide a floor, the Court would have found express preemption. Instead, the Court found that the action was removed from the scope of the express exemption clause, and it concluded that the action was not expressly preempted. *Id.* at 868. The presence of a saving

9

clause therefore saves more than only actions based upon regulations intended to provide a minimum safety standard.

As Defendants point out, the statute also states that the standards promulgated under the Act "shall include preemptive energy conservation standards in accordance with this subsection." *See* 42 U.S.C. § 5403(g)(2). Given the presence of the saving clause, the Court is not persuaded that Congress intended to preempt common law actions rather than state statutes or regulations. *See Geier*, 529 U.S. at 868 ("We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances."). In any case, both the preemption clause and the saving clause are nearly identical to those that were found not to preempt common law actions in *Geier* and *Choate*. The Court concludes that the doctrine of express preemption does not bar Plaintiff's claims. Accordingly, Defendants' Motion is due to be DENIED on the basis of express preemption.

## B. Implied Preemption

Defendants also contend that Plaintiff's state law claims are barred by both types of implied preemption. The presence of an express preemption provision does not foreclose an implied preemption analysis. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287-88 (1995). The Court turns first to field preemption, which occurs when "federal regulation in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it." *Cliff*, 363 F.3d at 1122.

10

The presence of a saving clause suggests that Congress did not intend to occupy the field.[3] The decisions the Court has found addressing field preemption with respect to common law actions have concluded that federal regulation under the Act is not sufficiently pervasive to occupy the field. *See Choate*, 222 F.3d at 795 ("[T]he Manufactured Housing Act does not support [the] assertion" that "Congress intended for the Federal Government to occupy the field of construction and safety of manufactured homes exclusively . . . ."); *Richard*, 4 F. Supp. 2d at 657 ("[T]here is no clear or manifest congressional intent for the federal regulation of the safety and sale of manufactured housing to completely occupy the field."). The Court agrees.

As Defendants note, Congress has amended the Manufactured Housing Act since these cases were decided. Defendants note that the 2000 amendments to the Act "interjected a consensus-based process for the proposal, revision, and implementation of performance standards." (Doc. # 4 at 7). However, these amendments only changed the process of promulgating the standards, because before the amendments the Secretary was to establish such standards "after consultation with the Consumer Product Safety Commission." *See* 42 U.S.C. § 5403, Historical and Statutory Notes, Amendments. It is unclear why changing the

---

[3] While *Geier* and *Choate* held that the presence of a saving clause does not foreclose the operation of conflict preemption principles, neither addressed the effect of a saving clause on field preemption. *See Geier*, 529 U.S. at 869 (addressing the effect of the presence of a saving clause on conflict preemption but not field preemption); *Choate*, 222 F.3d at 794-95 (noting that the saving clause did not foreclose the question of conflict preemption and that the defendant did not raise the issue of field preemption).

11

process of promulgating performance standards would make the resulting regulations more pervasive. The Court concludes that even considering the effect of the amendments, Congress did not intend to occupy the field.

Defendants also assert that Plaintiff's state law claims are barred by conflict preemption.[4] "Conflict preemption exists where state law actually conflicts with federal law, making it impossible to comply with both, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 768 (11th Cir. 1998) (internal quotation marks omitted). The Act's implementing regulations specify that the test for determining whether the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress is "whether the State rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act." 24 C.F.R. § 3282.11(d).

At least some of Plaintiff's claims are based on Defendants' selection of an option permitted by § 3280.504(b). As Plaintiff states in his brief, "Plaintiff has alleged that these Defendants have knowingly chosen to build homes to a known defective optional standard (when other reasonable options existed) under 24 C.F.R. § 3280.504." (Doc. # 6 at 1-2.)

Rather than provide a minimum standard, Section 3280.504(b), like the regulation at

---

[4] As with an express preemption provision, the presence of a saving clause does not foreclose the operation of conflict preemption. *See Geier*, 529 U.S. at 869.

issue in *Geier*, provides for a range of authorized options for exterior wall construction. *See* 24 C.F.R. § 3280.504(b). The regulations lay out "the requirements for condensation control, air infiltration, thermal insulation and certification for heating and comfort cooling." 24 C.F.R. § 3280.501. The language does not suggest that the regulation sets forth minimum standards. They are also intended to "meet high standards of protection." *See* 42 U.S.C. § 5403(a)(1)(A)(ii). Courts have suggested that regulations providing a range of options do not set forth minimum standards. *See Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 44 (D. Mass. 2002). The Court concludes that § 3280.504(b) does not set forth a minimum standard. Further, the one case of which the Court is aware to have addressed this issue found that the plaintiff's claims were barred by conflict preemption because they would penalize the manufacturer for choosing a federally authorized option. *See Guidroz v. Champion Enters., Inc.*, No. 05-1148 (W.D. La. Jan. 26, 2007). The Court agrees and concludes that Plaintiff may not penalize Defendant for choosing an option permitted by § 3280.504(b).

Plaintiff argues, looking both to case law and the structure of the regulations themselves, that the regulations at issue set forth are performance-based. In other words, the manufacturer is given several options to meet a performance-based requirement. Therefore, Plaintiff argues, the regulations set forth minimum standards. The Court disagrees. The regulation at issue in *Geier* also set a performance requirement. *See Geier*, 529 U.S. at 878 ("[The regulation at issue] set[] a performance requirement for passive restraint devices and

13

allow[ed] manufacturers to choose among different passive restraint mechanisms, such as airbags, automatic belts, or other passive restraint technologies to satisfy that requirement."). The *Geier* Court noted that the manufacturers were required to meet a performance requirement by choosing from a range of options. *See id.* at 878-79. Nonetheless, the plaintiff's claims were preempted because they penalized the manufacturer for choosing an option provided by the regulations. *See id.* at 881. Even if the regulations set forth performance requirements or a performance standard, the Court cannot agree that the regulations provide a minimum standard. Maintenance of Plaintiff's state court claims would "impair[] the Federal superintendence of the manufactured home industry as established by the Act." 24 C.F.R. § 3282.11(d). Defendants' motion to dismiss Plaintiff's state law claims is therefore due to be GRANTED to the extent that those claims seek to penalize Defendants for their choice of an option available under 24 C.F.R. § 3280.504(b).

## V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that

1. Defendants' Motion to Dismiss (Doc. # 4) is GRANTED IN PART and DENIED IN PART.

2. Plaintiff's state law claims are DISMISSED with prejudice to the extent that those claims seek to penalize Defendants for their choice of an option available under 24 C.F.R. § 3280.504(b). Any of Plaintiff's other state law claims remain pending.

3. All claims against the fictitious defendants are DISMISSED.

DONE this 28th day of September, 2007.

_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

RUSSELL J. GUIDROZ, JR., ET AL.                    *CIVIL NO. 05-1148

VERSUS                                             *MAGISTRATE JUDGE HILL

CHAMPION ENTERPRISES, INC., ET AL.                 *BY CONSENT OF THE PARTIES

## REASONS FOR JUDGMENT

Pending before the court are the Rule 12(b)(6) Motions to Dismiss filed on behalf of

Redman Homes, Inc. ("Redman") and Champion Enterprises, Inc. ("Champion") [rec. docs. 8

and 9]. Plaintiffs, Russel J. Guidroz, Jr. and Michelle L. Guidroz ("Guidroz")[1], have filed

opposition. [rec. doc. 15].

