### IN THE UNITED STATES DISTRICT COURT FOR THE
### MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

**TERRY DEESE,**     *

                      *

      **Plaintiff,**     *

                      *

**v.**     *     **1:06-cv-643-MHT**

                      *

**HOMES OF LEGEND, INC.,**     *

                      *

      **Defendant.**     *

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - PREEMPTION

Plaintiff, by undersigned counsel, files this Memorandum in Opposition to Defendant

Champion Homes of Boaz, Inc.'s ("CHB") Motion for Summary Judgment - Preemption.

### INTRODUCTION

Defendant CHB alleges that this case must be dismissed on federal preemption grounds

because: "[t]his Honorable Court is being asked to eliminate one of the federally mandated choices

for exterior wall design – interior vapor barriers under Section 3280.504(b)(1)." *See* Brief in Support

of Motion for Summary Judgment – Preemption at p.15 (emphasis supplied).  Defendant further

argues that "[t]he fact that HUD had an opportunity to limit (sic) ability to place a restriction of the

use of a §3280.504(b)(1) wall design in certain geographical locations, but did not, should be

persuasive to this Court to not alter controlling administrative regulations crafted by HUD." *See Id.*

at p.24 (emphasis supplied).  Defendant is alleging that §3280.504(b)(1) requires a vapor barrier of

less than 1 and thus they had to use the vapor barrier and Plaintiff cannot sue them because the

claims are preempted.  Defendant perverts the law on preemption as well as Plaintiff's claims but,

1

more importantly, have mislead this Court in a more material manner: this home was <u>not</u> built to

§3280.504(b)(1).

Defendant states in discovery that "[t]he manufactured home <u>was built in accordance with 24</u>

<u>CFR §3280.504(b)(3)</u>. That is the way the home was ordered." *See* Exhibit 1 (Defendant's

Supplemental Response to Plaintiff's First Set of Interrogatories to Homes of Legend, Inc.)

(emphasis supplied). 24 CFR §3280.504(b)(3) states "[w]all cavities shall be constructed so that

<u>ventilation is provided to dissipate any condensation occurring in these cavities</u>." (emphasis

supplied). There are no prescriptive requirements found whatsoever in this section other than to

ensure the wall cavities perform such that "ventilation is provided to dissipate any condensation

occurring in these cavities." Indeed, Defendant's own expert has admitted that §3280.504(b)(3) does

not specify permeance requirements, meaning that the prescriptive requirement of using a vapor

barrier of less than 1 is not a requirement of §3280.504(b)(3). Defendant's own corporate

representative admits this as well: "Q   504(b) does not tell you how to ventilate the wall cavities,

does it? A   No, sir." See Exhibit 11 Holloway Depo. Tr. p. 69:10-12.

It is disingenuous (to be polite) for this Defendant to file a brief urging this Court to find that

Deese's claims are preempted based upon §3280.504(b)(1) (which requires a vapor barrier of less

than 1) when the home was not even built to this standard but to §3280.504(b)(3). For this reason

alone, Defendant's Motion is due to be denied and this Court need read no further to do so.

Nonetheless, Plaintiff below provides a detailed explanation of how Defendant is perverting the case

law and Plaintiff's allegations even as it applies to §3280.504(b)(1).

2

## BACKGROUND AND RECENT RELATED OPINIONS

Plaintiff's Complaint does not focus on the "choice" made under §3280.504(b) but rather the fact that Defendant failed to implement it correctly.[1] Further, Plaintiff's claims focus on the failure of the moisture control performance of the design and actual construction of Defendant's products in the terms of the totality of construction choices made by Defendant; not just the vinyl covered walls, but the entire performance design and actual construction of the homes, including wall cavities, exterior coverings and ventilation systems, as actually constructed. Those building components <u>must</u> meet HUD performance standards so that the manufactured house is free from excessive condensation and moisture accumulation with the attendant damages. Stated simply, the home is not supposed to condensate (as Plaintiff has alleged) and no reading of the HUD Code supports such a finding. Even if the Deese home were built to §3280.504(b)(1), Defendant even misrepresents what Plaintiff is arguing under even that section. Defendant's conclusions that it can knowingly implement 504(b)(1) in a defective manner and further and in addition, it can violate certain other HUD prescriptive requirements, has no basis in law or fact.[2]

First, the HUD code expressly states:

Compliance with any Federal manufactured home construction or safety standard issued under this title does not exempt any person from any liability under common law.

---

[1] See ¶ 13 of Plaintiff's Complaint, "The manufactured homes designed and manufactured by Defendants, including the manufactured home purchased by Plaintiff, have an improper design and construction of exterior walls in violation of HUD Manufactured Home Construction and Safety Standards…" The manner in which the home was constructed is different than saying Defendant is liable merely for choosing a certain option.

[2] Defendant attaches a letter as an Exhibit from William Matchneer an individual at HUD which discusses Plaintiff's pleadings in some cases. The letter does not disclose which pleadings these were or even what they allege. Regardless, the letter does not state that Defendant can knowingly defectively implement an option under the HUD Code.

3

42 USC § 5409 (c). Also, the waiver itself[3] states (the Regulations): "Complying with the provisions of the waiver does not relieve manufacturers of their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR §3280.303(b) of the Standards."[4]

> All construction methods shall be in conformance with accepted engineering practices to insure durable, livable and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades.

24 CFR §3280.303(b) *Construction*.

If Defendant chooses to utilize option 1 under 24 C.F.R. §3280.504, even Defendant must admit that if option 1 is not implemented correctly it cannot argue preemption. Indeed, that is what Defendant has been alleged to have done in this and all cases. Defendant's reliance on *Geier* is misplaced in this respect for if in *Geier* Defendant had been sued because the seat belts were not installed properly and did not work, preemption would not apply (in fact Defendant in *Geier* was sued merely for *choosing* a seat belt which worked as it should have). If they were sued not for choosing a seat belt but for putting in seat belts that did not work, even Defendant must admit that preemption is baseless. No case anywhere states otherwise.

Finally, reliance on the *Guidroz* decision is also misplaced because on May 17, 2007, the Court granted Plaintiffs' Motion to Amend the Judgment of Dismissal. *See* attached Exhibit 4. Defendants then filed a new Motion to Dismiss Plaintiffs' *Amended* Complaint based on the grounds

---

[3] In March, 2000, HUD issued a waiver to 24 CFR Part 3280.504(b)1 for homes cited in hot and humid climates which allowed manufacturers to place a vapor retarder on the outside and remove it from the inside a/k/a "living" side of the walls. (*See* Exhibits 2 and 3). No such vapor retarder was ever required to be placed on the living side under 280.504(b)2 or (b)3 and there always existed a "blanket" alternate option which enabled the manufacturer to build the home in any manner necessary to make it perform.

[4] *See* Exhibit 2 attached hereto Final Rule dated April 24, 2002, Part IV Housing and Urban Development 24 CFR Part 3280 "Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Waiver; Final Rule" at page 20401.

4

of federal preemption.[5]  This motion to dismiss was fully briefed and argued and on August 1, 2007

the Court <u>denied</u> Defendants' Motion to Dismiss Plaintiffs' Amended Complaint Based on Federal

Preemption.  See attached Exhibit 5.   Defendant mischaracterizes the Court's holding at page 14 of

its Brief by leaving out important quotes and failing to mention that the *Guidroz* Court in fact

expressly denied Defendants' renewed motion to dismiss based on preemption in that case.  Finally,

and more recently, the United States District Court for the Middle District of Alabama, Northern

Division (the Honorable Mark E. Fuller) in *Perry v. Fleetwood Enterprises, Inc, et. al.* found that

Plaintiff's "state law claims are DISMISSED with prejudice to the extent that those claims seek to

penalize Defendants for their choice of an option available under 24 C.F.R. §3280.504(b).  Any of

Plaintiff's other state law claims remain pending."  *See* attached Exhibit 6 at p.14.

Thus, two separate and distinct Federal Courts in cases being prosecuted by Plaintiff's

counsel have allowed Plaintiff to go forward unless "those claims seek to penalize Defendants for

their choice of an option available under 24 C.F.R. §3280.504(b)."  The *Guidroz* Court had the

benefit of the matter being fully briefed and argued by the parties and still <u>denied</u> Defendants'

Motion to Dismiss Plaintiffs' Amended Complaint based on the very same Federal Preemption

arguments (except at least in *Guidroz* the home was built to §3280.504(b)(1)).  This Court need not

allow the same Defendant have another bite at the apple in advancing the same losing argument.

---

[5]  The Beasley, Allen firm (and now the law firm of Pels, Anderson, LLC) are indeed co-counsel with an additional law
firm but neither Beasley, Allen or Pels, Anderson drafted or filed the original complaint.  Each did work on the amended
complaint which was held <u>not</u> to be preempted.

## THE AD HOMINEM ATTACK ON THE PLAINTIFF'S EXPERTS

Besides the glaring omission that the Deese home was built to §3280.504(b)(3), Defendant regularly omits material matters when they attack the credibility of Robert Parks and suggests he is not qualified under *Daubert* v. *Merrill Dow Pharmaceuticals Inc.,* 509 U.S. 579 (1993), when the very same defense lawyers have used Mr. Parks as an expert on the very issues he is being used for in this case. They fail to mention that Mr. Parks serves as an expert currently (and in the past) to several manufacturers as it respects the very same issues he is being used for in this case.[6] Mr. Parks is indeed an industry expert and currently represents many manufacturers on the very issues he is addressing in this case. As stated in the attached Affidavit:

> I was brought in to be a presenter by the Louisiana State Fire Marshall's Office (who was serving as the states SAA) - at a COSAA (Council of State Administrative Agents) in 1999 in Myrtle Beach South Carolina and again in 2000 in Perdido Beach, Alabama. At this point I was already being recognized as a "person of interest" addressing and dealing with moisture related issue along the Gulf Coast.

> From these meeting I was asked to be a "Principle Member" of NFPA (standard writing organization for HUD) and was appointed top the "Mechanical for Manufactured Housing Committee" (which deals with sections involving a/c and moisture control)...... from there I also became involved with MHI (Manufactured Housing Institute) and MHRA (Manufactured Housing Research Alliance).

> I was contacted by Emanuel Levy and introduced to Francis Conlin[7] and asked to participate in the "Alternatives for Minimizing Moisture Problems in Homes Located in Hot, Humid Climates". This involvement included; 1) numerous conference calls; 2) Attending meetings in Old Alex. Virginia and Baltimore, Maryland 3) Establishing a protocol for testing homes for this project; 4) Because I already had a customer base of problematic homes, I supplied many homes to be tested; 5) I personal tested and collected data on many of the homes; 6) Francis Conlin actually visited Louisiana for approximately one week (that I can

---

6  As discussed briefly herein, Plaintiff believes that many of the opinions held by Defendant's experts are not only outside commonly accepted practices in the professional community but also contrary to their own previous opinions and will make the appropriate *Daubert* challenge when and if necessary.
7  Francis Conlin is serving as Defendant's expert in this matter.

recall) and because I already had all needed testing equipment - he brought basically nothing with him. We used my equipment to complete the data collection process.

I began being left out of the loop after I started representing plaintiff cases in 2004.

See Exhibit 12 (Affidavit of Bobby Parks). Additionally, Mr. Parks has the following experience in working with the manufactured housing industry on issues raised in this the Deese case (**Seminars and Presentations Presented**): (See Exhibit 14, Deposition of Bobby Parks, pp. 18-19, Exhibit 2)

> 1999 Council of State Administrative Agencies, (Regional Conference) Myrtle Beach, SC (Mfg. Housing Ventilation Systems - Field Study)
> 1999 Mfg. Housing Air Distribution Systems - Field Study
> 2000 Council of State Administrative Agencies, Featured Speaker (Regional Conference) Perdido Beach, AL (Indoor Air vs Outdoor Air -Field Study)
> 2000 La State Fire Marshall -Baton Rouge, LA (Building Inspection in Hot Humid Climates, Training Class)
> 2001 La. Mfg. Housing Association, Annual Conference - Baton Rouge, LA - Featured Speaker, (Indoor Air vs Outdoor Air -Field Study)
> 2001 Southern Energy Homes, Addison AL (Building Practices for Hot Humid Climates)
> 2001 National Manufactured Housing Congress - Las Vegas NV (Building Failure in Hot Humid Climate, Workshop Speaker)
> 2002 LA Mfg. Housing Commission - Inspector Training, Baton Rouge, LA
> 2002 LA Mfg. Housing Association - Continuing Education Class for Home Installers, Alexandria, LA
> 2003 LA Mfg. Housing Association - Continuing Education Class for Home Installers, Baton Rouge, LA
> 2003 Southern Energy Homes, Addison AL (Building Practices for Hot Humid Climates)
> 2003 Cavalier Homes, Addison AL (Building Practices for Hot Humid Climates)
> 2003 Buccaneer/Home Repair Service, Hamilton AL (Building Practices for Hot Humid Climates)
> 2003 Waverlee Homes, Hamilton, AL (Building Practices for Hot Humid Climates)
> 2003 LA Mfg. Housing Commission - Inspector Training, Baton Rouge, LA
> 2003 Cavalier Homes, Millen, GA (Building Practices for Hot Humid Climates)
> 2004 Cavalier Homes, Nashville, NC (Building Practices for Hot Humid Climates)

2004 Cavalier Homes, Ft. Worth, TX (Building Practices for Hot Humid Climates)
2004 LA Mfg. Housing Association - Continuing Education Class for Home Installers Baton Rouge, LA (Building Practices for Hot Humid Climates
2004 LA Mfg. Housing Association - Continuing Education Class for Home Installers, Alexandria, LA (Simplifying Home Installation Manuals)
2004 LA Mfg. Housing Association - Continuing Education Class for Retail Dealers Baton Rouge, LA and Alexandria, LA (Building Practices for Hot Humid Climates)
2005 Horton Homes, Eatonton, GA (Building Practices for Hot Humid Climates)
2005 Lexington Homes, Lexington, MS (Building Practices for Hot Humid Climates)
2006 Waverlee Homes, Muscle Shoals, AL (Building Practices for Hot Humid Climates)
2007 New River Homes. Burnsville, MS (Building Practices for Hot Humid Climates)

The protocols used by Mr. Parks in his inspection of the Deese home follow well settled protocols in the industry (and have been used in most of his over 700 inspections of other homes conducted on issues relating to the matters in this case). Specifically, this includes the Protocol for Wall Sampling (Exhibit 12a attached hereto); Protocol for Duct Testing (Exhibit 12b attached hereto); Protocol for Whole House Ventilation (Exhibit 12c attached hereto); Protocol for Air Sampling-Non Wall Cavity (Exhibit 12d attached hereto).[8]

They attack him merely because he is now working for Plaintiff instead of for the Defendant and do not like what he has repeatedly told many of the manufacturers. Defendant fails to mention Dr. Robert Konder, P.E., another of Plaintiff's experts in this case, agrees with Mr. Parks and further agrees that peer reviewed studies agree with the basic building premise Mr. Parks uses. *See* Exhibit 13 (Affidavit of Dr. Robert Kondner, P.E.) ("I deem each of these studies to be "reliable authority"

---

[8] Mr. Parks is also the consultant for the following State or Manufacturer(s) on the issues presented in this case: The Louisiana Governor Office: Louisiana State Administrative Agency (SAA) - Administrative Consultant 2003-Present; Louisiana Manufactured Housing Commission - Technical Consultant 2003 -2005; Contracted Consultant for Cavalier Homes Inc and subsidiaries, Addison, Alabama.2003–Present; Contracted Consultant for Liberty Homes and subsidiaries, Goshen, Indiana. 2003-Present; Contracted Consultant for Deer Valley Homes, Guin, Al. 2006 – Present.

and further state that each of these simply seem to reiterate a basic premise which runs throughout basic building science practices which come into play in all facets of construction relating to condensation control; that is that, simply stated, hot seeks cold and dry seeks moist.") *Id.* at ¶8. Indeed, lastly, this Defendant fails to mention that they in fact participated in many of these same peer reviewed studies and have actual knowledge of the content therein.

Indeed, Defendant's own corporate designee for deposition testified that the first he ever heard about some of the issues related to this case was from Plaintiff's expert, Bobby Parks at one of Mr. Parks' seminars:

> Q    Before Frances told you, did you have any knowledge that an oversized A/C could cause problems?
> A    The <u>first time I ever heard</u> about it was when I worked with Pioneer Housing Systems at a trade show – manufactured housing meeting in Mobile -- in Gulf Shores, <u>Alabama when Bobby Parks did his show</u>, showing the blower door test and everything. And he talked about how that a lot of retailers were selling air conditioners that were oversized for the home thinking that bigger was better and that wasn't true.
> Q    Okay.  You worked for Pioneer in '97 to November 2001; correct?
> A    Yes.

See Exhibit 11 Holloway Depo. Tr. p.49:9-23; p.50:1 (emphasis supplied).

## A.    <u>PREEMPTION STANDARDS</u>

The Federal Manufactured Home Construction and Safety Standards Act, 42 U.S.C. § 5401 et. seq., went into effect June 15, 1976 and is commonly referred to as the "HUD Code." In addition, and relevant to this case, are the Manufactured Home Construction and Safety Standards, 24 C.F.R. §3280, et. seq., (the "Standards") and the Manufactured Home Procedural and Enforcement Regulations, 24 C.F.R. §3282 et. seq.  (the "Regulations").[9]

---

[9] Collectively, the HUD Code, the Standards and the Regulations shall be referred to as these "provisions" when it is not necessary to specify one.

In general, federal pre-emption of state statues, local ordinances and/or common law claims can occur in three ways: (1) Congress may pass a statute that by its express terms pre-empts state law; (2) Congress may imply that it is pre-empting state law by occupation of an entire field of regulation, so that no room is left for supplementary regulation; or (3) where Congress speaks neither expressly nor impliedly of pre-emption, state law is pre-empted to the extent that it actually conflicts with federal law.   Such a conflict occurs when compliance with both state and federal law is impossible or when state law stands as and impediment to federal purpose.  *See English v. General Elec. Co.*, 496 U.S. 72, 110 S. Ct. 2270, 110 L. Ed. 2d 65, 5 I.E.R. Cas. (BNA) 609, 14 O.S.H. Cas. (BNA) 1609, 115 Lab. Cas. (CCH) P56262, 113 Pub. Util. Rep. 4th (PUR) 97 (1990), as quoted in *Choate v. Champion Home Builders Co.*, 222 F. 3d 7888, Prod. Liab. Rep. (CCH) P 15870, 172 A.L.R. Fed. 691 (10th Cir. 2000).

## 1.  **Express Preemption**

The HUD Code expressly states:

> Compliance with any Federal manufactured home construction or safety standard issued under this title does not exempt any person from any liability under common law.

42 USC § 5409 (c).  Also, the final waiver itself expressly states:

> Complying with the provisions of the waiver does not relieve manufacturers of their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR §3280.303(b) of the Standards.

*See* Exhibit 3 at page 20401; *See also* 24 CFR §3282.402(a) ("Nothing in this subpart or in these regulations shall limit the rights of the purchaser under any contract or applicable law.").  Additionally, 24 C.F.R. §3282.11 (c) makes it clear that that Plaintiff is entitled to bring his action: "…A State may establish or continue in force consumer protections, such as warranty or warranty

performance requirements, which respond to individual consumer complaints ..." If Plaintiff's claims were expressly (or impliedly for that matter) pre-empted, none of these sections would have been written.

Plaintiff respectfully suggests that any argument that the claims herein have been expressly preempted is baseless.

## 2. **Implied Preemption**

The next question which this Court must determine is whether Congress implied that it is pre-empting state law by occupying the entire field of regulation, so that no room is left for supplementary regulation. Is State law pre-empted because it actually conflicts with federal law? Such a conflict occurs when compliance with both state and federal law is impossible or when state law stands as an impediment to federal purpose.

First, Plaintiff is not attempting to hold Defendant to a different State standard but merely alleging that the Defendant has violated the HUD Code / Standards and/or Regulations themselves by failing to implement an option under the HUD Code correctly (and worse knowingly doing so when it knew how to properly implement such a choice). The question as to whether there is an actual conflict with federal law or if it is impossible to comply with both state and federal law is moot, since that is not being alleged.

Defendant is thus left arguing that being held to have violated these provisions themselves stands as an impediment to a federal purpose – as backwards as that sounds. As shown below, Plaintiff respectfully suggests that nothing in the provisions suggests that a federal mandate is being impeded by this lawsuit and, to the contrary, the federal purpose of ensuring safe and durable housing is being advanced through the provisions contemplated by Congress and HUD listed herein.

Stated differently, after reading the entire HUD Code, Regulations and/or Standards, to argue that a manufacturer can never be sued (which is really what Defendant is saying) is contradictory to these provisions themselves. The very essence of the HUD Code is a mandate that the home meet certain performance based results (e.g. condensation control such that it not be trapped in walls) and thus the manufacturer is provided with several options but must, obviously, implement whatever choice it makes correctly.

   **a. The language of the HUD Code demonstrates that Congress did not intend to impliedly occupy the entire field of manufactured housing standards but rather created performance based standards.**

To begin with, the standards are performance based:

42 U.S.C. § 5403. Construction and safety standards:

(a) Establishment.

   (1) Authority. The Secretary shall establish, by order, appropriate Federal manufactured home construction and safety standards, each of which—

      (A) shall—

         (i)  be reasonable and practical;

         (ii) meet high standards of protection consistent with the purposes of this title [42 USCS §§ 5401, et seq.]; and

         (iii) be performance-based and objectively stated, unless clearly inappropriate.

*Id.* (emphasis supplied). Defendant latches onto to the words "high standards" but ignores the very next section tells us that these provisions are designed to be, by and large, performance based "unless clearly inappropriate." Even when "clearly inappropriate" the manufacturer must always ensure that

12

the choice is implemented correctly. There is nothing in these provisions mandating that these homes be sold in the defectively implemented condition.

A full and honest reading of these provisions demonstrates that the Secretary followed the federal mandate and, by and large in general and specifically with respect to the issues in this case, created a performance based Code with numerous options at the disposal of the manufacturer to insure durable housing. Again, regardless of choice, Defendant has a duty to implement the choice correctly.

The Regulations themselves again tell us these are performance based Codes. The definition of the Federal manufactured home construction and safety standard follows: "…a reasonable standard for the <u>construction, design, and performance of a manufactured home</u> which meets the needs of the public including the need for <u>quality, durability and safety.</u>" 24 C.F.R. §3280.2 (emphasis supplied).

42 U.S.C. § 5403 (g) states that alternative approaches must be given so that the manufacturer can achieve or exceed the minimum performance based objectives of the Code:

> 42 U.S.C. § 5403 (g) Manufactured housing construction and safety standards. (1) The Federal manufactured home construction and safety standards established by the Secretary under this section shall include preemptive energy conservation standards in accordance with this subsection.
>
> (2) The energy conservation standards established under this subsection shall be cost-effective energy conservation performance standards designed to ensure the lowest total of construction and operating costs.
>
> (3) <u>The energy conservation standards established under this subsection shall take into consideration the design and factory construction techniques of manufactured homes and shall provide for alternative practices that result in net estimated energy consumption equal to or less than the specified standards.</u>

*Id.* (emphasis supplied).  The HUD Code is replete with language that preserves the rights of the homeowner and demonstrates that Congress did not intend to impliedly occupy the entire field: "Nothing in this subpart or in these regulations shall limit the rights of the purchaser under any contract or applicable law."  24 CFR §3282.402(a).  Further, §3282.14 Alternative construction of manufactured homes expressly provides:

> (a) Policy. In order to promote the purposes of the Act, the Department will permit the sale or lease of one or more manufactured homes not in compliance with the Standards under circumstances wherein no affirmative action is needed to protect the public interest. The Department encourages innovation and the use of new technology in manufactured homes. Accordingly, HUD will permit manufacturers to utilize new designs or techniques not incompliance with the Standards in cases: (1) Where a manufacturer proposes to utilize construction that would be prohibited by the Standards; (2) Where such construction would provide performance that is equivalent to or superior to that required by the Standards; and (3) Where (i) compliance with the Standards would be unreasonable because of the circumstances of the particular case, or (ii) the alternative construction would be for purposes of research, testing or development of new techniques or designs.

24 CFR §3282.14 (emphasis supplied); *See also* 24 C.F.R. §3280.10 Use of alternative construction ("Requests for alternative construction can be made…").  This section thus gives the manufacturer yet one more option with which to comply with its mandate of safe and durable housing, as long as they meet or exceed the minimum based performance standards.

Defendant in effect argues that Plaintiff criticizes HUD's design and engineering principals by contending that Defendant is liable under state laws for complying with one of HUD-mandated options.  Defendant also argues that the HUD Code precludes a State from setting standards of construction and safety that conflict with standards covered by these Federal Standards.

Plaintiff neither seeks to criticize HUD's design principals nor establish a conflicting State based standard.  To the contrary, Plaintiff alleges that Defendant is in violation of the very HUD

design principals that were established to protect consumers. The language of the HUD Code and the Regulations demonstrate that the manufacturers are left with wide discretion to be able to insure durable, livable and safe housing. 24 C.F.R. §3280.303(b). Again, regardless of the choice made, Defendant must implement that choice correctly and not in a knowing defective manner as is alleged to have occurred here.

### b. Case Law interpreting the HUD Code supports Plaintiff.

In *Bott v. Sterling Homes, Inc. et. al.*, 527 So. 2d 548 (La. 1988), the manufacturer attempted to use the very same argument that Defendant in this case attempts to use. Perhaps not coincidentally, *Bott* involved moisture problems in the walls, among other things. In *Bott,* the Plaintiff complained of manufacturing defects primarily related to the presence of numerous water leaks around the mobile home's top, sidewalls, doors, and windows. *Id.* at 548. At trial, the Court entered judgment against the manufacturer on behalf of the Plaintiff and further indemnified the seller / installer from liability against the manufacturer. In the appeal, the manufacturer: "… urge[d] that once a home is built in accordance with the standards set out in the "Code," then it can *never* be found to be redhibitorily defective." *Id.* at 549. (emphasis in original). The Appellate Court in affirming the Trial Court stated:

> However, as correctly stated by counsel for plaintiff in his appellate brief, this is a very narrow interpretation of *La. R.S. 51:911*-23(F). We find that the correct interpretation of the statute was stated by Mr. Dave Aymonds, an inspector for the State Fire Marshall's office. <u>Aymonds testified that the HUD regulations are regulatory of the end-result or finished product and not the method by which the mobile homes are to be constructed</u>. This is important when considering the fact that the mobile home has severe water damage which is attributable to either water leaks or condensation. <u>Aymonds stated unequivocally that if either of these two conditions are present, it is in itself a violation of the standards</u>. Moreover, Aymond testified that upon inspection of the mobile home, he found it to be in a condition which is substandard under the regulations.

15

Further support that the Federal regulations were properly considered can be found in the testimony of Mr. Dan Baird, an expert in Housing and Urban Development regulations. Baird opined that the water damage to plaintiff's home was most likely due to condensation <u>and that a home manufactured to HUD standards should not condensate</u>.[10]

*Id.* at 549-550. (emphasis supplied).

In the following cases, the courts held that, in general, the National Manufactured Housing Construction and Safety Standards Act of 1074 (42 U.S. C.A. 5504-5426) does not pre-empt state common-law claims.

In *Richard v. Fleetwood Enterprises, Inc,* 4 F. Supp. 2d 650 (E.D. Tex. 1998), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.A. 5401 et seq.) does not, in general, pre-empt state causes of action. The court noted that the Act does not explicitly pre-empt state causes of action, and, in fact, the Act provides in 42 U.S.C.A. 5409 (c) that compliance with the federal standards does not exempt any person from liability under common law.

In *Shorter v. Champion Home Builders Co.,* 776 F. Supp. 333 (N.D. Ohio 1991), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.A. 5401-5426) does not pre-empt most tort claims regarding mobile housing. The court quoted one provision of the Act, 5403 (d), which states that the Act pre-empts the authority of local governments to establish construction or safety standards for manufactured housing. However, the court went on to quote another provision of the Act, 5409 (c), which provides that compliance with the federal standards for mobile homes "does not exempt any person from any liability under common law." The court concluded that these two apparently contradictory standards, when read

---

[10] This is what Plaintiff is complaining of as well.

together, establish that the Act pre-empts state-law standards, but does not pre-empt most state-law claims. The court added that nothing in the legislative history suggests that a state-law claim would frustrate the intent of Congress in reducing personal injuries in mobile homes.

In *Choate v. Champion Home Builders Co.*, 222 F.3d 788, Prod. Liab. Rep. (CCH) P15870, 172 A.L.R. Fed. 691 (10th Cir. 2000), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.A 5401-5426) does not expressly pre-empt common-law actions, nor does the Act occupy the field of construction and safety of manufactured homes exclusively, so as to impliedly pre-empt all common-law actions. The court noted that the Act contained, in 42 U.S.CA 5403 (d), an express pre-emption provision that could be read, standing alone, as pre-empting common -law tort actions. The Court also noted however, that the Act contained, in 42 U.S.C.A 5409 (c), a saving clause, which provides that compliance with federal standards does not exempt any person form liability under common law. The court observed that the United States Supreme Court had considered the effect of almost identical pre-emption and saving clause provision in another statute in *Geier v. American Honda Motor Co., Inc.*, 529 U.S 861, 120 S Ct.1913, 146 L. Ed 2d 914, Prod. Liab. Rep. (CCH) P 19795 (2000). The Supreme Court's resolution of these two provisions, the instant court stated, was that the pre-emption clause was meant expressly to pre-empt only state statues and regulations, not common-law actions. The court added that a saving clause does not, by itself, foreclose an implied pre-emption argument but that it was not applicable in the instant case.

In *Turner v. PFS Corp.,* 674 So. 2d 60, Prod. Liab. Rep. (CCH) P 14439 (Ala. 1995), reh'g denied, (Feb 16, 1996), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.S 5401-5426), and regulations adopted under it, did not pre-

empt state law tort claims at issue, because those claims asserted a failure to comply with federal standards themselves.[11] The court quoted the holdings of *Shorter v. Champion Home Builders Co.,* 776 F. Supp. 333 (N.D. Ohio 1991), that the Act pre-empts state law standards, but does not pre-empt most state law claims. The court declared that enforcing the federal standards through state tort law does not frustrate federal supervision of the manufactured housing industry, and only claims that impose different state standards are pre-empted. *See also Gackler Land Co. v. Yankee Springs Township,* 138 Mich App 1, 359 NW2d (1984) 226, aff'd (1986), 427 Mich 562, 398 NW2d 393 (Township zoning ordinance, regulating placement of mobile homes, was not preempted by National Manufactured Housing Construction and Safety Standards Act which was designed to provide for minimum construction for safety purposes).

Recently (post *Geier*) the question of preemption was answered squarely by the U.S. Supreme Court's decision in *Sprietsma v. Mercury Marine, Corp.,* 537 U.S. 51 (2002). In *Sprietsma,* the Court examined the Coast Guard's decision in 1990 not to impose a universal requirement of propeller guards on boat engines, and found that this decision to "take no regulatory action," *id.* at 61, did not preempt a common-law claim that a boat manufacturer was negligent for failing to install a propeller guard on one of its boats. In *Sprietsma,* the Coast Guard, like NHTSA here, considered imposing a new regulatory requirement to address safety concerns. Ultimately, however, the agency decided (as did NHTSA here) that the available data did *not* support a regulation requiring propeller guards, and that it would instead continue to study the issue. The Supreme Court held unanimously that the plaintiff's claim would in no way undermine any

---

[11] Again, this is what Plaintiff argues in this case.

regulatory purpose underlying the Coast Guard's decision not to regulate. The same result is compelled here.

As the United States Supreme Court has instructed, a party arguing for preemption of state law bears a heavy burden of overcoming the longstanding "presum[ption] that Congress does not cavalierly preempt state-law causes of action." *Medtronic v. Lohr*, 518 U.S. at 485. This burden is especially heavy where, as here, preemption would displace the historic power of the states to protect the health and safety of their citizens. Indeed, the Court recently reaffirmed that, "[i]n areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention "clear and manifest." *Bates v. Dow Agrosciences*, 544 U.S. 431, 449 (2005) (internal citations omitted); *see also Medtronic*, 518 U.S. at 485.

The import of the *Turner*, *Shorter*, *Choate*, *Richard* and *Sprietsma* cases demonstrate the following points: 1) That claims asserted by Plaintiff in the present case are not preempted; 2) Congress and HUD have not expressly or impliedly preempted that field so as to preclude state law claims for the defects asserted in this action; and 3) that the type of claims asserted by Plaintiff herein are expressly preserved by §3282.11 (c).[12]

### c. The HUD Code, Standards and Regulations contemplate that it is the duty of the manufacturer to implement whatever option it chooses correctly.

Congress did not intend to occupy the entire field impliedly as Defendant argues. To the contrary, options were left to the discretion of the manufacturer so that the performance based objectives could be obtained. Congress contemplated, because it was necessary, that certain

---

[12] There is a heavy presumption against federal preemption of common-law tort claims. *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996); *Bates v. Dow Agrosciences*, 544 U.S. 431, 449 (2005). This presumption is particularly strong when a defense of implied conflict preemption is raised. Indeed, the U.S. Supreme Court has instructed that implied conflict preemption may only be found where there is an "actual conflict" with federal law.

prescriptive standards would not be appropriate in certain geographic locations. The HUD Code states that:

> … in recommending standards, regulations, and interpretations, and…in establishing standards or regulations or issuing interpretations under this section, [you] shall-- (3) consider whether <u>any such proposed standard is reasonable for the particular type of manufactured home or for the geographic region for which it is prescribed;</u>

42 U.S.C. § 5403(e) (emphasis supplied).

It is the responsibility of the manufacturer to choose from any one of a number of options to achieve the performance based objective, taking into account, among other things, geographic location. For example, 24. C.F.R. §3280.504 Condensation control and installation of vapor retarders states:

> (1) In Uo Value Zones 2 and 3, ceilings shall have a vapor retarder with a permanence of not greater than 1 perm (as measured by ASTM E-96-93 Standard Test Methods for Water Vapor Transmission of Materials) installed on the living space side of the roof cavity.
>
> (2) <u>For manufactured homes designed for Uo Value Zone 1, the vapor retarder may be omitted</u>.

24. C.F.R. §3280.504 (a) (emphasis supplied).[13]  Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina and Florida. *See* attached Exhibit 7 §3280.506 U/O Value Zone Map. While a manufacturer might be able to argue preemption for failing to place a ceiling vapor barrier in Zones 2 or 3 since there is arguably no choice,[14] it cannot argue that the HUD Code / Regulations required that they had to do so in Zone 1. Similarly, there is nothing precluding (nor

---

[13] The newest version of this section deletes paragraph 2 but the prescriptive requirement for Zones 2 and 3 remain and, as was the case previously, Zone 1 does not have the same prescriptive requirement.

[14] Again, the Code gives the manufacturer the option to use any alternate method to insure the home performs and is durable even when the Code appears to be prescriptive. Even in such allegedly prescriptive cases it would defy logic for a manufacturer to continue to build to a prescriptive standard if it knew the home would not perform. Regardless, even Defendant cannot argue that it can knowingly implement a chosen option correctly.

mandating for that matter) the manufacturer from placing a ceiling vapor retarder in Zone 1 but if they choose to do so, they must insure that the home will perform, be durable and safe and not condensate. If they choose to do so in Zone 1 they cannot claim preemption since they were given options with a mandate to insure that the home perform and be durable and safe and not condensate. This is just one example of why the Code is by and large performance based.[15]

The very next section of the Regulations (one of the sections at issue in this case) has similar options:

(1) Exterior walls shall have a vapor barrier not greater than 1 perm[16] (dry cup method) installed on the living space side of the wall, **or**

(2) Unventilated wall cavities shall have an external covering and/or sheathing which forms the pressure envelope. The covering and/or sheathing shall have a combined permeance of not less than 5.0 perms. In the absence of test data, combined permeance may be computed using the formula: $PTotal=(1/[(1/P1)+(1/P2)])$ where P1 and P2 are the permeance values of the exterior covering and sheathing in perms. Formed exterior siding applied in sections with joints not caulked or sealed shall not be considered to restrict water vapor transmission, **or**

(3) Wall cavities shall be constructed so that ventilation is provided to dissipate any condensation occurring in these cavities.

24. C.F.R. §3280.504(b) (emphasis supplied).

It is important to ask what is being required by section §3280.504(b). Is the requirement that a vapor barrier must be installed on the living side of the wall in Zone 1, or is it that the home achieve or exceed the performance based standard of condensation control to insure a durable home? Section 3280.504(b)(2) does not require a vapor retarder. Section 3280.504(b)(3) does not require a vapor retarder but merely that "… ventilation is provided to dissipate any condensation occurring in

---

[15] There are numerous examples of differing options for differing geographical regions in the Standards. *See e.g.* 24 CFR § 3280.305(c) Wind, snow, and roof loads (differentiating again between Zone I and Zones II and III); 24 CFR § 3280.306 Windstorm Protection (differentiating again between Zone I and Zones II and III).

[16] The lower the perm, the less permeable the material.

these cavities." Thus, two-thirds of the options that existed prior to the "waiver" being "implemented" did not require a vapor retarder on the living side. There exists yet another section even prior to the waiver found in 24 CFR §3282.14 which allows "…new designs or techniques not incompliance with the Standards… in cases…[w]here such construction would provide performance that is equivalent to or superior to that required by the Standards;[17] and…where compliance with the Standards would be unreasonable because of the circumstances of the particular case." *Id.* This provides the manufacturer with the ability to make the house perform which is a mandated responsibility to insure durable and safe housing. There is simply nothing in this section, or anywhere in these provisions, which required that Defendant do what it has been alleged to know would result in defective housing by implementing the choice of (b)(1) or (b)(3) in a knowingly defective manner that will (Plaintiff alleges) insure that moisture will be trapped in the walls which is directly contradictory to the long ago established mandate of insuring that the home be durable.[18]

The now fifth option, the waiver, does not require that the vapor retarder be placed on the living side of the walls either. Thus, four-fifths of the options now available to the manufacturer do not require what the manufacturer implies is a federally mandated choice. The title of §3280.504 is "Condensation control and installation of vapor retarders" and only one of the many options actually requires a vapor retarder on the living side. The performance based objective is controlling condensation and to suggest the manufacturer innocently complied with a HUD mandate by choosing one option over others is disingenuous. Regardless of which option a manufacturer chooses, the manufacturer must implement the option in a manner which insures the walls will properly perform.

---

[17] This section again highlights that these are minimum requirements and that the manufacturer may use alternative approaches that meet or exceed them.

[18] Plaintiff also believes that Defendant knew this and yet continued to profit from this region at the expense of the homeowner.

22

Defendant is also alleged to have violated 24 C.F.R. §3280.103(b)(3) which states, *inter alia*: "The ventilation system or provisions shall not create a positive pressure in Uo value Zones 2 and 3 or a negative pressure condition in Uo value Zone 1."[19] One of the many reasons you do not want a "negative air pressure" in Zone 1 (Alabama among others) is that you do not want to suck the hot, moist air into the home (which would then be trapped if you placed a vapor barrier on the living side as is alleged to have occurred here). This is yet another example of the geographic location being an important consideration for the manufacturer. Defendant could just as easily argue that since it built homes to one of the standards (Zone 2 or 3), it cannot be sued but this would highlight the absurdity of their argument.

Section 3280.504(b) provides options by use of the word "or" and requires the manufacturer to choose one of these options so that the home will obtain a performance level of durable, safe housing. The goal is to dissipate any condensation occurring in these cavities as stated in these subsections. HUD recognized that in humid and fringe climate areas, the manufacturer would need options to achieve the performance based objective of the Code and that, indeed, some construction techniques could be detrimental to this goal. Publishing the alternatives provided manufacturers with an alternative that a manufacturer can use in the design and construction of manufactured homes that may be compatible with their construction techniques.

It is important to note that four options were available to the manufacturer before the "waiver" was implemented in March 2000. The waiver now creates yet another option from which the manufacturer may choose to meet "their responsibilities to use construction methods that result in

---

[19] Again, Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina and Florida. *See* attached Exhibit 6 § 3280.506 U/O Value Zone Map.

'durable, livable, and safe housing' as required by 24 CFR §3280.303(b) of the Standards." *See* Exhibit 3 at page 20401.

### d. *Geier v. Honda* is inapposite.

*Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) involved a lawsuit by an individual who claimed that Honda should have provided an air bag as opposed to just a seat belt. The Department of Transportation ("DOT") not only concluded that the seat belt / air bag options were each equally as good but actually disfavored a mandatory air bag requirement for all cars in 1987 because, among other reasons, they wanted to foster an environment in which States were encouraged to pass seat belt laws. DOT thought seat belts were actually as safe as air bags (and certainly cheaper) *if* people actually used the seat belts.[20]

DOT actually stated that lawsuits such as that being brought by *Geier* defeated this purpose e.g. was impliedly preempted.[21] In *Geier*, the Court states*:*

> Without the saving clause, a broad reading of the express pre-emption provision arguably might pre-empt those actions, for, as we have just mentioned, it is possible to read the pre-emption provision, standing alone, as applying to standards imposed in common-law tort actions, as well as standards contained in state legislation or regulations. And if so, it would pre-empt all nonidentical state standards established in tort actions covering the same aspect of performance as an applicable federal standard, even if the federal standard merely established a minimum standard. On that broad reading of the pre-emption clause little, if any, potential "liability at common law" would remain. And few, if any, state tort actions would remain for the saving clause to save.

*Geier* at page 868. First, the entire premise of such a broad reading of a pre-emption clause is stated in the first sentence: "[w]ithout the saving clause, a broad reading of the express pre-emption

---

[20] "DOT believed that ordinary manual lap and shoulder belts would produce about the same amount of safety as passive restraints, and at significantly lower costs -- *if only auto occupants would buckle up*." *Geier* at page 880.

[21] "We place some weight upon DOT's interpretation of FMVSS 208's objectives and its conclusion, as set forth in the Government's brief, that a tort suit such as this one would "'stand as an obstacle to the accomplishment and execution'" of those objectives" page 883.

provision arguably might pre-empt those actions…" *Id.* (emphasis supplied). As shown however, the HUD Code has a "saving clause" and thus the premise is inapposite. Further, the very next portion of this quote is necessary to understand its meaning:

> We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances. Hence the broad reading cannot be correct. The language of the pre-emption provision permits a narrow reading that excludes common-law actions. Given the presence of the saving clause, we conclude that the pre-emption clause must be so read.

*Geier* at page 868. The Court thus concludes: "We have just said that the saving clause *at least* removes tort actions from the scope of the express pre-emption clause. Does it do more?" *Geier* at page 868.

Determining this answer requires an in-depth analysis into the DOT and the policy applicable to seat belts v. air bags, their safety and their respective costs. As such, any comparison to the instant case at this point is meaningless since the DOT standards and HUD standards are obviously entirely different. There are numerous cases interpreting the HUD standards (set forth above) and none stands for the proposition, that the claims brought herein are preempted which may explain why Defendant is latching onto a case outside the relevant HUD standards.

The Supreme Court in *Geier*, in a 5-4 decision with a dissent which approximates the length of the majority opinion, ultimately concludes that the plaintiff's common law claims:

> …would have required all manufacturers to have installed airbags in respect to the entire District-of-Columbia-related portion of their 1987 new car fleet, even though FMVSS 208 at that time required only that 10% of a manufacturer's nationwide fleet be equipped with any passive restraint device at all. It thereby also would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed. In addition, it could have made less likely the adoption of a state mandatory buckle-up law. Because the rule of law for which petitioners contend would have stood "as an obstacle to the accomplishment and execution of" the

25

important means-related federal objectives that we have just discussed, it is pre-
empted.

*Geier* at page 881.

Indeed, to make *Geier* more akin to the case at hand, the facts in *Geier* would have to be

changed such that, by way of hypothetical, Honda *knew* that the manner in which they were installing

seat belts was causing them to disintegrate in the Gulf Coast Region and worse, that they knew the

manner in which they were installing them would result in such an outcome.  Further, Honda would

have to have known that there was a proper way in which to install them to make them work.

Finally, Honda would have to have failed to comply with other federal regulations requiring, for

example, that in the Gulf Coast they need to ensure that hot, moist air does not infiltrate parts of the

seat belts.  Under this hypothetical, Defendant would not be sued merely for choosing to use an

option provided to them – here the seat-belt versus the air bag – but rather for the fact that the they

did not correctly implement the seat belt choice by utilizing the vapor barrier on the living side of the

walls in a known defective manner and by failing to comply with other relevant federal regulations.

While this hypothetical sounds absurd that is really what is happening in this case.  Defendant has

chosen to utilize an option and located a vapor barrier on the living side of the walls.  The exercise of

this choice does not mean that Defendant can knowingly implement that choice in a defective

manner especially when they knew how to do so correctly.  Further, the exercise of that choice does

not mean they can simply fail to comply with other relevant federal regulations to make this choice

(and thus the home) perform.

In essence, Defendant's argument is that even if they defectively implement 24 C.F.R.

§3280.504(b) relating to the location and/or use of a vapor barrier on the interior walls of the home,

26

they cannot be sued.  Such an argument, Plaintiff respectfully submits, is without merit and Defendant can cite to no case that supports this argument.

First, Defendant knows how to implement 504(b) correctly and knew at the time the Deese home was manufactured.  Further, regardless of which option Defendant chooses, it must still comply with 24 C.F.R. §3280.103(b)(3) which states, *inter alia*: "The ventilation system or provisions shall not create a positive pressure in Uo value Zones 2 and 3 *or a negative pressure condition in Uo value Zone 1*."[22]  One of the many reasons you do not want a "negative air pressure" in Zone 1 (Alabama among others) is that you do not want to suck the hot, moist air into the home (which would then be trapped if you placed a vapor barrier on the living side as is alleged to have occurred here).  By way of further example, if Defendant chooses option 1, it must still comply with 24 C.F.R. §3280.505 which states: "The opaque envelope shall be designed and constructed to limit air infiltration to the living area of the home.  *Any* design, material, method or combination thereof which accomplishes this goal may be used."  *Id.*  (emphasis supplied).

**e.  Defendant's argument on preemption defies logic.**

Defendant argues that the "waiver" could not be used until after Plaintiff's home was manufactured and thus, imply, it could not have complied with it.  Besides being factually incorrect, this logic highlights why Defendant's claim of preemption is unfounded.  Regardless of when the waiver was implemented, under Defendant's argument on preemption, it could still to this day choose to implement option 1 incorrectly with impunity since they chose one of the options available to them under 24 C.F.R. §3280.504(b), albeit the one which they know does not work.  Under their theory of preemption Defendant could still - today - choose the (b)(1) vinyl covered walls option and

---

[22]  Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina and Florida. *See* attached

never be sued, since it used one of the  condensation control options from which manufacturers are required to choose.[23]

The waiver itself tells us that it cannot be relied upon for this type of preemption argument even if it is complied with:  "Complying with the provisions of the waiver does not relieve manufacturers of their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR §3280.303(b) of the Standards."[24]

### f. The *Guidroz* decision.

In *Guidroz v. Champion Enterprises, Inc.*, *et. al.*, Civil Action No. 05-1148 L-O, (Federal Court La.) the U.S. Magistrate found that preemption defeated the Plaintiffs' claims *as framed* in the original complaint.  Nonetheless, and of particular significance, the Court made the following exchange with Defense counsel demonstrating that even Defense counsel concedes pled properly preemption must fail:

| THE COURT: | Well, you're asking me to hold that his – that his complaint as pled is preempted. |
| MR. DOMINGUE: | That's correct, Your Honor. |
| THE COURT: | And what I hear you saying is that it is conceivable *if he had pled made his complaint read in another way, that it might not be preempted.* |
| MR. DOMINGUE: | *Precisely.*  And let me offer this, Your Honor. |
| THE COURT: | In that case is the remedy to allow him to amend? |
| MR. DOMINGUE: | It could be.  Look, I agree with Your Honor.  There are remedies that's perfectly permissible if this Court chooses.  In fact, I think there's probably case law out there that say, look -- |

---

Exhibit 6 § 3280.506 U/O Value Zone Map.

[23] Defendant attempts to twist the meaning of "required."  Defendant wants this Court to think they had no option and complied with a HUD mandate but they are indeed required to choose the proper option to insure the home is durable.  Even at that, as shown, the alternative methods of 3282.14 have been available all along and thus Defendant was "required" to choose nothing except that their homes be durable.

[24] *See* Exhibit 3 attached hereto Final Rule dated April 24, 2002, Part IV Housing and Urban Development 24 CFR Part 3280 "Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Waiver; Final Rule" at page 20401.

THE COURT:    Well, the case law says if he can amend it, he can solve the
              Problem (unintelligible).
MR. DOMINGUE:    Exactly....

(Transcript of Proceedings, entered 8/18/2006, at page 56, lines 2-18) (emphasis supplied).  (See

Exhibit 8)

Plaintiff filed a Motion to Amend Judgment of Dismissal and for Leave to Amend Original

Complaint.  The proposed amended complaint in *Guidroz*, properly frames a claim which is not

preempted even under Judge Hill's reasoning which Plaintiff respectfully suggests was not in accord

with Supreme Court's "heavy presumption against federal preemption."[25]  Even under Judge Hill's

reasoning, it is clear that Plaintiff can seek to hold Defendant liable under the following argument

outlined in the amended complaint:

> If a manufacturer chooses to utilize option 1 of 24 CFR §3280.504(b) and place a
> vapor barrier on the 'living side' of the exterior walls, it still has a duty to take steps
> to ensure that option 1 is implemented correctly by ensuring the home performs in the
> manner prescribed in, among other things, sections 3280.103(b) (ventilation system
> 'shall not create a negative air pressure...) 504 ('Condensation control and
> installation of vapor retarders') 505 ('The opaque envelope shall be designed and
> constructed to limit air infiltration to the living area of the home.  Any design,
> material, method or combination thereof which accomplishes this goal may be used')
> and/or 303(b) (All construction methods shall be in conformance with accepted
> engineering practices...').

*Guidroz* amended complaint at ¶ 9 pending before Judge Hill.  (See Exhibit 9)

Clearly, Judge Hill agreed that a properly framed complaint could not be preempted because

on May 17, 2007, he Granted Plaintiffs' Motion to Amend his previous judgment by allowing the

Amended Complaint to be filed.  Importantly, Defendants in its Opposition to *Guidroz* Motion to

Amend argued extensively that even under the Amended Complaint, the claims were preempted.  *See*

---

[25]   There is a heavy presumption against federal preemption of common-law tort claims.  *Medtronic v. Lohr*, 518 U.S.
470, 485 (1996); *Bates v. Dow Agrosciences*, 544 U.S. 431, 449 (2005).  This presumption is particularly strong when a
defense of implied conflict preemption is raised.  Indeed, the U.S. Supreme Court has instructed that implied conflict

29

attached Exhibit 10 at pages 13-18. Judge Hill granted Defendants an opportunity to file a Motion to Dismiss Plaintiffs' Amended Complaint.

Defendant's Motion to Dismiss Plaintiff's Amended Complaint based on the grounds of federal preemption was fully briefed and argued. The arguments advanced by Defendants in *Guidroz* on preemption were identical to those advanced by Defendant in this case. As expected, on August 1, 2007 Judge Hill entered an order denying Defendants' Motion to Dismiss Plaintiffs' Amended Complaint based on federal preemption. See attached Exhibit 4. Plaintiff's complaints in this case have always maintained that Defendant has failed to implement 504(b) correctly and failed to comply with other federal regulations like not creating a negative air pressure as discussed extensively herein. Defendant has attempted to set up a straw man and then knock it over to demonstrate that they are right by misstating Plaintiff's arguments. Defendant should not be allowed to avoid the federal mandate that the homes which they build must perform as ultimately the HUD Code is all about performance.

## CONCLUSION

There is simply no basis to argue express or implied preemption. Plaintiff respectfully requests that Defendant's Motion for Summary Judgment - Preemption be denied and that this Court enter such relief as is just.

---

preemption may only be found where there is an "actual conflict" with federal law.

/s/ C. Lance Gould
C. LANCE GOULD (ASB-0913-G66C)
Attorney for Plaintiff

**OF COUNSEL:**

**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343
(334) 954-7555 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2007, I served a copy of the above and foregoing document upon counsel of record via electronically filing this document with the Clerk of Court using CM/ECF system which will send notification of the foregoing upon the following:

Gregory S. Ritchey
Ritchey & Simpson, PLLC
3288 Morgan Drive, Suite 100
Birmingham, Alabama 35216
Tel:    (205) 876-1600
Fax:    (205) 876-1616

/s/ C. Lance Gould
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRY DEESE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case Number: 1:06-cv-643 MHT** |
| | * | |
| **CHAMPION ENTERPRISES, INC., *et al.*,** | * | |
| | * | |
| **Defendants.** | * | |

**SUPPLEMENTAL RESPONSE TO**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES TO HOMES OF LEGEND, INC.**

**COMES NOW** one of the defendants, Homes of Legend, Inc. n/k/a Champion Homes of

Boaz, Inc. (hereinafter referred to as "Legend"), by and through counsel of record and in

supplement to its Response to the Plaintiff's First Interrogatories to Homes of Legend, Inc. states

as follows:

**GENERAL OBJECTIONS**

A.     An objection is made to any definitions and instructions to the extent they are

vague, ambiguous, over broad, and/or unduly burdensome, exceed the usual and ordinary

meaning of the words defined therein and are beyond the permissible scope of discovery as set

forth in the applicable Rules of Civil Procedure.  The referenced words will be defined with their

usual and customary meaning and/or in accordance with the applicable Rules of Civil Procedure.

B.     An objection is made to supplementing discovery responses, except as required by

the applicable Rules of Civil Procedure, and to providing responses to discovery requests made

outside of the time limitations allowed by the Court in any Status/Scheduling Order.

C.     An objection is made to the discovery requests to the extent they seek information

that is irrelevant to issues in this civil action or not reasonably calculated to lead to the discovery

1



EXHIBIT

1

of admissible evidence.

D.      An objection is made to providing discovery items that are protected, privileged, or exempt from discovery by the attorney-client privilege, the attorney work product doctrine, or other applicable privilege or exemption.   A further objection is made to providing any information relative to any non-parties and/or employees or former employees where disclosure of private, sensitive or confidential information may occur, absent either permission from the non-party or specific Court order. *See Blakenship v. City of Hoover,* 590 So.2d 245 (Ala. 1991); *see also Johnson v. Department of Treasury, I.R.S., C.A.S* (Tex) 1983, 700 F. 2d 971 (Since the Privacy Act [5 U.S.C. § 552] was designed to limit disclosure of public employee's files, this same limitation should be construed to forbear private employee's files from becoming public records).

E.      An objection is made to the discovery requests to the extent they are vague, over broad, and/or unduly burdensome, or not appropriately limited geographically by subject matter or by time, or to the extent that they seek proprietary information, trade secrets or other confidential matters or information concerning the private financial affairs of third parties.   An objection is also made to any request seeking information related to income tax returns (personal or corporate), as those are privileged. *See Hunt v. State,* 642 So.2d 999 (Ala.Civ.App. 1993); *see also Ex parte Morris,* 530 So.2d 785 (Ala. 1998) (unless a litigant himself makes an issue of income, his tax returns are not subject to discovery) (citations omitted); *see also Tele-Radio Systems, LTD, v. De Forest Electronics, Inc.,* 92 F.R.D. 371, 375 (N.J. 1981); *DeMasi v. Weiss,* 669 F.2d 114 (3rd Cir. 1982).   Notwithstanding the foregoing, some redacted copies of documents may be produced.   In producing the redacted copies, no waiver is made to the foregoing objections and an express reservation is made as to the right to further object to the

2

introduction of all or a portion of the documents at a later time. The redacted items may voluntarily be produced solely in the interest of judicial economy.

F.    An objection is made to the discovery requests to the extent they seek information or documents in the public domain as such information is equally available to the parties.

G.    An objection is made to the discovery requests to the extent they seek to have the responding party prepare the case for an opposing party, and determine what should be deemed relevant, supportive or pertinent to certain claims and allegations. Additionally, an objection is made to any requests that constitute an inappropriate "fishing expedition" on the part of the propounding party. *Ex parte Morris*, 530 So.2d 785 (Ala. 1988), *citing In re : IBM Peripheral EDP Device Antitrust Litigation*, 77 F.R.D. 39, 42 (N.D.Cal. 1977).

H.    An objection is made to the discovery requests to the extent they contain key terms which are not defined or that are unreasonably compound, disjunctive or conjunctive.

I.    An objection is made to the discovery requests to the extent they seek discovery that is inconsistent with or enlarges the scope of discovery under the applicable Rules of Civil Procedure.

J.    An objection is made.to any discovery request seeking to require the creation of a document which is not already in existence.

Each of the foregoing objections is expressly incorporated into each discovery response as if fully stated therein.

## RESPONSES

1.    Please list each parent or holding company and subsidiary company of yours.

**RESPONSE: Champion Home Builders, Co. owns all Legend's stock certificates.**

2.    Please list each agency, state or federal, that exercises any regulatory or supervisory control over the production of manufactured homes by this Defendant.

> **RESPONSE: Objection. This request is vague and overly broad. Without in any way waiving the foregoing and in a good faith effort to respond, this defendant states that the Secretary of Housing and Urban Development ("HUD") and the Alabama Manufactured Housing Commission exercise regulatory or supervisory control over the production of manufactured homes in this state.**

3.    Please identify each person now known to this Defendant who has any knowledge relating to the incident that is alleged in the Complaint or the defenses set out in the Defendant's answer.

> **RESPONSE: Objection, there is no "incident" alleged or defined in the complaint. Without in any way waiving the foregoing, Parker Holloway, Field Operations Manager, has information related to defenses set forth in this defendant's answer.**

4.    Please identify each person now known to this Defendant who has any knowledge relating to Defendant's failure to utilize or comply with the Waiver for Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates, Department of Housing and Urban Development 24 CFR Part 3280.

> **RESPONSE: Objection. There was no requirement that this defendant utilize or comply with the Waiver for Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates, Department of Housing and Urban Development 24 CFR Part 3280 as the Waiver was an option. Therefore, there was no "failure" on this defendant's behalf.**

5.    Please describe whether you ever reviewed an articled entitled "MOISTURE PROBLEMS IN MANUFACTURED HOUSING" by Neil Moyer March/April 2002 "Home Energy" (www.homeenergy .org) and, if so, what actions, if any, were taken by you to implement any of the suggestions found on page 29 "Solving Moisture Problems" and the reasons for taking or not taking these suggestions or any one of them.

4

**RESPONSE: Objection. Numerous people (agents and employees) have been employed by this defendant and it has no reliable way of knowing what any one employee or agent may have read in an article five (5) years ago. Without waiver of said objection, upon information and belief, this defendant has not subscribed to a periodical entitled "Home Energy."**

6.    Please list each complaint that has been filed against this Defendant within the past ten (10) years with any agency of the State of Alabama or federal government, giving the date of each complaint, the agency involved, the person making the complaint and their address and telephone number, and the results of each complaint.

**RESPONSE: This defendant objects to this discovery request to the extent that it seeks information not relevant to any claim or defense in this case and not reasonably calculated to lead to the discovery of admissible evidence based on the specific allegations in the complaint. This defendant further objects to the discovery request to the extent it is overly broad and unduly burdensome. Additionally, this defendant objects to this discovery request to the extent it seeks proprietary and confidential information without a sufficient showing of need and prior to the entry of an appropriate protective order. This defendant also objects to the discovery request to the extent it is vague, ambiguous, not reasonably limited in time, place and scope, and to the extent it seeks privileged or otherwise protected documents or information and/or is intended to harass. This defendant also objects to this discovery request to the extent it seeks class-related discovery prior to the time permitted by law and seeks discovery of incidents which occurred under circumstances not substantially similar to those in the instant case, as well as production of inadmissible information based on hearsay that potentially could be inflammatory as well as highly prejudicial and is thus inadmissible under the applicable Rules of Civil Procedure. See Verchot v. General Motors Corp., 2001 WL 564296 \*5-7 (Ala. May 25, 2001) (Relying on Uitts v. General Motors Corp., 411 F.Supp. 1380 (E.D.Pa.1974), aff'd, 513 F.2d 626 (3d Cir.1975), and Guild v. General Motors Corp., 53 F.Supp.2d 363, 368 (W.D.N.Y.1999), Supreme Court of Alabama found that trial court did not err as it could properly refuse to consider consumer complaints as evidence). Discovery seeking other unrelated complaints also will lead to inadmissible character evidence of "prior bad acts", which are neither relevant nor material to the instant case. Fed.R.Evid. 404. The 2000 Amendment to Rule 26 of the Federal Rules of Civil Procedure changed the scope of permissible discovery. Under the revised rule, "fishing expeditions" are not permitted. The discovery sought must relate to the claims or defenses of a party set forth in a pleading. A discovery request seeking every type of complaint made against this defendant for ten (10) years seeks far more information than is relevant or material to this case, which involves allegations that the vapor**

barriers on exterior walls are located on the "wrong" sides of the exterior walls. This defendant has manufactured tens of thousands of homes over the last ten (10) years, and complaint information would have to be obtained by reviewing every file in order to provide an accurate response, which will cause this defendant to incur enormous expense, and would interfere with normal business operations. This defendant does not in the ordinary course of business keep a separate file for such items and all such items are placed in a serial number file for each home. To accurately determine each and every home that has been made the subject of this request, each of tens of thousands of serial number files over the last ten (10) years would have to be pulled and individually reviewed. This defendant does not have the resources to independently pull and review those files. To accurately determine each and every home that has been made the subject of this request, each of the tens of thousands of serial number files over the last ten (10) years would have to be pulled and individually reviewed. This defendant does not have the resources to independently pull and review those files. It is estimated it would take a person at least fifteen (15) minutes to more than thirty (30) minutes to reasonably pull, review, record and refile a serial number file. This would equate to devoting such a person to over a year of work. Some complaints are subject to confidential agreements or arbitrations, which are considered private, and potentially privileged. Upon information and belief, Plaintiff's counsel is actively soliciting homeowners throughout the United States to represent such parties in cases identical to the instant case, including being lead counsel in a cause action seeking to represent a class of homeowners against this defendant, in as case styled *Sabrina Johnson, et al. v. Champion Enterprises, Inc., et al*, American Arbitration Association, Claim No. 11 421 02784 06, which sets forth allegations identical to those alleged here. Providing plaintiff's counsel with information requested (which may include addresses and phone numbers of homeowners) will likely lead to further solicitations with respect to other potential members of the class, as opposed to relevant evidence in the instant case, and improper communications with such class members prior to certification in violation of controlling federal law. *Jackson v. Motel 6 Multipurpose*, 130 F.3d 999 (11th Cir. 1997)(discussing standard for court order permitting class communications prior to certification). Further, the records of any state or federal agency are open to the public for copying and/or reviewing. Rule 26(b)(2) of the Federal Rules of Civil Procedure provides that discovery shall be limited if the Court determines "that the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." *Fed. R. Civ. Proc.* 26(b)(2); *see also Securities and Exchange Comm. V. Samuel H. Sloan & Co.*, 369 F. Supp. 994, 995 (S.D.N.Y. 1973)(discovery not required if information is equally accessible to all parties). Without in any way waiving the foregoing, this defendant is producing a copy of its serial number file for the subject manufactured home, which would contain any complaint filed with any

agency of the State of Alabama or federal government related to the subject manufactured home.

7.    What records are maintained by this Defendant concerning the manufacturing and sale of the manufactured home made the basis of this litigation?

**RESPONSE: This defendant maintains a serial number file for the manufacturing of the subject home and sale of the subject home to the dealer.**

8.    Please identify the person in your corporation that is most knowledgeable about the Waiver for Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates, Department of Housing and Urban Development 24 CFR Part 3280.

**RESPONSE:  See response to No. 3 above.**

9.    How many manufactured homes have you sold in areas deemed to be within the humid and fringe climate areas as provided in the Waiver for Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates, Department of Housing and Urban Development 24 CFR Part 3280?  How many of these manufactured homes comply with the Waiver?

**RESPONSE: See objections in Response No. 6 above.    Further, this defendant objects as this request seeks information or documents in the public domain as such information is equally available to the parties. Without in anyway waiving the foregoing, and in a good faith effort to respond, this defendant states that it does not always receive notification from various dealers when its homes are sold and does not keep a separate record in the regular course of business that would have specifically noted where the homes were sited.  Such information can be obtained by going to each state's SAA to obtain a listing of dealers in the hot and humid climate and further, obtain 302 Reports related to the installation of sold homes. The records of any state or federal agency are open to the public for copying and/or reviewing.  Rule 26(b)(2) of the Federal Rules of Civil Procedure provides that discovery shall be limited if the Court determines "that the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive." *Fed. R. Civ. Proc.* 26(b)(2).**

10.    Identify any individual(s) who have reviewed any of the following documents for Defendant(s) and the approximate date and capacity in which the individual(s) were acting at the time:

a.    *MEASURED PERMEANCE VALUES FOR SELECTED INTERIOR WALL ASSEMBLIES*, Manufactured Housing Research Alliance, September 2000;

b.    *MOISTURE PROBLEMS IN MANUFACTURED HOMES Understanding Their Cause and finding Solution* Excellence in Design, Manufacturing and Installation Series, Manufactured Housing Research Alliance, 2000;

c.    "*MOISTURE PROBLEMS IN MANUFACTURED HOUSING*" by Neil Moyer March/April 2002 "Home Energy" www.homeenergy .org;

d.    Burch, M. Douglas. 1995. *An Analysis of Moisture Accumulation in the Roof Cavities of Manufactured Housing.* STP 1255. Philadelphia: American Society for Testing and Materials: 156-177;

e.    Joe Lstiburek "Top Ten List" Dumb Things to Do in the South: "... for those too cheap to come to one of my sessions." Originally Posted 24 September 1996;

f.    Lstiburek, Joseph and John Carmody. 1991. *Moisture Control Handbook: New, Low-Rise Residential Construction.* Washington, D.C.: U.S. Department of Energy Conservation; Renewable Energy Office of Buildings; Community Systems Building Systems Division;

g.    Lstiburek, Joseph.  "Builder's Guide" series, 1997. Westford, MA: Building Science Corporation. *Construction details for buildings that perform better, for different climate zones throughout North America;*

h.    Lstiburek, Joseph. *Understanding the Terms Barrier and Retarder for Vapor and Air*, February 2002;

i.    Lstiburek, Joseph and John Carmody. *Moisture Control Handbook: Principals and Practices.* John Wiley & Sons, 1996 (available from the Energy & Environmental Building Association (www.eeba.org);

j.    Any other reports produced by Joseph Lstiburek including, but not limited to, reports for or reviewed by Defendant(s) in or around 1996 and 1997 relating to research and/or testing on the location of vapor retarder(s) and/or vapor barrier(s) and/or vinyl wall boards;

k.    Manufactured Housing and Standards Division and The National Conference of States on Building Codes and Standards. 1998. *The Essentials of Moisture*

*Control Through a Building Envelope.* Washington, D.C.: U.S. Department of Housing and Urban Development (February);

l.  Oak Ridge National Laboratory, Building Technology Center. 1996. *Moisture Control in Walls, Version 1.0* [computer software];

m.  TenWolde, Anton. 1993. *Ventilation, Humidity and Condensation in Manufactured Houses During Winter.* Washington, D.C.: U.S. Department of Agriculture, Forest Service Forest Products Laboratory;

n.  TenWolde, Anton, et al. 1993. *Air Flow and Moisture Conditions in Walls of Manufactured Homes.* Washington, D.C.: U.S. Department of Agriculture, Forest Service Forest Products Laboratory;

o.  U.S. Department of Commerce. National Institute of Standards and Technology. 1995. *Manufactured Housing Walls That Provide Satisfactory Moisture Performance in All Climates.* NISTIR 5558.

**RESPONSE: This defendant objects to this Request on the grounds that it is vague and overly broad both in scope and time. Numerous people (agents and employees) have been employed by this defendant and it has no reliable way of knowing what any one employee or agent may have read in an article five (5) to fifteen (15) years ago.**

11.  Please state, for the time of the production of the manufactured home made the basis of this lawsuit, the name and job title of each person in the supervisory chain of command for the plant at which the manufactured home was manufactured.

**RESPONSE: This defendant attempted to determine information in response, but due to the plant being closed for over two (2) years, no information could be found.**

12.  Do you contend that the subject manufactured home was not defective (including defectively designed, manufactured and/or marketed) for use in the Humid and Fringe Climates as defined in 24 CFR Part 3280 when sold? If so, state each and every fact that you contend supports your position that the subject manufactured home was not so defective.

**RESPONSE: Upon information and belief, the home was designed and constructed in accordance with the HUD code. See documents being produced.**

9

13    If you contend that you were required to build this home with a vapor barrier located on the living side of the wall(s), please state the reasons for such opinions.

> **RESPONSE: This defendant objects to this Request on the grounds that it is vague. Without in any way waiving the foregoing, this defendant states it was required to build the walls in accordance with the HUD code and to choose an option available under Section 3280.504(b) at the time the home was constructed.**

14.    Describe every form of notice given, if any, to the purchaser of the manufactured home and/or retailer since March, 2000 that a vapor barrier located on the living side of the walls or with a ventilation system which creates a negative air pressure may not be suitable for homes in a hot and humid climate as defined by 24 CFR Part 3280.

> **RESPONSE: None.**

15.    Describe whether Plaintiff(s)' home was designed and/or manufactured with a "positive" or "negative" pressure ventilation system as defined in 24 C.F.R. § 3280.103(b)(3): "The ventilation system or provisions shall not create a positive pressure in Uo value Zones 2 and 3 or a negative pressure condition in Uo value Zone 1."

> **RESPONSE: Objection. This question does not make sense. Without in any way waiving the foregoing, the subject home was designed in accordance with the standards for homes in Uo value Zone 1.**

16.    Describe whether it is your contention that the placement of a vapor retarder on the living side of the walls in a hot and humid climate as defined by 24 CFR Part 3280 is in conformance with accepted engineering practices, demonstrates acceptable workmanship reflecting journeyman quality of work of the various trades or insures durable, livable and safe housing. If so, describe the basis of such contention.

> **RESPONSE: This defendant contends that it built the home in accordance with the HUD code, which is generally considered to contain accepted engineering practices. See also HUD letter being produced.**

17.    If it is your contention that 24 CFR § 3280.504(b) is not a performance based code or that 24 CFR § 3280 in general is not a performance based code meaning that the manufacturer may utilize any method(s) necessary to insure conformance with accepted engineering practices, demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades and/or insure durable, livable and safe housing, please describe the basis for such contention.

**RESPONSE: Objection. This request calls for a legal conclusion. Without in any way waiving the foregoing, see opinion rendered in *Guidroz v. Champion Enterprises, Inc., et al.*, the United States District Court, Western District of Louisiana, Lafayette/Opelousas Division, CV05-1148 and cases cited therein.**

18.    Describe whether you have utilized the "waiver" by building homes to Part IV Housing and Urban Development 24 CFR Part 3280 "Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Waiver; Final Rule" at page 20401 or any later amendments to this "waiver." If so, describe how many homes have been so built, when this began and your reasons for doing so.

**RESPONSE: Not applicable.**

19.    Describe to what standard under 24 CFR 3280.504 you built the home which is the subject matter of this lawsuit and the reasons therefore.

**RESPONSE: The manufactured home was built in accordance with 24 CFR 3280.504(b)(3). That is the way the home was ordered.**

20.    Please describe any and all submissions and/or requests made by you to HUD for alternative construction of manufactured homes pursuant to 24 CFR § 3282.14 (emphasis supplied) and/or 24 C.F.R. § 3280.10 within the last twenty (20) years.

**RESPONSE: See objections in Response No. 6 above. In accordance with 3282.404(b), a manufacturer is only required to keep records for five (5)**

**years. Without in any way waiving the foregoing, this defendant is unaware of any submissions and/or requests made to the Department of Housing and Urban Development HUD for alternative construction of the subject manufactured home.**

21.    If you provided manufactured home(s) or temporary housing to the Federal Emergency Management Agency (FEMA) or any federal or state agency within the last ten (10) years, please describe whether such federal or state agency notified you of any problems with such home(s) regarding mold, wet, moist or soft walls and/or condensation problems and any response provided by you.

**RESPONSE: Not applicable.**

22.    Describe what efforts and/or any responses, if any, you made regarding any complaints pursuant to 24 CFR 3282.401-416 or other sub part which had been lodged regarding issues relating to mold, soft walls, moisture problems, condensation problems or issues relating to 24 C.F.R. § 3280.103(b)(3), 24 CFR § 3280.504(a) or (b).

**RESPONSE: See objections in Response to No. 6 above as well as objections and responses to the request for production of documents. Without in any way waiving the foregoing, this defendant is producing a copy of its serial number file for the subject manufactured home, which would contain any requests for service related to the subject manufactured home.**

23.    If you have replaced and/or repaired any wall(s) in the hot and humid climate as defined by 24 CFR Part 3280 in a manufactured home wherein you did not use a vapor barrier on the living side of the wall or walls, please describe such incidents.

**RESPONSE: See objections in Response to No. 6 above as well as objections and responses to the request for production of documents. Without in any way waiving the foregoing, this defendant states that with regard to the subject home, all information this defendant has relating to service of the home is being produced.**

24.    Please describe what type of training you give and have given over the last six (6) years to the dealer / installer with respect to how to properly install your manufactured home.

**RESPONSE: This defendant provided its Installation Manual, Retailer Installation and Service Guide and was available to provide specific training on an as needed basis.**

25.    Have you ever built a home which did not have a vapor barrier as defined by 24 CFR 3280.504 located on the living side of the wall or walls? If so, please describe each and every instance.

**RESPONSE: See objections in Response No. 6 above and objections in the responses to request for production of documents.  Upon information and belief, this defendant has utilized various options authorized under 24 CFR § 3280.504(b).**

26.    Please describe who produces the vinyl covered gypsum panels (VOG) for each facility shipping into the Hot and Humid Climate area, and provide the Material Safety Data Sheets for each producer, along with their installation instructions, warranty, and any other documents relating thereto.

**RESPONSE: See previous objections.  This defendant has no way of knowing who produces vinyl covered gypsum panels (VOG) for each facility shipping into the Hot and Humid Climate area.**

STATE OF ALABAMA    *

                      *

JEFFERSON COUNTY    *

## VERIFICATION

I, Parker W. Holloway, being first duly sworn, depose and say that I have read and signed the foregoing responses, and the facts stated therein as to matters of fact based on my own experience and understanding are true and correct, according to my information, knowledge and belief; and as to matters of contention, in reliance on my counsel, on information and belief, the remaining information that does not arise out of my own personal experience or understanding is true and correct.

**Champion Home Builders Co., improperly named in the complaint as Champion Home Builders Company, Inc.**

BY: _____

Its: _____

STATE OF ALABAMA    *

                      *         **A C K N O W L E D G E M E N T**

JEFFERSON COUNTY    *

I, the undersigned, a Notary Public in and for said County and State, hereby certify that Parker W. Holloway, whose name is signed to the foregoing Verification, and who is known to me, acknowledged before me on this date that, being informed of the contents of the instrument, he executed the same voluntarily.

Given under my hand and official seal this 29th day of May _____,

200 7.

_____

Notary Public

My Commission Expires: 6·8·08

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 8, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

As to objections:

Respectfully submitted,

RITCHEY & SIMPSON, PLLC

Gregory S. Ritchey, Esquire   {ASB-8193-H68G}
Richard S. Walker, Esquire   {ASB-8719-L70R}
Counsel for Homes of Legend, Inc. now known
as Champion Homes of Boaz, Inc., Champion
Home Builders Co., improperly named in the
complaint as Champion Home Builders
Company, Inc. and Champion Enterprises, Inc.

OF COUNSEL:
**RITCHEY & SIMPSON, PLLC**
3288 Morgan Road, Suite 100
Birmingham, AL 35216-3084
Telephone:    205.876.1600
Facsimile:    205.876.1616

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a copy of the foregoing has been served upon
the following:

Jere L. Beasley, Esquire
W. Daniel Miles, III, Esquire
C. Gibson Vance, Esquire
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103

by placing a copy of same in the United States Mail, postage prepaid, on this the _____ day of
_____, 200___

_____
OF COUNSEL



**Thursday,**
**March 30, 2000**

---

# Part III

# Department of Housing and Urban Development

24 CFR Part 3280
Condensation Control for Exterior Walls
of Manufactured Homes Sited in Humid
and Fringe Climates; Proposed Rule



EXHIBIT

tabbies®

2

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**24 CFR Part 3280**

**[Docket No. FR–4578–P–01]**

**Manufactured Home Construction and Safety Standards; Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Notice of Proposed Regulatory Waiver**

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Proposal of waiver; request for comments.

**SUMMARY:** This notice advises the public of HUD's proposal to issue a waiver of its regulations regarding manufactured home construction and safety standards. HUD may issue a final regulatory waiver after reviewing the public comments received in response to this notice. HUD proposes to waive certain provisions of these regulations when manufacturers, at their option, utilize the alternatives provided in this notice to reduce the problems currently being experienced in humid and fringe climate areas. Presently, there are no provisions in HUD's regulations that separately address condensation control and vapor retarder requirements for manufactured homes sited in warm, moist climates of the South Atlantic and Gulf Regions. The states have provided HUD with information that indicates there is an immediate need to consider alternate requirements for exterior walls in these humid and fringe climate areas, to prevent moisture damage due to condensation. HUD intends for this waiver to be in place for no more than 24 months, as permanent changes to the regulations are being considered.

**DATES:** *Comment due date:* May 1, 2000.

**ADDRESSES:** Interested persons are invited to submit comments regarding this notice to the Regulations Division, Office of General Counsel, Room 10276, Department of Housing and Urban Development, 451 Seventh Street, SW, Washington, DC 20410 0500. Communications should refer to the above docket number and title. Facsimile (FAX) comments are not acceptable. A copy of each communication submitted will be available for public inspection and copying between 7:30 a.m. and 5:30 p.m. weekdays at the above address.

**FOR FURTHER INFORMATION CONTACT:** Rebecca J. Holtz, Acting Director, Office of Consumer and Regulatory Affairs, Room 9146, Department of Housing and Urban Development, 451 Seventh Street SW, Washington, DC 20410 8000; telephone (202) 708 0502 (this is not a toll-free telephone number). Hearing or speech-impaired individuals may access this telephone number via TTY by calling the toll-free Federal Information Relay Service at 1 800 877 8339.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Manufacturers and State Administrative Agencies (SAAs) in southeastern States have recently reported an increase in the number and severity of consumer complaints caused primarily by moisture build-up and condensation in homes located in the south. They suggest this increase in complaints coincides with the Department's implementing more stringent energy efficiency requirements in its regulations regarding manufactured home construction and safety standards located at 24 CFR part 3280 (referred to as the "Standards").

At present, the Standards at 24 CFR 3280.504 do not distinguish between climates for requirements for condensation control and installation of vapor retarders. Thus, for example, the Standards do not separately address homes placed in humid and fringe environments or climates, which are predominantly located in the southeastern part of the United States. In these climates, it may be beneficial to prevent the outside, moisture laden air from entering through the warm (exterior) side of the home's exterior wall and condensing and collecting on the cold (living space or interior) side of the wall assembly. One means of preventing moisture from entering the exterior wall cavity from the outside, would be to install a vapor retarder on the warm or exterior side of the wall instead of on the interior or living space side of the exterior wall.

The interior surface of the exterior wall should also then be constructed of a permeable material. This would permit any moisture-laden air that may have entered the wall cavity through a discontinuity in the exterior vapor retarder to be dissipated through the interior permeable material. In such cases, use of vapor retarder paints, vinyl covered gypsum wallboard, or other impermeable materials or finishes on the interior side of exterior walls would be detrimental, because they would trap moisture within the wall.

**II. This Notice**

To address these concerns, HUD is considering issuing a waiver to the current condensation control and vapor barrier installation requirements for exterior walls in humid and fringe climates. Specifically, this waiver would allow for manufacturers, in humid and fringe climates, to install the vapor retarder on the exterior rather than interior or living space side of the exterior wall. The proposed waiver will permit manufacturers to locate the vapor retarder on the exterior side of the wall assembly provided there is no vapor retarder on the interior and the interior finish or interior wall panels are designed with a three perms or higher rating. The waiver will also require manufacturers to add a statement and a map to the data plate indicating that the home is only suitable for installation in humid and fringe climates and provide a map to designate the acceptable locations.

The Department intends for the final waiver to be effective for a period not to exceed 24 months. This will permit the Department to consider recommendations received from the National Fire Protection Association (NFPA), research, field data obtained from the use of this waiver, and other information to effectuate changes to the standards of a more permanent nature.

**III. NFPA Consensus Standards Process**

HUD has designated the NFPA to undertake a consensus process in developing recommendations for new manufactured housing standards. Participants in the NFPA process met in December 1999, to discuss comments received on recommended standards changes. One such recommendation that was discussed involved changes to HUD's regulation at 24 CFR 3280.504(b)(1) for homes sited in "humid climates" or "fringe climates" as set forth in figure 16, Chapter 21, 1989 ASHRAE Handbook of Fundamentals. (The Humid and Fringe Climate Map being proposed in this waiver is based on figure 16 in ASHRAE.) HUD looks forward to receiving the results of the consensus process and does not intend for this proposed waiver to undermine a consensus approach to standards revisions on this matter.

**IV. Alternative Methods**

This proposed waiver is not intended to limit alternate approaches by manufactured home producers in utilizing other solutions to assure that homes built and sited in warm humid and fringe climates are durable and free of moisture related problems. Other methods of moisture control that meet the intent of the 24 CFR part 3280 and this proposed waiver may be submitted for review and consideration in accordance with 24 CFR 3282.14

(entitled "Alternate Construction of Manufactured Homes").

## V. Comments Requested

Comments are specifically requested on the Department's decision to proceed with a waiver in warm humid and fringe climates to permit the vapor retarder to be located on the warm side of exterior walls.

## VI. Proposed Waiver

In accordance with 24 CFR 3280.8, the Secretary hereby proposes to waive the specific requirements of 24 CFR 3280.504(b)(1) for homes to be sited in a humid or fringe climate as identified in section VI.F. of this waiver. Manufacturers who elect to utilize this

alternative rather than to follow the requirements of the existing standards in 24 CFR 3280.504(b)(1), must produce homes in accordance with the following requirements (all other requirements of the Standards continue to apply):

A. Exterior walls must be constructed with a vapor retarder of not greater than 1.0 perm (dry cup method) or an exterior finish and sheathing with a combined permeance of not greater than 1.0 perm installed on the exterior (warm side) of the wall assembly.

B. The interior finish and interior wall panel materials shall be designed to have a combined vapor permeance greater than 3.0 perms (dry cup method). Vapor retarder paint, vinyl covered gypsum wall panels, and other

impermeable interior surfaces or finishes that have a combined rating less than 3.0 perms (dry cup method) shall be prohibited.

C. Exterior wall cavities shall not be ventilated to the outdoors.

D. An additional statement shall be provided on the data plate required by 24 CFR 3280.5 that indicates: "As designed and constructed, this home is suitable for installation only in humid and fringe climates as shown on the Humid and Fringe Climate Map provided with this data plate." The statement is to be typed in bold face using letters at least ¼ inch in size.

E. A reproduction of the following Humid and Fringe Climate Map is to be provided on the data plate.

## Humid and Fringe Climate Map



F. The following areas of local governments (listed by State) are deemed to be within the humid and fringe climate areas shown on the Humid and Fringe Climate Map, and this waiver would apply to homes built to be sited within these jurisdictions:

*Alabama*

Baldwin, Barbour, Bullock, Butler, Chootaw, Clarke, Cofee, Conecuh,

Covington, Crenshaw, Dale, Escambia, Geneva, Henry, Houston, Lowndes, Marengo, Mobile, Monroe, Montgomery, Pike, Washington, Wilcox.

*Florida*

All counties and locations within the State of Florida.

*Georgia*

Appling, Atkinson, Bacon, Baker, Ben Hill, Berrien, Brantley, Brooks, Bryan, Calhoun, Camden, Charlton, Chatham, Clay, Clinch, Coffee, Colquitt, Cook, Crisp, Decatur, Dougherty, Early, Echols, Effingham, Evans, GlynnWayne, Grady, Irwin, Jeff Davis, Lanier, Lee, Liberty, Long, Lowndes, McIntosh, Miller, Mitchell, Pierce, Quitman,

Randolph, Seminole, Tattnall, Terrell, Thomas, Tift, Turner, Ware, Worth.

## Louisiana

All counties and locations within the State of Louisiana.

## Mississippi

Adams, Amite, Clairborne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Pearl River, Perry, Pike, Rankin, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson.

## North Carolina

Brunswick, Carteret, Columbus, New Hanover, Onslow, Pender.

## South Carolina

Jasper, Beaufort, Colleton, Dorchester, Charleston, Berkeley, Georgetown, Horry.

## Texas

Anderson, Angelina, Aransas, Atascosa, Austin, Bastrop, Bee, Bexar, Brazoria, Brazos, Brooks, Burleson, Caldwell, Calhoun, Cameron, Camp, Cass, Chambers, Cherokee, Colorado, Comal, De Witt, Dimmit, Duval, Falls, Fayette, Fort Bend, Franklin, Freestone, Frio, Gavelston, Goliad, Gonzales, Gregg, Grimes, Guadalupe, Hardin, Harris, Harrison, Hays, Henderson, Hidalgo, Hopkins, Houston, Jackson, Jasper, Jefferson, Jim Hogg, Jim Wells, Karnes, Kaufman, Kennedy, Kinney, Kleberg, La Salle, Lavaca, Lee, Leon, Liberty, Limestone, Live Oak, Madison, Marion, Matagorda, Maverick, McMullen, Medina, Milam, Montgomery, Morris, Nacogdoches, Navarro, Newton, Nueces, Orange, Panola, Polk, Rains, Refugio, Robertson, Rusk, Sabine, San Augistine, San Jacinto, San Patricio, Shelby, Smith, Starr, Titus, Travis, Trinity, Tyler, Upshur, Uvalde, Val Verde, Van Zandt, Victoria, Walker, Waller, Washington, Webb, Wharton, Willacy, Williamson, Wilson, Wood, Zapata, Zavala.

Dated: March 23, 2000.

**William C. Apgar,**

*Assistant Secretary for Housing-Federal Housing Commissioner.*

[FR Doc. 00 7782 Filed 3 29 00; 8:45 am]

**BILLING CODE 4210-27-P**



Wednesday,
April 24, 2002

Part IV

# Housing and Urban Development Department

**24 CFR Part 3280**
**Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Waiver; Final Rule**

EXHIBIT
3
tabbies'

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 3280**

**[Docket No. FR–4578–F–02]**

## Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Waiver

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Final waiver.

**SUMMARY:** This document advises the public that HUD is issuing a waiver of its regulations regarding the condensation control provisions for exterior walls of the manufactured home construction and safety standards. By this action, HUD is waiving certain provisions of these regulations to permit manufacturers, at their option, to utilize the alternatives provided in this notice to reduce the problems currently being experienced in humid and fringe climate areas. Presently, there are no provisions in HUD's regulations that separately address condensation control and vapor retarder requirements for manufactured homes sited in warm, moist climates of the South Atlantic and Gulf Regions. Based on information provided by the States and the public, HUD has concluded there is an immediate need to recognize alternate requirements for exterior walls in these humid and fringe climate areas that help prevent moisture damage due to condensation. By this action, HUD is finalizing its previously announced proposed waiver. This waiver will be in place while HUD considers a more permanent change to the standards.

**EFFECTIVE DATE:** April 24, 2002.

**FOR FURTHER INFORMATION CONTACT:** Elizabeth A. Cocke, Director, Manufactured Housing and Standards Division, Office of Consumer and Regulatory Affairs, Room 9156, Department of Housing and Urban Development, 451 Seventh Street SW, Washington, DC 20410–8000; telephone (202) 708–6409 (this is not a toll-free telephone number). Hearing and speech-impaired individuals may access this telephone number via TTY by calling the toll-free Federal Information Relay Service at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### I. Background

The Department published a proposed waiver to 24 CFR 3280.504 of the Manufactured Home Construction and Safety Standards on March 30, 2000 (65 FR 17110). The proposed waiver was issued in response to information received from manufacturers and certain State Administrative Agencies (SAAs) in southeastern States concerning a recent increase in the number and severity of consumer complaints caused primarily by moisture build-up and condensation in homes located in the south. They suggest this increase in complaints coincides with the Department's implementing more stringent energy efficiency requirements in its regulations regarding manufactured home construction and safety standards located at 24 CFR part 3280 (referred to as the "Standards").

At present, § 3280.504 of the Standards does not distinguish among climates for requirements for condensation control and installation of vapor barriers. [The term "vapor barrier" is now commonly referred to as a "vapor retarder". Accordingly, the term "vapor retarder" will be used in all subsequent references throughout the text of this waiver.] Thus, for example, the Standards do not separately address homes placed in humid and fringe environments or climates, which are predominantly located in the southeastern part of the United States. In these climates, it may be beneficial to prevent the outside, moisture-laden air from entering through the warm (exterior) side of the home's exterior wall and condensing and collecting on the cold (living space or interior) side of the wall assembly. One means of preventing moisture from entering the exterior wall cavity from the outside, would be to install a vapor retarder on the warm or exterior side of the wall instead of on the interior or living space side of the exterior wall.

The interior surface of the exterior wall should also then be constructed of a permeable material. This would permit any moisture-laden air that may have entered the wall cavity through a discontinuity in the exterior vapor retarder to be dissipated through the interior permeable material. In such cases, use of vapor retarder paints, vinyl-covered gypsum wallboard, or other impermeable materials or finishes on the interior side of exterior walls could be detrimental, because they would trap moisture within the wall.

### II. This Waiver

To address these concerns, HUD is issuing a waiver that applies to the first of the alternatives available under § 3280.504(b), the current condensation control and vapor barrier installation requirements for exterior walls in humid and fringe climates. Specifically, this waiver allows manufacturers of homes for humid and fringe climates to install the vapor retarder on the exterior side, rather than the interior or living space side, of the exterior wall, provided: (1) The exterior side of the exterior wall is constructed with a vapor retarder or exterior covering and sheathing that has a permeance not greater than 1.0 perm; and (2) the interior finish and interior wall panels are designed with a 5 perm or higher rating. The waiver also requires manufacturers to add a statement and a map to the data plate indicating that the home is only suitable for installation in humid and fringe climates (the map designates the acceptable locations for which the waiver is applicable).

### III. The National Fire Protection Association (NFPA) Recommendations

Previously, HUD designated NFPA as the organization to undertake a voluntary consensus process to assist the Department in developing recommendations for new manufactured housing standards. Participants in the NFPA process met in December 1999 to discuss comments received on recommended standards changes. One such recommendation involved changes to HUD's regulation in § 3280.504(b)(1) for homes sited in "humid climates" or "fringe climates" as set forth in figure 16, in Chapter 21 of the 1989 American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) Handbook of Fundamentals. (The Humid and Fringe Climate Map being utilized in this waiver is based on ASHRAE's figure 16.) HUD received the preliminary results of the consensus process deliberations, and the NFPA recommendations have been considered in preparing this final waiver.

The Department expects that recommendations received from the NFPA, research, field data obtained from the use of this waiver, and other information will be available for considering whether to effectuate changes to the standards of a more permanent nature. Any such change would first be reviewed by the Department and the new consensus committee to be established pursuant to section 604 of the Manufactured Housing Improvement Act of 2000 (Pub. L. 106–569, 114 Stat. 2944, approved December 27, 2000). A proposed rule would then be published for public comment.

### IV. Analysis of Public Comments and Other Information Received

The public comments received in response to the proposed waiver ranged from support for the proposal, to suggestions for revising the proposal, to out-right rejection of its provisions. In

general, those who did not favor the proposal indicated that the waiver did not go far enough since it did not address the larger issues of air leakage and transport of moisture-laden or humid air into exterior wall cavities. Two commenters, referencing or quoting the 1993 ASHRAE Handbook of Fundamentals, suggested that while the amount of water deposited in wall or roof spaces by air currents or pressure diffusion cannot be calculated with certainty, under some conditions that amount of water can result in several times the amount of moisture that would be caused by other means, such as vapor diffusion.

While the Department agrees with the concerns raised in the comments, it also believes the waiver provides a partial solution for reducing the extent and number of moisture problems being experienced in Southern climates. Manufacturers who chose to take advantage of the waiver are reminded that it does not consider the larger transport of moisture by air leakage, and that their designs and construction in hot-humid climates also need to address those concerns. Among the strategies manufacturers should consider are: use of exterior air barriers; prevention of air leakage from supply duct systems and other penetrations causing negative pressurization of the home; avoiding use of oversized cooling equipment; and use of balanced mechanical ventilation systems. Complying with the provisions of the waiver does not relieve manufacturers of their responsibilities to use construction methods that result in "durable, livable, and safe housing" as required by 24 CFR 3280.303(b) of the Standards.

Several commenters agreed that an effectively located, good quality vapor retarder could eliminate condensation caused by vapor diffusion (differences in vapor pressure). However, the waiver also requires the interior wall surface to be permeable so that any moisture that does become deposited within the space is not trapped by having an impermeable surface, such as vinyl-covered gypsum panels, on the living space side of the wall.

The NFPA and another commenter recommended that a combined 5-perm rating be used instead of the 3 perm rating suggested in the proposed waiver. HUD agreed with this recommendation since there was no technical basis to support the lower perm rating in recognized engineering manuals, and the final waiver has been revised to require interior finish and wall panel materials to have a combined vapor permeance greater than 5.0 perms. Also, the Manufactured Housing Institute

(MHI) collaborated with the Manufactured Home Research Alliance (MHRA) to test commonly used generic interior finish and wall panel designs to determine if they complied with the combined interior perm rating criteria in the proposed waiver. The results of the testing indicate that compliance with the higher perm rating would easily be achieved. Further, based on the Department's review of the MHI test results (submitted to amend MHI's original comments), the Department will not require testing of gypsum panels (textured or non-textured) that are finished or laminated with acrylic or latex paint or non-vinyl decorative wall paper to demonstrate the panels comply with the 5-perm minimum rating; these combinations of interior finish will be deemed to provide an acceptable level of performance.

One State Agency expressed concern about enforcing different provisions for condensation control for the limited geographic area of the State subject to the Waiver. Two commenters were concerned about potential hardships in relocating homes built under the waiver to cold climate areas for which the homes were not suited. However, those concerns are no different than for other geographic-based requirements in the Standards, such as those for thermal, wind, or roof-load protection. Therefore, the Department has not made any changes based on these comments.

Some commenters also suggested there is authority under the current Standards to permit the vapor retarder to be located on the exterior side of the wall. These commenters assert the 1989 ASHRAE Handbook of Fundamentals recognizes this practice and is incorporated by reference into the Standards. The Department does not agree that all provisions of the 1989 ASHRAE have been incorporated by reference, but to the extent they have been incorporated, the requirements of the Standards govern whenever the provisions of the 1989 ASHRAE Handbook are inconsistent with the requirements of the Standards. In addition, Interpretative Bulletin F–1–76 is not appropriate for these circumstances as it was intended to clarify requirements for cold climates, where vapor diffusion would occur from the interior to the exterior of the home and not vice-versa. As such, IB F–1–76 is applicable to the requirements in § 3280.504(b)(2), rather than § 3280.504(b)(1), the provision to which this waiver is applicable.

The Department did not accept a further recommendation of MHI and another commenter to exempt certain construction (kitchen back splash

materials, bathroom tub and shower compartments, cabinetry and built-in furniture, and hardwood plywood paneling under chair rail areas) from the combined interior perm requirement, because the Department does not have technical data to support their proposal.

The Department also did not accept the commenters' recommendation to combine and simplify the "humid" and "fringe" designations on the map into one area, as both the ASHRAE Handbook of Fundamentals and the NFPA 501 Standard on Manufactured Housing refer to them as two distinct areas in their maps.

In view of all of the above, HUD is issuing this final waiver, but reminds manufacturers that additional measures are likely needed in the design and construction of their homes to sufficiently abate the moisture problems in hot, humid climates and, therefore, comply with other requirements in the Standards.

## V. Alternative Methods

This waiver is not intended to limit alternate approaches by manufactured home producers in assuring that homes built and sited in humid and fringe climates are durable and free of moisture-related problems. Other methods of moisture control that do not meet the Standards or the conditions of this waiver may be submitted for review and consideration in accordance with 24 CFR 3282.14 (entitled "Alternate Construction of Manufactured Homes").

## VI. Final Waiver

In accordance with 24 CFR 3280.8 and 42 U.S.C. 3535(q), the Secretary hereby waives, subject to certain conditions, the specific requirements of 24 CFR 3280.504(b)(1) for homes to be sited in humid or fringe climate areas as identified in section V.F of this waiver. Manufacturers who elect to utilize the alternative permitted under this waiver, rather than to follow the existing requirements in 24 CFR 3280.504(b)(1), must produce homes in accordance with the following requirements (all other requirements of the Standards also continue to apply):

A. Exterior walls must be constructed with one of the following installed on the exterior side of the wall assembly: (1) A vapor retarder of not greater than 1.0 perm when measured and tested in accordance with ASTM E–96–93, Standard Test Methods for Water Vapor Transmission of Materials (dry cup method); or (2) an external covering and sheathing with a combined permeance of not greater than 1.0 perm.

B. The interior finish and interior wall panel materials must have a combined

vapor permeance greater than 5.0 perm (dry cup method). Gypsum wall panels (textured or non-textured) that are finished or laminated with acrylic or latex paint or non-vinyl decorative wallpaper need not be tested to establish otherwise compliance with the 5.0 perm combined vapor permeance requirement. Other interior finish and wall panel materials, such as vapor retarder paint, vinyl-covered gypsum wall panels, and other impermeable interior surfaces and finishes, must be demonstrated to have a combined rating greater than 5.0 perm (dry cup method) or they are prohibited.

C. Exterior wall cavities shall not be ventilated to the outdoors.

D. An additional statement shall be provided on the data plate required by 24 CFR 3280.5, to read as follows: "As designed and constructed, this home is suitable for installation only in humid and fringe climates as shown on the Humid and Fringe Climate Map provided with this data plate." The statement is to be typed in bold face using letters at least ¼ inch in size.

E. A reproduction of the following Humid and Fringe Climate Map is to be provided on the data plate. The map shall not be less than 3½ in. by 2¼ in. in size.

# Humid and Fringe Climate Map



F. The following areas of local governments (counties or similar areas, unless otherwise specified), listed by State, are deemed to be within the humid and fringe climate areas shown on the Humid and Fringe Climate Map, and this waiver may be applied to homes built to be sited within these jurisdictions:

*Alabama*

Baldwin, Barbour, Bullock, Butler, Chootaw, Clarke, Cofee, Conecuh, Covington, Crenshaw, Dale, Escambia, Geneva, Henry, Houston, Lowndes, Marengo, Mobile, Monroe, Montgomery, Pike, Washington, Wilcox

*Florida*

All counties and locations within the State of Florida.

*Georgia*

Appling, Atkinson, Bacon, Baker, Ben Hill, Berrien, Brantley, Brooks, Bryan, Calhoun, Camden, Charlton, Chatham, Clay, Clinch, Coffee, Colquitt, Cook, Crisp, Decatur, Dougherty, Early, Echols, Effingham, Evans, Glynn, Wayne, Grady, Irwin, Jeff Davis, Lanier, Lee, Liberty, Long, Lowndes, McIntosh, Miller, Mitchell, Pierce, Quitman, Randolph, Seminole, Tattnall, Terrell, Thomas, Tift, Turner, Ware, Worth

*Louisiana*

All counties and locations within the State of Louisiana.

*Mississippi*

Adams, Amite, Clairborne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Pearl River, Perry, Pike, Rankin, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson

*North Carolina*

Brunswick, Carteret, Columbus, New Hanover, Onslow, Pender

*South Carolina*

Jasper, Beaufort, Colleton, Dorchester, Charleston, Berkeley, Georgetown, Horry

*Texas*

Anderson, Angelina, Aransas, Atascosa, Austin, Bastrop, Bee, Bexar, Brazoria, Brazos, Brooks, Burleson, Caldwell, Calhoun, Cameron, Camp, Cass, Chambers, Cherokee, Colorado, Comal, De Witt, Dimmit, Duval, Falls, Fayette, Fort Bend, Franklin, Freestone, Frio, Gavelston, Goliad, Gonzales, Gregg, Grimes, Guadalupe, Hardin, Harris, Harrison, Hays, Henderson, Hidalgo, Hopkins, Houston, Jackson, Jasper, Jefferson, Jim Hogg, Jim Wells, Karnes, Kaufman, Kennedy, Kinney, Kleberg, La Salle, Lavaca, Lee, Leon, Liberty, Limestone, Live Oak, Madison, Marion, Matagorda, Maverick, McMullen, Medina, Milam, Montgomery, Morris, Nacogdoches, Navarro, Newton, Nueces, Orange, Panola, Polk, Rains, Refugio, Robertson, Rusk, Sabine, San Augistine, San Jacinto, San Patricio, Shelby, Smith, Starr, Titus, Travis, Trinity, Tyler, Upshur, Uvalde, Val Verde, Van Zandt, Victoria, Walker, Waller, Washington, Webb, Wharton, Willacy, Williamson, Wilson, Wood, Zapata, Zavala

Dated: April 16, 2002.

**John C. Weicher,**

*Assistant Secretary for Housing-Federal Housing Commissioner.*

[FR Doc. 02–9860 Filed 4–23–02; 8:45 am]

**BILLING CODE 4210–27–P**

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

RUSSEL J. GUIDROZ, JR., ET AL.            *CIVIL NO. 05-1148

VERSUS                                    *MAGISTRATE JUDGE HILL

CHAMPION ENTERPRISES, INC., ET AL. *BY CONSENT OF THE PARTIES

### MINUTES AND ORDER

A hearing on the plaintiffs' Motion to Alter Judgment of Dismissal and Motion for
Leave to Amend Original Complaint [doc. 32] was held on May 17, 2007.[1]  Hugh E. McNeely
and Lamont P. Domingue attended.  The proceedings were transcribed by court reporter LaRea
Bourque. The following Orders were entered;

For the reasons assigned in open court during oral argument on May 17, 2007, the
plaintiffs' Motion for Leave to Amend Original Complaint [doc. 32] is **Granted**.
Accordingly, the Clerk shall file the First Amended Class Action Complaint (attached as an
Exhibit to the Motion [doc. 32-1]) into the record.

The plaintiffs' Motion to Amend Judgment of Dismissal [doc. 32] is **Granted** as
follows: This court's January 26, 2007 Judgment of Dismissal is amended to a Partial Judgment
of Dismissal, granting the Motions to Dismiss filed on behalf of Redman Homes, Inc. [doc. 8]
and Champion Enterprises, Inc. [doc. 9], and thereby dismissing all claims asserted in the
plaintiffs' Original Class Action Complaint. The claims asserted in the Amending complaint
allowed to be filed this date are not affected by this ruling.

---

[1]The oral argument lasted approximately fifteen minutes.



EXHIBIT
4

2

**On or before June 4, 2007**, the defendants may file an appropriate dispositive Motion addressing any claims asserted in the plaintiffs' First Amended Class Action Complaint. Should no such Motion be filed, the court will issue a Scheduling or other appropriate Order to place this matter back on the court's trial docket.

Signed at Lafayette, Louisiana on May 17, 2007.

C. MICHAEL HILL.
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

**RUSSEL J. GUIDROZ, JR., ET AL.**          *CIVIL NO. 05-1148

**VERSUS**          *MAGISTRATE JUDGE HILL

**CHAMPION ENTERPRISES, INC., ET AL.**          *BY CONSENT OF THE PARTIES

---

### MINUTES OF HEARING AND ORDER

A hearing on the defendants' Combined Rule 12(b)(6) Motion to Dismiss Amended Complaint, Rule 12(e) Motion for More Definite Statement and Rule 12(f) Motion to Strike [doc. 38] was held on August 1, 2007 before the undersigned Magistrate Judge.[1]   Hugh E. McNeely and Lamont P. Domingue attended.  The proceedings were transcribed by court reporter LaRea Bourque.  The following Orders are entered:

**IT IS ORDERED** that the defendants' Combined Rule 12(b)(6) Motion to Dismiss Amended Complaint, Rule 12(e) Motion for More Definite Statement and Rule 12(f) Motion to Strike [doc. 38] is **Denied** for the reasons set forth on the record.

**IT IS FURTHER ORDERED** that **within fifteen (15) days** of the date of this Order, the parties shall meet to discuss a reasonable way to conduct discovery relating to the design defect(s) alleged by plaintiffs in their Amended Complaint.  This discovery will be limited to the design defect alleged to exist in the Guidroz manufactured home.

---

[1]Court time: 1 hour 30 minutes.



EXHIBIT

5

2

**IT IS FURTHER ORDERED** that **within thirty (30) days** of the date of this Order,

the parties shall file a Joint Proposed Discovery Plan.  Should the parties disagree on any

substantive discovery issue, each party shall submit their proposed position on that issue in the

body of the Joint Proposed Discovery Plan.  A copy of the Joint Proposed Discovery Plan shall

be delivered to chambers of the undersigned commensurate with filing.  Upon filing, the court

will set a telephone status conference to discuss the proposed discovery plan with the parties.

**IT IS FURTHER ORDERED** that there being good cause shown, the time limitation

for filing a Motion for Class Certification set forth in LR 23.1 is hereby extended without date

until further notice of this court.

Signed at Lafayette, Louisiana on August 1,  2007.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JAMES PERRY,                          )
                                      )
        Plaintiff,                    )
v.                                    )    CASE NO. 2:06-cv-502-MEF
                                      )              (WO)
FLEETWOOD ENTERPRISES, INC.,          )
*et al.,*                             )
                                      )
        Defendants.                   )

## MEMORANDUM OPINION AND ORDER

James Perry (hereinafter "Plaintiff") brings this action against Fleetwood Enterprises,

Inc. and Fleetwood Homes of Georgia, Inc. (hereinafter collectively "Defendants").[1]

Plaintiff alleges violation of the Magnuson Moss Warranty Act, breaches of various

warranties, negligence, wantonness, and violation of the Alabama Extended Manufacturers

Liability Doctrine.  This cause is presently before the Court on Defendants' Motion to

Dismiss (Doc. # 4).  Therein, Defendants argue that Plaintiff's state law claims are

preempted by the National Manufactured Housing Construction and Safety Standards Act

of 1974, 42 U.S.C. §§ 5401 *et seq.* (hereinafter "the Manufactured Housing Act" or "the

Act").  The Court has considered the Complaint and the arguments in support of and in

---

[1] Plaintiff also names a number of fictitious defendants.  Federal courts do not allow
fictitious party practice.  *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n.1 (11th
Cir. 1997) ("[F]ictitious party practice is not permitted in federal court.").  Therefore, the
fictitious defendants are due to be dismissed.  *See, e.g., Wiggins v. Risk Enterprise Mgmt.
Ltd.*, 14 F. Supp. 2d 1279, 1279 n.1 (M.D. Ala. 1998) (DeMent, J.) (dismissing *sua sponte*
fictitious defendants).



EXHIBIT

6

opposition to the Motion. For the reasons set forth in this Memorandum Opinion and Order,

Defendants' Motion is due to be GRANTED IN PART and DENIED IN PART.

## I. JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332 (diversity). The parties do not contest personal jurisdiction or venue, and the Court

finds adequate allegations in support of both.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. Prior to the

Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct.

1955 (2007), a motion to dismiss could only be granted if a plaintiff could prove "no set of

facts . . . which would entitle him to relief." *See Conley v. Gibson*, 355 U.S. 41, 45-46

(1957); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Wright v. Newsome*, 795

F.2d 964, 967 (11th Cir. 1986). Now, in order to survive a motion to dismiss for failure to

state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible

on its face." *Twombly*, 127 S. Ct. at 1974. Plaintiff's "[f]actual allegations must be enough

to raise a right to relief above a speculative level on the assumption that the allegations in the

complaint are true." *Id*. at 1965. It is not sufficient that the pleadings merely "le[ave] open

the possibility that the plaintiff might later establish some set of undisclosed facts to support

recovery." *Id*. at 1968 (internal quotation and alteration omitted). The court will accept as

true all well-pleaded factual allegations and view them in a light most favorable to the

2

plaintiff. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). Furthermore, the threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985).

## III. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Fleetwood Homes (hereinafter "Fleetwood Homes") manufactures and sells manufactured homes. Fleetwood Enterprises (hereinafter "Fleetwood Enterprises") is the parent corporation or alter ego of Fleetwood Homes. On or about May 2, 2002, Plaintiff purchased a manufactured home made by Fleetwood Homes. Defendants made a written express warranty to Plaintiff as part of the purchase of the home. In addition, Defendants warranted that any defects in the materials or workmanship of the home would be repaired or remedied at no cost to Plaintiff if Defendant received notice within the warranty period. Plaintiff alleges that the home failed in its intended purpose. He further alleges that Fleetwood Homes failed to repair the home, despite his notice of its deficiencies, and that the home as a result continues to deteriorate structurally. Plaintiff alleges that he has given Defendants notice of his breach of warranty claim prior to bringing this suit, pursuant to § 7-2-607(3) of the Alabama Code.

Plaintiff filed the Complaint on May 1, 2006 in the Circuit Court of Bullock County (Doc. # 1). In his Complaint, he alleges causes of action under the following theories: the Magnuson Moss Warranty Act, 15 U.S.C. § 2301 *et seq*. (Count I); breach of express

3

warranty (Count II); breach of implied warranty of merchantability (Count III); breach of

fitness for particular purpose (Count IV); breach of warranty of habitability (Count V);

negligence (Count VI); wantonness (Count VII); and the Alabama Extended Manufacturers

Liability Doctrine (Count VIII).

On June 2, 2006, Defendants removed the action to this Court (Doc. # 1). Defendants

filed a Motion to Dismiss (Doc. # 4) on July 5, 2006.

## IV. DISCUSSION

Defendants contend that Plaintiff's state law claims are preempted by the

Manufactured Housing Act. "Congress's intent to preempt state law may be explicitly stated

in the language of a federal statute or implicitly contained in the structure and purpose of the

statute." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004). There

are three types of preemption: (1) express preemption; (2) field preemption; and (3) conflict

preemption. *Id.* The second and third types are collectively referred to as "implied

preemption." Defendants argue that Plaintiff's state law claims are both expressly and

impliedly preempted.

The Court's preemption analysis "start[s] with the assumption that the historic police

powers of the states are not superseded by federal law unless preemption is the clear and

manifest purpose of Congress." *Nat'l Ass'n of State Utility Consumer Advocates v. FCC*,

457 F.3d 1238, 1252 (11th Cir. 2006); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485

(1996) ("[W]e have long presumed that Congress does not cavalierly pre-empt state-law

4

causes of action."). "Therefore, [t]he purpose of Congress is the ultimate touchstone of preemption analysis." *Cliff*, 363 F.3d at 1122 (alteration and internal quotation omitted).

## A. *Express Preemption*

Defendants argue that Plaintiff's state law claims are barred by express preemption, whereby "Congress can define explicitly the extent to which its enactments pre-empt state law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). Express preemption may be found in the language of the statute, its legislative history, or the regulations promulgated pursuant to the statute. *Howard v. Uniroyal, Inc.*, 719 F.2d 1552, 1556 (11th Cir. 1983). Congress must express a clear intent to preempt state law. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (U.S. 1986). "Federal preemption under [subsection § 5403(d) of the Manufactured Housing Act] shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter." 42 U.S.C. § 5403(d).

Defendants contend that Congress expressly preempted Plaintiff's claims when it provided in the Act that the "manufactured home construction and safety standards established by the Secretary under this section shall include preemptive energy conservation standards in accordance with this subsection." 42 U.S.C. § 5403(g)(1). Defendants also point to the fact that the regulations specifically set out "the requirements for condensation control, air infiltration, thermal insulation and certification for heating and comfort cooling."

5

24 C.F.R. § 3280.501.

In response, Plaintiff points to the saving clause, which provides, "Compliance with any Federal manufactured home construction or safety standard issued under this chapter does not exempt any person from any liability under common law." 42 U.S.C. § 5409(c). Plaintiff argues that the saving clause exempts this action from preemption.

The statutory language instructs the Secretary to include "preemptive energy conservation standards." 42 U.S.C. § 5403(g)(1). The preemptive effect of the Act is set forth in subsection (d) of the same section:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding the construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403(d). *See Ga. Manufactured Hous. Ass'n, Inc. v. Spalding County*, 148 F.3d 1304, 1308-09 (11th Cir. 1998) (noting that Congress defined the preemptive effect of the Act in § 5403(d)).

The United States Supreme Court has held that nearly identical language in another statute does not expressly preempt state law tort claims. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000). Further, several courts have held that identical language in the Manufactured Housing Act does not expressly preempt state law products liability claims.

6

*See, e.g.*, *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 793-94 (10th Cir. 2000);

*Richard v. Fleetwood Enters., Inc.*, 4 F. Supp. 2d 650, 657 (E.D. Tex. 1998) ("The

Manufactured Housing Act does not explicitly preempt state causes of action."). In addition,

the regulations promulgated under the Act provide for the maintenance of state law claims.

*See, e.g.*, 24 C.F.R. § 3282.402(a) ("Nothing in this subpart or in these regulations shall limit

the rights of the purchaser under any contract or applicable law.").

Defendants argue that the preemption provision here should be read broadly and that

such a reading would preempt Plaintiff's state law claims. In *Geier v. Am. Honda Motor Co.*,

the Supreme Court addressed this issue in the context of a nearly identical preemption

provision and saving clause in the National Traffic and Motor Vehicle Safety Act.[2]  The

Court explained:

> [A] reading of the express pre-emption provision that excludes
> common-law tort actions gives actual meaning to the saving
> clause's literal language, while leaving adequate room for state
> tort law to operate-for example, where federal law creates only
> a floor, *i.e.,* a minimum safety standard.  Without the saving
> clause, a broad reading of the express pre-emption provision
> arguably might pre-empt those actions, for, as we have just
> mentioned, it is possible to read the pre-emption provision,
> standing alone, as applying to standards imposed in common-
> law tort actions, as well as standards contained in state

---

[2] The saving clause at issue in *Geier* is nearly identical to that in the Manufactured
Housing Act: "Compliance with any Federal motor vehicle safety standard issued under this
subchapter does not exempt any person from any liability under common law." *See* 49
U.S.C. § 30103(e); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 895 & n.11 (2000)
(Stevens, J., dissenting) (quoting the saving clause and noting that it is now codified in 49
U.S.C. § 30103(e)).

> legislation or regulations. And if so, it would pre-empt all
> nonidentical state standards established in tort actions covering
> the same aspect of performance as an applicable federal
> standard, even if the federal standard merely established a
> minimum standard.

*Geier*, 529 U.S. at 868 (internal citation omitted). The presence of the saving clause, however, did not permit a broad reading. The court stated that it did not find any convincing evidence of congressional intent to preempt common-law tort actions, and therefore, a broad reading of the preemption provision could not be correct. *Id.* Given the presence of the saving clause, the court stated that the preemption clause must be read narrowly. *Id.*

Defendants argue that the saving clause analysis set forth above is only applicable where the regulations set forth in the statute are minimum standards intended to provide a "floor," or minimum safety standard. They contend that the specifications in the Act are mandatory requirements, not minimum standards. Defendants point out that the Act states that the manufactured home construction and safety standards are to "meet high standards of protection," *see* 42 U.S.C. § 5403(a)(1)(A)(ii), and the relevant regulation is one of the "requirements for condensation control, air infiltration, thermal insulation and certification for heating and cooling," *see* 24 C.F.R. § 3280.501.

The Court does not agree that the saving clause only saves those actions challenging regulations intended to provide a minimum safety standard. In *Geier*, the Court listed regulations intended to provide a minimum safety standard as an example of a regulation that might fall within the savings clause. *Geier* did not state that state law actions are barred if

8

the federal regulation goes beyond providing a minimum standard. In fact, the opinion suggests that the saving clause exempts tort actions generally. *See, e.g., Geier*, 529 U.S. at 868 ("The language of the pre-emption provision permits a narrow reading that excludes common-law actions."); *id.* at 869 ("We have just said that the saving clause *at least* removes tort actions from the scope of the express pre-emption clause."). *But see id.* at 870 ("[T]he saving provision still makes clear that the express pre-emption provision does not of its own force pre-empt common-law tort actions. And it thereby preserves those actions that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor.").

This view is supported not only by the language in *Geier*, but also by its analysis. The Court stated that the regulation at issue was not a minimum standard; rather, the regulation provided manufacturers of airbags with a "range of choices among different passive restraint devices." *Id.* at 874-75. *See also Griffith v. Gen. Motors Corp.*, 303 F.3d 1276, 1281 (11th Cir. 2002) ("In *Geier*, the Court found that the rule-making history of [the regulation at issue] makes clear that [the Department of Transportation] saw it not merely as a minimum standard, but as a comprehensive regulatory scheme."). If the saving clause only excluded from operation of the express exemption clause actions based on those regulations intended to provide a floor, the Court would have found express preemption. Instead, the Court found that the action was removed from the scope of the express exemption clause, and it concluded that the action was not expressly preempted. *Id.* at 868. The presence of a saving

clause therefore saves more than only actions based upon regulations intended to provide a minimum safety standard.

As Defendants point out, the statute also states that the standards promulgated under the Act "shall include preemptive energy conservation standards in accordance with this subsection." *See* 42 U.S.C. § 5403(g)(2). Given the presence of the saving clause, the Court is not persuaded that Congress intended to preempt common law actions rather than state statutes or regulations. *See Geier*, 529 U.S. at 868 ("We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances."). In any case, both the preemption clause and the saving clause are nearly identical to those that were found not to preempt common law actions in *Geier* and *Choate*. The Court concludes that the doctrine of express preemption does not bar Plaintiff's claims. Accordingly, Defendants' Motion is due to be DENIED on the basis of express preemption.

### B.  Implied Preemption

Defendants also contend that Plaintiff's state law claims are barred by both types of implied preemption. The presence of an express preemption provision does not foreclose an implied preemption analysis. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287-88 (1995). The Court turns first to field preemption, which occurs when "federal regulation in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it." *Cliff*, 363 F.3d at 1122.

10

The presence of a saving clause suggests that Congress did not intend to occupy the field.[3] The decisions the Court has found addressing field preemption with respect to common law actions have concluded that federal regulation under the Act is not sufficiently pervasive to occupy the field. *See Choate*, 222 F.3d at 795 ("[T]he Manufactured Housing Act does not support [the] assertion" that "Congress intended for the Federal Government to occupy the field of construction and safety of manufactured homes exclusively . . . ."); *Richard*, 4 F. Supp. 2d at 657 ("[T]here is no clear or manifest congressional intent for the federal regulation of the safety and sale of manufactured housing to completely occupy the field."). The Court agrees.

As Defendants note, Congress has amended the Manufactured Housing Act since these cases were decided. Defendants note that the 2000 amendments to the Act "interjected a consensus-based process for the proposal, revision, and implementation of performance standards." (Doc. # 4 at 7). However, these amendments only changed the process of promulgating the standards, because before the amendments the Secretary was to establish such standards "after consultation with the Consumer Product Safety Commission." *See* 42 U.S.C. § 5403, Historical and Statutory Notes, Amendments. It is unclear why changing the

---

[3] While *Geier* and *Choate* held that the presence of a saving clause does not foreclose the operation of conflict preemption principles, neither addressed the effect of a saving clause on field preemption. *See Geier*, 529 U.S. at 869 (addressing the effect of the presence of a saving clause on conflict preemption but not field preemption); *Choate*, 222 F.3d at 794-95 (noting that the saving clause did not foreclose the question of conflict preemption and that the defendant did not raise the issue of field preemption).

process of promulgating performance standards would make the resulting regulations more pervasive. The Court concludes that even considering the effect of the amendments, Congress did not intend to occupy the field.

Defendants also assert that Plaintiff's state law claims are barred by conflict preemption.[4] "Conflict preemption exists where state law actually conflicts with federal law, making it impossible to comply with both, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 768 (11th Cir. 1998) (internal quotation marks omitted). The Act's implementing regulations specify that the test for determining whether the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress is "whether the State rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act." 24 C.F.R. § 3282.11(d).

At least some of Plaintiff's claims are based on Defendants' selection of an option permitted by § 3280.504(b). As Plaintiff states in his brief, "Plaintiff has alleged that these Defendants have knowingly chosen to build homes to a known defective optional standard (when other reasonable options existed) under 24 C.F.R. § 3280.504." (Doc. # 6 at 1-2.)

Rather than provide a minimum standard, Section 3280.504(b), like the regulation at

---

[4] As with an express preemption provision, the presence of a saving clause does not foreclose the operation of conflict preemption. *See Geier*, 529 U.S. at 869.

issue in *Geier*, provides for a range of authorized options for exterior wall construction. *See* 24 C.F.R. § 3280.504(b). The regulations lay out "the requirements for condensation control, air infiltration, thermal insulation and certification for heating and comfort cooling." 24 C.F.R. § 3280.501. The language does not suggest that the regulation sets forth minimum standards. They are also intended to "meet high standards of protection." *See* 42 U.S.C. § 5403(a)(1)(A)(ii). Courts have suggested that regulations providing a range of options do not set forth minimum standards. *See Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 44 (D. Mass. 2002). The Court concludes that § 3280.504(b) does not set forth a minimum standard. Further, the one case of which the Court is aware to have addressed this issue found that the plaintiff's claims were barred by conflict preemption because they would penalize the manufacturer for choosing a federally authorized option. *See Guidroz v. Champion Enters., Inc.*, No. 05-1148 (W.D. La. Jan. 26, 2007). The Court agrees and concludes that Plaintiff may not penalize Defendant for choosing an option permitted by § 3280.504(b).

Plaintiff argues, looking both to case law and the structure of the regulations themselves, that the regulations at issue set forth are performance-based. In other words, the manufacturer is given several options to meet a performance-based requirement. Therefore, Plaintiff argues, the regulations set forth minimum standards. The Court disagrees. The regulation at issue in *Geier* also set a performance requirement. *See Geier*, 529 U.S. at 878 ("[The regulation at issue] set[] a performance requirement for passive restraint devices and

13

allow[ed] manufacturers to choose among different passive restraint mechanisms, such as airbags, automatic belts, or other passive restraint technologies to satisfy that requirement."). The *Geier* Court noted that the manufacturers were required to meet a performance requirement by choosing from a range of options. *See id.* at 878-79. Nonetheless, the plaintiff's claims were preempted because they penalized the manufacturer for choosing an option provided by the regulations. *See id.* at 881. Even if the regulations set forth performance requirements or a performance standard, the Court cannot agree that the regulations provide a minimum standard. Maintenance of Plaintiff's state court claims would "impair[] the Federal superintendence of the manufactured home industry as established by the Act." 24 C.F.R. § 3282.11(d). Defendants' motion to dismiss Plaintiff's state law claims is therefore due to be GRANTED to the extent that those claims seek to penalize Defendants for their choice of an option available under 24 C.F.R. § 3280.504(b).

## V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that

1. Defendants' Motion to Dismiss (Doc. # 4) is GRANTED IN PART and DENIED IN PART.

2. Plaintiff's state law claims are DISMISSED with prejudice to the extent that those claims seek to penalize Defendants for their choice of an option available under 24 C.F.R. § 3280.504(b). Any of Plaintiff's other state law claims remain pending.

14

3.  All claims against the fictitious defendants are DISMISSED.

DONE this 28th day of September, 2007.

                              _____ /s/ Mark E. Fuller _____
                              CHIEF UNITED STATES DISTRICT JUDGE

health and comfort and within the limits of reasonable economics.

(1) *Envelope penetrations.* Plumbing, mechanical and electrical penetrations of the pressure envelope not exempted by this part, and installations of window and door frames shall be constructed or treated to limit air infiltration. Penetrations of the pressure envelope made by electrical equipment, other than distribution panel boards and cable and conduit penetrations, are exempt from this requirement. Cable penetrations through outlet boxes are considered exempt.

(2) *Joints between major envelope elements.* Joints not designed to limit air infiltration between wall-to-wall, wall-to-ceiling and wall-to-floor connections shall be caulked or otherwise sealed. When walls are constructed to form a pressure envelope on the outside of the wall cavity, they are deemed to meet this requirement.

§ 3280.506   **Heat loss/heat gain.**

The manufactured home heat loss/heat gain shall be determined by methods outlined in §§ 3280.508 and 3280.509. The Uo (Coefficient of heat transmission) value zone for which the manufactured home is acceptable and the lowest outdoor temperature to which the installed heating equipment will maintain a temperature of 70 F shall be certified as specified in § 3280.510 of this subpart. The Uo value zone shall be determined from the map in figure 506.



Office of Asst. Sec. for Housing, HUD                    §3280.506



U/O Value Zone Map for Manufactured Housing

Zones

U-Values

| 1 | 2 | 3 |
|---|---|---|
| 0.116 | 0.096 | 0.079 |

(a) *Coefficient of heat transmission.* The overall coefficient of heat transmission (Uo) of the manufactured home for the respective zones and an indoor design temperature of 70 F, including internal and external ducts, and excluding infiltration, ventilation and condensation control, shall not exceed

143

the Btu/(hr.) (sq. ft.) (F) of the manufactured home envelope are as tabulated below:

| Uo value zone | Maximum coefficient of heat transmission |
|---|---|
| 1 ......... | 0.116 Btu/(hr.) (sq. ft.) (F). |
| 2 ......... | 0.096 Btu/(hr.) (sq. ft.) (F). |
| 3 ......... | 0.079 Btu/(hr.) (sq. ft.) (F). |

(b) To assure uniform heat transmission in manufactured homes, cavities in exterior walls, floors, and ceilings shall be provided with thermal insulation.

(c) Manufactured homes designed for Uo Value Zone 3 shall be factory equipped with storm windows or insulating glass.

[58 FR 55009, Oct. 25, 1993; 59 FR 15113, Mar. 31, 1994]

§ 3280.507  Comfort heat gain.

Information necessary to calculate the home cooling load shall be provided as specified in this part.

(a) *Transmission heat gains.* Homes complying with this section shall meet the minimum heat loss transmission coefficients specified in § 3280.506(a).

§ 3280.508  Heat loss, heat gain and cooling load calculations.

(a) Information, values and data necessary for heat loss and heat gain determinations shall be taken from the 1989 ASHRAE Handbook of Fundamentals, chapters 20 through 27. The following portions of those chapters are not applicable:

21.1   Steel Frame Construction
21.2   Masonry Construction
21.3   Floor Systems
21.14  Pipes
21.16  Tanks, Vessels and Equipment
21.17  Refrigerated Rooms and Buildings
22.15  Mechanical and Industrial Systems
23.13  Commercial Building Envelope Leakage
25.4   Calculation of Heat Loss from Crawl Spaces

(b) The calculation of the manufactured home's transmission heat loss coefficient (Uo) shall be in accordance with the fundamental principals of the 1989 ASHRAE Handbook of Fundamentals and, at a minimum, shall address all the heat loss or heat gain considerations in a manner consistent with the

calculation procedures provided in the document Overall U-values and Heating/Cooling Loads-Manufactured Homes—February 1992–PNL 8006, HUD User No. 0005945.

(c) Areas where the insulation does not fully cover a surface or is compressed shall be accounted for in the U-calculation (see § 3280.506). The effect of framing on the U-value must be included in the Uo calculation. Other low-R-value heat-flow paths ("thermal shorts") shall be explicitly accounted for in the calculation of the transmission heat loss coefficient if in the aggregate all types of low-R-value paths amount to more than 1% of the total exterior surface area. Areas are considered low-R-value heat-flow paths if:

(1) They separate conditioned and unconditioned space; and

(2) They are not insulated to a level that is at least one-half the nominal insulation level of the surrounding building component.

(d) *High efficiency heating and cooling equipment credit.* The calculated transmission heat loss coefficient (Uo) used for meeting the requirement in § 3280.506(a) may be adjusted for heating and cooling equipment above that required by the National Appliance Energy Conservation Act of 1987 (NAECA) by applying the following formula:

Uo adjusted = Uo standard×[1+(0.6) (heating efficiency increase factor)+(cooling multiplier) (cooling efficiency increase factor)]

where:

Uo standard = Maximum Uo for Uo Zone required by § 3280.506(a)

Uo adjusted = Maximum Uo standard adjusted for high efficiency HVAC equipment

Heating efficiency increase factor = The increase factor in heating equipment efficiency measured by the Annual Fuel Utilization Efficiency (AFUE), or the Heating Seasonal Performance Factor (HSPF) for heat pumps, above that required by NAECA (indicated as "NAECA" in formula). The formula is heating efficiency increase factor = AFUE (HSPF) home − AFUE (or HSPF) NAECA divided by AFUE (HSPF) NAECA.

Cooling efficiency increase factor = the increase factor in the cooling equipment efficiency measured by the Seasonal Energy Efficiency Ratio (SEER) above that required by NAECA.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION


RUSSELL J. GUIDROZ, JR., ET AL.,          :        DOCKET NO. 05-1148
                                          :
                        Plaintiffs,       :
vs.                                       :        July 10, 2006
                                          :
CHAMPION ENTERPRISES, INC., ET AL., :
                                          :
                        Defendants.       :        Lafayette, Louisiana

---

OFFICIAL TRANSCRIPT OF THE HEARING
BEFORE THE HONORABLE C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE.


APPEARANCES:

FOR THE PLAINTIFFS:            HUGH E. MCNEELY
                              Hagens, Berman, et al.
                              1 Main St., 4th Fl.
                              Cambridge, MA  02142


FOR THE DEFENDANTS:           LAMONT P. DOMINGUE
                              Voorhies & Labbe
                              P.O. Box 3527
                              Lafayette, LA  70502



TRANSCRIBED BY:               LARAE BOURQUE
                              800 Lafayette Street, Ste. 3103
                              Lafayette, Louisiana  70501



EXHIBIT

tabbies


COPY

```
 1    condensation in the walls and causing problems with their homes.
 2            THE COURT:  Well, you're asking me to hold that his --
 3    that his complaint as pled is preempted.
 4            MR. DOMINGUE:  That's correct, Your Honor.
 5            THE COURT:  And what I hear you saying is that it is
 6    conceivable if he had pled -- made his complaint read in another
 7    way, that it might not be preempted.
 8            MR. DOMINGUE:  Precisely.  And let me offer this, Your
 9    Honor.
10            THE COURT:  In that case is the remedy to allow him to
11    amend?
12            MR. DOMINGUE:  It could be.  Look, I agree with Your
13    Honor.  There are remedies that's perfectly permissible if this
14    Court chooses.  In fact, I think there's probably case law out
15    there that says, look --
16            THE COURT:  Well, the case law says if he can amend it,
17    he can solve the problem (unintelligible).
18            MR. DOMINGUE:  Exactly.  And it goes back to -- for
19    example, let's say now he says, well, look, it was an improper
20    form of construction.  I mean, that's what happened in -- what
21    was the case I was citing to the Court?  Oh, the MacMillan case.
22    That's what the court did there.
23            They said, look, you're saying dangerous --
24    unreasonably dangerous levels of formaldehyde.  You've got to
25    give us more than that.  That's just a general -- you know, we've
```

UNITED STATES DISTRICT COURT -- WESTERN DISTRICT OF LOUISIANA
LAFAYETTE/OPELOUSAS DIVISION

| | | |
|---|---|---|
| RUSSELL J. GUIDROZ, JR. AND | § | |
| MICHELLE L.GUIDROZ, | § | |
| INDIVIDUALLY AND AS | § | |
| REPRESENTATIVES | § | |
| ALL PERSONS SIMILARLY SITUATED | § | |
| | § | Civil Action No. 05-1148 L-O |
| | § | |
| VS. | § | |
| | § | |
| CHAMPION ENTERPRISES, INC. AND | § | |
| REDMAN HOMES, INC | § | Magistrate Judge Hill |

**FIRST AMENDED CLASS ACTION COMPLAINT**

1.    NOW INTO COURT, through undersigned counsel, come Plaintiffs,
Russell J. Guidroz, Jr. and Michelle L. Guidroz, individually and as representatives of all
persons and/or entities similarly situated, who, with leave of Court, make this First
Amended Class Action Complaint and allege as follows:

2.    This is a class action brought pursuant to Rule 23 of the Federal Rules of
Procedure by Plaintiffs, individually, and on behalf of all other persons and/or entities
similarly situated (Plaintiffs and the members of the proposed class shall be referred to
collectively as "Plaintiffs"), to obtain relief from defendants, individually, jointly,
severally and *in solido* on the causes of action stated herein.

**THE PARTIES – PLAINTIFFS**

3.    Plaintiffs, Russell J. Guidroz, Jr. and Michelle L. Guidroz, (collectively
sometimes referred to as "the Guidrozes") are persons of the full age of majority and
domiciled in the Parish of St. Mary, State of Louisiana. Plaintiffs are Members of the

EXHIBIT
9

Plaintiff Class defined herein, will adequately represent the interests of the Plaintiff

Class, and seek to be certified as Class Representatives of this Class.

## THE PARTIES – DEFENDANTS

4.      Defendant, Champion Enterprises, Inc. ("Champion") is a Michigan

corporation headquartered at 2701 Cambridge Court, Suite 300, Auburn Hills, Michigan.

Champion is the parent corporation for a family of alter ego companies that manufacture

and retail manufactured and modular housing that comprise a single business enterprise

under the laws of Louisiana.  The names of the alter ego subsidiary companies or

divisions under which Champion conducts its single business enterprise include, but are

not limited to, the following: Redman Homes, Inc., Redman Home Builders, Moduline

Industries, Summit Crest Homes, Silvercrest Homes, Atlantic Homes, Titan Homes,

Fortune Homes, Commander Homes, Dutch Housing, Gateway Homes, Advantage

Homes, Homes of Legend, Homes of Merit, Chandeleur Homes, Genesis Homes and

Champion Homes. (hereinafter collectively referred to as the "Champion Group").

5.      Defendant, Redman Homes, Inc. ("Redman"), is a Delaware corporation

with its principal office at 2701 Cambridge Ct., Ste. 300, Auburn Hills, Michigan, 48326.

Redman, as a wholly owned subsidiary of Champion, is a member of the Champion

single business enterprise that comprises the Champion Group. Redman can be served in

this matter through its registered agent CT Corporation System, 8550 United Plaza Blvd.,

Baton Rouge, LA 70809.

## JURISDICTION

6.  The court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1)

because the plaintiffs and the defendants are citizens of different states, and the amount in

controversy exceeds $75,000, exclusive of interest and costs.

## INTRODUCTION

7.     This is an action under the Louisiana laws of redhibition and the Louisiana

Products Liability Act ("LTLA"). This class action seeks the rescission of sales of

manufactured homes defectively designed and manufactured by the Champion Group that

were purchased by Plaintiffs during the class period and to recover damages incurred by

Plaintiffs for which remedies are provided in Articles 2531 and/or 2545 of the Louisiana

Civil Code.  Alternatively, Plaintiffs seek damages from defendants for their liability as

the manufacturers of unreasonably dangerous products because of design, inadequate

warning and nonconformity to express warranty under the provisions of the LPLA.

8.     The design and manufacturing defect of the manufactured homes in this

matter consist of a uniform and specific nature that constitute the predominant common

factual basis for this class action in redhibition and for violations under the LTLA.

9.     The manufactured homes designed and manufactured by the Champion

Group, and purchased by Plaintiffs, have defectively designed and constructed moisture

control performance, exterior walls, wall cavities, and exterior coverings and/or

ventilation systems, in violation of the HUD Manufactured Home Construction and

Safety Standards.  Specifically, the defective manufactured homes use a design that

incorporates a vapor barrier on the "living side" of the wall structures combined with wall

cavities and external coverings or sheathing and/or ventilation systems that causes

moisture to accumulate and remain in the wall cavities of manufactured homes for sale

and use in Louisiana – a Gulf State known for hot and humid climactic conditions. The

Champion Group's construction of manufactured homes that causes moisture to

condense, accumulate and remain in the walls and wall cavities does not comply with accepted engineering practices to insure durable, livable, and safe housing as set forth in HUD standards Title 24 of the Code of Federal Regulations §§ 3208.303. The manner in which Defendants design and construct their products with wall cavities ventilated to the outside ambient air and/or ventilation systems that create negative pressure conditions in the wall structures for homes in the Gulf Coast region has led to or will lead to excessive accumulation of vapor condensation and a contiguous moisture problem throughout the exterior wall structures of the manufactured homes utilizing this design. The moisture environment within the walls and wall cavities is a performance failure created by the defective design and construction and has led or will lead to premature deterioration of wall materials, warping or weakening of wall materials, development of "soft walls", and to an extreme amount of mold and fungal growth throughout the wall structure thereby creating elevated exposure to such mold and fungal growth to occupants. The moisture control performance failure described in this paragraph caused by common design and manufacture defects is sometimes referred to herein as "the redhibitory defect". If a manufacturer chooses to utilize option 1 of 24 CFR 3280.504(b) and place a vapor barrier on the "living side" of the exterior walls, it still has a duty to take steps to ensure that option 1 is implemented correctly by ensuring the home performs in the manner prescribed in, among others, sections 3280.103(b) (ventilation system "shall not create a negative pressure condition") and/or 3280.504 ("Condensation control and installation of vapor retarders") and/or 3280.505 ("The opaque envelope shall be designed and constructed to limit air infiltration to the living area of the home. Any design, material, method or combination thereof which accomplishes this goal may be used.") and/or

3280.303(b) (All construction methods shall be in conformance with accepted engineering practices...").

10.    The redhibitory defect renders the manufactured homes totally useless or so inconvenient as a residence or dwelling structure that Plaintiffs are entitled to the legal presumption set forth in Civil Code Article 2520, i.e., that Plaintiffs would not have purchased the manufactured homes had they known of the redhibitory defect.

11.    The redhibitory defect existed at the time of delivery of manufactured homes to the Plaintiffs.  Accordingly, Plaintiffs are entitled to rescind the sale.

## FACTS RELEVANT TO PLAINTIFFS RUSSELL J. GUIDROZ, JR. AND MICHELLE L. GUIDROZ

12.    The Guidrozes are husband and wife. On or about February 20, 1997, the Guidrozes entered into a written agreement with defendants' distributor, Royer's Manufactured Homes of Opelousas, Inc. for the financed purchase of a new 1997 Redman manufactured home, a Brighton 6935B model, serial number 14718887.  The listed cash sale price with sales tax for the manufactured home was $32,276.75.

13.    On or about March 31, 1997, Plaintiffs purchased the Redman manufactured home and entered into a Manufactured Home Retail Installment Contract and Security Agreement.  Plaintiffs were provided written manufacturer warranty documents that expressly warranted that the manufactured home was free from defect.

14.    The Redman manufactured home was originally delivered to Oakdale, Louisiana. In March 2001, the Guidrozes moved the manufactured home to Bayou Vista, St. Mary Parish, Louisiana where they currently reside.

15.    In September, 2004, Plaintiffs noticed that the vinyl-covered sheetrock of the interior walls of their Redman manufactured home had become "soft". Upon applying a minimum of force with his bare hand to the "soft" sheetrock, Guidroz's hand broke through the sheetrock revealing wet material behind the vinyl covering and in the sheetrock panel in a state of decomposition due to the accumulation of moisture. In addition to the wet sheetrock material, Plaintiffs discovered what appeared to be mold growing within the interior of the walls.

16.    Following the discovery of the wet, deteriorating sheetrock and mold, Plaintiffs contacted their property insurer, Allstate Insurance Co., to make a claim on the damage. The claim was denied by Allstate as the wet sheetrock and mold growth was not caused by a leak but was caused by excessive vapor condensation within the exterior walls of the manufactured home due to a construction defect, namely, the absence of design features to prevent excessive and accumulating water condensation within the sheetrock and wall cavities.

17.    After the denial of the insurance claim, in the latter part of July, Plaintiffs tried to reach Redman Homes, Inc. by telephone to report the damage from the moisture accumulation construction defect. Plaintiffs were advised that Redman had been acquired or merged with the Champion Group and that they needed to contact Gateway Homes for service requests. Plaintiffs contacted Gateway Homes by telephone by the end of September 2004 and described the problems and damages arising from the defective outer wall system in the manufactured home and requested that the defects be repaired.

18.     Gateway Homes and/or anyone from the Champion Group failed to timely respond or repair the redhibitory defect and the resulting damages. Due to health concerns caused by the presence of mold and the continuing deterioration of the wet sheetrock, Plaintiffs moved out of the defective manufactured home and were required to incur the expense of making alternative housing arrangements.

19.     It was not until October 21, 2004 that a Gateway representative responded to the Plaintiffs' call for repairs. A person called stating that he was going to survey the manufactured home for potential repairs. On October 22, 2004, two representatives on behalf of Gateway arrived at the manufactured home location in Bayou Vista to inspect the manufactured home. While inspecting the wet sheetrock and mold growth, one of the inspectors leaned against one of the "soft" walls and broke through the sheetrock. After a brief inspection of the premises, the representative indicated that someone from Gateway would call Plaintiffs concerning repairs, if any.

20.     In January 2005, three months after Plaintiffs notified defendants of the problem, a Gateway representative wrote a letter that denied the existence of a "manufacturing defect" but expressed that Gateway "would like to repair the home...repairs would include removing the damaged materials caused by the condensation and replacing them with new material." Gateway failed to offer any repairs or correction of the underlying problem, i.e., the defective design and construction of the exterior walls, wall cavities and external covering in plaintiffs' manufactured home.

21.     The defect in the design and manufacture of Guidrozes' Redman manufactured home is identical to the redhibitory defect and existed at the time of purchase.

## FACTS RELEVANT TO DEFENDANTS CHAMPION AND REDMAN

22.     Since 1953, Champion and its subsidiaries, including Redman, have built
and sold more than 1.6 million manufactured and modular homes. During the class
period, thousands of those manufactured homes were sold in Louisiana to consumers
such as the Guidrozes and members of the Plaintiff Class.

23.     Champion, through and with its wholly owned subsidiaries, including
Redman, constitute a single business enterprise in the manufacture and sale of their
manufactured homes.

24.     As revealed on the Champion website at www.championhomes.net and
the SEC filings for Champion, including Champion's Form 10-k's filed during the class
period, Champion operates the manufacturing and sales of manufactured homes by its
subsidiaries, including Redman, as a unified and single business enterprise in the
following particulars:

    a.  For stockholder and investment relations, as well as SEC filings,
        Champion reports a unified "family of homebulders" to describe its
        manufacturing capabilities, employees and facilities;

    b.  For SEC filings of Annual Reports, Quarterly Reports and 10-k's,
        Champion uses condensed and consolidated financial statements for
        Champion Enterprises, Inc. and its subsidiaries, including Redman, in
        reporting statements of operations, balance sheets, statements of cash flow
        and statements of shareholders' equity;

    c.  The subsidiaries, including Redman, are wholly owned and controlled by
        Champion;

d.  Champion and its subsidiaries, including Redman, have common directors and officers;

e.  Champion directs subsidiaries to provide services of employees of one subsidiary corporation on behalf of another subsidiary corporation, as demonstrated by Gateway doing warranty service for Redman;

f.  Champion provides common offices, centralized accounting and employee insurance and benefits to its subsidiaries and their employees;

g.  Champion has common marketing and engineering departments that work with the subsidiaries' manufacturing facilities providing designs for local consumer markets and the Champion engineering division provides day-to-day supervision over the manufacturing operations of its subsidiaries;

h.  Champion has debt agreements and debt structure that are guaranteed by its subsidiaries, including Redman, with covenant terms that significantly restrict the subsidiaries abilities to operate as separate and independent entities; and

i.  Champion's parent-subsidiary organization constitutes excessive fragmentation of a single enterprise into separate corporations.

25.    Considering the above factors, Champion and its subsidiaries, including Redman, are a single business enterprise, whose collective manufactured products, i.e. manufactured homes, are the de facto and de jure products of Champion regardless of which specific subsidiary's facility constructed the manufactured homes or what subsidiary's name is shown as "manufacturer" of the data plate or registration documents of manufactured home.

9

26.    During the class period, Champion sold thousands of manufactured homes with the redhibitory defect to members of the class in Louisiana, including the sale to the Guidrozes, yet failed to disclose the redhibitory defect, despite its knowledge of the existence of the defect, at the time of sale.

## CLASS ACTION ALLEGATIONS

27.    This action is brought as a class action under Rule 23 of the Federal Rule of Procedure.  Plaintiffs bring this class action to secure redress on behalf of all purchasers of the Champion homes in Louisiana similarly situated to them who have suffered damages as a consequence of the defectively designed and constructed manufactured homes and the failure to give adequate warnings regarding the defects and nonconformity to express warranties. Plaintiffs bring this action individually, and on behalf of all persons similarly situated, and seek certification of the following Plaintiff Class:

> All persons or entities who have incurred damages as a result of moisture control performance failure in manufactured homes purchased in Louisiana, on or after May 15, 1995 through the time of trial of this matter, that were manufactured by Champion or its subsidiaries, that have a vapor barrier located on the living side of exterior walls combined with wall cavities and/or exterior coverings or sheathing and/or ventilation systems that cause moisture from outside air to condense, accumulate and remain in the wall cavities and wall structural materials, all in violation of accepted engineering practices and performance standards and/or one or all of the provisions of Title 24 of the Code of Federal Regulations §§ 3280.103(b), 3280.303(b), 3280.504 and/or 3280.505. Specifically excluded from this class is any person with claims for personal injury arising from this type of defect.

28.    On information and belief, membership in the Class is so numerous as to make it impractical to bring all Class Members before the Court as individual plaintiffs. The exact number of Class Members is unknown, though believed to be in the thousands, but can be reasonably determined from the records maintained by Champion.

29.    The named Plaintiffs are members of the Plaintiff Class described herein and will adequately represent the interests of the Class. The named Plaintiffs purchased their manufactured home from in March 1997. The manufactured home was manufactured by Redman, a wholly owned subsidiary of Champion. The manufactured home purchased by the Guidrozes contained the redhibitory defect described herein at the time of purchase. Although Redman knew of the redhibitory defect at the time of sale, Redman failed to disclose the defect to the Plaintiffs.

30.    As a result of the redhibitory defect rendering the manufactured home useless as a residence or dwelling structure, the defendants are liable unto the Guidrozes for the return of the purchase price with interest from the date of purchase, for the reimbursement of reasonable expenses occasioned by the sale and those incurred for the preservation of the manufactured home, and also for damages and reasonable attorney fees. The claims and damages arising from the redhibitory defect in the Guidroz manufactured home are typical of the Members of the Class.

31.    Alternatively, Plaintiffs allege that the purchased manufactured home was unreasonably dangerous in design, because of inadequate warnings and nonconformity to the manufacturer's express warranty in violation of the provisions of the LPLA.

32.    Despite their knowledge during the class period of Louisiana's climactic conditions, Defendants constructed their products with "living side" vapor barriers combined with wall cavities ventilated to outside air and/or ventilation systems that causes accumulation and retention of moisture in the wall materials and wall cavities, all breaches of accepted engineering practices, despite the availability of alternative designs that were economically practical for the manufacture of manufactured homes to be sold

11

in Louisiana. Defendants failed to use then-existing reasonably available scientific and

technological knowledge to design, construct and manufacture manufactured homes that

would not be subject to the excessive condensation characteristics of the defective vapor

barrier, wall cavity and ventilation design and construction that proximately caused

Plaintiff's damages.

33.    Plaintiffs' claims for damages under the LPLA are typical of the members

of the class.

34.    The named Plaintiffs have no interests adverse to the interests of the other

Members of the two Plaintiff Class.

35.    There are numerous substantial questions of law and fact common to all of

the Members of the Plaintiffs Class that will control this litigation and will predominate

over any individual issues. Included within the common questions of law and fact are:

a.    Whether the design and manufacture of manufactured homes that have

vapor barriers on the living side of exterior wall structures combined with

wall cavities ventilated to outside air and/or ventilation systems that cause

excessive accumulation of moisture in the walls' cavities and structural

materials is a redhibitory defect pursuant to Louisiana Civil Code Article

2520;

b.    Whether Redman or Champion and its subsidiaries in the course of

operating a single business enterprise designed and constructed

manufactured homes with the redhibitory defect;

c.    Whether Redman and Champion and its subsidiaries constitute a single

business enterprise for determining Champion's liability;

d.   Whether the redhibitory defect existed at the time of the sale;

e.   Whether Redman or Champion disclosed the existence of the redhibitory
defect at the time of the sale;

f.   Whether the manufactured homes in question were sold in Louisiana;

g.   Whether the actions of the defendant manufacturers and the redhibitory
defects caused the damages sustained by Plaintiffs;

h.   Whether the manufactured homes in question are unreasonably dangerous
in design as provided in La.-R.S. 9:2800.55;

i.   Whether the manufactured homes in question are unreasonably dangerous
because an adequate warning about the product has not been provided as
provided in La.-R.S. 9:2800.57;

j.   Whether the manufactured homes in question are unreasonably dangerous
because they do not conform to an express warranty of the manufacturer
about the product as provided in La.-R.S. 9:2800.58;

k.   Whether the unreasonably dangerous characteristics of the manufactured
homes existed at the time the product left the control of the defendants;
and

l.   Whether the damages sustained by plaintiffs were proximately caused by
the unreasonably dangerous characteristics of the manufactured homes.

## PLAINTIFFS' CAUSE OF ACTION IN REDHIBITION AGAINST DEFENDANTS

36.    Plaintiffs reiterate all factual allegations above by reference in support of
their cause of action in redhibition. As a consequence of the Champion Group being the

manufacturer and seller of defective manufactured homes in redhibition, the Champion Group is liable to the Plaintiffs and the Class for the following:

    a.   Return of the purchase price for the manufactured homes, together with interest from the time the purchase price was paid;

    b.   Reasonable expenses occasioned by the sale;

    c.   Damages caused by the use of the defective manufactured home, including but not limited to the expense incurred in attempted repairs and the cost of temporary alternative housing, but specifically excluding any personal injury; and

    d.   Reasonable attorney fees.

## PLAINTIFFS' CAUSE OF ACTION UNDER THE LPLA AGAINST DEFENDANTS

37.    Plaintiffs reiterate all factual allegation set forth above by reference in support of their claims for damages proximately caused by violations of the LPLA. As a consequence of the Champion Group violating the provisions of the LPLA, the Champion Group is liable unto the Plaintiff Class for all damages proximately caused by the unreasonably dangerous characteristics of the manufactured homes, namely, that the manufactured homes are unreasonably dangerous in design as provided in La.-R.S. 9:2800.55; are unreasonably dangerous because they do not conform to an express warranty of the manufacturer about the product as provided in La.-R.S. 9:2800.58; and, are unreasonably dangerous because an adequate warning about the product has not been provided as provided in La.-R.S. 9:2800.57.

38.    Plaintiffs further pray for the following:

    i.    That at a date and time to be set by this Honorable Court, The Court, after hearing, certify this case as a class action with the named Plaintiffs representing the interest of the Plaintiff Class;

    ii.    That Plaintiffs be awarded all remedies and damages incurred as a consequence of the liability of the defendants for the manufacturing and/or selling of defective manufactured homes;

    iii.    That the Court appoint Plaintiffs' undersigned counsel to represent the interests of the Plaintiff Class;

    iv.    That the Court award a reasonable sum for attorneys fees, as found by the trier of fact, with additional sums for the services of counsel in the event of subsequent appeal;

    v.    That the Court award post-judgment interest on the judgment at the rate provided by law from the date of judgment until paid; That the Court award all costs of these proceedings, including notice and class counsel fees; and

    vi.    Such other and further relief that Plaintiffs may justly entitled.

Respectfully submitted,


By: /s/ Hugh E. McNeely
Hugh E. McNeely, Esq. LSBA# 10628
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, Massachusetts 02142
Telephone: 617-482-3700
Facsimile: 617-482-3003

15

Gibson Vance, Esq.
Lance Gould, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles,
P.C.
218 Commerce Street
Montgomery, AL 36104


Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE/OPELOUSAS DIVISION

| | | |
|---|---|---|
| RUSSELL J. GUIDROZ, JR., ET AL | * | CIVIL ACTION NO.: CV05-1148 |
| | * | |
| VS. | * | JUDGE |
| | * | |
| CHAMPION ENTERPRISES, INC. | * | MAGISTRATE JUDGE HILL |
| and REDMAN HOMES, INC. | * | |

**MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION TO AMEND JUDGMENT OF DISMISSAL (DOC. 31)
AND FOR LEAVE TO AMEND ORIGINAL COMPLAINT**

RESPECTFULLY SUBMITTED

**VOORHIES & LABBÉ**
(A Professional Law Corporation)

_/s/ Lamont P. Domingue_
Lamont P. Domingue - #20787
Post Office Box 3527
700 St. John Street
Lafayette, Louisiana 70502-3527
Telephone: (337) 232-9700
ATTORNEYS FOR Redman Homes, Inc. and
Champion Enterprises, Inc. .

EXHIBIT
10

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Course of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Plaintiffs' Proposed Amendments: . . . . . . . . . . . . . . 5

III. STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Motions to Amend Judgments Under Rule 59(e): . . . . . 8

      B.    Motions to Amend Pleadings: . . . . . . . . . . . . . . . . . . . 9

      C.    Motions to Dismiss Under Fed. R. Civ. Proc.
           12(b)(6): . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    Plaintiffs' Attempt to Impose Additional Restrictions
           Through State Law Liability on Defendants'
           Federally Sanctioned Decision to Use the Living-
           Space Side Vapor Barrier is Still Preempted. . . . . . . . 13

      B.    Plaintiffs' New "Totality of Construction Choices"
           Theory is Not Protected by the Extraordinary
           Remedy of Post-Judgment Amendment. . . . . . . . . . . 15

      C.    Plaintiffs' Proposed Amendment is Vague,
           Conclusory and Still Preempted . . . . . . . . . . . . . . . . . 16

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

**JUDICIAL DECISIONS:**

*Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157, 1163-64 (5th Cir. 1982) .................................. 11

*Clancy v. Employers Health Ins. Co.*, 101 F. Supp. 2d 463, 465 (E.D. La. 2000) (citing 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice & Procedure § 2810.1, at 124 (2d ed. 1995) .................................. 8

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000) .......................................................... 16

*Combee*, 615 F.2d at 700 .................................... 11

*Cranberg v. Consumers Union of U.S., Inc.*, 756 F.2d 382 (5th Cir. 1985) .......................................... 12, 16

*Daves v. Payless Cashways, Inc.*, 661 F.2d 1022 (5th Cir. 1981) ...................................................... 10, 11

*Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 598 n.2 (5th Cir. 1981) .......................................... 10, 11

*Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962) ............................................ 9-12, 16

*Ford Motor Co. v. Auto Supply Co., Inc.*, 661 F.2d 1171, 1172 (8th Cir. 1981) ...................................................... 11

*Frank Adam Electric Co. v. Westinghouse Electric & Mfg. Co.*, 146 F.2d 165, 167 (8th Cir. 1945) .............................. 9

*Freeman v. Continental Gin Company*, 381 F.2d 459, 469 (5th Cir. 1967) ............................................ 9-12, 16

*Gregory v. Mitchell*, 634 F.2d 199 (5th Cir. 1981) ............. 9-12, 16

*Harkless v. Sweeny Ind. Sch. Dist. of Sweeny, Tex.*, 554 F.2d 1353, 1359 (5th Cir.), cert. denied, 434 U.S. 966, 98 S. Ct. 507, 54 L. Ed. 2d 452 (1977) ....................................... 9

*In re Transtexas Gas Corp.,* 303 F.3d 571, 581 (5th Cir. 2002)8*Kapps v. Torch Offshore, Inc.,* 379 F.3d 207, 210 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lone Star Motor Import, Inc. v. Citroen Cars Corp.,* 288 F.2d 69, 75 (5th Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Matte v. Sunshine Mobile Homes, Inc.,* 270 F.Supp.2d 805 (W.D. La. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

*Morgan Guaranty Trust Company of New York v. Blum,* 649 F.2d 342, 345 & n.4 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Old Time Enterprises, Inc. v. International Coffee Corporation,* 862 F.2d 1213, 1219 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Russ v. Int'l Paper Co.,* 943 F.2d 589, 593 (5th Cir. 1991) . . . . . . . . . . 8

*Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir. 1990) . . . . . . . . 8

*Templet v. Hydrochem, Inc.,* 367 F.3d 473, 478-479 (5th Cir. 2004), *cert. denied,* 543 U.S. 976, 125 S. Ct. 411, 160 L. Ed. 2d 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16

*Trinity Carton Company, Inc. v. Falstaff Brewing Corp.,* 767 F.2d 184, 194-195 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16

*Union Planters National Leasing, Inc. v. Woods,* 687 F.2d 117, 121 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 16

*Waltman v. Int'l Paper Co.,* 875 F.2d 468, 473 (5th Cir. 1989) . . . . . . . . 8

*Wedgeworth v. Fibreboard Corp.,* 706 F.2d 541, 546 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971) . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATUTES AND RULES:**

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 5403(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. §§ 5401, et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed R. Civ. Proc. 59(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Fed. R. Civ. Proc. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 15

Fed. R. Civ. Proc. 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. Proc. 8(a) and (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**REGULATIONS:**

24 C.F.R. § 3280.103(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

24 C.F.R. § 3280.303(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13

24 C.F.R. § 3280.504(b) . . . . . . . . . . . . . . . . . . . . . 1, 3-5, 13-15, 18

24 C.F.R. § 3280.504(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6

24 C.F.R. § 3282.22(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

MAY IT PLEASE THE COURT:

## I. INTRODUCTION

Redman Homes, Inc., and Champion Enterprises, Inc., file this memorandum in opposition to plaintiffs' Motion to Amend Judgment of Dismissal and for Leave to Amend Original Complaint because plaintiffs new theories are still preempted and not entitled to protection by amendment.  Plaintiffs' motion should be denied.

Plaintiffs' new proposed allegations are still preempted because they continue to challenge the manufacturer's selection of one federally sanctioned construction method over another.  Plaintiffs originally tried to use state law liability to place geographic limitations on the manufacturer's decision about which condensation control method to use under 24 C.F.R. § 3280.504(b). This Court correctly concluded plaintiffs' original complaint was preempted.  In their new allegations, plaintiffs merely attempt to impose even more restrictions on the manufacturer's choice by claiming that the living-space side vapor barrier should not have been used with certain unspecified "wall cavities and external coverings or sheathing and/or ventilation systems."  But, federal law places no restrictions on the manufacturer's choice under § 3280.504(b).  As a result, plaintiffs' new allegations are still preempted.

In addition, plaintiffs' new allegations are not entitled to protection by amendment. Plaintiffs offer no explanation for why their new facts and theories were omitted from their original complaint.  The absence of an explanation leads inescapably to the conclusion that they were strategically omitted because they would hinder class certification. After learning that their "singular construction choice" theory was preempted, plaintiffs are now trying to circumvent preemption through a vague and conclusory "totality of construction choices"

1

theory. Such a strategy represents the classic "presentation of theories seriatum" and is not entitled to protection by amendment.

## II. FACTS

### A.    Course of Proceedings:

Plaintiffs filed their original complaint on June 28, 2005, but did not allege that the wall cavities, external sheathing or ventilation systems in their home were improperly designed or constructed, or that their home experienced negative pressure. The only defect plaintiffs alleged in the original complaint was that defendants' constructed their home in accordance with 24 C.F.R. § 3280.504(b)(1) by placing a vapor barrier on the living-space side of the exterior walls in a home sold in a hot and humid climate.

Defendants were served with the complaint on October 17, 2005, and filed the motion to dismiss based on preemption on November 7, 2005, at which time plaintiffs were fully apprised of all the reasons why defendants claimed the complaint was preempted. Plaintiffs filed their opposition on November 25, 2005. The only argument they advanced was that their claims were not preempted because:

> The current requirements of the MHCSS, including the waiver, do not prohibit or require the use of 3280.504(b)(1) construction. **As alleged, the construction of exterior walls in accordance with 3280.504(b)(1) results in excessive moisture condensation and damages to mobile homes in Louisiana.** This fact is a prima facie indication that such construction practice is in violation of accepted engineering practices.[1] (Emphasis added.)

At the July 10, 2006, hearing on the motion to dismiss, this Court repeatedly questioned plaintiffs' counsel about the "essence" of plaintiffs' complaint, and plaintiffs' counsel consistently declared that plaintiffs' "real fight" with defendants was over the

---

[1]Plaintiffs' Consolidated Opposition to Defendants' Rule 12(b)(6) Motions to Dimiss, at p. 10.

singular decision to place a vapor barrier on the living-space side of the wall in homes sold in hot and humid climates.[2]  Plaintiffs' argued that defendants should have selected one of the other options under § 3280.504(b), and that the failure to do so violated the general durability standard set forth in § 3280.303(b) and constituted a redhibitory defect.[3] No other design or construction defect was alleged or argued by plaintiffs.

At the conclusion of the hearing, this Court advised that it was considering three possible rulings: (1) ordering plaintiffs to amend; (2) deciding the motion and, if it was decided adverse to plaintiffs, allowing plaintiffs an opportunity to amend; or (3) granting the motion without affording plaintiffs an opportunity to amend.[4]  Thereafter, plaintiffs orally requested an opportunity to amend if the Court ruled against plaintiffs on the motion.  While

---

[2]Transcript of the July 10, 2004 Hearing (hereinafter "Transcript"), at p. 34, beginning at line 13:

Mr. McNeely:    ... I wouldn't be here today if they used the other options.

The Court:    That's the essence of your argument, right?

Mr. McNeely:    Yes.

[3]Transcript, at pp. 37-38, beginning at line 24:

The Court:    If it does not meet the performance standard, but does meet a specific design standard, it is redhibitory.

Mr. McNeely:    Yes. If its an option that is not required, and they have a choice, and then if they go ahead despite the knowledge that they know it creates a problem, it is a redhibitory defect.
            *    *    *

The Court:    Do you concede that Champion had to choose on of those three?

Mr. McNeely:    Yes.

The Court:    All right. So your real fight here is that they were given three options and they chose the wrong one.

Mr. McNeely:    Yes.

[4]Transcript, at pp. 58-59.

3

the Court expressed a willingness to allow plaintiffs' such an opportunity, the amendment contemplated at the hearing is not what plaintiffs have now filed.

During the hearing, the Court directed plaintiffs' attention to the fact that the original complaint did not allege that defendants should have selected one of the other options authorized by § 3280.504(b) as plaintiffs had argued.[5]  Plaintiffs' also argued that the original complaint could be read as alleging that the use of vinyl-coated sheetrock to form the vapor barrier was improper, which prompted discussion about whether plaintiffs could amend to state a claim that was not preempted.[6]  But, as demonstrated at the hearing, plaintiffs alleged that the living-space side vapor barrier of "vinyl-coated sheetrock or other material"[7] was the defective design and construction feature.  In other words, regardless of the material, plaintiffs were singularly alleging that the placement of the vapor barrier on the living-space side of the exterior walls was defective.

---

[5]See Transcript, at pp. 36-38, concluding with the following exchange:

The Court:      All right. So your real fight here is that they were given three options and they chose the wrong one.

Mr. McNeely:    Yes.

The Court:      Okay. And I didn't see it, but I don't remember specifically either. That is your allegation in the complaint. The allegation is not specific in that you chose A when in fact you should have chosen B or C, right?

Mr. McNeely:    I believe that to be true. You know - -

The Court:      Okay.

Mr. McNeely:    But I think that we have alleged that there were other options that would have obviated the problem.

The Court:      I think so, but I'm not sure in the context of a preemption argument that that's sufficient. ...

[6]Transcript, at pp. 54-58.
[7]See Original Complaint, at para. 9.

Thus, the only amendment contemplated at the hearing that this Court could have arguably assented to, was that necessary to allege what plaintiffs argued, but had not alleged, i.e. that defendants should have selected one of the other two condensation control methods under § 3280.504(b) or that the use of vinyl-coated sheetrock as the vapor barrier was a violation of the HUD Code. This Court obviously concluded that this possible amendment would have been preempted and futile.

The reasons and judgment dismissing plaintiffs' claims were rendered January 26, 2007, nineteen (19) months after plaintiffs filed their complaint, fourteen (14) months after defendants filed their motions, and more than six (6) months after the hearing in which plaintiffs were warned that the motion might be granted without opportunity to amend. After this Court's decision and dismissal, Plaintiffs then moved to amend the Court's judgment, seeking an opportunity to amend their complaint. In the motion to amend, plaintiffs argue for the first time that the wall cavities, external sheathing "and/or" ventilation systems in their home, <u>together with</u> the living-space side vapor barrier, were improperly designed and constructed, causing negative pressure and moisture accumulation. Noticeably absent from plaintiffs' reasons for amending is any explanation about why these alleged defects were previously omitted.

**B.    Plaintiffs' Proposed Amendments:**

The plaintiffs summarize their amendments as follows:

As the Court can readily discern, these proposed amendments of the complaint do not make substantive changes or additions to the allegations of the Original Complaint. Rather, the amendments clarify the description of the failure of the performance of the design and construction of Defendant's products in terms of the totality of construction choices made by Defendants; **not just one choice, that being an exterior wall constructed in conformity to 24 C.F.R. § 3280.504(b)(1), but the entire performance**

5

> **design of the homes that are required to be free from excessive
> condensation and moisture accumulation with the attendant damages.**[8]
> (Emphasis added.)

If it is true that plaintiffs' proposed amendments make no substantive changes, then
it is axiomatic that their claims are still preempted. Whether that is true is unclear. One
view of plaintiffs' proposed amendments is that they are only attempting to place more
restrictions on defendants' federally sanctioned choice about which condensation control
method to use by alleging that the manufacturer should not have chosen to use the living-
space side vapor barrier in combination with certain unspecified "wall cavities and external
coverings or sheathing and/or ventilation systems." As shown below, under this view of the
proposed amendments, their claims are still preempted.

The other possible view of plaintiffs' proposed amendments is that, contrary to their
assertion, they are making substantive changes to their theory. In their own words,
plaintiffs are now advancing a "totality of construction choices" theory, which is entirely
different than the "single construction choice" theory they advanced before dismissal.
Previously, plaintiffs' only theory for the claimed moisture in their walls was defendants'
decision to construct their home in accordance with § 3280.504(b)(1). Now, under their
new theory, plaintiffs are alleging that unspecified wall cavities, external sheathing "and/or"
ventilation systems, in combination with the federally approved vapor barrier, are causing
negative pressure and moisture accumulation in a new and entirely different fight with
defendants.

---

[8]Memorandum in Support of Plaintiffs' Motions to Amend Judgment of Dismissal (Doc. 31) and for
Leave to Amend Original Complaint (hereinafter Plaintiffs' Memorandum"), at p. 6.

Plaintiffs may be correct in claiming they are alleging nothing new because they fail to specifically allege any particular design or construction of the allegedly defective "wall cavities", "external coverings or sheathing" and "ventilation systems" used in their home.[9] As a result, plaintiffs allegations are vague, ambiguous and conclusory, and not entitled to consideration by this Court. By comparison, plaintiffs' original complaint alleged a specific design and construction defect, i.e. placement of a vapor barrier not greater than 1 perm (dry cup method) on the "living side" of the exterior walls in homes sold in hot and humid climates. In other words, plaintiffs are attempting to overcome preemption by being less specific and more vague and conclusory in their allegations. Interestingly, while plaintiffs fail to provide any details about the particular wall cavities, sheathing and ventilation systems used in their home, they nonetheless characterize those features by way of unwarranted deduction as "common design and manufacture defects". Importantly, this alleged vague defect still is combined with the use of the interior vapor barrier, which this Court correctly found to be a preempted claim.

Under this alternate view of plaintiffs' proposed amendments, they allege an entirely new vague and conclusory "totality of construction choices" theory without explanation for why it was not alleged before their "singular construction choice" theory was dismissed. Such amendments are simply not entitled to protection under the extraordinary remedy of post-judgment amendment and are still preempted.

_____

[9]See plaintiff's Proposed Amended Complaint, at para. 9. In addition, plaintiffs' allegations are very ambiguous in the context of this litigation. For example, Redman and Champion are unable to determine whether plaintiffs' use of the terms "ventilated" or "ventilation systems" are references to "passive ventilation", "mechanical ventilation" or a combination of both passive and mechanical ventilation systems. All three systems are permitted by the HUD Code, see 24 C.F.R. § 3280.103(b)(3) and have been used by Redman in the construction of their products during the time frame for which plaintiffs are attempting to certify a class.

7

## III. STANDARDS OF REVIEW

**A.    Motions to Amend Judgments Under Rule 59(e):**

Plaintiffs file their motion pursuant to Fed R. Civ. Proc. 59(e).  The standard of

review for Rule 59(e) motions is:

> A Rule 59(e) motion "calls into question the correctness of a
> judgment." *In re Transtexas Gas Corp.,* 303 F.3d 571, 581 (5th Cir. 2002).
> **This Court has held that such a motion is not the proper vehicle for
> rehashing evidence, legal theories, or arguments that could have been
> offered or raised before the entry of judgment.** *Simon v. United States,*
> 891 F.2d 1154, 1159 (5th Cir. 1990).  **Rather, Rule 59(e) "serves the
> narrow purpose of allowing a party to correct manifest errors of law or
> fact or to present newly discovered evidence."** *Waltman v. Int'l Paper
> Co.,* 875 F.2d 468, 473 (5th Cir. 1989) (internal quotations omitted).
> **Reconsideration of a judgment after its entry is an extraordinary
> remedy that should be used sparingly.** *Clancy v. Employers Health Ins.
> Co.,* 101 F. Supp. 2d 463, 465 (E.D. La. 2000) (citing 11 CHARLES A.
> WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice &
> Procedure § 2810.1, at 124 (2d ed. 1995)).

*Templet v. Hydrochem, Inc.,* 367 F.3d 473, 478-479 (5th Cir. 2004), *cert. denied,* 543 U.S.

976, 125 S. Ct. 411, 160 L. Ed. 2d 352.

In *Templet* the Fifth Circuit denied the plaintiffs' Rule 59(e) motion, stating:

> We have held that an unexcused failure to present evidence available
> at the time of summary judgment provides a valid basis for denying a
> subsequent motion for reconsideration.  *Russ v. Int'l Paper Co.,* 943 F.2d
> 589, 593 (5th Cir. 1991).  In this case, the underlying facts were well within
> the Irvins' knowledge prior to the district court's entry of judgment.  However,
> the Irvins failed to include these materials in any form of opposition or
> response to the Defendants' motion for summary judgment.  Although the
> Irvins correctly point out that they were not represented by counsel for
> approximately five months between March and August 2002, they were
> represented by counsel, George Tucker, before the Defendants filed their
> motion for summary judgment and after the district court subsequently
> granted the motion. [Footnote omitted.]
>
> By denying the Irvins' motion for reconsideration, the district court's
> decision is not manifestly unjust in law or fact, nor does it ignore newly
> discovered evidence.  The district court reasonably determined that the facts

in this case do not warrant the extraordinary relief associated with the granting of a motion for reconsideration. Therefore, the district court did not abuse its discretion in denying the Irvins' Rule 59(e) motion.

367 F.3d at 479-480. (Emphasis added.)

**B.    Motions to Amend Pleadings:**

A very similar standard of review applies to motions to amend pleadings after

dismissal is granted. In *Gregory v. Mitchell*, 634 F.2d 199 (5th Cir. 1981) the Fifth Circuit

refused to allow a post-summary judgment amendment of the pleadings, stating:

> After the motions to dismiss and motions for summary judgment were taken under submission, plaintiffs moved to amend their pleadings to assert a shareholder derivative action by realigning the First Bank of Macon as a defendant, thereby invoking diversity jurisdiction under 28 U.S.C. § 1332. The district court denied leave to amend as untimely filed.  Our review is limited to determining whether the trial court abused its discretion in this denial. *Harkless v. Sweeny Ind. Sch. Dist. of Sweeny, Tex.*, 554 F.2d 1353, 1359 (5th Cir.), *cert. denied*, 434 U.S. 966, 98 S. Ct. 507, 54 L. Ed. 2d 452 (1977).  In exercising its discretion the trial court may consider such factors as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, (and) futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962). **All of this leads us to the difficult task of "assur(ing) a party a fair opportunity to present his claims and defenses," while at the same time protecting a "busy district court (from being) imposed upon by the presentation of theories seriatim."** *Freeman v. Continental Gin Company*, 381 F.2d 459, 469 (5th Cir. 1967).  At some point in time delay on the part of a plaintiff can be procedurally fatal.  In that situation the plaintiff must meet the burden of showing that the delay "was due to oversight, inadvertence, or excusable neglect," *Frank Adam Electric Co. v. Westinghouse Electric & Mfg. Co.*, 146 F.2d 165, 167 (8th Cir. 1945), a burden which properly shifts to the party seeking to amend where apparent lack of diligence exists. The instant case admittedly presents a difficult question as to whether leave to amend should have been granted.  However, we are not prepared to say that the denial by the district court constituted an abuse of its discretion.  In *Freeman* we concluded that there was no abuse in the disallowance of an amendment to the pleadings offered after summary judgment had been granted.  The differences in the request and timing in Freeman and in the case at bar are not significant enough to mandate a different result.  The rationale of the

9

holding in Freeman that there was no abuse of discretion in refusing to allow an amendment changing the theory of the case after a summary judgment was granted applies to the case sub judice.

634 F.2d at 202-203. (Emphasis added.)

Likewise, in *Union Planters National Leasing, Inc. v. Woods*, 687 F.2d 117, 121 (5th Cir. 1982), the Fifth Circuit denied a post-judgment motion to amend, stating:

> Under Fed. R. Civ. Proc. 15(a), permission to amend "shall be freely given when justice so requires." The rule, however, "is not a mechanical absolute." *Freeman*, 381 F.2d at 468 (*quoting Lone Star Motor Import, Inc. v. Citroen Cars Corp.*, 288 F.2d 69, 75 (5th Cir. 1961)). The decision whether justice requires amendment is committed to the discretion of the district judge, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971); *Daves v. Payless Cashways, Inc.*, 661 F.2d 1022 (5th Cir. 1981), reversible only for an abuse of discretion, *Gregory v. Mitchell*, 634 F.2d 199 (5th Cir. 1981). In the exercise of its discretion, the district court may consider such factors as prejudice to the opposing party, undue delay, repeated failure to cure deficiencies with prior amendment, bad faith, dilatory motive and futility of amendment.
>
> In the instant case, Woods sought to amend his answer more than a year after suit was filed and nearly two years after he was notified of default. Discovery had been completed. Woods had already amended his answer once after Union Planters had moved for summary judgment. The second attempt to amend came after the court had granted that motion.
>
> **"A busy district court need not allow itself to be imposed upon by the presentation of theories seriatim."** *Freeman*, 381 F.2d at 469. **Further, after summary judgment has been granted, the court has "even more reason for refusing to allow amendment."** *Id.; Gregory*, 634 F.2d at 203. **"Then, the concerns of finality in litigation become more compelling, and the litigant has had the benefit of a day in court, in some fashion, on the merits of his claim,"** *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 598 n.2 (5th Cir. 1981).

Similarly, in *Trinity Carton Company, Inc. v. Falstaff Brewing Corp.*, 767 F.2d 184, 194-195 (5th Cir. 1985), the Fifth Circuit ruled:

> Refusal of leave to amend is reviewable on an abuse of discretion standard. *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962); *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 546 (5th Cir.

1983). Discretionary denial of leave to amend must be based on a "substantial reason," *Wedgeworth*, 706 F.2d at 546; *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 598 (5th Cir. 1981), including undue delay n16, bad faith or dilatory motive, or undue prejudice to the opposing party. *Foman*, 371 U.S. at 182, 83 S. Ct. at 230; *Dussouy*, 660 F.2d at 597-98 (5th Cir. 1981). Post-verdict or -judgment amendments are occasionally allowed, but where they may substantially prejudice the other party or **are merely the result of a long and unreasonable delay, particularly if the movant was aware of the facts upon which the amendment is predicated and could have raised the matter before judgment, such amendments properly may be denied**. *Union Planters National Leasing, Inc. v. Woods*, 687 F.2d 117, 121 (5th Cir. 1982); *see also Combee*, 615 F.2d at 700.

> n16 The proposed amendment must be timely: it must not have been delayed solely for the purpose of gaining a tactical advantage. *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157, 1163-64 (5th Cir. 1982). Undue delay alone may be sufficient to foreclose amendment. *Dussouy*, 660 F.2d at 598-99. *See also, Chitimacha Tribe*, 690 F.2d at 1163; *Morgan Guaranty Trust Company of New York v. Blum*, 649 F.2d 342, 345 & n.4 (5th Cir. 1981); *Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir. 1981); *Dave v. Payless Cashways, Inc.*, 661 F.2d 1022, 1025 (5th Cir. 1981).

Falstaff did not previously plead or otherwise raise, as by motion or in the pretrial order, any of the matters contained in its post-verdict proffered pleading amendments. It necessarily was put on notice by the very nature of the suit that these matters of affirmative defense would be relevant to, if not potentially controlling of, the determination of liability. Falstaff makes no claim, and the record does not suggest, that it was unaware of any facts which form the bases of these defenses; nor does Falstaff offer any excuse beyond an assertion made at oral argument, which, when unveiled, is only that it did not expect to lose. It chose to postpone assertion of these grounds of defense over three years after the suit was filed, and nearly three and one-half months after the jury's verdict assessing liability had been entered. There is simply no justification for such delay. This Circuit has expressly disallowed the use of seriatim theories of defense. *Union Planters*, 687 F.2d at 121; *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469-70 (5th Cir. 1967); *see also Ford Motor Co. v. Auto Supply Co., Inc.*, 661 F.2d 1171, 1172 (8th Cir. 1981) (post-summary judgment motion to amend answer denied when it was "transparent attempt to manufacture a defense after [defendant's] liability had already been established"). Under these circumstances, it worked no miscarriage of justice, nor was it an abuse of the district court's discretion, to deny Falstaff's belatedly proposed pleading amendments.

The common thread in these decisions is *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469-70 (5th Cir. 1967), which, after reciting the principles cited above, declared:

> We hold that a district court does not abuse its discretion in refusing to allow an amendment of pleadings to change the theory of the case if the amendment is offered after summary judgment has been granted against the party, and no valid reason is shown for failure to present the new theory at an earlier time.

Finally, in *Matte v. Sunshine Mobile Homes, Inc.*, 270 F.Supp.2d 805 (W.D. La. 2003), an attempted class action strikingly similar to the one presently under consideration, filed in the Federal District Court for the Western District of Louisiana only a few years ago, United States Magistrate Judge Mildred E. Methvin rejected plaintiffs' request for an opportunity to amend raised <u>before</u> dismissal of the action under Fed. R. Civ. Proc. 12(b)(6) for lack of standing, stating:

> The undersigned has had the subject motions under advisement for several months due to the complexity of the issues presented. At no time have plaintiffs sought leave to amend the complaint to correct the deficiencies pointed out by the motions to dismiss.
>
> In exercising its discretion to allow amended pleadings, the court may consider such factors as undue delay, prejudice to the opposing parties, and futility of the proposed amendment. *Cranberg v. Consumers Union of U.S., Inc.*, 756 F.2d 382 (5th Cir. 1985), citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 222 (1962); *Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir. 1981). Considering these factors, and for the reasons discussed, there is no justification for allowing amendment of the pleadings.

270 F.Supp.2d at 830-831.

As in *Matte*, for this reason alone, plaintiffs' motion should be denied.

C.    **Motions to Dismiss Under Fed. R. Civ. Proc. 12(b)(6):**

The standard of review applicable to motions to dismiss under Fed. R. Civ. Proc. 12(b)(6) is:

On a [Rule 12(b)(6)] motion to dismiss, this Court must construe the factual allegations in a complaint, and all reasonable inferences therefrom, in the light most favorable to the plaintiffs. [Citations omitted] A motion to dismiss must be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

      \*        \*        \*

However, mere conclusory allegations will not suffice to prevent a motion to dismiss. [Citations omitted.]

*Kapps v. Torch Offshore, Inc.,* 379 F.3d 207, 210 (5th Cir. 2004).

## IV. ARGUMENT

**A.  Plaintiffs' Attempt to Impose Additional Restrictions Through State Law Liability on Defendants' Federally Sanctioned Decision to Use the Living-Space Side Vapor Barrier is Still Preempted.**

Plaintiffs attempt to circumvent this Court's ruling that their vapor barrier claims are preempted by changing their allegations from a "singular defect" theory to a "totality of construction choices" theory. Plaintiffs' proposed amendments are still preempted.

Plaintiffs' are simply trying to impose more restrictions on the manufacturer's federally sanctioned choice about which condensation control method to use. In the original complaint, plaintiffs attempted to eliminate the federally sanctioned choice in 24 C.F.R. § 3280.504(b) by claiming that § 3280.303(b) implicitly imposed geographic limitations on the use of living-space side vapor barriers in hot, humid climates. In their proposed amendment plaintiffs are now trying to impose even more restrictions on the manufacturer's choice about which condensation control method to use by claiming that § 3280.303(b) implicitly imposes restrictions on the use of vapor barriers in combination with certain unspecified "wall cavities and external coverings or sheathing and/or ventilation systems" in hot, humid climates.

13

The federal law imposes NO restrictions on a manufacturer's choice to use any of the three (now four since May 2006) condensation control methods for construction of external walls as set forth in § 3280.504(b). A manufacturer must use one of the three (now four) methods, but the choice concerning which one to use is unrestricted. The history behind the federal government's decision not to impose any restrictions on the manufacturer's choice authorized by § 3280.504(b) was reviewed by this Court in its reasons for dismissing plaintiffs' original complaint and clearly demonstrates that HUD intentionally avoided imposing any restrictions on that choice due to significant debate over the issue. Thus, as long as plaintiffs continue trying to impose state law liability, in whole or in part, upon a manufacturer for choosing Option 1 under § 3280.504(b), their claims are preempted.

> Whenever a Federal manufactured home construction and safety standard established under this title [42 U.S.C. §§ 5401, et seq.] is in effect, no State or political subdivision of a State shall have any authority to establish, or continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home **which is not identical to the Federal manufactured home construction and safety standard.** (Emphasis added.)

42 U.S.C. § 5403(d). (See also, 24 C.F.R. § 3282.22(a)).

Plaintiffs' proposed amendments still obstruct federal law by trying to use Louisiana law to impose a non-identical version of § 3280.504(b) upon defendants. They claim the federally sanction choice in 504(b) is restricted by other design and construction choices the manufacturer makes regarding certain unspecified "wall cavities, external sheathing and/or ventilation systems" in the construction of homes sold in hot, humid climates. No such restrictions are evident in the federal statutes or regulations, or their histories. As a

result, plaintiff's proposed amendments are still preempted and the motion to amend the judgment of dismissal should be denied.

**B.    Plaintiffs' New "Totality of Construction Choices" Theory is Not Protected by the Extraordinary Remedy of Post-Judgment Amendment.**

Plaintiffs were fully apprised of all of the grounds upon which defendants sought dismissal of their complaint in November 2005. As discussed in Section I(A) above, plaintiffs never alleged or argued that their vaguely described wall cavities, external sheathing "and/or" ventilation systems were defective until after their complaint was dismissed. Plaintiffs also did not allege or argue before dismissal that any design or method of construction created "negative air pressure" in their home. There was no mention of their new "totality of construction choices" theory before dismissal. Rather, their "real fight" with defendants pre-dismissal was over the singular decision to use Option 1 under Section 3280.504(b) in hot and humid climates, instead of Option 2 or 3.

The reasons and judgment dismissing plaintiffs' claims were rendered nineteen (19) months after plaintiffs filed their complaint, fourteen (14) months after the Rule 12(b)(6) motion was filed, and more than six (6) months after the hearing at which this Court warned that the motion might be granted without opportunity to amend. Plaintiffs offer no explanation for why they failed to allege or argue their "totality of construction choices" theory before dismissal.

The mere fact that this Court indicated a willingness to allow plaintiffs an opportunity to amend to allege what they argued at the hearing should not relieve plaintiffs of their obligation to have alleged their new facts and theories before dismissal was granted. Plaintiffs have not identified any justifiable excuse for their delay in presenting their new

15

allegations or any "manifest errors of law or fact or ... newly discovered evidence[,]" *Templet*, supra., that would justify granting their request for the very narrow and extraordinary relief of amending this Court's judgment.

The "if you rule against me, give me a chance to amend" argument is characteristic of dilatory strategic tactics and the "presentation of theories seriatum" that is not entitled to protection by amendment. See *Gregory*, *Union Planters*, *Trinity Carton*, and *Freeman*, supra. In that regard, the conclusions of Magistrate Judge Methvin in *Matte*, supra, are just as applicable to the plaintiffs' motion in this case:

> The undersigned has had the subject motions under advisement for several months due to the complexity of the issues presented. At no time have plaintiffs sought leave to amend the complaint to correct the deficiencies pointed out by the motions to dismiss.
>
> In exercising its discretion to allow amended pleadings, the court may consider such factors as undue delay, prejudice to the opposing parties, and futility of the proposed amendment. *Cranberg v. Consumers Union of U.S., Inc.*, 756 F.2d 382 (5th Cir. 1985), citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 222 (1962); *Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir. 1981). Considering these factors, and for the reasons discussed, there is no justification for allowing amendment of the pleadings.

Under the laws, facts and circumstances, Plaintiffs' new theory that tries to combine vague wall cavity or negative air pressure allegations with the preempted claim of interior vapor barrier construction should be denied.

**C.    Plaintiffs' Proposed Amendment is Vague, Conclusory and Still Preempted.**

Plaintiffs' proposed amendments are deficient. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000) states that to avoid dismissal for failure to state a claim "a plaintiff must plead specific facts, not mere conclusory allegations. We will thus not accept as true conclusory allegations or unwarranted deductions of fact." 224 F.3d at 498.

16

The court then dismissed for failure to state a claim. Plaintiffs' new allegations in this case are no more specific than those in *Collins*.

Plaintiffs ask this Court to accept that some unspecified defective design or construction of the wall cavities, external sheathing "and/or" ventilation systems in their home, in conjunction with the HUD-authorized vapor barrier, cause negative pressure and moisture in exterior walls in hot, humid climates.   But, the only specific design or construction method plaintiffs have alleged is defendants' use of the vapor barrier on the living-space side of the wall.   By failing to provide any specifics concerning the alleged design and construction flaws, the only allegations this Court can consider are those relating to the federally approved vapor barrier.   In other words, plaintiffs' proposed amendments are futile and still preempted.

Finally, plaintiffs' new allegations are made even more ambiguous and conclusory by their use of the alternatively conjunctive and disjunctive phrase "and/or".[10] Read plainly, plaintiffs' proposed amended complaint alleges that the federally approved use of living-space side vapor barrier in hot, humid climates, possibly in conjunction with defective, unspecified wall cavities, or possibly in conjunction with defective, unspecified external sheathing, or  possibly in conjunction with defective, unspecified ventilation systems, or possibly in conjunction any two of them or all three, allegedly cause excessive moisture in their walls.   As noted by the court in *Old Time Enterprises, Inc. v. International Coffee Corporation*, 862 F.2d 1213, 1219 (5th Cir. 1989), unclarified generalities and conclusory

---

[10]See Plaintiffs Proposed Amended Complaint, at paragraph 9, cited infra, stating in relevant part: "Specifically, the defective manufactured homes use a design that incorporates a vapor barrier on the 'living side' of the wall structures combined with wall cavities and external coverings or sheathing **and/or** ventilation systems that causes moisture to accumulate and remain in the wall cavities of manufactured homes for sale and use in Louisiana - a Gulf State known for hot and humid climactic conditions. ..."

allegations, together with alternative "and/or" allegations, are the type of pleading tactics that can result in a complaint failing to comply with Fed. R. Civ. Proc. 8(a) and (e). In this case, plaintiffs use of non-specific, ambiguous, conclusory and alternative allegations demonstrates the futility of their amendment because the only "real fight" they continue to allege with Redman and Champion is over the decision to place a vapor barrier on the living-space side of their exterior walls in accordance with the HUD Code, which as this Court correctly found are preempted.

## V. CONCLUSION

Plaintiffs' attempt to circumvent preemption by requesting the opportunity to file amendments that only further restrict the manufacturer's federally sanctioned choice to use Option 1 under § 3280.504(b) should be denied. Plaintiffs' proposed amendment is still an effort to impose state law liability upon a manufacturer for what the federal government authorized the manufacturer to do. Federal law imposes none of the restrictions on the manufacturer's choice to use the living-space side vapor barrier that plaintiffs are attempting to impose through common law liability. As a result, plaintiffs' claims are still preempted and their motion to amend the judgment dismissing their claims should be denied.

Additionally, plaintiffs' belated attempt to manufacture a claim that is not preempted should not be allowed. Plaintiffs never previously argued the new purported theory they are now trying to allege, and no explanation has been offered for why their "totality of construction choices" theory was not alleged or argued before dismissal. In addition, they have not articulated a non-conclusory factual theory of defect that survives preemption. While apparently trying to shift the focus of their cause of action from the singular

18

placement of the vapor barrier to a purported complex system of multiple and varied construction choices involving the vapor barrier, wall cavities, external sheathing and ventilation systems, plaintiffs merely describe the alleged defects in vague and conclusory fashion. They then characterize their non-specific allegations as "common design and manufacturing defects," all in a futile attempt to allege some non-preempted commonality where there is none. Simply put, plaintiffs' have not presented any factual or legal basis for granting them the extraordinary remedy of post-judgment amendment.

Redman and Champion pray that plaintiffs' Motion to Amend Judgment of Dismissal and for Leave to Amend Original Complaint be denied.

RESPECTFULLY SUBMITTED

**VOORHIES & LABBÉ**
(A Professional Law Corporation)


/s/ Lamont P. Domingue
Lamont P. Domingue - #20787
Post Office Box 3527
700 St. John Street
Lafayette, Louisiana 70502-3527
Telephone: (337) 232-9700
ATTORNEYS FOR Redman Homes, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 11, 2007, a copy of the foregoing Memorandum in Opposition to Plaintiffs' Motion to Amend Judgment of Dismissal (Doc. 31) and for Leave to Amend Original Complaint was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to:

Hugh E. McNeely, hemcneely.atty@yahoo.com

by operation of the court's electronic filing system.  I also certify that I have mailed by United States Postal Service this filing to the following non-CM/ECF participants:

C. Gibson Vance
Beasley Allen, et al,
272 Commerce Street,
Montgomery, AL 36103-4160


/S/ Lamont P. Domingue
Lamont P. Domingue - #20787
Post Office Box 3527
Lafayette, Louisiana 70502-3527
Telephone: (337) 232-9700
ATTORNEYS FOR Redman Homes, Inc. and
Champion Enterprises, Inc.

20

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CASE NO. 06-643-MHT

TERRY DEESE,


     Plaintiff(s),

v.

CHAMPION ENTERPRISES, INC.,


     Defendant(s).


DEPOSITION TESTIMONY OF:

PARKER HOLLOWAY


Commissioner:

Renny D. McNaughton

October 31, 2007

Birmingham, Alabama



EXHIBIT

11

1      Q      When did you -- when did you find

2 out about it?

3      A      I learned from Frances.

4      Q      When, or what year?

5      A      I don't recall.  The past couple

6 of years.  I've only been working with

7 Frances for maybe two -- two years.  Maybe

8 three.  I doubt three.

9      Q      Before Frances told you, did you

10 have any knowledge that an oversized A/C

11 could cause problems?

12      A      The first time I ever heard about

13 it was when I worked with Pioneer Housing

14 Systems at a trade show -- manufactured

15 housing meeting in Mobile -- in Gulf Shores,

16 Alabama when Bobby Parks did his show,

17 showing the blower door test and everything.

18 And he talked about how that a lot of

19 retailers were selling air conditioners that

20 were oversized for the home thinking that

21 bigger was better and that wasn't true.

22      Q      Okay.  You worked for Pioneer in

23 '97 to November 2001; correct?

1      A      Yes.

2      Q      Okay.  So in that time period is

3 when you first learned that that could be --

4 oversized A/C could be a problem; correct?

5      A      When he mentioned it, yes.

6      Q      All right.  What did Homes of

7 Legend do to ensure that either the

8 homeowner or the retailer knew that an

9 oversized air conditioner could cause

10 problems?

11      A      You know, I don't know what Homes

12 of Legend did in '97, or whatever it was

13 when I heard.  I wasn't working for Homes of

14 Legend.

15      Q      Okay.

16      A      We put the BTU information on the

17 data plate.  A competent air conditioner guy

18 is suppose to do calculations and look at

19 things to determine the right size air

20 condition.  That's what they're supposed to

21 do.  We don't build homes for A/C units.

22 We're required to build a home for the heat,

23 not the air.

1     Q     In the Deese house, if there's

2 mold in the wall, you don't have an opinion

3 whether that's good or bad; correct?

4     A     I don't know if it's good or bad.

5     Q     That means you don't have an

6 opinion?  You're not going to give an

7 opinion at trial as to whether the mold is

8 good or bad?

9     A     That means I don't know.

10     Q     504(b) does not tell you how to

11 ventilate the wall cavities, does it?

12     A     No, sir.

13     Q     The paper on the Deese home, the

14 inside cover you're calling paper, do you

15 know if it has a perm rating of one or less?

16     A     I told you earlier.  I don't know

17 what the perm rating is.

18     Q     Okay.  I just wanted to make

19 sure.  Do you agree that no matter what

20 standard under 504(b)(1), (2), or (3) a

21 manufacturer chooses, the walls have to

22 perform?

23          MR. RITCHIE:  Object to the form.

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TERRY DEESE,                              *
                                         *
        Plaintiff,                       *
                                         *
v.                                       *        1:06-cv-643-MHT
                                         *
CHAMPION ENTERPRISES, INC., *et al.,*    *
                                         *
        Defendants.                      *

## AFFIDAVIT OF ROBERT PARKS

Robert Parks, solemnly affirms under the penalties of perjury and upon personal

knowledge that the contents of this affidavit are true and correct, and he states as follows

based upon his first hand knowledge:

1.      I, Robert Parks of Healthy Homes of Louisiana, LLC, PO Drawer 3127,

West Monroe, La. 71294 "A Building Science Company", am over eighteen years of age.

I am serving as an expert consultant to the plaintiffs in this action, and competent to

testify to the matters contained herein.

2.      I was Class Valedictorian in 1981 from Calhoun High School in Calhoun,

Louisiana and went to work immediately upon my graduation due to family needs.  Since

then I have over twenty-five (25) years experience in the Manufactured Housing

(commonly incorrectly known as mobile homes) Modular and Site Built Housing

industries.

3.      I have inspected in excess of Seven-Hundred (700) homes in areas of

inquiry related to the matters in this, the Deese case including building failure analysis.

1



4.      I was brought in to be a presenter by the Louisiana State Fire Marshall's

Office (who was serving as the states SAA) - at a COSAA (Council of State

Administrative Agents) in 1999 in Myrtle Beach South Carolina and again in

2000 in Perdido Beach, Alabama. At this point I was already being recognized

as a "person of interest" addressing and dealing with moisture related issue

along the Gulf Coast.  From these meeting I was asked to be a "Principle Member" of

NFPA (standard writing organization for HUD) and was appointed to the "Mechanical

for Manufactured Housing Committee" (which deals with sections involving a/c and

moisture control)...... from there I also became involved with MHI (Manufactured

Housing Institute) and MHRA (Manufactured Housing Research Alliance).  I was

contacted by Emanuel Levy and introduced to Francis Conlin and asked to participate in

the "Alternatives for Minimizing Moisture Problems in Homes Located in Hot, Humid

Climates". This involvement included; 1) numerous conference calls; 2) Attending

meetings in Old Alexandria Virginia and Baltimore, Maryland 3) Establishing a protocol

for testing homes for this project; 4) Because I already had a customer base of

problematic homes, I supplied many homes to be tested; 5) I personally tested and

collected data on many of the homes; 6) Francis Conlin actually visited Louisiana for

approximately one week (that I can recall) and because I already had all needed testing

equipment - he brought basically nothing with him. We used my equipment to complete

the data collection process.  I began being left out of the loop after I started representing

plaintiff cases in 2004.

5.      I have been certified as an expert witness in the very issues for which I am

testifying in this case in numerous Court and Arbitration Proceedings.

2

6.    I have reviewed each of the Exhibits which generally consist of studies

(some of which I actually participated in as a Technical Advisor or for which I received a

reference as an authority) relating to the basic practices at play in this case, including, but

not limited to the following:

> Moisture Problems in Manufactured Homes – Understanding Their Causes and
> Finding Solutions;  Moisture Problems in Manufactured Housing:  Probable
> Cause and Cures; Alternatives for Minimizing Moisture Problems in Homes
> Located in Hot, Humid Climates:  Interim Report;  Minimizing Moisture
> Problems in Manufactured Homes Located in Hot, Humid Climates;  "Not in my
> Building" Moisture and Mold Growth and the Specification of Wallcovering; Air
> Infiltration in Coastal Regions – The "Paston Effect";  Understanding Vapor
> Barriers; Building Your Louisiana House;  Moisture & Mold Diagnostics and
> Mitigation;  Moisture Management in Wall Assemblies:  Air, Water, and Vapor
> Barriers – Selecting the appropriate barrier based on climate, codes, and design
> criteria;  Whole House Ventilation Strategies; Attic Ventilation Design Strategies
> for Manufactured Homes; Air Barriers:  Increasing Building Performance,
> Decreasing Energy Costs; Joe's Top Ten List of Dumb Things to do in the South;
> Assessing Water Damage to Gypsum Board;  Guidelines for Prevention of Mold
> Growth on Gypsum Board;  Installation of Predecorated Gypsum Board; Building
> Science and the Code – Moisture Control;  Micro Ecologies, Inc. Mold Clean-Up
> Guidelines for Residents;  Eagleroc Laminate Gypsum Board; Everything You
> Always Wanted to Know About Insulation, Ventilation, and Vapor Retarders.

7.    I deem each of these studies to be "reliable authority" and further state that

each of these simply seem to reiterate a basic premise which runs throughout basic

building science practices which come into play in all facets of construction relating to

condensation control; that is that, simply stated, hot seeks cold and dry seeks moist.

When the outside dew point is higher than the inside temperature, the hot, moist air will

seek the inside wall cavity.  Stated differently, if the dew point is 75 as is often the case

in the hot humid climate at play in this case, and the homeowner sets the Air Conditioner

at or below 75, for example 72, the hot moisture laden air outside the home will seek to

reach the colder surface, in this case the inside of the wall where it will condense and be

trapped, if the wall is not permeable enough to allow it to diffuse at a sufficient rate.

3

8.    Ventilating a wall intentionally as Defendant has admitted has been done in this case, will not allow dissipation of the moisture / condensation in the summer time because "mother nature" is the driving force and the hot moist air will continually seek to reach the interior wall.  This same premise is repeated in many of the studies referenced herein and it is not an alarming or new premise but rather well settled and undisputed principles at play in any home, any where when these conditions are present.

9.    The protocols used by me in inspecting the Deese home follow well settled protocols in the industry (and have been used in most of my over 700 inspections of other homes conducted on issues relating to the matters in this case).  Specifically, the included Protocol for Wall Sampling (Exhibit a attached hereto); Protocol for Duct Testing (Exhibit b attached hereto);  Protocol for Whole House Ventilation (Exhibit c attached hereto);   Protocol for Air Sampling-Non Wall Cavity (Exhibit d attached hereto).

I solemnly affirm under the penalties of perjury and upon personal knowledge that the foregoing contents of this Affidavit are true and correct.

Dated: 11/12/07                    Respectfully submitted,

Robert Parks,
Healthy Homes of Louisiana






 **SKC®**

# Operating Instructions

863 Valley View Road, Eighty Four PA 15330 USA
Tel: 724-941-9701  Fax: 724-941-1369  e-mail: skctech@skcinc.com

## Wall Sampling Guide
## with VersaTrap Cassettes

| Flow Rate: | 15 L/min |
| Sample Time: | 2 minutes |

*Complete Wall Sampling train.*

Wall Adapter (inserted in wall)

VersaTrap
Cassette

QuickTake 15
Sample Pump

## Calibration and Preparation

1. Calibrate sample pump with representative VersaTrap® Cassette in line to desired flow rate (15 L/min is recommended for VersaTrap). Remove cassette after calibration.

2. Use drill with bit to create a 3/8-inch hole in wall 3 to 6 inches from floor. *Caution: Drill slowly to minimize aerosolization of gypsum dust.*

3. Insert angled end of VersaTrap Wall Adapter tubing into hole.

4. Prepare a "vacuum" cassette by removing labels from inlet and outlet of a cassette. Attach rectangular end of adapter to cassette inlet. *Use "vacuum" cassette only to collect excess dust.*

5. Turn on pump for 10 seconds. Turn off pump. Remove "vacuum" cassette and set aside for re-use.

## Sampling

*Sampling Tip: Take a sample from a non-suspect wall cavity to use as a negative control.*

1. Remove sealing labels from a new cassette and attach to adapter without disturbing adapter tubing in wall.

2. Turn on pump and sample for two minutes.

3. Disconnect adapter and cassette. Before replacing sealing labels on cassette, hold it up to the light. If you cannot see through the slide, discard cassette and take another sample. Continue sampling until a usable sample is obtained.

4. Seal cassette inlet and outlet with sealing labels, label cassette, and ship with blanks to a laboratory for analysis. Go to *www.skcinc.com for a list of laboratories that analyze VersaTrap Cassettes.*

## Wall Sampling Considerations

1. **Sample location.** Total counts may vary in different types of wall cavities. E.g., a four-foot wall versus a 12-foot plumbing wall will differ in volume of air within the wall cavity.

2. **Moisture level.** Excessive moisture in a sample location can prevent microbial contaminants from becoming airborne.

3. **Gypsum dust.** If gypsum dust is trapped inside the cassette, accurate microscopic analysis cannot be performed because the dust will mask mold spores. Following the guidelines in this operating instruction should help minimize the collection of dust when using this device.

## Ordering Information

| Media and Accessories | Cat. No. |
|---|---|
| VersaTrap 37-mm Sampling Cassette | 225-9820/10 |
| *Shelf-life one year from date of manufacture.* | 225-9821/50 |
| VersaTrap Wall Adapters | 225-9822/5 |
| Wall Adapter Rod removes debris from adapter | 225-9823/ea |
| QuickTake 15 Sample Pump, 5 to 15 L/min, includes battery pack and AC charger/adapter (115 V) | 228-9515† |
| Wall Inspector Kit includes 10 VersaTrap Cassettes, 10 VersaTrap Wall Adapters, Wall Adapter Rod, drill with bit, stud finder, moisture meter, and carry case | 225-9690 |

† *Contains Li-Ion batteries and is subject to special shipping regulations.*

*(Deluxe Kit with pump and charger available. Contact SKC.)*

*This operating instruction may not address all safety concerns associated with this product and its use. The user is responsible for determining and following the appropriate safety and health practices and regulatory limitations (if any) before using the product. The information contained in this document should not be construed as legal advice, opinion, or as a final authority on legal or regulatory procedures.*

Form #40094 Rev 0508

EXHIBIT A

# Minneapolis Duct Blaster®

## Operation Manual

## (Series B Systems)



## The ENERGY CONSERVATORY

**DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE**



EXHIBIT

B

# Minneapolis Duct Blaster ®

# Operation Manual

# (Series B Systems)

The Energy Conservatory
2801 21st Ave. S., Suite 160
Minneapolis, MN  55407
(612) 827-1117 (Ph)
(612) 827-1051 (Fax)
www.energyconservatory.com
email:  info@energyconservatory.com

Minneapolis Duct Blaster and TrueFlow Air Handler Flow Meter are registered trademarks of The Energy Conservatory, Inc..  Minneapolis Blower Door, TECBLAST, Duct Mask and Automated Performance Testing (APT) System are trademarks of The Energy Conservatory, Inc.

Windows and Microsoft Word are registered trademarks of Microsoft Corporation.

Manual Edition:  September 2007
© 2007 by The Energy Conservatory.  All rights reserved.

## ENERGY CONSERVATORY WARRANTY

**EXPRESS LIMITED WARRANTY:**

Seller warrants that this product, under normal use and service as described in the operator's manual, shall be free from defects in workmanship and material for a period of 24 months, or such shorter length of time as may be specified in the operator's manual, from the date of shipment to the Customer.

**LIMITATION OF WARRANTY AND LIABILITY:**

This limited warranty set forth above is subject to the following exclusions:

a)   With respect to any repair services rendered, Seller warrants that the parts repaired or replaced will be free from defects in workmanship and material, under normal use, for a period of 90 days from the date of shipment to the Purchaser.

b)   Seller does not provide any warranty on finished goods manufactured by others. Only the original manufacturer's warranty applies.

c)   Unless specifically authorized in a separate writing, Seller makes no warranty with respect to, and shall have no liability in connection with, any goods which are incorporated into other products or equipment by the Purchaser.

d)   All products returned under warranty shall be at the Purchaser's risk of loss. The Purchaser is responsible for all shipping charges to return the product to The Energy Conservatory. The Energy Conservatory will be responsible for return standard ground shipping charges. The Customer may request and pay for the added cost of expedited return shipping.

The foregoing warranty is in lieu of all other warranties and is subject to the conditions and limitations stated herein. No other express or implied warranty IS PROVIDED, AND THE SELLER DISCLAIMS ANY IMPLIED WARRANTY OF FITNESS for particular purpose or merchantability.

The exclusive remedy of the purchaser FOR ANY BREACH OF WARRANTY shall be the return of the product to the factory or designated location for repair or replacement, or, at the option of The Energy Conservatory, refund of the purchase price.

The Energy Conservatory's maximum liability for any and all losses, injuries or damages (regardless of whether such claims are based on contract, negligence, strict liability or other tort) shall be the purchase price paid for the products. In no event shall the Seller be liable for any special, incidental or consequential damages. The Energy Conservatory shall not be responsible for installation, dismantling, reassembly or reinstallation costs or charges. No action, regardless of form, may be brought against the Seller more than one year after the cause of action has accrued.

The Customer is deemed to have accepted the terms of this Limitation of Warranty and Liability, which contains the complete and exclusive limited warranty of the Seller. This Limitation of Warranty and Liability may not be amended or modified, nor may any of its terms be waived except by a writing signed by an authorized representative of the Seller.

**TO ARRANGE A REPAIR:**  Please call The Energy Conservatory at 612-827-1117 before sending any product back for repair or to inquire about warranty coverage. All products returned for repair should include the reason for repair, a return shipping address, name and phone number of a contact person concerning this repair, and the purchase date of the equipment.

## Table of Contents

**Safety Information**                                                                                    **1**

    **Equipment Safety Instructions**                                                 **1**

    **Other Important Safety Instructions**                                           **1**

***Chapter 1***    **Introduction to the Minneapolis Duct Blaster®**                     **2**

***Chapter 2***    **Duct Leakage Basics**                                                 **3**

    **2.1 Why Is Duct Leakage Important?**                                             **3**

    **2.2 Where Does Duct Leakage Occur?**                                             **3**

    **2.3 How Much Can Energy Bills Be Reduced By Sealing Duct Leaks?**                **4**

    **2.4 Duct Leakage to the Outside**                                               **4**

    **2.5 Duct Leakage to the Inside**                                                **5**

***Chapter 3***    **System Components**                                                   **6**

    **3.1 Duct Blaster Fan**                                                          **6**

        3.1.a Determining Fan Flow and Using the Flow Rings:     7

    **3.2 Test Instrumentation (Pressure and Fan Flow Gauges)**                       **8**

    **3.3 Fan Speed Controller**                                                      **8**

    **3.4 Flexible Extension Duct**                                                   **9**

    **3.5 The Flow Conditioner**                                                      **9**

    **3.6 Duct Blaster Carrying Case**                                                **10**

    **3.7 TECBLAST Duct Airtightness Test Software (Optional)**                       **10**

        3.7.a TECBLAST Features:                                 10

***Chapter 4***    **Prepare the Duct System and Building for Testing**                   **11**

***Chapter 5***    **Setting Up the Duct Blaster for Pressurization Testing**            **12**

    **5.1 Where to Install the Duct Blaster System?**                                 **12**

    **5.2 Connecting the Duct Blaster to the Duct System**                            **13**

        5.2.a Installing at a Central Return:                    13

        5.2.b Installing at the Air Handler Cabinet:             14

    **5.3 The Gauge Mounting Board**                                                  **15**

    **5.4 Gauge Tubing Connections for Pressurization Testing**                       **15**

        5.4.a DG-700:                                           15

        5.4.b DG-3:                                             16

    **5.5 Selecting a Location to Measure Duct System Pressure**                      **16**

        5.5 a Insert the Pressure Probe:                        17

    **5.6 Tubing and Electrical Connections to the Fan**                              **17**

        5.6.a Connect Red Tubing to the Fan:                    17

        5.6.b Electrical Connections:                           17

*Chapter 6*    **Conducting a Total Leakage Pressurization Test**                                18

    6.1 **Final Preparations (Open a Door or Window to the Outside)**                              19

    6.2 **Choosing the Test Pressure and Number of Test Readings**                                19
        6.2.a  Test Pressure:                                                                      19
        6.2.b  Number of Test Readings:                                                            19

    6.3 **Total Leakage Test Procedures Using the DG-700**                                         20

    6.4 **Total Leakage Test Procedures Using the DG-3**                                           23

    6.5 **Using the Can't Reach Pressure Factors (*One-Point Tests*)**                             25
        6.5.a  Potential Errors In One-Point CFM25 Estimate from Using the CRP Factors:            26

    6.6 **Unable to Reach a Target Building Pressure During a Multi-Point Test?**                   27

    6.7 **Before Leaving the Building**                                                            27

*Chapter 7*    **Conducting a Leakage to Outside Pressurization Test**                             28

    7.1 **Final Preparations (Set Up Blower Door in Building)**                                     29
        7.1.a  Building Pressure Measurements:                                                     29

    7.2 **Choose the Test Pressure**                                                               30

    7.3 **Leakage to Outside Test Procedures Using the DG-700**                                     30

    7.4 **Leakage to Outside Test Procedures Using the DG-3**                                       32

    7.5 **What If You Can Not Pressurize the Building to the Test Pressure with the Blower Door Fan?** 33

    7.6 **What If You Can Not Pressurize the Duct System to the Same Pressure as the Building with
        the Duct Blaster Fan?**                                                                    34

    7.7 **Before Leaving the Building**                                                            35

*Chapter 8*    **Test Results**                                                                    36

    8.1 **Basic Duct Airtightness Test Results**                                                   36
        8.1.a  Duct Leakage at 25 Pascals:                                                         36
        8.1.b  Normalizing Duct Leakage for the Size of the HVAC System and Building:              37
        8.1.c  Leakage Areas:                                                                      38

    8.2 **Additional Test Result Options (requires use of TECBLAST software)**                      38
        8.2.a  Estimated System Efficiency Losses:                                                 38
        8.2.b  Duct Leakage Curve:                                                                 39

*Chapter 9*    **Setting Up the Duct Blaster for Depressurization Testing**                        40

    9.1 **Installing the Flow Conditioner and Flow Ring**                                          40

    9.2 **Where to Install the Duct Blaster System?**                                              41

    9.3 **Connecting the Duct Blaster to the Duct System**                                         41

    9.4 **Gauge Tubing Connections for Depressurization Testing**                                   41
        9.4.a  DG-700:                                                                             41
        9.4.b  DG-3:                                                                               42

    9.5 **Selecting a Location to Measure Duct System Pressure**                                    42

    9.6 **Tubing and Electrical Connections to the Fan**                                           42
        9.6.a  Connect Red Tubing to the Fan:                                                      42
        9.6.b  Connect Clear Tubing to the Round Transition Piece:                                 42
        9.6.c  Electrical Connections:                                                             43

*Chapter 10*     Conducting a Total Leakage Depressurization Test                                    **44**

  **10.1 Final Preparations (Open a Door or Window to the Outside)**                              **45**

  **10.2 Choosing the Test Pressure and Number of Test Readings**                                **45**

    10.2.a Test Pressure:                                                                    45

    10.2.b Number of Test Readings:                                                          45

  **10.3 Total Leakage Test Procedures Using the DG-700**                                        **46**

  **10.4 Total Leakage Test Procedures Using the DG-3**                                          **49**

  **10.5 Using the Can't Reach Pressure Factors (*One-Point Tests*)**                            **51**

    10.5.a Potential Errors In One-Point CFM25 Estimate from Using the CRP Factors:          52

  **10.6 Unable to Reach a Target Building Pressure During a Multi-Point Test?**                 **53**

  **10.7 Before Leaving the Building**                                                          **53**

*Chapter 11*     Conducting a Leakage to Outside Depressurization Test                                **54**

  **11.1 Final Preparations (Set Up Blower Door in Building)**                                   **55**

    11.1.a Building Pressure Measurements:                                                   55

  **11.2 Choose the Test Pressure**                                                             **56**

  **11.3 Leakage to Outside Test Procedures Using the DG-700**                                   **56**

  **11.4 Leakage to Outside Test Procedures Using the DG-3**                                     **58**

  **11.5 What If You Can Not Depressurize the Building to the Test Pressure with the Blower Door Fan?**    **59**

  **11.6 What If You Can Not Depressurize the Duct System to the Same Pressure as the Building with the Duct Blaster Fan?**    **60**

  **11.7 Before Leaving the Building**                                                          **61**

*Chapter 12*     Finding Duct Leaks                                                                   **62**

  **12.1 Using a Theatrical Fog Machine**                                                       **62**

  **12.2 Using a Handheld Smoke Puffer**                                                        **62**

*Chapter 13*     Using the Duct Blaster as a Powered Capture Hood                                     **63**

  **13.1 Measuring Total System Air Flow (Pressure Matching Method)**                            **63**

  **13.2 Measuring Return Register and Exhaust Fan Flows**                                       **65**

  **13.3 Measuring Supply Register Flows**                                                      **66**

*Chapter 14*     Pressure Balancing and System Performance Testing                                    **68**

  **14.1 Testing for Pressure Imbalances Caused By Forced Air System Flows**                     **68**

    14.1.a Dominant Duct Leak Test:                                                          68

    14.1.b Master Suite Door Closure:                                                        69

    14.1.c All Interior Doors Closed:                                                        69

    14.1.d Room to Room Pressures:                                                           69

  **14.2 System Performance Testing**                                                           **70**

    14.2 a Total System Air Flow:                                                            70

    14.2.b System Charge:                                                                    70

    14.2.c Airflow Balancing:                                                                70

*Chapter 15*    **Combustion Safety Testing**                                                                    **71**

   **15.1 Overview**                                                                                               **71**

   **15.2 Test Procedures**                                                                                        **72**

      15.2.a  Measure Ambient CO Level in Building:                                                                  73
      15.2.b  Survey of Combustion Appliances:                                                                      73
      15.2.c  Survey of Exhaust Fans:                                                                               73
      15.2.d  Measure Worst Case Fan Depressurization:                                                              73
      15.2.e  Spillage Test (natural draft and induced draft appliances):                                           75
      15.2.f  Draft Test (natural draft appliances):                                                                76
      15.2.g  Carbon Monoxide Test:                                                                                 76
      15.2.h  Heat Exchanger Integrity Test (Forced Air Only):                                                      76

*Chapter 16*    **Using the Duct Blaster as a Blower Door**                                                       **78**

*Appendix A*    **Calibration and Maintenance**                                                                   **79**

   **A.1 Fan Calibration**                                                                                         **79**

   **A.2 Issues Affecting Fan Calibration**                                                                        **80**

      A.2.a  Fan Flow Sensor and Motor Position:                                                                    80
      A.2.b  Upstream Air Flow Conditions:                                                                          82
      A.2.c  Operating Under High Backpressure Conditions:                                                          82

   **A.3 Duct Blaster Fan Maintenance and Safety**                                                                 **83**

      A.3.a  Maintenance Checks:                                                                                    83
      A.3.b  General Operational Notes and Tips:                                                                    83

   **A.4 Calibration and Maintenance of Digital Pressure Gauges**                                                  **83**

      A.4.a  Digital Gauge Calibration:                                                                            83
      A.4.b  Digital Gauge Maintenance:                                                                             84

   **A.5 Checking for Leaky Tubing**                                                                               **85**

*Appendix B*    **Flow Conversion Table**                                                                         **86**

   **Series B Duct Blaster (110V and 230V)**                                                                       **86**

*Appendix C*    **Sample Test Form**                                                                              **88**

*Appendix D*    **Technical Specifications**                                                                      **90**

   **D.1 Specifications**                                                                                          **90**

*Appendix E*    **Estimating HVAC System Loss From Duct Airtightness Measurements**                               **91**

# Safety Information

## <u>Equipment Safety Instructions</u>

1. The Duct Blaster® fan is a very powerful and potentially dangerous piece of equipment if not used and maintained properly. Carefully examine the fan before each use. If the fan housing, fan guards, blade, controller or cords become damaged, do not operate the fan until repairs have been made. Repairs should only be made by qualified repair personnel.

2. Keep people and pets away from the Duct Blaster fan when it is operating.

3. Do not operate the Duct Blaster fan unattended.

4. Do not use ungrounded outlets or adapter plugs. Never remove or modify the grounding prong.

5. Do not operate the Duct Blaster fan if the motor, controller or any of the electrical connections are wet.

6. Disconnect the power plug from the Duct Blaster fan receptacle before making any adjustments to the fan motor, blades or electrical components.

## <u>Other Important Safety Instructions</u>

6. The Duct Blaster fan motor is <u>not</u> a continuous duty motor and should <u>not</u> be run for extended periods of time (more than 2 hours at one time).

7. If using a theatrical fogger with the Duct Blaster system, inject the fog stream toward the edge of the fan housing and not directly into the Duct Blaster fan motor. In addition, clean off any theatrical fog residue from the Duct Blaster fan motor and fan housing following the test procedure.

8. Be sure to remove all temporary register seals after completing the test procedure.

9. When making repairs to the duct system with mastic or other curing sealants, allow the sealant to properly cure before conducting a duct leakage test to determine the effectiveness of your sealing efforts. Refer to sealant installation instructions for proper curing times.

10. Adjust all mechanical equipment (including the air handler fan) so that it does not turn on during the test.

11. Be sure you have returned the mechanical equipment controls back to their original position before leaving the building.

12. Sealing leaks in a duct system should always be part of a larger total system diagnostic procedure which includes examining total system air flow, system charge, airflow balancing and operation of vented combustion appliances. In addition, sealing air leaks (including duct leaks) in existing buildings can reduce the ventilation rate in those buildings. Existing ventilation rates and sources of indoor air pollutants should be considered by technicians before large changes in ventilation rates are undertaken. Because of these complicated systemic interactions between air sealing activities and occupant health and safety issues, it is highly recommended that technicians familiarize themselves with the Pressure Balancing/System Performance and Combustion Safety test procedures listed in Chapters 14 and 15 before attempting to seal leaks in a duct system.

1



The ENERGY CONSERVATORY
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

# *Chapter 1*    **Introduction to the Minneapolis Duct Blaster®**

Air leakage in forced air duct systems is now recognized as a major source of energy waste in both new and existing houses and commercial buildings. Research conducted by the Florida Solar Energy Center (FSEC), Advanced Energy Corporation (AEC), Proctor Engineering, Ecotope and other nationally recognized research organizations has shown that testing and sealing leaky distribution systems is one of the most cost-effective energy improvements available in many houses and light commercial buildings

The Minneapolis Duct Blaster® is a calibrated air flow measurement system designed to test and document the airtightness of forced air duct systems. Airtightness measurements of duct systems are used for a variety of purposes including:

- Documenting and certifying compliance with building code or other construction standards requiring airtight duct systems.
- Troubleshooting comfort and performance complaints from building owners.
- Measuring and documenting the effectiveness of duct sealing activities.
- Estimating annual HVAC system losses from duct leakage.

This manual describes how to measure duct airtightness using the Minneapolis Duct Blaster. Duct airtightness is determined by measuring the leakage rate of the duct system when it is subjected to a uniform test pressure by the Duct Blaster fan. Duct airtightness test results are typically expressed in terms of cubic feet per minute (cfm) of leakage at a corresponding test pressure (e.g. 155 cfm at 25 Pascals). Duct airtightness test results can also be expressed in terms of leakage areas (e.g. square inches of hole) or normalized leakage rates (e.g. measured duct leakage rate as a percent of total system air flow).

A duct airtightness test is performed by first connecting the Duct Blaster system to the ductwork at either a central return grille or at the air handler cabinet. After temporarily sealing off all intentional openings in the duct system (e.g. supply and return registers, and combustion or ventilation air inlets which are connected to the duct system), the Duct Blaster fan is used to pressurize or depressurize the entire duct system to a standard test pressure. For residential duct systems, 25 Pascals (0.10 inches w.c.) is the most commonly used test pressure. This test pressure has been adopted by most duct testing programs because research has shown that 25 Pascals represents a typical operating pressure in many residential systems. The air flow needed from the Duct Blaster fan to generate the test pressure in the duct system is the measured leakage rate. Both the duct system pressure and the Duct Blaster fan air flow are measured by a calibrated digital pressure gauge.

In addition to measuring duct airtightness, the Minneapolis Duct Blaster can be used as a powered flow hood to accurately measure total air flow through the air handler, supply and return registers, exhaust fans and other air flow devices. The Duct Blaster can also be used as a small Blower Door to test the airtightness of small or tightly built houses.

**Note:** The leakage rate of a duct system determined using the airtightness test procedures listed in this manual may differ from the leakage rates occurring in the duct system under actual operating conditions. When conducting an airtightness test, all leaks in the ductwork are subjected to approximately the same pressure (i.e. the test pressure). Under actual operating conditions, pressures within the duct system vary considerably with the highest pressure present near the air handler, and the lowest pressures present near the registers. Researchers are working on developing additional test procedures which will provide duct leakage measurements under actual operating conditions.



# *Chapter 2*    **Duct Leakage Basics**

## 2.1  Why Is Duct Leakage Important?

Studies indicate that duct leakage can account for as much as 25% of total house energy loss, and in many cases has a greater impact on energy use than air infiltration through the building shell. In many light commercial buildings, duct leakage is often the single largest cause of performance and comfort problems.
Here are just a few of the problems resulting from duct leakage:

- Leaks in the supply ductwork cause expensive conditioned air to be dumped directly outside or in the attic or crawlspace rather than delivered to the building.
- Leaks in the return ductwork pull unconditioned air directly into the HVAC system reducing both efficiency and capacity. For example, if 10 percent of the return air for an air conditioning system is pulled from a hot attic, system efficiency and capacity are often reduced by as much as 30 percent.
- In humid climates, moist air being drawn into return leaks can overwhelm the dehumidification capacity of air conditioning system causing buildings to feel clammy even when the system is operating.
- Duct leakage greatly increases the use of electric strip heaters in heat pumps during the heating season.
- Leaks in return ductwork draw air into the building from crawlspaces, garages and attics bringing with it dust, mold spores, insulation fibers and other contaminants.

## 2.2  Where Does Duct Leakage Occur?

Because the air leaking from ductwork is invisible, most duct leaks go unnoticed by homeowners and HVAC contractors. In addition, ducts are often installed in difficult to reach spots like attics and crawlspaces, or are "buried" inside building cavities making them even more difficult to find. And the hard to find leaks are usually the most important leaks to fix, because they are connected to a hot attic or humid crawlspace.

Common Duct Leakage Problems

*Return Leak Through Wall Cavity*

*Supply Leak at Take-Off Connection*






Duct leaks can be caused by a variety of installation and equipment failures including:

- Poorly fitting joints and seams in the ductwork.
- Disconnected or partially disconnected boot connections.
- Holes in duct runs.
- Use of improperly sealed building cavities for supply or return ducts.
- "Platform" return plenums which are connected to unsealed building cavities.
- Poor connections between room registers and register boots.
- Poorly fitting air handler doors, filter doors and air handler cabinets.
- Failed taped joints.

The impact on a particular building will depend on the size of the duct leak, the location of the duct leak and whether or not the leak is connected to the outside.

## 2.3  How Much Can Energy Bills Be Reduced By Sealing Duct Leaks?

Numerous studies conducted by nationally recognized research organizations has shown that testing and sealing leaky distribution systems is one of the most cost-effective energy improvements available in many houses. A summary of 19 separate duct leakage studies indicates that the average annual energy savings potential in a typical home is around 17 percent.[1]

A 1991 study in Florida found:[2]

- Air conditioner use was decreased by an average of 17.2% in a sample of 46 houses where comprehensive duct leakage diagnostics and sealing were performed.
- These houses saved an average of $110 per year on cooling bills at a cost of approximately $200 for repairs.

Duct leaks also waste energy in heating climates. A study of 18 houses in Arkansas showed that a duct leakage repair service saved 21.8% on heating bills by eliminating three-quarters of the duct leakage in the study houses.[3]  In addition to the energy savings, duct leakage repair improves homeowner comfort and reduces callbacks by allowing the HVAC system to work as designed.

## 2.4  Duct Leakage to the Outside

Duct leakage to the outside has the largest impact on HVAC system performance. Duct leakage to the outside commonly results from leaky ductwork running through unconditioned zones (attics, crawlspaces or garages). Most of the duct leakage research studies referenced in this manual have been performed on houses which contain significant portions of the duct system in unconditioned zones. However, significant leakage to the outside can also occur when all ductwork is located within the building envelope. In these cases, leaky ducts

---

1 Neme, Chris et. al. 1999, "Energy Savings Potential From Addressing Residential Air Conditioner and Heat Pump Installation Problems".

2 Cummings, James et. al. 1991, "Investigation of Air Distribution System Leakage and its Impacts in Central Florida Homes".

3 Davis, Bruce 1991, "The Impact of Air Distribution System Leakage on Heating Energy Consumption in Arkansas Homes".


The ENERGY CONSERVATORY
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

passing through wall or floor cavities (or the cavities themselves may be used as supply or return ducts) create a pressure differential between the cavity containing the ductwork and other building cavities indirectly connected to the outside. Air can be forced through these leaks whenever the air handler fan is operating.

## 2.5  Duct Leakage to the Inside

Much less is known about the energy and system efficiency impacts of duct leakage inside the house. A study of new houses in Minnesota has shown that the duct systems are very leaky, but that very little of that leakage was connected directly or indirectly to the outside.[4] One of the primary causes of duct leakage in Minnesota houses was found to be very leaky basement return systems which use panned under floor joists as return ductwork. Because most of the duct leakage was occurring within the conditioned space of the house, the energy efficiency penalty from this leakage is thought to be much less significant. **Note**: In Minnesota, basements are typically considered heated space.

However, the Minnesota study did find that leaky return systems can cause the basement (where the furnace and water heater are typically located) to depressurize to the point where combustion products from the water heater or furnace would spill into the house. Negative pressures from return leaks can also contribute to increased moisture and radon entry into houses. In addition, summertime comfort problems were often experienced due to supply duct leaks in the basement delivering cool air to the basement even though the basements have little or no cooling loads. These problems all suggest that controlling duct leakage to the inside may, in some cases, be just as important as leakage to the outside.

---

4 Nelson, Gary et. al. 1993, "Measured Duct Leakage, Mechanical System Induced Pressures and Infiltration in Eight Randomly Selected New Minnesota Houses".



# *Chapter 3*    **System Components**

The Series B Minneapolis Duct Blaster System consists of the following components:



- Series B Duct Blaster Fan
- Test Instrumentation (DG-700 or DG-3 Digital Pressure Gauge) and Fan Speed Controller
- Flexible Extension Duct
- Duct Blaster Carrying Case

## 3.1  Duct Blaster Fan

The Series B Duct Blaster fan consists of a molded fan housing with a variable speed motor. The Duct Blaster fan will move up to 1,500 cubic feet of air per minute (CFM) at zero back pressure (i.e. free air), and approximately 1,350 CFM against 50 Pascals (0.2 inches w.c.) of back pressure. With the flexible extension duct attached, the fan will move 1,250 CFM (free air) and 1,000 CFM against 50 Pascals of back pressure. Fan flow is determined by measuring the slight vacuum created by the air flowing over the flow sensor attached to the end of the motor. The Duct Blaster fan can accurately measure flows between 10 and 1,500 CFM using a series of three calibrated Flow Rings which are attached to the fan inlet (see **Appendix A** for issues affecting fan calibration and accuracy). The Duct Blaster fan motor is not reversible, however the fan can be installed to either pressurize or depressurize the duct system.

Duct Blaster Fan with Flow Rings                    Flow Sensor on Duct Blaster Fan





The Duct Blaster fan meets the flow calibration specifications of the CGSB Standard 149.10-M86, ASTM Standard E779-03, ASHRAE Standard 152 and EN 13829. The Minneapolis Duct Blaster has a fan flow accuracy of +/- 3 percent using either the DG-700 or DG-3 Digital Pressure Gauge. These calibration specifications include inaccuracies due to production tolerances of the fan and calibration error of the gauge.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

### 3.1.a  Determining Fan Flow and Using the Flow Rings:

Fan pressure readings from the flow sensor are easily converted to fan flow readings by using a Flow Conversion Table (see Appendix B), by reading flow directly from the digital pressure gauge, or through use of the TECBLAST Duct Leakage Test Software program. The Duct Blaster fan has 4 different flow capacity ranges depending on the configuration of Flow Rings on the fan inlet. Table 1 below shows the approximate flow range of the Duct Blaster fan under each of the 4 Flow Ring configurations. The greatest accuracy in fan flow readings will always be achieved by installing the Flow Ring with the smallest opening area, while still providing the necessary fan flow to pressurize the duct system to the test pressure. **Note:** When taking Duct Blaster measurements, stand at least 12 inches from the side of the fan inlet. Standing directly in front of the fan may affect the flow readings and result in erroneous measurements.

Table 1:  Fan Flow Ranges

| Flow Ring Configuration | Flow Range (CFM) | Minimum Fan Pressure (Pa) |
|---|---|---|
| Open (no Flow Ring) * | 1,500 – 600 | 25 Pa |
| Ring 1 | 800 – 225 | 25 Pa |
| Ring 2 | 300 – 90 | 25 Pa |
| Ring 3 | 125 – 10 | 3 Pa |

* The "Open" configuration can only be used when using the Duct Blaster fan to pressurize the duct system, not when depressurizing the duct system (see Chapters 9-11 for more information on depressurization testing).

**Flow Ring Installation:**

To install any of the Flow Rings, place the ring against the inlet of the fan so that the outer edges of the ring roughly line up with the outer edge of the inlet flange on the fan. Be sure the nozzle located in the middle of the ring is pointing inward toward the fan motor.



Secure the outer edge of the Flow Ring and the fan flange together by pushing the black connecting trim over both edges all the way around the fan flange.





**Note:**  You can also attach the Flow Rings using the four 2 inch long pieces of connecting trim found in the plastic parts bag stored in the accessory case.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

In addition to the 3 Flow Rings, the Duct Blaster fan comes with a nylon fan cap to cover the inlet of fan, and a foam foot which can be used to stabilize the fan housing during fan operation.



## 3.2  Test Instrumentation (Pressure and Fan Flow Gauges)

There are two instrumentation options available with the Minneapolis Duct Blaster;  the DG-700 or DG-3 Digital Gauges.

The DG-700 and DG-3 are differential pressure gauges which measure the pressure difference between either of their *Input* pressure taps and its corresponding bottom *Reference* pressure tap. Both gauges have two separate measurement channels which allows you to monitor the duct system pressure and fan pressure (air flow) signals during the duct airtightness test (the DG-700 allows for simultaneous display of both channels, while the DG-3 can display one channel at a time). In addition, both gauges are able to directly display air flow through the Duct Blaster fan. The digital gauge is shipped in a separate padded case which is stored in the Duct Blaster accessory case. Also included is a black mounting board to which the digital gauge can be attached using the Velcro strips found on the back of the gauge.

DG-700 Pressure Gauge          DG-3 Pressure Gauge

    

## 3.3  Fan Speed Controller



The Duct Blaster fan is controlled by a variable speed fan controller. Fan speed is adjusted using the adjustment knob on the face of the speed controller. The speed controller is clipped onto the black mounting board supplied with your Duct Blaster system. The Duct Blaster fan controller can be removed from the mounting board by sliding the controller clip off the board.



## 3.4  Flexible Extension Duct

The flexible extension duct consists of a 12 foot long section of 10" round flexible duct with one square and one round black plastic transition piece attached at either end. The flexible extension duct is used to connect the Duct Blaster fan to the duct system. The round transition piece connects to either the fan exhaust flange (pressurization testing) or the fan inlet flange (depressurization testing), while the square transition piece can be attached directly to a large return register, or installed at the air handler cabinet. The extension duct allows the Duct Blaster fan air flow to be easily directed to the duct system while leaving the fan on the floor or on a table.





The flexible extension duct is connected to the fan flange using black connecting trim. To connect the round transition piece to the Duct Blaster fan, first place the round transition piece against the fan flange so that the outer edges of the transition piece line up with the outer edge of the fan flange. Secure the outer edge of the transition piece and the fan flange together by pushing the black connecting trim over both edges all the way around the fan (similar to how Flow Rings are attached to the fan).

## 3.5   The Flow Conditioner

The flow conditioner is used whenever the flexible extension duct is connected to the inlet side (i.e. the side with the flow sensor) of the Duct Blaster fan.

The two primary applications which require use of the flow conditioner are:



- conducting a duct leakage test in the **depressurization** mode (i.e. pulling air out of the duct system (see Chapter 9).
- using the Duct Blaster as a powered flow hood to measure flows through supply registers (see Chapter 13).

The flow conditioner consists of a round one-inch wide perforated foam disk which is stored in the Duct Blaster accessory case. The flow conditioner is inserted into the round transition piece (part of the flexible extension duct) before the round transition piece is connected to the inlet flange of the Duct Blaster fan. The flow conditioner conditions the air flow upstream of the fan flow sensor to provide an accurate fan flow reading when the flex duct is connected to the inlet side of the fan.

To install the flow conditioner, first line up the crescent shaped key slot on the outside of the foam disk with the key indentation inside the round transition piece. Insert the flow conditioner all the way into the round transition piece until it is pushed beyond the three small round indentations located on the inside of the transition piece, and up tightly against the ridge stop. When fully engaged, the three round indentations will hold the flow conditioner in place during fan operation.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

## 3.6  Duct Blaster Carrying Case

The Duct Blaster system is stored in the lightweight fabric carrying case. A shoulder strap on the carrying case provides an easy method for carrying the system to and from testing locations. Inside the carrying case you will also find the Operation Manual, laminated flow table, extra tubing and a static pressure probe.

## 3.7  TECBLAST Duct Airtightness Test Software (Optional)

TECBLAST is a duct airtightness test analysis program for Windows computers. The TECBLAST program can be used to calculate and display test results from a Duct Blaster airtightness test. In addition, TECBLAST's choice of professional looking reports makes it simple to present the results of the test to your customers.

### *3.7.a  TECBLAST Features:*

- Designed specifically for use with Minneapolis Duct Blaster Systems.
- Easy entry of all test data.
- Calculation and display of test results including leakage rate in cubic feet per minute (CFM), leakage area in square inches, leakage as a percent of system air flow, and estimated annual system efficiency loss from the measured leakage rate.
- Built-in report generator and file storage features.
- TECBLAST lets you print your company logo directly on the reports.
- On-line Help.
- Compatible with all Windows computers.

**Note:**  If you purchased TECBLAST, you will receive a separate software operation manual. A 30 day demonstration copy of TECBLAST is available from The Energy Conservatory's website at *www.energyconservatory.com.*



# *Chapter 4*    **Prepare the Duct System and Building for Testing**

In order to conduct a duct airtightness test, you will need to prepare both the duct system and building. This typically includes temporarily sealing off intentional openings in the duct system (e.g. registers), and adjusting HVAC controls. The following setup procedures are recommended by The Energy Conservatory. If you are conducting the airtightness test according to a specific program guideline, the program guidelines may require you to set up the duct system and building differently than described below.

- Adjust the HVAC system controls so that the air handler fan does not turn on during the test.

- Temporarily seal off all supply and return registers (except any central return register being used to connect the Duct Blaster system to the duct system - see Chapter 5). A quick and easy way to temporarily seal registers is to use *Duct Mask*™ temporary register sealing material. A sample roll is provided with your Duct Blaster system and additional rolls can be purchased from The Energy Conservatory. It is also possible to tape directly over the register with high quality painter's masking tape and masking paper. Most local hardware stores carry both painter's masking tape and hand-held dispensers of masking paper.



  **Note:** Be sure to read the instructions provided with the *Duct Mask* before applying to registers. Importantly, it is best not to extend *Duct Mask* beyond the register because of the risk of damaging paint or wall paper. While in most applications it would be ideal to seal any leakage between the register and the wall (or ceiling, floor), there is often too great a risk of damage. Also, *Duct Mask* should not be applied to registers that have been painted (i.e. not the original factory finish).

- Temporarily seal off all combustion air and ventilation air inlets which are directly connected to the duct system. This is usually done by sealing the inlet opening on the outside of the building, but can also be done by temporarily removing the inlet from the ductwork and taping off the opening.

- Turn off all exhaust fans, vented dryers, and room air conditioners.

- Turn off all vented combustion appliances if there is a possibility that the space containing the appliance will be depressurized during the test procedure.

- Remove all filters from the duct system and air handler cabinet. If the Duct Blaster is installed at a central return grille, also remove the filter from that grille.

- If ducts run through unconditioned spaces such as attics, garages or crawlspaces, open vents, access panels, or doors between those spaces and the outside to eliminate pressure changes during the test procedure. This should also be done if the Duct Blaster fan will be installed in an unconditioned space (e.g. connected to an air handler located in a garage or crawlspace). Pressure changes during the test in spaces containing ductwork or the Duct Blaster fan can bias the test results.



# *Chapter 5*    Setting Up the Duct Blaster for Pressurization Testing

The following instructions are for conducting a duct airtightness **pressurization** test. Pressurization testing involves blowing air into the duct system with the Duct Blaster fan and measuring the duct system's leakage rate when it is subjected to a uniform test pressure. When conducting a pressurization test of the duct system, the **inlet** side of the Duct Blaster fan will be open to the room where the Duct Blaster is installed, and the exhaust side of the fan will be connected to the duct system, typically using the flexible extension duct. In this configuration, the fan housing rests on the floor or on a table while the square transition piece is connected to a central return grille, or the air handler cabinet access panel.



**Note:** During pressurization testing, the flow conditioner should **not** be installed in the round transition piece.

Information on how to conduct a duct airtightness **depressurization** test (i.e. pulling air out of the duct system) is discussed in Chapters 9 - 11. Both pressurization and depressurization tests typically provide similar test results. Use of one procedure over the other is primarily a matter of personal choice. If you are conducting the leakage test according to a specific program guideline, the program guidelines may specify which procedure to use.

## 5.1  Where to Install the Duct Blaster System?

For most duct testing applications, the Duct Blaster System will be connected to the duct system at a large central return, or at the air handler cabinet. In single, double or triple returned systems, the largest and closest return to the air handler is often the best choice. Large return grilles typically make a good choice because they provide the least resistance to air flow from the Duct Blaster fan. In addition, with this type of duct system, it is common to find the air handler in a location which is difficult to access such as an attic or crawlspace.

In multi-return systems (a return in every room), installing the Duct Blaster at the air handler cabinet is often the best choice. Return ductwork in multi-return systems is typically small in size, and as a result, can provide significant restriction to air flow. This restriction in air flow can reduce the maximum operating capacity of the Duct Blaster fan, can create large backpressures which can possibly degrade the fan calibration and can contribute to unequal pressures throughout the duct system. In addition, air handlers in these type of houses are commonly found in basements or air handler closets making them easy to access.

.

12



## 5.2  Connecting the Duct Blaster to the Duct System

The Duct Blaster System can be connected to the duct system at either a central return, or at the air handler cabinet (i.e. blower compartment access panel).

### 5.2.a  Installing at a Central Return:

• **Option 1: Using the Flexible Extension Duct**



The first step is to connect the square transition piece (from the flexible extension duct) to the return grille. The square transition piece is usually installed with the flex duct disconnected. **Note:** Be sure the filter has been removed from the grille filter rack before attaching the transition piece).

Place the square transition piece up against the middle of the grille and seal the transition piece to the grille with tape. We recommend using high quality painter's masking tape. You may also use the two 10" bungee cords provided with your Duct Blaster to hold the transition piece in place before using tape to make a final seal.

Once the square transition piece is in place, seal off the remaining opening of the return grille with tape. Now slide the flex duct fully over the round flange of the square transition piece, and tightly secure the flex duct using the black Velcro strap attached to the end of the flex duct. Always position the Duct Blaster fan to minimize very large bends in the flex duct (e.g. over 90 degree bend), particularly where the flex duct is attached to the fan.




• **Option 2: Using the Optional Filter Grille Attachment Panel**



An optional 20"x20" filter grille attachment panel is available from TEC to provide for quick attachment of the Duct Blaster fan to the filter slot of a central return. To use the attachment panel, first open the filter grille door, remove the existing filter, and push the attachment panel into the open filter slot. The H-channel gasket on the edges of the attachment panel should provide an airtight seal between the panel and the filter slot, and should hold the panel in place. You may now secure the Duct Blaster fan directly to the attachment panel using the 4 clips mounted on the panel. The clips are pushed down onto the exhaust flange of the Duct Blaster fan.

**Note:** This attachment method is very useful if you will be using the Duct Blaster system to also measure total air handler flow (see Chapter 13) on a single return duct system, and the return ductwork is substantially airtight. In addition, this method provides greater fan flow by reducing restrictions caused by the flex duct.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

### 5.2.b  *Installing at the Air Handler Cabinet:*

- **Option 1: Using the Flexible Extension Duct**

You will need a piece of cardboard (at least the size of the access panel), a box cutter, and masking tape.

First remove the access panel to the blower compartment. Cut a piece of cardboard approximately the same size as the blower compartment opening. Now cut a square hole in the center of the cardboard which is approximately one inch smaller than the outer flange on the square transition piece. It is helpful to





pencil an outline of the transition piece onto the cardboard before cutting. Center the square transition piece over the hole in the cardboard and tape the transition piece to the cardboard using tape.

Now insert the cardboard into the access opening of the blower compartment (with the square transition piece remaining outside of the air handler cabinet). Tape the cardboard to the air handler cabinet making sure to you have made an airtight seal on all sides.





Slide the flex duct fully over the round flange of the square transition piece, and tightly secure the flex duct using the black Velcro strap attached to the flex duct. Always position the Duct Blaster fan to minimize very large bends in the flex duct (e.g. over 90 degree bend), particularly where the flex duct is attached to the fan.

- **Option 2: Connecting the Fan Without the Flexible Extension Duct**

The Duct Blaster fan can be connected directly to the air handler cabinet without the flexible extension duct attached. The easiest way to install the fan without the extension duct is to tape the exhaust flange of the fan to a piece of cardboard which has a round hole cut out which is slightly smaller than the outside diameter of the exhaust flange. The cardboard can then be sealed in place of the blower compartment access panel. The fan is light enough (7 pounds) so that masking tape will hold the fan to the cardboard without additional support. Attaching the Duct Blaster in this way provides greater fan flow by reducing restrictions caused by the flex duct.





**The ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

 **Note:** If the air flow exiting from the Duct Blaster is severely obstructed by the air handler fan or other air handler components, this may significantly reduce the total flow capacity of the Duct Blaster. If this is a problem, try attaching the Duct Blaster fan to the blower compartment access opening using a small cardboard box rather than a flat piece of cardboard. This will tend to increase the Duct Blaster fan flow by providing less restriction to air flow as it enters the air handler blower compartment.

## 5.3  The Gauge Mounting Board

The black mounting board for the DG-700 or DG-3 digital pressure gauge and fan speed controller can be attached to any door or vertical surface using the C-clamp connected to the back of the board. The mounting board can also be attached to a horizontal surface by rotating the clamp 90 degrees. The gauge mounting board can also be placed on the floor near the Duct Blaster fan.

## 5.4  Gauge Tubing Connections for Pressurization Testing

The Duct Blaster comes with 2 pieces of color coded tubing - a 15 foot length of green tubing for measuring duct system pressure, and a 10 foot length of red tubing to measure fan pressure and flow. Connect the tubing to the gauge(s) as shown below:

### *5.4.a  DG-700:*



Connect the **Green** tubing to the **Channel A Input** tap. *The other end of the Green tubing will be connected to the duct system (section 5.5.a).*

Connect the **Red** tubing to the **Channel B Input** tap. *The other end of the Red tubing will be connected to Brass tap on the Duct Blaster fan (section 5.6.a).*

**Channel A Reference** tap should be connected to the inside of the building (if the Duct Blaster fan is installed inside the building, leave the tap open).

**Channel B Reference** tap should be connected to the space where the Duct Blaster fan is installed. If the fan and gauge are in the same space, leave the tap open.

15



*5.4.b  DG-3:*



Connect the **Green** tubing to the **Channel A Input** tap. *The other end of the Green tubing will be connected to the duct system (section 5.5.a).*

Connect the **Red** tubing to the **Channel B Input** tap. *The other end of the Red tubing will be connected to Brass tap on the Duct Blaster fan (section 5.6.a).*

**Channel A Reference** tap should be connected to the inside of the building (if the Duct Blaster fan is installed inside the building, leave the tap open).

**Channel B Reference** tap should be connected to the space where the Duct Blaster fan is installed. If the fan and gauge are in the same space, leave the tap open.

## 5.5  Selecting a Location to Measure Duct System Pressure

During the airtightness test we will need to measure the pressure in the duct system created by the Duct Blaster fan. The duct pressure will be measured using the tubing connected to **Channel A** of the digital gauge. Choose one of the following three most common locations to measure duct pressure:

- A main supply trunkline makes a very good choice due to its location approximately midway between the Duct Blaster fan and the supply registers.
- The supply plenum can be used if the Duct Blaster fan is installed at a central return.
- A supply register can also be used.

**Note:** If the duct system is relatively airtight (e.g. less than 200 cfm of leakage at 25 Pascals), the pressure in the duct system will tend to be quite uniform during the test and any of the 3 locations above will provide very consistent results. If the duct system is very leaky (e.g. more than 500 cfm of leakage at 25 Pascals), there may be large pressure differences from one part of the duct system to another during the test. In this case, the choice of pressure measurement locations may effect the test results.

For example in a very leaky duct system, using the farthest supply register from the air handler will tend to result in a higher leakage rate than would occur  from using a supply trunkline, the supply plenum or a register close to the air handler. In the case of very leaky systems, the operator may wish to conduct 2 separate tests (one with the pressure measurement location farthest from the air handler and one with a location close to the air handler) and average the 2 test results. For many duct testing programs, the choice of pressure measurement location is predetermined by the program guidelines.



### 5.5 a  Insert the Pressure Probe:

- **When Using a Supply Trunkline or Supply Plenum:**

Drill a small (1/4" to 3/8" OD) hole into the plenum to allow a static pressure probe to be installed (a static pressure probe is provided with the Duct Blaster system). Insert the static pressure probe into the hole and be sure the static pressure probe is pointed into the air stream that will be generated by the Duct Blaster fan. Connect the remaining end of the **Green** tubing to the static pressure probe. If you need additional tubing, connect the extra 30' of clear tubing stored in the accessory case to the **Green** tubing using one of the plastic tubing connectors.



- **When Using a Supply Register:**

When using a supply register to measure duct pressure, insert the remaining end of the **Green** tubing through the Duct Mask or tape covering the register. When measuring duct pressure at a supply register, use of a static pressure probe is not necessary.



## 5.6  Tubing and Electrical Connections to the Fan

### 5.6.a  Connect Red Tubing to the Fan:

The remaining end of the **Red** tubing should be connected to the brass pressure tap on the Duct Blaster fan housing.

### 5.6.b  Electrical Connections:



Connect the female plug from the fan speed controller to the male power receptacle on the fan housing. To connect the female plug, line up the plug with the three metal pins on the fan receptacle and push the plug completely onto the pins. Now secure the plug to the fan by pushing the locking ring from the plug against the fan and turning the ring clockwise until it locks in place. The remaining cord (power cord) should be plugged into a power outlet that is compatible with the voltage of the fan motor (be sure the fan controller knob is turned all the way counter clockwise to the "off" position before plugging into the power outlet). The standard Duct Blaster System sold in the United States is compatible with 110V AC power.

**Note:** The Duct Blaster fan motor is not reversible

17



# *Chapter 6*    Conducting a Total Leakage Pressurization Test

This chapter covers the test procedures for conducting a **Total Leakage Pressurization Test**. The Total Leakage Pressurization Test is used to measure the duct leakage rate in the entire duct system (including leaks in the air handler cabinet), when the duct system is subjected to a uniform test pressure. The Total Leakage Pressurization Test measures both duct leakage to the outside of the building (e.g. leaks to attics, crawlspaces, garages and other zones that are open to the outside), and duct leakage to the inside of the building. This test procedure requires use of a Duct Blaster system only.

Figure 1: Illustration of Total Leakage Pressurization Test
(at a Test Pressure of 25 Pascals)
with Duct Blaster Fan Installed at Air Handler



The air flow through the Duct Blaster fan required to pressurize the duct system to the test pressure is the measured total duct leakage rate.

The following instructions assume you have set up the Duct Blaster system for a pressurization test as outlined in Chapter 5 above. Information on how to conduct a Total Leakage **Depressurization** Test (i.e. pulling air out of the duct system ) is discussed in Chapters 9 and 10.



**Note:** It is possible to separately measure total supply and return duct leaks by installing a temporary barrier in either the supply or return opening to the air handler cabinet. With a temporary barrier in place, each side of the duct system can be tested independently. It is also possible to separately measure supply and return leakage before the air handler or furnace unit has been installed.

## 6.1  Final Preparations (Open a Door or Window to the Outside)

Open a door or window between the building and outside to prevent changes in building pressure when the Duct Blaster fan is running. We want to prevent changes in building pressures because the pressure difference across duct leaks will be different for leaks to the inside of the building compared with leaks to the outside. Changes in building pressure could be caused by:

⇒ If the Duct Blaster is installed inside the building and there are large leaks between the duct system and outside, pressurizing the duct system with building air may depressurize the building relative to outside.

⇒ If the Duct Blaster is installed in an unconditioned space (attic, garage or crawlspace air handler ), pressuring the duct system with outside air may pressurize the building relative to outside.

## 6.2  Choosing the Test Pressure and Number of Test Readings

### 6.2.a  Test Pressure:

For residential duct systems, we generally recommend that 25 Pascals (0.10 inches w.c.) be used as the test pressure. This pressure has been adopted by the majority of residential duct testing programs in the U.S. because 25 Pascals represents a typical operating pressure seen in many residential systems. In cases where 25 Pascals is not a representative pressure in the duct system being tested, it may be appropriate to use a different test pressure. For example, in small commercial HVAC systems which typically operate at higher duct pressures than residential systems, it may be appropriate to use a test pressure greater than 25 Pascals. In extremely leaky duct systems, such as duct systems found in many basement style houses, typical operating pressures in the duct system may be significantly less than 25 Pascals. In this case it may be appropriate to use a test pressure lower than 25 Pascals.

### 6.2.b  Number of Test Readings:

The most common test procedure is to conduct a ***One-Point Test*** to measure duct airtightness. The ***One-Point Test*** utilizes a single measurement of Duct Blaster fan flow needed to produce the test pressure in the duct system. The ***One-Point Test*** provides a quick and simple way to measure duct leakage without the need to have a computer to analyze the test data (although a computer program like TECBLAST can still be useful to generate reports and store data).

The ***Multi-Point Test*** procedure involves testing the duct system over a range of test pressures and analyzing the data using a duct airtightness test computer program (e.g. TECBLAST). A typical ***Multi-Point Test*** of a residential duct system includes taking measurements at 5 different test pressures including 35 Pascals, 30, 25, 20 and 15 Pascals. Making multiple measurements allows some of the errors introduced by fluctuating pressures and operator error to be averaged out over several measurements, typically increasing test accuracy.



## 6.3  Total Leakage Test Procedures Using the DG-700

The following test procedures cover use of the DG-700 for both *One-Point Tests* and *Multi-Point Tests*. These procedures assume that a test pressure of 25 Pascals is being used.

**a)    Turn on the DG-700 and place it in the proper Mode:**

- *DG-700: One-Point Test*

Turn on the gauge by pressing the **ON/OFF** button. Press the **MODE** button three times to put the gauge into the **PR/ FL @25** mode. In this specialized test mode, **Channel A** is used to measure duct system pressure while **Channel B** is used to display estimated total duct leakage at a test pressure of 25 Pascals (CFM25 Total). The leakage estimate shown on **Channel B** is determined by mathematically adjusting the actual air flow from the Duct Blaster fan to a test pressure of 25 Pascals, using the real-time **Channel A** duct system pressure reading and a Can't Reach Pressure (CRP) factor. CRP factors are discussed later in this Chapter.

- *DG-700: Multi-Point Test*

Turn on the gauge by pressing the **ON/OFF** button. Press the **MODE** button once to put the gauge into the **PR/ FL** mode. The **PR/ FL** mode is a multi-purpose mode used to measure a test pressure on **Channel A** while simultaneously measuring air flow from the Duct Blaster fan on **Channel B**.

**b)    Optional measurement of baseline duct pressure (same for both *One-Point* and *Multi-Point Tests*).**

When conducting a total leakage test, we want to measure the change in duct system pressure caused by air flowing through the Duct Blaster fan. In order to measure this change accurately, we sometimes need to account for any existing pressures on the duct system caused by stack, wind and other driving forces. This existing duct system pressure is called the "baseline duct pressure".

In many cases, the baseline duct pressure will be very small or zero, and this section of the test procedure can be omitted. For example, during mild weather conditions (e.g. little wind and less than 20 degrees temperature difference between inside and outside the building), the baseline duct pressure will typically be less than 1 Pascal and omitting baseline pressure measurements will have little or no effect on the final test results.

If it is very windy or there are very large temperature differences between inside and outside, and the ducts are located in unconditioned zones (e.g. attics, crawlspaces or garages), baseline duct pressures may be greater than 1 Pascal and should be measured. The DG-700 has a built-in baseline measurement procedure which allows the user to quickly measure and record the baseline pressure on **Channel A**, and then display the baseline adjusted pressure. This feature makes it possible to "zero out" the baseline duct pressure on **Channel A**, and display the actual change in duct pressure caused by the Duct Blaster fan.

With the fan sealed off, begin a baseline duct pressure reading from **Channel A** by pressing the **BASELINE** button. The word "BASELINE" will begin to flash in the **Channel A** display indicating that the baseline feature has been initiated. Press **START** to start the baseline measurement. During a baseline measurement, **Channel A** will display a long-term average baseline pressure reading while **Channel B** is used as a timer in seconds to show the elapsed measurement time. When you are satisfied with the baseline measurement, press the **ENTER** button to accept and enter the baseline reading into the gauge. The **Channel A** display will now show an **ADJ** icon to indicate that it is displaying a baseline adjusted duct pressure value.



**c)    Choose a Flow Ring for the Duct Blaster fan (same for both *One-Point* and *Multi-Point Tests*).**

Install the Flow Ring which you think best matches the needed
fan flow. Installation of Flow Rings will depend on the
tightness level of the duct system being tested. For example, for
relatively leaky duct systems (greater than 600 CFM25), you
will want to start the test using the Open Fan configuration (i.e.
no Flow Rings installed). As you test tighter duct systems, you

| Fan Configuration | Flow Range (cfm) for Series B DB fan |
|---|---|
| Open (no Flow Ring) | 1,500 -    600 |
| Ring 1 | 800 -    225 |
| Ring 2 | 300 -    90 |
| Ring 3 | 125 -    10 |

will need to install Flow Rings 1, 2, or 3. Refer to the Table to the right for approximate flow ranges of the fan
using the various Flow Rings configurations. Don't worry if you guess wrong and start the test with the incorrect
Flow Ring - you can change the Fan Configuration during the test procedure.

**d)    Enter the selected Flow Ring into the Gauge (same for both *One-Point* and *Multi-Point Tests*).**

In order for the DG-700 to properly display fan flow, you need to input the Duct Blaster fan model and selected
Flow Ring into the gauge. Check, and adjust if necessary, the selected test Device (i.e. fan) and Configuration
(i.e. Flow Ring) shown in the upper part of the gauge display to match the fan and Flow Ring being used in the
test.

Press the **DEVICE** button to change the selected Duct Blaster fan.

> **Device Icon**
>
> **DB   A**                       Series A Duct Blaster fan
> **DB   B**                       Series B Duct Blaster fan

Once the fan is selected, the configuration of the fan can be selected by pressing the **CONFIG** button. The
currently selected Flow Ring configuration is shown in the Config section of the gauge display.

> **Config Icon**
>
> **OPEN**            No Flow Ring
> **A1**              Ring 1
> **B2**              Ring 2
> **C3**              Ring3

Also be sure that **Channel B** is showing the proper air flow units for your test (this should typically be set to
**CFM**). Units can be changed by pressing the **UNITS** button.

**e)    Turn on and adjust the Duct Blaster fan:**

- *DG-700: One-Point Test*

Turn on the Duct Blaster fan by slowly turning the fan controller clockwise. As the fan speed increases, the duct
pressure displayed on **Channel A** should also increase. Continue to increase the fan speed until the duct
pressure on **Channel A** is between +20 and +30 Pascals.  Do not waste time adjusting and re-adjusting the fan
speed control to achieve a test pressure of exactly +25 Pascals – just get close to the target pressure and make
your measurement. As long you are using the **PR/ FL @25** mode and the test pressure displayed on **Channel A**
is within 5 Pascals of the 25 Pascal target pressure, any errors introduced by estimating the leakage on **Channel
B** will typically be very small (less than 1%).

**Channel B** will now display the *One-Point* CFM25 total leakage estimate. If the total leakage estimate is
fluctuating more than desired, try changing the Time Averaging setting on the gauge by pressing the **TIME
AVG** button and choosing the *5* or *10* second or *Long-term* averaging period. Record the CFM25 total leakage
estimate and turn off the fan.



(If "------" or "LO" appear on **Channel B**, see below).

Whenever "-----" or "**LO**" appears on **Channel B** in the **PR/ FL @ 25** Mode, the DG-700 can not calculate a reliable leakage estimate. The messages "-----" and "**LO**" appear on **Channel B** under the following three conditions:

- "-----" is continuously displayed when the duct test pressure from **Channel A** is below a minimum value of 5 Pascals. Estimating duct leakage results when the test pressure is below this value may result in unacceptably large errors. If possible, install a larger Flow Ring or remove the Flow Rings to generate more fan flow.

- "**LO**" is continuously displayed when there is negligible air flow through the test device.

- "**LO**" alternates with a flow reading when the air flow reading through the device is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the test device configuration to match the flow rate being measured (e.g. install a Flow Ring or a smaller Flow Ring).

**Note:** If you change the Flow Rings on the fan, be sure to change the Configuration setting on the gauge to match the installed Ring.

- *DG-700: Multi-Point Test*

Turn on the Duct Blaster fan by slowly turning the fan controller clockwise. As the fan speed increases, the duct pressure displayed on **Channel A** should also increase. Increase the fan speed until you achieve the highest target duct pressure (e.g. +35 Pascals) on **Channel A**. The fan flow needed to create this duct pressure can be read directly from **Channel B**. Record the test readings (duct pressure and fan flow).

Now reduce the fan speed until the duct pressure equals the next target pressure (e.g. +30 Pa). Once again record the test readings. Continue this procedure for each of the remaining target pressures. Turn off the fan when the final set of readings are completed.

Enter the test readings into the TECBLAST software to generate you final CFM25 total leakage estimate. **Note:** Always enter a baseline pressure value of 0 into the TECBLAST Manual Data Entry Screen (because you either "zeroed out" the baseline pressure using the DG-700's built-in baseline feature, or you skipped the optional baseline procedure).

(If "LO" appears on **Channel B**, see below).

Whenever "**LO**" appears on **Channel B** in the **PR/ FL** Mode, the DG-700 can not display a reliable fan flow reading. The message "**LO**" appears on **Channel B** under the following two conditions:

- "**LO**" is continuously displayed when there is negligible air flow through the test device.

- "**LO**" alternates with a flow reading when the air flow reading through the device is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the test device configuration to match the flow rate being measured (e.g. install a Flow Ring or a smaller Flow Ring).

**Note:** If you change the Flow Rings on the fan, be sure to change the Configuration setting on the gauge to match the installed Ring.



The **ENERGY CONSERVATORY**

DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

## 6.4  Total Leakage Test Procedures Using the DG-3

The following test procedures cover use of the DG-3 for both *One-Point Tests* and *Multi-Point Tests*. These procedures assume that a test pressure of 25 Pascals is being used.

**a)  Turn on the DG-3 and put it into the proper Mode (same for both *One-Point* and *Multi-Point Tests*).**

Turn the **CHANNEL** knob to **A**, turn the **MODE** switch to *Pressure*, and put the **RANGE** switch in the *Low Range* position (*200.0* Pa).

**b)  Optional measurement of baseline duct pressure (same for both *One-Point* and *Multi-Point Tests*).**

When conducting a total leakage test, we want to measure the change in duct system pressure caused by air flowing through the Duct Blaster fan. In order to measure this change accurately, we sometimes need to account for any existing pressures on the duct system caused by stack, wind and other driving forces. This existing duct system pressure is called the "baseline duct pressure".

In many cases, the baseline duct pressure will be very small or zero, and this section of the test procedure can be omitted. For example, during mild weather conditions (e.g. little wind and less than 20 degrees temperature difference between inside and outside the building), the baseline duct pressure will typically be less than 1 Pascal and omitting baseline pressure measurements will have little or no effect on the final test results. If it is very windy or there are very large temperature differences between inside and outside, and the ducts are located in unconditioned zones (e.g. attics, crawlspaces or garages), baseline duct pressures may be greater than 1 Pascal and should be measured.

If you are using the DG-3 gauge, the baseline duct pressure is read from **Channel A** of the gauge. With the fan sealed off, record the baseline duct pressure, including the sign of the reading (i.e. negative or positive reading). If the pressure is fluctuating too much to determine the reading, try changing the Time Averaging setting on the gauge by turning the **Mode Switch** to *Time Select*, choosing the *5* or *10* second or Long-term average, and then return the **Mode Switch** to the *Pressure* setting.

**Note:**  If you will be using the TECTITE software, the measured baseline building pressure will need to be entered into the program's Data Table.

**c)  Choose a Flow Ring for the Duct Blaster fan (same for both *One-Point* and *Multi-Point Tests*).**

Install the Flow Ring which you think best matches the needed fan flow. Installation of Flow Rings will depend on the tightness level of the duct system being tested. For example, for relatively leaky duct systems (greater than 600 CFM25), you will want to start the test using the Open Fan configuration (i.e. no Flow Rings installed). As you test tighter duct systems, you

| Fan Configuration | Flow Range (cfm) for Series B DB fan | |
|---|---|---|
| Open (no Flow Ring) | 1,500 - | 600 |
| Ring 1 | 800 - | 225 |
| Ring 2 | 300 - | 90 |
| Ring 3 | 125 - | 20 |

will need to install Flow Rings 1, 2, or 3. Refer to the Table to the right for approximate flow ranges of the fan using the various Flow Rings configurations. Don't worry if you guess wrong and start the test with the incorrect Flow Ring - you can change the Fan Configuration during the test procedure.

**d)  Enter the selected Flow Ring into the Gauge (same for both *One-Point* and *Multi-Point Tests*).**

In order for the DG-3 to properly display fan flow, you need to input the Duct Blaster fan model and selected Flow Ring into the gauge. To select the fan type and fan configuration being used in your test, first turn the **MODE** knob to the *Fan Select* position. The gauge display will show "-SEL" to indicate that a fan type and fan configuration have not yet been selected.  The fan type can be selected by toggling the **SELECT** Switch <u>up</u>. The fan configuration can be selected by toggling the **SELECT** switch <u>down</u>.

23



| If the Display Shows | Description |
|---|---|
| **-SEL** | Begin fan type selection by toggling the **SELECT** switch <u>up</u> twice. |
| **8-0** | This indicates that you have chosen the Series B Duct Blaster fan, and that the fan is in the "Open" inlet configuration (i.e. no Flow Rings installed). |
| | To change the fan inlet configuration for the Duct Blaster fan, toggle the **SELECT** switch <u>down</u>. |
| **8-1** | Series B Duct Blaster fan with Ring 1 installed. |
| **8-2** | Series B Duct Blaster fan with Ring 2 installed. |
| **8-3** | Series B Duct Blaster fan with Ring 3 installed. |

Once you have input the fan configuration, turn the **MODE** knob back to *Pressure,* and then flip the **RANGE** switch to the *2000* setting (*High Range*).

**e)   Turn on and adjust the Duct Blaster fan:**

- *DG-3: One-Point Test*

Slowly turn the knob on the fan speed controller clockwise until the Duct Blaster fan motor engages and the blades begin to turn. The fan should be blowing air into the duct system. As the fan speed increases, duct pressure indicated on **Channel A** should also increase. Increase the fan speed until the duct system is pressurized to the chosen test pressure of 25 Pascals.

> **Note:** If you measured a baseline duct pressure (Optional Section b), you may need to adjust the test pressure value (see below).
>
> - If you measured a baseline duct pressure and are using the TECBLAST software, no adjustment is necessary.
>
> - If you measured a baseline duct pressure and you are <u>**not**</u> using the TECBLAST software, you will need to manually adjust the test pressure by <u>adding</u> the baseline duct pressure to the test pressure value. For example, if the measured baseline duct pressure was (-2) Pascals, the new adjusted test pressure becomes 23 Pascals  (25 Pascals + (-2 Pascals)). In other words, during the test you need to change the duct system pressure by 25 Pascals from our starting point pressure of (-2) Pascals.

After adjusting the fan speed to pressurize the duct system by 25 Pascals, turn the **CHANNEL** knob to **Channel B**, and turn the **MODE** switch to *Flow*. The gauge will now display the *One-Point* CFM25 total leakage estimate for the duct system. If the gauge display is fluctuating too much to determine the reading, try changing the Time Averaging setting on the gauge by turning the **MODE** Switch to *Time Select*, choosing the *5* or *10* second or *Long-term* average, and then returning to the *Flow* mode. Record the CFM25 total leakage estimate and turn off the fan.

> (If the CFM flow reading on **Channel B** is blinking, see below):
>
> - The CFM flow reading on **Channel B** will blink when the air flow reading through the fan is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the fan configuration to match the flow rate being measured (e.g. install a Flow Ring or a smaller Flow Ring).
>
> - If you change Flow Rings, be sure to use the **Fan Select** feature to update the gauge with the new Flow Ring installed before reconducting the test.



- *DG-3: Multi-Point Test*

Slowly turn the knob on the fan speed controller clockwise until the Duct Blaster fan motor engages and the blades begin to turn. The fan should be blowing air into the duct system. As the fan speed increases, duct pressure indicated on **Channel A** should also increase. Increase the fan speed until you achieve the highest target duct pressure (e.g. +35 Pascals) on **Channel A**. Now determine the air flow through the fan needed to create this duct pressure by first turning the **CHANNEL** switch to **Channel B**, and then turning the **MODE** knob to the *Flow* position. The gauge will now display the flow through the fan. Record the test readings (duct pressure and fan flow).

Turn the **CHANNEL** switch back to **Channel A** and then turn the **MODE** knob back to the *Pressure* setting. Now reduce the fan speed until the duct pressure equals the next target pressure (e.g. +30 Pa). Once again determine the air flow from **Channel B** and record the test readings. Continue this procedure for each of the remaining target pressures. Turn off the fan when the final set of readings are completed.

Enter the test readings into the TECBLAST software to generate your final CFM25 total leakage estimate.

> (If the CFM flow reading on **Channel B** is blinking, see below):

- The CFM flow reading on **Channel B** will blink when the air flow reading through the fan is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the fan configuration to match the flow rate being measured (e.g. install a Flow Ring or a smaller Flow Ring).

- If you change Flow Rings, be sure to use the **Fan Select** feature to update the gauge with the new Flow Ring installed before reconducting the test.

## 6.5  Using the Can't Reach Pressure Factors (*One-Point Tests*)

If you were performing a *One-Point Test* and the Duct Blaster fan was unable to pressurize the duct system by 25 Pascals because one of the Flow Rings was installed, remove the Flow Ring and repeat the test (removing the Flow Ring will increase the maximum air flow available from the fan). If you were not able to pressurize the duct system by Pascals (with the "Open Fan" running at full speed) because the duct system is extremely leaky, use the following instructions:

- *For DG-700 Users:*

No adjustments to the test procedure above are necessary other than to make sure the gauge was in the **PR/ FL @25** mode during the *One-Point Test*.  If you can not achieve the target test pressure of approximately 25 Pascals because the duct system is extremely leaky, a CFM25 total leakage estimate will automatically be displayed on **Channel B**. The leakage estimate shown on **Channel B** is determined by continuously adjusting the measured air flow from the Duct Blaster fan to a test pressure of 25 Pascals, using the real-time **Channel A** duct pressure reading and the Can't Reach Pressure Factors shown in Table 2 below.

- *For DG-3 Users:*

Take your *One-Point Test* reading at the highest achievable duct pressure. Now manually use Table 2 below to estimate the amount of  air flow through the Duct Blaster fan it would take to reach the target pressure. To use Table 2, determine the flow required to maintain the highest achievable duct pressure listed in the Table. Multiply this flow by the corresponding "Can't Reach Pressure (CRP) Factor" to estimate flow that would be required to maintain a 25 Pascal duct pressure.



Table 2:  Can't Reach Pressure Factors (25 Pa Target)

| Duct Pressure (Pa) | CRP Factor | Duct Pressure (Pa) | CRP Factor |
|---|---|---|---|
| 24 | 1.02 | 14 | 1.42 |
| 23 | 1.05 | 13 | 1.48 |
| 22 | 1.08 | 12 | 1.55 |
| 21 | 1.11 | 11 | 1.64 |
| 20 | 1.14 | 10 | 1.73 |
| 19 | 1.18 | 9 | 1.85 |
| 18 | 1.22 | 8 | 1.98 |
| 17 | 1.26 | 7 | 2.15 |
| 16 | 1.31 | 6 | 2.35 |
| 15 | 1.36 | 5 | 2.63 |

*Example:*  *With no Flow Ring installed and the fan running full speed, you are able to achieve a duct system test pressure of 14 Pascals with a measured fan flow of 1,200 cfm. The corresponding CRP Factor for a duct pressure of 14 Pascals is 1.42. The estimated total duct leakage at a test pressure of 25 Pascals is 1,200 x 1.42 = 1,704 cfm.*

$$\text{Can't Reach Pressure Factor} = \left\{ \frac{25}{\text{Current Test Pressure (Pa)} \atop \text{(Channel A)}} \right\}^{0.60}$$

**Note:**  The TECBLAST program automatically applies the CRP Factors to *One-Point Test* data.

### 6.5.a  Potential Errors In One-Point CFM25 Estimate from Using the CRP Factors:

Table 3 below show the potential errors in the *One-Point* CFM25 total leakage estimates from using the CRP factors. There are two main sources of error:

- The actual test pressure (**Channel A**) not being equal to the target pressure of 25 Pascals.
- The actual exponent of the leaks being measured differing from the assumed exponent of 0.60.

Table 3:  Error in One-Point Leakage Estimate from CRP Factor

| | | **Actual exponent "n"** | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.5 | 0.55 | 0.6 | 0.65 | 0.7 | 0.75 |
| **Test** | 5 | 14.9% | 7.7% | 0.0% | -8.4% | -17.5% | -27.3% |
| **Pressure in Pa** | 10 | 8.8% | 4.5% | 0.0% | -4.7% | -9.6% | -14.7% |
| **(Channel A)** | 15 | 5.0% | 2.5% | 0.0% | -2.6% | -5.2% | -8.0% |
| | 20 | 2.2% | 1.1% | 0.0% | -1.1% | -2.3% | -3.4% |
| | 25 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | 30 | -1.8% | -0.9% | 0.0% | 0.9% | 1.8% | 2.7% |
| | 35 | -3.4% | -1.7% | 0.0% | 1.7% | 3.3% | 4.9% |
| | 40 | -4.8% | -2.4% | 0.0% | 2.3% | 4.6% | 6.8% |

**The ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

For example, Table 3 shows that for a *One-Point* 25 Pa duct airtightness test, a 4.5% error would be introduced if the leakage estimate was determined at an actual test pressure of 10 Pa (**Channel A**), and the actual exponent of the leaks was 0.55 rather than the assumed value of 0.60.

## 6.6  Unable to Reach a Target Building Pressure During a Multi-Point Test?

If the Duct Blaster fan was unable to achieve the highest target duct pressure (e.g. 35 Pascals) because one of the Flow Rings was installed, remove the Flow Ring and repeat the test.  If you were not able to reach the highest target pressure with the "Open Fan" running at full speed because the duct system is extremely leaky, take your first set of test readings the highest achievable duct pressure. Continue your test by using the remaining target pressures which are less than the highest achievable pressure. Enter these test values into the TECBLAST program to generate your total leakage estimate.

## 6.7  Before Leaving the Building

Be sure you have returned the building to its original condition before leaving. This includes removing any temporary register seals, turning HVAC controls to their original settings and closing access doors or vents opened during the test. In addition, it is highly recommended that the test procedures outlined in Chapters 14 and 15 be performed before leaving the building.

**The ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

## *Chapter 7*    Conducting a Leakage to Outside Pressurization Test

This chapter covers the test procedures for conducting a **Leakage to Outside Pressurization Test**. The Leakage to Outside Test is used to measure the duct leakage rate to the outside of the building only, when the duct system is subjected to a uniform test pressure. This test procedure requires simultaneous use of both a Duct Blaster and Blower Door system.

During this procedure, a Blower Door fan will be used to pressurize the building to the test pressure, while the Duct Blaster system is used to pressurize the duct system to the same pressure as the building. Because the duct system and the building are at the same pressure, there will be little or no leakage between the ducts and the building during the leakage rate measurement.

Figure 2:  Illustration of Leakage to Outside Pressurization Test
(at a Test Pressure of 25 Pascals)
with Duct Blaster Fan Installed at Air Handler



The air flow through the Duct Blaster fan required to pressurize the duct system to the same pressure as the building (while the Blower Door is pressurizing the building to the test pressure) is the measured duct leakage rate to the outside.

28



The following instructions assume you have set up the Duct Blaster system for a pressurization test as outlined in Chapter 5 above. Information on how to conduct a Leakage to Outside **Depressurization** Test (i.e. pulling air out of the duct system ) is discussed in Chapter 11.

**Note:** It is possible to separately measure supply and return duct leaks by installing a temporary barrier in either the supply or return opening to the air handler cabinet. With a temporary barrier in place, each side of the duct system can be tested independently. It is also possible to separately measure supply and return leakage before the air handler or furnace unit has been installed.

## 7.1  Final Preparations (Set Up Blower Door in Building)

Install the Blower Door system in a centrally located exterior door, including a gauge to measure building pressure. You will need to prepare the building for a Blower Door test as described in the Blower Door Operation Manual including closing all exterior doors and windows, opening all interior doors, and adjusting combustion appliances to remain off during the test. The Blower Door fan should be set up to pressurize (or blow air into) the building. Importantly, we will not be measuring air flow through the Blower Door fan during this test procedure. This means that the Blower Door fan can either be set up in the pressurization test mode, or it can be set up in the standard depressurization test mode, with the fan direction switch reversed to blow air into the building. Refer to your Blower Door manual for complete instructions on Blower Door system installation.

### 7.1.a  Building Pressure Measurements:

During the test, you will need to monitor the change in building pressure caused by the Blower Door system. Typically the Blower Door building pressure gauge will be setup to measure building pressure with reference to the outside (this is the typical set up for a Blower Door test).

However, if you are testing a duct system that is located primarily in one unconditioned zone (e.g. a single attic or single crawlspace), you have the option of setting up the building pressure gauge to measure building pressure with reference to that zone, rather than with reference to outside. The purpose of making this change is to ensure that the duct leaks located in that zone are subjected to the full test pressure.

For example, it is possible that a crawlspace containing most of the ductwork may be significantly pressurized by air being forced into that zone from the Blower Door fan (through air leaks between the building and the crawlspace). In this case, you may underestimate the duct leakage rate if you are measuring building pressure with respect to outside during your test because the leaks in the crawlspace ductwork will not be subjected to the full test pressure (i.e. they will be subjected to the test pressure minus the crawlspace pressurization caused by the Blower Door fan). Changing the reference tap on the Blower Door building pressure gauge from outside to the crawlspace would eliminate the underestimation problem in this building.



• *Using a Digital Gauge to Monitor Building Pressure:*

If you are using a separate DG-700 or DG-3 gauge to monitor building pressure, connect the outside building pressure tubing to the **CHANNEL A Reference** tap.



Connect the outside building pressure tubing to the Blower Door **CHANNEL A Reference** tap. The other end of this tubing should either be run to the outside, or to the unconditioned zone which contains the majority of the ductwork.

## 7.2  Choose the Test Pressure

For the Leakage to Outside Pressurization Test, we will be simultaneously pressuring the duct system and the building to the same test pressure. For residential duct systems, we generally recommend that 25 Pascals (0.10 inches w.c.) be used as the test pressure. This pressure has been adopted by the majority of residential duct testing programs in the U.S. because 25 Pascals represents a typical operating pressure seen in many residential systems. In cases where 25 Pascals is not a representative pressure in the duct system being tested, it may be appropriate to use a different test pressure. For example, in small commercial HVAC systems which typically operate at higher duct pressures than residential systems, it may be appropriate to use a test pressure greater than 25 Pascals. In extremely leaky duct systems (e.g. more than 600 cfm of leakage at 25 Pascals), such as duct systems found in many basement style houses, the typical operating pressures in the duct system may be significantly less than 25 Pascals. In this case it may be appropriate to use a test pressure lower than 25 Pascals.

## 7.3  Leakage to Outside Test Procedures Using the DG-700

The following test procedure covers use of the DG-700 for the Leakage to Outside Test procedure. This procedure assumes that a test pressure of 25 Pascals is being used.

**a)    Turn on the building pressure gauge and pressurize the building to 25 Pascals.**

Turn on the Blower Door building pressure gauge and set it to measure pressure on **Channel A**. Slowly turn on the Blower Door fan and begin to pressurize the building. Increase the Blower Door fan speed until the building is pressurized to the test pressure of  25 Pascals, as measured on the building pressure gauge. In leaky buildings, you may need to remove all Flow Rings from the Blower Door fan in order pressurize the building to the test pressure. Leave the Blower Door fan running.

**Note:** If you have an APT system to control your Blower Door system, use the Cruise Control feature in the TECTITE software to maintain a building pressure of 25 Pascals.

**b)    Turn on the Duct Blaster DG-700 and put it in the proper Mode.**

Turn on the gauge by pressing the **ON/OFF** button. Press the **MODE** button once to put the Duct Blaster gauge into the **PR/ FL** mode. The **PR/ FL** mode is a multi-purpose mode used to measure a test pressure on **Channel A** while simultaneously measuring air flow from the Duct Blaster fan on **Channel B**.



**c)    Choose a Flow Ring for the Duct Blaster fan.**

Install the Flow Ring which you think best matches the needed fan flow. Installation of Flow Rings will depend on the tightness level of the duct system being tested. For example, for relatively leaky duct systems (greater than 600 CFM25), you will want to start the test using the Open Fan configuration (i.e. no Flow Rings installed). As you test tighter duct systems, you

| Fan Configuration | Flow Range (cfm) for Series B DB fan |
|---|---|
| Open (no Flow Ring) | 1,500 -   600 |
| Ring 1 | 800 -   225 |
| Ring 2 | 300 -    90 |
| Ring 3 | 125 -    10 |

will need to install Flow Rings 1, 2, or 3. Refer to the Table to the right for approximate flow ranges of the fan using the various Flow Rings configurations. Don't worry if you guess wrong and start the test with the incorrect Flow Ring - you can change the Fan Configuration during the test procedure.

**d)    Enter the selected Flow Ring into the Gauge.**

In order for the DG-700 to properly display fan flow, you need to input the Duct Blaster fan model and selected Flow Ring into the gauge. Check, and adjust if necessary, the selected test Device (i.e. fan) and Configuration (i.e. Flow Ring) shown in the upper part of the gauge display to match the fan and Flow Ring being used in the test.

Press the **DEVICE** button to change the selected Duct Blaster fan.

> **Device Icon**
>
> **DB   A**              Series A Duct Blaster fan
> **DB   B**              Series B Duct Blaster fan

Once the fan is selected, the configuration of the fan can be selected by pressing the **CONFIG** button. The currently selected Flow Ring configuration is shown in the Config section of the gauge display.

> **Config Icon**
>
> **OPEN**          No Flow Ring
> **A1**             Ring 1
> **B2**             Ring 2
> **C3**             Ring3

Also be sure that **Channel B** is showing the proper air flow units for your test (this should typically be set to **CFM**). Units can be changed by pressing the **UNITS** button.

**e)    Turn on and adjust the Duct Blaster fan.**

Turn on the Duct Blaster fan by slowly turning the fan controller clockwise. The Duct Blaster fan should be blowing air into the duct system. Increase the Duct Blaster fan speed until the pressure between the duct system and the building (**Channel A** on the Duct Blaster DG-700) reads <u>zero</u>. Leave the Duct Blaster fan running.

**f)    Re-check the building pressure.**

Re-check the building pressure gauge and if necessary, re-adjust the Blower Door fan speed to maintain a test building pressure of 25 Pascals.

**g)    Re-check the duct pressure.**

Re-check the Duct Blaster system and if necessary, re-adjust the Duct Blaster fan until the pressure between the duct system and the building reads zero (**Channel A** on the Duct Blaster DG-700). **Channel B** on the Duct Blaster DG-700 will now display the CFM25 leakage to outside estimate. If the leakage estimate is fluctuating more than desired, try changing the Time Averaging setting on the gauge by pressing the **TIME AVG** button and choosing the *5* or *10* second or ***Long-term averaging*** period. Record the CFM25 leakage to outside estimate and turn off both the Blower Door and Duct Blaster fans.

31



(If "LO" appears on **Channel B**, see below).

Whenever **"LO"** appears on **Channel B** in the **PR/ FL** Mode, the DG-700 can not display a reliable fan flow reading. The message **"LO"** appears on **Channel B** under the following two conditions:

-    "LO" is continuously displayed when there is negligible air flow through the test device.

-    "LO" alternates with a flow reading when the air flow reading through the device is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the test device configuration to match the flow rate being measured (e.g. install a Flow Ring or a smaller Flow Ring).

**Note:** If you change the Flow Rings on the fan, be sure to change the Configuration setting on the gauge to match the installed Ring.

## 7.4  Leakage to Outside Test Procedures Using the DG-3

The following test procedure covers use of the DG-3 for the Leakage to Outside Test procedure. This procedure assumes that a test pressure of 25 Pascals is being used.

**a)   Turn on the building pressure gauge and pressurize the building to 25 Pascals.**

Turn on the Blower Door building pressure gauge and set it to measure pressure on **Channel A**. Slowly turn on the Blower Door fan and begin to pressurize the building. Increase the Blower Door fan speed until the building is pressurized to the test pressure of 25 Pascals, as measured on the building pressure gauge. In leaky buildings, you may need to remove all Flow Rings from the Blower Door fan in order pressurize the building to the test pressure. Leave the Blower Door fan running.

**Note:** If you have an APT system to control your Blower Door system, use the Cruise Control feature in the TECTITE software to maintain a building pressure of 25 Pascals.

**b)   Turn on the Duct Blaster DG-3 and put it in the proper Mode.**

Turn the **CHANNEL** knob to **A**, turn the **MODE** switch to *Pressure*, and put the **RANGE** switch in the *High Range* position (2000 Pa).

**c)   Choose a Flow Ring for the Duct Blaster fan.**

Install the Flow Ring which you think best matches the needed fan flow. Installation of Flow Rings will depend on the tightness level of the duct system being tested. For example, for relatively leaky duct systems (greater than 600 CFM25), you will want to start the test using the Open Flow configuration (i.e. no Flow Rings installed). As you test tighter duct systems, you will need to install Flow Rings 1, 2, or 3. Refer to the Table to the right for approximate flow ranges of the fan using the various Flow Rings configurations. Don't worry if you guess wrong and start the test with the incorrect Flow Ring - you can change the Fan Configuration during the test procedure.

| Fan Configuration | Flow Range (cfm) for Series B DB fan | |
|---|---|---|
| Open (no Flow Ring) | 1,500 - | 600 |
| Ring 1 | 800 - | 225 |
| Ring 2 | 300 - | 90 |
| Ring 3 | 125 - | 20 |

**d)   Enter the selected Flow Ring into the Gauge.**

In order for the DG-3 to properly display fan flow, you need to input the Duct Blaster fan model and selected Flow Ring into the gauge. To select the fan type and fan configuration being used in your test, first turn the **MODE** knob to the *Fan Select* position. The gauge display will show "-SEL" to indicate that a fan type and fan configuration have not yet been selected.  The fan type can be selected by toggling the **SELECT** Switch up. The fan configuration can be selected by toggling the **SELECT** switch down.



| If the Display Shows | Description |
|---|---|
| **-SEL** | Begin fan type selection by toggling the **SELECT** switch <u>up</u> twice. |
| **8-0** | This indicates that you have chosen the Series B Duct Blaster fan, and that the fan is in the "Open" inlet configuration (i.e. no Flow Rings installed). |
| | To change the fan inlet configuration for the Duct Blaster fan, toggle the **SELECT** switch <u>down</u>. |
| **8-1** | Series B Duct Blaster fan with Ring 1 installed. |
| **8-2** | Series B Duct Blaster fan with Ring 2 installed. |
| **8-3** | Series B Duct Blaster fan with Ring 3 installed. |

**e)    Turn on and adjust the Duct Blaster fan.**

Turn on the Duct Blaster fan by slowly turning the fan controller clockwise. The Duct Blaster fan should be blowing air into the duct system. Increase the Duct Blaster fan speed until the pressure between the duct system and the building (**Channel A** on the Duct Blaster DG-3) reads <u>zero</u>. Leave the Duct Blaster fan running.

**f)    Re-check the building pressure.**

Re-check the building pressure gauge and if necessary, re-adjust the Blower Door fan speed to maintain a test building pressure of 25 Pascals.

**g)    Re-check the duct pressure.**

Re-check the Duct Blaster system and if necessary, re-adjust the Duct Blaster fan until the pressure between the duct system and the building reads zero (**Channel A** on the Duct Blaster DG-3). After re-adjusting the fan speed, turn the **CHANNEL** knob to **Channel B**, and turn the **MODE** switch to *Flow*. The gauge will now display the CFM25 leakage to outside estimate. If the gauge display is fluctuating too much to determine the reading, try changing the Time Averaging setting on the gauge by turning the **MODE** Switch to *Time Select*, choosing the *5* or *10* second or *Long-term* average, and then returning to the *Flow* mode. Record the CFM25 leakage to outside estimate and turn off both the Blower Door and Duct Blaster fans.

> (If the CFM flow reading on **Channel B** is blinking, see below):
>
> -    The CFM flow reading on **Channel B** will blink when the air flow reading through the fan is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the fan configuration to match the flow rate being measured (e.g. install a Flow Ring or a smaller Flow Ring).
>
> -    If you change Flow Rings, be sure to use the **Fan Select** feature to update the gauge with the new Flow Ring installed before reconducting the test.

## 7.5  What If You Can Not Pressurize the Building to the Test Pressure with the Blower Door Fan?

If the Blower Door system is unable to pressurize the building to the test pressure because one of the Flow Rings was installed on the Blower Door fan, remove the Flow Ring and repeat the test. If you are not able to pressurize the building to the test pressure because the building is too leaky, then you will need to conduct the test at the highest achievable building pressure and use the Can't Reach Pressure Factors below to estimate the final duct leakage rate.



Table 4: Can't Reach Pressure Factors (25 Pa Target)

| Duct Pressure (Pa) | CRP Factor | Duct Pressure (Pa) | CRP Factor |
|---|---|---|---|
| 24 | 1.02 | 14 | 1.42 |
| 23 | 1.05 | 13 | 1.48 |
| 22 | 1.08 | 12 | 1.55 |
| 21 | 1.11 | 11 | 1.64 |
| 20 | 1.14 | 10 | 1.73 |
| 19 | 1.18 | 9 | 1.85 |
| 18 | 1.22 | 8 | 1.98 |
| 17 | 1.26 | 7 | 2.15 |
| 16 | 1.31 | 6 | 2.35 |
| 15 | 1.36 | 5 | 2.63 |

*Example:  With the Blower Door fan running at full speed (& no Flow Rings attached), you are only able to pressurize the building to 18 Pascals. While the Blower Door is pressurizing the building to 18 Pascals, adjust the Duct Blaster fan to create zero pressure between the duct system and the building. At this point the measured Duct Blaster fan flow is 450 cfm. The corresponding CRP Factor for a building pressure of 18 Pascals is 1.22. The estimated duct leakage to outside at a test pressure of 25 Pascals is 450 x 1.22 = 549 cfm.*

$$\text{Can't Reach Pressure Factor} = \left\{ \frac{25}{\substack{\text{Current Test Pressure (Pa)} \\ \text{(Channel A)}}} \right\}^{0.60}$$

**Note:**  The TECBLAST program automatically applies the CRP Factors to test data.

## 7.6  What If You Can Not Pressurize the Duct System to the Same Pressure as the Building with the Duct Blaster Fan?

If the Duct Blaster fan was unable to create a pressure difference of zero between the duct system and the building (while the Blower Door is pressurizing the building to the test pressure) because one of the Flow Rings was installed, remove the Flow Ring from the Duct Blaster fan and repeat the test. If you were not able to create a pressure difference of zero because the duct system is extremely leaky to the outside, then the test will need to be performed at a lower building pressure and the Can't Reach Pressure Factors (Table 4) used to estimate the final duct leakage rate.

*Example:  Because you were unable to create a pressure difference of zero between the duct system and the building, re-adjust the Blower Door to pressurize the building to a lower pressure (e.g. 20 Pascals). While the Blower Door is running, adjust the Duct Blaster fan to create a pressure difference of zero between the duct system and the building. If you are still unable to create a pressure difference of zero, repeat the test at an even lower building pressure (e.g. 15 Pascals). Finally, multiply the flow through the Duct Blaster fan needed to create a pressure difference of zero by the appropriate CRP factor.*



*For example, with the Blower Door pressurizing the building to 15 Pascals, the flow through the Duct Blaster fan needed to create a pressure difference of zero (between the duct system and the building) is 1,200 cfm. The corresponding CRP Factor for a building pressure of 15 Pascals is 1.36. The estimated duct leakage to outside at a test pressure of 25 Pascals is 1200 x 1.36 = 1,632 cfm.*

**Note:** The TECBLAST program will automatically apply the CRP Factors to test data.

## 7.7 Before Leaving the Building

Be sure you have returned the building to its original condition before leaving. This includes removing any temporary register seals, turning HVAC controls to their original settings and closing access doors or vents opened during the test. In addition, it is highly recommended that the test procedures outlined in Chapters 14 and 15 be performed before leaving the building.



# *Chapter 8*    Test Results

Basic test results from a duct airtightness test can be manually calculated to provide a quick assessment of the leakage rate of the duct system. For more complicated calculation procedures including analysis of Multi-Point Test data and estimated annual system efficiency losses from duct leakage, we recommend that you use the TECBLAST program.

## 8.1  Basic Duct Airtightness Test Results

Duct airtightness test results can be presented in a number of standardized formats.

### *8.1.a  Duct Leakage at 25 Pascals:*

- *Total Leakage at 25 Pascals:*

Total Duct Leakage at 25 Pascals is a measurement of the duct leakage rate (in cubic feet per minute) which occurs when the entire duct system is subjected to a uniform test pressure of 25 Pascals (0.1 inches of water column). The air flow through the Duct Blaster fan required to pressurize (or depressurize) the duct system to the test pressure is the measured total duct leakage rate. Total duct leakage includes both duct leakage to the outside of the building (e.g. leaks to attics, crawlspaces, garages and other zones that are open to the outside), and duct leakage to the inside of the building.

- *Leakage to Outside at 25 Pascals:*

Leakage to Outside at 25 Pascals is a measurement of the duct leakage rate (in cubic feet per minute) to the outside of the building only, when the duct system is subjected to a uniform test pressure of 25 Pascals (0.1 inches of water column). The air flow through the Duct Blaster fan required to pressurize (or depressurize) the duct system to the same pressure as the building, while a Blower Door is pressurizing (or depressurizing) the building to the test pressure, is the measured duct leakage rate. Duct leakage to the outside of a building typically has a much larger impact on HVAC system performance than does duct leakage to the inside of a building.

**Note:** A test pressure of 25 Pascals has been adopted by the majority of residential duct testing programs in the U.S. because 25 Pascals represents a typical operating pressure seen in many residential systems. In cases where 25 Pascals is not a representative duct system pressure, it may be appropriate to use a different test pressure.

Duct leakage rates for houses can vary dramatically based on the construction style and age of the building. Below are duct leakage test results from a few field tests of new and existing homes around the United States.

|  | Average Total Leakage at 25 Pa |
|---|---|
| 28 New Houses in Arizona (1996) | 310 cfm |
| 40 New Houses in Pacific Northwest (1995) | 166 cfm |
| 56 New Houses in California (1997) | 144 cfm |
| 8 New Houses in Minnesota (1993) | 1,463 cfm |
| 21 Existing Houses in Pacific Northwest | 379 cfm |
| 121 Existing Houses in California | 220 cfm |



|  | Average Leakage to Outside at 25 Pa |
|---|---|
| 28 New Houses in Arizona (1996) | 193 cfm |
| 40 New Houses in Pacific Northwest (1995) | 65 cfm |
| 32 New Manufactured Houses in US (1996) | 120 cfm |
| 8 Existing Manufactured Houses in Pacific Northwest | 242 cfm |
| 22 Existing Houses in Pacific Northwest | 221 cfm |
| 18 Existing Houses in Arkansas | 410 cfm |

### 8.1.b Normalizing Duct Leakage for the Size of the HVAC System and Building:

In order to compare the leakage rate of various duct systems, it is useful to adjust (or normalize) the leakage test results for the size of the HVAC system and the building. This allows easy comparison of duct airtightness tests conducted on various size buildings or HVAC systems with each other, or with program standards. The two most common variables used to normalize are the total HVAC system air flow rate, and the floor area of the building.

- *Duct Leakage as a % of Total System Airflow:*

One way to compare the leakage rate of various duct systems is to express the leakage rate as a percent of total airflow through the air handler. Duct Leakage as a Percentage of Total System Airflow is calculated by dividing the duct leakage rate by the air handler flow rate. Air handler flow rates can be estimated using the temperature rise method, or by directly measuring the airflow using a TrueFlow$^{TM}$ Air Handler Flow Meter or the Duct Blaster pressure matching method (see Chapter 13). For multiple speed air handler fans, the lowest fan speed is typically used.

$$\text{Duct Leakage as a \% of Total System Airflow} = \frac{\text{Duct Leakage at 25 Pa (cfm)}}{\text{Total System Airflow (cfm)}} \times 100$$

California's recently revised Title 24 Energy Code requires that all new houses have a measured total duct leakage rate of less than 6% of total system airflow.

- *Duct Leakage as a Percent of Floor Area:*

Another useful way to compare the leakage rate in different duct systems is to compare the measured duct leakage rate to the conditioned floor area of the building. *Duct Leakage as a Percent of Floor Area* is calculated by dividing the duct leakage rate by the conditioned floor area of the building.

$$\text{Duct Leakage as a \% of Floor Area} = \frac{\text{Duct Leakage at 25 Pa (cfm)}}{\text{Floor Area (square feet)}} \times 100$$

Over the past decade, a number of residential new construction programs have specified a maximum duct leakage target using *Duct Leakage as a Percentage of Floor Area*. These programs have typically specified maximum target leakage rates ranging from 3% to 6%.



### 8.1.c    Leakage Areas:

Once you have performed an airtightness test on the duct system and have quantified the leakage rate, it is possible to calculate a Leakage Area of the duct system in square inches. The Leakage Area estimate can be a useful way to visualize the physical size of all cumulative leaks in the duct system. The Leakage Area is defined in this manual as the size of a sharp edged hole (i.e. orifice) which would leak at the same flow rate as the measured duct system leakage, if the hole was subjected to the test pressure.

To calculate the Leakage Area, you first need to know the leakage rate of the duct system in cubic feet per minute (cfm), and the test pressure at which the leakage test was conducted (e.g. 25 Pa). Knowing these two variables, we can use the following equation to calculate the Equivalent Orifice Leakage Area (EOLA):

$$\text{EOLA (sq. in.)} \quad = \quad \frac{\text{Duct System Leakage Rate (cfm)}}{1.06 \ \times \ \sqrt{\text{test pressure (Pa)}}}$$

**Note:** Leakage Area calculations are performed automatically in the TECBLAST program.

Table 5:  Example Leakage Area Calculations:

| Duct Leakage Rate | Equiv. Orifice Leakage Area (test pressure at 25 Pa) | Equiv. Orifice Leakage Area (test pressure at 50 Pa) |
|---|---|---|
| 50 CFM | 9.4 sq. in. | 6.7 sq. in. |
| 100 CFM | 18.9 | 13.3 |
| 150 CFM | 28.3 | 20.0 |
| 200 CFM | 37.7 | 26.7 |
| 250 CFM | 47.2 | 33.4 |
| 300 CFM | 56.6 | 40.0 |
| 350 CFM | 66.0 | 46.7 |

## 8.2   Additional Test Result Options (requires use of TECBLAST software)

### 8.2.a   Estimated System Efficiency Losses:

The TECBLAST program contains a simple method for estimating HVAC system losses from field measurements of duct leakage. This method uses a duct leakage measurement along with a number of assumptions about the HVAC and duct system (including system airflow, average operating pressure in the ductwork, the breakdown of leakage between supply and return side, and the energy loss penalty from supply and return leaks) to estimate an energy loss penalty for heating or cooling. Information on the model used in the TECBLAST program can be found in Appendix E.



**Note:** Because duct leakage loss calculations are extremely complex, the estimation technique in TECBLAST should be used with caution and should be viewed only as a rough estimate of the magnitude of losses possible. The leakage rate of a duct system determined using the airtightness test procedures listed in this manual may differ from the leakage rates occurring in the duct system under actual operating conditions. In addition, the duct leakage loss estimates do not include many important but complex impacts on system efficiency including latent load impacts, heat pump strip heating impacts, conduction losses, increases in infiltration from dominant duct leakage, or interactions of leakage on mechanical operating efficiencies, all of which can be significant depending on the type and location of the system being tested. We do not recommend that this simple model be used for research purposes, program design studies or impact evaluations. More sophisticated duct leakage loss models are available and better suited to these needs. Listed below are three references to other duct leakage loss models:

> ASHRAE Standard 152-2004, Method of Test for Determining the Design and Seasonal Efficiencies of Residential Thermal Distribution Systems, ASHRAE, Atlanta GA, 2004.

> Development of a Practical Method for Estimating the Thermal Efficiency of Residential Forced Air Distribution Systems, EPRI, Palo Alto CA, January 1997.

> Improvements to ASHRAE Standard 152P, Paul Francisco and Larry Palmer, Ecotope, Seattle WA, June 1999.

### 8.2.b  Duct Leakage Curve:

Once the duct leakage test data has been collected and entered into the TECBLAST program, it is plotted on a Test Graph and a "best-fit" regression line (called the Duct Leakage Curve) is drawn through the plotted data. The Duct Leakage Curve can be used to estimate the leakage rate of the duct system at any pressure. If you conduct a single point test, TECBLAST assumes an exponent (n) of 0.60 in its calculation procedures.

> The Duct Leakage Curve is defined by the variables Coefficient (C) and Exponent (n) in the following equation:

$$Q = C \times P^n$$

> where:
> Q  is leakage into (or out of) the duct system (in CFM).
> C  is the Coefficient.
> P  is the pressure difference between inside and outside of the duct system (in Pascals).
> n  is the Exponent.



# Chapter 9    Setting Up the Duct Blaster for Depressurization Testing

The following instructions are for conducting a duct leakage **depressurization** test. Depressurization testing involves pulling air out of the duct system with the Duct Blaster fan and measuring the duct system's leakage rate when it is subjected to a uniform test pressure. When conducting a depressurization test of the duct system, the **exhaust** side of the Duct Blaster fan will be open to the room where the Duct Blaster is installed, and the inlet side of the fan will be connected to the flexible extension duct. In this configuration, the fan housing typically rests on the floor or on a table while the square transition piece is connected to a central return register, or the air handler cabinet access panel.



**Note:**  During depressurization testing, the flow conditioner should **always** be installed in the round transition piece (see Section 9.1 below).

Information on how to conduct a duct leakage **pressurization** test (i.e. pushing air into the duct system) is discussed in Chapters 5 - 7. Both pressurization and depressurization tests typically provide similar leakage results. Use of one procedure over the other is primarily a matter of personal choice. If you are conducting the leakage test according to a specific program guideline, the program guidelines may specify which procedure to use.

## 9.1  Installing the Flow Conditioner and Flow Ring

When conducting a duct leakage depressurization test, the flow conditioner and one of the Flow Rings must always be installed. The flow conditioner consists of a round one-inch wide perforated foam disk which is stored in the Duct Blaster accessory case. The flow conditioner is inserted into the round transition piece by lining up the crescent shaped key slot on the outside of the foam disk with the key indentation inside the round transition piece, and pushing the disk tightly into the transition piece and up against the ridge stop.

Before attaching the round transition piece (with flow conditioner installed) to the inlet side of the Duct Blaster fan, first place one of the Flow Rings against the fan inlet. Use the Flow Ring which you think will provide the appropriate air flow range for the test. Don't worry if you install the wrong Flow Ring, they can be changed during the test procedure.

Fan Flow Ranges

| Flow Ring Configuration * | Flow Range (CFM) |
|---|---|
| Ring 1 | 800 – 225 |
| Ring 2 | 300 – 90 |
| Ring 3 | 125 – 10 |

\* A Flow Ring must always be installed when depressurization testing.



Secure both the Flow Ring and round transition piece to the fan inlet flange using the black connecting trim. Because the flexible extension duct and one of the Flow Rings must always be used when using the Duct Blaster to conduct a depressurization test, the maximum air flow achievable during a depressurization test is approximately 800 cfm.

## 9.2  Where to Install the Duct Blaster System?

See **Section 5.1** - this section is the same for both pressurization and depressurization testing.

## 9.3  Connecting the Duct Blaster to the Duct System

See **Sections 5.2.a (Option 1)** and **5.2.b (Option 1)**.

**Note:** When conducting a depressurization test, the flexible extension duct must always be used to connect the Duct Blaster to the duct system. In addition, once the flexible extension duct has been connected to the duct system (at either a central return or the air handler cabinet), the flex duct should be stretched relatively straight for about 4 feet in front of the Duct Blaster fan.

## 9.4  Gauge Tubing Connections for Depressurization Testing

The Digital Pressure Gauges come with 2 pieces of color coded tubing - a 15 foot length of green tubing for measuring duct system pressure, and a 10 foot length of red tubing to measure fan pressure and flow. In addition, a 30 foot length of clear hose is stored in the Duct Blaster carrying case. Connect the tubing to the gauge(s) as shown below:

### 9.4.a  DG-700:



Connect the **Green** tubing to the **Channel A Input** tap. *The other end of the Green tubing will be connected to the duct system (section 9.5).*

**Channel A Reference** tap should be connected to the inside of the building (if the Duct Blaster fan is installed inside the building, leave the tap open).

Connect the **Red** tubing to the **Channel B Input** tap. *The other end of the Red tubing will be connected to Brass tap on the Duct Blaster fan (section 9.6.a).*

Connect the **Clear** tubing to the **Channel B Reference** tap. *The other end of the Clear tubing will be connected to the plastic tap on the round transition piece (section 9.6.b).*

41



### 9.4.b  DG-3:



Connect the **Green** tubing to the **Channel A Input** tap. *The other end of the Green tubing will be connected to the duct system (section 9.5).*

Connect the **Red** tubing to the **Channel B Input** tap. *The other end of the Red tubing will be connected to Brass tap on the Duct Blaster fan (section 9.6.a).*

**Channel A Reference** tap should be connected to the inside of the building (if the Duct Blaster fan is installed inside the building, leave the tap open).

Connect the **Clear** tubing to the **Channel B Reference** tap. *The other end of the Clear tubing will be connected to the plastic tap on the round transition piece (section 9.6.b).*

Once the tubing has been attached, turn the **CHANNEL** knob to *A*, turn the **MODE** switch to *Pressure*, and put the **RANGE** switch in the *Low Range (200.0 Pa)* position.

## 9.5  Selecting a Location to Measure Duct System Pressure

See **Section 5.5** - this section is the same for both pressurization and depressurization testing.

## 9.6  Tubing and Electrical Connections to the Fan

### 9.6.a  Connect Red Tubing to the Fan:

The remaining end of the **Red** tubing should be connected to the brass pressure tap on the Duct Blaster fan housing.



### 9.6.b  Connect Clear Tubing to the Round Transition Piece:

The remaining end of the **Clear** tubing should be connected to the plastic pressure tap on the round transition piece (which is installed on the inlet of the Duct Blaster fan).





The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

### 9.6.c  Electrical Connections:



Connect the female plug from the fan speed controller to the male power receptacle on the fan housing. To connect the female plug, line up the plug with the three metal pins on the fan receptacle and push the plug completely onto the pins. Now secure the plug to the fan by pushing the locking ring from the plug against the fan and turning the ring clockwise until it locks in place. The remaining cord (power cord) should be plugged into a power outlet that is compatible with the voltage of the fan motor (be sure the fan controller knob is turned all the way counter clockwise to the "off" position before plugging into the power outlet). The standard Duct Blaster system sold in the United States is compatible with 110V AC power.

**Note:**  The Duct Blaster fan motor is not reversible

The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

# Chapter 10    Conducting a Total Leakage Depressurization Test

This chapter covers the test procedures for conducting a **Total Leakage Depressurization Test**. The Total Leakage Depressurization Test is used to measure the duct leakage rate in the entire duct system (including leaks in the air handler cabinet) when the duct system is subjected to a uniform test pressure. The Total Leakage Depressurization Test measures both leakage to the outside of the building (e.g. leaks to attics, crawlspaces, garages and other zones that are open to the outside), and leakage to the inside of the building. This test procedure requires use of a Duct Blaster system only.

Figure 3: Illustration of Total Leakage Depressurization Test
(at a Test Pressure of 25 Pascals)
with Duct Blaster Fan Installed at Air Handler



The air flow through the Duct Blaster fan required to depressurize the duct system to the test pressure is the measured total duct leakage rate.

The following instructions assume you have set up the Duct Blaster system for a depressurization test as outlined in Chapter 9 above. Information on how to conduct a Total Leakage **Pressurization** Test (i.e. blowing air into the duct system ) is discussed in Chapter 6.

44



**Note:** It is possible to separately measure total supply and return duct leaks by installing a temporary barrier in either the supply or return opening to the air handler cabinet. With a temporary barrier in place, each side of the duct system can be tested independently. It is also possible to separately measure supply and return leakage before the air handler or furnace unit has been installed.

## 10.1  Final Preparations (Open a Door or Window to the Outside)

- Open a door or window between the building and outside to prevent changes in building pressure when the Duct Blaster fan is running. We want to prevent changes in building pressures because the pressure difference across duct leaks will be different for leaks to the inside of the building compared with leaks to the outside. Changes in building pressure could be caused by:

    ⇒ If the Duct Blaster is installed inside the building and there are large leaks between the duct system and outside, depressurizing the duct system may pressurize the building relative to outside.

    ⇒ If the Duct Blaster is installed in an unconditioned space (attic, garage or crawlspace air handler), depressurizing the duct system may depressurize the building relative to outside.

## 10.2  Choosing the Test Pressure and Number of Test Readings

### 10.2.a  Test Pressure:

For residential duct systems, we generally recommend that -25 Pascals (-0.10 inches w.c.) be used as the test pressure. This pressure has been adopted by the majority of residential duct testing programs in the U.S. because 25 Pascals represents a typical operating pressure seen in many residential systems. In cases where 25 Pascals is not a representative pressure in the duct system being tested, it may be appropriate to use a different test pressure. For example, in small commercial HVAC systems which typically operate at higher duct pressures than residential systems, it may be appropriate to use a test pressure greater than 25 Pascals. In extremely leaky duct systems, such as duct systems found in many basement style houses, typical operating pressures in the duct system may be significantly less than 25 Pascals. In this case it may be appropriate to use a test pressure lower than 25 Pascals.

### 10.2.b  Number of Test Readings:

The most common test procedure is to conduct a *One-Point Test* to assess duct airtightness. The *One-Point Test* utilizes a single measurement of Duct Blaster fan flow needed to produce the test pressure in the duct system. The *One-Point Test* provides a quick and simple way to measure duct leakage without the need to have a computer to analyze the test data (although a computer program like TECBLAST can still be useful to generate reports and store data).

The *Multi-Point Test* procedure involves testing the duct system over a range of test pressures and analyzing the data using a duct airtightness test computer program (e.g. TECBLAST). For example, a typical *Multi-Point Test* of a residential duct system includes taking measurements at 5 different test pressures including -35 Pascals, -30, -25, -20 and -15 Pascals. Making multiple measurements allows some of the errors introduced by fluctuating pressures and operator error to be averaged out over several measurements, typically increasing test accuracy.



## 10.3  Total Leakage Test Procedures Using the DG-700

The following test procedures cover use of the DG-700 for both *One-Point Tests* and *Multi-Point Tests*. These procedures assume that a test pressure of -25 Pascals is being used.

**a)   Turn on the DG-700 and place it in the proper Mode:**

- *DG-700: One-Point Test*

Turn on the gauge by pressing the **ON/OFF** button. Press the **MODE** button three times to put the gauge into the **PR/ FL @25** mode. In this specialized test mode, **Channel A** is used to measure duct system pressure while **Channel B** is used to display estimated total duct leakage at a test pressure of -25 Pascals (CFM25 Total). The leakage estimate shown on **Channel B** is determined by mathematically adjusting the actual air flow from the Duct Blaster fan to a test pressure of -25 Pascals, using the real-time **Channel A** duct system pressure reading and a Can't Reach Pressure (CRP) factor. CRP factors are discussed later in this Chapter.

- *DG-700: Multi-Point Test*

Turn on the gauge by pressing the **ON/OFF** button. Press the **MODE** button once to put the gauge into the **PR/ FL** mode. The **PR/ FL** mode is a multi-purpose mode used to measure a test pressure on **Channel A** while simultaneously measuring air flow from the Duct Blaster fan on **Channel B**.

**b)   Optional measurement of baseline duct pressure (same for both *One-Point* and *Multi-Point Tests*).**

When conducting a total leakage test, we want to measure the change in duct system pressure caused by air flowing through the Duct Blaster fan. In order to measure this change accurately, we sometimes need to account for any existing pressures on the duct system caused by stack, wind and other driving forces. This existing duct system pressure is called the "baseline duct pressure".

In many cases, the baseline duct pressure will be very small or zero, and this section of the test procedure can be omitted. For example, during mild weather conditions (e.g. little wind and less than 20 degrees temperature difference between inside and outside the building), the baseline duct pressure will typically be less than 1 Pascal and omitting baseline pressure measurements will have little or no effect on the final test results.

If it is very windy or there are very large temperature differences between inside and outside, and the ducts are located in unconditioned zones (e.g. attics, crawlspaces or garages), baseline duct pressures may be greater than 1 Pascal and should be measured. The DG-700 has a built-in baseline measurement procedure which allows the user to quickly measure and record the baseline pressure on **Channel A**, and then display the baseline adjusted pressure. This feature makes it possible to "zero out" the baseline duct pressure on **Channel A**, and display the actual change in duct pressure caused by the Duct Blaster fan.

With the fan sealed off, begin a baseline duct pressure reading from **Channel A** by pressing the **BASELINE** button. The word "BASELINE" will begin to flash in the **Channel A** display indicating that the baseline feature has been initiated. Press **START** to start the baseline measurement. During a baseline measurement, **Channel A** will display a long-term average baseline pressure reading while **Channel B** is used as a timer in seconds to show the elapsed measurement time. When you are satisfied with the baseline measurement, press the **ENTER** button to accept and enter the baseline reading into the gauge. The **Channel A** display will now show an **ADJ** icon to indicate that it is displaying a baseline adjusted duct pressure value.



**c)    Choose a Flow Ring for the Duct Blaster fan (same for both *One-Point* and *Multi-Point Tests*).**

Install the Flow Ring which you think best matches the needed fan flow. Installation of Flow Rings will depend on the tightness level of the duct system being tested. For example, for relatively leaky duct systems (greater than 500 CFM25), you will want to start the test using the Ring 1 configuration. As you test tighter duct systems, you will need to install Flow Rings 2

| Fan Configuration | Flow Range (cfm) for Series B DB fan |
|---|---|
| Ring 1 | 800 -    225 |
| Ring 2 | 300 -    90 |
| Ring 3 | 125 -    10 |

or 3. Refer to the Table to the right for approximate flow ranges of the fan using the various Flow Rings configurations. Don't worry if you guess wrong and start the test with the incorrect Flow Ring - you can change the Fan Configuration during the test procedure.

**d)    Enter the selected Flow Ring into the Gauge (same for both *One-Point* and *Multi-Point Tests*).**

In order for the DG-700 to properly display fan flow, you need to input the Duct Blaster fan model and selected Flow Ring into the gauge. Check, and adjust if necessary, the selected test Device (i.e. fan) and Configuration (i.e. Flow Ring) shown in the upper part of the gauge display to match the fan and Flow Ring being used in the test.

Press the **DEVICE** button to change the selected Duct Blaster fan.

> **Device Icon**
>
> **DB    A**                  Series A Duct Blaster fan
> **DB    B**                  Series B Duct Blaster fan

Once the fan is selected, the configuration of the fan can be selected by pressing the **CONFIG** button. The currently selected Flow Ring configuration is shown in the Config section of the gauge display.

> **Config Icon**
>
> **OPEN**        No Flow Ring (**Note:** When depressurizing, a Flow Ring must be installed.
> **A1**          Ring 1
> **B2**          Ring 2
> **C3**          Ring3

Also be sure that **Channel B** is showing the proper air flow units for your test (this should typically be set to **CFM**). Units can be changed by pressing the **UNITS** button.

**e)    Turn on and adjust the Duct Blaster fan:**

- *DG-700: One-Point Test*

Turn on the Duct Blaster fan by slowly turning the fan controller clockwise. The fan should be pulling air out of the duct system. As the fan speed increases, the duct pressure displayed on **Channel A** should also increase. Continue to increase the fan speed until the duct pressure on **Channel A** is between -20 and -30 Pascals. Do not waste time adjusting and re-adjusting the fan speed control to achieve a test pressure of exactly -25 Pascals – just get close to the target pressure and make your measurement. As long you are using the **PR/ FL @25** mode and the test pressure displayed on **Channel A** is within 5 Pascals of the -25 Pascal target pressure, any errors introduced by estimating the leakage on **Channel B** will typically be very small (less than 1%).

**Channel B** will now display the *One-Point* CFM25 total leakage estimate. If the total leakage estimate is fluctuating more than desired, try changing the Time Averaging setting on the gauge by pressing the **TIME AVG** button and choosing the 5 or 10 second or Long-term averaging period. Record the CFM25 total leakage estimate and turn off the fan.



(If "------" or "LO" appear on **Channel B**, see below).

Whenever "-----" or "**LO**" appears on **Channel B** in the **PR/ FL @ 25** Mode, the DG-700 can not calculate a reliable leakage estimate. The messages "-----" and "**LO**" appear on **Channel B** under the following three conditions:

- "-----" is continuously displayed when the duct test pressure from **Channel A** is below a minimum value of -5 Pascals. Estimating duct leakage results when the test pressure is below this value may result in unacceptably large errors. If possible, install a larger Flow Ring to generate more fan flow.

- "**LO**" is continuously displayed when there is negligible air flow through the test device.

- "**LO**" alternates with a flow reading when the air flow reading through the device is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the test device configuration to match the flow rate being measured (e.g. install a smaller Flow Ring).

**Note:** If you change the Flow Rings on the fan, be sure to change the Configuration setting on the gauge to match the installed Ring.

- *DG-700: Multi-Point Test*

Turn on the Duct Blaster fan by slowly turning the fan controller clockwise. The fan should be pulling air out of the duct system. As the fan speed increases, the duct pressure displayed on **Channel A** should also increase. Increase the fan speed until you achieve the highest target duct pressure (e.g. -35 Pascals) on **Channel A**. The fan flow needed to create this duct pressure can be read directly from **Channel B**. Record the test readings (duct pressure and fan flow).

Now reduce the fan speed until the duct pressure equals the next target pressure (e.g. -30 Pa). Once again record the test readings. Continue this procedure for each of the remaining target pressures. Turn off the fan when the final set of readings are completed.

Enter the test readings into the TECBLAST software to generate you final CFM25 total leakage estimate. **Note:** Always enter a baseline pressure value of 0 into the TECBLAST Manual Data Entry Screen (because you either "zeroed out" the baseline pressure using the DG-700's built-in baseline feature, or you skipped the optional baseline procedure).

(If "LO" appears on **Channel B**, see below).

Whenever "**LO**" appears on **Channel B** in the **PR/ FL** Mode, the DG-700 can not display a reliable fan flow reading. The message "**LO**" appears on **Channel B** under the following two conditions:

- "**LO**" is continuously displayed when there is negligible air flow through the test device.

- "**LO**" alternates with a flow reading when the air flow reading through the device is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the test device configuration to match the flow rate being measured (e.g. install a smaller Flow Ring).

**Note:** If you change the Flow Rings on the fan, be sure to change the Configuration setting on the gauge to match the installed Ring.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

## 10.4  Total Leakage Test Procedures Using the DG-3

The following test procedures cover use of the DG-3 for both *One-Point Tests* and *Multi-Point Tests*. These procedures assume that a test pressure of -25 Pascals is being used.

**a)   Turn on the DG-3 and put it into the proper Mode (same for both *One-Point* and *Multi-Point Tests*).**

Turn the **CHANNEL** knob to **A**, turn the **MODE** switch to *Pressure*, and put the **RANGE** switch in the *Low Range* position (*200.0* Pa).

**b)   Optional measurement of baseline duct pressure (same for both *One-Point* and *Multi-Point Tests*).**

When conducting a total leakage test, we want to measure the change in duct system pressure caused by air flowing through the Duct Blaster fan. In order to measure this change accurately, we sometimes need to account for any existing pressures on the duct system caused by stack, wind and other driving forces. This existing duct system pressure is called the "baseline duct pressure".

In many cases, the baseline duct pressure will be very small or zero, and this section of the test procedure can be omitted. For example, during mild weather conditions (e.g. little wind and less than 20 degrees temperature difference between inside and outside the building), the baseline duct pressure will typically be less than 1 Pascal and omitting baseline pressure measurements will have little or no effect on the final test results. If it is very windy or there are very large temperature differences between inside and outside, and the ducts are located in unconditioned zones (e.g. attics, crawlspaces or garages), baseline duct pressures may be greater than 1 Pascal and should be measured.

If you are using the DG-3 gauge, the baseline duct pressure is read from **Channel A** of the gauge. With the fan sealed off, record the baseline duct pressure, including the sign of the reading (i.e. negative or positive reading). If the pressure is fluctuating too much to determine the reading, try changing the Time Averaging setting on the gauge by turning the **Mode Switch** to *Time Select*, choosing the *5* or *10* second or Long-term average, and then return the **Mode Switch** to the *Pressure* setting.

**Note:**  If you will be using the TECTITE software, the measured baseline building pressure will need to be entered into the program's Data Table.

**c)   Choose a Flow Ring for the Duct Blaster fan (same for both *One-Point* and *Multi-Point Tests*).**

Install the Flow Ring which you think best matches the needed fan flow. Installation of Flow Rings will depend on the tightness level of the duct system being tested. For example, for relatively leaky duct systems (greater than 500 CFM25), you will want to start the test using the Ring 1 configuration. As you test tighter duct systems, you will need to install Flow Rings 2

| Fan Configuration | Flow Range (cfm) for Series B DB fan |
|---|---|
| Ring 1 | 800 -   225 |
| Ring 2 | 300 -   90 |
| Ring 3 | 125 -   20 |

or 3. Refer to the Table to the right for approximate flow ranges of the fan using the various Flow Rings configurations. Don't worry if you guess wrong and start the test with the incorrect Flow Ring - you can change the Fan Configuration during the test procedure.

**d)   Enter the selected Flow Ring into the Gauge (same for both *One-Point* and *Multi-Point Tests*).**

In order for the DG-3 to properly display fan flow, you need to input the Duct Blaster fan model and selected Flow Ring into the gauge. To select the fan type and fan configuration being used in your test, first turn the **MODE** knob to the *Fan Select* position. The gauge display will show "-SEL" to indicate that a fan type and fan configuration have not yet been selected.  The fan type can be selected by toggling the **SELECT** Switch up. The fan configuration can be selected by toggling the **SELECT** switch down.

49



The ENERGY CONSERVATORY
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

| If the Display Shows | Description |
|---|---|
| **-SEL** | Begin fan type selection by toggling the **SELECT** switch <u>up</u> twice. |
| **8-0** | This indicates that you have chosen the Series B Duct Blaster fan, and that the fan is in the "Open" inlet configuration (i.e. no Flow Rings installed). **Note:** When depressurizing, a Flow Ring must be installed. |
|  | To change the fan inlet configuration for the Duct Blaster fan, toggle the **SELECT** switch <u>down</u>. |
| **8-1** | Series B Duct Blaster fan with Ring 1 installed. |
| **8-2** | Series B Duct Blaster fan with Ring 2 installed. |
| **8-3** | Series B Duct Blaster fan with Ring 3 installed. |

Once you have input the fan configuration, turn the **MODE** knob back to *Pressure,* and then flip the **RANGE** switch to the *2000* setting (***High Range***).

**e)   Turn on and adjust the Duct Blaster fan:**

- *DG-3: One-Point Test*

Slowly turn the knob on the fan speed controller clockwise until the Duct Blaster fan motor engages and the blades begin to turn. The fan should be pulling air out of the duct system. As the fan speed increases, duct pressure indicated on **Channel A** should also increase. Increase the fan speed until the duct system is depressurized to the chosen test pressure of -25 Pascals.

> **Note:** If you measured a baseline duct pressure (Optional Section b), you may need to adjust the test pressure value (see below).
>
> - If you measured a baseline duct pressure and are using the TECBLAST software, no adjustment is necessary.
>
> - If you measured a baseline duct pressure and you are **not** using the TECBLAST software, you will need to manually adjust the test pressure by <u>adding</u> the baseline duct pressure to the test pressure value. For example, if the measured baseline duct pressure was (-2) Pascals, the new adjusted test pressure becomes -27 Pascals  (-25 Pascals + (-2) Pascals)). In other words, during the test you need to change the duct system pressure by 25 Pascals from our starting point pressure of (-2) Pascals.

After adjusting the fan speed to depressurize the duct system by -25 Pascals, turn the **CHANNEL** knob to **Channel B**, and turn the **MODE** switch to *Flow*. The gauge will now display the *One-Point* CFM25 total leakage estimate for the duct system. If the gauge display is fluctuating too much to determine the reading, try changing the Time Averaging setting on the gauge by turning the **MODE** Switch to *Time Select*, choosing the *5* or *10* second or *Long-term* average, and then returning to the *Flow* mode. Record the CFM25 total leakage estimate and turn off the fan.

> (If the CFM flow reading on Channel B is blinking, see below):
>
> - The CFM flow reading on **Channel B** will blink when the air flow reading through the fan is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the fan configuration to match the flow rate being measured (e.g. install a smaller Flow Ring).

If you change Flow Rings, be sure to use the **Fan Select** feature to update the gauge with the new Flow Ring installed before reconducting the test.



- *DG-3: Multi-Point Test*

Slowly turn the knob on the fan speed controller clockwise until the Duct Blaster fan motor engages and the blades begin to turn. The fan should be pulling air out of the duct system. As the fan speed increases, duct pressure indicated on **Channel A** should also increase. Increase the fan speed until you achieve the highest target duct pressure (e.g. -35 Pascals) on **Channel A.** Now determine the air flow through the fan needed to create this duct pressure by first turning the **CHANNEL** switch to **Channel B,** and then turning the **MODE** knob to the ***Flow*** position. The gauge will now display the flow through the fan. Record the test readings (duct pressure and fan flow).

Turn the **CHANNEL** switch back to **Channel A** and then turn the **MODE** knob back to the ***Pressure*** setting. Now reduce the duct pressure until the duct pressure equals the next target pressure (e.g. -30 Pa). Once again determine the air flow from **Channel B** and record the test readings. Continue this procedure for each of the remaining target pressures. Turn off the fan when the final set of readings are completed.

Enter the test readings into the TECBLAST software to generate your final CFM25 total leakage estimate.

(If the CFM flow reading on **Channel B** is blinking, see below):

- The CFM flow reading on **Channel B** will blink when the air flow reading through the fan is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the fan configuration to match the flow rate being measured (e.g. install a smaller Flow Ring).

- If you change Flow Rings, be sure to use the **Fan Select** feature to update the gauge with the new Flow Ring installed before reconducting the test.

## 10.5  Using the Can't Reach Pressure Factors (*One-Point Tests*)

If you were performing a *One-Point Test* and the Duct Blaster fan was unable to depressurize the duct system by -25 Pascals because one of the smallest Flow Rings was installed (e.g. Ring 2 or 3), replace the Flow Ring with a larger Flow Ring (e.g. Ring 1) to increase the maximum air flow available from the fan. If you were not able to depressurize the duct system by –25 Pascals because the duct system is extremely leaky, use the following instructions:

- *For DG-700 Users:*

No adjustments to the test procedure above are necessary other than to make sure the gauge was in the **PR/ FL @25** mode during the *One-Point Test.* If you can not achieve the target test pressure of approximately -25 Pascals because the duct system is extremely leaky, a CFM25 total leakage estimate will automatically be displayed on **Channel B.** The leakage estimate shown on **Channel B** is determined by continuously adjusting the measured air flow from the Duct Blaster fan to a test pressure of -25 Pascals, using the real-time **Channel A** duct pressure reading and the Can't Reach Pressure Factors shown in Table 6 below.

- *For DG-3 Users:*

Take your *One-Point Test* reading at the highest achievable duct pressure. Now manually use Table 6 below to estimate the amount of air flow through the Duct Blaster fan it would take to reach the target pressure. To use Table 6, determine the flow required to maintain the highest achievable duct pressure listed in the Table. Multiply this flow by the corresponding "Can't Reach Pressure (CRP) Factor" to estimate flow that would be required to maintain a -25 Pascal duct pressure.



**The ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

Table 6:  Can't Reach Pressure Factors (-25 Pa Target)

| Duct Pressure (Pa) | CRP Factor | Duct Pressure (Pa) | CRP Factor |
|---|---|---|---|
| -24 | 1.02 | -14 | 1.42 |
| -23 | 1.05 | -13 | 1.48 |
| -22 | 1.08 | -12 | 1.55 |
| -21 | 1.11 | -11 | 1.64 |
| -20 | 1.14 | -10 | 1.73 |
| -19 | 1.18 | -9 | 1.85 |
| -18 | 1.22 | -8 | 1.98 |
| -17 | 1.26 | -7 | 2.15 |
| -16 | 1.31 | -6 | 2.35 |
| -15 | 1.36 | -5 | 2.63 |

*Example:*  With Ring 1 installed and the fan running full speed, you are able to achieve a duct system test pressure of -14 Pascals with a measured fan flow of 700 cfm. The corresponding CRP Factor for a duct pressure of -14 Pascals is 1.42. The estimated total duct leakage at a test pressure of -25 Pascals is 700 x 1.42 = 994 cfm.

$$\text{Can't Reach Pressure Factor} = \left\{ \frac{25}{\text{Current Test Pressure (Pa)} \atop \text{(Channel A)}} \right\}^{0.60}$$

**Note:**  The TECBLAST program automatically applies the CRP Factors to *One-Point Test* data.

### 10.5.a  Potential Errors In One-Point CFM25 Estimate from Using the CRP Factors:

Table 7 below show the potential errors in the *One-Point* CFM25 total leakage estimates from using the CRP factors. There are two main sources of error:

- The actual test pressure (**Channel A**) not being equal to the target pressure of -25 Pascals.
- The actual exponent of the leaks being measured differing from the assumed exponent of 0.60.

Table 7:  Error in One-Point Leakage Estimate from CRP Factor

| | | Actual exponent "n" | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.5 | 0.55 | 0.6 | 0.65 | 0.7 | 0.75 |
| Test | -5 | 14.9% | 7.7% | 0.0% | -8.4% | -17.5% | -27.3% |
| Pressure in Pa | -10 | 8.8% | 4.5% | 0.0% | -4.7% | -9.6% | -14.7% |
| (Channel A) | -15 | 5.0% | 2.5% | 0.0% | -2.6% | -5.2% | -8.0% |
| | -20 | 2.2% | 1.1% | 0.0% | -1.1% | -2.3% | -3.4% |
| | -25 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | -30 | -1.8% | -0.9% | 0.0% | 0.9% | 1.8% | 2.7% |
| | -35 | -3.4% | -1.7% | 0.0% | 1.7% | 3.3% | 4.9% |
| | -40 | -4.8% | -2.4% | 0.0% | 2.3% | 4.6% | 6.8% |



The ENERGY CONSERVATORY
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

For example, Table 7 shows that for a *One-Point* 25 Pa duct airtightness test, a 4.5% error would be introduced if the leakage estimate was determined at an actual test pressure of -10 Pa (**Channel A**), and the actual exponent of the leaks was 0.55 rather than the assumed value of 0.60.

## 10.6  Unable to Reach a Target Building Pressure During a Multi-Point Test?

If the Duct Blaster fan was unable to achieve the highest target duct pressure (e.g. -35 Pascals) because one of the smallest Flow Rings was installed (e.g. Ring 2 or Ring 3), replace the Flow Ring with a Larger Flow Ring (e.g. Ring 1) and repeat the test. If you were not able to reach the highest target pressure because the duct system is extremely leaky, take your first set of test readings the highest achievable duct pressure. Continue your test by using the remaining target pressures which are less than the highest achievable pressure. Enter these test values into the TECBLAST program to generate your total leakage estimate.

## 10.7  Before Leaving the Building

Be sure you have returned the building to its original condition before leaving. This includes removing any temporary register seals, turning HVAC controls to their original settings and closing access doors or vents opened during the test. In addition, it is highly recommended that the test procedures outlined in Chapters 14 and 15 be performed before leaving the building.



# *Chapter 11*    Conducting a Leakage to Outside Depressurization Test

This chapter covers the test procedures for conducting a **Leakage to Outside Depressurization Test**. The Leakage to Outside Test is used to measure the duct leakage rate to the outside of the building only, when the duct system is subjected to a uniform pressure. This test procedure requires simultaneous use of both a Duct Blaster and Blower Door system.

During this test procedure a Blower Door fan will be used to depressurize the building to the test pressure, while the Duct Blaster system is used to depressurize the duct system to the same pressure as the building. Because the duct system and the building are at the same pressure, there will be no leakage between the ducts and building during the leakage rate measurement.

Figure 4:  Illustration of Leakage to Outside Depressurization Test
(at a Test Pressure of -25 Pascals)
with Duct Blaster Fan Installed at Air Handler



The air flow through the Duct Blaster fan required to depressurize the duct system to the same pressure as the building (while the Blower Door is depressurizing the building to the test pressure) is the measured duct leakage rate to the outside.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

The following instructions assume you have set up the Duct Blaster system for a depressurization test as outlined in Chapter 9 above. Information on how to conduct a Leakage to Outside **Pressurization** Test (i.e. blowing air into the duct system ) is discussed in Chapter 7.

**Note:** It is possible to separately measure supply and return duct leaks by installing a temporary barrier in either the supply or return opening to the air handler cabinet. With a temporary barrier in place, each side of the duct system can be tested independently. It is also possible to separately measure supply and return leakage before the air handler or furnace unit have been installed.

## 11.1  Final Preparations (Set Up Blower Door in Building)

Install the Blower Door system in a centrally located exterior door, including a gauge to measure building pressure. You will need to prepare the building for a Blower Door test as described in the Blower Door Operation Manual including closing all exterior doors and windows, opening all interior doors, and adjusting combustion appliances to remain off during the test. The Blower Door fan should be set up to depressurize (or blow air out of) the building. Importantly, we will not be measuring air flow through the Blower Door fan during this test procedure. This means that the Blower Door system can either be set up in the standard depressurization test mode, or it can be set up in the pressurization test mode, with the fan direction switch reversed to blow air out of the building. Refer to your Blower Door manual for complete instructions on Blower Door system installation.

### *11.1.a  Building Pressure Measurements:*

During the test, you will need to monitor the change in building pressure caused by the Blower Door system. Typically the Blower Door building pressure gauge will be setup to measure building pressure with reference to the outside (this is the typical set up for a Blower Door test).

However, if you are testing a duct system that is located primarily in one unconditioned zone (e.g. a single attic or single crawlspace), you have the option of setting up the gauge to measure building pressure with reference to that zone, rather than with reference to outside. The purpose of making this change is to ensure that the duct leaks located in that zone are subjected to the full test pressure.

For example, it is possible that a crawlspace containing most of the ductwork may be significantly depressurized by air being pulled out of that zone from the Blower Door fan (through air leaks between the building and the crawlspace). In this case, you may underestimate the duct leakage rate if you are measuring building pressure with respect to outside during your test because the leaks in the crawlspace ductwork will not be subjected to the full test pressure (i.e. they will be subjected to the test pressure minus the crawlspace depressurization caused by the Blower Door fan). Changing the reference tap on the Blower Door building pressure gauge from outside to the crawlspace would eliminate the underestimation problem in this building.



- *Using a Digital Gauge to Monitor Building Pressure:*

If you are using a separate DG-700 or DG-3 gauge to monitor building pressure, connect the outside building pressure tubing to the **CHANNEL A Reference** tap.



Connect the outside building pressure tubing to the Blower Door **CHANNEL A Reference** tap. The other end of this tubing should either be run to the outside, or to the unconditioned zone which contains the majority of the ductwork.

## 11.2  Choose the Test Pressure

For the Leakage to Outside Depressurization Test, we will be simultaneously depressurizing the duct system and the building to the same test pressure. For residential duct systems, we generally recommend that -25 Pascals (-0.10 inches w.c.) be used as the test pressure. This pressure has been adopted by the majority of residential duct testing programs in the U.S. because 25 Pascals represents a typical operating pressure seen in many residential systems. In cases where 25 Pascals is not a representative pressure in the duct system being tested, it may be appropriate to use a different test pressure. For example, in small commercial HVAC systems which typically operate at higher duct pressures than residential systems, it may be appropriate to use a test pressure greater than 25 Pascals. In extremely leaky duct systems (e.g. more than 600 cfm of leakage at 25 Pascals), such as duct systems found in many basement style houses, the typical operating pressures in the duct system may be significantly less than 25 Pascals. In this case it may be appropriate to use a test pressure lower than 25 Pascals.

## 11.3  Leakage to Outside Test Procedures Using the DG-700

The following test procedure covers use of the DG-700 for the Leakage to Outside Test procedure. This procedure assumes that a test pressure of -25 Pascals is being used.

**a)  Turn on the building pressure gauge and depressurize the building to 25 Pascals.**

Turn on the Blower Door building pressure gauge and set it to measure pressure on **Channel A**. Slowly turn on the Blower Door fan and begin to depressurize the building. Increase the Blower Door fan speed until the building is depressurized to the test pressure of -25 Pascals, as measured on the building pressure gauge. In leaky buildings, you may need to remove all Flow Rings from the Blower Door fan in order depressurize the building to the test pressure. Leave the Blower Door fan running.

**Note:** If you have an APT system to control your Blower Door system, use the Cruise Control feature in the TECTITE software to maintain a building pressure of -25 Pascals.

**b)  Turn on the Duct Blaster DG-700 and put it in the proper Mode.**

Turn on the gauge by pressing the **ON/OFF** button.  Press the **MODE** button <u>once</u> to put the Duct Blaster gauge into the **PR/ FL** mode. The **PR/ FL** mode is a multi-purpose mode used to measure a test pressure on **Channel A** while simultaneously measuring air flow from the Duct Blaster fan on **Channel B**.



The ENERGY CONSERVATORY
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

**c)   Choose a Flow Ring for the Duct Blaster fan.**

Install the Flow Ring which you think best matches the needed fan flow. Installation of Flow Rings will depend on the tightness level of the duct system being tested. For example, for relatively leaky duct systems (greater than 500 CFM25), you will want to start the test using the Ring 1 configuration. As you test tighter duct systems, you will need to install Flow Rings 2

| Fan Configuration | Flow Range (cfm) for Series B DB fan |
|---|---|
| Ring 1 | 800 -   225 |
| Ring 2 | 300 -   90 |
| Ring 3 | 125 -   10 |

or 3. Refer to the Table to the right for approximate flow ranges of the fan using the various Flow Rings configurations. Don't worry if you guess wrong and start the test with the incorrect Flow Ring - you can change the Fan Configuration during the test procedure.

**d)   Enter the selected Flow Ring into the Gauge.**

In order for the DG-700 to properly display fan flow, you need to input the Duct Blaster fan model and selected Flow Ring into the gauge. Check, and adjust if necessary, the selected test Device (i.e. fan) and Configuration (i.e. Flow Ring) shown in the upper part of the gauge display to match the fan and Flow Ring being used in the test.

Press the **DEVICE** button to change the selected Duct Blaster fan.

> **Device Icon**
>
> **DB   A**                   Series A Duct Blaster fan
> **DB   B**                   Series B Duct Blaster fan

Once the fan is selected, the configuration of the fan can be selected by pressing the **CONFIG** button. The currently selected Flow Ring configuration is shown in the Config section of the gauge display.

> **Config Icon**
>
> **OPEN**          No Flow Ring (**Note:** When depressurizing, a Flow Ring must be installed.)
> **A1**            Ring 1
> **B2**            Ring 2
> **C3**            Ring3

Also be sure that **Channel B** is showing the proper air flow units for your test (this should typically be set to **CFM**). Units can be changed by pressing the **UNITS** button.

**e)   Turn on and adjust the Duct Blaster fan.**

Turn on the Duct Blaster fan by slowly turning the fan controller clockwise. The Duct Blaster fan should be pulling air out of the duct system. Increase the Duct Blaster fan speed until the pressure between the duct system and the building (**Channel A** on the Duct Blaster DG-700) reads <u>zero</u>. Leave the Duct Blaster fan running.

**f)   Re-check the building pressure.**

Re-check the building pressure gauge and if necessary, re-adjust the Blower Door fan speed to maintain a test building pressure of -25 Pascals.

**g)   Re-check the duct pressure.**

Re-check the Duct Blaster system and if necessary, re-adjust the Duct Blaster fan until the pressure between the duct system and the building reads zero (**Channel A** on the Duct Blaster DG-700). **Channel B** on the Duct Blaster DG-700 will now display the CFM25 leakage to outside estimate. If the leakage estimate is fluctuating more than desired, try changing the Time Averaging setting on the gauge by pressing the **TIME AVG** button and choosing the *5* or *10* second or *Long-term averaging* period. Record the CFM25 leakage to outside estimate and turn off both the Blower Door and Duct Blaster fans.



(If "LO" appears on **Channel B**, see below).

Whenever **"LO"** appears on **Channel B** in the **PR/ FL** Mode, the DG-700 can not display a reliable fan flow reading. The message **"LO"** appears on **Channel B** under the following two conditions:

- "LO" is continuously displayed when there is negligible air flow through the test device.
- "LO" alternates with a flow reading when the air flow reading through the device is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the test device configuration to match the flow rate being measured (e.g. install a smaller Flow Ring).

**Note:** If you change the Flow Rings on the fan, be sure to change the Configuration setting on the gauge to match the installed Ring.

## 11.4  Leakage to Outside Test Procedures Using the DG-3

The following test procedure covers use of the DG-3 for the Leakage to Outside Test procedure. This procedure assumes that a test pressure of -25 Pascals is being used.

**a)  Turn on the building pressure gauge and depressurize the building to 25 Pascals.**

Turn on the Blower Door building pressure gauge and set it to measure pressure on **Channel A**. Slowly turn on the Blower Door fan and begin to depressurize the building. Increase the Blower Door fan speed until the building is depressurized to the test pressure of -25 Pascals, as measured on the building pressure gauge. In leaky buildings, you may need to remove all Flow Rings from the Blower Door fan in order depressurize the building to the test pressure. Leave the Blower Door fan running.

**Note:** If you have an APT system to control your Blower Door system, use the Cruise Control feature in the TECTITE software to maintain a building pressure of- 25 Pascals.

**b)  Turn on the Duct Blaster DG-3 and put it in the proper Mode.**

Turn the **CHANNEL** knob to **A**, turn the **MODE** switch to *Pressure*, and put the **RANGE** switch in the *High Range* position (2000 Pa).

**c)  Choose a Flow Ring for the Duct Blaster fan.**

Install the Flow Ring which you think best matches the needed fan flow. Installation of Flow Rings will depend on the tightness level of the duct system being tested. For example, for relatively leaky duct systems (greater than 500 CFM25), you will want to start the test using the Ring 1 configuration. As you test tighter duct systems, you will need to install Flow Rings 2

| Fan Configuration | Flow Range (cfm) for Series B DB fan |
|---|---|
| Ring 1 | 800 -    225 |
| Ring 2 | 300 -    90 |
| Ring 3 | 125 -    20 |

or 3. Refer to the Table to the right for approximate flow ranges of the fan using the various Flow Rings configurations. Don't worry if you guess wrong and start the test with the incorrect Flow Ring - you can change the Fan Configuration during the test procedure.

**d)  Enter the selected Flow Ring into the Gauge.**

In order for the DG-3 to properly display fan flow, you need to input the Duct Blaster fan model and selected Flow Ring into the gauge. To select the fan type and fan configuration being used in your test, first turn the **MODE** knob to the *Fan Select* position. The gauge display will show "-SEL" to indicate that a fan type and fan configuration have not yet been selected. The fan type can be selected by toggling the **SELECT** Switch up. The fan configuration can be selected by toggling the **SELECT** switch down.

58


The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

| If the Display Shows | Description |
|---|---|
| -SEL | Begin fan type selection by toggling the **SELECT** switch up twice. |
| 8-0 | This indicates that you have chosen the Series B Duct Blaster fan, and that the fan is in the "Open" inlet configuration (i.e. no Flow Rings installed). **Note:** When depressurizing, a Flow Ring must be installed.<br><br>To change the fan inlet configuration for the Duct Blaster fan, toggle the **SELECT** switch down. |
| 8-1 | Series B Duct Blaster fan with Ring 1 installed. |
| 8-2 | Series B Duct Blaster fan with Ring 2 installed. |
| 8-3 | Series B Duct Blaster fan with Ring 3 installed. |

**e)   Turn on and adjust the Duct Blaster fan.**

Turn on the Duct Blaster fan by slowly turning the fan controller clockwise. The Duct Blaster fan should be pulling air out of the duct system. Increase the Duct Blaster fan speed until the pressure between the duct system and the building (**Channel A** on the Duct Blaster DG-3) reads zero. Leave the Duct Blaster fan running.

**f)   Re-check the building pressure.**

Re-check the building pressure gauge and if necessary, re-adjust the Blower Door fan speed to maintain a test building pressure of -25 Pascals.

**g)   Re-check the duct pressure.**

Re-check the Duct Blaster system and if necessary, re-adjust the Duct Blaster fan until the pressure between the duct system and the building reads zero (**Channel A** on the Duct Blaster DG-3). After re-adjusting the fan speed, turn the **CHANNEL** knob to **Channel B**, and turn the **MODE** switch to *Flow*. The gauge will now display the CFM25 leakage to outside estimate. If the gauge display is fluctuating too much to determine the reading, try changing the Time Averaging setting on the gauge by turning the **MODE** Switch to *Time Select*, choosing the *5* or *10* second or *Long-term* average, and then returning to the *Flow* mode. Record the CFM25 leakage to outside estimate and turn off both the Blower Door and Duct Blaster fans.

(If the CFM flow reading on **Channel B** is blinking, see below):

- The CFM flow reading on **Channel B** will blink when the air flow reading through the fan is unreliable (i.e. you are trying to measure a flow outside of the calibrated range of the test device in its current configuration). If possible, you should change the fan configuration to match the flow rate being measured (e.g. install a smaller Flow Ring).

- If you change Flow Rings, be sure to use the **Fan Select** feature to update the gauge with the new Flow Ring installed before reconducting the test.

## 11.5  What If You Can Not Depressurize the Building to the Test Pressure with the Blower Door Fan?

If the Blower Door system is unable to depressurize the building to the test pressure because one of the Flow Rings was installed on the Blower Door fan, remove the Flow Ring and repeat the test. If you are not able to depressurize the building to the test pressure because the building is too leaky, then you will need to conduct the test at the highest achievable building pressure and use the Can't Reach Pressure Factors below to estimate the final duct leakage rate.



Table 8:  Can't Reach Pressure Factors (-25 Pa Target)

| Duct Pressure (Pa) | CRP Factor | Duct Pressure (Pa) | CRP Factor |
|---|---|---|---|
| -24 | 1.02 | -14 | 1.42 |
| -23 | 1.05 | -13 | 1.48 |
| -22 | 1.08 | -12 | 1.55 |
| -21 | 1.11 | -11 | 1.64 |
| -20 | 1.14 | -10 | 1.73 |
| -19 | 1.18 | -9 | 1.85 |
| -18 | 1.22 | -8 | 1.98 |
| -17 | 1.26 | -7 | 2.15 |
| -16 | 1.31 | -6 | 2.35 |
| -15 | 1.36 | -5 | 2.63 |

*Example:*  *With the Blower Door fan running at full speed (& no Flow Rings attached), you are only able to depressurize the building to 18 Pascals. While the Blower Door is depressurizing the building to 18 Pascals, adjust the Duct Blaster fan to create zero pressure between the duct system and the building. At this point the measured Duct Blaster fan flow is 450 cfm. The corresponding CRP Factor for a building pressure of 18 Pascals is 1.22. The estimated duct leakage to outside at a test pressure of -25 Pascals is 450 x 1.22 = 549 cfm.*

$$\text{Can't Reach Pressure Factor} = \left\{ \frac{25}{\substack{\text{Current Test Pressure (Pa)} \\ \text{(Channel A)}}} \right\}^{0.60}$$

**Note:**  The TECBLAST program automatically applies the CRP Factors to test data.

## 11.6  What If You Can Not Depressurize the Duct System to the Same Pressure as the Building with the Duct Blaster Fan?

If the Duct Blaster fan was unable to create a pressure difference of zero between the duct system and the building (while the Blower Door is depressurizing the building to the test pressure) because one of the smallest Flow Rings was installed (e.g. Ring 2 or Ring 3), install Ring 1 and repeat the test. If you were not able to create a pressure difference of zero because the duct system is extremely leaky to the outside, then the test will need to be performed at a lower building pressure and the Can't Reach Pressure Factors (Table 8) used to estimate the final duct leakage rate.

*Example:*  *Because you were unable to create a pressure difference of zero between the duct system and the building, re-adjust the Blower Door to depressurize the building to a lower pressure (e.g. -20 Pascals). While the Blower Door is running, adjust the Duct Blaster fan to create a pressure difference of zero between the duct system and the building. If you are still unable to create a pressure difference of zero, repeat the test at an even lower building pressure (e.g. -15 Pascals). Finally, multiply the flow through the Duct Blaster fan needed to create a pressure difference of zero by the appropriate CRP factor.*

60



*For example, with the Blower Door depressurizing the building to -15 Pascals, the flow through the Duct Blaster fan needed to create a pressure difference of zero (between the duct system and the building) is 600 cfm. The corresponding CRP Factor for a building pressure of -15 Pascals is 1.36. The estimated duct leakage to outside at a test pressure of -25 Pascals is 600 x 1.36 = 816 cfm.*

**Note:** The TECBLAST program will automatically apply the CRP Factors to test data.

## 11.7  Before Leaving the Building

Be sure you have returned the building to its original condition before leaving. This includes removing any temporary register seals, turning HVAC controls to their original settings and closing access doors or vents opened during the test. In addition, it is highly recommended that the test procedures outlined in Chapters 14 and 15 be performed before leaving the building.



# *Chapter 12*    **Finding Duct Leaks**

## 12.1  Using a Theatrical Fog Machine

One of the most effective ways to find leaks in a duct system is to use a theatrical fog machine while **pressurizing** the duct system with the Duct Blaster fan. With the registers and grilles temporarily sealed off, the fog machine is used to inject a non-toxic theatrical fog through the Duct Blaster fan and into the duct work. The theatrical fog is pushed out of the leakage sites in the duct system visually demonstrating the location and extent of the duct leakage problem. Use of the fogger helps crews find hidden leakage sites in attic and crawlspace ducts, as well as makes a fantastic presentation for homeowners and builders. Theatrical fog machines are available from many local theatre supply and electronics outlets.



**Note:**  Typically only a small amount of smoke is needed to create a good presentation. When using a theatrical fogger, inject the fog stream toward the edge of the fan housing and not directly into the Duct Blaster fan motor. In addition, always clean off any theatrical fog residue from the Duct Blaster flow sensor, fan motor and fan housing after using a fog machine.

## 12.2  Using a Handheld Smoke Puffer

The use of a handheld smoke puffer is often helpful in finding duct leaks. With the building air handler running, squirt small puffs of smoke toward suspected leakage sites and watch to see if the smoke gets sucked into the leak (return leak) or pushed away from the leak (supply leak). With a piece of tubing attached to the smoke puffer, you can often reach deep into corners or in hard to reach spots. Handheld smoke puffers are available from The Energy Conservatory.





**Note:**  Smoke from the chemical puffer is very corrosive. Do not store the puffer in a closed container with other items, especially tools or gauges.

**The ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

# *Chapter 13*    Using the Duct Blaster as a Powered Capture Hood

In addition to measuring duct airtightness, the Minneapolis Duct Blaster can be used as a powered capture hood to measure total air handler flow, as well as air flows through supply and return registers, exhaust fans and other air flow devices.

## 13.1  Measuring Total System Air Flow (Pressure Matching Method)

This procedure is used to measure total air flow through an air handler. **Note:** If you are using a DG-700, the gauge has a built-in mode (**PR/ AH**) which can be used for making measurements of total air handler flow with a Duct Blaster fan. Refer to the DG-700 manual for specific operating instructions.

### Part 1: Measure the Normal System Operating Pressure (NSOP)

-   Turn off the air handler fan.
-   Open a window or door between the building and outside to prevent pressure changes in the building during the test.
-   If the air handler fan is installed in an unconditioned zone (e.g. crawlspace, attic), open any vents or access doors connecting that zone to the outside (or to the building) to prevent pressure changes in the zone during the test.
-   Make sure all supply and return registers are open and untapped. Replace filters if they are dirty (or keep dirty filters in place if you want to measure flow in a "as found" condition).
-   Insert a static pressure probe into the supply plenum, or in a main supply trunk line a few feet away from the supply plenum. Make sure the static pressure probe is pointing into the air flow created by the air handler fan.
-   Connect a piece of tubing to the static pressure probe. Connect the other end of the tubing to the **Channel A Input** tap on the digital pressure gauge.
-   The **Channel A Reference** tap should be connected to the inside of the building, or it can be connected to an unconditioned zone containing the air handler provided that the zone remains at the same pressure as the building during the test.
-   Turn on the air handler and measure the Normal System Operating Pressure (**NSOP**) in the duct system using **Channel A**. If the **NSOP** is fluctuating too much to determine the reading, try using the *5* or *10* second or *L*ong-term time average setting on the gauge. Record the **NSOP** and turn off the air handler. Do not move the static pressure probe because you will need to use it in Part 3 of this test.

### Part 2: Connect the Duct Blaster Fan to the Duct System

The Duct Blaster fan is typically installed at the air handler cabinet. However, if this test is being performed on a single return duct system, and the return ductwork is substantially airtight, the Duct Blaster fan may be installed at the single return.



**Option 1: Installing at the Air Handler Cabinet**



- Open the air handler cabinet access panel. Seal off the return opening in the cabinet from the air handler fan using tape and cardboard.
- Now install the Duct Blaster in place of the air handler cabinet access door as described in *Section 5.2.b Option 2*. In this configuration, all return air flow will be moving through the Duct Blaster fan, with the return ductwork effectively sealed off from the supply system.
- Connect a piece of tubing to the brass pressure tap on the Duct Blaster fan housing. Connect the other end of the tubing to the **Channel B Input** tap.
- The **Channel B Reference** tap should be connected to the space where the Duct Blaster fan is installed. If the Duct Blaster fan and gauge are located in the same space, leave the **Channel B Reference** tap open.



**Note:** If the air flow exiting from the Duct Blaster is severely obstructed by the air handler fan or other air handler components, this may significantly reduce the total flow capacity of the Duct Blaster. If this is a problem, try attaching the Duct Blaster fan to the blower compartment access opening using a small cardboard box rather than a flat piece of cardboard. This will tend to increase the Duct Blaster fan flow by providing less restriction to air flow as it enters the air handler blower compartment.

**Option 2: Installing at the Single Central Return**



- An optional 20" x 20" filter grille attachment panel is available from TEC to provide for quick attachment of the Duct Blaster fan to the filter slot of a single return.
- To use the attachment panel, first open the filter grille door, remove the existing filter, and push the attachment panel into the open filter slot. The H-channel gasket on the edges of the attachment panel should provide an airtight seal between the panel and the filter slot, and should hold the panel in place.
- You may now secure the Duct Blaster fan directly to the attachment panel using the 4 clips mounted on the panel. The clips are pushed down onto the exhaust flange of the Duct Blaster fan.

**Note:** The Duct Blaster fan can also be attached to the filter slot using cardboard and tape.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

**Part 3: Match the Normal System Operating Pressure (NSOP)**

- Turn the air handler fan back on and re-measure the operating duct pressure using **Channel A** (be sure the static pressure probe has not been moved from **Part 1** above). Now turn on the Duct Blaster fan and adjust the fan speed until the operating duct pressure on **Channel A** equals the normal operating duct pressure (**NSOP**) measured in **Part 1** above. Once adjusted in this way, determine the air flow through the Duct Blaster fan by measuring the fan pressure on **Channel B** and using the flow table, or by using the digital gauge's fan flow feature.
- The measured Duct Blaster fan flow is your estimate of the total system air flow including flow through return registers, plus return duct leakage, plus leakage at the air handler access panel. The only component of total system airflow that is not included in this measurement is any leakage on the return side of the air handler cabinet (other than the air handler access panel).

## 13.2  Measuring Return Register and Exhaust Fan Flows

The first step is to construct a flow box to seal around the return register (or exhaust fan) where you want to make your measurement. One easy option is to use a cardboard box, but the hood from a commercial flow capture hood may also work well. The open end of the flow box or hood should have rough dimensions which are at least 2 times the register dimensions, and the depth of the box should be at least the average of the two opening dimensions.

**Part 1: Construct a Flow Box and Make Tubing Connections**

- Cut a square hole in the back side of cardboard flow box which is approximately one inch smaller than the dimensions of the square transition piece. Tape and seal the square transition piece over the hole you cut in the box.
- Attach the open side of the round transition piece to the exhaust flange of the Duct Blaster. Connect the open end of the flex duct to the square transition piece on the flow box. 
- Install the Flow Ring (on the fan inlet) which you think will provide the proper flow range for the test.
- Punch a small hole (1/4") in one of the corners of the open end of the box and insert a piece of tubing into the hole. Connect the other end of the tubing to the **Channel A Input** tap. The **Channel A Reference** tap should be left open to the room where the register or exhaust fan is located.
- Connect a piece of tubing to the brass pressure tap on the Duct Blaster fan housing. Connect the other end of the tubing to the **Channel B Input** tap.
- The **Channel B Reference** tap should be connected to the space where the Duct Blaster fan is installed. If the Duct Blaster fan and gauge are located in the same space, leave the **Channel B Reference** tap open.


**The ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

*Chapter 13    Using the Duct Blaster as a Powered Capture Hood*

### Part 2: Install Flow Box and Zero Out the Box Pressure

- Turn on the air handler fan (or exhaust fan), and place the flow box tightly over the return register (or exhaust fan grill). If the wall or ceiling surface is very uneven, you may want to attach a piece of gasket to the open end of the flow box to make a tighter seal - The Energy Conservatory has gasket available.
- Now turn on the Duct Blaster fan and slowly adjust the fan speed until the pressure on **Channel A** (the pressure difference between the flow box and the room) equals <u>zero</u>. Once adjusted in this way, determine the flow through the Duct Blaster fan by measuring the fan pressure on **Channel B** and using the flow table, or by using the digital pressure gauge's fan flow feature.
- The Duct Blaster fan flow at this point is your estimate of air flow through the return register (or exhaust fan) tested.

**Note:** The Energy Conservatory manufactures an Exhaust Fan Flow Meter which will measure exhaust fan flow rates up to 120 cfm with an accuracy of 10%.

## 13.3 Measuring Supply Register Flows

As in measuring return register flows, you will need to construct a flow measuring box for this method. One easy option is to use a cardboard box, but a hood from a commercial flow capture hood may also work well. The open end of the flow box or hood should have rough dimensions which are at least 2 times the register dimensions, and the depth of the box should be at least the average of the two opening dimensions.

### Part 1: Construct a Flow Box and Make Tubing Connections

- Cut a square hole in the back side of cardboard flow box which is approximately one inch smaller than the dimensions of the square transition piece. Tape and seal the square transition piece over the hole you cut in the box. 
- Insert the white foam flow conditioner into the round transition piece. Attach the open side of the round transition piece, along with one of the Flow Rings, to the <u>inlet</u> flange of the Duct Blaster fan. Use the Flow Ring which you think will provide the correct flow range. Connect the open end of the flex duct to the square transition piece on the flow box.
- Punch a small hole (1/4") in one of the corners of the open end of the box and insert a piece of tubing into the hole. Connect the other end of the tubing to the **Channel A Input** tap. The **Channel A Reference** tap should be left open to the room where the register or exhaust fan is located. 
- Connect a piece of tubing to the brass pressure tap on the Duct Blaster fan housing. Connect the other end of the tubing to the **Channel B Input** tap.
- The **Channel B Reference** tap should be connected to the plastic pressure tap on the round transition piece using an additional piece of tubing.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

### Part 2: Install Flow Box and Zero Out the Box Pressure

- Turn on the air handler fan and place the flow box tightly over the supply register. If the wall or ceiling surface is very uneven, you may want to attach a piece of gasket to the open end of the flow box to make a tighter seal - The Energy Conservatory has gasket available.

- <u>Make sure that flex duct is stretched relatively straight (for about 4 feet) where the flex duct is connected to the Duct Blaster fan.</u>

- Now turn on the Duct Blaster fan and slowly adjust the fan speed until the pressure on **Channel A** (the pressure difference between the flow box and the room) equals <u>zero</u>. Once adjusted in this way, determine the flow through the Duct Blaster fan by measuring the fan pressure on **Channel B** and using the flow table, or by using the digital gauge's fan flow feature.

- The Duct Blaster fan flow at this point is your estimate of air flow through the supply register tested.



# Chapter 14    Pressure Balancing and System Performance Testing

## 14.1  Testing for Pressure Imbalances Caused By Forced Air System Flows

Air handler fans commonly move 500 to 2,000 cubic feet of air per minute (CFM). Pressure imbalances within the building can be caused by air hander fan operation if supply and return air flows to each part of the building are not in balance. Pressure imbalances within the building can significantly increase infiltration rates, contribute to radon and moisture entry, create durability problems, and cause potential combustion appliance spillage and backdrafting. In addition, research on combustion appliances has found that very small negative pressures (as low as 2 Pascals) can cause spillage and backdrafting in natural draft appliances.

Building pressure imbalances can also be caused by duct leakage to the outside. If either the supply or return air ductwork has leaks to the outside, air will be forced through these leaks when the air handler fan is operating.  If the leaks are in the supply ducts, building air will be exhausted to the outside through the leaks and this will tend to depressurize the building. If the leaks are in the return system, outside air will be sucked into the leaks and the building will tend to be pressurized.  If there are equal amounts of leakage in both the supply and return, no change in building pressure will occur, even though large energy losses may result.

Below are a set of test procedures used to help identify pressure imbalances caused by leaks between the duct system and the outside, and by imbalanced supply and return air flows throughout a building. These tests are very sensitive to wind effects, and on windy days it can be very difficult to get accurate results.

### 14.1.a  Dominant Duct Leak Test:

This test measures whole building pressurization or depressurization caused by duct leakage to the outside during operation of the air handler fan. A pressure change due to duct leakage can cause safety, durability, comfort, and efficiency problems.

- Be sure all exterior doors and windows in the building are closed. Replace all HVAC filters (be sure they are clean). Open all interior doors and check that all exhaust fans and the air handler fan are off.
- Set up the digital pressure gauge to measure the building pressure With Respect To (WRT) outside. Connect tubing from the bottom (Reference) pressure tap on **Channel A** to the outside. The **Channel A** input tap should remain open to the building. Set up the gauge to measure pressures.
- Turn on the air handler fan and record the change in building pressure caused by operation of the fan. **Note:** The DG-700 gauge has a built-in "Baseline" feature which makes it easy to zero out the existing building baseline pressure and display the actual change in building pressure caused by turning on the air handler fan. See the DG-700 manual for specific operating instructions.
- Repeat this test several times by turning the air handler on and off for better certainty.

- Greater leakage on the return side of the duct system will cause the building to become pressurized since the return ductwork is drawing outside air into the ductwork. In this case, there will be a positive reading on pressure gauge. The size of the pressure change will depend on both the amount of imbalanced duct leakage and the tightness of the building being tested (see Figure 5 in Chapter 15).

- Greater leakage on the supply side of the system will cause the building to become depressurized since the supply ductwork is exhausting building air to the outside, just like an exhaust fan. In this case, there will be a negative reading on the pressure gauge. The size of the pressure change will depend on both the amount of imbalanced duct leakage and the tightness of the building being tested (see Figure 5 in Chapter 15).



In cold climates, pressurizing a building to even 1 Pascal could lead to moisture problems caused by forcing warm, moist air into the walls and attic where it can condense on cold surfaces. In warm humid climates, depressurization by 1 Pa can also cause severe moisture problems from warm moist outside air being drawn into the walls where it can condense on the backside of cooled gypsum board. If there are natural draft combustion appliances, or if radon is a problem, depressurizing a building by as little as 2 Pascals may also be a problem.

If there is no change in building pressure, this means that there is either equal supply and return leakage to the outside, no leaks to the outside, or the building itself is too leaky for the imbalanced duct leakage to create a measurable pressure change.

**Note:** For APT users, a prototype software program called ONOFF is available to help precisely measure small changes in building or room pressures. The program uses a signal averaging technique which significantly reduces noise, particularly in windy weather, allowing for precise measurement of small pressure changes. Contact The Energy Conservatory for more information.

### 14.1.b  Master Suite Door Closure:

This test measures the effect of closing the master suite door on the pressure in the main body of the building. The master bedroom is often the largest room in a building and can contain multiple supply registers while having no returns. Closing of bedroom doors can restrict the supply air pathway back to the air handler, causing bedrooms to become pressurized while other parts of the building may become depressurized. Repeat this test for other building areas that contain large numbers of registers and can be closed off from the main body of the building with one door (e.g. a basement door when the basement has supply registers).

- Keep the gauge set up to measure the pressure between the main body of the building WRT outside.
- With air handler still running, close the master suite door.
- Record the <u>pressure change</u> caused by closing the master suite door. (Large impacts from Master Suite Door Closure are most common in single and double return houses.)
- Consider pressure relief if the Master Suite door is frequently closed and causes the pressure in the main body of the building to change by 1 Pascal or more in either direction.

### 14.1.c  All Interior Doors Closed:

This test measures the added effect of closing all interior doors on the pressure in the main body of the building.

- Keep the gauge set up to measure the pressure between the main body of the building WRT outside.
- With the air handler still running, close all interior doors.
- Record the <u>pressure change</u> caused by closing all interior doors.
- Consider pressure relief if closing all the doors causes the pressure in the main body of the building to change by 2 Pascals or more in either direction.

### 14.1.d  Room to Room Pressures:

This test measures the pressure difference between each room in the building and the main body, with the air handler operating. Excessive pressurization in rooms can create durability problems by driving moisture into walls, ceilings and floors. Excessive depressurization in rooms can pull outside moisture into building components in humid climates. Pressure imbalances can also lead to large increases in building infiltration rates.

69



- Close all interior doors and walk around the building with the digital pressure gauge.
- Connect a piece of tubing to the **Channel A** Input tap and leave the **Channel A** Reference tap open to the room.
- While standing in the main body of the building, place the open end of the tubing under each door (including the combustion appliance room and/or basement).
- Record the pressure difference from each room WRT the main body.
- Consider pressure relief for any rooms pressurized or depressurized by 3 Pa or more with respect to the main body of the building.

**Note:** If there are combustion appliances in a depressurized area (i.e. fireplaces, furnace or water heater), their ability to draft properly may be affected. Try to eliminate all depressurization in combustion appliance zones by finding and sealing leaks in the return ducts, plenum, filter access door and air handler cabinet, or by providing pressure relief. See Chapter 15 for more information on Combustion Safety Testing procedures.

## 14.2  System Performance Testing

Although not covered in this manual, other important test procedures should be performed whenever repairs and changes are made to the duct system.

### 14.2 a  Total System Air Flow:

The air flow rate through air handlers is a very important variable in estimating and optimizing the performance of heat pumps, air conditioners and furnaces. Many studies of residential systems have shown low air flow to be a common problem. **In addition, sealing duct leaks will commonly result in reduced total system air flow, especially if the duct system is sized improperly.**

There are a number of methods to measure total system air flow including the Duct Blaster® pressure matching method (see Chapter 13), the temperature rise method, system static pressure and fan curve, as well as a new direct flow measuring tool (TrueFlow™ Air Handler Flow Meter) available from TEC. If the duct system is substantially airtight, directly measuring supply or return air flows with a calibrated flow capture hood may also be used to estimate total system airflow.

**Note:** Research has shown that in most cases, the temperature rise, fan curve and flow capture hood methods are much less accurate than either the Duct Blaster or TrueFlow methods.

### 14.2.b  System Charge:

Having the proper amount of refrigerant installed in a heat pump or air conditioning system is another critical variable in determining system efficiency, as well the longevity of the system compressor. Numerous studies have shown the incorrect amount of system charge to be a common installation problem.

### 14.2.c  Airflow Balancing:

Verification that proper air flow is being delivered to each room in a building is another important component of a complete system assessment. Air flow rates are commonly measured using a calibrated flow capture hood.


The ENERGY CONSERVATORY
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

# *Chapter 15*    **Combustion Safety Testing**

## 15.1  Overview

Buildings with natural draft combustion appliances should be routinely tested to ensure that the spillage of combustion products into the building is unlikely. Combustion safety testing is critical because of the potential for severe health effects from improperly venting appliances, including carbon monoxide poisoning.

Spillage of combustion products into the building can be caused by a variety of conditions including:

- Blocked or partially blocked chimneys, vents, or vent connectors.
- Improper equipment installation.
- Cracked heat exchangers.
- Leaks in the venting system (disconnected flue pipes, open cleanest door etc.).
- Low vent temperatures.
- Combustion appliance zone depressurization. As buildings are made tighter, it becomes easier for exhaust fans and forced air system imbalances to create potentially hazardous depressurization conditions.

Many cases of improperly venting combustion appliances have been related to depressurization (or negative pressures) in the room that contains the combustion appliance. Depressurization can be caused by exhaust fans, dryers, imbalanced forced air distribution systems, and forced air system duct leakage. As buildings (or combustion appliance rooms) are made tighter, these problems can be made worse, although very leaky buildings can also have venting problems related to depressurization. Figure 5 below estimates the amount of depressurization that can be caused by various exhaust fan flows. For example, from Figure 5 we can see that a 400 cfm exhaust fan will depressurize a 2,500 CFM50 building (or room) to approximately 3 Pascals. That same 400 cfm fan would produce over 10 Pascals of depressurization in a 1,000 CFM50 building.

The presence of code approved combustion air intakes does not ensure that venting problems will not occur. Significant combustion room depressurization is frequently found even after code approved combustion air intakes have been installed. Passive combustion room air intakes typically do not provide sufficient airflow to relieve negative pressures caused by distribution imbalances, duct leakage, or large exhaust appliances. For example, a typical 6" passive inlet can at best supply only about 50 cfm at a 5 Pa negative building pressure. And because passive air intakes are often poorly installed (i.e. many sharp bends, long runs), they typically provide much lower flows than designed. Building codes typically give little or no guidance on how one would design a combustion air opening when competing exhaust appliances are present (the 2000 Minnesota Energy Code is the only code we are aware of to give such guidance).

The only way to be reasonably sure that venting problems will not occur in a building is to perform combustion safety tests. Described below is a test procedure designed to locate existing or potential combustion safety problems in buildings. **These procedures are offered only as an example of what other organizations in North America typically recommend for testing. The Energy Conservatory assumes no liability for their use, and contractors should have a working knowledge of local codes and practices before attempting to use the procedures outlined below.**

If combustion safety problems are found, tenants and building owners should be notified immediately and steps taken to correct the problem including notifying a professional heating contractor if basic remedial actions are not available. Remember, the presence of elevated levels of carbon monoxide in ambient building air or in combustion products is a potentially life threatening situation. **Building or duct sealing work should not be undertaken until existing combustion safety problems are resolved, or unless air sealing is itself being used as a remedial action.**



Figure 5



This chart can be used to estimate the amount of house depressurization caused by operating exhaust fans. To use the chart, find the intersection between the airtightness (CFM50) of the house and the cfm capacity of the exhaust fans in question. The amount of depressurization caused by the fan(s) is read off the diagonal house depressurization lines. For example, a 400 cfm kitchen range hood operating in a house with an airtightness level of 2,500 CFM50 would depressurize the house by approximately 3 Pa relative to the outside. This same fan operating in a 1,000 CFM50 house would produce over 10 Pa of depressurization.

Note:   This chart was generated by assuming that all houses have a "House Leakage Curve" with an exponent (or slope) of n = 0.65,

## 15.2  Test Procedures

This procedure is not intended to cover all circumstances you will find in the field. A basic understanding of the dynamic interactions between building pressures, air flow and mechanical system operation is required to fully utilize the procedures presented below.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

### *15.2.a  Measure Ambient CO Level in Building:*

- Zero your digital CO tester outside before entering the building. CO tester should have 1 PPM resolution.
- Measure the ambient CO level in all occupied areas of the building. Be sure to measure ambient CO levels in kitchens and in combustion appliance rooms.
- Investigate any ambient CO levels above 2 ppm.  **Note:**  Areas close to very busy streets may have ambient CO levels above 2 ppm.
- Maximum CO concentration guidelines:

9 ppm for 8 hour exposure (EPA)
35 ppm for 1 hour exposure (EPA)
200 ppm single exposure (OSHA)

***CO concentrations at or above these levels requires immediate remedial action.***

### *15.2.b  Survey of Combustion Appliances:*

- Walk through the building and survey all combustion appliances including furnaces, water heaters, fireplaces, woodstove and auxiliary heating units, dryers and cooking stoves.
- Write down the following information on a survey form:

  - Location, type and input of combustion appliances.
  - Signs of visible deterioration and leaks in flue pipes and connections.
  - Presence of gas leaks, signs of spillage or flame roll-out.
  - Location, size and operable condition of combustion air supply(s).
  - Evidence of rusted interior surfaces of heat exchangers.

***Gas or fuel leaks are a very serious safety problem requiring immediate remedial action.***

### *15.2.c  Survey of Exhaust Fans:*

- Walk through building and note the location and rated capacity (or estimated capacity) of  all exhaust fans including kitchen and stove fans, bath fans, dryers, whole house vacuum systems, attic vent fans (not including whole house ventilation fans) etc.

### *15.2.d  Measure Worst Case Fan Depressurization:*

With this test procedure, the goal is to measure worst case depressurization in all combustion rooms with natural draft appliances and fireplaces. This measurement gives us an indication of the likelihood of exhaust and air handler fans causing the combustion appliances to backdraft and spill. The procedures below measure worst case depressurization under 3 separate operating conditions; running exhaust fans only, running exhaust and air handler fans, and running the air handler fan only. These tests are very sensitive to wind effects, and on windy days it can be very difficult to get accurate results.

**Initial Preparation**

Close all exterior windows and doors and be sure furnace, water heater and other vented combustion appliances are off. Close all interior doors. Set up the digital gauge to measure the pressure difference of the combustion appliance zone (CAZ) with reference to (WRT) outside. Record the existing baseline building pressure. **Note:** The DG-700 gauge has a built-in "Baseline" feature which makes it easy to zero out the existing building baseline pressure and display the actual change in building pressure caused by fan operation. See the DG-700 manual for specific operating instructions.



**1. Exhaust Fans Only**

Turn on all exhaust fans found in the survey above (for dryer, clean out lint filter before turning on). Now determine the worst case position of interior doors with the smoke test below:

> ***Smoke Test:*** While standing in the main body of the building, squirt smoke under each door containing an exhaust fan (except the CAZ currently being tested). If the smoke goes into the room, open the door. If the smoke comes back into the main body of the building, keep the door closed. Now squirt smoke under the CAZ door (while continuing to stand in the main body). If smoke goes into the CAZ, leave the CAZ door shut. If smoke comes back into the main body of the building, open the door.

Measure the depressurization of the CAZ WRT outside caused by turning on the exhaust fans (i.e. the change in building pressure from the baseline condition). Depressurization should not exceed the appropriate House Depressurization Limits (HDL) listed in Table 9 below. If it is windy, it is often necessary to turn fans off and on several times to obtain good pressure readings.

> ***Fireplace Zones:*** For Fireplace Zones, repeat the same procedure and measure and record depressurization of fireplace zone WRT outside from exhaust fan operation. Depressurization should not exceed the appropriate HDL listed below.

**2. Air Handler and Exhaust Fans**

With exhaust fans continuing to run, turn on the air handler fan (note: air handler fan only, do not turn on burner) and close any supply registers in combustion appliance room. For both CAZ and Fireplace Zone tests, re-determine worst case position of all interior doors with the smoke test described above. If cooling is available, be sure air handler fan is running at high speed. Repeat worst case depressurization measurements.

**3. Air Handler Fan Only**

Turn off all exhaust fans and leave air handler operating (if cooling is available, be sure air handler is running at high speed). For both CAZ and Fireplace Zone tests, re-determine worst case position of all interior doors with the smoke test described above. Repeat worst case depressurization measurements.

> ***If the HDL are exceeded for any of the worst case depressurization tests above, pressure relief is needed.*** Pressure relief could include duct system repair, undercutting of doors, installation of transfer grills, eliminating or reducing exhaust fan capacity, or instructing homeowner on safe exhaust fan operation. If negative pressures in the combustion appliance zone (or basement) are a function of return leaks in that area, check for leaks in the return ductwork, plenum, filter access door and air handler cabinet. Pay particular attention to panned under floor joists (used as returns) as they typically have many leaks.

**Note:** For APT users, a prototype software program called ONOFF is available to help precisely measure small changes in building or room pressures. The program uses a signal averaging technique which significantly reduces noise, particularly in windy weather, allowing for precise measurement of small pressure changes. Contact The Energy Conservatory for more information.



Table 9: House Depressurization Limits (HDL)

| Appliance Type | Depressurization Limit |
|---|---|
| Individual natural draft water heater (WH) | 2 Pascals |
| Natural draft WH and natural draft furnace/boiler | 3 Pascals |
| Natural draft WH and Induced Draft (ID) furnace/boiler | 5 Pascals |
| Individual natural draft furnace/boiler | 5 Pascals |
| Individual ID furnace/boiler | 15 Pascals |
| Power vented and sealed combustion appliances | >25 Pascals |

***Source:*** *CEE Appliance Safety Test Methods, MAC Part 150 Residential Sound Insulation Program, Mpls, MN.*

### 15.2.e  Spillage Test (natural draft and induced draft appliances):

This test identifies actual spillage of combustion byproducts into the living space under worst case depressurization conditions.

- With building set up in worst case depressurization mode (as specified above), fire up each combustion appliance.
- If appliances are common vented, conduct test on smallest input appliance first, then test with both appliances running.
- When burner lights, check for flame rollout (stand away from burner).
- Check for spillage (using chemical smoke) at the end of the spillage test period (see Table 10 below). For natural draft appliances, spillage is tested at the draft divertor. When an induced draft heating system is vented in common with a natural draft water heater, spillage is checked at the water heater draft divertor. For a single induced draft appliance, spillage is checked at the base of the chimney liner or flue, typically using the drip tee at the bottom of the liner.

Table 10: Spillage Test Period

| Appliance Type | Spillage Test Period (minutes) |
|---|---|
| Water heater, gravity furnace and boiler | 3.0 minutes |
| Space heater | 2.0 minutes |
| Furnace | 1.0 minutes |

***Source:*** *CEE Appliance Safety Test Methods, MAC Part 150 Residential Sound Insulation Program, Mpls, MN.*

- If spillage continues beyond the spillage test period, remove the negative pressure in combustion room by turning off fans and/or opening an exterior window or door.
- Re-check for spillage. If spillage stops, there is a pressure induced spillage problem. If spillage continues, check flue and chimney for obstructions, and check compatibility of appliance BTU input with chimney size.

  ***Spillage of combustion products beyond the spillage test period is a health and safety concern.*** If the problem is a blocked flue or chimney, or inadequately sized flue or chimney, consult a professional heating contractor. If the problem is pressure induced, provide pressure relief. Re-check for spillage following attempt to provide pressure relief. If spillage continues, contact a professional heating contractor to investigate the problem.

75



## 15.2.f  Draft Test (natural draft appliances):

This test measures flue draft pressure in the venting systems of all natural draft combustion appliances under worst case depressurization (not to be done for sealed combustion or induced draft appliances).

- Drill a small hole in the vent pipe approx. 2 feet downstream of the draft divertor or barometric damper. Insert a static pressure probe.
- Measure draft pressure (vent WRT combustion room) with Magnehelic or digital pressure gauge after 5 minutes of operation.
- Compare measured draft with minimum draft pressures below:

### Table 9:  Minimum Draft Pressures

| Outside Temp | Draft Pressure |
|---|---|
| Below 10 F | -2.50 Pa |
| 20 F | -2.25 Pa |
| 40 F | -1.75 Pa |
| 60 F | -1.25 Pa |
| 80 F | -0.75 Pa |
| Above 90 F | -0.50 Pa |

***Source:*** *CEE Appliance Safety Test Methods, MAC Part 150 Residential Sound Insulation Program, Mpls, MN.*

***If measured draft is below the minimum draft pressure above, check for flue or chimney obstructions, disconnected vents, open chimney cleanout doors etc.. Also remove sources depressurization (e.g. turn off exhaust fans) and test again to determine if CAZ depressurization is contributing to poor draft.***

## 15.2.g  Carbon Monoxide Test:

This test measures carbon monoxide levels in all operating combustion appliances.

- After 5 minutes of appliance operation, measure the CO level in the flue products of all combustion appliances.
- CO should be measured before appliance draft divertor, or barometric damper.
- CO levels should be below 100 ppm in all flues.
- For gas stoves, measure CO from oven exhaust port and 3 feet above burners with all burners running. CO level should be below 50 ppm.
- If CO found in gas stove, re-measure ambient kitchen CO after 10 minutes of stove operation.

***The presence of CO and spillage requires immediate remedial action.***

## 15.2.h  Heat Exchanger Integrity Test (Forced Air Only):

This test is used to determine if a crack or hole is present in the furnace heat exchanger. A crack or hole could allow products of combustion into the building, and/or promote carbon monoxide production through flame distortion and impingement. There are 3 main types of tests which can be performed:

### 1.  Flame Distortion Test

This test involves watching the furnace flame when the furnace air handler first turns on. Any distortion of the flame indicates a hole or crack in the heat exchanger. This test can be done in conjunction with the flame rollout



component of the spillage test. Another method for conducting a flame distortion test is to slowly extend a match up and down into each combustion chamber with the burner off and the air handler fan on, and watch for movement of the flame head.

**2.  Blocked Flue Test**

With the furnace off, block the flue ports leading from the combustion chamber to the draft divertor or barometric damper.  Squirt smoke into the combustion chamber. Turn on the furnace fan and watch to see if the smoke is disturbed when the fan comes on. Smoke movement indicates a hole or crack in the heat exchanger.

**3.  Tracer Gas Test**

A number of testing procedures exist for injecting a tracer gas into the combustion chamber (usually with the furnace fan off) and then measuring or detecting the tracer gas on the warm air side of the heat exchanger.

> ***If any of the above heat exchanger tests provides a positive indication for a cracked heat exchanger, immediate action should be taken to notify the residents of the potential danger, and a professional heating contractor should be contacted to investigate the problem.***

**Turn off fans and return appliance controls to their original settings once the test procedures have been completed.**

Special thanks to Advanced Energy, Sun Power and the Center for Energy and Environment (CEE) for their work in developing and refining the combustion safety test procedures above.



# *Chapter 16*    **Using the Duct Blaster as a Blower Door**

The Duct Blaster fan can be easily used as a Blower Door fan to test and measure the airtightness of buildings, as well as a diagnostic tool to find air leakage paths. The maximum Duct Blaster fan flow capacity of 1,500 CFM (1,350 at 50 Pa) will enable the fan to conduct complete airtightness testing procedures on many new houses which have been built to energy efficient airtightness standards. For example, a new 4,000 ft2 house built to a 1.5 Air Change per Hour at 50 Pa (ACH50) standard will require only about 800 CFM of fan capacity to perform a complete airtightness test.

The Energy Conservatory (manufacturer of the Minneapolis Blower Door) sells a nylon door panel which allows the Duct Blaster fan to be sealed into a door opening when used with the Minneapolis Blower Door adjustable aluminum door frame. The nylon panel has a smaller hole opening to accommodate the smaller diameter Duct Blaster fan. The Duct Blaster fan is supported by the middle cross bar on the aluminum frame. Because of its light weight, the Duct Blaster fan can also be easily sealed into a window opening using tape and cardboard.



When used as a Blower Door, the Duct Blaster fan will typically be operated without the flexible extension duct or the flow conditioner installed. To conduct a house depressurization test, install the Duct Blaster fan with the exhaust side of the fan on the outside of the house and the inlet side of the fan inside the house. Fan flow is determined using the Duct Blaster fan flow conversion table found in Appendix B

More information on Blower Door testing can be obtained from The Minneapolis Blower Door Operation Manual which is available from The Energy Conservatory.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

# *Appendix A*    Calibration and Maintenance

## A.1  Fan Calibration

*Series B Duct Blaster Fan Calibration Parameters (Updated January 2007):*

| Fan Configuration | Calibration Parameters |
|---|---|
| Open Fan | Flow (cfm) = **108.7** x (Fan Pressure in Pa)$^{.5032}$ |
| Ring 1 Installed | Flow (cfm) = **40.50** x (Fan Pressure in Pa)$^{.5038}$ |
| Ring 2 Installed | Flow (cfm) = **15.27** x (Fan Pressure in Pa)$^{.5064}$ |
| Ring 3 Installed | Flow (cfm) = **5.840** x (Fan Pressure in Pa)$^{.5140}$ |

**Note:** All fan flows indicated on Energy Conservatory gauges or flow tables are corrected to a standard air density of 0.075 lbs/cubic foot, and are not the actual volumetric flow going through the fan. The indicated flows are corrected to standard air density according to the CGSB Standard CAN/CG-SB-149.10-M86. The correction is done in such a way that, for particular types of leaks (where the viscosity of air is negligible and the flow exponent "n" equals 0.5), the indicated flow is independent of barometric pressure. For this type of leak, the indicated flow is the flow that would have been going through the fan if the test had been conducted at standard barometric pressure, and air temperatures were unchanged.

If the actual volumetric flow rate going through the fan is desired, multiply the flow indicated from the formula above by:



$$\sqrt{\frac{0.075}{\text{actual air density*}}} \qquad \text{(where air density is in lb/ft3)}$$

or

$$\sqrt{\frac{1.204}{\text{actual air density*}}} \qquad \text{(where air density is in Kg/m3)}$$

\* Use the density of air flowing through the fan.

**Flow Ranges and Minimum Fan Pressures (Pa)**

| Flow Ring Configuration | Flow Range (CFM) | Minimum Fan Pressure (Pa) |
|---|---|---|
| Open Fan | 1,500 – 600 | 25 Pa |
| Ring 1 | 800 – 225 | 25 Pa |
| Ring 2 | 300 – 90 | 25 Pa |
| Ring 3 | 125 – 10 | 3 Pa |

**Note:** Open Fan configuration may only be used in Pressurization mode.



The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

## A.2  Issues Affecting Fan Calibration

### *A.2.a  Fan Flow Sensor and Motor Position:*

Duct Blaster fans maintain their calibration unless physical damage occurs. Conditions which could cause the fan calibration to change are primarily damaged flow sensors, movement of the motor and blades relative to the fan housing, and leaks in the sensor or tubing running from the flow sensor to the fan pressure tap. These conditions are easily detected and should be tested for on a regular basis.

**Damaged Duct Blaster Flow Sensor**

The Duct Blaster uses a flow sensor manufactured out of thin stainless steel tubing.  The flow sensor is permanently attached to the end of the fan motor opposite the fan blades.

Duct Blaster Fan Flow Sensor



First visually confirm that the sensor is not broken or deformed due to impact. Check that the sensor is firmly attached to the motor. Next, perform a test for leaks in the sensor or the tubing connecting the sensor to the fan pressure tap.

Attach a piece of tubing to the brass pressure tap on the Duct Blaster fan housing. Leave the other end of the tubing open. Find the 3 intentional sensing holes in the flow sensor - they are evenly spaced on the back side of the sensor. Temporarily seal the 3 holes by covering them with masking tape. Next, create a vacuum in the fan pressure tubing by sucking on the open end. A vacuum in the tubing assures that the flow sensor does not leak. There is a vacuum, if by placing your tongue over the end of the tubing, the tubing sticks to your tongue. Make sure that the vacuum persists for at least 5 seconds. If a vacuum can not be created, contact The Energy Conservatory to further diagnose the sensor leakage problem.

**Duct Blaster Motor Position**

If a fan has been dropped, the motor may have shifted from its proper position in the motor mount. This can degrade the fan calibration. To test the motor position, lay the fan on its side with the flow sensor facing up and all Flow Rings removed. Place a straightedge (such as a heavy yardstick on edge) across the inlet of the fan. Use a ruler to measure the following distance and compare this measurement to the appropriate specification.

> ***Duct Blaster Fan:*** Measure the distance from the bottom of the straightedge to the tip of the motor bearing's domed cover. This distance should be in the range of 5/8[th] to 7/8[th] of an inch (see schematic below). If the motor is not in the proper position, call The Energy Conservatory for further instructions.



The **ENERGY CONSERVATORY**

DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

Figure 6:  Schematic of Series B Duct Blaster



flow sensor tubing

pressure tap

fan housing

fan blades

flow sensor

exit guard

3/4" +/- 1/8" gap measured from the inlet plane of the fan housing to the tip of the motor bearing's domed cover

motor

inlet guard / motor mount

**The ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

### A.2.b  Upstream Air Flow Conditions:

- When using the Duct Blaster fan to conduct a duct leakage depressurization test (i.e. the flex duct is connected to the inlet side of the fan), always position the fan so that the flex duct is stretched relatively straight for about 4 feet in front of the fan.
- When the fan inlet is open to the room, try to install the fan so that there is not a large obstruction within 2 feet in front of the fan.

### A.2.c  Operating Under High Backpressure Conditions:

**Note:** For most testing applications, backpressure is not a concern and can be ignored.

The term "backpressure" is used to describe the pressure that the Duct Blaster fan is working against when it is running. Backpressure is determined by measuring the static pressure difference between the air directly upstream of the fan, and the air directly exiting the fan. High backpressures are typically caused by a large restriction between the Duct Blaster fan and the location where the test pressure is being made.

Although the Duct Blaster's flow sensor was carefully designed to be affected as little as possible by variations in backpressure, under certain very high backpressure operating conditions (described below) the calibration of the fan can degrade.

**High Backpressure Conditions**

Series B Duct Blaster fans can be used in most testing applications with backpressures up to 100 Pascals with no significant effect on calibration accuracy. This is true for all fan flow configurations (Open through Ring 3), provided that the fan is operated within the accepted flow range for each configuration. The only exception to this rule is for flow measurements below 20 CFM (Ring 3 will measure down to 10 CFM). When measuring flows between 20 and 10 CFM using Ring 3, backpressures should be kept below 40 Pascals. Backpressures above these values can diminish the accuracy of the fan calibration and should be avoided.

One example of an application that could cause high backpressure is when the flexible extension duct is connected to a small, high resistance register. The high resistance register can cause the pressure in the flex duct to be very high (i.e. over 150 Pascals) even if the test pressure in the duct system is only 25 Pascals. Operating the Duct Blaster fan under these operating conditions is not advised. To avoid this problem:

- Always try to avoid connecting the Duct Blaster fan to the duct system using a relatively high resistance connection (such as a small supply register).
- If you are using a high resistance connection and suspect a high backpressure condition, try to measure the backpressure. If the measured backpressure is less than the values listed above, then there should not be a problem. If the flexible extension duct is being used, the backpressure can be easily determined by measuring the pressure difference between the room where the Duct Blaster fan is installed and pressure inside the flex duct (measured from the plastic tap on the round transition piece).



## A.3  Duct Blaster Fan Maintenance and Safety

There are several maintenance tips and procedures to ensure the proper operation of the Duct Blaster fan and to avoid any safety risks.

### A.3.a  Maintenance Checks:

- Examine the motor cooling holes for excessive dust and dirt build-up. Use a vacuum with a brush attachment to remove dust, or blow out the dust with compressed air.
- Inspect housing, blades and guards. Especially note clearance of blade tips relative to the fan housing. There should be about 1/4 to 1/8 inch of clearance.
- Inspect electrical wiring and electrical connections on the fan and the fan speed controller.

### A.3.b  General Operational Notes and Tips:

- The Duct Blaster fan motor is <u>not</u> a continuous duty motor and should <u>not</u> be run for extended periods of time (more than 2 hours at one time).
- The fan should not be left running unattended.
- Do not use ungrounded outlets or adapter plugs.
- Do not operate if the motor, controller or any of the electrical connections are wet.
- Keep people and pets away from the fan when it is operating.

**<u>The Duct Blaster fan is a very powerful and potentially dangerous piece of equipment if not used and maintained properly.</u>** Carefully examine the fan before each use. If the fan housing, fan guards, blade, controller or cords become damaged, do not operate the fan until repairs have been made. Contact The Energy Conservatory if there are any unusual noises or vibrations while the fan is running.

## A.4  Calibration and Maintenance of Digital Pressure Gauges

### A.4.a  Digital Gauge Calibration:

Re-calibration of digital pressure gauges is recommended every 12 months. Gauges should be sent back to The Energy Conservatory for re-calibration. It is also a good idea to perform gauge comparisons between calibrations, especially when damage is suspected (e.g. when a gauge has been dropped).

**Digital Gauge Comparison**

This technique is used to compare the readings of two digital gauges when they are both connected to the same pressure source. When two gauges are being compared, you should expect them to agree within their specifications:

> <u>DG-3 Accuracy Specifications:</u>
>
> Low Range:      +/- 1% of reading or 0.2 Pa, whichever is larger (0-200.0 Pa)
> High Range:     +/- 1% of reading or 2 Pa, whichever is larger (0-800 Pa)
>                 +/- 2% of reading (800-1,000 Pa)
>
> <u>DG-700 Accuracy Specifications:</u>
>
> +/- 1% of reading or 0.15 Pa, whichever is greater (0-1,250 Pa)


The **ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

**Parts Needed for Comparison**

- 2 digital gauges
- one Magnehelic gauge
- 2 "T" fittings
- one syringe
- five 1 foot sections of tubing

**Comparison Procedure**

Using the two T fittings and short sections of hose, hook up the gauges and syringe as shown in Figure 7 below. Turn on the digital gauges, (if DG-3's, set on High Range). They should both be reading 0 Pa. Pull out on the syringe slowly until the desired test pressure on the digital gauges is achieved. Record your results and compare with the specifications above.
.

Figure 7: Comparison Setup



- ALWAYS have a Magnehelic gauge connected to the syringe to avoid over-pressuring the digital gauges.
- Test at a variety of pressures, both high and low range.
- Repeat test with tubing connected to top taps on Channel A to check for positive pressure difference.

## *A.4.b  Digital Gauge Maintenance:*

- Operating temperature range: 32 °F to 120 °F.
- Storage temperatures 5 °F to 160 °F (best to keep it warm during cold weather).
- Avoid conditions where condensation could occur, for example taking a gauge from a cool environment into a hot humid environment.
- Do not store gauge in the same container as chemical smoke.  The smoke can and does cause corrosion.
- Do not ignore low battery indicator (readings can start being in error almost immediately).
- Avoid exposing the gauge to excessive pressures, such as caused by tubing slammed in a door.

**The ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

## A.5  Checking for Leaky Tubing

It does not happen very often, but leaky tubing can seriously degrade the accuracy of duct leakage tests. These leaks can be small enough to go undetected for years but large enough to affect fan calibration.

- Before starting, inspect both ends of the tubing to make sure they are not stretched out to the point where they will not make a good seal when attached to a gauge.
- Seal off one end of the tubing by doubling it over on itself near the end.
- Create a vacuum in the tubing by sucking on the open end (make sure the hose is clean first!). Let the end of the tubing stick to your tongue due to the vacuum.
- The tubing should stick to your tongue indefinitely if there are no leaks.  Waiting for 5 seconds or so is a good enough test.
- If the tubing has a leak, it should be replaced immediately.
- The ends of the tubing will sometimes get stretched out or torn after many uses.  Periodically trim 1/4" off the ends of the tubing to remove the damaged end.



# Appendix B    Flow Conversion Table

## Series B Duct Blaster (110V and 230V)

Flow (cfm)

| Fan Pressure | Open Fan | Ring 1 | Ring 2 | Ring 3 |
|---|---|---|---|---|
| (Pascals) | | | | |
| 4 | | | | 12 |
| 6 | | | | 15 |
| 8 | | | | 17 |
| 10 | | | | 19 |
| 12 | | | | 21 |
| 14 | | | | 23 |
| 16 | | | | 24 |
| 18 | | | | 26 |
| 20 | | | | 27 |
| 22 | | | | 29 |
| 24 | | | | 30 |
| 26 | 560 | 209 | 80 | 31 |
| 28 | 581 | 217 | 83 | 32 |
| 30 | 602 | 225 | 85 | 34 |
| 32 | 622 | 232 | 88 | 35 |
| 34 | 641 | 239 | 91 | 36 |
| 36 | 660 | 246 | 94 | 37 |
| 38 | 678 | 253 | 96 | 38 |
| 40 | 696 | 260 | 99 | 39 |
| 42 | 713 | 266 | 101 | 40 |
| 44 | 730 | 273 | 104 | 41 |
| 46 | 746 | 279 | 106 | 42 |
| 48 | 762 | 285 | 108 | 43 |
| 50 | 778 | 291 | 111 | 44 |
| 52 | 794 | 296 | 113 | 45 |
| 54 | 809 | 302 | 115 | 45 |
| 56 | 824 | 308 | 117 | 46 |
| 58 | 839 | 313 | 119 | 47 |
| 60 | 853 | 319 | 121 | 48 |
| 62 | 867 | 324 | 123 | 49 |
| 64 | 881 | 329 | 125 | 50 |
| 66 | 895 | 334 | 127 | 50 |
| 68 | 909 | 339 | 129 | 51 |
| 70 | 922 | 344 | 131 | 52 |
| 72 | 935 | 349 | 133 | 53 |
| 74 | 948 | 354 | 135 | 53 |
| 76 | 961 | 359 | 137 | 54 |
| 78 | 973 | 364 | 139 | 55 |
| 80 | 986 | 368 | 140 | 56 |
| 82 | 998 | 373 | 142 | 56 |
| 84 | 1010 | 377 | 144 | 57 |
| 86 | 1023 | 382 | 146 | 58 |
| 88 | 1034 | 386 | 147 | 58 |
| 90 | 1046 | 391 | 149 | 59 |
| 92 | 1058 | 395 | 151 | 60 |
| 94 | 1069 | 400 | 152 | 60 |
| 96 | 1081 | 404 | 154 | 61 |
| 98 | 1092 | 408 | 156 | 62 |
| 100 | 1103 | 412 | 157 | 62 |
| 102 | 1114 | 416 | 159 | 63 |
| 104 | 1125 | 420 | 160 | 64 |
| 106 | 1136 | 424 | 162 | 64 |
| 108 | 1147 | 428 | 164 | 65 |
| 110 | 1157 | 432 | 165 | 65 |
| 112 | 1168 | 436 | 167 | 66 |
| 114 | 1178 | 440 | 168 | 67 |
| 116 | 1189 | 444 | 170 | 67 |
| 118 | 1199 | 448 | 171 | 68 |
| 120 | 1209 | 452 | 172 | 68 |

Flow (cfm)

| Fan Pressure | Open Fan | Ring 1 | Ring 2 | Ring 3 |
|---|---|---|---|---|
| 122 | 1219 | 456 | 174 | 69 |
| 124 | 1229 | 459 | 175 | 70 |
| 126 | 1239 | 463 | 177 | 70 |
| 128 | 1249 | 467 | 178 | 71 |
| 130 | 1259 | 470 | 180 | 71 |
| 132 | 1269 | 474 | 181 | 72 |
| 134 | 1278 | 478 | 182 | 72 |
| 136 | 1288 | 481 | 184 | 73 |
| 138 | 1297 | 485 | 185 | 74 |
| 140 | 1307 | 488 | 186 | 74 |
| 142 | 1316 | 492 | 188 | 75 |
| 144 | 1325 | 495 | 189 | 75 |
| 146 | 1335 | 499 | 190 | 76 |
| 148 | 1344 | 502 | 192 | 76 |
| 150 | 1353 | 506 | 193 | 77 |
| 152 | 1362 | 509 | 194 | 77 |
| 154 | 1371 | 512 | 196 | 78 |
| 156 | 1380 | 516 | 197 | 78 |
| 158 | 1389 | 519 | 198 | 79 |
| 160 | 1397 | 522 | 200 | 79 |
| 162 | 1406 | 526 | 201 | 80 |
| 164 | 1415 | 529 | 202 | 80 |
| 166 | 1424 | 532 | 203 | 81 |
| 168 | 1432 | 535 | 205 | 81 |
| 170 | 1441 | 538 | 206 | 82 |
| 172 | 1449 | 542 | 207 | 82 |
| 174 | 1458 | 545 | 208 | 83 |
| 176 | 1466 | 548 | 209 | 83 |
| 178 | 1474 | 551 | 211 | 84 |
| 180 | 1483 | 554 | 212 | 84 |
| 182 | 1491 | 557 | 213 | 85 |
| 184 | 1499 | 560 | 214 | 85 |
| 186 | 1507 | 563 | 215 | 86 |
| 188 | 1516 | 566 | 217 | 86 |
| 190 | 1524 | 569 | 218 | 87 |
| 192 | 1532 | 573 | 219 | 87 |
| 194 | 1540 | 576 | 220 | 88 |
| 196 | 1548 | 578 | 221 | 88 |
| 198 | 1556 | 581 | 222 | 88 |
| 200 | 1564 | 584 | 223 | 89 |
| 202 | 1571 | 587 | 225 | 89 |
| 204 | 1579 | 590 | 226 | 90 |
| 206 | 1587 | 593 | 227 | 90 |
| 208 | 1595 | 596 | 228 | 91 |
| 210 | 1602 | 599 | 229 | 91 |
| 212 | 1610 | 602 | 230 | 92 |
| 214 | 1618 | 605 | 231 | 92 |
| 216 | 1625 | 608 | 232 | 93 |
| 218 | 1633 | 610 | 233 | 93 |
| 220 | 1640 | 613 | 234 | 93 |
| 222 | 1648 | 616 | 236 | 94 |
| 224 | 1655 | 619 | 237 | 94 |
| 226 | 1663 | 622 | 238 | 95 |
| 228 | 1670 | 624 | 239 | 95 |
| 230 | 1677 | 627 | 240 | 96 |
| 232 | 1685 | 630 | 241 | 96 |
| 234 | 1692 | 633 | 242 | 96 |
| 236 | 1699 | 635 | 243 | 97 |
| 238 | 1707 | 638 | 244 | 97 |
| 240 | 1714 | 641 | 245 | 98 |

The ENERGY CONSERVATORY
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

*Series B (110V & 230V)*

Flow (cfm)

| Fan Pressure | Open Fan | Ring 1 | Ring 2 | Ring 3 |
|---|---|---|---|---|
| 242 | 1721 | 643 | 246 | 98 |
| 244 | 1728 | 646 | 247 | 99 |
| 246 | 1735 | 649 | 248 | 99 |
| 248 | 1742 | 651 | 249 | 99 |
| 250 | 1749 | 654 | 250 | 100 |
| 252 | 1756 | 657 | 251 | 100 |
| 254 | 1763 | 659 | 252 | 101 |
| 256 | 1770 | 662 | 253 | 101 |
| 258 | 1777 | 664 | 254 | 101 |
| 260 | 1784 | 667 | 255 | 102 |
| 262 | 1791 | 670 | 256 | 102 |
| 264 | 1798 | 672 | 257 | 103 |
| 266 | 1805 | 675 | 258 | 103 |
| 268 | 1812 | 677 | 259 | 103 |
| 270 | 1818 | 680 | 260 | 104 |
| 272 | | 682 | 261 | 104 |
| 274 | | 685 | 262 | 105 |
| 276 | | 687 | 263 | 105 |
| 278 | | 690 | 264 | 105 |
| 280 | | 692 | 265 | 106 |
| 282 | | 695 | 266 | 106 |
| 284 | | 697 | 267 | 107 |
| 286 | | 700 | 268 | 107 |
| 288 | | 702 | 269 | 107 |
| 290 | | 705 | 270 | 108 |
| 292 | | 707 | 271 | 108 |
| 294 | | 710 | 272 | 108 |
| 296 | | 712 | 272 | 109 |
| 298 | | 714 | 273 | 109 |
| 300 | | 717 | 274 | 110 |
| 302 | | 719 | 275 | 110 |
| 304 | | 722 | 276 | 110 |
| 306 | | 724 | 277 | 111 |
| 308 | | 726 | 278 | 111 |
| 310 | | 729 | 279 | 111 |
| 312 | | 731 | 280 | 112 |
| 314 | | 734 | 281 | 112 |
| 316 | | 736 | 282 | 113 |
| 318 | | 738 | 283 | 113 |
| 320 | | 741 | 283 | 113 |
| 322 | | 743 | 284 | 114 |
| 324 | | 745 | 285 | 114 |
| 326 | | 748 | 286 | 114 |
| 328 | | 750 | 287 | 115 |
| 330 | | 752 | 288 | 115 |
| 332 | | 754 | 289 | 115 |
| 334 | | 757 | 290 | 116 |
| 336 | | 759 | 291 | 116 |
| 338 | | 761 | 291 | 116 |
| 340 | | 764 | 292 | 117 |
| 342 | | 766 | 293 | 117 |
| 344 | | 768 | 294 | 118 |
| 346 | | 770 | 295 | 118 |
| 348 | | 773 | 296 | 118 |
| 350 | | 775 | 297 | 119 |
| 352 | | 777 | 297 | 119 |
| 354 | | 779 | 298 | 119 |
| 356 | | 781 | 299 | 120 |
| 358 | | 784 | 300 | 120 |
| 360 | | 786 | 301 | 120 |
| 362 | | 788 | 302 | 121 |
| 364 | | 790 | 303 | 121 |
| 366 | | 792 | 303 | 121 |
| 368 | | 795 | 304 | 122 |
| 370 | | 797 | 305 | 122 |

Flow (cfm)

| Fan Pressure | Open Fan | Ring 1 | Ring 2 | Ring 3 |
|---|---|---|---|---|
| 372 | | 799 | 306 | 122 |
| 374 | | 801 | 307 | 123 |
| 376 | | 803 | 308 | 123 |
| 378 | | 805 | 308 | 123 |
| 380 | | 808 | 309 | 124 |
| 382 | | 810 | 310 | 124 |
| 384 | | 812 | 311 | 124 |
| 386 | | 814 | 312 | 125 |
| 388 | | 816 | 312 | 125 |
| 390 | | 818 | 313 | 125 |
| 392 | | 820 | 314 | 126 |
| 394 | | 822 | 315 | 126 |
| 396 | | 824 | 316 | 126 |
| 398 | | 827 | 317 | 127 |
| 400 | | 829 | 317 | 127 |
| 402 | | 831 | 318 | 127 |
| 404 | | 833 | 319 | 128 |
| 406 | | 835 | 320 | 128 |
| 408 | | 837 | 321 | 128 |
| 410 | | 839 | 321 | 129 |
| 412 | | 841 | 322 | 129 |
| 414 | | 843 | 323 | 129 |
| 416 | | 845 | 324 | 130 |
| 418 | | 847 | 324 | 130 |
| 420 | | 849 | 325 | 130 |
| 422 | | 851 | 326 | 131 |
| 424 | | 853 | 327 | 131 |
| 426 | | 855 | 328 | 131 |
| 428 | | 857 | 328 | 132 |
| 430 | | 859 | 329 | 132 |
| 432 | | 861 | 330 | 132 |
| 434 | | 863 | 331 | 132 |
| 436 | | 865 | 331 | 133 |
| 438 | | 867 | 332 | 133 |
| 440 | | 869 | 333 | 133 |
| 442 | | 871 | 334 | 134 |
| 444 | | 873 | 335 | 134 |
| 446 | | 875 | 335 | 134 |
| 448 | | 877 | 336 | 135 |
| 450 | | 879 | 337 | 135 |
| 452 | | 881 | 338 | 135 |
| 454 | | 883 | 338 | 136 |
| 456 | | 885 | 339 | 136 |
| 458 | | 887 | 340 | 136 |
| 460 | | 889 | 341 | 136 |
| 462 | | 891 | 341 | 137 |
| 464 | | 893 | 342 | 137 |
| 466 | | 895 | 343 | 137 |
| 468 | | 897 | 344 | 138 |
| 470 | | 899 | 344 | 138 |
| 472 | | 901 | 345 | 138 |
| 474 | | 903 | 346 | 139 |
| 476 | | 905 | 347 | 139 |
| 478 | | 906 | 347 | 139 |
| 480 | | 908 | 348 | 139 |
| 482 | | 910 | 349 | 140 |
| 484 | | 912 | 349 | 140 |
| 486 | | 914 | 350 | 140 |
| 488 | | 916 | 351 | 141 |
| 490 | | 918 | 352 | 141 |
| 492 | | 920 | 352 | 141 |
| 494 | | 922 | 353 | 142 |
| 496 | | 924 | 354 | 142 |
| 498 | | 925 | 355 | 142 |
| 500 | | 927 | 355 | 142 |

The ENERGY CONSERVATORY
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

## *Appendix C*   Sample Test Form

<u>**Example Completed Form**</u>      **Duct Leakage Test Form**

### Customer Information:

| | |
|---|---|
| Name: | Tom Jones |
| Address: | 2345 First Ave. |
| City: | Phoenix |
| State/Zip: | AZ,  86777 |
| Phone: | 333-333-3333 |
| Email: | tjones@wildworld.com |

### Building Address: *(if different from above)*

Street: _____
City/State: _____

### Test Conditions:

| | |
|---|---|
| Date: | May 23, 2001 |
| Time: | 8:00 AM |
| Indoor Temperature (F): | 78 F |
| Outdoor Temperature (F): | 84 F |
| Floor Area (ft$^2$): | 2,500 |
| System Airflow (cfm): | 1,625 |
| Cooling Size (tons): | 4 |
| Heating Size (btu): | 60,000 |
| Primary Location of Supply Ductwork: | Attic |
| Primary Location of Return Ductwork: | Garage |

### Comments:

Platform return in garage.  Platform open to wall cavity.  Single return.
Flex duct in attic.

### Total Leakage Test   Depress _____   Press   x

Test Pressure:   25 (Pa)

Baseline Duct Pressure (optional):    N/A (Pa)

| Duct Press. (Pa) | Flow Ring Installed | Fan Press (Pa) | Flow (cfm) |
|---|---|---|---|
| 25 | Ring 2 | 370 | 304 |
| | | | |
| | | | |
| | | | |

Fan Model/SN:  # 1056

### Results:

| | |
|---|---|
| Total Leakage (cfm): | 304 |
| Total Leakage as % System Airflow: | 18.7% |
| Total Leakage as % Floor Area: | 12.1% |

### Outside Leakage Test   Depress _____   Press   x

Test Pressure:   25 (Pa)

| Duct Press. (Pa) | Flow Ring Installed | Fan Press (Pa) | Flow (cfm) |
|---|---|---|---|
| 25 | Ring 2 | 242 | 246 |

Fan Model/SN:  #1056

### Results:

| | |
|---|---|
| Outside Leakage (cfm): | 246 |
| Outside Leakage as % System Airflow: | 15.1% |
| Outside Leakage as % Floor Area: | 9.8% |


**The ENERGY CONSERVATORY**
DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE

Example Blank Form

# Duct Leakage Test Form

**Customer Information:**

Name: _____
Address: _____
City: _____
State/Zip: _____
Phone: _____
Email: _____

**Building Address:** (if different from above)

Street: _____
City/State: _____

**Test Conditions:**

Date: _____
Time: _____
Indoor Temperature (F): _____
Outdoor Temperature (F): _____
Floor Area (ft$^2$): _____
System Airflow (cfm): _____
Cooling Size (tons): _____
Heating Size (btu): _____
Primary Location of
Supply Ductwork: _____
Primary Location of
Return Ductwork: _____

**Comments:**

_____
_____
_____
_____
_____
_____

**Total Leakage Test**   Depress _____   Press _____

Test Pressure: _____ (Pa)

Baseline Duct Pressure (optional): _____ (Pa)

| Duct Press. (Pa) | Flow Ring Installed | Fan Press (Pa) | Flow (cfm) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Fan Model/SN: _____

**Results:**

Total Leakage (cfm): _____
Total Leakage as %
System Airflow: _____
Total Leakage as %
Floor Area: _____

**Outside Leakage Test**   Depress _____   Press _____

Test Pressure: _____ (Pa)

| Duct Press. (Pa) | Flow Ring Installed | Fan Press (Pa) | Flow (cfm) |
|---|---|---|---|
| | | | |

Fan Model/SN: _____

**Results:**

Outside Leakage (cfm): _____
Outside Leakage as %
System Airflow: _____
Outside Leakage as %
Floor Area: _____

89

# *Appendix D*    **Technical Specifications**

## D.1  Specifications

| | | |
|---|---|---|
| **Maximum Flow:** | (without flex duct)<br>- 1,500 CFM @ 0 Pa<br>- 1,350 CFM @ 50 Pa | (w/ flex duct installed)<br>- 1,250 CFM @ 0 Pa<br>- 1,000 CFM @ 50 Pa |

**Flow Range:**    - 1,500 - 10 Cubic Feet per Minute (cfm)

**Flow Measurement System:**
- Integral flow measuring nozzles.
- Flow calibration meets ASTM Standard E779-03, ASHRAE 152-2004, CGSB Standard 149.10-M86 and EN 13829.
- Flow calibration accuracy:    +/- 3% or 1 CFM, whichever is greater (using DG-700 digital gauge).

**Pressure Gauge:**    - DG-700.

**Dimensions:**
- Fan:   10" diameter, 8" long.
- Flexible Extension Duct:    12 feet long w/ 10" flex duct.
- Digital Gauge:  7 1/2" long, 4" wide, 1 1/4" deep.

**Weight:**
- Fan:   7 lbs  (8.5 lbs with 3 flow nozzles).
- Flexible Extension Duct:  5 lbs.
- Digital Gauge:  1 lbs.
- Total System Shipping Weight:  27 lbs.

**Fan Controller:**
- Variable Speed Solid State DC (maximum controller output is 60 Volts DC nominal). Maximum 4 amp current draw (110V AC input).

# *Appendix E*     Estimating HVAC System Loss From Duct Airtightness Measurements

Appendix E contains a simple method for estimating HVAC system losses from field measurements of duct airtightness. This method uses a duct airtightness measurement along with a number of assumptions about the HVAC and duct system (including system airflow, average operating pressure in the ductwork, the breakdown of leakage between supply and return side, and the energy loss penalty from supply and return leaks) to estimate an annual energy loss for heating or cooling. The model shown below is used in the TECBLAST duct leakage test software to estimate annual system losses.

**Note:** Because duct leakage loss calculations are extremely complex, this estimation technique should be used with caution and should be viewed only as a rough estimate of the magnitude of losses possible. The leakage rate of a duct system determined using the airtightness test procedures listed in this manual may differ from the leakage rates occurring in the duct system under actual operating conditions. In addition, the duct leakage loss estimates do not include many important but complex impacts on system efficiency including latent load impacts, heat pump strip heating impacts, conduction losses, increases in infiltration from dominant duct leakage, or interactions of leakage on mechanical operating efficiencies, all of which can be significant depending on the type and location of the system being tested. We do not recommend that this simple model be used for research purposes, program design studies or impact evaluations.  More sophisticated duct leakage loss models are available and better suited to these needs.

## How to Use this Method:

The equation for this estimation procedure is located in section 5 below.  Follow procedures 1-4 to determine reasonable values to use in Section 5.

## 1.  Conduct a Duct Leakage Test

Set up your duct testing equipment to measure **Duct Leakage to the Outside** (in CFM). For consistency in reporting and comparison between duct systems, we recommend that you conduct your duct airtightness test at a test pressure of 25 Pa. This pressure has become the most commonly used test pressure for residential duct airtightness testing. (see Section 2 below for adjustments to the CFM25 leakage reading due to variations in duct operating pressures). Record the CFM25 of duct leakage to the outside.

## 2.  Determine the CFM25 Multiplier for Average Operating Pressure:

Because we tested the duct system at a test pressure of 25 Pascals, we have implicitly assumed that 25 Pascals is a representative pressure seen by the leaks in the duct system under normal operating conditions. While this appears to be a reasonable assumption for many residential duct systems, it can be modified if you have evidence to suggest that a different operating pressure better represents the pressure seen by the predominant duct leaks during normal operation.  Table 10 below can be used to adjust the measured CFM25 for different average operating pressures. This adjustment can be made separately for the supply leakage and the return leakage in the duct system.  **Note:** During normal operation, pressures in the duct system vary greatly, while during a duct leakage test, pressures are much more uniform.

For example, if the majority of leaks in the duct system are at supply boot connections, it might be reasonable to assume that the average operating pressure for the supply leaks is less than 25 Pascals (e.g. 10 or 15 Pascals).  If the majority of leaks are located at a high pressure location such as a supply or return plenum, then it might be reasonable to assume that the average pressure seen by the leaks is larger than 25 Pascals. Table 10 shows example multipliers. Write down separate multipliers for the return and supply duct systems, as appropriate.

**Note:** When possible, it is always best to measure actual operating pressure during normal operation to determine the appropriate multiplier to use from Table 10.

**Table 10 Multiplier for CFM25**

| Average Operating Pressure in the Duct System | Multiplier for CFM25 |
|:---:|:---:|
| 5 Pa | 0.38 |
| 10 Pa | 0.58 |
| 15 Pa | 0.74 |
| 20 Pa | 0.87 |
| 25 Pa | 1.00 |
| 30 Pa | 1.12 |
| 35 Pa | 1.22 |
| 40 Pa | 1.33 |
| 45 Pa | 1.42 |
| 50 Pa | 1.52 |

$$\text{Multiplier} = (\text{Avg. Operating Pressure}/25)^{0.60}$$

**3.  Calculate a Loss Factor For Supply and Return Leaks:**

Calculate and write down the Loss Factors for both sides of the system:

**A. Supply Loss Factor  =  (SLS x SLP x SPM)**

> where:
>> SLS = Supply Leakage Split  (Default Value = 0.5)
>> SLP = Supply Leakage Penalty  (Default Value = 1.0)
>> SPM = Supply Pressure Multiplier  (Default  Value = 1.0)

> Using the default values, the Supply Loss Factor  =  (0.5 x 1.0 x 1.0) =  <u>0.5</u>

- **Supply Leakage Split** is the percentage of the measured leakage which is located in the supply side of the system. The default value of 0.5 means that 50% of the measured leakage in the system is located in the supply side. If you have measured the supply leakage directly, or have other evidence that more or less of the measured leakage is in the supply side, then adjust the default value accordingly.

- **Supply Leakage Penalty** represents the effective annual energy  penalty to the HVAC system for each percent loss in delivered system air flow due to supply side leakage. In other words, the default value of 1.0 means that a measured supply leakage rate of 1 percent  (i.e. 1 percent of system airflow)  contributes to a 1 percent annual loss to the HVAC system. The default SLP of 1.0 assumes that supply side leaks are direct losses to the outside and are not recaptured back to the house. The SLP can be adjusted downward to reflect regain of usable energy to the house from duct leaks. For example, during the winter some of the energy lost from supply leaks in a crawlspace will probably be regained back to the house (sometimes 1/2 or  more may be regained). In this case, a SLP of less than 1.0 might be appropriate.

- **Supply Pressure Multiplier** is the appropriate CFM25 multiplier for supply leaks from Table 10 above. The default value of 1.0 assumes that 25 Pa is representative of the pressures seen by supply duct leaks during normal operation.

**B. Return Loss Factor  =  (RLS x RLP x RPM)**

> where:
>> RLS = Return Leakage Split  (Default Value = 0.5)
>> RLP = Return Leakage Penalty  (Default Value = 0.5)
>> RPM = Return Pressure Multiplier (Default Value = 1.0)

> Using the default values, the Loss Factor for Return Leaks =   (0.5 x 0.5 x 1.0) =   <u>0.25</u>

- **Return Leakage Split** is the percentage of the measured leakage which is located in the return side of the system. The default value of 0.5 means that 50% of the measured leakage in the system is located in the return side. If you have measured the return leakage directly, or have other evidence that more or less of the measured leakage is in the return side, then adjust the default value accordingly.  **(Note:** The SLS and the RLS, when added together, should always equal  1.0.)

- **Return Leak Penalty** represents the effective annual energy  penalty to the HVAC system for each percent of return air flow that is drawn from the outside. In other words, the default  value of 0.5 means that a measured return leakage rate of 1 percent (i.e. 1 percent of system airflow) contributes to a 0.5 percent annual loss to the HVAC system. The default value of 0.5 for the RLP suggests that on average, return leaks contribute less to energy losses than do supply leaks (default SLP of 1.0). The RLP value can be adjusted upward from the default value if you have reason to suspect that the measured return leaks contribute significantly  more energy loss than "average" (e.g. pulling return air from a super heated attic), or can be adjusted downward to represent significantly less energy loss (e.g. pulling return air from a moderate temperature crawl space) .

- **Return Pressure Multiplier** is the appropriate CFM25 multiplier for return leaks from Table 10 above. The default value of 1.0 assumes that 25 Pa is representative of the pressures seen by return duct leaks during normal operation

**Note:**  When in doubt, we recommend that you use the default values for Loss Factors.


## 4.  Estimate the HVAC System Airflow:

Estimate the total system airflow (in CFM) from either the system nameplate, measured static pressure and fan curve, or by measuring the system airflow using a reasonable flow measuring technique (e.g.  temperature rise method, flow hood, Duct Blaster pressure matching method, or the TrueFlow Air Handler Flow Meter. Write down the estimated/measured total system airflow.


## 5.  Calculate Percent HVAC System Loss:

Percent HVAC System Loss =

$$\frac{\text{CFM25 Leakage to Outside x  (Supply Loss Factor + Return Loss Factor)}}{\text{Estimated System Airflow (in CFM)}}$$

**Example 1:**

We conduct a duct leakage to outside test on a 3 ton, 11 SEER heat pump system (supplies located in the attic and returns in the crawlspace). The owners report a $1,500 a year cooling bill and a $500 a year heating bill. Using 25 Pascals as our duct testing pressure, we measure 355 CFM25 of duct leakage to the outside. We measure a total system airflow of 1,275 CFM using the TrueFlow Air Handler Flow Meter. We will use the default values for the Supply and Return Loss Factors.

**Percent HVAC System Loss =**

$$355 \text{ CFM25 x } (0.5 \text{ (Supply Loss Factor)} + 0.25 \text{ (Return Loss Factor))}$$

$$\overline{\hspace{2cm} 1,275 \text{ CFM (system airflow)} \hspace{2cm}}$$

= 266.3 / 1275     = **.209  or  20.9%**

This loss estimate (.209) can be used to estimate:

annual cooling loss:     .209 x  $1,500  =  $314
annual heating loss:     .209 x  $ 500  =  $105
annual capacity loss:    .209 x  3 ton  =  0.6 tons
annual operating SEER:   (1 - .209)  x 11 SEER  =  8.7 SEER

**Example 2:**

For the same house used in Example 1, we separately measure the leakage in the supply and return side of the duct system and determine that the majority of the leakage (300 CFM) is in the supply side, and is located at a high pressure plenum takeoff. Because the majority of the leaks in this system are at a plenum takeoff, we assume that the average operating pressure for the supply leaks is closer to 40 Pascals, instead of 25 Pascals. For the return side of the duct system, we will use the default operating pressure of 25 Pascals.

First, we determine the CFM25 Multipliers from Table 10.

For the supply side, we will use a SPMultiplier of 1.33 (average operating pressure of 40 Pascals)

For the return side, we will use a RPMultiplier of 1.0 (default value)

Now we calculate Leakage Splits for both sides of the system:

Supply Leakage Split (SLS)  = 300 CFM25 / 355 CFM25 =  0.845

Return Leakage Split (RLS)  =  55 CFM25 / 355 CFM25 =  0.155

Next, we calculate the Loss Factors for both sides of the system:

Supply Loss Factor = (0.845 (SLS) x  1.0 (default SLP) x  1.33 (SPMultiplier) ) = **1.12**

Return Loss Factor = (0.155 (RLS)  x  0.5 (default RLP) x  1.0 (RPMultiplier)) = **0.08**

94

*Appendix E*    Estimating HVAC System Loss From Duct Airtightness Measurements

**Percent HVAC System Loss =**

$$(355 \text{ CFM25 } x \ (1.12 \text{ (Supply Loss Factor) } + \ 0.08 \text{ (Return Loss Factor)})$$

1,275 CFM  (system airflow)

= 426.0 / 1275    = **.334   or 33.4%**

This loss estimate (.334)  can be used to estimate:

annual cooling loss:     .334 x  $1,500  =  $501
annual heating loss:     .334 x  $  500  =  $167
annual capacity loss:    .334 x  3 tons  =  1.0 tons
annual operating SEER:  (1 - .334)  x 11 SEER =  7.3 SEER

95

# *TECTITE (Ver. 3.2 for Windows)*

## (Building Airtightness Test Analysis Program)

## Software User's Guide



The **ENERGY CONSERVATORY**

**DIAGNOSTIC TOOLS TO MEASURE BUILDING PERFORMANCE**



EXHIBIT

C

# *TECTITE (Ver. 3.2 for Windows)*

## (Building Airtightness Test Analysis Program)

## Software User's Guide

The Energy Conservatory
2801 21st Ave. S., Suite 160
Minneapolis, MN  55407   USA
(612) 827-1117 (Ph)
(612) 827-1051 (Fax)
www.energyconservatory.com
email:  info@energyconservatory.com

Minneapolis Duct Blaster is a registered trademark, and Minneapolis Blower Door and Automated Performance Testing (APT) System are trademarks of The Energy Conservatory.

MS-DOS, Windows and Microsoft Word are registered trademarks of Microsoft Corporation.

Manual Edition:  January 2007
© 2007 by The Energy Conservatory.  All Rights Reserved.

THE ENERGY CONSERVATORY, INC.  SOFTWARE PRODUCT LICENSE AGREEMENT
(appears during software installation)

This legal document is an agreement between the end user (hereinafter "Licensee") and The Energy Conservatory, Inc. (hereinafter "TEC").  This agreement constitutes the complete agreement between the licensee and TEC for this software program, which includes computer software and may include associated media, printed materials and electronic documentation (hereinafter "Software Product") .

BY SELECTING THE YES BUTTON BELOW, YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, YOU UNDERSTAND IT AND YOU AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS, WHICH INCLUDE THE SOFTWARE PRODUCT LICENSE, THE EXPRESS LIMITED WARRANTY AND THE LIMITATION OF WARRANTY AND LIABILITY (Collectively the "Agreement").  THIS AGREEMENT APPLIES TO YOU AND ANY SUBSEQUENT LICENSEE OF THIS SOFTWARE PRODUCT.

IF YOU DO NOT ACCEPT OR AGREE TO THE TERMS OF THIS AGREEMENT, PRESS THE NO BUTTON BELOW.

1. THE ENERGY CONSERVATORY, INC. SOFTWARE PRODUCT LICENSE

A. GRANT OF LICENSE.  TEC grants to licensee a non-exclusive right to use this copy of the Software Product on a single computer at a single location.  This Software Product is licensed, not sold, to you by TEC and may be used, in object code form only and only in conjunction with testing hardware and software programs authorized by TEC. You agree not to translate, reverse engineer, reverse compile, disassemble or make derivative works from this Software Product.  You may neither sublicense the Software Product, nor sublicense or assign the license granted under this agreement, without prior written authorization from TEC.  TEC reserves all rights not expressly granted to licensee.

B. OWNERSHIP OF SOFTWARE.   TEC retains title and ownership of the Software Product.  This license is not a sale of the original Software Product or any copy thereof.

C. COPY RESTRICTIONS.  The Software Product and any accompanying documentation are copyrighted.  Unauthorized copying of the Software Product, including software that has been modified, merged, or included with other software, or of any accompanying documentation is expressly forbidden.

2.  EXPRESS LIMITED WARRANTY

TEC warrants that the Software Product will perform substantially in accordance with the accompanying written materials for a period of 90 days from the date of receipt by the licensee.

3.   LIMITATION OF WARRANTY AND LIABILITY

The foregoing warranty is in lieu of all other warranties and is subject to the conditions and limitations stated herein.  TEC MAKES NO WARRANTY OR REPRESENTATION, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO THIS SOFTWARE PRODUCT, INCLUDING ITS QUALITY, RESULTS OBTAINED, PERFORMANCE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

THE EXCLUSIVE REMEDY OF THE PURCHASER FOR ANY BREACH OF WARRANTY shall be the return of the Software Product to TEC for replacement, or, at the option of TEC, refund of the purchase price.

IN NO EVENT WILL TEC OR ITS DISTRIBUTORS OR AGENTS BE LIABLE FOR INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR THE INABILITY TO USE THE SOFTWARE PRODUCT, even if advised of the possibility of such damages.  In particular, TEC is not responsible for any costs including, but not limited to, those incurred as a result of lost profits or revenue, loss of the use of the software, loss of data, the cost of recovering such software or data, the cost of substitute software, or the claims of third parties.  In any case, TEC's maximum liability for any and all losses, injuries or damages (regardless of whether such claims are based on contract, negligence, strict liability or other tort) shall be the purchase price paid for the Software Product.

This limitation of Warranty and Liability may not be amended or modified, nor may any of its terms be waived except by a writing signed by an authorized representative of TEC.

# Table of Contents

**Chapter 1     Introduction to TECTITE**                                    **1**

   1.1  TECTITE Features                                                 1

   1.2  Auto Versus Manual Operation                                     1

   1.3  Help Buttons                                                      2

   1.4  Installing TECTITE for Windows                                    2

**Chapter 2     Setting Up the Hardware for Automated Testing**              **3**

   2.1  Hardware Set Up Using a DG-700                                    3

   2.2  Hardware Set Up Using an APT System                               4

   2.3  Optional Computer Stand:                                          6

**Chapter 3     Setting Up the Building for Testing**                        **7**

   3.1  Adjustable Openings                                               7

   3.2  Combustion Appliances/Exhaust Devices                             7

**Chapter 4     Starting the TECTITE Program**                              **8**

   4.1  Starting TECTITE 3.2                                              8

**Chapter 5     Overview of TECTITE (Auto and Manual Methods)**             **9**

   5.1  Starting a New Test                                               9

   5.2  Input Screens                                                     9

   5.3  Auto Test Method                                                  11

   5.4  Manual Test Method                                                11

   5.5  Test Results (Auto and Manual Methods)                            12

   5.6  Zone Data (Auto Method Only)                                      13

   5.7  Using the Goto Menu                                               13

**Chapter 6     Editing the Input and Test Settings Screens**              **14**

   6.1  Customer Information Screen                                       14

   6.2  Building Information Screen                                       14

   6.3  Climate Information Screen                                        16

   6.4  Comments Screen                                                   18

   6.5  Test Settings Screen                                              19

## Chapter 7    Conducting an Automated Airtightness Test    22

7.1  Overview of Test Graph Screen (Auto Method)    22

7.2  Selecting the Fan Model    23

7.3  Starting an Automated Test    24

7.4  Stopping an Automated Test    25

7.5  Adjusting the Auto Test Parameters    26

7.6  Operator Messages During the Automated Test    26

7.7  Manually Adjusting the Fan Speed    30

7.8  Real-Time ACH50 Estimator    30

7.9  Using the Display Large Meters Feature    31

## Chapter 8    Using the Manual Data Entry Method    32

8.1  Overview of Test Graph Screen (Manual Method)    32

8.2  Selecting the Fan Model    32

8.3  Entering Test Data into the Data Table    33

8.4  Tips on Using a DG-700 Gauge with the Data Table    34

8.5  Tips on Using a DG-3 Gauge with the Data Table    34

8.6  Tips on Using Magnehelic Gauges with the Data Table    35

## Chapter 9    Viewing Test Results    36

9.1  Overview of Test Results Screen    36

## Chapter 10    Measuring Building Zone Pressures    41

10.1  Using the Zonal Pressure Measurement Feature    41

10.2  Connecting Tubing to the DAB for Zone Pressure Measurements    42

10.3  Taking and Storing Zone Pressure Measurements    43

10.4  Viewing Zone Data    43

10.5  Overview of Zone Data Screen    44

10.6  ZPD Input Table    45

## Chapter 11    Saving and Retrieving Building Test Files    46

11.1  Saving Building Test Files    46

11.2  Retrieving Building Test Files    46

11.3  Retrieving a Previous Test as the Starting Point for a New Test    47

11.4  Format of Saved Building Files    47

## Chapter 12     Printing Test Reports                                    52

12.1  Printing and Preview Options                                            52
12.2  Putting Your Business Name and Logo at the Top of the Reports          52

## Chapter 13     Cruise Control                                            60

13.1  Starting the Cruise Feature                                            60
13.2  Ending Cruise/Stopping the Fan                                         62
13.3  Real-Time ACH50 Estimator                                             62
13.4  Using the Display Large Meters Feature                                 63

## Chapter 14     Creating and Using Configuration Files                    65

14.1  What is a Configuration File?                                          65
14.2  How to Create a Configuration File                                     65
14.3  How to Use Configuration Files                                         66

## Chapter 15     Troubleshooting TECTITE                                   68

15.1  Basic Tips                                                             68

## Chapter 16     Evaluating the Repeatability of Test Results              72

16.1  Looking at the Repeatability of Test Results                          72
16.2  Improving the Repeatability of Automated Test Results                 73
16.3  Improving the Repeatability of Manual Test Results                    74

## Chapter 17     Entering Custom Fan Calibration Parameters                75

## Chapter 18     Using the Compare Tests Feature                           77

18.1  Choosing the Test Files to Compare                                     77
18.2  Printing and Preview Options                                           78

# *Chapter 1*    **Introduction to TECTITE**

TECTITE (Ver. 3.2) is a building airtightness test analysis program for Windows computers.  The TECTITE program can be used with the Model 3 or Model 4 Minneapolis Blower Door™ or the Series A and B Duct Blaster® fans to conduct fully automated Blower Door airtightness tests.  During an automated Blower Door test, the program controls the speed of the Blower Door fan, prompts for installation or removal of flow rings, records both building pressure and fan airflow, and calculates and stores test results.  TECTITE can also be used to analyze and display manually collected Blower Door test data.

## 1.1  TECTITE Features

- Computerized control of Minneapolis Blower Door fans using either a DG-700 Digital Pressure Gauge or an APT system.
- Choice of pre-set test protocol (CGSB 149.10-M86) or custom test options.
- Calculation and display of airtightness test results.
- Measurement and display of multiple building zone pressures during the Blower Door test (requires APT system with 3 or more pressure channels).
- Automated operation and on-screen instructions reduce operator error, eliminates time spent zeroing gauges and adjusting fan speed, and ensures that tests are conducted the same way every time.
- Multiple simultaneous pressure measurements of building pressure and fan airflow reduce the variability of test results from wind.
- Cruise control for maintaining a constant building pressure during diagnostic tests or airsealing activities.
- Built-in report generator and file storage features.
- Compare feature generates test result comparison for any 2 previously saved building test files.
- On-line HELP screens.
- Manual mode for analyzing and displaying manually collected test data.

During automated testing, TECTITE adjusts the speed of the Blower Door fan while simultaneously monitoring the building pressure and fan airflow using 2 differential pressure channels built into either the DG-700 gauge or the APT's Data Acquisition Box (DAB).  One pressure channel is used to measure building pressure while the other pressure channel is used to measure Blower Door fan airflow.  Communications between the DG-700 or DAB and your computer is provided through an RS-232 serial communication link.

## 1.2  Auto Versus Manual Operation

The TECTITE program can be run using two different operating methods:

- The program can be used to fully automate a Blower Door airtightness test using the DG-700 gauge or an APT DAB (Auto Method).
- The program can be used to enter and analyze manually collected Blower Door test data (Manual Method).

The two different operating methods are selected from the Test Settings Screen (using the **Method** field).  The Test Settings Screen is discussed in more detail later in *Chapter 6*.  Much of the operation of the TECTITE program is the same for both Auto and Manual Methods.

## 1.3  Help Buttons

Each screen in the TECTITE program contains a Help button to provide you with detailed information for that screen.  Wherever you see the Help button, clicking on it will open a text window.  We recommend that you use all the Help buttons the first time you run the program.

## 1.4  Installing TECTITE for Windows

Before starting the install process, make sure you have at least 8 MB of hard drive space available. Place the TECTITE diskette or CD in the appropriate drive on your computer. From the **Start** button, open the Control Panel.

From the Control Panel window, click on **Add/Remove Programs** and then click on **Install**.



The computer will locate the TECTITE installation program on the floppy disk or CD and guide you through the remainder of the installation process.

TECTITE
Version 3.2

# *Chapter 2*    Setting Up the Hardware for Automated Testing

**Note:** If you will <u>not</u> be conducting automated Blower Door tests, skip to Chapter 3.

## 2.1 Hardware Set Up Using a DG-700

1.  Install the Blower Door system as described in the Blower Door operation manual.

2.  Connect the DG-700 to your computer using a 9-pin serial cable. The male end of the cable should be plugged into the serial communication port on the top of the gauge, and the female end of the cable should be plugged into an open serial communication port on your computer.



Serial Communication Port          Fan Control
Output Jack

> **Note:** If your computer does not have a serial port, but does have a USB port, you will need to purchase an after-market USB to Serial Port adapter (contact TEC for adapter recommendations).

3.  Connect the DG-700 to the Blower Door fan speed controller using the fan control cable. Plug one end cable into the 3.5 mm fan control output on the top of the DG-700, and plug the other end of the cable into the communication jack on the side of the fan speed controller box. **Note:** If your Blower Door speed controller does not have a communication jack on the side of the controller box, you will need to either purchase a new speed controller, or have a communication jack installed on your existing controller. Contact The Energy Conservatory (www.energyconservatory.com) to determine if your existing controller can be modified, or if you will need to purchase a new controller.

4.  Connect tubing between the DG-700 and the Blower Door system (tubing connections are detailed in the Blower Door operation manual).



To inside of building (leave open if gauge is in the building)          To BD fan (red tubing)

A          B

To outside (green tubing)          To space upstream of fan inlet. (If fan inlet and gauge are in the same space, leave open)

5.  Turn on the DG-700. Now turn on the Blower Door fan speed controller in the "just on" position (the fan should not be turning in this position).

**Hardware Set Up with DG-700**



## 2.2 Hardware Set Up Using an APT System

1.  Install the Blower Door system as described in the Blower Door operation manual.

2.  Connect the APT Data Acquisition Box (DAB) to your computer using a 9 pin serial cable. The male end of the cable should be plugged into the COM port on the end of the DAB, and the female end should be plugged into an open serial communication port on your computer.

**Communications Ports/Switches on the DAB**



**Note:** If your computer does not have a serial port, but does have a USB port, you will need to purchase an after-market USB to Serial Port adapter (contact TEC for adapter recommendations).

TECTITE
Version 3.2

3.  Connect the Blower Door fan speed controller to the DAB using the fan control cable provided. The phone plug end of the cable is plugged into the Fan Control Output Jack on the end of the DAB while the other end of the cable is plugged into the communication jack on the side of the speed controller. **Note:** If you have purchased a new Blower Door with your APT system, the system includes a speed controller with a built-in communication jack. If your older Blower Door speed controller does not have a communication jack, you will need to purchase a new speed controller.

4.  Connect tubing between the DAB and the Blower Door system (tubing connections are detailed in the Blower Door operation manual). **Note:** If you will be measuring building zone pressures during the airtightness test using Channels P3 – P8, refer to *Chapter 10* for more information on installing tubing from the DAB to the zones to be tested.



5.  Turn on the DAB (plug in the DAB's power supply if necessary). If the DAB's internal NiCad battery is fully charged, it should supply power for approximately 6 hours of continuous operation. Now turn on the Blower Door fan speed controller in the "just on" position (the fan should not be turning in this position).

**Hardware Set Up with APT System**



*DAB Mounting Board:*

If you purchased the APT and Blower Door system together, the Data Acquisition Box (DAB) comes fastened to a black ABS plastic mounting board.  The mounting board also contains two electrical outlets and the Blower Door fan speed controller.  Attach the mounting board to a door, table or horizontal surface using the C-clamp on the back of the board (the C-clamp can be rotated for horizontal surfaces).

**DAB Mounting Board for APT Systems**



The speed controller is connected to the fan by plugging one end of the fan extension cord into the Blower Door fan electrical box, and connecting the other end to the pig tail plug coming out the bottom side of the speed controller.  The upper pig tail plug coming out of the controller should be plugged into one of the two electrical outlets located above the controller on the mounting board (see diagram above).  The extra electrical outlet on the mounting board can be used for the DAB 12V power supply, or to power your laptop computer.

## 2.3  Optional Computer Stand:

The Energy Conservatory sells an optional laptop computer stand for conducting automated Blower Door tests. To use the computer stand, first open the stand tripod to the desired height and attach the flat tray. Now gently clamp the digital gauge board or DAB mounting board to the aluminum tripod pole using the adjustable C-clamp on the back of the board.  Place your computer on the tray and you are now ready to make the connections between the computer, the DG-700/DAB and the speed controller.



TECTITE
Version 3.2

# *Chapter 3*    Setting Up the Building for Testing

After installing the Blower Door system, you will need to set up the building in its normal heating or cooling mode. This typically includes closing adjustable openings and preparing combustion appliances. **Refer to your Blower Door manual for more specific instructions (or refer to set-up guidelines provided to you from other sources).**

## 3.1 Adjustable Openings

- Close all storm and prime windows.
- Close all exterior doors and attic or crawlspace hatches connected to conditioned spaces.
- Open all interior doors to rooms that are heated or cooled. The object here is to treat the entire building as one connected space. Because few basements can be completely sealed from the building and usually some conditioning of basement air is desirable, they are typically included as conditioned space.
- Tape plastic over window air conditioners if they appear to be a source of air leakage into the building and they are removed during the heating season.

## 3.2 Combustion Appliances/Exhaust Devices

- Adjust all combustion appliances so they do not turn on during the test. This is commonly done by temporarily turning off power to the appliance, or setting the appliance to the "pilot" position. *Note: If vented combustion appliances turn on during a depressurization test, it is possible for flames to be sucked out of the combustion air inlet (flame rollout).* *This is a fire hazard and can possibly result in high CO levels.*
- Be sure that fires in fireplaces and woodstoves are completely out. Take precautions to prevent ashes from being blown into the building during the test. In most cases closing dampers and doors is sufficient, but when they are leaky or absent, it will be necessary to tape fireplace doors shut, clean out the ashes, or cover the ashes with newspaper.
- Turn off all exhaust fans, vented dryers, air conditioners and air handler fans.

# *Chapter 4*    Starting the TECTITE Program

## 4.1  Starting TECTITE 3.2

To start TECTITE, click on  **Start...Programs...Energy Conservatory...TECTITE 3.2**.



The main TECTITE screen will now appear, with the Main Menu containing **File**, **Options**, **Goto** and **Help** located in the upper left hand corner.

**Main TECTITE Screen**



8

# *Chapter 5*    **Overview of TECTITE (Auto and Manual Methods)**

## 5.1  Starting a New Test

To start using the TECTITE program, open the File Menu by clicking on **File** in the Main Menu.  The top of the File Menu contains four starting options:

```
New Test
New Test with Custom Configuration...
Retrieve Existing Test...
Compare Tests...
```

> ⇒  *New Test*   is selected to begin a new building airtightness test using the factory default program settings.  Selecting this option automatically loads all factory default settings and takes you to the Customer Info Screen.
>
> ⇒  *New Test with Custom Configuration*   is selected to begin a new building airtightness test using custom configuration files which you have previously created and saved.  Using configuration files is the most efficient way to run TECTITE.  Creating and saving configuration files is discussed in *Chapter 14*.  After selecting a configuration file to load,  the Customer Info Screen will appear.
>
> ⇒  *Retrieve Existing Test*   lets you recall a previously saved building test file.  After selecting the building test file to retrieve, the values from the retrieved file are loaded into the program, and the Customer Info Screen appears.  Once a file is recalled, it may be viewed, edited and re-saved (with the same or a different file name).  Refer to *Chapter 11* for more information on retrieving and saving files.
>
> ⇒  *Compare Tests*   lets you recall two previously saved building test files and compare the saved test results.  After selecting the two test files to compare, a compare test results screen appears.  Refer to *Chapter 18* for more information on using the Compare Tests feature.

Menu choices are selected by clicking on the desired option.  We recommend that first time users begin by selecting New Test.  The other starting options should be explored after familiarizing yourself with the TECTITE program.

## 5.2  Input Screens

The first 4 pages of TECTITE are input screens where you will enter information about the customer, the building being tested, local climatic conditions and any relevant comments that you would like to save along with the test file.  An overview of the 4 screens are shown on the next page.  You can click on individual fields to enter information, or use the **Tab** key to quickly move between fields.  To clear a screen, click on the **Clear** button at the bottom of each page.  When you are finished with a screen, click on the **Next** button to proceed.  At any time, you can step back to earlier screens by using the **Previous** button.

### Customer, Building, Climate and Comment Screens



**Customer Information Screen:**
The Customer Information Screen is used to input the name, address and phone number of the customer for whom the airtightness test is being performed.



**Building Information Screen:**
The Building Information Screen is used to input the address and physical infomation for the building being tested.



**Climate Information Screen:**
The Climate Information Screen is used to enter weather information needed to calculate weather-dependent test results (e.g. design infiltration rates).  Indoor and outdoor temperature are also entered from this screen.



**Comments Screen:**
The Comments Screen is used to enter an unlimited number of lines of comments on the building being tested.  Comments are stored with the test file and are printed out along with the Detailed Report.

TECTITE
Version 3.2

## 5.3  Auto Test Method

After completing the Comments Screen, click on **Next** to move to the Test Settings Screen.  (**Note:**  If you want to operate in Manual Mode, refer to the **Manual Test Method** section below.)



**Test Settings Screen:**
The Test Settings Screen is used to input settings that will be used during the airtightness test.  When using TECTITE to conduct automated tests, be sure the **Method** button is set to **Auto**.  Click on **Next** to move to the Test Graph Screen.



**Test Graph (Auto Method):**
The automated airtightness test and cruise control features are controlled from this screen.  During an automated test, Blower Door test data are collected by TECTITE at a series of target building pressures, which are designated by the vertical blue lines on the graph.  To begin a test, click on the **Start Test** button.

## 5.4  Manual Test Method

After completing the Comment Screen, click on **Next** to move to the Test Settings Screen:



**Test Settings Screen:**
To set the program for manual entry of Blower Door test data (i.e. building and fan pressure readings), be sure the **Method** button is set to **Manual**.  Click on **Next** to move to the Test Graph Screen.

11



**Test Graph (Manual Method):**
When using Manual Method, manually entered test data are displayed on this screen. To begin entering data, click on the **Data Table** button.



**Data Table:**
The data table is used to input Blower Door test data that were collected manually, rather than collected automatically by TECTITE. The data table will allow entry of up to 10 sets of Blower Door test readings, plus one pre-test and one post-test baseline building pressure reading. The inclusion of baseline readings in the table allows for quick adjustments to entered test readings for baseline stack and wind effects. After you have entered all data into the table, click on **OK** to return to the Test Graph.

## 5.5 Test Results (Auto and Manual Methods)



**Test Results:**
To look at the calculated test results, click on **Next** from the Test Graph Screen. Test results are automatically calculated using all data points displayed on the graph, and values input into the building, climate and test settings screens.

**Note:** If you are conducting an automated test, and were measuring zone pressures during the Blower Door test, a **Next** button will appear at the bottom of the Test Results Screen. Clicking on the **Next** button will take you to the Zone Data Screen.

## 5.6  Zone Data (Auto Method Only)



**Zone Data:**
To look at the measured zone data, click on **Next** from the Test Results Screen. Zone data is only available if you are using an APT DAB with 3 or more pressure channels and have activated the Zonal Pressures feature from the Test Setting Screen.

## 5.7  Using the Goto Menu

The **Goto** item in the Main Menu allows you to quickly move to any active screen within the TECTITE program. Clicking on **Goto** will bring up the following dialog box.

> Customer Info...
> Building Info...
> Climate Info...
> Comments...
> Test Settings...
> Test Graph...
> Test Results...
> Zone Data...

Simply click on one of the active choices to immediately move to that screen. If no test data have been taken, the Test Results and Zone Data Screens will not be available.

TECTITE
Version 3.2

# *Chapter 6*    Editing the Input and Test Settings Screens

## 6.1  Customer Information Screen

The Customer Information Screen is used to input the name, address and phone number of the customer for whom the airtightness test is being conducted.  You may also input the name of the technician performing the test.  The customer's name and address are included in both the Customer and Detailed Reports.  All information entered on this screen is stored as part of the test file.

You can click on individual fields to enter information, or use the **Tab** key to quickly move between fields. To clear the Customer Information Screen, click on the **Clear** button.  When you are finished entering the customer information, click on **Next** to move to the Building  Information Screen.

**Customer Information Screen**



## 6.2  Building Information Screen

The Building Information Screen is used to input the address and physical information for the building being tested.  If any of the fields on this screen are left blank, the test can still be completed, however test results requiring those inputs will not be calculated or displayed on the Test Results Screen.  All information entered on this screen is stored as part of the test file.

You can click on individual fields to enter information, or use the **Tab** key to quickly move between fields. To clear the Building Information Screen, click on the **Clear** button.  When you are finished entering building information, click on **Next** to move to the Climate Information Screen, or **Previous**  to move back to the Customer Information Screen.

TECTITE
Version 3.2

**Building Information Screen**



**Building Address, City, State, Zip:**  Fill out these fields if the address for the building being tested is different from the address on the Customer Screen.

**Volume:**  Enter the building volume in cubic feet.  If you are testing a building, we recommend that you include the basement if it is to be kept closer to inside temperature than outside temperature.  (If you include the basement in the volume, perform the Blower Door test with the door between the basement and the building kept open.)  If you enter a value of 0 (or leave the field blank), all test results requiring the volume will not be calculated or printed (e.g. Air Changes per Hour at 50 Pascals).

**Surface Area:**  Enter the above grade surface area of the exterior envelope of the building, in square feet.  Include all surfaces separating the conditioned space of the building from unconditioned  spaces (e.g. exterior walls, floors over unheated and vented crawlspaces, surfaces separating the building and the attic).  This variable is used to calculate the Minneapolis Leakage Ratio (discussed in the results section).  If you enter a value of  0 (or leave the field blank), the Minneapolis Leakage Ratio will not be calculated.

**# of Bedrooms:**  Enter the number of bedrooms for the building being tested. This number is used to determine ventilation requirements. The occupancy of the building is assumed to be the number of bedrooms plus one or the number of occupants (see below), whichever is larger.

**Floor Area:**  Enter the floor area of the building in square feet.  Include all floors in intentionally heated spaces.  If you have included the basement in your volume calculation, also include the basement in the floor area calculation.  If you enter a value of  0 (or leave the field blank), CFM50/square foot of floor area, the estimated natural infiltration rate and the mechanical ventilation guideline will not be calculated.

**# Stories:**  Enter the number of stories, which are above grade, for the building being tested. The numberof stories is used in the infiltration models which estimate annual average and design infiltrationrates. Because the infiltration models assume an average floor height of 8 feet, calculate the number of stories by taking the average above grade height of the building (in feet), and dividing by 8.  For unheated crawl spaces, do not include the above grade crawl space in the building height.

**# of Occupants:**   Enter the number of occupants that are living in the building. When determining the occupancy of a building, the program uses either the # of occupants, or the # of bedrooms plus one, whichever is greater.

**Heating Fuel Type:**   Click on the fuel type used for heating..

**Heating Fuel Cost:**   Enter the fuel cost for the selected heating fuel type. For example, for natural gas (Gas), enter the cost in $ per CCF.

**Heating Efficiency:**   Enter the annual efficiency (i.e. AFUE) for the heating system. For example, for a gas furnace with an 82.5% AFUE, enter 82.5.

**Electric Cost for Cooling:**   Enter the cost per KWH for the cooling system. For example, enter 0.08 if your electrical rate is 8 cents per KWH.

**SEER Rating of Cooling System:**   Enter the SEER rating for the cooling system.

**Wind Shield Factor:**   Click on the appropriate building wind shielding class. The wind shield factor is used in the infiltration model which estimates natural infiltration rates.

   Shielding Class Description:

| | |
|---|---|
| **Heavy:** | Very heavy shielding; large obstructions surrounding the perimeter within two building heights; typical downtown shielding. |
| **Shielded:** | Obstructions around most of the perimeter, building or trees within 30 feet in most directions; typical suburban shielding. |
| **Moderate:** | Some obstructions within two building heights, thick hedge, solid fence or one neighboring building. |
| **Light:** | Few obstructions, a few trees or a small shed. |
| **Exposed:** | No obstructions. |

## 6.3  Climate Information Screen

The Climate Information Screen is used to enter weather information needed to calculate certain air leakage test results such as the estimated annual and design infiltration rates, the annual cost of air  leakage, and the ventilation guideline. Indoor and Outdoor Temperature inputs are required to complete a building airtightness test and must always be entered prior to beginning a test. If any of the other fields on this screen are left blank, the test can be completed. However, test results requiring those inputs will not be calculated or displayed on the Test Results Screen. All information entered on this screen is stored as part of the test file

To enter climate information, you can use the **Select Climate Location** button (see below), or you can click or **Tab** through the individual fields to enter the information manually. To clear the Climate Information Screen, click on the **Clear** button. When you are finished entering climate data, click on **Next** to move to the Comment Screen, or **Previous** to move back to the Building Information Screen.

**Note:** The Indoor and Outdoor Temperature fields must be entered manually.

**Climate Information Screen**



***Using the Select Climate Location button:***

TECTITE contains a listing of climate data from selected cities in the United States and Canada.  You can automatically load this information into the Climate Information Screen by clicking on the **Select Climate Location** button, and then selecting the city closest to your test site using the **Location** field which appears in the screen.  To use the **Location** field, first click on the selection arrow to bring up the list of cities.  Now browse through the list using the up and down arrows and then click on the city closest to your test site.  The climate data for the selected city will appear in the right hand column of the location window.  To automatically load this information into the Climate Information Screen, click on OK.

**Selecting Climate Location**

| Location Climate Data | |
|---|---|
| You may select climate data for a specific location by using the Climate Location Selection list below. | |
| **Location** | Energy Climate Factor. |
| AL Birmingham | Ventilation Weather Factor |
| AL Mobile | Heating Degree Days (65 F) |
| AK Fairbanks | Cooling Degree Days (70 F) |
| AK Juneau | Winter Design Temp Diff (F) |
| AK Kodiak | |
| AZ Phoenix | Winter Design Wind Speed (MPH) |
| AZ Prescott | Summer Design Temp Diff (F) |
| AZ Tuscon | Summer Design Wind Speed (MPH) |
| AZ Winslow | |
| AZ Yuma | |
| AR Fort Smith | |

OK    Cancel

17

**Indoor Temperature:**  Enter the indoor temperature (in degrees F) at the beginning of the test.  This is a required field that must be entered manually.

**Outdoor Temperature:**  Enter the outdoor temperature (in degrees F) at the beginning of the test.  This is a required field that must be entered manually.

**Heating Degree Days:**  Enter the number of base 65 degree F heating degree days for the location closest to the building being tested.   This field is used in the estimation of annual air leakage costs.

**Cooling Degree Days:**  Enter the number of base 70 degree F cooling degree days for the location closest to the building being tested.   This field is used in the estimation of annual air leakage costs.

**Energy Climate Factor:**  Enter the energy climate adjustment factor for the location closest to the building being tested.  The energy climate factor is used to estimate the average annual natural infiltration rates for purposes of estimating the annual cost of air leakage.  The energy climate factor is part of a simplified version of the LBL infiltration model developed by Max Sherman, and is discussed in more detail in Appendix E of the Operation Manual for the Model 3 Minneapolis Blower Door.  The calculation procedure for estimating the annual cost of air leakage can be found in the Model 3 Operation Manual.

**Ventilation Weather Factor:**  Enter the ventilation weather factor for the location closest to the building being tested.  The ventilation weather factor is used to estimate the average annual natural infiltration rate for purposes of estimating ventilation rates due to infiltration.  The calculation procedure used to estimate average annual ventilation rates is based on ASHRAE Standard 136-1993. Ventilation weather factors can be found in Standard 136-1993.

**Design Winter Temperature Difference and Wind Speed:**  Enter the design winter temperature difference and wind speed for the location closest to the building being tested.  The design winter temperature difference and wind speed are used to calculate the infiltration rate under design winter conditions.  The estimated design infiltration rate can be used in ACCA Manual J load calculations in lieu of Manual J's infiltration estimation procedure.  The calculation procedure used to estimate design infiltration rates is based on the LBL infiltration model and is discussed in more detail in the ASHRAE Fundamentals Handbook, Chapter on Infiltration and Ventilation.

**Design Summer Temperature Difference and Wind Speed:**  Enter the design summer temperature difference for the location closest to the building being tested.  Enter your best estimate of design summer wind speed (data source not available, 7 MPH appears to be commonly used in the HVAC industry).   The design summer temperature difference and wind speed are used to calculate the infiltration rate under design summer conditions.  The estimated design infiltration rate can be used in ACCA Manual J load calculations in lieu of Manual J's infiltration estimation procedure.  The calculation procedure used to estimate design infiltration rates is based on the LBL infiltration model and is discussed in more detail in the ASHRAE Fundamentals Handbook, Chapter on Infiltration and Ventilation.

## 6.4  Comments Screen

The Comments Screen can be used to enter an unlimited number of lines of comments on the building being tested.  Comments are saved along with the building test file and can be printed out as part of the detailed test report.  Typical comments entered on this screen include client interview  information, building and weather conditions during the test, the location of major air leakage sites  etc.  To clear the Comments Screen, click on the **Clear** button.  When you are finished entering comments, click on **Next** to move to the Test Settings Screen, or **Previous** to move back to the Climate Information Screen.

**Note:** You can access standard Windows copy and paste commands within the Comments Screen by clicking on the right mouse button. This allows you to easily move text between TECTITE and other Windows programs such as Microsoft Word.

## 6.5  Test Settings Screen

The Test Settings Screen is used to set up the airtightness test procedures to be used by the TECTITE program. You can click on individual fields to enter information, or use the **Tab** key to quickly move between fields. When you are finished selecting test settings, click on **Next** to move to the Test Graph Screen(s), or **Previous** to move back to the Comments Screen. **Note:** When using the Manual Method for data entry, only **Test Mode** and **Method** are active.

**Test Settings Screen**



*Test Mode:*

Select **Pressurize** if the Blower Door will be blowing air into the building (i.e. the building will be at a higher pressure than outside), or select **Depressurize** if the Blower Door will be blowing air out of the building (i.e. the building will be at a lower pressure than outside). The factory default setting is **Depressurize**.

*Method:*

Click on **Manual** if you will be manually entering the Blower Door airtightness test readings (i.e. house and fan pressure readings), or select **Auto** if TECTITE will be used to perform an automated test.

***Test Pressures (only available when Auto Method is chosen):***

Select the target building pressures at which Blower Door data will be collected by clicking on the appropriate button.

⇒ **CGSB standard (149.10-M86):**    consists of an 8 point Blower Door test conducted at building target pressures varying from 50 to 15 Pascals.  For most users, this is the preferred test method.

⇒ **Custom:**    allows the user to create a custom list of up to 10 target building target pressures at which Blower Door data will be collected.  Once **Custom** has been selected, click on the **Edit Custom Pressures** button to open the list of custom target building pressures.  Click on the **Help** button on the custom pressure list window for more information.

***Zonal Pressures (only available when Auto Method is chosen):***

If you are using an APT DAB with 3 or more pressure channels, you can activate the Zonal Pressures feature (by clicking on the **Active** button) to allow the measurement of building zone pressures using installed pressure channels P3 – P8 during the normal airtightness test sequence.  Once activated, the **Settings** button can be used to access the Zonal Pressures Set-Up Screen. Click on the **Help** button in the Zonal Pressures Set-Up Screen, or refer to *Chapter 10*  for more information on using this feature.

***Auto Test Parameters (only available when Auto Method is chosen):***

⇒ **Samples Per Station:**  The **Samples Per Station** field is the number of readings (or samples) of building pressure and fan flow that are taken at each pressure station (i.e. target building pressure) during an automated test.  Each reading or sample is displayed on the graph as a small dot as it is collected.  The default number of samples is 100, and should work fine for most test applications (you may vary this number from 1 to 1000).  In most cases, larger numbers of samples will lead to higher correlation coefficients.  If the **Zonal Pressures** feature is active, the **Samples Per Station** also determines the number of zone pressure measurements taken for each active zone pressure channel.

If the **CGSB** test standard is selected, the number of samples per station is also used to determine the number of pre and post test baseline building pressure readings that are taken during an automated test sequence.

⇒ **Fan Adjust Rate:**  During either an automated airtightness test or a cruise procedure, the computer is in charge of adjusting the fan speed to reach the desired (or target) building pressures.  The **Fan Adjust Rate** determines how quickly the fan speed changes as the computer tries to achieve the target building pressure.  For most cases, the factory default **Fan Adjust Rate** of 0.5 will work fine. In some cases, such as windy weather, it may be necessary to reduce the fan adjust rate to prevent the fan from responding too quickly to pressure changes caused by the wind.  In such cases, try a lower setting (e.g. 0.2 or 0.1) so that the fan adjusts slowly enough to successfully complete the test.  If you would like to speed up fan response, try a higher setting (e.g. 1.0 or 2.0).

**Note:**  When changing the Fan adjust rate, do not enter values greater than 5 or less than 0.1. In addition, the fan speed can be manually adjusted by dragging the manual fan speed adjustment slider on the Test Graph, or by pressing down on the **Up** and **Down** arrow keys (the arrow keys are only active when the manual adjustment slider is highlighted).

⇒ **Target Tolerance:**  The **Target Tolerance** is used by TECTITE to determine whether the measured building pressure is close enough to the target building pressure so that data collection may begin.  The **Target Tolerance** is a number (in Pascals) stating how close the actual building pressure needs to be to the target pressure before a reading will be taken.  In most cases the factory default setting of 2 (Pa) works fine. In windy weather you may need to increase the target tolerance (e.g. 3 or 4) to account for the fluctuations in building pressure caused by the wind.  The target tolerance used has little impact on the final test results, but your particular test standard (e.g. **CGSB**) may require you to get very close to your target pressures.

**Note:**  If during an automated test you would like to manually instruct the computer to go ahead and take data, click on the **SAMPLE** button.  At this point the computer will proceed with data collection just as if it had decided that the target tolerance had been met.

⇒ **Building High Pressure Limit:**  If TECTITE detects a building pressure higher than the set **Building High Pressure Limit**, the fan will shut off immediately and you will be informed that the maximum allowable building pressure was exceeded.  The purpose of the **Building High Pressure Limit** is to prevent damage to the building from excessive test pressures.  The default setting is 90 Pa.  **Note:** The Blower Door fan calibration parameters are not accurate above test pressures of 80 Pascals.

⇒ **Fan Start %:**  Enter a number, typically in the range 1% to 25%.  At the beginning of an automated test or cruise procedure, the fan output signal from the DG-700/DAB will immediately be set to this value to reduce the delay associated with fan startup.  A good value for this parameter can be determined by manually moving the fan control slider and estimating at which point the fan begins to turn.  This allows you to customize the computer control to the particular combination of fan motor and controller being used.  This value is stored in the building test files (.bld) and configuration files (.cfa).  The default value is 0.

The **Fan Start %** setting will not affect the minimum fan output which may occur during cruising or automated testing.  The computer will still be allowed to reduce the fan output below the **Fan Start %** value if needed to achieve low target pressures.

**Note:**  If you input an inappropriately high **Fan Start %** setting, the fan will begin operation at a high speed and may trigger the warning message (Exceeded Maximum Building Pressure).  Reduce the **Fan Start %** setting if this occurs.

⇒ **Restore Factory Settings:**  The **Restore Factory Settings** button will restore the factory default settings for all five Auto Test Parameter fields.

# *Chapter 7*    **Conducting an Automated Airtightness Test**

## 7.1  Overview of Test Graph Screen (Auto Method)

The automated airtightness test is conducted from the Test Graph Screen.  The main feature of the Test Graph Screen is a plot of Blower Door fan flow (or building leakage) on the vertical axis versus building pressure on the horizontal axis.  During a Blower Door test, data are automatically collected at a series of pre-set target building pressures, which are designated by the vertical (blue) lines on the graph.  If you have selected the **CGSB Test Pressures** (from the Test Settings Screen), there will be 8 target pressure lines at 50, 45, 40, 35, 30, 25, 20 and 15 Pascals of building pressure.  If you selected **Custom Test Pressures** (from the Test Settings Screen), a blue target pressure line will appear for each value that you input into the Custom Target Pressure List.

**Test Graph Screen (Auto Method)**



* Building pressure values shown on the graph and in the Bldg Pressure status window are adjusted for the measured baseline pressure (displayed in the Bldg Baseline status window).
** Zonal pressure values shown in the Zone Pressure status windows are adjusted for measured zonal baseline pressure.

During the automated test sequence, the Blower Door fan will turn on and increase speed until the building pressure reaches the highest target pressure line shown on the graph (e.g. 50 Pa for a CGSB test).  Once the appropriate building pressure is achieved, TECTITE takes a number of simultaneous measurements of building pressure and fan flow (the default number of samples is 100).  Each sample is displayed on the graph as a small dot as it is collected.  When the system is finished collecting samples for the first target pressure, the average value of all samples for that target pressure is displayed as a red circle.  The fan speed is then reduced until the building pressure reaches the next target pressure line and the data collection process is repeated.

If the **Zonal Pressures** feature has been activated from the Test Settings Screen, the Zone Pressure status window will display the current measured zone pressures during the course of the automated test. While TECTITE is collecting data for the building airtightness test (from Channels P1 and P2), it will also collect data from each active zone pressure channel (P3 – P8). The number of data samples taken for each active zone pressure channel is determined by the **Samples per Station** field in the Test Settings Screen.

In addition to the graphical display, TECTITE will provide a series of messages or prompts on the Test Graph Screen to ensure that proper testing procedures are followed. The DAB Status Box directly below the Graph will also provide information on the current operating status of the DG-700 or APT DAB. The system also detects common testing or equipment problems (e.g. tubing connected to the wrong pressure tap) and provides a warning message to the operator.

## 7.2  Selecting the Fan Model

Before beginning a test, be sure that the selected fan model displayed at the top of the Test Graph Screen matches the Blower Door fan being used. To change the selected fan model, click on **Options** located in the Main TECTITE Menu. From the Options Menu, select **Fan Info**.

### Fan Information Window



In the Fan Information window, select the appropriate fan model (or type), and then click on **OK**. You may also input a fan serial number which will be stored along with the building test file, and is printed out on the detailed test report. Importantly, if you change the selected fan model while test data are displayed on the graph, the test data will be automatically cleared.

**Note:** The selected flow ring may be changed directly on the Test Graph Screen by clicking on the selection arrow to the right of the indicated ring. However, in most cases you will not need to change the selected ring from this screen, because TECTITE will prompt you for flow ring selection during the automated test sequence.

## 7.3  Starting an Automated Test

Whenever you are in the Test Graph (Auto Method) Screen, TECTITE checks to be sure that your computer and DG-700 or APT DAB are communicating properly. Automated testing cannot begin until a communication link has been established.

If a communication link has <u>not</u> been established, the **Start** and **Cruise** buttons are grayed out and the message **DATA BOX NOT CONNECTED** appears in the DAB Status Window.  To establish communication, first check to be sure that the serial cable between the computer and the DG-700/DAB has been properly installed.  Also check that the DG-700/DAB has been turned ON and has power (plug in the power supply to the DAB if you are unsure if its internal batteries are charged).  Once a communication link has been established, the message **Idle -  Monitoring** appears in the DAB Status Window and the **Start** and **Cruise** buttons are activated.

For more information on establishing communication between the your computer and the DG-700/DAB, see *Chapter 15*.

*Start Test Button:*

Clicking on the **Start Test** button will begin an automated airtightness test sequence.  TECTITE will guide you through the test sequence using a series of operator messages.

An automated test sequence includes the following steps:

1. The operator is prompted to cover the fan inlet so that TECTITE can measure the baseline building pressure (due to wind and stack effects) prior to the test.  If you are using a Model 3 or 4 Blower Door fan install the no-flow plate; if you are using a Duct Blaster fan install the nylon fan cap,  then click on **OK**.
2. TECTITE will automatically make a number of pre-test baseline pressure measurements (the default number of readings is 100 ) and then display the average value of these readings in the **Bldg Baseline (Pa)** status window on the right side of the screen.  All subsequent building pressure measurements shown on the graph and in the Building Pressure status window will be adjusted by this measured baseline pressure.  **Note:**  TECTITE will also measure the baseline pressure for any active zone pressure channel at the same time.
3. The operator is prompted to remove the fan inlet cover and install the appropriate flow ring on the fan for the beginning of the test.  Use your best judgment and install the flow ring that you think will provide the correct air flow for the highest target pressure.  Don't worry if you guess wrong, the program will instruct you to install a different ring later on if you start with the wrong one.  Click on **OK** after you've removed the inlet cover and installed the chosen flow ring.
4. The operator is now prompted to indicate which flow ring was installed on the fan.  Select the appropriate ring and click on **Proceed with Test**.
5. The fan will automatically turn on and increase speed until the building pressure reaches the highest target pressure line shown on the graph (50 Pa for a CGSB test).[1]  The current fan flow and building pressure is shown on the graph by the moving Fan Flow and Building Pressure Cursor.  Once the appropriate target building pressure is achieved, TECTITE takes a number of simultaneous readings of building pressure and fan flow (the default number of readings is 100).  Each reading is displayed on the graph as a small dot as it is collected.  Once the program is finished collecting readings for the first target pressure line, the average value of all readings for that target pressure is displayed as a red circle.  The fan speed is then reduced until the building pressure reaches the next lowest target pressure line

---

[1]  If the program is unable to reach the highest target pressure line with the fan running full speed, the operator will be prompted to change to the next larger flow ring.  If the fan is in open configuration and still not able to reach the highest target pressure line, the program will display the message "Can't Reach Target Pressure...Collecting Data at Highest Building Pressure" (see Section below  - Operator Messages During the Automated Airtightness Test).

and the data collection process is repeated.  **Note:**  If the Zonal Pressures feature has been activated from the Test Settings Screen, the Zone Pressure status window will display the current measured zone pressure during the course of the automated test.  While TECTITE is collecting data for the building airtightness test (from Channels P1 and P2), it will also collect and store data from each active zone pressure channel (P3 – P8).

6.  After data have been collected for the last target pressure line, the fan turns off and the operator is again prompted to cover the fan inlet for another set of baseline building and zone pressure readings.  After taking the post-test baseline readings, the "*Bldg. Baseline (Pa)*" field is updated with the average value for both pre and post test building baseline readings.

7.  All airtightness test data shown on the graph are now automatically adjusted for the average of the two building baseline readings, and the test is completed.  A "best fit" line is then drawn through the data.

8.  Calculated building airtightness test results can be seen on the Test Results Screen by clicking on **Next**.  The measured zone pressure data are available from the Zone Data Screen (click **Next** from the Test Results Screen, or use the **Goto** Menu Item).

*Using the Sample Button (manually activating data collection):*

The **Sample** button is used to manually activate data collection for a target building pressure line during an automated test sequence, rather than waiting for TECTITE to automatically activate data collection.  This button is particularly useful if it is windy and the building pressures are fluctuating.

*Using the Clear Button (Clearing Data From the Graph):*

The **Clear** button is used to clear all Blower Door data from the graph.  This will not affect the information that you have entered into the test input screens, or any results that you have previously saved.

*Conducting and Displaying Multiple Tests on the Same Graph:*

Data from more than 1 automated test can be displayed on the Test Graph at one time.  This occurs when conducting a second airtightness test (using **Start Test**) and not clearing data before beginning the next test.  If data from multiple tests are displayed on the graph, test results are calculated using all displayed data.  Combining multiple tests can increase the repeatability of test results, which is particularly useful in windy weather.  The # of tests displayed on the Graph is shown by the **Completed Test** indicator.

*Using the Pause Button:*

Once an automated test has been initiated, the **Pause** button can be used to temporarily pause the test sequence.  After clicking on **Pause**, the fan will turn off and the message  *The Test Is Paused*  appears on screen.  From this message box, the user has 3 options:

⇒  Clicking on **Adjust Auto Test Settings** allows you to change the *Fan Adjust Rate*, the *Target Tolerance*, the *Building High Pressure Limit* and the *Fan Start %* fields during the middle of a test.

⇒  Clicking on **Proceed With Test** will restart the test sequence from where the **Pause** button was activated.

⇒  Clicking on **Stop Test** allows you to end the current test sequence.

## 7.4  Stopping an Automated Test

In addition to using the **Pause** button, the fan can be quickly turned off during a test by pressing the **Esc** key, or by clicking on the **Stop Test** button.  After the fan has been turned off, the user can choose to end the current test sequence, or can restart the test.  If data from more than one test are being displayed on the graph, stopping a test will not clear data from previously completed tests.  In addition, stopping a test will not affect information that you have typed into the test input screens or have previously saved.

25

## 7.5  Adjusting the Auto Test Parameters

The Test Settings Screen contains a number of **Auto Test Parameter** fields which are used to adjust data collection and fan control variables during the automated test sequence.  Refer to *Chapter 6* for a detailed description of each of the **Auto Test Parameter** fields.

## 7.6  Operator Messages During the Automated Test

During the airtightness test, the TECTITE program provides a series of on-screen messages or prompts to the operator to ensure that proper testing procedures are followed.  In addition, the program detects common testing or equipment problems (e.g. hoses connected to the wrong pressure tap) and provides a warning message to the operator.  Below is a listing of on-screen test procedure and operator warning messages provided by the TECTITE program:

*Chapter 7   Conducting an Automated Airtightness Test*

| **On- Screen Test Procedure Messages** | **Operator Action Required** |
|---|---|
| *Cover fan inlet to measure starting building pressure baseline. Press OK when ready.* <br> *or* <br> *Cover fan inlet to measure ending building pressure baseline. Press OK when ready.* | Cover the fan inlet so that TECTITE can measure the baseline building pressure (due to wind and stack effects) prior to, or following completion of the test. If you are using a Model 3 Blower Door install the no-flow plate; if you are using a Duct Blaster install the nylon fan cap. |
| *Remove fan inlet cover and install appropriate flow ring. Press OK when ready.* | Remove the no-flow plate or nylon fan cap from the fan inlet so that the fan can be turned on. Install the flow ring that you think will provide the appropriate air flow for the beginning of the test. |
| *Which flow ring is installed?* | Select the flow ring that is currently installed on the fan, and then click on **Proceed with Test**. |
| *Install Ring _ and press here to continue test, OR Press here to end test at previous test pressure.* | TECTITE has determined that a different flow ring should be installed on the fan. Install the ring listed in the message. If the listed ring is not available, or you wish to end the test at this point, click on the end test message.[2] |
| *Remove all rings and press here to continue test, OR Press here to end test at previous test pressure.* | TECTITE has determined that all low flow rings should be removed from the fan. Remove all rings from the inlet of the fan. You may also select to end the test at this point. |
| *This will end testing. Do you wish to end it?* <br> *or* <br> *This will end cruising. Do you wish to end it?* | This message appears when you have pressed **Esc** or clicked on **Stop Test** during a test, or while the cruise control feature is active. To end the test or turn off cruise control, click on **Yes**. |

| **On-Screen Warning Messages** | **Operator Action Required** |
|---|---|
| *Can not reach target pressure and have open fan. Collecting data at highest building pressure.* | No action required. If the fan is in open configuration (i.e. no flow plates installed), running at full speed, and not able to reach the target pressure line, TECTITE will automatically collect data for that target pressure at the highest achievable building pressure. |
| *Warning: Wrong sign (+/-) on building pressure. Check A/P1. Press OK to terminate test.* | The measured building pressure on Channel A/P1 is changing in the wrong direction from the indicated Test Mode. Check to be sure the A/P1 Reference tap is connected to the outside, the A/P1 Input tap is measuring the pressure inside of the building, and that the direction of the Blower Door fan flow is consistent with the indicated Test Mode (i.e. depressurization vs. pressurization). Click on **OK** to end test. |
| *Warning: Wrong sign (+/-) on fan pressure. Check B/P2. Press OK to terminate test.* | The measured fan pressure on Channel B/P2 is changing in the wrong direction. Check to be sure the B/P2 Input tap is connected to the Blower Door fan, and the B/P2 Reference is measuring the pressure in the space upstream of the fan inlet. Click on **OK** to end test. |
| *Warning: Not detecting fan pressure. Check B/P2. Press OK to terminate test.* | The measured fan pressure on Channel B/P2 is less than 1 Pa, but the building pressure is changing. Possible fan pressure tubing disconnect. Check to be sure the B/P2 Input tap is connected to the Blower Door fan, and the B/P2 Reference is measuring the pressure in the space upstream of the fan inlet. Click on **OK** to end test. |
| *Warning: Not detecting fan or building pressure. Check system. Press OK to terminate test.* | TECTITE is not detecting a fan or building pressure reading, even though the program is calling for full fan speed. Check building and fan pressure tubing connections to the DG-700/DAB. If the fan was not running, check the fan speed controller to make sure: <br> - It is properly connected to the fan and plugged into power. <br> - The speed control knob is turned on. <br> - The speed controller is properly connected to the DG-700/DAB. Click on **OK** to end test. |

---

[2] If you end the test and data has been collected for at least one previous target pressure line, test results will be calculated using all data collected prior to ending.

| On Screen Warning Messages | Operator Action Required |
|---|---|
| *Warning:  At full fan speed but <2 Pa building pressure.  Check system.  Press OK to terminate test.* | The measured building pressure on Channel A/P1 is less than 2 Pa when the fan is at full speed.  First check to be sure the A/P1 Reference tap is connected to the outside, and the A/P1 Input is measuring the pressure inside of the building.  Second, check that outside windows and doors in the building are closed and that there are no other large openings to the outside preventing the building pressure from changing. Click on **OK** to end test. |
| *Warning:  Not detecting building pressure on A/P1.* | TECTITE is not detecting a change in building pressure, even though the fan pressure is at least 50 Pa.  Check to be sure that one end of the (green) building reference tubing is connected to the A/P1 Reference tap, and that the other end is placed outside of the building and away from the Blower Door fan flow.  Click on **End Test** to terminate test.

<u>Advanced Users:</u>  If you are conducting an advanced diagnostic procedure where you are trying to maintain or measure very small (or zero) building pressures (e.g. "cruising zero"), you can temporarily turn off this message by checking the **Turn off this warning** box. |
| *Warning:  Excessive building pressure fluctuation.  Check A/P1 tubing/increase Target Tolerance.* | While attempting to reach a target pressure line, the measured building pressure has been fluctuating beyond the Target Tolerance for more than 90 seconds. To determine the cause of the fluctuating building pressure problem, and the appropriate operator action,  see *Chapter 15*.  To proceed with the test, click on **Proceed with Test**, or choose **Cancel Test** to end the current test sequence. |
| *Warning   Maximum allowable building pressure exceeded. Do you wish to terminate test?* | The default maximum allowable measured building pressure is 90 Pascals.  This maximum pressure is designed to prevent accidental damage to the building being tested.  In addition, calibration formulas for the Blower Door fans may not be accurate at back pressures greater than 90 Pascals, depending on the flow ring installed and the fan pressure. Click on **Yes** to end test.

**Note**:  If you input an inappropriately high **Fan Start %** (on the Test Settings Screen), the fan will begin operation at a high speed and may trigger the maximum pressure warning.  Reduce the **Fan Start %** setting if this occurs.  In addition, lowering the **Fan Adjust Rate** (also on the Test Settings Screen) may also help to prevent this message inadvertently being triggered at the start of test procedure. |
| *No test pressures available.* | If the Test Pressure field has been set to Custom, and you have not entered any building pressure values into the custom pressure list (see test Setting Screen), this message appears.  Enter building pressure values into the custom pressure list, or change the Test Pressure field to CGSB. |
| *Data for more than one test will be combined on the graph.* | Data for more than one test can be combined and displayed on the Test Graph at one time.  This occurs when conducting a second airtightness test (by pressing the **Start Test** button) without clearing previously collected data from the graph.  Once multiple test data are combined, test results are calculated using all values from each target pressure line.   The primary reason to combine data from multiple tests is to increase the repeatability of test results in windy weather.

If you would like to save the current test data before adding additional data points, select **Cancel Test** and then save the data using the File menu.  Select **Proceed with Test** to combine data from multiple tests on the graph. |

| On Screen Warning Messages | Operator Action Required |
|---|---|
| *Communication lost.  Testing ended.*<br>*or*<br>*Communication lost.  Cruising ended.* | Communication between the DG-700/DAB and your computer have been disrupted, and the current test or cruise procedure has been ended.  If you were conducting an airtightness test when communication was lost, the test sequence is ended and all data from the current test are cleared from the graph.<br><br>**Note:** If the fan is still running, it can be stopped by completely turning off the knob on the fan speed controller.<br><br>Lost communication can be caused by a poor connection between the DG-700/DAB and your computer, or by a loss of power to the DG-700/DAB.  Check the serial cable between the computer and the DG-700/DAB, and check to be sure the DG-700/DAB is turned on.  If you are unsure if the DAB's internal battery is charged, plug in the power supply to the DAB.  Click on **OK** to return to the Test Graph Screen.  See *Chapter 15* for more information on lost communications. |
| *Warning:  Flow too small to measure.  Press* **OK** *to terminate test.* | You are trying to measure a fan flow below the acceptable operating range of the equipment.  Click on **OK** to end the test. |
| *Cannot start the test because there are not enough pressure channels for the existing test data.  Do you wish to clear the data and proceed with the test?* | You are trying to combine data for more than 1 test, and the current APT DAB being used has fewer pressure channels than were used during the first test.  For example, this message would appear if a 5 pressure channel DAB was used to record 3 zone pressures during the first test, and you are now using a 4 pressure channel DAB to combine data with the first test.  Click on **Yes** to clear all existing test data and proceed with a new test, or click on **No** to end the current test sequence. |
| *Warning: Data box due for re-calibration.* | The DG-700/DAB should be re-calibrated once per year.  If it has been more than 1 year since the last calibration (based on your computer's internal clock), this message will appear.   The calibration date for your DG-700/DAB can be found on the calibration sticker located on the bottom of the unit, or click on **Data Box Info** from the Test Graph (Auto Method) Screen. |
| *Low Battery Warning.  Press* **OK** *to end procedure.* | The program has detected that the DG700/DAB battery is low.  Automated testing and cruise procedures can not begin.  If the low battery warning appears during the middle of an automated test, the current test sequence will be ended and all data from the current test will be cleared.<br><br>The DAB is powered by an internal re-chargeable NiCad battery.  Plug in the 12V power supply supplied with the APT system to charge the NiCad battery.  The fully charged NiCad battery will power the DAB for approximately 6 - 12 hours of testing.  The DAB can be also be operated with the power supply plugged in.<br><br>The DG-700 is powered by 6 AA batteries located in the back battery compartment.  The battery voltage can be viewed by clicking on the DATA BOX INFO button. If the battery voltage drops below 6.1 Volts then TECTITE produces a Low Battery warning and the LCD screen shows a flashing BAT indicator.  As long as the voltage is above 5.5 Volts, the gauge will still make accurate readings.  Once the voltage drops below 5.5 volts, the LCD will show LO BAT and any active TECTITE test or cruise procedure will be terminated and the data discarded.  Therefore it is advisable to replace the batteries the first time the low battery warning is displayed and before the voltage drops to the 5.5 Volt level. |

### 7.7  Manually Adjusting the Fan Speed

The fan speed can be manually adjusted by dragging the Manual Fan Speed adjustment slider on the Test Graph Screen, or by pressing down on the **Up** and **Down** arrow keys.  In order for manual fan speed adjustment to work, a communication link between the computer and DG-700/DAB must have been established, and the message **Idle - Monitoring** should appear in the DAB Status Window.  If the message **DATA BOX NOT CONNECTED** appears in the DAB Status Window, you will need to establish a communication link.  See *Chapter 15*, Problem 1 for more information on establishing a communication link.

### 7.8  Real-Time ACH50 Estimator

During **Idle - Monitoring** (or when the Cruise Control feature is active), TECTITE can display a real-time estimate of Air Changes per Hour at 50 Pascals of building pressure in the ACH50 Status Window.  To estimate ACH50, TECTITE uses the current measured fan flow, the volume estimate input into the Building Information Screen, and an assumed Building Leakage Curve exponent (n value) of 0.65.  The ACH50 Status Window is only active when the current building pressure is between 40 and 60 Pascals, and a valid fan flow measurement is being made. The Real-Time ACH50 display is useful for quickly estimating building leakage rates before conducting a full airtightness test.

**Note:**  The Real-Time ACH50 estimator is not active during an automated test sequence.

**Real-Time ACH50 Estimator**

## 7.9  Using the Display Large Meters Feature

The Display Large Meters feature replaces the graph on the Test Graph (Auto Method) Screen with 3 large status windows showing Real-Time ACH50, Current Fan Flow, and Current Building Pressure.  The feature can be toggled on and off by clicking on **Display Large Meters** from the Options Menu.



The Display Large Meters feature is particularly useful when looking at the computer screen from a distance while "Cruising" or manually adjusting the Blower Door fan in **Idle-Monitoring** mode.  The Real-Time ACH50 Status Window is only active when the current building pressure is between 40 and 60 Pascals, and a valid fan flow measurement is being made.  The Real-Time ACH50 display is not active during an automated test sequence.

**Display Large Meters Feature**

# *Chapter 8*    **Using the Manual Data Entry Method**

## 8.1  Overview of Test Graph Screen (Manual Method)

Manual Method is used to input Blower Door test data (e.g. building pressure and fan flow readings) that were collected manually, rather than collected automatically by TECTITE.  The Manual Method option is only available if the Method field is set to **Manual** from the Test Settings Screen

The figure below shows the Test Graph Screen when using Manual Method.  Like the Auto Method Test Graph Screen, the main feature of the Manual Method Test Graph Screen is a plot of Blower Door fan flow (or building leakage) on the vertical axis versus building pressure on the horizontal axis.  However, when using Manual Method, all auto control buttons and status windows have been removed, and replaced with a **Data Table** button which opens a simple data entry table.  Test data (i.e. fan and building pressure measurements) entered into the Data Table are plotted on the graph, and a best-fit regression line is automatically drawn through the plotted data points.

**Test Graph Screen (Manual Method)**



## 8.2  Selecting the Fan Model

Before entering data into the Data Table, select the Blower Door fan model being used for the test.  To select the fan model, click on **Options** located in the Main TECTITE Menu.  From the Options Menu, select **Fan Info**.  In the Fan Information window, select the appropriate fan model (or type), and then click on **OK**.  You may also input a fan serial number which will be stored along with the building test file, and is printed out on the detailed test report.  Importantly, if you change the selected fan model while test data are displayed on the graph, the test data will be automatically cleared from the graph and the Data Table.

TECTITE
Version 3.2

**Fan Information Window**



## 8.3  Entering Test Data into the Data Table

To manually enter test data, first click on the **Data Table** button from the Test Graph Screen.  The Data Table which appears allows entry of up to 10 sets of Blower Door test readings (arranged in rows), plus one Pre-Test Baseline reading, and one Post-Test Baseline reading.  The use of baseline pressure readings in the Table allows the program to quickly adjust the manually collected test data for baseline stack and wind effects. You can move through the Table using the **Tab** key, or by clicking on the individual entry fields

**Data Table for Manual Entry of Test Readings**



To begin data entry, you must first input a Pre-Test Baseline reading in Pa. Once a Pre-Test Baseline reading has been entered, you may input as few as 1 and as many as 10 sets of test readings.  For each set of test readings, you must enter the measured building pressure (in Pa), the fan configuration corresponding to this set of readings (i.e. which Flow Ring was installed on the fan), and the measured fan flow used to generate the building pressure.  Fan flow can either be entered directly in CFM (by choosing the Flow button in the Flow Data Source field), or by entering the fan pressure signal in Pascals (by choosing the Fan Pressure button in the Flow Data Source field).  If you enter the fan pressure signal, the

flow value will be automatically determined by TECTITE.  If you input fewer than 10 sets of readings, simply leave the remaining rows empty.

The Post-Test Baseline reading is an optional field for those who wish to take a second baseline building pressure reading following completion of the airtightness test.  If you input a Post-Test Baseline reading, the program will use the average of the Pre and Post Baseline readings in its analysis.  If you leave the Post-Test Baseline reading field empty, the program will simply use the Pre-Test reading when adjusting for baseline pressure effects.

When you are finished entering test data into the Table, click on OK to return to the Test Graph.  You can clear the Table at any time by clicking on the **Clear Data** button


## 8.4  Tips on Using a DG-700 Gauge with the Data Table

⇒   Be sure you have the gauge set up properly (refer to your Blower Door or digital gauge manual).
⇒   If you are using the DG-700's **Baseline** feature, enter **0** into the Baseline fields (you may leave the Post-Test Baseline field blank).  This is because the DG-700's **Baseline** feature has already adjusted the building pressure reading(s) for baseline effects.
⇒   If you are using the DG-700's **@50** feature to conduct a one-point Blower Door test, always enter the building pressure as **50** Pa.  This is because the @50 feature automatically adjusts the displayed flow reading to a test pressure of 50 Pa.
⇒   If you take and enter a Pre-Test Baseline reading, be sure to include the proper sign of the reading.
⇒   If you are Depressurizing the building, enter the Building Pressure readings as negative numbers (TECTITE automatically places a negative sign in the Building Pressure entry fields if the Test Mode is set to DEPRESSURIZE).
⇒   If you are Pressurizing the building, enter the Building Pressure readings as positive readings.
⇒   Fan pressure readings can be entered as positive or negative readings.
⇒   If you choose to take and enter a Post-Test Baseline reading, be sure to include the proper sign of the reading.


## 8.5  Tips on Using a DG-3 Gauge with the Data Table

⇒   Be sure you have the gauge set up properly (refer to your Blower Door or digital gauge manual).
⇒   Always take a Pre-Test Baseline pressure reading and enter it into the Data Table.  Be sure to keep track of the proper sign (+ or -) of the baseline reading.
⇒   If you are Depressurizing the building, enter the Building Pressure readings as negative numbers (TECTITE automatically places a negative sign in the Building Pressure entry fields if the Test Mode is set to DEPRESSURIZE).
⇒   If you are Pressurizing the building, enter the Building Pressure readings as positive readings.
⇒   Fan pressure readings can be entered as positive or negative readings.
⇒   If you choose to take and enter a Post-Test Baseline reading, be sure to include the proper sign of the reading.

TECTITE
Version 3.2

## 8.6  Tips on Using Magnehelic Gauges with the Data Table

⇒  Be sure you have the gauges set up properly (refer to your Blower Door manual).

⇒  Always zero the gauges prior to starting the test using the instructions contained in your Blower Door manual.

⇒  Always enter 0 into the Baseline fields (you may leave the Post-Test Baseline field blank).  This is because zeroing the 60 Pa building pressure gauge adjusts the building pressure reading(s) for baseline effects.

⇒  If you are Depressurizing the building, enter the Building Pressure readings as negative numbers (TECTITE automatically places a negative sign in the Building Pressure entry fields if the Test Mode is set to DEPRESSURIZE).

⇒  If you are Pressurizing the building, enter the Building Pressure readings as positive readings.

⇒  Fan pressure readings can be entered as positive or negative readings.

## *Chapter 9*   Viewing Test Results

Once an automated test has been completed, or test data have been manually entered into the Data Table, test results are automatically calculated using all data points displayed on the graph, and values input into the building and climate screens.  To view the Test Results Screen, click on **Next** from either Test Graph Screen.

**Test Results Screen**



**Note:**  If you are conducting an automated test, and are measuring zone pressures during the Blower Door test, a **Next** button will appear at the bottom of the Test Results Screen.  Clicking on the **Next** button will take you to the Zone Data Screen, which is discussed in more detail in *Chapter 10*.

### 9.1  Overview of Test Results Screen

*Airflow At 50 Pascals:*

> **CFM50:**  This is the airflow (in Cubic Feet per Minute) needed to create a change in building pressure of 50 Pascals.  CFM50 is the most commonly used measure of building airtightness.

> **ACH at 50 Pa:**  The Air Changes per Hour (ACH at 50 Pa) is another commonly used measure of building airtightness.  ACH at 50 Pa is the number of complete air changes that will occur in one hour with a 50 Pascal pressure being applied uniformly across the building envelope.  ACH at 50 Pa is a useful method of adjusting (or normalizing) the leakage rate by the size (volume) of the building.  If you did not enter the building volume on the Building Information screen, ACH50 will not be calculated.

> > $\Rightarrow$  ACH at 50 Pa  =   (CFM50 x 60) / building volume in cubic feet

> **CFM50/square foot of floor area:**  This is the CFM50 reading for the building divided by the floor area of the building.  CFM50/square foot adjusts (or normalizes) the leakage rate by the size (floor area) of the building.  If you did not enter the floor area on the Building Information screen, this variable will not be calculated.

> > $\Rightarrow$  CFM50/square foot  =  CFM50 / floor area in square feet

**CFM50/square foot of surface area (MLR):** Also known as the Minneapolis Leakage Ratio (MLR), this is the measured CFM50 divided by the above grade surface area of the building. MLR is a useful method of adjusting (or normalizing) the leakage rate by the amount of envelope surface through which air leakage can occur. The MLR has been particularly useful for weatherization crews working on wood frame buildings. Experience to date has shown that for buildings with a MLR above 1.0, very large cost-effective reductions in infiltration can often be achieved using Blower Door guided infiltration and insulation techniques. In buildings with a calculated MLR in the 0.5 to 1.0 range, it is often more difficult to achieve economical improvements in airtightness. If you did not enter an Above Grade Surface Area value into the Building Information screen, MLR will not be calculated.

$$\Rightarrow \quad \text{MLR} = \text{CFM50} / \text{above grade surface area in square feet}$$

*Leakage Areas:*

Once the leakage rate for the building has been measured, it is useful to estimate the cumulative size (in square inches) of all leaks or holes in the building's air barrier. The estimated leakage areas not only provide us with a way to visualize the physical size of the measured holes in the building, but they are also used in infiltration models to estimate the building's natural air change rate.

The Test Results Screen includes two leakage area calculations, based on differing assumptions about the physical shape of the hole, which are compatible with the two most commonly used infiltration models.

**Equivalent Leakage Area (EqLA):** EqLA is defined by Canadian researchers at the Canadian National Research Council as the area of a sharp edged orifice (a sharp round hole cut in a thin plate) that would leak the same amount of air as the building does at a pressure of 10 Pascals. The EqLA is used in the AIM infiltration model (which is used in the HOT2000 simulation program).

**Effective Leakage Area (ELA):** ELA was developed by Lawrence Berkeley Laboratory (LBL) and is used in their infiltration model. The Effective Leakage Area is defined as the area of a special nozzle-shaped hole (similar to the inlet of your Blower Door fan) that would leak the same amount of air as the building does at a pressure of 4 Pascals.

**Note on Leakage Areas:**

When using leakage area calculations to demonstrate physical changes in building airtightness, we recommend using the EqLA measurement. Typically, EqLA more closely approximates physical changes in building airtightness. For example, if you performed a Blower Door test, and then opened a window to create a 50 square inch hole and repeated the test, the estimated EqLA for the building will have increased by approximately 50 square inches from the initial test results.

*Building Leakage Curve:*

**Coefficient (C) and Exponent (n):** Once an automated airtightness test sequence (or manual entry of data into the table) has been completed, a "best-fit" line (called the Building Leakage Curve) is drawn through the collected Blower Door data. The Building Leakage Curve can be used to estimate the leakage rate of the building at any pressure. If you have conducted a single point test, the program assumes an exponent (n) of 0.65 in its calculation procedures.[3]

---

[3]   The assumed exponent value of 0.65 is based on the average observed exponent for a large sample of residential Blower Door tests.

The Building Leakage Curve is defined by the variables Coefficient (C) and Exponent (n) in the following equation:

$$Q = C \times P^n$$

where:
Q  is airflow into the building (in CFM).
C  is the Coefficient.
P  is the pressure difference between inside and outside of the building.
n  is the Exponent.

Example:  Use the Building Leakage Curve to estimate the exhaust fan airflow in a building needed to create a 5 Pa negative pressure.  From our Blower Door test we determined the following Building Leakage Curve variables.

C = 110.2   n = 0.702    From the equation above:

Airflow (at 5 Pa) =  110.2 x 5^.702  =  341 CFM.  In other words, we estimate from the Building Leakage Curve that it would take exhaust fans with a combined capacity of 340 CFM to cause a 5 Pa pressure change in this building.

**Correlation Coefficient:**  The correlation coefficient is a measure of how well the collected Blower Door data fit onto the "best-fit" Building Leakage Curve.  The closer all data points are to being exactly on the Building Leakage Curve, the larger the calculated correlation coefficient (note:  the largest possible value for the correlation coefficient is 1.0).  Under most operating conditions, the correlation coefficient will be at least 0.99 or higher.

*Estimated Annual Infiltration:*

Estimating the natural infiltration rate of a building is an important step in evaluating indoor air quality and the possible need for mechanical ventilation.  Blower Doors do not directly measure the natural infiltration rates of buildings.  Rather, they measure the building leakage rate at pressures significantly greater than those normally generated by natural forces (i.e. wind and stack effect).  Blower Door measurements are taken at higher pressures because these measurements are highly repeatable and are less subject to large variations due to changes in wind speed and direction.

In essence, a Blower Door test measures the cumulative hole size, or leakage area, in the building's air barrier (see **Leakage Areas** above).  From this measurement of leakage area, estimates of natural infiltration rates can be made using mathematical infiltration models.  The TECTITE program uses the calculation procedure contained in ASHRAE Standard 136-1993 to estimate the <u>average annual natural infiltration rate</u> for purposes of evaluating indoor air quality and the need for mechanical ventilation.

**CFM, ACH and CFM/person:**  The estimated annual natural infiltration rate (based on ASHRAE Standard 136-1993) is expressed in Cubic Feet per Minute (CFM), Air Changes Per Hour (ACH), and CFM per person.  When determining occupancy for the CFM/person calculation, the program uses the number of bedrooms plus one, or the number of occupants, whichever is greater.

**Notes on Estimated Annual Infiltration Rates:**

⇒  Daily and seasonal naturally occurring air change rates will vary dramatically from the estimated average annual rate calculated here due to changes in weather conditions (i.e. wind and outside temperature).

TECTITE
Version 3.2

⇒   The physical location of the holes in the building air barrier compared to the assumptions used in the infiltration model will cause actual annual infiltration rates to vary from the estimated values.  Research done in the Pacific Northwest on a large sample of houses suggests that estimated infiltration rates for an individual house (based on a Blower Door test) may vary by as much as a factor of two or more when compared to PFT tracer gas tests.  (PFT tracer gas tests are one of the most accurate methods of measuring actual natural infiltration rates.)

⇒   The annual average infiltration estimates from ASHRAE Standard 136-1993 should be used only for evaluating detached single-family dwellings, and are not appropriate for use in estimating peak pollutant levels or energy loss due to infiltration.  If any of the building leakage is located in the forced air distribution system, actual air leakage rates may be much greater than the estimates provided here.  Duct leaks result in much greater air leakage because they are subjected to much higher pressures than typical building leaks.

### *Estimated Design Infiltration:*

In addition to estimating an annual infiltration rate above, the program estimates the design winter and summer infiltration rates for the building.  The design infiltration rates are the infiltration rates used to calculate winter and summer peak loads for purposes of sizing heating and cooling equipment.  The calculated design infiltration rates can be used in ACCA Manual J load calculations in lieu of the estimation procedures listed in Manual J.  The estimation procedure uses the design wind speed and temperature difference values input into the Climate Information Screen, and are based on the calculation procedures listed in the ASHRAE Fundamentals Handbook, Chapter on Infiltration and Ventilation.

**Winter and Summer:  CFM, ACH:**  The estimated design infiltration rates are expressed in Cubic Feet per Minute (CFM), and Air Changes per Hour (ACH).

### *Mechanical Ventilation Guideline:*

It is possible, even easy in the case of new construction or when air sealing work is done by trained skilled contractors, to increase the airtightness of a house to the point where natural air change rates (from air leakage) may not provide adequate ventilation rates to maintain acceptable indoor air quality.  To help evaluate the need for mechanical ventilation in buildings, national ventilation guidelines have been established by ASHRAE.  The recommended whole building mechanical ventilation rate presented in this version of TECTITE is based on ASHRAE Standard 62.2 and is only appropriate for low-rise residential structures.

**Recommended Whole Building Mechanical Ventilation Rate:** This value is the recommended whole building ventilation rate to be supplied on a continuous basis using a mechanical ventilation system.  The recommended mechanical ventilation rate is based on 7.5 CFM per person (or number of bedrooms plus one – whichever is greater), plus 1 CFM per 100 square feet of floor area.  This guideline assumes that in addition to the mechanical ventilation, natural infiltration is providing 2 CFM per 100 square feet of floor area..

For buildings where the estimated annual natural infiltration rate (based on the Blower Door test) is greater than 2 CFM per 100 square feet of floor area, the recommended mechanical ventilation rate is reduced to provide ventilation credit for excess infiltration.  In these cases, the recommended mechanical ventilation rate is reduced by the following amount:

0.5 x (estimated annual natural infiltration rate (CFM) –  0.02 CFM x sq. ft. of floor area )

**Notes on Ventilation Guidelines:**

⇒ ASHRAE Standard 62.2 also contains requirements for local kitchen and bathroom mechanical exhaust systems. These local exhaust systems may be incorporated into a whole building ventilation strategy. Consult Standard 62.2 for more information on ventilation strategies and specific requirements and exceptions contained in the Standard.

⇒ Compliance with the ventilation guideline does not guarantee that a moisture or indoor air quality (IAQ) problem will not develop. Many factors contribute to indoor air quality including ventilation rates, sources and locations of pollutants, and occupant behavior. Additional testing (including combustion safety testing) is needed to fully evaluate air quality in buildings. In many cases, a combination of pollutant source control and mechanical ventilation will be required in order to ensure adequate indoor air quality.

⇒ Previous versions of TECTITE used ASHRAE Standard 62-1989 to determine an annual ventilation guideline. The Standard 62-1989 guideline (which was superceded by Standard 62.2) was based on 15 CFM per person or 0.35 Air Changes per Hour (whichever was greater).

*Estimated Cost of Air Leakage:*

The program estimates the annual cost associated with air leakage, both for heating and cooling. The equations used to calculate the annual cost for air leakage are:

$$\text{Annual Heating Cost} = \frac{26 \times HDD \times \text{Fuel Price} \times CFM50}{N \times \text{Seasonal Efficiency}} \times 0.6$$

- HDD is the annual base 65 F heating degree days for the building location.
- The Fuel Price is the cost of fuel in dollars per Btu.
- N is the Energy Climate Factor from the Climate Information Screen (adjusted for wind shielding and building height). See Appendix E of the Model 3 Blower Door Operation Manual for more information on this calculation procedure.
- Seasonal Efficiency is the AFUE rating of the heating system.

$$\text{Annual Cooling Cost} = \frac{.026 \times CDD \times \text{Fuel Price} \times CFM50}{N \times SEER}$$

- CDD is the base 70 F cooling degree days for the building location.
- The Fuel Price is the cost of electricity in dollars per kwh.
- N is the Energy Climate Factor from the Climate Screen (adjusted for wind shielding and building height). See Appendix E of the Model 3 Blower Door Operation Manual for more information on this calculation procedure.
- SEER is the SEER rating for the air conditioner.

**Note:** Cooling Cost procedure is based on sensible loads only. In hot humid climates, latent loads due to air leakage can be greater than the sensible loads which are estimated by this procedure.

# *Chapter 10*   Measuring Building Zone Pressures

Many important air leaks in a building are not direct leaks to the outside. Indirect air leaks, or "series leaks", often follow complicated paths through building cavities and through unconditioned zones (such as attics, crawlspaces or garages) on their way into or out of the building. Attic bypasses are a good example of a series leak. Air leaving the house first must flow through the ceiling/attic boundary and then through the attic/roof boundary before exiting the house.

Diagnostic procedures have recently been developed to help analyze series leakage paths in buildings. These diagnostic procedures, usually called pressure diagnostics, combine standard Blower Door airtightness tests with building zone pressure measurements to help prioritize airsealing activities. The TECTITE program can be used to automate the measurement of building zone pressures during a building airtightness test. The zone pressure test results can then be used directly as a performance measurement, or as inputs into a separate series leakage analysis program such as the ZPD Calculation Utility program available at no charge from The Energy Conservatory website (www.energyconservatory.com).

## 10.1  Using the Zonal Pressure Measurement Feature

In order to make use of TECTITE's zonal pressure measurement feature, you must have an APT DAB with 3 or more installed pressure channels. During an automated airtightness test channels P1 and P2 are used to measure building pressure and fan flow respectively. Installed channels P3 through P8 can be used to measure zonal pressures during the airtightness test.

To activate the zonal pressure feature, first click on the **Active** button in the Zonal Pressures field on the Test Settings Screen. Now click on the **Settings** button to bring up the Zonal Pressures Set-Up Screen.

**Zonal Pressures Set-Up Screen**



From this screen you can configure TECTITE to measure zonal pressures during the automated airtightness test. For each installed pressure channel that you want to use, click on the appropriate check box under "Activate". Edit the corresponding Zone Name field with a descriptive label for the zone being measured. Now choose the reference pressure location for that zone in the "With Reference To" field.

When choosing the reference pressure location for a zone, we recommend that you choose "outside" if the zone being measured is intended to be better connected to the outside (such as in the case of a vented attic, or a garage), or choose inside if the zone is intended to be better connected to the inside (such as in the case of most basements).

The information that you have entered on the Zonal Pressure Set-Up Screen will be stored when you save a test file or a configuration file. You may wish to make zonal pressure set-up part of your default configuration file (see *Chapter 14* for information on creating and using configuration files). Once you have completed the Zonal Pressure Set-Up Screen, click on OK to return to the Test Settings Screen.

## 10.2  Connecting Tubing to the DAB for Zone Pressure Measurements

After the Zonal Pressure Set-Up Screen has been completed, you will need to run tubing between the DAB and the zones to be tested. The first step is to connect tubing between the zone and the appropriate Input tap on the DAB. For example, if you have designated P3 to measure attic pressure, connect tubing from the attic space to the P3 Input tap. You will now need to connect the Reference pressure tap for each zone channel to the reference space that you have designated in the Zonal Pressure Set-Up Screen (i.e. outside or inside). For example, if you have set up Channel P3 to measure attic pressure with reference to outside, you will need to connect the P3 Reference tap to tubing running outside.

**Connecting Tubing to the DAB for Zone Testing**



Connect Input taps to zone spaces.

INPUT   P1   P2   P3   P4   P5   P6   P7   P8
REF

Connect Reference taps to reference location
designated in Zonal Pressure Set-Up Screen.

**Note:**  If more than 1 channel is being referenced to the outside, run a single piece of tubing to the outside and use "T" connectors (along with short pieces of tubing) to connect the outside tubing to multiple reference pressure taps.

## 10.3  Taking and Storing Zone Pressure Measurements

Once the Zonal Pressures feature has been activated and the Set-Up Screen completed, the zone pressure status windows will appear at the top of the Test Graph (Auto Method) Screen.  Operating status windows will only appear for installed pressure channels that have been activated in the Set-Up Screen.

**Zone Pressure Status Windows**



To begin taking zone pressure measurements, you must initiate an airtightness test sequence by clicking on the **Start Test** button.  Zone pressure measurements, including baseline zone pressures, are taken at the same time that TECTITE is collecting building pressure and fan flow measurements for the airtightness test. For example, if you are conducting a standard CGSB airtightness test procedure at 8 separate target building pressures, TECTITE will collect 8 sets of zone pressure measurements, along with a pre-test and post-test baseline measurement.  The number of samples taken at each target pressure for the zone pressure channels is determined by the **Samples Per Station** field on the Test Setting Screen.

**Note:** Zonal pressures displayed in the status windows are adjusted for their current baseline zone pressure readings.  During a test sequence, numbers only appear in the zone pressure status windows during data sampling.

## 10.4  Viewing Zone Data

Once the automated Blower Door test is completed, the measured zone data are shown on the Zone Data Screen.  To view the Zone Data Screen, click on **Next** from the Test Results Screen, or choose **Zone Data** from the Goto Menu.

**Zone Data Screen**



## 10.5  Overview of Zone Data Screen

The left side of the Zone Data Screen contains a graph of measured zonal pressure (y-axis) versus house pressure (x-axis). The pressure data points shown on the graph are not adjusted for measured baseline zones pressures, and the baseline pressure measurements themselves are included on the graph. Each data point shown on the graph is an average of all samples taken for that zone at a particular target building pressure. Data for an individual zone can be temporarily removed from the graph by clicking on the zone name or the check box next to the name. The graph is automatically re-scaled to accommodate all active zone channels.

The columns to the right of the graph provide summary data for each zone. The summary data can be used directly as a performance measurement, or as inputs into a separate series leakage analysis program.

⇒ **House to Zone @ 50 Pa:**  This is the estimated change in house to zone pressure (in Pascals) that would occur when the house to outside pressure is changed by 50 Pascals, based on a linear relationship between house pressure and zone pressure.

⇒ **Zone to Outside @ 50 Pa:**  This is the estimated change in zone to outside pressure (in Pascals) that would occur when the house to outside pressure is changed by 50 Pascals, based on a linear relationship between house pressure and zone pressure.

⇒ **+/-:**  The third numerical column is the estimated repeatability of the **House to Zone @ 50 Pa**, and the **Zone to Outside @ 50 Pa** estimates. If you were to repeat this test under the same building setup and weather conditions, the new results would not likely differ by more than the estimated repeatability.

⇒ **Pressure Ratio:**  This is the **Zone to Outside @ 50 Pa** estimate divided by 50.  The Pressure Ratio will almost always be a number between 0 and 1.  If the Pressure Ratio is between 0.0 and 0.5, then the zone being measured is better connected to outside than inside.  If the Pressure Ratio is between 0.5 and 1.0, then the zone being measured is better connected to inside than outside.  As a simple memory aid:  remember that "0 = O̲utside" and "1 = I̲nside".

**Example Pressure Ratios**

| House to Zone @ 50 Pa | Zone to Outside @ 50 Pa | Pressure Ratio |
|:---:|:---:|:---|
| 50 | 0 | 0.00 (zone is outside) |
| 49 | 1 | 0.02 |
| 45 | 5 | 0.10 |
| 40 | 10 | 0.20 |
| 30 | 20 | 0.40 |
| 25 | 25 | 0.50 |
| 20 | 30 | 0.60 |
| 10 | 40 | 0.80 |
| 5 | 45 | 0.90 |
| 1 | 49 | 0.98 |
| 0 | 50 | 1.00 (zone is inside) |

⇒ **+/-:**  The fifth numerical column is the estimated repeatability of the **Pressure Ratio.**  If you were to repeat this test under the same building setup and weather conditions, the new **Pressure Ratio** would not likely differ by more than the estimated repeatability.

**Note:**  If you have set up the pressure hoses to your DAB correctly, the **House to Zone @ 50** and **Zone to Outside at 50** estimates will almost always appear as positive numbers, whether you are depressurizing or pressurizing the building.  If these estimates appear as negative numbers, you have probably connected the hoses incorrectly, or have designated the wrong reference location in the Zone Pressure Set-Up Screen.

## 10.6  ZPD Input Table

If you are using The Energy Conservatory's ZPD Calculation Utility program to estimate air leakage rates from zones monitored during an automated Blower Door test, the ZPD Input Table contains all of the test data required to be input into the calculation utility program.  The ZPD Input Table can be found at the end of the Zone Data Report which is available from the main **File** menu (see *Chapter 12  Printing Test Reports* for more information).  The ZPD Input Table is not contained on the Zone Data Screen.

# *Chapter 11*    Saving and Retrieving Building Test Files

## 11.1  Saving Building Test Files

Test files can be saved at any time by selecting **File** from the Main TECTITE Menu, and then clicking on
**Save Current Test File** which appears in the File Menu.



Saved building test files contain all information entered into the Customer, Building, Climate, Comments
and Test Settings Screens, as well as all test data shown on the Graph and Zone Data Screens.  When saving
a test file, you will need to enter a file name in the file saving browser that appears on screen.  You may also
choose a different destination folder for the saved file by clicking on the **Save in** window.  Once you have
chosen a file name and destination, click on **Save**.

**Saving File Browser**



**Note:**  All building test files are automatically given a *.bld* extension.

## 11.2  Retrieving Building Test Files

To retrieve a previously saved building test file for viewing, editing or printing, first select **File** from the
Main TECTITE Menu, and then click on **Retrieve Existing Test** which appears in the File Menu.

After selecting the "Retrieve" option, a file browser will appear on screen which lists all the building (*.bld*) files contained in the default folder. To select a file, click on the file name from the list and then click on **Open**. Once the file has been selected, the file information is loaded into the TECTITE program and the Customer Screen appears. To change the folder being listed, click on the **Look in** window.

**Retrieving File Browser**



## 11.3  Retrieving a Previous Test as the Starting Point for a New Test

If you want to perform a repeat test at a building that you have previously tested, it is very convenient to start by retrieving the old test. Choose **Retrieve Existing Test** from the File menu and select the old building test file. As you go through the data entry screens, check for any information that has changed since the old test was performed.

Importantly, when you get to the Test Graph screen click on the **Clear Data** button. This clears the Blower Door test data (including zone pressure data) so that you can perform a new airtightness test. Use of the **Clear Data** button will not affect the original building test file stored on your computer. When you are done, save your new test using a new file name.

*Manual Method Users:*

When using the Manual data entry method, the data on the graph can be cleared by clicking on the **Clear Data** button from the Data Table window.

## 11.4  Format of Saved Building Files

All building test files (*.bld*) are space delimited ASCII text files. The format for saved building files is shown below.

**Format of Saved Test Files**

TECTITE Version: ———————————— *Software Version*
Flow_Units:
Building Dimension_Units:
Leakage_Dimension_Units:
Temperature_Units:
Serial_Number:
Last_Calibration_Date:
Pr_Channels:
Device_Type: *(1=APT, 2=DG-700)*
DAB Calibration Parameters:
   *(depends on Device Type)*      *DAB Parameters*


Test_Date: 7-31-97
Technician: Bill Smith
Name: Jim Darby
Address: 1507 Center Ave.
Address_Line2:             *Customer Info*
City: Wheaton
State: IL
Zip: 60187
Phone: 708-668-8469
Fax:
Building_Address:
Building_Address_Line2:
Building_City:
Building_State:
Building_Zip:
Volume: 28500
Floor: 2400
Surface: 1850
Stories: 2
Bedrooms: 4
Occupants: 4
Windshield: L
Heat_Fuel: G
Heat_Cost: 0.85           *Building Info*
Heat_Eff: 92
Cool_Cost: 0.13
SEER: 12
Gas: ccf 0.85 92
Propane: gallon
Electric: gallon
Oil: kwh
Wood: cord
Coal: ton
Heat Pump: kwh

Inside_Temp: 70
Outside_Temp: 85
Heat_Degree_Day: 6155
Cool_Degree_day: 430
Energy_Climate_Factor: 18
Vent_Climate_Factor: 0.93                                    ***Climate Info***
Design_Winter_Temp_Diff: 71
Design_Summer_Temp_Diff: 15
Design_Winter_Wind_Speed: 12
Design_Summer_Wind_Speed: 7
Location_Climate_Data:

Business: Smith and Sons Heating
B_Address: 5678 Main St.
B_Address_Line2:
B_City: Wheaton
B_State: IL                                                 ***Business Info***
B_Zip: 60187
B_Phone: 708-222-5555
B_Fax

Comments: Owner complains of excess humidity in winter.
Downspouts dump right at base of foundation .              ***Comments***
2 smokers.

Build_Press_#1:
Build_Press_#2:
Build_Press_#3:
Build_Press_#4:
Build_Press_#5:
Build_Press_#6:          ***Target Building Pressures (Auto Method-Custom Pressures)***
Build_Press_#7:
Build_Press_#8:
Build_Press_#9:
Build_Press_#10:

Manual_Entry_Rows: 10
Manual_Entry_Data_0: -1 1.0 0.0 0.0
Manual_Entry_Data_1: 1 -52 272 2895
Manual_Entry_Data_2: 1 -45 240 2721
Manual_Entry_Data_3: 1 -39 208 2535            ***Data Table Entries***
Manual_Entry_Data_4: 1 -30 165 2260           ***(Manual Method)***
Manual_Entry_Data_5: 1 -25 135 2047
Manual_Entry_Data_6: 1 -20 109 1841
Manual_Entry_Data_11: -1 0 0.0 0.0

Build_Test_Mode: D
Build_Standard: C
Build_Test_Method: M
Target_Tolerance: 2.0
Fan_adjust: 0.5
Data_samples: 100                              ***Test Settings***
Building_High_Pressure_Limit: 80
Zonal_Pressures_Active:
Zone3_Active:
Zone3_Name:
Zone3_Reference:
Zone4_Active:
Zone4_Name:
Zone4_Reference:
(repeats through Zone8)

```
Station_count: 8
Complete_test: 1
Data_pt_0: -1 0.000000 1.000000 0.000000 0.000000 0.000000 0.000000
Data_pt_1: 1 -52.000000 -52.000000 272.000000 2895.000000 0.000000 0.000000
Data_pt_2: 1 -45.000000 -45.000000 240.000000 2721.000000 0.000000 0.000000
Data_pt_3: 1 -39.000000 -39.000000 208.000000 2535.000000 0.000000 0.000000          *Test Data*[4]
Data_pt_4: 1 -30.000000 -30.000000 165.000000 2260.000000 0.000000 0.000000
Data_pt_5: 1 -25.000000 -25.000000 135.000000 2047.000000 0.000000 0.000000
Data_pt_6: 1 -20.000000 -20.000000 109.000000 1841.000000 0.000000 0.000000
Data_pt_7: -1 0.000000 0.000000 0.000000 0.000000 0.000000 0.000000
Q50: 2879.024082
Q50_err: 0.322922
ACH50: 6.061103
ACH50_err: 0.000011
Q50_sq.ft.: 1.199593
EOA50: 378.407409
EOA50_err: 0.042444
EqLA: 390.747088
EqLA_err: 1.029979
ELA: 242.780169
ELA_err: 1.716245
MLR: 1.556229
C: 440.183579
C_err: 2.764983                                                                      *Calculated Test Results*
n: 0.480062
n_err: 0.007609
r: 0.999498
Est_Nat_CFM: 382.054248
Est_Nat_ACH: 0.804325
Est_Nat_CFM_Occ: 76.410850
Min_CFM_Mech: 166.250000
Winter_Des_CFM: 483.413055
Winter_Des_ACH: 1.017712
Summer_Des_CFM: 250.240293
Summer_Des_ACH: 0.526822
Est_Heat_Cost_Year: 187.097373
Est_Cool_Cost_Year: 25.543938
```

---

[4]  Columns from left to right:  Fan Configuration (-1 = baseline reading), Target Building Pressure, Building Pressure Reading (* for auto test, the average of all samples collected at the target pressure), Fan Pressure Reading (* for auto test, the average of all samples collected at the target pressure), Calculated Flow in CFM (* for auto test, the average of all samples collected at the target pressure), Standard Deviation of the Building Pressure Reading, Standard Deviation of the Fan Flow Reading, (if Zonal Pressures Active) Zone 3 Pressure Reading, Standard Deviation of Zone 3 Pressure Reading, Zone 4 Pressure Reading, Standardard Deviation of Zone 4 Pressure Reading (repeats through Zone 8).

Build_Fan_Model: 3
Model3_Serial_Number:
DuctBlasterA_Serial_Number:
DuctBlasterB_Serial_Number:
Fan_Calib_Model3_Ring0: 490.2 0.4945
Fan_Calib_Model3_Ring1: 180.7 0.4948
Fan_Calib_Model3_Ring2: 57.2 0.5065
Fan_Calib_Model3_Ring3: 22.34 0.5048
Fan_Calib_Model3_Ring4: 7.596 0.4927
Fan_Calib_Model3_Ring5: 3.041 0.5016
Fan_Calib_DBA_Ring0: 104.38 0.5
Fan_Calib_DBA_Ring1: 39.25 0.5
Fan_Calib_DBA_Ring2: 15.31 0.5
Fan_Calib_DBA_Ring3: 6.26 0.5
Fan_Calib_DBA_Ring4: 0 0
Fan_Calib_DBA_Ring5: 0 0
Fan_Calib_DBB_Ring0: 108.5 0.5
Fan_Calib_DBB_Ring1: 41.42 0.5
Fan_Calib_DBB_Ring2: 15.8 0.5
Fan_Calib_DBB_Ring3: 6.33 0.5
Fan_Calib_DBB_Ring4: 0 0
Fan_Calib_DBB_Ring5: 0 0

*Fan Info*

# *Chapter 12*    **Printing Test Reports**

## 12.1  Printing and Preview Options

Report printing and previewing options are available by clicking on **File** in the Main Menu.

```
Print Customer Report...
Print Detailed Report...
Print Zone Data Report...
Print Graph...


Preview Customer Report
Preview Detailed Report
Preview Zone Data Report
Preview Graph
```

The TECTITE program includes a choice of three pre-formatted reports: a 1 page Customer Report, a 3 page Detailed Report and a 1 page Zone Data Report.  In addition, the airtightness Test Graph can be printed separately.  **Note:**  The actual length of the Detailed Report and Zone Data Report depends on the number of data points collected during the test.

The Customer Report contains the basic building airtightness test results and a simplified description of how to interpret the test results.  Detailed Reports contain a complete listing of the building airtightness data and results, as well as any comments input into the Comment Screen.  The Zone Data Report contains a listing of all measured zone pressures and estimated building to zone and zone to outside pressures at 50 Pascals of building pressure, as well as a graph of zone pressures versus building pressures. In addition, the end of the Zone Data Report includes a ZPD Input Table which contains test data which can be directly input into The Energy Conservatory's ZPD Calculation Utility program used to estimate the leakage rate of monitored zones.

The Test Graph is similar to the graph of fan flow (or leakage) vs. building pressure from the Test Graph Screen.  It can be used to visually estimate the relationship between air leakage and  building pressure.

The printing and preview functions within TECTITE utilize the Windows printer drivers and configuration options currently installed in your computer.

## 12.2  Putting Your Business Name and Logo at the Top of the Reports

The name, address and phone number for your business can be placed at the top of the first page of all printed reports by completing the Business Info window.  To access the Business Info window, click on **Options** in the Main Menu, and then click on **Business Info** from the Options Menu.  Information entered in the Business Info window is saved as part of the data files.

### Business Information Window



To insert a logo at the top of the printed reports, simply place an electronic image of your logo in the working directory of the TECTITE program. The image file must be named "reportlogo", and the file format must be either a Windows Bitmap File (*.bmp* extension) or a Windows Enhanced Meta File (.*emf* extension). The default working directory for TECTITE Ver. 3.2 is *C:\Program Files\Energy Conservatory\TECTITE 3.2*. If you chose a custom install directory for TECTITE during program installation, you will need to place the image file in that directory.

If a *reportlogo.bmp* or *reportlogo.emf* file is found by TECTITE, the image is automatically placed in the upper left hand corner of the printed reports. The image is placed in a 2" wide by 1" high box, and TECTITE sizes the image (using its saved aspect ratio) to maximize its size within the box. Because TECTITE uses a 2" wide by 1" high image box, images saved with a 2 to 1 width to height ratio will completely fill the image box. Images saved with any other aspect ratio will completely fill the image box in only one dimension.

### Top of Customer Report with Business Name and Logo



**Sample Customer Report (without logo)**

AIR LEAKAGE TEST RESULTS

Wilson's Consulting Services
566 Birch Street
Minneapolis, MN 55409
Phone: 612-333-3333

---

Date of Test: 1-04-2000  Test File: Example Manual Test

Test Performed For:    Tom Jones
2345 First Ave.
Minneapolis, MN 55444
Phone 612-566-6000

---

**Test Results**

1. Measured Leakage:              205 sq. in.  (3673 CFM @ 50 Pa)

   This leakage area represents the cumulative size of all holes and cracks in the exterior of your house through which unconditioned outside air enters your home and conditioned air escapes.

2. Est. Annual Air Change Rate:    0.49 air changes/hour (36.2 CFM/person) *

3. Est. Cost of Air Leakage        $ 278 per year (heating and cooling) *

---

**Ventilation Guideline**

ASHRAE Standard 62.2-2003 recommends minimum ventilation requirements for residential buildings to maintain acceptable indoor air quality.  Based on the results of this airtightness test, Standard 62.2-2003 recommends that a whole building mechanical ventilation rate of 8 CFM  be continuously provided in this building. **

---

**Additional Information**

If some of the house leakage is located in the forced air duct system, both the leakage rate and energy costs will tend to be higher than reported above.  Duct leaks result in much greater air leakage because they are subjected to much higher pressures than typical house leaks.  Duct leaks can also seriously degrade indoor air quality.

Many factors contribute to indoor air quality including ventilation rates, sources and locations of pollutants, proper operation of combustion appliances and occupant behavior.  Additional testing is needed to fully evaluate the air quality in your house.

* The estimated annual air change rate is based on ASHRAE Standard 136-93 and assumes no mechanical ventilation.  Actual air change rates and costs may differ from these estimates by a factor of 2 or more.

** ASHRAE Standard 62.2-2003 also contains requirements for local kitchen and bathroom mechanical exhaust systems.  These local exhaust systems may be incorporated into a whole building ventilation strategy.  Consult Standard 62.2-2003 for more information on ventilation strategies and specific requirements and exceptions contained in the Standard.

TECTITE
Version 3.2

**Sample Detailed Report (without logo)**

---

### BUILDING LEAKAGE TEST

Wilson's Consulting Services
566 Birch Street
Minneapolis, MN 54666
Phone: 612-333-3333

---

Date of Test: 3-12-99   Test File: example1          Technician:  Bill Smith

Customer:   Tom Jones                                Building Address:
            2345 First Ave.
            Minneapolis, Mn 55533
            Phone 612-566-6000

**Test Results**

1.  Airflow at 50 Pascals:        1566 CFM ( +/- 1.4 %)
    (50 Pa = 0.2 w.c.)            5.05 ACH
                                  0.65 CFM per ft2 floor area

2.  Leakage Areas:               160.8 in2 ( +/- 7.2 %) Canadian Equivalent L.A. @ 10 Pa
                                 85.2 in2 ( +/- 11.5 %) LBL Effective L.A. @ 4 Pa

3.  Minneapolis Leakage Ratio:   0.60 CFM50 per ft2 surface area

4.  Building Leakage Curve:      Flow Coefficient (C) = 121.4  ( +/- 18.0 %)
                                 Exponent (n) = 0.654 ( +/- 0.047 )
                                 Correlation Coefficient = 0.99225

5.  Test Settings                Test Standard = CGSB
                                 Test Mode = Depressurization
                                 Equipment = Model 3 Minneapolis Blower Door, S/N

**Infiltration Estimates**

1.  Estimated Average Annual Infiltration Rate:     91.3 CFM
                                                    0.29 ACH
                                                    18.3 CFM per person
                                                        (using bedrooms + 1)

2.  Estimated Design Infiltration Rate:    Winter:  153.9 CFM
                                                    0.50 ACH

                                           Summer:  55.3 CFM
                                                    0.18 ACH

3   Recommended Whole Building Mechanical            7.8 CFM
    Ventilation Rate: (based on ASHRAE 62.2-2003)

**Cost Estimates**

1.  Estimated Cost of Air Leakage for Heating:      $ 421 per year heating

2.  Estimated Cost of Air Leakage for Cooling:      $  10 per year cooling

---

BUILDING LEAKAGE TEST   Page 2

Date of Test: 3-12-99   Test File: example1

**Building Conditions**

| | | | |
|---|---|---|---|
| Inside Temperature: | 70  deg F | Heating Fuel: | Electric |
| Outside Temperature: | 70  deg F | Heating Fuel Cost: | $0.100/kwh |
| # of Stories | 2.0 | Heating Efficiency: | 100.00 |
| | | Heating Degree Days: | 7981 |
| Wind Shield: | M | Cooling Fuel Cost: | $0.100/kwh |
| # of Occupants | 4.0 | Cooling SEER: | 9.5 |
| | | Cooling Degree Days: | 330 |
| # of Bedrooms: | 4.0 | | |
| Volume: | 18600 ft3 | Ventilation Weather Factor: | 0.97 |
| Surface Area: | 2600 ft2 | Energy Climate Factor: | 17.0 |
| Floor Area: | 2400 ft2 | | |
| Design Winter Wind Speed: | 9.0 mph | Design Winter Temp Diff: | 82  deg F |
| Design Summer Wind Speed: | 0 mph | Design Summer Temp Diff: | |

**Comments**

Owner complains of condensation on windows in winter.

Crawlspace is wet.

2 smokers in the house.

Downspouts dump directly at the base of the house.

**BUILDING LEAKAGE TEST   Page 3**

Date of Test: 3-12-99   Test File: example1

**Data Points:  Data Entered Manually**

| Nominal Building Pressure (Pa) | Fan Pressure (Pa) | Nominal Flow | Temperature Adjusted Flow | % Error | Fan Configuration |
|---|---|---|---|---|---|
| 0.0 | n/a | | | | |
| -55.0 | 94.0 | 1711 | 1711 | 2.7 | Ring A |
| -50.0 | 77.0 | 1550 | 1550 | -1.0 | Ring A |
| -44.0 | 64.0 | 1415 | 1415 | -1.8 | Ring A |
| -38.0 | 52.0 | 1277 | 1277 | -2.5 | Ring A |
| -20.0 | 25.0 | 869 | 869 | 3.3 | Ring A |

*The data table on Page 3 contains the following information:*

⇒ **Nominal Building Pressure:** Building pressure measurements for each target pressure at which sampling was conducted, including the pre and post test baseline measurements. Baseline building pressure measurements correspond to Fan Pressure readings of "n/a". Building pressure data are not adjusted for measured baseline pressures.

⇒ **Fan Pressure:** Fan pressure measurements for each target pressure at which sampling was conducted.

⇒ **Nominal Flow (CFM):** Calculated air flow through the Blower Door fan, based on the measured fan pressure and the calibration formula for the fan.

⇒ **Temperature Adjusted Flow (CFM):** Calculated air flows through the fan are adjusted for differences in air density due to temperature. The TECTITE program makes the following air density adjustments in accordance with CGSB Standard 149.10-M86.

Depressurization Test:

Adjusted Flow (CFM) = Nominal Fan Flow  x  $((T_o + 459.7)/(T_i + 459.7))^{0.5}$

where:  $T_o$ = outside temperature when the Blower Door test was performed in °F.
$T_i$ = inside temperature when the Blower Door test was performed in °F.

Pressurization Test:

Adjusted Flow (CFM) = Nominal Fan Flow  x  $((T_i + 459.7)/(T_o + 459.7))^{0.5}$

where:  $T_i$ = inside temperature when the Blower Door test was performed in °F.
$T_o$ = outside temperature when the Blower Door test was performed in °F.

⇒ **% Error:** The % error column is the % difference between the temperature adjusted flows and the flows calculated by the computer using the "best fit" Building Leakage Curve. The CGSB airtightness test standard requires that the error be less than 6% for each of the pressure stations.

⇒ **Fan Configuration:** The configuration of the fan (i.e. which low-flow ring was installed) when the data point was collected.

TECTITE
Version 3.2

**Sample Zone Data Report (without logo)**

**Zone Data Report**

Wilson's Consulting Services
566 Birch Street
Minneapolis, MN 54666
Phone: 612-333-3333

Date of Test: 8-19-2002   Test File: exampleauto



Zonal Pressures (Pa)

| Zone Name | Reference | Building to Zone @50Pa (Pa) | Zone to Outside @50Pa (Pa) | +/- Zone Pressure (Pa) | Pressure Ratio | +/- Pressure Ratio |
|---|---|---|---|---|---|---|
| Attic-P3 | out | 3.56 | 46.44 | 0.47 | 0.929 | 0.009 |
| Crawlspace-P4 | out | 2.55 | 47.45 | 0.70 | 0.949 | 0.014 |
| Garage-P5 | out | 3.12 | 46.88 | 0.93 | 0.938 | 0.019 |

| Nominal Building Pressure (Pa) | Attic-P3 Pressure (Pa) | Crawlspace-P4 Pressure (Pa) | Garage-P5 Pressure (Pa) |
|---|---|---|---|
| 0.04 | 0.07 | 0.08 | -0.01 |
| 46.60 | 43.72 | 44.54 | 42.75 |
| 40.87 | 37.65 | 38.67 | 37.84 |
| 38.88 | 35.72 | 36.79 | 37.89 |
| 32.64 | 30.42 | 30.43 | 31.50 |
| 28.49 | 26.49 | 25.46 | 26.52 |
| 23.83 | 22.98 | 21.91 | 21.83 |
| 0.15 | 0.11 | 0.14 | 0.12 |

**ZPD Input Table**

Building Baseline Standard Deviation: 0.13 Pa

| Zone Name | Zone to Outside Pressure @50 Pa |
|---|---|
| Attic-P3 | 46.44 |
| Crawlspace-P4 | 47.45 |
| Garage-P5 | 46.88 |

| | |
|---|---|
| Blower Door Flow: | 1361 CFM |
| Largest Ring Used: | Ring A |

*The data table in the middle of the Zone Data Report contains the following information:*

⇒ **Nominal Building Pressure:** Building pressure measurements (in Pa) for each target pressure at which sampling was conducted, including the pre and post test building baseline measurements. Building pressure data are not adjusted for measured baseline pressures.

⇒ **Zone A-P3 Pressure** through **Zone F-P8 Pressure:** Zone pressure measurements (in Pa) for each target building pressure at which sampling was conducted, including the pre and post test zone baseline measurements. Zone pressure data are not adjusted for measured baseline pressures.

*ZPD Input Table:*

The ZPD Input Table contains all of the test data required to be input into the ZPD Calculation Utility program, used to estimate air leakage rates from zones monitored during an automated Blower Door test. The ZPD Calculation Utility program is available at no charge from the Energy Conservatory website (www.energyconservatory.com).

## *Chapter 13*  **Cruise Control**

The Cruise Control feature automatically adjusts the speed of the Blower Door fan to maintain a constant building pressure while the operator or technician performs additional diagnostic or air-sealing procedures. While cruising, the program displays the current building pressure and fan flow, and displays current zone pressures if the zonal pressures feature is active.  However, TECTITE does not store fan flow, building pressure or zone pressure data while cruising.  Common applications of the Cruise Control feature include:

⇒ Pressure pan testing for evaluating leakage in forced air duct systems.
⇒ Maintaining a constant building pressure while locating and sealing air leaks.
⇒ Quickly estimating the building leakage rate before conducting a full airtightness test.
⇒ Series leakage tests such as the Leakage Area Matching Method, or Add-a-Hole method to quantify leakage rates between various zones within a building.

### 13.1  Starting the Cruise Feature

Before using the Cruise Control feature, be sure that the building and fan pressure tubing is properly connected to the DG-700/DAB.

**DG-700 Tubing Connections**



**APT DAB Tubing Connections**



**Note:** If you want to display building zone pressures while cruising, be sure the zonal pressures feature is active, and you will need to connect hoses between the DAB and the zones being measured (see *Chapter 10* for more information on zonal pressure testing.)

The Cruise Control feature is started from the Test Graph (Auto Method) Screen. Cruising cannot begin until a communication link has been established between your computer and the DG-700/DAB. If a communication link has <u>not</u> been established, the **Start** and **Cruise** buttons are grayed out and the message **DATA BOX NOT CONNECTED** appears in the DAB Status Window. To establish communication, first check to be sure that the serial cable between the computer and the DG-700/DAB has been properly installed. Also check that the DG-700/DAB has been turned ON and has power. Once a communication link has been established, the message **Idle - Monitoring** appears in the DAB Status Windows and the **Start** and **Cruise** buttons are activated.

For more information on establishing a communication link between the your computer and the DG-700/DAB, see *Chapter 15*, Problem 1.

To activate the Cruise Control feature, click on the **Cruise** button from the Test Graph (Auto Method) Screen. Now fill in the **Cruise Pressure** field and select a **Baseline** option in the Cruise Test Conditions window which appears on screen.

**Cruise Test Conditions Window**



*Cruise Pressure:*

Enter the building pressure (in Pa) that you would like the Blower Door fan to maintain. Always enter the cruise pressure as a positive number, even if you are depressurizing the building. For example, if the test mode is set to depressurize, and you wish to cruise at a building pressure of -50 Pa, enter the cruise pressure as 50. The TECTITE program will now adjust the speed of the Blower Door fan until the cruise pressure is achieved, and will continuously adjust the fan speed to maintain the cruise pressure.

*Baseline:*

⇒ **No Baseline:** This option is used when you want to cruise without first measuring and adjusting for the baseline building pressure. In other words, you will not adjust the displayed building pressure by the measured baseline building pressure. If you are displaying zone pressures while cruising, they will not be adjusted for the baseline zone pressure.

⇒ **Cruise With Baseline:** This option is used when you want to adjust the displayed building pressure by the measured baseline building pressure. Use this feature when you want to *change* the building pressure by the specified cruise pressure. <u>For most users, this is the preferred cruising method</u>. If you are displaying zone pressures while cruising, they will be adjusted for the measured baseline zone pressures.

After clicking on **OK** in the Cruise Test Conditions window, you will be asked to indicate which flow ring will be installed on the fan during cruising. Click on the appropriate ring and then click on **Proceed with Cruise.** This allows the program to display the fan flow, as well as the building and zone pressures while cruising. Current fan flow and building pressure are displayed in the status windows on Test Graph Screen, and by the moving cursor on the graph.[5] The entered cruise pressure is displayed on the graph by a red vertical line. Current zone pressures are displayed in the zone pressure status windows located above the graph.

## 13.2  Ending Cruise/Stopping the Fan

Once Cruise Control has been activated, there are two ways to turn off the cruise feature:

⇒ Click on **Pause** or press the **Esc** key. This immediately stops the fan, and the operator is allowed to either adjust the **Auto Test Settings**, re-start cruising or terminate the cruise procedure.

⇒ Click on **Stop Cruise**. This immediately stops the fan and ends the cruise procedure.

## 13.3  Real-Time ACH50 Estimator

When the Cruise Control feature is active, TECTITE will display a real-time estimate of Air Changes per Hour at 50 Pascals of building pressure (ACH50) on the Test Graph Screen. To estimate ACH50, TECTITE uses the current measured fan flow, the volume estimate input into the Building Information Screen, and an assumed Building Leakage Curve exponent (n value) of 0.65. The ACH50 display window is only active when the current building pressure is between 40 and 60 Pascals, and a valid fan flow measurement is being made. The on-screen ACH50 display is useful for quickly estimating building leakage rates before conducting a full airtightness test.

---

[5] If you activate the **Cruise** option while Blower Door data are being displayed on the graph, the data will remain on the graph and will not be affected or changed in any way.

**Real-Time ACH50 Estimator**



ACH50 Estimator Window

**Note:** The Real-Time ACH50 display is also active when the DAB is in the **Idle – Monitoring** mode and the user is manually adjusting the fan speed (and the current building pressure is between 40 and 60 Pa). The Real-Time ACH50 display is not active during an automated test sequence.

## 13.4  Using the Display Large Meters Feature

The Display Large Meters feature replaces the graph on the Test Graph (Auto Method) Screen with 3 large status windows including Real-Time ACH50, Current Fan Flow, and Current Building Pressure. The feature can be toggled on and off by clicking on **Display Large Meters** from the Options Menu.



The Display Large Meters feature is particularly useful when looking at the computer screen from a distance while cruising or manually adjusting the Blower Door fan in Idle-Monitoring mode. The Real-Time ACH50 display window is only active when the current building pressure is between 40 and 60 Pascals, and a valid fan flow measurement is being made. The Real-Time ACH50 display is not active during an automated test sequence.

**Large Meter Display**



# *Chapter 14*    Creating and Using Configuration Files

## 14.1  What is a Configuration File?

There is a significant amount of data entry required in filling out all of the screens of TECTITE.  A configuration file is a place to save test settings, building and climate information, and comments that you routinely use so they can be quickly loaded into the program.  The configuration file can then be used as a shortcut for speeding up data entry for future tests.  A configuration file looks just like a building test file, except that no test data (i.e. building pressure or fan flow readings) are stored in configuration files.[6]

## 14.2  How to Create a Configuration File

Before creating a configuration file, first be sure to save any current test data loaded into TECTITE by using the **Save Current Test File** option from the File Menu.

Now select the **New Test** option from the File Menu.  Proceed through the Customer, Building, Climate, Comments, and Test Settings Screens, filling in only the information which will be always be the same for your testing.  For example, on the Customer Info screen you would not want to fill in the customer name but you probably would fill out the technician name.  On the Building Info screen you would probably want to fill in the heating and cooling pricing information for as many fuel types as you expect to see regularly.  However, you would not fill in the efficiency and SEER rating, since they will vary from one test to another.  If there are any "standard" comments which you would like to have on all tests, type them in on the Comments Screen at this time.  On the Test Settings Screen, choose the settings you wish to save.  Finally, open the Business and Fan Info and Com Port Selection windows (found in the Options Menu) and complete the appropriate fields.

When you have finished entering information and settings that you wish to save, select **Save Configuration File** from the File Menu.

```
  Save Configuration File...
  Save Current Test File...
```

When saving a configuration file, you will need to enter a file name in the file saving browser that appears on screen.  You may also choose a different destination folder for the saved file by clicking on the **Save in** window.  Once you have chosen a configuration file name and destination, click on **Save**.

**Note:**  All configuration files are automatically given a *.cfa* extension.

---

[6] Information entered using the Options Menu (e.g.  Business and Fan Info Screens) are also stored when a configuration file is created.

**Saving Configuration File Browser**



## 14.3 How to Use Configuration Files

To use a configuration file when conducting a new test, click on **New Test with Custom Configuration** from the File Menu.

> New Test
> New Test with Custom Configuration...
> Retrieve Existing Test...

After selecting the "Custom Configuration" option, a file browser will appear on screen which lists all the configuration (*.cfa*) files contained in the current directory. To select a file, click on the file name from the list and then click on **Open**. Once the configuration file has been selected, the file information is loaded into the TECTITE program and the Customer Screen appears. To change the folder being listed, click on the **Look in** window.

**Retrieving Configuration File Browser**



After loading the selected configuration file, complete the remaining data entry fields and proceed with the test.  Importantly, you are not "locked into" the entries which were loaded from your configuration file.  You can always edit all data entry fields during the test.

Some users may wish to create custom configuration files for a variety of testing situations they frequently encounter.  For example, a user may have separate configuration files for each city where they frequently test.  Configurations can also be created which are specific to:

> test location
> house type
> fan model and serial number
> testing protocol (e.g. custom pressure lists or zone pressure setup)
> calm versus windy conditions

Keep in mind that the Comments Screen can be a particularly useful part of custom configuration files by containing "boiler plate" comments which you would like to print out (or edit) for all tests.


**Note:**  Because configuration files are so useful, we recommend that everyone create at least one configuration file and call it "*default.cfa*".  This file should contain your most frequently used settings and information.  When you start a new test using **New Test with Custom Configuration**, the program will automatically highlight the *default.cfa* file (if it exists) in the file selection browser, so all you need to do is click on **Open**.

# *Chapter 15*    **Troubleshooting TECTITE**

## 15.1  Basic Tips

• If there is an on-screen warning message, refer to the list of Operator Messages in *Chapter 7*.

• If you are having trouble completing an automated Blower Door test, first check that the Blower Door and DG-700/DAB system are set up as shown in *Chapter 2*.

Refer to example problems below for information on more specific operating problems.

*Problem 1:*   *When trying to start an automated test or cruise procedure from the Test Graph Screen, the Start and Cruise buttons are grayed out and the message "DATA BOX NOT CONNECTED" appears in the DAB Status Window.*

Automated testing or cruising cannot begin until a communication link has been established between the DG-700/DAB and your computer. A number of different problems could be causing the **DATA BOX NOT CONNECTED** message to appear. To establish communication:

⇒ Make sure the DG-700/DAB is turned On and has power.

The DG-700 is powered by 6 AA batteries located in the rear battery compartment. The battery voltage for the DG-700 is displayed on the gauge immediately upon turning on the gauge, and can also be read by clicking on the **Data Box Info** button on the Test Graph. Replace the DG-700 batteries if the battery voltage drops below 6 volts. **Note:** Always turn off the DG-700 before replacing the batteries. If this is not done, it is possible for the DG-700 to lock-up. If this occurs, the gauge may not respond to any keys and you must:

- remove the batteries.
- hold down the ON/OFF button for approximately 5 seconds to clear the DG-700.
- replace the batteries.
- turn on the DG-700 and resume testing.

The APT DAB is powered by an internal re-chargeable NiCd battery. Plug in the 12V power supply supplied with the APT system to charge the NiCd battery. The fully charged NiCd battery will power the DAB for approximately 6 - 12 hours of testing. The DAB can be also be operated with the power supply plugged in. If you are using your APT System for the first time, we recommend that you fully charge the DAB battery overnight before beginning testing. The green light next to the connection terminal on the DAB indicates that the power supply is providing power to the internal battery.

⇒ Make sure the serial cable is securely connected between the DG-700/DAB and computer.

⇒ Make sure that the COM Port Selection in TECTITE corresponds to the physical COM port on your computer that the serial cable is connected to. See *Setting the COM Port in TECTITE* below.

⇒ Make sure you are not running 2 copies of TECTITE at the same time, both set to Auto Method.

⇒ Make sure that there are no other devices (such as digital cameras, serial mouse or keyboards) attempting to use the COM port which you have chosen. Shut down other programs that may be running and interfering with communications through your COM port (such as PDA synchronization software). Be sure to check the section of the Windows task bar where the clock appears for program icons that may be causing the problem.

⇒  If you are using a USB to Serial adapter (because your computer does not have a serial port), make sure the adapter is installed correctly.

⇒  If you have a continuity tester,  make sure that pins 2, 3 and 5 on the serial cable are continuous from one end to the other and are not connected to one another.

Once a communication link has been established, the message "**Idle – Monitoring**" appears in the DAB Status Box and the Start and Cruise buttons are activated.

***Setting the COM Port in TECTITE:***

TECTITE allows you to specify the COM port on your computer which is being used to communicate with the DAB.  To set the COM port, click on **Options** in the Main TECTITE Menu and choose **COM Port Selection**.  The COM port selection window allows you to choose between 10 options;  AUTO SELECT, COM1, COM2, COM3, COM4, COM5 and COM9.  If you know which COM port is being used, then choose that port from the selection list.  If you are uncertain of the port being used, either choose AUTO SELECT (which allows TECTITE to search for the correct port), or look up the port information using the **Device Manager** in your computer's operating system.  **Note:**  The **Device Manager** can be accessed on most computers by right-clicking on the **My Computer** icon on your desktop and selecting **Properties** – from the **System Properties** window click on **Hardware**, then **Device Manager** and finally **Ports**.

**COM Port Selection Window**



**Note:**  Whenever possible, it is best to select the proper COM port, rather than use AUTO SELECT, because program operation will be faster, and depending on your computer's port settings, AUTO SELECT may not always provide a reliable communication link.  If you have successfully used the AUTO SELECT setting to establish a communication link, you can determine which COM port TECTITE is using by clicking on the DATA BOX INFO button from the Test Graph (Auto Method) Screen.

**_Problem 2:_**  *During an automated  test, the program occasionally loses communication with the*
*DG-700/DAB and displays the message "Communication lost.  Testing ended."*

Intermittent communication problems are typically caused by another program, or your computer's power
management system, interfering with communication through the selected serial communication port.

⇒   Shut down other programs that may be running and interfering with communications through your
COM port (such as PDA synchronization software).  Be sure to check the section of the Windows
task bar where the clock appears for program icons that may be causing the problem.

⇒   Turn off power management features that may be shutting down the COM port.

⇒   Turn off any program that alters your system clock, for example some power management schemes
automatically correct the system clock at regular intervals.  The "device drivers" which make these
corrections are not always turned off automatically when the power management features are
turned off.  You may need to manually disable these device drivers.

⇒   Turn off the automatic reset option found in **Control Panel ...Accessibility Options ...General**.

⇒   Check the serial cable for intermittent connections.  Use a continuity tester to make sure that pins
2, 3 and 5 on the serial cable are continuous from one end to the other and are not connected to one
another.

**_Problem 3:_**  *During an automated  test, the program never starts taking data at a target pressure line,*
*even though the Flow and Building Pressure Cursor appears to be bouncing around the*
*target pressure.  After a few minutes the message  "Warning:  Excessive building*
*pressure fluctuation.  Check A/P1 tubing / increase Target Tolerance." appears.*

In order for the TECTITE program to start taking data at any target pressure line, it must first determine that
the current measured building pressure is within a specified range from the target building pressure. This
specified range is called the **Target Tolerance**.  If the current measured building pressure is
fluctuating beyond the **Target Tolerance**, then data collection for that target pressure will not begin.
Fluctuating building pressure readings can be caused by improper installation of the building pressure
reference hose, or by windy weather.

⇒   First check to be sure that the outside end of the building pressure tubing (e.g.  the green
tubing connected to the Channel A/P1 Reference tap) is not placed directly in the exhaust air
flow of the Blower Door fan.  You must be careful to run the end of the tubing well away (at
least 5 feet to the side) from the exhaust of the fan.  A good location for the end of the
building pressure tubing is at the base of the building where it meets the ground.

**Note:**  Although it is common practice for Blower Door operators to insert the open end
of the building pressure tubing a few inches through the patch on the nylon panel, and
leave it, we have determined that this set up practice can create inaccurate building
pressure readings due to the exhaust airflow from the fan hitting the end of the tubing.
You should always follow the tubing set-up practice listed above to prevent fluctuating
building pressures.

⇒   If the building pressure tubing is installed correctly, the fluctuating building pressures are
probably caused by wind.  Try increasing your **Target Tolerance** to 3 or 4 from the default
value of 2  (see the Test Settings Screen).  If this doesn't work, you may increase the **Target
Tolerance** to 5 or greater, or use the **Sample** button (see below).

**Note:** As the **Target Tolerance** is increased from the default value of 2, gathered data may not be as close to the pressure stations as would be the case when using the default value. This has negligible effect on the final test results. However, some test standards do require that the measured building pressures be within a specified range of the pressure station (e.g. the CGSB test standard requires that the measured building pressures be within +/- 2.5 Pa of the specified pressure stations).

*Sample Button:*

During an automated test, you can manually instruct the computer to go ahead and take data by clicking on the **Sample** button. At this point, the computer will proceed just as if it has decided that the **Target Tolerance** for the current pressure station line had been met.

*Problem 4:* *The Blower Door fan seems to be oscillating during automated testing or when using the Cruise feature.*

Try decreasing the **Fan Adjust Rate** (see Test Settings Screen). Decreasing the **Fan Adjust Rate** makes the fan adjust more slowly when seeking the target building pressures, and should reduce oscillation. First try changing the **Fan Adjust Rate** to 0.2 from its default value of 0.5. If this doesn't work, decrease it further (minimum value is 0.1). If you are still having problems with oscillation, contact The Energy Conservatory (www.energyconservatory.com) for technical assistance.

*Problem 5:* *My computer seems to lock-up during automated testing.*

⇒ Make sure that there are no other devices attempting to use the COM port which you have chosen (such as an infrared printer driver). Use the Device Manager in Windows to check this - the Device Manager can be found in *Control Panel...System*.

⇒ Shut down other programs that may be running and interfering with communications through your COM port (such as PDA synchronization software). Be sure to check the section of the Windows task bar where the clock appears for program icons that may be causing the problem.

# *Chapter 16*    Evaluating the Repeatability of Test Results

You may have wondered how much the test results of a building would change if you immediately repeated the test and compared the two results. The amount of possible change from one test to another is called "repeatability". The TECTITE program calculates an estimate of test repeatability and displays this estimate along with the test results. **Note**: This estimate assumes the building was unchanged from one test to another and the weather conditions were similar.

One of the strengths of automated Blower Door testing is its ability to automate the data collection process and make repeatable airtightness measurements in both calm and windy weather conditions. During automated testing, TECTITE is able to quickly gather and analyze hundreds of times more readings during a single test sequence than would be practical with a manual Blower Door test. By quickly collecting large samples of data, the repeatability of test results is greatly improved over manual test methods without laborious data entry or hand calculations. In addition, if very good repeatability is needed, multiple tests on the same building can be quickly performed and combined on the Test Graph to further increase the test precision.

## 16.1  Looking at the Repeatability of Test Results

The repeatability of the test results can be quickly evaluated by looking at the calculated standard errors that are shown on the Test Results Screen (i.e. the " +/-   % value shown to right of **Airflow at 50 Pascals**, **Leakage Areas** and **Building Leakage Curve** results - see the figure below).[7]  Once a test has been completed, look at the Test Results Screen to determine if the repeatability of the test results is sufficient to meet your needs.

**Calculated Standard Errors of Test Results**



**Note:**  Standard error calculations are reported when using both **Auto** and **Manual** Test Methods.

The standard errors, shown as a percentage of the measurement, give you an estimate of how much the measurement could change if you repeated the test. For example, from the figure above, a 1.4 % standard error in the CFM50 reading of 1,484 means that if you repeated the test, the new CFM50 reading would not

---

[7]  These standard errors are statistical estimates of repeatability calculated according to CGSB Standard 149-10 M86. One assumption made is that data points deviate from a straight line due to random variations in pressure and flow measured during a test.

likely differ by more than 20.8 CFM50 (1,484 x 0.014). In this case the repeatability of our CFM50 reading is quite good since separate repeated tests of this building would likely produce readings of between 1,463 and 1,505 CFM50.

If you are conducting an airtightness test to simply measure the current airtightness level of a building, or to estimate the natural infiltration rate of a building, we suggest that standard errors of test results on the order of +/- 5.0% are generally acceptable. The results in the figure above are all well within our recommended 5.0% guideline.

If on the other hand, you are comparing two or more Blower Door tests to determine a change in airtightness (e.g. to document the performance of airsealing work, or as part of the "open a door" series leakage diagnostic procedure, etc.), then better repeatability may be warranted. When comparing two Blower Door tests, we often recommend that the standard error in both tests be less that 20% of the measured change in airtightness.

For example, suppose we conducted two separate tests on a building, one before airsealing was performed, and one after airsealing was performed, and the results of the tests were as follows:

$\Rightarrow$  Pre Airsealing CFM50 =    2,565  (+/-  3.2%)  standard error = 2565 x 0.032 = 82.1

$\Rightarrow$  Post Airsealing CFM50 =  2460  (+/-  2.9%)  standard error = 2460 x 0.029 = 71.3

The calculated change in airtightness = 105 CFM50 (2565 minus 2460). 20% of the change in airtightness = 21.0 (105 x 0.2).

In this case, both test standard errors of 82.1 and 71.3 are greater than 20% of the measured change (or 21.0), therefore we should not accept the measured change of 105 CFM50 as a valid result. We would need to increase the repeatability of our tests (i.e. reduce the standard error) in order to accurately measure this relatively small change in building airtightness.

## 16.2  Improving the Repeatability of Automated Test Results

The simplest way to improve the repeatability of automated test results is to conduct one or more additional tests and have the TECTITE program combine all data into one test result. Data from more than one test can always be combined on the graph. This occurs when starting a new test sequence while data from a previous test are currently on the graph screen. For example, if you perform a test and after reviewing the Test Results Screen you would like to increase the repeatability (i.e. reduce the standard error) of the test results, begin another test (by clicking on the Start Test button), and do not clear the previous data prior to starting the second test.

When viewing the Test Results Screen and there are data from multiple tests on the graph, results are calculated using all data points displayed on the screen.[8] In addition, the Completed Test Indicator on the Test Graph Screen will be updated to reflect the number of completed tests being displayed.

**Note:** When combining multiple tests, the calculated standard errors in the results will generally decrease as more tests are added. However, the calculated correlation coefficient will typically remain about the same and may even get worse. Therefore, when evaluating the repeatability or precision of a test, the most important factor to consider is the standard errors in the test results

---

[8]   When there are multiple test results on-screen, TECTITE adjusts the collected data for each individual test by the baseline building pressure readings taken immediately before and after that test.

## 16.3  Improving the Repeatability of Manual Test Results

Improving repeatability when conducting Manual Tests is not as easy.   However, there are a few simple strategies for increasing Manual Test repeatability.

⇒  Collect more data points during each test.  The manual entry Data Table will accept up to 10 sets of Blower Door test readings.  Collecting 10 set of Blower Door data will almost always increase repeatability over collecting 5 sets of data.

⇒  Conduct separate multiple tests and manually average the calculated results.

# *Chapter 17*    Entering Custom Fan Calibration Parameters

The TECTITE program comes installed with factory default fan calibration parameters for the 110V and 230V Model 3 Minneapolis Blower Door fans, the 230V Model 4 (CE approved) Blower Door fan, and the Series A and B Duct Blaster fans. The fan calibration parameters are used by the program to convert the measured fan pressure in Pascals to airflow in Cubic Feet per Minute.

If your Blower Door fan was custom calibrated by The Energy Conservatory, you can input your custom calibration parameters directly into the TECTITE program in lieu of the factory default values. To enter custom calibration parameters, first open the Fan Information window by clicking on **Options...Fan Info** from the Main TECTITE Menu.

**Fan Information Window**



From the Fan Information window, select the appropriate fan model, and then click on the **Enter Custom Calibration** button to open the Fan Calibration Parameter window.

**Fan Calibration Parameter Window**



TECTITE
Version 3.2

The Fan Calibration Parameter window shows the calibration parameters being used by the program for the currently selected fan type. There is a unique set of parameters for each of the flow ring configurations used with the fan. The individual calibration parameters can be selected for editing by using the **Tab** key, or by clicking on the input fields. Whenever you input a custom calibration parameter, the new value shown in the field will be displayed in red, rather than black for the default values. You can easily return all calibration parameters to the factory default values by clicking on **Set to Defaults**. The currently entered fan calibration parameters are stored as part of the data file.

**Note:** Most users should never have to edit fan calibration parameters. The default fan calibration parameters which come with TECTITE should work fine for all standard Minneapolis Blower Door and Duct Blaster fans. This feature is necessary only if you receive custom calibration parameters for your fan from The Energy Conservatory.

# *Chapter 18*    **Using the Compare Tests Feature**

The Compare Tests features allows you to select two previously saved building test files and to quickly compare the stored test results. To use this feature, select **File** from the Main TECTITE Menu, and then click on **Compare Tests** which appears in the File Menu.

---

New Test
New Test with Custom Configuration...
Retrieve Existing Test...
Compare Tests...

---

## 18.1  Choosing the Test Files to Compare

After selecting the **Compare Tests** option, a file browser titled "Select Building Test File #1 to Compare" will appear on screen which lists all the building (*.bld*) files contained in the default folder. Select the first file by clicking on a file name from the list and then click on **Open**. Once the first file has been selected, a second file browser titled "Select Building Test File #2 to Compare" will appear. Select the second file and once again click on **Open**. To change the file folder being listed, click on the **Look in** window.



After both files have been selected, a comparison of the test results from the two files will be displayed on the screen. Both the numeric change and percent change between the two tests are displayed for each of the test result items. If a test result item is missing from one or both of the building files, then comparison results for that item will not be displayed. If zone data were collected for either building file, it can be viewed by clicking on the **Zone Data** button. A graph comparing the building leakage curves for both selected building files can be viewed by clicking on the **Test Graph** button.

To exit the Compare Tests feature, simply select a different option from the top of the **FILE** menu, or exit the TECTITE program.

## 18.2  Printing and Preview Options

Printing and previewing options for the Compare Tests feature are available by clicking on **File** in the Main Menu.

```
┌─────────────────────────────────────┐
│                                     │
│   Print Comparison Report...        │
│   Print Comparison Graph...         │
│                                     │
├─────────────────────────────────────┤
│                                     │
│   Preview Comparison Report         │
│   Preview Comparison Graph          │
│                                     │
└─────────────────────────────────────┘
```

The Comparison Report contains the same information that is displayed on the Compare Test Results screen, plus any zone data that were collected for either building file. The Comparison Graph displays the building leakage curve for both selected test files.  The printing and preview functions within TECTITE utilize the Windows printer drivers and configuration options currently installed in your computer. Windows printer setup options can be accessed by clicking on   **Start**....**Settings**....**Printers**.



COMPANY        SERVICES        SOLUTIONS

Related Links

Reference Information

IH Live Online Chat





GALSON
LABORATORIES

Equipment Rentals

FreeSamplingBadges™

FreePumpLoan™

## Microbial Sampling Procedures

*IAQ, Mold, PCR, Formaldehyde*

The Zefon Air-O-Cell™ is an impaction-based air sampler designed to pull air across a tacky sampling medium, trapping any airborne particulates. It is designed for use in conjunction with a high-flow vacuum pump set to 15 Lpm (liters per minute).

**Utilize Air-O-Cells™ in the following manner:**

1. Attach tubing to the vacuum pump.
2. Attach Air-O-Cell™ adapter to the tubing.
3. Turn on the vacuum pump and set the rotameter to 15Lpm (reading the middle of the ball) using the knob at the top of the rotameter.
4. Turn pump off.
5. Carefully remove the rectangular labels covering the rectangular inlet and the round outlet from the Air-O-Cell™ and set labels aside.
6. Attach round Air-O-Cell™ outlet to Air-O-Cell™ adapter.
7. Turn vacuum pump on.
8. Check pump rotameter and readjust to 15 Lpm as necessary.
9. Allow pump to run for a length of time depending upon sampling environment.
10. Turn pump off.
11. Replace rectangular labels over the inlet and outlet of the Air-O-Cell™ to prevent contamination.

**ENVIRONMENT**          **SAMPLING DURATION**
Clean office; outdoors on dry day          10 minutes

EXHIBIT
tabbies®



Microbiology Analysis

Average room with minimal visible dirt   5 minutes
Visibly contaminated area, with mold or
airborne dust; outdoors on wet day (not 2 minutes
during precipitation)

## NOTES on Air-O-Cell™ Sampling:

Handle Air-O-Cells™ with care. Rough treatment may result in
breakage of the sampling medium inside them, preventing analysis.

If the environment you wish to sample is not similar to those in the
table above, a sampling duration of 5 minutes is best to obtain an
adequate sample while minimizing chances of overcrowding on the
sample.

Sampling for less than 2 minutes or more than 10 minutes is not
recommended as data can be inaccurate i.e., not enough mold
spores to accurately determine contamination or too many to count.

The investigator should stand away from the Air-O-Cell™ while a
sample is being collected to avoid false readings. The Air-O-Cell™
should be mounted on a tripod or something similar, and the sample
should be collected at breathing height (around 4-5 feet) to provide
an accurate representation of occupant exposures.

The Biostage-1 or Andersen N6 viable impaction sampler is designed to
sample air for viable or living microbes only. Air is pulled by a vacuum
pump through the inlet cone, and then through the diffuser plate to
impact a 100-mm agar plate on the stage. This traps particulates in the
agar to promote growth of viable organisms to detectable levels.

## Utilize The Biostage-1 or Andersen N6 viable impaction sampler in the following manner:

1.  Attach tubing to the vacuum pump.
2.  Turn on the vacuum pump and set the rotameter to 28 Lpm
    (reading the middle of the ball) using the knob at the top of the
    rotameter.
3.  Turn pump off.
4.  Attach tubing to brass hose barb on sampler.
5.  Carefully wipe all surfaces of the aluminum sampler, inside and
    out, with isopropyl alcohol.
6.  Remove agar plate from cooler and place on top of pegs on the
    bottom stage.
7.  Remove lid of agar plate and set lid aside, face down to minimize
    contamination.
8.  Reassemble sampler.
9.  Turn vacuum pump on.
10. Check pump rotameter and readjust to 28 Lpm as necessary.
11. Allow pump to run for a length of time depending upon sampling
    environment.

12. Turn pump off.

13. Remove agar plate from sampler.

14. Replace lid of agar plate.

15. Label with a unique identifier, such as location and date sample was taken.

16. Tape lid to bottom to prevent contamination and place agar plate within a zipper-lock bag and then into the cooler.

| ENVIRONMENT | SAMPLING DURATION |
|---|---|
| Clean office; outdoors on dry day | 10 minutes |
| Average room with minimal visible dirt | 5 minutes |
| Visibly contaminated area, with mold or airborne dust; outdoors on wet day | 2 minutes |
| (not during precipitation) | |

**NOTES on Biostage-1 Sampling:**

Handle agar plates with care. Rough treatment may result in breakage of the dish, which can contaminate samples.

Agar plates should be stored in the cooler with the agar face down. Condensation can collect on the lid and drip back into the culture, favoring the growth of some organisms over others and perhaps causing spread of some molds or bacteria within the plate, giving an inaccurate colony count.

Always transport agar in a cooler with "blue ice" before and after sampling. Cold temperatures slow the growth of microorganisms, allowing for more reliable analysis. Wrap the blue ice container in bubble wrap, thick cloth, or several paper towels to prevent contact between it and the agar plates. Avoid using regular ice, which can freeze the agar. Freezing the sample can damage it, leading to inaccurate data.

When sending the viable air samples back to Galson Laboratories for analysis, always ship them for next-day delivery ( if shipped on Friday, for Saturday delivery). This is to ensure that the sample remains at a lower temperature to prevent microbial overgrowth until it arrives at the lab for incubation and analysis. If next day shipping is not possible, store the samples in a refrigerator< until they can be shipped. Re-freeze the "blue ice" before reuse.

If the environment you wish to sample is not similar to those in the table above, a sampling duration of 5 minutes is best to obtain an adequate sample while minimizing chances of overcrowding on the sample.

Sampling for less than 2 minutes or more than 10 minutes is not recommended data can be inaccurate: i.e., not enough mold spores to accurately determine contamination or too many to count.

The investigator should stand away from the Biostage-1 sampler while a sample is being collected to avoid false readings. The sampler

should be mounted on a tripod or something similar, and the sample should be collected at breathing height (around 4 to 5 feet) to provide an accurate representation of occupant exposures.

If the investigator needs to obtain data for both thermophilic (potential human pathogens) and environmental organisms, at least two samples must be taken. A single agar plate can only be incubated at one temperature. If the temperature is lower than freezing during sampling, care must be taken to prevent freezing of the plate. Freezing the media can prevent trapping of viable organisms and can damage those already trapped. Spore concentrations and can change rapidly and constantly. Viable fungi air samples that are to be used in conjunction with Air-O-Cell™ samples should be taken at the same time to provide more accurate results.

A transport swab is a cotton-tipped swab with a protective case and media to preserve the sample during shipment. The swabs can be used for mold screens and viable analysis.

**Utilize a Transport Swab in the following manner:**

1.  Pull apart the plastic wrapping of the swab until it is halfway open.

2.  Grasp the swab by the plastic handle at the top and remove from wrapping. Do not touch the shaft

3.  Designate a location to be swabbed, taking care to note the size of the area.

4.  Swab the entire area in a zigzag pattern, rolling the swab over to ensure the entire swab is used.

5.  Remove the cap from the swab case and discard.

6.  Carefully insert the swab into the case, making sure to seat the cap firmly on the case, and that the swab end is touching the media-soaked sponge at the bottom.

7.  Label the sample with a unique identifier, such as the location the sample was taken and the date.

8.  Place in a cooler to prevent microbial proliferation of the sample.

**NOTES for SWAB SAMPLING**

Some investigators prefer to sample with a wet swab rather than a dry swab as noted above. The media-soaked sponge in the swab case can be used for wetting the swab, as the media is sterile. Tap water should not be used as a wetting agent because it may contain microorganisms that could interfere with analysis.

The size of the swabbed area should be noted on the chain of custody. If a viable analysis is requested, a measure of CFUs per square centimeter can be obtained from this information. The area should be no larger than 10 cm by 10 cm, or roughly 4" x 4", as too large an area may provide inaccurate data. Because several analyses can be performed from a single swab, there is no need to take multiple samples from the same area.

Swabs should be shipped in a cooler to arrive at the laboratory within 72 hours of collection to maintain sample integrity.

Transparent adhesive tape can be used to obtain a useful look at surface contamination. Most any tape that is clear can be used. The analysis will provide a rough quantitation of the level of surface contamination.

**Obtain a tape sample in the following manner:**

1.  Obtain a 2" (5 cm) piece of tape, being careful not to touch the middle of the piece.

2.  Hold the tape at one end between the thumb and forefinger.

3.  Place tape against the surface to be sampled.

4.  Gently press down on the tape using the other hand.

5.  Slowly peel the tape off of the surface.

6.  Affix tape sample flat against the inside of a clean zipper-lock plastic bag.

7.  Seal the bag and label it with a unique identifier, such as the sampling location and the date.

8.  Alternatively, use Bio-Tape™ provided by Galson.

**Notes for Tape Sampling:**

The tape used must be transparent, as the sample will be analyzed by direct microscopy, and therefore must be able to transmit light. Do not use electrical tape or frosted ("Magic") tape, as no analysis can be completed.

Avoid creasing or folding the tape. The tape should be as flat as possible at all times to ensure accurate analysis. Creases interfere with the ability to visualize the trapped spores on the tape.

Tape samples can be analyzed only by direct microscopy. No viable analysis can be completed on a tape sample.

Bulk samples are pieces of material that can be tested for mold or bacterial contamination. These samples can include pieces of drywall, carpet, or other items. Bulk samples can be used for both screen and viable analysis.

**To collect a bulk sample:**

1.  While wearing gloves, obtain material and place in a zipper lock plastic bag.

2.  Label the bag with a unique identifier, such as the location the sample was obtained and the date.

3.  Place bag in a cooler to prevent overgrowth of microbes on the sample, which can corrupt results.

**Notes for Bulk Sampling:**

Samples should be no longer than 10 cm (about 4") in any dimension. This reduces shipping costs and keeps analytical data

more accurate.

Large samples, especially those with large areas that are free of visible mold, will dilute the sample and give deceptively low numbers.

Certain materials such as ceramics and metals, with hard, sealed surfaces, cannot support the growth of mold, and therefore do not generally make useful bulk samples.

The best bulk samples are commonly porous and/or organic in nature, such as wood or drywall.

Bulks should be shipped in a cooler to arrive at the laboratory within 72 hours of collection to maintain sample integrity.

Sampling Condensate/Standing Water

**To sample condensate or standing water:**

1. Wear sterile plastic gloves.
2. Remove sample vial from plastic bag.
3. Remove cap from vial.
4. Dip sample vial into condensate. Fill vial with approximately 2 milliliters of condensate.
5. Replace lid on vial and seal tightly.
6. Label the sample with a unique identifier, such as the location the sample was taken and the date.
7. Read and record on the chain of custody the volume of water collected in the vial.

**Notes for Water Sampling**

Water samples should not be collected from public (city/county) water systems. These samples cannot be analyzed for microbes of any kind at Galson Laboratories.

Sampled water used in industrial processes should not contain toxic chemical compounds such as VOCs or heavy metals. Call Galson Laboratories at 888- 577-5227 for guidance.

Because several analyses can be performed from a single sample, there is no need to take multiple samples from the same source. When sending samples back to Galson Laboratories for analysis, always ship them for next-day delivery (if shipped on Friday, for Saturday delivery). Ship in a cooler to prevent microbial proliferation within the vial.

Galson Laboratories
6601 Kirkville Road East Syracuse, NY 13057

Phone: (315) 432-5227 or 888-432-5227    Fax: (315) 437-0571
Privacy Policy | Terms and Conditions | Site Feedback

FROM :                        FAX NO. :4103295548          Nov. 11 2007 06:55PM  P2

### IN THE UNITED STATES DISTRICT COURT FOR THE
### MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| TERRY DEESE, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 1:06-cv-643-MHT |
| | * | |
| CHAMPION ENTERPRISES, INC., *et al.*, | * | |
| Defendants. | * | |

### AFFIDAVIT OF DR. ROBERT KONDNER

Dr. Robert Kondner, solemnly affirms under the penalties of perjury and upon personal knowledge that the contents of this affidavit are true and correct, and he states as follows based upon his first hand knowledge:

1.      I, Dr. Robert Kondner, am over eighteen years of age.  I am serving as an expert consultant to the plaintiffs in this action, and competent to testify to the matters contained herein.

2.      I obtained my Bachelor and Master's Degrees in Civil Engineering as well as my Doctorate from the Department of Mechanics of The John's Hopkins University with a special emphasis on Deformable Mechanics and Rheology, among other topics.

3.      I have had Professorships at Technological Institute of Northwestern University, the Univeristy of Maryland, The Johns Hopkins University, Loyola College – teaching at both the undergraduate and graduate levels and have served as Direcotr of numerous projects and programs of Ph.D. and Master Degree Graduates.

4.      I have authored more that 125 publications in areas of expertise in various national and international journals, symposia, proceedings, texts, etc.

1

EXHIBIT

13

tabbies'

5.      I have over thirty-five (35) years experience in construction trouble-shooting, damage claims and design analysis as well as research and teaching in a number of fields.

6.      I have served as an expert witness in City, County, State and Federal Courts as well as U.S. Court of Claims, Legislative Hearings, Arbitration Proceedings and Insurance Investigations.

7.      I have reviewed each of the Exhibits which generally consist of studies relating to the basic practices at play in this case, including, but not limited to the following:

> Moisture Problems in Manufactured Homes – Understanding Their Causes and Finding Solutions;  Moisture Problems in Manufactured Housing:  Probable Cause and Cures;  Alternatives for Minimizing Moisture Problems in Homes Located in Hot, Humid Climates:  Interim Report;  Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates;  "Not in my Building" Moisture and Mold Growth and the Specification of Wallcovering;  Air Infiltration in Coastal Regions – The "Paston Effect";  Understanding Vapor Barriers;  Building Your Louisiana House;  Moisture & Mold Diagnostics and Mitigation;  Moisture Management in Wall Assemblies:  Air, Water, and Vapor Barriers – Selecting the appropriate barrier based on climate, codes, and design criteria;  Whole House Ventilation Strategies;  Attic Ventilation Design Strategies for Manufactured Homes;  Air Barriers:  Increasing Building Performance, Decreasing Energy Costs;  Joe's Top Ten List of Dumb Things to do in the South;  Assessing Water Damage to Gypsum Board;  Guidelines for Prevention of Mold Growth on Gypsum Board;  Installation of Predecorated Gypsum Board;  Building Science and the Code – Moisture Control;  Micro Ecologies, Inc. Mold Clean-Up Guidelines for Residents;  Eagleroc Laminate Gypsum Board;  Everything You Always Wanted to Know About Insulation, Ventilation, and Vapor Retarders.

8.      I deem each of these studies to be "reliable authority" and further state that each of these simply seem to reiterate a basic premise which runs throughout basic building science practices which come into play in all facets of construction relating to condensation control; that is that, simply stated, hot seeks cold and dry seeks moist. When the outside dew point is higher than the inside temperature, the hot, moist air will

seek the inside wall cavity.  Stated differently, if the dew point is 75 as is often the case in the hot humid climate at play in this case, and the homeowner sets the Air Conditioner at or below 75, for example 72, the hot moisture laden air outside the home will seek to reach the colder surface, in this case the inside of the wall where it will condense and be trapped, if the wall is not permeable enough to allow it to diffuse at a sufficient rate.

9.     Ventilating a wall intentionally as Defendant has admitted has been done in this case, will not allow dissipation of the moisture / condensation in the summer time because "mother nature" is the driving force and the hot moist air will continually seek to reach the interior wall.  This same premise is repeated in many of the studies referenced herein and it is not an alarming or new premise but rather well settled and undisputed principles at play in any home, any where when these conditions are present.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the foregoing contents of this Affidavit are true and correct.

Dated: _11/11/07_                        Respectfully submitted,

Dr. Robert Kondner, P.E.

3

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CASE NO. 06-643-MHT

TERRY DEESE,


      Plaintiff(s),

v.

CHAMPION ENTERPRISES, INC.,


      Defendant(s).


DEPOSITION TESTIMONY OF:

PARKER HOLLOWAY




Commissioner:

Renny D. McNaughton

October 31, 2007

Birmingham, Alabama

KONDNER ENGINEERING & TECHNICAL SERVICES

19624 Downes Road

Parkton, Maryland 21120

FACSIMILE CONTROL SHEET

PAGE: _1_ OF ____ (INCLUDING COVERSHEET)

TO: _Larry Anderson_ of _P.A.L._
                                   Company Name

FROM: _Bob Kondner_

DATE: _11/11/07_

MESSAGE: _Affidavit for Deese_

ORIGINATING FAX:   410-329-6548

DESTINATION FAX: _1-301/986-5571_

CONFIDENTIALITY NOTICE

This information is intended only for the addressee. It may be legally privileged and confidential. If you have received this information in error, please notify us immediately. If the reader of this message is not the intended recipient, you are hereby notified that any disclosure, dissemination, distribution or copying of this communication or its contents is strictly prohibited.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NUMBER

1:06-CV-643-MHT


TERRY DEESE,

    Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al.,

    Defendant(s).


DEPOSITION TESTIMONY OF:

ROBERT PARKS


February 19, 2007

9:10 a.m.


COURT REPORTER:

DEBORAH B. TOWNSEND, CSR

EXHIBIT
14



**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

1      Q.      Okay.  And you have no post-high

2    school education?

3      A.      No college education, that's

4    correct.

5      Q.      Okay.  And do you have the CV in

6    front of you, and I'll --

7      A.      Yes.  And it printed on some heavy

8    paper, so rather than reprint it -- I think I

9    brought two copies of it.

10      Q.      Okay.  That's fine.  May I mark

11   one of these?

12      A.      Absolutely.

13      Q.      All right.  What I'm going to do

14   is mark as Defendant's Exhibit 2 the CV that you

15   brought, and I'm going to give you that one --

16      A.      Okay.

17      Q.      -- if that's okay.

18      A.      Yes, sir.

19             (WHEREUPON, Defendant's Exhibit

20   Number 2 was marked for identification and is

21   attached to the original transcript.)

22      Q.      And is this CV comprehensive as

23   far as what you have done, I suppose, since

**www.AmericanCourtReporting.com**
**February 19, 2007**

Page 19

1    graduating from high school?

2          A.      Yes, sir.  I believe it to be.

3          Q.      Okay.  All right.  On page three

4    under HVAC, you have several items listed.  Are

5    those -- those your licenses and courses?

6          A.      Correct, yes, sir.

7          Q.      Okay.  Would it be fair to say

8    that since 1999, you have not taken any

9    licenses -- or taken any courses or obtained any

10   licenses in HVAC?

11         Well, let me -- let me strike that.

12         A.      Well, I think in --

13         Q.      Let me strike that.

14         A.      Yeah.

15         Q.      It looks like -- I apologize.  It

16   looks like you still hold -- hold mechanical

17   license and electrical license to the present,

18   right?

19         A.      Correct.  All of -- Right.

20         Q.      Okay.  As far as any courses,

21   though, it appears that 1999 was the last time

22   you ever took a course?

23         A.      No.  Actually, I think the Air --

# Healthy Homes of Louisiana, llc. / Parks Mobile Air, llc.
## PO Drawer 3127
## West Monroe, La 71294

Ph. 318-397-1974          Fax 318-397-2123          Bobby@ParksMobileAir.com
www.ParksMobileAir.com

**Robert Parks**
**President**

**Graduate:** Calhoun High School, 1981 Class Valedictorian
Calhoun, Louisiana

**Employment:**
Parks Air, Heat, And Electrical -Installer/Service Tech.  1981-1984
Holiday Manufactured Housing - Operations Manager   1984-1987
Parks Air and Heat, Inc. / Parks Mobile Air, LLC      1987- 2005
Owner and President
Healthy Homes of Louisiana, llc - Managing Member 2003 - Present

**Short Biography:**

Robert Parks has over 25 years experience in Manufactured Housing, Modular Homes, Residential Site Built Homes and Light Commercial. Specialties include Air Conditioning, Heating, Ventilation, Condensation Control and Building Failure Analysis with an excess of 700 buildings analyzed and documented since 1998.  Cases have ranged from product liability to wrongful death with experience in litigation support, deposition, discovery / production, and testimony.

**Consultant for:**
The Louisiana Governor Office :
Louisiana State Administrative Agency (SAA) - Administrative Consultant 2003-Present
Louisiana Manufactured Housing Commission  - Technical Consultant 2003-2005
Contracted Consultant for Cavalier Homes Inc and subsidiaries, Addison, Alabama.2003-Present
Contracted Consultant for Liberty Homes and subsidiaries, Goshen, Indiana. 2003-Present
Contracted Consultant for Deer Valley Homes, Guin, Al. 2006 - Present
Also (non-contracted) consultant for, Lexington Homes, Skyline Homes , Karsten Homes, Horton Homes and others.
Technical Advisor,  Manufactured Housing Institute an The Mfg. Housing Research Alliance- (Project) **Alternatives for Minimizing Moisture Problems in Homes Located in Hot, Humid Climates** 2001-2004
Committee Volunteer,  Mfg. Housing Research Alliance- (Project) **Energy Star Cooling Equipment Sizing Guidelines** 2004-2005

1


DEFENDANT'S EXHIBIT

2

**Seminars and Presentations Presented:**

1999 Council of State Administrative Agencies, (Regional Conference) Myrtle Beach, SC
(Mfg. Housing Ventilation Systems - Field Study)

1999 Mfg. Housing Air Distribution Systems - Field Study

2000 Council of State Administrative Agencies, Featured Speaker(Regional Conference)
Perdido Beach, AL  (Indoor Air vs Outdoor Air -Field Study)

2000 La State Fire Marshall -Baton Rouge, La
(Building Inspection in Hot Humid Climates, Training Class)

2001 La. Mfg. Housing Association, Annual Conference - Baton Rouge, La.
Featured Speaker, (Indoor Air vs Outdoor Air -Field Study)

2001 Southern Energy Homes, Addison AL (Building Practices for Hot Humid Climates)

2001 National Manufactured Housing Congress - Las Vegas NV
(Building Failure in Hot Humid Climate, Workshop Speaker)

2002 La. Mfg. Housing Commission - Inspector Training, Baton Rouge, La.

2002 La. Mfg. Housing Association - Continuing Education Class for Home Installers
Alexandria, La.

2003 La. Mfg. Housing Association - Continuing Education Class for Home Installers
Baton Rouge, La.

2003 Southern Energy Homes, Addison AL (Building Practices for Hot Humid Climates)

2003 Cavalier Homes, Addison AL (Building Practices for Hot Humid Climates)

2003 Buccaneer/Home Repair Service, Hamilton Al. (Building Practices for Hot Humid Climates)

2003 Waverlee Homes, Hamilton, Al.  (Building Practices for Hot Humid Climates)

2003 La. Mfg. Housing Commission - Inspector Training, Baton Rouge, La.

2003 Cavalier Homes, Millen, Ga. (Building Practices for Hot Humid Climates)

2004 Cavalier Homes, Nashville, N.C. (Building Practices for Hot Humid Climates)

2004 Cavalier Homes, Ft. Worth, Texas  (Building Practices for Hot Humid Climates)

2004 La. Mfg. Housing Association - Continuing Education Class for Home Installers
Baton Rouge, La.  (Building Practices for Hot Humid Climates)

2004 La. Mfg. Housing Association - Continuing Education Class for Home Installers
Alexandria, La. (Simplifying Home Installation Manuals )

2004 La. Mfg. Housing Association - Continuing Education Class for Retail Dealers
Baton Rouge, La. and Alexandria, La. (Building Practices for Hot Humid Climates)


## Industry Service, Completed Courses and License Held

**Manufactured Housing:**

Louisiana Manufactured Housing Association - State Board of Directors 1999-2004
Northeast Chapter -La Mfg. Housing -Chapter President 1999-2004

**Appointment,** National Fire Protection Association (NFPA)
Mechanical for Manufactured Housing Committee  2000-2002

**HVAC:**

Louisiana State Mechanical License 1994-Present, Licences Number LA#29900
Louisiana State Electrical License 1994-Present, Licences Number LA#29900
Refrigeration Service Engineers Society  Type 1, Type 2, Type 3, Universal
Evcon Mfg. Housing Furnace Certification Course 1994
Manufactured Housing Installation Course 1995
Evcon Mfg. Housing Special Training Course/Application, Installation ,and Service 1996
Mechanical Application of Refrigeration   1997
American Standard   -A.S.S.E.T. Program    1998
American Standard  - 16 SEER H/P & A/C Certification   1998
Evcon Furnaces and Heat Pump Application Certification    1998
Nordyne Mfg. Housing Furnace Seminar 1998
Mfg. Housing Installer Certification Course 1998
Nordyne -Mfg. Housing Seminar 1999
Air Conditioning Contractors of America (ACCA) -Fundamental of Load Calculation and
                                 System Design.  Certified in Manual J and Manual D
Aces/Coleman/Evcon Dealer Council          1996-98


**Building Science:**

Home Energy Rating - *Kansas Building Science Institute, Manhattan KS*
Infrared Thermography (Level 1) - *Snell Infrared , Phoenix Ar.*
Member Energy & Environmental Building Association (EEBA)
Co-operative project work - *Florida Solar Energy Center, Orlando, Florida*
Co-operative project work - *Mfg. Housing Research Alliance,*
Building Science: Understanding and Controlling Moisture in Buildings;
        *American Industrial Hygiene Association (AIHA) ,San Francisco, Ca. 02-2005*
Member of American Society of Heating, Refrigeration, A/C and Electrical (ASHRAE)
Listed, Building Science Consultant for the American Industrial Hygiene Association
Associate Member - Northeast La., Louisiana, and National Home Builders Association
Member - Building Science Corp., Westford, MA.
Westford 10th Annual Building Science Symposium - Westford, MA. (Invitation only
                                 conference)


**Indoor Air Quality:**

Environmental Inspector Certification - Certified by The Environmental Assessment
                                 Association Certification number # 74080
Member Environmental Assessment Association 2002-Present
Member American Industrial Hygiene Association (AIHA) 2003-Present
Member Indoor Environmental Standards Organization(IESO) - 2003 - Present


**continued;**

**Indoor Air Quality: continued**

Louisiana's Unfair Trade Practices and Consumer Protection Law -
(Mold Remediation/Consultant Ethics and Standards) - 2004
**Medical University of South Carolina - College Of Health Professions Program in
Environmental Health Sciences**
Certified At The Medical University of South Carolina;
A) Indoor Air Quality Investigations - Certification number # IAQI27120-21801
B) Microbial Remediation: Design and Abatement - Certification number # MR27120-
22273
Louisiana State Mold Remediation Contractor - Licences Number #250061

**Civic Involvement:**
Christ Church  - Executive Board of Directors   1995-2001
Graduate   - Leadership Ouachita   1997
Leadership Council  - Leadership Ouachita 1998
West Monroe Chamber of Commerce - 2000- 2004
Adopt-A-School Task Force
Economic Development Committee
Chairman  - Work Force Development Task Force
Boys and Girls Club of West Monroe  - Board of Directors 1999-Present
Nominated for "New Board Member of Year" at National Convention 1999
"Board Member of Year" - 2000
Achievement award for "Meritorious Service"  - 2001
Board President-Elect  - 2001-03

Robert Parks
104 Cherokee Dr..
West Monroe, La 71291

4