## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRY DEESE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **1:06-cv-643-MHT** |
| | * | |
| **CHAMPION ENTERPRISES, INC.,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO MERITS

Plaintiff, by undersigned counsel, files this Memorandum in Opposition to Defendant's

Motion for Judgment on the Pleadings based upon the merits of Deese's claims.

## INTRODUCTION

Defendant has filed a summary judgment motion as to the causes of action brought by Deese

but have either misrepresented or failed to properly disclose the record and allegations herein.[1]

Defendant's Motion is untimely as at the time of the filing of this Opposition, Defendant itself had

not been able to provide any response to the perm rating of the interior walls in Deese or even what

they were: "Q   Do you know the permeance rating of any of the materials in this wall?  A.  No."

See Exhibit 1 Holloway Depo. Tr.  p. 55:14-16.  Defendant then uses this lack of responsiveness as a

sword to buttress its instant Motion.

---

[1] Defendant states that it disputes that "…the Magnuson-Moss Act is applicable to manufactured housing."  *See* Defendant's Brief in Support of Summary Judgment @ n.1.  Amazingly enough, the same Defense counsel in another case filed a brief two weeks ago stating that "[t]he habitability claims also fail because these cases involve manufactured homes, which are goods subject to the UCC."  *See* Defendant's Post-Trial Brief *Byrd v. Southern Energy Homes, Inc.* Arbitration Case No. 30 420 00810 06.  Regardless, Defendant cites case law in their Brief that finds that the manufactured homes are covered by the Magnuson-Moss Warranty Act including at page 10 of their Brief, *Bryant v. Southern Energy Homes, Inc.* 682 So.2d 3, 5 (Ala. 1996).

1

Defendant's attorney does not think the Defendant's 30(b)(6) deponent has a "requirement he make himself familiar with something he's not already familiar with":

> Q   Okay.  And did you make yourself familiar with any of these studies, articles, or anything listed in number 17?
> MR. RITCHIE:  Objection to form. <u>There's no requirement he make himself familiar with something he's not already familiar with.  I mean, unless you've got something that says he's got to go out and research this for a deposition notice, next question.</u>  I mean that's -- that's ridiculous.
> MR. GOULD:  Well, I'm going to go through it.  And if he -- Q    Did you make yourself familiar with any of this?
> A    Under my job responsibilities, <u>I'm not required to, you know, read these things.</u>  I'm -- you know, the 3280, you know, I have to have general familiarity with that.  But these aren't the kinds of things I get involved in.

See Exhibit 1 Holloway Depo. Tr. p. 97:3-23; 98:1 (emphasis supplied).

Indeed, there is a "requirement" that the corporate designee under Rule 30(b)(6) make himself familiar with the areas of inquiry if he does not have independent knowledge:

> The Court agrees that if none of defendant's current employees has sufficient knowledge to provide plaintiffs with the requested information, defendant is obligated to 'prepare [one or more witnesses] so that they may give complete, knowledgeable and binding answers on behalf of the corporation.

*Canal Barge Co. v. Commonwealth Edison Co.*, 2001 U.S.Dist. LEXIS 10097 at * 8 (N.D. Ill. 2001);  *See also Alexander v. FBI*, 186 F.R.D. 148, 152 (D.D.C. 1999); *Mitsui & Co. v. Puerto Rico Water Res. Auth.*, 93 F.R.D. 62, 67 (D.P.R. 1981); *The Paul Revere Life Insurance Company v. Jafari*, 206 F.R.D. 126 (D.Maryland 2002); See *Black Horse Lane Assoc. v. Dow Chem. Corp.*, 228 F.3d 275, 303 (3d Cir. 2000); *Resolution Trust Corp. v. S. Union Co.*, 985 F.2d 196, 197 (5th Cir. 1993); *United States v. Taylor*, 166 F.R.D. 356, 363 (M.D.N.C. 1996); *Marker v. Union Fidelity Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C. 1989)

The deponent answered "I don't know" on nearly every area of inquiry: " Q  You didn't do your homework.  A  No, I didn't do my homework.  I think that's pretty much it.  I looked over my

resume so I would remember the dates and stuff like that." See Exhibit 1 Holloway Depo. Tr. p.

33:14-23; p. 34:1-14. When asked if homes that were going in the Gulf Coast Region had a

permeable wall, Defendant's corporate designee testified: "I wouldn't know. I don't know. I don't

know. I wouldn't know." See Exhibit 1 Holloway Depo. Tr p. 126:1-5.

The undersigned is currently attempting to resolve this discovery dispute without the

necessity of Court intervention and have Defendant provide a responsive deponent. Plaintiff

believes that the answers to these areas of inquiry will be damaging to Defendant.

## FACTUAL BACKGROUND

Other than the 30(b)(6) witness, the expert / fact witnesses being used by Defendant have

testified in several other cases being prosecuted by the undersigned. When deposed in this case each

testified that his recent testimony in the other related cases was, of course, truthful and accurate.

Importantly, Plaintiff believes that the claims and theory being advanced by Deese are supported not

only by Plaintiff's experts but also by Defendant.

For example, Francis Conlin, Defendant's expert in this case, recently testified that the

testimony given in other cases was answered truthfully, although he feels Plaintiff is taking his

statements out of context. Plaintiff believes that his statements were so damaging that the best case

scenario for him is to allege they are being taken out of context but, regardless, this will ultimately

be an issue for the trier of fact to determine. Mr. Conlin testified as follows: "Q. Mr. Conlin, we've

met before, and you've given deposition testimony and arbitration hearing testimony on these same

issues, haven't you? A. Yes, I have." See Exhibit 2 Conlin Depo. p. 6:4-7. "Q. Okay. But you feel

like you've answered all the questions truthfully -- A. Yes. Q. -- that you've been asked? A. Yes.

The whole part of it, yes." See Exhibit 2 Conlin Depo. p. 7:1-5.

Additionally, David Tompos, another of Defendant's witnesses stated: "Q. Mr. Tompos, as I stated before I got started, I've taken your deposition and you've also given testimony in an arbitration hearing on these same issues; that's correct? A. Yes, it is.  Q. You do not, you do not intend to change any of the testimony that you've previously given, do you? A. I hope not. Q. Okay. That will save us a lot of time.  I'm trying to keep these as quick as I can…"  See Exhibit 3 Tompos Depo. p. 69:6-18.

The following are admissions in previous arbitration hearings by these two witnesses who will be testifying in this case:

Conlin Testimony in *Whitaker v. Fleetwood Enterprises, Inc.,* (Exhibit 4)

1. If a material is colder than the dew point of the air, moisture is going to condense.  Conlin p. 187: 2; p. 188: 1-2.
2. 2 % of condensation or moisture is from diffusion while 98% of moisture gets into a building through the air; Conlin p. 189: 17-20.
3. Conlin worked on the protocol and was project coordinator for "Alternatives for Minimizing Moisture Problems in homes in the Hot and Humid Climate"  Conlin p.  202:19-23; p. 203:1; p. 203:9-11.
4. Despite having worked on the protocol and was project coordinator for "Alternatives for Minimizing Moisture Problems in homes in the Hot and Humid Climate", Mr. Conlin was not "thrilled" with the data.  Conlin p. 209:23.
5. He did not however have problems with "Minimizing Moisture Problems in Manufactured Homes" which he helped to write and which is on his resume.  Conlin p. 228: 19-22; p. 230: 3-7.
6. "Minimizing Moisture Problems in Manufactured Homes" lists "Alternatives for Minimizing Moisture Problems in homes in the Hot and Humid Climate" as Phase Two and Conlin can find no "disclaimers" and does "not know" of any such language that supports his testimony that the data for "Alternatives" was invalid in any way even though he was not "thrilled" with it.  Conlin p. 216: 2-3 On page 4 of this study, it states "Location of vapor retarders. In hot, humid climates, the interior of building shell components should be vapor permeable, allowing cavities to dry in the direction of the home's interior."  Id.
7. Oversized AC can actually have a benefit [contrary to Conlin's report] because an oversized AC will run less and perhaps only runs half the time.  p. 206:18-23; p. 207:14-16; p. 208: 14-21;
8. The bellyboard whether ripped or not will not impact exterior walls but only the flooring, if anything [contrary to Conlin's report].  Conlin p. 219: 1-3.
9. 24 CFR 3280.504(b)(1) and (b)(3) both assume outside ventilation of the wall cavity.  Conlin p. 227: 13-14.

4

10. There are no permeance requirements under (b)(3) and thus no vapor barrier is required. Conlin p. 231:13-21.

11. The manufacturer did not have to use a vapor barrier on the inside of the wall.  Conlin p. 232:1-3.

12. Conlin thinks it is ideal not to have vinyl or a vapor barrier on the living sides of the walls as that "would be the way you would want to do it."  Conlin p. 231:11-13.

13. It would be ideal that you would want a vapor permeable interior wall surface.  Conlin p. 234: 1-3.

14. Conlin thinks using a vapor barrier on the living side of the wall in these homes is "not ideal."  Conlin p. 233: 1-3.

15. Placing a vapor barrier on the living side of the wall or using vinyl on the living side of the walls is "not ideal.  And I [Conlin] don't think I can show you any learned treatise that says its ideal."  Conlin p. 253: 17-23.

16. Despite the fact that Conlin states in his report that Gypsum has the unique ability to dry and get wet and dry out, Conlin does not "know much about that other than what Mr. Wessel said…"  Conlin p. 257: 18-23.

17. Conlin agrees that you do not want mold in a wall cavity.  Conlin p. 258: 19-20.

18. Conlin thinks the Gypsum Association documents which were exhibits of Plaintiffs is a "reliable authority."  Conlin p. 264: 10-12.

19. Conlin agrees thus that if there is ever a doubt, we must replace the wet gypsum.  Conlin p. 264.

20. Conlin agrees that mold can "germinate" in 24 to 48 hours.  Conlin p. 268: 7-9.

21. Conlin agrees that you can only have limited intermittent exposure.  Conlin p. 268: 17-19.

22. Conlin agrees that you have to not only replace the gypsum but "fix the source too" or it is moot as it will get wet again.  Conlin p. 269: 6-12.

23. In "Moisture Problems in Manufactured Homes, understanding the causes and finding solutions" which was copyrighted in 2000, Conlin was a "coordinating member."  Conlin p. 273: 15-21.  On page 1.2, the second moisture drop from the top states "in hot humid climates avoid placing a vapor retarder on the inside of the wall."  Conlin p. 274: 12-13.  On page 3.5, it states that "the interior vapor retarder acts like a dam holding water inside the wall board" and "if the wall cannot dry out, it will eventually fail completely."  On page 3.7 under remedy, it states "Replace failed gypsum wallboard with plain gypsum covered with vapor permeable paint which will allow water vapor to more easily migrate through the wallboard."  Conlin p. 276: 6-13.

24. A reason to do a mold sample test like Mr. Parks, would be to "investigate areas which are not visible."  Conlin p. 282: 4-8.

25. When asked if he believed that the only areas where he tested were the only areas where there was mold, Mr. Conlin states "I don't know."  Conlin p. 282:17-20.

26. Despite his criticism of Mr. Parks' testing of the wall cavities, Conlin stated that doing so has had "some good success."  Conlin p. 283:: 19-20.

27. When asked why not test the wall cavites [as opposes to the outside of the home and the inside of the home when the case is about wall cavities], Mr. Conlin, among other things, states "…certainly that would have been one way to do it."  Conlin p. 285: 13-15.

28. Conlin agrees that the HUD Code does not say it is ok to have mold in the walls. Conlin p. 286:19-21.

29. In "Moisture Problems in Manufactured Housing: Probable Cause and Cures" Conlin admits that all problems that were encountered related to moisture flow in a vapor state. Conlin p. 289: 1-2. This study was copyrighted 2001. See attached Exhibit 5. "All of the homes inspected that experienced wall board failure were vinyl coated." Id. p. 8. This study concluded that the vapor retarder was in the wrong location i.e. vinyl or other impermeable wall coverings and concluded "if possible, remove vapor barriers located on the wrong surfaces." Id. p. 10 and p. 2.

Conlin testimony in *Byrd* and *Daugherty v. Southern Energy Homes, Inc.* (Exhibit 6)

30. Vol III, p. 987:12-14: "You did a swab test but you lost the swab? Yes sir." ; "And if not and you screw it up, there could be legal implications. Q. Like putting it in an inbox and forgetting about it. A. Absolutely." p. 926: 16-2. *See also* I did swab in Byrd as a clearance test to say everything is okay. p. 989: 1-5.
31. Nowhere in HUD code does it say its acceptable to have mold in the wall cavities, p. 954: 9-12. Mold can occur in 24-48 hours if it gets moist. p. 908: 8-9.
32. Vol III, p. 909: 14-23: "Can you refute Mr. Parks' findings about mold in the wall cavities from his test….I don't know what you mean by refute….I don't have mold testing that shows different."
33. "Redundant protection is best moisture protection, p. 921: 20-23; Belts and suspenders (is redundant protection.) p. 993: 12. The more things you have to keep water away from, that's what I refer to as redundant protection. p. 993: 20-21.
34. "Examination of exterior walls is key, as exterior walls are typically unaffected by possible installation shortcomings…." p. 810: 8-14.
35. "Do you have any drafts? No, sir", p. 825: 6-7. When a draft report was shown to him which he apparently did not realize had been produced and which had a materially different statement in which benefited the Plaintiff and had been removed in the final report he stated: "So I didn't mean to imply I don't make a draft…you know I like this sentence better (in the draft)", p. 826: 11-17.

Tompos testimony in *Byrd* and *Daugherty v. Southern Energy Homes, Inc.* (Exhibit 7)

36. David Tompos, Defendant's expert, concedes that if walls are deteriorating, they are not performing. Vol. IV, p. 241:16-20.


The record demonstrates that that nowhere in HUD code does it say it's acceptable to have mold in the wall cavities and mold can occur in 24-48 hours if it gets moist. (See Nos. 20 and 18 above) The use of a continuous vapor barrier on the wall board on the interior is "not ideal" for this

climate but rather it's ideal that you would want a vapor permeable interior wall surface.[2] (See Nos. 13, 14 and 15 above)

Hot seeks cold and moist seeks dry are uncontested and basic rules of thermodynamics. Redundant protection is the best moisture protection. (See No. 33 above) When the dew point is 75 degrees outside and the AC is kept at or below 75 degrees, thermodynamics dictate that the hot, humid air will seek to reach the colder living side of the walls but will be trapped behind the vinyl covered walls. (See Nos. 1 and 23 above) This means that condensation will occur all summer in the hot and humid climate as stated by industry studies. (See Nos. 23 and 29 above) Regardless of the standard to which the manufacturer builds the home under 504(b), the home must perform and ensure durability and quality. In gulf coast (or elsewhere), you want to limit condensation in the walls. "Heat moves from high temperature to low." "Water vapor moves from high pressure to low." (Exhibit 13, p. 25, Moisture & Mold Diagnostics and Mitigation) Stated differently, water vapor is going to move from hot, moist regions to regions that are relatively cool and dry.

 If walls are deteriorating, they are not performing. (See No. 36 above) Implementing a 504(b)(3) wall design never required using a continuous vapor barrier on the walls. (See No. 10 above) In fact, a vapor permeable wall covering such as tape and texture and/or paper could have and should have been used. (See Nos. 10 and 11 above) In fact, Defendants have failed to identify the perm rating of the walls in the Deese home. However, Plaintiff believes it will be proven that the walls in the Deese home are covered with a vapor retarder as opposed to a tape and texture or paper covered wall which would provide a permeance rating of fifteen (15) or greater.[3]

---

[2] Defendant's expert has testified that using a vapor barrier on the living side of the walls in this hot and humid climate is "not ideal. And I [Conlin] don't think I can show you any learned treatise that says its ideal." The ideal would be to have breathable, permeable wall

[3] Defendant's Motion is untimely as at the time of the filing of this Opposition, Defendant itself had not been able to provide any response to the perm rating of the interior walls in Deese or even what they were.

Defendant made Plaintiff's home to act as "moisture traps" not to "control condensation" as required by 24 CFR 3280.504 and, more specifically, were not "dissipating condensation" as mandated by 3280.504(b)(3): "Wall cavities shall be constructed so that ventilation is provided to dissipate any condensation occurring in these cavities."  Defendant cannot point to <u>one</u> study that said placing the vapor retarder on the living side of the walls was a good practice in this hot, humid climate.  (See No. 15 above)  To the contrary, approximately thirty (30) studies and articles (Defendant's expert participated in) were adamant and redundant (e.g. "never, ever") in their condemnation of placing vapor retarder on the living side of the walls in the hot and humid climate ("the interior vapor retarder acts like a dam holding water inside the wall board").[4]  (See Exhibit 8, Published list of references and warnings as to the use of a vapor barrier/retarder within the hot, humid climate)

Plaintiff further believes it undermines any credibility in blaming the homeowner, the installer and the satellite antenna installer, which is predictably and consistently done in every case in which Defendant's expert has appeared.  Even if true and these alleged problems are remedied (the antenna man caulks the alleged hole), Plaintiff will still own a home that is "not ideal" for this climate.  (See No. 14 above)  It is important to remember that by design these walls are manufactured to be ventilated which means to (on purpose) allow the hot humid air a direct path into the wall cavities where it will become trapped behind the vapor retarder for the entire summer.

---

[4] Each of these studies are in evidence as they were deemed "reliable authority" by Defendant's own witnesses or by Plaintiffs' experts.  **Rule 803(18)**  *The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (18)* ***Learned treatises.***  *To the extent called to the attention of an expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.  If admitted, the statements may be read into evidence but may not be received as exhibits."  **See** Gamble's Alabama Rules of Evidence for Annotations; § 803(18) Learned Treaties, Periodicals and Pamphlets.**

The following quotes are taken from studies performed on behalf of the manufactured housing industry and predate the date of purchase of the Deese home: "in order for ventilation drying to be effective, it is still necessary for water vapor to be able to diffuse from the envelope into the ventilated space. Given the importance of vapor diffusion as a drying mechanism, it is critical that a diffusion pathway is considered." Exhibit 9, Whitaker Transcript, p. 535:6-23; p. 536:1-23; p. 537:1-9.  "Alternatives for Minimizing Moisture Problems in Homes Located in Hot Humid Climates, Interim Report" This study states that "such ventilation [as in Whitaker home] will not serve the intended purpose of keeping the cavity dry if the vapor pressure of the outside air is greater than the cavity." Id., p. 539:9-14. Building Your Louisiana House, Homeowner's Guide" by LSU AG Center Research & Extension states: "Any moisture that gets in must be able to dry to the inside cooler and dehumidified space.  The interior side of the wall should be permeable as possible – as permeable as possible, meaning no vinyl wallpaper, no oil-based interior paints, no interior vapor barrier on insulation.  Having no vapor barrier on the interior side is more important than having a vapor retarder on the outside.  None is preferable to one on the wrong side." Id. Transcript, p. 564:3-9.  This study states "Replace failed gypsum wallboard with plain gypsum, cover with vapor permeable paint, which will allow water vapor to more easily migrate through the wallboard."  Id. Transcipt,  p. 568:15-20.  This study states "The interior vapor retarder acts like a dam, holding water inside the wallboard.  When the conditions support condensation inside the wall, the wall will begin to condense on the coldest material, in this case the inner surface of the wallboard.  If the conditions for drying are poor, the outside humidity high and the vapor retarder blocks diffusion to the inside, moisture will begin to accumulate on surfaces and saturate the material.  If the wallboard cannot dry out, it will eventually fail completely."  Id. Transcript, p. 570:4-23.

In the hot and humid Southeastern U.S., the outside air is consistently above a dewpoint of 75°F during the summer months. Exhibit 5, p. 4, Moisture Problems in Manufactured Housing: Probable Causes and Cures. If the homeowner decides to keep the interior temperature of the home below 75°F…then when moisture-laden outside air comes into contact with cold inside surfaces, condensation occurs. Exhibit 5, p. 4. The goal of 504 (b)(3) is to "dissipate condensation." When an interior vapor retarder is used in the construction, the relative humidity at the outside surface of the vapor retarder can approach saturation, thereby providing an environment conductive to mold and mildew growth. (Exhibit10, p. B-2, Whole House Ventilation Strategies) Avoidance of using vapor retarders where vapor permeable materials will provide satisfactory performance. Thereby encouraging drying mechanisms over wetting prevention mechanisms. (Exhibit 11, p. 4).

**Express Warranty and Magnuson Moss**

Defendant contends that notice concerning defects must be in writing and since Plaintiff did not provide written notice, notice was not proper. The warranty states that "[t]he warranty only applies to substantial defects that become evident within the Warranty Period and where written notice is provided to the Manufacturer not later than 10 days following the expiration of the Warranty Period." The warranty, however, does not specify that Plaintiff must provide the written notice. The warranty simply states that written notice must be provided. Numerous published reports have indicated the manufactured home in this case was defective. These *written* published reports provided Defendant with *written* notice of the defect. This written notice was also provided within the Warranty Period because Defendant had this written notice before Plaintiff even purchased his manufactured home. Defendant drafted the warranty and, therefore, the warranty should be strictly construed against it. *See Ex parte Helton*, 814 So.2d 251, 257 (Ala. 2001)(stating the document "must be construed strictly against the drafter"); *Dumas v. First Federal Sav. and*

10

*Loan Ass'n*, 654 F.2d 359, 361, fn. 1 (5th Cir. 1981)(stating "the general rule is that a writing is to be strictly construed against the drafter").  Notice, therefore, was proper.

In *Rhode v. E & T Investments, Inc.*, the plaintiff was required to provide notice to the manufacturer under the terms of the warranty.  *Rhode v. E & T Investments, Inc.*, 29 F.Supp.2d 1298, 1300 (M.D.Ala. 1998).  The plaintiff in that case provided written notice, but the issue became whether the plaintiff had to give the manufacturer continual notice that repair work performed was unsatisfactory.  *Id.* at 1303.  The warranty in that case did not require the plaintiff to give continual notice of the defect to the manufacturer.  *Rhode v. E & T Investments, Inc.*, 29 F.Supp.2d at 1303.  The Middle District of Alabama stated that "whether the Plaintiff gave proper notice in this case is a question of fact for the jury and not a proper matter for summary judgment."  *Id.*  In the case at hand, Defendant was provided with proper notice because of the written reports, discussed above, and the fact that Defendant knew of the defect, discussed below.  The warranty in this case did not require that Plaintiff be the one to provide written notice.  Therefore, whether proper notice was given to Defendant under the warranty is a question of fact for the jury and Defendant's Motion for Summary Judgment should be denied.

Defendant argues that notice of the defect was given after the warranty expired and, therefore, a claim for breach of warranty cannot be maintained.  The buyer, however, is not required to provide direct notice of the defect if "the seller has actual knowledge of the defect of the particular product."  *In re McDonald's French Fries Litigation*, 2007 WL 1576550, *2 (N.D.Ill. 2007).  The reason why the buyer does not have to provide notice to a seller that already has notice is because of the reasoning behind the notice requirement.  Providing notice of defects to the seller creates the possibility of settlement and provides "'ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or

minimize his damages while the facts are fresh in the minds of the parties.'" *Jewell v. Seaboard Indus., Inc.*, 667 So.2d 653, 660 (Ala. 1995), quoting *Parker v. Bell Ford, Inc.*, 425 So.2d 1101, 1103 (Ala. 1983).     As stated in *Radford v. Daimler Chrysler Corp*:

> Plaintiff brings claims under the Magnuson-Moss Warranty …Defendant asserts plaintiff's claims under the Act must be dismissed because she has failed to allege that defendant was afforded the opportunity to cure the alleged defect…Plaintiff does allege, however, that defendant "was aware for years of the problems with these dangerous, defective instrument panels . . . Plaintiff cites *Alberti v. General Motors Corp., 600 F. Supp. 1026 (D.C.D.C. 1985)*, for the proposition that the "opportunity to cure the defect" pleading requirement is satisfied by an allegation that a defendant knew of the alleged defect at the time of sale. Because plaintiff has alleged defendant knew of the allegedly defective instrument panel at the time of sale of plaintiff's car, I find that plaintiff has met the pleading requirement of alleging defendant had an opportunity to cure the defect, and will not dismiss the claim on this ground.

*Radford,* 168 F. Supp 2d 751, 754 (N.D. OH 2001).

Defendant had actual knowledge of the defect and, therefore, Defendant had an opportunity to cure the defect and enter into settlement negotiations.  Requiring Plaintiff to provide notice of a defect to Defendant when it already had actual knowledge of the defect is redundant.

The Uniform Commercial Code states that a "buyer must **within a reasonable time** after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  Ala. Code 1975 § 7-2-607 (emphasis added).  The warranty only provided Plaintiff with one year to discover latent defects in the manufactured home.  Defendant essentially shifted the risk of latent construction defects to Plaintiff by only allowing a remedy for defects that appeared quickly.  *Badgett Const. and Development Co. v. Kan-Build, Inc.*, 102 F.Supp.2d 1098, 1105 (S.D.Iowa 2000).  Many courts have looked to the length of the warranty period in order to make a determination of whether the time limitation is reasonable.  *See Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1217 (3d Cir. 1970)(stating the time limitation was "manifestly unreasonable if it is construed to require that notice be given of latent defects which would not be

discoverable until after the time specified has elapsed); *Q. Vandenberg & Sons, N.V. v. Siter*, 204 A.2d 494, 498 (Pa.Super. 1964)(stating "a limitation which renders the warranties ineffective as regards latent defects, literally covered by the warranty but not discoverable within the limitation period of the contract, is manifestly unreasonable and therefore invalid under § 1-204 of the code"); *Held v. Mitsubishi Aircraft Intern., Inc.*, 672 F.Supp. 369, 382-83 (D.Minn. 1987)(stating warranty limitations in connection with sale of an aircraft extending up to three years was unreasonable as applied to a latent design defect). In *Community Television Services, Inc. v. Dresser Industries, Inc.*, the Eighth Circuit noted the trial court's finding that a six-month warranty of material and workmanship of a television and radio broadcasting tower was unreasonable given the twenty-five year useful life of the tower. *Community Television Services, Inc. v. Dresser Industries, Inc.*, 586 F.2d 637, 641-42 (8th Cir. 1978). At least one study has indicated that manufactured homes have comparable useful life spans as site-built homes and that the estimated median manufactured home life span is 57.5 years. *See* Carol Meeks, Manufactured Housing Institute, *Manufactured Home Life: Existing Housing Stock Through 1997* (May, 1998). The one year warranty period relative to the estimated useful life span of the manufactured home may be viewed as unreasonable, which is a genuine issue of material fact that must be decided.

The Fourth Circuit has stated that "[w]hen a manufacturer is aware that its product is inherently defective, but the buyer has 'no notice of or ability to detect' the problem, there is perforce a substantial disparity in the parties' relative bargaining power." *Carlson v. General Motors Corp.*, 883 F.2d 287, 296 (4th Cir. 1989), quoting *Martin v. Joseph Harris Co., Inc.*, 767 F.2d 296, 302 (6th Cir. 1985) *overruled on other grounds*. In that case, it was presumed that the buyer did not voluntarily accept limitation periods on his remedies when the manufacturer knew of a defect and the buyer did not. *Id.* Therefore, the limitations period was deemed to be

unconscionable. *Carlson v. General Motors Corp.*, 883 F.2d at 296. In the case at hand, Defendant knew of the defect and Plaintiff did not. The manufactured housing industry has participated in studies as early as 1999 relating to moisture problems in manufactured homes. (See Exhibit 12, Moisture Problems in Manufactured Homes – Understanding Theirs Causes and Finding Solutions) These studies and other publications made Defendant aware of the defect and that knowledge should render the limitation period unreasonable.

A party is said to have notice of a fact "when: (1) he has actual knowledge of it; or (2) he has received a notice or notification of it; or (3) from all of the facts and circumstances known to him at the time in question he has reason to know that it exists." *Jones v. First Nat. Bank of Pulaski*, 505 So.2d 352, 355 (Ala. 1987). Defendant had actual knowledge of the defect. Therefore, Defendant had notice of the defect.

Defendant's notice of the defect is not only evidenced by the fact it knew of the defect, but also the fact that it attempted to exclude the defect in the warranty. Defendant attempted to remove itself from the potential of being held liable for the defect by attempting to exclude damage it knew would occur caused by humidity or condensation from the warranty. Defendant knew of the defect and, more egregiously, intentionally tried to disclaim the problems associated with the defect. As such, Defendant had notice of the defect.[5]

**Implied Warranty Claims**

Alabama generally does not allow a cause of action on an implied warranty claim for economic loss without privity of contract. *Jenkins Brick Co. v. Waldrop*, 384 So.2d 117, 118 (Ala.Civ.App. 1980). The Uniform Commercial Code, however, states that "[a] sellers' warranty,

---

[5] When asked about Defendant's knowledge of the studies on this problem in the Deese's home, the 30(b)(6) deponent repeatedly testified "I don't know." Plaintiffs' are requesting that Defendant's produce someone who does know and

whether express or implied, extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." Ala. Code 1975 § 7-2-318. Although the term "in person" may appear to only allow recovery to a third-party beneficiary when the beneficiary has suffered physical injury, Alabama courts have not specifically addressed whether a nonprivity buyer claiming to be a beneficiary with strictly economic injury could claim to be covered by an implied warranty. *Harris Moran Seed Co., Inc. v. Phillips*, 949 So.2d 916, 923 (Ala.Civ.App. 2006). The Alabama Supreme Court, however, has "indicated that a vertical nonprivity purchaser might be able to recover against a manufacturer under just such a theory." *Id.*; *see Bay Lines, Inc. v. Stoughton Trailers, Inc.*, 838 So.2d 1013 (Ala. 2002)(stating "Bay Lines presented no evidence indicating that Crane knew, when it sold the panels to Stoughton, that Bay Lines was a purchaser of Stoughton's products, *or that Crane intended to protect future customers of Stoughton, such as Bay Lines, when it warranted its products to Stoughton*. Bay Lines, therefore, cannot rely on the warranty to support its [third-party-beneficiary] claim against Crane").

The Alabama Code states that "[u]nless excluded or modified (Section 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Ala. Code 1975 § 7-2-314. Therefore, any contract between Defendant and the seller in this case had an implied warranty of merchantability. Any contract between Defendant and the seller was intended to ultimately benefit Plaintiff, purchaser of the manufactured home. Plaintiff, therefore, was an intended beneficiary of the contract and, thus, the nonprivity claim is covered by the implied warranty of merchantability.

---

hope to avoid Court intervention.

The implied warranties of fitness for a particular purpose and habitability were also implied in any contract between Defendant and the seller. The contract was made with the intended purpose of ultimately benefitting Plaintiff. Plaintiff, therefore, was an intended beneficiary of the contract and, thus, covered by the implied warranties of fitness for a particular purpose and habitability, despite the lack of privity.

In order to demonstrate that Plaintiff is a third-party-beneficiary, he "must show: 1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; 2) that the complainant was the intended beneficiary of the contract; and 3) that the contract was breached." *Harris Moran Seed Co., Inc. v. Phillips*, 949 So.2d at 920, quoting *Sheetz, Aiken & Aiken, Inc. v. Spann, Hall, Ritchie, Inc.*, 512 So.2d 99, 101-02 (Ala. 1987). At the time Defendant and the seller created any contracts between them, the known end result would be to sell manufactured homes to customers, including Plaintiff. Therefore, Plaintiff was the intended beneficiary of these contracts. Plaintiff needs the opportunity to present evidence at trial that the implied warranties were in fact breached.

The implied warranty of habitability does apply to manufactured homes, contrary to Defendant's belief. *See Erwin v. Shiloh Homes*, 360 So.2d 1003, 1005 (Ala.Civ.App. 1978)(stating the case was tried on the theory of breach of warranty of habitability and, therefore, the court would not review on a theory of recission due to the fact that it is a different theory from that proceeded on below). The purpose of the implied warranty of habitability is "'to discourage much of the sloppy work and jerry building that has become perceptible over the years.'" *Brown v. Merit Corp.*, 494 So.2d 399, 400 (Ala. 1986), quoting *Cochran v. Keeton*, 252 So.2d 307, 310 (Ala.Civ.App. 1970). This purpose should apply to any home built, including manufactured homes.

**<u>Negligence and Wanton</u>**

16

Generally, the "discovery rule," which tolls the running of the statute of limitations until the defect is discovered, does not apply to claims of negligence or wantonness, only to fraud claims. *Henson v. Celtic Life Ins. Co.*, 621 So.2d 1268, 1274 (Ala. 1993). The beginning of the statute of limitations is not delayed even if the injury is not discovered until after it occurs, nor is the statute of limitations delayed due to the ignorance of the plaintiff, "*at least as long as there is no fraudulent concealment by the defendant*." *Ex parte Floyd*, 796 So.2d 303, 307 (Ala. 2001)(emphasis added), quoting *Kelly v. Shropshire*, 75 So. 291, 292 (Ala. 1917). As discussed below, Defendant fraudulently concealed the fact that the manufactured home contained a serious defect. The statue of limitations, therefore, is tolled.

Furthermore, the statute of limitations does not begin to run for negligence and wantonness claims *until the injury has occurred. Dorsey v. Bowers*, 709 So.2d 51, 56 (Ala.Civ.App. 1998). An action for property damage or injury "'accrues on the date of the injury or damage, and *not* upon the occurrence of the negligence itself, or the last known negligent act.'" *Id.* (emphasis in original), quoting *Rumford v. Valley Pest Control, Inc.*, 629 So.2d 623, 627 (Ala. 1993). The Eleventh Circuit has stated that "[i]t is well settled under Alabama law that a negligence cause of action accrues when the plaintiff can first maintain the action. . . ." *Piazza v. Ebsco Industries, Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001). All injuries in this case stem from the moisture in the walls created by the defect. The injury, therefore, occurred when moisture first began to accumulate in the walls. The injury had to occur between the time the manufactured home was built and when the home was inspected and discovered to contain moisture in the walls. Plaintiff will infer that it took time for the moisture to build up and accumulate, meaning the injury occurred near the time the home was inspected. This would place the negligence and wantonness claims within the statute of limitations. When the injury actually occurred is debatable and "when a disputed issue of fact is raised, the determination of the

17

date of accrual of a cause of action for statue-of-limitations purposes is a question of fact to be submitted to and decided by a jury." *Kindred v. Burlington Northern R. Co.*, 742 So.2d 155, 157 (Ala. 1999). Defendant's Motion for Summary Judgment, therefore, should be denied so that a jury can determine when the statute of limitations began to run.

Plaintiff is unaware of any case in Alabama which discusses both the general rule that the "discovery rule" does not apply to negligence and wantonness claims and the affect the rule has when dealing with hidden defects, like the case at hand. The Court may infer the rule is still applicable in cases dealing with latent defects from the fact that discovery of a defect is not necessary to begin the running of the statute of limitations. Plaintiff, however, contends that the rationale behind the "discovery rule" "is to 'protect those who are ignorant of their cause of action through no fault of their own.'" *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003), quoting *April Enterprises, Inc. v. KTTV*, 147 Cal.App.3d 805, 832 (Cal.App.2Dist. 1983). Plaintiff in this case was ignorant of the negligence and wantonness construction of the manufactured home. Plaintiff in this case "'should not suffer where circumstances prevent [him] from knowing [he has] been harmed and defendants should not be allowed to knowingly profit from their injuree's ignorance.'" *Id.*, quoting *April Enterprises, Inv. v. KTTV*, 147 Cal.App.3d at 831. Not applying the "discovery rule" in this case would deprive Plaintiff of a cause of action prior to his being aware of his injuries, which is manifestly unjust.

Defendant correctly states that, generally, "[t]he economic-loss rule prevents tort recovery when a product damages itself, causing economic loss, but does not cause personal injury or damage to any property other than itself." *Vesta Fire Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So.2d 84, 106-07 (Ala. 2004). There was, however, personal injury caused to Plaintiff. Plaintiff suffered mental anguish and "Alabama has allowed mental-anguish damages when economic harm has

occurred to a person's home." *Carrell v. Masonite Corp.*, 775 So.2d 121, 124-25 (Ala. 2000). Therefore, the economic loss rule would not apply if Plaintiff proved mental anguish. A trial is needed so that Plaintiff may prove to a jury mental anguish was suffered.

Furthermore, the result of the defect has caused more than just damage to the walls. The entire manufactured home has been damaged by the large reduction in the home's fair market value as a result of the defect. As stated by Justice Johnstone, "[t]he mere-economic-loss rule of *Carrell v. Masonite Corp.*, 775 So.2d 121 (Ala. 2000), as it applies to homes, bars recovery only for a particular *component* of a home which fails in such a way as to damage only the component itself." *Ex parte Grand Manor, Inc.*, 778 So.2d 173, 185 (Ala. 2000)(Johnstone, J. concurring in part and dissenting in part)(emphasis in original). Justice Johnstone went on to state that "[t]he mere economic loss rule does not apply when the product is the *entire home*. *Id.* (emphasis added). It is indisputable that the entire home has been damaged as indicated by the decreased value of the home.

Defendant argues Plaintiff cannot support any negligent or wanton manufacture or repair claims because Defendant did not harbor an intent not to repair the home or otherwise injure or deceive Plaintiff. Defendant's intent, however, is irrelevant. Wanton conduct occurs when a "party acting or failing to act is conscious of his conduct, *and even though without any actual intent to injure* is aware from his knowledge of existing circumstances and conditions that his conduct would probably result in injury to another or in damage to his property." *Hooper v. Columbus Regional Healthcare System, Inc.*, 956 So.2d 1135, 1140 (Ala. 2006)(emphasis added), quoting *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So.2d 665, 679-80 (Ala. 2001). Evidence will show Defendant was aware of the injury that would result to Plaintiff as a result of its wanton construction of the mobile home.

Defendant contends that is has no duty to construct a manufactured home free from defects. Defendant does not cite directly to any case, so the only evidence of this contention is the conclusory statements made by Defendant.  The Manufactured Home Construction and Safety Standards states the following:

> **Every manufacturer of manufactured homes shall furnish notification of any defect** in any manufactured home produced by such manufacturer which he determines, in good faith, relates to a Federal manufactured home construction or safety standard or contains a defect which constitutes an imminent safety hazard to the purchaser of such manufactured home, within a reasonable time after such manufacturer has discovered such defect.

42 U.S.C.A. § 5401(a)(emphasis added).

Defendant states at page 15 of its Brief that "…there is no public or common law duty owed by manufactured home builders in Alabama or anywhere else in the country to build a perfect home or to perform repairs." *Id.* (emphasis supplied).   Plaintiff is not sure what "public or common law duty" means but Defendant apparently did not search the HUD Code which states:  "Compliance with any Federal manufactured home construction or safety standard issued under this title does not exempt any person from any liability under common law."  42 USC § 5409 (c) (emphasis supplied).

 In *Choate v. Champion Home Builders Co.*, 222 F.3d 788, (10th Cir. 2000), the court held that the Act does not expressly pre-empt common-law actions, nor does the Act occupy the field of construction and safety of manufactured homes exclusively, so as to impliedly pre-empt all common-law actions.[6]

---

[6] See also *Shorter v. Champion Home Builders Co., 776* F. Supp. 333 (N.D. Ohio 1991), court held that the Act does not pre-empt most tort claims regarding mobile housing;  In *Turner v. PFS Corp.,* 674 So. 2d 60, (Feb 16, 1996), the court held that the Act and regulations adopted under it, did not pre-empt state law tort claims at issue, because those claims asserted a failure to comply with federal standards themselves. The court quoted the holdings of *Shorter v. Champion Home Builders Co.,* 776 F. Supp. 333 (N.D. Ohio 1991), that the Act pre-empts state law standards, but does not pre-empt most state law claims. *Id.*

This statutory language indicates that Defendant's customers have a reasonable expectation that the manufactured home they purchase will be free from defects. In any event, Defendant appears to be admitting defects exist in the Deese home and whether damage has resulted is a question of fact for the fact finder.

## Mental Anguish

The Supreme Court of Alabama has stated that "[t]he general rule is that mental anguish is not a recoverable element of damages arising from breach of contract." *B & M Homes, Inc. v. Hogan*, 376 So.2d 667, 671 (Ala. 1979). However, it is reasonably foreseeable that the faulty construction of a home will cause severe mental anguish. *Id.* at 672. A purchase of a home constitutes the largest investment an average family will make. *B & M Homes, Inc. v. Hogan*, 376 So.2d at 672. A home purchase places a family in debt for years and if the home bought is a new home, a buyer does not expect defects to exist in the home. *Id.* Therefore, if the defects are severe, it is foreseeable that a buyer would experience extreme mental anguish. *B & M Homes, Inc. v. Hogan*, 376 So.2d at 672. The Alabama Supreme Court has stated that "it is a clear indication that contracts dealing with residences are in a special category and are exceptions to the general damages rule applied in contract cases which prohibits recovery for mental anguish." *Id.*

Defendant contends that Plaintiff cannot recover for mental anguish because Plaintiff has not been diagnosed with regard to any physical ailment. However,

> the rule that damages for mental anguish are not recoverable for negligence which causes only loss to property but no physical injury or danger of physical injury to any person does not apply to negligence committed upon a home. A person who suffers both property damage and mental anguish as a result of negligence committed upon a home may recover for both elements of damage notwithstanding the absence of any physical injury to the person.

*Ex parte Grand Manor, Inc.*, 778 So.2d at 185 (Johnstone, J. concurring in part and dissenting in part); *See Carson v. City of Prichard*, 709 So.2d 1199, 1203 (Ala. 1998)(stating in a case involving mental anguish that "[t]here was substantial evidence from which the jury could find that the Board had been negligent and that the plaintiffs had suffered damage as a result of the Board's negligence," despite the lack of physical injury). This is clearly a case where negligence was committed upon the home. Defendant constructed the manufactured home with a serious defect. Therefore, physical injury is not necessary to establish damages for mental anguish.

Assuming, *arguendo*, that residences are not placed in a special category as an exception to the general rule that prohibits recovery for mental anguish in contract cases, Plaintiff still satisfies the zone-of-danger test. The zone-of-danger test "'limits recovery of mental anguish damages to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct.'" *Ex parte Grand Motor, Inc.*, 778 So.2d at 179, quoting *Wal-Mart Stores, Inc. v. Bowers*, 752 So.2d 1201, 1203 (Ala. 1999). It is hard to dispute that mold caused by Defendant's negligence, which can grow quickly and cause immediate physical reactions, did not place Plaintiff in immediate risk of physical injury. The zone-of-danger test, therefore, has been satisfied.

**Unjust Enrichment**

A party has been unjustly enriched when the party retains a benefit unjustly. *Mantiply v. Mantiply*, 951 So.2d 638, 654 (Ala. 2006). The Supreme Court of Alabama has stated that "[t]he retention of a benefit is unjust if '(1) the donor of the benefit acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit engaged in some unconscionable conduct, such as fraud, coercion, abuse of a confidential relationship." *Id.* at 654-55, quoting *Welch v. Montgomery Eye Physicians, P.C.*, 891 So.2d 837, 843 (Ala. 2004). There is no doubt that

22

Plaintiff acted under the mistake of fact that the manufactured home was free from defects.  Also, Defendant engaged in fraudulent concealment and, thus, retained the benefit of Plaintiff's payment for the manufactured home unjustly.  A trial is needed to prove the elements of unjust enrichment. Evidence presented will render Defendant's claim that no evidence supports the unjust enrichment claim inaccurate.  Furthermore, Defendant's claim that Plaintiff cannot show unjust enrichment because the home may be worth what it is insured for is not a correct statement of law.  The elements of unjust enrichment only require Plaintiff to show that he acted under the mistake of fact that the home was free from defects and Defendant engaged in fraudulent behavior.  The value of the home's insurance policy is irrelevant.

Defendant incorrectly states that unjust enrichment is not a cause of action.  *See Atlantic Nat. Trust, LLC v. McNamee*, -- So.2d --, 2007 WL 2898263, *7 (Ala. 2007)(stating "To prevail on a *claim* of unjust enrichment. . . .)(emphasis added).  Courts use constructive trusts to prevent unjust enrichment.  *Berryman v. Adams*, 883 So.2d 214, 217 (Ala.Civ.App. 2003).  A quasi-contract is created when a party voluntarily obligates himself to make restitution of a benefit he received unjustly.  *Jordan v. Mitchell*, 705 So.2d 453, 460 (Ala.Civ.App. 1997).  A court's creation of a constructive trust or parties' creation of a quasi-contract is irrelevant to this case.  If a party has been unjustly enriched, that party can be forced to make restitution to the donor.

**Fraudulent Concealment**

Defendant contends the two year statute of limitations for the fraudulent concealment claim expired prior to the filing of the lawsuit.  However, the State of "'Alabama does recognize that a fraudulent concealment by a defendant tolls the running of the statute until the tort or injury is discovered or could have been discovered by due diligence.'"  *Rutledge v. Freeman*, 914 So.2d 364, 370 (Ala.Civ.App. 2004).  The damage to the manufactured home could not have been discovered

by due diligence and Plaintiff was not "privy to facts which would 'provoke inquiry in the mind of a person of reasonable prudence, [ ] which, if followed up, would have led to the discovery of the fraud.'" *Davant v. United Land Corp.*, 896 So.2d 475, 491 (Ala. 2004), quoting *Willcutt v. Union Oil Co.*, 432 So.2d 1217, 1219 (Ala. 1983). Therefore, the statute of limitations has not expired on Plaintiff because of the "discovery rule".

Defendant implies that Plaintiff could not have reasonably relied on Defendant's misrepresentations and, thus, Plaintiff could not have been induced to purchase the defective manufactured home as a result. It is reasonable to infer that if Defendant would not have failed to disclose the fact that the home was severely defective, Plaintiff would not have been induced to purchase the home. Therefore, Plaintiff satisfies the elements of fraudulent concealment because Defendant had a duty to disclose the fact that the home was defective, Defendant concealed this fact, Plaintiff was induced to purchase the home as a result of this concealment, and Plaintiff suffered actual damage as a result of the concealment.

Defendant had a duty to inform Plaintiff that the home had a serious defect. A duty to disclose is created and, thus, Defendant is liable for damages for nondisclosure, "[i]f the seller or the [seller's] agent has knowledge of specific defects that affect health or safety and the defect is not known to or readily observable by the buyer. . . ." *Roberts v. C & S Sovran Credit Corp. of Alabama*, 621 So.2d 1294, 1297 (Ala. 1993). It is indisputable that exposure to mold affects the health and safety of Plaintiff. Therefore, Defendant had a duty to disclose the defect to Plaintiff.

A party can bring a fraudulent concealment claim against the seller and the manufacturer. *See Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So.2d 883 (Ala. 2005)(concluding in a suit against both a *seller and a manufacturer* that the truck *manufacturer* did not have any duty to disclose an internal audit to the trucking company which brought fraudulent a

24

suppression claim due to a defect in the tucks because the transaction did not warrant disclosure in this situation and the truck company did not inquire)(emphasis added). Plaintiff, therefore, can bring a claim against Defendant, the manufacturer. Defendant's conclusory statement that it did not have a duty to disclose the defect because it was not the seller is irrelevant. A manufacturer can have a duty to disclose defects in certain circumstances much like a seller.

Defendant cites to *Tittle v. Steel City Oldsmobile GMC Truck, Inc.* where the Supreme Court of Alabama looked at a warranty and determined that rather than guaranteeing the car to be free of defects, the warranty actually anticipated that defects would arise and provided for remedying such defects. *Tittle v. Steel City Oldsmobile GMC Truck, Inc.*, 544 So.2d 883, 891 (Ala. 1989). The Court made that determination because the statute of limitations had expired and, therefore, the buyer could no longer sue under the warranty because the warranty did not extend to cover future defects. In that case, however, not only did the buyer file suit after the statute of limitations had expired, but there was also no fraud involved. In Plaintiff's case, there is fraud involved and, as mentioned above, the running of the statute of limitations is tolled because of the fraud.

Defendant cites to *Mason v. Chrysler Corporation* for the proposition that there is no duty to disclose recurring defects in a line of products to a buyer. *Mason v. Chrysler Corp.*, 653 So.2d 951, 954-55 (Ala. 1995). The Court in that case stated that "[w]hen the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." *Id.* Although Plaintiff and Defendant were dealing at arm's length in the case at hand and no confidential relationship existed, there are other factors that must be looked at to determine whether a duty to disclose a defect exists. The factors to determine whether a duty to disclose a defect exists are the following: "'(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs'

25

opportunity to ascertain the fact; (5) the custom of the trade; and (6) other relevant circumstances.'" *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d at 677, quoting *State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834, 842-43 (Ala. 1998).

Defendant's knowledge of the defect was far more superior to that of Plaintiff, considering Defendant knew of the serious defect and Plaintiff had no knowledge about the defect. The defect has significantly reduced the fair market value of Plaintiff's home, caused Plaintiff mental anguish, and placed Plaintiff in immediate risk of physical harm. Therefore, the value of the fact known by Defendant was enormous. Plaintiff also had no opportunity to ascertain the fact about the defect because he was not privy to any information that would lead him to inquire about the serious defect. Another relevant circumstance that created a duty for Defendant to disclose the defect is the serious nature of the defect. Defendant knew the defect would lead to mold, which would affect the health and safety of Plaintiff. In Alabama, "if the seller or agent has knowledge of specific defects that affect health or safety and the defect is not known to or readily observable by the buyer, the seller or the agent has a duty to disclose and is liable for damages for nondisclosure." *Roberts v. C & S Sovran Credit Corp. of Alabama*, 621 So.2d at 1297. Plaintiff was unable to adequately protect his interests and, therefore, Defendant had a duty to disclose the serious defect it had knowledge of.

## AEMLD

As discussed above in the negligence and wantonness section, the statute of limitations period for the Alabama Extended Manufacturers Liability Doctrine should be tolled because of the fraudulent concealment of Defendant. Much like the statute of limitations for negligence and wantonness claims' statute of limitations is tolled when fraudulent concealment is involved, the same rationale would apply to tolling the statute of limitations for an AEMLD claim. There is some evidence that the statute of limitations is tolled for an AEMLD claim when fraudulent concealment

prevents a plaintiff from discovering a defect. *See Cline v. Ashland, Inc.*, -- So.2d --, 2007 WL

30070, *1 (Ala. 2007)(See, J., concurring specially)(discussing an AEMLD claim and then stating

the statute of limitations will not be postponed by plaintiff's ignorance of the tort or injury, there

being no fraudulent concealment involved).   Defendant's fraudulent concealment should toll the

running of the statue of limitations.

Nevertheless, the statute of limitations will not begin to run until a cause of action arises, i.e.

until the injury occurs.  It is well settled that "[a] party has a cause of action, and the statute of

limitations begins to run, on the date the first legal injury occurs, but not necessarily from the date of

the act causing the injury." *Spain v. Brown & Williamson Tobacco Corp.*, 872 So.2d 101, 125 (Ala.

2003).  The injury did not occur until moisture accumulated in the walls.  The statute of limitations,

therefore, did not begin to run until moisture became present in the walls.  When the injury actually

occurred is debatable and "when a disputed issue of fact is raised, the determination of the date of

accrual of a cause of action for statue-of-limitations purposes is a question of fact to be submitted to

and decided by a jury." *Kindred v. Burlington Northern R. Co.*, 742 So.2d at 157.

Defendant correctly states that the Supreme Court of Alabama has not specifically addressed

whether a manufactured home is considered a product under the AEMLD.  *See Ex parte Grand*

*Manor, Inc.*, 778 So.2d 179 fn. 4 (stating that "[n]either party argues that a mobile home is not a

product, and we express no opinion on that issue").  However, a "product" is defined as something

distributed for use or consumption commercially and that is "(1) tangible personal property, (2) the

result of fabrication or processing, and (3) an item that has passed through a chain of commercial

distribution before ultimate use or consumption." Bryan A. Garner, BLACK'S LAW DICTIONARY (8th

ed. 2004).  The manufactured home was in fact distributed commercially for use.  The manufactured

home is also tangible personal property.  *See Herrin v. Greentree—AL, LLC*, --- B.R. ---, 2007 WL

27

2791603, *1 (S.D. Ala. 2007)(stating "Under Alabama law, the mobile home is deemed to be personal property, not real property). The manufactured home was produced as a result of fabrication. The manufactured home also was passed from Defendant, to a distributor, and ultimately to Plaintiff for use. Therefore, a manufactured home is a "product" for purposes of the AEMLD.

Also, although the Alabama Supreme Court has not specifically addressed whether a manufactured home is a product, it has treated it like it was a product. In *Foremost Ins. Co. v. Indies House, Inc.*, the plaintiff sued the manufacturer of a manufactured home alleging violations of the AEMLD, among other claims, after the manufactured home caught on fire. *Foremost Ins. Co. v. Indies House, Inc.*, 602 So.2d 380, 381 (Ala. 1992). The defendant raised the no-causal relation defense arguing there was no causal relation between its handling of the manufactured home and the defective condition. *Id.* at 381-82. The Court stated that the "[no-causal relation] defense is available only to persons distributing a finished *product* or in the process of distributing a finished *product*. By implication, this defense is not available to the manufacturer of the finished *product*." *Foremost Ins. Co. v. Indies House, Inc.*, 602 So.2d at 382 (emphasis added). The Court held the no-causal relation defense was inapplicable because the defendant was the manufacturer of the finished product. *Id.* In the case at hand, Defendant was the manufacturer of the finished *product*, the manufactured home.

The Alabama Supreme Court later recognized its implication that a manufactured home is a product. As mentioned above, the Court stated in a footnote in *Ex parte Grand Manor, Inc.* the following:

> [n]either party argues that a mobile home is not a product, and we express no opinion on that issue. But see *Foremost Ins. Co. v. Indies House, Inc.*, 602 So.2d 380, 382 (Ala. 1992)(*holding that an assembler of a mobile home is deemed to be a*

> *manufacturer of a finished product*, that is, the mobile home, for purposes of determining the applicability of the affirmative causal-relation defense under the AEMLD.

*Ex parte Grand Manor, Inc.*, 778 So.2d at 179, fn. 4 (emphasis added).

The Alabama Supreme Court did not address whether a manufactured home is a product, but it did point out that it had treated manufactured homes as products.

Furthermore, Defendant argues that Plaintiff cannot maintain an AEMLD claim because "the only claims made by [Plaintiff] relate to property damage to the *product* itself, there is no cause of action and Defendant is entitled to a judgment in its favor."  Defendant's Motion for Summary Judgment, page 29 (emphasis added).  So, Defendant has argued that an AEMLD claim is improper because the manufactured *is a product* for purposes of the economic loss rule (although there is an exception that applies in this case) and *is not a product* to satisfy the elements of the AEMLD claim.  Plaintiff contends Defendant had it correct in the former argument, that the manufactured home is a product.

Plaintiff contends that a manufactured home is a product because the courts in Alabama have applied the economic loss rule to manufactured homes.  *See Ex parte Grand Manor, Inc.*, 778 So.2d at 178-89 (agreeing that the plaintiffs "made no allegation and offered no evidence indicating that they suffered any injury to themselves or to their property (other than the mobile home) and that the [plaintiffs] alleged only injury to the mobile home itself").  The economic loss rule prevents a plaintiff from recovering under a tort theory when the only property damage is to the *product* itself.  *Carrell v. Masonite Corp.*, 775 So.2d at 124.  Manufactured homes must be products since the economic loss rule applies.  In this case, however, the economic loss rule is rendered inapplicable because of the exception to the rule discussed above.

Defendant claims Plaintiff cannot satisfy the requirements to prove violation of the AEMLD because the defect was not "unreasonably dangerous." The Supreme Court of Alabama has determined the terms "defect" and "unreasonably dangerous" are synonymous, "that is, defective means unreasonably dangerous and has no independent significance." *Casrell v. Altec Industries, Inc.*, 335 So.2d 128, 133 (Ala. 1976). Therefore, the Court determined an unreasonably dangerous defect is one which renders the product not fit for the intended purpose of the product. *Id.* The Eleventh Circuit has drawn on this definition when determining whether a plaintiff satisfies the first element of an AEMLD claim and stated that "[u]nder the first element of the prima facie case, a defect in a product is defined as 'that which renders a product 'unreasonably dangerous,' i.e., not fit for its intended purpose.'" *Goree v. Winnebago Industries, Inc.*, 958 F.2d 1537, 1541 (11th Cir. 1992), quoting *Casrell v. Altec Industries, Inc.*, 335 So.2d at 133. The Eleventh Circuit went on to state that a plaintiff only has to establish that the product was unreasonably dangerous, not that his injury was caused by the specific defect. *Id.* Based on the interpretations of the Supreme Court of Alabama and the Eleventh Circuit, therefore, a plaintiff must prove that a product is not fit for its intended purpose to establish the product was unreasonably dangerous. The Plaintiff in this case has proven that the manufactured home failed to serve as a suitable place of residence, which was the intended purpose of the manufactured home.

Defendant correctly states the general rule in Alabama is that a plaintiff cannot recover under an AEMLD claim if the only damage was to the product itself. *Wellcraft Marine v. Zarzour*, 577 So.2d 414, 418 (Ala. 1990). As discussed above, however, more than just damage to the manufactured home was caused. Plaintiff suffered mental anguish and "Alabama has allowed mental-anguish damages when economic harm has occurred to a person's home." *Carrell v. Masonite Corp.*, 775 So.2d at 124-25. The economic loss rule does not apply because Plaintiff has

30

suffered mental anguish.

Furthermore, the result of the defect has caused more than just damage to the walls. The home's fair market value has decreased, which is an injury to the entire home. An injury to the entire home renders the economic loss rule inapplicable. *Ex parte Grand Manor, Inc.*, 778 So.2d at 185 (Johnstone, J. concurring in part and dissenting in part). Plaintiff, therefore, can maintain his AEMLD claim and Defendant's Motion for Summary Judgment should be denied.

Also, as discussed above, the zone-of-danger test "'limits recovery of mental anguish damages to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are place in immediate risk of physical harm by that conduct.'" *Ex parte Grand Motor, Inc.*, 778 So.2d at 179, quoting *Wal-Mart Stores, Inc. v. Bowers*, 752 So.2d 1201, 1203 (Ala. 1999). It is hard to dispute that mold caused by Defendant's negligence, which can grow quickly and cause immediate physical reactions, did not place Plaintiff in immediate risk of physical injury. Plaintiffs should be allowed to present evidence to the fact finder in this respect which includes Defendant's witnesses and a responsive 30(b)(6) deponent.

## **Damages**

It will be proven that Defendant knew the defective design of the walls in the manufactured home would produce condensation if placed in areas of high humidity. Defendant, therefore, attempted to disclaim damage caused by high humidity or condensation in its warranty. The disclaimer should be deemed ineffective because Defendant had access to information that put it on notice about the latent defect and Defendant failed to disclose such information to Plaintiff. A company should not be allowed to commit fraud on a consumer by disclaiming a known defect.

The purpose of the warranty was to provide Plaintiff with a home free from defects. The purpose of the warranty was never achieved because of the serious defect of the manufactured home.

Due to the defect and Defendant's knowledge of the defect, a jury may likely find that the warranty failed its essential purpose. If the jury finds the warranty to have failed its purpose, Plaintiff would be able to recover damages, despite Defendant's exclusion of the defect in the warranty. *See Liberty Homes, Inc. v. Epperson*, 851 So.2d 449, 453 (Ala. 1991)(stating "When a jury finds that the limited warranty has failed of its essential purpose, it may then award damages allowed by the Uniform Commercial Code"). The warranty's purpose "was to provide [Plaintiff] with a home reasonably free from defects, and there [is] evidence to show that this purpose was never achieved, [Defendant's] warranty may be deemed a failure." *Id.*

Furthermore, Plaintiff asserts that the warranty, or at least the portion of the warranty that excludes liability for damages caused by the known defect, is unconscionable. In Alabama, "[t]he test for determining whether an agreement in unconscionable is 'whether there are (1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power.'" *Carraway v. Beverly Enterprises Alabama, Inc.*, --- So.2d ---, 2007 WL 2070354, *4 (Ala. 2007), quoting *Steele v. Walser*, 880 So.2d 1123, 1129 (Ala. 2003). Defendant knew of the defect and then drafted a warranty that specifically excluded that defect in the hopes of insulating themselves from liability. Excluding liability in a warranty for a known defect certainly could be considered grossly favorable to Defendant, especially considering Plaintiff did not have knowledge of the defect. Defendant also had overwhelming bargaining power, given the warranty was a contract of adhesion and Defendant is sophisticated in legal and business matters and Plaintiff is unsophisticated. Therefore, the warranty is unconscionable or, at the very least, the portion of the warranty that Defendant drafted in an attempt to shield itself from liability is unconscionable. Defendant has attempted to analogize this case to *Pfizer, Inc. v. Farsian*, 628 So.2d 405 (Ala. 1996), and contends that Plaintiff cannot recover for a future injury. However, injury has already occurred, unlike the artificial heart valve in

*Pfizer, Inc. v. Farsian.*  Mold has already begun to grow in Plaintiff's walls, decreasing the value of the manufactured home.  Furthermore, as a result of the decrease in fair market value, Plaintiff has suffered mental anguish.  This case does not involve a hypothetical future injury, but rather an injury that has already begun to occur.

Furthermore, Plaintiff will prove that the disclaimer or limitation in the express warranty does not exclude the damages Plaintiff is claiming in this case.  This is because damage to the exterior walls is not as a result of the "installation" issues listed in the disclaimer.  The disclaimer or limitation states as follows:

THE WARRANTY DOES <u>NOT</u> COVER:

> Deterioration or damage from high relative humidity, condensation, ground moisture, the use of moisture producing appliances (i.e., kerosene heaters, humidifiers, etc.) or extended moisture exposure caused by plants, building attachments or accessories; or the failure to maintain adequate ventilation in and/or underneath the home; or the failure to properly vent the dryer exhaust away from the home; or the failure to provide an adequate vapor barrier; or the failure to provide adequate drainage away from the home;

(Ex. 1, Defendant's Ex. 18, pp. 4, 5: ¶ 3).

Plaintiff will prove that Defendant's own expert has stated that exterior walls are generally not impacted by such installation related issues such as found in the warranty disclaimer in previous cases and that studies in which he participated support this contention.  Defendant's own expert admitted: "Examination of exterior walls is key, as exterior walls are typically unaffected by possible installation shortcomings…." Exhibit 6, p. 810: 8-14.  This concurs with Plaintiff's expert opinion.[7]  Regardless, such issues are left for the fact finder.

---

[7] Defendant's expert is not credible when he contradicts himself and the studies in which he participated.  He also was less than candid in other areas: "Do you have any drafts?  No, sir", Exhibit 6 p. 825: 6-7.  When a draft report was shown to him which he apparently did not realize had been produced and which had a materially different statement in in which benefited the Plaintiff and had been removed in the final report he stated:  "So I didn't mean to imply I don't make a draft…you know I like this sentence better (in the draft), p. 826: 11-17.

## <u>CONCLUSION</u>

Based on the above, Plaintiff respectfully requests that Defendant's Motion for Summary

Judgment based on merits be denied and that this Court enter such relief as is just.

<u>/s/ C. Lance Gould</u>
C. LANCE GOULD (ASB-0913-G66C)
Attorney for Plaintiff

**OF COUNSEL:**

**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343
(334) 954-7555 (fax)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 12, I served a copy of the above and foregoing document upon counsel of record via electronically filing this document with the Clerk of Court using CM/ECF system which will send notification of the foregoing upon the following:

Gregory S. Ritchey
Ritchey & Simpson, PLLC
3288 Morgan Drive, Suite 100
Birmingham, Alabama 35216
Tel:    (205) 876-1600
Fax:    (205) 876-1616


<u>/s/ C. Lance Gould</u>
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CASE NO. 06-643-MHT

TERRY DEESE,


     Plaintiff(s),

v.

CHAMPION ENTERPRISES, INC.,


     Defendant(s).


DEPOSITION TESTIMONY OF:

PARKER HOLLOWAY




Commissioner:

Renny D. McNaughton

October 31, 2007

Birmingham, Alabama



PLAINTIFF'S EXHIBIT

1

Page 33

1 go through and ask if there's anybody more

2 qualified to answer any of these areas other

3 than yourself.  And I suppose your response,

4 Greg, is "he's all we've got"?

5          MR. RITCHIE:  That's all we have.

6          I mean, he's the only one that's

7          out there.

8     Q    We will proceed with the

9 deposition.

10         MR. RITCHIE:  Is that going to be

11         one?

12         MR. GOULD:  Yeah.  That's one.

13         Thanks.

14    Q    Did you -- what did you do to

15 prepare?  I don't want to know any

16 conversations you had with your attorney,

17 but what did you do to prepare for the

18 deposition today?

19    A    Greg and I went over some

20 documents yesterday.  I reviewed my letter

21 -- my report that I sent to Greg after I

22 inspected the home.  That's about all.

23    Q    Okay.  What documents did you

1 review yesterday?

2    A    I skimmed through the homeowners

3 manual.  I looked over my -- the letter that

4 I sent to Greg.  Greg and I went through the

5 notice of deposition.  We looked at some of

6 the interrogatory responses.  We looked at

7 the request for production, I believe.

8 Yeah, we did.  And Greg gave me a copy of

9 the Deese opinions, but I didn't read it.

10    Q    You didn't do your homework.

11    A    No, I didn't do my homework.  I

12 think that's pretty much it.  I looked over

13 my resume so I would remember the dates and

14 stuff like that.

15    Q    Just to back up one step here.

16 You did say that the paper can have varying

17 perm ratings?

18    A    I suppose.

19    Q    Okay.  But you don't know what

20 the lowest perm rating paper can have, do

21 you?

22    A    No, sir, I don't.

23    Q    Can you tell me what sections of

1 nothing before the insulation?  Is it just

2 metal?

3      A     The metal is hung directly -- you

4 have the metal and then you have what we

5 call a belt rail, which is like a one-by or

6 two-by that runs horizontally.  You look at

7 the house and you see the screws.  That's

8 screwed directly into the belt rail.  The

9 belt rail is stapled or -- usually stapled,

10 maybe screwed, to the stud.  And then

11 there's studs.  And in between the studs is

12 insulation, and then on the opposite side of

13 the metal is wallboard.

14      Q     Do you know the permeance rating

15 of any of the materials in this wall?

16      A     No.

17      Q     Do you know if Homes of Legend

18 ever recommended that the homeowners

19 maintain their thermostat at a certain

20 temperature?

21      A     There is some language in the

22 homeowners manual about the thermostat, but

23 I don't recall from memory if it says a

1    Q    Yes, sir.

2    A    Yes, sir.

3    Q    Okay.  And did you make yourself

4 familiar with any of these studies,

5 articles, or anything listed in number 17?

6         MR. RITCHIE:  Objection to form.

7         There's no requirement he make

8         himself familiar with something

9         he's not already familiar with.  I

10        mean, unless you've got something

11        that says he's got to go out and

12        research this for a deposition

13        notice, next question.  I mean

14        that's -- that's ridiculous.

15        MR. GOULD:  Well, I'm going to go

16        through it.  And if he --

17    Q    Did you make yourself familiar

18 with any of this?

19    A    Under my job responsibilities,

20 I'm not required to, you know, read these

21 things.  I'm -- you know, the 3280, you

22 know, I have to have general familiarity

23 with that.  But these aren't the kinds of

1 things I get involved in.

2      Q    Let's look at B, which is the

3 condensation control for exterior walls of

4 manufactured home sited in the humid and

5 fringe climates that's the Waiver, another

6 part of 3280, are you familiar with that?

7      A    No, sir.

8      Q    And, I mean, I definitely think

9 that's --

10           MR. RITCHIE:  Hold on.  That's

11           not a part of 3280.  That was a

12           proposed rule.  That's a

13           publication.  That's not part of

14           3280.

15           MR. GOULD:  Okay.  Well, I think

16           that he definitely has, since a

17           lot of this is part of the

18           allegations, and so forth, I think

19           he has a duty to be familiar with

20           the Waiver and so forth.  Look at

21           --

22           MR. RITCHIE:  Based on what?

23      A    I'm not familiar with the Waiver.

1 going to other regions had a nonpermeable,

2 would that cost the plant more money as

3 opposed to running one line?

4      A    I wouldn't know.  I don't know.

5 I don't know.  I wouldn't know.

6      Q    Let me ask you just a couple

7 questions about Defendant's Exhibit Number

8 6.  This is a document that was produced by

9 your attorneys.  If you can, tell me what

10 this document is.

11      A    It's a 30-day satisfaction

12 inspection sheet.  It's a sheet that Homes

13 of Legend provides with the home.  And

14 usually what happens is the homeowner and

15 the retailer will go through the home and

16 inspect these items together and list, you

17 know, if there's any problem.

18      Sometimes when we do -- when we service

19 a home, the contractor will go through the

20 home with the homeowner and list any

21 problems.  And, occasionally, the homeowner

22 does it by themselves.  And this is signed

23 by a retailer.  So it looks like the

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TERRY DEESE,

    Plaintiff,

               CIVIL ACTION NUMBER

VS.             CV 1:06-CV-643-MHT

CHAMPION ENTERPRISES, INC., et al.,

    Defendants.


DEPOSITION OF FRANCIS CONLIN, P.E.


S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by
and between the parties through their
respective counsel that the deposition
of:

FRANCIS CONLIN, P.E.,
May be taken before Carol J. Reyer, Court
Reporter of Birmingham, Alabama, Notary
Public for the State of Alabama at Large,
at the Law Offices of Ritchey & Simpson,
3288 Morgan Drive, Suite 100, Birmingham,
Alabama, on the 1st day of November, 2007,



PLAINTIFF'S
EXHIBIT
2
tabbies

1 record, please?

2      A. Francis Conlin.

3      Q. Mr. Conlin, we've met before, and

4 you've given deposition testimony and

5 arbitration hearing testimony on these

6 same issues, haven't you?

7      A. Yes, I have.

8      Q. Do you intend today to change any

9 testimony you've previously given?

10      A. Yeah, I'm concerned with some of

11 the writings I've seen that I believe have

12 been taken out of context, and that I

13 don't think is fair to what I said

14 previously.  So, you know, I want to be

15 clear, you know, with answers that are not

16 taken out of context.

17      Q. Okay.  But the testimony, you

18 don't intend to change the testimony, do

19 you?

20      A. As I said, when it's taken out of

21 context and used in a way that doesn't

22 reflect what I believe, then I have

23 concerns about that.

1    Q. Okay.  But you feel like you've

2 answered all the questions truthfully --

3    A. Yes.

4    Q. -- that you've been asked?

5    A. Yes.  The whole part of it, yes.

6    Q. Okay.  If a material is colder

7 than the dew point of the air and moisture

8 hits that material, will condensation

9 occur?

10    A. That's a very, very simplistic

11 way to look at that.  I mean, it's

12 basically high school science, is what

13 you're talking about.  When you're talking

14 about complex construction, it's not

15 always true.

16    Q. Okay.  Explain to me how it's not

17 true.

18    A. You know, for example, I had

19 frost on my car just a couple of days ago

20 because, you know, it was 38 degrees

21 outside.  So, how does frost form, which

22 is an ice, at 32 degrees, form in a

23 38-degree environment?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TERRY DEESE,

      Plaintiff,

               CIVIL ACTION NUMBER

VS.             CV 1:06-CV-643-MHT

CHAMPION ENTERPRISES, INC., et al.,

      Defendants.


DEPOSITION OF DAVID R. TOMPOS, P.E.


S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by
and between the parties through their
respective counsel that the deposition
of:

DAVID R. TOMPOS, P.E.,
May be taken before Carol J. Reyer, Court
Reporter of Birmingham, Alabama, Notary
Public for the State of Alabama at Large,
at the Law Offices of Ritchey & Simpson,
3288 Morgan Drive, Suite 100, Birmingham,
Alabama, on the 1st day of November, 2007,



PLAINTIFF'S
EXHIBIT
3

1          MR. GOULD:  If we can, let's take

2 just a quick break.

3          (Whereupon, the deposition was

4 recessed from approximately 10:41 a.m. to

5 approximately 10:48 a.m.)

6      Q. (BY MR. GOULD:)  Mr. Tompos, as I

7 stated before I got started, I've taken

8 your deposition and you've also given

9 testimony in an arbitration hearing on

10 these same issues; that's correct?

11     A. Yes, it is.

12     Q. You do not, you do not intend to

13 change any of the testimony that you've

14 previously given, do you?

15     A. I hope not.

16     Q. Okay.  That will save us a lot of

17 time.  I'm trying to keep these as quick

18 as I can.

19          What facts do you have to prove

20 that the permeance rating of the material

21 on the inside of the wall is five or

22 greater?

23     A. What facts?

EXCERPT TESTIMONY OF

    FRANCIS CONLIN

    TAKEN 9/27/07

PLAINTIFF'S
EXHIBIT
4

1 air, moisture is going to condense?

2      A.      There's a potential for that, yes.

3      Q.      And that would be called its dew

4 point, that critical -- whatever that

5 critical temperature is would be called its

6 dew point?

7      A.      Yes.

8      Q.      I'm glad you agree with that

9 because that is from Moisture and Mold

10 Diagnostics and Mitigation.

11              Do you recognize that book name?

12      A.      Moisture and Mold --

13      Q.      It's your presentation.

14      A.      Oh, okay.  Sure.  Where was that?

15              You have to help me out with that

16 presentation.

17      A.      It's a presentation you put on

18 called Moisture and Mold Diagnostics and

19 Mitigation.

20      A.      Does it give you a date?

21      Q.      I could.  If we need to get there,

22 I will.

23      A.      I would like a date because I --

Page 189

1    Q.    Well, we'll get there if I need it

2 but I don't think I need it since you agreed

3 with me.

4          But I'll talk to you after the

5 hearing and give it to you, absolutely.

6    A.    Okay.

7    Q.    You talked a little bit about

8 2 percent of condensation or moisture coming

9 through as a diffusion issue.

10          Is that accurate?

11    A.    That's what I said, yes.

12    Q.    And, therefore, that 98 percent of

13 moisture condensation is an air infiltration

14 issue?

15          Would that be the --

16    A.    Say that again?

17    Q.    98 percent of moisture gets into a

18 building through the air.

19    A.    Those are numbers I've seen.  I

20 think there's a variety of those types of

21 numbers but that's --

22    Q.    Close enough?

23    A.    -- trying to give an order of

1 January 6th of 2003.

2    A.    It's 15.

3          MR. GOULD:  Did you say 15?

4          THE WITNESS:  I said 15.

5          MR. WALKER:  Francis said 15.  You

6 don't happen to have a clean copy of that, do

7 you?

8          The one we've got has got all our

9 notes on it.

10         MR. PELS:  Well, if you can't read

11 it, let me know.

12         MR. WALKER:  Tell me what page you

13 want.

14         MR. PELS:  Well, let's start with

15 the first page, the cover.

16         MR. WALKER:  I think we're good

17 with that.

18 BY MR. PELS:

19    Q.    Do you recognize that study, Mr.

20 Conlin?

21         I think that's the one that you

22 said you actually -- you worked on the

23 protocol on that?

Page 203

1    A.    Yes, I did.

2    Q.    And --

3    A.    I did not, however, write this.  I

4 wasn't involved in the report writing and

5 that part of it.

6    Q.    Excellent.  And that's probably why

7 it's not on your resume as a publication?

8    A.    Yes.

9    Q.    If we could flip to Page 2 here,

10 we'll see, I believe, that you are listed

11 there as a project coordination staff member?

12    A.    Yes.

13    Q.    And then just above that that's

14 where we'll see Bobby Parks?

15    A.    Correct.

16    Q.    And then above him we'll see Neal

17 Moyer --

18    A.    Yes.

19    Q.    From Florida Solar Energy Center?

20    A.    Yes.

21    Q.    If you could turn to Page 25 in

22 that report now.

23          MR. GOULD:  I believe that's 363.

Page 206

1 wanted to get you to understand.

2          And I think I agree with you it's

3 probably been a long time that you've looked

4 at this.

5          You had also talked about the

6 oversized air conditioner?

7     A.    Excuse me?  The what?

8     Q.    The oversized air conditioner.

9     A.    Yes, sir.

10    Q.    And I believe you were getting to

11 this on your direct until your lawyer was

12 leading you away from it -- I'm joking, for

13 the record -- about sometimes oversized air

14 conditioners can actually be a good thing in

15 these situations?

16    A.    I don't think I talked -- I had no

17 intention of talking about that with David.

18          But the research, it was kind of

19 interesting that it -- you know, when we did

20 a statistical analysis, that was one of the

21 surprises was that occasionally an oversized

22 air conditioner did seem to be a benefit.

23          Now, a benefit to what type of

1 problem, let's not go there right now.  I'll

2 be glad to go there in a minute.

3           But what we surmised from the kind

4 of counterintuitive result there was if your

5 problem is duct leakage and negative

6 pressure, and you have less of it, then --

7 which you would have with an oversized air

8 conditioner because an oversized air

9 conditioner will run less -- will run less

10 hours -- so in terms of moisture like through

11 the wall, you get less through-put.

12          So in terms of that 600 CFM that we

13 might be sucking through the walls with the

14 Whitaker home, if you have a way oversized

15 air conditioner, perhaps it only runs half

16 the time.  So you get less through-put.

17 That's not always the case but in this sample

18 set it showed that it was possible that under

19 some conditions an oversized air conditioner

20 might be a benefit if you're looking at those

21 kind of problems.

22    Q.    Let's go ahead and turn to Page 50.

23          MR. GOULD:  That's 388.

1 BY MR. PELS:

2    Q.    And I put up on the Elmo an

3 underlined section there.

4          Go ahead and read that for us for

5 the record.

6    A.    Yes.  If the effect of negative

7 pressure is more problematic than high

8 relative humidity of the indoor air, then

9 oversized equipment that runs less frequently

10 may protect some homes from certain types of

11 moisture problems, particularly problems

12 within concealed areas (sic).

13          So --

14          MR. CROSBY:  Cavities.

15    A.    Concealed cavities.  That's a

16 mouthful, isn't it?

17          MR. WALKER:  What --

18 BY MR. PELS:

19    Q.    If you want to continue, just

20 continue.

21    A.    I just -- what it says is oversized

22 air conditioner will -- when it talks about

23 the high relative humidity of the indoor air,

1 an oversized air conditioner traditionally is

2 understood to make homeowners more

3 uncomfortable, therefore, they crank the

4 thermostat down and the equipment runs longer

5 anyway.

6         So what that sentence is saying is,

7 hey, if the relative humidity doesn't seem to

8 be a problem that an oversized air-condtioner

9 may run less; if you're not running it more

10 because you cranked the thermostat down, then

11 running it less could be a benefit.

12         Again, it's combining all the

13 different aspects and trying to put it in one

14 sentence is a little tricky.

15    Q.    That's true.  And you had said

16 earlier on direct that you wanted to be fair

17 and balanced.

18         And I don't know why it doesn't say

19 in your report that this is also a

20 potentiality.  Wouldn't that be fair and

21 balanced to have pointed that out?

22    A.    I don't use this report as a

23 reference because it's an interim report and

1 better statistical analysis and gotten a

2 little more -- a higher correlation

3 coefficient in our results.

4          We did get some things to float to

5 the top.  Their coefficient of correlation

6 was not very high, not very acceptable under

7 any scientific method.

8          Regardless, there were some things

9 that floated up to the top.  And it's my

10 understanding that looking at that, talking

11 with the committee, they decided what they

12 wanted to do next.

13          I think Phase 1, Phase 2, Phase 3

14 has more to do with the funding than it has

15 to do with science and this begot this begot

16 this in terms of the way you traditionally

17 think about science.

18    Q.    I don't see anything in that

19 paragraph that you just read that has such

20 disclaimers, however.

21          Is there anything in there I'm

22 going to find that says that?

23    A.    I don't know.  I didn't write this.

1          This is a common sense thing.  If

2 the belly is ripped open, you're probably

3 going to have floor problems.

4    Q.    Let's turn to the next page, then,

5 sir, Page 37, whatever the next Bates stamp

6 is.

7          MR. GOULD:  375.

8 BY MR. PELS:

9    Q.    And you can start reading the part

10 that's underlined, for the record, please.

11          MR. WALKER:  Wait.  Which part?

12 There's a bunch of it underlined.

13          MR. PELS:  At the top.

14          MR. WALKER:  The air pressure?

15          MR. PELS:  Yes.

16    A.    The air pressure differentials

17 between the home and the floor cavity

18 averaged minus 38 pascals for homes with

19 floors --

20 BY MR. PELS:

21    Q.    With holes?

22    A.    With holes.  I'm sorry.  With

23 holes, Figure 515, and minus 37 pascals for

1 for the record.

2    A.    The one you have underlined?

3    Q.    Yes, sir.  During periods...

4    A.    Okay.  During periods when the

5 outside air vapor pressure is higher than

6 that within building assemblies, the only

7 opportunity to dry the cavity is toward the

8 inside of the home.

9    Q.    That's a comma.

10    A.    Oh, continue?  Where the

11 conditioned air has a lower vapor pressure.

12    Q.    And if you can read that.

13    A.    HUD 304 B-1 and 3 both assume

14 outside ventilation of the wall cavity --

15    Q.    And then we'll go to the next page.

16    A.    -- specifically to dissipate

17 moisture.

18    Q.    Keep going, please.

19    A.    Okay.  Such ventilation will not

20 serve the intended purpose of keeping the

21 cavity dry if the vapor pressure of the

22 outside air is greater than in the cavity.

23    Q.    And I assume that -- first, did you

Page 228

1 write that?

2    A.    No, sir.

3    Q.    Are you going to disagree with

4 that?

5    A.    I think it's -- I disagree with

6 that in its entirety.  I think in general

7 just talking to physics but it doesn't talk

8 about balance in a wall.  It talks about --

9 it's a little too absolute for me, yes.

10    Q.    Something was curious to me and

11 this is something that maybe at another time

12 we can talk about because I've kind of become

13 a HUD junkie myself.

14            B-1, reading this, they say B-1 is

15 a ventilated wall cavity.

16    A.    Yes.

17    Q.    Do you agree with that?

18    A.    I believe that's its intent, yes.

19    Q.    Okay.  All right.  Let's move on.

20            If we could go back to the next

21 report, the Minimizing Moisture Problems in

22 Manufactured Homes.

23            MR. CROSBY:  Which one?

Page 230

1 you were listed or acknowledged as

2 participating in this study.

3        My question is this:  Is this study

4 -- does this one have problems, too, or is

5 this one good?

6    A.    I don't remember having any

7 difficulties with this one.

8    Q.    Do you recall why -- do you recall

9 whether the results of any of these reports,

10 Phase 1, Phase 2 or Phase 3, were delayed

11 because of a lawsuit in Louisiana?

12    A.    I would have no knowledge of that

13 whatsoever.

14    Q.    Did you ever meet with the

15 manufacturers' -- any of the attorneys,

16 general in-house counsel for the

17 manufacturers?

18    A.    No, sir.

19    Q.    With respect to any of these

20 reports?

21    A.    No, sir.

22    Q.    If we can go to Page 44 -- and I've

23 highlighted obviously the part that I like,

1 which is Number 7.

2          If you could read that into the

3 record, please.

4    A.    Location of vapor retarders:  In

5 hot, humid climates, the interior of the

6 building shell components should be vapor

7 permeable allowing cavities to dry in the

8 direction of the home's interior.

9    Q.    We've already discussed that you

10 think this is a good report?

11    A.    I think that's ideal.  That would

12 be the way you would want to do it.

13    Q.    And we already discussed that under

14 B-3 there are no permeance requirements of

15 the components in that wall cavity; is that

16 correct?

17    A.    That's what I understand, yes.

18    Q.    And I think that's what Mr. Farrish

19 said?

20    A.    Yes.

21    Q.    And therefore we don't need a vapor

22 barrier on the living side of the wall under

23 B-3?

Page 232

1    A.    What I understand is, yes, we don't

2 need a vapor retarder on the inside of the

3 wall.

4    Q.    Let's talk about that definition.

5 And I note Joe Lstiburek has a

6 characterization.  He's got like ten

7 categories of them.  We don't need to get

8 into that today.

9         But is it not a fair definition

10 that 1 perm or less is referred to as a vapor

11 barrier?  Have you seen that?

12    A.    I have seen that.

13    Q.    And then if you go above 1 that's

14 when you get into the vapor retarder, that's

15 when you get into various categorizations of

16 them -- and I think I agree with you -- let's

17 forget about what we call it, let's look at

18 the perm rating?

19    A.    Thank you.

20    Q.    Fair enough.  We are at a point, I

21 think, where you have testified that using --

22 I'm going to use the vapor barrier term --

23 using vapor barrier on the living side of the

1 wall in these Whitaker homes is not, quote,

2 unquote, not ideal?

3     A.    Yes.

4     Q.    Do you believe it's fair to sell

5 somebody a home with a wall that is not ideal

6 for the location it's going to be in?

7     A.    I think we sell all kinds of

8 products that are not ideal including, for

9 example, crawl spaces in homes.  I've already

10 testified that's not ideal.

11          I don't sell houses so that's

12 really not my call.

13     Q.    And you agree with me that your

14 final study that we just looked at, Phase 3,

15 it tells you right there in black and white

16 the interior of the living side should be

17 vapor permeable?

18          Does it say that or not?

19     A.    This is the ideal that you would

20 want to have.

21     Q.    Well, that's a fair estimation of

22 what I stated, though, that the interior

23 should be vapor permeable?

Page 234

1    A.    You asked me -- yes, that's ideal

2 that you would want a vapor permeable

3 interior wall surface.

4    Q.    And a vapor barrier with 1 perm or

5 less is not going to qualify as vapor

6 permeable, is it?

7    A.    It is permeable to a degree.

8    Q.    But that's not what they're talking

9 about here, is it?

10    A.    I don't know.  I guess you know

11 what they're talking about.  I don't.

12    Q.    Fair enough.  I'll take that

13 answer.

14        We want to switch on now to 3280

15 504-A.  And I'll put that up here.  This is

16 an old version of the HUD Code but it is

17 free.  They mail it to you for free if you

18 call them up.

19        MR. ANDERSON:  It pays to be in

20 Washington.

21        MR. WALKER:  Can we have one?

22        MR. ANDERSON: I'll get you a phone

23 number.

Page 253

1 something in writing that says it's great, do

2 it?

3          MR. WALKER:  Well, you can ask him

4 that question.  I think you're

5 mischaracterizing what he's been saying.

6     A.    I think so.  And what I said was

7 the summary of the literaure --

8 BY MR. PELS:

9     Q.    Can you show me one that says it's

10 a good practice?

11    A.    I can see practice that seems to be

12 successful and acceptable performance by

13 learned, accepted experts in the field,

14 including Neal Moyer, who lends his name and

15 his reputation to many manufacturers who

16 build that way.

17    Q.    Sir, can you show me a written

18 report that says putting a vapor barrier on

19 the living side of a wall in the hot and

20 humid climate is a good practice?

21    A.    It's not ideal.  And I don't think

22 I can show you any learned treatise that says

23 it's ideal.

1 covered quite a bit so far.  I think we want

2 to turn to your statement -- you quote a

3 gentleman in your report about that gypsum

4 drywall, sheetrock, whatever you want to call

5 it, has the unique ability to -- you're going

6 to need that.

7          MR. WALKER:  Oh, I thought we were

8 moving to something.

9          MR. PELS:  Unless he decides to

10 start agreeing with me, he's going to need

11 that in front of him.

12          MR. WALKER:  Well, he's going to

13 need it, then.

14          MR. PELS:  That's my guess.  He's

15 not agreeing with himself so he's not going

16 to agree with me.

17 BY MR. PELS:

18    Q.    You talk about gypsum.  You put in

19 a footnote that the drywall has a unique

20 ability to dry and get wet and dry out.

21          Expand on that for me, please.

22    A.    I don't know much about that other

23 than what Mr. Wessel said was that some of

Page 258

1 the processes with gypsum are to wet it,

2 particularly if you're going around a curve

3 in a sheet, in an application, you get the

4 thing saturated, you wrap it around the

5 curve, and it will dry out and it will

6 perform.

7           I asked him about wetting and

8 drying.  And he said wet, dry, he says, you

9 know, that -- what he said in his letter,

10 that it has a unique ability.  I'm quoting

11 him.

12          We talked about it on the phone and

13 he summarized that in a letter to me.

14    Q.    Let me go with you through a couple

15 of statements and see if I can get you to

16 agree with me.

17          First of all, we don't want mold in

18 a wall cavity; right?  You agree with that?

19    A.    I agree with that.

20    Q.    That's not acceptable; right?

21    A.    I agree we don't want mold in a

22 wall cavity.

23    Q.    If the gypsum has visible mold

Page 264

1          If you could identify it again.

2     A.    This is Assessing Water Damage to

3 Gypsum Board by the Gypsum Association.

4     Q.    Yes.  And if you could read the

5 highlighted portion.

6     A.    It says:  However, if there's ever

7 been a doubt about whether to keep or replace

8 gypsum board that has been exposed to

9 moisture, replace it.

10    Q.    And would you consider this a

11 reliable authority?

12    A.    Yes.  It's the Gypsum Association.

13    Q.    Okay.  And let's go ahead and talk

14 about some of these other highlighted

15 portions here.

16          If you could go ahead and read into

17 the record, please -- why don't you go ahead

18 and read this entire sentence right

19 underneath assessing the need for replacement

20 of gypsum board.

21    A.    When gypsum board is exposed to

22 elevated levels of moisture, an assessment of

23 the potential damage to the gypsum board must

1 dried thoroughly before mold growth begins?

2    A.    That's typically the time that EPA

3 recommends.

4    Q.    So if it's -- explain that to me.

5 If it's wet for 24 to 48 hours or if it can't

6 dry?  What are they talking about there?

7    A.    They're talking about there's a

8 risk that mold can germinate in 24 to 48

9 hours.  It doesn't necessarily but there's a

10 risk that it can.

11          In situations I see in attics where

12 it's very hot, it doesn't germinate at all

13 with a lot of moisture because it's too hot

14 for mold to grow.

15          Other conditions vary, but that's

16 the minimum that EPA recommends.

17    Q.    Okay.  So we can have limited

18 intermittent exposure, this gypsum can have

19 limited intermittent exposure to moisture,

20 anything above that is not acceptable, right,

21 according to the Gypsum Board?

22    A.    According to the Gypsum Board, yes.

23    Q.    And you've already said they're a

1 reliable authority?

2    A.    (Witness nods head affirmatively.)

3    Q.    And would you agree that the source

4 of moisture has to be eliminated as well

5 obviously?

6    A.    If the gypsum is moist to the

7 degree that it is damaged and failed,

8 obviously you have to get rid of the source

9 of the moisture before you can move on.

10    Q.    Because it would continue to fail;

11 if you put new gypsum in, it would continue

12 to fail, it would be stupid, wouldn't it?

13    A.    Right.  If we replaced the gypsum

14 under the light and didn't reseal that light,

15 then it would fail again.

16    Q.    Or hypothetically -- this is going

17 to kill you -- but if the plaintiffs are

18 correct -- and that hot, moist air keeps

19 hitting that interior living side vapor

20 barrier from May through September, every

21 single year, year in and year out, and it

22 doesn't have the opportunity to dry -- if

23 we're right -- then we have to eliminate that

Page 273

1          Do you recognize that?

2     A.     Yes, I do.

3     Q.     And what is that?

4     A.     That was the first moisture

5 publication we put out in Manufactured

6 Housing Research Alliance.  Moisture Problems

7 in Manufactured Homes, Finding the Cause --

8 or Understanding Their Causes and Finding

9 Solutions.

10    Q.     And on the third page -- and it's

11 not numbered -- Bill Farrish is mentioned

12 there, Fleetwood Enterprises --

13    A.     Yes.

14    Q.     -- as leading the efforts.  And

15 also you are, again, a coordinating member of

16 the MHRA staff at the bottom; is that

17 accurate?

18    A.     Yes.

19    Q.     Okay.  What's the date of that,

20 please?

21    A.     It's copyrighted 2000.

22    Q.     2000.  So this was copyrighted and

23 printed, therefore, prior to the manufacture

Page 274

1 of the Whitaker homes; is that accurate?

2    A.    That is accurate.

3    Q.    If we can go to Page 1.2.

4          MR. GOULD:  That's 240, Bates

5 number.

6 BY MR. PELS:

7    Q.    And if you could just read the

8 second teardrop or raindrop from the top, the

9 bold part is good enough.

10   A.    Yes.

11   Q.    The moisture drop.

12   A.    In hot, humid climates, avoid

13 placing a vapor retarder on the inside of the

14 wall.

15   Q.    If you could flip to Page 3.7, I

16 don't know what the Bates stamp is.

17          Before we turn, sir, I'm sorry.

18 Footnote 2 on that page, can you read that

19 into the record, please?

20   A.    Yes.  As this guide goes to press,

21 the HUD Manufactured Housing Construction

22 Safety Standards require that the vapor

23 retarder be located on the interior side of

Page 276

1 please.

2          Could you read the top of the --

3 what that page says at the top?

4     A.    Moisture Problem Mitigation.

5     Q.    And then below that?

6     A.    Moisture Problem Case Study, Vapor

7 Retarder on the Wrong Side.

8     Q.    Under Remedy, could you read the

9 last sentence into the record?

10    A.    Replace failed gypsum wallboard

11 with plain gypsum covered with vapor

12 permeable paint which will allow water vapor

13 to more easily migrate through the wallboard.

14    Q.    Let's turn to your report now.  And

15 I believe it's on Page 9 of your report.

16          And we're talking about the fan.

17    A.    Yes.

18    Q.    And somewhere on there, on Page 9,

19 I believe you said:  Regardless, typical

20 operation of this fan will have had little

21 overall impact on the moisture performance of

22 the home.

23          Is that accurate?

1 don't normally test in this situation.

2          I don't know if I'm answering your

3 question but...

4    Q.    Is it fair to say that for

5 investigating areas which are not visible is

6 the reason you test?  Is that one reason you

7 might want to test?

8    A.    That would be a reason to test.

9 Should people be having symptoms or things

10 that they can't explain and you look around,

11 you don't see a problem, yes, in that

12 instance, you look, you know, if you give up

13 in the easy stuff, you don't see anything,

14 that is an appropriate time when you would do

15 an air sample, to look and see, you know, do

16 you see anything in the air.

17   Q.    Do you believe the only areas where

18 you tested is the only areas where there was

19 mold in this home, or these homes?

20   A.    I don't have any idea.  I do know

21 that I did see some in one of the crawl

22 spaces because, when I went under the home, I

23 saw what I assume -- I didn't test it -- but

1 I saw some staining in one of the areas where

2 the belly had been torn out.

3          I did see some staining on the wood

4 underneath.

5    Q.    If we're talking about the walls

6 and the wall cavities, which is what the

7 plaintiffs have been talking about as the

8 area of concern and design defect, why would

9 you not test to verify if within these wall

10 cavities whether there was mold?

11   A.    You know, that would have been, you

12 know, a statistical type investigation that I

13 wasn't prepared to do.

14          Now, I have seen wall samples where

15 checks have been used and come up positive

16 that, you know, when they're exposed from the

17 outside there's nothing to see.

18          So I find the wall check as a

19 method to be of mixed success.  I think it

20 has some good success.  I think it's best

21 used as a clearance criteria.

22          Usually what happens in a

23 situation, you have a flood like in Mobile,

1           My question to you is:  If you

2 think that is not proper, why did you fail to

3 test within the wall cavities yourself?

4     A.    Because I thought it was not

5 proper.  I don't understand the question, I

6 don't think.

7     Q.    Well, couldn't you refute Mr. Parks

8 by testing within the wall cavities to show

9 why it's not proper, your theory as to why

10 it's not proper?

11           Wouldn't that be a way to

12 demonstrate look how crazy this man is?

13     A.    Had I set up a hypothesis to do the

14 test, certainly that would have been one way

15 to do it.

16     Q.    Do you think you would find mold in

17 the wall cavities?

18     A.    Frankly, no.

19     Q.    Do you consider yourself an expert

20 in the HUD Code?

21     A.    No.  I'm familiar with some parts

22 of HUD Code but I'm not an expert.  I don't

23 have to apply to it.

Page 286

1           I read it occasionally and try to

2 understand it.

3    Q.    You're an expert in design

4 construction performance in manufactured

5 housing?

6    A.    Not in design, not in construction.

7 I know a pretty narrow field of manufactured

8 housing.

9           Design is a huge, huge field and I

10 know some parts of it.

11    Q.    You agree with me there is nowhere

12 in the Code of Federal Regulations on code,

13 any part of it, subpart, that allows mold

14 growth, condensation or moisture within those

15 wall cavities?

16           Is there anything in the HUD Code

17 that would allow that, in your opinion?

18    A.    Are you saying does the HUD Code

19 say it's okay to have mold in the walls?

20    Q.    Basically.

21    A.    I don't think it does.

22    Q.    Can you give me just a minute?  I

23 think in the interest of brevity, I'm going

1 vapor state.

2    Q.    Vapor state, what is that?

3    A.    It's water vapor.  It's a part of

4 air.

5    Q.    Not bulk?

6    A.    No, it's not bulk.

7         MR. PELS:  Okay.  I don't think I

8 have any other questions.

9              EXAMINATION

10 BY MR. WALKER:

11    Q.    Francis, I'm going to try to go

12 through some of the things that they've

13 pointed out to you.  I say try, because it's

14 a little hard to keep track of some of them.

15 I may miss something but -- that's not

16 highlighted like theirs was.

17         Can you remember which parts of

18 these, if I show them to you, that you

19 actually read off that board?

20    A.    I don't know that I can.

21         MR. CROSBY:  Which one are you

22 looking at, David, and I may have my notes

23 that can help?

# Moisture Problems in Manufactured Housing: Probable Causes and Cures

**Neil Moyer**    **David Beal**    **David Chasar**    **Janet McIlvaine**    **Chuck Withers**
                              Associate Member

**Subrato Chandra**
Member

## ABSTRACT

*A significant number of new manufactured houses built to HUD code and located in the hot, humid Southeast are experiencing moisture problems. Soft wallboards, buckled floors, damaged wood molding and extensive mold growth are the most common symptoms. These problems do not respond to the standard service and repair strategies for water intrusion*

*At the request of four manufacturers, over twenty-five such moisture damaged homes were investigated in 1999 and 2000 to determine likely causes. One time blower door, duct tightness and pressure differential measurements were performed on all homes. Field data on ambient, crawlspace, belly and house temperatures and RH were collected on a few of the homes. Recommendations and reports were prepared for the manufacturers service, production and design staff. Field repairs were performed in most of these homes.*

*A generalized theme existed in the houses investigated.*

- *Lowered air conditioner thermostat setting (typically 68-73°F), below the ambient dew point.*
- *Negative pressures across the envelope from high supply duct leakage (cfm @25Pa > 10 per 100 square feet of conditioned floor area), inadequate return air paths, interior door closures, exhaust fans or a combination thereof.*
- *Inadequate moisture removal from disconnected return ducts, fans always on (air handler or ventilation), inadequate drainage of condensate, oversized air conditioner or a combination thereof.*
- *Moisture diffusion from the ground into the house because of poor site drainage, inadequate crawl space ventilation, tears in the belly board, or a combination thereof.*
- *Vapor retarder in the wrong location i.e. vinyl or other impermeable wall or floor coverings located on the colder surfaces.*

*Recommended solutions provided to the manufacturers to eliminate moisture problems include:*

- *Maintain air conditioner thermostat above the ambient dew point (at least 75°F )*
- *Eliminate long term negative pressures created by air handler fans or ventilation equipment.*
- *Tightly seal all ductwork and provide adequate return air pathways.*
- *Enhance moisture removal from the conditioned space by correct sizing and maintainence of equipment*
- *Eliminate ground source water and provide adequate moisture barrier for the floor assembly*
- *If possible, remove vapor barriers located on the wrong surfaces.*

*Work is continuing to determine if these steps will be sufficient to prevent problems even in the presence of vapor barriers in the wrong locations for the hot, humid climates that are preferred by manufacturers and customers.*

## INTRODUCTION

Of the two million homes built in the U.S. in 1999, over 18.5% were built in factories to the code of the U.S. Housing and Urban Development (HUD). In 2000, one out of six new single-family housing starts were manufactured homes. Last year, the industry shipped 250,550 homes from 280 manufacturing facilities. Over 19 million people, about 8 percent of the U.S. population, live full-time in over 8 million manufactured homes (Manufactured Housing Institute 2000a). These manufactured homes are one of the most affordable single family detached housing available any where in the world, generally costing less

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

PLAINTIFF'S
EXHIBIT
5

than $35/ ft$^2$ plus land costs for centrally air conditioned and heated homes with built in kitchens. Available in all parts of the country, manufactured homes are more popular in the southern and western U.S. where land is still plentiful and in rural areas elsewhere.

In 1999, the U.S. Department of Energy (DOE) competitively selected the Florida Solar Energy Center (FSEC) as the Building America Industrialized Housing Partnership (BAIHP) team leader. This group's primary function is to serve the manufactured housing industry by fostering technology-based innovations that will increase energy efficiency through a systems engineering of the whole house. The systems engineering approach considers the interaction between the building site, envelope, and mechanical systems, as well as other factors. It recognizes that features of one component in the house can greatly affect others and it enables the teams, including the manufacturers and suppliers, to incorporate energy-saving strategies at no extra cost. System trade-offs, like the tightened shell that enables an engineer to recommend a smaller HVAC system, can improve the quality and performance of a home without affecting its first cost to the builders or to the consumers. The BAIHP team has three specific objectives in mind while serving the industry:

1.  Cost effectively reduce the heating, cooling and hot water energy usage of industrialized housing and portable classrooms by up to 50% while enhancing indoor air quality, durability and manufacturing productivity.
2.  Assist in the construction of thousands of energy efficient industrialized houses annually. This goal is accomplished by touring production facilties to try and pin-point problem areas and work with the manufacturers to resolve the problems, and provide design assistance.
3.  Make our team members pleased and proud to be working with us.

Industrialized housing includes manufactured housing (built to the HUD code), modular housing (factory built housing modules assembled on site) and production housing (site built housing produced in a systematic manner). Currently, there are five HUD-code manufacturers that are BAIHP team members. These include:

- Cavalier Homes
- Clayton Homes
- Fleetwood Homes
- Palm Harbor Homes
- Southern Energy Homes

The driving force that has encouraged these builders to become team members varies from builder to builder, however there is a general underlying theme. A number of their homes built for the hot and humid climate (built according to HUD-code specifications) have experienced various degrees of building failure due to moisture. A subtask of the effort with the DOE Building America Program is entitled "Moisture Research". In this endeavor, FSEC will attempt to help team members to eliminate moisture problems plaguing HUD Code homes in the Southeast by "...conducting diagnostic tests in problem homes, fixing problem homes, evaluating the effectiveness by conducting pre/post fix short term tests, and related activities..."

## THE HUD-CODE HOME

What is the difference between a manufactured home, a modular home and a panelized home? Many types of structures are built in a factory and designed for long-term residential use. Manufactured and modular home units are built in a factory, transported to the site location and installed. Panelized and pre-cut homes, essentially flat units (factory-built panels or factory-cut building materials) are transported to the site location and assembled. The major difference is that manufactured homes are federally regulated by the HUD Code under Title 24 CFR 3280. The HUD Code provides the design and construction requirements for the complete production of the entire home in the factory, with some modifications permitted for on-site completion. Modular, panelized and pre-cut homes fall under the auspice of the model building code enforced in the jurisdiction where the home will be located. These codes can include the BOCA National Building Code, the ICBO Uniform Building Code, the Southern Standard Building Code or the ICC One- and Two-Family Dwelling Code.

### The Construction Process and Setup

The process of constructing a manufactured home is very different from the conventional site built home – the home is built from the inside out as it travels down an assembly line. A steel chassis is

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

constructed and the floor assembly (containing plumbing, wiring, and duct work) is attached. Floor coverings, interior walls, plumbing fixtures, and furnace are installed. The exterior walls with the interior finish and insulation are hoisted into place and attached to the floor. The finished ceiling assembly is then lifted from the construction jig and lowered onto the home (*figure 1*). As exterior sheathings and coverings are attached, a flurry of interior activities continues within to provide finishing touches. The newly constructed assembly is then moved to the operational test site where the various plumbing and electrical systems are checked.

*Figure 2* shows a typical HUD-code home just produced leaving the factory. These homes have a permanent steel chassis with axles attached below the floor. After production the homes could travel a few hundred miles, hauled by a truck, before set up in its final location. The homes are set upon blocks or piers and the steel frame chassis is firmly anchored to the ground. A vented skirting conceals the underside of the home.

## The Duct System

Manufactured homes are typically heated or cooled by a forced air system employing ductwork, which delivers hot or cold air from the air handler unit (AHU). The ductwork may be located in the attic or in the belly cavity of the home. *Figure 3* shows the ducts in the belly, supplying conditioned air to all rooms through floor vents. This is a very common and inexpensive system that is used in manufactured homes. The ducts are typically made out of aluminum or fiberglass trunk lines which supply air to the floor registers through in-line boots or through flex ducts, which terminate at perimeter registers on the floor. The most common method of sealing the various joints and connections is with a foil tape.

Multi-section homes will also have a section of the ductwork that is connected during the setup operation. A flexible duct is used to connect the supply sections together in the attic or in the crawlspace. These connections are usually made with duct tape and/or a tie strap. (Note: the authors have seen three out of twenty-five instances during the course of this project where there has been complete or nearly complete separation of this connector duct.)

## The Ventilation System

All HUD-code homes are required to have a ventilation system installed. Title 24 CFR Part 3280.103b 'Light and ventilation', states that…

> "Each manufactured home shall be capable of providing a minimum of 0.35 air changes per hour continuously or at an equivalent hourly average rate. The following criteria shall be adhered to.
>
>> Natural infiltration and exfiltration shall be considered as providing 0.25 air changes per hour.
>>
>> The remaining ventilation capacity of 0.10-air change per hour or its hourly average equivalent shall be calculated using 0.035 cubic feet per minute per square foot of interior floor space. This ventilation capacity shall be in addition to any openable window area.
>>
>> The remaining ventilation capacity may be provided by: a mechanical system, or a passive system, or a combination passive and mechanical system…."

Currently, there are two main types of ventilation systems that are employed by the manufacturing housing industry to meet the 0.10 air change per hour requirement. Both types are used in the hot and humid climate; an exhaust only system that is located in a hallway or utility room and an outside air supply system that is ducted from the roof to the return airside of the air handler fan. The exhaust ventilation system is manually controlled with a simple on-off switch. The outside air supply system is linked to the operation of the air handler and controlled with an automatic damper (if applicable).

## MOISTURE PROBLEMS IN MANUFACTURED HOMES

Moisture problems are being experienced by a significant number of manufactured homes in the hot, humid climate of the Southeast United States. According to the Manufactured Housing Research Allaince (MHRA), solving moisture problems is the highest research priority of the HUD code industry. Moisture problems (*Figure 4*) include extensive mold, soft wallboards, buckled floors, damaged wood molding and trim, and high relative humidities in the home. Frequently, these homes have a high air-conditioning bill as homeowners attempt to increase comfort by lowering the thermostat temperature. (Note: each degree F drop in temperature causes an approximate 10% increase in cooling costs. The BAIHP team has

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

investigated over 25 problem homes and has found that the problems are caused by the following factors acting individually or in combination

- Lowered air conditioner thermostat setting (typically 68-73°F), well below the ambient dew point.
- Negative pressures across the envelope from high supply duct leakage (cfm @25Pa > 10 per 100 square feet of conditioned floor area), inadequate return air paths, interior door closures, exhaust fans or a combination thereof.
- Inadequate moisture removal from disconnected return ducts, continuous operation of air handler or exhaust fans, inadequate removal of condensate, oversized air conditioner, poorly maintained equipment or a combination thereof.
- Moisture diffusion from the ground into the house because of poor site drainage, inadequate crawl space ventilation, tears in the belly board, or a combination thereof.
- Vapor retarder in the wrong location i.e. vinyl or other impermeable wall or floor coverings.

## Building Science Basics For Moisture Plagued Homes

In the hot and humid Southeastern U.S., the outside air is consistently above a dewpoint of 75°F during the summer months. If the homeowner decides to keep the interior temperature of the home below 75°F, in an effort to maintain comfort, or if an interior surface is cooled below the exterior dewpoint temperature, then when moisture-laden outside air comes into contact with cold inside surfaces, condensation occurs. If it condenses behind an impermeable surface such as vinyl flooring or vinyl wallpaper, wall board damage, floor buckling problems and mold problems can result. There are six main sources that we have seen in our investigations of ~25 problem homes with moisture damage of "unknown" causes.

## Interior Temperature Below Outside Dewpoint (100% of the homes investigated)

Homeowners want to be comfortable in their homes. Thermal comfort is, in a simplified form, a function of the temperature, humidity and the physical activity of an individual (Fanger 1972). In most homes, the only "control" feature is that of the thermostat. The common perception is that lowering the temperature will provide the cooling comfort desired. The HVAC supplier/installer wants to ensure that the homeowner has a unit that is oversized to prevent callbacks of high interior temperatures or home owner precieved excessive run-times of the air conditioning system. Oversizing can cause several problems that are detrimental to the house and occupant comfort (Karg, R. and Krigger J. 2000).

- The unit is not operating long enough to provide dehumidification. Dehumidification is acomplished by passing return air over the cooling coil.
- The interior house temperatures can be lowered to a point far below the ambient air temperature dewpoint. This can lead to condensation on interior surfaces, with it's attendant material degradation and mold growth. Typical summer dewpoint temperatures range between 70 and 80 degrees F for most of the hot, humid South, especially near coastal regions.
- The oversized unit has a larger blower fan, which exacerbates duct leakage and pressure differential problems associated with the forced air system.

## Negative pressures across the envelope (100% of the homes investigated)

Negative pressure is the driver that brings warm moist exterior air into the building through every crack, crevice, hole or opening that exists. The negative pressure field may encompass the entire building or there may be zones within the building that experience negative pressures created by inadequate return air paths, or interior door closures. For example, supply duct leakage and/or exhaust fans may create negative pressures in the entire house, while door closure may create negative pressure in a single room or zone of the house. It is important to note that we are talking about miniscule amounts of negative pressures – on the order of 1 to 3 Pascals. However, over time, even these tiny air pressures can lead to serious damage (Odom, 1996).

## Duct leaks and return air pathways (100% of the homes investigated)

One of the biggest causes of moisture problems in manufactured homes, in hot and humid climates, is leakage from the supply ducts. In manufactured housing, the leakage is often caused by poor design and construction practices which leaves holes at the connection points of the AHU to the main trunk, the boots (or risers) to the trunk, the boots to the supply registers, end caps, cross-over duct connections and other

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

connection points in the duct work. When the AHU moves air, some of it leaks into the belly and eventually to the outside through tears in the belly board. This loss of air creates a negative pressure inside the house and a positive pressure in the belly as schematically shown in *figure 5*. The negative pressure draws outside or attic air into the house through the numerous cracks and crevices connecting the inside of the house to the outside or the attic. If this outside air is cold and dry, like it is in the wintertime in the Northern U.S. it will increase the heating energy use and occupant discomfort. This situation would not rot the home in this climate but it will in the hot, and humid Southern U.S..

Another aggravating factor is the lack of return air transfers when interior doors are closed. In many manufactured and site built homes there is a single return located in the main body, e.g. living room, dining room, central hallway, of the house. Air returning from individual rooms can be restricted by door closure. There is often very little area provided for return air from closable rooms; typically this pathway is the undercut at the bottom of the doors. When interior doors are closed, the bedrooms become pressurized and the main body of the house depressurizes. *Figure 6* shows the pressure differential effect of duct leakage and inadequate return air pathways. House #10 shows a postive pressure because of a disconnected main return air duct; that house operates nearly 9 Pascals positive when the air handler fan cycles on. The typical manufactured home experiences supply only type leakage as the return grill is normally located on the air handler unit.

### Exhaust fans (8% of the homes investigated)

Negative pressures can also be created by the use of exhaust fans. Whole house ventilation fans installed in HUD code housing are designed to be able to continuously exhaust air from the house at a rate of at least 0.035 cubic feet per minute per square foot of interior floor space. These fans are operated by manually switching them on or off (24 CFR Part 3280.103). In our inspections, we noted only one home where the factory installed ventilation fan ran continuously – and it suffered moisture problems (house #4). Typically, this fan is not operated because of the noise that it creates. Another case (house #16) we investigated involved the installation of a dual fan window unit. The owners converted a bedroom into a pet care room and operated the window fans to control odor. Unfortunately, this not only removed the pet odor, but also depressurized the entire house by 1 Pascal. High dewpoint crawlspace air was pulled into the floor assembly through numerous penetrations in the belly board and entered the home via the plumbing, electrical and other penetrations that existed in the floor. The result was mold growth in the bathroom cabinets and the deterioration of the subfloor under the kitchen vinyl.

### Inadequate moisture removal (~80% of the homes investigated)

Proper sizing, operation and maintenance of the air conditioning system is necessary to maintain interior temperatures and provide humidity control. It appears that there may be a fair degree of oversizing of equipment, though not specifically analyzed. Houses #19 and #20 are the same size, model, manufactured in the same plant and are located a short distance apart, yet one has a 4-ton air conditioning system and the other only a 2.5 ton. Both experienced problems, however the one with the larger unit had a more severe moisture problem. Based on the comments of the homeowners, some of the units have the ability to lower interior temperatures as much as 30 degrees below the ambient exterior temperature. Anecdotally, we may say that if the unit is capable of such a temperature difference, then the unit is probably oversized. An oversized unit will tend to short cycle, lowering the interior temperatures, but not able to adequately remove moisture from the air. In an effort to be comfortable, the thermostat setting is lowered.

Excessive duct system leakage also prevented adequate moisture removal from the house. The air conditioning systems were overwhelmed with ambient humidity conditions. Three houses that were investigated, had a portion of the duct system that was completely disconnected. One (house #9) had a return duct that had failed and was pulling the majority of it's air from the crawlspace. A second one (house #3) experienced a disconnected crossover supply duct. The majority of the conditioned air was lost to the attic space. The third home (house #16) had had the supply duct connecting the package air condition system to the house fall off at least three times within the first few months after being installed.

Maintenance and operation of the equipment also impacted the moisture levels within the home. The thermostat of house #4 was not operating correctly and the air handler fan was always on. Operation of the blower with supply leakage and door closure continuously placed the home in a negative pressure of -1.0 Pascal. The home had had the interior wallboard of all exterior walls replaced within the first year of

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

occupancy due to moisture damage. The repair crew could not find the cause of the problem, so the damaged wall was replaced, only to fail again.

Blockage in condensate drain line appears to have been the final element needed to cause catastrophic floor and wall damage to house #11. The homeowner reported that the house had operated adequately for the first year. They reportedly kept the thermostat between 78-80°F and were fairly comfortable. All at once the home felt uncomfortable and the thermostat setting was lowered to compensate, failure of materials and mold growth soon followed. During our investigation, a pie tin and plastic wrapper was found in the drain pan of the evaporator coil of the unitary system. The plastic wrapper was effectively blocking the condensate drain line causing flooding of the cabinet and recycling of the water back to the house.

### Moisture diffusion through floor assembly (100% of the homes investigated)

It appears in these homes inspected that one of the moisture diffusion pathways existed between the earth and floor coverings. The typical barrier between the earth and floor coverings on a manufactured home is a "belly board". When these belly boards have numerous penetrations or holes, free passage of both air and water vapor into the floor cavity now become an issue of concern. In many cases, standing water, or evidence thereof, existed in the crawlspaces below the belly boards. A skirting that is designed to hide the crawlspaces and provide attractive appearances then surrounds these high moisture sources. [Note: a standard for skirting ventilation of the area under the home is to provide openings that have a net area of at least one square foot for each 150 square feet (Fleetwood Homes (1999) & Palm Harbor Homes (2000))[1]. Leaving warm, moist air no choice but to rise up through the tears and other openings of the belly boards into the subfloorings. (This may be the result of air transported moisture or moisture vapor diffusion or both.) The subfloorings, composed of either plywood or wood composite materials, allow moisture vapor to pass through to the floor coverings. Carpeted surfaces offered little resistance and moisture passes into the home; vinyl floor coverings, on the other hand, are impermeable surfaces and prevent moisture intrusion. If that surface is at or below the dewpoint temperature of the crawlspace air, then condensation occurs on the underside of the impermeable flooring creating favorable environments for mold growth.

There appears to be a pattern of floor moisture/staining problems when the duct system is located overhead in the attic. Staining and warping of vinyl-covered floors has occurred in areas under the register. The areas of the vinyl covered flooring showing the worst staining were being washed by cold air from the supply registers (*figure 7 & 8*). Though measurements were not made of floor temperatures, it stands to reason that areas being washed by the supply air will tend to be cooler than those areas not washed. This cooling of the surfaces creates temperatures below the crawlspace dewpoint temperature and condensation occurs.

### Vapor retarder in the wrong location (100% of the homes investigated)

The homes inspected followed the HUD code ruling on moisture vapor control as defined by section 504, which states…

3280.504 Condensation control and installation of vapor retarders.

(a) Ceiling vapor retarders. (1) In Uo Value Zones 2 and 3, ceilings shall have a vapor retarder with a permanence of not greater than 1 perm (as measured by ASTM E-96-93 Standard Test Methods for Water Vapor Transmission of Materials) installed on the living space side of the roof cavity. (2) For manufactured homes designed for Uo Value Zone 1, the vapor retarder may be omitted.

(b) Exterior walls. (1) Exterior walls shall have a vapor barrier not greater than 1 perm (dry cup method) installed on the living space side of the wall, or (2) Unventilated wall cavities shall have an external covering and/or sheathing which forms the pressure envelope. The covering and/or sheathing shall have a combined permeance of not less than 5.0 perms….

(Note: Uo Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina, and Florida.)

---

[1] The authors believe that substantially increasing skirting venting above the current standard might work to reduce moisture levels in the crawlspace.

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

It is common practice for the manufacturers to use a vinyl covered wallboard as the interior finished surface. This is one of the most economical finishes that can be applied and meets the vapor barrier requirement. Testing of the wallboard with the vinyl finish has been completed by others according to the ASTM E-96 standard . The results of the test showed that a 3/8" gypsum wall board laminated with 4-mil vinyl has a perm rating of 0.42 (gr./hr.-ft$^3$-in. Hg) (Manufactured Housing Institute (2000b).

All of the homes inspected that experienced wall board failure were vinyl coated. Typical symptoms included staining of the vinyl wallcoverings and bowing of the wallboards. Additionally, negative air pressures within the buildings were created by duct leakages, door closures or a combination of both.

The vinyl floor coverings also fall into this category. The vapor retarder is located on the interior surface. The difference is that the problem has only been seen in houses with overhead duct systems. It is believed (testing to verify is still ongoing) that the cool air from the supply registers is being blown down to the floor and is cooling the surfaces below outside air dewpoints. At this point, the solution has been to replace the current uni-directional registers with a multi-directional one. Additionally, the belly board is also sealed to prevent crawlspace vapor intrusion.

## FIELD TESTING

Currently, more than 25 homes with moisture problems have been field tested by BAIHP researchers and were accompanied by the various manufacturer's service managers and other interested parties. Table 1 provides observed and measured data from several homes. The homes investigated are generally located within 25 miles of the Atlantic Ocean or Gulf of Mexico, ranging from North Carolina to Texas (*figure 9*). All of the homes have had at least one extensive changeout of moisture damaged building materials, many have had two or three.

## Testing Equipment and Procedures

FSEC's testing protocol employs a battery of tests to establish the integrity of the building envelope and the duct system. These tests assist in the determination of the potential for air transported moisture problems that can cause severe damage to building components, increase energy consumption and decrease occupant comfort. Ideally, the protocol begins with three tests using a calibrated blower door and a calibrated duct tester.

The first test employs the calibrated blower door and establishes a leakage rate for the house at a specific pressure differential. This is usually expressed in cubic feet per minute at 50 Pascals (CFM50) or air changes per hour at 50 Pascals (ACH50). The next two tests establish duct system airtightness. These tests use the duct tester and yield the leakage rate of the duct system in a similar manner to the building air-tightness test and are expressed in cubic feet per minute at 25 Pascals (CFM25). One test measures the total leakage from the duct system to the interior and exterior of the building (CFM25$_{total}$) by pressurizing the duct system to 25 Pascals. The second test measures leakage to the exterior of the building only (CFM25$_{out}$) by pressurizing the building and the duct system to the same pressure, removing any driving force for leakage between the building and the duct system. This results in the remaining leakage being to the outside of the building envelope. The results are airflow at 25 Pascals (cfm @ 25 Pa) and air leakage at 25 Pa normalized by the conditioned house square footage (cfm/ft2 @ 25 Pa). A duct system to be considered to be "essentially leak free" in the BIAHP project when the normalized duct leakage to the outside is less than 0.03 cfm/ft2 and the normalized total duct leakage is less than 0.06 cfm/ft2.[2]

The testing protocol continued with a series of pressure differential measurements across the building envelope and across various zones within the building as defined by interior doors. A digital micromanometer with a resolution of 0.1 Pascal was used in all of the pressure differential measurements. Pressure differences may be created by either normal operation of the building's heating and cooling equipment, ventilation system or exhaust fan (including clothes dryers). Measurements were completed to

---

[2] The current industry standard for reporting duct leakage is actually a normalized value of cfm per square foot and is typically written as a percentage. This is also referred to as percent leakage to outside and percent leakage total.

Percent Leakage Outside = (CFM25out / conditioned floor area) * 100

Percent Leakage Total= (CFM25total / conditioned floor area) * 100

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

determine a magnitude and direction of flow across the envelope when the various fans operate. Interior door closure effect was also measured when the air handler fan operated. Ideally, the pressure differentials created across the building envelope and bedroom doors should be fairly close to neutral.

### Results of Field Investigation

Since the beginning of the moisture investigations in the BAIHP project, it was the desire of this team to try and determine the commonality that may have existed. It appears that there is a common thread that links moisture related failures and the HUD code house of today.

There are a number of similarities that existed in the buildings that we inspected for the four manufacturer team members:

- All located in Southeast and generally located within thirty miles of a large body of water, either the Atlantic Ocean or the Gulf of Mexico.
- All had a forced air distribution system that would generally considered to be oversized. Most had duct leakage that was significant and caused the building to operate in a negative pressure.
- Most of the homeowners kept the thermostat setting between 68 and 75 degrees F in an effort to maintain comfort.
- Either a vinyl wallcovering or a vinyl floor product was associated with the moisture problem.
- All of the homes have had at least one major retrofit to repair the damaged areas. Since a cause of the problem was not located, the replaced materials were the same as those that were removed.
- Ventilation systems were usually not used or disabled.
- Typically, the master bedroom door was closed for extended periods of time. Usually, other bedroom doors were also closed – especially at night if children were present.
- The belly board (vapor retarder) contained numerous holes, penetrations and tears. The typical repair or seal was with the use of an adhesive backed cloth tape (duct tape) which had failed.

*Table 1* identifies some of the characteristics of the homes and symptoms observed. In general, the investigation team was dealing with a homeowner that has a problem, sometimes severe, and data was gathered to identify the cause or source of the problem. This limited time at the house caused the focus to be on solutions and not necessarily research, though an effort was exerted to have a common data collection protocol.

### SUMMARY AND DISCUSSION

The BAIHP investigation team was usually called out to homes that were not able to be solved by the normal channels that existed through the manufacturers' service departments. All of the problems that were encountered related to moisture flow in a vapor state. The causes of failure varied slightly from house to house, but in general could be catorigized as a result of any or all of the following:

- manufacturing design and/or techniques,
- set-up and installation of non-factory items such as air conditioning and
- homeowner operation and maintainence

It appears that moisture damage to the building materials was a result of poor design criteria and workmanship of a building that is located in a hot and humid climate. There were some symptoms that were common in cases:

- Lowered air conditioner thermostat setting (typically 68-73°F), well below the ambient dew point.
- Negative pressures across the envelope from high supply duct leakage (cfm @25Pa > 10 per 100 square feet of conditioned floor area), inadequate return air paths, interior door closures, exhaust fans or a combination thereof.
- Inadequate moisture removal from disconnected return ducts, continuous operation of air handler or exhaust fans, inadequate removal of condensate, oversized air conditioner, poorly maintained equipment or a combination thereof.
- Moisture diffusion from the ground into the house because of poor site drainage, inadequate crawl space ventilation, tears in the belly board, or a combination thereof.

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

- Vapor retarder in the wrong location i.e. vinyl or other impermeable wall or floor coverings.

Recommended solutions provided to the manufacturers to eliminate moisture problems include:

- Maintain air conditioner thermostat above the ambient dew point (at least 75°F )
- Eliminate long term negative pressures created by air handler fans or ventilation equipment.
- Tightly seal all ductwork and provide adequate return air pathways.
- Enhance moisture removal from the conditioned space by correct sizing and maintainence of equipment
- Eliminate ground source water and provide adequate moisture barrier for the floor assembly
- If possible, remove vapor barriers located on the wrong surfaces.

One of our manufacturing team members has been working for the last five years in incorporting the best practice designs and techniques into their product. The result is that last year they reported no moisture vapor related failures for the first time in several years.

Work is continuing to determine if these steps will be sufficient to prevent problems even in the presence of vapor barriers in the wrong locations for the hot, humid climates that are preferred by manufacturers and customers. There is still much to done in the area of moisture research as it relates to the interactions of buildings and its mechanical systems. Negative pressures created by mechanical systems within buildings is sometimes difficult at best to correct. Obviously, tight, well constructed duct systems with adequate return air pathways is a giant step in the right direction. There are still issues with ventilation, especially exhaust only ventilation in the hot and humid climates. Currently the HUD code does not address the type of ventilation, only that it must exist. Clothes dryers are another mechanical exhaust device that exists in a great number of homes. What is the effect of long term operation in a home where it may operate three to six hours per day? The industry, especially the HUD code manufacturing industry is slow to change – change costs money. They are looking for ways to lower manufacturing costs and still provide affordable housing.

Education. HUD code manufacturers, suppliers, retailers, setup crews, and various code officials struggle with moisture related problems, especially those problems caused by moisture in the vapor form. Good, simple and to the point training materials and courses are needed to assist in the design, construction, operation and diagnostics as it relates to moisture and moisture movement mechanisms.

The Building America Industrialized Housing Partnership will continue working with manufacturers, suppliers and building officials in an effort to provide research, training and support.

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

## TABLES

### Table 1 Collected Data From 25 HUD Code Homes With Moisture Related Problems

| Identifier | Inspect Date | Location | Number Floor Sections | House Size | Ventilation type | Bowed/Buckled/Soft Walls | Mold Present | Buckled Floors under vinyl | Stains / Rust / Condensation | Interior Temperature | Problem walls vinyl covered | Tears in belly board | Ground cover | MBR door typically closed | Unsealed marriage line | Air Conditioner Tonnage | House CFM50 | Duct Leak, total CFM25 | House with ref to Out, ahu off (pa) | Hse-Out, ahu on, doors open (pa) | Hse-Out, MBed closed (pa) | Hse-Out, all Bed closed (pa) | MBed-LR (pa) | Bed2-LR (pa) | Bed3-LR (pa) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Oct | LA | Double | 3BR/2BA | V4 | Y | Y | | N | 68-70F | Y | Y | N | Y | | | 2453 | 184 | 0.1 | -0.3 | -1.4 | | 5.2 | 5.1 | 3.6 | C1,C2,C4 |
| 2 | Aug | LA | Single | 1368 | V4 | Y | N | N | | 67-75F | Y | Y | Y | NA | | 4 | 1789 | 329 | -0.2 | -2.6 | -5.7 | -5.8 | 6.7 | 1.0 | 3.4 | C1,C2,C4 |
| 3 | Oct | TX | Double | 4BR/3BA | V4 | Y | Y | N | | | Y | Y | Y | Y | | | 3247 | 430 | 0.0 | -5.6 | -7.0 | -8.0 | 8.0 | 3.8 | 4.9 | C5, C6 |
| 4 | Oct | TX | Double | 5BR,2BA | V4 | Y | N | N | | 71F | Y | Y | Y | Y | | | 1271 | 188 | 0.0 | -1.0 | -1.1 | -2.0 | 4.0 | 2.3 | 2.7 | C2,15,16 |
| 5 | Oct | TX | Double | 3BR, 2BA | V4 | Y | | N | | 74-76F | Y | Y | Y | Y | | | 1507 | 204 | -0.5 | -0.8 | -0.7 | -2.5 | 2.8 | 3.0 | 6.6 | C1,2,16 |
| 6 | Oct | NC | Single | 3BR,2BA | V4 | Y | | N | N | | Y | Y | Y | N | | | 1336 | 162 | 0.0 | -0.4 | -0.9 | -2.0 | 5.0 | 2.1 | 2.3 | C2 |
| 7 | Aug | LA | Double | 4BR/2BA | V4 | N | M1 | N | N | 75-76 | Y | Y | N | Y | | | 2564 | 285 | 0.0 | -1.4 | -1.5 | -1.2 | 1.3 | 2.1 | 2.1 | C1 |
| 8 | Jun | LA | Double | 1568 | V4 | Y | M2,6,7 | N | N | 72F | Y | Y | N | Y | | | 2022 | 314 | -0.1 | -1.0 | -3.5 | -4.3 | 9.0 | 3.0 | 3.0 | C2,15,16 |
| 9 | Jul | FL | Double | 1492 | V4 | Y | M2 | N | Y | 75-80F | Y | Y | N | N | | 3 | 1230 | 34 | 0.0 | 0.0 | -2.2 | -2.6 | 5.3 | 6.4 | 4.4 | C7 |
| 10 | July | FL | Double | 1492 | V4 | Y | M2 | N | Y | 70-78F | Y | Y | N | N | | 3 | 1492 | 540 | 0.0 | 8.6 | 7.9 | 7.7 | | | | C7,C8 |
| 11 | Oct | FL | Double | 2000 | V4 | Y | M3,4 | Y | Y | 73F | Y | Y | N | N | | 4 | 2000 | 112 | 0.0 | 0.5 | -0.5 | -1.2 | 5.5 | 1.4 | 2.4 | C5 |
| 12 | Aug | FL | Single | 900 | V4 | N | N | Y | | 72-80F | Y | | Y | N | | 2.5 | 835 | 114 | | -0.2 | -2.7 | -2.7 | 6.5 | | | C3,9,16 |
| 13 | Aug | FL | Single | 1,080 | V4 | N | N | Y | | 72-80F | Y | | Y | N | | 2.5 | | | | -0.2 | -3.0 | -3.0 | 10.4 | | | C3,9,16 |
| 14 | Sep | LA | Double | 1008 | V5 | Y | Y | N | Y | 69-72F | Y | Y | Y | N | NA | 3 | 1187 | 286 | 0.0 | -2.5 | -4.5 | -8.5 | 2.2 | 1.5 | 17.0 | C2,15 |
| 15 | Sep | LA | Double | 1008 | V5 | Y | Y | N | Y | 69-72F | Y | Y | Y | N | NA | 3 | 1425 | 150 | | | | -4.0 | 9.0 | 4.0 | 3.6 | C2,14,15 |
| 16 | Sep | LA | Double | 1008 | V5 | Y | Y | N | Y | 69-72F | Y | Y | Y | N | NA | 3 | 1261 | 135 | | | | -4.0 | 7.0 | 7.4 | 5.7 | C2,14,15 |
| 17 | Sep | LA | Double | 1792 | V5 | Y | M1,6,7 | N | Y | 71F | Y | Y | N | Y | | 4 | 3967 | 510 | | | | -1.8 | 2.9 | 2.4 | 0.8 | C15 |
| 18 | Sep | LA | Double | 1792 | V5 | Y | M1,3 | N | Y | 75F | Y | Y | N | Y | | 4 | 3173 | 197 | | | | -1.8 | 3.5 | 3.8 | 1.2 | |
| 19 | Sep | FL | Double | 1348 | V5 | Y | M1, 2 | Y | Y | 76F | Y | Y | N | N | | 4 | 1000 | 158 | 0.0 | -1.2 | | -3.3 | 4.5 | 0.9 | 1.2 | C2,7,16 |
| 20 | Sep | FL | Double | 1348 | V5 | Y | M1, 2 | Y | Y | 78-80F | Y | Y | N | N | | 2.5 | 1007 | 128 | | 1.0 | | -2.0 | 6.3 | 4.5 | 3.7 | C7 |
| 21 | Sep | TX | Double | | V4 | Y | M6,7 | N | Y | 72-78F | Y | Y | N | Y | | | 1250 | 93 | | | | | | | | |
| 22 | Sep | TX | Double | | V4 | Y | | | | 75F | Y | Y | N | N | | | 1423 | 77 | 0.0 | -0.6 | | -1.6 | 3.7 | 2.2 | 2.3 | C17 |
| 23 | Oct | FL | Double | 1948 | V4 | Y | N | M4 | | 75F | N | Y | N | Y | | 5 | 1900 | 258 | 0.0 | 0.0 | | -2.0 | 2.3 | 1.7 | 1.5 | C11, C12 |
| 24 | Oct | FL | Double | 3BR | V4 | Y | N | Y | N | 77F | Y | Y | N | Y | | 5 | 2496 | 85 | 0.5 | -0.5 | | -2.2 | 2.8 | 1.7 | 3.1 | |
| 25 | Oct | FL | Double | 2128 | V4 | Y | | Y | N | 67-77F | Y | Y | N | Y | | 4 | 2683 | 185 | 0.0 | -0.2 | | -1.2 | 4.2 | 1.2 | 1.3 | C3 |

C1: House had extra vents in w alls and/or roofs as an ll conceived moisture control measure
C2: House interior w all board w as repaired /replaced/covered before
C3: House Floors repaired/ replaced before
C4: House had both vinyl covered and tape and textured w all board. Problems seen only on vinyl covered exterior w alls
C5: Very high utility bills >$300 up to $500/mo
C6: Extra window a/c added as house could not be cooled
C7: Mold on floor on cold spot directly under register
C8: Return duct disconnected at the outdoor unit!
C9: Unoccupied home (model center)
C10: Appears to be w inter time problem only
C11: One room had animal care facility and large exhaust running all the time
C12: Supply flex fallen off from time to time
C13: Crossover not directly under furnace.
C14: Results after attempt to seal ducts using butyl foil backed tape
C15: Standing w ater in craw lspace
C16: AHU blow er fan operates continuously
C17: Return in utility rm dP> 5pa across utility door
C18: Year round moisture problem
C19: * pressure measurement w / positive pressure ventilation closed

Mold Present Com m ents:
M1: Marriage w all
M2: Under vinyl floor
M3: Closets
M4: Bath
M5: Floors
M6: Interior Walls
M7: Exterior Walls
M8: Exterior Wall Hallw ay
M9: Switch plate of level

Ventilation Com m ents:
V1: Interior ventilation intentionally disabled
V2: Mechanical attic ventilation
V3: Through w all pressure relief vents present
V4: Hallw ay or Utility room exhaust fan
V5: POS type- deactivated
V6: POS type- active

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

000083

**FIGURES**



**Figure 1 –** Finished ceiling assembly being transferred to the house. This assembly will be fastened to the exterior walls with screws. At this point, the floors, plumbing, duct system and electrical wiring rough-ins are complete

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.



**Figure 2 - A finished house in the function test area. The plumbing and electrical systems are tested, final touch-ups are completed and the home is readied for transport.**

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.



**Figure 3 - A finished metal inline duct system. Insulation on the ductwork may or may not be installed, depending on final destination of the home. This floor is currently being lowered onto the chassis**

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.



**Figure 4 This home is experiencing a buckled floor problem. The subfloor is a HUD code approved composite wood product that has taken on moisture from the crawlspace.**

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

000092



**Figure 5 A typical manufactured house with an inline floor supply system loses 10-30% of the air to the "belly" of the home. There are usually numerous holes, penetrations and tears in the "belly" board, which allows free air movement between the crawlspace and the "belly". The loss of the supply air tends to depressurize the living space above.**

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.



**Figure 6 Pressure differential measured across the front door when the air handler fan is operating and all of the interior bedroom doors are open and then closed.  The main body or area containing the central return experiences a negative pressure with reference to outside.**

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.



Figure 7 Breakfast nook with a vinyl floor covering and overhead supply register. Visible discoloration of the floor (pink spots) existed primarily in the area between the table and the cabinets on the right side of the picture. The supply register was oriented as to blow air to the outside wall.

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.



**Figure 8 The floor covering has been partial removed.  The plywood flooring was wet to the touch and staining exists on much of the under side of the vinyl.  The floor decking was removed to inspect the underside – it appeared dry.**

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

000096



Figure 9 The southeastern portion of the United States is considered to be a hot and humid climate. The investigations that the BAIHP team has completed are indicated. Note that most are near coastal areas.

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

**REFERENCES**

Manufactured Housing Institute (2000a), "Quick Facts, The latest Trends in Manufactured Housing 2000-2001", 2101 Wilson Blvd. Suite 610 • Arlington, VA 22201–3062

Odom, J.D. and DuBose, G., (1996) Preventing Indoor Air Quality Problems in Hot, Humid Climates: Problem Avoidance Guidelines, CH2M Hill, Orlando

24 CFR Part 3280, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT [Docket No. FR-4376-P-01] Manufactured Home Construction and Safety Standards

Fanger, P.O. (1972), Thermal Comfort, McGraw-Hill, New York, USA

Karg, R. and Krigger J. (2000), Specification of Energy-Efficient Installation and Maintenance Practices for Residential HVAC Systems, Consortium for Energy Efficiency, One State Street, Suite 1400, Boston, MA 02109-3507

Fleetwood Homes (1999), "Installation Manual, Multi Section, Wind Zone II & III", Fleetwood Enterprises Inc., PO Box 76387638, Riverside, CA 92513-9953

Palm Harbor Homes (2000), "Installation Manual", Palm Harbor Homes Inc., 15303 Dallas Parkway, Suite 800, Addison, TX 75001

Manufactured Housing Institute (2000b), "Manufactured Housing Technologies", Volume 2 Issue 2, 2101 Wilson Blvd. Suite 610 • Arlington, VA 22201–3062

Reprinted by permission from ASHRAE, Conference Proceedings IAQ2001, ©2001, American Society of Heating, Refrigerating, & Air Conditioning Engineers, Inc.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 685

AMERICAN ARBITRATION ASSOCIATION


STANLEY and SHEILA BYRD,
    Plaintiffs,


vs.          Case No. 30 420 00810 06


SOUTHERN ENERGY HOMES, INC.,
    Defendant.

_____


CHARLES and DINAH DAUGHERTY,
    Plaintiffs,


vs.          Case No. 30 420 00809 06


SOUTHERN ENERGY HOMES, INC.,
    Defendant.


                VOLUME III


    *   *   *   *   *   *   *   *


    TESTIMONY AND PROCEEDINGS, taken
before Ben F. Beckham, Arbitrator, at
Beasley, Allen, Crow, Methvin, Portis &
Miles, 272 Commerce Street, Montgomery,
Alabama, on October 3, 2007, commencing
at approximately 10:00 a.m.; and
reported by Bridgette Mitchell, Court
Reporter and Commissioner for the State
of Alabama at Large.


    *   *   *   *   *   *   *   *

PLAINTIFF'S
EXHIBIT

6

tabbies

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 810

1    Q. I'm on page 2 of the report.

2    A. Page 2 of the report.  I'm sorry.

3    Q. Last sentence from the second full

4       paragraph from the top.

5    A. Where it starts, Holes had been cut

6       into a number of walls?

7    Q. Yes.

8    A. Okay.  Examination of the exterior

9       walls is key, as exterior walls are

10      typically unaffected by possible

11      installation shortcomings that have

12      been in place in an undisturbed state

13      for the duration of the home's

14      five-year life.

15   Q. And, again, this is a report you

16      prepared for the defendant manufacturer

17      in a case in Louisiana; is that

18      correct?

19   A. I -- yes, it was.

20   Q. And it was relating to moisture

21      condensation issues?

22   A. Yes.

23   Q. Okay.  And if we could go down two more

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 825

1    any changes there, but I don't have

2    any -- I don't have any drafts of

3    these.  I basically just go through and

4    edit what I have and send them out as

5    soon as I can.

6  Q. So you don't have any drafts?

7  A. No, sir.

8           MR. PELS:  If we could get this

9    marked.

10          MR. GOULD:  Marking this as

11   Byrd Exhibit No. 75.

12          (Byrd Exhibit 75 was

13          marked for identification.)

14  Q. And if you could turn to page 6 of

15   this, what I'm going to call, draft

16   report.  And I believe we're looking at

17   photo H this time.  And I'll read for

18   you the same sentence.

19          THE ARBITRATOR:  Page 6?

20          MR. PELS:  Yes, sir.  It's Byrd

21   Expert 31 as a Bates.

22  Q. And we're on photo H this time.  And I

23   want to read that same sentence aloud.

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 826

1    Improper door piers can result in

2    sagging, hard-to-open doors, and

3    occasionally moisture intrusion.  What

4    I don't see in drafts that you

5    apparently said you don't make are the

6    words "into the walls."

7  A. I didn't say I didn't make drafts.  I

8    said I don't keep drafts.  I make

9    reports.  I may occasionally, you know,

10   have a report and then send another

11   one.  So I didn't mean to imply I don't

12   make a draft.  What I said was, I edit

13   as I go, so I can't really speak to did

14   I say it one way and then say it a

15   different way.  Obviously I added that,

16   because -- who knows.  You know, I like

17   this sentence better.

18 Q. Did you speak to your attorney or did

19   your attorney speak to you about adding

20   the words "into the walls"?

21 A. No.  I get no feedback from these guys.

22 Q. There are several other substantive

23   changes, but I think -- I think we can

2e8de02e-e222-4606-ba09-622da8b34123

Page 908

1 said it was a reliable source, the

2 Gypsum Association?

3 A. Correct.

4 Q. And I believe you agreed that the

5 Gypsum Association's opinion, that mold

6 can occur within twenty-four to forty-

7 eight hours if it gets moist?

8 A. That's, yes, standard time that we

9 assume mold can develop.

10 Q. Yeah.  And I think you said that's

11 typically the time the EPA recommends?

12 A. Yeah.

13 Q. Your words were mold can germinate for

14 twenty-four to forty-eight hours.  And

15 you further agreed that according to

16 the gypsum board we can have limited

17 intermittent exposure to moisture in

18 these walls; right?

19 A. Yes.

20 Q. And the -- I believe we stated that by

21 eliminating intermittent we're saying

22 we don't want mold to grow, which can

23 happen within twenty-four to forty-

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 909

1    eight hours; right?

2  A. What we don't know is what moisture

3    level is critical to what moisture

4    availability needs to happen for mold

5    to grow in the way that I think you're

6    indicating.  When I look at the Byrd

7    home, having seen moisture meters

8    indicate levels of moisture and having

9    seen no evidence of mold in the walls,

10   it tells me that there's a disconnect

11   between that measurement of moisture

12   and the expression of any biological

13   growth in the wall cavity.

14  Q. Can you refute Mr. Parks' findings

15    about mold in the wall cavities from

16    his tests?

17  A. I have difficulty in the technique.

18  Q. Can you refute, as we sit here --

19  A. I don't know what you mean by "refute."

20  Q. What mold testing do you have that can

21    show --

22  A. I don't have mold testing that shows

23    different.

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 921

1    Q. You'd agree with that?

2    A. I'd agree that I said that.  And,

3       again, this was for a pretty simplistic

4       audience.  I had no idea that the level

5       of the audience was Energy Star

6       builders, so Energy Star -- it was an

7       Energy Star presentation.  So, yeah, I

8       was trying to bring the thermodynamics

9       down to the level of my audience.

10   Q. So hot seeks cold?

11   A. In a simplistic way, yes.

12   Q. And air moves from high pressure to low

13      pressure?

14   A. Yes.

15   Q. Water vapor moves from high pressure to

16      low?

17   A. Yes.

18   Q. Meaning wet is going to seek dry?

19   A. Yes.

20   Q. I believe you also state in that study

21      that the best moisture protection is

22      redundant protection?

23   A. Yes, I did.

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 926

1    my experience, I have found that it can
2    be taken out of context and made to
3    look like something it's not.  And I'll
4    give you a sample.  If I take an air
5    sample and it has one spore of
6    Stachybotrys, that can send somebody
7    through the roof when Stachybotrys is
8    one of the more common molds that we
9    have in the outdoor environment.  So
10   I'm trying to -- and, again, this is a
11   fairly junior level of audience here.
12   I'm just trying to demonstrate to them
13   that, you know, that sampling is --
14   should be done with chain of custody,
15   should be done in a way that -- with
16   the proper protocol.  And if not and
17   you screw it up, there could be legal
18   implications.
19 Q. Like putting it in an inbox and
20   forgetting about it?
21 A. Absolutely.
22 Q. You state -- the title of this is, Be
23   sure sampling provides benefit.  And

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 927

1       then you state, If there are health
2       issues, hidden mold may be uncovered.
3       What do you mean by that?
4   A.  Well, sometimes you may go to a
5       house -- this has not been my
6       experience.  This has been my having
7       read this.  Occasionally we go to a
8       house -- I do a lot of studies on
9       houses like, for example, odor
10      problems.  What's going on with this
11      house?  There's odor problems.  And
12      they can be any number of source,
13      anything from rats in the wall to bad
14      paint.  But if people are experiencing
15      some allergies or symptoms that might
16      be associated with mold and you don't
17      see anything, then air sampling is a
18      good idea.  My best example there is,
19      we had a woman that was very allergic
20      when she went in her house.  We did air
21      sampling and the lab uncovered that
22      there had previously been birds in the
23      house because she could see bird dander

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 954

1    of the carpet, you know, that had been

2    protected and the color of carpet that

3    hadn't been protected.  There was a

4    significant staining of the carpet.

5  Q. You'd agree that wherever it's cupping

6    along the perimeter of that roof, you'd

7    want to fix; right?

8  A. Yes.

9  Q. Nowhere in the HUD code does it say

10   it's acceptable to have mold in the

11   wall cavities; right?

12 A. Not that I'm aware of.  I don't think

13   so.

14 Q. Okay.  Give me one second.  I think I

15   am finished.

16          (Brief pause)

17 Q. Mr. Conlin?

18 A. Yes.

19 Q. Last week you produced a report at

20   trial in the Whitaker case versus

21   Fleetwood?

22 A. Yes, I did.

23 Q. And I just want to point out that in

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 987

1          THE WITNESS:  Yes, sir.  It's

2     visible.  I've had people complain

3     about it before, so I tend not to do

4     pin tests.

5          THE ARBITRATOR:  But you can do

6     them behind a picture frame?

7          THE WITNESS:  Yeah, you can do

8     them behind a picture frame.

9          THE ARBITRATOR:  You ever do

10     the drilling test like Mr. Parks?

11          THE WITNESS:  Never.

12          THE ARBITRATOR:  You did a swab

13     test, but you lost the swab?

14          THE WITNESS:  Yes, sir.

15          THE ARBITRATOR:  So basically

16     that's the six tests that can be

17     undertaken to determine if there's mold

18     and/or moisture in a home?

19          THE WITNESS:  In the wall

20     cavity, yes.  In terms of moisture in

21     the home, you could measure relative

22     humidity.

23          THE ARBITRATOR:  But I'm

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 989

1    of the reasons you do mold testing is a

2    clearance test to say everything is

3    okay.  And that was the intent for my

4    trying to do a swab test in that case.

5            THE ARBITRATOR:  I understand

6    that you disagree with Mr. Parks' test

7    results and Mr. Parks' methods of

8    testing --

9            THE WITNESS:  Yes, sir.

10           THE ARBITRATOR:  -- his

11   drilling and pulling air out.  But

12   hypothetically, if we assumed that his

13   test was reliable, that it was done

14   correctly -- you've reviewed the

15   results of his test; correct?

16           THE WITNESS:  Yes.  To a

17   certain extent, yes, sir.

18           THE ARBITRATOR:  Reviewing the

19   results of that test, what would that

20   indicate to you?

21           THE WITNESS:  In -- you know,

22   we can look at the Daugherty home.  In

23   that wall cavity where we had moisture

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 993

1       the relative humidity gets high enough

2       in the wall cavity, there's a potential

3       that that mold will continue to grow.

4              THE ARBITRATOR:  Mr. Pels asked

5       you about if the best protection was

6       redundant protection.  Is that the

7       correct term?

8              THE WITNESS:  Yes.  I like to

9       say that.

10             THE ARBITRATOR:  What is that

11      type of protection?

12             THE WITNESS:  That's belt and

13      suspenders, basically.  You've got more

14      than one system.  You look at a wall,

15      the vinyl is the first protection to

16      keep rainwater out, then you've got a

17      vapor permeable -- or vapor

18      impermeable -- a vapor retarder of some

19      sort on the outside with the sheathing

20      that helps keep water out of the wall.

21      The more things you have to keep water

22      away, that's what I refer to as

23      redundant protection.

2e8de02e-e222-4606-ba09-622da8b34123

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

AMERICAN ARBITRATION ASSOCIATION


STANLEY and SHELIA BYRD,

     Plaintiffs,

vs.                    CASE NO.

SOUTHERN ENERGY HOMES, INC.,  30 420 00810 06

     Defendants.

_____


CHARLES and DINAH DAUGHERTY,

     Plaintiffs,

vs.                    CASE NO.

SOUTHERN ENERGY HOMES, INC.,  30 420 00809 06

     Defendants.

_____


*  *  *  *  *  *

VOLUME IV

TESTIMONY AND PROCEEDINGS, taken

before Ben F. Beckham, Arbitrator, at

Beasley, Allen, Crow, Methvin, Portis &

Miles, 272 Commerce Street, Montgomery,

Alabama, on October 4, 2007, commencing

approximately 10:00 a.m.; and

PLAINTIFF'S
EXHIBIT
7

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 241

1              THE ARBITRATOR:  Go ahead.  I'm

2              listening.

3              CROSS-EXAMINATION

4    (BY MR. ANDERSON:)

5    Q.    Mr. Tompos, I would like to ask you some

6          things I think will help clarify what I

7          want to talk about and clarify some

8          things that you said on direct here.

9                    I think we can agree in

10         general the HUD Code is a

11         performance-based Code?

12   A.    Like I said earlier, under the scope,

13         it's performance based on and

14         prescriptive under the scope, but the

15         overall has to perform, yes.

16   Q.    We can also agree that if a wall is

17         deteriorating, that is not performing?

18   A.    If the wall is deteriorating, yes, it's

19         not performing.

20   Q.    Are you aware of any HUD-approved homes

21         that have received the sticker, received

22         the seal from the manufacturer that went

23         out in the field that didn't perform?

# Published list of references and warnings as to the use of a vapor barrier/retarder within the hot, humid climate.



PLAINTIFF'S
EXHIBIT

tabbies

**Department of Housing and Urban Development (HUD) Research Grant**
*1995 - Manufactured Housing Walls That Provide Satisfactory
Moisture Performance in All Climates.*
"A current-practice manufactured housing wall with an interior vapor retarder was shown to provide satisfactory performance in cold climates, **but poor performance in a hot, humid climate.** The use of an interior vapor retarder in the wall of an air conditioned building exposed to a hot and humid climate can cause high relative humidity at it's outside surface, thereby **providing a conducive environment for mold and mildew growth."**


**Manufactured Housing Research Alliance**
*1999 - Moisture Problems in Manufactured Homes,
Understanding Their causes and Finding Solutions*
**"The interior vapor retarder acts like a dam holding water inside the wall board.** When the conditions support condensation inside the wall, water will begin to condense on the coldest material—in this case, the inner surface of the wallboard. If the conditions for drying are poor—the outside humidity is high and the vapor retarder blocks diffusion to the inside—moisture will begin to accumulate on the surface and saturate the material. If the wall board cannot dry out, **it will eventually fail completely.**


**Department of Housing and Urban Development (HUD)**
24 CFR Part 3280
*2000 - Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid
and Fringe Climates; Proposed Rule*
"The states have provided HUD with information that indicates **there is an immediate need to consider alternate requirements for exterior walls in these humid and fringe climate areas, to prevent moisture damage due to condensation"**....

**"The interior surface** of the exterior wall **should** also then **be constructed of a permeable material....**
In such cases, use of vapor retarder paints, **vinyl covered gypsum wallboard,** or other impermeable materials or finishes **on the interior side of exterior walls would be detrimental, because they would trap moisture within the wall."**


**Florida Solar Energy Center (FSEC)**
*2000 - Moisture Problems in Manufactured Housing:
Probable Causes and Cures*
**Building Science Basics For Moisture Plagued Homes**"In the hot and humid Southeastern U.S., the outside air is consistently above a dewpoint of $75^{\circ}F$ during the summer months. If the homeowner decides to keep the interior temperature of the home below $75^{\circ}F$, in an effort to maintain comfort, or if an interior surface is cooled below the exterior dewpoint temperature, then when moisture-laden outside air comes into contact with cold inside surfaces, condensation occurs. **If it condenses behind an impermeable surface such as** vinyl flooring or **vinyl wallpaper, wall board damage, floor buckling problems and mold problems can result.**

2

**Manufactured Housing Research Alliance**
**Manufactured Housing Technologies**
*2000 - Solving Moisture Problems in Manufactured Housing*
"**When the vapor retarder is on the interior wall in hot , humid climate,**
warm, moist air that enters the wall cavity can accumulate on the cold interior wall board,
**causing it to swell and disintegrate."**

**Home Energy**
*2000 - Moisture Problems in Manufactured Housing*
"**Vapor retarder in the wrong location. (100% of the homes investigated)"...**
"All the homes inspected that experienced wallboard failure used vinyl-coated wallboard.
Typical symptoms included staining of the vinyl wall covering and bowing of the wallboards."

**Department of Housing and Urban Development (HUD)**
24 CFR Part 3280
*2002 - Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid
and Fringe Climates; Final Rule*
A. **Exterior walls must** be constructed with one of the following installed of the **exterior side of the wall
assembly:** (1) **A vapor retarder of not greater than 1.0 perm....** or (2) an external covering and sheathing with a
combined permeance of **not greater than 1.0 perm.**

B. The **interior finish** and **interior wall panel materials** must have a combined
vapor permeance **greater** than 5.0 perm

C. Exterior wall cavities shall not be ventilated to the outdoors.

**The Partnership for Advancing Technology in Housing (PATH)**
*2003 - Alternatives for Minimizing Moisture Problems in Homes Located in Hot, Humid Climates:
Interim Report*
"**Most building scientists agree** that a vapor retarder is preferred on the warm side of the wall assembly
(the outside in predominately hot, humid climates)2324. **Vapor retarders located on the interior side** of
a wall (the cool side in hot, humid climates) diminishes the ability of the wall cavity to dry towards
the climate-controlled interior, and can **allow moisture invading from the outside to accumulate
within the wall cavity, potentially leading to condensation."**

3

**The Partnership for Advancing Technology in Housing (PATH)**
*2003 - Minimizing Moisture Problems in Homes Located in Hot, Humid Climates: Final Report*
Location of vapor retarders. In hot, humid climates,  **the interior** of building shell components **should be vapor permeable,** allowing cavities to dry in the direction of the home's interior.

**Building America / U.S. Department of Energy**
*2004 - Alleviating Moisture Problems in Hot, Humid Climate Housing*
"A significant number of new manufactured (mobile) homes built to the HUD Code and located in the hot, humid Southeast are experiencing moisture problems. Soft wallboards, buckled floors, damaged wood molding and extensive mold growth are the most common symptoms." ...................."* **Vapor retarder in the wrong location i.e. vinyl or other impermeable wall or floor coverings located on the cool side of the assembly. colder surfaces."**

**Prepared for: U.S. Department of Housing and Urban Development Washington, D.C.**
**October 2004 Office of Policy Development and Research**
*2004 - BUILDING MOISTURE AND DURABILITY*
"As discussed in the Moisture Control Handbook, **moisture problems arise** when houses in cooling climates are built with interior (e.g. behind the drywall or an interior wall covering) vapor diffusion retarders. Low permeance interior wall coverings (e.g. **vinyl wallpaper,** vapor impermeable interior paints) and polyethylene vapor retarders located behind drywall can create moisture problems when **hot , humid outdoor air comes in contact with these surface.**

**U.S. Department of Housing and Urban Development (HUD)**
*2006 - Moisture-Resistant Homes*
"In hot/humid climates exterior wall systems should **dry towards the interior** by locating vapor retarding materials on the **outside of the wall assembly** and **keeping interior materials vapor permeable"....**

"Finishes that could compromise the wall's ability to dry inward
include vinyl wallpaper finishes and vapor barrier paints."

**ASHRAE CHAPTER 23**
*2005 - THERMAL AND MOISTURE CONTROL IN INSULATED ASSEMBLIES: Fundamentals*
In typical building situations, however, water vapor is present and the reflective facing should be placed on the warm side of the air space;otherwise, condensation can increase the emittance and reduce the insulation value
.an airflow retarder should not be where it can cause moisture to condense if it also has vapor-retarding properties. For example, an airflow retarder placed on the cold side of a building envelope may cause condensation, particularly if the vapor retarder at the inside is ineffective.

**ASHRAE CHAPTER 24**

*2005- THERMAL AND MOISTURE CONTROL IN INSULATED ASSEMBLIES APPLICATIONS*

**"Low-permeance paints, <u>vinyl wallpaper,</u> or any other similar low-permeance material <u>should not be used on the inside of walls</u> and ceilings in warm, humid cooling climates."**

**New Texas Residential Building and Energy Code Requirements as of 2002**

*Vapor Barrier Ban -*

A vapor barrier (permeability rating of less than 1 .0perm) on the warm-in-winter side of the framing is not allowed."

**"In a hot, humid climate, vapor barriers on the warm-in-winter side cause moisture and mold problems."**

**A Technical Report by .... Johns Manville**

*"Not in My Building" Moisture and Mold Growth /*
*and the Specification of Wall coverings*

**"One of he more storied causes of moisture damage in buildings come from moisture condensation behind <u>impermeable wall coverings like vinyl"</u>**

**Bailey Engineering Corporation**

*Air Infiltration in Coastal Regions / The "Paston Effect"*

**"<u>*Never ever*</u> install a vapor retarder on the inside of an outside wall. Vinyl wall coverings have become a biological playground..."**

**Sto Corp**

*Moisture Control Principles for Design and Construction of Wall Assemblies*

**"* Do not install interior vapor retarders in hot, humid climates..."**

**Florida Solar Energy Center**

*Managing Mold in Your Florida Home: A Consumer Guide*

"**Vinyl Wall Covering:** Impermeable interior surfaces like **<u>vinyl wall coverings can result in severe mold problems</u>** in hot humid climates such as Florida's. Moisture coming from outdoors can accumulate within the gypsum wallboard that is behind the vinyl wall covering.''

**Clemson University**

*Residential Housing Moisture: Build to Keep It Out ofHomes in The Warm, Humid Climate*

Moisture trapped by **<u>vinyl wall coverings</u>** or vapor retarders **<u>enables mold to grow,</u>** reducing insulation values and enhances decay in stud spaces. **<u>This destroys the strength of the structure."</u>**

**Building Science Digest 106 - Joseph Lstiburek**
*Understanding Vapor Barriers*
"The recommendation are based on the following principles; Avoidance of the installation of **vinyl wall coverings** on the inside of air conditioned assemblies - **a practice that has been linked to moldy buildings.**"

**Claudette Hanks Reichel, Ed, Professor (Housing), LSU AgCenter**
*Building your Louisiana House*
The interior side of the wall should be as permeable as possible - **meaning no vinyl wallpaper,** no oil-based interior paints, no interior vapor barrier on insulation.

**ENERGY EFFICIENCY MANUAL**
*Vapor Barriers -Reference Note 42*
**Where Should the Vapor Barrier be Installed?**
*Vapor barriers must be installed on the warm side of the insulation. This is because condensation occurs as water vapor moves from the warm side of the wall to the cold side. If a vapor barrier is installed on the cold side, it traps moisture inside the envelope, making moisture problems worse.*

**Department of Homeland Security Federal Emergency Management Agency**
*Alternative Housing Pilot Program*
*Park Model & Mississippi Cottage*
*It is critical that all systems exposed to flooding be able to dry thoroughly; therefore materials such as oil base paint and **vinyl wall coverings or other low permeable finishes that could trap moisture within the system must be eliminated.***

**2003 APA -The Engineered Wood Association**
*Building A Better Home - Avoiding Moisture Accumulation in Walls*
In warm, humid regions close to the Gulf of Mexico, and in Hawaii and the Caribbean regions, where air conditioning is prevalent, the vapor barrier should be installed on the exterior side of the wall behind the sheathing.

**The Vinyl Institute**
*AIA/ARCHITECTURAL RECORD - CONTINUING EDUCATION Series*
Condensation behind vinyl wall-covering in hot humid climates is caused by design details and construction which leak moist air and water. Design and specify tight construction and use an air barrier where appropriate. Consider the use of perforated vinyls. **The objective is to keep warm, moist air from reaching the back side of the cold wall-covering, avoiding condensation and possible mold and mildew growth.**

6

**ASTM Designation: E 1186 –03**
***Standard Practices for Air Leakage Site Detection in Building***
***Envelopes and Air Barrier Systems***

Air infiltration can affect occupant comfort by producing drafts, cause indoor air quality problems by carrying outdoor pollutants into occupied building space and, **in hot humid climates, can deposit moisture in the building envelope resulting in deterioration of building envelope components**

**LSU AgCenter**
***Ideal Wall Assemblies for Hot-humid and Mixed-humid Climates***

Permeable interior finish: Any moisture that gets in a wall must be able to dry to the inside (cooler and dehumidified space). The interior side of the wall should be as permeable as possible -- **meaning no vinyl wallpaper,** no oil-based interior paints and no interior vapor barrier on insulation. **Having no vapor barrier on the interior side is more important than having a vapor retarder on the outside; none is preferable to one on the wrong side.**

**PermaVent TM**
***Microvented Wallcovering***

There is little published or recommended perm ratings information for commercial buildings. However, US HUD (Housing and Urban Development) has specified a perm rating minimum of 5.0 on interior walls for residential manufactured construction in hot humid climates. And, several sources suggest that greater than 10 perms is considered *"breathable"*.

**Omnova Solutions Inc**
***Moisture, Permeability and Mold.***

However, **if deficiencies in the design,** construction or maintenance of a building, or other circumstances, allow liquid or vapor moisture to accumulate in a wall or wall cavity, **vinyl wallcovering can act as a vapor barrier restricting the escape of moisture and increasing the risk of mold growth** and other building damage from trapped moisture.

\* This is a partial list of references and publications which are meant to substantiate the position that the utilization of an interior vapor barrier within the hot, humid climate is NOT an acceptable engineering practice.

FREEDOM COURT REPORTING

Page 274

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

* * * * * * * * * * *

STEVEN WHITAKER,          *

 Claimant/Plaintiff,   *

versus                    *      AAA CASE NO:
                                 30 434 01029 06
FLEETWOOD                 *
ENTERPRISES, INC.,
and FLEETOOD HOMES        *
OF GEORGIA, INC.,
                          *
Respondents/Claimants.

* * * * * * * * * * * *

Arbitration taken at the Alabama

State Bar, 415 Dexter Avenue,

Montgomery, Alabama, on the 26th day

of September, 2007, commencing at

approximately 8:30 o'clock, a.m.

PLAINTIFF'S
EXHIBIT
9
tabbies

cc9a1170-f53d-4ce2-85a8-4c8b3a2c38ff

FREEDOM COURT REPORTING

Page 535

1    sitting here and telling me that that's going

2    to dissipate?

3        A.    I'm saying you said it was

4    impossible and I'm not going to agree with

5    that.

6        Q.    Okay.  Well, perhaps not

7    impossible.  But the bottom line is it's

8    critical, is it not, that the hot, humid air

9    be able to diffuse to the interior of the

10   home with a ventilated cavity under those

11   conditions?

12       A.    No.  No.  I don't agree with that.

13       Q.    Mr. Farish, I would like to hand

14   you a printout called Moisture Management in

15   Wall Assemblies, Air, Water and Vapor

16   Barriers, and ask you if you have ever seen

17   that before?

18           MR. WALKER:  Do you know which

19   number it is?

20           MR. CROSBY:  Do you have an exhibit

21   number?  Oh, I'm sorry.  You're looking at

22   it.

23           MR. PELS:  I actually do not know

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

cc9a1170-f53d-4ce2-85a8-4c8b3a2c38ff

FREEDOM COURT REPORTING

Page 536

1    the exhibit number.

2         MR. WALKER:  Which one is it?

3    What's the name of it?

4         MR. CROSBY:  Could you let us know

5    what the title of it is, please?

6         MR. PELS:  Yeah, I'll tell you.

7         MR. WALKER:  What is the title of

8    it again, Jim?

9         THE WITNESS:  Moisture Management

10   in Wall Assemblies, Air, Water and Vapor

11   Barrier.  At the very top it says:

12   Architectural Record, Advertising Supplement

13   provided by Dupont Tyvek.  9 pages.

14        MR. CROSBY:  Is it on you all's

15   exhibit list?

16        MR. PELS:  It may not be.

17        MR. WALKER:  It doesn't look

18   familiar so I don't think so.

19        MR. CROSBY:  Let me see it.  No.  I

20   don't think so

21   BY MR. PELS:

22     Q.    If I could borrow that back, I'm

23   going to put a page up on the screen here.

cc9a1170-f53d-4ce2-85a8-4c8b3a2c38ff

FREEDOM COURT REPORTING

Page 537

1      Could you read the highlighted
2  portion, please, for the record?
3      A.    However, in order for ventilation
4  drying to be effective, it is still necessary
5  for water vapor to be able to diffuse from
6  the envelope into the ventilated space.
7  Given the importance of vapor diffusion as a
8  drying mechanism, it is critical that a
9  diffusion pathway is considered.
10     Q.    Have you ever seen this study
11  before?
12     A.    I don't recall it, no.  I mean, I'm
13  familiar with Dupont Tyvek, but not this --
14  this study doesn't look familiar.
15     Q.    Are you able to render an opinion
16  as to whether you would consider this a
17  reliable authority?
18         MR. CROSBY:  Let me object to that.
19  He said he hasn't seen it.  How could he give
20  it a reliability standard if he hasn't even
21  seen it before?
22         MR. PELS:  He may know the source
23  which he --

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

cc9a1170-f53d-4ce2-85a8-4c8b3a2c38ff

FREEDOM COURT REPORTING

1          MR. CROSBY:  Is it the January '03?

2          THE WITNESS:  Yes.

3     BY MR. PELS:

4     Q.     Mr. Farish, could you -- do you

5     want me to move?

6     A.     That's fine.

7     Q.     Would you just read the top

8     sentence there that's highlighted?

9     A.     Sure.  Such ventilation will not

10    serve the intended purpose of keeping the

11    cavity dry if the vapor pressure of the

12    outside air is greater than the cavity.

13    Q.     I would assume you would consider

14    this study a reliable authority?

15    A.     I think it's a very good study,

16    yes.  In its entirety.

17         MR. STRICKLAND:  May I ask a

18    question?

19         THE WITNESS:  Yes, sir.

20         MR. STRICKLAND:  What you just

21    read, can you explain that to me?

22         THE WITNESS:  I would like to see

23    context personally.  I have read this study a

cc9a1170-f53d-4ce2-85a8-4c8b3a2c38ff

FREEDOM COURT REPORTING

Page 564

1  outside.  None is preferable to one on the

2  wrong side.

3      Q.    My simple question to you on this

4  study, mindful that you have not seen it

5  before, I take it, is --

6      A.    No.

7      Q.    -- would you consider this study a

8  reliable authority?

9      A.    I'm sorry.  I haven't even heard of

10  LSU Ag Center.  So I really don't know.

11      Q.    Fair enough.

12      A.    And I'm not sure what all is

13  addressed here.  I really hate to give

14  authoritative statement at this time.

15      Q.    Okay.

16      A.    I see further down they get into

17  things like brick or stucco, you know,

18  siding.  And so they are obviously studying

19  more than manufactured housing, I think.

20  But, anyway, I don't know.

21      Q.    Mr. Crosby had asked Mr. Parks on

22  cross-exam about replacing vinyl covered

23  wallboard with tape and texture?

cc9a1170-f53d-4ce2-85a8-4c8b3a2c38ff

FREEDOM COURT REPORTING

Page 568

1    then I can give it to you if you like.

2              MR. CROSBY:  Is that 3.7?

3              MR. PELS:  Yes.

4              MR. CROSBY:  I've got it.  Thank

5    you.

6              MR. PELS:  It's one of those oddly

7    numbered documents.  If it's easier to read

8    from here or up there, it would be fine.

9              I would like for you to read for the

10   record under, Remedy, the last sentence in

11   that paragraph?

12        A.    Just the last?

13   BY MR. PELS:

14        Q.    Yes, sir.

15        A.    All right.  Replace failed gypsum

16   wallboard with plain gypsum, cover with vapor

17   permeable paint, which will allow water vapor

18   to more easily migrate through the wallboard.

19        Q.    You deem this study a reliable

20   authority?

21        A.    I do.

22        Q.    Okay.  And we talked just a moment

23   ago about my question, the hypothetical that

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

cc9a1170-f53d-4ce2-85a8-4c8b3a2c38ff

FREEDOM COURT REPORTING

Page 570

1          MR. CROSBY:  You want to borrow

2     this?

3          THE WITNESS:  Sure.

4     A.     The interior vapor retarder acts

5     like a dam, holding water inside the

6     wallboard -- I assume you want me to

7     continue?

8     BY MR PELS:

9     Q.     Yes, sir.

10    A.     When the conditions support

11    condensation inside the wall, the wall will

12    begin to condense on the coldest material, in

13    this case the inner surface of the wallboard.

14          Continue?

15    Q.     Yes, please.

16    A.     If the conditions for drying are

17    poor, the outside humidity high and the vapor

18    retarder blocks diffusion to the inside,

19    moisture will begin to accumulate on surfaces

20    and saturate the material.  If the wallboard

21    cannot dry out, it will eventually fail

22    completely.  Wetting of the gypsum usually

23    occurs at night and the walls partially dry

cc9a1170-f53d-4ce2-85a8-4c8b3a2c38ff

# Whole House Ventilation Strategies

Prepared in cooperation with:

**U.S. Department of Housing and Urban Development**
Affordable Housing Research and Technology Division
451 7th Street S.W.
Washington DC  20410

Submitted by:

**Manufactured Housing Research Alliance**
2109 Broadway, Suite 203
New York, NY 10023
(212) 496-0900

**January 2, 2003**



PLAINTIFF'S
EXHIBIT
10
tabbies

# ACKNOWLEDGEMENTS

The following individuals participated in the preparation of this document:

**Whole House and Ventilation Committee Members**

Michael Zieman*, RADCO, Inc.,* Project Chair
Michael D. Blanford, *U.S. Dept. of HUD*
Larry Boyce, *Nordyne*
Elizabeth Cocke, Ph.D., *U.S. Dept. of HUD*
Michael Dalton, *York Unitary Products*
Victor Ferrante, *U.S. Dept. of HUD*
William E. Freeborne, *U.S. Dept. of HUD*
Robert Garcia, *Fleetwood Enterprises*
Nick Koskolos, *Mortex Products*
Ronald V. LaMont, *Alpine Engineered Products, Inc.*
Michael Lubliner, *Washington State University Cooperative Extension Energy Program*
Rob Luter, *Ventline, Division of Philips Products Inc.*
Michael Mckitrick, *Nevemar Company*
Rick Mendlen, *U.S. Dept. of HUD*
Frank Quigley, *U.S. Dept. of HUD*
Ron Salmon, *Broan-NuTone LLC*
Dwight Shuler, *Owens Corning*
John R. Stevens, *U.S. Dept. of HUD*
Andrea Vrankar, *U.S. Dept. of HUD*
Jim Welz, *Philips Products*
Alan Zimmerman, *York International Corp.*

**Project coordination staff and consultants**

Emanuel Levy, *Manufactured Housing Research Alliance*
Francis Conlin, *Manufactured Housing Research Alliance*
Jordan Dentz, *Manufactured Housing Research Alliance*

# TABLE OF CONTENTS

**1   EXECUTIVE SUMMARY** ...................................................................................1

**2   CURRENT STATE OF KNOWLEDGE**................................................................3
   2.1  Understanding air flow characteristics.................................................. 3
   2.2  Codifying ventilation requirements ...................................................... 5

**3   FURTHER RESEARCH NEEDS** ........................................................................9
   3.1  Research goals and tasks....................................................................... 9
   3.2  Deliverables ........................................................................................ 10

**APPENDICES**

**A   CHARACTERIZATION OF EXISTING VENTILATION SYSTEMS**................ A-1
   A.1  Fresh air inlet to the return air compartment of the furnace .................. A-1
   A.2  Dedicated fan ....................................................................................... A-2

**B   SUMMARY OF LITERATURE**..........................................................................B-1

# 1

# EXECUTIVE SUMMARY

The purpose of this research was to provide a baseline for evaluating whole house ventilation strategies for manufactured homes.

The first step was to conduct a literature search and review to investigate whole house ventilation requirements and design strategies for manufactured homes. The findings of the literature review were debated among, and analyzed by a Steering Committee of industry representatives.

In general, airflow through homes, and its impact on building performance and homeowner comfort, is one of the most difficult building science phenomenons to quantify and predict. ASHRAE recommends a minimum whole house ventilation equal to 0.35 air changes per hour for residences. Previous studies of manufactured homes indicate that approximately 0.25 air changes per hour are provided by natural infiltration. In order to turn the ASHRAE recommendation and the estimate of natural infiltration into a prescription suitable for inclusion in the Manufactured Housing Construction and Safety Standards, HUD calls for all manufactured homes to include a ventilation system with the capacity of 0.035 cubic feet per minute per square foot of floor area. This aligns with the recommendation of the NFPA 501 Committee.

It is unclear how whole house ventilation systems currently in use in manufactured homes perform with respect to the HUD requirements, including this static ventilation rate. Research is proposed to establish whether or not existing whole house ventilation systems, once installed and operating in typical manufactured homes, exchange air with the outdoors at the rate that is specified in the HUD code and to consider options to improve system performance and cost efficiency. The development of a "best practices" manual for whole house ventilation systems design, installation and operation is also proposed. Finally, follow-up research is proposed to correlate the newly developed ventilation system design(s) against the target ventilation rate of 0.35 air changes per hour to determine if ventilation targets are being met.

# 2

# CURRENT STATE OF KNOWLEDGE

Whole-house ventilation is the process of supplying fresh air to a living space and exhausting stale air, either by natural or mechanical means in order to maintain an acceptable level of air quality. Normal human activities such as cooking, bathing, breathing, and maintaining house plants introduce indoor pollutants (including excessive levels of water vapor) into the home. Additionally, building materials and furnishings can contribute to indoor pollution through outgassing of chemicals used in their manufacture. Finally, appliances such as heaters and fireplaces can add harmful combustion byproducts to the air in the home. Pollutants can build up to levels that may negatively impact human health unless they are removed or diluted with fresh outside air.

Ventilation acts to either dilute pollutants (including excessive levels of humidity) or flush them from the home. Residential construction traditionally has relied on infiltration to provide ventilation. Infiltration is the leakage of air through the building envelope through unintended gaps in walls, roofs, windows, doors and other construction elements. Improvements in construction, however, have resulted in more airtight buildings and hence the need for dedicated mechanical or passive devices to satisfy ventilation needs. Furthermore, infiltration has been shown to vary with environmental conditions such as wind and temperature differentials, and for significant periods these driving forces may not be sufficient to achieve adequate natural infiltration.

In general, airflow through homes, and its impact on building performance and homeowner comfort, is one of the most difficult building science phenomenons to quantify. Ventilation system performance involves much more than simply air exchange. Ventilation systems can induce pressure differentials, add or remove humidity beyond desirable levels, affect comfort, add to space conditioning costs, over- or under-ventilate depending on seasonal driving forces, and may distribute ventilation unevenly throughout the home. Ventilation systems add to the cost of housing; besides the capital costs, ventilation accounts for a portion of the total energy load on the home. Thus efforts to characterize different ventilation strategies and to optimize their performance in various climates are important research areas.

The goal of this effort was to define a series of research questions whose results:

1.  update the foundation upon which recommendations to the ventilation standards for HUD-code homes are made, and

2.  guide the industry towards improved, more efficient and cost-effective practices to achieve the desired ventilation level. An important part of this second goal is to identify effective whole-house ventilation strategies and provide a baseline for evaluating ventilation products and practices.

## 2.1    UNDERSTANDING AIR FLOW CHARACTERISTICS

### 2.1.1    *Quantifying Whole House Airflow*

Much effort has gone into attempts to quantify airflow within a home and the rate of air changes with the outside. A number of field studies conducted from the late seventies through early nineties

*Whole House Ventilation Strategies*

attempted to quantify the average natural infiltration rate for typical manufactured homes. These studies established an approximate average rate of 0.25 air changes per hour (ACH) under natural conditions (3, 13, 14, 35). This data formed the foundation upon which the MHCSS whole-house ventilation standards are now based.

While two of these studies monitored homes in the field over long periods, they were all conducted on a limited number of homes (two homes in Indiana for 16 months (13); 35 homes in the northwest over a winter (14); one home in a test chamber (35)) and all derived, through extrapolation, average air change rates over an extended period of time (3).

Two more recent efforts by the Manufactured Housing Research Alliance measured envelope leakage rates in 66 existing and 22 newly constructed energy-efficient manufactured homes using blower door tests[1]. Blower door tests measure envelope "leakage" rates at a given pressure (usually 50 Pascal) rather than natural infiltration rates directly. The leakage rates found translate into average infiltration rates of 0.43 ACH for the existing homes, and 0.26 ACH for the new homes, using a simplified version of the LBL Infiltration Model (see below) to estimate an average infiltration rate from the blower door measurements to an average infiltration rate. The variation within these data sets, expressed as standard deviation as a percentage of the mean value, is 36% and 23% for the existing and new energy efficient homes respectively[2]. This indicates some lack of consistency of envelope tightness for typical manufactured homes, but a trend towards improved tightness and consistency of the building envelope for current practice energy efficient homes.

### 2.1.2   Predicting Air Exchange With The Outdoors

Two primary methods are used to measure the leakiness, and thereby predict the natural infiltration rate, of a home's envelope: tracer gas tests and blower door tests. Tracer gas tests are more precise and can be conducted over long periods of time to measure actual air change rates either with or without ventilation systems operating. A gas is released into the home and concentrations of the gas are monitored over time to determine how quickly the gas dissipates through the home's envelope. Tracer gas tests are time-consuming and complicated to administer but are useful for measuring airflow patterns and air change rates in limited numbers of homes and for calibrating computer models.

Blower door tests are one-time assessments of a home's leakage rate measured when the home is artificially pressurized. This test is relatively simple and quick to perform and gives a good snapshot of the leakiness of a home's envelope. The standard blower door test is conducted with the ducts open to the home; therefore, leaks in the ducts are incorporated in the results of a blower door test. Blower door tests, however, do not directly measure the air movement though a home's envelope under conditions of normal pressure. Therefore, a given home's average infiltration rate cannot be directly determined from this type of test. Attempts have been made to infer the natural infiltration rate from blower-door tests by accounting for additional design and climactic factors that impact the rate such as inside-outside temperature differential, wind speed, height of the home, and construction type.

The most commonly used method for predicting the natural infiltration rate from test data is the LBL Infiltration Model, developed by researchers at the Lawrence Berkeley National Laboratory. It incorporates four factors intended to account for the additional variables of wind, construction type,

---

[1] Alternatives For Minimizing Moisture Problems in Homes Located in Hot, Humid Climates, Manufactured Housing Research Alliance, 2002
[2] The standard deviation of the data sets is 0.15 for the existing homes and 0.06 for the new energy efficient homes. Expressing this number as a percentage of the mean value of the data set, reveals the consistency of the measurements, or lack thereof.

climate, and building height. Selection of these factors, particularly those for wind shielding and construction type, requires some degree of subjective interpretation.

Examining the extremes of these factors permits the prediction of the maximum variation in natural infiltration for two manufactured homes with the same blower door test results according to the model. The model's wind shielding correction factor ranges from 0.9 to 1.2. The leakiness correction factor (which accounts for the type of cracks in the home's envelope) ranges from 0.7 to 1.4. The climate factor ranges from 14 to 26. The height factor does not affect this analysis since virtually all manufactured homes are one story. Multiplying the extremes of these factors together results in a minimum overall factor of approximately nine (0.9 * 0.7 * 14 = 8.82) and a maximum of approximately 44 (1.2 * 1.4 * 26 = 43.68), a variation of up to 490%. So, applying the LBL infiltration model, two manufactured homes with equal blower door test results, may have estimated average infiltration rates that vary by nearly a factor of five depending on the homes' climate, microclimate and construction characteristics.

### 2.1.3   The Difficulty in Quantifying Air Flow

Developing a "typical" natural infiltration rate for manufactured homes with any degree of certainty has proven exceedingly difficult. While it is possible to measure the static leakage rates for large samples of homes using blower door tests (MHRA studies), this tells us little about how these homes perform over time under varying daily and seasonal weather conditions (17). Site factors such as temperature, wind, orientation of the home, and construction type further complicate the issue by their varying impacts on the natural infiltration in homes with equal leakage areas.

These points speak to the limits of attempting to predict airflow rates with any degree of certainty. The large body of accumulated experience does not suggest that *most* homes built to the current standards experience severe indoor air quality and building moisture control problems due to inadequate ventilation. But there is no concrete evidence one way or the other. It is also unclear to what extent homes are over-ventilated, and suffer corresponding energy penalties and moisture control problems.

### 2.1.4   The Engineering Community Consensus

The consensus of the engineering community, expressed through the ASHRAE process, is that a natural infiltration rate of 0.35 ACH measured using the accepted techniques will result in adequate indoor air quality most of the time for most homes. ASHRAE settled on a recommended air change rate of 0.35 ACH for residential structures as a balance of health (indoor air quality) concerns against the desire for energy conservation. It is understood to be a rough and imperfect approximation of how a healthy, energy-efficient home should perform on average. It is this static target to which the current MHCSS sets the bar, and which existing ventilation methods strive to attain.

## 2.2   CODIFYING VENTILATION REQUIREMENTS

### 2.2.1   The Current HUD-Code

In attempting to codify a target rate for whole house ventilation, HUD made the following simplifying assumptions:

1. Homes should be capable of being ventilated at 0.35 ACH. That is, the target rate does not need to be achieved on a continuous basis but under "average" conditions and with

ventilation system operating, the home would be expected to be exchanging air with the outdoors at this rate[3].

2. Of this total, 0.25 ACH is assumed to be provided by natural infiltration resulting from the construction of the home, its operation, and site factors.

3. The remaining ventilation shall be provided by a balanced mechanical, passive, or combination mechanical/passive system with a minimum capacity of 0.035 cubic feet per minute per square foot (cfm/sf) floor area. When the mechanical or passive system is activated, pressure differentials are initiated which often reduce the degree of natural infiltration. Therefore, the mechanical or passive system must make up for this reduction, in addition to the simple 0.1 ACH differential between the 0.35 ACH requirement and the 0.25 ACH assumed from natural infiltration. The formula used by HUD, which accounts for this reduction as well as typical ventilation system efficiencies, yields a minimum capacity of 0.035 cfm/sf floor area, which translates to approximately 0.20 ACH.

Several active and passive strategies have been designed to meet the MHCSS specification including supply and exhaust ventilation systems using both manual and automatic controls.

How these ventilation strategies actually perform in manufactured housing on a dynamic basis is not well understood. It is believed that many ventilation strategies over ventilate or under ventilate and do not provide a continuous exchange of indoor air. Not all approaches to whole house ventilation work equally well nor are they all intended for the same set of environmental conditions. For example, some strategies that are adequate in smaller homes may not perform as well in larger homes. Others that are suitable in heating dominated climates may add excess moisture in hot, humid climates. Current whole-house ventilation strategies are characterized in Appendix A.

## 2.2.2   NFPA Committee Recommendations

The issue of whole house ventilation has been considered by the NFPA Committees.

In the 2000 edition of the 501 Standard on Manufactured Housing, NFPA drops the reference to natural infiltration and the 0.35 ACH overall goal, and simply prescribes the minimum ventilation system capacity of 0.035 cfm/sf floor area as its overall air exchange requirement.

As described above in Section 1.2.1, two primary assumptions are made in order to result in the HUD/NFPA prescription of 0.035 cfm/sf floor area ventilation system capacity: the 0.35 ACH goal for an average fresh air ventilation rate and the average natural infiltration rate of 0.25 ACH for manufactured homes. It is not within the scope of this work to challenge either of these assumptions. The proposed research will investigate cost effective ways of meeting the parameters set forth by NFPA 501 (2000 edition) 2.3.2 Whole House Ventilation.

NFPA establishes the following parameters for whole house ventilation (excerpted from Manufactured Housing Standard 501, 2000 edition, 2.3.2):

1. "2.3.2 Whole-House Ventilation. Each manufactured home shall be provided with whole-house ventilation having a minimum capacity of 0.035 ft3/min * ft2 (10.8 L/min * m2) of interior floor space or its hourly average equivalent."

---

[3] The HUD-code also requires dedicated kitchen and bathroom ventilation fans for local moisture removal. These fans are not counted towards the whole house ventilation requirement and so are not discussed in this report. The HUD Code allows operable glazed areas in place of mechanical ventilation for toilet compartments in Uo Zones I and II.

*Whole House Ventilation Strategies*

2. "2.3.2.1 …The ventilation system or provisions for ventilation shall not create a positive pressure in Uo value Zone 2 and Zone 3 or a negative pressure condition in Uo value Zone 1 in excess of 0.03 inches of water (7 Pa)."

3. "2.3.2.2 … The ventilation system shall be designed to ensure that outside air is distributed to all bedrooms and main living areas."

This last requirement is somewhat vague. It has been demonstrated that manufactured housing can be built to perform well in terms of inter-zonal air distribution. However, it is far from certain that many homes are performing well in this regard and it is not clear what the maximum acceptable inter-zonal pressure differentials should be and what effect this has on ventilation and long term home performance.

# 3

# FURTHER RESEARCH NEEDS

## 3.1   RESEARCH GOALS AND TASKS

Research is needed to establish whether or not existing whole house ventilation systems, once installed and operating in typical manufactured homes, exchange air with the outdoors at the rate that is specified in the HUD code and to consider options to improve system performance and cost efficiency.

The goal of this work is to develop design strategies that meet the HUD requirements and those proposed by NFPA in the most cost effective manner, while maximizing comfort and minimizing potential moisture problems.

This goal will be reached through the process outlined below:

### 3.1.1   *Improve Ventilation Strategies and Publish Guidelines*

#### Task a.    Develop comprehensive system design strategies

Comprehensive strategies include the mechanical or passive ventilation system in concert with the design of the home itself.  This system must function consistently well in a variety of home sizes and configurations and in a range of climates.  It is relatively simple to design a fan that will move the required amount of air under laboratory conditions.  It is far more complex to ensure that this system performs as intended once installed in a home.  Factors that will be considered include the layout and installation of the ductwork, location of registers, location of air handler unit, shell leakage, duct leakage, the location of interior walls and doors, control systems and recommended operating profile.

Two or three system alternatives are expected to be developed in addition to the current ventilation system designs currently used by most manufacturers.  These systems may include elements of fresh air inlet to furnace systems (Appendix A.1), whole house dedicated exhaust fans (Appendix A.2), heat recovery ventilators, and other ventilation systems.  The designs will be investigated in conjunction with an actual home.  Home manufacturers and ventilation system suppliers will be involved in the development of the new ventilation system concepts.

#### Task b.    Evaluate the performance of the systems developed

Full scale testing and/or computer models will be used to evaluate the performance of the systems designed above in meeting the HUD performance targets.

- Each system developed will be installed in up to three homes of varying sizes and configurations – at least one single and one double section home.  If possible, multiple systems will be installed in the same home and tested independently.

- Duct leakage[4] and shell leakage measurements taken with duct blaster and blower door tests will be analyzed to benchmark each home's air leakage performance characteristics.

---

[4] The ducts in these homes will be constructed so that they are relatively tight – a maximum of 5% cfm per sf floor area of duct leakage to the outside.

- Short-term tracer gas tests will be conducted to determine the air change rates during operation of the ventilation systems. This actual rate will be compared to name plate cubic feet per minute (cfm) flow rate of the ventilation system in use.

- Air pressures will be measured in each room of the home, comparing inside and outside pressures during operation of the ventilation system(s) to determine if positive or negative pressures are generated and the degree of those pressures.

- Interior and exterior air moisture content will be monitored to gauge how the system impacts humidity and vapor pressure.

- Tests will be repeated to evaluate the effects of a number of occupant-controlled variables such as door position and operation of spot kitchen and bath ventilation fans and clothes dryer vents. Tests will be conducted with windows closed as the prescribed ventilation requirements are in addition to window opening area.

- A cost analysis will be performed to determine the impact on home price and operating costs of the newly developed ventilation systems.

### Task c.     Refine designs

Designs will initially be refined based on computer simulations and/or calculations. Once installed in test homes, the systems will be modified as necessary to achieve target ventilation rates and other performance criteria such as reliability, pressure balancing, and cost. The refinement process will push the envelope of system designs in the search for optimal system performance.

### Task d.     Manual of best practices

The outcome of this task will be a document illustrating best practices for whole-house ventilation of manufactured homes.

## 3.2     DELIVERABLES

### 3.2.1   Technical Report of Findings

This report will discuss the design process utilized to develop the ventilation systems, the characteristics of the systems, and the homes in which they were installed. It will document the testing procedures and initial test results, as well as the redesign efforts and final testing results. It will include detailed drawings and specifications of the ventilation systems, as well as schematic drawings of the test homes and test set-ups.

### 3.2.2   Publish Guidelines for Whole House Ventilation in Manufactured Homes

A best practice manual for whole house ventilation will be created for the industry. This manual will address comprehensive system design and optimization of system operation, including

- Design and specifications for one to three ventilation system types suitable for manufactured homes that will meet the performance targets established by HUD and NFPA.

- Estimate of the initial and operating costs of these systems

- The optimum operating profile on a daily and seasonal basis for these systems on a climate-specific basis.

- How the operating profile should be modified by climate.

- How shell and duct leakiness and building design affect the optimum operating profile.

Consumer education is also a key component in the proper operation of whole house ventilation systems. Currently, there is confusion and a lack of understanding of the purpose and need for whole

house ventilation systems. Educational materials targeted at the purchasers of manufactured homes will be created to address this need.

### 3.2.3    Make Substantial Recommendations For Changes in the HUD-Code

A technical report documenting the research and testing results will be written. The report will substantiate any proposed recommendations for modifying or fine-tuning the HUD-code. These recommendations may be climate-specific.

# APPENDICES

# *A*

# CHARACTERIZATION OF EXISTING VENTILATION SYSTEMS

The whole house ventilation systems commonly in use today can be grouped together into two basic categories, with some options within each category. Both are active (mechanical) ventilation systems.

## A.1    FRESH AIR INLET TO THE RETURN AIR COMPARTMENT OF THE FURNACE

With this system, fresh air is ducted from the outside directly into the return air compartment of the furnace. There are a few variations of this strategy:

- ✓  The inlet duct either has a gravity-damper or no damper. This system is the most common.

- ✓  The inlet duct has a motorized damper, which opens on call from the thermostat.

- ✓  A timer can be added to this system to prevent long periods of inadequate ventilation during the "shoulder" months (spring and autumn) when the air handler operates infrequently.

- ✓  A roof-mounted fan pressurizes the attic, which is exhausted through gable vents. A portion of the fresh air is directed into the furnace cabinet, where it is conditioned before being distributed to the home.

This type of system is a simple method of introducing fresh air into the home, however it does have drawbacks. Air is drawn into the fresh air duct only when there is a call for heating and cooling and the main furnace blower is activated (systems with timers are an exception). This results in inconsistent ventilation operation, particularly during the swing seasons when the air handler, and therefore the ventilation system, is not operating for long periods of time. Operational frequency will also vary greatly by climate with the operation of the heating and cooling system.

When operating, outside air enters the air handler without regard to the temperature or humidity of the incoming air. This can increase the load on the air conditioner beyond its dehumidification capacity. Gas furnaces may be able to overcome the additional heating load, but total electric systems may have difficulty, which can result in high utility bills and comfort problems. The HUD-mandated ventilation rate of 0.035 cfm/sf floor area may be more than the air conditioning system and/or furnace can satisfactorily condition in some circumstances. Although reports of this phenomenon are anecdotal and not necessarily widespread, this factor should be considered when designing whole house ventilation systems. Field technicians have been known to recommend that homeowners seal off the fresh air duct or detach it from the furnace to solve the comfort problem and reduce utility bills. This solution, however, compromises fresh air ventilation.

## A.2    DEDICATED EXHAUST FAN

A dedicated exhaust ventilation fan connected to a fresh air duct to the outside is installed in a central area in the home – usually a central hallway.  This fan is typically manually operated, although it is possible to connect it to a timer, humidistat, or the central heating and cooling system operation.

The advantage of this system is that a timer or humidistat control can be calibrated to provide ventilation at regular intervals or when humidity, one of the most important indoor "pollutants", is high.  A dedicated exhaust fan is typically much smaller and uses considerably less energy than a furnace blower.  It also provides maximum occupant control.

Occupant control can be a disadvantage if the occupants choose not to use it, as humans are poor judges of ventilation needs.  As with the fresh-air to furnace system, temperature and humidity of incoming air is not controlled and can add to the latent or sensible load of the home.  In this case the potential for moisture and comfort problems is even greater since the air is not pre-conditioned by the HVAC system before entering the home.  The source for the make up air is not provided as part of this ventilation system, and so the exhaust fan has the potential to contribute to negative pressures within the home, which is theorized to contribute to moisture problems in hot, humid climates in particular[5].

Dedicated exhaust ventilation fans are similar to dedicated spot ventilation fans for kitchens and baths, as mentioned in Section 2.2.1.  In some cases, a system may be designed as a dual-function spot and whole house dedicated exhaust fan.

---

[5] Minimizing Moisture Problems in Homes Located in Hot, Humid Climates: Interim Report, Manufactured Housing Research Alliance 2002

# *B*

# SUMMARY OF LITERATURE

Most of the literature reviewed for this report was based on research conducted on HUD-code homes (25 of 35 applicable articles). Natural air infiltration varies greatly on a daily and seasonal basis, as well as by local climate factors including wind and temperature, which also influence the frequency of window opening by occupants. A regular air change rate of 0.25 ACH due to natural infiltration can not be depended upon on a regular basis (3, 17, 26). Although some older manufactured homes showed leakage levels that would exceed the rate required by code, achieving acceptable natural infiltration at least some of the time (10), it is theorized that newer homes built to higher energy conservation standards do not. One researcher concludes that natural infiltration is an important component of a good whole house ventilation system, but provides an unknown level of ventilation (33). This same researcher claims that infiltration is highest during times of the year when window opening is least desirable (33), i.e. cold and windy weather. A number of researchers make the point that occupant-controlled mechanical and passive ventilation systems can not be counted on as their pattern of use is unknown, variable and inconsistent (3, 17, 26). The two most advantageous mechanical ventilation systems for HUD-code homes from a cost and operational standpoint are fresh-air-duct-to-furnace and whole-house-exhaust-fan (22). At least two studies conclude that the location of the whole house exhaust fan does not significantly affect ventilation performance in HUD-code homes (17,26), however, studies of site-built homes show that fresh air distribution is not adequate for closed rooms without fresh air distribution ducts located within them (27, 30). Two field studies claim that many whole house ventilation systems on the market do not perform up to their rated cfm specification level (14, 23).

1.  **Pacific Northwest National Laboratories, June 1991. "Air Exchange Rates in New Energy-Efficient Manufactured Housing." Pacific Northwest National Laboratories, Richland, WA, at *http://mfdhousing.com/pnnl/ots.html.***

This study describes the performance of the whole house ventilation system and presents results of the air leakage and air exchange measurements of 139 newly constructed, energy efficient manufactured homes built under Bonneville's RCDP and 35 current practice manufactured homes. Standard door fan pressurization was used to estimate shell leakiness and a passive perfluorocarbon tracer was used to estimate air exchange rates.

2.  **Alternative Energy Corporation, 1996. "Air of Importance: A Study of Air Distribution Systems in Manufactured Homes." Alternative Energy Corporation, Raleigh, NC.**

ADS degrade energy performance dramatically through air leakage and conduction, mainly as a result of poor installation and set-up.

3.  **Burch, D.M., May 1993. "Indoor Ventilation Requirements for Manufactured Housing." NISTIR 4574, Building and Fire Research Laboratory, National Institute of Standards and Technology, Gaithersburg, MD.**

Mathematical analysis of HUD code homes indicates that natural infiltration is not sufficient to meet the 0.35 ACH guideline/requirement. Recommendation is that 55 cfm mechanical equipment be

required since occupant-operated fans and windows can not be counted on in cold or hot periods to supply the remaining ventilation. Three independent field tests also found natural air infiltration rates in the 0.25-0.28 ACH range.

4.   **Burch D. M., and A. TenWolde, 1993."A Computer Analysis of Moisture Accumulation In The Walls Of Manufactured Housing." ASHRAE Trans. 1993, vol.99, Part 2, Paper number DE-93-16-1, 977-990.**

Abstract: A detailed computer analysis was conducted to investigate the effectiveness of three alternative practices for controlling moisture accumulation in the walls of manufactured housing during the winter. The three practices included (1) providing an interior vapor retarder, (2) using permeable sheathing and siding, and (3) providing an outdoor ventilated cavity. The current HUD Manufactured Home Construction and Safety Standards do not require a vapor retarder for practices 2 and 3. The analysis was carried out for cold winter climate (Madison, WI), an intermediate winter climate (Boston, MA), a mild winter climate (Atlanta, GA), and a Pacific Northwest climate (Portland, OR). The practice of providing a vapor retarder was found to be effective in all four climates. The moisture content of the siding was always considerably below fiber saturation. On the other hand, the practice of using permeable sheathing and siding and the practice of providing an outdoor ventilated cavity were not always effective in colder climates. Moisture accumulated above fiber saturation, and free liquid water existed within the pore structure, providing a potential for material degradation. A detailed computer analysis was also conducted of moisture accumulation in manufactured housing walls in a hot and humid climate (Lake Charles, LA). During the summer, moisture from the outdoor environment is transferred into manufactured housing by diffusion and, more important, infiltration. As a result, moisture accumulates at interior layers of the construction cooled by air conditioning. When an interior vapor retarder is used in the construction, the relative humidity at the outside surface of the vapor retarder can approach saturation, thereby providing an environment conducive to mould and mildew growth.

5.   **Burch, D.M., and A. TenWolde, 1993. "Ventilation, Moisture Control, and Indoor Air Quality in Manufactured Houses: A Review of Proposed Changes in the HUD Standards and a Proposal for Revised Standards." Forest Products Laboratory, Madison, WI, and National Institute of Standards and Technology, Gaithersburg, MD.**

FPL/NIST proposed revisions of 3280.103:

B1) To accomplish 0.35 ach, home should be equipped with one of the following ventilation systems with a minimum continuous capacity of 0.035 cfm/sf floor area.

i.   Fresh air inlet from exterior to furnace with exhaust vents to prevent positive indoor air pressure during winter.

ii.  Mechanical ventilation system designed for continuous operation

iii. Passive system other than operable windows

iv.  Combination of passive and mechanical system

v.   Operable windows except in region 4 and Alaska

Ventilation system shall not create adverse positive indoor pressure in regions 3 & 4 or negative in southern cooling climates.

Kitchens shall have mechanical system capable of 100 cfm, bathrooms 50 cfm.

6.   **Conlin, F., E. Levy, and B. Warren, 1997. "Measured Air Flow Capacity Through Engineered Orifices." The Levy Partnership, New York, NY.**

Many kitchen and bath vents can fulfill the requirement for sidewall vents in manufactured homes.

7.  **Davis, B., 1997. "Response to 'Ventilation Facts and Fallacies in Manufactured Homes'." Home Energy Magazine, Nov./Dec., at** *http://hem.dis.anl.gov/eehem/97/971102.html#97110207.*

Furnace-based ventilation systems, because they operate only intermittently and use a large fan to circulate air in most homes, result in very little long-term pollutant dilution or removal in a manufactured home. Continuously operating moderate-volume exhaust fans designed to run for long periods with quiet operation do a much better job of pollution dilution and removal.

8.  **Devine J., R. Kunkle, and M. Lubliner, 1999. "Occupant interaction with Washington State Ventilation and Indoor Air Quality Code Mandated Whole House Ventilation Systems: Telephone Survey Results - Washington State University Energy Program." ASHRAE Transactions, Vol.105, Part 2, Paper number SE-99-11-04, 877-880.**

Abstract: The Washington State Ventilation and Indoor Air Quality Code (VIAQ) has required the installation of whole house ventilation systems in all new homes since July 1991. A variety of systems are allowed by the VIAQ. In May 1998, a survey was conducted to explore occupant interaction with the code mandated systems. The survey is part of a research project designed to explore the effectiveness of the VIAQ. Examines the data collected from a survey of 235 Washington State residents living in homes effected by the ventilation requirements. During a 10 minute telephone interview, respondents were asked about repair records, alterations, inconveniences, and benefits of their whole house ventilation systems. The study reveals that people are concerned about indoor air quality, and believe fresh air is important for health. However, they do not operate their ventilation systems near as much as recommended (3.4 hours on average compared to 8 hours per day recommended) and when they adjust their systems, they adjust them to provide even less fresh air. Over 99% of the people surveyed believed the air in their homes was good or average. People who have problems with the systems, such as noise, draughts and/or energy waste, use their systems less than other people. While people who have code mandated ventilation systems are typically not aware of all the systems components, 64% of those with ventilation systems say they would install the same systems again.

9.  **Dorer, V., and D. Breer, 1998. "Residential Mechanical Ventilation Systems: Performance Criteria and Evaluations."** *Energy and Buildings*, **Vol. 27, No. 3, June. pp. 247-255.**

Abstract: The performance of mechanical ventilation systems has been checked in several innovative residential houses as part of either a Swiss research or a P&D (pilot and demonstration) project. This paper gives a list of performance criteria for the ongoing comparison and evaluation of these mechanical ventilation systems. For some criteria, target values are proposed. In the second part, this paper briefly describes four residential buildings with mechanical ventilation systems where such evaluations were performed, and highlights interesting design features and results from the measurements. It then focuses on discrepancies between the design goals and what has been encountered in reality during the evaluation campaign. Problem items were, among others, commissioning, occupant acceptance and window opening behavior as well as sealing of ducts and heat exchangers.

10.  **Ek, C.W., S.A. Onisko, and G.O. Gregg, 1989. "Air Leakage Tests of Manufactured Housing in the Northwest USA." Symposium on Air Change Rate and Air Tightness in Buildings, ASTM, Atlanta, GA April 16-17.**

93 double-wide manufactured homes from 19 manufacturers were tested via blower door tests. The average leakage rates were found to be 8.40 Pa, correlating to 0.50 ACH predicted in normal atmospheric pressure. Specific areas of leakage in the envelope were determined with smoke stick tests.

*Whole House Ventilation Strategies*

11. **Pacific Northwest National Laboratories, Nov. 1996. "Energy and Indoor Air Quality Measurements from Five Energy Conserving Manufactured Homes." Pacific Northwest National Laboratories, Richland, WA, at** *http://mfdhousing.com/pnnl/ots.html.*

This study attempted to determine whether manufactured homes built to the Model Conservation Standards performed according to the energy requirements of the standards. Air exchange rates in these homes and indoor air pollutants levels were measured. All analyses were made under unoccupied conditions to establish a baseline independent of occupant characteristics and behavior.

12. **Feustel H. E., M.P. Modera, et al, 1986. "Ventilation Strategies for Different Climates." Proceedings IAQ 86, Managing Indoor Air for Health and Energy Conservation USA, American Society of Heating, Refrigerating and Air Conditioning Engineers, Atlanta, Georgia, April 20-23, 342-363.**

Abstract: Until recently, residential ventilation in the United States has been provided by infiltration. In this report we compare natural ventilation (ventilation by infiltration) with several mechanical ventilation strategies and examine the overall energy consumption associated with strategies in different climatic regions in the US. The strategies examined are; natural ventilation, balanced ventilation with an air-to-air heat exchanger, exhaust ventilation without heat recovery and exhaust ventilation with heat recovery via heat pump. Two strategies for utilizing the heat pump output for domestic hot water are examined. One heat pump strategy employs exhaust fan reversal to provide space cooling whenever possible during the summer months. A modified TRNSYS residential load model incorporating the LBL infiltration model, an algorithm to calculate effective ventilation and a modified TRNSYS domestic hot water model are used to simulate the energy consumption associated with each strategy. The domestic hot water model is used to determine the useful heat supplied by an exhaust ventilation heat pump as a function of daily hot water demand. The simulations indicate that the choice of ventilation strategy can have a significant impact on energy consumption. They show that total end-use energy consumption can be reduced to as much by mechanical ventilation as by super insulation of a house. The comparisons also show that for the same effective ventilation rate, houses with mechanical ventilation systems (especially those with exhaust fans) have better indoor air quality than those that rely on natural ventilation.

13. **Goldschmidt, V.W., and D.R. Wilhelm, 1981. "Relation of Infiltration to Weather Parameters for a Mobile Home." ASHRAE Transactions, V. 87, Pt. 2.**

Natural infiltration rates were measured in two mobile homes in Indiana for 16 months. The researchers developed a correlation for the rate of infiltration as a function of inside-outside temperature difference and wind speed. Results indicated a rate of 0.25 ACH for a temperature difference of 30 degrees F and a wind speed of 7 mph.

14. **Hadley, D.L., and S.A. Bailey, 1990. "Infiltration/Ventilation Measurements in Manufactured Houses - Residential Construction Demonstration Program." Pacific Northwest Laboratory, Richland, WA, PNL-7494.**

139 MCS (energy-efficient) homes and 35 current practice homes were tested. The exhaust system did not perform up to its 50 cfm rating (performance was approx. 30 cfm). The MCS homes were much tighter as tested with blower door test. In a 2-6 week "as lived in" PF tracer gas test, air infiltration rates were similar, indicating additional ventilation in the MCS house, although it is hypothesized that this was primarily due to passive ventilation since the exhaust systems were insufficient. Mean infiltration rate for the 35 homes measured with tracer gas during heating season was 0.28 ach.

15. **Jewell, R.L., August, 1981. "Reduction of Manufactured Housing Formaldehyde Levels by Ammonia Fumigation." Chemistry Department, Weyerhauser Company, Federal Way, WA.**

Measurements of 18 manufactured homes with tracer gas ranged from 0.1 to 0.5 ACH with mean of 0.27 ach.

16. **Lee, A.D., Z.T. Taylor, G.B. Parker, G.L. Wilfert, J.W. Callaway, and S.A. Onisko, November 1986. "Energy and Indoor Air Quality, Measurements from 5 Energy Conserving Manufactured Homes." Pacific Northwest National Laboratories, Richland, WA.**

Tests were performed on 5 unoccupied Model Conservation Standards (energy-efficient) HUD-code homes. Conclusions: (1) manufactured homes can be built with low air change rates (although leakage increases 20-100% with transport). Rates were 0.1 ACH or less without air-to-air heat exchangers operating. (2) Tight construction does not necessarily lead to high levels of formaldehyde or radon – both fell well below HUD targets. (3) Air-to-air heat exchangers are helpful in increasing air exchange rates, but do not perform up to designed air exchange rate calculations. In 4 homes, the air-to-air heat exchangers achieved the 0.6 ACH target.

17. **Lubliner, M., and A. Gordon, September 2000. "Ventilation in U.S. Manufactured Homes: Requirements, Issues and Recommendations." Presented at 21st Annual AIVC Conference, The Hague, Netherlands.**

Using a single value for weather-driven infiltration is problematic. For example, according to a computer model, the air change rate is below 0.25 ACH for about 33% the year in Albany and Seattle and 70% of the year in Miami (the percentages would be lower if duct-leakage were eliminated). Effectiveness of mechanical strategies is dependent on their operating schedule. Whole-house exhaust fan location was unimportant. MHCSS recommendations included.

18. **Lubliner, M., and D. Stevens, 1997. "Ventilation Facts and Fallacies in Manufactured Homes." Home Energy Magazine, July/August, at *http://hem.dis.anl.gov/eehem/97/970704.html#97070401.***

A continuous-exhaust ventilation system with inlet vents in the window frames is more cost-effective than a furnace-based system. It offers homeowners efficient mechanical ventilation systems, maintains comfort, and reduces operating costs. These systems can thus allow manufactured homes to be made tighter without creating indoor air quality problems.

19. **Lubliner M., D.T. Stevens, and B. Davis, 1997. "Mechanical Ventilation in HUD-code Manufactured Housing in the Pacific Northwest." ASHRAE Transactions 1997, Vol.103, Part 1, paper number PH-97-8-2, 693-705.**

Abstract: Electric utilities in the Pacific Northwest have spent more than 100 million dollars to support energy-efficiency improvements in the Housing and Urban Development (HUD) code manufactured housing industry over the past several years. More than 65,000 manufactured housing units have been built since 1991 that exceed the new HUD standards for both thermal performance and mechanical ventilation that became effective in October 1994. All of these units included mechanical ventilation systems that were designed to meet or exceed the requirements of ASHRAE Standard 62-1989. Addresses the ventilation solutions that were developed and compares the comfort and energy considerations of the various strategies that have evolved in the Pacific Northwest and nationally. The use and location of a variety of outside air inlets will be addressed, as will the acceptance by the occupants of the ventilation strategy.

20. **Ecotope, Inc., May 1992. "Measured Infiltration and Ventilation in Manufactured Homes." Item #33 at *http://mfdhousing.com/pnnl/ots.html.***

This report summarizes the results of infiltration measurements made on two groups of manufactured homes in Bonneville's service area: 131 energy efficient homes constructed under RCDP and a control group of 29 homes not participating in energy efficiency programs. Two basic techniques

were used to estimate infiltration: the perfluorocarbon tracer method and the blower door depressurization tests combined with an infiltration model developed at Lawrence Berkeley Laboratory.

21. **Meier, A., 1994. "Infiltration: Just ACH50 Divided by 20?" Home Energy Magazine Online, January/February.**

Discussion of how to convert one-time blower-door air leakage measurements to approximate average infiltration rates. Discusses the genesis of two methods, including the LBL infiltration method.

22. **Miller, J.D., and C.C. Conner, 1993. "HUD Ventilation Standard for Manufactured. Homes: System Prototype Descriptions and Cost Information." Pacific Northwest National Laboratories, Richland, WA.**

Descriptions of five prototype ventilation systems that could meet the new HUD requirements. System 1 (fresh air duct to furnace) and system 2 (house exhaust fan) offered the lowest cost and most advantages. Cost for these systems range from $200-$300 per home for materials and labor installation (1993 dollars).

23. **Palmiter, L., T. Bond, I. Brown, and D. Baylon, April 28, 1992. "Measured Infiltration and Ventilation in Manufactured Homes; Cycle II." Ecotope, Inc., Seattle, WA.**

Ventilation and infiltration measurements of 160 homes (131 of which were built to energy-efficient Super Good Cents (SGC) standards). The standard of deviation of infiltration and tightness parameters was too high (30% of the mean) for efficient operation of the mechanical ventilation equipment. Ventilation in most SGC homes failed to meet the 0.35 ACH standard. Even with fans operating 24hr/day, 0.35 ACH would not be achieved in many conditions. Most fans did not provide ventilation at the rated capacity due to system design and installation flaws. From an engineering standpoint, the optimum home is nearly airtight and has a mechanical ventilation system. If a significant component of ventilation is natural infiltration, problems with control and predictability result in either energy waste or inadequate ventilation.

24. **Parks, B., 1999. "Manufactured Housing Fresh Air Ventilation System Field Test." Prepared for the Administrator of Manufactured. Homes, Office of the State Fire Marshall, Department of Public Safety and Corrections, by Parks Air & Heating, West Monroe, LA.**

Field test to determine if FAVS contribute to MH moisture problems. Conclusions: (1) FAVS are ok in the north where small amounts of moisture are needed, but not in south because it adds moisture (2) central A/C unit should be toward center of home to minimize humidity problems.

25. **Persily, A.K., May 1998. "A Modeling Study of Ventilation, IAQ and Energy Impacts of Residential Mechanical Ventilation." NISTIR 6162, Building and Fire Research Laboratory, National Institute of Standards and Technology, Gaithersburg, MD.**

Multi-zone simulations of IAQ, ventilation, and energy impacts of site-built house in Washington State. One year simulations for 4 different ventilation approaches.

26. **Persily, A.K., and S.R. Martin, 2000. "A Modeling Study of Ventilation in Manufactured Houses / Ventilation Strategies for U.S. Manufactured Homes." NISTIR 6455, Building and Fire Research Laboratory, National Institute of Standards and Technology, Gaithersburg, MD.**

Computer modeling of double-wide manufactured homes predicted infiltration rates lower than the assumed 0.25 ACH for many hours of the year. The supplemental ventilation systems examined meet

*Whole House Ventilation Strategies*

or exceed the required 0.35 ach, but are dependant on operation schedule. Impact of whole-house exhaust fan is independent of whether located in main living area or bath off main living area. For the case of a whole-house exhaust fan, passive inlet vents are not required with the assumed levels of leakage. HUD standards changes are suggested.

27. **Rudd, A.F., 1998. "Measured Air Change Rates and Distribution of Ventilation Air In A Single Family Home." Building Science Corporation, Westford, MA, at** *www.buildingscience.com.*

A 1-story, 1350 sf house in Las Vegas was outfitted with two independent ventilation systems. The relative difference in air change rate and distribution of ventilation air induced by their operation was evaluated. (1) Intermittently operated central-fan-integrated supply ventilation system, wherein, 47 ft3/min of outside air was ducted into the return air side of the central heating and cooling system blower. Tracer gas test results showed excellent uniformity of ventilation air distribution, while the installed outside air duct was undersized. (2) Continuously operated separate supply ventilation system, not connected to the central air ducts, wherein, a separate fan drew 54 ft3/min of outside air and 112 ft3/min of re-circulated inside air from the master bedroom and delivered the resulting 166 ft3/min of mixed air to the main living area. Results showed poor ventilation air distribution for closed bedrooms where there was no ventilation system ducting, while the air change rate for the main living area, and to a lesser extent the master bedroom, was adequate.

28. **Rudd, A.F., 2000. "Practical Approaches to Residential Ventilation for Improved Durability and Indoor Air Quality." Durability and Disaster Mitigation in Wood-Frame Housing Conference, November 8, Madison, Wisconsin.**

29. **Rudd, A.F., 1999 "Discussion of Ventilation System Energy Performance and Cost." Building Science Corp., Westford, MA, at** *www.buildingscience.com.*

An hourly simulation study using DOE2.1E was conducted to determine the annual difference in energy consumption between various ventilation options in different climates. Comparison of central fan vs. multi-port system with ducts installed either inside or outside the conditioned space. Compares energy use and operating cost.

30. **Rudd A. F., and J.W. Lstiburek, 2000. "Measurement of Ventilation and Inter-Zonal Distribution in Single Family Homes." ASHRAE Transactions, Vol.106, Part 2, paper number MN-00-10-3, 709-718, at** *www.buildingscience.com.*

Abstract: Ventilation air change rate, local mean age-of-air, and interzonal ventilation air distribution were measured for two single-family homes and eight ventilation systems. A multizone, single-gas, tracer gas decay measurement technique was used. A single-story, slab-on-grade, 1350ft2 house was tested in Las Vegas, Nevada, and a two-story, 3192ft2 house with basement was tested in Minneapolis, Minnesota. The ventilation systems studied included various configurations of exhaust, supply, and balanced ventilation, with and without whole-house recirculation by the central heating and cooling air-handler unit fan. Some of the systems were independent of the central air distribution system, while others were integrated with it. In general, results showed that all ventilation systems benefited from periodic operation of the central fan, giving excellent uniformity of ventilation air distribution. Systems without central fan recirculation showed poor ventilation air distribution for closed rooms where there was no ventilation system duct.

31. **Sherman, M.H., 1999. "ASHRAE's Residential Ventilation Standard: Exegesis of Proposed Standard 62.2." Lawrence Berkeley National Laboratory, University of California, Berkeley, CA.**

Summary of the draft standard. Addresses questions and concerns that those affected by the proposed ASHRAE Standard 62.2 might have.

32. **Sherman M.H., 2001. "Comments Welcome on Standard 62.2P." ASHRAE IAQ Applications, vol.2, no.4, 10-11.**

Abstract: Reports on discussions within the ASHRAE Standards Project Committee on two issues: 1) unvented combustion appliances and 2) whether windows alone could provide whole house ventilation especially in cold climates. Compromise decisions were arrived at. The status of the various addenda to ASHRAE Standard 62-1999 is given.

33. **Sherman, M., and N. Matson, 1996. "Residential Ventilation and Energy Characteristics." Lawrence Berkeley National Laboratory, University of California, Berkeley, CA.**

The U.S. housing stock currently has a negligible number of houses using whole-house ventilation systems. Infiltration is the dominant ventilation system. Infiltration is often viewed as a poor ventilation mechanism because the flow paths are diffuse and unknown while the driving mechanism is both unstable and variable over the year. While these qualities do little for those who strive for certainty, they do have some advantages. Averaged over any time longer than a day, infiltration provides a floor on the ventilation rate even when no ventilation systems operate. Infiltration rates are the highest during the times of the year when window opening is least desirable. Although infiltration may have relatively low ventilation efficiency, it is at times the optimal system or, more often, a component of an optimal system.

34. **Strunk, P.R., T.F. Brennan, W.R. Smith, and L.F. Kinney, 1999. "Residential Air Infiltration and Ventilation Demonstration." New York State Energy Research and Development Authority, Albany, NY, Report 99-5.**

This report discusses results from eight homes in upstate New York in which continuous mechanical ventilation systems were installed. Measurements of air exchange, airflows, pressure differences, sound levels, and electrical power consumption were obtained to assess the system's performance. In addition, design and installation practices, as well as installation costs were evaluated.

Air exchange measurements under a variety of conditions indicated that natural air exchange s less than or very near 0.35 ACH much of the time in all eight homes. Four different types of ventilation systems were designed, installed, and tested in two homes each. Installation costs ranged from $1,426 to $3,398. Installed airflows at ducts and grilles were found to be within 10% of design airflows for the most part; tracer gas measurements of natural air exchange and exchange during ventilation showed average increases of 0.23 ACH and 0.41 ACH for the whole house and master bedroom, respectively. The systems were found to perform well in most respects, although several recommendations for improved performance are offered as a result of the work. Finally, the cost of ventilation in terms of extra space-conditioning energy and in electricity was evaluated at each house and found to be minimal for most of the systems.

35. **Teitsma, G.J., and B.A. Peavy, 1978. "The Thermal Performance of a 2-Bedroom Mobile Home." NBS Building Science Series 102, National Institute of Standards and Technology, Gaithersburg, MD.**

Air infiltration was measured for a mobile home in a test chamber. The researchers determined a correlation that resulted in a natural infiltration rate of 0.25 ACH for a temperature difference of 30 degrees F and a wind speed of 7 mph.

36. **TenWolde, A., March, 1994. "Ventilation, Humidity and Condensation in Manufactured Houses During Winter." ASHRAE Transactions, Vol.100, Part 1, paper number 3746, 103-115.**

Abstract: Many manufactured homes have lower natural ventilation rates than those in site-built houses. This, combined with high occupancy levels, may lead to moisture problems, which can cause

structural damage and health problems. The objectives of this study were to (1) obtain information on the moisture behavior of manufactured houses and moisture release from occupants and other sources and (2) evaluate the effect of mechanical ventilation. The ventilation and indoor humidity was measured in six manufactured houses during winter. The measurements indicate that ventilation in manufactured homes is often less than recommended. Using a mathematical model, the average moisture release and moisture storage rates were determined and the effect of mechanical ventilation with controls on humidity and comfort, condensation, and energy consumption during winter was analyzed. Results show that the average moisture release is similar to documented rates and that manufactured houses appears to store less moisture than site-built houses. However, moisture storage in manufactured houses is enough to reduce the potential for condensation during winter. To prevent significant condensation, natural ventilation is usually sufficient and mechanical ventilation is needed only in case of high occupancy and moisture loads or in an airtight house with negligible natural ventilation. ASHRAE's minimum ventilation requirements usually exceed the level needed to prevent condensation, and in cold winter climates, these minimum ventilation levels without humidification will cause the indoor air to be uncomfortably dry. To improve ventilation, manufactured houses should be supplied with balanced mechanical ventilation with an automatic control and manual override. In the absence of a better inexpensive alternative, a humidistat control may be used during winter to prevent condensation without excessive heat or comfort loss. However, a humidistat control does not ensure that ASHRAE minimum ventilation levels will be achieved.

37.    **Tuluca, A. N., M.H. Sherman, and M. Krati, 1990. "Reduction of the Effective Leakage Areas of Single-Section HUD-Code Manufactured Homes Due to Air Infiltration Barriers." ASHRAE Transactions, Vol. 96, Part 1, 39-45.**

Abstract: This paper addresses the effective leakage area (ELA) reduction in single-section HUD-code manufactured homes due to the application of an air-infiltration barrier (AIB). The data used for the analysis were generated over a period of three seasons, through hourly measurements of air infiltration, temperature, and wind speed, at a site with two HUD-code homes, one sheathed with an AIB and the other one caulked (Wilhelm 1979). The effective leakage areas are calculated using a model (Sherman and Grimsrud 1980) that correlates the air infiltration rate in residences to (1) weather variables, (2) the effective leakage area of the house, and (3) coefficients that are determined by construction and terrain characteristics. Two sets of ELA calculations are performed for both AIB and caulked homes. In the first one, the model has the site-built housing coefficients presented in the ASHRAE Handbook of Fundamentals (ASHRAE 1989). In the second one, the construction coefficients in the model are modified to account for the particular construction characteristics of single-section HUD-code manufactured homes. The magnitude of the ELAs is discussed and recommendations are made for the value of the ELA reduction attributable to an AIB.

38.    **Wray, C. P., N. E. Matson, and M.H. Sherman, 2000. "Selecting Whole-House Ventilation Strategies to Meet Proposed Standard 62.2: Energy Cost Considerations." ASHRAE Transactions, Vol.106, Part 2, paper number MN-00-10-1, 681-691.**

Abstract: ASHRAE Standard 62.2P is being proposed to address residential ventilation issues. As housing, especially new housing, gets more airtight and better insulated, it has become clear that many homes are under-ventilated. The standard contains requirements that provide minimum ventilation rates and source control measures necessary for acceptable indoor air quality. Previously reported analytical techniques are used to compare the energy costs of various ventilation strategies for a wide variety of climates and housing types. Concludes that for new construction, mechanical ventilation is needed. In new houses with gas heating, the cheapest whole-house system is a central exhaust fan. The marginal energy costs to provide such ventilation are on the order of 50 cents per day. However, other systems can be more appropriate when depressurization, filtration, moisture, and more expensive heating fuels are considered. For most of the existing housing stock, concludes that infiltration provides adequate ventilation.

39.  **Zieman, M.L., and J. D. Waldman, 1984. "Moisture Problems in Mobile Homes."
     RADCO, Inc., Gardena, CA.**

59 existing manufactured homes with moisture problems were surveyed in 5 regions.  Condensation
problems are believed to be caused by low indoor ventilation rates.  Authors recommend 0.5 ACH to
maintain indoor relative humidity low enough to prevent mold and condensation.  Other studies have
shown air change rates due to natural infiltration of 0.09 to 0.3 ACH with a mean of 0.16 ACH
(Moduline International tests of 9 homes) and 0.1 to 0.5 ACH with a mean of 0.27 ACH (1981 study
by Jewell).

**building science.com**

© 2006 Building Science Press                    All rights of reproduction in any form reserved.

## Building Science Digest 106

### Understanding Vapor Barriers

2006-10-24 by Joseph Lstiburek

Abstract:

*The function of a vapor barrier is to retard the migration of water vapor. Where it is located in an assembly and its permeability is a function of climate, the characteristics of the materials that comprise the assembly and the interior conditions. Vapor barriers are not typically intended to retard the migration of air. That is the function of air barriers.*

Confusion on the issue of vapor barriers and air barriers is common. The confusion arises because air often holds a great deal of moisture in the vapor form. When this air moves from location to location due to an air pressure difference, the vapor moves with it. This is a type of migration of water vapor. In the strictest sense air barriers are also vapor barriers when they control the transport of moisture-laden air.

An excellent discussion about the differences between vapor barriers and air barriers can be found in Quirrouette (1985).

Vapor barriers are also a cold climate artifact that have diffused into other climates more from ignorance than need. The history of cold climate vapor barriers itself is a story based more on personalities than physics. Rose (1997) regales readers of this history. It is frightening indeed that construction practices can be so dramatically influenced by so little research and reassuring indeed that the inherent robustness of most building assemblies has been able to tolerate such foolishness.

### So What is The Problem?

Incorrect use of vapor barriers is leading to an increase in moisture related problems. Vapor barriers were originally intended to prevent assemblies from getting wet. However, they often prevent assemblies from drying. Vapor barriers installed on the interior of assemblies prevent assemblies from drying inward. This can be a problem in any air-conditioned enclosure. This can be a problem in any below grade space.



PLAINTIFF'S EXHIBIT

11

This can be a problem when there is also a vapor barrier on the exterior. This can be a problem where brick is installed over building paper and vapor permeable sheathing.

### What Do We Really Want to Do?

Two seemingly simple requirements for building enclosures bedevil engineers and architects almost endlessly:

- keep water out

- let water out if it gets in

Water can come in several phases: liquid, solid, vapor and adsorbed. The liquid phase as rain and ground water has driven everyone crazy for hundreds of years but can be readily understood - drain everything and remember the humble flashing. The solid phase also drives everyone crazy when we have to shovel it or melt it, but at least most professionals understand the related building problems (ice damming, frost heave, freeze-thaw damage). But the vapor phase is in a class of craziness all by itself. We will conveniently ignore the adsorbed phase and leave it for someone else to deal with. Note that adsorbed water is different than absorbed water (see Kumaran, Mitalas & Bomberg, 1994).

The fundamental principle of control of water in the liquid form is to drain it out if it gets in – and let us make it perfectly clear – it will get in if you build where it rains or if you put your building in the ground where there is water in the ground. This is easy to understand, logical, with a long historical basis.

The fundamental principle of control of water in the solid form is to not let it get solid and if it does – give it space or if it is solid not let it get liquid and if it does drain it away before it can get solid again. This is a little more difficult to understand, but logical and based on solid research. Examples of this principle include the use of air entrained concrete to control freeze-thaw damage and the use of attic venting to provide cold roof decks to control ice damming.

The fundamental principle of control of water in the vapor form is to keep it out and to let it out if it gets in. Simple right? No chance. It gets complicated because sometimes the best strategies to keep water vapor out also trap water vapor in. This can be a real problem if the assemblies start out wet because of rain or the use of wet materials.

It gets even more complicated because of climate. In general water vapor moves from the warm side of building assemblies to the cold side of building assemblies. This is simple to understand, except we have trouble deciding what side of a wall is the cold or warm side. Logically, this means we need different strategies for different climates. We also have to take into account differences between summer and winter.

Finally, complications arise when materials can store water. This can be both good and bad. A cladding system such as a brick veneer can act as a reservoir after a

rainstorm and significantly complicate wall design. Alternatively, wood framing or masonry can act as a hygric buffer absorbing water lessening moisture shocks.

What is required is to define vapor control measures on a more regional climatic basis and to define the vapor control measures more precisely.

Part of the problem is that we struggle with names and terms. We have vapor retarders, we have vapor barriers, we have vapor permeable we have vapor impermeable, etc. What do these terms mean? It depends on whom you ask and whether they are selling something or arguing with a building official. In an attempt to clear up some of the confusion the following definitions are proposed:

> Vapor Retarder*:    The element that is designed and installed in an assembly to retard the movement of water by vapor diffusion.

> \* taken somewhat from ASHRAE Fundamentals 2001, Chapter 23.

The unit of measurement typically used in characterizing the water vapor permeance of materials is the "perm". It is further proposed here that there should be several classes of vapor retarders (this is nothing new – it is an extension and modification of the Canadian General Standards Board approach that specifies Type I and Type II vapor retarders – the numbers here are a little different however):

> Class I  Vapor Retarder:    0.1 perm or less
>
> Class II  Vapor Retarder:    1.0 perm or less and greater than 0.1 perm
>
> Class III  Vapor Retarder:    10 perm or less and greater than 1.0 perm

> Test Procedure for vapor retarders:    ASTM E-96 Test Method A (the desiccant method or dry cup method)

Finally, a vapor barrier is defined as:

> Vapor Barrier:    A Class I vapor retarder.

The current International Building Code (and its derivative codes) defines a vapor retarder as 1.0 perm or less (using the same test procedure). In other words the current code definition of a vapor retarder is equivalent to the definition of a Class II Vapor Retarder proposed by the author.

Continuing in the spirit of finally defining terms that are tossed around in the enclosure business. It is also proposed that materials be separated into four general classes based on their permeance (again nothing new, this is an extension of the discussion in ASHRAE Journal, February 02 – Moisture Control for Buildings):

| | |
|---|---|
| Vapor impermeable: | 0.1 perm or less |
| Vapor semi-impermeable: | 1.0 perm or less and greater than 0.1 perm |
| Vapor semi-permeable: | 10 perms or less and greater than 1.0 perm |
| Vapor permeable: | greater than 10 perms |

## Recommendations for Building Enclosures

The following building assembly recommendations are climatically based (see SIDE BAR 1) and are sensitive to cladding type (brick or stone veneer, stucco) and structure (concrete block, steel or wood frame, precast concrete).

The recommendations apply to residential, business, assembly, and educational and mercantile occupancies. The recommendations do not apply to special use enclosures such as spas, pool buildings, museums, hospitals, data processing centers or other engineered enclosures such as factory, storage or utility enclosures.

The recommendations are based on the following principles:

- Avoidance of using vapor barriers where vapor retarders will provide satisfactory performance. Avoidance of using vapor retarders where vapor permeable materials will provide satisfactory performance. Thereby encouraging drying mechanisms over wetting prevention mechanisms.

- Avoidance of the installation of vapor barriers on both sides of assemblies — i.e. "double vapor barriers" in order to facilitate assembly drying in at least one direction.

- Avoidance of the installation of vapor barriers such as polyethylene vapor barriers, foil faced batt insulation and reflective radiant barrier foil insulation on the interior of air-conditioned assemblies — a practice that has been linked with moldy buildings (Lstiburek, 2002).

- Avoidance of the installation of vinyl wall coverings on the inside of air-conditioned assemblies — a practice that has been linked with moldy buildings (Lstiburek, 1993).

- Enclosures are ventilated meeting ASHRAE Standard 62.2 or 62.1.

Each of the recommended building assemblies were evaluated using dynamic hygrothermal modeling. The moisture content of building materials that comprise the building assemblies all remained below the equilibrium moisture content the materials as specified in ASHRAE 160 P under this evaluation approach. Interior air conditions and exterior air conditions as specified by ASHRAE 160 P were used. WUFI was used as the modeling program (Kunzel, 1999).

More significantly, each of the recommended building assemblies have been found by the author to provide satisfactory performance under the limitations noted. Satisfactory performance is defined as no moisture problems reported or observed over at least a 10 year period.



**Vapor Profile**

**Figure 1: Concrete Block With Exterior Insulation and Brick or Stone Veneer**

Applicability – all hygro-thermal regions

This is arguably the most durable wall assembly available to architects and engineers. It is constructed from non-water sensitive materials and due to the block construction has a large moisture storage (or hygric buffer) capacity. It can be constructed virtually anywhere. In cold climates condensation is limited on the interior side of the vapor barrier as a result of installing all of the thermal insulation on the exterior side of the vapor barrier (which is also the drainage plane and air barrier in this assembly). In hot climates any moisture that condenses on the exterior side of the vapor barrier will be drained to the exterior since the vapor barrier is also a drainage plane. This wall assembly will dry from the vapor barrier inwards and will dry from the vapor barrier outwards.



Brick veneer/stone veneer

Drained cavity

Membrane or trowel-on or spray applied vapor barrier (Class I vapor retarder), air barrier and drainage plane (impermeable)

Concrete block

Insulated steel or wood stud cavity

Cavity insulation (unfaced fiberglass batts, spray-applied cellulose or spray-applied low density foam)

Gypsum board

Latex paint or vapor semi-permeable textured wall finish

Vapor Profile

Figure 2: Concrete Block With Interior Frame Wall Cavity Insulation and Brick or Stone Veneer

Applicability – Limited to mixed-humid, hot-humid, mixed-dry, hot-dry and marine regions – should not be used in cold, very cold, and subarctic/arctic regions

This wall assembly has all of the thermal insulation installed to the interior of the vapor barrier and therefore should not be used in cold regions or colder. It is also a durable assembly due to the block construction and the associated moisture storage (hygric buffer) capacity. The wall assembly does contain water sensitive cavity insulation (except where spray foam is used) and it is important that this assembly can dry inwards – therefore vapor semi impermeable interior finishes such as vinyl wall coverings should be avoided. In this wall assembly the vapor barrier is also the drainage plane and air barrier.



Figure 3: Concrete Block With Interior Rigid Insulation and Stucco

Applicability – all hygro-thermal regions*

This assembly has all of the thermal insulation installed on the interior of the concrete block construction but differs from Figure 2 since it does not have a vapor barrier on the exterior. The assembly also does not have a vapor barrier on the interior of the assembly. It has a large moisture storage (hygric buffer) capacity due to the block construction. The rigid insulation installed on the interior should be non-moisture sensitive and allow the wall to dry inwards – hence the recommended use of vapor semi permeable foam sheathing. Note that the foam sheathing is not faced with aluminum foil or polypropylene skins. It is important that this assembly can dry inwards except in very cold and subarctic/arctic regions – therefore vapor semi impermeable interior finishes such as vinyl wall coverings should be avoided in assemblies – except in very cold and subarctic/arctic regions. Vapor impermeable foam sheathings should be used in place of the vapor semi permeable foam sheathings in very cold and subarctic/arctic regions. The drainage plane in this assembly is the latex painted stucco rendering. A Class III vapor retarder is located on both the interior and exterior of the assembly (the latex paint on the stucco and on the interior gypsum board.

* In very cold and subarctic/arctic regions vapor impermeable foam sheathings are recommended



**Vapor Profile**

Figure 4: Concrete Block With Interior Rigid Insulation/Frame Wall With Cavity Insulation and Stucco

Applicability – all hygro-thermal regions*

This assembly is a variation of Figure 3. It also has all of the thermal insulation installed on the interior of the concrete block construction but differs from Figure 3 due to the addition of a frame wall to the interior of the rigid insulation. This assembly also does not have a vapor barrier on the exterior. The assembly also does not have a vapor barrier on the interior of the assembly. It has a large moisture storage (hygric buffer) capacity due to the block construction. The rigid insulation installed on the interior should be non-moisture sensitive and allow the wall to dry inwards – hence the recommended use of vapor semi permeable foam sheathing. Note that the foam sheathing is not faced with aluminum foil or polypropylene skins. It is important that this assembly can dry inwards even in very cold and sub arctic/arctic regions – therefore vapor semi impermeable interior finishes such as vinyl wall coverings should be avoided in assemblies. Vapor impermeable foam sheathings should be used in place of the vapor semi permeable foam sheathings in very cold and sub arctic/arctic regions. The drainage plane in this assembly is the latex painted stucco rendering. A Class III vapor retarder is located on both the interior and exterior of the assembly (the latex paint on the stucco and on the interior gypsum board).

* In very cold and sub arctic/arctic regions vapor impermeable foam sheathings are recommended – additionally the thickness of the foam sheathing should be determined by hygro-thermal analysis so that the interior surface of the foam sheathing remains above the dew point temperature of the interior air (see Side Bar 2)

Understanding Vapor Barriers                                                9



**Figure 5: Frame Wall With Exterior Insulation and Brick or Stone Veneer**

Applicability – all hygro-thermal regions

This wall is a variation of Figure 1 – but without the moisture storage (or hygric buffer) capacity. This wall is also a durable wall assembly. It is constructed from non-water sensitive materials and has a high drying potential inwards due to the frame wall cavity not being insulated. It can also be constructed virtually anywhere. In cold climates condensation is limited on the interior side of the vapor barrier as a result of installing all of the thermal insulation on the exterior side of the vapor barrier (which is also the drainage plane and air barrier in this assembly). In hot climates any moisture that condenses on the exterior side of the vapor barrier will be drained to the exterior since the vapor barrier is also a drainage plane. This wall assembly will dry from the vapor barrier inwards and will dry from the vapor barrier outwards.



Brick veneer/stone veneer

Ventilated and drained cavity

Drainage plane (vapor permeable building paper, house wrap)

Non paper-faced exterior gypsum sheathing, plywood or oriented strand board (OSB)

Insulated steel or wood stud cavity

Cavity insulation (unfaced fiberglass batts, spray-applied cellulose or spray-applied low density foam)

Gypsum board

Latex paint or vapor semi-permeable textured wall fiinish

**Vapor Profile**

Figure 6: Frame Wall With Cavity Insulation and Brick or Stone Veneer

Applicability – Limited to mixed-humid, hot-humid, mixed-dry, hot-dry and marine regions – can be used with hygro-thermal analysis in some areas in cold regions (Zone 5, but not Zone 6 see Side Bar 2)- should not be used in very cold and subarctic/arctic regions

This wall is a flow through assembly – it can dry to both the exterior and the interior.  It has a Class III vapor retarder on the interior of the assembly (the latex paint on the gypsum board).  It is critical in this wall assembly that the exterior brick veneer (a "reservoir" cladding) be uncoupled from the wall assembly with a ventilated and drained cavity.  The cavity behind the brick veneer should be at least 2 inches wide (source: Brick Institute of America) and free from mortar droppings.  It must also have air inlets ("weep holes") at its base and air outlets ("weep holes") at its top in order to provide back ventilation of the brick veneer.  The drainage plane in this assembly is the building paper or building wrap.  The air barrier can be any of the following: the interior gypsum board, the exterior gypsum wallboard or the exterior building wrap.



Brick veneer/stone veneer

Ventilated and drained cavity

Drainage plane (glass fiber-faced exterior gypsum sheathing with mesh tape and mastic at joints — vapor permeable)

Insulated steel or wood stud cavity

Cavity insulation (unfaced fiberglass batts, spray-applied cellulose or spray-applied low density foam)

Gypsum board

Latex paint or vapor semi-permeable textured wall finish

**Vapor Profile**

Figure 7: Frame Wall With Cavity Insulation and Brick or Stone Veneer

Applicability – Limited to mixed-humid, hot-humid, mixed-dry, hot-dry and marine regions – can be used with hygro-thermal analysis in some areas in cold regions (Zone 5, but not Zone 6 see side bar 3)- should not be used in very cold and subarctic/arctic regions

This wall is a variation of Figure 6.  The exterior gypsum sheathing becomes the drainage plane.  As in Figure 6 this wall is a flow through assembly – it can dry to both the exterior and the interior.  It has a Class III vapor retarder on the interior of the assembly (the latex paint on the gypsum board).  It is also critical in this wall assembly that the exterior brick veneer (a "reservoir" cladding) be uncoupled from the wall assembly with a ventilated and drained cavity. The cavity behind the brick veneer should be at least 2 inches wide (source: Brick Institute of America) and free from mortar droppings.  It must also have air inlets ("weep holes") at its base and air outlets ("weep holes") at its top in order to provide back ventilation of the brick veneer.  The air barrier in this assembly can be either the interior gypsum board or the exterior gypsum sheathing.



Brick veneer/stone veneer

Drained cavity

Exterior rigid insulation — extruded polystyrene, expanded polystyrene, isocyanurate, rock wool, fiberglass

Membrane or trowel-on or spray applied vapor barrier (Class 1 vapor retarder), air barrier and drainage plane (impermeable)

Non paper-faced exterior gypsum sheathing, plywood or oriented strand board (OSB)

Insulated steel or wood stud cavity

Cavity insulation (unfaced fiberglass batts, spray-applied cellulose or spray-applied low density foam)

Gypsum board

Latex paint or vapor semi-permeable textured wall fiinish

**Vapor Profile**

Figure 8:  Frame Wall With Exterior Rigid Insulation With Cavity Insulation and Brick or Stone Veneer

Applicability – all hygro-thermal regions except subarctic/arctic – in cold and very cold regions the thickness of the foam sheathing should be determined by hygro-thermal analysis so that the interior surface of the foam sheathing remains above the dew point temperature of the interior air (see Side Bar 2)

This wall is a variation of Figure 5.  In cold climates condensation is limited on the interior side of the vapor barrier as a result of installing some of the thermal insulation on the exterior side of the vapor barrier (which is also the drainage plane and air barrier in this assembly).  In hot climates any moisture that condenses on the exterior side of the vapor barrier will be drained to the exterior since the vapor barrier is also a drainage plane.  This wall assembly will dry from the vapor barrier inwards and will dry from the vapor barrier outwards.  Since this wall assembly has a vapor barrier that is also a drainage plane it is not necessary to back vent the brick veneer reservoir cladding as in Figure 6 and Figure 7.  Moisture driven inwards out of the brick veneer will condense on the vapor barrier/drainage plane and be drained outwards.

. . . .

Understanding Vapor Barriers    13



Brick veneer/stone veneer

Ventilated and drained cavity

Drainage plane (vapor permeable building paper, house wrap)

Non paper-faced exterior gypsum sheathing, plywood or oriented strand board (OSB)

Insulated steel or wood stud cavity

Cavity insulation (fiberglass batts, spray-applied cellulose or spray-applied low density foam)

Kraft facing on a fiberglass batt or a "smart vapor barrier membrane"

Gypsum board

Latex paint or vapor semi-permeable textured wall finish

Vapor Profile

Figure 9: Frame Wall With Cavity Insulation and Brick or Stone Veneer With Interior Vapor Retarder

Applicability – Limited to cold and very cold regions

This wall is a variation of Figure 6 except it has a Class II vapor retarder on the interior limiting its inward drying potential – but not eliminating it. It still considered a flow through assembly – it can dry to both the exterior and the interior. It is critical in this wall assembly – as in Figure 6 and Figure 7 - that the exterior brick veneer (a "reservoir" cladding) be uncoupled from the wall assembly with a ventilated and drained cavity. The cavity behind the brick veneer should be at least 2 inches wide (source: Brick Institute of America) and free from mortar droppings. It must also have air inlets ("weep holes") at its base and air outlets ("weep holes") at its top in order to provide back ventilation of the brick veneer. The drainage plane in this assembly is the building paper or building wrap. The air barrier can be any of the following: the interior gypsum board, the exterior gypsum board or the exterior building wrap.



Brick veneer/stone veneer

Ventilated and drained cavity

Drainage plane (vapor permeable building paper, house wrap)

Non paper-faced exterior gypsum sheathing, plywood or oriented strand board (OSB)

Insulated steel or wood stud cavity

Cavity insulation (unfaced fiberglass batts, spray-applied cellulose or spray-applied low density foam)

Polyethylene vapor barrier (Class I vapor retarder)

Gypsum board

Latex paint or vapor semi-permeable textured wall finish

**Vapor Profile**

Figure 10: Frame Wall With Cavity Insulation and Brick or Stone Veneer With Interior Vapor Barrier

Applicability – Limited to very cold, subarctic and arctic regions

This wall is a further variation of Figure 6 but now it has a Class I vapor retarder on the interior (a "vapor barrier") completely eliminating any inward drying potential. It is considered the "classic" cold climate wall assembly. It is critical in this wall assembly – as in Figure 6, Figure 7 and Figure 9 - that the exterior brick veneer (a "reservoir" cladding) be uncoupled from the wall assembly with a ventilated and drained cavity. The cavity behind the brick veneer should be at least 2 inches wide (source: Brick Institute of America) and free from mortar droppings. It must also have air inlets at its base and air outlets at its top in order to provide back ventilation of the brick veneer. The drainage plane in this assembly is the building paper or building wrap. The air barrier can be any of the following: the interior polyethylene vapor barrier, the interior gypsum board, the exterior gypsum board or the exterior building wrap.



Latex paint

Stucco rendering

Building paper bond break

Drainage space between bond break and drainage plane

Building paper or house wrap drainage plane

Non paper-faced exterior gypsum sheathing, plywood or oriented strand board (OSB)

Insulated steel or wood stud cavity

Cavity insulation (unfaced fiberglass batts, spray-applied cellulose or spray-applied low density foam)

Gypsum board

Latex paint or vapor semi-permeable textured wall finish

Vapor Profile

Figure 11: Frame Wall With Cavity Insulation and Stucco

Applicability – Limited to mixed-humid, hot-humid, mixed-dry, and hot-dry regions should not be used in marine, cold, very cold, and subarctic/arctic regions

This wall is also a flow through assembly similar to Figure 6 – but without the brick veneer – it has a stucco cladding. It can dry to both the exterior and the interior. It has a Class III vapor retarder on the interior of the assembly (the latex paint on the gypsum board). It is critical in this wall assembly that a drainage space be provided between the stucco rendering and the drainage plane. This can be accomplished by installing a bond break (a layer of tar paper) between the drainage plane and the stucco. A spacer mat can also be used to increase drainability. Alternatively, a textured or profiled drainage plane (building wrap) can be used. The drainage plane in this assembly is the building paper or building wrap. The air barrier can be any of the following: the interior gypsum board, the exterior stucco rendering, the exterior sheathing or the exterior building wrap.



Latex paint

Stucco rendering

Building paper bond break

Drainage space between bond break and drainage plane

Building paper or house wrap drainage plane

Non paper-faced exterior gypsum sheathing, plywood or oriented strand board (OSB)

Insulated steel or wood stud cavity

Cavity insulation (fiberglass batts, spray-applied cellulose or spray-applied low density foam)

Kraft facing on a fiberglass batt or a "smart vapor barrier membrane"

Gypsum board

Latex paint or vapor semi-permeable textured wall finish

**Vapor Profile**

Figure 12: Frame Wall With Cavity Insulation and Stucco With Interior Vapor Retarder

Applicability – Limited to marine, cold and very cold regions

This wall is a variation of Figure 6 and Figure 11 except it has a Class II vapor retarder on the interior limiting its inward drying potential – but not eliminating it. It still considered a flow through assembly – it can dry to both the exterior and the interior. It is critical in this wall assembly – as in Figure 11 – that a drainage space be provided between the stucco rendering and the drainage plane. This can be accomplished by installing a bond break (a layer of tar paper) between the drainage plane and the stucco. A spacer mat can also be used to increase drainability. Alternatively, a textured or profiled drainage plane (building wrap) can be used. The drainage plane in this assembly is the building paper or building wrap. The air barrier can be any of the following: the interior gypsum board, the exterior stucco rendering, the exterior sheathing or the exterior building wrap.



Polymer-based (PB) stucco rendering

Exterior rigid insulation — extruded
polystyrene, expanded polystyrene,
isocyanurate, rock wool, fiberglass

Drainage space between exterior rigid
insulation and drainage plane

Building paper or house wrap drainage plane

Non paper-faced exterior gypsum
sheathing, plywood or oriented strand
board (OSB)

Insulated steel or wood stud cavity

Cavity insulation (unfaced fiberglass
batts, spray-applied cellulose or
spray-applied low density foam)

Gypsum board

Latex paint or vapor semi-
permeable textured wall finish

Vapor Profile

**Figure 13: Frame Wall With Exterior Rigid Insulation With Cavity Insulation and Stucco**

Applicability – all hygro-thermal regions except subarctic/arctic – in cold and very cold
regions the thickness of the foam sheathing should be determined by hygro-thermal
analysis so that the interior surface of the foam sheathing remains above the dew point
temperature of the interior air (see Side Bar 2)

This is a water managed exterior insulation finish system (EIFS). Unlike "face-sealed" EIFS
this wall has a drainage plane inboard of the exterior stucco skin that is drained to the
exterior. It is also a flow through assembly similar to Figure 6. It can dry to both the exterior
and the interior. It has a Class III vapor retarder on the interior of the assembly (the latex
paint on the gypsum board). It is critical in this wall assembly that a drainage space be
provided between the exterior rigid insulation and the drainage plane. This can be
accomplished by installing a spacer mat or by providing drainage channels in the back of
the rigid insulation. Alternatively, a textured or profiled drainage plane (building wrap) can
be used. The drainage plane in this assembly is the building paper or building wrap. The
air barrier can be any of the following: the interior gypsum board, the exterior stucco
rendering, the exterior sheathing or the exterior building wrap.



**Vapor Profile**

Figure 14: Precast Concrete With Interior Frame Wall Cavity Insulation

Applicability – Limited to mixed-humid, hot-humid, mixed-dry, hot-dry and marine regions – should not be used in cold, very cold, and subarctic/arctic regions

The vapor barrier in this assembly is the precast concrete itself. Therefore this wall assembly has all of the thermal insulation installed to the interior of the vapor barrier. Of particular concern is the fact that the thermal insulation is air permeable (except where spray foam is used). Therefore this wall assembly should not be used in cold regions or colder. It has a small moisture storage (hygric buffer) capacity due to the precast concrete construction. The wall assembly does contain water sensitive cavity insulation (except where spray foam is used) and it is important that this assembly can dry inwards – therefore vapor semi impermeable interior finishes such as vinyl wall coverings should be avoided. In this wall assembly the precast concrete is also the drainage plane and air barrier.



**Latex paint**

**Precast concrete**

**Rigid insulation (vapor semi-permeable) — unfaced extruded polystyrene, unfaced expanded polystyrene, fiber-faced isocyanurate**

**Metal channel or wood furring**

**Gypsum board**

**Latex paint or vapor semi-permeable textured wall fiinish**

**Vapor Profile**

Figure 15: Precast Concrete With Interior Rigid Insulation

Applicability – all hygro-thermal regions*

This assembly has all of the thermal insulation installed on the interior of the precast concrete. The assembly also does not have a vapor barrier on the interior of the assembly. It has a small moisture storage (hygric buffer) capacity due to the precast concrete construction. The rigid insulation installed on the interior should be non-moisture sensitive and allow the wall to dry inwards – hence the recommended use of vapor semi permeable foam sheathing. Note that the foam sheathing is not faced with aluminum foil or polypropylene skins. It is important that this assembly can dry inwards except in very cold and subarctic/arctic regions – therefore vapor semi impermeable interior finishes such as vinyl wall coverings should be avoided in assemblies – except in very cold and subarctic/arctic regions. Vapor impermeable foam sheathings should be used in place of the vapor semi permeable foam sheathings in very cold and subarctic/arctic regions. The drainage plane in this assembly is the latex painted precast concrete. A Class III vapor retarder is located on both the interior and exterior of the assembly (the latex paint on the stucco and on the interior gypsum board.

* In very cold and subarctic/arctic regions vapor impermeable foam sheathings are recommended



**Figure 16: Precast Concrete With Interior Spray Applied Foam Insulation**

Applicability – all hygro-thermal regions*

This assembly has all of the thermal insulation installed on the interior of the precast concrete. The assembly also does not have a vapor barrier on the interior of the assembly. It has a small moisture storage (hygric buffer) capacity due to the precast concrete construction. The spray foam insulation installed on the interior of the precast concrete is non-moisture sensitive and allows the wall to dry inwards. It is important that this assembly can dry inwards except in very cold and subarctic/arctic regions – therefore vapor semi impermeable interior finishes such as vinyl wall coverings should be avoided in assemblies – except in very cold and subarctic/arctic regions. High-density spray foam, due to its vapor semi impermeable characteristics should be used in place of low-density foam in very cold and subarctic/arctic regions. The drainage plane in this assembly is the latex painted precast concrete. A Class III vapor retarder is located on both the interior and exterior of the assembly (the latex paint on the stucco and on the interior gypsum board.

* In very cold and subarctic/arctic regions high-density spray foam (vapor semi impermeable) is recommended

## References

Kumaran, M.K., Mitalas, G.P., and Bomberg, M.T.; *Fundamentals of Transport and Storage of Moisture in Building Materials and Components*, Moisture Control in Buildings, ASTM Manual Series: MNL 18, ASTM Publication Code (PCN) 28-018094-10, Philadelphia, PA, 1994.

Kunzel, H.M.; *WUFI: PC Program for Calculating the Coupled Heat and Moisture Transfer in Building Components*, Fraunhofer Institute for Building Physics, Holzkirchen, Germany, 1999.

Lstiburek, J.W.; Humidity Control in the Humid South, *Workshop Proceedings – Bugs, Mold & Rot II*, BETEC, Washington, November 1993.

Lstiburek, J.W.; "Moisture Control For Buildings;" *ASHRAE Journal*, February 2002.

Lstiburek, J.W.; "Investigating Diagnosing Moisture Problems," *ASHRAE Journal*, December 2002.

Quirouette, R.L.; *The Difference Between a Vapor Barrier and an Air Barrier*, Building Practice Note 54, Division of Building Research, National Research Council of Canada, ISSN 0701-5216, Ottawa, Ontario, Canada, July 1985.

Rose, W.; *Moisture Control in the Modern Building Envelope: The History of the Vapor Barrier in the US – 1923 to 1952*, APT, Volume XXVIII, Number 4, 1997.

**Joseph Lstiburek**, Ph.D., P.Eng., is a principal of Building Science Corporation in Westford, Massachusetts. He has twenty-five years of experience in design, construction, investigation, and building science research. Joe is an ASHRAE Fellow and an internationally recognized authority on indoor air quality, moisture, and condensation in buildings. More information about Joseph Lstiburek can be found at www.buildingsciencecorp.com

## Limits of Liability and Disclaimer of Warranty:

Building Science Digests are information articles intended for professionals. The author and the publisher of this article have used their best efforts to provide accurate and authoritative information in regard to the subject matter covered. The author and publisher make no warranty of any kind, expressed or implied, with regard to the information contained in this article.

The information presented in this article must be used with care by professionals who understand the implications of what they are doing. If professional advice or other expert assistance is required, the services of a competent professional shall be sought. The author and publisher shall not be liable in the event of incidental or consequential damages in connection with, or arising from, the use of the information contained within this Building Science Digest.

## Side Bar 1

**Hygro-Thermal Regions**



### Subarctic and Arctic

A subarctic and arctic climate is defined as a region with approximately 12,600 heating degree days (65 degrees F basis) *[7,000 heating degree days (18 degrees C basis)]* or greater.

**Very Cold**

A very cold climate is defined as a region with approximately 9,000 heating degree days or greater (65 degrees F basis) [5,000 heating degree days (18 degrees C basis)] or greater and less than 12,600 heating degree days (65 degrees F basis) *[7,000 heating degree days (18 degrees C basis)]*.

**Cold**

A cold climate is defined as a region with approximately 5,400 heating degree days (65 degrees F basis) *[3,000 heating degree days (18 degrees C basis)]* or greater and less than approximately 9,000 heating degree days (65 degrees F basis) *[5,000 heating degree days (18 degrees C basis)]*

**Mixed-Humid**

A mixed-humid and warm-humid climate is defined as a region that receives more than 20 inches (50 cm) of annual precipitation with approximately 4,500 cooling degree days (50 degrees F basis) *[2,500 cooling degree days (10 degrees C basis)]* or greater and less than approximately 6,300 cooling degree days (50 degrees F basis) *[3,500 cooling degree days (10 degrees C basis)]* and less than approximately 5,400 heating degree days (65 degrees F basis) *[3,000 heating degree days (18 degrees C basis)]* and where the average monthly outdoor temperature drops below 45 degrees F (7 degrees C) during the winter months.

**Marine**

A marine climate meets is defined as a region where all of the following occur:

- a mean temperature of the coldest month between 27 degrees F *(-3 degrees C)* and 65 degrees F *(18 degrees C)*;

- a mean temperature of the warmest month below 72 degrees F *(18 degrees C)*;

- at least four months with mean temperatures over 50 degrees F *(10 degrees C)*; and

- a dry season in the summer, the month with the heaviest precipitation in the cold season has at least three times as much precipitation as the month with the least precipitation

**Hot-Humid**

A hot-humid climate is defined as a region that receives more than 20 inches *(50 cm)* of annual precipitation with approximately 6,300 cooling degree days (50 degrees F basis) *[3,500 cooling degree days (10 degrees C basis)]* or greater and where the monthly average outdoor temperature remains above 45 degrees F *(7 degrees C)* throughout the year.

This definition characterizes a region that is similar to the ASHRAE definition of hot-humid climates where one or both of the following occur:

- a 67 degree F *(19.5 degrees C)* or higher wet bulb temperature for 3,000 or more hours during the warmest six consecutive months of the year; or

- a 73 degree F *(23 degrees C)* or higher wet bulb temperature for 1,500 or more hours during the warmest six consecutive months of the year.

**Hot-Dry, Warm-Dry and Mixed-Dry**

A hot-dry climate is defined as region that receives less than 20 inches *(50 cm)* of annual precipitation with approximately 6,300 cooling degree days (50 degrees F basis) *[3,500 cooling degree days (10 degrees C basis)]* or greater and where the monthly average outdoor temperature remains above 45 degrees F *(7 degrees C)* throughout the year.

A warm-dry and mixed-dry climate is defined as a region that receives less than 20 inches *(50 cm)* of annual precipitation with approximately 4,500 cooling degree days (50 degrees F basis) *[2,500 cooling degree day (10 degrees C basis)]* or greater and less than approximately 6,300 cooling degree days (50 degrees F basis) *[3,500 cooling degree days (10 degrees C basis)]* and less than approximately 5,400 heating degree days (65 degrees F basis) *[3,000 heating degree days (18 degrees C basis)]* and where the average monthly outdoor temperature drops below 45 degrees F *(7 degrees C)* during the winter months.

## Side Bar 2

### Recommendations for Vapor Retarders

The recommendations are based on a combination of field experience and laboratory testing. The requirements were also evaluated using dynamic hygrothermal modeling. The modeling program used was WUFI (Kunzel, 1999). Under the modeling evaluation, the moisture content of building materials that comprise the building assemblies evaluated all remained below the equilibrium moisture content of the materials as specified in ASHRAE 160 P. Interior air conditions and exterior air conditions as specified by ASHRAE 160 P were used. Enclosures are ventilated meeting ASHRAE Standard 62.1 or 62.2.

The climate zones referenced are the U.S. Department of Energy climate zones as proposed for adoption in the 2006 International Residential Code (IRC) and International Energy Conservation Code (IECC). Their development is the subject of two ASHRAE papers (Briggs, Lucas & Taylor, 2003). An accompanying map defines the climate zones.



Note that vapor retarders are defined and classed using ASTM E-96 Test Method A (the desiccant method or dry cup method) or Test Method B (the wet cup method).

1.  Zone 1, Zone 2, Zone 3 and Zone 4 (except Zone 4 Marine) do not require any class of vapor retarder on the interior surface of insulation in insulated wall and floor assemblies.

2.  Zone 4 (marine) requires a Class II (or lower) vapor retarder on the interior surface of insulation in insulated wall and floor assemblies where the permeance of the exterior sheathing/cladding assembly is less than or equal to

1.0 perm and greater than 0.1 perm as tested by Test Method B (the "wet cup" method) of ASTM E-96).

3.  Zone 4 (marine) requires a Class III (or lower) vapor retarder on the interior surface of insulation in insulated wall and floor assemblies where the permeance of the exterior sheathing is 0.1 perm or less as tested by Test Method B (the "wet cup" method) of ASTM E-96) and the interior surface of the exterior sheathing shall be maintained above the dew point temperature of the interior air. Under this design approach assume steady state heat transfer, interior air at a temperature of 70 degrees F (21 degrees C), at a relative humidity specified in Table 1 and exterior air at a temperature that is equal to the average outdoor temperature for the location during the coldest three months of the year (e.g. December, January and February).

4.  Zone 5 requires a Class III (or lower) vapor retarder on the interior surface of insulation in insulated wall and floor assemblies where the permeance of the exterior sheathing is greater than 1.0 perm as tested by Test Method B (the "wet cup" method) of ASTM E-96).

5.  Zone 6 and Zone 7 require a Class II (or lower) vapor retarder on the interior surface of insulation in insulated wall and floor assemblies where the permeance of the exterior sheathing is greater than 1.0 perm as tested by Test Method B (the "wet cup" method) of ASTM E-96).

6.  Zone 5, Zone 6 and Zone 7 require a Class II (or lower) vapor retarder on the interior surface of insulation in insulated wall and floor assemblies where the permeance of the exterior sheathing/cladding assembly is less than or equal to 1.0 perm and greater than 0.1 perm as tested by Test Method B (the "wet cup" method) of ASTM E-96).

7.  Zone 5, Zone 6 and Zone 7 require a Class II (or lower) vapor retarder on the interior surface of insulation in insulated wall and floor assemblies where the permeance of the exterior sheathing is 0.1 perm or less as tested by Test Method B (the "wet cup" method) of ASTM E-96) and the interior surface of the exterior sheathing shall be maintained above the dew point temperature of the interior air. Under this design approach assume steady state heat transfer, interior air at a temperature of 70 degrees F (21 degrees C), at a relative humidity specified in Table 1 and exterior air at a temperature that is equal to the average outdoor temperature for the location during the coldest three months of the year (e.g. December, January and February).

TABLE 1:      DESIGN CONDITIONS FOR STEADY STATE DESIGN PROCEEDURE – WALL
              AND FLOOR ASSEMBLIES (not the actual service conditions for typical
              residential occupancy – but the design conditions for the simple steady state
              design procedure being used)

| Zone 4 (marine) | 40 percent RH @ 70 degrees F | (Dew Point 45 degrees F) |
| Zone 5 | 30 percent RH @ 70 degrees F | (Dew Point 37 degrees F) |
| Zone 6 | 25 percent RH @ 70 degrees F | (Dew Point 32 degrees F) |
| Zone 7 | 20 percent RH @ 70 degrees F | (Dew Point 28 degrees F) |

TABLE 2:      DESIGN CONDITIONS FOR STEADY STATE DESIGN PROCEEDURE – ROOF
              AND ATTIC ASSEMBLIES (not the actual service conditions for typical residential
              occupancy – but the design conditions for the simple steady state design
              procedure being used)

| Zone 5 | 35 percent RH @ 70 degrees F | (Dew Point 39 degrees F) |
| Zone 6 | 30 percent RH @ 70 degrees F | (Dew Point 37 degrees F) |
| Zone 7 | 25 percent RH @ 70 degrees F | (Dew Point 32 degrees F) |

8.   Zone 5 requires a Class III (or lower) vapor retarder on the interior surface of
     insulation in ventilated insulated roof or attic assemblies.

9.   Zone 5, Zone 6 and Zone 7 require a Class II (or lower) vapor retarder on the
     interior surface of insulation in unvented insulated roof or attic assemblies and
     the condensing surface shall be maintained above the dew point temperature
     of the interior air.  The condensing surface is defined as either the interior
     surface of the structural roof deck or the interior surface of an air-
     impermeable insulation applied in direct contact to the underside/interior of
     the structural roof deck.  "Air-impermeable" is quantitatively defined by
     ASTM E 283.  Under this design approach assume steady state heat transfer,
     interior air at a temperature of 70 degrees F *(21 degrees C)*, at a relative humidity
     specified in Table 2 and exterior air at a temperature that is equal to the
     average outdoor temperature for the location during the coldest three months
     of the year (e.g. December, January and February).

10.  Zone 6 and Zone 7 require a Class II (or lower) vapor retarder on the interior
     surface of insulation in ventilated insulated roof or attic assemblies.

11.  Concrete slab floors in ground contact are required to have a Class I vapor
     retarder below the slab in direct contact with the slab or rigid insulation
     having a thermal resistance of at least R-5 below the slab in direct contact with
     the slab.

TABLE 3:     SUMMARY OF RECOMMENDATIONS FOR VAPOR RETARDERS ON THE
             INTERIOR OF WALL ASSEMBLIES

| Zone | Wall Assembly Exterior Sheathing (Greater than 1.0 perm) | Wall Assembly Exterior Sheathing (Less than or equal to 1.0 perm, and greater than 0.1 perm) | Wall Assembly Assembly (Less than or equal to 0.1 perm) |
|---|---|---|---|
| 1 | not required | not required | not required |
| 2 | not required | not required | not required |
| 3 | not required | not required | not required |
| 4 (not marine) | Class III | Class III | Class III |
| 4 (marine) | Class III | Class II | Class III* |
| 5 | Class III | Class II | Class II* |
| 6 | Class II | Class II | Class II* |
| 7 | Class II | Class II | Class II* |

\*     Additionally, the interior surface of the exterior sheathing shall be
      maintained above the dew point temperature of the interior air (see
      Table 1).

## What This Means From A Practical Perspective

Polyethylene is a Class I vapor retarder. A kraft faced fiberglass batt is a Class II vapor
retarder. Latex painted gypsum board (one coat of latex paint) is a Class III vapor
retarder.

Plywood sheathing and oriented strand board (OSB) have perm values of greater than
1 perm when using the wet cup test. Similarly for exterior gypsum sheathing or
fiberboard sheathing.

Extruded polystyrene of 1 inch thick or thicker has a perm value of 1.0 perm or less.
Film faced extruded polystyrenes of 1/2 inch thickness that have perforated facings
have perm values of greater than 1 perm. Non-perforated foil and polypropylene
faced rigid insulations have perm values of less than 0.1 perms.

Three-coat hard-coat stucco installed over two layers of Type D asphalt saturated kraft
paper and OSB has a combined perm value of less than 1.0 under a wet cup test.
Therefore the sheathing/cladding assembly is less than or equal to 1.0 as tested by Test
Method B of ASTM E-96.

Foil-faced isocyanurate 1/2 thick (R 3.5) installed over a 2x4 frame wall meets
requirement #9 in Chicago. Therefore, a kraft-faced batt (Class II vapor retarder) is
required on the interior of this assembly.

Foil-faced isocyanurate 1 inch thick (R 6) installed over a 2x6 frame wall (R 19) meets requirement #9 in Minneapolis.  Therefore, a kraft-faced batt (Class II vapor retarder) is required on the interior of this assembly.

In Chicago where plywood or OSB exterior sheathing is used, an unfaced fiberglass batt can be installed within the wall cavity and gypsum board painted with latex paint (Class III vapor retarder) is required on the interior of this assembly.  If this assembly is moved to Minneapolis, a Class II vapor retarder is required on the interior (a kraft paper faced fiberglass batt).

**References**

Briggs, R.S., Lucas, R.G., and Taylor, T.;  "Climate Classification for Building Energy Codes and Standards:  Part 1 – Development Process," *Technical & Symposium Papers, ASHRAE Winter Meeting*, Chicago, IL, January, 2003.

Briggs, R.S., Lucas, R.G., and Taylor, T.;  "Climate Classification for Building Energy Codes and Standards:  Part 2 – Zone Definitions, Maps and Comparisons," *Technical & Symposium Papers, ASHRAE Winter Meeting*, Chicago, IL, January, 2003.

Kunzel, H.M.;  *WUFI: PC Program for Calculating the Coupled Heat and Moisture Transfer in Building Components*,  Fraunhofer Institute for Building Physics, Holzkirchen, Germany, 1999.

Glossary Entries

- vapor barrier

- water vapor

- air barrier

- air barrier system

- drying

- ice dam

- frost heave

- freeze-thaw damage

- vapor diffusion

- vapor retarder

- vapor impermeable

- vapor semi-permeable

- vapor semi-impermeable

- vapor permeable

- hygrothermal modeling

- hygric buffer

- Subartic Climate

- Arctic Climate

- Very Cold Climate

- Cold Climate

- Mixed-Humid Climate

- Marine Climate

- Hot-Humid Climate

- Hot-Dry Climate

- Warm-Dry Climate

- Mixed-Dry Climate

Keywords (on topic, minimum 7):

Vapor barriers, vapor retarders, vapour barriers, vapour retarders, air barriers, vapor diffusion

# MOISTURE PROBLEMS IN MANUFACTURED HOMES
## UNDERSTANDING THEIR CAUSES AND FINDING SOLUTIONS

Excellence in Design,
Manufacturing and Installation Series



**Moisture Problem Checklists**

**Moisture Problem Prevention**

**Moisture Problem Mitigation**

**Moisture Problem Basics**



PLAINTIFF'S
EXHIBIT

12

tabbies®

# MOISTURE PROBLEMS
# IN MANUFACTURED HOMES
## UNDERSTANDING THEIR CAUSES
## AND FINDING SOLUTIONS

Excellence in Design,

Manufacturing and Installation Series








# Acknowledgements

The Manufactured Housing Research Alliance wishes to acknowledge the assistance, advice, and guidance of a number of people without whose help the publication of this guide would not have been possible.

The dynamics of moisture flow in buildings is well understood yet the circumstances that will result in moisture-related problems are often difficult to predict, but when understood, possible to avoid. We use the term "moisture problems" to capture a whole array of different types of building failures that may have multiple sources, occur in different seasons of the year and geographical locations, and result from decisions made by manufacturers, installers, homeowners or some combination of the three. Weaving together a clear and concise resource guide on this complex topic was a task requiring many perspectives and a wide breadth of practical experience.

The effort was lead by a project Steering Committee consisting of the following members:

**Richard Christjansen,** *Johns Manville Corporation,* Project Chair
**Subrato Chandra,** *Florida Solar Energy Center*
**Bob Davis,** *Ecotope*
**Andre Desjarlais,** *Oak Ridge National Laboratory*
**Mark Ezzo,** *Oakwood Homes Corporation*
**William Farish,** *Fleetwood Enterprises, Inc.*
**William Freeborne,** *US Department of Housing and Urban Development*
**John Freeman,** *Friedrich Air Conditioning Company*
**William Harker,** *TACC International*
**George James,** *US Department of Energy*
**Frank Kern,** *Heatilator*
**Bert Kessler,** *Palm Harbor Homes*
**Rob Luter,** *Ventline, Inc.*
**Mike Lubliner,** *Washington State University Energy Program*
**Mike Kinard,** *Kinro, Inc.*
**Mike McKitrick,** *International Paper*
**Neil Moyer,** *Florida Solar Energy Center*
**Armin Rudd,** *Building Science Corporation*
**Dwight Schuler,** *Owens Corning*
**Richard Veenstra,** *Fleetwood Enterprises, Inc.*
**Andrea Vrankar,** *US Department of Housing and Urban Development*
**Frank Walter,** *Manufactured Housing Institute*
**Bill Warren,** *AirTech Solutions*
**James Welz,** *Philips Products*
**Paul Ziegler,** *National Council of States on Building Codes and Standards*
**Mike Zieman,** *RADCO*

Design, production, and editorial subcontractors:

**Hoi Ling Chu,** *H. L. Chu and Co.* (Graphic Design)
**Dorothy Foster,** *Pacific Consulting Services* (Editing)
**Robert La Pointe** (Illustrations)

MHRA staff responsible for coordinating and facilitating the development of the guide:

**Emanuel Levy,** Executive Director
**Francis Conlin,** Project Coordinator
**Sandra Ho,** Editorial Director

# Disclaimer

The Manufactured Housing Research Alliance, its members, consultants, contractors and representatives make no representations, warranty or guarantee, express or implied, as to the accuracy or appropriateness of any materials or information in this manual for use in a specific home, nor assume any liability for the use of the information, methods, or materials contained herein, or for damages arising from any such use.

ISSN 1529-3424

Copyright © 2000 Manufactured Housing Research Alliance

# CONTENTS

List of Illustrations    v

Chapter 1    Introduction    1.1
    1.2    The Manufacturer's Checklist
    1.3    The Installer's and HVAC Contractor's Checklist
    1.4    The Homeowner's Checklist

Chapter 2    Moisture Problem Prevention    2.1
    2.2    Avoiding Problems Through Design and Construction
    2.8    Avoiding Problems Through Setup
    2.11    Avoiding Problems Through Operation

Chapter 3    Moisture Problem Mitigation    3.1
    3.1    Floor System
    3.5    Wall and Window System
    3.12    Roof System
    3.15    Equipment Closet
    3.17    Crawlspace
    3.19    Air Distribution System
    3.21    Climate Control and Air Movement
    3.22    Mold, Mildew, and Microbes

Chapter 4    Moisture Problem Basics    4.1
    4.1    Moisture Sources
    4.3    Moisture Movement
    4.5    Moisture Accumulation
    4.6    Solving Moisture Problems

Appendix A    Glossary    A.1

Appendix B    Bibliography    B.1

# LIST OF ILLUSTRATIONS

Figure                                                                                                      Page

2.1   Moisture Problems by Region of Country ............................................... 2.1

2.2   Avoid Compressing Insulation ......................................................... 2.4

2.3   Make Airtight, Durable Duct Connections ............................................. 2.6

2.4   Seal All Penetrations Through the Floor .............................................. 2.7

2.5   Site Grading Practices to Avoid ...................................................... 2.9

3.1   Floor Perimeter Stain ................................................................ 3.2

3.2   Bump in the Floor .................................................................... 3.3

3.3   Bulge in the Belly ................................................................... 3.4

3.4   Interior Wall Filled With Outside Air ................................................ 3.6

3.5   Vapor Retarder on Wrong Side ......................................................... 3.7

3.6   Misplaced Window Flashing ............................................................ 3.8

3.7   Condensation Between Glass Panes ..................................................... 3.9

3.8   Water on Windows ..................................................................... 3.10

3.9   Frozen Walls ......................................................................... 3.11

3.10  Ice Dam .............................................................................. 3.13

3.11  Attic Condensation ................................................................... 3.14

3.12  Clogged Filter ....................................................................... 3.16

3.13  Crawlspace Moisture Control and Ventilation .......................................... 3.17

3.14  Raining in the Crawlspace ............................................................ 3.18

3.15  Flooded Ducts ........................................................................ 3.20

3.16  Water in Crossover Duct Insulation ................................................... 3.21

3.17  Closed-Off Room ...................................................................... 3.23

4.1   Moisture Balance ..................................................................... 4.1

4.2   Moisture Production From Indoor Activities ........................................... 4.2

4.3   Sources of Moisture .................................................................. 4.3

4.4   Moisture Movement .................................................................... 4.4

4.5   Moisture Accumulation ................................................................ 4.5

# INTRODUCTION

The demands of the housing marketplace today challenge the home building and manufacturing industry to offer more and more features and increasingly better quality. Each element added and each improvement made in home design, installation, and operation has an impact on overall home performance, including the moisture balance within the home and its building components. When new designs are introduced without consideration for the effect on moisture dynamics, conditions are prime for water to accumulate and cause damage.

This manual is designed to assist manufacturers, retailers, setup crews, and homeowners to recognize and solve moisture problems in manufactured homes. It reviews the symptoms of typical problems, outlines preventive measures, and provides solutions pertinent to home design, manufacture, installation, operation, and maintenance.

A home's ability to resist potential moisture problems is a result of many decisions made at different stages of the home's life. Chapter 2 describes actions that can be taken during home design and construction, installation, and operation to prevent moisture-related problems. To provide a real-world perspective, Chapter 3 includes examples of homes experiencing moisture-related damage. The examples document why moisture problems occur and how they can be avoided. They are organized by the predominant location of the symptoms: floors, walls, ceiling, heating and cooling systems, and the crawlspace (or whole house). It is intended that users of this manual will first identify where their symptom is located, and then use this manual to review similar problems at the same site. Chapter 4 reviews the basic building blocks of a moisture problem: moisture source, transport mechanism, and accumulation site characteristics. This manual does not attempt to include all of the many specific and detailed moisture problems that have faced the industry; rather it is intended to be a snapshot of the more common types of moisture problems existing in current manufactured housing. Many published texts describe in greater detail the physics of moisture dynamics in residential buildings. Readers interested in learning more about the subject are encouraged to explore the materials listed in the bibliography.

A manual specific to moisture problems in manufactured housing is necessary because of the differences between factory-built and site-built housing. Manufactured homes must comply with the provisions of the Manufactured Home Construction and Safety Standards[1] , a set of regulations administered by the US Department of Housing and Urban Development (HUD). The HUD standards represent a national building code for manufactured housing and sometimes specify construction details that are unique to manufactured housing.

Some of the design characteristics more commonly found in manufactured homes create the need for special approaches to moisture control:

- Homes are built in one or more sections in manufacturing plants using assembly line construction methods and materials not found in site-built homes.
- Home sections are built on steel frames with wheels and have an integrated floor system design that is enclosed with a plastic cover, called bottom board.
- Homes from the same manufacturing plant can be shipped to a number of destinations and experience a wide range of temperature and humidity conditions at their final locations.
- Home sections are designed to be installed quickly on site. Perimeter skirting and protection from ground moisture may or may not be added later.

These features have implications for the development of moisture problems and several are clearly associated with problems experienced by owners of manufactured housing. The relevant precautions can be as simple as ensuring adequate weather protection for a home during transport and setup. Over the past few decades, however, less obvious and more challenging moisture issues involving condensation and indoor air quality have surfaced in all types of homes. Many of these problems center on condensation-induced structural damage (such as buckled floors) or fungal growths (molds and mildew) found within framing cavities and on home surfaces, furnishings, and other homeowner belongings. This manual covers the range of potential moisture-related problems known to occur in manufactured homes to give readers a comprehensive guide to their prevention and remedy.

---

[1] Part 3280, Manufactured Home Construction and Safety Standards and Interpretative Bulletins to the Standards, US Department of Housing and Urban Development (April 1999)

# THE MANUFACTURER'S CHECKLIST

♦ **Minimize ceiling penetrations**

Unless tightly sealed, penetrations in the ceiling are natural pathways for moisture vapor migration, resulting in condensation and mold in the attic cavity. Warm air entering the attic can also melt snow on the outer surface of the roof and cause water leaks from ice damming.

♦ **In hot, humid climates, avoid placing a vapor retarder on the inside of the wall**

If the vapor retarder is on the cool side of the wall insulation, water vapor that migrates into the wall cavity can condense inside the wall and become trapped. The inside covering of an exterior wall in hot, humid climates should have enough permeability to allow trapped vapor to diffuse into the living area.[2]

♦ **Insulate the outside walls and ceiling without voids or compression**

Voids and compressed insulation, especially near the top plate and outside wall corners, result in cold spots that encourage condensation and mold growth.

♦ **Reduce opportunities for air leakage through the walls**

The uncontrolled movement of air though the walls leads to the reduction in thermal efficiency, cold spot on building surfaces, and water vapor migration into the home. Proper sealing of all penetrations and the application of an effective exterior air retarder are good strategies for reducing the entry of unconditioned outdoor air entering the home.

♦ **Recommend properly sized cooling equipment and climate appropriate ventilation**

Oversized cooling equipment (air conditioners and heat pumps) cycles on and off frequently, doing a poor job of removing moisture from the air. Excess ventilation in humid climates can overwhelm the dehumidification capacity of the air conditioning equipment.

♦ **Carefully plan the air supply and return registers**

Ensure adequate register size, avoid locating registers near sources of water, and don't place supply registers where they are likely to be covered by furniture or otherwise blocked. Provide for adequate return air transfers from bedrooms, especially master bedroom suites.

♦ **Seal ducts to make airtight, durable connections**

Leaky ducts can substantially increase the amount of outside air that enters a home, adding to the space conditioning load and increasing opportunities for moisture problems. Joints in the ducts and connections to the furnace should be sealed with mastic (preferable) or properly applied tape (less effective) to make durable and leak-proof seals.

♦ **Specify production details that minimize moisture damage**

Attention to detail is the most important measure that can be taken during home construction to avoid moisture problems. No matter how well engineered a design is for moisture control, it can be defeated by incorrect installation of materials.

♦ **Specify plant installation of items that minimize setup errors**

The marriage line gasket, utility connections, and other items can easily and more effectively be installed at the plant, where quality is easier to control.

---

[2] As this Guide goes to press, the HUD Manufactured Housing Construction and Safety Standards require that the vapor retarder be located on the interior side of the wall in all locations. However, HUD is considering issuing a waiver that would allow the vapor retarder to be located on the outside of the wall insulation for hot, humid climates.

1.2

# THE INSTALLER'S AND HVAC CONTRACTOR'S CHECKLIST

💧 **Make sure the site is properly graded to shed water**

Inspect the site before the home is delivered. Water draining under a home can destabilize the foundation as well as increase the chance of moisture migrating into the house.

💧 **Seal the marriage line completely**

A non-porous gasket should be placed along the inside edge of the insulation in a continuous "ring" to prevent air and water vapor from infiltrating into the home and wall cavities. Consider also installing an air retarder along the wall seams.

💧 **Install a ground cover**

Installation of a ground cover is one of the most overlooked and underestimated setup tasks. Water vapor from the ground is often the largest source of moisture load on a house.

💧 **Ensure that any tears or gaps in the bottom board material are durably sealed**

Water vapor from the ground will find its way into the floor cavity through tears in the bottom board, adding to the house moisture load and condensing on cold surfaces such as air conditioning ducts.

💧 **Leave no metal surfaces exposed when installing the crossover duct**

When the air conditioner is operating, metal duct exposed to the crawlspace will become cold and condense moisture from the air. Be sure ducts and metal boxes are off the ground, connected securely, sealed tight, and completely insulated.

💧 **Make sure the dryer exhaust duct is supported and installed correctly**

Like a drainpipe, the dryer exhaust duct needs to slope downhill and have proper support. Water can easily condense inside this duct, blocking airflow, tearing the duct, and allowing delivery of moist dryer exhaust under the home.

💧 **Properly size cooling equipment and, in humid climates, recommend equipment with higher latent removal capacity**

Cooling equipment should be sized to closely match the design load. If the equipment is already installed and has a large overcapacity for the load, set the blower as low as 350 cfm per ton of cooling capacity to increase dehumidification.

💧 **Make sure the air conditioner condensate line is properly trapped and terminates outside of the skirting**

An improperly trapped line will not function properly: air will be drawn in through the condensate line and prevent drainage; condensate water will overflow onto the floor, often resulting in damage under the air handler.

# THE HOMEOWNER'S CHECKLIST

**Eliminate moisture problems at the source**

Many moisture problems begin with excess amounts of water dumped into the air by common household activities, such as cooking and bathing. Ventilation fans should be turned on during such activities. They should be left on for a short time after the moisture producing activity ceases.

**When it comes to the size of your air conditioner or heat pump, bigger is not better**

Air conditioners and heat pumps should be sized to meet the cooling needs of your home. Equipment that is too large will turn on and off frequently, allowing humidity to build up indoors.

**Do not use unvented propane, kerosene, or other unvented combustion heaters**

About a gallon of water vapor is released into the air for every gallon of fuel consumed. This is a significant source of water vapor that can quickly cause damage. Some unvented heaters can also increase pollutant levels and contribute to health problems.

**Do not cover or close off the floor registers**

In many homes, air from the heater or air conditioner is distributed through registers in the floor. Covering these registers with furniture or rugs can imbalance the system and create cold spots on room surfaces, increasing the potential for moisture condensation.

**Check your cooling equipment filter monthly**

Clogged filters can interfere with an air conditioner's ability to remove moisture from the air, and in some cases interfere with condensate drainage. Dirty filters should be either cleaned or replaced. Consider using pleated filters for better dust control and better dehumidification.

**Keep the thermostat set above 75°F in hot, humid climates**

Keep the thermostat setting at or above 75°F in the summer. In high humidity climates, a lower setting could cause water to condense inside wall cavities.

**Recognize signs of moisture problems**

Big moisture problems start as small ones, and any moisture problem is more easily cured if discovered early on. The following are warning signs of possible moisture problems: persistent musty smells; discoloration on walls or ceilings; swelling of floor, wall, or ceiling finishes; condensation on window glass; or standing water under your home.

# MOISTURE PROBLEM PREVENTION

CHAPTER 2

Moisture, as liquid and vapor, is an integral part of daily life—we breath it, drink it, bathe in it, and use it for growing foods. We don't often think of it as a part of or a potential problem in housing.

Most homes do an excellent job of keeping moisture in check. As a result, moisture-related problems are relatively rare. There is new anecdotal evidence, however, that moisture-driven problems are occurring with greater frequency in new homes, particularly in the hot, humid areas of the nation.

However, moisture problems occur in all climates and different regions are prone to different types of problems. The climate region dictates the level of heating or cooling needed, and the degree of outdoor humidity. **Figure 2.1** shows average humidity levels across the United States. The areas with high outdoor humidity are known for summertime moisture condensation problems. The map also shows the cooler areas of the country most prone to wintertime moisture condensation problems.

**Figure 2.1    Moisture Problems by Region of Country**



▦ Very high risk for summer moisture problems

☐ Moderate to high risk for summer moisture problems

☐ Moderate to high risk for winter moisture problems

☐ Low risk for moisture problems

The problems common in homes in Northern regions are typically the result of cold temperatures from outdoors mixing with water vapor generated inside the home, causing condensation. In the South, the problem is reversed: the cold conditions are created by air conditioning, and the moisture source is typically humid outdoor air. Whenever humid outdoor air meets building materials cooled by air conditioning, condensation is possible. In both the Southeast and Northeast, outdoor humidity can be high long enough to significantly slow drying. In these climates, materials stay wetter longer and are more subject to rot and other types of decay. Local climates also can subject a home to water damage from driven rain, extreme humidity, and flooding.

Most building materials can tolerate occasional wetting—as long as they also have ample exposure to dryer air, which will act to dry them out. Sometimes, however, circumstances prevent drying and cause moisture to build up to amounts that can damage a home. When damage does occur, it can be difficult to diagnose and expensive to

repair. Extreme moisture problems can degrade material properties, such as strength and insulating capacity, support the growth of rot, mold, and rust, and increase the weight of building materials beyond the capacity of supporting structures. Although such moisture-related catastrophic damage in homes is rare, smaller problems such as mold growth or uncomfortable humidity are more common.

The best approach for avoiding moisture-related problems is to take steps to prevent excessive moisture buildup from occurring. There are multiple opportunities over the life of a home to take actions that minimize the potential for moisture accumulation. This chapter describes precautions that can be taken at the stages of home design and construction, home installation, and home operation.

# AVOIDING PROBLEMS
# THROUGH DESIGN AND CONSTRUCTION

The first place to take precautions against moisture problems is on the drawing board. Understanding the principles of moisture dynamics is essential to developing a building plan for a home free of moisture problems. A good design considers interior and exterior moisture sources, all possible moisture transport methods, and the various potential moisture accumulation sites. A comprehensive solution must also account for climate and other region-specific concerns. If all of these issues are factored into a design, the resulting home is much less likely to experience moisture problems and will dry out more readily if moisture accumulation does occur.

Taking extra measures in design can significantly minimize risk—at relatively little added cost. The basic measures involve limited use of ceiling penetrations, use of climate-appropriate vapor retarders and ventilation systems, careful installation of insulation, control of air leakage, appropriate planning of duct supplies and returns, correct sizing of air conditioning equipment, and provision of comprehensive setup materials and instructions.

Attention to detail during home construction is also important to avoid moisture problems. No matter how well engineered a design is for moisture control, it can be defeated by incorrect installation of materials. Production crews are easily tempted to make assumptions about the function of certain construction elements and to then take uninformed shortcuts in construction. Such shortcuts ignore the fact that, as part of a complex system, any specific construction element may serve functions other than those immediately obvious. Periodic employee training and reinforcement is essential to keep staff on target and informed about new materials and techniques. Although the in-house and third-party inspection system helps to detect construction faults that may lead to problems, inspectors too can overlook or be unaware of details important to moisture control.

🜄 **Minimize ceiling penetrations**
*Unless tightly sealed, penetrations in the ceiling are natural pathways for moisture vapor migration, resulting in condensation and mold in the attic cavity. Warm air entering the attic can also melt snow on the outer surface of a roof and cause water leaks from ice damming.*

Water vapor and heat moving up through the ceiling and accumulating in the attic space can result in moisture problems. Although the manufactured housing standards specify use of a ceiling vapor retarder in colder zones (HUD Thermal Zones 2 and 3), this moisture control strategy addresses only vapor that moves by diffusion. Holes in the ceiling provide a pathway for air to infiltrate into the attic from the living space. The forces that drive air into the attic include stack effect and pressure imbalances caused by ventilation equipment, leaky ducts, poorly balanced air distribution systems, and insufficient return air pathways.

Ceilings in manufactured housing are initially relatively airtight. In the plant, most ceilings begin as a monolithic construction without perforations. All of the ceiling panel intersections are sealed, which is all that is required to prevent air movement into the attic space. The attic space is also protected in some climates by vapor retarders on the ceiling that are often applied as paint; these have good reliability in minimizing vapor diffusion in winter-dominated climates. Ceiling sections that rely on faced attic insulation for a vapor retarder are less protected from diffused water vapor. In summer-dominated climates, a vapor barrier on the inside of a ceiling can increase the risk of

moisture accumulation in the ceiling material. Stain blocking paint is a vapor barrier, and covering stains with such paint can make the problem worse if it is caused by condensation within the building cavity.

The attic spaces in double-section manufactured homes are usually ventilated, increasing the potential for drying and reducing the risk of moisture damage in cold climates. However, attic ventilation may not be effective in drying out significant localized accumulations that can occur when moist air is transported through ceiling perforations. Single-section homes with metal roofs are not required to have ventilated attics; thus, careful sealing of all penetrations from the living space to the attic cavity is important in these homes.

The installation of lights, vents, complex ceiling designs and other items necessitates puncturing the ceiling many times. Care must be taken to seal ventilation fans, recessed canned lights, intercom speakers, ceiling duct diffusers, jumper ducts, and all electrical cables that run into the attic. Properly applied caulk, foam, or gasket seals are airtight and durable. Surface-mounted electrical boxes, when appropriate, are easier to seal than recessed boxes. Make sure recessed light fixtures are both suitable for "insulation contact" (IC-rated) and performance-tested to minimize air leakage into the attic space.

💧 **In hot, humid climates, avoid placing a vapor retarder on the inside of the wall insulation**
*If a vapor retarder is on the cool side of the wall insulation, water vapor that migrates into the wall cavity can condense inside the wall and become trapped. The inside covering of an exterior wall in hot, humid climates should have enough permeability to allow trapped vapor to diffuse into the living area.*

Use of interior vapor retarders is problematic in hot, humid climates. Experts in building moisture control advise against exterior walls with a vapor retarder on the inside in hot, humid regions, particularly when combined with a permeable surface on the outside. Vinyl-covered wall board has a particularly low permeability rating on its interior surface and has been implicated in a number of recent significant wall failures in the hot, humid Gulf Coast states. Use of vinyl wall board particularly should be avoided for homes where outside air can easily penetrate beneath the exterior siding into the wall cavity. Although this is a relatively common practice, and is allowed under the manufactured housing building standards, the recent increase in reported failures of this wall system provides ample reason for reconsidering this approach.

Building systems tend to be forgiving of moisture accumulation and dry out if given the opportunity. Indeed, there are many homes in humid regions in which the vinyl-covered wall board has not failed. However, with vinyl, the wall is more likely to be near a critical threshold for failure and small changes in design, construction, operation, or the local climate can create moisture problems.

💧 **Insulate the outside walls and ceiling without voids or compression**
*Voids and compressed insulation, especially near the top plate and outside wall corners, result in cold spots that encourage condensation and mold growth.*

Insulating the cavity spaces within walls and ceilings is relatively easy. Insulating around all of the details and framing components is more challenging but just as important for moisture control. During the winter, these components conduct heat faster to the outdoors and become the site of cold spots that support growth of mold and mildew. Avoid excess wall framing material, which has less insulating value, particularly in corners, headers, and top and bottom plates. It is also important to allow the insulation to expand to its full thickness and avoid compressing the insulation with wires and other materials placed in the exterior walls. The ceiling near the soffit edge is at increased risk because space limits the amount of insulation that can be placed there. Insulation should be placed up against the edge baffles at the heel of the attic truss (used to keep an attic ventilation path open). Insulation should completely fill wall cavities, leaving no voids for convection.

In the floor, outrigger sections are often the site of insulation compression. Here it is important to install the insulation blanket in a way that relieves the otherwise compressed insulation. Additional batt insulation in outrigger cavities helps minimize the potential for cold spots and mold on the floor and carpet above.

**Figure 2.2    Avoid Compressing Insulation**



Compressed insulation and
voids create cold spots

Cut  insulation to accommodate
wires and junction box, and
completely fill the cavity

Compressing the insulation with wires and other material placed in the exterior walls will create
cold spots on the inside wall covering (left). Cut insulation to fit around junction boxes and to
completely fill the cavity (right).

### 💧 Reduce opportunities for air leakage through the walls
*The uncontrolled movement of air though the walls leads to a reduction in thermal efficiency, cold spots
on building surfaces, and water vapor migration into the home.  Proper sealing of all penetrations and the
application of an effective exterior air retarder are good strategies for reducing the entry of unconditioned
outdoor air into the home.*

Most exterior sidings allow for normal expansion and contraction from either moisture or heat.  Material movement
and the normal seams in the siding materials provide an entry point for air that can bring in both liquid water and
humidity-laden air that may condense in the wall cavities.  Small openings in the electrical outlets, switch plates,
floor-to-wall and wall-to-ceiling interfaces offer pathways for air and the moisture it holds to migrate through the
walls.  The use of caulk, tape, and air retarders will reduce this unwanted air leakage.

🔸 **Recommend properly sized cooling equipment and climate-appropriate ventilation**
*Oversized cooling equipment (air conditioners and heat pumps) cycles off frequently, doing a poor job of removing moisture from the air. Excess ventilation in humid climates can overwhelm the dehumidification capacity of the air conditioning equipment.*

Oversizing of air conditioners is a common practice that results in high indoor humidity. Dehumidification from air conditioning is a function of how long the equipment runs; and oversized equipment cools the air quickly but does not run long enough to provide significant indoor dehumidification. Homeowners often respond by lowering the thermostat set point, decreasing the temperature. The resulting high humidity can lead to mold, and colder temperatures increase the potential for damaging condensation.[3]

Ventilation is part of a good heating, ventilating, and air conditioning (HVAC) design. Ventilation in humid climates should be carefully planned so that it doesn't add significant moisture to a home. At minimum, ventilation air should pass through the air conditioner dehumidification coils before being distributed through the home.

🔸 **Carefully plan the air supply and return registers**
*Ensure adequate register size, avoid locating registers near sources of water, and don't place supply registers where they are likely to be covered by furniture or otherwise blocked. Provide for adequate return air transfers from bedrooms, especially master bedroom suites.*

The air distribution system design should ensure that bathroom and kitchen air supply ductwork is installed at locations and elevations that minimize their chance of being flooded with spilled water. It is best to locate bathroom ducts off the floor so they are unaffected if water overflows a tub, toilet, or sink. Molds and bacteria grow well in moist duct (particularly in the warm air of the heating season). A flooded duct can readily overwhelm the dehumidification capacity of an air conditioner, raising the relative humidity of the conditioned air and initiating mold growth throughout a home.

Air supply, rather than flooding, is the key consideration when locating supply registers in other parts of a home. The home design should place these registers where they are unlikely to be obstructed by furniture or drapes. Proper distribution of air is needed to assure an even distribution of heated or cooled air throughout a home. Blocked or poorly located supply registers result in wintertime cold spots that encourage mold. Equally important is adequate return air provision. Deficient return air, often caused by door closures, will cause negative pressures in portions of the home that will bring in unconditioned outdoor air.

Providing adequate return air paths from all rooms separated from the HVAC equipment by a door is also critical. Avoid placement of HVAC equipment within a utility room that is separated from the remainder of the home by a solid door. Ventilation air that is supplied directly to the air handler cabinet and bypasses the cooling/dehumidification coils, may add too much moisture in humid climates.

🔸 **Seal ducts to make airtight, durable connections**
*Leaky ducts can substantially increase the amount of outside air that enters a home, adding to the space conditioning load and increasing opportunities for moisture problems. Joints in the ducts and connections to the furnace should be sealed with mastic (preferable) or properly applied tape (less effective) to make durable and leak-proof seals.*

Air that leaks from ducts is replaced with unconditioned air infiltrating from the outside. In humid climates such infiltration can substantially increase the amount of water vapor that enters a home, both adding to the cooling load and increasing opportunities for moisture problems. Properly sealed ducts help keep a home pressure-balanced to minimize infiltration. Uninsulated duct and materials that have been cooled by duct leakage will result in cold materials in the floor cavity that can condense moisture out of the air. This moisture may be absorbed by the surrounding materials, causing them to swell or drip into the belly cavity where chances of re-evaporation are limited.

---

3 The Manufactured Housing Research Alliance (MHRA) has published state-specific guidelines for properly sizing cooling equipment. The *Manufactured Home Cooling Equipment Sizing Charts* are available from MHRA.

**Figure 2.3     Make Airtight, Durable Duct Connections**



Leaky ducts increase the chance of moisture problems. To make airtight connections, cut accurate holes in the trunk, use boots and collars with a hip to accept sealant, and mechanically fasten connections.

**♦ Specify production details that minimize moisture damage**
*Attention to detail is the most important measure that can be taken during home construction to avoid moisture problems. No matter how well engineered a design is for moisture control, it can be defeated by incorrect installation of materials.*

Install window, wall, and roof flashing details according to the manufacturer's specifications. Flashing and building paper not only prevents any rain that streams down a window or roof from entering a home, but also protects the interior cavities against water that is driven uphill by wind or capillary action. Capillary action between adjacent materials can bring water uphill several inches. Likewise, holes drilled in the outside wall for installation of light fixtures and windows must be properly sealed with caulk or a durable gasket to prevent rainwater from draining or being sucked into the wall cavity when the home is under negative pressure.

Create effective, durable seals to stop air and water vapor movement. Sealing cracks and holes with caulk, foam, or gaskets is part of an overall home design, but a seal's performance depends on how well the seal is made. It takes only a small imperfection in a seal to cause a significant failure. For example, a small gap in the seal joining a tub enclosure to the floor can allow gallons of spilled water to drain into the floor cavity. In a site-built home, the water would drain out of the floor system with potentially little repercussion, but in a manufactured home, the bottom board will retain this water for a long period of time. Overlooking this small detail in construction can cause significant damage. It is similarly important to seal penetrations into the ceiling cavity, including those made by electrical wiring.

Patch access holes in the belly material. Repairs made to the bottom board should include both mechanical fastening and a flexible sealant that will set up to resist moisture transport as well as cover the hole in the original belly material. Holes in the bottom board that are not sealed or that quickly fail invite water vapor from the damp crawlspace into the floor cavity. The best bottom board repair technique is to place sheathing material within the belly

**Moisture Problem Prevention**

above the hole, mechanically fasten the torn belly to the sheathing, apply a sealant—mastic, silicon, or adhesive—to the tear, cover the outside of the tear with scrap belly material or sheathing, and fasten this piece to the sheathing within the belly with staples or screws. Bottom board repairs made in the plant should set an exemplary standard and be the model for work in the field by the setup crew.

**Figure 2.4    Seal All Penetrations Through the Floor**



The floor is a natural moisture and air barrier. Keep it intact by sealing all floor penetrations with the appropriate sealant or gasket.

🖤 **Specify plant installation of items that minimize setup errors**
*The marriage line gasket, utility connections, and other items can easily and more effectively be installed at the plant—where quality is easier to control.*

Installation quality influences the moisture balance of a home. Unfortunately, proper setup remains one of the biggest challenges facing the manufactured housing industry. A home manufacturer can circumvent several problems by taking responsibility for some of the installation tasks traditionally conducted during installation:

- Specify installation of the marriage line gasket in the plant to avoid misalignment or use of inferior gasket materials by setup crews.

- Include setup materials with the home. Once on-site, if the proper materials are not available, the crew will often simply do the best they can with the materials on hand.

- Specify adequate telephone and cable terminals for prewiring and provide a dedicated outside service connection. This will eliminate the need for installers to make holes in the bottom board.

- Specify above-floor connections for electrical, plumbing, and other systems to minimize penetrations through the bottom board.

- Specify plant installation of the dryer exhaust vent and ensure it terminates outside of the home. If possible, route the exhaust duct inside the belly, above the insulation, to prevent condensation and to provide good support.

## AVOIDING PROBLEMS THROUGH SETUP

Even though manufactured homes are principally built in a factory, there is a considerable amount of work for the on-site installation crews that will impact a home's moisture balance. Installation crews range from independent contractors to factory employees and may include both career setup professionals and unskilled laborers. Setup determines the final quality of a home, ensuring either comfort, durability, and efficiency or discomfort, high-energy costs, and moisture problems. Quality home installation has been cited as the biggest challenge facing the manufactured housing industry; however, due to increased awareness and efforts by many professionals, improvements are already in evidence.

Setup is a difficult task. It is dirty, dangerous, and demanding. Completion deadlines often require intimate knowledge of several manufacturers' installation instructions; work in confined spaces; and a knack for simultaneously satisfying manufacturers, retailers, state inspectors, and homeowners. Just as in manufacture, a poor installation can defeat even the best planning. Given the financial pressures of completing the setup quickly, it can be tempting for a setup crew to take shortcuts that have a negative effect on the moisture balance. Furthermore, homes are usually set up far from supplies or supervision, making installation shortcomings even more likely.

Manufactured housing is unique in that air conditioning (and heat pump) systems are commonly treated as optional add-on appliances—even in areas where air conditioning is added to every home sold. The majority of air conditioners are installed on-site because half of the system's equipment is mounted on the ground outside the home. Thus, holes are cut through the floor cavity during setup to connect the equipment, potentially exposing the floor cavity and the living spaces of the home to humid outside air.

💧 **Make sure the site is properly graded to shed water**
*Inspect the site before the home is delivered. Water draining under a home can destabilize the foundation as well as increase the chance of moisture migrating into the house.*

A home site should be properly graded to shed water before a home is delivered. It is difficult to determine the quality of a good grading job by visual inspection, but a bad job is always obvious. If it looks as though rain will drain along the skirting or actually run under a home, it probably will. The ground under a home need not be level as long as runoff water is routed around the home.

Professional landscape designers should be consulted if the property is near a natural drainage area or shows signs of runoff, or if the landscape is complex. Take into account that runoff from the roof or gutters may concentrate rainwater near a home. Adequate drainage should be provided by sloping the ground away from a home at a 5% grade (6 inches at 10 feet from the side wall) to route any runoff around the home from its natural drainage path. Some retailers allow homeowners to grade their sites to save on setup costs. Don't move a home to a site until the grading is complete and satisfies the guidelines above. Septic tanks and other underground services that could alter the landscape also should be completed before a home is installed.

Other on-site preparations to guard against moisture intrusion are:

- Keep the plastic rain guard that covered the home during transport intact as long as possible during setup. Removing the rain guard is typically one of the first tasks a setup crew undertakes, but any installation delay then puts the exposed building at risk of rain damage. If rain gets into the insulation or other building cavities, it should be allowed to dry out before setup continues. Once a home is put together, its interior cavities will not easily dry out; any water trapped during setup raises the potential for mold problems.

- Consider contingencies when gearing up for installation, and outfit the truck with sufficient amounts of the recommended setup materials. Often homes are set up far from material supply houses; having what is needed on hand will lessen the crew's temptation to take shortcuts or use inferior materials.

- Pay attention to the long-term stability of a home with careful construction of support piers and leveling of the home. If piers are not constructed according to proper design criteria, the home may shift after setup, creating openings that allow rainwater or moist air from the crawlspace into the building cavities and living spaces. Some moisture damage may be an early warning that the foundation has shifted and may be impossible to repair until the foundation is stabilized.

**Moisture Problem Prevention**

**Figure 2.5     Site Grading Practices to Avoid**



A properly graded site has a crown underneath the home and sloping ground that carries water away from the house, unlike the poor grading job shown above. Gutters and downspouts prevent splash back and direct water away from the foundation. Ground should be covered with a polyethelene sheet.

💧 **Seal the marriage line completely**
*A non-porous gasket should be placed along the inside edge of the insulation in a continuous ring to prevent air and water vapor from infiltrating into the home and wall cavities.*

Ensure that the marriage line is sealed with a non-porous gasket and apply an air retarder along the interior wall seams as added protection against air leakage.  The gasket should be placed along the inside edge of the insulation in a continuous ring around the marriage line.  Using a porous or incomplete gasket will allow air and water vapor from the crawlspace or attic to infiltrate into the wall cavities and interior spaces.  Fiberglass insulation and carpet pad are porous and make for a poor gasket.  Patching the marriage line with foam after the home is pulled together can leave many sections unreachable and unsealed.

💧 **Install a ground cover**
*Installation of a ground cover is one of the most overlooked and underestimated setup tasks.  Water vapor from the ground is often the largest source of moisture load on a house.*

A ground cover minimizes the amount of water vapor that accumulates in the crawlspace under a house.  Moist air from the crawlspace is often the most significant source of moisture entering a home.  The soil, even in a well-graded site, can hold a significant amount of moisture.  Cover 100% of the ground with a 6-mil (thick) polyethylene or other vapor retarder, as specified by the manufacturer.  It is not necessary to seal joints in the ground cover; over-lapping the ground cover material by 12 inches at joints will provide satisfactory performance.  It is easiest to install a ground cover before the skirting goes up.  Some setup crews prefer to install a polyethylene ground cover before the foundation is set and then cut holes for piers, plumbing, and tie downs.

🌢 **Ensure that any tears or gaps in the bottom board material are durably sealed**
*Water vapor from the crawlspace will find its way into the floor cavity through tears in the bottom board, adding to the home moisture load and condensing on cold surfaces, such as uninsulated air conditioning ducts.*

Voids in the belly fabric seem to be an inevitable result of transportation and setup. Holes and tears in the belly come from debris on the road or contact with the transport tires; from numerous punctures at the factory (some are intentional, such as the space around the crossover collar that makes room for the flex duct crossover); from lagging the marriage beams together; and from electrical and plumbing crossovers. A complete setup should include repair of all holes in the belly to prevent moist air from entering the floor cavity. The tears must be durably sealed and any lost or shifted insulation must be reinstalled. Holes made through the belly and into the air handler closet to install air conditioning are subjected to the greatest pressure difference in the system. Even a small hole can bring in large quantities of moist crawlspace air. To avoid infiltration, insulate refrigerant lines and seal up holes made for the refrigerant lines and the crossover duct—both at the belly and at the equipment closet floor. Easy-to-use latex and other air-sealing foams are appropriate for this task; tapes are short lived and ineffective.

Repairs to the belly fabric should include both a mechanically fastened cover and a flexible sealant that will resist moisture transport as well as cover the hole. The best bottom board repair technique is to place sheathing material within the belly above the hole, staple the torn belly to the sheathing, apply a sealant—mastic, silicon, or adhesive—to the tear, cover the outside of the tear with scrap belly material or sheathing, and fasten this piece to the sheathing within the belly with staples or screws. Small holes can be repaired with foams designed for air sealing. Most repairs made with tape are not durable, often lasting only a few months.

🌢 **Leave no metal surfaces exposed when installing the crossover duct**
*When the air conditioner is operating, metal duct exposed to the crawlspace will become cold and condense moisture from the air. Be sure ducts and metal duct boxes are off the ground, connected securely, sealed tight, and completely insulated.*

When installing the crossover duct, it is important to repair any tears in the outer lining and to cover exposed metal surfaces from boots and connections with a minimum of R-4 insulation and a vapor retarder that is approved for outdoor use. Cold metal ducts will condense moisture, which often then drains into the crossover duct insulation layer, reducing the insulating capacity and adding enough weight to the duct to rip through supports. Insulating all the metal surfaces in the crossover connections can be a time-consuming task. Air handlers that are not located over the trunk duct will have a more complex crossover and may have significantly more metal surfaces that require insulation.

🌢 **Make sure the dryer exhaust duct is supported and installed correctly**
*Like a drainpipe, the dryer exhaust duct needs to slope downhill and have proper support. Water can easily condense inside this duct, blocking airflow, tearing the duct, and allowing delivery of moist dryer exhaust under the home.*

Make sure the dryer exhaust duct is supported so that it slopes downhill. This duct must extend to the outside of the skirting when the crawlspace is enclosed. The exhaust duct must not sag or it will be a site for water accumulation; it should be secured with tape and screws to a rigid exhaust collar that terminates outside of the skirting. In cold climates, the dryer hose should be insulated. Without insulation, when the crawlspace gets cold, moisture will condense inside the hose and can build up until it completely blocks airflow through the hose or until its weight pulls the hose off the skirting or the back of the dryer. In either case, the result is moist air flowing into the crawlspace. A blocked dryer exhaust vent is also a fire hazard.

🌢 **Properly size cooling equipment and, in humid climates, recommend equipment with higher latent removal capacity**
*Cooling equipment should be sized to closely match the design load. If the equipment is already installed and has a large overcapacity for the load, set the blower speed as low as 350 cubic feet per minute (cfm) per ton of cooling capacity to increase dehumidification.*

**Moisture Problem Prevention**

Use cooling equipment with a higher humidity removal capacity in humid climates (a latent heat ratio of 25% or higher is desirable). If the air conditioning equipment specified by the retailer is obviously oversized, check with the retailer to see if a smaller capacity can be arranged.[4] Oversized air conditioning equipment will not sufficiently dehumidify a home and will aggravate several types of moisture problems. Many homeowners and retailers are ill-advised and select larger equipment in the desire to ensure comfort. The air handler blower can be set as low as 350 cubic feet per minute (cfm) per ton of cooling to increase dehumidification. While lowering the flow rate across the coil will increase dehumidification, it should not be considered the cure for an oversized unit. Lowering the fan speed may cause condensation at the registers, can make proper charging difficult, and may cause the inside coil to ice up.

💧 **Make sure the air conditioner condensate line is properly trapped and terminates outside of the skirting**
*An improperly trapped line will not function: air will be drawn in through the condensate line and prevent drainage; condensate water will overflow, often resulting in damage to the floor under the air handler.*

Make sure the air conditioner condensate line is properly trapped. Lack of proper condensate drainage could result in spills into the air handler that will damage the floor of the equipment closet or dump water into the ducts or the crawlspace. Some air conditioning equipment is trapped internally and will not work properly if a second trap is inadvertently installed. It is also important to install the condensate line so that it slopes downhill, is supported against sagging, and terminates outside of the skirting.

# AVOIDING PROBLEMS THROUGH OPERATION

A homeowner can take many actions that affect the level of moisture in a home. Steps taken during purchasing, setup, and in the day-to-day operation of a home can minimize the risk of moisture problems. Homeowners are typically the first to experience any symptoms of moisture problems. It is up to them to recognize problem symptoms and report them quickly—before they grow into big problems. If residents have allergies or asthma, it is especially important to consider measures for good moisture control.

💧 **Eliminate moisture problems at the source**
*Many moisture problems begin with excess amounts of water deposited into the air by common household activities, such as cooking and bathing. Ventilation fans should be turned on during such activities. They should be left on for a short time after the moisture-producing activity ceases.*

Minimize the in-home production and storage of moisture: cover pots while cooking, empty bath tubs after use, cover fish tanks, and don't store large amounts of wet firewood or laundry (they transfer water vapor into the air as they dry). Be aware of the fact that a large number of indoor plants (15 or more) can introduce excess water vapor into a home.

Proper use of whole-house and spot ventilation systems is also an important part of humidity control. Use the whole-house ventilation system for fresh air as needed; operate spot ventilation fans during and for several minutes after cooking or showering. Many people can tell if inside air is humid; however, wall-mounted relative humidity gauges are available at hardware and electronic stores and make it possible to accurately measure the humidity level. Strive to keep the home at 30-60% relative humidity. Use of whole-house ventilation fans in the wintertime or in a home with many moisture sources generally reduces inside humidity levels. Whole-house ventilation in humid climates can add humidity to a home and should not be used excessively.

If, despite these precautions, a home still has a high number of moisture sources, dehumidification equipment may be needed to remove the excess water vapor from the air.

---

[4] The Manufactured Housing Research Alliance (MHRA) has published state-specific guidelines for properly sizing cooling equipment called *Manufactured Home Cooling Equipment Sizing Charts*. Copies are available from MHRA.



**♦ When it comes to the size of an air conditioner or heat pump, bigger is not better**
*Air conditioners and heat pumps should be sized to meet the cooling needs of a home. Equipment that is too large will turn off frequently, allowing humidity to build up indoors.*

Several precautions can be taken when purchasing and installing a home. One of the most important is to purchase a properly sized air conditioner. Bigger is not better when it comes to air conditioning comfort. Oversized air conditioners are sometimes specified to mask other problems in a home, such as leaky ducts. A larger-than-necessary air conditioner will cool the air quickly but will do a poor job of dehumidification, leaving the air cool but uncomfortably clammy, and the humidity level potentially high enough to promote mold growth. If the thermostat is lowered to offset the uncomfortable clamminess, surfaces in the home become colder, which increases the potential for condensation.

Other actions to take to prevent moisture problems when buying a home:

- Attention to detail during setup can minimize future problems. It is helpful to understand the setup crew's tasks and how they will assure a quality installation. Make sure the home site is properly graded to shed water before the home arrives.

- Insist on a ground cover. Even a well-graded site can harbor a large amount of moisture in the soil under a home. The ground cover is easiest to install before the skirting goes up.

- Tears in the belly fabric are not uncommon during transportation and setup. Make sure that any tears (including those into the air handler closet) are sealed and that insulation is reinstalled if necessary.

**♦ Do not use unvented propane, kerosene, or other unvented combustion heaters**
*About a gallon of water is released into the air for every gallon of fuel consumed. This is a significant source of water vapor that can quickly cause damage. Some unvented heaters can also increase pollutant levels and contribute to health problems.*

Many manufacturers specify that use of an unvented combustion heater will invalidate a home warranty. Manufactured homes are more airtight than site-built homes and will not dissipate water vapor added by unvented combustion heaters through infiltration. The ventilation systems built into every manufactured home are not designed to remove the amount of moisture generated from this source. Use an electric heater to spot heat for comfort reasons, and install a vented combustion heater (such as vented fireplace gas logs) if auxiliary heat is desired for power outages.

**♦ Do not cover or close off the floor registers**
*In many homes, air from the heater or air conditioner is distributed through registers in the floor. Covering these registers with furniture or rugs can imbalance the system and create cold spots on room surfaces, increasing the potential for moisture condensation.*

Be sure that furniture, rugs, and drapes do not cover the supply air vents. Outside walls depend on good circulation from the supply registers to keep them uniformly warm in the winter. Without good circulation, cold spots that can support mold growth will develop on walls. Closing off individual rooms will also have this effect. Blocked supplies also lower the overall airflow, which can cause overheating and shorten the life of cooling equipment. Stacking items against outside walls in closets also creates cold spots in winter by limiting air circulation, and makes these areas prone to mold and mildew.

**♦ Check the cooling equipment filter monthly**
*Clogged filters can interfere with an air conditioner's ability to remove moisture from the air, and in some cases interfere with condensate drainage. Dirty filters should be either cleaned or replaced. Consider using pleated filters for better dust control and better dehumidification.*

Keep the air conditioner functioning to capacity by following maintenance instructions and changing the air handler filter as recommended. The filter cleans the air that circulates through a home and over time will become caked with dust and dirt. A dirty filter can prevent the condensate from draining and cause it to spill out into the ducts or onto the floor, potentially causing structural damage. This task is more difficult in homes where the filter is located behind closed panels.

🔴 **Keep the thermostat set above 75°F in hot, humid climates**
*Keep the thermostat setting at or above 75°F in the summer. In high humidity climates, a lower setting could cause water to condense inside wall cavities.*

In hot, humid climates, don't set the air conditioner thermostat lower than 75°F. The dew point of the outdoor air can be very high in hot, humid weather. If the indoor temperature is too cold, water vapor will condense within wall cavities. One sign this is occurring is water condensing on outside window surfaces; if it is condensing there, it is also likely condensing inside wall cavities. Use other measures instead to stay comfortable at higher temperatures: use fans to increase air movement; reduce moisture sources in the home; repair voids in the ground cover and tears in the belly material; or install a supplemental dehumidifier.

If a home is still not comfortable except at very low temperatures, consider that the air conditioning system may be significantly oversized. An HVAC dealer may be able to increase a unit's dehumidification ability by lowering the fan speed; or consider replacing it with a unit with better dehumidification potential.

🔴 **Recognize signs of moisture problems**
*Big moisture problems started as small ones, and any moisture problem is more easily cured if discovered early on. The following are warning signs of possible moisture problems: persistent musty smells; discoloration   on walls or ceilings; swelling of floor, wall, or ceiling finishes; condensation on window glass; or standing water         under the home.*

Note any odors, especially mold and musty smells. Find the source of the odor and eliminate the cause. Irresolvable odors can be the only clue that wall or floor cavities are rotting on the inside due to an undiscovered moisture problem.

Treat wall and ceiling stains as serious moisture problems. Don't assume these stains are due to rain; often the cause is condensation inside these cavities. If the stains show up during cold winter conditions, it may be due to water vapor moving from the living space and condensing inside the walls on the cold insulation. Stains that show up in the hot, humid summer may be due to water vapor moving from the outside and condensing on the cold cavity side of the wall board. Obviously, if stains occur only after rain, leakage should be suspected. Have the problem fixed before it causes serious damage. In hot, humid climates, painting over stains using low-permeability paints (stain-blocking paints are of this type) can make condensation problems worse.

In many climates, during cold winter months, water occasionally condenses on window panes inside a home. If this happens a lot it signals either excessive humidity in the home or failure of or lack of suitable storm windows. Check that storm windows are properly closed. In the summer, particularly in more humid climates, water forming on the outside of windows is a sign that it is likely condensing within the walls cavities as well. This can happen if the indoor thermostat setting is too low.

Make sure the air conditioner condensate line and dryer exhaust duct terminate outside of the skirting. If no water or water vapor can be detected from these sources, they are probably disconnected and dumping their contents under the home; they need repair.

Correct small problems before they get big. Immediately repair holes made by tree limbs or other damage to roofing and exterior walls to avoid rain leaking into these cavities. Water entering these holes can travel considerable distances (often into the floor cavity, to settle on the belly material) before leaving any symptoms of a problem.

Invest in a thorough home check-up six months after setup to verify that the crawlspace is dry and moisture control strategies are still in place. Have an installation technician crawl under the entire home and inspect the dryer vent, the air conditioner condensate line, low spots in the belly (potentially holding water), and any signs of rain or other water drainage under the home. It is also wise to inspect post-setup installations such as phone and cable lines, and to look for landscape alterations that may direct water under the home.

# MOISTURE PROBLEM MITIGATION

This chapter presents a number of typical moisture problems associated with manufactured housing. It is organized by the location of the symptoms, beginning with floor systems because they are the most commonly damaged structural component. It also addresses moisture problems associated with a home's heating, cooling, and ventilation systems. Examples of common problems and their remedies (drawn from actual case studies) are given throughout the chapter.

## FLOOR SYSTEM

The floor system consists of the finish flooring (carpet, etc.), subflooring, floor framing, insulation, bottom board material, and metal frame. Since water flows downhill, it is no surprise that floor systems experience more moisture and water damage problems than other building components. Water intruding from outside sources (such as rain through a leaky roof system, or flood water) as well as inside sources (such as plumbing malfunctions and water spills) finds it's way into carpets, flooring, and the floor insulation cavity. In addition, water vapor from a variety of crawlspace sources often attacks floor systems from below.

Wall-to-wall carpet is the floor covering of choice in manufactured homes. A carpet and the pad beneath it can readily absorb and hold excess moisture. Carpets also collect dirt, dander, food crumbs, and a host of other nutrients that support the growth of microorganisms. A nutrient-rich carpet with a high level of moisture makes an ideal environment for mold and dust mite populations. Small amounts of these growths are found in almost all carpets, and individuals with extreme allergies to mildew, mold, and other organisms are increasingly excluding carpet from their homes.

To avoid problems associated with microbiological growths, carpets must be kept clean and dry. Keeping a carpet clean means vacuuming it regularly and following up with periodic steam cleaning. Professional carpet restoration is usually required to treat and dry out heavily wetted installed carpet (e.g., from an overflowing sink or flooding). Water damage specialists recommend removal and replacement of carpets that have been wet for several days or more. Substantial mold colonies can form within 48 to 72 hours, and removal of large spore colonies from a carpet and padding is very difficult.

A less obvious moisture problem can occur at the perimeter of carpeting along outside walls. During winter months, the floor adjoining the perimeter of a building is often colder than the rest of the home, and so is its floor covering. This is due to its proximity to the exterior, to insulation compression in the floor, to thermal bridging associated with the framing, and/or to air leaking in under the wall. The resulting cold spot can run the length of a wall. If a cold perimeter area is not well ventilated (e.g., if furniture or drapes block air movement), the cold spot causes a localized increase in humidity or, if cold enough, causes condensation, either of which can support mold growth. It is sometimes possible to inspect these perimeter areas by prying carpet edges from the nail strips and examining the carpet backing, the pad, and the subfloor. The telltale signs of high moisture are rusty nail strips, visible molds, localized odors, and/or cold or damp carpeting.

### Moisture Problem Case Study: FLOOR PERIMETER STAIN

| | |
|---|---|
| Season: | Winter |
| Symptom: | Dark shadowy line on carpet at room perimeter, particularly under windows. Stain removed by steam cleaning but returned quickly. |
| Cause: | Noticeable air leakage through the joint between the exterior wall and flooring combined with convection from cold window caused a cold spot on the floor. Window drapes extend to the top of the carpet, preventing air circulation and thus keeping the spot cold. The cold spot increases relative humidity in that part of the carpet and supports mold growth. |
| Remedy: | Increase ventilation by shortening drapes so they no longer reach the carpet. Caulk where the wall board meets the subfloor, particularly under windows. |

**Figure 3.1      Floor Perimeter Stain**



Cold air infiltrates
under wall plate
and drops along
wall surface

Curtain extends to floor

Mold creates dark,
shadowy stain

*A cold spot at the floor perimeter promotes moisture problems, such as mold growth.*

Leaky plumbing accounts for a high number of reported flooring problems. When organic building structural mate-
rials like wood are wetted repeatedly, they can absorb water, swell, and eventually lose their structural integrity. In
extreme cases, water-damaged floor materials give way under the weight of appliances, furniture, or people—any-
thing that tests its strength. Repairing a subfloor that experiences moisture-related damage is a two-step process
involving complete replacement of any soft spots, and removal of the moisture source. During the repair, the belly
cavity must be inspected and dried as needed before the subfloor is replaced.

Good home maintenance helps prevents most sources of water damage. Plumbing leaks should be repaired
quickly, and major water spills must be thoroughly dried. In both cases, inspection of the belly material is advised
to determine if water has accumulated inside the cavity. If water has been trapped, the belly cavity must be opened
up, drained, dried, and resealed with a durable repair.

**Moisture Problem Mitigation**

### Moisture Problem Case Study: BUMP IN THE FLOOR

**Season:**    Summer

**Symptom:**    Section of floor expanding, creating noticeable hump.

**Cause:**    Large opening in the belly due to improperly repaired holes in the bottom board. Metal duct cooled by air conditioning is exposed to humid crawlspace air, resulting in water condensation on exposed surfaces of the ducts. The adjacent floor sheathing absorbs the moisture condensing on the branch duct. Swelling of the floor sheathing causes the floor to warp.

**Remedy:**    Dry out wetted materials. Reinsulate exposed metal duct and floor. Staple new belly material over the hole and seal with silicon. Install ground vapor retarder to reduce moisture that evaporates from the ground. Adding weight to the hump may help bring it back to level as it dries. If not, cut out and replace the affected flooring.

**Figure 3.2    Bump in the Floor**



Warping of the floor sheathing can occur when a hole in the bottom board allows moist crawlspace air to condense on exposed metal ducts. Water is absorbed by the floor sheathing, which swells.

Fiberglass insulation is the most common material used to insulate floor systems in manufactured homes. This insulation is highly porous and can hold a significant amount of moisture. Moisture in the floor system can condense in the insulation, potentially leading to mold and mildew problems and dramatically reducing its insulating properties. Damp insulation can be dried out and reused; deeply wetted (soggy) insulation usually must be removed and replaced.

If the floor system gets wet, the bottom board—typically a polyethylene membrane that wraps the floor system—prevents water from draining away from the structural materials and slows the drying process. In the case of a significant plumbing leak, water spill, or condensation in the floor frame, it is not uncommon to find water pooling on top of the bottom board within the floor cavity.

**Moisture Problem Case Study: BULGE IN THE BELLY**

| | |
|---|---|
| **Season:** | Summer and winter |
| **Symptom:** | Section of belly material bulging considerably, and the bulge is heavy and cold. |
| **Cause:** | Any source of water leaking into the floor cavity—in this case, a poorly sealed bathtub—can allow gallons of water to pool on the bottom board. Left unchecked, the tub leakage could rot out a large section of floor materials. |
| **Remedy:** | Reseal the tub. Strengthen any weakened floor joists. Replace belly insulation and restore the belly material. |

**Figure 3.3    Bulge in the Belly**



When seals around tubs fail, water drains into the floor cavity and pools on the bottom board.
Unchecked, the leaks can rot out floor materials.

## WALL AND WINDOW SYSTEM

Because they have less depth for insulating material, wall systems generally offer less thermal resistance (R-value) than do thicker floors and ceilings. Windows offer even less resistance to the flow of heat. The lower thermal resistance of glass results in interior glass surface temperatures that can approach outdoor temperatures. Temperatures at the window surface and at cold spots on a wall can easily fall below the dew point of the indoor air and cause condensation. A window is generally the coldest surface in winter and thus is the surface where water vapor inside the home first condenses. During extreme cold spells, windows in many homes become cold enough to condense and even freeze water on the inside surface. If this happens only occasionally and is mopped up, such condensation rarely causes damage. Wall systems are also particularly susceptible to wind-driven rain leakage at window and door flashings and at improperly sealed penetrations.

HUD's Manufactured Home Construction and Safety Standards⁵ (MHCSS) offers choices for the control of condensation. One alternative is the use of a vapor retarder. A second is an external covering or sheathing that forms a pressure envelope limiting air and moisture leakage. Vapor retarders are coatings that slow the rate of molecular diffusion of water through building materials. These include special paints or a vinyl coating adhered to gypsum wall board. Coatings with a rating of less than 1 "perm" are considered effective vapor diffusion retarders.

The HUD-code sets the location for the vapor retarder at the inside surface (the living-space side) of the home. This strategy minimizes the amount of water vapor that diffuses into the wall assembly from inside the home. Although suitable for protecting wall cavities in the northern climates from wintertime condensation problems, recent experience shows this strategy may be problematic for air-conditioned homes located in hot, humid climates. In these homes, the moisture level is higher outside than inside, reversing the direction of water vapor movement such that it flows from the hot, humid outside environment through the wall components and into to the cooler and dehumidified home interior. The interior vapor retarder acts like a dam holding water inside the wall board. When the conditions support condensation inside the wall, water will begin to condense on the coldest material—in this case, the inner surface of the wallboard. If the conditions for drying are poor—the outside humidity is high and the vapor retarder blocks diffusion to the inside—moisture will begin to accumulate on the surface and saturate the material. If the wall board cannot dry out, it will eventually fail completely. Wetting of the gypsum usually occurs at night and walls partially dry out during the day as they heat up. Adding insulation to these walls may make the problem worse by slowing the daytime drying. In a humid climate, similar problems can occur with any wall whose interior is open to the outside air—including poorly sealed marriage lines. (At this writing, HUD is considering a waiver allowing manufacturers to move the vapor retarder to the outside surface of the wall in the hot, humid climates of the Southeast.)

Water condensing on a windowpane inside a home is another common concern. This happens when the window's thermal resistance properties are too low for the climate (such as when the storm window is left open during a cold period) or when the humidity level of the home is elevated. Often it is a combination of the two factors.

During the heating season, it is not uncommon to find homes heated by unvented propane or kerosene heaters, despite the fact that nearly every home manufacturer explicitly warns against the practice. Unvented heaters add about a gallon of water to the air for every gallon of fuel they consume. A kerosene heater that burns two gallons of fuel per day can raise the relative humidity from 55% to 70%, sufficient to upset the moisture balance in the home and cause condensation on building surfaces.

⁵ PART 3280, Manufactured Home Construction and Safety Standards and Interpretive Bulletins to the Standards, US Department of Housing and Urban Development (HUD), April 1999

**Moisture Problem Case Study: INTERIOR WALL FILLED WITH OUTSIDE AIR**

**Season:**    Summer (mostly in the humid Southeast)

**Symptom:**    Interior walls swelling and bowing—by as much as 3 inches in some places. Some of the vinyl-coated gypsum wall board behind the swelling is soft to the touch.

**Cause:**    Removal of bowed interior walls revealed poorly sealed holes into the attic space for electrical wiring. Humid outside air was being driven into the wall by the attic ventilation system. The thermostat was set quite low (68°F) such that the cavity side of the wall board was cold enough to condense water vapor from the humid air.

**Remedy:**    Remove failing sections of the wall. Seal the electrical cable holes to prevent outside air from entering the wall cavity. Replace the wall board. Encourage the home owner to set the thermostat higher, and suggest measures to increase comfort at that setting.

**Figure 3.4    Interior Wall Filled With Outside Air**



Humid outside air can enter an interior wall cavity through poorly sealed holes for wiring. Moisture condenses on the cold wall. The moisture cannot dry through the vinyl, causing the interior wall to swell.

**Moisture Problem Mitigation**

## Moisture Problem Case Study: VAPOR RETARDER ON THE WRONG SIDE

**Season:** Summer (mostly in the Gulf Coast states)

**Symptom:** Indoor surface of the exterior walls "bubbling." Gypsum wall board beginning to disintegrate.

**Cause:** Exterior walls with siding open to the outside allow humid air into the wall cavity where it can condense on cold surfaces. A vinyl-coated finish on the gypsum wall board prevents this moisture from drying to the inside. This home was installed on gravel fill with a marshy area nearby, creating a zone of high humidity around the home. The thermostat was set low, at 70°F, increasing the potential for condensation.

**Remedy:** Removal of the interior vapor retarder may not be feasible. First step: raise the cooling set point to 76°F so the temperature inside the wall is more often above the dew point. Use ceiling fans and a dehumidifier to improve indoor comfort. Second step: remove affected wall panels and seal all openings in the cavity to slow air intrusion from the outside. Replace failed gypsum wall board with plain gypsum covered with vapor-permeable paint, which will allow water vapor to more easily migrate through the wall board.

Figure 3.5    Vapor Retarder on the Wrong Side



When the vapor retarder is on the interior wall in hot, humid climates, warm, moist air that enters the wall cavity can accumulate on the cold interior wall board, which swells and disintegrates.

**Moisture Problem Case Study: MISPLACED WINDOW FLASHING**

**Season:**     Summer and winter

**Symptom:**     Wall sections underneath windows are damp and growing mold.

**Cause:**     Flashing installed around the windows is not functioning properly: rainwater is deposited behind the asphalt paper rain screen. This detail was installed incorrectly at the plant.

**Remedy:**     Remove siding and window and correct immediate failure in the field. Educate installers in the plant and recommend closer plant supervision of this detail.

**Figure 3.6     Misplaced Window Flashing**



When windows aren't installed properly, rainwater can be driven behind the rain screen.

### Moisture Problem Case Study: CONDENSATION BETWEEN GLASS PANES

**Season:**   Winter

**Symptom:**   Water condensing on the primary window—in between the two panes of glass—in a home with inside storm windows.

**Cause:**   The air handler and ventilation system in this home slightly pressurize the home when they operate, pushing air out wherever there are leaks.  Leaks in the primary window allow conditioned indoor air to flow behind the storm window onto the relatively cold primary window, where it condenses.

**Remedy:**   Achieving a perfect pressure balance in a home is very difficult.  It is ideal to have a slightly negative pressure in the home during the winter and positive pressure in summer—thus always forcing the drier air into building cavities.  The best solution: seal up leaking storm windows.  If air can be felt escaping through a "finger width" crack in the front door when it is open and the air handler is on, then the home may have a significant pressure imbalance that may be forcing moist air into other cavities as well.

**Figure 3.7     Condensation Between Glass Panes**



Pressure imbalance in a house will push warm air through leaks in the interior window allowing moisture to condense between the two panes of glass.  A durable seal should be applied to the storm window to minimize leaks.

**Moisture Problem Case Study: WATER ON WINDOWS**

| | |
|---|---|
| **Season:** | Winter |
| **Symptom:** | Water running down inside the window glass onto windowsills, peeling the paint and softening the surrounding material. |
| **Cause:** | Excessive interior humidity—generated, in this case, by an unvented combustion space heater. (Note: The problems caused by unvented heaters are so serious that their use may invalidate a home's warranty.) |
| **Remedy:** | Eliminating the unvented heater cleared up the moisture problem within one week. Significant residual moisture absorbed by the furniture and other materials often will take some time to dry out. |

**Figure 3.8     Water on Windows**



In winter, excessive interior humidity causes water to condense and run down inside the surface of the window glass and damage the sill. Unvented combustion space heaters that give off a good deal of moisture are sometimes the culprit.

**Moisture Problem Mitigation**

**Moisture Problem Case Study: FROZEN WALLS**

| | |
|---|---|
| **Season:** | Winter (mostly in the extremely cold North) |
| **Symptom:** | Home will not stay warm. Walls are cold to the touch. |
| **Cause:** | Water vapor migrating into the walls has condensed and frozen within the wall insulation. The vapor retarder on the inside has failed and/or water vapor is being driven into the wall cavities by a combination of holes in the wall and positive air pressure in the home. |
| **Remedy:** | The exterior wall finish must be removed and wet and frozen insulation removed and replaced. Penetrations through the interior wall must be sealed and the vapor retarder must be repaired (e.g., by painting the interior with a vapor barrier paint). Diagnose the cause of the pressure imbalance (perhaps excess powered ventilation) and repair. |

**Figure 3.9    Frozen Walls**



Cold and dry outside air

Warm and moist inside air

Air pressure drives moist inside air through the walls

Moist air condenses and freezes within cold wall

Static and vapor pressure drives moist inside air through the walls, where it condenses on the insulation and freezes. The frozen walls are cold to the touch, and the home will not feel warm.

# ROOF SYSTEM

The roof system covers the home and provides the primary weather barrier as well as a main thermal barrier. From the outside, the roof assembly consists of shingles or other finish material typically nailed over a rain screen, sheathing, a roof truss frame that provides an attic cavity, the ceiling insulation layer, and, finally, the interior ceiling board. A roof's most elemental function is to shed rainwater and snow, and typically there are few problems in this regard. The more roof penetrations that exist, such as vents and skylights, the greater the risk of leaks around these penetrations. Obviously, any damage from tree limbs or other debris puncturing a roof should be repaired immediately to minimize the potential for water damage. If a leak has already occurred, the roof system should be allowed to dry before any repair work is completed. With a manufactured house, gaining access to the roof cavity is very difficult and should be attempted only by a qualified repair contractor. Roof moisture problems are not always easy to diagnose; the symptoms of moisture damage are often far removed from the source of moisture.

A common roof system moisture problem arises when moisture diffuses or infiltrates from the living space into the roof system and condenses or freezes within the attic cavity and later drips onto the ceiling material. Many roofs are unnecessarily reshingled because this moisture problem is misdiagnosed as a leaking roof. The HUD standards require that ceilings be designed to control condensation and dictate the use of a ceiling vapor retarder in cold climates. This vapor retarder is optional in warmer climates. These provisions, however, do not necessarily protect the roof system from moisture transported by air moving through holes in the ceiling for lights, speakers, or other electrical devices.

Ice dams are a common phenomenon in climates that get a lot of snow. They occur when either insulation is insufficient or warm home air enters the roof cavity through penetrations in the ceiling. In both cases, the roof sheathing is warmed enough to melt snow resting above it on the shingles. The melted water trickles down to the colder surfaces at the edge of the roof; there it refreezes and forms an ice dam on top of the shingles. Once a dam is in place, additional melt water backs up and seeps through the bottom edge of the shingles and into the roof cavity. Gravity then carries the water down to drip on the ceiling or to flow down the wall surfaces and cavities.

Preventing ice dams in manufactured housing requires adequate and evenly distributed ceiling insulation, and a continuous air retarder throughout the ceiling. These two measures minimize the amount of home heat that can enter the attic cavity. The third measure is to properly ventilate the attic. Ventilating the attic cavity helps dissipate heat in the attic that contributes to ice damming.

Water vapor that gets into an attic cavity through holes in the ceiling board and condenses on the cold attic materials causes other problems. Condensation that forms on the cold roof sheathing in winter can run down the underside of the roof and collect in the soffits. Some of this water may appear as water droplets or icicles on soffit vents. Some of the water can be absorbed by the ceiling material and shows up as stains. To solve wintertime moisture condensation in the attic cavity requires sealing any holes in the ceiling membrane. Once all punctures are sealed, painting over the stains and monitoring the site carefully is wise to double-check that all moisture sources were addressed.

Stains that form on a ceiling during or immediately following a rainstorm are signs of a roof leak. If such stains appear, it is prudent to investigate all penetrations through the roof, especially those uphill from the stain site, and repair the roof as necessary (seal a metal roof only with a paint designed for that purpose). Particular attention should be paid to any area that may have been damaged by tree branches or other debris. If the stains continue or enlarge, an experienced contractor should be consulted to determine if reroofing is appropriate. To prevent mold, water in the attic should be dried out before undertaking repair work, especially in homes with no attic ventilation.

**Moisture Problem Mitigation**

**Moisture Problem Case Study: ICE DAM**

| | |
|---|---|
| **Season:** | Winter (high snow regions) |
| **Symptom:** | Water dripping out of ceiling lights and along the bottom of the outside wall; puddles of water on the floor in some rooms; visible ice buildup at roof edge. |
| **Cause:** | Warm air from the home is entering the roof cavity through holes in the ceiling at recessed can light fixtures.  Attic ventilation is blocked by snow and/or insulation and is thus unable to circulate dry, outside air. |
| **Remedy:** | Decrease the temperature of the attic cavity and roof sheathing: seal the leaks caused by the recessed light fixtures, and clear insulation blocking the soffit vents to increase attic ventilation. |

**Figure 3.10     Ice Dam**



Ice dams occur when attic insulation is insufficient or warm home air enters the attic space. Melting snow or ice on the roof surface backs up and seeps through the shingles into the roof cavity, damaging materials and reducing insulation values.

3.13

## Moisture Problem Case Study: ATTIC CONDENSATION

**Season:**  Winter

**Symptom:**  Brown water stains appeared on the ceiling just above the outside wall during a dry but cold period.  The homeowner coated the metal roof with roof cement and painted over the stains.  The stains reappeared during a subsequent cold spell.

**Cause:**  Moist air from the home is leaking into the attic and condensing on the underside of the roof sheathing.  From there it runs down the sheathing and is absorbed by the ceiling material.

**Remedy:**  Seal all penetrations through the ceiling.  Check to see if bathroom and kitchen fan vents are secure and not venting into the attic cavity.  Paint over stains again and monitor sites.

**Figure 3.11    Attic Condensation**



Warm, moist air that leaks from the home into the roof cavity will promote condensation on the underside of cold roof sheathing. Water runs down and is absorbed by the ceiling and wall sheathing, creating stains.

## EQUIPMENT CLOSET

Manufactured homes typically come with a heating system installed at the plant. Usually this is a furnace that is located within a special equipment closet inside the home, often along with the water heater. Additional air conditioning equipment is typically installed on-site; the evaporator is installed alongside the air handler and the condenser is located outside of the home. Heated or cooled air is distributed through a duct system that is located in the floor or attic space. In most homes, air returns to the furnace through an intake grille in the door or wall of the equipment closet.

Air conditioning equipment is more often associated with moisture problems than is heating equipment. Air conditioners dehumidify the inside air as well as cool it, and several variations of moisture problems can arise if an air conditioning system cannot properly dispose of the condensate that it removes from the air or if conditioned air cools the surface of building materials.

A common air conditioner problem is a clogged condensate line. In most air conditioning systems, condensate water produced when the air conditioner is running drips into a collecting pan at the bottom of the coil and overflows into a condensate line. The condensate line is a sloped pipe that drains water outside the crawlspace skirting of the home. If this drain line becomes clogged, the water in the drain pan overflows into the furnace and/or onto the floor. Several days of a clogged condensate drain can cause major damage. A wide range of materials can accumulate to block a condensate line, including home dust, animal dander, sediment and rust from the coil, and biological growths.

To drain properly, condensate lines also require a trap, similar to the trap under a sink. Condensate lines without a water-filled trap will suck in air, preventing water from draining while the fan is operating—again setting up conditions for condensate to overflow the collecting pan.

Filters are used to clean the air stream that feeds the heating and cooling equipment. If the filter is not changed frequently enough, it will clog with dirt and restrict the volume of air reaching the heating or cooling elements. "Starved" for air, the fan will begin pulling air from around the edges of the coil and the condensate pan, preventing the water from running out the condensate drain, causing it to spill out. Since an air handler is not watertight, the water often ends up wetting the equipment closet floor. Such problems—particularly in equipment closets with the difficult-to-access screw-on panels—may go unnoticed for long periods of time.

Ideally, an air conditioner condensate line drains water to a point beyond the home skirting. Condensate water drained into the crawlspace can be a significant source of moisture problems. A central cooling system can discharge 10 gallons or more of water through its drain line on a hot, humid day. If the drain discharges water on top of the ground vapor retarder, a large puddle of water can form in the crawlspace and persist throughout the cooling season—fostering a variety of moisture problems (see discussion of crawlspaces on page 3.17).

### Moisture Problem Case Study: CLOGGED FILTER

| | |
|---|---|
| **Season:** | Summer |
| **Symptom:** | Air conditioning equipment not cooling home. |
| **Cause:** | As the result of a heavily clogged air filter, the "starved" air handler fan sucked condensate water out of the drain line and the water leaked onto the subfloor. The water softened the particle board subfloor, causing the air handler and top-mounted cooling coil to partially collapse through the equipment room floor. The weight of the system crushed the main supply duct under the air handler. |
| **Remedy:** | Remove the air handler and cooling coil. Replace the subfloor, straighten the collapsed duct, and reinstall the air handler and cooling coil. Clean the air handler and install a new filter. Instruct the homeowner on how to check and replace the filter monthly. |

**Figure 3.12    Clogged Filter**



A clogged air conditioner filter blocks return airflow, and the "starved" air handler fan sucks water out of the drain line. Water spills into the air handler cabinet, leaking into ducts and seeping into the floor.

**Moisture Problem Mitigation**

## CRAWLSPACE

The crawlspace is the area directly under a home. Ideally the ground in the crawlspace is completely covered with a vapor retarder such as a polyethylene sheet, and the ground slopes away to shed rainwater away from the home. Even with these precautions, the crawlspace is often a major source of moisture. Crawlspace moisture comes from water vapor evaporating from the soil; infiltration of humid outdoor air through vented crawlspace walls, rainwater runoff, and spills and other water leaks.

**Figure 3.13    Crawlspace Moisture Control and Ventilation**



Gaps in polyethylene sheets

Drain pipe leaks

Dryer vent
not connected

Crawlspaces are a major source of moisture. To keep the crawlspace dry, cover the ground with a continuous polyethylene sheet and install properly sized skirting vents. The dryer should vent and the condensate line should drain to the outside.

Crawlspace walls are typically ventilated to allow water vapor to escape. Observations in more humid climates show that crawlspace ventilation can actually increase moisture levels in the crawlspace where, in the relative coolness, it can condense and form puddles. Regardless, ventilation is typically insufficient to remove significant amounts of water, so moist air from the crawlspace is in good position to gain access to the floor cavity through holes in the bottom board. Once in the floor cavity, the moist air dampens structural materials and diffuses into the conditioned space. Some of this moist air will be blown through penetrations in the floor cavity into the home when the air handler comes on. If penetrations exist between the crawlspace and the walls above, moist air is blown into the wall cavities as well. For all these reasons, it is important to keep the crawlspace dry and sealed from the building interior.

Persistent water in the crawlspace can soften the soil beneath pier supports and other parts of the foundation system. When this happens, the load-bearing capacity of the soil decreases and eventually the weight of a home can force the home to shift. Excess crawlspace humidity also promotes rust on the painted steel chassis. Further, wooden skirt framing and sheathing can absorb crawlspace moisture. Wet wood rots and invites termites and insects to infest the home.

## Moisture Problem Case Study: RAINING IN THE CRAWLSPACE

**Season:**  Summer (mostly in the humid Southeast)

**Symptom:**  Extreme condensation in crawlspace: water dripping from large patches of the belly onto the plastic vapor retarder covering the ground.

**Cause:**  Air leaking from the underfloor duct system cools the belly material enough in some areas to support condensation of the moist crawlspace air. A significant duct leak was found directly underneath the air handler.

**Remedy:**  Remove the crossover duct underneath the air handler to gain access to the inside of the duct. Apply approved duct mastic to the seams of the duct boot. Bridge gaps larger than one inch with fiberglass mesh tape along with the mastic. Do not use tape. Tape is ineffective for long-term sealing of duct.

**Figure 3.14     Raining in the Crawlspace**



Duct leaks can cause water to "rain" into the crawlspace. Cold air that leaks from the underfloor duct system cools the belly material, supporting the condensation.

**Moisture Problem Mitigation**

## Moisture Problem Case Study: DRYER HOSE TORN FROM SKIRTING

| | |
|---|---|
| **Season:** | Winter |
| **Symptom:** | Extreme condensation in crawlspace. Dryer hose torn from the skirting. |
| **Cause:** | A six-foot long dryer exhaust hose made of uninsulated plastic was installed from the belly to outside the skirting. It was attached with tape and screws, but without support for the length of the hose. The cold air of the crawlspace causes damp air from the dryer to condense and build up inside the sagging hose. The weight of the water eventually ripped the hose away from the skirting. |
| **Remedy:** | Drain and reattach dryer hose to skirting. Install supports for the hose along its length, and slope the hose toward the outside so any water condensing in the hose drains outside the crawlspace. Insulate the dryer hose to minimize condensation. |

## Moisture Problem Case Study: RAIN WASH UNDER HOME

| | |
|---|---|
| **Season:** | Summer and winter |
| **Symptom:** | Once-even floors going out of level with visible sagging of the home and cracks appearing in the wall board. |
| **Cause:** | Home site poorly graded, allowing runoff from rain to flow through the crawlspace. Water accumulation under the home made the soil wet so that its weight-bearing ability decreased, allowing the piers to settle. |
| **Remedy:** | Properly grade the site to shed water away from the foundation area. Let the ground dry out and then re-level the home. |

# AIR DISTRIBUTION SYSTEM

There are three main types of supply ducts in manufactured housing: metal ducts enclosed in insulation, rigid fiberglass duct board, and flexible insulated ducts. Each type of duct is insulated to reduce heat loss or gain into the attic cavity or floor system. In homes with central air conditioning, good duct insulation is also essential to prevent moist air from condensing on the outside surface of the cold ducts.

Wet and damp ducts are linked to many building moisture problems. Ducts have cool, dark interiors with high relative humidity and offer an ideal environment for mold growth. Water can get into ducts and collect at low spots through condensate pan overflows or other spills that find their way into the air distribution system. A flooded duct can readily overwhelm the dehumidification capacity of an air conditioner, raising the relative humidity of the home and initiating mold growth throughout the interior. Standing water trapped within duct systems can foster bacteria, particularly in the heating season. The water will remain in the duct until it evaporates back into the distribution air stream, leaks out of the duct system, or until it is physically drained. If the flooding continues, the duct may never dry out. With extreme flooding, the added weight of the water can damage or entirely collapse the duct system.

When a metal duct system is exposed to moist crawlspace air through openings in the belly, it becomes a site for condensation. Water that condenses on the metal duct exterior is absorbed by surrounding materials, thereby compromising the material properties, degrading the surrounding insulation, promoting mold, and potentially causing duct joint failures.

**Moisture Problem Case Study: FLOODED DUCTS**

| | |
|---|---|
| **Season:** | Summer |
| **Symptom:** | Moldy odors are present when the air conditioner is running. The system is cooling but the indoor humidity is high. There are no plumbing leaks or other sources of water intrusion, and no standing water under the home. |
| **Cause:** | Water intrusion into the packaged air conditioning unit's main supply and return ducts. The packaged unit is contained in a metal cabinet adjacent to the home and is connected to the home by the supply and return ducts. Heavy rain occasionally floods the area around the packaged unit and then drains into the soil. The water leaks through the access panel seams to accumulate in the main ducts. |
| **Remedy:** | Drain the standing water out of the ducts. Replace the ducts if there is mold on the inner liner or if the insulation layer is wet. Raise the unit off the ground by placing it on a platform. |

**Figure 3.15    Flooded Ducts**



Heavy rains may drive water into the outside air conditioner's main supply and return ducts. When the air conditioner runs, moist air and often moldy odors are the result.

**Moisture Problem Case Study: WATER IN CROSSOVER DUCT INSULATION**

**Season:**    Summer

**Symptom:**    Very little airflow on one side of a double-section home when the air conditioner is running. The air conditioner worked fine when the home was new.

**Cause:**    The flexible crossover duct system uses a metal boot to connect the "offset" furnace to the two supply trunks. The boot was not insulated, and water condensing from the crawlspace on the cold metal boot drained into the flexible duct insulation layer. The water built up until its weight kinked the duct and severely restricted air flow to one side of the home.

**Remedy:**    Add an additional insulation vapor and retarder wrap to provide thermal and condensation protection for the exposed metal boot. Replace the saturated crossover duct.

**Figure 3.16    Water in Crossover Duct Insulation**



Condensed water drips into flexible duct insulation layer

Exposed metal on crossover connections

Exposed metal on crossover connections condenses water that can seep into the flexible duct insulation layer. The water builds up until its weight kinks the flexible duct, restricting airflow.

## CLIMATE CONTROL AND AIR MOVEMENT

Air temperature, velocity, and quality are all obvious contributors to indoor comfort, but relative humidity (moisture level) is often overlooked. Most people consider indoor air comfortable if the relative humidity is between 30% and 60%. Complaints of discomfort—feeling hot and sweaty or feeling clammy at normal room temperatures (between 72°F and 82°F)—should be taken seriously and may be an early warning of moisture problems severe enough to cause damage. Moisture levels are generally higher in homes during peak heating and cooling seasons when:

- Occupants keep windows closed;
- Ventilation fans are not used (heating climate), are overused (hot, humid climate), or are broken;
- Exhaust fan ducts or the dryer hose is constricted, blocked, or does not vent to the outside; and/or
- The cooling system does an ineffective job of lowering humidity.

While it is possible to measure the relative humidity of a home, it is important to consider that a home's relative humidity will vary by 10% or more as equipment cycles on and off. During periods when the equipment runs less (e.g., an air conditioner runs less in the evening than during the day), the humidity level indoors will drift toward that of the outdoors. To complicate matters further, depending on the air conditioner's effectiveness and moisture removal capability, and the home ventilation system, the relative humidity for any particular home can vary considerably throughout the day.

A relative humidity over 70% is sufficient to support mold and mildew as well as to aggravate asthma and allergies. A home is considered to have excessive humidity if it reaches the 70% or higher level for even a portion of the day. Homes with such excessive humidity must reduce their sources of water vapor or increase water vapor removal. The latter is achieved by operating a properly sized air conditioner or other dehumidification equipment (in cooling season) or by increasing ventilation (in heating season).

Under the mistaken impression that bigger is better (i.e., more effective), many homes have larger-than-necessary air conditioners. Oversizing, in fact, reduces an air conditioner's dehumidification effectiveness because dehumidification is a function of how long the equipment runs. Oversized equipment cools the air quickly, but too quickly to provide significant dehumidification, resulting in a home that is cool but damp and often uncomfortable. The typical homeowner response is to lower the thermostat further. It is not uncommon to find setpoint temperatures lower than 70°F in this situation. In some regions, such indoor temperatures will support the condensation of water within wall cavities.

Some homes gain excess moisture though their fresh air ventilation system. This is particularly a problem for homes in humid climates whose outdoor ventilation intake is connected to the air handler in such a way that it bypasses the cooling (and dehumidifying) air conditioning coils. Ironically, ventilation requirements intended to increase indoor air quality and remove moisture during the cool periods can have the exact opposite effect in humid climates—increasing humidity to the home and increasing the likelihood of mold growth.

## MOLD, MILDEW, AND MICROBES

Mold and mildew are simple plants that grow on material surfaces. Mold can cause stains, create odor problems, deteriorate materials, and prompt allergic reactions in susceptible individuals. To flourish, mold needs a nutrient base (most surfaces contain sufficient nutrients), moderate temperatures (between 40°F and 100°F), and relative humidity in excess of 70%. Because air at a lower temperature cannot hold as much water, colder rooms have a higher relative humidity. It is common for mold to first show up at cold spots that develop because of inadequate insulation and relatively still air. These cold spots become more humid than other areas and support more active mold growth.

Mold and mildew problems are related to high humidity throughout a home, however, it is common to find mold and mildew in only localized areas where conditions are prime to support their growth. Isolated cold spots on walls and high-moisture areas such as bathrooms are examples of these sites, particularly bathrooms with underutilized ventilation fans.

### Moisture Problem Case Study: CLOSET MOLD

| | |
|---|---|
| **Season:** | Winter |
| **Symptom:** | Mold growing on the interior surface of a closet. |
| **Cause:** | A closed closet door prevents heat from the home from entering the closet and warming the exterior wall. Cool temperatures and little air movement yield a relative humidity of over 70% in the closet. Stored clothes further prevent even minimal warming of this wall. |
| **Remedy:** | Advise homeowner to avoid stacking clothing against the exterior wall and to increase ventilation in the closet by leaving the door open. |

**Moisture Problem Mitigation**

## Moisture Problem Case Study: CLOSED-OFF ROOM

| | |
|---|---|
| **Season:** | Winter |
| **Symptom:** | Mold growing around windows and along the top of walls in a room that is seldom used and kept closed off from the rest of the home. |
| **Cause:** | Little-used guest room was closed off for winter, including shutting the heating supply duct. The quantity of moisture in the guest room air is the same as in other rooms of the home, but its lower temperature makes for higher relative humidity and an ideal environment for mold growth. |
| **Remedy:** | Advise homeowner to resume conditioning the room—and to seek other strategies for reducing the home energy bill. |

**Figure 3.17    Closed-Off Room**



When the supply grilles are closed, warm air cannot enter a closed-off room. The inside air will become cold enough to significantly raise the relative humidity level in the room, supporting mold growth.

# MOISTURE PROBLEM BASICS

All moisture problems share the same components: a moisture source, a mode of moisture transport, and a moisture accumulation site. This chapter explains each of these components, how their interactions can lead to problems, and how understanding them can point to solutions.

The physical properties of water allow it to move about very easily; in most cases, this acts to reduce moisture problems. If water is spilled on a floor, for example, gravity spreads the water over a wide area; water is molecularly attracted to most materials and it therefore tends to spread out and move away from a spill site. The net effect is greater water-to-air contact, which, because water has also a high vapor pressure, results in quick evaporation. This tendency of water to dissipate is a natural safeguard that helps protect homes from serious moisture damage. Most building materials can tolerate occasional wetting—as long as they are given the opportunity to dry out; this is the essence of the home "moisture balance." Each building material has a specific tolerance for wetness and can accumulate (store) moisture until this tolerance level is reached; above this level, the material fails to function properly and may deteriorate. Research indicates that materials absorb moisture faster than they release it; thus, more time is needed to dry a material and prevent continued accumulation. Any factor that increases the moisture added to a building material or decreases the speed at which it is removed can cause moisture to build up in amounts that can damage a home.

**Figure 4.1    Moisture Balance**



Drying to outside

Drying to inside

Moisture added to a wall

Drying to outside

Drying to inside

Moisture added to a wall

**Balanced:** The wall can store some moisture as long as it can dry out.

**Unbalanced:** Moisture is added faster than it can dry out accumulation and damage occurs.

## MOISTURE SOURCES

One of the keys to managing a moisture problem is determining the origin of the moisture. Once a source is identified, it may be possible to control, if not eliminate it, altogether. Rain, for example, cannot be prevented, but it can be kept out of attics and walls where it can cause damage.

The sources of excess moisture in homes can be quite varied. The ground under most homes has high moisture content. Even when it appears dry, it can contribute significant water vapor to a home. Likewise, the outside air contains moisture, especially in humid climates; under some conditions water vapor from outside air will contribute to problems inside a home or its building components. Everyone knows that plumbing fixtures contain water, but other household equipment contains water as well: air conditioners, refrigerators, washers, and even clothes dryers

can be the source of damaging moisture if they are not properly maintained. One source of moisture that is recognized and discouraged by many home manufacturers is unvented space heaters. Although such heaters are claimed as "clean burning," no one denies that water vapor is given off during operation—about a gallon of water for every gallon of fuel consumed. Even moderate use of unvented combustion heaters can be a significant source of problem moisture.

In many climates, rain and snow are persistent in challenging a home's defenses. Every imperfection in the increasingly complex outer shell of a home is a potential entry point for these water sources.

People and their activities are another source of moisture. Although the average person does not usually add enough moisture to cause a problem, excessive activity—for example, keeping 15 or more indoor plants, or an extended period of steam cooking—can upset the moisture balance. Other people-related sources of moisture include the storage of damp materials in the home (e.g., firewood), and showering without using the bathroom fan. Many moisture sources are subtle and require some experience or training to locate. Identifying the source(s) is the first step to eliminating or managing damaging moisture accumulation.

**Figure 4.2    Moisture Production from Indoor Activities**



Domestic sources of moisture include bathing, showering, cooking, mopping, and clothes washing and drying. The more problematic indoor sources are unvented gas appliances, indoor gardens, saunas, hot tubs, and indoor storage of firewood.

**Moisture Problem Basics**

**Figure 4.3    Sources of Moisture**



Identifying the source of moisture is the first step to eliminating or managing the problem.

## MOISTURE MOVEMENT

Water moves from one place to another as it seeks "equilibrium" in its surroundings. Water has several paths of movement within a building and sometimes uses several paths at once. Liquid flow, capillary action, and air movement are some of the important ways that water moves.

**Liquid flow:** Gravity causes liquid to flow downhill. Sometimes this movement is simple, such as when water condenses on a window pane and flows down onto the sash. Sometimes the movement is more complex, such as when water collects in an attic and flows horizontally along the sheathing, eventually making its way into a wall where it shows up as a stain on an interior wall, floor, or ceiling.

**Capillary suction:** Porous materials such as wood, wall board, or concrete block, and materials that are sandwiched together, such as shingles or flashing, often act like sponges, bringing water uphill against gravity. This is what is happening when a puddle touching a wall leaves stains on the wall far above the floor level.

**Air movement:** After liquid flow, air movement is the most important of the moisture movement mechanisms. The movement of air can be the result of several driving factors: exterior wind speed, negative and positive pressure inside the home (see **Mechanical equipment operation** on page 4.4), and stack effect (hot air rises because it is less dense). The rate of air movement through the envelope of the home depends on these factors acting simultaneously. For example, on a windy day with the thermostat set to cool the home, there will be significant combination of pressures pushing outside air into the home. Holes in the envelope are natural pathways for air movement. For example, if there are gaps in the marriage line gasket, air can be exhausted through openings in the ceiling gasket with makeup air drawn from the moist crawlspace, transporting unwanted moisture into marriage wall cavities where it can cause damage or enter into the home.

**Figure 4.4    Moisture Movement**



Water moves from one place to another via liquid flow, capillary action, vapor diffusion, air movement, and equipment operation.

**Vapor diffusion:** Even where there is no air movement, water vapor migrates to areas where it is less concentrated. This property, vapor diffusion, causes water molecules to move through materials such as wall board. Vapor retarders, such as "low-permeability" paints, resist this molecular movement and can minimize moisture movement caused by vapor diffusion.

**Mechanical equipment operation:** Dehumidifiers and humidifiers are designed to remove or add moisture to a home's indoor environment. Air conditioners are quite effective dehumidifiers if properly sized and charged. Air conditioner-based dehumidification is a function of equipment run-time; the longer a system operates, the more water vapor it removes. Oversized air conditioners are poor dehumidifiers. Since the thermostat that controls a cooling system is triggered only by air temperature, an oversized air conditioner cools the air quickly but may not run long enough to sufficiently dehumidify the air.

# MOISTURE ACCUMULATION

Moisture in a home has many sources and can move in many ways. It becomes a problem only when it stops moving and accumulates. Moisture damage occurs when the amount of moisture accumulated exceeds the moisture storage tolerance of a specific building component—from the roof sheathing to the wood window sash or wall and floor cavities. Each of these sites will experience problems if moisture is added faster than it can be removed.

**Figure 4.5    Moisture Accumulation**



Condensation destroys
roof sheathing and
causes ceiling drips

Improperly located vapor
barriers cause moisture to
accumulate inside walls

Condensation on windows
drips onto sash

Water collects in a pool in the
belly, reducing insulation values
and saturating nearby wood

Moisture in a home becomes a problem only when it stops moving and accumulates in damaging amounts.

Water moving by gravity flow eventually finds a low spot, such as the belly of the home, where it can flow no further. This is the simplest illustration of accumulation. The materials in the floor system can tolerate this condition for a short period of time; however, if the water remains, mold will grow, the wet insulation will lose its thermal resistance capacity, and the wooden floor frame will swell and eventually rot.

Summertime moisture damage is increasingly occurring inside wall cavities: when the indoor temperature is low because of air conditioning, moisture accumulates by condensation on the backside of the wall board.  The use of a vapor retarder on the inside of exterior walls in hot, humid climates limits the ability of these walls to dry out, setting up conditions for mold and structural damage inside the wall cavity.

## SOLVING MOISTURE PROBLEMS

The key to solving moisture problems is to understand:

- Why moisture has accumulated at the damage site,
- Where the moisture is coming from, and,
- When the source of the damage is physically removed from the site of the damage, how the moisture traveled from one place to the other.

In many cases, altering just one of these elements is enough to solve a specific moisture problem.  More often, remedying moisture problems poses quite a puzzle, especially if multiple sources and transport methods are involved, or if the moisture source is far removed from the site where damage is manifested.  Fortunately, effective moisture control can be achieved consistently and is the result of good design, careful installation, and intelligent home operation.

# GLOSSARY

**air retarder**
A material or system designed and installed to reduce air leakage into or through the exposed areas of a wall or other building components that enclose conditioned space.

**bottom board**
Most commonly a flexible sheet material that is used to enclose the bottom side of the floor system from the crawlspace. Also referred to as the "belly."

**capillary action**
Uphill movement of water against the force of gravity into porous materials such as brick, wood, and wall board due to the relative surface attraction between the molecules of water and the solid.

**condensation**
A process in which water vapor changes into liquid water by the extraction of heat from the vapor.

**convective loops**
Convection is the transfer of heat through the movement of air. When convection occurs in a closed cavity, such as inside a wall, the air movement forms a loop—moving up one side of the wall and down the other. This is a moderately effective way of moving heat and can defeat insulation effectiveness.

**dehumidification**
The removal of water vapor from air by either cooling the air below the dew point and draining the resulting liquid away, or by absorbing it from the air through a repeatable chemical process.

**dew point**
The temperature at which humid air becomes saturated and the water vapor begins to condense to liquid water.

**duct leakage**
Air leakage from holes, faulty seams, rips, and tears in the heating and cooling air distribution system.

**dust mites**
Microscopic insects that grow in carpets, upholstered furniture, and mattresses when the relative humidity levels reach 50%. Many people are allergic to the fecal matter produced by dust mites.

**exfiltration**
The uncontrolled flow of air out of a building through cracks, holes, doors, or other openings that allow air to escape. Air that leaks out of a home is replaced by outdoor air that is brought in by fans or infiltration. (See infiltration.)

**infiltration**
The uncontrolled flow of air into a building through cracks, holes, doors, or other openings that allow air to move in from the outside. (See exfiltration.)

**insulation**
A building layer that has a high resistance to heat flow in and out of buildings. Common insulation materials used in manufactured housing are cellulose, fiberglass, and rock wool.

**latent heat**
Heat given up when a substance changes from vapor to liquid. Although heat is removed, the substance stays at the same temperature while condensing.

**marriage line**
The line of intersection through the floor, walls, ceiling, and roof that joins two home sections together.

**MHCSS (Manufactured Home Construction and Safety Standards)**
A set of specifications to which manufactured housing manufacturers must build. This is a comprehensive national standard administered by HUD; it preempts all other building regulations. Also referred to as the "HUD-code."

**moisture and vapor retarder**
Materials used to slow the passage of water vapor or moisture into building assemblies through diffusion.

**mold and mildew**
Fungal colonies that grow on surfaces when the relative humidity is 70% or higher and a nutrient or food source is available, such as the cellulose fibers in the paper finishes of wall board. Mold spores are allergens that can emit odors and make stains, and are associated with respiratory symptoms in sensitized individuals.

**permeance**
A measure of the ability of a material to transmit free water molecules by diffusion. The term "perm" is the rate of water movement through a material.

**perm rating**
A measurement of the amount of molecular diffusion of water through a given material. HUD-code-required vapor retarders usually have a perm rating of less than 1.0. Typical vapor retarders include polyethylene sheets, special interior paints, and the vinyl finish on wall board.

**pressure balance**
Air movement is caused by pressure imbalance. Air always moves from high pressure to low; if there is a pressure balance, air will not move. Pressure balance in a home keeps air from moving into undesirable places such as into building cavities.

**relative humidity (RH)**
The ratio of water vapor in the air to the amount the air could potentially hold at a given temperature.

**skirting**
A perimeter enclosure that creates the crawlspace area under a manufactured home. Skirting materials range from ventilated vinyl siding to brick walls.

**stack effect**
A pressure difference that exists because of the temperature difference of the air masses inside and outside a building. In winter conditions this pressure difference causes airflow into a building at its lower levels and out at its higher levels.

**thermal barrier**
A continuous blanket of materials (such as fiberglass insulation) used to slow the flow of heat into building assemblies.

**vapor diffusion**
The movement of water vapor from a region of high concentration to a region of low concentration.

**vapor retarder**
Material used to slow the passage of water vapor into building assemblies; usually a sheet or coating with low permeance. Also referred to as "vapor diffusion retarder."

**ventilation**
The introduction of outdoor air into a building. Passive ventilation takes place naturally through windows, doors, and air leakage sites. Mechanical ventilation uses a fan to move air. Mechanical systems that use exhaust fans depressurize a home, whereas systems that bring in ventilation air with the furnace fan pressurize a home. Spot ventilation is the temporary use of bath and stove exhaust fans to remove odors and water vapor.

**wall, ceiling, and floor cavities**
Spaces between the outside sheathing and the inside surface treatment; usually containing insulation, ductwork plumbing, and electrical wiring.

# BIBLIOGRAPHY

Burch, M. Douglas. 1995. *An Analysis of Moisture Accumulation in the Roof Cavities of Manufactured Housing.* STP 1255. Philadelphia: American Society for Testing and Materials: 156–177.

Cutter Information Corporation. 1986. "Moisture in Houses—Control Technology for Designers and Builders." New York.

Elovit, Kenneth M. 1999. "Understanding What Humidity Does and Why." *ASHRAE Journal*, Vol. 41, No. 4 (April): 84–90.

Lstiburek, Joseph and John Carmody. 1991. *Moisture Control Handbook: New, Low-Rise Residential Construction.* Washington, D.C.: U.S. Department of Energy Conservation; Renewable Energy Office of Buildings; Community Systems Building Systems Division.

Manufactured Housing and Standards Division and The National Conference of States on Building Codes and Standards. 1998. *The Essentials of Moisture Control Through a Building Envelope.* Washington, D.C.: U.S. Department of Housing and Urban Development (February).

Proctor, John, Zinoviy Katsnelson, and Brad Wilson. 1995. "Bigger Is Not Better—Sizing Air Conditioners Properly." *Home Energy Magazine*, Vol. 12, No. 3 (May/June): 19–26.

Oak Ridge National Laboratory, Building Technology Center. 1996. *Moisture Control in Walls, Version 1.0* [computer software].

Swinton, M.C., W.C. Brown, and G.A. Chown. 1999. "Small Buildings—Technologies in Transition: Controlling the Transfer of Heat, Air, and Moisture Through the Building Envelope." *Building Science Insight Series.* NRCC 3233. Ottawa, Canada: National Research Council Canada.

Tang Lee Environmental Design. 1984. *Condensation in Manufactured Housing.* Alberta, Canada: The University of Calgary.

TenWolde, Anton. 1993. *Ventilation, Humidity and Condensation in Manufactured Houses During Winter.* Washington, D.C.: U.S. Department of Agriculture, Forest Service Forest Products Laboratory.

TenWolde, Anton, et al. 1993. *Air Flows and Moisture Conditions in Walls of Manufactured Homes.* Washington, D.C.: U.S. Department of Agriculture, Forest Service Forest Products Laboratory.

Tsongas, George. 1995. "Moisture and Mobile Home Weatherization." *Home Energy Magazine*, Vol. 12, No. 4 (July/August): 29–31.

U.S. Department of Commerce. National Institute of Standards and Technology. 1997. *MOIST-A PC Program for Predicting Heat and Moisture Transfer in Building Envelopes (Release 3.0)* [computer software]. NIST Special Publication 917 (September).

U.S. Department of Commerce. National Institute of Standards and Technology. 1996. *Mathematical Analysis of Practices to Control Moisture in the Roof Cavities in Manufactured Homes.* NISTIR 5880.

U.S. Department of Commerce. National Institute of Standards and Technology. 1995. *Manufactured Housing Walls That Provide Satisfactory Moisture Performance in All Climates.* NISTIR 5558.

U.S. Department of Commerce. National Institute of Standards and Technology. 1995. *Heat and Moisture Transfer in Wood-Based Wall Construction: Measured Versus Predicted.* NIST Building Science Series 173.

U.S. Department of Commerce. National Institute of Standards and Technology. 1991. *Indoor Ventilation Requirements for Manufactured Housing.* NISTIR 4574.

U.S. Department of Commerce. National Institute of Standards and Technology. 1992. *Controlling Moisture in the Walls of Manufactured Housing.* NISTIR 4981.

U.S. Department of Commerce. National Institute of Standards and Technology. 1992. *Controlling Moisture in the Roof Cavities of Manufactured Housing.* NISTIR 4916.

# Moisture & Mold
# Diagnostics and Mitigation

## NC Energy Star Conference
### December 6, 2006
### Raleigh, NC

Francis Conlin



*Produced in cooperation with:*



PLAINTIFF'S
EXHIBIT
13
tabbies



# Building Moisture Problem Solving Flowchart

# Francis Conlin

Diagnose building problems in the field

Conduct building science research

Authored several guidebooks

Consultant for Commercial and Residential construction industries regarding building performance issues

25 year experience working in building performance



3

# Moisture & Mold Diagnostics and Mitigation

- Why should the E- Star community care
- Mold basics
- Building Science of Moisture Movement
- Mold Diagnostics
- Mold Testing
- Mold Remediation
- Clearance Sampling

4

mSolve



# Why Should the Energy Star Community Care about Mold?



CASE STUDY

HOME PERFORMANCE WITH ENERGY STAR®

"When Fresno homeowners Matt and Lisa Nutting and their family were battling asthma, respiratory problems, mold problems and high energy bills they called local contractor Gary Richardson in nearby Clovis. Richardson was trained to diagnose and fix homes using the "house as a system" approach and is an contractor offering ENERGY STAR services...."



# You are the Building Performance Experts





"The professionals of Home Performance with ENERGY STAR have the training to identify the cause of problems or potential problems in your home and provide you with solutions."



7



Mold Lawsuits Escalating:

got mold?

MOLD in Buildings

"Creates New Frontier in Construction Defect Litigation, & Definition of Pollution"



# Mold Lawyers



# Mold Lawyers



# Mold Litigation Conference

June 16-17, 2005
The Ritz-Carlton Hotel, Marina del Rey, CA

## CONFERENCE AGENDA

Learn about the top cases from different jurisdictions. Discuss the impact of recent mold cases – claims & defenses, verdicts, settlements and the impact on claims across the nation

**Materials Covered**
- State of the law on subsequent remedial measures
- State of the law on spoliation of evidence
- "After the fact" Operations & Management (O&M) plans
- What experts do you really need and how do you protect them
- Analysis of recent hearings relating to personal injury & property damage
- How to document mold exposure, testing and remediation
- Contrast & compare – the prosecution of property damage vs. personal injury
- Identifying the proper parties to the litigation
- The most effective claims by plaintiffs
- The most effective defenses

**Strategies in Mold Litigation – Break-Out Sessions**
Moderators will lead discussions focusing on the hot-button issues in mold litigation faced in your day-to-day practice

# Prosecuting Mold Claims

Stephen Wright Mullins
Law Firm of Alwyn H. Luckey
2016 Bienville Boulevard, Suite 102
P.O. Box 724
Ocean Springs, MS 39566





# Old Problem – New Issues





mSolve

# Reported Mold Effects

- **Allergic reactions**: allergies and asthma trigger

- **Irritant**: eye, skin, respiratory tract

- Respiratory **disease** in workers with high mold exposure: Farmers Lung disease

- **Infections** mainly in people with compromised health

- Fungus associated with bat, bird droppings causes histoplasmosis



# Reported Mycotoxin Effects

- Respiratory problems, Nasal and sinus congestion
- Eyes-burning, reddened, blurry vision
- Dry, hacking cough, sore throat
- Nose and throat irritation
- Shortness of breath and lung disease
- Chronic fatigue
- Skin irritation
- Central nervous system problems
- Aches and fever, headaches, diarrhea, etc.



15

# Mold & Health

Mold and damp conditions in homes are linked to asthma symptoms, to coughing, wheezing, and upper respiratory tract symptoms in healthy people

However, the available evidence does not support an association between indoor dampness or mold and the wide range of other health complaints that have been ascribed to them.

Institute of Medicine authors clearly state that there are <u>no such things as toxic mold</u>



Institute of Medicine of the National Academies, 2004

16



# Media Response

- Time Magazine
- Wall St. Journal
- Reader's Digest
- People Magazine
- 48 Hours





# How Mold Grows



**1**

**Moist food source**

Spore lands on a moist surface

Enzymes use surface moisture to dissolve food

**2**

Spore germinates, producing filaments (hyphae)

Hyphae extend both reach and area of absorptive surface. Fungal metabolism generates more surface moisture to accellerate growth.



**3**

Hyphae grow thickly, digging into the surface and forming a protective mat (mycelium) that keeps the surface moist even if surrounding air is dry.



**4**

The mold grows conidia, which generate and release spores to the air.



mSolve

# Conditions for Mold Growth

- Food: Organic materials
  - Cellulose building materials (wood, paper faced sheetrock)

- Temperature:
  - Best conditions between 60 to 125 degrees F

- Excess moisture: Primary factor
  - Water: flooding, roof and plumbing leaks
  - Water vapor: Mold grows above 70% RH

- Time. Mold colonies will form in 48 hours



# Conditions for Mold Growth

- Excess moisture: Primary factor
  - Water: flooding, roof and plumbing leaks
  - Water vapor: Mold grows above 70% RH



# Building Mold Locations

- Crawl spaces and basements

- Attics

- Inside damp/wet walls and on siding

- Carpets on concrete slabs

- Windows

- Bathrooms

- Behind vinyl wall coverings

- Ductwork





# Building Science

The study of how buildings interact within their 'natural' environment…

Building Science includes: Heat and <u>moisture transfer</u>, heating and cooling equipment, ventilation, the immediate climate and homeowner behavior.



# First Law of Building Science

- **Everything in a building participates as one system**
  - You can never do just one thing
  - Actions in one spot or system may show up as symptoms far removed and seemingly unrelated

24

*mSolve*

# Second Law of Building Science

- **Things want to go from high to low**
  - Heat moves from high temperature to low
  - Air moves from high pressure to low
  - Water vapor moves from high pressure to low
  - Gravity moves matter from high elevation to low

mSolve

# Third Law of Building Science

- **But they don't always…**

  - You can force things to go in the opposite direction from where it wants to go

  - This can be on purpose or ACCIDENTALLY

26

m.SOWe

# Experience tells us . . . .

Moisture problems often have more than one source, several modes of transport and accumulation sites.

Multiple construction shortcomings increase likelihood of moisture problems - exponentially.

People do stupid things: by using <u>Bad Science (BS)</u> instead of Building Science.

Complex construction = complex moisture dynamics.

The best moisture protection is redundant protection.



# Understanding Moisture Dynamics

- Accumulation Site Characteristics

- Transport Mechanisms
  - *Bulk Moisture Movement*
  - *Capillary Action*
  - *Air Transported*
  - *Vapor Diffusion*
  - *Equipment Condensate*

- Source(s) of Excess Moisture



28

# Moisture Accumulation

**Accumulation:**

- More moisture is coming in than can possibly go out

- The level of moisture rises until it becomes a problem



29

# Accumulated Moisture Storage



Drying to outside

Drying to inside

Drying to outside

Moisture added to a wall

Moisture added to a wall

(To a limit...)



30

# Sources of Moisture



Ice dams cause leaks into attics

Entry path for humid outdoor air

Plumbing and spills

Poor site drainage

Moist air from crawlspace

Infiltration of humid outdoor air

Rain enters wall cavity through light fixture penetration

Water vapor from unvented space heater

31

# Moisture Transport

**Moisture moves by:**

- Gravity: (liquid)
- Capillary action
- Carried in by air
- Diffusion (vapor)
- Equipment condensate



# Liquid Flow of Water

- Responsible for most problems
  - Floods
  - Roof Leaks
  - Plumbing leaks and spills
  - Driving rain and rain splash

- Most problems easy to recognize

*Do not neglect or delay fixing these!*



# Capillary Action





# Capillary Action

mSolve

# Air Transported Moisture





# Air Movement Driving Forces

Wind

Exhaust fans

Clothes drier

Stack effect (Gravity)

Air handler

Return leaks

Supply leaks

Closed doors

Stack Effect

Fans and Blowers

Wind

mSolve



# Driving Forces and Pressure

**Driving forces:**

Closed doors



Driving Forces and Pressure

**Driving forces:**

Closed doors

39

mSolve



Driving Forces and Pressure

**Driving forces:**

Closed doors

40

mSolve



# Driving Forces and Pressure

**Driving forces:**

Closed doors

41

mSolve

# Air Transported Moisture vs. Diffusion

Vapor diffusion is less important than air pressure in moving moisture

*Source: Builder's Guide Cold Climates*



42

# Relative Humidity & Condensation

As the temperature of air lowers, it is able to hold less water

If a material is colder than the dew point of the air, moisture will condense

This critical temperature is called its dew point





43

# Relative Humidity

As the temperature of air lowers, it is able to hold less water

If a material is colder than the dew point of the air, moisture will condense

This critical temperature is called its dew point





44

# Relative Humidity

As the temperature of air lowers, it is able to hold less water

If a material is colder than the dew point of the air, moisture will condense

This critical temperature is called its dew point

65 F

100% RH



45

# Relative Humidity

As the temperature of air lowers, it is able to hold less water

If a material is colder than the dew point of the air, moisture will condense

This critical temperature is called its dew point



65 F

100% RH



46

# Relative Humidity and Wood Moisture Content



| Relative Humidity of Air % | Wood Moisture Content % |
|---|---|
| 40 | 9 |
| 50 | 11 |
| 60 | 13 |
| 70 | 15 |
| 80 | 18 |
| 90 | 23 |
| 100 | 35 |

47

nuSolve



# How to Investigate Mold

- Use your eyes and nose
- Inspect all areas:
  - Crawl space, attic, equipment chases, and suspect hidden areas
- Interview the occupants
- Know the principles of moisture movement, condensation & storage
- Utilize qualified specialists for difficult problems



49

# Diagnostic Tools

- Moisture meters
- Hygrometer
- Blower Door and Duct Blaster
- Boroscope
- Digital pressure meter
- Smoke bottle
- Data loggers
- Infrared camera
- Digital Camera
- Appropriate PPE



msolve

# Case Study 1

## Mold on Ceilings



## Ceiling Stains



52

## Common Ceiling Stain Patterns

| Random | Isolated (One or more) | Linear Round In a line | Adjacent to a wall or peak | Concentric saturation lines | Identify stain boundary | Air brush pattern |
|---|---|---|---|---|---|---|



53



Ceiling Stains



54

mSolve



Ceiling Stains

mSolve



Ceiling Stains

Ceiling Stains



mSolve



Ceiling Stains





Ceiling Stains

mSolve

59

- Insulated walls, but left vents open
- No insulation/Vapor retarder on floor or ducts
- Plastic *under* the gravel
- Sump pump at top of gravel
- Perimeter drain





Although excess moisture entered attic all year, only when it condensed on the snow covered roofs and dripped back down was the problem realized

## Building Science:

As warm air rises out of the attic, it must be replaced by other air,

Air takes the path of least resistance (comes either from CS or Soffit vents)

Moist air will condense on cold surfaces (nails)

Gravity causes it to drip down – sufficient volume will develop into water stains on ceiling

## B S:

A fan in the crawlspace will fix this problem

More vents in the attic will fix the problem

A attic fan will fix this problem

If we do enough things & spend enough money the crawlspace and attic will be dry



# Case Study 2

# Mold on Walls

mSolve

Wall Stains





Wall Stains

mSolve



Wall Stains

# Wall Stains



Upstairs supply duct location and location of floral activity in down stairs dining room

mSolve.au

# Wall Stains

Mold seen from inside the downstairs dining room.

An oval shaped duct is located in this 6" wall cavity to supply the upstairs. Duct access to the wall in the crawlspace is not sealed, putting wet crawlspace air in communication with the wall cavity.





Hole from crawlspace into wall cavity

mSolve

# Wall Stains



Damp crawlspace near site —
Note high water mark.

# Wall Stains

Mold seen from inside the downstairs dining room.

An oval shaped duct is located in this 6" wall cavity to supply the upstairs.

Duct access to the wall in the crawlspace is not sealed, putting wet crawlspace air in communication with the wall cavity.

Crawl space is very wet.





Damp crawlspace near wall stain





Hole from crawlspace into wall cavity

mSolve

Wall Stains

We still haven't found the ultimate source of moisture





mSolve

## Building Science:

Water vapor goes from high to low pressure – It will move into the wall cavity from the crawlspace

Water will condense on cold ducts inside the walls and collect on the wallboard

Mold will grow on damp gypsum board.

The CS is not the source of moisture its just another accumulation site.

## B S:

A fan in the crawlspace will fix this problem

More vents in the crawlspace will fix the problem.

It just needs a ground vapor barrier

Seal the hole – problem fixed!



# Case Study 3

# Mold on Floors



Mold Stain on Vinyl Floor - 2

# Mold Stain on Vinyl Floor





Case 1:06-cv-00643-MHT-SRW  Document 54-14  Filed 11/12/2007  Page 77 of 126





Mold Stain on Vinyl Floor - 2

72°F

Dewpoint = 75°F

78

## Building Science:

Cooled air from the home cause the floor to be cool.

Moisture from crawlspace enters floor cavity and condenses under cold vinyl.

Insulation needs to be aligned with the air and vapor barriers.

## B S:

We don't really need a vapor barrier under the home.

A small opening in the insulation doesn't matter much. - Insulation doesn't have to be "100%"

Vapor barriers are bad in the South aren't they?



# Case Study 4

## Mold and Bathrooms
## (closets, etc.)





Bathrooms



Bathrooms

mSolve



83

msolve



Bathrooms

84



Hole in ceiling - Light from bathroom below





87

Bathrooms



## Building Science:

Water vapor can be pulled out of the humid attic with low pressures even from reverse stack.

Hot, humid air will float on the top of the room. Concentrated in a small area.

Bathrooms are overcooled, anyway and the toe kick often doesn't mix the air in the ceiling area.

Holes in the ceiling are risky

## B S:

People will use a noisy bath fan.

People will open bathroom windows to ventilate moisture.

A little extra supply air isn't going to cause problems.

A few exposed bays in the attic won't hurt anything.

Factory fan, UL listed has to work right, Right?





# Should You Test?

mSolve

# Be Sure Sampling Provides a Benefit

All molds are undesirable - speciation doesn't effect cleanup response or protocol.

Homeowners may insist, or have already sampled, often with questionable techniques.

There may be legal reasons to sample or not to sample

If there are health issues, hidden mold may be uncovered

May prove that a suspected stain is not mold

If it looks like mold, smells like mold, don't sample - clean it!

Sampling is often conducted as a clearance criteria







# Mold Testing is Expensive

Laboratory Analytical Services

**Price List of Services**
Standard turnaround time
Minimum order: $40

**Air Samples, Culturable: Andersen, RCS, SAS, etc.**

| | | |
|---|---|---|
| Standard Fungal Analysis (Genus ID + *Aspergillus* to species) | $ 40.00 | per sample |
| + *Penicillium* speciation | add | $ 60.00 | per sample |
| + *Cladosporium* speciation | add | $ 50.00 | per sample |
| Premium Fungal Analysis with Full Species Identification | **$ 200.00** | **per sample** |
| Quantitative Bacterial Analysis | $ 30.00 | per sample |
| Quantitative Bacterial Analysis & Additional Identification | $ 60.00 | per sample |
| Gram Negative Bacteria | $ 30.00 | per sample |
| Thermophillic Actinobacteria (=Actinomycetes) | $ 25.00 | per sample |

**Air Samples, Non-Culturable: Zefon, Allergenco, Burkard, BioSIS, etc.**

* Spore Trap: Analysis — $ 50.00 per sample
* Spore Trap: Analysis with other Biological Particles — $ 75.00 per sample
* Burkard 7 Day Recording Sample — call lab



# Don't over sample

Do we need to sample this?

Do we need 24 samples?

mSolve



# Types of Sampling

- Culturable vs. non-culturable samples

- Bulk and surface sampling

- Air sampling

- Homeowner kits















**Comparison of Total Outside Mold Counts - and Master Bedroom**

Mold levels indoors is an average of the mold levels from outdoor sources – some from air in the yard, some from air in the crawlspace

Area represents 500 Spores/m³

4,780 Outside Sep

400 Master Bd Sep

5,000 Crawlspace Sep

2,716 Master Bd Apr

3,201 Outside Apr

29,933 Crawlspace Apr

100



**Comparison of Outside Mold Counts - and Master Bedroom Penicillium/Aspergillus (Pen/Asp)**

Mold levels indoors is an average of the mold levels from outdoor sources – some from air in the yard, some from air in the crawlspace



27 Outside Sep

20 Master Bd Sep

640 Crawlspace Sep

483 Master Bd Apr

367 Outside Apr

16,200 Crawlspace Apr

Area represents 500 Spores/m³



101



**Comparison of Total Outside Mold Counts –**

Mold levels outside vary with the season, windspeed, time of day and collection location. Following are each of the reported outside mold levels cited in this case.



102

| Table 1. | Comparison of air sampling results & recommendations | | | | | |
|---|---|---|---|---|---|---|
| Investigator Qualifications | Certified Mold Remediator PE | Certified Industrial Hygienist Certified Indoor Environmentalist | | Certified Industrial Hygienist Certified Safety Professional | | |
| Sample date | October 3, 2006 | September 8, 2006 | | April 5, 2006 | | |
| Mold observations | No visible mold | No visible mold | | Visible in CS | | |
| Moisture observations | Moisture at door HVAC accumulation | Moisture at door | | None | | |
| Sample results | Spores cfu/m³ | | Spores cfu/m³ | | Spores cfu/m³ | |
| | Total | Pen/Asp | Total | Pen/Asp | Total | Pen/Asp |
| Outdoor | 17,469 | 81 | 4,780 | 27 | 3,201 | 367 |
| Crawlspace | 46,029 | 5,360 | 5,000 | 640 | 29,933 | 16,200 |
| Master Bed | | | 400 | 20 | 2,716 | 483 |
| Conclusion | No mold sources are present within the home | No amplification of airborne fungi | | Significant microbial contamination from the CS | | |
| Recommendations | Dry the crawlspace and seal bottom plastic. Conduct follow up testing | Remediation not indicated. | | Significant remediation specified ($111,000) | | |



# Mold Professional Certifications

IAQA Certified Indoor Environmentalist Consultant - (CIEC)

IAQA Certified Indoor Environmentalist - (CIE)

IAQA Certified Indoor Environmentalist Associate - (CIEA)

IAQA Certified Microbial Remediatior - (CMR)

IAQA Certified Microbial Consultant - CMC

IAQA Certified Microbial Investigator - CMI

IAQA Certified Residential Mold Inspector - CRMI

IAQA Certified Residential Mold Inspector Associate - CMIA

Certified Industrial Hygienist – CIH

Certified Associate Industrial Hygienist - CAIH

Certified Safety Professional - CSP

Certified Mold Inspectors - CMI

Certified Mold Remediators/Contractors - CMRC

Certified Toxic Mold Exterminator - CTME

Certified Environmental Hygienist - CEH

Certified Waterproofing Pro - CWP

Certified Water Leak Locator - CWLL

Certified Mold Inspector - (CMI)

Certified Mold Remediation Contractor - (CMRC)

Certified Mold Professional Program - (CMP)

Certified Restorer Program - (CRP)

NAMP Certified Mold Professional - CMP

NORMI™ Certified IAQ/Mold Inspector - CMI

NORMI™ Certified Mold Assessor - CMA

NORMI™ Certified Mold Remediator - CMR

NORMI™ Certified Environmental Evaluator - CEE

NORMI™ Certified Indoor Environmental Advisor - CIEA

NORMI™ Certified Biocide Applicator - CBA

Mold Worker Certification – MWC

Pro Lab Mold Certification Classes –PLMC

Mold Inspection Certified Professional - (MICP)

The Indoor Environmental Certified Consultant - (IECC)

Indoor Environmental Master Consultant - (IEMC)

Certified Mold Detection Dog – (CMDD)





# EPA Remediation Flow Chart



# Remediation Simplified

- Respond Promptly
- Protect the occupants, Keep them informed
- Protect the workers – use PPE
- Fix the moisture problem
- Dry out excess moisture
- Clean up all the mold
  - Be aware of potential hidden mold
- Supervise contractors



# Grandma's  Cleanup Guidelines





# Remediation Cleanup Guidelines



**IICRC S520**

**Standard and Reference Guide for Professional Mold Remediation**

*First Edition December 2003*

IEInstitute

Contributing Organization

Contributing Organization



# EPA Cleanup Guidelines

## Three clean up categories

- Small – Less than 10 ft$^2$

- Medium – 10 to 100 ft$^2$

- Large – Greater than 100 ft$^2$



# EPA Cleanup Methods

1. Wet vacuum (Steam clean carpets & upholstered furniture)

2. Damp wipe surfaces with plain or soapy water

3. HEPA vacuum after materials dried

4. Remove water damaged materials



# Guidelines for Remediating Building Materials with Mold Growth Caused by Clean Water*

| Total Surface Area Affected Less Than 10 square feet (ft²) | | | |
|---|---|---|---|
| Material or Furnishing Affected | Cleanup Methods† | Personal Protective Equipment | Containment |
| Books and papers | 3 | Minimum | None required |
| Carpet and backing | 1, 3 | | |
| Concrete or cinder block | 1, 3 | | |
| Hard surface, porous flooring (linoleum, ceramic tile, vinyl) | 1, 2, 3 | N-95 respirator, gloves, and goggles | |
| Non-porous, hard surfaces (plastics, metals) | 1, 2, 3 | | |
| Upholstered furniture & drapes | 1, 3 | | |
| Wallboard (drywall and gypsum board) | 3 | | |
| Wood surfaces | 1, 2, 3 | | |



# Guidelines for Remediating Building Materials with Mold Growth Caused by Clean Water*

| Material or Furnishing Affected | Cleanup Methods† | Total Surface Area Affected Between 10 and 100 (ft2) | |
|---|---|---|---|
| | | Personal Protective Equipment | Containment |
| Books and papers | 3 | Limited or Full | Limited |
| Carpet and backing | 1, 3, 4 | | |
| Concrete or cinder block | 1, 3 | Use professional judgment, consider potential for remediator exposure and size of contaminated area | Use professional judgment, consider potential for remediator/occupant exposure and size of contaminated area |
| Hard surface, porous flooring (linoleum, ceramic tile, vinyl) | 1, 2, 3 | | |
| Non-porous, hard surfaces (plastics, metals) | 1, 2, 3 | | |
| Upholstered furniture & drapes | 1, 3, 4 | | |
| Wallboard (drywall and gypsum board) | 3, 4 | | |
| Wood surfaces | 1, 2, 3 | | |



# Guidelines for Remediating Building Materials with Mold Growth Caused by Clean Water*

| Material or Furnishing Affected | Cleanup Methods† | Personal Protective Equipment | Containment |
|---|---|---|---|
| **Total Surface Area Affected Greater Than 100 (ft²)** or Significant Potential for Increased Occupant or Remediator Exposure During Remediation | | | |
| Books and papers | 3 | Full | Full |
| Carpet and backing | 1, 3, 4 | | |
| Concrete or cinder block | 1, 3 | | |
| Hard surface, porous flooring (linoleum, ceramic tile, vinyl) | 1, 2, 3, 4 | Use professional judgment, consider potential for remediator exposure and size of contaminated area | Use professional judgment, consider potential for remediator/occupant exposure and size of contaminated area |
| Non-porous, hard surfaces (plastics, metals) | 1, 2, 3 | | |
| Upholstered furniture & drapes | 1, 3, 4 | | |
| Wallboard (drywall and gypsum board) | 3, 4 | | |
| Wood surfaces | 1, 2, 3, 4 | | |





# Remediation Simplified

Have we
found all of
the water
sources?



115

# Remediation Simplified

## What level remediation is needed?





116

# Remediation Simplified

Will surface
cleaning fix
this problem?



117

mSolve

# Remediation Simplified



If walls get and stay wet, repair often requires that:

- First 4 ft of sheetrock and insulation be replaced.

- Exposed wood framing is dried and cleaned.



118

# EPA Containment Levels

1. **None:**

2. **Limited:** Seal off area with floor-to-ceiling polyethylene.

   - Maintain negative pressure with HEPA filter

3. **Full:** Level 2 plus double layer of fire-retardant poly with air lock entry

   - Exhaust HEPA filtered air outside



# Remediation Simplified: Containment





120

mSolve

# Biocide Use

- EPA generally does not recommend use of biocides (e.g.bleach) to kill mold

- Cleaning is needed to remove existing mold. Dead mold remains a health issue.

- Ventilate space if biocides used

- Do not use inside air ducts

- Do not use outdoor designed fungicides inside



# Clearance Criteria

- Completely fixed the moisture problem.
- You should complete mold removal. Visible mold, and moldy odors should not be present.
- Is an Encapsulant part of the strategy?
- Types of mold in the building should be similar and Concentrations less compared to those found outside.
- Revisit the site – it should show no signs of water damage or mold growth.
- People should be without health complaints or physical symptoms.



# Bathrooms



123

mSolve

124

# Mold Stain on Vinyl Floor







Wall Stains

125





## Multiple Problems

## May be too costly to repair

126

mSolve