IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRY DEESE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case Number:  1:06-cv-643 MHT** |
| | * | |
| **CHAMPION ENTERPRISES, INC.,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |

## REPLY TO PLAINTIFF'S OPPOSITION TO
## <u>MOTION FOR SUMMARY JUDGMENT-PREEMPTION</u>

**COMES NOW** the defendant, Champion Homes of Boaz, Inc., f/k/a Homes of Legend, Inc. ("Legend"), and in reply to the Plaintiff's Opposition to Defendant's Motion for Summary Judgment – Preemption (hereinafter referred to as "Plaintiff's Opposition-Preemption"), states as follows:

1.      As additional support, Legend is submitting herewith to be included in Exhibit "1", additional excerpts from the deposition of Robert Parks, (hereinafter referred to as "Parks").

2.      Legend is also attaching as Exhibit 9, excerpts from the deposition of Parks in the American Arbitration Association (hereinafter referred to as "AAA") cases styled *Byrd v. Southern Energy Homes, Inc.,* AAA Case No. 30 420 00810 06/*Daughtry v. Southern Energy Homes, Inc.,* AAA Case No. 30 420 00809 06 (hereinafter referred to as "Parks-*Bryd/Daughtry* Depo."), true and correct copies of which are attached hereto and made a part hereof by reference.

3.      Legend is also attaching as Exhibit 10, excerpts from Park's arbitration testimony in the cases styled *Byrd v. Southern Energy Homes, Inc.,* AAA Case No. 30 420 00810 06/*Daughtry v. Southern Energy Homes, Inc.,* AAA Case No. 30 420 00809 06 (hereinafter

referred to as "Parks-*Byrd/Daughtry* Arb."), true and correct copies of which are attached hereto and made a part hereof by reference.[1]

4.     Legend is also attaching hereto as Exhibit "11", excerpts from the deposition of Robert Kondner (hereinafter referred to as "Kondner").

## I. Introduction

The plaintiff, Terry Deese (hereinafter referred to as "Deese"), now asserts that his Complaint alleges that vapor retarder regulations set forth in 24 CFR §3280, *et seq.*, and 24 CFR §3282, *et seq.*, promulgated by the United State Department of Housing and Urban Development ("HUD") pursuant to the National Manufactured Home Construction and Safety Standards Act, 42 U.S.C. §5401, *et seq.*, ("MHCSSA") were not "*properly implemented*", there were violations of another wall option, 24 CFR § 3280.504(b)(3) (ventilated wall cavity option) and that it was also alleged that the defendant violated 24 CFR § 3280.103(b)(3). (Plaintiff's Opposition, pp. 2-3, 23). **This is not what is alleged in the Complaint.**[2] Paragraph 8 of the Complaint states as follows:

> 8.     The interior surface of the exterior wall should also then need to be constructed of a permeable material. . . use of vapor retarder paints, vinyl-covered gypsum wallboard, or other impermeable materials or finishes on the interior side of exterior walls could be detrimental, because they would trap moisture within the wall.

Paragraphs 6, 7, 9, 10, 11, and 12 address the proposed waiver, the waiver and 24 CFR § 3282.504(b)(4) with regard to the option of utilizing a vapor retarder on the exterior walls for

---

1 The *Byrd v. Southern Energy Homes, Inc.,* AAA Case No. 30 420 00810 06 and the *Daughtry v. Southern Energy Homes, Inc.,* AAA Case No. 30 420 00809 06 matters were arbitrated at the same time. The deposition of Parks was also for both cases.

2 Deese now admits that the home was not built to 24 CFR § 3280.504(b)(1) (requiring an interior vapor retarder), but rather to § 3280.504(b)(3) (as alleged by Legend) and that Legend was "disingenuous (to be polite)" for setting forth arguments related to preemption based on the choice of a wall design in 24 CFR § 3280.504(b). Respectfully, Legend was in no way being disingenuous as it was only addressing the claims in the Complaint as alleged by Deese. Since Deese admits the home was not built as alleged in the Complaint, Legend is entitled to a judgment in its favor. There are absolutely no claims in the Complaint related to 24 CFR § 3280.504(b)(3) or any violation of that code section.

certain areas. (Complaint, ¶¶ 6, 7, 9, 10, 11, and 12). There are no allegations in the Complaint that Legend "improperly implemented" anything, that Legend violated 24 CFR § 3280.504(b)(3) or that it "violated 24 CFR § 3280.103(b)(3)". Simply put, Deese alleged that the home was built to §3280.504(b)(1) (with an interior vapor retarder) and now admits he was wrong; it was built in accordance with §3280.504(b)(3) (the ventilated wall cavity option). By the arguments in Plaintiff's Opposition-Preemption, Deese is attempting to amend the Complaint long after the deadline for amendments to the Complaint. It is now too late to amend his complaint and Legend is entitled to a judgment in its favor on this admission alone. However, assuming Deese can overcome the above, Legend will address the arguments in Plaintiff's Opposition-Preemption.

In another Alabama wallboard case, the plaintiffs moved to amend their complaint to include other factors in addition to internal vapor retarders. The court promptly denied the motion stating that the amended complaint still "does not demonstrate the inapplicability of federal preemption in this case and would thus be futile." *Ford v. Champion Enterprises Inc.,* No. 06-0423 (S.D. Ala. Sept. 17, 2007) (a true and correct copy of which is attached hereto as Exhibit "8"). The same reasoning exists in this matter.

Deese also contends that a recent development in a nearly identical case, *Guidroz v. Champion Enterprises, Inc.,* pending in the Federal District Court for the Western District of Louisiana, undermines Legend's argument that all of Deese's claims are preempted under federal law. This is patently false: (1) the *Guidroz* court reaffirmed its position on federal preemption, holding that all of the plaintiffs' original claims are preempted and that any amendment incorporating such claims would likewise be preempted; (2) Judge Mark Fuller, citing *Guidroz,* held only a few weeks ago in *Perry v. Fleetwood Enterprises, Inc.,* No. 2:06-cv-502 (M.D. Ala.

Sept. 28, 2007) (attached as Exhibit 4 to Legend's Brief in Support of Motion for Summary Judgment-Preemption, hereinafter referred to as "Summary Judgment Brief-Preemption") that the Manufactured Housing Act regulations regarding wallboard construction impliedly preempt state tort law, and that the plaintiff "may not penalize Defendant for choosing an option permitted by §3280.504(b)."

Deese contends that Legend's selection of a wallboard design under 24 CFR § 3280.504(b)(1) (interior vapor retarder) violates a general provision of the HUD Code set forth at 24 CFR § 3280.303(b). But as pointed out in Legend's original Brief, a general provision of the HUD Code cannot be invoked to overcome a specific provision. Moreover, HUD recently reviewed this novel legal theory and firmly rejected it through an informal opinion letter.

Deese relies on a handful of legal decisions from other jurisdictions in support of his position that his claims are not preempted. Deese conveniently overlooks the only decisions directly on point – *Guidroz* and *Perry*– which held that wallboard claims attacking the use of interior vapor retarders under the HUD Code are preempted by federal law. This court should not be persuaded by the other cases cited by Deese, as they are factually and legally distinguishable from the instant case, especially Deese's argument claiming that more recent Supreme Court decision has somehow "overruled" *Geier*.

Finally, Deese argues that Section 3280.504(b) is a "performance code" and that Legend can be held liable for failing to select what Deese, in hindsight, now contends would have been the "best" choice on a list of approved HUD code design options. The *Guidroz* and *Perry* courts soundly rejected this argument, relying on analogous United States Supreme Court precedent, *Geier v. American Honda Motor Corp., Inc.*, 529 U.S. 861 (2000).

Furthermore, HUD purposely chose *not to* impose a geographical limitation on the use of interior vapor retarder designs because HUD approves of that design everywhere in the United States. Deese's attempt to undermine that position of uniformity through a lawsuit should be viewed as a direct attack on the HUD Code, which is exactly what is foreclosed by federal preemption doctrine.

## II. Performance based issue- *Perry* Supports Defendant's Preemption Argument

The plaintiff's case as pled is preempted. On September 28, 2007, Judge Fuller held in a similar case that the plaintiff's state law claims should be dismissed, stating:

> Plaintiff argues, looking both to case law and the structure of the regulations themselves, that the regulations at issue set forth are performance-based. In other words, the manufacturer is given several options to meet a performance-based requirement. Therefore, Plaintiff argues, the regulations set forth minimum standards. The Court disagrees. . . Plaintiff's state law claims are DISMISSED with prejudice to the extent that those claims seek to penalize Defendants for their choice of an option available under 24 C.F.R. § 3280.504(b).

*Perry v. Fleetwood Enterprises, Inc.,* No. 2:06-cv-502 (M.D. Ala. Sept. 28, 2007) .

The decision in *Perry* (attached as Ex. 4 to Summary Judgment Brief-Preemption), confirming the logic of *Guidroz* and *Geier*, should effectively end the discussion as to whether a performance-based standard exists and whether a manufacturer can be penalized for choosing a design that complies with the code in these cases. The design chosen and implemented by the defendant was an option within the HUD code, and Legend cannot be penalized for its design choice. The plaintiff's argument regarding "performance-based" regulations should be likewise overruled here.

## III. The *Guidroz* Court Reaffirmed that Wallboard Claims are Preempted

In *Guidroz*, after issuing a thorough 29-page order dismissing plaintiffs' wallboard claims with prejudice, the court granted plaintiffs leave to amend their complaint in order to plead a new

theory of recovery, which might survive a preemption attack. Deese contends that the court's decision to permit an amendment is a signal that the preemption defense is flawed. Deese's characterization of the court's order is incorrect, and the fact that the *Perry* court agreed with the *Guidroz* decision only confirms this fact.

