IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRY DEESE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case Number:  1:06-cv-643 MHT** |
| | * | |
| **CHAMPION ENTERPRISES, INC.,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |

## REPLY TO PLAINTIFF'S OPPOSITION TO
## <u>LEGEND'S MOTION FOR SUMMARY JUDGMENT</u>

**COMES NOW**, Champion Homes of Boaz, Inc., formerly known as Homes of Legend,

Inc. (hereinafter referred to as "Legend"), one of the defendants in the above-styled action, by

and through counsel of record, and in reply to the Plaintiff's Memorandum in Opposition to

Defendant's Motion for Summary Judgment as to Merits (hereinafter referred to as "Plaintiff's

Opposition"), states as follows:

1.       As additional support, Legend is submitting herewith as Exhibit "5", excerpts

from the deposition of Legend's corporate representative, Parker Holloway, (hereinafter referred

to as "Holloway").

2.       Legend is also attaching hereto as Exhibit "6", additional excerpts from the

deposition of Robert Parks (hereinafter referred to as "Parks") in this case as well as Exhibit "7",

excerpts from the deposition of Parks in *Strickland v. Champion Enterprises, Inc.,* pending in the

Middle District of Alabama, Southern Division, Case No. 1:06-cv-00682-TFM and *Ford v.*

*Champion Enterprises, Inc.,* pending in the Southern District of Alabama, Southern Division,

Case No.: 1:06-cv-423-BH-C.[1]

---

1  Parks was deposed at one time for both cases.

1

## ARGUMENT

Because the plaintiff, Terry Deese (hereinafter referred to as "Deese) has the burden of proof at trial, Legend may move for summary judgment with or without supporting evidence. Fed.R.Civ.P. 56(c); *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991). To defeat summary judgment, Deese may not rest on the pleadings; instead, Deese must introduce admissible evidence showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Deese cannot meet this burden as in the over 100 pages of documentation filed in opposition to Legend's Summary Judgment Motion, nothing was submitted in contradiction of the Narrative Summary of Undisputed Facts contained in said motion and most importantly, not a single reference to testimony given by Deese, was offered by Deese.

A nonmoving party, opposing a summary judgment motion which is supported by depositions or affidavits "cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991), *citing Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986). "The evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d at 1577, citing *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). Thus, there is no disputed question of fact. If the nonmoving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986) the moving party is entitled to summary judgment. *Four Parcels of Real Property*, 941 F.2d at 1438. Therefore, the facts must be considered as uncontroverted and Legend is entitled to a judgment in its favor.

Assuming, *arguendo*, that Deese has in some way met his burden on any particular argument, Legend offers the following.

Deese first attempts to put the burden on Legend to prove whether or not the Deese home had a 1 permeance interior vapor retarder.[2] (Plaintiff's Opposition, p. 1). As set forth above, it is Deese's burden. Obviously, Deese has not met that burden and therefore, Legend's assertion that the home does not have an interior vapor barrier is uncontroverted. Further, it is claimed that counsel is "attempting to resolve this discovery dispute." However, the discovery deadline has expired.

Legend's corporate representative, Parker Holloway, is the only remaining representative of Legend, which closed over two (2) years ago. (Holloway, p. 27: 12-21; 28: 1-19; 104: 2-21; 105: 1). All files of Legend are contained in several tractor trailers located on a storage lot in Guin and Legend offered to allow Deese's counsel to go through them. (Holloway, p. 29: 5-23; 30: 1-3). No effort was made to do the above, presumably because Deese did not schedule the deposition of Legend's corporate representative until the day before the discovery deadline and waited too late. Therefore, Deese's attempt to characterize Legend as somehow not cooperating in discovery is inappropriate.

In an attempt to hide the lack of any disputed fact, Deese cites testimony from other cases and tidbits of information out of context. No question of fact is being created by Deese, but rather, only generalized statements regarding germination of mold, whether a vapor barrier is ideal and basic high school science statements such as "[h]ot seeks cold", "moist seeks dry",

---

2 Deese also attempts to criticize Legend's corporate representative for not being familiar with a laundry list of items in No. 17 that Deese claims is applicable to manufactured housing. The HUD Code is the *only* standard for the industry, not the articles, partial studies, advertisements or product inserts listed in No. 17 of the deposition notice. While a corporate representative does have an obligation to become familiar with company related documentation, files, procedures, etc., , there does not appear to be a duty for a corporate representative of a closed plant to become familiar with every item some plaintiff or plaintiff's perceived expert believes is pertinent.