### Motion to Dismiss Standard

It is black-letter law that a motion to dismiss for failure to state a claim under Federal

Rule of Civil Procedure 12(b)(6) is to be evaluated only on the pleadings. *Mahone v. Addicks

Utility District of Harris County*, 836 F.2d 921, 935 (5th Cir. 1988). In considering a motion to

dismiss for failure to state a claim under Rule 12(b)(6), the district court must accept all well-

pleaded facts as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal*,

75 F.3d 190, 196 (5th Cir. 1996). Moreover, a complaint should not be dismissed for failure to

state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim that would entitle him to relief. *Kaiser Aluminum & Chemical Sales v.*

---

[1]Plaintiffs assert individual claims and claims as the proposed representatives of a class of similarly situated persons. However, at this time, no class has been certified. The defect alleged by the named plaintiffs is alleged to be common to all persons in the proposed class. [*See* rec. doc. 1, ¶ 8, 9 and 29]. Accordingly, the instant ruling is applicable to all claims asserted herein, whether asserted individually or in a proposed representative capacity.


EXHIBIT
5

*Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982) citing *Conley v. Gibson*, 355 U.S. 41,

45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

However, these principles are subject to limitations. Conclusory allegations and

unwarranted deductions of fact are not accepted as true. *Id.* citing *Associated Builders, Inc. v.*

*Alabama Power Company*, 505 F.2d 97, 100 (5th Cir. 1974). A complaint may be dismissed if

it is clear on the face of the pleadings that an affirmative defense would be successful. *Id.*

(citations omitted).

### Factual Background

_____Plaintiffs filed the instant action under the Louisiana Products Liability Act ("LPLA")

and the Louisiana law of redhibition seeking rescission of the February 20, 1997 purchase of

their mobile home, damages and attorney fees. Plaintiffs allege that their 1997 mobile home,

designed and manufactured by Redman, has "an improper design and construction of exterior

walls ... that incorporates [a] vapor barrier not greater than 1 perm (dry method) on the 'living

side' of the wall structures for use in a Gulf Coast region state that is subject to hot and humid

climactic conditions." [rec. doc. 1, ¶ 9]. Plaintiffs further allege that the "vapor barrier on the

'living side' of the wall structure is vinyl-coated sheetrock or other material" and that "this

design and manufacture aspect does not comply with accepted engineering practices to insure

durable, livable, and safe housing as set forth in HUD standards Title 24 of the Code of Federal

2

Regulations [§ 3280.303 and 3280.504(b)]."[2] *Id.* Use of this vapor barrier in the Gulf Coast region has allegedly led "to excessive accumulation of vapor condensation and a continuous moisture problem throughout the exterior wall structures of the mobile home[]" causing deterioration of the wall materials and fungal growth throughout the wall structure. *Id.*

In the instant Motions, Redman and Champion claim that plaintiffs seek to impose liability under Louisiana's redhibition and product liability laws for their *compliance* with a mandatory federal safety and construction regulation, namely 24 C.F.R. § 3280.504(b). They contend that plaintiffs claims are expressly and impliedly preempted by the Manufactured Housing Construction and Safety Standards Act ("MHCSSA")[3], and the federal regulations promulgated by the United States Department of Housing and Urban Development ("HUD")[4], and accordingly that plaintiffs' Complaint should be dismissed for failing to state a claim upon which relief may be granted pursuant to FRCP 12(b)(6).

More specifically, Redman and Champion contend that plaintiffs' claims are expressly preempted by the MHCSSA general preemption clause set forth at § 5403(d), applicable to all federal manufactured home construction and safety standards, and a second "energy conservation standards" preemption clause set forth at § 5403(g)(1) and (2), applicable to the specific construction standard at issue herein (24 C.F.R. § 3280.504(b)). Redman and

---

[2] In their Complaint, the plaintiffs mis-cited the applicable sections as "3208.303 and 3208.504(b)". The correct citations are inserted above in accordance with the plaintiff's recognition of this error in their opposition to the instant Motions. [*See* rec. doc. 15, p. 2 at fn. 2].

[3] 42 U.S.C. § 5401, et. seq.

[4] 24 C.F.R. 3280.1 et seq.

Champion argue that the MHCSSA general preemption clause, § 5403(d), when read in conjunction with the MHCSSA "savings clause" (§ 5409(c)) and MHCSSA "state enforcement clause" (§ 5422(a)), leads to the inescapable conclusion that compliance with the federal standards does not preclude state law claims based on construction and safety issues unregulated by the federal standards, but specifically precludes construction and safety issues that are regulated by the federal standards to the extent that any standard not identical to the federal standards is sought to be imposed.

Redman and Champion further argue that the standard at issue herein, § 3280.504(b), is an "energy conservation standard" by virtue of its inclusion in Subpart F of the Code of Federal Regulations addressing "Thermal Protection", and as such is subject to a second preemption clause set forth at § 5403(g)(1) and (2), which designates "energy conservation standards" as "preemptive." Redman and Champion additionally argue that express preemption is warranted because the specific standard at issue herein, 24 C.F.R. § 3280.504(b), does not establish a "minimum" standard, but rather constitutes a mandatory requirement, which, unlike a minimum standard, does not permit liability for compliance with the standard on grounds that a higher standard could have been employed.[5]

---

[5]Redman and Champion also contend that plaintiffs purported class action claims are expressly preempted by the preemption clause set forth in the Code of Federal Regulations, § 3282.11. They argue that a favorable decision on these claims would impose a state "system[] of enforcement of the Federal standards" which would "impair[] the Federal superintendence of the manufactured home industry ..." contrary to the purposes and objectives of Congress in enacting the MHCSSA. Rather, Redman and Champion assert that when a state law action challenges a defect existing in a class of homes, as opposed to a defect in an individual home, the proper avenue of redress is to propose an amendment to the standards in accordance with the standards review process, which review is done every two years.

Plaintiffs respond that § 3280.11(c) expressly reserves their right to bring a class action lawsuit. They argue that each claimant in the action is asserting an individual consumer complaint under Louisiana's consumer

4

Redman and Champion further contend that plaintiffs' claims are impliedly preempted because the claims conflict with manufacturing methods authorized by federal law and because federal statutes and regulations occupy the field of manufactured home construction. More specifically, they argue that under United States Supreme Court precedent, namely the Court's decision in *Geier American Honda Motor Company, Inc.*, 529 U.S. 861, 120 S.Ct. 1913 (2000), plaintiffs claims, which seek to impose liability for the defendants' exercise of a federally granted option explicitly authorized and permitted by federal regulation, conflicts with federal law and, is thusly conflict preempted. They argue that preemption is warranted because the specific standard at issue herein, 24 C.F.R. § 3280.504(b), does not establish a "minimum" standard, but rather gives manufacturers a choice of exterior wall construction that states are forbidden from precluding. Consequently, a favorable judgment for plaintiffs in this action would effectively eliminate a federally granted and federally authorized option via state court action, which would be inconsistent with federal law. They further argue that Congress and HUD have established an extensive federal statutory and regulatory scheme controlling the construction of manufactured homes, including the construction of the walls of those homes, thus preempting the field. They argue that the plaintiffs seek to impose a geographic restriction on the construction of exterior walls in homes situated in humid climates, a restriction which has been extensively debated, rejected, and only recently imposed by HUD. They cite the

---

protection laws as authorized by the regulation, and accordingly, that consideration of each individual consumer protection complaint in a class action setting will not result in a prohibited state "system for enforcement of the Federal standards."

At this time, no class has been certified. Therefore, the undersigned will not reach these arguments.

Secretary's 2002 waiver of the § 3280.504(b)(l) requirement that vapor barriers be placed on the "living side" of walls in homes situated in humid climates, and the ten year debate preceding that amendment, as evidence of Congress' intent to occupy the field with respect to the control of condensation in manufactured housing situated in humid climates, and the placement of vapor barriers in those areas.