A transcript of the hearing in *Guidroz* demonstrates that the court has not reconsidered its decision on the preemption issue. Rather, the hearing transcript makes clear that the court reaffirmed that its original decision was, and remains, correct: the plaintiff's wallboard theory is preempted by federal law. The court entered an order partially amending its prior decision, only because the court had promised plaintiffs' counsel the opportunity to do so in a prior hearing. During the hearing, the court again held that plaintiffs' wallboard theory was preempted and that any amendment incorporating similar allegations would likewise be preempted. Thus, contrary to Deese's contention in his Opposition, the *Guidroz* court did not substantively amend its original 29-page decision addressing federal preemption standards in the context of wallboard claims. The pertinent portions of the court's remarks at the hearing in *Guidroz* are set forth on page 16 of the Summary Judgment Brief-Preemption.

The Defendants in *Guidroz* filed a second motion to dismiss attacking the plaintiffs' new theory of recovery – that some unidentified aspect of manufactured home ventilation systems (i.e., furnaces and/or air conditioners) is defective – which is an entirely new and separate claim. That claim has nothing to do with the instant case.

### IV. Deese Misapprehends the Relationship Between Sections 3280.504(b) and 3280.303(b).

Deese incorrectly contends that Legend's selection of an interior vapor retarder design under Section 3280.504(b)(1) of the HUD Code violates another, more general HUD Code provision, set forth at Section 3280.303(b). Deese is attempting to improperly overrule one *specific* HUD

Code provision (3280.504(b)) with a *general* provision (3280.303(b)). which runs afoul of controlling rules of regulatory and statutory construction. Again, the *Guidroz* court rejected this very argument, holding that a general regulation cannot be used to control a specific regulation that is "tailor-made for" the facts of the case. (*Guidroz*, pp. 17-18; Ex. 5 to Summary Judgment Brief-Preemption). *See, Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 948 (11th Cir. 2001) (holding that general code provisions cannot be utilized to supersede specific ones). HUD's Associate Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, William W. Matchneer III, has also specifically addressed this issue, and concluded that the HUD regulations best serve their statutory purpose when the ***most specific*** regulation is applied, rather than resorting to a general one. (Ex. 7 to Summary Judgment Brief-Preemption). Agency interpretations are given deference. *See Secretary of the Interior v. Tallman*, 380 U.S. 1, 16 (1965).

Importantly, Deese's entire case rests on the theory that Section 3280.303(b) should be read to displace the design option set forth at Section 3280.504(b)(1) (or perhaps now, 3280.5049b)(3)). If this court rejects the Section 3280.303(b) argument, then Deese will have no legal authority <u>at all</u> to articulate a case that Legend's wallboards are defective under the HUD Code. Accordingly, this Court should hold that the general regulation of section 3280.303(b) does not overcome or displace the wallboard design option set forth at Section 3280.504(b), and dismiss Deese's claims with prejudice.

## V. Deese's Case Law is Neither Applicable nor Persuasive

Deese argues that other case law supports his argument against preemption. The cases cited by Deese are factually and legally distinguishable and, in many respects, only lend further support to Legend's position. Deese offers no reasoning to overcome the opinion in *Guidroz*,

choosing instead to mischaracterize the outcome of the *Guidroz* plaintiffs' motion to amend the judgment. (see argument in Section III, *supra*).

The most important case cited by Deese is *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002). Legend would first note that much of *Sprietsma*'s importance is based on its rejection of Mercury Marine's "field preemption" theory. Legend is not making a "field preemption" claim regarding the HUD Code regulations.

*Sprietsma* was a case where a woman had fallen off a boat and been killed by the propeller of the boat in which she had been riding. The plaintiff argued that a propeller guard would have prevented her death. Unlike the instant case, in which HUD specifically regulated the allegedly "defective" condition asserted by Deese, the Coast Guard purposefully did *not* promulgate regulations regarding propeller guards. The Illinois state courts had applied preemption on the grounds that the Coast Guard's decision not to regulate was a "field preemption" decision. The Supreme Court disagreed:

> We first consider and reject respondent's reliance on the Coast Guard's decision not to adopt a regulation requiring propeller guards on motorboats. It is quite wrong to view that decision as the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation. The decision in 1990 to accept the subcommittee's recommendation to "take no regulatory action," App. 80, left the law applicable to propeller guards exactly the same as it had been before the subcommittee began its investigation. Of course, if a state common law claim directly conflicted with a federal regulation promulgated under the Act, or if it were impossible to comply with any such regulation without incurring liability under state common law, preemption would occur. This, however, is not such a case.

*Sprietsma*, 537 U.S. at 65.

The *Sprietsma* Court also pointed out the specific differences between the preemption situation presented in *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000). In *Geier*, the regulatory agency had, just as HUD did here, provided acceptable alternatives from which the

industry could choose: automatic seatbelts or airbags. But in *Sprietsma*, the Coast Guard had decided that available accident data did not support a decision to impose uniform regulations at all, and that major technical, practical and economic impediments prevented Coast Guard regulation.

Just as in *Geier*, allowing a private tort or warranty suit would stand as an obstacle to the accomplishment and execution of the policy objectives embodied in the MHCSSA, especially as the regulatory agency itself is uniquely qualified to comprehend the impact of varying state regulations and has weighed in on the side of preemption.

> The Coast Guard's decision not to impose a propeller guard requirement presents a sharp contrast to the decision of the Secretary of Transportation that was given preemptive effect in *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000). As the Solicitor General had argued in that case, the promulgation of Federal Motor Vehicle Safety Standard (FMVSS) 208 embodied an affirmative
>
> > policy judgment that safety would best be promoted if manufacturers installed alternative protection systems in their fleets rather than one particular system in every car.
>
> *Id.* at 881. In finding preemption, we expressly placed
>
> > weight upon the DOT's interpretation of FMVSS 208's objectives and its conclusion, as set forth in the Government's brief, that a tort suit such as this one would "'stan[d] as an obstacle to the accomplishment and execution'" of those objectives. . . . Congress has delegated to DOT authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive. The agency is likely to have a thorough understanding of its own regulation and its objectives, and is "uniquely qualified" to comprehend the likely impact of state requirements.
>
> *Id.* at 883. In the case before us today, the Solicitor General, joined by counsel for the Coast Guard, has informed us that the agency does not view the 1990 refusal to regulate or any subsequent regulatory actions by the Coast Guard as having any preemptive effect. Our reasoning in *Geier* therefore provides strong support for petitioner's submission.

*Sprietsma*, 537 U.S. at 67-68.

As Deese admits, various climates require various adaptations in manufactured housing construction. HUD has specifically stated that it does not apply 3280.303(b) to a manufacturer that has complied with 3280.504(b). (See HUD Letter, Ex. 7 to Summary Judgment Brief-Preemption). In *Sprietsma*, the Coast Guard had purposefully refrained from promulgating regulation regarding the specific allegations of the plaintiff's complaint. Here, as in *Geier*, the regulatory agency has set forth not just one regulation, but a whole regulatory scheme based on a manufacturer's ability to choose from among acceptable alternatives. It is therefore easy to see that the plaintiffs' citation to *Sprietsma* is merely another red herring, and is not to be taken seriously.

Deese also cites *Bott v. Sterling Homes, Inc.*, 527 So.2d 548 (La.Ct.App. 1988) in support of his position that his wallboard claims are not preempted. In *Bott*, the Louisiana Third Circuit Court of Appeals affirmed the judgment of a trial court that awarded damages to a mobile home purchaser who made a habitation claim based on numerous, severe water leaks. *Id.* at 549-50. The manufacturer argued that the plaintiff's claims failed because the home was HUD Code compliant *when it left the factory*. Applying a Louisiana statute that requires courts to apply the standard of care set forth in the HUD Code, the Court of Appeals held that HUD Code violations *in the field* could serve as a basis for liability. *Id.* at 549-50. *Bott* does not help Deese. Rather, *Bott* undermines his position because in *Bott*, the court applied the HUD Code, whereas Deese is seeking to show that compliance with Section 3280.504(b)(1) somehow creates liability.

*Richardson v. Fleetwood Enterprises, Inc.*, 4 F. Supp.2d 650 (E.D. Tex 1998) also lends no support to Deese's argument because *Richardson* addressed the issue of whether the HUD Code preempts *all* causes of action. The *Richardson* court correctly held that violations of the HUD Code can serve as the basis for common law liability. *Id.* at 657. This holding does not

apply to Deese's case, because he admits that Legend is governed by the HUD Code provisions. Deese's rather illogical argument is that the court should hold Legend liable in warranty and tort *because* it followed a HUD Code provision, a provision with which Deese disagrees. Deese cannot cite to this court any decisional law or statute that permits a plaintiff to create a theory of recovery predicated on *compliance* with federal law. *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998) ("a state cannot impose common law damages on individuals for doing what a federal act or regulation 'authorized them to do'"). Therefore, *Richardson* offers no helpful analysis.

Deese also cites *Shorter v. Champion Home Builders Co.*, 776 F. Supp. 333 (N.D. Ohio), where the court held that the HUD Code preempts common law standards but not common law claims. Again, the defendant completely agrees. Common law claims are preserved, as long as they are not predicated on standards that seek to re-write the HUD Code. But because that is exactly what Deese seeks to do, the *Shorter* case is inapplicable to the case before the Court.

Deese cites *Choate v. Champion Home Builders Co.*, 222 F.3d 788 (10th Cir. 2000), which was a housing case involving a manufacturer's alleged failure to install battery powered smoke detectors. *Id.* at 790-91. The court held that the plaintiffs' tort claims were not preempted where the HUD Code required a hard-wired smoke detector and the plaintiffs advocated a local standard requiring battery powered detectors. *Id.* at 797. The evidence showed that the manufacturer built this particular model of home two different ways – under the HUD Code and under the local building code. *Id.* at 791 n.3. In homes built under the local code, the manufacturer used battery backed-up detectors; in HUD Code homes, the manufacturer used only electrically-wired detectors. *Id.* The court reversed the lower court's entry of summary judgment holding that plaintiffs' theory of recovery was not preempted. *Id.* at 797.