"[h]eat moves from high temperatures to low", "[w]ater vapor moves from high pressure to low" "mold can occur in 24-48 hours". (Plaintiff's Opposition, pp. 6-7). Deese then parades the statement that the defendant cannot point to one study that says placing the vapor barrier on the living side of the wall is good practice in hot, humid climates. (Plaintiff's Opposition, p. 8). What Legend can point to is the HUD Code. The HUD Code which specifically allows a vapor retarder[3] to be located on the interior wall in any area of the country. 24 CFR § 3280.504(b)(1). In fact, in Alabama, vapor retarders are also allowed in "stick-built" housing built within the hot, humid climate.[4]

All of the above is just an attempt to mask the obvious flaw in Deese's case: there is no evidence that the Deese's wall has a vapor retarder on the interior, living side of the wall. Instead, the evidence supports that the Deese home was built in accordance with 24 CFR § 3280.504(b)(3). Even if the home did have an interior vapor retarder, Deese's cannot overcome the fact that HUD reviewed the research in the field and STILL PERMITS manufactured home builders to place interior vapor retarders in ANY AREA of the country. 24 CFR 3280.504(b)(1). A more detailed explanation of the HUD Code process and review procedures is set forth in Legend's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment-Preemption.

---

3  Vapor retarders and vapor barriers are used interchangeably by HUD. It should be understood that a vapor retarder does not "trap" moisture as suggested by Deese, but rather, restricts the flow of moisture. A perm rating is a measure of the flow of water vapor through a material. The higher the perm rating, the more permeable (porous) the material. Based upon building codes, any membrane that has a perm rating of 1.0 (dry cup method) or less is considered a vapor retarder. An air retarder is different from a vapor retarder in that it blocks only air and liquid water, not water vapor. Air retarders block drafts of hot or cold air caused by winds and pressure differences between the inside and outside of the house. A housewrap is one form of an air retarder. Typical exterior "housewraps" are not vapor retarders.

4  Alabama voluntarily adopted the 2000 International Energy Conservation Code building code for site-built homes and references vapor retarders in Section 501.1.1.1 and states that "Vapor retarders must be installed in all non-vented frame ceilings, walls and floors . . ." but goes on to set forth an exception: "Vapor barriers are not required" in zones identified as hot and humid. Thus, vapor barriers may be used; the IECC stipulates only that vapor barriers are not required in hot, humid climates.

**Express Warranty and Magnuson-Moss Claims**

Glaringly missing from Plaintiff's Opposition is any evidence to refute that Deese failed to provide notice or that Legend in any way failed to comply with the terms of its warranty. Instead, Deese cites out of state cases to allege exceptions that do not exist in Alabama.[5] A federal court, while sitting in diversity, is bound to apply the substantive law of the state in which it sits. *See Erie, R.R. v. Tompkins*, 304 U.S. 64 (1938). As set forth in Legend's initial brief, Alabama treats a warranty as any other contract, and the limits imposed by a manufacturer or seller are reflected in the consideration paid by the buyer, and filing a lawsuit does not constitute notice. Therefore, such out of state cases are of no use to Deese in this state.

Nonetheless, Legend will address the out of state cases, as well as the one Alabama case. The plaintiff cites *Rhode v. E&T Investments, Inc.*, 29 F.Supp.2d 1298 (M.D.Ala. 1998) for the proposition that the plaintiff did not personally give notice. The problem with that argument is that the notice was timely in *Rhode*, and there is no dispute that there was no timely notice given here. Moreover, the complaints in *Rhode* made after the expiration of the warranty period were all related to repairs made *during* the warranty period. Therefore, *Rhode* provides no support for the plaintiff's position.

*In re: McDonald's French Fries Litigation*, 1:06-cv-04467 (N.D.Ill. 2007) alludes to certain exceptions to notice requirements *under Illinois law*. The plaintiff ignores the entire *Erie* doctrine body of caselaw in making this argument. Deese does not provide any such exception

---

5 Deese also attempts to confuse the record by including briefs from another case relating to whether a manufactured home is a consumer product as that term is defined under the Magnuson-Moss Warranty Act (as opposed to the definition of "consumer good" under the Code of Alabama). Deese has the burden of proof to establish that a manufactured home satisfies the definition of "consumer product" under the Magnuson-Moss Warranty Act. Deese statement that *Bryant v. Southern Energy Homes, Inc.*, stands for the proposition that manufactured homes are covered by the Magnuson-Moss Warranty Act is incorrect as there is no mention of the Magnuson-Moss Warranty Act in the *Bryant* case. This is merely a misinterpretation of another manufacturer's brief.

under Alabama law (the substantive law that must be applied to this case) and the argument is misleading at best.

Deese also relies on a twenty-year-old case from the DC Circuit, *Alberti v. General Motors Corp.*, to establish "notice." 600 F.Supp 1026 (D.C. 1985). *Alberti's* suspect reasoning has since been criticized by the Second Circuit Court of Appeals in *Abraham v. Volkswagen of America, Inc.*, 795 F.2d 238 (1986). In *Abraham,* the court pointed out that all products have parts that will fail eventually, and the fact that a manufacturer may know parts could fail after the expiration of a warranty period does not establish notice of a defect. *Id.*, at 250. For a court to rule otherwise would render time limitations in warranties meaningless. *Id.* Any reference on *Radford v. Daimler Chrysler Corp.*, 168 F.Supp.2d 751 (N.D.OH 2001) is also misplaced as that decision was based on a review of the pleadings in a motion to dismiss context.