Plaintiffs, on the other hand, contend that their claims seek to impose liability on the defendants under Louisiana's primary consumer protection laws, the LPLA and redhibition, for Redman's and Champion's *violation* of the federal construction standard set forth at 24 C.F.R. § 3280.303(b) which requires that accepted engineering practices be employed in the construction of mobile homes. They therefore assert that their claims are not expressly or impliedly preempted.

More specifically, plaintiffs argue that no choice set forth in 24 C.F.R. § 3280.504(b) is mandatory, but rather each choice is an "alternative." Therefore, they argue that manufacturers, such as Redman and Champion, must chose an option that complies with accepted engineering practices as required by § 3280.303(b), and their failure to do so may subject the manufacturer to liability under state law. In sum, they argue that Redman and Champion had a "regulatory duty to make the construction choice[] that complied with accepted engineering practices to insure durable, liveable and safe housing as set forth in 24 C.F.R. § 3280.303." [*See* rec. doc. 15, p. 9]. However, given the humid Louisiana climate, the defendants' choice did not comply with this standard. In support, plaintiffs cite the Secretary's

6

2002 waiver of the § 504(b)(1) requirements for construction of walls in mobile homes situated in Louisiana, which was allegedly intended to avoid moisture and condensation damage like those alleged by plaintiffs herein, as *prima facie* evidence that the defendants choice of wall construction for homes in Louisiana did not comply with accepted engineering practices.

With respect to preemption, plaintiffs contend that the general preemption clause § 5403(d), when read in conjunction with the "savings clause" § 5409(c), provides for preemption of state and local safety standards, but generally does not preempt state law causes of action. They argue that courts have permitted state law actions, like the instant action, which assert a failure to comply with the federal standards because such actions enforce those standards without frustrating federal supervision of the manufactured housing industry. They further argue that, contrary to the defendants' position, the jurisprudence interpreting these seemingly contradictory statutes establishes that the "savings clause" does not exempt any person from liability for compliance with the federal standards.

## Law and Analysis

### Preemption

Preemption can be express or implied. *Morales v. Transworld Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031 (1992). The touchstone of every preemption issue is Congressional intent. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608 (1992). When regulations are promulgated under a congressional act, the regulation's preemptive reach becomes a question of departmental intent. The opinion of the agency on whether or not its regulations have preemptive effect is entitled to "some weight". *Geier v. American Honda*

7

*Motor Company, Inc.*, 529 U.S. 861, 883, 120 S.Ct. 1913, 1926 (2000). Express preemption occurs when Congress declares within the four corners of the statute its intention to preempt state laws. *English v. General Electric, Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270 (1990). In such cases, courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732 (1993). Conversely, implied preemption occurs when an act's "structure and purpose" suggest that Congress intended federal law to supersede state actions. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305 (1977). The Supreme Court has identified two different categories of implied preemption. One category, called "field preemption," is found where Congress legislates a field so completely that it is clear Congress intended the federal government to have exclusive jurisdiction in that field. *English*, 496 U.S. at 79; *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004). In such cases, Congressional intent to preempt may be inferred from the existence of a "pervasive regulatory scheme." *Id.* The second category of implied preemption is broadly referred to as "conflict preemption." *Id.* Conflict preemption occurs when state action conflicts with federal law, by interfering with, or standing as an obstacle to, the achievement of federal purposes and objectives as set out in the statutes or regulations. *Id.*

**Statutory Provisions**

The stated purposes of the MHCSSA are: (1) to protect the quality, durability, safety, and affordability of manufactured homes; (2) to facilitate the availability of affordable

8

manufactured homes and to increase homeownership; (3) to provide for the establishment of

practical, uniform, and, to the extent possible, performance-based Federal construction

standards for manufactured homes; (4) to encourage innovative and cost-effective construction

techniques for manufactured homes; (5) to protect residents of manufactured homes with

respect to personal injuries and property damages in manufactured housing, consistent with the

other purposes of this Act; (6) to establish a balanced consensus process for the development,

revision, and interpretation of Federal construction and safety standards for manufactured

homes and related regulations for the enforcement of such standards; (7) to ensure uniform and

effective enforcement of Federal construction and safety standards for manufactured homes;

and (8) to ensure that the public interest in, and need for, affordable manufactured housing is

duly considered in all determinations relating to the Federal standards and their enforcement.

42 U.S.C. § 5401.

To accomplish these purposes, the MHCSSA grants the Secretary of HUD authority to

establish appropriate Federal construction and safety standards for manufactured homes, which

standards are to be "performance based" and "reasonable and practical", while also meeting

"high standards of protection." 42 U.S.C.A. §§ 5403(a) and 5402(11). These standards are

published at 24 C.F.R. §§ 3280 et seq.

The MHCCA provides that the federal standards established by the Secretary of HUD

shall preempt, "with respect to any manufactured home covered, any standard regarding

construction or safety applicable to the same aspect of performance of such manufactured

home which is not identical to the Federal manufactured home construction and safety standard." 42 U.S.C.A. § 5403(d).

Enacted in December 2000, the American Homeownership and Economic Opportunity Act of 2000 amended 42 U.S.C.A. § 5403(d) to include a paragraph stating that: "Federal preemption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter. Subject to section 5404 of this title, there is reserved to each State the right to establish standards for the stabilizing and support systems of manufactured homes sited within that State, and for the foundations on which manufactured homes sited within that State are installed, and the right to enforce compliance with such standards, except that such standards shall be consistent with the purposes of this title and shall be consistent with the design of the manufacturer." Pub.L. 106-569, Title VI, § 604, Dec. 27, 2000, 114 Stat. 2999. This amendment was to provide explicit statutory support for the HUD regulation at 24 C.F.R. § 3282.11 which interprets the preemptive effect of § 5403(d) of the Act, which was enacted in response to the 1998 Eleventh Circuit decision in *Georgia Manufactured Housing Ass'n., Inc. v. Spalding County, Ga.,* 148 F.3d 1304, 1309 fn. 8 (11th Cir. 1998), which raised a concern as to whether the regulation was valid because in the court's view that the regulation "seem[ed] to expand the scope of the unambiguous preemption provision enacted by Congress." 68 Fed. Reg. 42327, 42328 (July

10

17, 2003). "The amendment did not modify the basic substance of the statutory preemption provision." *Id.*; *See also* 146 Cong. Rec. H11960, H11988 (Dec. 27, 2000) (Rep. Leach) (noting that the revision to § 5403 would "clarify" the scope of federal preemption).

The HUD regulation which sets out the preemptive reach of § 5403(d) of the Act is set forth at 24 C.F.R. § 3282.11. That regulation provides in pertinent part:

> (a) No State manufactured home standard regarding manufactured home construction and safety which covers aspects of the manufactured home governed by the Federal standards shall be established or continue in effect with respect to manufactured homes subject to the Federal standards and these regulations unless it is identical to the Federal standards.
>
> ...
>
> (c) States may participate in the enforcement of the Federal standards enforcement program under these regulations either as SAAs or PIAs or both. These regulations establish the exclusive system for enforcement of the Federal standards. No State may establish or keep in effect through a building code enforcement system or otherwise, procedures or requirements which constitute systems for enforcement of the Federal standards or of identical State standards which are outside the system established in these regulations or which go beyond this system to require remedial actions which are not required by the Act and these regulations. A State may establish or continue in force consumer protections, such as warranty or warranty performance requirements, which respond to individual consumer complaints and so do not constitute systems of enforcement of the Federal standards, regardless of whether the State qualifies as an SAA or PIA.
>
> (d) No State or locality may establish or enforce any rule or regulation or take any action that stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The test of whether a State rule or action is valid or must give way is whether the State rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act.