*Choate* is distinguishable because there, the plaintiffs urged a standard of care that *augmented* an existing safety standard. There was no argument that a properly enacted HUD Code provision should be repealed by judicial fiat, as Deese is asking the Court to do here. There was no choice between two HUD regulations as to proper smoke detectors, and if HUD had approved such a choice between battery back-up and hard-wired detectors, the *Choate* plaintiffs' claims would have been preempted.

Lastly, Deese points to an Alabama Supreme Court decision, *Turner v. PFS Corp.*, 674 So. 2d 60 (Ala. 1995). *Turner* offers no help to Deese because, like *Richardson*, it merely holds that the violation of a federal standard can create tort liability. A tort claim that seeks to impose a standard of care *different* from the HUD Code is still expressly preempted. *Id.* at 62-3. This decision captures the defendant's point exactly. Deese is not arguing that Legend violated the provisions of Section 3280.504(b) by selecting an unapproved wall design. Instead, he argues that Legend violated the general dictates of Section 3280.303(b) by incorporating a design option expressly permitted in Section 3280.504(b)(1) (or his new theory, 3280.504(b)(3)). Essentially, Deese has attempted to draft his own version of the HUD Code by simultaneously declaring Section 3280.504(b)(1) to be retrospectively invalid, and then seeking to hold Legend liable. Deese's interpretation must be rejected because the law does not allow a litigant to invalidate a formal regulation, enacted in accordance with federal law, simply by urging incongruity with another regulation. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (*quoting TVA v. Hill*, 437 U.S. 153, 195 (1978)).

The HUD Code cannot be set aside in this case simply because one litigant, who also has no constituency, desires that outcome. HUD's policy choices with respect to wallboard design were made in keeping with federal administrative law in order to ensure that the public is

properly protected and the correct outcome is reached. Once again, Legend must point out to Deese that Congress enacted comprehensive manufactured home legislation (the MHCSSA), in order to regulate construction and safety standards for manufactured homes. Congress delegated rule-making authority to HUD, and ordered HUD to promulgate construction standards consistent with the purposes of the MHCSSA. 42 U.S.C. § 5403. Uniformity of regulation is among the stated purposes of the Act, and Deese's claims would directly undermine that goal. The purposes of the Act are set forth on page 20 of the Summary Judgment Brief-Preemption. The HUD Code balances the policy goals of the MHCSSA, and meets Congress' intent with respect to construction standards, especially uniformity.

## VI. Section 3280.504(b) is not a "Performance Based" Standard that Implies a Duty to Choose One Federal Option Over Any Other.

Deese argues that Section 3280.504(b) is "performance based" standard that requires manufacturers to select the "best" choice from among the federally prescribed options set forth in the HUD Code. Of course, nothing in Section 3280.504(b) actually says that. On the contrary, the regulation is written in the disjunctive (each choice is set off by the word "or"), which gives every manufacturer the right to select *any* method prescribed by HUD. Deese's attempt to persuade this court that there is an *implied* picking duty with respect to wallboard designs is without merit, and is negated by federal preemption law.

The *Guidroz* court specifically addressed this argument and found "[t]o the contrary, the options are contained in one of the energy conservation regulations, designated by Congress as['']preemptive.['] *See* 42 U.S.C. 5403 (g); *See also* 57 Fed. Reg. 6420 (Feb. 24, 1992) (proposing to amend 504 "to include preemptive standards significantly upgrading the existing energy conservation requirements"); 58 Fed. Reg. 54975, 54975 (Oct. 25, 1993) (amending 504 "to include preemptive standards significantly upgrading the existing energy conservation

requirements")." *Guidroz*, Ex. 5 to Summary Judgment Brief-Preemption, pp. 25. (Emphasis

added).

The court in *Perry* agreed with *Guidroz*, and flatly disagreed with the plaintiff's

"performance-based" argument.

> Plaintiff argues, looking both to case law and the structure of the regulations
> themselves, that the regulations at issue set forth are performance-based. In other
> words, the manufacturer is given several options to meet a performance-based
> requirement.    Therefore, Plaintiff argues, the regulations set forth minimum
> standards.    The Court disagrees. The regulation at issue in *Geier* also set a
> performance requirement. *See Geier*, 529 U.S. at 878 ("[The regulation at issue]
> set[] a performance requirement for passive restraint devices and allow[ed]
> manufacturers to choose among different passive restraint mechanisms, such as
> airbags, automatic belts, or other passive restraint technologies to satisfy that
> requirement."). The *Geier* Court noted that the manufacturers were required to
> meet a performance requirement by choosing from a range of options. *See id.* at
> 878-79.    Nonetheless, the plaintiff's claims were preempted because they
> penalized the manufacturer for choosing an option provided by the regulations.
> *See id.* at 881. Even if the regulations set forth performance requirements or a
> performance standard, the Court cannot agree that the regulations provide a
> minimum standard. Maintenance of Plaintiff's state court claims would "impair[]
> the Federal superintendence of the manufactured home industry as established by
> the Act." 24 C.F.R. § 3282.11(d). Defendants' motion to dismiss Plaintiff's state
> law claims is therefore due to be GRANTED to the extent that those claims seek
> to penalize Defendants for their choice of an option available under 24 C.F.R. §
> 3280.504(b).

*Perry*, Ex. 6 to Summary Judgment Brief-Preemption, pp. 13-14.

The interior vapor retarder design choice (§ 3280.504(b)(1)) is not a regulation that HUD

decided to limit geographically.   In the 2006 changes, HUD did specify one geographical

limitation on exterior wall design, but that regulation does not help Deese's case, because the

waiver provided a fourth option, and did not affect a manufacturer's ability to choose from the

other three approved designs. Exterior vapor retarders are now permitted in the humid and fringe

zone climates *only*.   24 CFR § 3280.504(b)(4).   HUD did not limit the use of interior vapor

retarder designs under Section 3280.504(b)(1) to any specific locale.   The fact that HUD

14

consciously chose *not to limit* the use of interior vapor retarders in the south only underscores the weakness of Deese's position. The fact that HUD reached a different interpretation than Deese on a point of technical design should not persuade this Court to alter controlling administrative regulations crafted by HUD after careful study and research.

### VII.   The MHCSS Act Creates No Private Right Of Action

Deese asserts that there is a "duty of the manufacturer to implement whatever option it chooses correctly" and in support of this statement, cites 42 USC § 5403(e).  Deese conveniently leaves out of the quoted code section, the first three (3) words: "The consensus committee . . ." The above section, in its entirety, states as follows:

> (e) Consideration in Establishing and Interpreting Standards and regulations.  <u>The consensus committee</u>, in recommending standards, regulations and interpretations, and the Secretary, in establishing standards or regulations or issuing interpretations under this section, shall –
>> (1) consider relevant available manufactured home construction and safety data, including the results of the research, development, testing, and evaluation activities conducted pursuant to this title, and those activities conducted by private organization and other governmental agencies to determine how best to protect the public;
>> (2) consult with such State or interstate agencies (including legislative committees) as he deems appropriate;
>> (3) consider whether any such proposed standard is reasonable for the particular type of manufactured home or for the geographic region for which it is prescribed;
>> (4) consider the probable effect of such standard on the cost of manufactured home to the public; and
>> (5) consider the extend to which any such standard will contribute to carrying out the purposes of this title.

42 USC § 5403(e) (Emphasis added).

Legend agrees with the above.  Deese's out of context citation of the above code section, used to support his "duty" theory, is just another attempt to mislead the Court.  As is Deese's erroneous statement that the manufacturer must choose an option to "achieve the performance based objective, taking into account, among other things, geographic location." (Plaintiff's

Opposition, p. 20). Nonetheless, Legend asserts that Deese's reference to the above section is the exact point Legend wishes to make: if one wants to make a change in the HUD Code, the items set forth above would first have to be considered before a change is made. That is exactly what transpired in the approval of the waiver and the addition of a fourth option under 24 CFR § 3280.504(b)(4). See, *e.g.*, 65 Fed. Reg. 17110 (March 30, 2000) (proposal of the waiver and request for comments); 67 Fed. Reg. 20400 (April 24, 2002) (final waiver notification); 69 Fed. Reg. 70016 (December 1, 2004 (proposed rule changes to adopt recommendations made to HUD by the consensus committee and request for comments); 70 Fed. Reg. 72024 (November 30, 2005) (final rule change notification); and 71 Fed. Reg. 19638 (April 17, 2006) (technical corrections to final rule changes).

Section 5403 of the revised MHCSS Act contains an extensive process for the promulgation, revision and enforcement of manufactured housing construction and safety standards, 42 U.S.C. § 5403(a)-(c), and requires that the standards be evaluated for revision every two (2) years. 42 U.S.C. § 5403(a)(4). Nowhere in the act is any suggestion that the Federal construction and safety standards for manufactured homes could unilaterally be altered by the judicial system.

Indeed, HUD has had the opportunity to review the practice of placing interior vapor retarders on the interior walls and at times, specifically addressed this building practice. For instance, in the Final Rule issued by HUD on October 25, 1993, HUD stated as follows with regard to not making changes to 24 CFR 3280.504(b):

*The Placement of the Vapor Retarder in the Exterior Wall*

Many of the comments discussed in the ceiling vapor retarder section would also apply to the placement of the vapor retarder in the exterior wall. As was stated previously, **there is a wide range of views on the placement and need for a vapor retarder.**

**HUD has reviewed all of the comments concerning the placement and/or need for a vapor retarder on the exterior wall.** Since the Department did not propose a standard in this area, a decision on this issue will be included in future revisions to the FMHCSS. (Emphasis added)

58 FR 54975 at 54993 (October 1993).[3]

Even Deese's purported "expert" cannot deny the above as he has written to HUD

specifically to question the use of vapor retarders on the interior walls in hot, humid climates. In

Parks' August 10, 2005 correspondence to HUD he asked the following question:

Question:   Does HUD consider the application (and/or choice of use) of 3280.504(b)(1) "a reasonable" application for use in homes "prescribed" to be placed within the "geographic region" known by HUD as Thermal Zone 1 which contains the hot humid climate?