There is also no evidence that all vinyl walls will fail. Indeed, Deese's alleged "expert" recently admitted under oath that the walls just have the "ability to fail". (Ex. 7, p. 106:2-9). Thus, there is no evidence to support the grandiose assertion that all vinyl walls will fail every time and this case is merely a fear of future damages case.

Deese also cites the case of *Q. Vandenberg & Sons, N.V. v. Siter*, 204 A.2d 494 (Pa.Super 1964), and also, expresses the opinion that a manufactured home has a lifespan of 57.5 years. This would seem improbable if every vinyl wall failed as Mr. Parks asserted, but again, this is simply not material to the case before the Court. *Q. Vandenberg* is not binding law, and in *Traffic Safety Devices, Inc. v. Safety Barriers, Inc.*, 2006 U.S. Dist. LEXIS 67606 (E.D.Tenn. 2006), the court clarified that the holding in *Q. Vandenberg* stating the discovery was ***inherently impossible***, not merely difficult or inconvenient. For the plaintiff to take advantage of that

6

Pennsylvania law exception (unrecognized in Alabama and inapplicable to this case under the *Erie* doctrine) it must be impossible to detect.

*Held v. Mitsubishi Aircraft International, Inc.*, 672 F.Supp. 369 (D.Minn. 1987) is also not binding law. *Held* found that the time limitation on the warranty was too short because the latent defect was not likely to be revealed within the warranty's time limits. The defect could only be revealed due to an unusual occurrence, a particularly violent ice storm. This distinction was later noted in *Loucks v. New Holland Manufacturing, Inc.*, 1993 Minn. App. LEXIS 508. The plaintiff cannot make this claim, because *every* summer in Alabama is hot and humid. Not only is it not unusual, it can be counted on every year. Therefore, even if this Minnesota exception were applied to Alabama, it would not help the plaintiff's argument.

The plaintiff also cites *Community Television Services, Inc. v. Dresser Industries, Inc.*, 586 F.2d 637 (8th Cir. 1978) as a case that allowed warranty coverage beyond the time limits stated in the warranty. Again, this caselaw is neither binding nor is it applicable to the case at bar. In *Community Television Services*, the court extended the warranty specifically because the defendants had made promises in advertisements that exceeded those stated in the warranty, and the court found that the plaintiff could reasonably have relied upon such extra-contractual covenants. In this case there was no similar advertising or presale contact upon which the plaintiff could have reasonably relied.

It should also be noted that in the Alabama case of *Jones v. First Nat. Bankd of Pulaski*, 505 So.2d 352 (Ala. 1987) cited by Deese in support of the "notice" assertion, **Tennessee law was utilized.** *Id.* At 354. It is no coincidence that every case on which Deese relies in a desperate attempt to create a judicial exception to the clear notice requirements he ignored, or to

extend the warranty limits he exceeded, are based on caselaw from outside Alabama. There is no basis for applying these exceptions to the Deese's case.

**Implied Warranty Claims**

Deese failed to provide any admissible evidence to support the claim that any contract between Legend and the dealer was intended to ultimately benefit Deese. Although Deese cited Court of Civil Appeals decisions, he failed to distinguish any of the various Supreme Court of Alabama decisions finding that implied warranties are not applicable to remote manufacturers such as Legend. In any event, there is a clear disclaimer in Legend's warranty which states, in pertinent part, as follows:

> **DISCLAIMER OF WARRANTIES: THIS WARRANTY IS GIVEN EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE REMEDIES SET FORTH IN THIS WARRANTY ARE THE SOLE REMEDIES PROVIDED BY THE MANUFACTURER.** (Emphasis in original).

> See Ex. 1, Defendant's Ex. 18, p. 4 of Legend's Brief in Support of Motion for Summary Judgment.

Exclusions of warranties, if done conspicuously, are allowed in Alabama. See *Code of Alabama (1975)* § 7-2-316. *Code of Alabama (1975)* § 7-2-316(2) provides as follows:

> (2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

*Code of Alabama (1975)* § 7-1-201(10) defines "conspicuous" as follows:

> "Conspicuous": A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals . . . is conspicuous. Language in the body of a form is

"conspicuous" if it is in larger or other contrasting type or color. . . . Whether a term or clause is "conspicuous" or not is for decision by the court.

The language contained in the Limited Warranty has been determined to be conspicuous and therefore, successfully disclaimed implied warranties. *See e.g. Feil v. Wittern Group, Inc.,* 784 So.2d 302, 311-312 (Ala.Civ.App. 2000) (the disclaimer in the contract stating in all caps that "SELLERS MAKE NO OTHER WARRANTY, EXPRESS OR IMPLIED, AND MAKES [sic] NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE . . ." satisfied the requirements of §§ 7-2-316(2) and 7-1-201(10)); *Morgan Building and Spas, Inc. v. Gillett,* 762 So.2d 366, 371-372 (Ala.Civ.App. 2000) (trial court erred in denying motion for judgment as a matter of law on claims alleging breach of implied warranty where warranty-disclaimer provision was printed in all capital letters, in bold print and in a print that was larger than the print used in the rest of the contract as such provision was "conspicuous"); *Fincher v. Robinson Brothers Lincoln-Mercury, Inc.,* 583 So.2d 256, 258 (Ala. 1991) (warranty-disclaimer satisfied requirement of conspicuousness where language printed in a type and color (red) that contrasted with the type and color used in rest of the contract); *Fleming Farms v. Dixie AG Supply, Inc.,* 631 So.2d 922, 927 (Ala. 1994) (warranty-disclaimer printed in capital letters and in bold, that was larger and darker than other print, and additional disclaimer in capital letters which were larger than the letters on form clearly met requirements of § 7-2-316(2)).