Section 5403(g) requires that the manufactured home construction and safety standards established by the Secretary include "preemptive energy conservation standards ... [which]

11

shall be cost-effective energy conservation performance standards designed to ensure the lowest total of construction and operating costs ... [and] shall take into consideration the design and factory construction techniques of manufactured homes and shall provide for alternative practices that result in net estimated energy consumption equal to or less than the specified standards." 42 U.S.C. § 5403(g).

The MHCCA also contains a "savings clause" which provides that "[c]ompliance with any Federal manufactured home construction or safety standard ... does not exempt any person from any liability under common law."[6] 42 U.S.C. § 5409(c).

The Act additionally contains a "state enforcement" statute which contains a clause setting forth state court jurisdiction under state law as follows:

> Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any manufactured home construction or safety issue with respect to which no Federal manufactured home construction and safety standard has been established pursuant to the provisions of section 5403 of this title.

42 U.S.C. § 5422(a).

Several HUD regulations govern the construction of manufactured homes. Section 3280.303 sets forth "general requirements" for construction of the body and frame. Subsection (b) of that section states that "[a]ll construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing ...." 24 C.F.R. § 3280.303(b). With respect to the construction of exterior walls, prior to May, 2006,

---

[6] While the "savings clause" refers to "common law", it is clear that it is meant to include state actions brought under state statutory law (the LPLA) and the Louisiana Civil Code, as is the case here.

§ 504(b) required manufacturers to use one of three methods of construction:

(1) Exterior walls must have a vapor retarder with a permeance no greater than 1 perm (dry cup method) installed on the living space side of the wall; or

(2) Unventilated wall cavities must have an external covering and/or sheathing that forms the pressure envelope. The covering and/or sheathing must have a combined permeance of not less than 5.0 perms. In the absence of test data, combined permeance is permitted to be computed using the following formula: P total = (1/[ (1/P$_1$) +(1/P$_2$) ]), where P$_1$ and P$_2$ are the permeance values of the exterior covering and sheathing in perms. Formed exterior siding applied in sections with joints not caulked or sealed, are not considered to restrict water vapor transmission; or

(3) Wall cavities must be constructed so that ventilation is provided to dissipate any condensation occurring in these cavities.

In February 1992, in connection with upgrading energy conservation requirements, HUD noted that manufactured homes were "being constructed with materials and construction systems that require more attention to the problem of dissipating moisture from within the home and from within the ceiling, wall and floor systems." 57 Fed. Reg. 6420, 6422 (Feb. 24, 1992). Accordingly, HUD proposed geographic restrictions on the construction of attic and roof cavities to permit that ceiling vapor retarders be omitted in the southern condensation zone, providing that certain ventilation requirements are met. *Id.* at 6423 and 6428. HUD additionally asked for comments on the continued use of ventilated walls and whether "the placement and location of vapor retarders in exterior walls [should] be related to the condensation zone in which it is located." *Id.* 6423.

In response to the proposed amendments, HUD received "varied [comments] from recommending no vapor retarder to advocating a vapor retarder in certain weather conditions ...

13

[however] no clear consensus seem[ed] to exist ...." 58 Fed. Reg. 54975, 54992 (Oct. 25, 1993). Noting that HUD "understands that the placement of a vapor retarder in one uniform location on all homes is desirable ..." *Id.* HUD nevertheless concluded that "a single location for the vapor retarder is not technically desirable." *Id.* Thus, stressing "the need for a vapor retarder that is a function of climate", and further noting that two major standards specified the placement of "a vapor retarder on the inside for cold climates and on the outside for warm climates", HUD determined that ceiling vapor retarders would be required in all but humid climates. *Id.* Accordingly, this new standard was adopted.

With respect to comments received regarding whether the placement of vapor retarders in exterior walls should be related to the condensation zone in which the home is located, HUD noted that many of the comments discussed, with respect to the placement of ceiling vapor retarders, also apply to the placement of vapor retarders in exterior walls. *Id.* at 54993. Moreover, as was the case with comments on the placement of ceiling retarders, "there [was] a wide range of views on the placement and need for a vapor retarder" in exterior walls. *Id.* After reviewing all of these comments, the Department did not propose a new standard in this area, and the Secretary therefore declined to make a decision on the issue, instead leaving the issue for future revisions of the regulations. *Id.*

In March 2000, acting on reports by manufacturers and southeastern states' administrative agencies which indicated an increase in the number and severity of consumer complaints caused primarily by moisture build-up and condensation in homes located in the

14

south after the implementation of the more stringent energy efficiency requirements, and noting that the regulations (§ 3280.504) did not at that time distinguish between climates for condensation control and installation of vapor retarders in the construction of exterior walls, HUD proposed a waiver of the vapor barrier requirements set forth in § 3280.504(b)(1), allowing manufacturers of homes in humid climates, at their option, to install the vapor retarder on the exterior rather than the interior or "living space" side of the exterior wall, provided that the interior wall was constructed of a permeable material meeting a certain permeability rating. 65 Fed.Reg. 17110-17112 (March 30, 2000)  The waiver was issued on April 24, 2002. 67 Fed. Reg. 20400-20403 (April 24, 2002). In issuing the waiver, the Department noted that the waiver constituted only a "partial solution" to the problem in that it did "not consider the larger transport of moisture by air leakage" and accordingly, manufacturers choosing to use the waiver, and thereby install the vapor barrier on the external side of the wall, were advised that compliance with the waiver would not relieve them of their responsibility to use construction methods that result in "durable, liveable, and safe housing" as required by § 3280.303(b). *Id.* at 20401. In meeting that standard, it was suggested that manufacturers electing to use the waiver consider the use of exterior air barriers, prevention of air leakage from duct systems and other penetrations causing negative pressurization of the home, avoiding the use of oversized cooling equipment and the use of balanced mechanical ventilation systems. *Id.*

In December 2004, HUD proposed an amendment to § 504(b) to incorporate the geographical waiver for homes situated in hot and humid climates. 69 Fed.Reg. 70016 (Dec. 1,

2004). Following public comment, however, HUD found that virtually no manufacturer had been able to use the geographical waiver because it did not have necessary exceptions for the interior wall permeability rating requirement in certain areas of the home. 70 Fed.Reg. 72024 (Nov. 30, 2005). Accordingly, HUD amended § 3280.504(b) to permit the placement of vapor retarders on the exterior side of walls in homes manufactured to be sited in humid climates, provided that the interior wall was constructed of a permeable material meeting a certain permeability rating, except in areas such as the kitchen and bathroom, and where cabinetry or trim are located. *Id.* The amended regulation became effective on May 30, 2006. *Id.*

## I. Plaintiff's claimed violation of § 3280.303(b)

The parties disagree on the federal standard which governs this action. Redman and Champion contend that plaintiffs seek to impose liability under Louisiana's redhibition and product liability laws for their compliance with 24 C.F.R. § 3280.504(b), which sets forth the requirements for construction of exterior walls of manufactured homes. Plaintiffs, on the other hand, contend that their claims seek to impose liability on the defendants for Redman's and Champion's violation of § 3280.303(b) which requires that accepted engineering practices be employed in the construction of mobile homes.