See Ex. 1 to Legend's Brief in Support of Motion for Summary Judgment-Preemption, Defendant's Ex. 12.

In response, HUD wrote the following:

The Department does not have data, research, or other information that would substantiate restricting the use of the alternative condensation control method written in the Manufactured Home Construction and Safety Standards and codified as 3280.504(b)(1) to only Thermal Zones 2 and 3. . . **Should you believe that the Manufactured Home Construction and Safety Standards needs modification, please provide a proposed standards change to the Administering Organization for the Manufactured Housing Consensus Committee.**

See Ex. 1 to Legend's Brief in Support of Motion for Summary Judgment-Preemption, Defendant's Ex. 12. (Emphasis added).

---

3   In 1993, one of HUD's "main issues" with respect to moisture control "concerned vapor retarder placement[.]" 58 Fed. Reg. at 54991. The "wide range of views" were submitted by a variety of interested parties, including manufacturers, housing authorities, and standards organizations, many of whom believed vapor retarder placement should be dictated by climate. *Id.* at 54992. Notwithstanding such views, HUD elected not to revise Standard 3280.504(b).

Of course, Parks did not do so but rather, is profiting[4] handsomely from plaintiff's counsel in trying to affect some kind of change through the courts, rather than through the Consensus Committee and adherence to HUD code change procedures.

For over a decade, HUD has monitored the research and studies in this field and chosen not to restrict the use of vapor retarders in hot, humid climates. HUD found that the research was not sufficient to warrant a change. This decade-long evaluation of the regulations concerning the placement of vapor retarders clearly demonstrates HUD's preemptive occupation of the manufactured housing construction standards. See, e.g. 70 FR 72024, 72025 (Nov. 30, 2005) (A HUD study entitled, "Alternatives for Minimizing Moisture Problems in Hot, Humid Climates (2003)" found that the most significant factors contributing to moisture problems were pressure imbalances in a house, including imbalances caused by uneven distribution of conditioned air; duct air leakage; and leakage through building walls). The significant research conducted by the Manufactured Research Alliance (hereinafter referred to as the "MHRA") indicated that moisture related problems are not typically attributable to one single issue, but rather in most cases may relate to a combination of manufacturer, installer, mechanical equipment designer and homeowner responsibilities. See, e.g. Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates-Response of Interior Air Pressures to Various Operating Conditions, Manufactured Housing Research Alliance, September 4, 2003; Moisture Problems in Manufactured Homes-Understanding Their Causes and Finding Solutions, Manufactured Housing Research Alliance, (2000).

Deese and his experts disregard the significant research and the HUD Code's extensive process for the promulgation, revision and enforcement of manufactured housing construction

---

4  At his deposition in February, 2007, Parks testified that he had already been paid $135,000.00 for the work he has done for the Beasley firm. (Ex. 1, p. 36: 12-23; 37:1-9).

and safety standards, and instead, assert that there is only one cause of moisture related issues in homes, the location of the vapor retarder. The submissions by Deese do not support this single issue theory and clearly support HUD's position. For instance, in one of the Manufactured Housing Research Alliance publications (some of which are cited by Deese on page 9 of Plaintiff's Opposition) it was specifically noted as follows:

> Homes that exhibit moisture problems, even in the hot, humid Gulf Coast region (the focus of the current research) are a **small fraction of all new homes.** Many thousands of homes, both manufactured and site-built, as well as other structures, are built each year and serve their occupants well without signs of moisture problems.
>
> Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates, (September 4, 2003), p. 1 FN 1. (Emphasis added).

That same publication found that "[m]oisture problems can result from a variety of factors, often acting in combination, and no single action can completely protect a home from the detrimental effects of moisture accumulation and condensation." Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates, (September 4, 2003), p. 3-4. Deese's own submission, Moisture Problems in Manufactured Housing: Probable Causes and Cures, Ex. 5 to Plaintiff's Opposition, an article written in 2001, found that even without removing the interior vapor retarder, one of the manufacturing team members, by incorporating the best practice designs and techniques, reported that during the last year, no moisture vapor related failures. (Ex. 5 to Plaintiff's Opposition, bates No. 000087). In other words, the system is working.

Simply stated, if the HUD Code (or any building code) changed at the whim of individuals conducting studies and research, without some code change process (such as exists in the HUD Code, 42 U.S.C. § 5403(a)-(c)) one would never know exactly how to build a structure. In any event, all of the submissions by Deese appear only to be a decoy tactic to direct this

Court's attention away from the obvious: Deese failed to refute Legend's evidence that there is no interior vapor retarder in the Deese home.

Deese cannot resort to his "statutory duty" theory for one more reason, the MHCSS Act creates no private right of action in favor of purchasers of allegedly defective homes against manufacturers or sellers of such as there exists an adequate remedy for purchasers, *i.e.*, claims for breach of warranty. *See Hueur v. Forest Hill State Bank*, 728 F. Supp. 1197, 1198 (D.Md. 1989) *see also Richard v. Fleetwood Enterprises. Inc.*, 4 F.Supp.2d 650, 653-4 (E.D.Tex. 1998) (While the Act establishes a system for ensuring the safety and quality of manufactured homes and gives the Secretary of Housing and Urban Development, the Attorney General of the United States, appropriate United States attorneys, and distributors and dealers of mobile homes some remedies and powers, the Act does not create a private cause of action for injured purchasers; citing 42 U.S.C. §§ 5411(a), 5412(b)). In *Hueur v. Forest Hill State Bank*, the court determined as follows:

> The statute in question does not expressly create any private cause of action in favor of purchasers. The Court is not aware of any case in which a federal or state court has held that it implies a private right of action. The Court has analyzed the matter, as stated by the Fourth Circuit's reasoned decision in *Newcome v. Esrey*, 862 F.2d 1099 (4th Cir.1988), and it finds that, applying the tests stated therein, the NMHCSSA does not imply any private right of action. Study of the legislative history of the statute, reprinted at 1974 *U.S. Code Cong. & Admin. News* 4273, *et seq.*, shows no Congressional intention at all to create a private cause of action. *See id.*, especially at 4340-41. Rather, the purpose of the legislation was to set up a federal set of manufacturing standards, to be enforced "to the maximum extent" by the States. Especially significant is the fact that consumer protection was to be achieved by warranty and recall notice provisions. There was no mention of providing a federal forum to enforce these measures. Of course, it was well known to Congress that actions for breach of warranty, based on state law, are traditional enforcement remedies for dissatisfied consumers. Because this Court cannot find any Congressional intent to imply a private remedy for purchasers of allegedly defective homes, because the basic causes of action traditionally provided by state law are adequate to remedy any claim the purchaser might have (as is evidenced by the fact that such claims have been set forth in this case in other counts of the complaint), and because the **intent of the legislative scheme**

was primarily to establish uniformity in construction standards. this Court is of the opinion that Congress did not intend to create a private cause of action for violation of the NMHCSSA of 1974.

*Hueur v. Forest Hill State Bank,* 728 F. Supp. at 1198. (Emphasis added).

The court in *Richard* explained its ruling as follows:

> Applying the doctrine of statutory construction, *expressio unius est exclusio alterius,* it is clear that Congress did not intend to create a private cause of action for purchasers. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). The expression of remedies for distributors, dealers, the Attorney General, and appropriate United States Attorneys indicates an intention to exclude a remedy for private purchasers, whom Congress could have easily listed had it intended to create a private right of action.

*Richard v. Fleetwood Enterprises, Inc.,* 4 F.Supp.2d at 654.

Thus, the new allegations in Plaintiff's Opposition-Preemption – and no such allegation was made in the plaintiff's complaint – regarding Legend's "implementation" of the Federal manufacturing standards do not provide the plaintiff any grounds for relief. One of the explicit purposes of the Congressional statutory and regulatory scheme is "to ensure uniform and effective enforcement of Federal construction and safety standards for manufactured homes." A private right of action is simply not compatible with the statutory goal of uniform and effective enforcement by the regulators authorized under the statute.

The plaintiff argues he should be permitted to second-guess the Congressional regulatory scheme by alleging incorrect "implementation" of that scheme. This is *exactly* the type of claim that is barred by the preemption doctrine, especially in light of Congressional concern for uniformity of regulation.

## VIII.  Plaintiff's "Expert" Has Admitted That He Is Not A Mold Expert

The plaintiff also claims that Parks is qualified to testify as an expert based on the fact that defense lawyers have used him as an expert on the "very issues" involved in this case. This

is not true.  His past services with defense lawyers were limited to HV/AC issues, the *only* subject in which he is expert.  The other subjects on which Parks seeks to testify are outside the scope of his training, knowledge and expertise.  In fact, in recent deposition and arbitration testimony, Parks himself confirmed that he should not be admitted as a mold expert in Federal Court:

> Q.  Okay.  All right.  You say you're an expert in mold count, but you can't tell me – you can't even pronounce some of the these molds and you know nothing about theses molds?
> A.  That's correct.
> Q.  Do you want to reconsider your opinion on whether you're a mold expert?
> A.  Well, I guess you would have to define or be more specific or I will define for you –
> Q.  Let me ask you this: Do you think that these lawyers could get you qualified as a mold expert in Federal Court in Alabama?
> A.  Probably not, but I do feel like I'm competent to take air samples and interpret the data.

Ex. 9, Parks- *Byrd/Daughtry* Depo., p. 155: 1-18.