Further, under Paragraph 10 of the Form 500 Contract with the dealer, Best Value Homes, it was specifically stated that "BUYER UNDERSTANDS THAT THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTIES EXPRESSED OR IMPLIED ARE EXCLUDED BY DEALER FROM THIS TRANSACTION AND SHALL NOT APPLY TO THE UNIT OR ANY

COMPONENT OR ANY APPLIANCE CONTAINED THEREIN". See Ex. 1, Defendant's Ex. 7, p. 2 of Legend's Brief in Support of Motion for Summary Judgment. Based on the forgoing, all implied warranties and specifically the implied warranty of merchantability have been properly excluded from the sale.

**Negligence and Wanton**

Once again, Deese's own brief proves that his case has no support under Alabama law. Deese admits that the discovery rule does not apply to negligence or wantonness claims, and that the economic loss rule prevents recovery in tort when the product damages itself rather than other persons or property. He further claims he requires a trial to prove that he suffered mental anguish, but the point of summary judgment is to require the plaintiff to prove that he has substantial evidence that could be presented to a jury. Deese has no such evidence of mental anguish. There is also no substantial evidence to show that an alleged cause of action for negligence or wantonness could have accrued within the two years prior to the filing of this lawsuit, rather than at the time of delivery of the home in 2003.

The plaintiff's perplexing arguments amount, in the end, to the assertion: "The statutory language indicates that Defendant's customers have a reasonable expectation that a manufactured home they purchase will be free from defects." Alabama caselaw is clear, the language of an express warranty to repair cannot be construed as a representation that a product is entirely free of defects. *Palm Harbor Homes, Inc. v. Crawford,* 689 So.2d 3, 10-11 (Ala. 1997). Deese's cite to 42 USCA § 5401(a) regarding notice of imminent safety hazards is also fruitless, because even if there were some real problem with the walls, Deese's own expert stated it was not an imminent safety hazard. (Ex. 4 to Brief in Support of Motion for Summary Judgment, pp. 239: 7-23; 240: 1-23; 241:1-23; 242: 1-11). Further, as expressed in Legend's

Brief in Support of Motion for Summary Judgment, the Manufactured Home Act does not create, expressly or impliedly, any private right of action. *Heuer v. Forest Hill State Bank*, 728 F.Supp. 1199, 1200 (D.Md.1989), *aff'd.*, 894 F.2d 402 (4th Cir.1990).

**Mental Anguish Damages**

Deese continually asserts that the "general rule" does not apply to him. Apparently Deese believes that *none* of the rules applies to him. It is undisputed Deese has never lived in the house, and has suffered no physical ailment or injury that might support an allegation of mental anguish. The only support for his argument is a statement in a concurring in part and dissenting in part opinion in *Ex parte Grand Manor, Inc.*, 778 So.2d 173 (Ala. 2000). The majority of the Court held that the "zone of danger" test limits recovery of mental anguish damages to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct. *Id.*, at 179. To support his "zone of danger" claim, Deese generally states it is "hard to dispute that mold . . ., which can grow quickly and cause immediate physical reactions, did not place Plaintiff in immediate risk of injury." This statement is of course, unsupported by evidence, especially when you consider that Deese has never lived in the home. [6]

---

[6]    Any alleged exposure to mold or damages related thereto cannot be proven. In an article published in the America Industrial Hygiene Association Journal ("AIHAJ"), which was authored by individuals from the Centers for Disease Control in Atlanta, a comprehensive review and summary of the published literature addressing possible causal connections between mold spores in the home and illness in humans was undertaken. It was concluded that "the literature indicates that there is inadequate evidence to support the conclusions that exposure to mycotoxins in the indoor (nonindustrial) environment is causally related to symptoms or illness among building occupants." Elena H. Page and Douglas B. Trout, *The Role of Stachybotrys Mycotoxins in Building-Related Illness*, AIHAJ 62: No.5, 644-648. Even if the above burden can be overcome, a plaintiff will still have difficulty proving that any illness is the result of exposure to mold. The only known test utilized to make this connection is a blood test which is inherently unreliable. The unreliability of the test is discussed in an article prepared by the California Department of Human Services, "Misinterpretation of Stachybotrys Serology," California

11

Further, at his deposition, Deese responded as follows with regard to clearing up a response to a Request for Admission concerning any mold related personal injury claim:

Q.    All right. Number six, just on the next page, are you making any mold-related personal injuries in this case?

A.    No.

(Ex. 1 to Brief in Support of Motion for Summary Judgment, p. 30: 9-12).