As noted above, § 3280.303(b) sets forth only "general requirements" for construction of the body and frame of manufactured homes. The regulation is somewhat ambiguous regarding the scope of its application as neither the terms "body" nor "frame" are defined in Code. However, § 3280.504(b) is quite specific as to the scope of its application. The

16

regulation expressly sets forth the specific requirements for the construction of "[e]xterior walls" of manufactured homes. Furthermore, the regulation is contained in that Subpart of the Code which specifically deals with "condensation control." 24 C.F.R. § 3280.501

It is a well known and well accepted canon of statutory construction that a specific statutory provision controls over the general, and that "a general statutory rule does not govern if a more specific rule covers the case." *Morales v. Transworld Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031 (1992); *Resolution Trust Corp. v. Seale*, 13 F.3d 850, 854 (5th Cir. 1994); *Carmona v. Andrews*, 357 F.3d 535, 538 (5th Cir. 2004) *citing United States v. John*, 309 F.3d 298, 302 fn. 5 (5th Cir. 2002), and *Kirby Corp. v. Pena*, 109 F.3d 258, 270 (5th Cir. 1997). The same is true with federal regulations, "a general regulation ... is not controlling in the face of a specific regulation ...." *Spreckels v. Helvering*, 315 U.S. 626, 628, 62 S.Ct. 777, 778 (1942); *Brigham v. Eugene Water & Electric Bd.*, 357 F.3d 931, 940 fn. 17 (9th Cir. 2004); *Frysinger v. Comm. of Internal Revenue*, 645 F.2d 523, 526-527 (5th Cir. 1981); *Jackson v. Noble Drilling Corp.*, 1996 WL 291740, *2 (E.D.La. 1996). Moreover, "[h]owever inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment.'" *Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 107, 64 S.Ct. 890 (1944); *Ehlmann v. Kaiser Foundation Health Plan*, 20 F.Supp.2d 1008, 1012 (N.D.Tex. 1998).

In this action, plaintiffs seek to impose liability on the defendants for the allegedly defective construction of the exterior walls of their mobile home, which allegedly resulted in

an excessive accumulation of condensation throughout the exterior walls of their manufactured home, causing deterioration of the exterior walls. However, the court concludes that §3280.303(b), the general construction provision, is trumped by § 3280.504(b), the more specific provision that applies to the construction of exterior walls of mobile homes and control of condensation in those walls. Section 3280.504(b) is "tailor made for", and governs, the facts of this case.

## II. Express Preemption

Redman and Champion argue that the MHCSSA general preemption clause, § 5403(d), when read in conjunction with the MHCSSA "savings clause" (§ 5409(c)) and MHCSSA "state enforcement clause" (§ 5422(a)), leads to the conclusion that plaintiffs' claims are expressly preempted. In support, they rely on the Supreme Court's decision in *Geier* and a pre-*Geier* 1991 Texas state appellate court decision, *MacMillan v. Redman Homes*, 818 S.W.2d 87 (Tex. Ct. App. 1991).

In *Geier*, the Court considered the effect of almost identical preemption and savings clause provisions in the National Traffic and Motor Vehicle Safety Act ("NTMVSA") on a state tort action. The Court found that "the savings clause assumes that there are some significant number of common-law liability cases to save." *Geier*, 529 U.S. at 868. However, the Court noted that if the express preemption clause was broadly read to apply to common law actions and standards imposed by such actions, there would be little, if any, common law liability remaining. *Id.* Thus, if Congress had intended little or no liability to remain, the Court questioned why the Act would include a savings clause which would have had virtually no

meaning. *Id.* Consequently, the Court held that a broad reading of the express preemption clause could not be correct, and in order to harmonize the two clauses, the Court held that given the presence of the savings clause, the express preemption clause must be read narrowly to expressly preempt only state statutes and regulations, not state common law private actions. *Id.* Thus, the Court found that the plaintiffs' state law tort action was not expressly preempted. *See also Sprietsma v. Mercury Marine*, 537 U.S. 51, 63-64, 123 S.Ct. 518 (2002) (interpreting the Federal Boat Safety Act, containing both a preemption and savings clause, as expressly preempting only "positive enactments" imposed by statute or regulation, not common law tort actions).

Although the *Geier* Court reached a contrary result than that urged by Redman and Champion here, they distinguish this result on grounds that the preemption clause at issue in this case, unlike the clause at issue in *Geier*, expressly states that the clause must be "broadly and liberally construed." Thus, they argue that the narrow construction of the clause afforded by the *Geier* Court is inapplicable in this case. Affording the general preemption clause in the MHCSSA broad and liberal construction, Redman and Champion assert that the clause applies to standards imposed by common law tort actions. Consequently, they assert that plaintiffs' claims are expressly preempted because the claims attempt to impose a state standard, via a Louisiana state law tort action that is not identical to the federal standard.

However, as noted above, the amendment to § 5403(d) which added the "broad and liberal" construction language to the preemption clause of the MHCSSA was to not intended to

19

modify or expand the basic substance, or reach, of the statutory preemption provision as Redman and Champion suggest. Rather, this amendment was merely enacted in response to the 1998 Eleventh Circuit decision in *Georgia Manufactured Housing Ass'n, Inc. v. Spalding County, Ga.*, 148 F.3d 1304, 1309 fn. 8 (11th Cir 1998) to provide explicit statutory support for the previously issued HUD regulation found at 24 C.F.R. § 3282.11. *See* 68 Fed. Reg. 42327, 42328 (July 17, 2003); *See also* 146 Cong. Rec. H11960, H11988 (Dec. 27, 2000) (Rep. Leach) (noting that the revision to § 5403 would "clarify", not expand or modify, the scope of federal preemption). Accordingly, the undersigned finds Redman's and Champion's argument on this point unpersuasive.

Relying on *MacMillan*, Redman and Champion also argue that the state enforcement clause mandates a result different than that reached by the *Geier* Court. While the NTMVSA regulation at issue in *Geier* did not contain a similar provision, the undersigned nevertheless concludes that this additional clause present in the MHCSSA does not lead to the conclusion advocated by Redman and Champion. The *MacMillan* court reasoned that because § 5422(a) expressly gives state courts jurisdiction over matters on which no federal standard has been established, Congress intended that state courts would have no jurisdiction over matters on which federal standards have been established. *MacMillan*, 818 S.W.2d at 92.[7] To adopt the

---

[7] To reconcile the savings clause and the state enforcement clause, the court interpreted the two provisions as allowing state court suits only on matters not covered by a specific federal standard, and that compliance with a federal standard covering other matters would not shield a defendant from liability in such suits. *See Id.* at 93. In other words, the court found that the two statutes reflect the difference between Congress withdrawing an entire field, or merely a part of that field, from the jurisdiction of the state courts by "eliminat[ing] any suggestion that federal regulation of certain aspects of safety in manufactured housing ... preempts the entire field of liability involving manufactured housing" safety issues. *Id.* In a pre-*Geier* decision, an Ohio court of appeals did not find the *Macmillan* interpretation of § 5422(a) persuasive, nor does the undersigned for those reasons set forth above. *See*

20

*MacMillan* reasoning urged by the defendants, however, would, in effect, "read-out" the plain language of the savings clause and negate the interpretation of that clause made by the *Geier* Court. The *Geier* Court found that the savings clause saves actions where a federal standard has been established, and explained that compliance with that federal standard would not automatically exempt a person from state law liability, citing as an example an action involving a federal standard establishing only a "floor" or minimum requirement.[8] *Geier*, 529 U.S. at 867-868. Accordingly, the undersigned finds *MacMillan*'s interpretation of the state enforcement clause neither persuasive nor controlling.

Finally, the undersigned notes that the state enforcement clause relates to jurisdiction in a case where no federal standard exists. It does not speak to the case where, as here, a federal standard has been issued. *See Mizner v. North River Homes, Inc.*, 913 S.W.2d 23, 25 fn.1 (Mo.Ct.App.E.D. 1995), *adopted and reinstated* (Mo.S.Ct. 2/5/96). Thus, this provision is wholly inapplicable in this case. That conclusion is based on the explicit wording of the regulation, and is further buttressed by the absence of reliance on the state enforcement clause in any other decision concerning preemption of state law claims involving matters on which a federal standard exists; rather, those courts uniformly only cite the general preemption clause and savings clause in support of their decisions. *See e.g. Shorter v. Champion Home Builders Co.*, 776 F.Supp. 333 (N.D.Ohio 1991); *Richard v. Fleetwood Enterprises, Inc.*, 4 F.Supp.2d

---

*Hall v. Fairmont Homes, Inc.*, 664 N.E.2d 546, 555-556 (Ohio App. 4th Dist. 1995).