> Q.  Now, do you think you're a mold expert?
> A.  No.  We clarified that.  I'm not a mold expert as far as the - - analyzation and what have you.  I misspoke there.  We were talking about defining an expert and what an expert is.  I do think I'm more than capable and trained to take air samples and interpret those.
> Q.  All right.  Let's just make sure.  On page 154 of you deposition from Friday, I asked you, Are you a mold expert?  And you said, Yes, I guess I would be.
> A.  Well, we just got through talking about a few pages earlier about what an expert is as far as what defines an expert, someone who is hired and retained to offer an opinion of which they have an elevated level of knowledge either by training or experience.  And when I made that statement, I meant as far as being able to take the samples and elaborate on those samples.  I am frequently hired and called upon to do that.  Now, I don't think, and I didn't mean to misrepresent myself there as a mold expert that could put it under a microscope, analyze it, tell everything about it nor - -
> Q.  That's fair.
> A.  -- even pronounce most of the names.
> Q.  That's fair.
> A.  That was not my intent.

Q.   And in fairness to you, you did say you couldn't get qualified in federal court?

A.   That's correct.

. . .

Q.   What is the life cycle of Aspergillus?

A.   We've already discuss that - -

Q.   you don't know?

A.   - - Mr. Simpson, and I told you I'm not that type of --

Q.   Okay.

A.   - - mold expert.

Q.   All I want to see is, if you'll agree with me, that - - you've emphasized the presence of water in exclusion of all other variables. And all I want you to see, if you agree with me, is you don't know any of the other variables from a life cycle epidemiology standpoint, so you can't exclude those or rule those out?

A.   I couldn't comment as to how much of a factor that may be in the propagation of that mold.

Q.   All right. And you don't know why mold is elevated in the wall cavity, scientifically speaking; correct?

A.   No. My – my –

Q.   That's all I want.

A.   Okay.

Q.   We're almost done. You have no scientific data to show the rates of gypsum deterioration by mold?

A.   No, sir.

Ex. 10, Parks-*Byrd/Daughtry* Arb., pp. 215: 16-23; 216: 1-23: 217:1-8; 221: 14-23; 222: 1-19.

In addition to the above, Deese misstates the protocols used by Parks as being "well settled protocols in the industry". (Plaintiff's Opposition, p. 8). Parks himself admitted he did not use the "well settled protocols in the industry", which would have to be the ones established by the MHRA. (Ex. 1, pp. 105:3-23; 106: 1-2) Rather, Parks used his own made up protocols which he used in all of the houses he looked at for the Beasley firm. (Ex. 1, pp., 104: 4-16; 273: 23; 274: 1-23; 275: 1-11; 315: 17-21). Parks admits that the compilation of records he did for the Beasley firm is not a scientific test of any kind and has not been peer reviewed. (Ex. 1, p. 277: 10-23; 278: 1-8). Remarkably, on page 8 of Plaintiff's Opposition, Parks now has some new protocols he claims he used. However, his own testimony contradicts what he states in his

affidavit. For instance, Parks claims that he used the "Protocol for Wall Sampling". That protocol calls for only one hole to be drilled into the wall 3 to 6 inches from the floor. (Ex. A to Ex. 12 of Plaintiff's Opposition). At his deposition, Parks gave a completely different story saying that the "protocol" he used in all of his wall sampling was as follows: He would drill two holes through the gypsum, insert a tool into the lower hole to push the insulation back, and then insert the sample stem in the other hole, and extract approximately 15 liters of air. (Ex. 1, p. 143: 11-17; 280: 1-23; 281: 1-21). At his deposition, Parks said the protocol he used was from Galston Labs. (Ex. 1, p. 281: 22-23; 282: 1-5). Park's Affidavit says the protocol he used was attached as Ex. A, which is operating instructions for a VersaTrap Cassette from SKC. (Ex. A to Ex. 12 of Plaintiff's Opposition).

Fearing Parks may not be credible or survive a *Daubert* challenge, Deese submitted the Affidavit of Kondner. (Ex. 13 to Plaintiff's Opposition). Kondner's Affidavit is essentially the same as Parks' Affidavit and appears to be a "pat on the back" for whatever Parks says. Kondner's expertise in the manufactured housing arena is very suspect. For instance, when asked what is bottom board,[5] Kondner responded as follows:

> Q.    Are you familiar with the term bottom board?
> A.    Yes.
> Q.    What is that?
> A.    That is the board underneath the unit.
> Q.    Can you describe it for me?
> A.    Describe what it looks like?
> Q.    Yes.
> A.    It's the boom underneath the envelope under - - where the main rails are. It's underneath the floor.
> Q.    What kind of material?
> A.    What kind of material?
>        MR. ANDERSON: Object to the form and foundation.
> A.    I would think it would be wooden.

---

5    "Bottom board" as that term is used in the manufactured housing industry, refers to the woven polyethylene lining underneath the home.

Ex. 11, pp. 38: 18-21; 39: 1-12.

Kondner never looked at the Deese home, never looked at a home in the hot, humid climate, never met Parks before this case, did not verify anything in Parks' report and only depended on Parks' report to reach his "opinions" which are essentially, whatever Parks put in his report. (Ex. 11, pp. 21: 7-10; 66:6-21; 67:1-6; 71: 5-7;75:20-21). Essentially, Kondner's beliefs relate to the understanding there was vinyl on the interior walls of the Deese home. (Ex. 11, pp. 74: 11-21; 75: 1-5). Of course, it is undisputed that the walls in the Deese home are paper.

The Affidavits of both Parks and Kondner merely assert what items they claim are authoritative treatises to support the theory that such articles trump the HUD Code requirements and by implication, create a question of fact. No caselaw was cited to support the above.[6]

---

[6] In fact, caselaw suggests otherwise. It is respectfully submitted that the interpretation of the requirements of a code are a question of law for the Court, not a jury or expert to determine. *See, e.g. Williams v. State of Florida Dept. of Trans.*, 579 So.2d 226 (Fla. 1991) *overruled on other grounds*, (It is not within the province of the jury to determine whether the requirements of a code have been met based on a witnesses' opinion, as such determinations must be made by the trial court); *Seibert v. Bayport Beach and Tennis Club Association, Inc.*, 573 So.2d 889 (Fla. 2d DCA 1990) (allowing testimony of an expert witness that one unenclosed exit did not comply with the Standard Building Code was error, it was the duty of the trial judge to interpret the meaning of the code and instruct the jury concerning that meaning; any conflicts in interpretation were for the court to resolve and their resolution was not a jury issue); *Nicholson v. Turner/Cargile*, 107 Ohio App.3d 797, 809, 699 N.e.2d 529 (Ohio App.10 Dist. 1995) (claim that engineering did not meet the standard of engineering care because it did not comply with OBBC 1201.3 and attempted use of expert witness both to interpret obligation under OBBC 1201.3 and to establish that engineering company breached that obligation not allowed as while "expert testimony may be used to establish breach of a standard created by statute or rule, such testimony is not admissible to interpret statutory terms which create the standard" *citing Payne v. A.O. Smith Corp.* (S.D.Ohio 1985), 627 F.Supp. 226, 228 (expert may not testify as to the rules and procedure of Consumer Product Safety Commission, but expert may testify as to industry practices which are not a matter of law); *see, also, Eagan v. Marr Scaffolding Co.* (1982), 14 Mass.App.Ct. 1036, 1037, 442 N.E.2d 743, 745 (expert could testify whether platform was capable of meeting rules and regulations for prevention of accidents); Rogers, *The Law of Expert Testimony* (3 Ed.1941) 38, 44, 293 (a qualified witness may testify to methods in general use in a specific type of construction, but the expert may not testify to

Thus, the plaintiff's accusations of an *"ad hominem"* attack, an ambiguous and unnecessarily contentious phrase in describing an argument over an alleged "expert's" credentials, have no basis in fact. The defendant's objections to Parks' testimony are based on evidence he has given, and the complete lack of evidence supporting his supposed "expertise" in any area outside HV/AC matters, not on his lack of character and integrity. He is simply not qualified to state an expert opinion under the Federal Rules of Evidence.

## CONCLUSION

Respectfully, Deese cannot engage in legal "make-believe" to hold Legend liable under a legal standard that does not exist, any more than he can wish away a construction standard promulgated under controlling federal law. For the reasons stated herein, Legend urges this Court to grant its Motion for Summary Judgment based on federal preemption standards.

Respectfully submitted,

RITCHEY & SIMPSON, PLLC

{Gregory S. Ritchey, Esquire {ASB-8193-H68G}
Richard S. Walker, Esquire {ASB-8719-L70R}
Counsel for Homes of Legend, Inc. now
known as Champion Homes of Boaz, Inc.

---

questions involving points of law); *See, e.g. Perry v. Medeiros,* 369 Mass. 836, 343 N.E.2d 859 (Mass. 1976) (finding trial court properly ruled that the building inspector was properly precluded from giving the jury his opinion interpreting the code and the effect thereof on facts to be found by the jury); citing *S. D. Shaw & Sons, Inc. v. Joseph Rugo, Inc.,* 343 Mass. 635, 639, 180 N.E.2d 446 (1962); *Killam v. Standard Oil Co. of N.Y.,* 248 Mass. 575, 582, 143 N.E. 698 (1924); *Campbell v. Leach,* 352 Mass. 367, 373, 225 N.E. 594 (1967); *Edward J. Siebert, AIA, v. Bayport Beach and Tennis Club,* 573 So.2d 889 (Fla. 1990) (permitting experts to testify regarding their opinions on how building code fire exit requirements should be interpreted was erroneous, as interpretation of building code presented question of law; it was duty of trial court to interpret meaning of building code fire exit requirements).