Based on the foregoing, Deese cannot prove mental anguish damages.

**Unjust Enrichment**

In *ASD Specialty Healthcare, Inc. v. Hickes, M.D., P.C.*, No. 1:05cv592-MHT (WO), 2006 U.S. Dist LEXIS 55129, *5 (M.D. Ala. August 7, 2006), the court held that a party cannot assert an unjust enrichment claim when the parties are subject to a written contract (or written warranty). The existence of the explicit contract precludes the application of a contract implied by law or quasi contract, which is the basis for applying an unjust enrichment test in the first place. Here, Deese received an express limited warranty from Legend. The existence of that explicit, written warranty bars any implied contract theory in equity. Thus, Deese's unjust enrichment claims do not exist because he cannot prove the absence of a legal remedy.

**Fraudulent Concealment**

Not a single citation to the record was made by Deese to support his fraudulent concealment claim. There is no evidence of a concealed defect. Deese claims that having a vapor retarder on the living side of an exterior wall is a defect. But there is no evidence to

---

Department of Health Service, Environmental Health Investigations Branch (December 2000). In the article, it was determined that there are currently no validated biomarkers of exposure to specific indoor fungi or their toxins. It was also determined that symptoms associated with mold exposure are nonspecific, vary greatly with individual susceptibility and that the mere demonstration of mold-specific antibodies alone is generally considered insufficient to prove that health effects reported by individuals in moisture-damaged buildings are caused by mold exposure. Thus, mold related illness in humans due to exposure in an indoor (nonindustrial) environment cannot be scientifically proven under technology available today.

support the claim that there is a vapor retarder on the living side of Deese's walls. Even if there was a vapor retarder, the living side of the wall is not hidden. It is seen by every person who enters the home. At any time Deese could have investigated his walls. Deese failed to discover the defect not because it is hidden, but because it does not exist. There is no evidence that the walls in this home are failing or will fail at some future date, much less substantial evidence that might serve as an actual objection to the defendant's motion for summary judgment, especially in light of the preemption issue.

Essentially, Deese claims that Legend should have disclosed that the home was built to a standard he claims is defective. There would be no duty for Legend to disclose anything as it built the subject home in accordance with the HUD Code. The Data Plate or Compliance Certificate which Deese admits is located inside the home, specifically states "This manufactured home is designed to comply with the federal manufactured home construction and safety standards in force at time of manufacture." (Ex. 1 to Brief in Support of Motion for Summary Judgment, Defendant's Ex. 11). If Deese claims that HUD standards are defective, he had knowledge of the supposed defect at the time of purchase, as he was on notice that the home was built to the standards at the time of purchase.

**AEMLD**

Deese cites *Casrell v. Altec Industries, Inc.*, 335 So.2d 128 (Ala. 1976), and claims that it stands for the proposition that "defect" is equivalent to "unreasonably dangerous." If a plaintiff cannot prove a particular defect is unreasonably dangerous, then the AEMLD claim is not actionable. The plaintiff's own "expert," Parks, testified that the wall design used in the Deese

home is not unreasonably dangerous. (Ex. 4 to Brief in Support of Motion for Summary Judgment, pp. 239: 7-23; 240: 1-23; 241:1-23; 242: 1-11).[7]

## Damages

Deese failed to offer any evidence to support any claimed damages or to rebut the undisputed statements from Deese that he has not seen any soft walls, does not seek any personal injury claims related to mold and that the house is worth the amount for which it is insured. (Ex. 1 to Brief in Support of Motion for Summary Judgment, pp. 30: 9-12; 107: 15-23; 108: 1-14).

## CONCLUSION

Respectfully, Deese cannot engage in legal "make-believe" to hold Legend liable under a legal standard that does not exist, any more than he can wish away a construction standard promulgated under controlling federal law. For the reasons stated herein, Legend urges this Court to grant its Motion for Summary Judgment.

Respectfully submitted,

RITCHEY & SIMPSON, PLLC

Gregory S. Ritchey, Esquire {ASB-8195-H68G}
Richard S. Walker, Esquire {ASB-8719-L70R}
Counsel for Homes of Legend, Inc. now
known as Champion Homes of Boaz, Inc.

OF COUNSEL:
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, AL 35216-3084
Phone:         205.876.1600
Facsimile      205.876.1616

---

7    Deese must also prove that the manufactured home is a product. Deese's citation to *Herron v. Greentree*, 2007 WL 2791603 (S.D.Ala. Sept. 24, 2007) is not helpful as the subject home was unattached to realty. There is no evidence submitted to establish that Deese's house is not attached to realty.

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on the _19th_ day of _Nine_____, 200__7, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of the foregoing upon the following:

Jere L. Beasley, Esquire
W. Daniel Miles, III, Esquire
C. Gibson Vance, Esquire
C. Lance Gould, Esquire
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103

Jon D. Pels, Esquire
Lawrence J. Anderson, Esquire
Pels, Anderson & Lee, LLC
4833 Rugby Avenue, 4th Floor
Bethesda, MD 20814

OF COUNSEL

# EXHIBIT "5"

FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CASE NO. 06-643-MHT

TERRY DEESE,


Plaintiff(s),

v.