[8]The Court explained that the words "compliance" and "does not exempt" were meant to bar a special kind of defense in such actions, "namely, a defense that compliance with a federal standard automatically exempts a defendant from state law ..." liability  *Geier*, 529 U.S. at 869.

650, 657 (E.D.Tex. 1998); *Turner v. PFS Corporation*, 674 So.2d 60 (Ala. S.Ct. 1995).

The undersigned finds that § 5403(g), which designated "energy conservation standards" as "preemptive", has no impact on the issues before this court. Plaintiffs do not seek to impose an energy conservation standard not adopted or approved by HUD.

Given the nearly identical nature of the general preemption and saving clause provisions in the NTMVSA and MHCSSA, this court finds, in light of *Geier*, that plaintiffs' claims are not expressly preempted. The general preemption clause § 5403(d), when read in conjunction with the "savings clause" § 5409(c), provides for preemption of state and local safety standards, not standards imposed by the operation of state law tort law. The savings clause preserves some state law tort actions involving matters on which federal standards have been established, and in such actions, compliance with the federal standards will not automatically preclude liability. The state enforcement clause permits state court jurisdiction under state law over matters on which no federal standard has been established.

## II. Implied Preemption

Although the undersigned has found that plaintiffs' claims are not expressly preempted, that finding does not bar this court from finding that plaintiffs' claims are impliedly preempted. In *Geier*, after determining that the savings clause preserved some common law actions, the Court examined whether the clause went further, preserving all tort actions from ever being preempted. *Geier*, 529 U.S. at 869. The Court concluded that the savings clause did not bar the ordinary application of implied preemption principles. *Id.* The Court reasoned that

22

Congress would not enact legislation that required compliance with federal regulation as a precondition, and then allow states to carve away at that regulation through common law private actions that were in conflict. *Id.* at 869-870. Rather, the savings clause serves as a buffer to the express preemption clause allowing for some common law liability while still preserving implied preemption principles to protect the overall objectives of the regulatory scheme. *Id.* at 870.

Redman and Champion argue that under *Geier* plaintiffs claims are conflict preempted because § 3280.504(b) does not establish a "minimum" standard, but rather gives manufacturers a choice of exterior wall construction that states are forbidden from prohibiting. Consequently, Redman and Champion argue that a favorable judgment for plaintiffs in this action would effectively eliminate a federally granted and federally authorized option via a state court action, which would present an actual conflict with the superintendence of federal law. The undersigned agrees.

The test for determining whether a state action stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress is "whether the State rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act." 24 C.F.R. § 3282.11(d); *Choate*, 222 F.3d at 795. The rule of state law that plaintiffs seek to impose by this action would compromise the federal superintendence of the manufactured home industry as established by the MHCSSA.

In *Geier*, the regulation at issue established the types of passenger restraint systems which car manufacturers were permitted to install in their vehicles. The regulation did not establish a minimum standard above which the states were free to regulate, but rather provided the manufacturer with a range of choices among different passenger restraint devices, any of which would satisfy the federal government's cost, safety and performance requirements. *Geier*, 529 U.S. at 874-875. The car manufacturer selected one of the options and installed that option in a vehicle in which the plaintiff was injured. The plaintiff claimed that the car manufacturer should have selected an option utilizing an airbag instead of the other options presented. *Id.* at 881. The Court found that this would have effectively eliminated use of the other choices offered under the federal standards. Thus, if the plaintiff's action was allowed to proceed, a state rule of law would effectively eliminate one of the chosen federal methods of passenger restraint by declaring that only one federally granted option was appropriate, thus destroying the "variety and mix" allowed by the regulation. *Id.* Thus, the Court found that the rule of state tort law sought by the plaintiff would have stood as an obstacle to the accomplishment and execution of federal objectives. *Id.* The plaintiff's action was therefore impliedly preempted.

Section 3280.504(b), like the regulation at issue in *Geier*, does not set a minimum standard for exterior wall construction, but rather the regulation provides manufacturers with federally authorized options for the construction of exterior walls. While HUD has, in some instances, designated certain manufactured housing standards as "minimums" or used

24

modifying language to designate that the standard sets only a minimum requirement, there is no such language contained in § 3280.504(b). To the contrary, the options are contained in one of the energy conservation regulations, designated by Congress as "preemptive." See 42 U.S.C. § 5403(g); See also 57 Fed. Reg. 6420 (Feb. 24, 1992) (proposing to amend § 504 "to include preemptive standards significantly upgrading the existing energy conservation requirements"); 58 Fed. Reg. 54975, 54975 (Oct. 25, 1993) (amending § 504 "to include preemptive standards significantly upgrading the existing energy conservation requirements"). Accordingly, as in Geier, if plaintiffs were successful in this action, a state rule of law would effectively eliminate one of the statutorily approved options, forcing manufactured home manufacturers to choose one of the other two options (ventilated or unventilated walls) over the option permitting placement of a vapor barrier on the "living space side" of the wall.[9] Such a rule would conflict with, impair and frustrate the Federal superintendence of the manufactured home industry by effectively precluding the use of one of the federal chosen methods of exterior wall construction. Under Geier, that result is impermissible. Plaintiffs' state law claims are impliedly conflict preempted.

The undersigned's conclusion is further supported by post-Geier jurisprudence. Since Geier, courts have consistently relied on the distinction between federal regulations which offer manufacturers a choice and federal regulations which set only a minimum standard in

---

[9] An award of damages by a state or federal court is considered to be a method of regulation because it is designed to influence conduct. Kelly v. General Motors Corp., 705 F.Supp. 303, 305 (W.D.La. 1988) (citations omitted). Thus, a "manufacturer faced with the prospect of choosing [an] option or facing potential exposure to compensatory and punitive damages for failing to do so, has but one realistic choice." Id. A court decision that removes the element of choice authorized by federal regulations will frustrate the statutory scheme. Id.

determining whether state law actions are impliedly preempted. *See Choate v. Champion Home Builders Company*, 222 F.3d 788, 795-796 (10th Cir. 2000); *Griffith v. General Motors Corp.*, 303 F.3d 1276, 1280-1282 (11th Cir. 2002); *Harris v. Great Dane*, 234 F.3d 398, 401-403 (11th Cir 2000); *Stone v. Frontier Airlines, Inc.*, 256 F.Supp.2d 28, 43-44 (D.Mass. 2002); *Molina v. BIC USA, Inc.*, 136 F.Supp.2d 196208-209 (S.D.N.Y. 2000); *O'Hara v. General Motors Corp.*, 2006 WL 1094427, *4-5 (N.D.Tex. 2006). If the federal regulation does not provide manufacturers a choice, but rather sets only a minimum standard of compliance, courts routinely find the state law action is not preempted. *See Choate* and *Harris*. On the other hand, when the federal regulation provides manufacturers a choice, courts routinely find that the state law action is preempted to the extent that success in the action would effectively eliminate a federally authorized option. *See Griffith* and *O'Hara, supra.; Hurley v. Motor Coach Industries, Inc.*, 222 F.3d 377, 381-382 (7th Cir. 2000); *Heinricher v. Volvo Car Corp.*, 809 N.E.2d 1094, 1097-1098 (Mass. App. Ct. 2004); *Moser v. Ford Motor Co.*, 28 Fed.Appx. 168170-171 (4th Cir. 2001); *Carrasquilla v. Mazda Motor Corp.*, 166 F.Supp.2d 169, 175-176 (M.D.Pa. 2001).