OF COUNSEL:
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, AL 35216-3084
Phone:        205.876.1600
Facsimile     205.876.1616

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on the ___ day of _____,
200__, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system
which will send notification of the foregoing upon the following:

Jere L. Beasley, Esquire            Jon D. Pels, Esquire
W. Daniel Miles, III, Esquire       Lawrence J. Anderson, Esquire
C. Gibson Vance, Esquire            Pels, Anderson & Lee, LLC
C. Lance Gould, Esquire            4833 Rugby Avenue, 4th Floor
BEASLEY, ALLEN, CROW,              Bethesda, MD 20814
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103

OF COUNSEL

# EXHIBIT "1"

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

CIVIL ACTION NUMBER
1:06-CV-643-MHT

TERRY DEESE,

    Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al.,

    Defendant(s).

DEPOSITION TESTIMONY OF:

ROBERT PARKS

February 19, 2007
9:10 a.m.

COURT REPORTER:

DEBORAH B. TOWNSEND, CSR

Page 36

```
 1          Q.      And then attached to it is also an

 2    invoice, and I can't tell -- Does this invoice

 3    relate only to the Deese house?

 4          A.      No.  The Deese house is included

 5    in those invoices.

 6          Q.      Okay.  Okay.  I got you.  All

 7    right.  Is -- Are these all the invoices that

 8    you've sent?

 9          A.      No, sir.  No, sir.  Those are only

10    the invoices that pertain to the Deese home.

11          Q.      Okay.  And I see on the second

12    page it's got various houses that were listed.

13          Okay.  Do -- do you have an indication of

14    how much you've been paid?  When -- It looks

15    like you were hired in November.  Or -- or

16    actually, the agreement was signed November

17    18th, '05.

18          A.      Uh-huh.

19          Q.      From that time till today, do you

20    have an understanding of how much has been paid

21    to you?

22          A.      Yes, sir.  I think there was a --

23    a ledger sheet in there as well.
```

American Court Reporting
toll-free (877) 320-1050

Page 37

1    Q.    Okay.

2    A.    I thought it was attached there.

3          MR. RITCHEY:  Is there a

4    ledger sheet in there?

5    A.    That shows the full scope of work

6    that I've done since I started.

7          MR. GOULD:  Do you have an

8    idea about how much it is?

9    A.    Roughly 135,000.

10   Q.    Okay.

11         MR. SIMPSON:  Give you this

12   back, and I'll let you --

13   Q.    Should I -- should I attach that

14   to this?  Is that what was meant to be?

15   A.    I don't recall it.  The --

16   Q.    Okay.

17   A.    The subpoena was pretty broad and

18   extensive --

19   Q.    Okay.

20   A.    -- so I don't remember

21   specifically which -- which one it was

22   answering.  I thought I had them all together

23   there, but --

Page 104

1          Q.      Okay.  What is Tectite?

2          A.      Tectite is a whole-house

3    ventilation program.  Runs the blower door.

4          Q.      Okay.  Did you make up this --

5    with this -- the part on the front of it?

6          A.      Yes, sir, I did.

7          Q.      Okay.  The next is a home

8    inspection worksheet.  Is this something you

9    made up also?

10         A.      Yes, sir.  It -- it originated

11   years ago from some investigative work that I

12   did with the Manufactured Housing Research

13   Alliance.  I've taken it and tweaked it and

14   added in stuff over the years to provide a

15   worksheet to help me to remember to get -- be

16   more complete and thorough.

17         Q.      Okay.  Was that some type of

18   testing protocol you -- that was involved with

19   the Manufactured Housing Research Alliance?

20         A.      Yes, sir, it was.

21         Q.      I'm going to show you what I'm

22   going to mark --

23                 MR. RITCHEY:  Nine, is that

Page 105

```
 1    right --

 2                    THE REPORTER:   Nine.

 3         Q.       -- Defendant's Exhibit 9 and see

 4    if you recognize that.

 5                    (WHEREUPON, Defendant's Exhibit

 6    Number 9 was marked for identification and is

 7    attached to the original transcript.)

 8         A.       Yes, sir.  This appears to be the

 9    protocol that was used within that research

10    project.

11         Q.       Okay.  Now, who developed that

12    protocol?

13         A.       The Manufactured Housing Research

14    Alliance.

15         Q.       And was that developed with

16    various individuals giving input?

17         A.       Yeah.  I think we -- we had

18    numerous conference calls, and the protocol was

19    passed around, bounced back and forth, until it

20    was finally decided upon.

21         Q.       Okay.  So it's peer reviewed,

22    right?

23         A.       I -- I guess that's
```

Page 106

1    argumentative.  Yes, sir, it could be considered

2    that, I assume.

3        Q.      Now, you said you tweaked it,

4    yours, based off of that Manufactured Housing

5    Alliance protocol?

6        A.      Yes, sir.

7        Q.      How did you tweak it?

8        A.      Well, I changed some of the

9    stuff.  This -- this protocol was done for a

10   research project to -- to investigate and

11   collect data for a statistician that was going

12   to take this accumulation of a tremendous amount

13   of data and come up with different statistical

14   calculations and what-have-you to -- to focus --

15   It was meant to focus on numerous different

16   moisture problems that could occur within the

17   home.

18       Q.      Uh-huh.

19       A.      My inspection sheet is geared more

20   to information that I use, typically, with the

21   manufacturers or when I'm investigating a house

22   to -- that is geared more specific to

23   particular -- particular types of issues, not --

Page 143

1    is that?

2        A.        That's where I took the air

3    samples from the wall cavities.

4        Q.        Okay.  So you took an air sample,

5    it looks like, in the --

6        A.        Master bedroom, master closet --

7        Q.        And --

8        A.        -- hallway, and front bedroom.

9        Q.        Okay.  And this is -- Now, these

10   are the interior wall samples?

11       A.        Right.  I drilled an eight-

12   millimeter hole through the gypsum itself,

13   typically two holes.  A tool is inserted into

14   the lower hole to push the insulation back, and

15   then the sample stem is inserted in the other

16   hole, the secondary hole, which extracts

17   approximately 15 liters of air.

18       Q.        Okay.  What kind of drill do you

19   have?

20       A.        Pardon?

21       Q.        What kind of drill?  What do

22   you -- what kind of drill?

23       A.        Kind of -- Little DeWalt.

Page 273

1    know?  What -- what have you done with this

2    camera to show a one-degree difference?

3         A.     I've seen many walls that do not

4    show that type of illustration with more than

5    one degrees difference.

6         Q.     Have you ever set the camera at

7    one degree?

8         A.     I can't specifically recall that.

9         Q.     Have you ever set the camera at

10    two degrees' difference?

11         A.     I don't specifically recall that.

12         Q.     Three degrees' difference?

13         A.     I don't specifically recall.

14         Q.     Four degrees?

15         A.     Don't specifically recall.

16         Q.     So as we sit here today, we don't

17    know what degree differences between the two --

18    whatever is green, yellow, red, or blue?

19         A.     That is correct.  It only

20    illustrates that there is a temperature

21    difference along that wall significant enough

22    that the camera picked it up.

23         Q.     Well, how did you do your mold

Page 275

1    these records that you did dealt with homes that

2    you were investigating for lawsuits?

3         A.      For a combination of for Beasley-

4    Allen, and I think there's a couple of older

5    houses in there that were for other customers,

6    yes.

7         Q.      Okay.  So these are just all your

8    records from the various lawsuits you've done?

9         A.      Well, the -- the project that I've

10   done for Beasley-Allen and a couple others, yes,

11   sir.

12        Q.      When you say project, this isn't a

13   study of any type, is it?

14        A.      Well, I -- I guess of -- of

15   sorts.  It's an ongoing accumulation to show

16   the -- the contributing factors that can -- can

17   make the problem escalate to the difference

18   between -- For instance, such as the Deese house

19   that's kept at 75 degrees and the way the home

20   is utilized, minimum duct leakage, pressure

21   imbalances, versus a home that showed to have

22   more serious problems or establish a level of

23   severity, if you will.

Page 342

1                    C E R T I F I C A T E

2

3    STATE OF ALABAMA)

4    JEFFERSON COUNTY)

5

6                 I hereby certify that the above

7    and foregoing deposition was taken down by me in

8    stenotype, and the questions and answers thereto

9    were transcribed by means of computer-aided

10   transcription, and that the foregoing represents

11   a true and correct transcript of the deposition

12   given by said witness upon said hearing.

13                 I further certify that I am

14   neither of counsel nor of kin to the parties to

15   the action, nor am I in anywise interested in

16   the result of said cause.

17                 *Deborah B. Townsend*

18

19                 DEBORAH B. TOWNSEND, CSR

20                 Certificate No. AL-CSR-207

21

22   My Commission expires

23   March 3, 2008

# EXHIBIT "8"

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ROBERT FORD, et al.,             )
                                   )
      Plaintiffs,           )
                                   )
v.                             )    CIVIL ACTION NO.
                                 )    06-0423-BH-C
CHAMPION ENTERPRISES, INC., et al.,  )
                                 )
      Defendants.         )

## ORDER

This action is before the Court on plaintiffs' motion (Doc. 55) for leave to amend

their complaint "to clarify the factual grounds of Plaintiffs' Complaint to demonstrate the

inapplicability of the affirmative defense of federal preemption." Upon consideration of

the motion, plaintiffs' proposed amendment, defendant's response in opposition thereto

(Doc. 58), and all other pertinent portions of the record, the Court concludes and it is

therefore **ORDERED** that the motion to amend is due to be and is hereby **DENIED** for

the reasons stated by the defendant, Champion Home Builders Co. The Court specifically

concludes that the Complaint, as amended, does not demonstrate the inapplicability of

federal preemption in this case and would thus be futile.