CHAMPION ENTERPRISES, INC.,


Defendant(s).


DEPOSITION TESTIMONY OF:

PARKER HOLLOWAY




Commissioner:

Renny D. McNaughton

October 31, 2007

Birmingham, Alabama

Page 6

1          I, Renny D. McNaughton, a Court

2     Reporter of Greenville, Alabama, and a

3     Notary Public for the State of Alabama at

4     Large, acting as Commissioner, certify that

5     on this date, pursuant to the Alabama Rules

6     of Civil Procedure, and the foregoing

7     stipulation of counsel, there came before me

8     at the offices of Ritchey & Simpson, 3288

9     Morgan Drive, Suite 100, Birmingham,

10    Alabama, commencing at approximately 10:00

11    a.m. on the 31st day of October, 2007,

12    Parker Holloway, witness in the above cause,

13    for oral examination, whereupon the

14    following proceedings were had:

15

16          PARKER HOLLOWAY,

17    being first duly sworn, was examined and

18    testified as follows:

19                   EXAMINATION

20    BY MR. GOULD:

21          Q     Will you state your name for the,

22    record, please.

23          A     Parker Holloway.

FREEDOM COURT REPORTING

Page 27

1          lawyer, to answer all these

2          questions.  I mean, we're entitled

3          to a witness that's knowledge

4          about this.

5          MR. RITCHIE:  Well, the reason it

6          was answered that way is because

7          it is a ventilated wall cavity.

8          MR. GOULD:  Okay.  Well, I'm

9          going to leave that standing

10         objection.

11         MR. RITCHIE:  Okay.

12         MR. GOULD:  And we will ask this

13         witness what he knows about this.

14         MR. RITCHIE:  But you've got to

15         understand, there's nobody else.

16         MR. GOULD:  What do you mean by

17         that?

18         MR. RITCHIE:  Homes of Legend has

19         been closed for two years.

20         MR. GOULD:  Are all the employees

21         gone?

22         MR. RITCHIE:  Yeah.  I mean, it

23         has not -- the plant has been

FREEDOM COURT REPORTING

Page 28

1        closed for two years.

2            MR. GOULD:  Let me ask you this.

3        Is Homes of Legend, was it under

4        Champion?  When did Homes of

5        Legend become part of Champion or

6        when did they buy it?

7            MR. RITCHIE:  Homes of Legend,

8        the stock was purchased in '95,

9        '96.

10           MR. GOULD:  Okay.

11           MR. RITCHIE:  It became a wholly

12       owned subsidiary.  And then it

13       merged with Chandaleur in 2000 --

14       late 2004, early 2005, whatever,

15       for a short period of time.  They

16       -- the two plants were cutting

17       back, cutting back, cutting back,

18       they finally merged the two

19       plants.

20           I think they had a plant open

21       or two plants open there for a

22       short period of time and went down

23       to one plant and then they just

29096995-bffa-4dfa-88e7-95e74ba9da26

FREEDOM COURT REPORTING

Page 29

1    closed the whole thing.

2          So, I mean, that's the

3    problem.

4     MR. GOULD:  Okay.

5     MR. RITCHIE:  You know, he is --

6    he's all we have.  You know, if

7    you want to go, we can go -- we

8    can go this afternoon if you want

9    to -- go look at the trailer up

10   there.  You're welcome to go

11   through whatever you want to go

12   through.  I don't know what you

13   will find we can't find.

14         I mean, all the purchasing

15   and stuff like that, it would have

16   been moved from one plant to

17   another, if it was, in fact, moved

18   from the Homes of Legend plant,

19   which I don't know that it was.

20   But whatever was left at

21   Chandaleur, that's where they

22   merged both of them into.

23   Whatever was left there was sent

FREEDOM COURT REPORTING

Page 30

1          up and put in a trailer that's

2          outside in Guin plant just in a

3          parking lot.

4           MR. GOULD:  Okay.

5           MR. RITCHIE:  Two trailers --

6          three trailers.  Two trailers.  So

7          I mean, that's --

8           MR. GOULD:  I just want to have

9          that standing objection.  We will

10         go forward and we will get

11         together --

12          MR. RITCHIE:  I just don't know

13         what to --

14          MR. GOULD:  Okay.

15          MR. RITCHIE:  I hope you

16         understand.

17          MR. GOULD:  I understand.

18          MR. RITCHIE:  It's going to be

19         the same problem with Chandaleur.

20          MR. GOULD:  Let me ask you this.

21         Did the -- when they were under

22         Champion, did the Champion

23         engineers, did they oversee the

29096995-bffa-4dfa-88e7-95e74ba9da26

FREEDOM COURT REPORTING

Page 104

1          A     I have no knowledge.

2          Q     Do you have any knowledge as to

3     why -- let me ask you this.  When did Homes

4     of Legend go out or stop manufacturing

5     homes?