That is the case here. If plaintiffs succeed here, this would effectively eliminate a federally authorized option. At the time plaintiffs mobile home was constructed, the regulatory scheme set forth in § 3280.504(b) provided a "variety or mix" of alternative exterior wall construction methods. Thus, Redman and Champion had the option of placing a vapor barrier on the "living space side" of the wall, constructing an unventilated wall, or constructing a

26

ventilated wall. None of the options was mandated, nor was any option required to be used in hot and humid climates. Redman and Champion complied with the regulatory scheme by selecting the vapor barrier on the "living space side" option, instead of the ventilated or unventilated exterior wall options in the construction of plaintiffs' mobile home.

By this lawsuit, plaintiffs clearly challenge the manufacturer's selection of one federally sanctioned construction method over another. Their cause of action, if successful, would establish a rule that, to avoid liability in hot and humid climates, manufacturers must construct either ventilated or unventilated walls in all of their manufactured homes. As such, the vapor barrier option specifically afforded manufacturers by HUD under the regulatory scheme would be foreclosed. Plaintiffs' claims would frustrate HUD's decision to allow manufacturer's a choice of exterior wall construction techniques by excluding one federally sanctioned method from the range of available federally approved methods of construction, while imposing a uniform state law requirement on manufacturers of homes in situated in hot and humid climates. Plaintiffs' state law claims are therefore impliedly conflict preempted. *See Griffith, O'Hara, Hurley, Heinricher, Moser,* and *Carrasquilla, Supra.*

Moreover, to impose common law damages on Redman and Champion for doing what a federal regulation specifically authorized them to do would directly conflict with federal law. "A state cannot impose common law damages on individuals for doing what a federal act or regulation 'authorized them to do.'" *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998) quoting *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318-320,

27

101 S.Ct. 1124 (1981).

Finally, permitting the instant action to proceed would be inconsistent with HUD's initial decision not to impose a geographic restriction on the construction of exterior walls in homes situated in humid climates. The history of § 504(b) set forth above reveals that in 1992 and 1993, HUD considered amending the standard for construction of exterior walls, and more specifically, considered whether the placement of vapor retarders in exterior walls should be related to the condensation zone in which the home is located. *See* 57 Fed. Reg. 6420 (Feb. 24, 1992) and 58 Fed. Reg. 54975 (Oct. 25, 1993). After reviewing comments expressing "a wide range of views on the placement and need for a vapor retarder" in exterior walls, the Department did not propose a new standard or an additional construction option for homes located in hot and humid climates. 58 Fed. Reg. at 54993. Thus, the existing standard for construction of exterior walls was left undisturbed. Accordingly, no geographical restriction was implemented at that time. Rather, it was not until November 2005 that HUD adopted a standard incorporating an additional method for construction of exterior walls of homes situated in hot and humid climates. *See* 70 Fed.Reg. 72024 (Nov. 30, 2005).

Although in 1993 HUD did not expressly state that it was not necessary to adopt a standard accounting for the geographical location in which a manufactured home is located, the regulative history implies that after careful consideration HUD affirmatively chose not to change the existing standard at that time. Nevertheless, by this lawsuit, plaintiffs seek to retroactively impose a geographic restriction on the standard under which their 1997 model

28

mobile home was constructed, a restriction which, at that time, HUD had declined to impose. Given the regulatory history cited above, such a rule would be inconsistent with HUD's initial determination not to change the existing standard.[10] This additional reason provides further support for the undersigned's conclusion that plaintiffs' action is impliedly conflict preempted.

## Conclusion

Based on the foregoing reasons, the Motions to Dismiss filed on behalf of Redman and Champion are GRANTED. Accordingly, this action is DISMISSED with prejudice.

January 26, 2007, at Lafayette, Louisiana.

C. Michael Hill
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

---

[10]This distinguishes the instant case from *Sprietsma v. Mercury Marine*, 537 U.S. 51, 123 S.Ct. 518 (2002). In *Sprietsma*, there was no standard or existing regulation regarding propeller guards, either requiring such guards or not requiring such guards. Although the Coast Guard considered, but had not adopted, a federal propeller guard regulation, the Coast Guard did not establish a federal policy against the use of propeller guards or decide that as a matter of policy, the States could not impose some version of propeller guard regulation. *Id.* at 67. Here, in sharp contrast to the Coast Guard's decision at issue in *Sprietsma*, HUD's decision was not that there would be no federal regulation of the construction of exterior walls of manufactured homes, but rather that the existing standard, mandating that one of three options be employed in the construction of exterior walls of manufactured homes, not be changed.

29

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION


RUSSELL J. GUIDROZ, JR., ET AL.,     :     DOCKET NO. 05-01148
                                     :
                    Plaintiffs,      :
                                     :     May 17, 2007
vs.                                  :
                                     :
CHAMPION ENTERPRISES, INC., ET AL.,  :
                                     :
                    Defendants.      :     Lafayette, Louisiana

_____


REPORTER'S OFFICIAL TRANSCRIPT OF THE HEARING
BEFORE THE HONORABLE C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE.


APPEARANCES:

FOR THE PLAINTIFFS:          HUGH E. MCNEELY
                             Hagens, Berman, et al.
                             1 Main St., 4th Floor
                             Cambridge, MA  02142


FOR THE DEFENDANTS:          LAMONT P. DOMINGUE
                             Voorhies & Labbe
                             P.O. Box 3527
                             Lafayette, LA  70502



REPORTED BY:                 LARAE BOURQUE, RPR, CRR
                             United States Court Reporter
                             800 Lafayette Street, Ste. 3103
                             Lafayette, Louisiana  70501



EXHIBIT
6



COPY

```
 1              P R O C E E D I N G S
 2                        (Call to order of the court.)
 3         THE COURT:  Good morning, gentlemen.
 4         All right, gentlemen.  We're going to take up Guidroz
 5    vs. Champion Enterprises first, 05-1148.
 6         Counsel make your appearances, please.
 7         MR. MCNEELY:  Your Honor, Hugh McNeely on behalf of the
 8    plaintiffs.
 9         MR. DOMINGUE:  Lamont Domingue on behalf of the
10    defendants.
11         THE COURT:  Mr. McNeely.
12         MR. MCNEELY:  Yes, sir.
13         THE COURT:  I owe you an apology.
14         MR. MCNEELY:  Well, I don't know about that.
15         THE COURT:  Well, I do.  I told you I was going to do
16    something and then I forgot completely about it.
17         MR. MCNEELY:  Yes, sir.
18         THE COURT:  So I apologize to you.  I apologize
19    forgetting about you, for forgetting about what I told you.  I
20    don't apologize for the opinion, which I happen to think was
21    right, but I do apologize for not allowing you your opportunity
22    to amend which I told you I was going to do.  I have no excuse
23    for that.
24         This was an opinion that Janet and I agonized over for
25    a long time.  It's a hard case and it was a hard opinion to
```

1  write.  She and I don't normally agonize.  We usually argue.  In
2  this one we agonized.
3       I believe the conclusion I reached was the correct one
4  under the circumstances, but it was the passage of that time in
5  trying to get the opinion right that it just simply slipped my
6  mind what I had told you I was going to allow you to do.  So I
7  apologize.  I apologize for that.  Under the circumstances --
8  Mr. Domingue, I'll let you say something before I rule against
9  you if you'd like.
10       MR. DOMINGUE:  No, Your Honor.  We'll just file the
11  motion following the allowance of the amendment.
12       THE COURT:  All right.  This is what I'm going to do.
13  I'm going to grant your motion to alter judgment in this way.  I
14  am going to amend the judgment so as to make it a partial
15  judgment of dismissal on the claims asserted in the original
16  complaint so I don't have to go through that again, Mr. McNeely.
17       I will then allow the amendment to the -- I probably
18  ought to do it the other way around just to make sure the case
19  doesn't get dismissed.  First, (a), I'm going to amend the
20  amendment; (b), I'm going to grant the motion to alter and amend
21  the judgment so as to provide that the judgment is a partial
22  dismissal of those claims filed in the original complaint.  And
23  we'll deal with the amended complaint as soon as y'all file them.
24  Okay?
25       Does that solve -- does that get us there, Mr. McNeely?