      **DONE** this 17th day of September, 2007.

                                         _____ s/ W. B. Hand_____
                                         SENIOR DISTRICT JUDGE

# EXHIBIT "9"

Case 1:06-cv-00643-MHT-SRW    Document 55-4    Filed 11/19/2007    Page 2 of 5
Transcript (with Word Index) of Parks, Robert (Vol. 01) - 09/28/2007
Tuesday, October 16, 2007, 9:11:21 AM

## Daugherty-Byrd

Page 1

```
 1              AMERICAN ARBITRATION ASSOCIATION

 2

 3

 4    STANLEY and SHELIA BYRD,

 5         Plaintiffs,

 6    vs.                        CASE NO.

 7    SOUTHERN ENERGY HOMES, INC.,   30 420 00810 06

 8         Defendants.

 9    _____

10    CHARLES and DINAH DAUGHERTY,

11         Plaintiffs,

12    vs.                        CASE NO.

13    SOUTHERN ENERGY HOMES, INC.,   30 420 00809 06

14         Defendants.

15    _____

16

17              *    *    *    *    *    *

18                   DEPOSITION

19                       OF

20                   ROBERT PARKS,

21    taken pursuant to notice and stipulation on

22    behalf of the Defendant, at the Offices of

23    Beasley, Allen, Crow, Methvin, Portis & Miles
```

2

Transcript (with Word Index) of Parks, Robert (Vol. 01) - 09/28/2007
Tuesday, October 16, 2007, 9:11:21 AM

**Daugherty-Byrd**

Page 8

```
 1              P R O C E E D I N G S
 2                 (ROBERT PARKS, of lawful age,
 3                     having been duly sworn,
 4                     testified as follows:)
 5              THE COURT REPORTER:  And you both
 6                     agreed on the usual
 7                     stipulations?
 8                 MR. SIMPSON:  Yes.
 9          MR. GOULD:  Yes.
10
11                 EXAMINATION
12      (BY MR. SIMPSON:)
13      Q.   Hey, Bobby.  Is it okay if I call you
14           that?
15      A.   Absolutely.
16      Q.   Call me Scott.  We are old friends.
17           We've known each other since what,
18           1999?
19      A.   Thereabouts.
20      Q.   Okay.  You used to do some work for me?
21      A.   Yes, I did.
22      Q.   Call me sir.  You used to do some work
23           for Southern Energy?
```

Transcript (with Word Index) of Parks, Robert (Vol. 01) - 09/28/2007
Tuesday, October 16, 2007, 9:11:21 AM

## Daugherty-Byrd

Page 155

```
 1   Q.   Okay.  All right.  You say you're an
 2        expert in mold count, but you can't tell
 3        me -- you can't even pronounce some of
 4        these molds and you know nothing about
 5        these molds?
 6   A.   That's correct.
 7   Q.   Do you want to reconsider your opinion on
 8        whether you're a mold expert?
 9   A.   Well, I guess you would have to define or
10        be more specific or I will define for
11        you --
12   Q.   Let me ask you this:  Do you think that
13        these lawyers could get you qualified as
14        a mold expert in Federal Court in
15        Alabama?
16   A.   Probably not, but I do feel like I'm
17        competent to take air samples and
18        interpret the data.
19   Q.   Okay.  So you're not a mold expert now,
20        but you can take air samples and
21        interpret the data?
22   A.   I think I have the ability and competence
23        to do that, yes, sir.
```

CONFIDENTIAL

Case 1:06-cv-00643-MHT-SRW    Document 55-4    Filed 11/19/2007    Page 5 of 5
Transcript (with Word Index) of Parks, Robert (Vol. 01) - 09/28/2007
Tuesday, October 16, 2007, 9:11:21 AM

**Daugherty-Byrd**

Page 222

```
1                    CERTIFICATE
2    STATE OF ALABAMA
3    AT LARGE
4               I hereby certify that the above
5    and foregoing proceedings were taken
6    down by me in stenotype and the
7    questions and answers thereto were
8    transcribed by means of computer-aided
9    transcription and that the foregoing
10   represents a true and correct transcript
11   of the testimony given by said witness
12   upon said hearing.
13
14               I further certify that I am
15   neither of counsel nor of kin to the
16   parties to the action, nor am I in
17   anywise interested in the result of said
18   cause.
19
                         _____
20                       DAWN A. GOODMAN, Commissioner
                         Certified Court Reporter,
21                       ACCR #262 - Expires 9/30/08
                         Commission Expires 9/19/09
22
23
```

# EXHIBIT "10"

MERRILL LEGAL SOULTIONS
Court Reporting Legal Videography Trial Services

Page 1

1         AMERICAN ARBITRATION ASSOCIATION

2
                                    ORIGINAL
3

STANLEY and SHEILA BYRD,
4       Plaintiffs,

5
vs.                    Case No. 30 420 00810 06
6

7  SOUTHERN ENERGY HOMES, INC.,
        Defendant.
8
    _____
9

10 CHARLES and DINAH DAUGHERTY,
        Plaintiffs,
11
12 vs.                    Case No. 30 420 00809 06

13
SOUTHERN ENERGY HOMES, INC.,
14      Defendant.

15

16      *    *    *    *    *    *    *    *

17      TESTIMONY AND PROCEEDINGS, taken
before Ben F. Beckham, Arbitrator, at
18 Beasley, Allen, Crow, Methvin, Portis &
Miles, 272 Commerce Street, Montgomery,
19 Alabama, on October 1, 2007, commencing
at approximately 10:00 a.m.; and
20 reported by Bridgette Mitchell, Court
Reporter and Commissioner for the State
21 of Alabama at Large.

22      *    *    *    *    *    *    *    *

23

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

1           MR. GOULD: Yes, sir.  We call

2      Mr. Bobby Parks.

3           ROBERT PARKS, having first been

4      duly sworn or affirmed to speak the

5      truth, the whole truth, and nothing but

6      the truth, testified as follows:

7           DIRECT EXAMINATION

8      BY MR. GOULD:

9      Q. Will you state your full name?

10     A. Robert Lynn Parks.  I go by Bobby.

11     Q. Where do you live, Mr. Parks?

12     A. Live at 104 Cherokee Drive at West

13        Monroe, Louisiana.

14     Q. How are you currently employed?

15     A. My primary business is Healthy Homes of

16        Louisiana.  I'm a consultant for

17        several manufacturers to build

18        manufactured homes and modular homes;

19        that is my primary source of income,

20        consulting and problem-solving with

21        them.  I also serve, of course, in

22        expert witness capacity from time to

23        time.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 215

```
 1          to that 25 to 30 percent, that's

 2          usually when I start finding the mold

 3          propagating in the walls.

 4     Q.   Right.

 5     A.   Anything --

 6     Q.   But from the gypsum industry, I'm

 7          saying.  They don't -- you've not

 8          relied on anything from them for a

 9          scale?

10     A.   No, sir.  The gypsum industry just

11          basically says if it gets wet, dry it

12          out early and quickly.  And if you see

13          mold on it, it has to be changed or

14          can't be used -- or basically can't be

15          used.

16     Q.   Now, do you think you're a mold expert?

17     A.   No.  We clarified that.  I'm not a mold

18          expert as far as the -- the analyzation

19          and what have you.  I misspoke there.

20          We were talking about defining an

21          expert and what an expert is.  I do

22          think that I'm more than capable and

23          trained to take air samples and
```

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 217

1    Q. That's fair.

2    A. -- even pronounce most of the names.

3    Q. That's fair.

4    A. That was not my intent.

5    Q. And in fairness to you, you did say you

6       couldn't get qualified in federal

        court?

8    A. That's correct.

9    Q. Okay. And I'm not going to -- I mean,

10      I don't mean to say this to embarrass

11      you, because I can't pronounce them

12      either. But after I asked you if you

13      were a mold expert, I asked you if you

14      could even pronounce the molds on your

15      list and I think your answer was you

16      couldn't?

17   A. That's correct. And just -- I probably

18      couldn't pronounce most of the names

19      that were on that list, but I -- I am

20      very fluent in taking -- and capable of

21      taking the samples and interpreting the

22      data, which is the process that I've

23      been trained in.

Page 221

```
 1          showing up in this Aspergillus

 2          Penicillium is obviously coming from

 3          another source than outside.

 4     Q.  You think it's water?

 5     A.  It's moisture.  And Aspergillus

 6          Penicillium is known to be closely

 7          connected to gypsum wallboard.

 8     Q.  Okay.  But now you're talking about

 9          life cycles and epidemiology and you're

10          not qualified to do that?

11     A.  I'm talking about the samples that I

12          took and the use -- where the purpose

13          of these samples was to support --

14     Q.  What is the life cycle of Aspergillus?

15     A.  We've already discussed that --

16     Q.  You don't know?

17     A.  -- Mr. Simpson, and I told you I'm not

18          that type of --

19     Q.  Okay.

20     A.  -- mold expert.

21     Q.  All I want to see is, if you'll agree

22          with me, that -- you've emphasized the

23          presence of water in exclusion of all
```

Page 222

1        other variables.  And all I want you to

2        see, if you agree with me, is you don't

3        know any of the other variables from a

4        life cycle epidemiology standpoint, so

5        you can't exclude those or rule those

6        out?

7    A.  I couldn't comment as to how much of a

8        factor that may be in the propagation

9        of that mold.

10   Q.  All right.  And you don't know why mold

11       is elevated in the wall cavity,

12       scientifically speaking; correct?

13   A.  No.  My -- my --

14   Q.  That's all I want.

15   A.  Okay.

16   Q.  We're almost done.  You have no

17       scientific data to show the rates of

18       gypsum deterioration by mold?

19   A.  No, sir.

20   Q.  You don't have pictures of mold in

21       either house in your report?  We

22       established that Friday.