6          A     I don't recall the date.

7          Q     Do you know the year?

8                MR. RITCHIE:  Well, for which

9                one?  I mean, Homes of Legend,

10               itself, stopped manufacturing

11               homes, I think, in 2004, and then

12               it merged with Chandaleur and then

13               it --

14         A     I want to say it stopped -- Homes

15    of Legend ceased to exist at the end of

16    2003.  I think.  And then they combined the

17    two plants of Chandaleur for a little while.

18    Chandaleur and what was left of Homes of

19    Legend combined --

20               MR. RITCHIE:  Champion Home

21               Builders.

22         A     -- with Champion Home Builders.

23               MR. RITCHIE:  I'm sorry, Champion

FREEDOM COURT REPORTING

Page 105

1          Homes of Boaz.

2          A     Champion Homes of Boaz.  I don't

3    recall the exact dates that Homes of Legend

4    ceased to exist and the exact date that -- I

5    don't remember.  I'm not --

6          Q     Okay.  Do you know if Homes of

7    Legend or Chandaleur ever utilized a Waiver

8    in building homes?

9          A     They did not, to my knowledge.

10         Q     Okay.  Number 6, do you have any

11   knowledge regarding Defendant's

12   communications with any retailers or

13   homeowners related to any warning it

14   attempted to give to retailer and/or

15   homeowners regarding moisture related

16   problems in the region defined as the hot,

17   humid and fringe climate?

18         A     No, sir.

19         Q     Do you have any knowledge as to

20   how the Defendants, when they first became

21   aware of the location of vapor barrier on

22   the living side of the wall was causing or

23   contributing to moisture related problems in

29096995-bffa-4dfa-88e7-95e74ba9da26

# EXHIBIT "6"

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NUMBER

1:06-CV-643-MHT


TERRY DEESE,

      Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al.,

      Defendant(s).


DEPOSITION TESTIMONY OF:

ROBERT PARKS


February 19, 2007

9:10 a.m.


COURT REPORTER:

DEBORAH B. TOWNSEND, CSR

ORIGINAL

Page 7

1    Alabama, Southern Division.

2                    Will counsel please state who you

3    are and who you represent?

4                        MR. GOULD:  Lance Gould for

5    the plaintiffs.

6                        MR. RITCHEY:  Greg Ritchey for

7    the defendants, and also Scott Simpson.

8                        THE VIDEOGRAPHER:  Will the

9    court reporter please swear in the witness?

10                       ROBERT PARKS,

11   After having first been duly sworn, was examined

12   and testified as follows:

13                       THE REPORTER:  Do you want

14   usual stipulations?

15                       MR. RITCHEY:  Yes.

16                       MR. GOULD:  Yes.

17                   Before we get started, I'd like

18   for Mr. Ritchey to identify all the individuals

19   in attendance for the deposition that they have

20   brought today.

21                       MR. RITCHEY:  All right.  Dave

22   Tompos, Parker Holloway, Francis Conlin, and

23   Jack Henry.

American Court Reporting
toll-free (877) 320-1050

Page 239

1                   02:02 p.m.

2               (Brief recess.)

3                   02:13 p.m.

4               THE VIDEOGRAPHER:   This marks

5      the beginning of the videotape number four.

6      Going back on the record, 2:13 p.m.

7          Q.      You mentioned earlier that you

8      felt that the use of interior vapor barrier on

9      these houses was a defect under the HUD code.

10     Is that still -- Is that your opinion?  Am I

11     saying that right?

12         A.      I believe it would -- it could be

13     classified as that, because it will eventually

14     render the home unfit -- or the -- the walls

15     unfit for its intended purpose.

16         Q.      Are you familiar with the -- the

17     classifications HUD has with regard to those

18     problems with -- inside manufacturing housing?

19         A.      Yes, sir.

20         Q.      And is it your opinion that this

21     particular issue fits into the -- the defect

22     classification, as opposed to any of the other

23     three, I guess?

Page 240

1  A.  Well, it -- it would be -- Are we

2 talking about the specific Deese home?

3  Q.  We're just talking about

4 anything. I mean, I guess let's -- What

5 classifications are you familiar with?

6  A.  Non-compliance, defect, serious

7 defect, imminent safety haz -- hazard.

8  Q.  And if you had to classify the use

9 of interior vapor barriers in a home, where

10 would you classify it, as a defect?

11  A.  In -- in general, at best, at --

12 at defect, because it will render a component of

13 the home unfit for its intended purpose. You

14 know, I think it's argumentatively -- At times,

15 I've seen some of these walls get to the point

16 and so much water built up in them that, you

17 know, it may be arguably determined an imminent

18 safety hazard.

19  Q.  You've never made that

20 determination, though?

21  A.  I don't recall specifically.

22  Q.  Okay. I mean, you're not making

23 that determination in any of these cases you

American Court Reporting
toll-free (877) 320-1050

Page 241

1    have now, are you?

2         A.     Well, I can only speak to the

3    Deese case right here, but we have seen some

4    pretty serious wall damage in some of these

5    cases.

6         Q.     Okay.  But you're not making that

7    determination in the Deese case?

8         A.     I haven't made that determination

9    in any of the cases that I'm aware of.