1    MR. MCNEELY:  It certainly gets us down the road, and

2    I'll -- as far as the dismissal relative to what was in the

3    original complaint, you know, that's -- I'll have to think about

4    that, but I understand what you're doing.

5    THE COURT:  Well, I just don't want to have to -- I

6    don't want to have to reinvent that wheel, and I think that the

7    initial claim that you pled -- or I'll put it this way.  The

8    claim that you pled in the initial complaint I believe to be

9    peremptory.

10    We'll see if the amending complaint gets you past that,

11    but to the extent that the amending complaint incorporates those

12    allegations found in the original complaint, I believe that is

13    preempted and that's why I'm going to make it a partial

14    dismissal.  That's the intent of what I'm trying to get done, and

15    then we'll take a look at -- we'll take a look at the amended

16    pleading after that.

17    MR. MCNEELY:  Very good.

18    THE COURT:  Okay.  Mr. Domingue, I assume that we're

19    going to get another 12(b)(6) motion.

20    MR. DOMINGUE:  I would assume that to be the case, Your

21    Honor.

22    THE COURT:  Y'all have discussed, as I understand it,

23    settling the case and that just didn't work out.

24    MR. DOMINGUE:  That's correct, Your Honor.

25    THE COURT:  Would it -- do either one of you think it

1  would be of benefit to either you or your clients for me to order

2  further mediation in the case?

3          MR. DOMINGUE:  I did not participate in the mediation

4  that took place.  It involved other claims existing in other

5  states as well, Your Honor.

6          THE COURT:  I understand.

7          MR. DOMINGUE:  And so I would have to talk to my client

8  as to whether they thought it --

9          THE COURT:  No.  That's all right then.  If the intent

10  was to settle these claims outside -- or claims that exist

11  outside of this lawsuit, which it sounds like it was, I'm not

12  going to get myself involved in that.

13          MR. DOMINGUE:  It was all claims, whether it was in

14  Louisiana, Alabama or wherever.

15          THE COURT:  On behalf of my fellow brethren on the

16  bench, we'd probably like to see you do that.

17          MR. MCNEELY:  Judge, I think it certainly is

18  worthwhile.  We'll have some more discussions relative to whether

19  we feel like mediation would be helpful, and we'll certainly let

20  you know whether or not that --

21          THE COURT:  Okay.  That's fine.  I think you continue

22  to have a tough row to hoe, Mr. McNeely.  You know, sharpen up

23  your hoe and go after it.  And I'm certainly not prejudging it

24  because I really haven't read with any detail at all the amended

25  complaint, only to such -- only in such detail as I thought I

1   might have to to deal with Mr. Domingue's argument that the

2   amendment would be without benefit, and certainly it isn't that.

3   So I've read enough to know that you get past that hurdle anyway.

4   Whether you win in the end or not, I don't know, but, like I say,

5   sharpen up your hoe and take your best shot.

6           MR. MCNEELY:  Your Honor, that's how we make our money,

7   how we earn it.

8           THE COURT:  That's how we earn it.  Sometimes we make

9   it differently, but that's how we earn it.  Just ask these guys

10  behind you.  Thank you very much, gentlemen.  You're excused.

11          Hold on a second, Mr. McNeely.

12          MR. MCNEELY:  Yes, sir.

13          THE COURT:  Janet pointed out to me that the case is

14  not set for trial and I don't want it to fall through -- I don't

15  want it to fall through the cracks.  I tell you what we'll do.

16  Can you -- if you're going to file a 12(b) motion, can you do it

17  in 15 days?

18          MR. DOMINGUE:  Yes, Your Honor.

19          THE COURT:  Let's do it that way.  I'm going to order

20  you to file your 12(b)(6) motion within 15 days in default of

21  which we will set a scheduling order.  Does that work for

22  everybody?

23          MR. MCNEELY:  Yes, sir.

24          THE COURT:  Otherwise, if we don't do that, I'll commit

25  an error of faux pas, lack of memory number two in this case, and

1    it will sit here forever.  So we'll do it that way.  Thank you,

2    gentlemen.

3             MR. DOMINGUE:  Thank you, Your Honor.

4             MR. MCNEELY:  Thank you.

5                                      (Hearing adjourned.)

6                          _  _  _

```
 1                UNITED STATES DISTRICT COURT

 2               WESTERN DISTRICT OF LOUISIANA

 3              LAFAYETTE-OPELOUSAS DIVISION

 4

 5   RUSSELL J. GUIDROZ, JR., ET AL.    :
                                        :
 6   vs.                                :   DOCKET NUMBER 05-1148
                                        :
 7   CHAMPION ENTERPRISES, INC., ET AL. :

 8   ─────────────────────────────────────────────────

 9                CERTIFICATE OF REPORTER

10         I, LaRae E. Bourque, Official Court Reporter for the

11   United States District Court, Western District of Louisiana,

12   do hereby certify that the foregoing 7 pages are a true and

13   accurate transcript of the proceedings had in this matter,

14   as hereabove set forth, and that I have no interest of any

15   nature whatsoever regarding the ultimate disposition of this

16   litigation.

17         I further certify that the transcript fees and format

18   comply with those prescribed by the Court and the Judicial

19   Conference of the United States.

20

21

22                          _____
                            LARAE E. BOURQUE, RRR, CRR
23                          Official Court Reporter

24

25
```

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

January 19, 2007

Mr. Brian D. Cooney
Vice President, Government Affairs
Manufactured Housing Institute
2101 Wilson Blvd., Suite 610
Arlington, VA 22201-3062

Dear Mr. Cooney:

Following up on our December meeting with you and your colleagues, we have had a chance to review the plaintiffs' pleadings you have provided us on various vapor barrier cases. As the HUD official responsible for the enforcement of the Manufactured Home Construction and Safety Standards, I can say that these pleadings consistently misrepresent HUD enforcement policy by arguing that HUD's general standard at 3280.303(b) should be applied to manufacturers' practices regarding the placement of vapor barriers even though these manufacturers have complied with HUD's more specific vapor barrier standard at 3280.504(b).

Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction. Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).

Thank you again for bringing this situation to our attention. HUD has a distinct interest in maintaining an accurate understanding by arbitrators and the courts of HUD's enforcement policies and practices regarding the Manufactured Home Construction and Safety Standards. We would be especially concerned by a reported judicial decision that misstated HUD policy and practice, so please keep us advised of developments in these cases.

Sincerely,

William W. Matchneer III
Associate Deputy Assistant Secretary for
    Regulatory Affairs and Manufactured Housing

EXHIBIT
tabbies
7

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

JUN 2 1 2007

I, _Theodore A. Ford_, Director, employed by United States Department of Housing and Urban Development, certify that I have official duties in the United States Department of Housing and Urban Development, District of Columbia and have authority to make and issue this certificate. I further certify that the signature of William W. Matchneer III, Associate Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, United States Department of Housing and Urban Development, District of Columbia, appearing on the attached copy of the document is a copy of a genuine signature and that the signer has the official capacity indicated thereon.

Theodore A. Ford

Theodore Ford
Director