23   A.  Yeah.  We have the sample here that we

```
1              *   *   *   *   *   *   *   *   *   *   *

2                    REPORTER'S  CERTIFICATE

3              *   *   *   *   *   *   *   *   *   *   *

4      STATE OF ALABAMA

5      COUNTY OF MONTGOMERY

6              I hereby certify that the above and

7      foregoing proceeding was taken down by me by

8      stenographic means, and that the content

9      herein was produced in transcript form by

10     computer aid under my supervision, and that

11     the foregoing represents, to the best of my

12     ability, a true and correct transcript of

13     the proceedings occurring on said date at

14     said time.

15             I further certify that I am neither

16     of counsel nor of kin to the parties to the

17     action; nor am I in anywise interested in

18     the result of said case.

19

20

21

22             Bridgette Mitchell
               Bridgette Mitchell
23             Reporter and Notary Public
               State of Alabama at Large
```

# EXHIBIT "11"

1              IN THE UNITED STATES DISTRICT COURT FOR THE
                      MIDDLE DISTRICT OF ALABAMA
2                        SOUTHERN DIVISION

3
        ----------------------------x
4       TERRY DEESE,                :
                                    :
5                Plaintiff          :
                                    :
6            vs.                    :  NO. 1:06-cv-643 MHT
                                    :
7       CHAMPION ENTERPRISES,       :
        INC., et al.,               :
8                                   :
                 Defendants         :
9       ----------------------------x

10           The deposition of DR. ROBERT KONDNER was held

11      on Tuesday, January 16, 2007, commencing at 10:20 a.m.,

12      at the Law Offices of Pels, Anderson & Lee, L.L.C.,

13      4833 Rugby Avenue, Fourth Floor, Bethesda, Maryland

14      20814, before Ronald E. Bennett, Notary Public.

15

16

17

18

19

20

21      REPORTED BY:  Ronald E. Bennett

```
1                    P R O C E E D I N G S

2    Whereupon,

3                DR. ROBERT KONDNER,

4    called as a witness, having been first duly sworn to

5    tell the truth, the whole truth, and nothing but the

6    truth, was examined and testified as follows:

7            EXAMINATION BY COUNSEL FOR DEFENDANTS

8            BY MR. RITCHEY:

9        Q.    Can I ask you to give your full name.

10       A.    Dr. Robert L. Kondner.

11       Q.    If it's okay if I just call you Dr.

12   Kondner?

13       A.    Just call me Bob, if you want.  Whatever

14   you call me, just call me for dinner.

15       Q.    I am Greg Ritchey.  I represent Homes of

16   Legend in this matter we have asked you to appear

17   for a deposition.  I'm assuming you have done

18   depositions before?

19       A.    Yes, I have.

20       Q.    I have somewhat of a little bit of cold.

21   If I ask an unclear question, you can't understand
```

1    see -- couple of those concrete cases.

2        Q.    Why don't we come back to that one.

3        A.    All right.

4        Q.    Have you ever done any work for the

5    Beasley Allen firm before other than this case?

6        A.    No, I haven't.

7        Q.    Have you investigated the Deese home?

8        A.    No, I have not.  Personally I have not.

9        Q.    Have you been to Alabama?

10       A.    Yes.  Not for this case.

11       Q.    Have you been to Alabama for not this case

12   but you have been to Alabama before?

13       A.    Oh, yes.  I had several projects in

14   Alabama.  One in Montgomery.  One in Mobile.

15       Q.    Those are involving the Ramada Inn?

16       A.    Yes.

17       Q.    Both of those involved underground suer?

18       A.    Well, I took a series of soil test borings

19   at both locations and made geotechnical reports for

20   both of those.  And the one in Mobile was done

21   several times because it had been burned down.

1    construction exterior wall --

2        A.   Do I have a design?

3        Q.   Yes.

4        A.   I haven't designed anything.

5        Q.   In theory you say it exists.  You have not

6    designed anything?

7        A.   No.

8        Q.   Are you aware of anybody that has, other

9    than what is already listed in the HUD Code?

10            MR. ANDERSON:  Objection.  Form and

11    foundation.  You can answer.

12        A.   I think I probably could come up with some

13    of the information that exists that I've seen and

14    supply to you.

15        Q.   As we sit here today, do you have

16    anything?

17        A.   I don't have it handy.

18        Q.   Are you familiar with the term bottom

19    board?

20        A.   Yes.

21        Q.   What is that?

Page 39

```
 1      A.   That is the board underneath the unit.

 2      Q.   Can you describe it for me?

 3      A.   Describe what it looks like?

 4      Q.   Yes.

 5      A.   It's the bottom underneath the envelope

 6  under the -- where the main rails are.  It's

 7  underneath the floor.

 8      Q.   What kind of material?

 9      A.   What kind of material?

10           MR. ANDERSON:  Object to the form and

11  foundation.

12      A.   I would think it would be wooden.

13      Q.   Are you familiar with HUD's third party?

14           MR. ANDERSON:  Objection to form and

15  foundation.  You can answer.

16           THE WITNESS:  HUD's third party?

17      Q.   Yes.

18      A.   Would you clarify that a little bit.

19      Q.   Well, their contract agent.

20           MR. ANDERSON:  Objection form and

21  foundation.
```

1          BY MR. RITCHEY:

2      Q.    Dr. Kondner, are you familiar with them

3    other than looking them up in the HUD Code?

4      A.    No, I'm not -- I don't memorize any of

5    this stuff.

6      Q.    Have you ever read the definition of

7    noncompliance in the HUD Code?

8      A.    I probably have.

9      Q.    When do you think you last read that?

10     A.    I don't know.

11     Q.    Have you ever read the definition for

12   defect?

13     A.    I don't recall.  I probably have.  I've

14   gone through that -- I can tell you this.  I was

15   hired to do a job and it has to do with engineering

16   practice.  For the Deese house on Mr. Bonney's

17   report and Mr. Parks's report.

18          Now let's get Mr. Parks's report up here

19   and I will show you exactly what I'm talking about.

20   He has detected a source of water.  He's detected a

21   path of water.  And forces that are involved in that

1    water.  And the consequences of that water.

2        Q.    Have you verified anything that is in that

3    report?

4        A.    Have I gone back and looked at the house?

5    No.  I depended on his report.  You talk to him, if

6    you don't like his report.

7        Q.    All right.  You listed in your report a

8    term defect.  Was that a defect as defined in the

9    HUD Code or is that your own specific term?

10        A.    Show me where I used that.

11        Q.    Page 5 of your report.  Very top of page

12    5.  First sentence.

13        A.    Okay.  Word defect.

14        Q.    Are you using the definition of defect as

15    defined in the HUD Code or is this your own

16    definition?

17        A.    I'm using it here as a generalized term,

18    meaning something that's wrong.

19        Q.    So your definition of defect in that

20    case --

21        A.    It would be a dictionary --

Page 71

1    impermeable.  It couldn't get out.  So it condensed

2    on there.  The temperature went up.

3        Q.    How many manufactured homes in the hot

4    humanity climate have you inspected?

5        A.    I haven't inspected any in any of those

6    states that are within that.  But I know the

7    engineering principles behind this.

8        Q.    I understand.

9        A.    That's all you got to apply.

10       Q.    You just guaranteed that vinyl -- any

11   residential structures too other than manufactured

12   housing?

13       A.    Manufactured housing is a little different

14   than any other kind of construction.

15       Q.    How is that?

16       A.    What do you mean how's that?

17       Q.    How is that?

18       A.    Well, generally, what I would say is that

19   manufactured housing, some of the units look pretty

20   decent, I would rather have a stick-built house than

21   I would a manufactured house.

Page 74

1      Q.    The Deese unit.

2      A.    The Deese unit.  No, I don't know which

3  plant that was made in.

4      Q.    It was made in Homes of Legend plant?

5      A.    Where is that located?

6      Q.    In Boaz, Alabama?

7      A.    Okay.  It's in a hot humid climate.  Isn't

8  it?

9      Q.    No, sir.

10     A.    It's not?  What county is that in?

11     Q.    Do you know anything about the wall in the

12  Deese unit?

13     A.    Other than the fact that it's got vinyl on

14  the inside and it's got moisture behind it inside

15  the wall.  And it's eventually going to build up in

16  there.  It's eventually going to destroy that wall

17  material.

18     Q.    Are you finished?

19     A.    Yes.  And it's poor engineering practice.

20     Q.    Did you see the vinyl on the Deese house?

21          MR. ANDERSON:  Objection.

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 75

```
 1        A.    No, I didn't see it.

 2        Q.    So you are assuming?

 3        A.    From the reports that I evaluated.

 4        Q.    That that is there?

 5        A.    Yes.  I believe the report.

 6        Q.    You are assuming that the report is

 7   correct with regard --

 8        A.    I'm assuming that the report is correct.

 9   Because the people who are writing the reports, in

10   particular Mr. Bonney, is well versed in the

11   construction of manufactured housing and in the

12   plants and in the servicing.  And I rely on his

13   report like I could rely on any other expert's

14   report.

15        Q.    You never knew Bonney or Parks until

16   October, when you were first brought into this case?

17        A.    Oh, no, I knew Mr. Bonney from before.

18        Q.    Where?

19        A.    The other cases.

20        Q.    How about Mr. Parks?

21        A.    I just met Mr. Parks for this case.  I've
```

Page 206

1    STATE OF MARYLAND

2    DORCHESTER COUNTY, to wit:

3           I, Ronald E. Bennett, a Notary Public

4    of the State of Maryland, County of Dorchester, do

5    hereby certify that the within-named witness personally

6    appeared before me at the time and place herein set

7    out, and after having been duly sworn by me according

8    to law, was examined by counsel.

9           I further certify that the proceedings were

10   recorded stenographically by me and this transcript is

11   a true record of the proceedings.

12          I further certify that I am not of counsel to

13   any of the parties, nor in any way interested in the

14   outcome of this action.

15          As witnessed my hand and notarial seal this

16   31st day of January, 2007.

17                    _____

18                         Ronald E. Bennett,

19                          Notary Public

20   My commission expires:

21   October 1, 2007