10        Q.     Then why would you say that the

11   use of VOG in the hot, humid climate would be an

12   imminent safety hazard?

13        A.     Well, I -- I think that's --

14        Q.     Or do you agree you say that?

15        A.     I didn't say that.

16        Q.     Okay.  That's fine.

17        A.     I think that, you know, you can

18   run into some situations to where the problems

19   have manifested themselves to such an extreme

20   level that that situation may be interpreted,

21   you know, as an imminent safety hazard.

22        Q.     Okay.  Have you made any -- In any

23   of the reports that you've done for Mr. -- or

Page 242

1    for the Beasley firm, have you made any

2    determination that the use of the vinyl-on-

3    gypsum in hot, humid climates is an imminent

4    safety hazard?

5         A.    I think I pretty much stuck with

6    the defect.  I believe it's a non-conformance or

7    defect

8         Q.    A non-conformance or a defect, or

9    just a non-conformance?

10        A.    Well, it's -- I believe it to be a

11   defect.

12        Q.    Okay.  If the house is maintained

13   at neutral to slightly positive pressure, would

14   you ever have a problem with the wallboard,

15   whether or not it has the interior vapor

16   barrier?

17        A.    Yes, sir.  I think even -- I think

18   a lot of the research and a lot of these homes

19   were actually found to be slightly pressurized

20   and still had moisture accumulation within the

21   wall structures.

22        Q.    Okay.  And -- and that would show

23   up in some of these reports that you have?

Page 342

1               C E R T I F I C A T E

2

3      STATE OF ALABAMA)

4      JEFFERSON COUNTY)

5

6               I hereby certify that the above

7      and foregoing deposition was taken down by me in

8      stenotype, and the questions and answers thereto

9      were transcribed by means of computer-aided

10     transcription, and that the foregoing represents

11     a true and correct transcript of the deposition

12     given by said witness upon said hearing.

13               I further certify that I am

14     neither of counsel nor of kin to the parties to

15     the action, nor am I in anywise interested in

16     the result of said cause.

17               *Deborah B. Townsend*

18

19               DEBORAH B. TOWNSEND, CSR

20               Certificate No. AL-CSR-207

21

22     My Commission expires

23     March 3, 2008

# EXHIBIT "7"

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NO.:  1:06-CV-00682-TFM

NICHOLAS STRICKLAND, et al.,

          Plaintiff(s),     ORIGINAL

vs.

CHAMPION ENTERPRISES, INC., et al.,

          Defendant(s).

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CIVIL ACTION NO:  1:06-CV-423-BH-C

ROBERT FORD, et al.,

          Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al.,

          Defendant(s).

                    DEPOSITION OF

                    BOBBY PARKS

                    JOB NO. 55250

BEFORE:  Sabrina L. Nimmer, CSR

          Court Reporter and

          Notary Public

Page 7

1    yourselves and state whom you represent.

2           MR. GOULD:  Lance Gould for the

3    plaintiffs.

4           MR. RITCHEY:  Greg Ritchey for

5    Champion Builders in each case.

6           THE VIDEOGRAPHER:  Would the court

7    reporter please swear in the witness.

8

9

10                ROBERT PARKS,

11       having been first duly sworn,

12    was examined and testified as follows:

13

14                EXAMINATION

15    BY MR. RITCHEY:

16       Q.   Mr. Parks, I'm Greg Ritchey.  Can I

17    get you to give us your full name for the

18    record.

19       A.   Robert Lynn Parks.

20       Q.   Okay.  You've been deposed before,

21    have you not?

22       A.   Yes, sir.

23       Q.   In fact, we deposed you recently in

Page 106

1      and the temperature of the surface.

2           Q.    Okay.  So it's your opinion that

3      every single wall in a hot, humid climate

4      that has a one perm vapor barrier is going

5      to fail?

6           A.    It has the -- it has the ability to

7      fail.

8           Q.    It has the ability to fail?

9           A.    That's correct.

10          Q.    And things to watch with regard to

11     that ability to fail is the lower of the

12     temperature; right?

13          A.    Correct.

14          Q.    Duct leakage; right?

15          A.    Anything that will exaggerate the

16     source.

17          Q.    And how leaky the house is in

18     comparison to the insulation?

19          A.    That goes back to how leaky the

20     house -- exaggerating the source.  How

21     much -- excuse me.  How much air is able to

22     get into that cavity as to how quickly the

23     symptoms will show up.

1                    C E R T I F I C A T E

2    STATE OF ALABAMA        )

3    COUNTY OF JEFFERSON )

4

5              I hereby certify that the

6    above and foregoing proceeding was taken

7    down by me by stenographic means, and that

8    the content herein was produced in

9    transcript form by computer aid under my

10   supervision, and that the foregoing

11   represents, to the best of my ability, a

12   true and correct transcript of the

13   proceedings occurring on said date at said

14   time.

15              I further certify that I am

16   neither of counsel nor of kin to the

17   parties to the action; nor am I in anywise

18   interested in the result of said case.

19

20

21   _____

22        Court Reporter and Commissioner

23